## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC.,<br>*et al.*<br><br>Debtors. | Chapter 11<br><br>Bankr. Case No. 23-13575 (MBK) |
| WHITTAKER, CLARK & DANIELS, INC.,<br>BRILLIANT NATIONAL SERVICES, INC.,<br>L. A. TERMINALS, INC., and SOCO WEST,<br>INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BRENNTAG AG, BRENNTAG CANADA<br>INC., BRENNTAG GREAT LAKES, LLC,<br>BRENNTAG MID-SOUTH, INC., BRENNTAG<br>NORTH AMERICA, INC., BRENNTAG<br>NORTHEAST, INC., BRENNTAG PACIFIC,<br>INC., BRENNTAG SOUTHEAST, INC.,<br>BRENNTAG SOUTHWEST, INC.,<br>BRENNTAG SPECIALTIES, INC.,<br>BRENNTAG SPECIALTIES LLC, COASTAL<br>CHEMICAL CO., LLC, MINERAL AND<br>PIGMENT SOLUTIONS, INC., THOSE<br>PARTIES LISTED ON APPENDIX A TO THE<br>COMPLAINT, and JOHN AND JANE DOES 1-<br>1,000,<br><br>Defendants. | Adv. Pro. No. 23-01245 (MBK) |

| | |
|---|---|
| OFFICIAL COMMITTEE OF TALC CLAIMANTS *et al.*,<br><br>Appellants,<br><br>v.<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>Appellees. | Civil Action No. 3:24-cv-10914-ZNQ |

## APPELLANTS' JOINT APPENDIX TO APPELLANTS' OPENING BRIEF

### JOINT APPENDIX INDEX[1]

| Tab | Docket Entry | Description | Page |
|:---:|:---|:---|:---:|
| 1 | Adv. D.I. 1 | Complaint by Whittaker, Clark & Daniels, Inc., Brilliant National Services, Inc., L.A. Terminals, Inc., Soco West, Inc. against Brenntag AG; Brenntag Canada Inc.; Brenntag Great Lakes, LLC; Brenntag Mid-South, Inc.; Brenntag North America, Inc.; Brenntag Northeast, Inc.; Brenntag Pacific, Inc.; Brenntag Southeast, Inc.; Brenntag Southwest, Inc.; Brenntag Specialties, Inc.; Brenntag Specialties LLC; Coastal Chemical Co., LLC; Mineral and Pigment Solutions, Inc.; Those Parties Listed on Appendix A to the Complaint and John and Jane Does 1-1000. | JA1 |
| 2 | Adv. D.I. 3 | Motion For Summary Judgment in favor of the Debtors and against the Defendants | JA32 |
| 3 | Adv. D.I. 4 | Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Debtors' Summary | JA91 |

---

[1] Pleadings filed in the adversary proceeding *Whittaker, Clark & Daniels, Inc. v. Brenntag AG*, No. 23-01245(MBK) are designated **Adv. D.I. __**. Pleadings filed in the bankruptcy case *In re Whittaker, Clark & Daniels, Inc.* No. 23-13575 (MBK) (Bankr. D.N.J.) are designated **Bankr. D.I. __**.

| Tab | Docket Entry | Description | Page |
|-----|--------------|-------------|------|
| | | Judgment and Preliminary Injunction Motions | |
| 4 | Adv. D.I. 4-1 | Exhibit A - Second Amended Tippin Complaint | JA102 |
| 5 | Adv. D.I. 4-2 | Exhibit B - Alloway Complaint | JA176 |
| 6 | Adv. D.I. 4-3 | Exhibit C - Alloway Minute Order | JA210 |
| 7 | Adv. D.I. 4-4 | Exhibit D - Payne Complaint | JA226 |
| 8 | Adv. D.I. 4-5 | Exhibit E - Payne Trial Order | JA349 |
| 9 | Adv. D.I. 4-6 | Exhibit F - MSPA - Part 1 | JA352 |
| 10 | Adv. D.I. 4-7 | Exhibit F - MSPA - Part 2 | JA427 |
| 11 | Adv. D.I. 4-8 | Exhibit G - 2004 Soco APA | JA499 |
| 12 | Adv. D.I. 4-9 | Exhibit H - 2004 WCD APA | JA510 |
| 13 | Adv. D.I. 4-10 | Exhibit I - Brilliant APA | JA519 |
| 14 | Adv. D.I. 4-11 | Exhibit J - 2007 SPA | JA529 |
| 15 | Adv. D.I. 52 | Case Management Order | JA589 |
| 16 | Adv. D.I. 61 | Debtors' Motion for Entry of an Order: (I) Temporarily Enjoining Certain Actions Against Non-Debtors; and (II) Approving Procedures for Seeking Extensions of Temporary Restraining Order Filed by Whittaker, Clark & Daniels, Inc.. | JA596 |

| Tab | Docket Entry | Description | Page |
|-----|--------------|-------------|------|
| 17 | Adv. D.I. 61-1 | Notice of Hearing | JA619 |
| 18 | Adv. D.I. 61-2 | Exhibit A - Temporary Restraining Order | JA623 |
| 19 | Adv. D.I. 61-3 | Exhibit B - Declaration of Mohsin Y. Meghji | JA633 |
| 20 | Adv. D.I. 68 | Limited Opposition of the Official Committee of Talc Claimants to Debtors' Motion for Entry of an Order: (I) Temporarily Enjoining Certain Actions Against Non-Debtors; and (II) Approving Procedures for Seeking Extensions of Temporary Restraining Order | JA640 |
| 21 | Adv. D.I. 89 | Temporary Restraining Order | JA663 |
| 22 | Adv. D.I. 288 | Ninth Order Extending Temporary Restraining Order | JA672 |
| 23 | Adv. D.I. 292 | Order Granting Summary Judgment in Favor of the Debtors on Count I and IV of the Complaint | JA685 |
| 24 | Adv. D.I. 299 | Debtors' Motion for (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors Pending Entry of a Final, Non-Appealable Order Regarding the Debtors' Proposed Settlement and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision on the Debtors' Request for Such Injunctive Relief | JA693 |
| 25 | Adv. D.I. 299-1 | Exhibit A - Proposed Preliminary Injunction Order | JA745 |
| 26 | Adv. D.I. 299-2 | Exhibit B - Proposed Temporary Restraining Order | JA774 |
| 27 | Adv. D.I. 299-3 | Exhibit C - Declaration of Lathrop B. Nelson, III | JA801 |

| Tab | Docket Entry | Description | Page |
|---|---|---|---|
| 28 | Adv. D.I. 310 | Omnibus Objection of the Official Committee of Talc Claimants to (I) Debtors' Motion for a Temporary Restraining Order Enjoining Certain Actions Against Non-Debtors Pending the Court's Decision on the Debtors' Request for Preliminary Injunctive Relief and (II) Debtors | JA828 |
| 29 | Adv. D.I. 318 | Transcript regarding Hearing Held Sept. 18, 2024 | JA865 |
| 30 | Adv. D.I. 335 | Order Certifying Direct Appeal to the United States Court of Appeals for the Third Circuit | JA945 |
| 31 | Adv. D.I. 348 | Objection to Debtors' Motion for (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors Pending Entry of a Final, Non-Appealable Order Regarding the Debtors' Proposed Settlement and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision on the Debtors' Request for Such Injunctive Relief Filed by Whittaker, Clark & Daniels, Inc. | JA949 |
| 32 | Adv. D.I. 354 | Brenntag's (I) Joinder in Debtors' Reply in Further Support of Motion for a Preliminary Injunction and (II) Reservation of Rights | JA993 |
| 33 | Adv. D.I. 360 | Opinion Granting Motion to Extend Stay | JA1014 |
| 34 | Adv. D.I. 366 | Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Actions Against Non-Debtors | JA1038 |
| 35 | Adv. D.I. 370 | Notice of Appeal | JA370 |
| 36 | Bankr. D.I. 1 | Chapter 11 Voluntary Petition Filed by Michael D. Sirota on behalf of Whittaker, Clark & Daniels, Inc. | JA1142 |
| 37 | Bankr. D.I. | Document re: Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & | JA1161 |

| Tab | Docket Entry | Description | Page |
|---|---|---|---|
| | 5 | Daniels, Inc., in Support of Chapter 11 Petitions and First Day Motions (Related Document:[1] Voluntary Petition (Chapter 11) Filed by Debtor Whittaker, Clark & Daniels, Inc.) Filed by Michael D. Sirota on Behalf of Whittaker, Clark & Daniels, Inc.. (Sirota, Michael) | |
| 38 | Bankr. D.I. 121 | Notice of Appointment of Official Committee Of Talc Claimants filed by U.S. Trustee. (United States Trustee, by Martha Hildebrandt, Assistant United States Trustee) | JA1184 |
| 39 | Bankr. D.I. 1297 | Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform all of their Obligations Thereunder, and (III) Granting Related Relief Filed by Michael D. Sirota on behalf of Whittaker, Clark & Daniels, Inc.. Hearing scheduled for 9/24/2024 at 02:00 PM at MBK - Courtroom 8, Trenton. (Attachments: # (1) Notice of Hearing on Debtors' Motion # (2) Exhibit A - Settlement Agreement Summary of Proposed Terms # (3) Exhibit B - Proposed Order) (Sirota, Michael) | JA1186 |
| 40 | Bankr. D.I. 1297-1 | Notice of Hearing on Debtors' Settlement Motion | JA1233 |
| 41 | Bankr. D.I. 1297-2 | Exhibit A - Settlement Agreement Summary of Proposed Terms | JA1237 |
| 42 | Bankr. D.I. 1297-3 | Exhibit B - Proposed Order | JA1239 |
| 43 | Bankr. D.I. 1429 | Transcript of Hearing Held on October 15, 2024 | JA1287 |
| 44 | Bankr. D.I. 1302 | Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II)) Granting Liens and Providing Claims Super =priority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; | JA1371 |

| Tab | Docket Entry | Description | Page |
|---|---|---|---|
|  |  | and (V) Granting Related Relief |  |
| 45 | Bankr. D.I. 1848 | Debtors' Motion for Entry of an Order (I) Authoring the Debtors to Amend the DIP Credit Agreement and (II) Granting Related Relief | JA1848 |

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

      Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND PIGMENT
SOLUTIONS, INC., THOSE PARTIES LISTED ON
APPENDIX A TO THE COMPLAINT, and JOHN
AND JANE DOES 1-1,000,

      Defendants.

Adv. Proc. No. 23-_____

## DEBTORS' VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (I) DECLARING THAT THE AUTOMATIC STAY APPLIES TO SUCCESSOR LIABILITY CLAIMS AGAINST NON-DEBTORS, (II) EXTENDING THE AUTOMATIC STAY TO SUCH CLAIMS, (III) PRELIMINARILY ENJOINING SUCH CLAIMS, AND (IV) DECLARING THAT SUCCESSOR LIABILITY CLAIMS ARE PROPERTY OF THE DEBTORS' ESTATES

TO THE HONORABLE MICHAEL B. KAPLAN,
CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT:

      Whittaker, Clark & Daniels, Inc. ("**WCD**") and its debtor affiliates (together with WCD,

"**Plaintiffs**" or the "**Debtors**"), the debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Chapter 11 Cases**") and plaintiffs in the above-captioned

adversary proceeding (this "**Adversary Proceeding**"), hereby allege as follows:

2

**JA2**

## NATURE OF THE ACTION

1.      The Debtors commenced the Chapter 11 Cases on April 26, 2023 to address and fairly resolve the following claims in an effective, efficient, and centralized forum under title 11 of the United States Code (the "**Bankruptcy Code**"): (i) existing and future tort claims against the Debtors alleging injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest (the "**Asbestos Claims**," and such claimants, the "**Asbestos Claimants**"); (ii) environmental litigation against the Debtors relating to the production or handling of hazardous materials which allegedly contaminated certain properties[2] (the "**Environmental Claims**," and such claimants, the "**Environmental Claimants**," and together with the Asbestos Claims and Asbestos Claimants, the "**Tort Claims**" and "**Tort Claimants**," respectively); (iii) claims against certain non-Debtor entities seeking to establish such entities' liability for Tort Claims on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors (the "**Successor Liability Claims**"); and (iv) indemnification or contribution claims against the Debtors with respect to any Successor Liability Claim (the "**Indemnification Claims**").[3]

2.      The Debtors are currently defendants in lawsuits across more than 30 different jurisdictions and have managed an active docket of asbestos lawsuits and environmental claims for close to 40 years.  The Debtors are not the result of divisive merger or any recent strategic corporate reorganization.  Instead, they are the same corporate entities whose historical operations

---

[2] For the avoidance of doubt, by the Adversary Proceeding, the Debtors are not seeking to stay or enjoin the negotiation of any Remedial Action Plan ("**RAP**") with respect to any Environmental Claim or any responsible party's obligation to perform in connection with any agreed upon RAP.

[3] Contemporaneously with the filing of this Complaint, the Debtors have filed the following motions (collectively, the "**Motions**"): (1) a motion for a preliminary injunction of the commencement, continuation, and settlement of Successor Liability Claims while the Chapter 11 Cases are pending; and (2) a motion for summary judgment in favor of the Debtors on Counts I, II, and IV of this Complaint.

**JA3**

(which concluded nearly 20 years ago) precipitated these Chapter 11 Cases. Accordingly, it was the Debtors' sincere hope that filing for bankruptcy and the resulting imposition of the automatic stay, coupled with the successful defense of a motion to dismiss these Chapter 11 Cases, would provide the requisite breathing spell to negotiate and implement a consensual and comprehensive resolution of the Debtors' various liabilities. Instead, the commencement, continuation and, most recently, settlement of Successor Liability Claims against Brenntag,[4] which purchased substantially all of the Debtors' operating assets in 2004 and which has indemnification rights[5] against certain Debtors, has continued apace. Successor Liability Claims are property of the Debtors' estates and cannot and should not be pursued or compromised outside of these Chapter 11 Cases.

3.      The commencement, continued litigation, and piecemeal settlement of Successor Liability Claims against Brenntag and other non-Debtors in the tort system threatens the success of these Chapter 11 Cases. In addition to potentially triggering the Debtors' indemnification obligations, Successor Liability Claims implicate the Debtors' business operations prior to the sale of substantially all of their operating assets in 2004 and require an initial determination of the Debtors' asbestos and environmental liabilities. The continued prosecution of Successor Liability Claims in the tort system would require the Debtors to defend themselves no differently than with respect to stayed Tort Claims and would significantly deplete estate resources that could otherwise be used to fund a comprehensive resolution of these Chapter 11 Cases.

---

[4] Brenntag AG, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, and Mineral and Pigment Solutions, Inc. are referred to collectively herein as "**Brenntag**."

[5] Nothing in this Complaint shall constitute an admission as to the validity, extent, or priority of any Indemnification Claim asserted against the Debtors. The Debtors reserve all rights and defenses as to such claims.

4.     The Debtors seek a declaration that section 362(a) of the Bankruptcy Code prohibits the commencement, continuation, or settlement of any action by the defendants in the Adversary Proceeding (collectively, the "**Defendants**")[6] seeking to hold the following entities liable for Successor Liability Claims either because the automatic stay applies to such claims by its express terms or because "unusual circumstances" warrant an extension of the automatic stay to such claims: (i) certain of the Debtors' non-debtor affiliates (the "**Non-Debtor Affiliates**"); (ii) Brenntag and other non-Debtors that have been or may be alleged to be successors to, or alter egos of, the Debtors (the "**Alleged Successors**"); and (iii) third-parties who may have contractual or common law indemnification rights against the Debtors for the Successor Liability Claims asserted against them (the "**Indemnified Parties**" and, collectively with Non-Debtor Affiliates and the Alleged Successors, the "**Protected Parties**").[7]  The Debtors also seek an injunction under section 105(a) of the Bankruptcy Code providing for the same relief while the Chapter 11 Cases are pending.

5.     Finally, the Debtors seek a declaration that Successor Liability Claims are property of the Debtors' estates that the Debtors have sole standing to pursue and compromise while the Chapter 11 Cases are pending.  Successor Liability Claims are key estate assets that must be preserved for the benefit of all creditors in these cases (including future claimants), rather than

---

[6]  The Defendants include Brenntag and plaintiffs or potential plaintiffs in lawsuits that seek to hold, or may seek to hold, one or more of the Protected Parties (defined below) liable for Successor Liability Claims.  These Defendants, with the exception of Brenntag and the John and Jane Doe Defendants, are listed in Appendix A to this Complaint. Appendix A identifies the civil action number (where available) for each lawsuit and the law firm representing each of the Defendants on account of their claims.  The Debtors reserve the right to supplement, amend, or otherwise modify Appendix A.  For the avoidance of doubt, the inclusion of a lawsuit on Appendix A is not an admission that such Defendant holds a valid claim against either the Debtors or the Protected Parties.  The Debtors are only seeking to prohibit Brenntag from settling Successor Liability Claims because, upon information and belief, Brenntag is the only Protected Party that has been sued on account of Successor Liability Claims to date.  The Debtors reserve the right to seek additional relief as to other Protected Parties in the future.

[7]  The Protected Parties are listed on Appendix B to this Complaint.  The Debtors reserve the right to seek to supplement, amend, or otherwise modify the list of Protected Parties.

pursued by individual plaintiffs for their own private benefit. A global resolution of the Successor Liability Claims, along with the Tort Claims and Indemnification Claims, is essential to a successful outcome in the Chapter 11 Cases.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to entry of final orders or a final judgment by this Court in this Adversary Proceeding.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

8. The statutory bases for the relief requested herein are sections 105(a), 362(a), and 541(a) of the Bankruptcy Code and Bankruptcy Rules 7001 and 7065. The Debtors have made no prior request for the relief requested herein to this or any other court.

## THE PARTIES

9. The Plaintiffs are the Debtors.

10. WCD is a New Jersey corporation. *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (hereinafter, the "**First Day Declaration**"), Ex. B.

11. Brilliant National Services, Inc. ("**Brilliant**") is a Delaware corporation. *Id.*

12. Soco West, Inc. ("**Soco**") is a Delaware corporation. *Id.*

13. L.A. Terminals, Inc. ("**LAT**") is a California corporation. *Id.*

14. Defendant Brenntag acquired substantially all of the operating assets of Debtors WCD, Brilliant, and Soco in connection with the 2004 Transactions (defined below). Brenntag is

a named defendant in a substantial number of actions alleging Successor Liability Claims, many of which also allege Tort Claims against one or more Debtors.

15.     Each named Defendant in <u>Appendix A</u> is a plaintiff in a pending Tort Claim against one or more Debtors or Successor Liability Claim against Brenntag.  *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc. in Support of Debtors' Complaint for Declaratory and Injunctive Relief and Related Motions* (hereinafter, the "**Meghji Declaration**"), ¶ 13.[8]

16.     Each of Defendants John and Jane Does 1-1,000 is a prospective plaintiff who, absent the relief requested herein, might seek to commence a Successor Liability Claim against one or more Protected Parties during the pendency of the Chapter 11 Cases.  *Id.* at ¶ 14.

17.     The Protected Parties include: (i) the Non-Debtor Affiliates (*i.e.,* Berkshire Hathaway, Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company, Resolute Management, Inc. and Ringwalt & Liesche Co.); and (ii) the Alleged Successors/Indemnified Parties (*i.e.,* Bain Capital, Brenntag AG, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, Mineral and Pigment Solutions, Inc., and Mineral Pigment Solutions, Inc.).  *Id.* at ¶ 15.

## FACTUAL BACKGROUND

### I.     Overview of the Debtors

18.     The Debtors and their predecessors in interest were formed as early as 1918 and continued their operations as late as 2004.  First Day Declaration, ¶ 16.  Debtors WCD, Soco, and

---

[8] The Meghji Declaration was filed contemporaneously herewith.

LAT are direct or indirect subsidiaries of Debtor Brilliant.  *Id.*  From the time of their formation until substantially all of the Debtors' operational assets were sold, the Debtors' businesses consisted of storage and distribution of minerals and pigments, including talc, industrial chemicals, and solvents.  *Id.*  The Debtors ceased all operations by 2004 but continued their corporate existence to manage alleged asbestos and environmental liabilities related to the historical processing and distribution of cosmetic and industrial compounds.  *Id.* at ¶ 1.

19.    WCD was formed and began its operations as a supplier and distributor of minerals and pigments in New York in 1918.  First Day Declaration, ¶ 17.  At its zenith in the 1970s and 1980s, WCD operated one of the largest talc and industrial compound supply and distribution businesses in the United States.  *Id.* at ¶ 2.  In 1972, WCD reincorporated in New Jersey.  *Id.* at ¶ 17.  Brilliant (then named Brenntag Inc.), purchased the stock of WCD in 1988.  *Id.*  The operational assets of WCD were divested in 2004, as discussed further below, and the Debtors' current business activities largely relate to the management of Tort Claims alleged against WCD. *Id.*

20.    Soco's pre-2004 operations began as early as 1933, with the formation and incorporation of A.J. Lynch Co. ("**A.J. Lynch**"), which sold and distributed chemicals and raw materials to the paint industry.  First Day Declaration, ¶ 18.  Over multiple decades and through a series of strategic mergers and acquisitions and corporate name changes, Soco's historical operations expanded to include those of:

- Western Chemical & Manufacturing Co. ("**Western Chemical**"), which manufactured and distributed industrial chemicals and was incorporated in California in 1944;

- Dyce Chemical Inc. ("**Dyce Chemical**"), which repackaged and distributed industrial chemicals and was incorporated as Dyce Sales & Engineering Service Co. in Montana in 1957;

- Crown Chemical Corp. ("**Crown Chemical**"), which sold and distributed industrial chemicals and was incorporated as Petrosolve Corp. Ltd. in California in 1969; and

- Holchem Inc. ("**Holchem**"), which distributed chemicals and handled and recycled solvents and was incorporated in California in 1981.

*Id.* By 2001, after the culmination of various mergers, acquisitions, and name changes, A.J. Lynch, Western Chemical, Dyce Chemical, Crown Chemical, and Holchem became Brenntag West, Inc. ("**Brenntag West**"), an indirect subsidiary of Stinnes Corporation ("**Stinnes**"). *Id.*

21.     LAT was formed and began its operations importing and storing industrial chemicals in 1981.  First Day Declaration, ¶ 19.  Specifically, LAT operated a chemical storage and distribution terminal and bulk plant located within the Los Angeles Harbor.  *Id.*  LAT ceased its storage and distribution operations in 1994 and has largely resolved its liabilities through ordinary course claims management.  *Id.*  By 2001, through a series of stock purchases, LAT became a direct subsidiary of Stinnes. *Id.*

22.     Brilliant was formed and began its operations in 1977 as Stinnes Oil & Chemical Company, Inc. ("**Stinnes Oil & Chemical**").  First Day Declaration, ¶ 20.  Stinnes Oil & Chemical was a subsidiary of Stinnes, and by 1982, Stinnes Oil & Chemical withdrew from the oil business and concentrated its business on the marketing, distributing, and trading of chemicals.  *Id.*  Stinnes Oil & Chemical changed its name twice: first to Soco Chemical Inc. in 1986, and then to Brenntag Inc., a direct subsidiary of Stinnes, in 1998.  *Id.*

23.     As of 2004, the Debtors were owned by Stinnes or its affiliates, all of which were affiliates of Deutsche Bahn AG.  First Day Declaration, ¶ 21.  In 2004, substantially all of WCD's, Soco's, and Brilliant's operating assets were sold to entities under the umbrella of Brenntag North America, and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets (collectively, the "**2004 Transactions**").  *Id.*  LAT was not involved in the 2004 Transactions, as it had previously ceased all operations.  *Id.*  The 2004 Transactions are discussed in greater detail below.

## II.     The 2004 Transactions

24.     The 2004 Transactions are governed by a Master Sale and Purchase Agreement (the

"**MSPA**")[9] dated December 9, 2003, by and among Stinnes AG, Stinnes UK Limited, Stinnes,

Brenntag Inc.,[10] and Schenker-BTL, S.A., as sellers ("**Sellers**"), Deutsche Bahn AG, as sellers'

guarantor, and Blitz03-1303 GmbH, CM Komplementar 03-AP III. GmbH & Co. KG, PASR

Siebente Beteiligungsverwaltung GmbH, and Fireball Holding France SAS, as purchasers

("**Purchasers**").  *See* MSPA at p. 13-14.  The MSPA provided for, among other transactions, the

sale of substantially all of the Debtors' operational assets pursuant to separate asset purchase

agreements.  *See* MSPA, § 2.11.

25.     Under the MSPA, the Sellers (which include Debtor Brilliant under the name

Brenntag, Inc.) agreed, as joint and several debtors, subject to certain limitations and exclusions,

to indemnify and hold harmless certain parties to the MSPA, including the Purchasers and their

affiliates, from and against certain Environmental Liabilities.  *See* MSPA, §§ 10.1, 10.9.

26.     With respect to Asbestos Claims, Debtors WCD and Soco agreed to indemnify

certain parties to the MSPA, including the Purchasers, their affiliates, and certain related persons,

from and against certain losses incurred in connection with any present or future Retained

Subsidiary Asbestos Claims relating to the applicable Debtor or any alleged corporate predecessor-

in-interest thereof.  MSPA, §§ 12.1.1, 12.1.2.

---

[9]  Capitalized terms used in this Section B but not defined herein shall have the meanings ascribed to such terms in the MSPA.  A true and correct copy of the MSPA is attached as Exhibit F to the Meghji Declaration.

[10]  As noted above, Brenntag Inc. would later become Debtor Brilliant.

27.     The above indemnification obligations with respect to the Retained Subsidiary Asbestos Claims were guaranteed by Debtor Brilliant and, if Brilliant is unable to financially satisfy any such claims, Stinnes.  MSPA, § 12.1.1, 12.1.2.

28.     Additionally, Brilliant and Stinnes agreed, as joint and several debtors, to indemnify and hold harmless certain parties to the MSPA, including the Purchasers, their affiliates, and certain related persons from and against certain losses incurred in connection with present or future Non-Retained Subsidiary Asbestos Claims.  *See* MSPA, §§ 12.1.5, 12.3.

29.     In furtherance of the transactions contemplated by the MSPA, certain Debtors entered into additional asset purchase agreements providing for the disposition of substantially all of their assets to certain US Asset Purchasers affiliated with Brenntag.  *See* MSPA, § 2.11.

30.     More specifically pursuant to that certain asset purchase agreement dated February 27, 2004 (the "**2004 Soco APA**"),[11] Soco (then named Brenntag West, Inc.) divested substantially all of its assets in exchange for approximately $44 million and the assumption of certain ongoing liabilities by the purchaser, Brenntag Pacific, Inc.  First Day Declaration, ¶ 22.  Pursuant to the 2004 Soco APA, Soco retained all liability for the Tort Claims and retained certain assets, including asbestos- and environmental- related insurance receivables and certain real estate.  *Id.* Following these transactions, on March 8, 2005, Soco changed its name from Brenntag West, Inc. to Soco West, Inc.  *Id.*

31.     Simultaneously, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "**2004 WCD APA**"),[12] WCD divested substantially all of its assets in exchange for

---

[11] A true and correct copy of the 2004 Soco APA is attached as Exhibit G to the Meghji Declaration filed contemporaneously with this Complaint.

[12] A true and correct copy of the 2004 WCD APA is attached as Exhibit H to the Meghji Declaration filed contemporaneously with this Complaint.

approximately $15.9 million and the assumption of certain ongoing liabilities by the purchaser, Mineral & Pigment Solutions Inc. First Day Declaration. ¶ 23. Pursuant to the 2004 WCD APA, WCD retained all liabilities as to the Tort Claims and retained certain assets, including asbestos- and environmental-related insurance receivables and certain real property. *Id.*

32.    Together with the execution of the 2004 Soco APA and the 2004 WCD APA, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "**Brilliant APA**,"[13] and together with the 2004 WCD APA and the 2004 Soco APA, the "**2004 Transaction Documents**"), Brilliant (then named Brenntag Inc.) engaged in an asset sale transaction with Brenntag North America. First Day Declaration, ¶ 24. In connection with this transaction, Brilliant terminated certain management fee agreements, resigned from certain LLC agreements, and divested its intellectual property assets in exchange for Brenntag North America's assumption of certain non-asbestos-related and non-environmental ongoing liabilities, in addition to certain other consideration and the consideration provided under the 2004 WCD APA and 2004 Soco APA. *Id.* Contemporaneously with the execution of the 2004 Brilliant APA, Brilliant changed its name from Brenntag Inc. to Brilliant National Services, Inc. *Id.*

33.    The consideration the Debtors received under the 2004 Transaction Documents remained on the Debtors' books to satisfy the Tort Claims. First Day Declaration, ¶ 25.

### III.    The 2007 NICO Equity Sale

34.    In December 2007, National Indemnity Company ("**NICO**")[14] agreed to purchase—and assigned to an affiliated entity, Ringwalt & Liesche Co. ("**Ringwalt**")—the equity

---

[13] A true and correct copy of the Brilliant APA is attached as Exhibit I to the Meghji Declaration filed contemporaneously with this Complaint.

[14] NICO and Ringwalt are affiliates of Berkshire Hathaway, Inc. None of Ringwalt, the Debtors' other indirect parent entities, NICO, or any other BHI affiliate were involved with the Debtors at the time the Debtors were conducting any of the historical business operations that gave rise to the Tort Claims. To date, none of the complaints alleging Tort

in Debtors Brilliant[15] and LAT (the "**2007 NICO Equity Sale**") pursuant to that certain stock

purchase agreement dated November 7, 2007 (the "**2007 SPA**").[16]  First Day Declaration, ¶ 3; *see*

*also* 2007 SPA, Preamble.  Pursuant to an assignment agreement dated December 12, 2007, NICO

assigned its right to receive the Debtors' equity interests to Ringwalt, which remains the direct

parent of Brilliant (and the indirect parent of the other Debtors) today.  First Day Declaration, ¶ 26.

## IV.    The Tort Claims

### A.    The Asbestos Claims

35.    Asbestos Claimants first began alleging that the Debtors' chemical processing and

distribution operations were causally related to their asbestos-related injuries in 1979.  First Day

Declaration, ¶ 30.  In more recent years, such claims have engulfed the Debtors in litigation.  *Id.*

at ¶ 6.  Indeed, since 2007, the Debtors' asbestos and environmental liabilities have increased

materially as a result of the evolution of the tort litigation landscape, as the talc-asbestos theory of

liability has risen to prominence and major talc suppliers have availed themselves of chapter 11

protection, leaving the Debtors as a main litigation target.  *Id.* at ¶ 3.

36.    As of the commencement of the Chapter 11 Cases, the Debtors have been sued by

approximately 2,700 individual Asbestos Claimants, with over 1,000 actions generally alleging

exposure to asbestos- and talc- containing compounds and products arising from the Debtors'

historical processing and distribution of cosmetic and industrial talc currently pending.  First Day

Declaration, ¶¶ 6, 30.  The Debtors have been managing an active docket of cases across the United

---

Claims or Successor Liability Claims reviewed by the Debtors name these entities as defendants or allege that they manufactured, distributed, or possessed any of the products at issue in the Tort Claims and Successor Liability Claims.

[15]  At the time of the 2007 NICO Equity Sale, Brilliant owned all of the outstanding capital stock of Eastech Chemical Inc. and Debtors WCD and Soco.

[16]  Capitalized terms used in this Section C but not defined herein shall have the meanings ascribed to such terms in the 2007 SPA.  A copy of the 2007 SPA is attached as Exhibit J to the Meghji Declaration filed contemporaneously with this Complaint.

States for close to 40 years—a task that has recently become increasingly cumbersome to manage absent a centralized forum to achieve global resolution for the benefit of all Asbestos Claimants. *Id.* at ¶ 6.

37.     Notably, many of these actions name Brenntag as a defendant based on a theory that it is an alleged successor to, or alter ego of, the Debtors, and therefore is liable for Tort Claims. Meghji Declaration, ¶ 16.  For the reasons explained in the Motions, these Successor Liability Claims constitute property of the Debtors' estates that the Debtors have sole standing to pursue and compromise while the Chapter 11 Cases are pending.

38.     Based on the Debtors' review of approximately 1,500 complaints alleging Tort Claims against the Debtors or Successor Liability Claims against Brenntag, approximately 1,000 name Brenntag as a defendant based on a theory that it is an alleged successor to, or alter ego of, the Debtors.  Meghji Declaration, ¶ 16.  While the Debtors conceptually have no issue with the commencement, continuation, or settlement of claims against Brenntag that are independent of its association with the Debtors (*i.e.*, claims alleging injury resulting from business operations conducted by Brenntag following the 2004 Transactions for which the Debtors do not owe indemnification obligations), the Debtors have not identified a single complaint that differentiates such claims from claims against Brenntag related to its association with the Debtors (*i.e.*, Successor Liability Claims for which the Debtors may owe indemnification obligations to Brenntag).  *Id.*

39.     Dispositions of historical Asbestos Claims have varied significantly, from outright dismissal to judgments in excess of $76 million.[17]   First Day Declaration, ¶ 7.  Continued

---

[17] *See*, *e.g.*, Calif. Jury Awards Talc Plaintiff $76 Million; Case Settles Before Punitives Phase, HarrisMartin (Dec. 16, 2021),  https://www.harrismartin.com/publications/1/asbestos/articles/28555/calif-jury-awards-talcplaintiff-76-million-case-settles-before-punitives-phase/#:~:text=OAKLAND%2C%20Calif.,plaintiff's%20risk %20of % 20developing%20cancer.

prosecution of the Asbestos Claims has burdened the Debtors with substantial defense and litigation costs, depleting resources and delaying or limiting recoveries to any legitimate claimants for years to come. *Id.* Prior to commencing the Chapter 11 Cases, the Debtors were incurring up to $1,000,000 in monthly defense costs in connection with the Asbestos Claims. *Id.*

40. The Debtors anticipate that continued litigation of Asbestos Claims would consume an enormous amount of the Debtors' remaining resources with unpredictable and potentially unfairly preferential outcomes for the Asbestos Claimants. *Id.* Accordingly, the Debtors commenced the Chapter 11 Cases to centralize and resolve the Asbestos Claims in one forum. *Id.* at ¶ 40.

### B. The Environmental Claims

41. Federal and state governmental entities and plaintiffs have pursued actions or brought claims against the Debtors alleging that the Debtors produced and handled hazardous materials that subsequently contaminated approximately 32 properties across at least 14 states. First Day Declaration, ¶ 33. These properties housed the Debtors' or their predecessors' historical chemical processing and distribution operations, including legacy solvent recovery, reclamation, and recycling, chemical storage, treatment, and distribution, and waste transfer activities. *Id.* Like the Asbestos Claims, Brenntag is alleged to be a responsible party under applicable environmental laws in connection with certain Environmental Claims. *See* Meghji Declaration, ¶ 16.

42. The Debtors have actively engaged with both federal and state governmental entities with respect to responding to, investigating, monitoring, and remediating the alleged contamination of these properties. First Day Declaration, ¶ 34. The Debtors intend to resolve the Environmental Claims in the Chapter 11 Cases. *See* Meghji Declaration, ¶ 6.

## V.     The Chapter 11 Cases

43.     The Debtors commenced the Chapter 11 Cases on April 26, 2023 (the "**Petition Date**").  Meghji Declaration, ¶ 4.  Since the Petition Date, the Debtors have operated their businesses and managed their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  *Id.* at ¶ 5.  On May 8, 2023, the Court entered an order [Docket No. 72] authorizing procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On May 24, 2023, the United States Trustee for the District of New Jersey (the "**U.S. Trustee**") appointed an official committee of talc claimants pursuant to section 1102(a)(1) of the Bankruptcy Code (the "**Committee**") [Docket No. 121].

44.     Following the Petition Date, the Debtors filed notices of suggestion of bankruptcy (the "**Bankruptcy Notices**") on the dockets of pending Tort Claims against the Debtors.  Meghji Declaration, ¶ 7.  The Bankruptcy Notices informed the applicable courts and the parties about the commencement of the Chapter 11 Cases and the application of the automatic stay to the assertion of Tort Claims against the Debtors.  *Id.*

45.     The Debtors sought bankruptcy protection due to the lack of any alternative mechanism to efficiently and equitably address the Tort Claims, Successor Liability Claims, and Indemnification Claims.  First Day Declaration, ¶ 35; *see also* Meghji Declaration, ¶ 8.  The continuing influx of Asbestos Claims and recent judgments have made clear that it is nearly impossible for the Debtors to obtain finality with respect to these claims absent the Chapter 11 Cases.  First Day Declaration, ¶ 35.

46.     Further, certain recent developments arising from the growing number of claimants pursuing talc manufacturers in the United States, including the significant increase in settlement demands with respect to cosmetic talc claims in the wake of recent verdicts such as those rendered

16

**JA16**

against Johnson & Johnson, have threatened to swiftly exhaust the Debtors' remaining assets, leaving the universe of potential future claimants without any remaining assets from which to collect. First Day Declaration, ¶ 36. The Debtors have become a main target for claimants asserting asbestos- and talc- based claims. *Id.*

47. Prior to the Petition Date, litigation costs continued to drain the Debtors of resources that could be more efficiently allocated to a trust designed to process claims in a single forum and get money into the hands of legitimate claimants on a far more expedited basis than can be accomplished through sequential, expensive trials, all without the attendant risk of disparate judgments among Asbestos Claimants across the country. First Day Declaration, ¶ 40. Indeed, section 524(g) of the Bankruptcy Code provides such an effective, efficient, and equitable mechanism for the Debtors to address the Asbestos Claims in a single forum. *Id.*

48. The Debtors intend to use the breathing spell and other tools afforded by chapter 11 of the Bankruptcy Code to establish one or more claims trusts consistent with the requirements of sections 105(a) and 524(g) of the Bankruptcy Code, and ultimately seek approval of a settlement as part of a chapter 11 plan. First Day Declaration, ¶ 10. The Debtors seek to efficiently administer their remaining assets to maximize recoveries for claimants. *Id.* Resolving the Tort Claims, Successor Liability Claims, and Indemnification Claims in a comprehensive manner will be the most efficient and equitable use of resources, expenses, and time and will inure to the benefit of all stakeholders—including both present and future Tort Claimants and Indemnified Parties. *Id.*

49. Since commencing their Chapter 11 Cases, the Debtors have defeated a motion to dismiss the cases (*see* Docket No. 211)[18] and obtained the appointment of a future claims representative (*see* Docket No. 231). The Debtors are committed to engaging with claimant

---

[18] The Order denying the motion to dismiss is currently on appeal. *See* Docket Nos. 246, 247, 248.

JA17

representatives and key stakeholders to consensually resolve the Chapter 11 Cases, including through a mediation process. Meghji Declaration, ¶ 8.

50.     As set forth in the Debtors' *Schedules of Assets and Liabilities*, the Debtors had combined cash and cash equivalents of approximately $76 million as of the Petition Date. *See* Docket Nos. 134, 135, 136, 137. The Debtors intend to use these funds, as well as any funds contributed by the Protected Parties as part of a comprehensive resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims, to fund these Chapter 11 Cases, including through a plan that equitably and finally resolves the Debtors' asbestos and environmental liabilities. Meghji Declaration, ¶ 8.

## VI.     <u>The Need for the Requested Relief</u>

51.     The declaratory and injunctive relief sought in this Adversary Proceeding and the related Motions is critical to the Debtors' ability to achieve a global resolution of the claims that precipitated the Debtors' bankruptcy filings. The Debtors cannot engage in meaningful global settlement negotiations absent a broad stay/injunction of Successor Liability Claims against the Protected Parties and a declaration that Successor Liability Claims are property of the Debtors' estates.

52.     Successor Liability Claims are factually and legally predicated on the Debtors' operations and therefore require an initial determination of the Debtors' asbestos and environmental liabilities. Moreover, the Debtors may owe indemnification obligations to certain Protected Parties in connection with Successor Liability Claims. Accordingly, the Debtors require a declaration that the automatic stay prohibits the commencement, continuation, or settlement of Successor Liability Claims or an injunction prohibiting such actions while the Chapter 11 Cases are pending. *See* Meghji Declaration, ¶¶ 10, 21-23.

53.     Subsequent to the Petition Date, at least 23 complaints alleging Successor Liability Claims against Brenntag have been filed, none of which differentiate as between Successor Liability Claims and claims against Brenntag that are independent of its association with the Debtors.  Meghji Declaration, ¶ 17.

54.     Moreover, plaintiffs have continued to prosecute existing Successor Liability Claims against Brenntag during the pendency of these Chapter 11 Cases.  Meghji Declaration, ¶ 18.  For example, in April 2022, Brenntag and the plaintiff in an action styled *Corey Tippin v. Brenntag Specialties, et al.*, Case No. 190062/2021 currently pending in the Supreme Court of New York (the "**Tippin Action**") stipulated to stay the prosecution of Successor Liability Claims unless and until WCD failed to satisfy a final judgment or filed for bankruptcy protection.[19] *Id.*  In response to the bankruptcy filings, on August 16, 2023, plaintiff filed a second amended complaint to proceed with the prosecution of Successor Liability Claims against Brenntag Specialties, LLC and Brenntag North America, Inc.  *Id.*

55.     Brenntag also recently settled two Successor Liability Claims in advance of upcoming trials that were continuing postpetition.  Meghji Declaration, ¶ 19.  On August 2, 2022, the Honorable Laura A. Seigle of the Superior Court of the State of California for the County of Los Angeles entered a Minute Order in an action styled *Alloway v. Almay, Inc., et al.*, Case No. 22STCV14241 (the "**Alloway Action**") that scheduled a jury trial against Brenntag to begin on September 11, 2023.  *Id.*  Brenntag settled the Successor Liability Claims in the Alloway Action on or about August 11, 2023.  *Id.*

56.     On March 16, 2023, the Honorable Jean H. Toal of the Court of Common Pleas for the Fifth Judicial Circuit in the State of South Carolina entered an Order continuing trial against

---

[19]  The Debtors are not party to this stipulation.

Brenntag in the action styled *Kelly Payne Clark and Shannon Payne Clark, as Co-Executors of the Estate of Shelby Linville Payne v. 3M Company, et al.*, Case No. 2022-CP-40-01281 (the "**Payne Action**") to August 28, 2023. Meghji Declaration, ¶ 20. Brenntag settled the Successor Liability Claims in the Payne Action on or about August 11, 2023. *Id.*

57.     The Debtors believe that the commencement, continuation, and settlement of Successor Liability Claims against the Protected Parties in the tort system would harm the Debtors' efforts in these Chapter 11 Cases. Meghji Declaration, ¶ 21. Permitting the Defendants to liquidate claims against the Debtors through prosecution or settlement of Successor Liability Claims outside of this Court would disrupt the Debtors' efforts to comprehensively resolve all Tort Claims, Successor Liability Claims, and Indemnification Claims in these Chapter 11 Cases. *Id.*

58.     Moreover, without immediate injunctive relief, the Debtors will be compelled to pull key estate resources and personnel away from the Chapter 11 Cases and actively defend Successor Liability Claims against the Protected Parties, even as they attempt to resolve these very same claims in the Chapter 11 Cases. Meghji Declaration, ¶ 22.

59.     In the absence of the relief requested by this Complaint, the Debtors believe that:

    A. Defendants who have asserted Successor Liability Claims against Brenntag have contended or will contend that the automatic stay applies only to the Debtors and will attempt to continue prosecuting such claims against Brenntag outside of the Chapter 11 Cases;

    B. Defendants who have sued only the Debtors will seek to amend their complaints to name one or more of the Protected Parties and prosecute Successor Liability Claims against those Protected Parties outside of the Chapter 11 Cases;

    C. Defendants who have pending motions to amend their complaints to add Successor Liability Claims will continue to pursue those amendments in an effort to proceed with litigation against the Protected Parties outside of the Chapter 11 Cases; and

    D. Defendants John and Jane Does 1-1,000 will commence Successor Liability Claims against the Protected Parties without naming the Debtors.

Meghji Declaration, ¶ 23.

**JA20**

## CAUSES OF ACTION

## COUNT I

### Declaratory relief pursuant to section 362 of the Bankruptcy Code

60.     The Debtors incorporate by reference paragraphs 1 through 59 as if fully set forth herein.

61.     Section 362(a)(3) of the Bankruptcy Code prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]" 11 U.S.C. § 362(a)(3).

62.     Section 541 of the Bankruptcy Code provides that the filing of a chapter 11 petition "creates an estate . . . comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

63.     Third Circuit precedent recognizes that claims (1) for which the debtor has standing to assert under applicable non-bankruptcy law and (2) that constitute "general claims" available to the debtor's other creditors are property of the debtor's bankruptcy estate. *See In re Emoral, Inc.*, 740 F.3d 875, 879-82 (3d Cir. 2014) (applying New York and New Jersey law in holding that personal injury claimants' successor liability claims against transferee were property of the debtor's estate); *Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs.by Jamie, Inc.)*, 230 B.R. 36, 43 (Bankr. D.N.J. 1998) (holding that trustee succeeded to debtor's right to assert alter ego claim because corporate debtor's interest in its alter ego's assets is property of the estate).

64.     The Debtors have standing to pursue Successor Liability Claims under applicable non-bankruptcy law, whether the Court applies the substantive law of Delaware (which governs the 2004 Soco APA, 2004 WCD APA, and Brilliant APA), New York (the State where the 2004 Transactions closed), or New Jersey (the forum State for the Chapter 11 Cases and the State in

21

**JA21**

which WCD is incorporated). *See*, *e.g. Emoral*, 740 F.3d at 881 (holding that successor liability claims against the transferee were property of the estate under the state law of both New York and New Jersey and were thus settled and released by bankruptcy trustee); *In re Tronox Inc.*, 855 F.3d 84, 104 (2d Cir. 2017) ("Under Delaware law, a trustee possesses standing to bring—and by logical extension, settle and release—an alter ego claim on behalf of a creditor of the debtor, as long as the claim qualifies as a 'general' claim.").

65.     Successor Liability Claims are "general claims" available to the Debtors' entire creditor body because both the successor and alter ego theories of recovery are "based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors." *Emoral*, 740 F.3d at 881.

66.     Accordingly, and in line with Third Circuit precedent, Successor Liability Claims are automatically stayed under section 362(a)(3) of the Bankruptcy Code because any attempt by Defendants to commence, continue to prosecute, or settle such claims against one or more Protected Parties while the Chapter 11 Cases are pending constitutes an act to control property of the Debtors' estates.

**WHEREFORE**, the Debtors respectfully request that this Court: (a) after notice and a hearing, enter an order and judgment declaring that the commencement, continued prosecution, or settlement of Successor Liability Claims by Defendants against one or more Protected Parties while the Chapter 11 Cases remain pending violates the automatic stay imposed by section 362(a)(3) of the Bankruptcy Code; and (b) grant such other and further relief as the Court may deem proper.

# COUNT II

## Extension of the Automatic Stay to Successor Liability Claims to the Extent Such Claims are not Automatically Stayed Pursuant to Section 362(a)(3)

67.     The Debtors incorporate by reference paragraphs 1 through 66 as if fully set forth herein.

68.     Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]" 11 U.S.C. § 362(a)(1).

69.     Third Circuit precedent recognizes that the automatic stay imposed by section 362(a)(1) extends to enjoin actions against non-debtors in "unusual circumstances" such as where "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009); *see also McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 996 (4th Cir. 1986).

70.     There exists an identity of interest between the Debtors and the Protected Parties with respect to Successor Liability Claims such that the Court's extension of the automatic stay is warranted.  Successor Liability Claims are legally and factually predicated on the Debtors' property or operations prior to the sale of substantially all their operating assets in 2004 such that the Debtors are the *de facto* defendants in Successor Liability Claims.

71.     Indeed, Successor Liability Claims asserted against Brenntag to date involve the same products, time periods, alleged injuries, and evidence as Tort Claims against Debtors, and

23

**JA23**

fail to differentiate claims against Brenntag that are independent of its association with the Debtors (*i.e.*, claims alleging injury resulting from business operations conducted by Brenntag following the 2004 Transactions for which the Debtors do not owe indemnification obligations) from claims against Brenntag related to its association with the Debtors (*i.e.*, Successor Liability Claims for which the Debtors may owe indemnification obligations to Brenntag).

72.     As a result, litigating or attempting to establish the value of Successor Liability Claims would liquidate claims against the Debtors.  The prosecution of Successor Liability Claims would also trigger potential indemnification and similar obligations of the Debtors owed to the Protected Parties.  Because the Debtors are the real-party defendants in any suit seeking to liquidate and recover on account of Successor Liability Claims, section 362(a)(1) stays such actions.

73.     In addition, the commencement, continuation, or settlement of Successor Liability Claims by Defendants would have an adverse impact on the Debtors and the Chapter 11 Cases for similar reasons, including that any resolution of Successor Liability Claims could liquidate Indemnification Claims against the Debtors outside of the Chapter 11 Cases and subject the Debtors to the risk of *res judicata*, collateral estoppel, and record taint with respect to Tort Claims. Absent the relief sought herein, the Debtors would be compelled to defend their interests in Successor Liability Claims against the Protected Parties to prevent such harm to the estates, thereby defeating the "breathing spell" intended by the automatic stay.

74.     Moreover, the commencement, continuation, and piecemeal settlement of Successor Liability Claims would divert funds and resources to the Debtors' defense costs and reduce funds available for  a global resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims in these Chapter 11 Cases.  Permitting the Defendants to circumvent the

bankruptcy process in such a manner serves only to disrupt the Debtors' efforts to comprehensively resolve their liabilities in these Chapter 11 Cases.

75. Accordingly, the "unusual circumstances" of these cases warrant the Court's extension of the automatic stay to Successor Liability Claims against the Protected Parties to the extent such claims are not automatically stayed as requested in Count I.

**WHEREFORE**, the Debtors respectfully request that this Court: (a) after notice and a hearing, enter an order and judgment extending the automatic stay to prohibit the commencement, continuation, or settlement of any action by Defendants seeking to hold the Protected Parties liable for Successor Liability Claims to the extent such claims are not automatically stayed as requested in Count I; and (b) granting such other and further relief as the Court may deem proper.

## COUNT III

### Preliminary Injunctive Relief, Pursuant to Sections 105 and 362 of the Bankruptcy Code

76. The Debtors incorporate by reference paragraphs 1 through 75 as if fully set forth herein.

77. Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue any order that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Chapter 11 Cases, aid in the preservation of the assets of the Debtors' estates, and aid in the formulation and confirmation of a chapter 11 plan that maximizes recovery to all of the Debtors' creditors.

78. Pursuant to sections 105(a) and 362 of the Bankruptcy Code, this Court may enjoin creditor actions against third parties to prevent an adverse impact on the Debtors' estates or to assure the orderly administration of these Chapter 11 Cases, including by fully effectuating the protections of the automatic stay. An injunction is appropriate in this case to prohibit Defendants

25

**JA25**

from commencing, continuing or settling Successor Liability Claims while the Chapter 11 Cases are pending. Further, such an injunction is critical to the Debtors' ability to achieve the purposes for which it commenced the Chapter 11 Cases.

79. In the Third Circuit, courts considering the propriety of an injunction under section 105(a) apply the traditional four-factor test for injunctions, as tailored to the unique circumstances of bankruptcy. In bankruptcy, these four factors are: (i) the Debtors' reasonable likelihood of successful reorganization; (ii) the imminent risk of irreparable harm to the Debtors' estates in the absence of an injunction; (iii) the balance of harms between the Debtors and their creditors; and (iv) whether the public interest weighs in favor of an injunction.

80. "In considering a request for an injunction, these four factors are not weighed simultaneously against one another. Rather, the Court determines whether the first two threshold prongs are established, and if so, only then does it proceed to consider the third and fourth factors." *In re Philadelphia Newspapers*, LLC, 423 B.R. 98, 106 n.11 (E.D. Pa. 2010).

81. The Debtors are likely to prevail on the merits of their request for an injunction under applicable Third Circuit law. First, the Debtors' prospects for a successful outcome in the Chapter 11 Cases are strong. The Debtors entered bankruptcy in good faith to permanently, fully, and equitably resolve the Tort Claims, Successor Liability Claims, and Indemnification Claims in one centralized forum.

82. The Debtors have sufficient assets to fund these Chapter 11 Cases. As set forth in the Debtors' *Schedules of Assets and Liabilities*, the Debtors had combined cash and cash equivalents of approximately $76 million as of the Petition Date. The Debtors intend to use these funds, as well as any funds contributed by the Protected Parties as part of a comprehensive resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims, to fund

26

**JA26**

these Chapter 11 Cases, including through a plan that equitably and finally resolves the Debtors' asbestos and environmental liabilities.

83. Second, the failure to grant the requested injunction would irreparably harm the Debtors and defeat the purpose of these Chapter 11 Cases. Absent the requested injunction, Defendants would be permitted to pursue Successor Liability Claims belonging to the Debtors' estates, the value of which should be recovered for the benefit of all of the Debtors' creditors.

84. Moreover, the resolution of Successor Liability Claims against certain Protected Parties, whether through adverse judgment in the tort system or piecemeal settlement, may give rise to Indemnification Claims against the Debtors. Permitting Defendants to indirectly establish claims against the Debtors through actions against third parties with potential indemnity rights would undermine the purpose of these Chapter 11 Cases—to consolidate and collectively resolve all current and future Tort Claims against the Debtors, as well as the Successor Liability Claims and Indemnification Claims, through the bankruptcy process. This non-bankruptcy litigation, if not stayed, would undermine (or eliminate) the parties' and the Court's ability to achieve confirmation of a plan that treats all creditors (including current and future Tort Claimants and Indemnified Parties) fairly and equitably.

85. Because Successor Liability Claims are legally and factually predicated on the Debtors' operations prior to the closing of the 2004 Transactions, such claims necessarily require an initial determination of the Debtors' asbestos and environmental liabilities. An additional risk of continued litigation of Successor Liability Claims is that the resolution of such claims could bind the Debtors or impact their liability on Tort Claims under the doctrines of collateral estoppel and *res judicata*. Litigation of Successor Liability Claims also creates a substantial risk that Tort Claimants will use statements, testimony and other evidence generated in those proceedings to try

**JA27**

to establish the Tort Claims against the Debtors. To avoid these types of risks, the Debtors would be compelled to actively defend Successor Liability Claims in the tort system. This would undermine the purpose of the automatic stay.

86. Third, the balance of the harms weighs heavily in favor of the requested injunction because prosecution of Successor Liability Claims in the tort system would cause irreparable harm to the Debtors and their estates by liquidating claims against the Debtors and/or binding the Debtors with respect to rulings, judgments and evidentiary records established in those cases. It would also compromise the protections of the automatic stay. Failure to issue an injunction also may also prejudice certain Defendants by leading to different recoveries among similarly situated claimants depending on whether they recover through the tort system or a future, court-approved trust.

87. On the other hand, the harm, if any, that an injunction might cause the Defendants is minimal, to the extent it would exist at all. The issuance of an injunction will not permanently deprive the Defendants of an opportunity to pursue Successor Liability Claims. Instead, it will merely halt those claims, giving the Debtors time to reach consensus on a comprehensive resolution of these Chapter 11 Cases. Moreover, the Defendants would still be permitted to proceed against, and collect from, other alleged tortfeasors in the tort system on account of claims that do not constitute Successor Liability Claims.

88. Fourth, the public interest weighs in favor of an injunction. There is a strong public interest in a global resolution of Tort Claims against the Debtors, and injunctive relief is critical to the Debtors' efforts in that regard. It also is in the public interest to promote fairness among similarly situated creditors and judicial economy within the court system. This result is not possible if Defendants are permitted to circumvent the bankruptcy process through piecemeal

litigation of Successor Liability Claims in the tort system. A successful outcome for the Chapter 11 Cases—and an injunction that makes such success possible—particularly serves the public interest by providing for a uniform and equitable resolution of the Debtors' liabilities.

89. Accordingly, an injunction barring the commencement, continuation, and settlement of Successor Liability Claims while the Chapter 11 Cases are pending is appropriate and essential to the orderly and effective administration of the Debtors' estates. Good cause exists for the entry of injunctive relief pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

**WHEREFORE**, the Debtors respectfully request that this Court: (a) after notice and a hearing, issue a preliminary injunction pursuant to sections 105 and 362 of the Bankruptcy Code prohibiting the filing, continued prosecution, and settlement of Successor Liability Claims while the Chapter 11 Cases are pending; and (b) grant such other and further relief as the Court may deem proper.

## COUNT IV

### Declaratory relief pursuant to section 541 of the Bankruptcy Code

90. The Debtors incorporate by reference paragraphs 1 through 89 as if fully set forth herein.

91. Successor Liability Claims are property of the applicable Debtor's estate for the reasons set forth in Count I above. Accordingly, the Debtors have sole standing to pursue Successor Liability Claims while the Chapter 11 Cases are pending. *In re Wilton Armetale, Inc.*, 968 F.3d 273, 280 (3d Cir. 2020) ("[O]nce a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it.").

29

**JA29**

**WHEREFORE**, the Debtors respectfully request that this Court: (a) after notice and a hearing, enter an order and judgment declaring that Successor Liability Claims are property of the applicable Debtor's estate; and (b) grant such other and further relief as the Court may deem proper.

Dated: September 7, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com

-and-

Seth Van Aalten, Esq. (*pro hac vice pending*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone:  (212) 752-8000
Email:     svanaalten@coleschotz.com
           adeleo@coleschotz.com

-and-

G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Email:     ddean@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

30

**JA30**

## **VERIFICATION**

I, Mohsin Y. Meghji, hereby certify:

I am the Chief Restructuring Officer of the Debtors and a Managing Partner of M3 Partners, LP ("**M3 Partners**"), the Debtors' restructuring advisor.  As Chief Restructuring Officer, I am generally familiar with the Debtors' historical businesses, financial condition, policies and procedures, claims management operations, books and records, and Chapter 11 Cases, as well as the Tort Claims asserted against the Debtors and Successor Liability Claims asserted against Brenntag.  I have read the Complaint[20] and certify that the factual allegations contained in the Complaint are true to the best of my knowledge, information, and belief.

I certify that the foregoing statements are true.  I am aware that if any statement made herein is willfully false, I am subject to punishment.

Dated: September 7, 2023

*/s/ Mohsin Meghji*
Mohsin Meghji
Chief Restructuring Officer
Brilliant National Services, Inc.

---

[20] Capitalized terms used but not defined in this Verification shall the meanings ascribed to such terms in the Complaint to which this Verification is attached.

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*,[1] | Case No. 23-13575 (MBK) |
| Debtors. | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

                 Plaintiffs,

      v.

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND PIGMENT
SOLUTIONS, INC., THOSE PARTIES LISTED ON
APPENDIX A TO THE COMPLAINT, and JOHN
AND JANE DOES 1-1,000,

                 Defendants.

Adv. Proc. No. 23-01245 (MBK)

**Objection Deadline: September 26, 2023**
**Hearing Date: October 3, 2023 at 11:00 a.m. (ET)**

## DEBTORS' MOTION FOR SUMMARY JUDGMENT
## WITH RESPECT TO COUNTS I, II, AND IV OF THE COMPLAINT

# **TABLE OF CONTENTS**

JURISDICTION AND VENUE ........................................................................................ 4

SUMMARY OF THE ARGUMENT ............................................................................... 4

   I.    Successor Liability Claims are Property of the Debtors' Estates. .................... 4

   II.   Alternatively, an Extension of the Automatic Stay to the Successor
       Liability Claims is Warranted ............................................................................ 6

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 7

   I.    Overview of the Debtors .................................................................................... 7

   II.   The 2004 Transactions ....................................................................................... 9

   III.  The 2007 NICO Equity Sale ............................................................................ 12

   IV.  The Tort Claims ................................................................................................ 13

         A.    The Asbestos Claims ............................................................................. 13

         B.    The Environmental Claims .................................................................... 15

   V.   The Chapter 11 Cases ....................................................................................... 15

   VI.  Successor Liability Claims Postpetition .......................................................... 17

LEGAL STANDARD .................................................................................................... 18

ARGUMENT .................................................................................................................. 19

   I.    Successor Liability Claims are Property of the Debtors' Estates Subject
       to the Automatic Stay ....................................................................................... 20

         A.    The Debtors Have Standing to Bring Successor Liability Claims Under
            Applicable State Law ............................................................................. 23

         B.    Successor Liability Claims Constitute "General" Claims .................... 28

   II.   Extension of the Automatic Stay to Successor Liability Claims is
       Warranted Under the Circumstances ............................................................... 33

         A.    There is an Identity of Interest Between the Debtors and the Protected Parties with
            Respect to Successor Liability Claims ................................................... 34

         B.    The Commencement, Continuation, and Settlement of Successor Liability Claims
            Will Adversely Impact the Debtors ....................................................... 35

NOTICE ......................................................................................................................... 39

CONCLUSION ............................................................................................................... 40

**JA34**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
   788 F.2d 994 (4th Cir. 1986) ................................................. 34

*Acands, Inc. v. Travelers Cas. & Sur. Co.*,
   435 F.3d 252 (3d Cir. 2006) .................................................. 33

*Action Nissan, Inc. v. Hyundai Motor Am.*,
   2020 WL 7419669 (M.D. Fla. Nov. 5, 2020) ......................... 24

*In re Alcon Demolition, Inc.*,
   204 B.R. 440 (Bankr. D.N.J. 1997) ....................................... 24

*Alloway v. Almay, Inc., et al.*,
   Case No. 22STCV14241 .......................................................... 18

*In re Am. Film Techs., Inc.*,
   175 B.R. 847 (Bankr. D. Del. 1994) ...................................... 37

*Bd. of Trustees of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*,
   296 F.3d 164 (3d Cir. 2002) .................................................. 29

*In re Bestwall LLC*,
   606 B.R. 243 (Bankr. W.D.N.C. 2019), *aff'd*, No. 3:20-CV-103-RJC, 2022
   WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168 (4th Cir. 2023) .............................. 37

*In re Bridgepoint Nurseries, Inc.*,
   190 B.R. 215 (Bankr. D.N.J. 1996) ....................................... 23

*Cardinal Holdings, Ltd. v. Indotronix Int'l Corp.*,
   73 A.D.3d 960, 902 N.Y.S.2d 123 (App. Div. 2010) ............ 27

*Coleman v. Deutsche Bank nat. Trust Co.*,
   No. 15-1080 (JLL)(JAD), 2015 WL 2226022 (D.N.J. May 12, 2015) .................... 22

*Corey Tippin v. Brenntag Specialties, et al.*,
   Case No. 190062/2021 ................................................ 17, 18

*Corman v. LaFountain*,
   38 A.D.3d 706, 835 N.Y.S.2d 201 (2007) ............................ 27

*In re Denby-Peterson*,
   941 F.3d 115 (3d Cir. 2019) .................................................. 33

JA35

*In re Emoral, Inc.*,
   740 F.3d 875 (3d Cir. 2014)...........................................................................*passim*

*In re First Interregional Advisors Corp.*,
   271 B.R. 463 (Bankr. D.N.J. 2001) ...............................................................24

*Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*,
   2015 WL 4092392 (S.D.N.Y. July 6, 2015) .......................................................25

*In re Guarneri*,
   No. BR 16-33945 (KCF), 2019 WL 4749980 (D.N.J. Sept. 30, 2019) ...................................5

*Harrison v. Soroof Int'l, Inc.*,
   320 F. Supp. 3d 602 (D. Del. 2018)...........................................................23, 29

*Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs. v. Sharemax.com, Inc.*,
   334 F. Supp. 2d 620 (D.N.J. 2004) ...................................................................19

*In re Johns-Manville Corp.*,
   26 B.R. 420 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984) ..........................37

*In re Kaplan*,
   186 B.R. 871 (Bankr. D.N.J. 1995) ...................................................................24

*In re Keene Corp.*,
   164 B.R. 844 (Bankr. S.D.N.Y. 1994)...............................................................27

*Kelly Payne Clark and Shannon Payne Clark, as Co-Executors of the Estate of Shelby Linville Payne v. 3M Company, et al.*,
   Case No. 2022-CP-40-01281 ............................................................................18

*Koch Ref. v. Farmers Union Cent. Exch., Inc.*,
   831 F.2d 1339 (7th Cir. 1987) .........................................................................23

*Labarbera v. United Crane & Rigging Servs, Inc.*,
   Nos. 08-CV-3274 (DLI)(ALC), 08-CV-3983 (DLI)(ALC), 2011 WL 1303146 (E.D.N.Y. March 2, 2011) ...............................................................................30

*In re LTL Mgmt., LLC*,
   638 B.R. 291 (Bankr. D.N.J. 2022) ...........................................................*passim*

*In re Mallinckrodt PLC*,
   Adv. No. 21-50428 (JTD), 2021 WL 2460227 (Bankr. D. Del. June 16, 2021) ...............21, 38

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
   740 F.3d 81 (2d Cir. 2014)...........................................................................29

iii

**JA36**

*McCartney v. Integra Nat. Bank N.*,
  106 F.3d 506 (3d Cir. 1997)...............................................................33, 34

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979)...............................................................................36

*Patin v. Thoroughbred Power Boats Inc.*,
  294 F.3d 640 (5th Cir. 2002) ................................................................24

*Premier Pork, LLC v. Westin Packaged Meats, Inc.*,
  406 F. App'x 613 (3d Cir. 2011) .....................................................25, 26

*Reuland Elec. Co. v. Burgi Eng'rs LLC*,
  2014 WL 12570927 (C.D. Cal. Dec. 8, 2014) ......................................25

*Sourcing Mgmt., Inc. v. Simclar, Inc.*,
  118 F. Supp. 3d 899 (N.D. Tex. 2015) ..................................................25

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
  884 F.2d 688 (2d Cir. 1989)...................................................................23

*In re Sudbury, Inc.*,
  140 B.R. 461 (Bankr. N.D. Ohio 1992) ................................................37

*In re Tronox Inc.*,
  855 F.3d 84 (2d Cir. 2017)...............................................28, 30, 31, 32

*Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs.by Jamie, Inc.)*,
  230 B.R. 36 (Bankr. D.N.J. 1998) ...................................................23, 28

*United States v. Gen. Battery Corp.*,
  423 F.3d 294 (3d Cir. 2005)...................................................................25

*In re W.R. Grace & Co.*,
  115 F. App'x 565 (3d Cir. 2004) ...........................................................38

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
  386 B.R. 17 (Bankr. D. Del. 2008) ..................................................35, 38

*Williams v. Stone*,
  109 F.3d 890 (3d Cir. 1997)...................................................................24

*In re Wilton Armetale, Inc.*,
  968 F.3d 273 (3d Cir. 2020)......................................................5, 29, 32

**Statutes**

11 U.S.C. § 362 .................................................................................... passim

**JA37**

11 U.S.C. § 541 ..................................................................................................5, 22, 32

11 U.S.C. §105 ............................................................................................................17

11 U.S.C. § 524 ...............................................................................................16, 17, 39

11 U.S.C. § 541 ............................................................................................................22

11 U.S.C. § 1102 ..........................................................................................................15

11 U.S.C. § 1107 ..........................................................................................................15

28 U.S.C. § 157 ..............................................................................................................4

28 U.S.C. § 1334 ............................................................................................................4

28 U.S.C. § 1409 ............................................................................................................4

28 U.S.C. § 2201 ....................................................................................................20, 21

**Other Authorities**

Fed. R. Bankr. P. 1015 .................................................................................................15

Fed. R. Bankr. P. 7001 .................................................................................................21

Fed. R. Bankr. P. 7008 ...................................................................................................4

Fed. R. Bankr. P. 7056 ....................................................................................1, 18, 20

Fed. R. Civ. P. 56 ............................................................................................1, 18, 19

D.N.J. LBR 7056-1 .....................................................................................................1, 4

TO THE HONORABLE MICHAEL B. KAPLAN,
CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT:

      Whittaker, Clark & Daniels, Inc. and its debtor affiliates (collectively, the "**Debtors**" or "**Plaintiffs**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") and plaintiffs in the above-captioned adversary proceeding (this "**Adversary Proceeding**"), by and through their undersigned counsel, hereby submit this motion (this "**Motion**"), pursuant to sections 105(a), 362(a), and 541(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 56 of the Federal Rules of Civil Procedure (the "**Federal Rules**") (made applicable to this Adversary Proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**")), and Rule 7056-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**"), for entry of an Order, substantially in the form attached hereto as <u>**Exhibit A**</u> (the "**Proposed Order**"), granting summary judgment in favor of the Debtors on Counts I, II, and IV of the Complaint (defined below).  In support of this Motion, the Debtors incorporate the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Debtors' Summary Judgment and Preliminary Injunction Motions*, filed contemporaneously herewith (the "**Meghji Declaration**"), which incorporates the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "**First Day Declaration**"), and further respectfully state as follows:

<u>**NATURE OF THE ACTION**</u>

      1.    The Debtors commenced these Chapter 11 Cases on April 26, 2023 to address and fairly resolve the following claims in an effective, efficient, and centralized forum under the Bankruptcy Code: (i) existing and future tort claims against the Debtors alleging injuries resulting

from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest (the "**Asbestos Claims**," and such claimants, the "**Asbestos Claimants**"); (ii) environmental litigation against the Debtors relating to the production or handling of hazardous materials which allegedly contaminated certain properties[2] (the "**Environmental Claims**," and such claimants, the "**Environmental Claimants**," and together with the Asbestos Claims and Asbestos Claimants, the "**Tort Claims**" and "**Tort Claimants**," respectively); (iii) claims against certain non-Debtor entities seeking to establish such entities' liability for Tort Claims on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors (the "**Successor Liability Claims**"); and (iv) indemnification or contribution claims against the Debtors with respect to any Successor Liability Claim (the "**Indemnification Claims**").

2.      The Debtors are currently defendants in lawsuits across more than 30 different jurisdictions and have managed an active docket of asbestos lawsuits and environmental claims for close to 40 years.  The Debtors are not the result of divisive merger or any recent strategic corporate reorganization.  Instead, they are the same corporate entities whose historical operations (which concluded nearly 20 years ago) precipitated these Chapter 11 Cases.  Accordingly, it was the Debtors' sincere hope that filing for bankruptcy and the resulting imposition of the automatic stay, coupled with the successful defense of a motion to dismiss these Chapter 11 Cases, would provide the requisite breathing spell to negotiate and implement a consensual and comprehensive resolution of the Debtors' various liabilities.  Instead, the commencement, continuation and, most

---

[2]  For the avoidance of doubt, by the Adversary Proceeding, the Debtors are not seeking to stay or enjoin the negotiation of any Remedial Action Plan ("**RAP**") with respect to any Environmental Claim or any responsible party's obligation to perform in connection with any agreed upon RAP.

**JA40**

recently, settlement of Successor Liability Claims against Brenntag,[3] which purchased substantially all of the Debtors' operating assets in 2004 and which has indemnification rights[4] against certain Debtors, has continued apace. Thus, the Debtors commenced this Adversary Proceeding seeking declaratory and injunctive relief prohibiting the commencement, continuation, and settlement of Successor Liability Claims outside of these Chapter 11 Cases.

3. The Debtors are entitled to summary judgment with respect to the declaratory relief sought in the complaint initiating the Adversary Proceeding [Adv. Proc. Docket No. 1] (the "**Complaint**")[5] because there can be no material dispute that Successor Liability Claims are property of the Debtors' estates as a matter of law. As a result, Successor Liability Claims are subject to the automatic stay provisions set forth in section 362(a)(3) of the Bankruptcy Code, and the Debtors have sole standing to pursue or compromise such claims while the Chapter 11 Cases are pending.

4. Alternatively, in the event this Court determines that Successor Liability Claims are not property of the Debtors' estates, and thus not automatically stayed, the Debtors are entitled to summary judgment with respect to their request to extend the automatic stay to Successor Liability Claims given there is no dispute of material fact that that the Debtors are the *de facto* defendants to such claims, and their commencement, continuation, and settlement threatens the success of these Chapter 11 Cases. In addition to potentially triggering the Debtors'

---

[3] Brenntag AG, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, and Mineral and Pigment Solutions, Inc. are referred to collectively herein as "**Brenntag**."

[4] Nothing in this Motion shall constitute an admission as to the validity, extent, or priority of any Indemnification Claim asserted against the Debtors. The Debtors reserve all rights and defenses as to such claims.

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Complaint.

3

**JA41**

indemnification obligations, Successor Liability Claims implicate the Debtors' business operations prior to the sale of substantially all of their operating assets in 2004 and require an initial determination of the Debtors' asbestos and environmental liabilities. The continued prosecution of Successor Liability Claims in the tort system would require the Debtors to defend themselves no differently than with respect to stayed Tort Claims and would significantly deplete estate resources that could otherwise be used to fund a comprehensive resolution of these Chapter 11 Cases. Accordingly, to the extent necessary, the Court should award summary judgment on Count II and extend the automatic stay to Successor Liability Claims.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this Adversary Proceeding and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to Bankruptcy Rule 7008, the Debtors consent to the entry of final orders or a final judgment by this Court in this Adversary Proceeding.

6.  Venue of this proceeding is proper in this District pursuant to 28 U.S.C. § 1409.

7.  The statutory predicates for the relief requested herein are 28 U.S.C. § 2201, sections 105(a), 362(a), and 541(a) of the Bankruptcy Code, Bankruptcy Rules 7001 and 7056, Federal Rule 56, and Local Rule 7056-1.

## SUMMARY OF THE ARGUMENT

### I.    Successor Liability Claims are Property of the Debtors' Estates

8.  The Successor Liability Claims are derivative actions belonging to the Debtors' estates subject to the automatic stay under section 362(a)(3) of the Bankruptcy Code. The Debtors have sole standing to prosecute and compromise Successor Liability Claims while the Chapter 11 Cases are pending. *See* 11 U.S.C. § 362(a)(3) (prohibiting "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate");

4

**JA42**

11 U.S.C. § 541(a) (defining "property of the estate" broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case"); *In re Emoral, Inc.*, 740 F.3d 875, 881 (3d Cir. 2014) (holding that a cause of action asserted against a third-party non-debtor corporation premised on a theory of successor liability is a general claim constituting property of the estate as to which the trustee alone has standing to assert as representative of the estate); *In re Wilton Armetale, Inc.*, 968 F.3d 273, 280 (3d Cir. 2020) ("[O]nce a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it.").

9.     The Debtors are entitled to summary judgment as to ownership of Successor Liability Claims because there can be no genuine factual dispute that such claims constitute property of the Debtors' estates. *See In re Guarneri*, No. BR 16-33945 (KCF), 2019 WL 4749980, at *3 (D.N.J. Sept. 30, 2019) ("What constitutes property of a bankruptcy estate is a question of law.") (citing *Westmoreland Hum. Opportunities, Inc. v. Walsh*, 246 F.3d 233, 242 (3d Cir. 2001)).

10.    In *In re Emoral, Inc.,* the Third Circuit held that successor liability claims were property of the debtor's estate because (i) the debtor had standing to prosecute such claims on its own behalf as of the bankruptcy filing under applicable non-bankruptcy law, and (ii) the claims at issue were "general" (and not "particularized") because such claims were "based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors." 740 F.3d at 881. This standard is easily met here. The Debtors had standing to prosecute Successor Liability Claims as of the Petition Date under applicable non-bankruptcy law and such claims were available to all creditors because they do not depend upon any particularized facts or alleged injury.

5

**JA43**

11.     Accordingly, as a matter of law, Successor Liability Claims constitute property of the Debtors' estates subject to 362(a)(3) of the Bankruptcy Code, and sole standing to prosecute and compromise such claims resides with the Debtors while the Chapter 11 Cases are pending.

## II.     Alternatively, an Extension of the Automatic Stay to the Successor Liability Claims is Warranted

12.     Alternatively, to the extent this Court determines that the Successor Liability Claims are not property of the Debtors' estates, the Court should award summary judgment on Count II and extend the automatic stay to such claims because the Debtors are the *de facto* defendants of such claims and their continued prosecution outside of the Chapter 11 Cases would adversely impact the Debtors' estates.  *See In re LTL Mgmt., LLC*, 638 B.R. 291, 304 (Bankr. D.N.J. 2022) (extending the automatic stay to non-debtors in such "unusual circumstances").

13.     There can be no material dispute of fact that "unusual circumstances" warranting an extension of the automatic stay are present here.  The Successor Liability Claims are legally and factually predicated on the Debtors' operations prior to the sale of substantially all of their assets in 2004.  These claims involve the same products, time periods, alleged injuries, and evidence as Tort Claims asserted against the Debtors.  Accordingly, the adjudication of Successor Liability Claims requires an initial determination of the Debtors' asbestos and environmental liabilities.

14.     Moreover, as discussed herein, judgments or settlements of Successor Liability Claims against Brenntag may give rise to Indemnification Claims against the Debtors.  Accordingly, there is a clear identity of interest between the Debtors and the defendants to Successor Liability Claims.

15.     Likewise, there can be no material dispute of fact that the commencement, continuation, or settlement of Successor Liability Claims in the tort system may result in the

6

liquidation of claims against the Debtors and/or bind the Debtors with respect to rulings, judgments and evidentiary records established in those cases. Such results would undermine the protections afforded to the Debtors by the automatic stay.

16.     The continued prosecution of Successor Liability Claims would also divert the Debtors' funds and resources towards defense costs. This would diminish the funds available to the Debtors to comprehensively resolve the Tort Claims, Successor Liability Claims, and Indemnification Claims in these Chapter 11 Cases. Moreover, piecemeal settlements of Successor Liability Claims in the tort system may lead to unequal recoveries among similarly situated creditors and impair global settlement negotiations. These "unusual circumstances" warrant an extension of the automatic stay to Successor Liability Claims as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     Overview of the Debtors

17.     The Debtors and their predecessors in interest were formed as early as 1918 and continued their operations as late as 2004. First Day Declaration, ¶ 16. Debtors WCD, Soco, and LAT are direct or indirect subsidiaries of Debtor Brilliant. *Id.* From the time of their formation until substantially all of the Debtors' operational assets were sold, the Debtors' businesses consisted of storage and distribution of minerals and pigments, including talc, industrial chemicals, and solvents. *Id.* The Debtors ceased all operations by 2004 but continued their corporate existence to manage alleged asbestos and environmental liabilities related to the historical processing and distribution of cosmetic and industrial compounds. First Day Declaration, ¶ 1.

18.     WCD was formed and began its operations as a supplier and distributor of minerals and pigments in New York in 1918. First Day Declaration, ¶ 17. At its zenith in the 1970s and 1980s, WCD operated one of the largest talc and industrial compound supply and distribution businesses in the United States. *Id.* at ¶ 2. In 1972, WCD reincorporated in New Jersey. *Id.* at ¶

JA45

17.     Brilliant (then named Brenntag Inc.), purchased the stock of WCD in 1988.  *Id.*  The

operational assets of WCD were divested in 2004, as discussed further below, and the Debtors'

current business activities largely relate to the management of Tort Claims alleged against WCD.

*Id.*

19.     Soco's pre-2004 operations began as early as 1933, with the formation and

incorporation of A.J. Lynch Co. ("**A.J. Lynch**"), which sold and distributed chemicals and raw

materials to the paint industry.  First Day Declaration, ¶ 18.  Over multiple decades and through a

series of strategic mergers and acquisitions and corporate name changes, Soco's historical

operations expanded to include those of:

- Western Chemical & Manufacturing Co. ("**Western Chemical**"), which
  manufactured and distributed industrial chemicals and was incorporated in
  California in 1944;

- Dyce Chemical Inc. ("**Dyce Chemical**"), which repackaged and distributed
  industrial chemicals and was incorporated as Dyce Sales & Engineering Service
  Co. in Montana in 1957;

- Crown Chemical Corp. ("**Crown Chemical**"), which sold and distributed industrial
  chemicals and was incorporated as Petrosolve Corp. Ltd. in California in 1969; and

- Holchem Inc. ("**Holchem**"), which distributed chemicals and handled and recycled
  solvents and was incorporated in California in 1981.

*Id.*  By 2001, after the culmination of various mergers, acquisitions, and name changes, A.J. Lynch,

Western Chemical, Dyce Chemical, Crown Chemical, and Holchem became Brenntag West, Inc.

("**Brenntag West**"), an indirect subsidiary of Stinnes Corporation ("**Stinnes**").  *Id.*

20.     LAT was formed and began its operations importing and storing industrial

chemicals in 1981.  First Day Declaration, ¶ 19.  Specifically, LAT operated a chemical storage

and distribution terminal and bulk plant located within the Los Angeles Harbor.  *Id.*  LAT ceased

its storage and distribution operations in 1994 and has largely resolved its liabilities through

ordinary course claims management.  *Id.*  By 2001, through a series of stock purchases, LAT became a direct subsidiary of Stinnes. *Id.*

21.     Brilliant was formed and began its operations in 1977 as Stinnes Oil & Chemical Company, Inc. ("**Stinnes Oil & Chemical**").  First Day Declaration, ¶ 20.  Stinnes Oil & Chemical was a subsidiary of Stinnes, and by 1982, Stinnes Oil & Chemical withdrew from the oil business and concentrated its business on the marketing, distributing, and trading of chemicals.  *Id.*  Stinnes Oil & Chemical changed its name twice: first to Soco Chemical Inc. in 1986, and then to Brenntag Inc., a direct subsidiary of Stinnes, in 1998.  *Id.*

22.     As of 2004, the Debtors were owned by Stinnes or its affiliates, all of which were affiliates of Deutsche Bahn AG.  First Day Declaration, ¶ 21.  In 2004, substantially all of WCD's, Soco's, and Brilliant's operating assets were sold to entities under the umbrella of Brenntag North America, and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets (collectively, the "**2004 Transactions**").  *Id.*  LAT was not involved in the 2004 Transactions, as it had previously ceased all operations.  *Id.*  The 2004 Transactions are discussed in greater detail below.

## II.     The 2004 Transactions

23.     The 2004 Transactions are governed by a Master Sale and Purchase Agreement (the "**MSPA**")[6] dated December 9, 2003, by and among Stinnes AG, Stinnes UK Limited, Stinnes, Brenntag Inc.,[7] and Schenker-BTL, S.A., as sellers ("**Sellers**"), Deutsche Bahn AG, as sellers' guarantor, and Blitz03-1303 GmbH, CM Komplementar 03-AP III. GmbH & Co. KG, PASR

---

[6]  Capitalized terms used in this Section B but not defined herein shall have the meanings ascribed to such terms in the MSPA.  A true and correct copy of the MSPA is attached as Exhibit F to the Meghji Declaration filed contemporaneously with the Complaint and this Motion.

[7]  As noted above, Brenntag Inc. would later become Debtor Brilliant.

9

**JA47**

Siebente Beteiligungsverwaltung GmbH, and Fireball Holding France SAS, as purchasers ("**Purchasers**"). *See* MSPA at p. 13-14. The MSPA provided for, among other transactions, the sale of substantially all of the Debtors' operational assets pursuant to separate asset purchase agreements. *See* MSPA, § 2.11.

24.     Under the MSPA, the Sellers (which include Debtor Brilliant under the name Brenntag, Inc.) agreed, as joint and several debtors, subject to certain limitations and exclusions, to indemnify and hold harmless certain parties to the MSPA, including the Purchasers and their affiliates, from and against certain Environmental Liabilities. *See* MSPA, §§ 10.1, 10.9.

25.     With respect to Asbestos Claims, Debtors WCD and Soco agreed to indemnify certain parties to the MSPA, including the Purchasers, their affiliates, and certain related persons, from and against certain losses incurred in connection with any present or future Retained Subsidiary Asbestos Claims relating to the applicable Debtor or any alleged corporate predecessor-in-interest thereof. MSPA, §§ 12.1.1, 12.1.2.

26.     The above indemnification obligations with respect to the Retained Subsidiary Asbestos Claims were guaranteed by Debtor Brilliant and, if Brilliant is unable to financially satisfy any such claims, Stinnes. MSPA, § 12.1.1, 12.1.2.

27.     Additionally, Brilliant and Stinnes agreed, as joint and several debtors, to indemnify and hold harmless certain parties to the MSPA, including the Purchasers, their affiliates, and certain related persons from and against certain losses incurred in connection with present or future Non-Retained Subsidiary Asbestos Claims. *See* MSPA, §§ 12.1.5, 12.3.

28.     In furtherance of the transactions contemplated by the MSPA, certain Debtors entered into additional asset purchase agreements providing for the disposition of substantially all

**JA48**

of their assets to certain US Asset Purchasers affiliated with Brenntag North America.  *See* MSPA,
§ 2.11.

29.     More specifically, pursuant to that certain asset purchase agreement dated February
27, 2004 (the "**2004 Soco APA**"),[8] Soco (then named Brenntag West, Inc.) divested substantially
all of its assets in exchange for approximately $44 million and the assumption of certain ongoing
liabilities by the purchaser, Brenntag Pacific, Inc.  First Day Declaration, ¶ 22.  Pursuant to the
2004 Soco APA, Soco retained all liability for the Tort Claims and retained certain assets,
including asbestos- and environmental- related insurance receivables and certain real estate.  *Id.*
Following these transactions, on March 8, 2005, Soco changed its name from Brenntag West, Inc.
to Soco West, Inc.  *Id.*

30.     Simultaneously, pursuant to that certain asset purchase agreement dated February
27, 2004 (the "**2004 WCD APA**"),[9] WCD divested substantially all of its assets in exchange for
approximately $15.9 million and the assumption of certain ongoing liabilities by the purchaser,
Mineral & Pigment Solutions Inc.  First Day Declaration. ¶ 23.  Pursuant to the 2004 WCD APA,
WCD retained all liabilities as to the Tort Claims and retained certain assets, including asbestos-
and environmental-related insurance receivables and certain real property.  *Id.*

31.     Together with the execution of the 2004 Soco APA and the 2004 WCD APA,
pursuant to that certain asset purchase agreement dated February 27, 2004 (the "**Brilliant APA**,"[10]
and together with the 2004 WCD APA and the 2004 Soco APA, the "**2004 Transaction**

---

[8]   A true and correct copy of the 2004 Soco APA is attached as Exhibit G to the Meghji Declaration filed
contemporaneously with this Motion.

[9]   A true and correct copy of the 2004 WCD APA is attached as Exhibit H to the Meghji Declaration filed
contemporaneously with this Motion.

[10]   A true and correct copy of the Brilliant APA is attached as Exhibit I to the Meghji Declaration filed
contemporaneously with this Motion.

Documents"), Brilliant (then named Brenntag Inc.) engaged in an asset sale transaction with Brenntag North America.  First Day Declaration, ¶ 24.  In connection with this transaction, Brilliant terminated certain management fee agreements, resigned from certain LLC agreements, and divested its intellectual property assets in exchange for Brenntag North America's assumption of certain non-asbestos-related and non-environmental ongoing liabilities, in addition to certain other consideration and the consideration provided under the 2004 WCD APA and 2004 Soco APA.  *Id.*  Contemporaneously with the execution of the 2004 Brilliant APA, Brilliant changed its name from Brenntag Inc. to Brilliant National Services, Inc.  *Id.*

32.    The consideration the Debtors received under the 2004 Transaction Documents remained on the Debtors' books to satisfy the Tort Claims.  First Day Declaration, ¶ 25.

### III.    The 2007 NICO Equity Sale

33.    In December 2007, National Indemnity Company ("**NICO**")[11] agreed to purchase—and assigned to an affiliated entity, Ringwalt & Liesche Co. ("**Ringwalt**")—the equity in Debtors Brilliant[12] and LAT (the "**2007 NICO Equity Sale**") pursuant to that certain stock purchase agreement dated November 7, 2007 (the "**2007 SPA**").[13]  First Day Declaration, ¶ 3; *see also* 2007 SPA, Preamble.  Pursuant to an assignment agreement dated December 12, 2007, NICO

---

[11] NICO and Ringwalt are affiliates of Berkshire Hathaway, Inc.  None of Ringwalt, the Debtors' other indirect parent entities, NICO, or any other BHI affiliate were involved with the Debtors at the time the Debtors were conducting any of the historical business operations that gave rise to the Tort Claims.  To date, none of the complaints alleging Tort Claims or Successor Liability Claims reviewed by the Debtors allege that these non-Debtor entities ever manufactured, distributed, or possessed any of the products that are the basis of the Tort Claims and Successor Liability Claims.

[12] At the time of the 2007 NICO Equity Sale, Brilliant owned all of the outstanding capital stock of Eastech Chemical Inc. and Debtors WCD and Soco.

[13] Capitalized terms used in this Section C but not defined herein shall have the meanings ascribed to such terms in the 2007 SPA.  A copy of the 2007 SPA is attached as Exhibit J to the Meghji Declaration filed contemporaneously with this Motion.

assigned its right to receive the Debtors' equity interests to Ringwalt, which remains the direct

parent of Brilliant (and the indirect parent of the other Debtors) today.  First Day Declaration, ¶ 26.

## IV.     The Tort Claims

### A.     The Asbestos Claims

34.     Asbestos Claimants first began alleging that the Debtors' chemical processing and

distribution operations were causally related to their asbestos-related injuries in 1979.  First Day

Declaration, ¶ 30.  In more recent years, such claims have engulfed the Debtors in litigation.  *Id.*

at ¶ 6.  Indeed, since 2007, the Debtors' asbestos and environmental liabilities have increased

materially as a result of the evolution of the tort litigation landscape, as the talc-asbestos theory of

liability has risen to prominence and major talc suppliers have availed themselves of chapter 11

protection, leaving the Debtors as a main litigation target.  *Id.* at ¶ 3.

35.     As of the commencement of the Chapter 11 Cases, the Debtors have been sued by

approximately 2,700 individual Asbestos Claimants, with over 1,000 actions generally alleging

exposure to asbestos- and talc- containing compounds and products arising from the Debtors'

historical processing and distribution of cosmetic and industrial talc currently pending.  First Day

Declaration, ¶¶ 6, 30.  The Debtors have been managing an active docket of cases across the United

States for close to 40 years—a task that has recently become increasingly cumbersome to manage

absent a centralized forum to achieve global resolution for the benefit of all Asbestos Claimants.

*Id.* at ¶ 6.

36.     Notably, many of these claims name Brenntag as a defendant based on a theory that

it is an alleged successor to, or alter ego of, the Debtors, and therefore is liable for Tort Claims.

Meghji Declaration, ¶ 16.

37.     Based on the Debtors' review of approximately 1,500 complaints alleging Tort

Claims against the Debtors or Successor Liability Claims against Brenntag, approximately 1,000

name Brenntag as a defendant based on a theory that it is an alleged successor to, or alter ego of, the Debtors.  Meghji Declaration, ¶ 16.  While the Debtors conceptually have no issue with the commencement, continuation, or settlement of claims against Brenntag that are independent of its association with the Debtors (*i.e.*, claims alleging injury resulting from business operations conducted by Brenntag following the 2004 Transactions for which the Debtors do not owe indemnification obligations), the Debtors have not identified a single complaint that differentiates such claims from claims against Brenntag related to its association with the Debtors (*i.e.*, Successor Liability Claims for which the Debtors may owe indemnification obligations to Brenntag).  *Id.*

38.     Dispositions of historical Asbestos Claims have varied significantly, from outright dismissal to judgments in excess of $76 million.[14]  First Day Declaration, ¶ 7.  Continued prosecution of the Asbestos Claims has burdened the Debtors with substantial defense and litigation costs, depleting resources and delaying or limiting recoveries to any legitimate claimants for years to come.  *Id.*  Prior to commencing the Chapter 11 Cases, the Debtors were incurring up to $1,000,000 in monthly defense costs in connection with the Asbestos Claims.  *Id.*

39.     The Debtors anticipate that continued litigation of Asbestos Claims would consume an enormous amount of the Debtors' remaining resources with unpredictable and potentially unfairly preferential outcomes for the Asbestos Claimants.  *Id.*  Accordingly, the Debtors commenced the Chapter 11 Cases to centralize and resolve the Asbestos Claims in one forum. *Id.* at ¶ 40.

---

[14]  *See*, *e.g.*, Calif. Jury Awards Talc Plaintiff $76 Million; Case Settles Before Punitives Phase, HarrisMartin (Dec. 16, 2021),  https://www.harrismartin.com/publications/1/asbestos/articles/28555/calif-jury-awards-talcplaintiff-76-million-case-settles-before-punitives-phase/#:~:text=OAKLAND%2C%20Calif.,plaintiff's%20risk%20of% 20developing%20cancer.

### B. The Environmental Claims

40.     Federal and state governmental entities and plaintiffs have pursued actions or brought claims against the Debtors alleging that the Debtors produced and handled hazardous materials that subsequently contaminated approximately 32 properties across at least 14 states. First Day Declaration, ¶ 33.  These properties housed the Debtors' or their predecessors' historical chemical processing and distribution operations, including legacy solvent recovery, reclamation, and recycling, chemical storage, treatment, and distribution, and waste transfer activities.  *Id.*  Like the Asbestos Claims, Brenntag is alleged to be a responsible party under applicable environmental laws in connection with certain Environmental Claims.  *See* Meghji Declaration, ¶ 16.

41.     The Debtors have actively engaged with both federal and state governmental entities with respect to responding to, investigating, monitoring, and remediating the alleged contamination of these properties.  First Day Declaration, ¶ 34.  The Debtors intend to resolve the Environmental Claims in the Chapter 11 Cases.  *See* Meghji Declaration, ¶ 6.

### V.    The Chapter 11 Cases

42.     The Debtors commenced the Chapter 11 Cases on April 26, 2023 (the "**Petition Date**").  Meghji Declaration, ¶ 4.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. *Id.* at ¶ 5.  On May 8, 2023, the Court entered an order [Docket No. 72] authorizing procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On May 24, 2023, the United States Trustee for the District of New Jersey (the "**U.S. Trustee**") appointed an official committee of talc claimants pursuant to section 1102(a)(1) of the Bankruptcy Code (the "**Committee**") [Docket No. 121].

43.     Following the Petition Date, the Debtors filed notices of suggestion of bankruptcy (the "**Bankruptcy Notices**") on the dockets of pending Tort Claims against the Debtors.  Meghji

15

**JA53**

Declaration, ¶ 7.  The Bankruptcy Notices informed the applicable courts and the parties about the commencement of the Chapter 11 Cases and the application of the automatic stay to the assertion of Tort Claims against the Debtors.  *Id.*

44.     The Debtors sought bankruptcy protection due to the lack of any alternative mechanism to efficiently and equitably address the Tort Claims, Successor Liability Claims, and Indemnification Claims.  First Day Declaration, ¶ 35; *see also Meghji Declaration*, ¶ 8.  The continuing influx of Asbestos Claims and recent judgments have made clear that it is nearly impossible for the Debtors to obtain finality with respect to these claims absent the Chapter 11 Cases.  First Day Declaration, ¶ 35.

45.     Further, certain recent developments arising from the growing number of claimants pursuing talc manufacturers in the United States, including the significant increase in settlement demands with respect to cosmetic talc claims in the wake of recent verdicts such as those rendered against Johnson & Johnson, have threatened to swiftly exhaust the Debtors' remaining assets, leaving the universe of potential future claimants without any remaining assets from which to collect.  First Day Declaration, ¶ 36.  The Debtors have become a main target for claimants asserting asbestos- and talc- based claims.  *Id.*

46.     Prior to the Petition Date, litigation costs continued to drain the Debtors of resources that could be more efficiently allocated to a trust designed to process claims in a single forum and get money into the hands of legitimate claimants on a far more expedited basis than can be accomplished through sequential, expensive trials, all without the attendant risk of disparate judgments among Asbestos Claimants across the country.  First Day Declaration, ¶ 40.  Indeed, section 524(g) of the Bankruptcy Code provides such an effective, efficient, and equitable mechanism for the Debtors to address the Asbestos Claims in a single forum.  *Id.*

47.     The Debtors intend to use the breathing spell and other tools afforded by chapter 11 of the Bankruptcy Code to establish one or more claims trusts consistent with the requirements of sections 105(a) and 524(g) of the Bankruptcy Code, and ultimately seek approval of a settlement as part of a chapter 11 plan. First Day Declaration, ¶ 10.  The Debtors seek to efficiently administer their remaining assets to maximize recoveries for claimants.  *Id*.  Resolving the Tort Claims, Successor Liability Claims, and Indemnification Claims in a comprehensive manner will be the most efficient and equitable use of resources, expenses, and time and will inure to the benefit of all stakeholders—including both present and future Tort Claimants and Indemnified Parties.  *Id.*

48.     As set forth in the Debtors' *Schedules of Assets and Liabilities*, the Debtors had combined cash and cash equivalents of approximately $76 million as of the Petition Date.  *See* Docket Nos. 134, 135, 136, 137.  The Debtors intend to use these funds, as well as any funds contributed as part of a comprehensive resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims, to fund these Chapter 11 Cases, including through a plan that equitably and finally resolves the Debtors' asbestos and environmental liabilities.  Meghji Declaration, ¶ 8.

## VI.     Successor Liability Claims Postpetition

49.     Subsequent to the Petition Date, at least 23 complaints alleging Successor Liability Claims against Brenntag have been filed, none of which differentiate as between Successor Liability Claims and claims against Brenntag that are independent of its association with the Debtors.  Meghji Declaration, ¶ 17.

50.     Moreover, plaintiffs have continued to prosecute existing Successor Liability Claims against Brenntag during the pendency of these Chapter 11 Cases.  Meghji Declaration, ¶ 18.  For example, in April 2022, Brenntag and the plaintiff in an action styled *Corey Tippin v. Brenntag Specialties, et al.*, Case No. 190062/2021 currently pending in the Supreme Court of

17

New York (the "**Tippin Action**") stipulated to stay the prosecution of Successor Liability Claims

unless and until WCD failed to satisfy a final judgment or filed for bankruptcy protection.[15]  *Id.*

In response to the bankruptcy filings, on August 16, 2023, plaintiff filed a second amended

complaint to proceed with the prosecution of Successor Liability Claims against Brenntag

Specialties, LLC and Brenntag North America, Inc.  *Id.*

      51.     Brenntag also recently settled two Successor Liability Claims in advance of

upcoming trials that were continuing postpetition.  Meghji Declaration, ¶ 19.  On August 2, 2022,

the Honorable Laura A. Seigle of the Superior Court of the State of California for the County of

Los Angeles entered a Minute Order in an action styled *Alloway v. Almay, Inc., et al.*, Case No.

22STCV14241 (the "**Alloway Action**") that scheduled a jury trial against Brenntag to begin on

September 11, 2023.  *Id.*  Brenntag settled the Successor Liability Claims in the Alloway Action

on or about August 11, 2023.  *Id.*

      52.     On March 16, 2023, the Honorable Jean H. Toal of the Court of Common Pleas for

the Fifth Judicial Circuit in the State of South Carolina entered an Order continuing trial against

Brenntag in the action styled *Kelly Payne Clark and Shannon Payne Clark, as Co-Executors of*

*the Estate of Shelby Linville Payne v. 3M Company, et al.*, Case No. 2022-CP-40-01281 (the

"**Payne Action**") to August 28, 2023.  Meghji Declaration, ¶ 20.  Brenntag settled the Successor

Liability Claims in the Payne Action on or about August 11, 2023.  *Id.*

## LEGAL STANDARD

      53.     Federal Rule 56, made applicable herein through Bankruptcy Rule 7056, provides

that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[15]  The Debtors are not party to this stipulation.

56.  "In other words, 'summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party.'" *Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs. v. Sharemax.com, Inc.*, 334 F. Supp. 2d 620, 624 (D.N.J. 2004).

54.     With respect to the movant's burden in connection with a motion for summary judgment, the District Court has stated:

> The party seeking summary judgment always bears the initial burden of production. This requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

*Id.* (citations omitted).

55.     With respect to the non-movant's burden:

> To avoid summary judgment, the nonmoving party must demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of "genuine issue[s] of material fact" justifying trial.
>
> If a moving party satisfies its initial burden of establishing a prima facie case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

*Id.* (citations omitted).

## ARGUMENT

56.     By this Motion, the Debtors seek summary judgment against the defendants in this Adversary Proceeding (the "**Defendants**")[16] under Federal Rule 56 (made applicable to this

---

[16]  The Defendants include Brenntag and plaintiffs or potential plaintiffs in lawsuits that seek to hold, or may seek to hold, one or more third parties liable for Successor Liability Claims.  These Defendants, with the exception of Brenntag

**JA57**

Adversary Proceeding by Bankruptcy Rule 7056) with respect to the following Counts in the

Complaint: (i) Count I (declaring that the Successor Liability Claims are automatically stayed

under section 362(a)(3) of the Bankruptcy Code); (ii) Count II (seeking an extension of the

automatic stay under section 362(a) to Successor Liability Claims, if necessary); and (iii) Count

IV (declaring that Successor Liability Claims are property of the Debtors' estates for which the

Debtors have sole standing to pursue or compromise while the Chapter 11 Case are pending).

There are no genuine issues of material fact with respect to whether the Successor Liability Claims

constitute property of the Debtors' estates or, alternatively, whether the automatic stay should be

extended under the circumstances.  Accordingly, the Debtors are entitled to relief prohibiting the

Defendants from commencing, continuing, or settling Successor Liability Claims against the

Protected Parties[17] while the Chapter 11 Cases are pending.

### I.    Successor Liability Claims are Property of the Debtors' Estates Subject to the Automatic Stay

57.    As a threshold matter, declaratory relief is an appropriate way to resolve the

pending matter.  Section 2201(a) of title 28 of the United States Code (the "**Declaratory Judgment**

**Act**") provides that a court "upon the filing of an appropriate pleading, may declare the rights and

---

and the John and Jane Doe Defendants, are listed in Appendix A to the Complaint.  Appendix A identifies the civil action number (where available) for each lawsuit and the law firm representing each of the Defendants on account of their claims.  The Debtors reserve the right to supplement, amend, or otherwise modify Appendix A.  For the avoidance of doubt, the inclusion of a lawsuit on Appendix A is not an admission that such Defendant holds a valid claim against the Debtors.  The Debtors are only seeking to prohibit Brenntag from settling Successor Liability Claims because, upon information and belief, Brenntag is the only party that has been sued on account of Successor Liability Claims to date.  The Debtors reserve the right to seek additional relief as to other parties in the future.

[17]  The Protected Parties include: (1) Bain Capital; (2) Berkshire Hathaway, Inc.; (3) BH Columbia Inc.; (4) Brenntag AG; (5) Brenntag Canada Inc.; (6) Brenntag Great Lakes, LLC; (7) Brenntag Mid-South, Inc.; (8) Brenntag North America; (9) Brenntag North America, Inc.; (10) Brenntag Northeast, Inc.; (11) Brenntag Pacific, Inc.; (12) Brenntag Southeast, Inc.; (13) Brenntag Southwest, Inc.; (14) Brenntag Specialties, Inc.; (15) Brenntag Specialties LLC; (16) Coastal Chemical Co., LLC; (17) Columbia Insurance Company; (18) Mineral and Pigment Solutions, Inc.; (19) Mineral Pigment Solutions, Inc.; (20) National Indemnity Company; (21) Resolute Management, Inc.; and (22) Ringwalt & Liesche Co.  The Debtors reserve the right to seek to supplement, amend, or otherwise modify the list of Protected Parties.

other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Declaratory Judgment Act provides that "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id*. The Bankruptcy Rules explicitly contemplate a declaratory judgment as an appropriate form of relief sought in "a proceeding to obtain an injunction or other equitable relief" such as this Adversary Proceeding. *See* Fed. R. Bankr. P. 7001(7), (9).

58.    Here, there is a substantial controversy between the parties that warrants declaratory judgment in favor of the Debtors. Whether Successor Liability Claims are property of the Debtors' estates that only the Debtors may pursue or compromise during the pendency of these Chapter 11 Cases is a threshold question that must be resolved before a comprehensive resolution of these cases can be negotiated in earnest. Successor Liability Claims constitute key estate assets that should inure to the benefit of all creditors, including future claimants. Absent this Court's determination that Successor Liability Claims are property of the estates, there is little incentive for the Protected Parties or the Tort Claimants (who have continued to prosecute Successor Liability Claims against Brenntag postpetition) to negotiate a comprehensive resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims.

59.    Moreover, summary judgment is appropriate to resolve the requests for declaratory relief. "In the Third Circuit, '[t]he standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief.'" *In re Mallinckrodt PLC*, Adv. No. 21-50428 (JTD), 2021 WL 2460227, at *3 (Bankr. D. Del. June 16, 2021) (quoting *Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*, 298 F.3d 201, 210 n. 12 (3d Cir. 2002) (alteration in original). "Before a federal court may grant a declaratory judgment, there must be a substantial controversy between the parties having adverse legal interests of

21

sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Coleman v. Deutsche Bank nat. Trust Co.*, No. 15-1080 (JLL)(JAD), 2015 WL 2226022, at \*2 (D.N.J. May 12, 2015) (citing *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1170 (3d Cir. 1987)).

60.     Here, summary judgment is appropriate under the facts of this case.  Section 541 of the Bankruptcy Code provides that the filing of a bankruptcy case creates an "estate" that includes "all legal or equitable interests of the debtor in property as of the commencement of the case," wherever located and by whomever held. 11 U.S.C. § 541(a)(1).  Thus, the Debtors' estates include causes of action, "which are considered property of the bankruptcy estate 'if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law.'"  *Emoral*, 740 F.3d at 879 (quoting *Bd. of Trustees of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)).

61.     The debtor has sole standing to pursue claims that constitute property of the debtor's estate in bankruptcy.  *See Emoral,* 740 F.3d at 879 (noting that upon a bankruptcy filing, "creditors lack standing to assert claims that are 'property of the estate.'") (quoting *Foodtown,* 296 F.3d at 169).

62.     As the Third Circuit explained in *Emoral*:

> A cause of action that is "property of the estate" is properly pursued by the bankruptcy trustee because it inures to the benefit of all creditors.  This promotes the orderly distribution of assets in bankruptcy, and comports with "the fundamental bankruptcy policy of equitable distribution to all creditors that should not be undermined by an individual creditor's claim." [W]hen examining "common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion," where a claim is "a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."

740 F.3d at 879.

22

63.     To determine whether a creditor's claim against a non-debtor constitutes an act to exercise control over property of the estate, a court must answer two questions: (i) whether "the debtor could have asserted the claim on his own behalf under state law" and (ii) whether the individual creditor's claim against the non-debtor is a "general claim" available to the debtor's other creditors.  *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 613 (D. Del. 2018).  The answers to those questions here establish that Successor Liability Claims are property of the Debtors' estates.  *See Emoral,* 740 F.3d at 880–82 (holding that personal injury claimants' successor liability claims against transferee were property of the debtor's estate because the debtor could have asserted the claims under New Jersey and New York law and the claim was generally available to the debtor's other creditors); *Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs.by Jamie, Inc.)*, 230 B.R. 36, 43 (Bankr. D.N.J. 1998) (holding that trustee succeeded to debtor's right to assert alter ego claim because corporate debtor's interest in its alter ego's assets is property of the estate). There are no material disputes of facts as to these two questions, and thus, as discussed below, summary judgment is appropriate.

### A.      The Debtors Have Standing to Bring Successor Liability Claims Under Applicable State Law

64.     Whether the Debtors had standing to assert Successor Liability Claims on the Petition Date is a question of state law.  *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989) ("Whether the rights belong to the debtor or the individual creditors is a question of state law."); *see also Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1344 (7th Cir. 1987) (whether alter ego claim belongs to estate or creditors is a question of state law); *In re Bridgepoint Nurseries, Inc.*, 190 B.R. 215, 219 (Bankr. D.N.J. 1996) ("[I]n determining property rights courts must look to state law.").

65.     To determine which state law is the "relevant state law" for this inquiry, courts use the choice-of-law rules of the forum state in which the bankruptcy case sits.  *See In re First Interregional Advisors Corp.*, 271 B.R. 463, 469 (Bankr. D.N.J. 2001) ("Where state law governs in a federal case, the federal court must apply the choice of law doctrine from the forum state."); *In re Alcon Demolition, Inc.*, 204 B.R. 440, 446 (Bankr. D.N.J. 1997) ("A federal court applies the choice-of-law doctrine in the forum state in which it sits."); *In re Kaplan*, 186 B.R. 871, 874 (Bankr. D.N.J. 1995) ("In an action where state law governs, federal courts generally look to the law of the forum state to resolve choice of law issues.").

66.     Importantly, a court need only engage in a choice of law analysis if there is an *actual conflict* with respect to the law governing the issues presented to the court.  *See Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997) ("Under general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question.").  Thus, the first step in the choice of law analysis is to determine which states' laws might apply and then determine whether there is an actual conflict among those laws with respect to the successor liability issues before the Court.  As discussed herein, there is no substantive conflict among potentially governing laws (Delaware, New Jersey, or New York) because the Debtors had standing to bring the Successor Liability Claims under the laws of each of these states as of the Petition Date.

67.     Most jurisdictions utilize the "internal affairs doctrine," which applies the law of the state in which the debtor is incorporated in resolving choice of law questions regarding successor liability.  *See Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 649 (5th Cir. 2002) (concluding law of the state of incorporation "governs our substantive determination whether Velocity is subject to successor liability"); *Action Nissan, Inc. v. Hyundai Motor Am.*,

24

2020 WL 7419669, at *6 (M.D. Fla. Nov. 5, 2020) ("the question of successor liability involves [companies]' internal affairs" and the law of the state of incorporation therefore applies); *Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*, 2015 WL 4092392, at *3 n.1 (S.D.N.Y. July 6, 2015) ("[I]t is the law of the successor's state of incorporation that typically determines successor liability."); *Sourcing Mgmt., Inc. v. Simclar, Inc.*, 118 F. Supp. 3d 899, 918 n.7 (N.D. Tex. 2015) ("[U]nder general choice of law principles, the law of the state of incorporation generally applies to successor liability" (citing Restatement (Second) Conflict of Laws § 302)); *Reuland Elec. Co. v. Burgi Eng'rs LLC*, 2014 WL 12570927, at *6 (C.D. Cal. Dec. 8, 2014) ("For a question of successor liability, the state of incorporation … controls."). The Debtors, as well as the purchasers of WCD's, Soco's, and Brilliant's assets pursuant to the 2004 Transactions, are incorporated in New Jersey and Delaware.[18]*See* First Day Declaration, Ex. B; *see also* 2004 Soco APA, Preamble; 2004 WCD APA, Preamble; Brilliant APA, Preamble.

68.     However, New Jersey courts appear to apply a "governmental interest" analysis when deciding choice of law questions regarding successor liability claims that focuses on (i) where the underlying sale contract was formed, (ii) where the underlying sale took place, and (iii) where the creditors are located. *See Premier Pork, LLC v. Westin Packaged Meats, Inc.*, 406 F. App'x 613, 616 (3d Cir. 2011); *see also United States v. Gen. Battery Corp.*, 423 F.3d 294, 301 (3d Cir. 2005) ("The choice of law framework governing successor liability remains unsettled."). In applying this analysis, the Third Circuit has cautioned that "it is generally appropriate for the law of the state where a [] sale occurs to govern such a sale, not the laws of the states in which creditors reside, because *a state has a strong interest in ensuring debtors can dispose of their assets*

---

[18]  Debtor LAT is incorporated in California; however, only one Environmental Claim is pending against LAT as of the Petition Date. Accordingly, the Court need not consider California law with respect to the relief requested in this Motion.

*without being subject to the laws of multiple different states*."). *Premier Pork*, 406 F. App'x at
616 (emphasis added).

69.     Here, the 2004 Soco APA, the 2004 WCD APA, and the Brilliant APA are all
governed by Delaware law and the buyer in each of the respective transactions (Brenntag North,
Inc., Brenntag Pacific Inc., and Mineral Pigment Solutions, Inc) was a Delaware corporation at the
time of the 2004 Transactions.  *See* 2004 Soco APA, Preamble, § 2.5; 2004 WCD APA, Preamble,
§ 2.5; Brilliant APA, Preamble, § 2.5.  The closing in each of these transactions took place in New
York.  *See* 2004 Soco APA, § 1.4; 2004 WCD APA, § 1.4; Brilliant APA, § 1.4.  Accordingly, a
New Jersey court applying the governmental interest test would likely apply either Delaware or
New York law to Successor Liability Claims.

70.     Regardless of whether the internal affairs doctrine or governmental interest test
applies to Successor Liability Claims, the Court need not engage in a choice of law analysis here
because the Debtors had standing to bring Successor Liability Claims on the Petition Date under
the laws of New Jersey, New York, and Delaware.

71.     Starting with New Jersey, in *Emoral*, the Third Circuit, applying New Jersey law,
determined that a chapter 11 debtor has standing to assert successor liability claims.  In that case,
the debtor manufactured a chemical used in food flavoring that gave rise to personal injury claims.
*Emoral*, 740 F.3d at 877.  After the debtor sold its operating assets to a transferee, the debtor filed
for bankruptcy protection.  The trustee for the debtor's estate entered into a settlement with the
transferee in which the trustee released the transferee from claims that "are property of the"
debtor's estate.  *Id.*  Personal injury claimants subsequently sued the transferee in state court,
alleging that the transferee was a "mere continuation" of the debtor and therefore liable for the
debtor's tort liabilities under a theory of successor liability.  *Id.*

72.    The bankruptcy court denied the transferee's motion to enforce the order approving

its settlement with the trustee, which the district court reversed on appeal.  The Third Circuit

affirmed the district court's reversal of the bankruptcy court, holding that the personal injury

claimants' successor liability claims against the transferee were property of the estate under New

Jersey law and were thus settled and released by the trustee.  *Id.* at 880–82, n.3.  The court

explained:

> As we observed in *Phar–Mor*, so, too, here it "may seem strange"
> to hold that a cause of action for successor liability against Aaroma
> is property of Emoral's bankruptcy estate. As a practical matter, it
> is difficult to imagine a factual scenario in which a solvent Emoral,
> outside of the bankruptcy context, would or could bring a claim for
> successor liability against Aaroma. Just as the purpose behind
> piercing the corporate veil, however, the purpose of successor
> liability is to promote equity and avoid unfairness, and it is not
> incompatible with that purpose for a trustee, on behalf of a debtor
> corporation, to pursue that claim.

*Id.* at 881 (internal citations omitted).

73.    In *Emoral*, the Third Circuit noted that it did not need to engage in a choice of law

analysis to determine whether to apply New Jersey or New York law because "the two states'

relevant applicable legal standards are identical[.]"  *Id.* at 879 n.2; *see also In re Keene Corp.*, 164

B.R. 844, 853 (Bankr. S.D.N.Y. 1994) ("[C]laims based upon successor liability should be asserted

by the trustee on behalf of all creditors."); *Cardinal Holdings, Ltd. v. Indotronix Int'l Corp.*, 73

A.D.3d 960, 962, 902 N.Y.S.2d 123, 126 (App. Div. 2010) ("[T]he cause of action seeking

recovery on the [New York State court] judgment under an alter-ego theory was the property of

the bankruptcy estate[.]"); *Corman v. LaFountain*, 38 A.D.3d 706, 708, 835 N.Y.S.2d 201, 203

(2007) ("[P]laintiff cannot maintain her alter ego claim outside of the bankruptcy proceedings . . .

[because] there was no showing in the record that the bankruptcy trustee abandoned the claim,

which therefore remains property of the bankruptcy estate[.]") (citing *St. Paul Fire & Marine Ins.*

*Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701-04 (2d Cir. 1989)).  Accordingly, a court applying New

York law would follow the Third Circuit's decision in *Emoral* in finding that Successor Liability

Claims are property of the estate.

74.     Similarly, "[u]nder Delaware law, a trustee possesses standing to bring—and by

logical extension, settle and release—an alter ego claim on behalf of a creditor of the debtor, as

long as the claim qualifies as a 'general' claim." *In re Tronox Inc.*, 855 F.3d 84, 104 (2d Cir. 2017)

(quoting *In re Alper Holdings USA, Inc.*, 398 B.R. 736, 759 (S.D.N.Y. 2008)).  For instance, in *In

re OODC*, a chapter 11 trustee commenced adversary proceedings seeking to undo a leveraged

buyout by which the debtor had acquired the assets of multiple companies. 321 B.R. 128, 136–7

(Bankr. D. Del. 2005).  The *OODC* court held that the trustee's claims implicated all of the

exceptions to the general rule against successor liability, and following the majority of courts, the

court ruled that the trustee had standing to bring successor liability and alter ego claims on behalf

of all creditors.  *Id.* at 137 ("most other courts have found that the trustee in bankruptcy has

standing to bring successor liability (or alter ego) suits on behalf of all creditors.") (citing *St. Paul,*

884 F.2d at 703–04); *see also In re Buildings by Jamie, Inc.*, 230 B.R. 36, 43 (Bankr. D.N.J. 1998)

("The majority of the courts in other jurisdictions that have addressed the issue of authority to

pursue an alter ego action on behalf of a corporate debtor have also held that the trustee has

standing.") (collecting cases).

75.     Accordingly, the Debtors had standing under applicable non-bankruptcy law to

bring Successor Liability Claims as of the Petition Date.

**B.      Successor Liability Claims Constitute "General" Claims**

76.     State law affords an individual creditor the right in some circumstances to recover

a claim against an entity from a third party based on alter ego and successor liability theories.  But

once that entity files for bankruptcy, the creditor's pursuit of the claim against the third party is

automatically stayed by section 362(a)(3) if it constitutes an act "to exercise control over" the same or similar claim that state law permits the debtor to assert generally on behalf of its creditors. When the individual creditor's claim against the third party is based on facts and legal theories "generally available" to the debtor's other creditors, the stay applies because the individual creditor's pursuit of the claim interferes with, and thus constitutes an act "to exercise control over," the same or similar claim that is property of the estate. Accordingly, an individual creditor's successor liability claim will be automatically barred by section 362(a)(3) unless it is based on facts and legal theories of liability that are "personal" and "unique" to that creditor. *Emoral*, 740 F.3d at 880; *Baillie Lumber*, 391 F.3d at 1321.

77.     "To distinguish general from personal claims," the Third Circuit focuses "not on the nature of the injury, but on the 'theory of liability.'" *Wilton*, 968 F.3d at 283 (quoting *Emoral*, 740 F.3d at 879). "A claim for an injury is personal to the creditor if other creditors generally have no interest in that claim." *Foodtown*, 296 F.3d at 170 (citing *Koch Refining*, 831 F.2d at 1348-49). Conversely, where a theory of recovery "would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors," the claim is general, not personal. *Emoral*, 740 F.3d at 881. "Only when a particular creditor suffers a direct, particularized injury that can be 'directly traced' to the defendant's conduct is the claim personal to that creditor and not property of the estate." *Wilton*, 968 F.3d at 283 (quoting *Tronox*, 855 F.3d at 100); *see also Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 89 (2d Cir. 2014). In undertaking this inquiry, the Court "should be focused on [the creditor]'s alter ego claim itself—not [the creditor]'s underlying claim" against the debtor. *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 619 (D. Del. 2018). "The case law demonstrates that an alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, *only if the*

*conduct that supports the claim is the same conduct that directly harmed the creditor in the underlying cause of action.*"*Labarbera v. United Crane & Rigging Servs, Inc.*, Nos. 08-CV-3274 (DLI)(ALC), 08-CV-3983 (DLI)(ALC), 2011 WL 1303146, at *7 (E.D.N.Y. March 2, 2011) (emphasis added).

78. Here, Successor Liability Claims are "general" and not "personal," because the facts and legal theories on which such claims are based could be asserted by any individual claimant. The fact that Tort Claims against the Debtors may be individualized does not alter the conclusion that Successor Liability Claims are generalized. As the Third Circuit explained in *Emoral*:

> To determine whether the Diacetyl Plaintiffs' cause of action against Aaroma constitutes property of Emoral's bankruptcy estate, we must examine the nature of the cause of action itself. While the Diacetyl Plaintiffs focus on the individualized nature of their personal injury claims against Emoral, we cannot ignore the fact, and fact it be, that their only theory of liability as against Aaroma, a third party that is not alleged to have caused any direct injury to the Diacetyl Plaintiffs, is that, as a matter of state law, Aaroma constitutes a 'mere continuation' of Emoral such that it has also succeeded to all of Emoral's liabilities. . . .
>
> The Diacetyl Plaintiffs fail to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors of Emoral. Likewise, they fail to demonstrate how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities. . . .
>
> Therefore, the District Court appropriately classified the cause of action as a generalized claim constituting property of the estate.

740 F.3d at 879-81; *accord Tronox*, 855 F.3d at 103 (agreeing with *Emoral* and holding that personal injury claimants' successor liability claim was "general" rather than "individualized," observing, "[t]hat the plaintiffs in *Emoral* had an underlying harm specific to them did not put the claims automatically outside the estate. Indeed, every creditor in bankruptcy has an individual

30

claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or otherwise.").

79.     The Second Circuit's analysis of the issue in *Tronox* is instructive here.  In that case, the court emphasized the "critical distinction between the underlying tort claim against" the debtors and the alter ego and successor liability claims against the newly created transferee that received assets from the debtors' predecessors.  855 F.3d at 107. In holding that the court below had "correctly classified the [tort claimants'] claims as generalized, derivative claims comprising estate property," the Second Circuit explained that:

> establishing the former [the underlying tort claim] would benefit only [the tort claimants] as individual creditors, whereas establishing the latter—that New Kerr-McGee is the alter ego of the relevant Tronox debtors and should therefore be charged with all its liabilities—would benefit all creditors of the Tronox debtors generally. *The facts necessary to prove that the Tronox debtors committed the underlying torts may be particular to the [tort claimants], but the facts necessary to impute that liability to New Kerr-McGee 'would be . . . generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors.'*

*Tronox*, 855 F.3d at 107 (quoting *Emoral*, 740 F.3d at 881) (emphasis added).  The court in *Tronox* emphasized that, "[i]n distinguishing derivative claims from particularized claims exclusive to individual creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy." 855 F.3d at 100.  "In other words," the court explained, "we are wary of putting form over substance. Thus, we 'inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted.'" *Id.* (citations omitted).

80.     Enforcing the automatic stay to prevent individual creditors from pursuing Successor Liability Claims is essential to provide the Debtors with control over the assets available for distribution to all claimants.  As the Second Circuit pointed out in *Tronox*, preserving the

estate's control over such claims not only ensures a fair distribution, but also promotes the efficient

resolution of those causes of action, which are part of the debtor's estate:

> The whole point of channeling claims through bankruptcy is to
> avoid creditors getting ahead of others in line of preference and to
> promote an equitable distribution of debtor assets. That is why, after
> a company files for bankruptcy, creditors lack standing to assert
> claims that are estate property. Instead, the trustee is conferred the
> right to recover for derivative, generalized claims; only the estate is
> charged with ensuring equitable distribution of estate assets and
> preventing individual creditors from pursuing their own interests
> and thus diminishing the res available to the rest of the creditors.
> Even more, it encourages, as it did here, orderly settlements—an
> interest not taken lightly.

855 F.3d at 106 (internal citations omitted).

81.    Like the claims at issue in the *Emoral* and *Tronox* cases, Successor Liability Claims

are based on facts and theories generally available to the Debtors' other claimants and therefore

constitute property of the Debtors' estates for which the Debtors have sole standing to pursue or

compromise while the Chapter 11 Cases are pending. *Wilton*, 968 F.3d at 280 ("[O]nce a cause of

action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee,

the statutory authority to pursue it."). Section 362(a)(3) of the Bankruptcy Code prohibits "any act

to obtain possession of property of the estate or of property from the estate or to exercise control

over property of the estate[.]"  11 U.S.C. § 362(a)(3).  It is well established that when claims

against a non-debtor "are property of the estate under section 541(a), any similar extraneous

lawsuits brought by individual creditors will be subject to the automatic stay provision of 11 U.S.C.

§ 362(a)(3)." *Baillie Lumber*, 391 F.3d at 1319.

82.    There is no genuine dispute of material fact concerning the Debtors' ownership of

Successor Liability Claims under section 541(a) or that the commencement, continuation, or

settlement or such claims is barred by the automatic stay under section 362(a)(3).  The Debtors are

entitled to summary judgment on the declaratory relief sought in Counts I and IV of the Complaint.

## II.  Extension of the Automatic Stay to Successor Liability Claims is Warranted Under the Circumstances

83.    In the event the Court determines that Successor Liability Claims are not property of the Debtors' estates, and thus are not automatically stayed, the Debtors are entitled to an extension of the automatic stay as to such claims.  Because there are no material disputes of fact as to the Debtors' entitlement to the requested stay extension, summary judgment is also proper on Count II's stay extension request.

84.    Section 362(a) of the Bankruptcy Code provides for an automatic stay of, among other things, the commencement or continuation of a proceeding against the debtor that was or could have been commenced prepetition, or to recover a claim against the debtor that arose prepetition, as well as any act to obtain possession of or control over property of the debtor's estate.  *See* 11 U.S.C. § 362(a)(1), (3).  The Third Circuit has held that the purpose of the automatic stay is:

> (1) to protect the debtor, by stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a respite from creditors and a chance 'to attempt a repayment or reorganization plan or simply be relieved of the financial pressures that drove him [or her] into bankruptcy;' and (2) to protect 'creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors.'

*In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) (citations omitted); *see also McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 511 (3d Cir. 1997) (one purpose of section 362 is "to centralize all prebankruptcy civil claims against a debtor in the bankruptcy court.").

85.    "Although the scope of the automatic stay is broad, its protections typically apply only to debtors, not nondebtor defendants."  *See LTL Mgmt., LLC*, 638 B.R. at 299; *see also Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006) ("The scope of the automatic stay is broad and covers all proceedings against a debtor, including arbitration.").

86.     Nonetheless, bankruptcy courts have entered orders extending the automatic stay to non-debtors in "unusual circumstances" such as where "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." *Philadelphia Newspapers*, 407 B.R. at 616; *see also McCartney*, 106 F.3d at 510; *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986).

87.     Each of these "unusual circumstances" is present and the Debtors' request to extend the automatic stay to Successor Liability Claims is warranted as a matter of law.  There can be no reasonable dispute that an identity of interest between the Debtors and the Protected Parties exists with respect to Successor Liability Claims given that such claims are predicated on the Debtors' operations prior to the 2004 Transactions.  There can also be no reasonable dispute that the commencement, continuation, or settlement of Successor Liability Claims would adversely impact the Debtors' efforts to comprehensively resolve their liabilities in these Chapter 11 Cases.

**A.      There is an Identity of Interest Between the Debtors and the Protected Parties with Respect to Successor Liability Claims**

88.     An identity of interest "arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Robins*, 788 F.2d at 999; *accord McCartney*, 106 F.3d at 510–11 (concluding that the automatic stay extended to enjoin an action against a non-debtor third party where the debtor "was, in essence, the real party in interest" in the pursuit of a deficiency judgment against the third party).

89.     In *LTL Management*, this Court held that there was an identity of interest between the debtor in that case and the non-debtor co-defendants such that the talc claims sought to be stayed were effectively suits against the debtor because "the talc claims against the Protected

34

**JA72**

Parties involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor." 638 B.R. at 306; *see also W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 30 (Bankr. D. Del. 2008) (finding an identity of interest between a debtor and a non-debtor where the debtor's conduct or product was "at the core of the issues raised" in actions against the non-debtor).

90.     Here, Successor Liability Claims are premised on the Debtors' operations prior to the sale of substantially all of their operating assets pursuant to the 2004 Transactions. As such, the adjudication of these claims requires an initial determination of the Debtors' liability on account of stayed Tort Claims and would require the Debtors to defend themselves outside of these Chapter 11 Cases.

91.     The Debtors' indemnification obligations also give rise to an identity of interest with certain Protected Parties. Importantly, the indemnification claims need not be "absolute" but, as this Court explained in *LTL Management*, "the mere possibility of indemnification obligations warrants extension of the automatic stay." 638 B.R. at 312. The Debtors may have significant indemnification obligations in favor of certain parties with respect to Successor Liability Claims. *See* MSPA, §§ 10.1, 10.9, 12.1, 12.2. Any adverse judgment or settlement of Successor Liability Claims could potentially result in significant Indemnification Claims against the Debtors.

92.     Accordingly, there is an identity of interest between the Debtors and Protected Parties with respect to Successor Liability Claims.

**B.     The Commencement, Continuation, and Settlement of Successor Liability Claims Will Adversely Impact the Debtors**

93.     "[A] critical factor in deciding whether to extend the stay is the potential adverse impact on a debtor's estate[.]" *LTL Mgmt.*, 638 B.R. at 306. In *LTL Management*, this Court held that "continued litigation against the Protected Parties would liquidate pending tort claims, as well

35

**JA73**

as indemnification claims, against Debtor outside of chapter 11 . . . frustrating the purpose of the automatic stay." *Id.* at 307.

94.    Similarly, many of the same facts that give rise to an identity of interest between the Debtors and the Protected Parties demonstrate the adverse impact on the Debtors' estates posed by the commencement, continuation, and settlement of Successor Liability Claims.  For instance, any adverse judgment against or settlement with the Protected Parties outside of the Chapter 11 Cases may give rise to Indemnification Claims against the Debtors.

95.    The Debtors also face significant risk that state court findings and judgments on Successor Liability Claims could bind the Debtors or impact their liability on Tort Claims under the doctrines of collateral estoppel and *res judicata*.  This risk is underscored by the fact that collateral estoppel has been applied offensively by litigants who were not parties to the prior litigation. *See*, *e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (allowing offensive use of collateral estoppel to prevent a corporation from defending against the stockholder class action of plaintiffs who were not parties to prior SEC litigation against the corporation).  Tort Claimants may seek to use adverse judgments or settlements of Successor Liability Claims to establish liability against the Debtors for Tort Claims.  Under these circumstances, the Debtors would be required to actively defend Successor Liability Claims, even as they attempt to simultaneously negotiate a comprehensive resolution of such claims in these Chapter 11 Cases. *See* Meghji Declaration. ¶¶ 21-22.

96.    Courts have consistently concluded that the risks of collateral estoppel and *res judicata* warrant a stay of third-party litigation that thwarts the purposes of the automatic stay. *See*, *e.g.*, *LTL Mgmt.*, 638 B.R. at 313-17 ("Debtor contends that permitting continued litigation against the Protected Parties 'creates risks of binding the Debtor through res judicata and collateral

estoppel, and creating an evidentiary record that prejudices the Debtor.' The Court agrees."); *see also In re Bestwall LLC*, 606 B.R. 243, 256 (Bankr. W.D.N.C. 2019), *aff'd*, No. 3:20-CV-103-RJC, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168 (4th Cir. 2023), and *aff'd*, No. 3:20-CV-105-RJC, 2022 WL 68763 (W.D.N.C. Jan. 6, 2022), and *aff'd*, 71 F.4th 168 (4th Cir. 2023) (determining that the risks posed by the doctrines of res judicata and collateral estoppel, among other factors, warrant a preliminary injunction of litigation against non-debtor affiliates); *In re Sudbury, Inc.*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); *In re Johns-Manville Corp.*, 26 B.R. 420, 429 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984), and *appeal allowed, decision vacated in part on other grounds*, 41 B.R. 926 (S.D.N.Y. 1984) (concluding that the risk of collateral estoppel would irreparably injure the estate and, thus, issuance of a stay of claims against non-debtors was warranted); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850-55 (Bankr. D. Del. 1994) (staying claims against debtor's directors and holding that a potential finding of liability against such directors would be based on acts undertaken by directors as agents of the debtor and therefore would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions).

97.    The same concerns warrant extension of the stay here.  If allowed to pursue Successor Liability Claims, the Defendants would litigate the same key facts—involving the same products, time periods, and alleged injuries—related to the Debtors' asbestos and environmental liabilities that are at issue with respect to the Tort Claims.  Accordingly, any rulings or findings regarding Successor Liability Claims may bind the Debtors or impact their liability on Tort Claims.

This result would frustrate the Debtors' efforts to resolve the Tort Claims and Successor Liability Claims in the Chapter 11 Cases and would undermine the effect of the automatic stay.

98. Beyond the potential consequences of collateral estoppel and *res judicata*, litigation of Successor Liability Claims would allow parties to use statements, testimony and other evidence generated in those proceedings in connection with the separate prosecution of Tort Claims against the Debtors. The burden of protecting against evidentiary prejudice was part of the justification for extending the automatic stay in *LTL Management*. *See* 638 B.R. at 317 ("As stated previously, the risk that litigation against the Protected Parties could result in adverse consequences for Debtor—such as record taint—weighs in favor of extending the automatic stay."). In support of this conclusion, the Court cited favorably to a number of Third Circuit decisions and bankruptcy cases within the Third Circuit. *See, e.g., In re W.R. Grace & Co.*, 115 F. App'x 565, 569 n.4 (3d Cir. 2004) (citing *In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) and acknowledging a risk that the evidentiary record created in a case against a nondebtor could later be used in a case against the debtor); *Healthcor Offshore Master Fund, L.P. v. Mallinckrodt plc (In re Mallinckrodt PLC)*, Adv. Pro. No. 20-50850-JTD, 2021 WL 5275781, at *2 (D. Del. Nov. 10, 2021) (denying leave to file interlocutory appeal of order extending preliminary injunction because bankruptcy court appropriately performed "unusual circumstances" test and held that continued proceedings created "significant risk" of, among other thing, record taint); *W.R. Grace & Co.*, 386 B.R. at 35 ("Under this 'broader view of the potential impact on the debtor,' this court takes into account the risks of collateral estoppel and record taint.").

99. Finally, the continued prosecution of Successor Liability Claims minimizes the incentive for all parties to participate in a comprehensive resolution of these Chapter 11 Cases, as evidenced by the Tort Claimants' continued prosecution of Successor Liability Claims against

Brenntag postpetition.  Continued prosecution and piecemeal settlements of Successor Liability Claims would also divert funds and resources towards defense costs and diminish funds available to comprehensively resolve the Tort Claims, Successor Liability Claims, and Indemnification Claims.  *Cf. LTL Mgmt.*, 638 B.R. at 307; First Day Declaration, ¶ 43 ("The Debtors' goal in these chapter 11 cases is to negotiate and ultimately confirm a plan that would, among other things, establish and fund claims trusts to resolve current and future Liabilities pursuant to sections 524(g) and 105(a) of the Bankruptcy Code.").

100.    There is no genuine dispute of material fact that extension of the automatic stay to prohibit the commencement, continuation, and settlement of Successor Liability Claims is warranted under the circumstances present in these Chapter 11 Cases.  The Debtors are entitled to relief on Count II of the Complaint as a matter of law, in the alternative.[19]

## NOTICE

101.    Consistent with Paragraph 18 of the Case Management Order,[20] notice of this Motion is being provided to: (i) the Office of the United States Trustee for Region 3; (ii) the Defendants in this Adversary Proceeding (through their counsel, if known);[21] (iii) counsel for the Committee and the Committee's co-chairs; (iv) the Protected Parties; (v) the Future Claimants' Representative and its counsel; and (vi) any other person or entity listed on the Core Service List (as defined in the Case Management Order).

---

[19]  Because Count II is being pled in the alternative, the Proposed Order does not include a provision for granting summary judgment on Count II.

[20]  *See Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 67] (the "**Case Management Order**").

[21]  Consistent with the relief requested in the *Debtors' Expedited Ex Parte Motion for Approval of Service Procedures for Summons, Complaint, and Other Initial Pleadings* filed contemporaneously herewith, the Debtors served this Motion on Defendants that constitute Talc Claimants (as defined in such motion) through their counsel.

## **CONCLUSION**

For the reasons discussed above, the Debtors are entitled to summary judgment with respect to Counts Count I, II, and IV of the Complaint.  A proposed form of order granting the Debtors' requests for summary judgment on these Counts, which the Debtors request be entered, is attached hereto as **Exhibit A**.

Dated: September 7, 2023

*/s/ Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:  msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com

-and-

Seth Van Aalten, Esq. (pro hac vice pending)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone:  (212) 752-8000
Email: svanaalten@coleschotz.com
           adeleo@coleschotz.com

-and-

G. David Dean, Esq. (pro hac vice pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Email:        ddean@coleschotz.com

*Counsel to the Debtors*
*And Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

      Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND PIGMENT
SOLUTIONS, INC., THOSE PARTIES LISTED ON
APPENDIX A TO THE COMPLAINT, and JOHN
AND JANE DOES 1-1,000,

      Defendants.

Adv. Proc. No. 23-01245 (MBK)

## NOTICE OF HEARING ON DEBTORS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO COUNTS I, II, AND IV OF THE COMPLAINT

2

**JA80**

PLEASE TAKE NOTICE that on **October 3, 2023 at 11:00 a.m. (ET)**, or as soon thereafter as counsel can be heard, the above-captioned debtors and debtors in possession (the "**Debtors**") by and through their undersigned counsel, shall move (the "**Motion**") before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, New Jersey 08608 (the "**Bankruptcy Court**"), for entry of an order granting summary judgment in favor of the Debtors on Counts I, II and IV of the complaint [Adv. Proc. Docket No. 1] (the "**Complaint**") in the above-captioned adversary proceeding.

PLEASE TAKE FURTHER NOTICE that the Motion sets forth the relevant legal and factual bases upon which the relief requested therein should be granted.  A proposed Order granting the relief requested in the Motion is also submitted herewith.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the relief requested in the Motion shall: (i) be in writing, (ii) state with particularity the basis of the objection; and (iii) be filed with the Clerk of the Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the (a) *Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 67] (the "**Case Management Order**") and (b) *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "General Order") and the *Commentary Supplementing Administrative Procedures* dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary, and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the Case Management

3

**JA81**

Order, the General Order and the Supplemental Commentary, so as to be received no later than seven (7) days before the hearing date set forth above.

        **PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto, Inc. at https://cases.stretto.com/whittaker.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

        **PLEASE TAKE FURTHER NOTICE** that, unless responses are timely and properly filed and served, the Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d), and the relief requested may be granted without further notice or hearing.

**JA82**

Dated: September 7, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

-and-

Seth Van Aalten, Esq. (*pro hac vice pending*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone:  (212) 752-8000
Email:      svanaalten@coleschotz.com
            adeleo@coleschotz.com

-and-

G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Email:      ddean@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

5

**JA83**

**Exhibit A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

(Page 2)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors

| | |
|---|---|
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC.,<br><br>       Plaintiffs,<br><br>v.<br><br>BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000,<br><br>       Defendants. | Adv. Proc. No. 23-01245 (MBK) |

## ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEBTORS AND DECLARING THAT SUCCESSOR LIABILITY CLAIMS ARE PROPERTY OF THE DEBTORS' ESTATES

The relief set forth on the following pages, numbered three (3) through six (6), is

**ORDERED**.

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors

This matter coming before the Court on the *Debtors' Motion for Summary Judgment With Respect to Counts I, II, and IV of the Complaint* [Adv. Dkt. __] (the "**Motion**");[2] and the Court having considered (i) the submissions of the parties, the Motion, the Meghji Declaration (including the incorporated First Day Declaration), and the responses, objections and replies in respect of the Motion, (ii) the arguments set forth on the record at a hearing held on _____ __, 2023, and (iii) the evidence submitted by the parties, including declarations, testimony and exhibits filed with or presented to the Court, the Court finds and concludes as follows:

### Background, Jurisdiction, and Venue

A.    For purposes of this Order, the term "**Tort Claim**" shall mean: (i) existing and future tort claims against the Debtors alleging injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest; and (ii) environmental litigation against the Debtors relating to the production or handling of hazardous materials which allegedly contaminated certain properties.

B.    For purposes of this Order, the term "**Successor Liability Claim**" shall mean any claim against a non-Debtor entity seeking to establish such entity's liability for Tort Claims on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors.

C.    The Debtors seek a declaration that Successor Liability Claims are property of the Debtors' estates for which the Debtors have sole standing to pursue or compromise while the Chapter 11 Cases are pending and which are subject to the automatic stay provisions set forth in section 362(a)(3) of the Bankruptcy Code.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

(Page 4)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors

D.     The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   Pursuant to

Bankruptcy Rule 7008, the Debtors have consented to the entry of final orders or a final judgment

by this Court in the Adversary Proceeding.   Venue for this matter is proper in this District pursuant

to 28 U.S.C. § 1409.

### Request for Declaratory Relief

E.     The Court finds and concludes that Successor Liability Claims constitute property

of the Debtors' estates for which the Debtors have sole standing to pursue and compromise while

the Chapter 11 Cases are pending, and which are subject to the automatic stay provisions set forth

in section 362(a)(3) of the Bankruptcy Code.

F.     In that regard, the Court specifically finds that: (1) on the Petition Date, the Debtors

had standing to pursue Successor Liability Claims under applicable non-bankruptcy law; and

(2) Successor Liability Claims constitute "general claims" available to the applicable Debtor's

entire creditor body because both the successor and alter ego theories of recovery are based on

facts generally available to any such creditor, and recovery on account of such claims would serve

to increase the pool of assets available to all creditors of the applicable Debtor.

G.     The legal and factual bases set forth in the Complaint, the Motion, the Meghji

Declaration (including the incorporated First Day Declaration), and at the Hearing establish just

cause for the relief granted herein.

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors

**Based on these findings and conclusions, IT IS HEREBY ORDERED THAT:**

1.        Summary judgment is **GRANTED** in favor of the Debtors with respect to Counts I and IV of the complaint filed in the Adversary Proceeding**,** and the Adversary Proceeding is resolved in favor of the Debtors.  All objections to the relief granted herein are **OVERRULED**.

2.        The Court finds and declares that Successor Liability Claims constitute property of the applicable Debtor's estate.  Accordingly, each Debtor has sole standing to pursue and compromise Successor Liability Claims that constitute property of its estate while its Chapter 11 Case is pending, and such claims are subject to the automatic stay provisions set forth in section 362(a)(3) of the Bankruptcy Code.

3.        The Debtors shall cause a copy of this Order to be served via e-mail, facsimile, hand delivery or overnight carrier on counsel for the known Defendants, counsel for the Committee, the Protected Parties, the Office of the United States Trustee, and the parties listed on the Core Service List (as defined in the Case Management Order)[3] within three business days of its entry on the Court's docket.

4.        The requirement set forth in D.N.J. LBR 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

5.        The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

---

[3] *See Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 67] (the "**Case Management Order**").

(Page 6)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors

6.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

7.    The terms and conditions of this Order shall be effective immediately upon its entry.

8.    The Court shall have exclusive jurisdiction over this Order and any and all matters arising from or relating to the implementation, interpretation, or enforcement of this Order.

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (*pro hac vice* pending)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

| | |
|---|---|
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC., | |
| Plaintiffs, | Adv. Proc. No. 23-01245 (MBK) |
| v. | |
| BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000, | |
| Defendants. | |

### DECLARATION OF MOHSIN Y. MEGHJI, CHIEF RESTRUCTURING OFFICER OF WHITTAKER, CLARK & DANIELS, INC., IN SUPPORT OF DEBTORS' SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION MOTIONS

I, Mohsin Y. Meghji, hereby declare under penalty of perjury:

### Introduction

1.     I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and plaintiffs in the above-captioned adversary proceeding (the "**Adversary Proceeding**") and a Managing Partner of M3 Partners, LP ("**M3 Partners**"), the Debtors' restructuring advisor.

2.     I submit this declaration (this "**Declaration**") in support of the: (1) *Debtors' Motion for an Order Preliminarily Enjoining Certain Actions Against Non-Debtors* [Adv. Proc. Docket

No. 2] (the "**Preliminary Injunction Motion**"); and (2) *Debtors' Motion for Summary Judgment with Respect to Counts I, II, and IV of the Complaint* [Adv. Proc. Docket 3] (the "**Summary Judgment Motion**" and, together with the Preliminary Injunction Motion, the "**Motions**") filed by the Debtors in the Adversary Proceeding contemporaneously herewith.

3.        As Chief Restructuring Officer, I am generally familiar with the Debtors' historical businesses, financial condition, policies and procedures, claims management operations, books and records, and Chapter 11 Cases, as well as the Tort Claims asserted against the Debtors and the Successor Liability Claims (each as defined below) asserted against Brenntag.  The statements in this Declaration are based upon my personal knowledge, information, and belief.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## The Chapter 11 Cases

4.        The Debtors commenced the Chapter 11 Cases on April 26, 2023 (the "**Petition Date**").  On the Petition Date, I submitted the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "**First Day Declaration**").[2]  The First Day Declaration also supports the Motions, and I incorporate it by reference herein.  I now submit this Declaration to provide additional facts in support of the Motions.

5.        Since the Petition Date, the Debtors have operated their businesses and managed their property as debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**").  On May 24, 2023, the United States Trustee for the District of New Jersey appointed an official committee of talc claimants pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 121].

---

[2]  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the First Day Declaration and the Motions, as applicable.

6.      The Debtors commenced the Chapter 11 Cases to address and fairly resolve the following claims in an effective, efficient, and centralized forum under the Bankruptcy Code: (i) existing and future tort claims against the Debtors alleging injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest (the "**Asbestos Claims**," and such claimants, the "**Asbestos Claimants**"); (ii) environmental litigation against the Debtors relating to the production or handling of hazardous materials which allegedly contaminated certain properties[3] (the "**Environmental Claims**," and such claimants, the "**Environmental Claimants**," and together with the Asbestos Claims and Asbestos Claimants, the "**Tort Claims**" and "**Tort Claimants**," respectively); (iii) claims against certain non-Debtor entities seeking to establish such entities' liability for Tort Claims on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors (the "**Successor Liability Claims**"); and (iv) indemnification or contribution claims against the Debtors with respect to any Successor Liability Claim (the "**Indemnification Claims**").[4]

7.      Following the Petition Date, the Debtors filed notices of suggestion of bankruptcy (the "**Bankruptcy Notices**") on the dockets of pending Tort Claims against the Debtors.  The Bankruptcy Notices informed the applicable courts and the parties about the commencement of the Chapter 11 Cases and the application of the automatic stay to the assertion of Tort Claims against the Debtors.

---

[3] For the avoidance of doubt, by the Adversary Proceeding, the Debtors are not seeking to stay or enjoin the negotiation of any Remedial Action Plan ("**RAP**") with respect to any Environmental Claim or any responsible party's obligation to perform in connection with any agreed upon RAP.

[4] Nothing in this Declaration shall constitute an admission as to the validity, extent, or priority of any Indemnification Claim asserted against the Debtors.  The Debtors reserve all rights and defenses as to such claims.

8.      Since commencing their Chapter 11 Cases, the Debtors have defeated a motion to dismiss the Chapter 11 Cases (*see* Docket No. 211)[5] and obtained the appointment of a future claims representative (*see* Docket No. 231). The Debtors are committed to engaging with claimant representatives and key stakeholders to consensually resolve the Chapter 11 Cases, including through a mediation process. As set forth in the Debtors' *Schedules of Assets and Liabilities*,[6] the Debtors had combined cash and cash equivalents of approximately $76 million as of the Petition Date. The Debtors intend to use these funds, as well as any funds contributed by the Protected Parties as part of a comprehensive resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims, to fund these Chapter 11 Cases, including through a plan that equitably and finally resolves the Debtors' asbestos and environmental liabilities. Accordingly, I believe there is a strong likelihood of a successful outcome in these cases.

## The Adversary Proceeding, the Motions, and the Relief Sought Therein

9.      On the date hereof, the Debtors commenced the Adversary Proceeding by filing the *Debtors' Verified Complaint for Declaratory and Injunctive Relief (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Extending the Automatic Stay to Certain Actions Against Non-Debtors, (III) Preliminarily Enjoining Such Actions, and (IV) Declaring that Successor Liability Claims are Property of the Debtors' Estates* [Adv. Proc. Docket No. 1] (the "**Complaint**") and the Motions.

10.     In the Complaint, the Debtors seek a declaration that section 362(a) of the Bankruptcy Code prohibits the commencement, continuation, or settlement of any action by the

---

[5] The Order denying the motion to dismiss is currently on appeal. *See* Docket Nos. 246, 247, 248.

[6] *See* Docket Nos. 134, 135, 136, 137.

defendants in the Adversary Proceeding (collectively, the "**Defendants**")[7] seeking to hold the

Protected Parties liable for Successor Liability Claims either because the automatic stay applies to

such claims by its express terms or because "unusual circumstances" warrant an extension of the

automatic stay to such claims. The Debtors also seek a declaration that Successor Liability Claims

are property of the Debtors' estates which the Debtors have sole standing to pursue and

compromise for the benefit of all creditors while the Chapter 11 Cases are pending. Successor

Liability Claims are key estate assets that must be preserved for the benefit of all creditors in these

cases, rather than pursued by individual plaintiffs for their own private benefit. A global resolution

of Successor Liability Claims, along with the Tort Claims and Indemnification Claims, is essential

to a successful outcome in the Chapter 11 Cases. By the Summary Judgment Motion, the Debtors

seek summary judgment as to the declaratory relief sought in the Complaint.

11.    In addition to declaratory relief, Count III of the Complaint and the Preliminary

Injunction Motion seeks an injunction under section 105(a) of the Bankruptcy Code enjoining the

commencement, continuation, and settlement of Successor Liability Claims against the Protected

Parties while the Chapter 11 Cases are pending.

**The 2004 Transactions, Ensuing Litigation, and the Parties to the Adversary Proceeding**

12.    Defendant Brenntag acquired substantially all of the operating assets of Debtors

WCD, Brilliant, and Soco in connection with the 2004 Transactions. Brenntag is a named

---

[7] The Defendants include Brenntag and plaintiffs or potential plaintiffs in lawsuits that seek to hold, or may seek to hold, one or more of the Protected Parties (defined below) liable for Successor Liability Claims. These Defendants, with the exception of Brenntag and the John and Jane Doe Defendants, are listed in Appendix A to the Complaint. Appendix A identifies the civil action number (where available) for each lawsuit and the law firm representing each of the Defendants on account of their claims. The Debtors reserve the right to supplement, amend, or otherwise modify Appendix A. For the avoidance of doubt, the inclusion of a lawsuit on Appendix A is not an admission that such Defendant holds a valid claim against either the Debtors or the Protected Parties (defined below). The Debtors are only seeking to prohibit Brenntag from settling Successor Liability Claims because, upon information and belief, Brenntag is the only Protected Party that has been sued on account of Successor Liability Claims to date. The Debtors reserve the right to seek additional relief as to other Protected Parties in the future.

defendant in a substantial number of actions alleging Successor Liability Clams, many of which also allege Tort Claims against the Debtors.

13.     Each named Defendant listed in <u>Appendix A</u> to the Complaint is a plaintiff in a pending Tort Claim against one or more Debtors or Successor Liability Claim against Brenntag.

14.     Each of Defendants John and Jane Does 1-1,000 is a prospective plaintiff who, absent the relief requested in the Complaint and Motions, might seek to commence a Successor Liability Claim against one or more Protected Parties during the pendency of the Chapter 11 Cases.

15.     The Protected Parties include: (i) certain of the Debtors' non-debtor affiliates (*i.e.,* Berkshire Hathaway, Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company, Resolute Management, Inc. and Ringwalt & Liesche Co.); and (ii) Brenntag and other non-Debtors that have been or may be alleged to be successors to, or alter egos of, the Debtors, as well as certain third-parties who may have contractual or common law indemnification rights against the Debtors for Successor Liability Claims (*i.e.,* Bain Capital, Brenntag AG, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, Mineral and Pigment Solutions, Inc., and Mineral Pigment Solutions, Inc.).[8]

16.     Based on a review of approximately 1,500 complaints alleging Tort Claims against the Debtors or Successor Liability Claims against Brenntag performed at my direction and under my supervision, approximately 1,000 name Brenntag as a defendant based on a theory that it is an alleged successor to, or alter ego of, the Debtors.  While the Debtors conceptually have no issue

---

[8] The Debtors reserve the right to seek to supplement, amend, or otherwise modify the list of Protected Parties.

with the commencement, continuation, or settlement of claims against Brenntag that are independent of its association with the Debtors (*i.e.*, claims alleging injury resulting from business operations conducted by Brenntag following the 2004 Transactions for which the Debtors do not owe indemnification obligations), the Debtors have not identified a single complaint that differentiates such claims from claims against Brenntag related to its association with the Debtors (*i.e.*, Successor Liability Claims for which the Debtors may owe indemnification obligations to Brenntag).

17.  Subsequent to the Petition Date, at least 23 complaints alleging Successor Liability Claims against Brenntag have been filed.  Based on a review of these complaints performed at my direction and under my supervision, none differentiate as between Successor Liability Claims and claims against Brenntag that are independent of its association with the Debtors.

18.  Moreover, plaintiffs have continued to prosecute existing Successor Liability Claims against Brenntag during the pendency of these Chapter 11 Cases.  For example, in April 2022, Brenntag and the plaintiff in an action styled *Corey Tippin v. Brenntag Specialties, et al.*, Case No. 190062/2021 currently pending in the Supreme Court of New York (the "**Tippin Action**") stipulated to stay the prosecution of Successor Liability Claims unless and until WCD failed to satisfy a final judgment or filed for bankruptcy protection.[9]  On August 16, 2023, plaintiff filed a second amended complaint to proceed with the prosecution of  Successor Liability Claims against Brenntag Specialties, LLC and Brenntag North America, Inc.  A true and correct copy of this second amended complaint is attached hereto as Exhibit A.

19.  Brenntag also recently settled two Successor Liability Claims in advance of upcoming trials that were continuing postpetition.  On August 2, 2022, the Honorable Laura A.

---

[9]  The Debtors are not party to this stipulation.

Seigle of the Superior Court of the State of California for the County of Los Angeles entered a

Minute Order in an action styled *Alloway v. Almay, Inc., et al.*, Case No. 22STCV14241 (the

"**Alloway Action**") that scheduled a jury trial against Brenntag to begin on September 11, 2023.

A true and correct copy of the complaint initiating the Alloway Action is attached hereto as

Exhibit B.  A true and correct copy of the above-referenced Minute Order in the Alloway Action

is attached hereto as Exhibit C.  Brenntag settled the Successor Liability Claims in the Alloway

Action on or about August 11, 2023.

20.     On March 16, 2023, the Honorable Jean H. Toal of the Court of Common Pleas for

the Fifth Judicial Circuit in the State of South Carolina entered an Order continuing trial against

Brenntag in the action styled *Kelly Payne Clark and Shannon Payne Clark, as Co-Executors of*

*the Estate of Shelby Linville Payne v. 3M Company, et al.*, Case No. 2022-CP-40-01281 (the

"**Payne Action**") to August 28, 2023.  A true and correct copy of the complaint initiating the Payne

Action is attached hereto as Exhibit D.  A true and correct copy of the above-referenced Order in

the Payne Action is attached hereto as Exhibit E.  Brenntag settled the Successor Liability Claims

in the Payne Action on or about August 11, 2023.

### The Debtors' Need for Declaratory and Injunctive Relief

21.     The commencement, continuation, and settlement of Successor Liability Claims

against the Protected Parties in the tort system would harm the Debtors' efforts in these Chapter

11 Cases.  Permitting the Defendants to liquidate claims against the Debtors through prosecution

or settlement of Successor Liability Claims outside of this Court would disrupt the Debtors' efforts

to comprehensively resolve all Tort Claims, Successor Liability Claims, and Indemnification

Claims in these Chapter 11 Cases.

22.     Without immediate injunctive relief, the Debtors will be compelled to pull key estate resources and personnel away from the Chapter 11 Cases and actively defend Successor Liability Claims against the Protected Parties, even as they attempt to resolve these very same claims in the Chapter 11 Cases.

23.     Based on the foregoing, there is significant risk that the following will continue or occur in the absence of the relief requested in the Motions:

   a.   Defendants who have asserted Successor Liability Claims against Brenntag have contended or will contend that the automatic stay applies only to the Debtors and will attempt to continue prosecuting such claims against Brenntag outside of the Chapter 11 Cases;

   b.   Defendants who have sued only the Debtors will seek to amend their complaints to name one or more of the Protected Parties and prosecute Successor Liability Claims against those Protected Parties outside of the Chapter 11 Cases;

   c.   Defendants who have pending motions to amend their complaints to add Successor Liability Claims will continue to pursue those amendments in an effort to proceed with litigation against the Protected Parties outside of the Chapter 11 Cases; and

   d.   Defendants John and Jane Does 1-1,000 will commence Successor Liability Claims against the Protected Parties without naming the Debtors.

**<u>Authentication of Certain Additional Documents Referenced in the Motions</u>**

24.     The Motions reference a number of corporate transactional documents related to 2004 Transactions and the 2007 NICO Equity Sale, the substance of which is not discussed in this Declaration.

25.     A true and correct copy of the MSPA without ancillary documents is attached hereto as <u>Exhibit F</u>.

26.     A true and correct copy of the 2004 Soco APA without ancillary documents is attached hereto as <u>Exhibit G</u>.

27.     A true and correct copy of the 2004 WCD APA without ancillary documents is attached hereto as <u>Exhibit H</u>.

28.     A true and correct copy of the Brilliant APA without ancillary documents is attached hereto as <u>Exhibit I</u>.

29.     A true and correct copy of the 2007 SPA without ancillary documents is attached hereto as <u>Exhibit J</u>.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 7, 2023                    */s/ Mohsin Meghji*
                                            Mohsin Meghji
                                            Chief Restructuring Officer
                                            Brilliant National Services, Inc.

**JA101**

**Exhibit A**

Second Amended Tippin Complaint

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x          **Index No. 190062/2021**

COREY G. TIPPIN                                                **SUMMONS AND**
                                                               **SECOND AMENDED**
             Plaintiff,                                        **COMPLAINT**

        -against-

3M COMPANY,
    f/k/a MINNESOTA MINING AND
    MANUFACTURING COMPANY;
ALCAT, INCORPORATED;
AMERICAN INTERNATIONAL INDUSTRIES;
AVON PRODUCTS, INC.;
BLOCK DRUG COMPANY, INC. ind. and as
        successor-in-interest to the GOLD BOND
        STERILIZING POWDER COMPANY, a/k/a
        THE GOLD BOND COMPANY;
BLOCK DRUG CORPORATION ind. and as
        successor-in-interest to the GOLD BOND
        STERILIZING POWDER COMPANY, a/k/a
        THE GOLD BOND COMPANY;
BOURJOIS, LTD.;
BRENNTAG NORTH AMERICA, INC.
    individually and as successor-in-interest to
    MINERAL PIGMENT SOLUTIONS, INC. and
    WHITTAKER CLARK & DANIELS, INC.;
BRENNTAG SPECIALTIES, LLC
    f/k/a BRENNTAG SPECIALTIES, INC. f/k/a
    MINERAL PIGMENT SOLUTIONS, INC. as
    successor-in-interest to WHITTAKER CLARK
    & DANIELS, INC.;
BRISTOL-MYERS SQUIBB COMPANY
    individually and as successor-in-interest to
    CHARLES OF THE RITZ GROUP LTD.;
CHANEL, INC.;
CHATTEM, INC.;
COLGATE-PALMOLIVE COMPANY
    individually and as successor-in-interest to THE
    MENNEN COMPANY;
COTY INC.;
GLAMOUR INDUSTRIES CO.
    individually and as successor-in-interest to
    AMERICAN INTERNATIONAL
    INDUSTRIES;

JOHNSON & JOHNSON;
JOHNSON & JOHNSON CONSUMER INC.
    f/k/a JOHNSON & JOHNSON CONSUMER
    COMPANIES, INC.;
KERR CORPORATION;
KRYOLAN CORPORATION;
L'ORÉAL USA, INC.
    individually and as successor in interest to
    CHARLES OF THE RITZ GROUP LTD.;
MAX FACTOR CO., INC.;
MAYBELLINE LLC;
PFIZER INC.
    individually and as successor in interest to
    COTY, INC. and COTY INTERNATIONAL,
    INC.;
R.T. VANDERBILT HOLDING COMPANY, INC.,
    individually and as successor-in-interest to R.T.
    VANDERBILT COMPANY, INC.;
REVLON, INC.
    individually and as successor in interest to
    CHARLES OF THE RITZ GROUP LTD.;
THE NESLEMUR COMPANY;
UNION CARBIDE CORPORATION;
VANDERBILT MINERALS, LLC
    f/k/a R.T. VANDERBILT COMPANY, INC.,
    individually and as successor-in-interest to
    INTERNATIONAL TALC CO.;
WHITTAKER CLARK & DANIELS, INC.; and
YVES SAINT LAURENT AMERICA, INC.

**AND DEFENDANTS:**

**JANSSEN PHARMACEUTICALS, INC.,**
    **individually and as successor-in-interest to**
    **Johnson & Johnson subsidiaries named**
    **JOHNSON & JOHNSON CONSUMER INC.,**
    **both prior to and after its 2021 restructurings**
    **and colloquially known as "Old JJCI" and**
    **"New JJCI";**
**JOHNSON & JOHNSON HOLDCO (NA) INC.,**
    **f/k/a JOHNSON & JOHNSON CONSUMER**
    **INC., individually and as successor-in-interest**
    **to Johnson & Johnson subsidiary "Old JJCI";**
**KENVUE INC., individually and as successor-in-**
    **interest to JOHNSON & JOHNSON**
    **CONSUMER INC., both prior to and after its**

2021 restructurings and colloquially known as
"Old JJCI" and "New JJCI";

**LTL MANAGEMENT LLC**

      **Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**To the above-named Defendants:**

  **YOU ARE HEREBY SUMMONED**, to answer this Summons and Second Complaint, originally filed 3/26/2021, and to serve a copy of your answer, or, if the complaint is not served with this summons to serve a Notice of Appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

**Date: 8/16/23**

New York, New York

To:  See attached rider
Floor

/S/ Brian Early

**Brian Early, Esq.**
The Early Law Firm, LLC
Attorneys for Plaintiffs
360 Lexington Avenue, 20th

New York, NY 10017

Plaintiffs, by their attorneys, with reference to the Complaint filed in this action on 3/26/2021, which set forth claims for personal injuries based on theories of negligence, breach of express and implied warranty and strict product liability, due to asbestos exposure, hereby adds additional defendants pursuant to NEW YORK ASBESTOS LITIGATION Case Management Order Paragraph VII(B), by this "Long Form Amended Complaint", incorporating each and every claim, allegation, paragraph and request for relief in the original and amended complaints which set forth, among others, claims for personal injuries and which has been served by Plaintiff's counsel on all defense counsel and filed in the New York Asbestos Litigation Master File.

**Dated: 8/16/23**

New York, New York

To: See attached rider

/S/ Brian Early
**Brian Early, Esq.**
The Early Law Firm, LLC
Attorneys for Plaintiffs
360 Lexington Avenue, 20th Floor
New York, NY 10017

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues present herein.

/S/ Brian Early
**Brian Early, Esq.**
The Early Law Firm, LLC
360 Lexington Avenue, 20th Floor
New York, NY 10017
212.986.2233

To:    See attached Service Rider

Case 3:23-cv-10614-MBK Document 18-09 Filed 03/22/23 Page 104 of 1429 PageID:
Exhibit A - Second Amended Toppin Complaint    Page 6 of 74

**SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COREY G. TIPPIN

            Plaintiff,

      -against-

3M COMPANY,
   f/k/a MINNESOTA MINING AND
   MANUFACTURING COMPANY;
ALCAT, INCORPORATED;
AMERICAN INTERNATIONAL INDUSTRIES;
AVON PRODUCTS, INC.;
BLOCK DRUG COMPANY, INC. ind. and as
      successor-in-interest to the GOLD BOND
      STERILIZING POWDER COMPANY, a/k/a
      THE GOLD BOND COMPANY;
BLOCK DRUG CORPORATION ind. and as
      successor-in-interest to the GOLD BOND
      STERILIZING POWDER COMPANY, a/k/a
      THE GOLD BOND COMPANY;
BOURJOIS, LTD.;
BRENNTAG NORTH AMERICA, INC.
   individually and as successor-in-interest to
   MINERAL PIGMENT SOLUTIONS, INC. and
   WHITTAKER CLARK & DANIELS, INC.;
BRENNTAG SPECIALTIES, LLC
   f/k/a BRENNTAG SPECIALTIES, INC. f/k/a
   MINERAL PIGMENT SOLUTIONS, INC. as
   successor-in-interest to WHITTAKER CLARK
   & DANIELS, INC.;
BRISTOL-MYERS SQUIBB COMPANY
   individually and as successor-in-interest to
   CHARLES OF THE RITZ GROUP LTD.;
CHANEL, INC.;
CHATTEM, INC.;
COLGATE-PALMOLIVE COMPANY
   individually and as successor-in-interest to THE
   MENNEN COMPANY;
COTY INC.;
GLAMOUR INDUSTRIES CO.
   individually and as successor-in-interest to
   AMERICAN INTERNATIONAL
   INDUSTRIES;

**Index No. 190062/2021**

**<u>VERIFIED SECOND AMENDED COMPLAINT</u>**

JOHNSON & JOHNSON;

JOHNSON & JOHNSON CONSUMER INC.
    f/k/a JOHNSON & JOHNSON CONSUMER
    COMPANIES, INC.;

KERR CORPORATION;

KRYOLAN CORPORATION;

L'ORÉAL USA, INC.
    individually and as successor in interest to
    CHARLES OF THE RITZ GROUP LTD.;

MAX FACTOR CO., INC.;

MAYBELLINE LLC;

PFIZER INC.
    individually and as successor in interest to
    COTY, INC. and COTY INTERNATIONAL,
    INC.;

R.T. VANDERBILT HOLDING COMPANY, INC.,
    individually and as successor-in-interest to R.T.
    VANDERBILT COMPANY, INC.;

REVLON, INC.
    individually and as successor in interest to
    CHARLES OF THE RITZ GROUP LTD.;

THE NESLEMUR COMPANY;

UNION CARBIDE CORPORATION;

VANDERBILT MINERALS, LLC
    f/k/a R.T. VANDERBILT COMPANY, INC.,
    individually and as successor-in-interest to
    INTERNATIONAL TALC CO.;

WHITTAKER CLARK & DANIELS, INC.; and

YVES SAINT LAURENT AMERICA, INC.

**AND DEFENDANTS:**

**JANSSEN PHARMACEUTICALS, INC.,
    individually and as successor-in-interest to
    Johnson & Johnson subsidiaries named
    JOHNSON & JOHNSON CONSUMER INC.,
    both prior to and after its 2021 restructurings
    and colloquially known as "Old JJCI" and
    "New JJCI";**

**JOHNSON & JOHNSON HOLDCO (NA) INC.,
    f/k/a JOHNSON & JOHNSON CONSUMER
    INC., individually and as successor-in-interest
    to Johnson & Johnson subsidiary "Old JJCI";**

**KENVUE INC., individually and as successor-in-
    interest to JOHNSON & JOHNSON
    CONSUMER INC., both prior to and after its**

2021 restructurings and colloquially known as
"Old JJCI" and "New JJCI"
**LTL MANAGEMENT LLC**

**Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Brian Early, Esq.,** an attorney duly admitted to practice law before all of the courts in the State of New York, hereby affirms that on 8/16/23, I served the within NEW YORK LONG FORM COMPLAINT upon the defendants listed in the enclosed service rider by depositing a true copy thereof in an enclosed post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within the State of New York.

<div style="margin-left: 50%;">

**S/Brian Early**
**Brian Early, Esq.**

</div>

**Defendants address:  See**
**attached rider**

<div style="margin-left: 50%;">

The Early Law Firm, LLC
360 Lexington Avenue, 20th Fl.
New York, NY 10017
(212) 986-2233

</div>

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM        INDEX NO. 190062/2021

NYSCEF DOC. NO. 1057        Case 23-cv-1065-JKQ  Document 18-09  Filed 03/24/25  Page 307 of 1429 PageID:        RECEIVED NYSCEF: 08/16/2023

Exhibit A - Second Amended Complaint        Page 9 of 74

### SECOND AMENDED COMPLAINT

### THE PARTIES, JURISDICITON AND VENUE

#### A.    Introduction

1.    Plaintiff Mr. Corey Grant Tippin (hereinafter, "Plaintiff" refers to Mr. Corey Tippin) was born on December 29, 1949.

2.    On October 28, 2020, Mr. Tippin was diagnosed with peritoneal mesothelioma.

3.    Each of the defendants mined, processed, designed, manufactured, marketed, sold and/or distributed asbestos-containing products, including asbestos-containing talc.

4.    Mr. Tippin used, applied and/or was exposed to defendants' asbestos-containing products. Mr. Tippin's use of defendants' asbestos-containing products in the ordinary and intended way caused the release of airborne asbestos fibers in Mr. Tippin's breathing zone at dangerous concentrations orders of magnitude higher than the ambient background that he inhaled.

5.    As a direct result of Mr. Tippin's exposure to defendants' asbestos-containing products, he developed malignant mesothelioma.

6.    Throughout the period of his use and exposure, Mr. Tippin never knew defendants' products contained asbestos and could cause deadly latent diseases such as mesothelioma.

7.    Defendants' asbestos-containing were unreasonably dangerous and defective. Their products were defective because, among other reasons, they contained asbestos (a complete carcinogen), their use caused the release of airborne asbestos fibers, safer substitute materials were available and they never contained appropriate labels and warnings.

8.    Throughout the time the period Mr. Tippin purchased, used and was exposed to defendants' asbestos-containing products, defendants knew, and by exercising reasonable care could have and should have known, that their products contained asbestos and inhaling asbestos (including from their products) can cause deadly diseases such as mesothelioma.

9.    Mr. Tippin's mesothelioma has caused him pain, discomfort, emotional anguish, loss of wages, medical expenses and loss of the ability to enjoy life. His mesothelioma will continue to cause him such pain, suffering and loss.

Case 23-cv-1206-4 BKQ Document 18-09 Filed 03/22/23 09/23/23 08:01 1429 Page ID:
Exhibit A - Second Amended Tippin Complaint    Page 10 of 74

10.    In or around November 2022, Corey Tippin married longtime partner Christopher Stevens.

B.    **Plaintiff Corey Tippin**

11.    Mr. Tippin lives in Bridgeport, Connecticut. From his birth to 1967 and from about 1977 to the present, Mr. Tippin has been a resident of the State of Connecticut.

12.    Mr. Tippin lived in New York from approximately (a) the summer of 1967 to late 1969 and (b) from 1974 to 1977. While based in Paris, France from 1969 to 1974, Mr. Tippin stayed in New York City on several occasions for one to two months each.

13.    Throughout his life, a substantial part of Mr. Tippin's work was in New York City, including as an artist, make-up specialist, designer and stylist.

14.    Mr. Tippin used, applied and/or was otherwise exposed to each defendant's asbestos-containing products when living in New York City throughout 1967 to 1977.

15.    Mr. Tippin purchased defendants' asbestos-containing products in New York City. He thereafter used such products at his homes in New York City and Connecticut.

16.    Additionally, Mr. Tippin's application and use of defendants' asbestos-containing products caused asbestos fibers to accumulate on his person and clothing. Immediately thereafter when going to work in or otherwise traveling to New York City for the day, Mr. Tippin was thereafter exposed to and inhaled such asbestos fibers from his person or clothing.

17.    Mr. Tippin has received and will receive medical treatment in New York City, including at Mt. Sinai.

C.    **Defendants**

18.    Each defendant has conducted business in the City and State of New York. Each defendant mined, processed, designed, manufactured, marketed, sold and/or distributed asbestos-containing products, including asbestos-containing talc, in the State of New York and/or with the reasonable expectation that be used in this State. Each of the above-identified defendants have committed tortious acts in this State.

19.    If is deemed that Article 16 of the CPLR applies to this action, the plaintiffs assert that this action falls within one or more of the exceptions set forth in CPLR1602 including, but not limited to, the exception for cases where a person is held liable for causing the claimant's injury by having acted with reckless disregard for the safety of others (CPLR 1602(7)); the exception for cases involving any person held liable for causing claimant's injury having unlawfully released into the environment a substance hazardous to public health, safety or the environment (CPLR 1602(9)); the

Case 23-cv-1065-WBKQ   Document 18-9 Filed 08/22/23   Page 11 of 74 PageID:
Exhibit A - Second Amended Tippin Complaint   Page 11 of 74

exception for any parties found to have acted knowingly or intentionally and in concert to cause the acts or failure upon which liability is based (CPLR 1602(11)); the exception based upon defendants' non-delegable duty to warn of the health hazards of asbestos (CPLR 2602(2)(iv)); and the exception for persons held liable in a product liability action where the manufacturer of the product is not a party to the action and jurisdiction over the manufacturer could not with due diligence be obtained (CPLR 1602(10)).

20.    Defendant Revlon Inc. has its headquarters (or principal place of business) in the State of New York. When the action commenced over a year ago (on or around March 26, 2021), the Complaint named multiple other defendants (including without limitation Avon Products, Inc., Colgate Palmolive Company, Coty Inc. and Pfizer, Inc.) that were headquartered in, had their principal place of business in and/or were incorporated in the State of New York. These non-diverse and/or forum defendants remained in the action for over a year following testimony and extensive discovery.

21.    Each defendant (and/or their predecessors) (a) sold their asbestos-containing products, including asbestos-containing talc products, to the State of New York (to which Mr. Tippin thereafter purchased and/or became exposed to), (b) delivered, supplied and/or sold their asbestos-containing products to production facilities located in the State of New York (which, after incorporation into finished products, Mr. Tippin thereafter became exposed), (c) entered contracts with persons and/or entities in the State of New York for the sale of asbestos-containing products (to which Mr. Tippin thereafter became exposed) and/or (d) mined, processed and/or packaged (without appropriate labels and warnings) asbestos-containing products to which Mr. Tippin was exposed in the State of New York.

22.    In addition to the above-identified suit-related New York acts, defendants also committed other tortious acts in the State of New York, including (but not limited to) (a) gaining relevant knowledge of the health hazards of exposure to asbestos and/or their products in New York, (b) sending their products to New York laboratories and scientists to test for the presence of asbestos in New York (e.g., Dr. Lewin of New York University in 1971 to 1973, Mt. Sinai in 1971 to 1976, Dr. Fullam of Schenectady in 1973), (c) meeting with other asbestos-containing products manufacturers at trade organization meetings in New York to discuss ways to oppose regulation and oversight of their asbestos-containing products (e.g., the Talc Producers' Association meetings in the early 1970s) and/or (d) having their principal place of business located in New York City during the time period of Mr. Tippin's exposure (e.g., Whittaker, Clark & Daniels in 1918 to 1971, Vanderbilt in 1916 to 1974).

23.    This Court has general consent jurisdiction over Defendants based on the New York business registration statute. This Court further has specific jurisdiction over every defendant that has obtained a certificate of authority to transact business in New York because the defendant has agreed that it is amenable to suit in this State. This Court may exercise general jurisdiction over such foreign corporations consistent with due process.

24.     Defendant AMERICAN INTERNATIONAL INDUSTRIES was and still is a duly organized foreign corporation doing business in the State of New York. Defendant AMERICAN INTERNATIONAL INDUSTRIES was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

25.     Defendant BRENNTAG SPECIALTIES, LLC, was and still is a duly organized foreign limited liability corporation doing business in the State of New York. Defendant BRENNTAG SPECIALTIES, LLC, was and still is a duly organized foreign limited liability corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

26.     Defendant BRISTOL-MYERS SQUIBB COMPANY, was and still is a duly organized foreign corporation doing business in the State of New York. Defendant BRISTOL-MYERS SQUIBB COMPANY, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

27.     Defendant JOHNSON & JOHNSON, was and still is a duly organized foreign corporation doing business in the State of New York. Defendant JOHNSON & JOHNSON was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

28.     Defendant REVLON, INC., was and still is a duly organized foreign corporation doing business in the State of New York. Revlon's headquarters, or principal place of business, is in the State of New York. Defendant REVLON, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

29.     Defendant THE NESLEMUR COMPANY, was and still is a duly organized foreign corporation doing business in the State of New York. Defendant THE NESLEMUR COMPANY, was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

30.     Defendant UNION CARBIDE CORPORATION, was and still is a duly organized domestic corporation doing business in the State of New York. Defendant UNION CARBIDE CORPORATION, was and still is a duly organized domestic corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

31.     Defendant WHITTAKER CLARK & DANIELS, INC., was and still is a duly organized foreign corporation doing business in the State of New York. Defendant

WHITTAKER CLARK & DANIELS, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

32.     Defendant JANSSEN PHARMACEUTICALS, INC., individually and as successor-in-interest to JOHNSON & JOHNSON subsidiaries named JOHNSON & JOHNSON CONSUMER INC., both prior to and after its 2021 restructurings and colloquially known as "OLD JJCI" and "NEW JJCI", was and still is a duly organized foreign corporation doing business in the State of New York. Defendant JANSSEN PHARMACEUTICALS, INC., was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

33.     Defendant JOHNSON & JOHNSON HOLDCO (NA) INC., f/k/a JOHNSON & JOHNSON CONSUMER INC., individually and successor-in-interest to JOHNSON & JOHNSON subsidiary "OLD JJCI", was and still is a duly organized foreign corporation doing business in the State of New York. Defendant JOHNSON & JOHNSON HOLDCO (NA) INC. was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

34.     Defendant KENVUE, INC., individually and as successor-in-interest to JOHNSON & JOHNSON CONSUMER INC., both prior to and after its 2021 restructurings and colloquially known as "Old JJCI" and "New JJCI," was and still is a duly organized foreign corporation doing business in the State of New York. Defendant KENVUE, INC. was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

35.     Defendant LTL MANAGEMENT, LLC was and still is a duly organized foreign corporation doing business in the State of New York. Defendant LTL MANAGEMENT, LLC was and still is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

## ALLEGATIONS APPLICABLE TO ALL DEFENDANS AND ALL COUNTS

### A.     Mr. Tippin's exposure to defendants' products

36.     Throughout most of his life, Mr. Tippin frequently and regularly used Johnson's Baby Powder ("JBP"). In the late 1950s to early 1960s, Mr. Tippin regularly used, and was in the immediate vicinity of family members using, JBP on his younger siblings. From the early 1960s to the 2000s, Mr. Tippin regularly used JBP on his body after bathing and/or showering. From about the late 1960s to about 1977, Mr. Tippin used JBP in his work as a make-up man. He used JBP as a base and/or as part of various mixtures that he created. Throughout the 1980s to the 2000s, Mr. Tippin regularly applied JBP to his skating shoes before figure skating.

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057

Case 3:23-cv-12001-VBK Document 18-09 Filed 03/12/25 Page 122 of 1429 PageID:
Exhibit A - Second Amended Toxin Complaint    Page 14 of 74
RECEIVED NYSCEF: 08/16/2023

37.    From the late 1950s to early 1960s, Mr. Tippin regularly used his stepmother's talcum powder products on himself. Such talc-containing products included Cashmere Bouquet, Jean Nate and Avon.

38.    Throughout 1966 to the 2000s, Mr. Tippin frequently and regularly used Clubman/Pinaud talcum powder on his face, neck and/or upper shoulders during and/or after grooming. Defendant American International Industries manufactured and/or sold talc-containing Clubman/Pinaud, including in New York, from at least 1987 onward.

39.    From approximately 1967 to 1973, Mr. Tippin frequently and regularly used Coty loose face powder on himself. From about the late 1960s to about 1977, Mr. Tippin used Coty loose face powder in his work as a make-up man. He used Coty as a base and/or as part of various mixtures that he created.

40.    From about 1967 to 1973, Mr. Tippin regularly used talcum powder-based face powders, compacts and/or blush powders, including Maybelline, Max Factor, Revlon, Charles of the Ritz, Hazel Bishop and/or Helene Curtis.

41.    From approximately the late 1960s to the mid-1970s, Mr. Tippin at times used Bourjois talc powder(s) on himself and others as part of his work as a make-up man.

42.    From roughly the late 1970s to 2000s, Mr. Tippin regularly used a Gold Bond powder over his body after bathing and/or showering. During this period, he sometimes used Gold Bond for this purpose instead of JBP.

43.    From about the late 1980s to the 2000s, Mr. Tippin regularly applied the product "Keep It In Your Sneakers" in his skating shoes before figure skating. Throughout this period, he sometimes used the product for this purpose instead of JBP.

44.    Mr. Tippin's social security records have been ordered or will be immediately ordered. Plaintiffs will provide such information, as well as authorizations for the same, as soon as possible.

**B.    Allegations regarding all defendants for all counts**

**i.    Defendants knew of the association of talc and asbestos**

45.    Throughout the time that defendants sold their talc and talc-containing products that plaintiff was exposed to, defendants knew of the association of talc with asbestos. At the very least, defendants could have and should have known of the association in the exercise of reasonable care. Defendants were therefore on notice that their talc-containing products were likely to contain asbestos and needed to closely monitor and test their talc sources and products for asbestos content.

46.    Since 1898, mineralogy treatises recognized that asbestos is associated with, and often occurs as an accessory mineral to, talc. Edward Dana's 1898 "Text-Book of Mineralogy" stated that "talc … is often associated with serpentine … and frequently

Case 23-cv-1065-MBQ  Document 18-09  Filed 03/12/25  Page 123 of 1429 PageID:
Exhibit A - Second Amended Third Complaint   Page 15 of 74

contains crystals of … asbestos, actinolite …" Mineralogy and geology texts frequently and consistently reported this association throughout the twentieth century.

### ii.    Defendants knew their talc products contained asbestos

47.    Throughout the time that defendants sold the talc and talc-containing products that plaintiff was exposed to, defendants knew their products, in fact, contained asbestos. At the very least, defendants could have and should have known of the presence of asbestos in their products in the exercise of reasonable care, including monitoring and testing their products.

48.    Cosmetic talc from the Val Chisone, Italy region (including the Fontane mine) contains tremolite asbestos, actinolite asbestos, anthophyllite asbestos and chrysotile.

49.    Defendants knew, and could have and should have known in the exercise of reasonable care, of publicly-available scientific literature reporting asbestos in Italian cosmetic talc. As early as the 1910s, texts recognized Italian talc ore source contains accessory tremolite. A 1966 (Peretti) text observed in the Val Chisone talc mines the presence of "accessory minerals … at times diffused over considerable volumes" including "amphiboles of the tremolite-actinolite series." It reported "tremolite-actinolite" occurring in bundles of "asbestoid fibers" and displayed an image of talc containing actinolite. The company mining and milling Italian cosmetic talc, the Societa Talco E Grafite Val Chisone ("SVC"), published a brochure in 1974 referring to their containing chrysotile. An April 1975 Industrial Minerals edition referred to trace amounts of chrysotile and tremolite in Italian cosmetic talc. A 1984 (Paoletti) a published analysis of Italian talc samples, including cosmetic talc, showed the majority contained tremolite asbestos or chrysotile ranging from 0.2% to 1.6%.

50.    Cosmetic talc from Vermont (including the Hammondsville, Argonaut and Hamm mines) contains tremolite asbestos, actinolite asbestos, anthophyllite asbestos and chrysotile.

51.    Defendants knew, and could have and should have known in the exercise of reasonable care, of publicly-available scientific literature reporting the presence of asbestos in the talc mines of Vermont. Such literature began appearing early on. A 1914 (Perkins) geology text observed "well-developed" chrysotile and "a good deal of actinolite," described as a "needle-like substance," throughout the Vermont talc deposits. In 1927 (Gillson), Vermont talc was described as "associated … usually with actinolite." In the Hammondsville mine, the paper identified "a few residuals of actinolite," noting that "the same minerals occur" and "the same process is indicated" as other Vermont talc mines. In October 1948, the U.S. Public Health Service found asbestos in Vermont talc. In March 1951, the USGS reported cross-fiber and slip-fiber asbestos occurred in some Vermont talc mines. It identified actinolite in the Hammondsville talc quarry. A 1957 (Morrill) text observed tremolite, actinolite, anthophyllite and serpentine throughout the talc mines of Vermont. In the Reading talc mine (Hammondsville), it reported actinolite in the form of "mountain leather" with actinolite "fibers." In February 1979, Cyprus

Industrial Minerals Company ("CIMC") talc company employees published an article stating that Vermont talc contains 0 to 2% tremolite.

52.     Cosmetic talc from the Murphy, North Carolina talc district contains asbestos.

53.     Defendants knew, and could have and should have known in the exercise of reasonable care, of publicly-available scientific literature reporting the presence of asbestos in North Carolina talc. A 1900 (Pratt) geological survey recognized that the talc deposit formed as a "result of the alternation of former deposits of tremolite." It observed areas where "many crystals of tremolite" branch through to contact with talc. It described the tremolitic talc having a "decidedly fibrous" structure. A 1948 (Van Horn) geology bulletin observed tremolite occurring throughout the talc deposit, including adjacent to and "embedded in" the talc belt. It also recognized actinolite as "widely distributed throughout" the formation. It specifically reported "minute tremolite fragments" in the Hitchcock Corporation mines. In February 1979, CIMC employees stated that North Carolina talc contains 0 to 5% anthophyllite in their published text.

54.     Talc from the Gouverneur talc district in upstate New York contains anthophyllite asbestos, tremolite asbestos and chrysotile.

55.     Defendants knew, and could have and should have known in the exercise of reasonable care, of publicly-available scientific literature reporting asbestos in upstate New York talc. A 1925 (Cushing) geological bulletin reported "fibrous tremolite, or brittle asbestos, is not uncommon in the walls of the talc mines" and "the flexible asbestos, or chrysotile, is an accompaniment." In 1962 (Engel), the U.S. Geological Survey ("USGS") published a comprehensive analysis of the talc district. The USGS reported "highly striated, fibrous bundles of anthophyllite" and "fibers of anthophyllite." It found chrysotile as "abundant and ubiquitous" with "fibrous serpentine" appearing as "slip-fiber asbestos." A 1968 paper co-authored by Johnson & Johnson's Mr. Ashton recognized "fibrous anthophyllite" in the "Arnold pit."

56.     Talc from southwestern Montana (including the Treasure and Regal mines) contains tremolite asbestos, actinolite asbestos, anthophyllite asbestos and chrysotile.

57.     Defendants knew, and could have and should have known in the exercise of reasonable care, of publicly-available scientific literature reporting the presence of asbestos in finished cosmetic talc products. In August 1968, Dr. Cralley published his analysis of 22 cosmetic talc products in "Fibrous and Mineral Content of Cosmetic Talcum Products." Defining "fibers" as "particulate" with a 3-to-1 length-to-width ratio, Dr. Cralley found the cosmetic talc products contained an average of 19% "fibrous material" with fibers generally less than one micrometer wide. X-ray diffraction ("XRD") analysis showed such fibers consisted of minor amounts of tremolite, anthophyllite and chrysotile. In July 1970 (Moskowitz), a published case report reviewed the lung tissue of a recently-deceased Revlon employee who was exposed to talcum powders several years, finding "small fibers and asbestos bodies." In August 1976, researchers from Mt. Sinai in

Case 3:23-cv-1065-MBK   Document 80   Filed 03/21/25   Page 125 of 1429 PageID:
Exhibit A - Second Amended Main Complaint    Page 17 of 74

New York City published "Consumer Talcums and Powders: Mineral and Chemical Organization." Analyzing 21 cosmetic talc products, they found tremolite, anthophyllite and chrysotile asbestos in many off-the-shelf samples.

### iii.    The ordinary use of defendants' products causes users to inhale dust

58.    The ordinary, foreseeable and intended uses of cosmetic talc include, but are not limited to (a) shaking talc powder out of bottles, (b) scraping a brush across a compacted powder and/or (c) applying a brush or "poof" to a loose powder product then the body or face. Such application methods inevitably results in airborne dust that enter the user's breathing zone and the surrounding area. Consequently, using asbestos-containing cosmetic talc in the intended manner results in airborne asbestos fibers that users inevitably inhale.

59.    Throughout the time defendants sold the talc and talc-containing products to which the plaintiff was exposed, defendants knew and intended that end users would use their products in the above-identified ways. Indeed, defendants designed their talc-containing products to be powdery. Because defendants knew (and, by exercising reasonable care, should have known) their talc-containing products contained asbestos, defendants likewise knew that the intended uses of their products cause the release of airborne asbestos fibers that users breathe.

### iv.    Defendants knew that exposure to asbestos causes mesothelioma

60.    Throughout the time defendants sold the talc-containing products that the plaintiff was exposed to, defendants knew that breathing asbestos fibers (including in cosmetic talc) can and does cause fatal diseases, including pleural and peritoneal mesothelioma. Throughout this period, the hazards of asbestos were knowable and known in the scientific community.

61.    The capacity for asbestos to cause disease was first reported in the scientific literature in the 1890s. By the 1920s and 1930s, it was widely known in the scientific literature and generally accepted in the scientific community that asbestos exposure can cause asbestosis.

62.    In the 1930s, it was first reported that asbestos exposure can cause lung cancer. By the early 1950s, the general consensus in the scientific and medical community was that asbestos exposure can cause lung cancer.

63.    In the 1940s, it was first reported that asbestos exposure can cause mesothelioma. By the early 1960s, it was widely known in the scientific literature and generally accepted in the scientific community that asbestos exposure can cause pleural and peritoneal mesothelioma. Defendants were aware of such information about asbestos hazards before and during the time that they sold the products to which plaintiff was exposed.

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM    INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057    RECEIVED NYSCEF: 08/16/2023

Case 23-cv-1084-MBK    Document 18-9 Filed 03/21/25    Page 126 of 1429 PageID:
Exhibit A - Second Amended Main Complaint    Page 18 of 74

64.     Throughout the 1930s to 1950s, numerous state governments enacted regulations of asbestos in the workplace. Such regulations included exposure limits and making asbestos-related disease compensable under workers' compensation and/or occupational disease statutory schemes. Defendants knew, and could have and should have been aware from exercising reasonable care, of such asbestos regulations and therefore the hazards of asbestos.

65.     Numerous trade organizations to which defendants that defendants were members of regularly distributed information about the health hazards of exposure to asbestos.

66.     As a complete carcinogen, relatively low cumulative exposures to all forms of asbestos can and do cause mesothelioma, including pleural and peritoneal mesothelioma. In the 1930s and 1940s, the scientific literature began reporting that threshold limit values do not protect against the development of cancers. Throughout the 1960s, publicly-available scientific literature reported that mesothelioma can be caused by contact with the asbestos-laden clothing of family members and from living nearby mines and certain factories using asbestos. It became generally accepted in the scientific community in the 1960s and 1970s that relatively low-level, brief and/or intermittent exposures to asbestos can cause mesothelioma. Before and during the time that defendants sold the asbestos-containing products that plaintiff was exposed to, defendants knew (and should have known in the exercise of reasonable care) that relatively low levels of asbestos exposure can cause mesothelioma.

### v.     Defendants failed to label and warn

67.     Defendants knew (and, by the operation of reasonable care, should have known) that ordinary end users like (and including) the plaintiff (a) did not know that they were being exposed to asbestos and (b) asbestos is a carcinogenic substance that can cause deadly diseases.

68.     Defendants knew (and should have known in exercising reasonable care) that their products required asbestos labels and warnings of their products' dangers and cancer risk.

69.     Defendants failed to place any labels, cautions or warnings on the products that they sold (and the plaintiff ultimately used) which indicated that they contain asbestos fibers and/or could cause fatal diseases such as mesothelioma.

### vi.     Defendants' other wrongful acts and omissions

70.     Defendants' negligent acts and omissions regarding testing included, but are not limited to, (a) failing to begin testing their products for the presence of asbestos until far too late, (b) failing to test using adequate methods intended to detect asbestos if present and(c) failing to test with enough frequency to reasonably monitor their products' asbestos content.

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM          INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057                                                    RECEIVED NYSCEF: 08/16/2023

Case 1:23-cv-12051-WGY   Document 18-1   Filed 03/12/25   Page 127 of 1429   Page ID:
                                    785
Exhibit A - Second Amended Bill in Complaint    Page 19 of 74

71.     The testing programs implemented by defendants, if any, were knowingly designed to not detect asbestos when present. Defendants were aware of techniques and tools that could detect asbestos at relatively low bulk concentrations, including a preconcentration technique and the use of transmission electron microscopy ("TEM"). Despite such knowledge, defendants made a conscious choice not to use them. In so doing, defendants knowingly ignored and/or permitted the presence of asbestos in their products.

72.     Instead of using more sensitive techniques and tools defendants knew about, defendants instead knowingly devised schemes to (a) use methods that could not detect asbestos below certain bulk concentrations and, when not detected, (b) falsely equate a "non-detect" result with a "not present" result. Based on "non-detect" results obtained from insensitive tools incapable of detecting asbestos below certain bulk concentrations, defendants then knowingly mislead legislators, regulators and the public by presenting the results as "asbestos-free."

73.     Defendants failed to develop in an expeditious manner products using a safer alternative or substitute, corn starch. Defendants' products have no medicinal value. A safer substitute, cornstarch, does not have the same tendency of asbestos contamination as talc. Cornstarch also works as effectively as talc. Defendants were aware of the use of cornstarch as a substitute for talc and cornstarch was used beginning in the early 1900s.

### vii.     The CTFA and defendants' misconduct

74.     The industry trade and lobbying organization for the cosmetics industry was then-called the Cosmetics Toiletries and Fragrances Association ("CTFA"). In the early 1970s, the CTFA created the "Asbestos in Talc" subcommittee. Subcommittee members and active participants included (but were not limited to) defendants Avon, Bristol-Myers, Colgate-Palmolive ("Colgate"), Johnson & Johnson ("J&J"), Pfizer (including its Coty division), Vanderbilt and Whittaker, Clark & Daniels ("WC&D").

75.     The CTFA subcommittee regularly met to exchange information and address public relations and regulatory matters of common interest regarding asbestos. Its members regularly met with FDA representatives. Its members worked together to attempt to delay, weaken and thwart regulation and oversight of the cosmetics industry regarding asbestos. When considering whether to implement regulation concerning asbestos in talc, the FDA gave CTFA members the opportunity to present data on its own internal testing. Despite repeated findings of chrysotile asbestos in their products, members told that chrysotile had never been found. For example, despite having well over a hundred internal findings of tremolite and actinolite (including their fibrous varieties), Johnson & Johnson told the FDA that it had never found such minerals in its talc ore or products.

76.     The CTFA knowingly advocated for less powerful, less sensitive and less accurate test methods that would fail to detect millions of asbestos fibers in ordinary-sized cosmetic talc containers. The FDA proposed a method to test asbestos in talc. Applying that test method in December 1973, CTFA committee members found asbestos

in multiple committee members' talc sources. Likewise, in evaluating the use of TEM in December 1974, CTFA members concluded the "ultra-sensitivity" of TEM "could be a problem."

77.    Instead of choosing more powerful tools capable of yielding more accurate results, the CTFA members developed and advocated for the J4-1 method. Under this method, members start with a test by XRD, a weak or insensitive tool that cannot detect tremolite at concentrations of 0.1-0.5% tremolite or less (with even weaker power for chrysotile and anthophyllite). If members' XRD test resulted in a "non-detect," no further testing was required. If the XRD test was positive, J4-1 utilized a second step of polarized light microscopy ("PLM"). PLM is also less powerful and less accurate than TEM testing. By implementing this method, CTFA committee members virtually guaranteed that concentrations of less than 0.5% by weight (still millions of asbestos fibers in containers) would not be detected and therefore permitted.

78.    CTFA members knew the J4-1 method was unreliable and weak. CTFA members distributed talc samples spiked with tremolite to see if they could detect the tremolite using the J4-1 method. In a "round robin" test, six of seven members could not detect tremolite in the spiked sample containing tremolite asbestos. From participating in that experiment, CTFA subcommittee members knew that the J4-1 method allowed asbestos to go undetected and therefore sold to consumers. In October 1976, CTFA members adopted the J4-1 method. In the written procedures for the J4-1 method, it admits that TEM testing (compared to the J4-1) is better at detecting asbestos. But the CTFA document states that members rejected TEM because of the "drawbacks" of the time, expertise and expense required.

## ADDITIONAL ALLEGATIONS REGARDING SOME DEFENDANTS

### A.    The Johnson & Johnson entities

#### i.    Relevant corporate history of Johnson & Johnson

79.    From the 1890s to December 1978, defendant Johnson & Johnson alone designed, manufactured, marketed, distributed and sold Johnson's Baby Powder ("JBP") in the United States.

    a.  Johnson & Johnson incorporated in 1887 and began selling Johnson's® Baby Powder in 1894, launching its baby care line of products.

    b.  In 1972, Johnson & Johnson established a formal operating division for its baby products business. Johnson & Johnson transferred all its assets and liabilities associated with the baby products division to Johnson & Johnson Baby Products. Johnson & Johnson Baby Products remained an operating division (rather than a separate or independent subsidiary) through at least December 1978.

    c.  Thus, from the 1890s to 1978, defendant Johnson & Johnson designed, manufactured, marketed, distributed and sold Johnson's Baby Powder, including talc-containing Johnson's Baby Powder, and other talc-

containing products.

80.     From at least January 1979 through October 2021, Old JJCI designed, manufactured, marketed, distributed and sold Johnson's Baby Powder, including talc-containing Johnson's Baby Powder, and other talc-containing products.

    a.  In about January 1979, Johnson & Johnson transferred the assets associated with its baby products division to Johnson & Johnson Baby Products.

    b.  In 1981, Johnson & Johnson Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of Johnson & Johnson Baby Products. In turn, Omni assumed all liabilities of Johnson & Johnson Baby Products except those liabilities related to its diaper program. Immediately following the transaction, Johnson & Johnson Baby Products merged into another subsidiary of Johnson & Johnson and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.

    c.  In 1988, Johnson & Johnson Baby Products Company transferred all its assets for its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc.

    d.  In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson & Johnson Consumer Companies, Inc.

    e.  In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms from at least 1979 to October 2021, "Old JJCI"). Johnson & Johnson was the parent of subsidiary Old JJCI.

81.     Johnson & Johnson (the parent) holds responsibility (along with Old JJCI and the New J&J Defendants) for Johnson's Baby Powder on and after January 1979. Johnson & Johnson exercised substantial control over the affairs of Old JJCI in January 1979 through October 2021 (and, as described/identified below, the New J&J Defendants after October 2021), particularly as to issues pertaining to asbestos in the talc contained in Johnson's Baby Powder.

    a.  During and after January 1979, Johnson's Baby Powder bottles continued bearing the Johnson & Johnson name and the Johnson's trademark held by Johnson & Johnson.

    b.  Johnson & Johnson owned (and ultimately sold) the Vermont talc mines that sourced Johnson's Baby Powder throughout the mid-1960s to 1988.

    c.  During and after January 1979, Johnson & Johnson (a) engaged in efforts to promote Johnson's Baby Powder and (b) sought to benefit from the "emotional bond," recognizability and goodwill developed from the baby products line, including Johnson's Baby Powder. Numerous memoranda, including as reflected in power points in April 1997, August 1997 and

June 2010, reflect Johnson & Johnson's conscious strategy of benefiting from Johnson's Baby Powder, referring it to as their "flagship product" and "golden egg" that "feed[s] the goose" and "lead[s] the flock." Johnson & Johnson Board of Directors met in June 2017 to discuss the reputational risk resulting from information becoming public about the asbestos content of the talc in Johnson's Baby Powder.

d.   During and after January 1979, Johnson & Johnson managed, controlled and/or issued statements, including false and/or misleading statements, to the public, government/regulatory bodies and in courts about the safety and/or asbestos content of talc in its products. Johnson & Johnson (a) drafted and issued statements defending the composition and safety of the talc in Johnson's Baby Powder (including, as non-exclusive examples in February 1998, October 2000, May 2016 and throughout 2017 to the present), (b) received advance copies of statements to the media (including, as a non-exclusive example, a January 2, 1986 memorandum from Nancy Musco) and (c) maintained websites that provided false, incomplete and/or misleading information about the composition and safety of the talc in Johnson's Baby Powder.

e.   During and after January 1979, Johnson & Johnson remained actively involved in the manufacturing process of Johnson's Baby Powder. Johnson & Johnson was regularly copied on routine correspondence regarding the selection of talc ores, mining, processing and testing of the talc used in Johnson's Baby Powder.

f.   During and after January 1979, Johnson & Johnson managed and directed litigation strategy (and thus control of information released publicly) regarding the composition of the talc in Johnson's Baby Powder. Johnson & Johnson in-house counsel Frank Bolden attended depositions/matters in the *Westfall* case and received regular correspondence regarding the testing of talc ores for the presence of the asbestos. Johnson & Johnson implemented litigation holds and other document retention policies. Johnson & Johnson employees/managers, including Mr. William Ashton, made false and/or misleading statements regarding the composition of the talc in Johnson's Baby Powder in affidavits and others sworn statements submitted to courts (that contributed to concealing information to the public about the true composition of the talc in Johnson's Baby Powder).

82.   In October 2021, Johnson & Johnson and/or Old JJCI implemented a plan as part of a larger effort to avoid or eliminate the responsibility and liability of Johnson & Johnson and Old JJCI for injuries and harm caused by Johnson's Baby Powder and other talc products.

a.   In October 2021, Old JJCI underwent a series of corporate restructuring transactions in which it split itself into two separate entities through a device referred to as a "divisive merger." The device is more commonly known as the "Texas Two Step."

b.   The corporate restructuring was designed and undertaken with the intent to isolate the talc liabilities of Old JJCI into a newly-invented company

created by J&J called "LTL Management LLC" ("LTL"). "LTL" is an acronym for "Legacy Talc Liability." LTL held no productive business assets and served no ongoing business concern.

c.   Immediately thereafter in October 2021, LTL was put into a Chapter 11 Bankruptcy wherein LTL and other Johnson & Johnson entities sought the protection of the Bankruptcy Code's processes to (a) obtain a stay of all pending litigation and (b) construct an aggregate resolution of its outstanding present and future talc/asbestos liabilities that would foreclose jury trials and reduce the compensation owed to those harmed by Johnson's Baby Powder and other talc products.

d.   As part of the corporate restructuring effort (the "Texas Two Step") designed to escape or limit liabilities for Johnson's Baby Powder and other talc products, all of the productive assets of Old JJCI, including those used to manufacture and market Johnson's Baby Powder, were transferred to a newly-minted corporate entity bearing the same name, "Johnson & Johnson Consumer Inc." ("New JJCI"). As explained in greater detail below, upon receipt of Old JJCI's operating assets, New JJCI continued to sell Johnson's Baby Powder, including talc-containing Johnson's Baby Powder. New JJCI continued the same business operations as Old JJCI; New JJCI became a new hat for Old JJCI.

e.   The Bankruptcy Court presiding over LTL's first bankruptcy case stayed and enjoined prosecution of all litigation against the debtor LTL and, importantly, Johnson & Johnson and New JJCI for harm and injury caused by Johnson's Baby Powder and other talc products. The stay was over the objection of thousands harmed and injured by such products.

f.   The United States Court of Appeals for the Third Circuit held on January 30, 2023 that the bankruptcy filing by LTL was not proper and/or made in bad faith. Ultimately, on April 4, 2023, the lower Bankruptcy Court formally dismissed the first LTL bankruptcy case.

g.   On April 4, 2023, within hours of the dismissal of the first LTL bankruptcy case, LTL filed a second Chapter 11 petition for bankruptcy protection in the same court seeking the same relief. Johnson & Johnson and/or LTL responded to the finding of bad faith by exhibiting more bad faith in a second filing.

h.   On July 28, 2023, the Bankruptcy Court issued a memorandum opinion dismissing the second LTL bankruptcy case (by granting motions to dismiss on the basis of bad faith). The Bankruptcy Court formally dismissed the second bankruptcy on August 11, 2023.

83.   Unbeknownst to Plaintiffs, during the appeal process for the first LTL bankruptcy, New JJCI began the process of transferring its business to defendant Kenvue, Inc.

a.   In December 2022, New JJCI changed its name to defendant Johnson & Johnson Holdco (NA) Inc. ("New JJCI (Holdco)").

b.   In January 2023, New JJCI (Holdco) transferred its productive assets and business to its direct parent entity, defendant Janssen Pharmaceuticals, Inc.

("Janssen").

c. In or around February 2023, Janssen transferred the productive assets of the consumer business it recently received (from New JJCI (Holdco) in January 2023), including those related to the manufacture and sale of Johnson's Baby Powder, to another Johnson & Johnson subsidiary, Kenvue, Inc. ("Kenvue").

d. Until at least April 2023, Plaintiff did not know, and/or could not have known or discovered, that New JJCI changed its name to New JJCI (Holdco) and then transferred the relevant productive assets and business to Janssen and then Kenvue in early 2023. The entities did not exist and/or did not receive the relevant productive assets/business, and/or Plaintiffs could not have known or discovered such facts. Separately and additionally, the Bankruptcy Court barred Plaintiff from naming (a) New JJCI, New JJCI (Holdco), Janssen and Kenvue until at least April 20, 2023 and (b) LTL Management, LLC until August 11, 2023.

84.    Under New York substantive law (and/or New Jersey substantive law on issues relating to successor liability under New York choice-of-law rules), defendants New JJCI (Holdco), Janssen and Kenvue ("New J&J Defendants") are (1) directly liable (including as the alter ego or the "same company" in the "product liability context") and/or (2) liable as successors-in-interest for the conduct of (and/or products sold by) Old JJCI and/or Johnson & Johnson. Their liability as successors-in-interest include (without limitation) that (a) the New J&J Defendants were the "mere continuation" of Johnson & Johnson and/or Old JJCI (and/or the result of a "de facto merger"), (b) the restructuring transactions described above were entered in an attempt to escape liability and/or (c) the New J&J Defendants are the manufacturers, marketers, designers, distributors and/or designers of the same product line(s), including Johnson's Baby Powder.

a. The New J&J Defendants (culminating in defendant Kenvue, as described above) essentially continue as Old JJCI under a new nomenclature. Kenvue repeatedly acknowledged and admitted to being the same as Old JJCI in public statements to the SEC, including (as a non-exclusive example) repeatedly referring to and comparing Kenvue's 2023 financial performance to 2018-2021 (*i.e.*, before Kenvue was created). No meaningful or significant difference existed in the business operations the day before the October 2021 Texas Two Step and the day after the October 2021 Texas Two Step.

b. Old JJCI and the New J&J Defendants had or have essentially the same ownership by the parent Johnson & Johnson (aside from *de minimus* shares of Kenvue sold in a public offering). The New J&J Defendants held or hold the same (or substantially similar) position vertically integrated within the same corporate structure of Johnson & Johnson.

c. The New J&J Defendants hold themselves out as a continuation of Old JJCI. In the eyes of the public, the New J&J Defendants are the continuation of Old JJCI.

d. Old JJCI and the New J&J Defendants maintain continuity in leadership and management. Per its own public SEC filings, Kenvue's "senior

leadership team … effectively transformed our business since taking the helm in 2019…" (*i.e.*, the same management started with Old JJCI and continued the same positions/roles in New JJCI, New JJCI (Holdco), Janssen and Kenvue). As another non-exclusive example, Mr. Mongon went from acting as the president of Old JJCI to the president of New JJCI, culminating in his position as the president of Kenvue.

e. All (or virtually all) of the employees of Old JJCI continued working for the New J&J Defendants (culminating in defendant Kenvue).

f. Old JJCI and the New J&J Defendants (culminating in defendant Kenvue, as described above) maintain continuity in operating business locations. As non-exclusive examples, the New J&J Defendants had/have the same headquarters of Old JJCI in Skillman, New Jersey and Kenvue operates from the same manufacturing sites as Old JJCI.

g. The New J&J Defendants (culminating in defendant Kenvue, as described above) used/use the same productive assets and undertake the same research, manufacturing, marketing, distribution and/or sales operations as Old JJCI. The New J&J Defendants maintain and use the same supply chain networks, distribution networks and sales structures as the Old JJCI. The New J&J Defendants extended essentially the same business contracts as Old JJCI to ensure continuity of business operations.

h. The New J&J Defendants (culminating in defendant Kenvue, as described above) make, market and sell the same product lines as Old JJCI. In Kenvue's public filings to the SEC, Kenvue designates three business segments (Self Care, Skin Health and Beauty and Essential Health), the same three business segments of Old JJCI.

i. The New J&J Defendants continued designing, manufacturing, marketing, distributing and selling Johnson's Baby Powder from October 2021 to the present. The New J&J Defendants continue to market and sell talc-containing Johnson's Baby Powder overseas through at least 2023. Talc-containing Johnson's Baby Powder remains available for purchase in the United States at retail stores and online (and therefore the New J&J Defendants continue to profit from such ongoing sales).

j. The New J&J Defendants (culminating in defendant Kenvue, as described above) benefit and profit from the goodwill, research, recognizability, brand loyalty, trademarks and/or customer base of Old JJCI, including as to Johnson's Baby Powder.

k. Kenvue acknowledged and admitted in a public SEC filing that it may be held accountable for the harm caused by the talc-containing products made and sold by Old JJCI. Kenvue admitted that "it is also possible that various parties will seek to bring and will be successful in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." Kenvue also acknowledged that it is "responsible for all liabilities on account of or relating to harm arising out of, based upon, or resulting from, directly or indirectly, the presence of or exposure to talc or talc-containing products sold outside the United States or Canada."

l. The New J&J Defendants continue the same media and/or

communications campaign (that includes false statements and/or misrepresentations about the asbestos content and health risks associated with the same talc-containing products sold by Johnson & Johnson, Old JJCI and the New J&J Defendants) designed to influence regulators and/or public opinion.

m. For purposes of clarity and avoidance of doubt, this Second Amended Complaint is not asserting and does not assert claims against, or seek any relief from, LTL during or while a stay, injunction or bar order is imposed by the Bankruptcy Court (or any other court) in connection with its Chapter 11 Proceedings, and no relief obtained by Plaintiffs pursuant to the Complaint will be used by the Plaintiffs against LTL in any manner. Plaintiff reserves all rights to assert claims against LTL in the event any stay of litigation concerning LTL is lifted or otherwise discontinued.

85.    In September 1965, J&J's wholly-owned subsidiary Docrom, Inc., incorporated in Vermont for the purpose of acquiring Eastern Magnesia Talc Co., Inc. Immediately thereafter, Docrom changed its name to Eastern Magnesia Talc Co. ("EMT"). In September 1967, EMT changed its name to Windsor Minerals, Inc. ("WMI"). For J&J, WMI, among other things, mined and processed Vermont talc that was then incorporated into JBP. Such Vermont talc mines included the Hamnondsville, Argonaut and Hamm mines.

86.    Johnson's Baby Powder ("JBP") sold in the United States contained (a) Italian talc (from the Fontane mine in Val Chisone, Italy) from June 1946 to April 1964, (b) Vermont talc (Emtal Extra) from April 1964 to December 1965, (c) a combination and/or blend of Vermont talc (Emtal Extra) and Italian talc from December 1965 to December 1966, (d) Vermont talc (Windsor 66) from December 1966 to late 1979, (e) Italian talc from late 1979 to early- to mid-1980, (f) Vermont talc (Windsor 66) from 1980 to 2003 and (g) Guangxi, Chinese talc from 2003 2020 and beyond.

### ii.    J&J[1] knew that asbestos exposure causes mesothelioma

87.    Throughout the time that J&J made and/or sold JBP that plaintiff used and was exposed to, J&J knew that asbestos exposure can and does cause mesothelioma.

88.    Since the 1930s, J&J employees in its medical department knew of scientific and medical literature demonstrating that asbestos exposure is associated with cancer. Since at least the 1930s onward, J&J received literature discussing the health hazards of exposure to asbestos. J&J kept abreast, and remained specifically aware of, the published scientific and medical literature discussing asbestos dangers. By the late 1960s, J&J's employees, including Mr. Ashton, read scientific literature associating asbestos exposure and mesothelioma. J&J recognized the seriousness of even a small amount of asbestos in JBP in repeatedly observing in internal memoranda throughout the 1970s that

---

[1] Plaintiff herein refers to Johnson & Johnson, Old JJCI and the New J&J Defendants as, collectively, "J&J."

scientific literature showed that relatively low levels of asbestos exposure can cause cancer and mesothelioma.

89.    An October 1997 internal J&J memorandum recognized that "the association between asbestos and both pleural and peritoneal mesothelioma has clearly been established since the 1960s." Likewise, J&J acknowledged that "mesothelioma may occur after brief or indirect exposure to asbestos" and tremolite is considered one of "the most potent mesothelioma producers." In fact, J&J stated internally in October 1997 that findings of talc, tremolite asbestos and anthophyllite asbestos in lung tissue "suggests that rare cases of mesothelioma among women with no other identifiable exposure might be related to exposure to cosmetic talc."

### iii.    J&J knew of the association of talc and asbestos

90.    Throughout the time that J&J made and sold JBP that plaintiff was exposed to, J&J knew of the association between talc and asbestos. Because J&J knew of such an association, J&J was (at the very least) on notice that their talc products could contain asbestos.

91.    Since 1949, J&J knew of the association of talc and asbestos. J&J's February 22, 1955 raw material specification for "EGT Extra 00000" (Italian talc) stated that it "shall … show no acicular … crystals," defining "acicular" as "needle-like crystals." J&J has previously admitted that specifications for the absence of asbestos and tremolite needles dates back to 1949. J&J made such specifications because it knew of their tendency to occur and harmful effects.

92.    On April 9, 1969, J&J's Mr. Ashton stated that "it is normal to find different levels of tremolite in many U.S. talcs" and "some varieties of [tremolite] match asbestos." On April 15, 1969, J&J's medical director acknowledged that trace amounts of tremolite were "unavoidable." In February 1971, J&J reported that "anthophyllite asbestos is the rock which naturally turns to talc." In October 16, 1997 internal memorandum, J&J acknowledged that "tremolite asbestos" is a "known contaminant [of] some deposits of talc."

### iv.    J&J knew the talc in JBP contained asbestos

93.    Throughout the time that J&J made and sold JBP that plaintiff was exposed to, J&J knew that the talc in JBP contained asbestos.

94.    Throughout the 1950s to 1960s, J&J repeatedly (a) received tests results showing its Italian talc contained amphiboles and serpentine, including the fibrous varieties and (b) acknowledged the presence of such material internally. In February 1956, the Battelle Memorial Institute ("BMI") reported that the Italian cosmetic talc J&J used contained "trace" tremolite with a crystallographic habit consisting of "minor" amounts of "fibrous aggregates and single crystal fibers." Regularly throughout 1957 to the early 1960s, BMI reported to J&J that nearly every sample (of a set numbering well over 100) of Italian talc analyzed contained trace to 6% tremolite. BMI's analyses

Case 23-cv-1205-MBK Document 18-07 Filed 03/21/25 Page 136 of 1429 PageID:
489 RECEIVED NYSCEF: 08/16/2023

included unground ore, processed ore and "off the shelf" JBP. After a February 1959 trip to the Fontane mine in Italy, J&J noted the presence of accessory tremolite. In an October 1961 report to J&J, BMI stated the "trace" quantities of "tremolite," "other amphiboles" and "serpentine" were "usual contaminants" in Italian cosmetic talc. In January 1967, J&J found a competitor talc (Baby Mate) contained "fibrous tremolite." Revealing familiarity gained only by repeated observation of the same in JBP, J&J remarked in an internal memorandum that "the structure of the particles … and the presence of … tremolite lead me to believe this is an Italian talc."

95.     Throughout the 1960s to 1970, J&J repeatedly received information on the presence of tremolite-actinolite and serpentine in the Vermont talc that J&J incorporated in JBP. In August 1961, BMI told J&J that three of three samples Hammondsville, Vermont talc ore contained trace to 1% "altered amphibole." A November 1967 analysis by J&J found trace to 4% tremolite and serpentine in two samples of Vermont ore J&J recently mined. A December 1970 analysis by the Colorado School of Mines Research Institute ("CSMRI") found "tremolite-actinolite inclusions" at numerous points in the Hammondsville, Vermont mine.

96.     Throughout 1971 to 1975, J&J's own consultants (CSMRI, McCrone, Dr. Pooley) repeatedly informed J&J that its products contained asbestos.  In April 1971, CSMRI found trace and 1% tremolite-actinolite in two samples of "final product" containing Vermont talc. In July 1971, CSMRI found trace to 3% tremolite-actinolite in six of seven samples containing Vermont talc used in JBP. In September 1971, McCrone told J&J that it found chrysotile fiber in both J&J's medicated powder ("MP") and Shower-to-Shower ("STS") products. In October 1972, McCrone reported to J&J that it found "a few individual crystals of tremolite, some rod shaped" in both J&J samples. In May 1973, J&J's T.H. Shelley reported that its consultant, Dr. Pooley, found "asbestos" in J&J's Vermont talc. In April 1974, McCrone told J&J that it found "fibrous tremolite" and/or "chrysotile asbestos" in 15 samples from J&J's Argonaut ore body. In July 1975, McCrone reported "confirmed asbestos" in 9 samples of J&J's Vermont fines, including amphibole fibers occurring in bundles. In November 1975, McCrone told J&J that it detected amphibole asbestos fibers" in 13 samples of Vermont WMI talc ore, including some with a "rather high" number of fibers and "bundles" of fibers.

97.     Throughout 1971 to 1975, independent analysts repeatedly found asbestos in J&J's products and informed J&J of the results. In July 1971, Dr. Langer of Mt. Sinai in New York City reported to J&J that his electron microscopy analysis showed "very fine fibers" of "chrysotile asbestos" in JBP. In 1972, Dr. Hutchins of the University of Minnesota reported to J&J that he found chrysotile asbestos in both JBP and STS. In April 1972, NIOSH found 13.3 million fibers per gram by PCM longer than 5um in JBP. In August 1972, Dr. Lewin found 5% chrysotile in a sample of J&J's STS. In August 1972, the FDA told J&J that it found thin chrysotile asbestos fibers in J&J's STS, including fibers with 10:1 to 50:1 aspect ratios (ratios of length-to-width). In March 1974, Dartmouth College's Professor Reynolds analyzed J&J's talc to conclude "actinolite is the dominant fiberform amphibole in the ore and talc produced provided by" WMI. In September 1975, J&J reported that Dr. Langer's manuscript found off-the-shelf JBP contained chrysotile asbestos, tremolite and anthophyllite.

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM    INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057                              RECEIVED NYSCEF: 08/16/2023

Case 23-cv-12051-MBQ   Document 18-09   Filed 03/21/25   Page 137 of 1429 PageID:
Exhibit A - Second Amended Main Complaint    Page 29 of 74

98.    Throughout 1971 to 1975, J&J routinely acknowledged the presence of tremolite and actinolite, including their asbestos varieties, in JBP. In a May 1971 memorandum, J&J's Mr. Ashton recognized the presence of tremolite "needles" in its Vermont-supplied talc. In July 1971, J&J's Dr. Nashed admitted that Vermont ore supplying JBP contained "trace amounts of fibrous minerals (tremolite/actinolite)." In an August 1971 memorandum, J&J's Mr. Ashton referred to the typical mineralogy of Italian cosmetic talc as containing chrysotile, tremolite and actinolite. In August 1972, J&J analyzed a sample of J&J's product (the same sample as Dr. Lewin) to find 1 of 500 particles being a "fiber, rod or needle" with one-third of those being tremolite. After receiving McCrone's report, J&J's Dr. Goudie stated in October 1972 that "there are trace quantities present [in J&J's talc products], confirmed both by McCrone and Bill Ashton. Levels are extremely low, but occasionally can be detected optically. This is not new." On April 26, 1973, J&J Dr. Petterson conceded that J&J defense on the grounds that its Vermont source mine is asbestos-free "is over." He confirmed that "we are … confident that fiber forming, or fiber type minerals could be found" in its source. He admitted that Our Baby Powder contains … occasionally sub-trace quantities of tremolite or actinolite … identifiable (optical microscope) and these might be classified as asbestos fiber." In April 1973, J&J examined JBP samples, finding "trace" tremolite-actinolite in all four samples with actinolite particles shaped as "prismatic, columnar, parallel-sided rods." In May 1973, the president of J&J subsidiary's WMI, Roger Miller, told J&J the Vermont "ore body contains actinolite." In May 1973, J&J's Mr. Ashton stated the "the first showing of actinolite we know of is October 1972."

99.    After the mid-1970s, J&J continued to consistently and repeatedly receive information that the talc in JBP contained asbestos. In April 1977, EMV Associates told J&J that it found tremolite, including "fibrous tremolite," in four samples. In December 1977, Mountain States Research and Development told J&J that its Vermont ore contained trace to 4% tremolite-actinolite, including tremolite-actinolite occurring as "long prismatic needles." In March 1988, consultant R.J. Lee reported to J&J that it found 0.024% chrysotile and 0.14% fibrous tremolite in JBP. In November 1990, McCrone informed J&J that its talc contained anthophyllite fiber and chrysotile. In 1991, Dr. Blount published a paper analyzing samples of JBP, finding 0.6 to 0.8% tremolite, including tremolite "needles" (structures with aspect ratios of 6:1 to 15:1) and "fibers" (structures with aspect ratios greater than 15:1). The list of positive results continues until at least October 2019 when the FDA reported chrysotile asbestos in JBP still on shelves.

### v.    J&J knew that users would inhale talc dust when using JBP

100.    Throughout the time that J&J made and sold JBP that plaintiff used, J&J knew that users inhale some portion of the talc and therefore asbestos fibers. Throughout this time, J&J knew that particles inhaled could reach deep into the lung.

101.    In April 1969, a physician at J&J stated that he "reviewed the literature on the hazards relating to the inhalation of talc particles on several occasions" and received inquiries from pediatricians "expressing concern over the possibility of adverse effects on the lungs of babies or mothers who might inhale substantial amounts of our talc formulations." Beginning in the 1970s, J&J conducted numerous studies showing the

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM     INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057     RECEIVED NYSCEF: 08/16/2023

Case 3:23-cv-12002-MBK   Document 18-09   Filed 03/12/25   Page 30 of 74   PageID:
Exhibit A - Second Amended Joint Complaint     Page 30 of 74

quantity of talc per use and the amount of dust that becomes airborne from the ordinary application of JBP.

### vi.    Despite the depth of its knowledge, J&J failed to warn

102.    J&J never warned. J&J never placed any sort of label on its products indicating it contained asbestos. J&J has always told the public that there has never been a single asbestos fiber in its products. J&J never affix labels and warnings stating the products contained asbestos and can cause fatal diseases such as mesothelioma. Prior to approximately 2017, J&J never provided the consumers/end-users, regulators, courts and/or the public the numerous reports, results and analyses that it had showing the presence of asbestos minerals and/or asbestos in the sources of talc (talc ore) of JBP, milled talc that would go in JBP and/or JBP bottles themselves.

### vii.    J&J failed to develop and implement a safer cornstarch alternative

103.    J&J failed to develop an alternative to talc in JBP in an expeditious manner.

104.    J&J knew that other companies began using cornstarch for baby powders in the early 1900s. By 1964, J&J had begun a cornstarch development program. In June 1971, J&J internally acknowledged the need to "develop alternatives to talc." After recognizing that talc-containing JBP contains tremolite and actinolite that might be classified as fiber in April 1973, J&J's Dr. Petterson noted that "cornstarch is obviously another answer. The product by its very nature does not contain asbestos fibers." In November 1973, J&J referred to the "corn starch contingency" as an alternative to address its problems with asbestos in talc-containing JBP. In March 1976, the chief of pathology for NIOSH told J&J's medical director that he recommends against using talc on babies because of the possibility of asbestos contamination.

105.    J&J failed to introduce cornstarch JBP in the United States until the late 1970s.

106.    Once J&J began selling cornstarch-containing JBP, J&J failed to fully replace talc-containing JBP, continuing to sell it in the United States through 2020. In August 1983, J&J surveyed pediatricians to find they are "strongly biased against" talc-containing baby powder. J&J interpreted this as an "opportunity" to "leverage pediatricians' positive disposition towards corn starch." Some J&J advertisements stated that cornstarch JBP was "the safest powder you can use on your body." J&J nevertheless continued to sell talc-containing JBP.

107.    Talc-containing JBP was defective because it served no medicinal value and it was no more effective than cornstarch, a safer alternative.

108.    In June 1966, J&J commented on a recently-published scientific paper stating that "the traditional association of talcum powder and babies should be

abandoned" because of three deaths from babies inhaling talc powder. The paper stated that talc "has no medicinal value." In April 2008, J&J's marketing team acknowledged internally "the reality" that "talc is not actually safe for use around babies." Re-recognizing what J&J knew two generations before, J&J's employees stated that selling talc-based baby powder conflicts with their "Best for Baby" slogan.

### viii.    J&J failed to adequately and meaningfully test JBP

109.    By 1971, J&J knew of transmission electron microscopy ("TEM") and its advantages in its ability to detect asbestos in talc. J&J began receiving test results using this tool from its consultants in 1971. In January 1974, J&J wrote to its subsidiary WMI that there is "general agreement that [TEM] is the only absolute proof with electron diffraction for the identification of asbestos in talc." In April 1974, J&J received a report from McCrone in which TEM found asbestos in over a dozen J&J samples yet asbestos minerals were not detected by using less powerful and less sensitive methods.

110.    By 1973, J&J was aware of a preconcentration preparation technique that separates the asbestos from the rest of the talcum powder. This technique, particularly when used along with TEM, was most able to detect the presence of asbestos in talc and provide the most accurate results. In May 1973, J&J acknowledged that Dr. Pooley, using the technique, found actinolite asbestos in J&J's Vermont product.

111.    J&J made the conscious decision to reject the preconcentration technique in favor of less powerful, less sensitive and less accurate methods that permit millions of asbestos fibers in JBP to go undetected. J&J chose to reject the preconcentration technique because J&J knew that using more sensitive techniques would find asbestos in JBP. In May 1973, J&J's Dr. Rolle wrote that "the limitation of [the preconcentration technique] is it may be too sensitive." In June 1973, J&J's T.H. Shelley expressed concern that its "Vermont talc will from time to time show traces of tremolite" using the preconcentration technique. In December 1974, J&J did not object to the CTFA's conclusion that a "disadvantage" of the use of TEM is that "its ultra-sensitivity could be a problem." In February 1975, J&J rejected the use of the preconcentration method, concluding it was not "in the worldwide company interest."

112.    Despite knowing the superiority of TEM over the J4-1 method, J&J did not itself test its talc by TEM until about 1995.

113.    In 1995, J&J began testing its talc by TEM on a limited basis under its TM7024 procedure. J&J designed its reporting methodology to yield negative results rather than accurate results. J&J implemented its TM7024 procedure. It required J&J to report results as negative and/or "not quantifiable" unless the analyst found at least five asbestos fibers of the same asbestos mineral variety. Analysts identifying up to sixteen asbestos fibers (four of four different asbestos varieties) reported the analysis as "not quantifiable" and/or a "non-detect."

114. J&J tested a vanishingly small proportion of the talc it sold. It test a monthly composite of its float feed and a composite of two silos (several hundred tons of talc) quarterly.

115. J&J promoted regulations of asbestos in talc that called for less sensitive methods of detecting asbestos in talc. In September 1974, J&J wrote to the FDA that "a substantial safety factor can be expected with talc containing 1% w/w asbestos fibers. Therefore, methods capable of determining less than 1% asbestos in talc are not necessary to assure the safety of cosmetic talc." In December 1974, J&J wrote to the CTFA to state that "it is critical for the C.T.F.A. to now recommend these methods to the F.D.A. before the art advances to more sophisticated techniques with higher levels of sensitization." J&J knew that more sensitive techniques would gain greater general acceptance with time and, by encouraging adoption of weaker and under less sensitive techniques then, J&J knew it would be harder for the FDA to alter those standards later.

### ix.   J&J made false statements to the FDA, courts and American public

116. J&J believed that JBP was its "flagship product." In numerous internal documents, J&J referred to JBP as its "sacred cow" and "golden egg." As a diverse company with numerous revenue streams, J&J knew that changed public perception of its flagship product as associated with cancer might affect its other businesses. J&J believe that that if the truth about JBP's asbestos content became exposed, it would affect their bottom line. Consequently, J&J went to great length to conceal evidence. J&J engaged in a pattern of making false statements to government entities, courts and the American public.

117. By the early- to mid-1970s, J&J was well-aware that it would be false to tell the FDA that no test of JBP ever found asbestos. Even more egregious, by the early 1970s, J&J knew that it was false to say no one ever detected tremolite or actinolite in its talc. By that time, J&J had received well over 100 results showing otherwise, as stated in greater detail in above paragraphs. In February 1956, J&J received a report stating its Italian contained tremolite and fibrous material. Throughout the 1950s and 1960s, J&J received dozens of test results from BMI showing the presence of amphibole minerals and serpentine, including their fibrous varieties. Throughout 1971 to 1975, J&J repeatedly (a) received test results from its own consultants (CSMRI, Dr. Pooley, McCrone) concluding that J&J's talc contains asbestos, including chrysotile asbestos, (b) was told by independent analysts (Dr. Langer, Dr. Lewin, Dr. Hutchinson, Dr. Reynolds) that its talc contains asbestos, including chrysotile asbestos and (c) acknowledged the presence of tremolite and actinolite in its talc, including the fibrous variety. By 1971, and certainly by 1976, J&J had received well over 100 test results finding, (a) at the very least, amphibole minerals (e.g., tremolite, actinolite), (b) the asbestos varieties of amphibole minerals and/or (c) chrysotile.

118. Discussions between the FDA and the CTFA subcommittee occurred throughout the early- to nid-1970s. At the time, the FDA was considering regulating and overseeing asbestos in cosmetic talc products. The FDA eventually asked CTFA

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM                INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057                                      RECEIVED NYSCEF: 08/16/2023

Case 23-cv-12061-MBK Document 18-09 Filed 03/12/25 Page 141 of 1429 PageID:
Exhibit A - Second Amended Main Complaint     Page 33 of 74

subcommittee members to send the FDA their own internal test results. The FDA would use that information to analyze the composition of popular cosmetic talc products and evaluate the frequency and rigor of the industry's internal testing programs. The CTFA members knew the FDA would base its decision on whether and how to regulate the industry on the information members provided. J&J gave its response in writing on March 15, 1976. J&J told the FDA that, by XRD, DTA and TEM analysis, no asbestos had ever been found. J&J also asserted that "no amphiboles or serpentine minerals have been detected." Despite over 100 internal results showing otherwise, J&J claimed no one ever found tremolite or actinolite in its talc. Despite numerous tests from both CSMRI and McCrone finding asbestos in its talc, J&J falsely denied its consultants such as CSMRI and McCrone ever found asbestos or asbestos minerals. In short, J&J lied to the FDA.

119.    J&J's false statements to the FDA in March 1976 were not the first or last. For example, in October 1971, J&J's consultant McCrone purposely omitted findings of asbestos in reports to be submitted to the FDA. J&J knew McCrone omitted the positive findings and approved. It wrote back to McCrone that presenting the truth "would only tend to confuse the issue perhaps with the FDA." Despite numerous findings of chrysotile asbestos by multiple analysts, J&J's Dr. Rolle told FDA representatives in February 1975 that no cosmetics talcs (from J&J or otherwise) contain chrysotile. J&J continued this pattern for decades. In response to a Citizens Petition to J&J and others regarding ovarian cancer risk, J&J told the FDA in 1995 that it had confirmed "the absence of asbestiform minerals." When editing J&J's website in 2016, J&J acknowledged internally that it "cannot say our talc-based consumer products have always been asbestos free." But, on March 17, 2016, J&J represented to the FDA that no asbestos structures had ever been found in J&J's talc-based products by any testing method.

120.    J&J made false statements to other government entities. J&J represented to the National Toxicology Program that there has never been any evidence of asbestos in talc used in JBP. J&J submitted misleading and false statements to the CTFA, who J&J knew would convey that false information to others. The CTFA conveyed J&J's false information to the Occupational Health and Safety Association ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH") and the Mine Health and Safety Administration ("MHSA").

121.    J&J engaged in a pattern of manipulating and destroying evidence. As stated above, in October 1971, J&J ratified McCrone's purposeful omission of a positive finding for asbestos.  In a report dated October 27, 1972, McCrone found tremolite asbestos in J&J talc products. J&J made a handwritten note stating: "DO NOT USE THIS REPORT." The report was then revised to remove the quantification of asbestos found. In March 1978, the CTFA conducted a "round robin" in which committee members tested each other's samples. When the results distributed amongst members showed which members' products contained asbestos, a J&J employee (and then-chairmen of the CTFA committee) instructed members to "destroy your copy of the table" containing the results. Making every effort to conceal positive findings for asbestos, J&J and its consultant, McCrone, established a protocol where McCrone segregated positive findings. For example, in 1986, under McCrone Project No. ME-2275 and Purchase Order

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM          INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057                                                    RECEIVED NYSCEF: 08/16/2023

Case 23-cv-12055-MBK   Document 18-09   Filed 03/12/25   Page 142 of 1429 PageID:
                                    500
Exhibit A - Second Amended Join Complaint    Page 34 of 74

WS-0503, McCrone authored two separate reports of test results for J&J's subsidiary WMI. The first stated all samples contained "no quantifiable" amounts of asbestos with three samples noticeably missing from the numbering sequence of samples. The second reported three samples contained chrysotile.

122.    Since 1969, J&J knew of the potential for litigation arising from the inhalation of its talc products. On April 15, 1969, J&J's medical director Dr. Thompson advised the company of the danger of inhaling "needle-like" crystals of tremolite in J&J's talc. Reasoning that the use of J&J's "products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that [J&J] could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." Dr. Thompson recommended that "someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise." He also warned J&J that it might become compelled to remove its talc products "if it became known that our talc formulations contained any significant amount of tremolite."

123.    J&J's medical director's premonitions proved true. J&J was named in suits related to talc or talc exposure as early as 1971. Revealing the existence of then-existing litigation, J&J identified documents in 1971, and nearly every year thereafter, relating to "ongoing," "pending," and "anticipated" litigation regarding JBP. In the 1970s, for example, J&J was named in cases in 1971, 1972, 1973, 1974, 1976, 1977, 1978, 1979. The trend continued through the 2010s.

124.    In litigation concerning JBP spanning the 1970s to 2010s, J&J engaged in a pattern of concealing known material evidence. J&J was repeatedly asked in litigation whether the talc in JBP contained asbestos (or, more specifically, whether there exists "any evidence"). J&J consistently represented no such evidence existed. In the late 1980s, the president of J&J's subsidiary WMI (the entity that mined and milled Vermont talc for use in JBP), Roger Miller, submitted several affidavits. Despite being personally copied on numerous test results finding asbestos and affirmatively making contrary statements in documents, Mr. Miller gave false affidavits stating no such evidence exists. In some discovery responses, J&J went as far as claiming its talc products never contained the mineral tremolite or fibrous talc. J&J has since been forced to admit these sworn statements were false. Through decades of litigation, J&J managed to never produce a single internal test result for asbestos until 2017. Among other things, J&J's decades-long, knowing concealment (a) induced dismissals under false pretenses, (b) deprived litigants of information about Italian and Vermont talc and, (c) importantly, contributed to the perception of J&J's products as safe for use that the plaintiff (and many others) relied on to his detriment.

125.    J&J had an obligation to preserve evidence once litigation concerning the health effects of its talc products was foreseeable. J&J foresaw litigation by 1969 and was indeed involved in such litigation in the 1970s. Despite its legal obligation, J&J failed to preserve evidence. J&J failed to preserve samples of its talc products and talc ore until 2017. J&J failed to retain all test results that J&J generated or received. Beginning in the early 1970s, J&J maintained a paper file documenting the content of its telephone

conversations with the FDA related to its talc products. The file no longer exists because of J&J's failure. J&J lost or destroyed all but a few discovery responses that it gave in litigation in the 1970s to 1990s. When J&J sold WMI to Cyprus Mines Corporation in January 1989, J&J destroyed records relating to its Hammondsville, Vermont mining operation. J&J failed to institute a litigation hold of any kind until the late 1990s.

126.     J&J consistently represented to the public that JBP was safe. JBP's label called it the "Purest Protection." J&J advertised JBP as "the purest." In response to consumer inquiries, J&J consistently stated that asbestos had never been found in JBP. As recently as December 2018, J&J told the public that JBP "does not contain asbestos and never will. We test every single lot to ensure it." The statement contradicts dozens of test results and its protocols calling for far less frequent testing. J&J has acknowledged that the intent of these representations to consumers was "to reassure them they could feel safe and comfortable using Johnson's Baby Powder because it does not contain asbestos."

127.     As a direct result of J&J's decades-long pattern of consistently making false statements that no positive result for asbestos in JBP ever occurred, J&J altered public perception that resulted in consumer use of JBP. J&J made these false statements deliberately as part of a wider pattern of concealing evidence. Plaintiff (and many others similarly situated) relied on such misrepresentations to his detriment and caused his continued use of the product.

### B.     Whittaker, Clark & Daniels and Brenntag Specialties, LLC

#### i.     WC&D's vast talc enterprise

128.     With origins dating back to 1890, Whittaker, Clark & Daniels, Inc. ("WC&D") incorporated in New York in 1918. From 1918 to 1971, WC&D's headquarters were in New York City. In 1971, WC&D reincorporated in, and moved its headquarters to, New Jersey.

129.     Since its formation, WC&D operated as a supplier of mineral products with talc its biggest seller and specialty. For decades, WC&D was one of the largest distributors of talc products in the United States. WC&D offered a diverse variety of talc products to, among others, the paint, rubber, pharmaceutical and cosmetic industries. WC&D sold talc from all, or nearly all, domestic talc sources, including Alabama, California, Georgia, Montana, New York, North Carolina, Texas and Vermont. WC&D sold talc from many international sources, including Italy, Canada, France, India, Korea, China and Australia. WC&D maintained several branch offices and over a dozen warehouses throughout the United States to aid in its distribution scheme.

130.     To offer customers a wide range of talc products, WC&D established a network of business relationships with other talc importers, miners and millers. From about 1947 to 1965, WC&D owned about 40% of the Fine Pigments Corporation involved in the processing of Montana talc. Throughout the 1950s to 1980s, WC&D sold talc from North Carolina mined by the Hitchcock Corporation and the Warner

Case 23-cv-1065-MBK Document 18-9 Filed 09/12/23 Page 141 of 142 PageID:
Exhibit A - Second Amended Joplin Complaint   Page 36 of 74

Corporation. Beginning in the early 1960s, WC&D owned (all or much of) Pioneer Talc involved in the mining, processing and sale of Texas talc. In January 1966 and August 1970, New York-based WC&D entered a contract with New York-based Pfizer. The contract called for WC&D to promote and sell Pfizer's California and Montana talc products. In around 1980, WC&D formed a subsidiary, Clark Minerals, Inc. Throughout 1981 to 1994, WC&D 's Clark Minerals (a) milled and processed talc in upstate New York using talc ore from Montana, North Carolina, Australia, Korea and China and (b) bagged the products without warnings from this New York location. In the late 1980s, WC&D establish a subsidiary Cherokee Minerals to process and sell talc from the Murphy, North Carolina district.

131.   WC&D established a close business relationship with Charles Mathieu, Inc. ("Mathieu"), including its subsidiaries American Talc Company ("ATC"), Metropolitan Talc Company ("Metropolitan"), Resource Processors and Imperial Products. From at least the 1930s through 1979, Mathieu held the exclusive right to import and sell Italian cosmetic talc from SVC in the Val Chisone, Italy region. Mathieu subsidiary ATC (a) mined talc from its Winterboro, Alabama deposit and (b) milled talc from the Alabama deposit (late 1950s to late 1970s), the Murphy, North Carolina talc district and the Willow Creek, Montana mine (1970 to 1979). Mathieu subsidiary Metropolitan formed in 1964 for the purpose of processing talc from at least (a) the Henderson mine in Canada and (b) SVC from Val Chisone, Italy.

132.   WC&D began distributing Italian talc for Mathieu in the 1930s and 1940s. By the early 1960s, WC&D became the sales agent for Mathieu, including its subsidiaries Metropolitan and ATC. In fact, WC&D owned 49% of Metropolitan from December 1964 to November 1977. As the sales agent for Mathieu's Metropolitan, WC&D sold and/or received a commission on all, or virtually all, Italian cosmetic talc Mathieu sold (and Mathieu held the exclusive right to Italian talc in the U.S.). The Italian talc was imported into New York City before milling. WC&D also sold Metropolitan's Canadian talc throughout the 1960s until at least the late 1970s. As the sales agent for Mathieu's ATC, WC&D sold ATC talc, including talc from (a) the Winterboro, Alabama mine, (b) the Regal mine in North Carolina and (c) the Willow Creek, Montana mine.

**ii.   WC&D sold talc that plaintiff was exposed to**

133.   WC&D sold talc to codefendants and/or finished product manufacturers. Such talc was then incorporated in talc-containing finished products that plaintiff used to. WC&D made some of these sales to codefendants when WC&D's headquarters were located in New York City up until 1971.

134.   WC&D knew that the talc it milled, sold, supplied and/or distributed would be incorporated into finished cosmetic products and such products would be used in the reasonably foreseeably, expected and intended ways, including by shaking powder out of a bottle, scraping a brush across a compact and applying a poof or brush to a loose powder then the body or face.

135.    To Pfizer's Coty division for use in Coty's Airspun loose face powder, WC&D sold at least (a) Canadian talc (including Talc #4601) in at least 1969 to 1970 and (b) Italian talc (Talc #1615) throughout 1970 to 1979 and (c) some Alabama talc (Talc #141). A November 1969 WC&D sales report and March 1970 WC&D memorandum reveal WC&D sold Canadian talc to Pfizer in at least 1969 to 1970. Until or through 1973, WC&D sold such talc to Pfizer's manufacturing facilities for Coty Airspun in New York City.

136.    WC&D began selling talc to Avon in the 1940s and continuously to Avon through at least the 1990s. WC&D sold Avon talc from Italy (including Talc #1615 and Talc #1621), Canada (including Talc #4602), North Carolina (including Talc #2450 and Regal), Alabama (including Talc #141) and Montana (including Pfizer's Talc #399 and talc from Willow Creek, Montana). Some talc sales were sent to Avon's Suffern, New York manufacturing facility.

137.    WC&D sold substantial quantities of talc to, among other manufacturers, (a) American International Industries, serving as the exclusive supplier to the Clubman shaving talc products throughout at least 1987 to 2004, (b) entities making Gold Bond body powder talc products, serving as the exclusive supplier of such talc from at least 1990 to 2000 and (c) Revlon, with WC&D's Talc 141 (ground by and sold from WC&D's New York-based Clark Minerals location) specified in Revlon's Touch & Glow face powder from 1985 onward.

### iii.    WC&D knew that its talc products contained asbestos

138.    WC&D always remained at the forefront of talc industry knowledge and always held itself out as an expert on the properties of talc. WC&D distributed industry trade publications. WC&D promoted itself as "The Talc House." In November 1959, Johnson & Johnson asked WC&D for its advice on alternate talc sources suitable for its baby powder. In November 1964, leaders of Pfizer's Coty division stated that WC&D knew "more about the requirements of the cosmetic industry in regard to talc than anyone else in the country."

139.    Throughout the time that WC&D sold talc to which plaintiff was ultimately exposed, WC&D knew, and in the exercise of reasonable care could have and should have known, that its talc products contained asbestos.

140.    WC&D knew that the Italian talc that it sold and profited from contained asbestos. WC&D repeatedly received information that the Italian talc that it sold contained asbestos. In a March 1964 edition of the "Schimmel Brief" in which WC&D's trade publications were cited, an article entitled "Talc for Baby Powder Refined by Flotation" referred to Italian talc containing 2.6% "fibers" and "2.4% of impurities, mainly dolomite and tremolite." In September 1971, WC&D was forwarded test results from Bristol-Myers' Dr. Berdick showing the presence of probable chrysotile fiber in Italian cosmetic talc. In June 1972, WC&D received test results showing Italian cosmetic talc contained 1% chrysotile by x-ray diffraction ("XRD"). In August 1972, WC&D learned that its consultant, Dr. Lewin of NYU, found tremolite and chrysotile in over

forty samples of cosmetic talc (including J&J), many of which were WC&D's customers. In September 1972, Dr. Lewin reported to WC&D that its Italian talc contained 2% tremolite and 0.5% chrysotile. In April 1976, McCrone told WC&D its Italian talc contained tremolite.

141.    WC&D knew that the Canadian talc that it sold contained asbestos. In November 1971, Dr. Lewin told WC&D that he found asbestos minerals in the fibrous form in two grades of WC&D's Canadian talc. In November 1971, E.S. Laboratories told WC&D it detected 3% tremolite in Talc #4615, a Canadian talc, by XRD. In May 1972, the same lab found 10% tremolite and 15% chrysotile in Talc #4615. In July 1972, Dr. Lewin told WC&D that Talc #4601, a Canadian talc, contained 1-2% tremolite and 1-2% chrysotile. In December 1972, Dr. Brown of Princeton informed WC&D that Talc #4615 contained 10% tremolite and 3% chrysotile. In April 1973, the FDA told WC&D that it found chrysotile in talc #4603, a Canadian talc. In April 1976, McCrone told WC&D that Talc #4615 contained 10-20% tremolite with 5-10% of the fibrous variety (i.e., 0.5-2.0% fibrous tremolite).

142.    WC&D knew that the Montana talc that it sold (from both Willow Creek and Pfizer's mines) contained asbestos. In June 1972, E.S. Laboratories found detectable chrysotile in WC&D's Talc #399 containing Pfizer's Montana talc. It likewise found 1% chrysotile in WC&D Talc #4609 containing 60% Willow Creek talc and 40% Italian talc. In November 1973, Dr. Fullam of New York reported to WC&D that he found (a) 450,000 and 18 million chrysotile and amphibole fibers per gram, respectively, in Pfizer's Montana talc (from the Treasure or Regal mines) and (b) 5.2 and 29.25 million chrysotile and amphibole fibers per gram, respectively, in Willow Creek, Montana talc.

143.    WC&D knew that the North Carolina talc that it sold contained asbestos. In November 1973, Dr. Fullam reported to WC&D that he found 6 million and 20.85 million fibers of chrysotile and amphibole fibers per gram, respectively, in North Carolina cosmetic talc. In May 1977, Dr. McCrone (for the NBS) detected tremolite-actinolite in Hitchcock, North Carolina finished product (sample 34) and ore from the Hitchcock, North Carolina mine #5 (sample 46). Such talc was used to make WC&D Talc #2450. In August 1978, McCrone told WC&D that "240 NC Talc" contains 1% tremolite-actinolite of which 65% was of the fibrous variety (in other words, 0.65% fibrous tremolite-actinolite). Former WC&D employee and corporate representative George Dippold admitted that WC&D received test results showing North Carolina talc contains asbestos.

144.    WC&D knew that the Alabama talc that it sold contained asbestos. In November 1973, Dr. Fullam reported to WC&D that he 6.07 million and 21.82 million fibers of chrysotile and amphibole fibers per gram, respectively, in Alabama cosmetic talc.

145.    WC&D received positive test results for Vermont talc throughout the 1970s and 1980s. E.S. Laboratories reported findings of tremolite and/or chrysotile in Talc #156 (Vertal 95) in July 1972, October 1977, May 1978, September 1980 and July 1987.

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM    INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057                                RECEIVED NYSCEF: 08/16/2023

Case 23-cv-1051-MBKQ   Document 18-09   Filed 03/22/25   Page 147 of 1429 PageID:
Exhibit A - Second Amended Joint Complaint    Page 39 of 74
505

### iv.    WC&D knew that asbestos exposure causes mesothelioma

146.    Throughout the time that WC&D sold talc products that plaintiff was exposed to, WC&D knew that exposure to asbestos can cause deadly diseases, including mesothelioma. Consequently, WC&D knew the asbestos in its talc products can cause such diseases.

147.    WC&D sold raw chrysotile asbestos from Asbestos Corporation, Ltd. from the 1930s through 1975. Throughout the time that WC&D sold asbestos, WC&D was subject to federal and state regulations on asbestos, including New Jersey and New York laws regulating asbestos in the workplace since the 1940s to 1950s. In February 1973, the Quebec Asbestos Mining Association sent WC&D literature on ways to protect from asbestos hazards. As a member of the National Paint & Coatings Association ("NPCA"), WC&D received asbestos handling guidelines in October 1973.

### v.    WC&D failed to warn

148.    WC&D never warned. WC&D never placed a label on (or with) any of its products indicating that it contained asbestos fibers. WC&D never informed its customers and/or end users that its talc products contained asbestos. WC&D never placed a caution or warning of any kind on (or with) its products indicating that such asbestos-containing talc can cause deadly diseases, including mesothelioma. WC&D never warned its customers and/or end users that its talc products can cause fatal diseases, including mesothelioma.

149.    WC&D knew, and through the exercise of reasonable care should have known, that the finished product manufacturers that it sold talc to (for which plaintiff was ultimately exposed to) would not provide warnings for end users as to the asbestos content and unreasonably dangerous nature of the product and, with such knowledge, WC&D failed to take adequate steps to ensure that the finished product manufacturers and end users possessed adequate information as to the asbestos content and carcinogenic properties of the asbestos-laden or asbestos-containing talc.

### vi.    WC&D failed to adequately and meaningfully test

150.    WC&D failed to test any of its talc products for asbestos until 1971.

151.    By 1972, WC&D learned of TEM. WC&D knew that TEM was more sensitive, and therefore more effective, in detecting asbestos in talc. In October 1976, the CTFA published its J4-1 method which admitted that TEM had "a lower level of detection than by" XRD and TEM "offers greater sensitivity." From its active participation in the CTFA subcommittee and following the CTFA's method, WC&D knew of such statements.

152.    WC&D failed to test its talc products for the presence of asbestos using techniques and tools capable of detecting asbestos at relatively low bulk concentrations.

The only method that WC&D routinely used was by XRD, primarily by contract with E.S. Laboratories.

153.    WC&D failed to test its talc products frequently enough. In July 1972, WC&D told Avon that WC&D did "not regularly analyze for asbestos in each talc shipment." In March 1976, the FDA expressed "great" concern over WC&D's "limited effort to control the quality of their cosmetic talc." It found WC&D's customer assurances "might be misleading and give the cosmetic industry the false impression that [WC&D] talcs are adequately tested for asbestos."

154.    WC&D gave false statements about its talc products.  In an effort to avoid regulation and oversight in March 1976, WC&D failed to tell the FDA (and did not otherwise report to the CTFA) of its own positive findings for asbestos, including chrysotile asbestos, in its talc products. WC&D did not report its findings from ES Laboratories, Dr. Lewin and Dr. Fullam of chrysotile asbestos in Italian, North Carolina, Montana and Canadian cosmetic talc.

### vii.    WC&D continued as Brenntag Specialties, LLC

155.    Some of the corporate history relevant to Plaintiff's claims against defendant Brenntag Specialties, LLC alleged herein is as follows:

A.    In or around November 1998, Brenntag Inc. acquired WC&D, purchasing all (or substantially all) of WC&D's assets. WC&D continued operating the same business. As of February 2004, Brenntag, Inc. was its sole owner or stockholder.

B.    Brenntag, Inc. was a vertically integrated corporate entity under its corporate parent, Brenntag Aktiengesellschaft ("Brenntag AG"), which was in turn a part of the Stinnes Group.

C.    Sometime in late 2003 to February 2004, Brenntag Inc. changed its name to Brenntag North America, Inc. Alternatively, Brenntag, Inc. merged into Brenntag North America, Inc. or Brenntag North America, Inc. operated as the mere continuation of Brenntag Inc. As a non-exclusive example, a February 3, 2004 letter from WC&D's president (Theodore Hubbard) to a talc customer (Chanel) quoted Brenntag, Inc.'s president (Steve Clark) that the "old name" Brenntag, Inc. changed to the "new name" of Brenntag North America, Inc.

D.    In December 2003, both Mineral and Pigment Solutions, Inc. ("MPSI") and Brenntag North America, Inc. incorporated in Delaware. Brenntag North America, Inc. was the sole owner or stockholder of MPSI.

E.    In February 2004, MPSI acquired WC&D, purchasing all (or substantially all) of WC&D's assets. MPSI remained a subsidiary of Brenntag North America, Inc. WC&D immediately ceased its productive business operations. As described further herein, MPSI

Case 23-cv-12851-MBK Document 18-09 Filed 03/21/25 Page 149 of 1429 PageID:
Exhibit A - Second Amended Talc in Complaint    Page 41 of 74
5001

continued the business operations of WC&D; MPSI became a new hat for WC&D.

F.     The officers and directors of pre-February 2004 WC&D continued in their roles as officers and directors of the post-February 2004 MPSI, including the President (Theodore Hubbard), the Vice President (Thomas Gunstra), multiple other Vice Presidents, including Ray Rogers and Robert Przbylowski, corporate secretaries Edward Boyadjian and Julia Bonechi, lab manager Frank McGonigle and controller Bradley Owens.

G.     The operations of post-February 2004 MPSI were identical (or virtually identical) to the pre-February 2004 WC&D. MPSI continued with the same employees, offices, sales contracts and took ownership of WC&Ds pre-February 2004 real estate lease obligations.

H.     In or around July to August 2007, MPSI changed its name to Brenntag Specialties, Inc. Brenntag Specialties, Inc. remained a subsidiary of Brenntag North America, Inc. As described further herein, Brenntag Specialties, Inc. continued the business operations of WC&D and MPSI.

I.     In or around December 2019 to January 2020, Brenntag Specialties, Inc. changed its name to Brenntag Specialties, LLC. Brenntag Specialties, LLC continued the same business operations of WC&D, MPSI and Brenntag Specialties, Inc.

J.     From February 2004 to April 2023, WC&D engaged in no productive business activity (other than managing the defense and payment of claims of those injured from the former sales of WC&D products, including claims alleging injuries from mesothelioma caused or contributed by exposure to the talc WC&D sold). On or around April 26, 2023, WC&D filed for Chapter 11 bankruptcy. The Bankruptcy Court implemented a stay of litigation against WC&D shortly thereafter. The Bankruptcy Court has not issued a stay of such litigation against defendant Brenntag Specialties, LLC.

156.    Under New York law (and/or New Jersey substantive law on these particular issues), defendant Brenntag Specialties, LLC, including under its former names (collectively, as MPSI, Brenntag Specialties, Inc. and Brenntag Specialties, LLC from February 2004 onward, "Defendant MPSI/BSL") is (1) directly liable (as the alter ego) and/or (2) liable as the successor-in-interest for the conduct of (and/or products sold by) WC&D. Defendant MPSI/BSL's liability as a successor-in-interest to WC&D includes (without limitation) that (a) Defendant MPSI/BSL serves as the "mere continuation" of WC&D (and/or the result of a "de facto merger"), (b) the restructuring transactions described above were entered in an attempt to escape liability and/or (c) Defendant MPSI/BSL is the manufacturer, marketer, designer, distributors and/or supplier of the same product line(s) as WC&D.

A.     WC&D business operations continued uninterrupted following the

Case 23-cv-1051-MKQ   Document 18-09   Filed 03/12/25   Page 150 of 1429 PageID:
Exhibit A - Second Amended Sub in Complaint   Page 42 of 74

February 2004 asset purchase transaction under a new name, as Defendant MPSI/BSL repeatedly acknowledged and admitted. As a non-exclusive example, WC&D's president (and the soon-to-be MPSI president) Theodore Hubbard stated in a February 3, 2004 letter to a talc customer (quoting Brenntag, Inc.'s president) that (a) the "old name" WC&D will be changed to the "new name" MPSI, (b) the only difference between WC&D and MPSI will be the name and (c) "business will continue as usual with no reduction in jobs, no changes to any headquarter locations, no change in sales personnel or customer service locations. The phone and fax numbers you currently use will continue under the new entities."

B.   Defendant MPSI/BSL held itself out as a continuation of WC&D and actively encouraged the perception in the eyes of the public.

C.   WC&D and Defendant MPSI/BSL maintained continuity in ownership. Brenntag, Inc. owned WC&D before the February 2004 transaction. Brenntag North America, Inc. owned MPSI after the February 2004 transaction. Per the same February 3, 2004 letter identified above, Brenntag, Inc. and Brenntag North America, Inc. were the same corporate entity with different names. More broadly, MPSI maintained the same position as WC&D vertically integrated within Brenntag AG's broader corporate structure.

D.   WC&D and Defendant MPSI/BSL maintained continuity in employees. All (or virtually all) of WC&D employees continued working for Defendant MPSI/BSL after the February 2004 transaction. There was no change in the health insurance or 401(k) accounts of employees.

E.   WC&D and Defendant MPSI/BSL maintained continuity in leadership and management. Key management continuing in the same (or essentially the same) positions at WC&D before the February 2004 transaction and MPSI after the February 2004 transaction include (without limitation) Theodore Hubbard (president), Robert Przbylowski (vice president), Bradley Owens (treasurer/controller), Thomas Grunstra (VP of marketing), H. Edward Boyadija (secretary) and Frank McGonigle (lab manager/technical services). As of February 12, 2004, the officers of WC&D consisted of Theodore Hubbard, Robert Prezbylowski, Thomas Grunstra, Ray Rogers, H. Edward Boyadijan and Julia Bonechi. The same six individuals were also listed as officers of MPSI in February 2005, February 2006 and February 2007. James Doyle and Theodore Hubbard were listed as directors of WC&D as of February 12, 2004. By February 27, 2004, James Doyle and Theodore Hubbard were directors of MPSI.

F.   WC&D and Defendant MPSI/BSL maintained continuity in operating locations. For many years before and after the February 2004 transaction, WC&D and Defendant MPSI/BSL maintained

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM        INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057                                      RECEIVED NYSCEF: 08/16/2023

Case 3:23-cv-12051-MBK    Document 18-09    Filed 03/12/25    Page 151 of 1429 PageID:
509
Exhibit A - Second Amended Join Complaint    Page 43 of 74

(a) headquarters at 1000 Coolidge Street in South Plainfield, New Jersey and (b) regional offices and/or facilities in Norgross, Georgia, Plainfield, Illinois, Houston, Texas and Laguna Hills, California.

G.    WC&D and Defendant MPSI/BSL maintained continuity in general business purpose. Nothing about the nature of WC&D's business (and what its employees/management did on a day-to-day basis) changed after the February 2004 transaction. Defendant MPSI/BSL maintained business contracts to ensure continuity of business operations. WC&D and Defendant MPSI/BSL maintained the same suppliers (*e.g.*, Luzenac, Minerals Technologies), laboratory, business procedures, sales structures and distribution networks (as reflected/admitted, among other places, in the February 3, 2004 letter identified above).

H.    Defendant MPSI/BSL continued selling and distributing the product lines as WC&D before February 2004 transaction. As non-exclusive examples of talc grades and/or product numbers, Defendant MPSI/BSL continued selling 184 (French talc), 190 (Italian talc), 1745 (Montana talc), IMP 1887L, 2755 (Montana talc), 3465 Supra H and 5215 Olympic H. Defendant MPSI/BSL used the same designations as the pre-2004 WC&D entity and from the same sources as the pre-2004 WC&D entity. Some of these talc grade designations continued to carry the designation "WCD" after the 2004 asset sale, presumably to maintain the marketing/goodwill advantage developed by WC&D.

I.    From late 1998 to February 2004, WC&D letterhead repeatedly and/or consistently featured the name "Brenntag" and/or associated WC&D as "A Brenntag company."

J.    Defendant MPSI/BSL benefitted from the goodwill, recognizability and association with WC&D's business operations. After February 2004, Defendant MPSI/BSL continued distributing material safety data sheets, product data sheets, certificates of analysis, correspondence, brochures, pamphlets and/or other literature (a) created by WC&D (prior to February 2004), (b) with the WC&D name and/or (c) in the same recognizable format as previously WC&D. After February 2004, Defendant MPSI/BSL repeatedly promoted products bearing WC&D names. As a non-exclusive example, a January 2008 Brenntag Specialties, Inc. product data sheet advertised the following talc or mineral products: Whittaker IMP 1887L, Whittaker IMP 1824L, Whittaker IMP 1889L, WCD 1745, Whittaker IMP 1823L, WCD 2755, WCD 2747, WCD 2457, Whittaker IMP 1820L, Whittaker 3328 and WCD 2749.

157.    Plaintiff and Brenntag Specialties, LLC stipulated in April 2022 that Plaintiffs will not pursue alter-ego or successor liability claims against Brenntag

Specialties, LLC unless WC&D cannot satisfy any final judgment or WC&D declares bankruptcy preventing Plaintiff from continuing his pursuit of claims against WC&D. Because WC&D declared bankruptcy around April 26, 2023 and the Bankruptcy Court implemented a litigation stay shortly thereafter, and pursuant to the parties' stipulation, Plaintiff asserts such claims (as alleged above, below and herein) against Brenntag Specialties, LLC (without bifurcation).

### C.   Pfizer (Coty)

#### i.   Background on Pfizer's extensive NYC-based talc business

158.    From about 1962 to 1992, Pfizer's Minerals, Pigments & Metals ("MPM") division mined, processed and sold talc, among other minerals. MPM sold talc from the southern Death Valley, California region from 1962 to 1987. MPM sold Montana talc from 1966 to 1992. Throughout this period, Pfizer sold both California and Montana MPM talc products to WC&D and WC&D sold such products to Avon, Revlon, American International Industries and others in the cosmetic or personal care industry.

159.    In 1963, Pfizer acquired Coty and Coty operated as a division of Pfizer throughout 1963 to 1992.  Among other talc-containing products like body powders, Pfizer (through its Coty division) made and sold Coty Airspun loose face powder in 1963 to 1992.

160.    Pfizer maintained a personal care product division, Leeming/Pacquin, from about 1961 to the 2000s. In at least the 1960s and 1970s, Pfizer's Leeming/Pacquin division made and sold a talc-containing baby powder called Desitin.

161.    Pfizer's headquarters have always been in New York City. Throughout their existence from the early 1960s to early 1990s, Pfizer's MPM and Coty divisions maintained their headquarters in New York City. Pfizer's Coty division manufactured Coty Airspun loose powder in New York City throughout 1963 to 1973 (before relocating to Sanford, North Carolina).

#### ii.   The sources of talc in Pfizer/Coty's products

162.    Throughout most, or nearly all, of the 1960s and 1970s, Pfizer's Coty Airspun loose face powder ("Coty Airspun") used Italian talc from the Val Chisone region, including Talc #1615. WC&D supplied Coty all its talc from at least 1969-1970 to 1979. A November 1965 Pfizer analytical report refers to Coty containing Italian talc. A December 1972 Pfizer reports refers to Coty Airspun using Talc #1615, a trade name for WC&D's Italian talc. Pfizer's lab notebooks consistently refer to WC&D's "Talc #1615" being used in Coty Airspun.

163.    For some time in at least the late 1960s to 1970, Pfizer's Coty Airspun used Canadian talc from the Henderson mine, including Talc #4601. A WC&D sales report for November 1969 reveals that WC&D sold Pfizer/Coty Talc #4601. A March 16,

Case 23-cv-1006-MBK   Document 18-09   Filed 03/12/23   Page 153 of 1429 PageID:
Exhibit A - Second Amended Slip in Complaint   Page 45 of 74

1970 WC&D memorandum refers to WC&D sending a truckload of Canadian talc to Coty.

### iii.   Pfizer knew that asbestos exposure causes mesothelioma

164.   Throughout the time that Pfizer made and sold Coty Airspun that plaintiff was exposed to, Pfizer knew that asbestos exposure can and does cause mesothelioma.

165.   Pfizer has previously admitted that, over the years, it remained abreast of the literature concerning potential health hazards of exposure to asbestos. Pfizer had been a member of the National Safety Council since at least 1956. Consequently, Pfizer regularly received information on published scientific literature discussing asbestos dangers. Pfizer made and sold the asbestos-containing products Kilnoise from 1965 to 1972 and Firex from the early 1970s to 1986. Throughout the time that Pfizer sold such asbestos-containing products, Pfizer was subject to federal and state regulations on asbestos.

166.   Pfizer has previously admitted that, by the late 1960s, Pfizer knew about diseases caused by the inhalation of asbestos fibers. In June 1971, a Pfizer MPM employee attended a conference in Toronto regarding asbestos hazards. Pfizer recognized the "seriousness and harmful effects" of exposure "most sobering to say the least." In July 1971, Pfizer distributed internally a professional biography of "renowned asbestos investigator" Dr. Irving Selikoff, reflecting Pfizer's familiarity with his publications and work. In August 1971, two Pfizer representatives attended an FDA-sponsored conference. There, Dr. Selikoff presented data on the ability of asbestos to cause lung cancer.

167.   Pfizer knew that exposure to asbestos in talc can cause mesothelioma. By July 1974, Pfizer was aware of, as evidenced by its distribution amongst MPM division employees, Dr. Kleinfeld's mortality study showing the incidence of lung cancer among New York talc miners and millers four higher than expected and cases of mesothelioma. In January 1975, Pfizer recognized that persons who develop cancer after exposure to Pfizer's talc products may one day name Pfizer in lawsuits. In about 1975, Pfizer told its MPM employees at its California talc mill that its California talc contained tremolite fibers that can cause cancer.

### iv.   Pfizer knew of the association of talc and asbestos

168.   Throughout the time that Pfizer sold Coty Airspun and MPM products that plaintiff was exposed to, Pfizer knew of the association between talc and asbestos. Since 1962, Pfizer was on notice that its talc products, including Coty Airspun, may contain asbestos.

169.   By 1962, Pfizer was on notice that the talc in Coty Airspun may contain asbestos. Pfizer has previously admitted that, as of 1962, Pfizer (a) knew that its California talc contained tremolite and (b) knew that some of that material occurred as fibrous tremolite, specifically tremolite fibers. A January 1967 Pfizer MPM "Tech

Report" for its talc products for the ceramic industry referred to the presence of tremolite in some such products.

170.    Pfizer has previously admitted that, by 1971, there was some publicity concerning the presence of asbestos in cosmetic talc. In a July 1971 Pfizer Leeming/Paquin division technical service report, Pfizer reported "recent publicity given to a medical opinion concerning the presence of asbestos in cosmetic type talcs." In August 1971, two Pfizer representatives attended an FDA-sponsored conference discussing, among other things, analytical methods to detect asbestos in cosmetic talc. At the conference, Pfizer employees heard Dr. Cralley report on his 1968 publication concerning his analysis of 22 cosmetic talc products. In September 1974, Pfizer employees distributed a newspaper article discussing researchers at New York City's Mt. Sinai analyzed off-the-shelf cosmetic talc products and "did not find one cosmetic talcum powder purchased on the open market which did not have asbestos in it."

### v.    Pfizer knew the talc in Coty Airspun contained asbestos

171.    Throughout the time that Pfizer sold Coty Airspun and MPM products that plaintiff was exposed to, Pfizer knew that the talc in Coty Airspun contained asbestos fibers.

172.    In December 1972, Pfizer's H.D. Stanley wrote the technical services manager for its Coty division, J.E. Clements, about its analysis of Talc #1615, Italian talc used in Coty Airspun. He stated that Pfizer "found a very occasional [tremolite] fiber which we suspect to be asbestos …" In March 1976, Pfizer learned that Mt. Sinai of New York City found 11% tremolite in a July 1969 sample of Coty Airspun. Pfizer tested Coty Airspun, finding 1-2% tremolite in both samples. Between July 1976 and December 1977, Pfizer found tremolite fibers by TEM in Talc #1615 for Coty on at least twenty occasions.

173.    After 1977, Pfizer continued to repeatedly and consistently report tremolite fibers in Talc #1615, including multiple findings of 40 tremolite fibers per 100 fields of view. On numerous occasions, Pfizer documented finding tremolite fibers thinner than 1 micrometer, with aspect ratios of 10:1 to 15:1 and occurring in bundles of fibers.

174.    In April 1977, Pfizer's W.M. Stephenson reported to the head of Pfizer's MPM division that "Pfizer has chosen not to attempt to challenge the OSHA regulations" with respect to their definition of an asbestos fiber. In February 1980, Pfizer's D.G. Brant admitted internally that "to me it is not logical nor reasonable to say an 'asbestos fiber' ceases to be a fiber merely because it is shortened to less than 5 micrometers."

175.    By 1975, Pfizer recognized internally that regulations concerning the presence of asbestos in talc set regulatory limits on the concentration of airborne asbestos fiber, not the bulk concentration. In April 1979, Pfizer received information from a California regulatory body that even talc products containing less than 0.1% asbestos

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM        INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057        Case 23-cv-1063-MBLO   Document 18-09   Filed 03/21/25   Page 155 of 1429 PageID:   RECEIVED NYSCEF: 08/16/2023
Exhibit A - Second Amended Strip in Complaint    Page 47 of 74

(bulk concentration) can result in dangerous levels of airborne asbestos fiber concentrations (4 f/cc).

### vi.    Pfizer failed to warn

176.    Pfizer never warned. Pfizer never placed any sort of label on its products indicating it contained asbestos. Pfizer never placed any label on its products indicating that it can cause fatal diseases such as mesothelioma.

177.    By January 1975, Pfizer recognized that Johns-Manville began placing asbestos labels on its bags of asbestos-containing talc. Revealing the motive for Pfizer's failure to warn, a December 1976, Pfizer stated internally that placing such labels were bad for Pfizer's image.

### vii.    Pfizer failed to test and reported misleading test results

178.    Pfizer failed to test until too late. In July 1971, Pfizer tested Desitin baby powder for asbestos content by TEM, demonstrating its availability to Pfizer. By 1972 to 1973, Pfizer presented at conferences and appeared in newspaper articles regarding its use of TEM. Despite its availability, Pfizer never tested Coty Airspun by TEM for asbestos content until 1976 (aside from one test in December 1972 that found "asbestos fiber" in Coty Airspun),

179.    Pfizer presented misleading results after devising a scheme to falsely equate (a) "not quantifiable" concentrations of detectable (and detected) asbestos fibers with (b) asbestos being absent. Pfizer developed its own internal "calibration curve" that equated the number of asbestos fibers seen in reviewing 100 fields of view by TEM with certain bulk percentages-by-weight of asbestos. Below a certain level, Pfizer could not assign a percentage-by-weight to the number of asbestos fibers viewed. Below that level, Pfizer could detect asbestos fibers, but it just could not quantify that amount of asbestos in the metric of percentage-by-weight. Pfizer (a) falsely assumed that the only concentration metric is percentage-by-weight (rather than, for example, fibers per gram) and, (b) importantly, falsely equated its inability to quantify the concentration of asbestos by that metric with the claim it was absent. Despite repeatedly finding numerous asbestos fibers in samples of Coty Airspun talc, Pfizer misleadingly reported it as "not detected" or not present. Indeed, in its internal doucments, Pfizer referred to it as the "acceptability level," meaning Pfizer accepted and sold talc with detected asbestos.

### D.    Vanderbilt Minerals, LLC

### i.    Background on Vanderbilt

180.    From 1948 to at least 2006, R.T. Vanderbilt's ("RTV") wholly-owned subsidiary, the Gouverneur Talc Company ("GTC"), mined and milled upstate New York talc that RTV sold. GTC merged into RTV in 2006. RTV merged into Vanderbilt Minerals, LLC ("Vanderbilt") in 2012.

Case 23-cv-1086-MBK   Document 18-09   Filed 03/22/24   Page 156 of 1429 PageID:
Exhibit A - Second Amended Slip in Complaint    Page 48 of 74

181.    In 1974, RTV also acquired the International Talc Company ("ITC"). After the acquisition, RTV continued the same product lines of the former ITC, including from "Mine #2" and "Mine #3." RTV changed the names of some of the products, such as the Asbestine line of products, in an effort to minimize their association with asbestos.

182.    GTC, ITC and RTV ("Vanderbilt") sold upstate New York talc to, among others, manufacturers of paints, lacquers, plastics and various materials used in paper mache, ceramics and mask making.

183.    Vanderbilt's suit-related New York contacts include, but are not limited to, (1) having its headquarters in New York City from 1916 to 1974 (before relocating to Norwalk, Connecticut, where it has remained since), (2) mining its products from a New York deposit, (3) milling, processing and bagging its products from New York without adequate warnings, (4) gaining relevant knowledge about its products' hazards from New York and (5) arranging meetings with other talc producers in New York City to attempt to influence talc regulations.

**ii.    Vanderbilt knew its talc contained asbestos**

184.    Throughout the time that Vanderbilt mined, milled and sold upstate New York talc, Vanderbilt knew, and in exercising reasonable care could have and should have known, that its talc products contained asbestos.

185.    Throughout the time that Vanderbilt mined, milled and sold upstate New York talc, the scientific literature consistently reported anthophyllite asbestos, tremolite asbestos and chrysotile in the talc mines of St. Lawrence County, New York. Vanderbilt knew, and at the very least should have been aware, of such publicly-available scientific literature repeatedly reporting asbestos in the same deposit that it exploited. A 1925 geological bulletin reported "fibrous tremolite, or brittle asbestos, is not uncommon in the walls of the talc mines" and "the flexible asbestos, or chrysotile, is an accompaniment." A January 1943 scientific paper (Siegel) referred to the St. Lawrence County talc as of a "fibrous variety known as asbestine." It reported the talc occurring with tremolite "in a fibrous or asbestiform state." A 1945 geological survey (Gilluly) described the deposit's tremolite as "needlelike or finely fibrous." An October 1948 paper on talc products produced from upstate New York stated they contain the "fibrous form of the mineral anthophyllite." In 1962, the U.S. Geological Survey ("USGS") (Engel) published a comprehensive analysis of the talc deposits of the talc district. The USGS reported "highly striated, fibrous bundles of anthophyllite" and "fibers of anthophyllite." It characterized chrysotile as "abundant and ubiquitous" with "fibrous serpentine" appearing as "slip-fiber asbestos." A 1968 paper co-authored by Johnson & Johnson's Mr. Ashton recognized "fibrous anthophyllite" in the "Arnold pit." In 2004 (Webber), a published scientific analysis presented compelling evidence of the anthophyllite asbestos and chrysotile content of upstate New York talc, showing the historical concentrations of airborne anthophyllite asbestos in the immediate area correlated with historical production volumes.

Case 23-cv-1205-MBKQ Document 88-09 Filed 03/21/25 Page 157 of 1429 PageID:
Exhibit A - Second Amended Complaint    Page 49 of 74

186.    Throughout the 1970s to 2000s, a variety of analysts repeatedly and consistently found anthophyllite asbestos, tremolite asbestos and chrysotile in Vanderbilt talc and they informed Vanderbilt of such findings. For example, in May 1975, McCrone & Associates ("McCrone") analyzed samples of Vanderbilt's products and told Vanderbilt they contained "anthophyllite fibers … of the classic asbestiform type showing evidence of splitting into finer fibers …" In October 1976, NIOSH analyzed samples of Vanderbilt's products finding 7 of 7 contained "large quantities" of "asbestiform tremolite and anthophyllite." NIOSH told Vanderbilt in June 1977 that "all laboratories independently concluded that all Vanderbilt products analyzed contained asbestiform amphibole minerals." In February 1987, the New York State Department of Health found anthophyllite asbestos and tremolite asbestos in Vanderbilt samples, including anthophyllite fibers with aspect ratios greater than 10:1. As another example, in August 2000, the U.S. Consumer Product Safety Commission found "trace amounts of anthophyllite asbestos" in crayons for schoolchildren containing talc supplied by Vanderbilt.

187.    Vanderbilt has admitted on numerous occasions that its talc products contained anthophyllite asbestos, tremolite asbestos and chrysotile. For example, in June 1966, Vanderbilt's own brochure promoting the properties of upstate New York talc and its trademarked product ("Nytal") stated that "tremolite occurs in long-prismatic crystals and columnar to fibrous aggregates. Asbestiform varieties are common." Specifically referring to its products, Vanderbilt stated they contain one-third tremolite with "fibers" being one of four "dominant shapes." Vanderbilt knew that its former chemist stated in 1976 that GTC and ITC talc contained "fiber of the asbestos family."

### iii.    Vanderbilt knew that asbestos exposure causes mesothelioma

188.    Throughout the time that Vanderbilt mined, milled and sold upstate New York talc, Vanderbilt knew, and in the exercise of reasonable care could have and should have known, that exposure to asbestos can cause deadly diseases, including cancer and mesothelioma.

189.    In 1952, two Vanderbilt employees attended the Seventh Saranac Symposium in which attendees discussed health hazards of inhaling various dusts, including the association between asbestos and lung cancer. In 1969, the New York Department of Labor told Vanderbilt that even relatively low-level exposures to asbestos (including anthophyllite asbestos and tremolite asbestos) can cause mesothelioma.

### iv.    Vanderbilt knew its talc can and does cause mesothelioma

190.    Throughout the time that Vanderbilt mined, milled and sold upstate New York talc, the scientific literature repeatedly found New York talc miners and millers with (a) elevated levels of non-commercial asbestos fibers in their lungs, (b) asbestosis, a disease caused only by substantial asbestos exposure and (c) mesothelioma, a disease uniquely associated with asbestos exposure. All three findings present compelling evidence that the upstate New York talc that Vanderbilt mined, milled and sold throughout 1948 to the late 2000s contained asbestos and can cause deadly asbestos-

Case 23-cv-1069-MRC  Document 18-09 Filed 05/24/25  Page 158 of 1429  PageID:
Exhibit A - Second Amended Join Complaint    Page 50 of 74

related disease. Vanderbilt knew, and at the very least should have been aware, of such scientific literature reporting on the mines that it exploited.

191.    As early as 1942, the New York State Department of Labor analyzed the lung tissue of New York talc workers to consistently find the presence of asbestos bodies. In 1947 (Greenburg) and 1955 (Kleinfeld), researchers found New York talc workers' lungs showing signs of "early asbestosis." In 1955, Kleinfeld observed a "mesothelioma of the pleura" among a group of recently-deceased New York talc workers. Dr. Kleinfeld's 1967 mortality study on upstate New York talc workers found the incidence of lung cancer four times greater than expected and reported a peritoneal mesothelioma. The first known Vanderbilt employees developing lung cancer and mesothelioma occurred in the mid-1970s and early 1980s, respectively. From the mid-1980s through the 1990s, Dr. Abraham repeatedly informed Vanderbilt that its present and former talc miners and millers (a) showed non-commercial amphibole asbestos in their lungs and (b) developed asbestosis, lung cancer and mesothelioma.

### v.    Vanderbilt failed to warn

192.    Vanderbilt never warned. Vanderbilt never placed a label on products originating from Mine #1 and Mine #2 stating that they contained asbestos. Vanderbilt never provided a warning stating talc from such mines can cause deadly asbestos-related diseases. Vanderbilt repeatedly told the public that its talc was asbestos-free and cannot cause mesothelioma.

193.    Vanderbilt has previously admitted that it knew in 1972 that its talc contained anthophyllite and tremolite particles longer than 5um with an aspect ratio greater than 3:1. Such structures qualify as asbestos under federal regulations and render the product subject to regulations requiring Vanderbilt affix asbestos labels. Yet Vanderbilt consciously chose to disregard the legal requirement, selling its deadly products without warnings.

### vi.    Vanderbilt failed to adequately and meaningfully test

194.    Vanderbilt failed to adequately test (and otherwise monitor) its talc products for the presence of asbestos.

195.    Despite being among the largest talc producers in the U.S., Vanderbilt never implemented any program to regularly test its products for the presence of asbestos. Vanderbilt never itself acquired equipment for PLM, SEM or TEM testing.

196.    Vanderbilt's mining instructions both (a) acknowledge the presence of asbestos and (b) prescribe a woefully inadequate procedure purporting to mine around such asbestos. In December 1974 instructions for its mining team, Vanderbilt acknowledged that the deposit contained areas where tremolite "fiber is suspected to occur" and "visible" fibrous tremolite exists. The instructions called for untrained miners to determine whether tremolite fiber (asbestos) exists through naked eye observation and with an ordinary pocket magnifying glass. As Vanderbilt knew, the procedure failed to

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM          INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057                                                          RECEIVED NYSCEF: 08/16/2023

Case 23-v-1265-ABKQ Document 18-09 Filed 08/28/29 Page 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 PageID:
Exhibit A - Second Amended Slip in Complaint     Page 51 of 74

prevent microscopic asbestos fibers from being included within product. The visibility of fibrous tremolite to the naked eye highlights the abundance of such deadly material within the deposit.

### vii.  Vanderbilt gave false statements to conceal its products' dangers

197.    Vanderbilt progressively changed how it characterized its talc products to the public, revealing (a) its early knowledge of its products' content and (b) its willingness to bend the truth to avoid liability. In June 1966, Vanderbilt referred to the "dominant shapes" in its products' tremolite as "fibers, rods, plates and irregular nodules." In 1971, OSHA implemented regulations on asbestos in talc. By March 1972, Vanderbilt called them "nodules, rods, plates and needles." In June 1973, Vanderbilt called them "prisms, nodules and acicular crystals."

198.    Vanderbilt repeatedly made false statements to government entities considering implementing regulations on talc products. For example, behind closed doors, Vanderbilt's management stated internally in December 1972 that Dr. Kleinfeld's 1967 mortality study "makes a devastating case that the New York talcs are responsible for an increased death rate due to cancer of the lungs." But in a public petition to OSHA in July 1973, Vanderbilt stated that the scientific evidence, including Dr. Kleinfeld's study, "points inescapably to the conclusion" that its talc products are "non-carcinogenic." Behind closed doors, in February 1974 Vanderbilt's mineralogist reported internally that 24 of 24 samples of Vanderbilt's talc products contained "observable chrysotile fibers." But in a presentation to OSHA representatives in July 1975, Vanderbilt stated that "we [have] not yet detected chrysotile in any of our talcs." Vanderbilt repeatedly made such false statements to government entities contemplating regulation.

199.    From 1972 to the present, Vanderbilt engaged in a persistent lobbying campaign. Vanderbilt's lobbying campaign was designed to enable Vanderbilt to continue selling (and profiting from) its products and avoid liability. Revealing its mental state, Vanderbilt began telling legislators and regulatory bodies in early 1972 that its talc was asbestos-free *before* Vanderbilt ever tested its talc specifically for the presence of asbestos (in August 1972). In the mid-1970s, Vanderbilt made campaign contributions to specific Congress members who then advocated redefining asbestos in regulations. In the late 1970s, Vanderbilt's president bragged to his employees that he has a Senator in his back pocket. In 1980, NIOSH published analysis showing that Vanderbilt's products contain asbestos and are associated with increased risk for lung cancer. In the mid-1980s, Vanderbilt secretly contacted NIOSH employees in an effort to control, influence and manipulate a follow-up study that Vanderbilt hoped would nullify the 1980 publication. Vanderbilt secretly sent agenda items for such a study to specific NIOSH employees and instructed them to avoid further distribution. After a NIOSH ethics investigation revealed the specific NIOSH had over a dozen secret meetings with Vanderbilt employees, three NIOSH scientists resigned.

200.    In the early 1980s, Vanderbilt was first named in suits alleging asbestos-related injury caused by inhaling Vanderbilt's talc. By the late 1990s, Vanderbilt had

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057 RECEIVED NYSCEF: 08/16/2023

Case 23-cv-12051-MBK Document 18-9 Filed 03/12/25 Page 160 of 1429 PageID:
Exhibit A - Second Amended Short Form Complaint    Page 52 of 74

been named in over a thousand such suits. Despite this, Vanderbilt never implemented a litigation hold on documents potentially relevant to talc-asbestos litigation until 2004. Throughout the period of over two decades that Vanderbilt was continuously named in suits alleging asbestos-related injury, Vanderbilt never formulated any written policy on preserving potentially relevant documents. Vanderbilt never communicated any unwritten or verbal policy on preserving documents to all of its employees prior to 2004.

### E.    Colgate's Cashmere Bouquet

201.    Colgate-Palmolive Corporation ("Colgate") made and/or sold talc-containing Cashmere Bouquet from about 1871 to 1995. From at least 1940 to the mid-1960s, Cashmere Bouquet contained Italian talc from the Val Chisone region.  From the mid-1960s to about 1979, Cashmere Bouquet contained talc from the (a) Val Chisone region of Italy, (b) Murphy, North Carolina talc district, (c) Willow Creek, Montana mine and/or (d) blends thereof.

202.    Colgate's talc products were repeatedly found to contain asbestos. In February 1974, McCrone told Colgate that it found chrysotile asbestos in samples of Cashmere Bouquet and Regal, North Carolina source talc. In December 1974, McCrone told Colgate that it found amphibole fibers in a sample sent to them by Colgate. In early March 1976, Colgate became aware that Dr. Langer of New York City's Mt. Sinai found anthophyllite and tremolite totaling 20% in a sample of Cashmere Bouquet. On or about March 8, 1976, Colgate found by XRD the presence of (a) tremolite in Italian talc, (b) tremolite in Regal, North Carolina talc and (c) anthophyllite and tremolite in talc from its Willow Creek, Montana source. On March 11, 1976, Colgate found anthophyllite by XRD in the sample of Cashmere Bouquet analyzed by Mt. Sinai. On or about March 25, 1976, Colgate found tremolite and anthophyllite in a sample of Cashmere Bouquet by XRD. In August 1976, McCrone told Colgate it found chrysotile asbestos fiber in a sample Colgate sent. In September 1976, Colgate told CIMC that Colgate had found asbestos minerals in its talc "on occasion." In November 1976, McCrone informed Colgate it found tremolite fiber in a sample of "finished product." In November 1977, McCrone provided results to Colgate showing tremolite fibers in Talc #1615 that Colgate used in its products. In July 1983, McCrone told Colgate that it found chrysotile asbestos in a sample Colgate sent. In October 1983, McCrone again found three of three samples Colgate sent positive for chrysotile asbestos by TEM. In April 1984, McCrone informed Colgate that another three of three finished product samples were positive for chrysotile asbestos.

203.    Colgate was a member and active participant in the asbestos in talc subcommittee of the CTFA throughout the 1970s. By attending regularly-scheduled meetings and receiving minutes and other information from the CTFA, Colgate received test results conducted by other CTFA members on the asbestos-content of talc from the same sources as that it sold.

204.    Colgate failed to warn. Colgate never placed any sort of label on its products indicating it contained asbestos. Colgate never placed any label on its products indicating that it can cause fatal diseases such as mesothelioma.

205.     Colgate failed to adequately and meaningfully test its products. Colgate failed to test Cashmere Bouquet for the presence of asbestos at any time before 1971. Colgate did not own an in-house transmission electron microscope.

F.     **Avon**

206.     Avon made and sold a variety of talc-containing products. Throughout the late 1950s to early 1970s, Avon purchased, used and manufactured its talc-containing products with talc from at least the (a) Val Chisone region of Italy, including Talc #1600, Talc #1615 and Talc #1621, (b) Murphy, North Carolina talc district, including Regal talc and Talc #2450, (c) Willow Creek, Montana mine, including Talc #4608, (d) other Montana mines, including Pfizer's product distributed by WC&D as Talc #399, (e) Winterboro, Alabama mine, including Talc #141, (f) southern California Death Valley talc products, including Sierra Talc and Warm Springs Talc and (g) Canada.

207.     Avon's talc products were repeatedly found to contain asbestos. In August 1971, CIMC sent Avon test results showing trace levels of tremolite in talc from North Carolina, 2% tremolite in Alabama talc and high levels of tremolite in California and Canadian talc by XRD. In December 1971, Avon itself found 1% tremolite and high levels of tremolite in its California and Canada talc products. In October 1972, NIOSH surveyed Avon's Ohio plant to find tremolite in two Alabama talc products. In April 1973, Avon detected 1% tremolite in Italian talc and trace tremolite in Montana talc from the Willow Creek mine. In September 1973, Avon summarized its findings up to that point, noting several dozen positive findings in Italian, North Carolina, Montana and Alabama talc. In March 1975, Avon found chrysotile in Italian talc. Avon detected 1.5-2.0/5 tremolite in Italian talc in May 1975. In December 1977, McCrone found 1% tremolite, mostly fibrous, in a sample of Avon's Italian talc.

208.     Avon made and sold a variety of talc-containing products. Throughout the late 1950s to early 1970s, Avon purchased, used and manufactured its talc-containing products with talc from the (a) Val Chisone region of Italy, including Talc #1600, Talc #1615 and Talc #1621, (b) Murphy, North Carolina talc district, including Regal talc and Talc #2450, (c) Willow Creek, Montana mine, including Talc #4608, (d) other Montana mines, including Pfizer's product distributed by WC&D as Talc #399, (e) Winterboro, Alabama mine, including Talc #141, (f) southern California Death Valley talc products, including Sierra Talc and Warm Springs Talc and (g) Canadian talc.

## FIRST CAUSE OF ACTION: SOUNDING IN NEGLIGENCE

209.     Plaintiff repeats, reiterates, re-alleges and incorporates each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

210.    Defendants had a duty to mine, mill, process, design, manufacture, market, sell and/or distribute products that were not unreasonably dangerous or defective when in the reasonably foreseeable manner.

211.    Defendants had a duty to warn plaintiff (and all foreseeable users of their products) of the hazards and defects that defendants created, knew of and, with the exercise of reasonable care, should have known.

212.    Defendants knew, or with the exercise of reasonable care should have known, that the products they mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed (that plaintiff was exposed to) contained asbestos.

213.    Defendants knew, or with the exercise of reasonable care should have known, that the products they mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed (that plaintiff was exposed to) were inherently dangerous and hazardous to the health and well-being of those using and/or exposed to.

214.    Defendants knew, or with the exercise of reasonable care should have known, that plaintiff would come in contact with the products mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed by defendants (that plaintiff was exposed to) because such products would be incorporated in.

215.    Defendants knew, or with the exercise of reasonable care should have known, that the reasonably foreseeable and/or intended use of the products they mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed (that plaintiff was exposed to) would cause the release of dangerous concentrations of airborne asbestos fibers and that plaintiff would inhale such asbestos fibers.

216.    Defendants knew, or with the exercise of reasonable care should have known, that plaintiff would not have any knowledge that the products defendants mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed contained asbestos, were unreasonably dangerous and/or could increase his risk of the development of mesothelioma.

217.    Defendants knew, or with the exercise of reasonable care should have known, that inhaling asbestos fibers (including from asbestos-laden or asbestos-containing talc) significantly increases the risk of, and can, cause fatal disease, including pleural and peritoneal mesothelioma.

218.    Mr. Tippin did not know that the products mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed contained asbestos and asbestos exposure increases the risk of fatal disease such as mesothelioma.

219.    Despite knowledge of asbestos content, carcinogenic properties and unreasonably dangerous nature of their asbestos laden talc products, the Defendants negligently, as well as recklessly and willfully:

(a)  failed to study, investigate and/or properly test their products for their asbestos content, ability to release airborne asbestos fibers and danger of inhaling asbestos fibers in causing mesothelioma;

(b)  failed to warn the public at large, and more particularly this plaintiff, of the dangers and hazards associated with or caused by the use of, and exposure to defendants' products resulting from their ordinary, expected and intended use;

(c)  failed to communicate or convey their notice and knowledge with respect to potential or actual dangers and health hazards associated with the use of, exposure to or contact with defendants' products resulting in exposure to talc contaminated with asbestos, to the end users and consumers of such products;

(d)  failed to affix to the product, and/or advise the public at large, more particularly this Plaintiff, of instructions and/or measures to minimize the hazard and harm from the use of their products, including respiratory protection, protective garments and/or means to apply the product so as to minimize the dust exposure;

(e)  failed to adequately package their products in a manner which would insure safe handling and use by those individuals, including this Plaintiff, who the defendants' knew or should have reasonably anticipated would be exposed to talc contaminated with asbestos in the ordinary and foreseeable use of defendants' products and failed to design a means of application that minimizes the exposure to respirable dust;

(f)  failed to remove their products from the stream of commerce despite knowledge of their unsafe and dangerous nature;

(g)  continued to mine, produce, process, design, manufacture, market, supply, deliver, distribute, use, purchase, remove and sell the products for general application and purposes without any alteration or change, despite the potential and known health hazards and dangers posed to the foreseeable and anticipated user and consumer of those products;

(h)  failed to timely develop and utilize substitute materials for talc in their products, including the development and use of cornstarch;

(i)  failed to design or redesign talc-containing products contaminated with asbestos to prevent, impede or minimize the exposure to talc contaminated with asbestos;

(j)    failed to recall and/or issue a post-sale warning for their products;

(k)    misrepresented or failed to disclose that asbestos was in their products, thus denying plaintiff and the public of the knowledge required to take necessary safety precautions while using or otherwise being exposed to their products;

(l)    ignored and suppressed medical and scientific information, studies, tests, data and literature that defendants acquired concerning the health risks associated with exposure to asbestos contained in their products;

(m)    failed to advise plaintiff who Defendants knew, and in the exercise of reasonable care should have known, had been exposed to asbestos from the ordinary and foreseeable use of their products: (i) to cease further uncontrolled or unprotected exposure to said products and the inhalation and/or ingestion of asbestos therefrom; (ii) to be examined by competent medical doctors to determine the nature and extent of all diseases caused by inhalation and/or ingestion of asbestos; and (iii) to receive medical care and treatment for such diseases; and

220.    The products that defendants mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed (that plaintiff was exposed to) were defective and unreasonably dangerous when they left the possession of the defendants in that they contained no warnings and/or warnings insufficient to alert consumers, including Plaintiff here, of the dangerous risks associated with the subject product, including but not limited to its propensity to cause permanent physical injuries like developing mesothelioma.

221.    At all relevant times, a safer feasible alternative to the products that defendants mined, milled, processed, designed, manufactured, sold, and/or distributed (that plaintiff was exposed to) had existed, including (for the talc-containing products) cornstarch. Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects. Cornstarch powders have been sold and marketed for the same uses as talc with nearly the same effectiveness.

222.    The defendants, as miners, millers, processors, designers, manufacturers, marketers, sellers, and/or distributors of asbestos-containing products, including asbestos-containing talc, are held to the level of knowledge of an expert in their field.

223.    Defendants had a continuing duty to warn plaintiff of the dangerous associated with the products that they mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed.

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM          INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057                                       RECEIVED NYSCEF: 08/16/2023

Case 23-cv-1085-MBK   Document 18-09   Filed 03/24/25   Page 165 of 1429 PageID:
Exhibit A - Second Amended Brian Complaint   Page 57 of 74

224.   Plaintiff reasonably relied upon defendants' skill, superior knowledge and judgment, as well as statements concerning the safety and/or content of the products that they mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed.

225.   Had the defendants provided and/or affixed adequate warnings, plaintiff would have heeded such a warning and/or he would have not used the products that defendants mined, milled, designed, marketed, sold and/or distributed.

226.   Plaintiff's inhalation of repeated, frequent, regular and/or long-term exposure to dangerous, (qualitatively) medically significant concentration of asbestos fibers orders of magnitude above background as to (or from) each product and/or defendant (to which he was so exposed) were each a substantial factor in the development of his mesothelioma and consequent damages.

227.   Plaintiff's malignant mesothelioma is a direct and proximate result of the defendants' negligence and carelessness, and their demonstrated reckless, immoral, malicious and/or wanton disregard for his safety and well-being.

228.   As a result of the Defendants' negligence and recklessness, the plaintiff (a) has endured severe physical pain and suffering, as well as mental and emotional anguish and will continue to endure such suffering, (b) has lost the ability to enjoy his life, passions, interests, hobbies, friendships and relationships and he will likely continue to not be able to enjoy his life in the same manner, (c) will likely have a substantially decreased life expectancy and will lose years of his life, (d) has expended sums of money for medical care, treatment and monitoring and will be required to continue to expend additional monies in the future for medical care and treatment, (e) has lost, or had impaired, his ability to earn income from his work impaired and will likely continue to be unable to have the same earning capacity, if any, in the future, (f) has suffered other pecuniary losses and (g) has otherwise been damaged.

## SECOND CAUSE OF ACTION: NEGLIGENCE PER SE

229.   Plaintiff repeats, re-asserts, reiterates and incorporates herein by reference the prior allegations of this Complaint with the same force and effect as if hereinafter set forth at length.

230.   The Federal Food, Drug, and Cosmetic Act (FDCA), codified as 21 U.S.C. §§ 301-399, governs the manufacture, sale, supply, distribution and marketing of cosmetic products in the United States. 21 U.S.C. § 321(i) defines cosmetics by their intended use as (1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any party thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance, and (2) articles intended for use as a component of any such articles. Defendants' products and the ingredients therein are cosmetic products as defined by 21 U.S.C. § 321(i).

Case 23-cv-1295-MBK    Document 18-09    Filed 03/12/25    Page 166 of 1429 PageID:

Exhibit A - Second Amended Tippin Complaint    Page 58 of 74

231.    The FDCA was designed to protect consumers from hazardous cosmetic products. Plaintiff was and are members of the class of persons the FDCA was intended to protect. The FDCA prohibits the manufacture, sale, supply, distribution and marketing of adulterated cosmetics in interstate commerce. 21 U.S.C. § 331. Adulterations refer to violations involving product composition, whether they result from ingredients, contaminants, processing, packaging, or shipping and handling. A cosmetic product is adulterated if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under conditions of use as are customary and usual. 21 U.S.C. § 361. The FDCA governs all persons and companies involved in cosmetics in interstate commerce— including manufacturers, packers, distributors and retailers—who are accordingly responsible for ensuring that they are not dealing in products that are adulterated or misbranded. Under the FDCA, defendants owed plaintiff a duty not to sell to or otherwise expose Mr. Tippin to adulterated, hazardous cosmetic products.

232.    Defendants mined, milled, processed, designed, manufactured, assembled, marketed, distributed, sold and/or sold talc and talc-containing cosmetic products throughout the United States and internationally. In violation of the FDCA, and their duty to Plaintiff, said products were contaminated with various carcinogens, including asbestos, a poisonous and deleterious disease, causing mineral known by Defendants since the early to mid-1900s to cause death and disease. Under normal and customary use and application, Defendants' talc-containing products released respirable asbestos, and end users, including Mr. Tippin, were exposed to and consequently inhaled asbestos. Defendants manufactured, sold, supplied, distributed and marketed adulterated cosmetic products that were contaminated with asbestos and other carcinogens in clear violation of the FDCA. Defendants' violation of the FDCA, which governs the sale of cosmetic products, including talcum powder and the ingredients therein, and plaintiff's subsequent inhalation of asbestos from said products were substantial factors in bringing about Mr. Tippin's mesothelioma as and consequential damages. In violating the FDCA, which was enacted, among other things, to prevent the sale of carcinogen-containing products, defendants were and are negligent per se.

233.    Defendants participated in, authorized, expressly and impliedly ratified, and had full knowledge of and should have known of each of the acts set forth herein.

234.    Additionally, Defendants were and are negligent per se for the aforementioned reasons pursuant to various state laws and regulations, including but not limited to, NY Education Law § 6811, et seq., and NJ Stat. § 24:5-1, et seq.

235.    Defendants' violation of the FDCA (and the other laws and regulations cited above) was a proximate cause of the injuries and damages alleged in this complaint.

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM        INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057        RECEIVED NYSCEF: 08/16/2023

Case 3:23-cv-12064-MBK   Document 18-09   Filed 03/12/25   Page 167 of 1429 PageID:
Exhibit A - Second Amended Complaint        Page 59 of 74

## THIRD CAUSE OF ACTION: SOUNDING IN BREATH OF WARRANTY

236.    Plaintiff repeats, re-asserts, reiterates and incorporates herein by reference the prior allegations of this Complaint with the same force and effect as if hereinafter set forth at length.

237.    Defendants expressly and impliedly warranted that their products were of good and merchantable quality and fit for their intended uses and purposes.

238.    Defendants expressly and impliedly warranted through direct-to-consumer marketing, advertisements, and/or labels, that the products were safe and effective for reasonably anticipated uses, including use by women to their bodies.

239.    At the time the defendants manufactured, marketed, labeled, promoted, distributed and/or sold the products, the defendants knew or should have known of the uses for which the products were intended and impliedly warranted the to be of merchantable quality and safe for such use.

240.    The express and implied warranties made by these defendants were false, misleading, and/or otherwise contained misrepresentations rendering these products unreasonably dangerous, defective, hazardous, and/or harmful when used and/or applied the manner, and for the purposes, intended and/or foreseeable.

241.    Plaintiff relied on defendants' express and/or implied representations as to the good and merchantability quality, and as to the safety and fitness of such products, in choosing to use those products and/or to be in areas in which those products were being used.

242.    As a direct, foreseeable and proximate result of the Defendants' breaches of implied warranties, Plaintiff purchased and used, as aforesaid, the products that directly and proximately caused her to develop Mesothelioma; Plaintiff was caused to incur, among other damages, medical bills, lost wages, and conscious pain and suffering.

243.    Defendants designed, manufactured, assembled, fabricated and/or distributed the products in question in a defective condition and therefore breached an implied warranty of fitness and an implied warranty of merchantability, in addition to various express  warranties. The defendants, as sellers, were merchants with respect to the products which they sold. In addition, these products were not fit for the ordinary purposes for which such  goods  are used. Defendants also had reason to know of the particular purpose for which these products would be used, as well as the knowledge that persons such as Plaintiff's would rely on the seller's skill to furnish suitable products.

244.    Therefore, Defendants have breached the implied warranty of merchantability as well as the implied warranty of fitness for a particular purpose, in addition to various express warranties. Such breach or breaches of implied and

Case 1:23-cv-10511-WGY  Document 168-09  Filed 03/21/25  Page 168 of 1429 PageID:
Exhibit A - Second Amended Join Complaint    Page 60 of 74

express warranties by the defendants was a proximate cause of the injuries and damages sustained by plaintiff.

## FOURTH CAUSE OF ACTION: SOUNDING IN STRICT LIABILITY

245.     Plaintiff repeats, reiterates, re-alleges and incorporates each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein

246.     At all pertinent times, the defendants sold or otherwise placed their asbestos-containing products, including asbestos-containing talc products, into the stream of commerce in a defective, unsafe and unreasonably dangerous condition.

247.     The defendants knew and/or otherwise expected that their asbestos-containing products, including asbestos-containing talc products, would reach the end user and/or consumer without substantial change from, or alteration of, the condition in which these products were originally manufactured and sold.

248.     The defendants knew that their products would be used without inspection for defects and, by placing them in the marketplace, represented to the public at large and more particularly this plaintiff that these products could be utilized safely, in the manner, and for the purpose for which they were intended.

249.     The defendants knew (a) their products were defective and were incapable of being made safe for their ordinary and intended uses and (b) these defects were not discoverable by the plaintiff in the exercise of reasonable care, nor were the dangers of these products perceivable to the plaintiff.

250.     At all pertinent times, including the time of sale and time of consumption, defendants' products were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the asbestos content and the increased risk of mesothelioma associated with the use of the products. Defendants themselves failed to properly and adequately warn and instruct the plaintiff as to the risks and benefits of the products.

251.     The risks and dangers created by the use of defendants' products outweighed the utility of these products, including because they lacked any medicinal value and there were safer substitutes/alternatives feasible and available.

252.     The development of mesothelioma by the plaintiff (and his consequent damages) was the direct and proximate result of the unreasonably dangerous and defective condition of the products at the time of sale and consumption, including their asbestos content and lack of warnings.

## FIFTH CAUSE OF ACTION: STRICT LIABILITY – DESIGN DEFECT

253.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

254.    The products that defendants mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed (that plaintiff was exposed to) were defective in their design or formulation in that they are not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

255.    The products that defendants mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed (that plaintiff was exposed to) were expected to reach, and did reach, consumers or end users in the State of New York and the State of Connecticut, including Plaintiff's herein, without substantial change in the condition in which it was sold.

256.    Defendants are strictly liable to Plaintiff by reason of the following:

(a)    Defendants mined, milled, processed, designed, manufactured, marketed, sold, and/or distributed and/or otherwise placed in the stream of commerce products containing asbestos;

(b)    Defendants knew and had reason to know that plaintiff and other persons similarly situated would be users or consumers of their asbestos products or would otherwise be exposed to asbestos therefrom;

(c)    The ordinary and foreseeable use of defendants products constituted a dangerous and ultra-hazardous activity and created an unreasonable risk of injury to users and bystanders; and

(d)    Defendants products were defective in that they were incapable of being made safe for their ordinary and intended use and purpose, and Defendants failed to give any warnings or instructions (or failed to give adequate or sufficient warnings or instructions) about the risks, dangers and harms associated with exposure to asbestos from their products.

257.    At all times material to this action, the asbestos-containing products to which plaintiff was exposed were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce.

258.    In addition, at the time the subject product left the control of the Defendants, there were safer, practical, and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff's injuries without

impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.

259.    Defendants, by virtue of the foregoing, are strictly liable to the Plaintiff for injuries and illnesses resulting from the defects and dangerous propensities of their talc products contaminated with asbestos alleged herein.

## SIXTH CAUSE OF ACTION: STRICT LIABILITY – MANUFACTURING DEFECT

260.    Plaintiff repeats, re-alleges and incorporates each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

261.    The design specifications, formulae, and/or performance standards applicable to defendants' products did not incorporate, include or otherwise involve asbestos.

262.    Because they contained asbestos, said products deviated from the design specifications, formulae, performance standards, and/or from otherwise identical units manufactured to the same manufacturing specifications or formulae.

263.    Said manufacturing defect existed before the products left the defendants control.

264.    As a result of said manufacturing defect, Defendants products contained asbestos and, therefore, were hazardous and not reasonably safe for their intended or reasonably foreseeable uses.

265.    As a direct and proximate result of the manufacturing defects(s), plaintiff inhaled asbestos, developed mesothelioma and  suffered consequent damages as alleged above and elsewhere.

## SEVENTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION

266.    Plaintiff repeats, re-alleges and incorporates each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

267.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, plaintiff, end users, and the public, that the products had been tested and found to be safe and effective for use to the body. The representations made by defendants, in fact, were false.

268.    Defendants failed to exercise ordinary care in the representations concerning the products while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because defendants negligently misrepresented the inherent dangers and risks of defendants' products, including their asbestos content and ability to cause fatal diseases such as mesothelioma. .

269.    Defendants breached their duty in representing that exposure to defendants' products, including asbestos-containing talc products, result in no serious side effects.

270.    As a proximate result of defendants' misconduct, plaintiff developed mesothelioma and sustained consequent damages.

## EIGHTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT

271.    Plaintiff repeats, re-alleges and incorporates each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

272.    At all times mentioned in this Complaint, defendants had the duty and obligation to disclose to Plaintiff, the true facts concerning the products that is, that the products were unreasonably dangerous and defective in that they contained asbestos and could cause fatal diseases such as mesothelioma.

273.    Defendants concealed important facts from Plaintiff which facts include, but are not limited to, the fact that defendants:

(a)    Failed to disclose the information that it had concerned concerning the asbestos mineral and asbestos content of the products,

(b)    Failed to disclose connection between use of the products and the development of mesothelioma;

274.    Defendants made affirmative representations to plaintiff prior to the day the products were first purchased by plaintiff that the products were safe as set forth above while concealing the material facts set forth herein.

275.    At all times mentioned in this Complaint, Defendants intentionally, willfully, and maliciously concealed and /or suppressed the facts set forth above from Plaintiff, with the intent to defraud as alleged herein.

276.    Plaintiff was not aware of the concealed facts set forth herein. Had he been aware of those facts, he would not have acted as he did, that is, the products would not have been purchased and used by Plaintiff and Plaintiff would not have been injured as a result.

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM    INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057    RECEIVED NYSCEF: 08/16/2023

Case 3:23-cv-12051-MBKQ Document 18-09 Filed 03/12/25 Page 172 of 1429 PageID:
Exhibit A - Second Amended Join Complaint    Page 64 of 74    580

277. As a proximate result of the concealment or suppression of the facts set forth above, Plaintiff reasonably relied on Defendants' deception and, Plaintiff purchased the PRODUCTS and subsequently sustained injuries and damages as set forth in this Complaint. Defendants' concealment was a substantial factor in causing the injuries described herein.

278. As a result of the foregoing fraudulent and deceitful conduct by Defendants, and each of them, Plaintiff, for the sake of example and by way of punishing Defendants, seeks punitive damages according to proof.

279. As a proximate result of defendants' misconduct, plaintiff developed mesothelioma and sustained consequent damages.

**NINTH CAUSE OF ACTION: CIVIL CONSPIRACY/CONCERT OF ACTION**

280. Plaintiff repeats, re-alleges and incorporates each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

281. The defendants with the CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff, regarding the hazards of exposure to carcinogens, including asbestos, from talc and talc-containing products.

282. The defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including plaintiff, of the serious bodily harm and/or death which may result from the inhalation of asbestos in their talc and talc-containing products.

283. The defendants with the CTFA, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which plaintiff was exposed.

284. The defendants and CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including plaintiffs, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

285. The defendants and CTFA conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

(a) to withhold from users of their products—and from persons

Case 3:23-cv-12051-MBK   Document 18-09   Filed 03/27/25   Page 173 of 1429 PageID:
Exhibit A - Second Amended Tobin Complaint   Page 65 of 74

who the defendants knew and should have known would be exposed thereto—information regarding the health risks of inhaling and/or ingesting asbestos and other carcinogens contained in talc and talcum powder products;

(b)    to eliminate or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products;

(c)    to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos and other carcinogens therein; and

(d)    to falsely represent that talc and talcum powder products, including those of the defendants were safe for use by consumers.

286.    Plaintiff reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by the defendants with the CTFA regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens and was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

287.    The defendants with the CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, marketing, distribution and use of asbestos-containing talcum powder products, and controlled the level of knowledge and information available to the public regarding the hazards of exposure to asbestos and other carcinogens from talc and talc-containing products.

288.    The defendants with the CTFA, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including plaintiff and her family members, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos from their talc and talc-containing products.

289.    The defendants with the CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, and specifically talc and talcum powder used in the production of products to which plaintiff was exposed.

290.    The defendants with the CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled through agreement and

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM          INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057          RECEIVED NYSCEF: 08/16/2023

Case 1:23-cv-10511-WGY   Document 18-09   Filed 03/12/25   Page 174 of 1429   Page ID:
Exhibit A - Second Amended Join Complaint   Page 66 of 74

consciously parallel behavior, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-containing products to which plaintiff was exposed.

291.     The defendants with the CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled both acting individually and in concert with others, including the CTFC, violated the common law duty of care owed to Plaintiffs or otherwise engaged in intentionally culpable activity that caused Plaintiffs to suffer severe injuries and damages.

292.     The actions and inactions of defendants with the CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled, independently and collectively, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiff as described in this complaint.

293.     By reason of the foregoing, the defendants with the CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled are jointly and severally liable to Plaintiff for the injuries and damages sustained by virtue of their fraudulent and intentionally deceptive actions and conspiracy to commit such actions.

## JOINT AND SEVERAL LIABILITY

294.     Plaintiff repeats, re-alleges and incorporates each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

295.     The limitations on liability set forth in CPLR 1601 do not apply because certain exceptions/exemptions apply.

296.     Plaintiff sustained a "grave injury" as defined by NY Workers Compensation Law section 11. CPLR 1602(4).

297.     Plaintiff alleges a cause of action requiring proof of intent. CPLR 1602(5).

298.     Defendants acted with reckless disregard for the safety of others. CPLR § 1602(7).

299.     Defendants unlawfully released into the environment a substance hazardous to public health, safety or the environment, a substance acutely hazardous to public health, safety or the environment or a hazardous waste, as defined in articles 37 and 27 of NY Environmental Conservation Law and in violation of Article 71 of such law. CPLR 1602(9).

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM
INDEX NO. 190062/2021

NYSCEF DOC. NO. 1057
Exhibit A - Second Amended Sholin Complaint
Page 67 of 74
RECEIVED NYSCEF: 08/16/2023

300.    Plaintiff brings a products liability claim, the manufacturer of the product is not a party to the action and jurisdiction over the manufacturer could not with due diligence be obtained and that if the manufacturer were a party to the action, liability for claimant's injury would have been imposed upon said manufacturer by reason of the doctrine of strict liability, to the extent of the equitable share of such manufacturer. CPLR 1602(10).

301.    Defendants acted knowingly or intentionally, and in concert, to cause the acts or failures upon which liability is based. CPLR 1602(11).

302.    Defendants have construed the article to create or enlarge actions for contribution or indemnity barred because of the applicability of the workers' compensation law of this state, any other state or the federal government, or NY General Obligations Law section 18-201.

## PUNITIVE DAMAGES

303.    Plaintiff repeats, re-alleges and incorporates each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

304.    Plaintiff is entitled to punitive damages because defendants' wrongful acts and/or omissions were wanton or in conscious disregard of the rights of others. Defendants misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety and utility of the products and by failing to provide adequate instructions concerning their use.

305.    Defendants acted maliciously, wantonly and recklessly, and demonstrated a conscious indifference and utter disregard of the health, safety and rights of others, by acting with an improper motive or vindictiveness and with outrageous or oppressively intentional misconduct, such actions representing a high degree of immorality and showing wanton dishonesty as to imply a criminal indifference to civil obligations, thereby warranting an award of punitive damages.

306.    The Defendants have acted willfully, wantonly, with an evil motive, and recklessly in one or more of the following ways:

(a)    Before and during the years of relevant exposure, defendants knew and were specifically aware of the asbestos content of their products and the unreasonably high risk of mesothelioma posed by the products before and during the time it manufactured, marketed, distributed and/or sold the products to which plaintiff yet purposefully proceeded with such action;

(b)    Despite their knowledge of the high risk of mesothelioma associated with the products they sold to which plaintiff was exposed, the defendants failed to minimize this risk through

marketing and promotional efforts and product labeling and/or indeed consciously exacerbated the problem by misrepresenting the hazards (and/or giving false statements about) the hazards of such products;

(c)     Through the actions outlined above, defendants expressed a reckless indifference to the safety of users of the asbestos-containing products to which the Plaintiff and others similarly situated were exposed. Defendants' conduct, as described herein, knowing the dangers and risks of the products, yet concealing and/or omitting this information, in furtherance of their conspiracy and concerted action was outrageous because of Defendants' evil motive or a reckless indifference to the safety of users.

307.     As a direct and proximate result of the willful, wanton, evilly motivated and/or reckless conduct of the defendants, plaintiff has sustained damages as set forth above.

## PRAYER FOR RELIEF

308.     WHEREFORE, Plaintiff prays for relief on the entire Complaint as follows:

1.     Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by the Plaintiff, loss of enjoyment of life, a shortened life expectancy, health care costs, medical monitoring and lost wages or income, together with interest and cost as provided by law (in an amount far in excess of the jurisdictional requirement to remain in this Court).

2.     Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.     Awarding Plaintiff reasonable attorneys' fees;

4.     Awarding Plaintiff the costs of these proceedings; and

5.     Such other and further relief as this Court deems just and proper.

## ATTORNEY'S VERIFICATION

The undersigned, an attorney admitted to practice in the Courts of the State of New York, shows that:

Affirmant is associated with the attorney of record for plaintiff in the within action; Affirmant has read the foregoing SECOND AMENDED COMPLAINT and knows the contents thereof to be true to Affirmant's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters, Affirmant believes those matters to be true.

The grounds of Affirmant's belief as to all matters not stated upon his knowledge are based upon information contained in the file maintained in Affirmant's office.

This verification is made by Affirmant and not by the plaintiff because the plaintiffs reside outside the county wherein Affirmant maintains his office.

The undersigned affirms that the foregoing statements are true under the penalties of perjury.

<u>S/Brian Early</u>

**Brian Early, Esq.**

Dated: August 16, 2023

<u>S/Brian Early</u>

**Brian Early, Esq.**

<u>**SERVICE RIDER FOR COREY G. TIPPIN**</u>
**As of 8/16/2023**

**3M COMPANY**
f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY
Corporation Service Company
80 State Street
Albany, NY 12207

**ALCAT, INCORPORATED**
William V. Boynton, Sr.
108 W. Main Street
Milford, CT 06460

**AMERICAN INTERNATIONAL INDUSTRIES**
c/o Officer, Director or Managing Agent
2220 Gaspar Avenue
Los Angeles, CA 90040

**AVON PRODUCTS, INC.**
c/o Officer, Director or Managing Agent
1 Avon Place
Suffern, NY 10901

**BLOCK DRUG COMPANY, INC.**
257 Cornelison Avenue
Jersey City, NJ 07302

**BLOCK DRUG CORPORATION**
257 Cornelison Avenue
Jersey City, NJ 07302

**BOURJOIS, LTD.**
CT Corporation System
28 Liberty Street
New York, NY 10005

**BRENNTAG NORTH AMERICA, INC.**
individually and as successor-in-interest to MINERAL PIGMENT SOLUTIONS, INC.
and WHITTAKER CLARK & DANIELS, INC.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**BRENNTAG SPECIALTIES, LLC**

f/k/a BRENNTAG SPECIALTIES, INC. f/k/a MINERAL PIGMENT SOLUTIONS,
INC. as successor-in-interest to WHITTAKER CLARK & DANIELS, INC.
The Corporation Trust Company
Mountain View Office Park
820 Bear Tavern Road, Suite 305
West Trenton, NJ 08628

**BRISTOL-MYERS SQUIBB COMPANY**
individually and as successor-in-interest to CHARLES OF THE RITZ GROUP LTD.
CT Corporation System
28 Liberty Street
New York, NY 10005

**CHANEL, INC.**
CT Corporation System
28 Liberty Street
New York, NY 10005

**CHATTEM, INC.**
Corporation Service Company
2908 Poston Avenue
Nashville, TX 37203

**COLGATE-PALMOLIVE COMPANY**
individually and as successor-in-interest to THE MENNEN COMPANY
CT Corporation System
28 Liberty Street
New York, NY 10005

**COTY INC.**
Corporation Service Company
80 State Street
Albany, NY 12207

**GLAMOUR INDUSTRIES CO.**
individually and as successor-in-interest to AMERICAN INTERNATIONAL
INDUSTRIES
c/o Brian Dror
5967 W. Third Street, #102
Los Angeles, CA 90036

**JOHNSON & JOHNSON**
Michael Ullmann, General Counsel
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

FILED: NEW YORK COUNTY CLERK 08/16/2023 11:34 AM
INDEX NO. 190062/2021
NYSCEF DOC. NO. 1057
Case 3:23-cv-10614-MBK Document 18-09 Filed 03/22/25 09/23/30 01 1429 Page ID:
RECEIVED NYSCEF: 08/16/2023
Exhibit A - Second Amended Sain Complaint    Page 72 of 74

**JOHNSON & JOHNSON CONSUMER INC.**
f/k/a JOHNSON & JOHNSON CONSUMER COMPANIES, INC.
CT Corporation System
28 Liberty Street
New York, NY 10005

**KERR CORPORATION**
CT Corporation System
28 Liberty Street
New York, NY 10005

**KRYOLAN CORPORATION**
c/o Officer, Director or Managing Agent
322 W. Broadway
New York, NY 10013

**L'ORÉAL USA, INC.**
individually and as successor in interest to CHARLES OF THE RITZ GROUP LTD.
Corporation Service Company
80 State Street
Albany, NY 12207

**MAX FACTOR CO., INC.**
c/o Officer, Director or Managing Agent
501 Seventh Avenue
New York, NY 10018

**MAYBELLINE LLC**
Corporation Service Company
80 State Street
Albany, NY 12207

**PFIZER INC.**
individually and as successor in interest to COTY, INC. and COTY INTERNATIONAL, INC.
CT Corporation System
28 Liberty Street
New York, NY 10005

**R.T. VANDERBILT HOLDING COMPANY, INC.**
individually and as successor-in-interest to R.T. VANDERBILT COMPANY, INC.
Corporation Service Company
80 State Street
Albany, NY 12207

**REVLON, INC.**

Case 3:23-cv-12098-MBK Document 18-09 Filed 03/12/25 Page 181 of 1429 PageID:
Exhibit A - Second Amended Join Complaint    Page 73 of 74

individually and as successor in interest to CHARLES OF THE RITZ GROUP LTD.
Corporate Creations Network Inc.
600 Mamaroneck Avenue, Suite 400
Harrison, NY 10528

**THE NESLEMUR COMPANY**
The Corporation Trust Company
Corporate Trust Center
1209 Orange Street
Wilmington, DE 19801

**UNION CARBIDE CORPORATION**
CT Corporation System
28 Liberty Street
New York, NY 10005

**VANDERBILT MINERALS, LLC**
f/k/a R.T. VANDERBILT COMPANY, INC., individually and as successor-in-interest to
INTERNATIONAL TALC CO.
Corporation Service Company
80 State Street
Albany, NY 12207

**WHITTAKER CLARK & DANIELS, INC.**
c/o Joe Cobuzio, Esq.
Tompkins, McGuire, Wachenfeld & Barry, LLP
3 Becker Farm Road, 4th Floor
Roseland, NJ 07068

**YVES SAINT LAURENT AMERICA, INC.**
CT Corporation System
28 Liberty Street
New York, NY 10005

**JANSSEN PHARMACEUTICALS, INC.**
C T Corporation System
600 N. 2nd Street, Suite 401
Harrisburg, PA 17101

**JOHNSON & JOHNSON HOLDCO (NA), INC.**
C T Corporation System
820 Bear Tavern Road
West Trenton, NJ 08628

**LTL MANAGEMENT, LLC**
C T Corporation System

160 Mine Lake Court, Suite 220
Raleigh, NC 27615

**KENVUE, INC.**
The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

## Exhibit B

Alloway Complaint

22STCV14241

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Stuart Rice

Electronically FILED by Superior Court of California, County of Los Angeles on 04/27/2022 03:58 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Covarrubias,Deputy Clerk

1  STUART J. PURDY, CA Bar No. 239878
   **SIMON GREENSTONE PANATIER, PC**
2  3760 Kilroy Airport Way, Suite 680
   Long Beach, California 90806
3  Telephone (562) 590-3400
   Facsimile (562) 590-3412
4
   Attorneys for Plaintiff
5

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **FOR THE COUNTY OF LOS ANGELES**

10

11 | **BARBARA ALLOWAY,**              | Case No. 22STCV14241
12 |              Plaintiff,            | THIS ACTION CONSTITUTES
                                        | COMPLEX ASBESTOS LITIGATION --
13 |       vs.                         | SUBJECT TO THE GENERAL ORDERS
                                        | CONTAINED IN FILE NO. C 700000 --
14 | **ALMAY, INC.** a subsidiary of REVLON, | DEPT. 59
   | INC.;
15 | **AVON PRODUCTS, INC.;**
   | **BARRETTS MINERALS INC.;**
16 | **BEACON CMP CORPORATION;**       | **COMPLAINT FOR**
   | **BLOCK DRUG COMPANY, INC.** (sued | **PERSONAL INJURY– ASBESTOS**
17 | individually and as successor-in-interest to | **(NEGLIGENCE, STRICT LIABILITY,**
   | THE GOLD BOND STERILIZING        | **AND FRAUD)**
18 | POWDER COMPANY a/k/a THE GOLD
   | BOND COMPANY);
19 | **BLOCK DRUG CORPORATION** (sued
   | individually and as successor-in-interest to
20 | THE GOLD BOND STERILIZING
   | POWDER COMPANY a/k/a THE GOLD
21 | BOND COMPANY);
   | **BRENNTAG NORTH AMERICA, INC.**
22 | (sued individually and as successor-in-
   | interest to MINERAL PIGMENT
23 | SOLUTIONS, INC. and as successor-in-
   | interest to WHITTAKER CLARK &
24 | DANIELS, INC.);
   | **BRENNTAG SPECIALTIES LLC** f/k/a
25 | BRENNTAG SPECIALTIES, INC. f/k/a
   | MINERAL PIGMENT SOLUTIONS, INC.
26 | (sued individually and as successor-in-
   | interest to WHITTAKER CLARK &
27 | DANIELS, INC.);
   | **BRISTOL-MYERS SQUIBB**
28 | **COMPANY** (sued individually and as

                                    1
                 PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS

1 | successor-in-interest to CHARLES OF THE RITZ);
2 | **BUTH-NA-BODHAIGE, INC.** d/b/a THE BODY SHOP;
3 | **CHATTEM INC.** f/k/a CHATTEM DRUG & CHEMICAL COMPANY;
4 | **CLINIQUE LABORATORIES LLC** f/k/a CLINIQUE LABORATORIES, INC.,
5 | a subsidiary of THE ESTEÉ LAUDER COMPANIES INC.;
6 | **COLGATE-PALMOLIVE COMPANY** (sued individually and as successor-in-
7 | interest to THE MENNEN COMPANY); **COLOR TECHNIQUES, INC.;**
8 | **COSMETIC SPECIALTIES, INC.** (sued individually and formerly d/b/a G&G
9 | SPECIALTY PRODUCTS CO.); **COTY, INC.** (sued individually and d/b/a
10 | RIMMEL LONDON and RIMMEL INC); **ESTEÉ LAUDER, INC.**, a subsidiary of
11 | THE ESTEÉ LAUDER COMPANIES, INC.;
12 | **ESTEÉ LAUDER INTERNATIONAL, INC.;**
13 | **THE ESTEÉ LAUDER COMPANIES, INC.** (sued individually and for LEN-RON
14 | MANUFACTURING CO. INC.) **GUERLAIN, INC.;**
15 | **LONGS DRUG STORES CALIFORNIA, L.L.C.;**
16 | **L'OREAL USA, INC.** d/b/a LANCOME; **LVMH FRAGRANCE BRANDS US**
17 | LLC; **LVMH PERFUMES AND COSMETICS**
18 | INC.; **LVMH PERFUMES & COSMETICS**
19 | LLC; **NATURA INTERNATIONAL, INC.;**
20 | **PFIZER INC.;** **PLAYTEX PRODUCTS, LLC** f/k/a
21 | PLAYTEX PRODUCTS, INC. (sued individually and as successor-in-interest to
22 | ESMARK INC. and MAX FACTOR & COMPANY);
23 | **PRESPERSE CORPORATION; PRESPERSE INTERNATIONAL**
24 | **CORP;** **THE PROCTER & GAMBLE**
25 | **COMPANY** (sued as successor-in-interest to THE SHULTON GROUP and/or
26 | SHULTON INC., PLAYTEX PRODUCTS INC. and MAX FACTOR & COMPANY)
27 | and as successor-in-interest to THE SHULTON GROUP and/or SHULTON
28 | INC.:

2

**JA178**

1  **REVLON CONSUMER PRODUCTS**
**CORPORATION** (sued individually and
2  as successor-in-interest to PLAYTEX
PRODUCTS INC., MAX FACTOR &
3  COMPANY, and CHARLES OF THE
RITZ);
4  **SPECIALTY MINERALS INC.** (sued
individually and as a subsidiary of
5  MINERALS TECHNOLOGIES INC.);
**UNILEVER UNITED STATES, INC.**
6  formerly d/b/a RIMMEL LONDON;
**WHITTAKER CLARK & DANIELS,**
7  **INC.;**
**WYETH HOLDINGS LLC** f/k/a
8  WYETH HOLDINGS CORPORATION
f/k/a AMERICAN CYANAMID
9  COMPANY (sued individually and as
successor-in-interest to THE SHULTON
10 GROUP and/or SHULTON INC.); and
**DOES 1-450,**
11
                    Defendants.
12

13

## GENERAL ALLEGATIONS
14

15      COMES NOW Plaintiff BARBARA ALLOWAY (hereinafter "Plaintiff") and
complains and alleges as follows:
16
17      1.    The true names and capacities, whether individual, corporate, associate,
governmental or otherwise, of Defendant DOES 1 through 450, inclusive, are unknown to
18
Plaintiff at this time, who therefore sues said Defendants by such fictitious names. When
19
the true names and capacities of said Defendants have been ascertained, Plaintiff will amend
20
this Complaint accordingly. Plaintiff is informed and believes, and thereon alleges, that each
21
Defendant designated herein as a DOE is responsible, negligently or in some other actionable
22
manner, for the events and happenings hereinafter referred to, and caused injuries and
23
damages proximately thereby to the Plaintiff as hereinafter alleges.
24
25      2.    At all times herein mentioned, each of the Defendants was the agent, servant,
employee and/or joint venture of their Co-Defendants, and each of them, and at all said times
26
each Defendant was acting in the full course and scope of said agency, service, employment
27
and/or joint venture. Plaintiff is informed and believes, and thereon alleges that at all times
28

3
PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS
**JA179**

1  herein mentioned, Defendants: **ALMAY, INC.** a subsidiary of REVLON, INC.; **AVON**

2  **PRODUCTS, INC.; BARRETTS MINERALS INC.; BEACON CMP**

3  **CORPORATION; BLOCK DRUG COMPANY, INC.** (sued individually and as

4  successor-in-interest to THE GOLD BOND STERILIZING POWDER COMPANY a/k/a

5  THE GOLD BOND COMPANY); **BLOCK DRUG CORPORATION** (sued individually

6  and as successor-in-interest to THE GOLD BOND STERILIZING POWDER COMPANY

7  a/k/a THE GOLD BOND COMPANY); **BRENNTAG NORTH AMERICA, INC.** (sued

8  individually and as successor-in-interest to MINERAL PIGMENT SOLUTIONS, INC. and

9  as successor-in-interest to WHITTAKER CLARK & DANIELS, INC.); **BRENNTAG**

10 **SPECIALTIES LLC** f/k/a BRENNTAG SPECIALTIES, INC. f/k/a MINERAL PIGMENT

11 SOLUTIONS, INC. (sued individually and as successor-in-interest to WHITTAKER

12 CLARK & DANIELS, INC.); **BRISTOL-MYERS SQUIBB COMPANY** (sued

13 individually and as successor-in-interest to CHARLES OF THE RITZ); **BUTH-NA-**

14 **BODHAIGE, INC.** d/b/a THE BODY SHOP; **CHATTEM INC.** f/k/a CHATTEM DRUG

15 & CHEMICAL COMPANY; **CLINIQUE LABORATORIES LLC** f/k/a CLINIQUE

16 LABORATORIES, INC., a subsidiary of THE ESTEÉ LAUDER COMPANIES INC.;

17 **COLGATE-PALMOLIVE COMPANY** (sued individually and as successor-in-interest to

18 THE MENNEN COMPANY); **COLOR TECHNIQUES, INC.; COSMETIC**

19 **SPECIALTIES, INC.** (sued individually and formerly d/b/a G&G SPECIALTY

20 PRODUCTS CO.); **COTY, INC.** (sued individually and d/b/a RIMMEL LONDON and

21 RIMMEL INC.); **ESTEÉ LAUDER, INC.**, a subsidiary of THE ESTEÉ LAUDER

22 COMPANIES, INC.; **ESTEÉ LAUDER INTERNATIONAL, INC.; THE ESTEÉ**

23 **LAUDER COMPANIES, INC.** (sued individually and for LEN-RON

24 MANUFACTURING CO. INC.); **GUERLAIN, INC.; LONGS DRUG STORES**

25 **CALIFORNIA, L.L.C.; L'OREAL USA, INC.** d/b/a LANCOME; **LVMH**

26 **FRAGRANCE BRANDS US LLC; LVMH PERFUMES AND COSMETICS INC.;**

27 **LVMH PERFUMES & COSMETICS LLC;  NATURA INTERNATIONAL, INC.;**

28 **PFIZER INC.; PLAYTEX PRODUCTS, LLC** f/k/a PLAYTEX PRODUCTS, INC. (sued

4

1  individually and as successor-in-interest to ESMARK INC. and MAX FACTOR &
2  COMPANY); **PRESPERSE CORPORATION**; **PRESPERSE INTERNATIONAL**
3  **CORP**; **THE PROCTER & GAMBLE COMPANY** (sued as successor-in-interest to THE
4  SHULTON GROUP and/or SHULTON INC., PLAYTEX PRODUCTS INC. and MAX
5  FACTOR & COMPANY) and as successor-in-interest to THE SHULTON GROUP and/or
6  SHULTON INC.; **REVLON CONSUMER PRODUCTS CORPORATION** (sued
7  individually and as successor-in-interest to PLAYTEX PRODUCTS INC., MAX FACTOR
8  & COMPANY and CHARLES OF THE RITZ); **SPECIALTY MINERALS INC.** (sued
9  individually and as a subsidiary of MINERALS TECHNOLOGIES INC.); **UNILEVER**
10 **UNITED STATES, INC.** formerly d/b/a RIMMEL LONDON); **WHITTAKER CLARK**
11 **& DANIELS, INC.**; **WYETH HOLDINGS LLC** f/k/a WYETH HOLDINGS
12 CORPORATION f/k/a AMERICAN CYANAMID COMPANY  (sued individually and as
13 successor-in-interest to THE SHULTON GROUP and/or SHULTON INC.); and **DOES 1-**
14 **450** inclusive, were individuals, corporations, partnerships and/or unincorporated
15 associations organized and existing under and by virtue of the laws of the State of California,
16 or the laws of some other state or foreign jurisdiction, and that said Defendants, and each of
17 them, were and are authorized to do and are doing business in the State of California, and
18 that said Defendants have regularly conducted business in the County of Los Angeles, State
19 of California.

20    3.    Plaintiff BARBARA ALLOWAY alleges that she developed malignant
21 mesothelioma as a result of exposure to asbestos from Defendants' raw asbestos fiber of
22 various kinds and grades, and/or asbestos-containing products, and/or asbestos-containing
23 talc and/or chalk, and/or other finished and unfinished asbestos-containing talcum powder
24 products, and/or any other powder-like product, and/or asbestos-containing cosmetics while
25 living in California and throughout the United States, as well as in the United Kingdom,
26 including: **ALMAY, INC.** a subsidiary of REVLON, INC. (*for asbestos-containing Almay*
27 *loose powder, Almay compact powder, Almay pressed powder eyeshadows and Almay*
28 *pressed powder blushes*; **AVON PRODUCTS, INC.** (*for asbestos-containing Avon face*

1    *powders and Avon powdered blushes*); **BARRETTS MINERALS INC.** (*as a supplier of*
2    *asbestos-containing talc*); **BEACON CMP CORPORATION** (*as a supplier of asbestos-*
3    *containing talc*); **BLOCK DRUG COMPANY, INC.** (sued individually and as successor-
4    in-interest to THE GOLD BOND STERILIZING POWDER COMPANY a/k/a THE GOLD
5    BOND COMPANY) (*for asbestos-containing Gold Bond powder*); **BLOCK DRUG**
6    **CORPORATION** (sued individually and as successor-in-interest to THE GOLD BOND
7    STERILIZING POWDER COMPANY a/k/a THE GOLD BOND COMPANY) (*for*
8    *asbestos-containing Gold Bond powder*); **BRENNTAG NORTH AMERICA, INC.** (sued
9    individually and as successor-in-interest to MINERAL PIGMENT SOLUTIONS, INC. and
10   as successor-in-interest to WHITTAKER CLARK & DANIELS, INC.) (*as a supplier of*
11   *asbestos-containing talc*); **BRENNTAG SPECIALTIES LLC** f/k/a BRENNTAG
12   SPECIALTIES, INC. f/k/a MINERAL PIGMENT SOLUTIONS, INC. (sued individually
13   and as successor-in-interest to WHITTAKER CLARK & DANIELS, INC.) (*as a supplier*
14   *of asbestos-containing talc*); **BRISTOL-MYERS SQUIBB COMPANY** (sued
15   individually and as successor-in-interest to CHARLES OF THE RITZ) (*for asbestos-*
16   *containing Jean Nate talcum powder*); **BUTH-NA-BODHAIGE, INC.** d/b/a THE BODY
17   SHOP (*for asbestos-containing The Body Shop loose face powder, The Body Shop compact*
18   *face powder, The Body Shop pressed powder eyeshadows and blushes*); **CHATTEM INC.**
19   f/k/a CHATTEM DRUG & CHEMICAL COMPANY (*for asbestos-containing Corn Silk*
20   *pressed compact face powder*); **CLINIQUE LABORATORIES LLC** f/k/a CLINIQUE
21   LABORATORIES, INC., a subsidiary of THE ESTEÉ LAUDER COMPANIES INC. (*for*
22   *asbestos-containing Clinique loose face powder, Clinique pressed compact face powder and*
23   *Clinique pressed powder eyeshadows and blushes*); **COLGATE-PALMOLIVE**
24   **COMPANY** (sued individually and as successor-in-interest to THE MENNEN
25   COMPANY) (*for asbestos-containing Cashmere Bouquet bath powder*); **COLOR**
26   **TECHNIQUES, INC.** (*as a supplier of asbestos-containing talc*); **COSMETIC**
27   **SPECIALTIES, INC.** (sued individually and formerly d/b/a G&G SPECIALTY
28   PRODUCTS CO.) (*as a supplier of asbestos-containing talc*); **COTY, INC.** (sued

1  individually and d/b/a RIMMEL LONDON and RIMMEL INC.) *(for asbestos-containing*
2  *Rimmel loose face powder, Rimmel compact face powder, Rimmel pressed powder*
3  *eyeshadows and blushes and Corn Silk pressed compact face powder)*; **ESTEÉ LAUDER,**
4  **INC.,** a subsidiary of THE ESTEÉ LAUDER COMPANIES, INC. *(for asbestos-containing*
5  *Estee Lauder loose face powder, Estee Lauder compact face powder, Estee Lauder pressed*
6  *powder eyeshadows and blushes, Clinique loose face powder, Clinique pressed compact*
7  *face powder, and Clinique pressed powder eyeshadows and blushes)*; **ESTEÉ LAUDER**
8  **INTERNATIONAL, INC.** *(for asbestos-containing Estee Lauder loose face powder, Estee*
9  *lauder compact face powder, Estee Lauder pressed powder eyeshadows and blushes,*
10  *Clinique loose face powder, Clinique pressed compact face powder, and Clinique pressed*
11  *powder eyeshadows and blushes)*; **THE ESTEÉ LAUDER COMPANIES, INC.** (sued
12  individually and for LEN-RON MANUFACTURING CO. INC.) *(for asbestos-containing*
13  *Clinique loose face powder, Clinique pressed compact face powder and Clinique pressed*
14  *powder eyeshadows and blushes)*; **GUERLAIN, INC.** *(for asbestos-containing Shalimar*
15  *bath powder)*; **LONGS DRUG STORES CALIFORNIA, L.L.C.** *(as a supplier of*
16  *asbestos-containing talc)*; **L'OREAL USA, INC.** d/b/a LANCOME *(for asbestos-*
17  *containing Lancome loose face powder, Lancome compact face powder, Lancome pressed*
18  *powder eyeshadows and blushes, L'Oreal loose face powder, L'Oreal compact face powder,*
19  *L'Oreal pressed powder eyeshadows and blushes, The Body Shop loose face powder, The*
20  *Body Shop compact face powder and The Body Shop pressed powder eyeshadows and*
21  *blushes)*; **LVMH FRAGRANCE BRANDS US LLC** *(as a supplier of asbestos-containing*
22  *talc and for asbestos-containing Shalimar bath powder)*; **LVMH PERFUMES AND**
23  **COSMETICS INC.** *(as a supplier of asbestos-containing talc and for asbestos-containing*
24  *Shalimar bath powder)*; **LVMH PERFUMES & COSMETICS LLC** *(as a supplier of*
25  *asbestos-containing talc and for asbestos-containing Shalimar bath powder)*; **NATURA**
26  **INTERNATIONAL, INC.** *(for asbestos-containing The Body Shop loose face powder, The*
27  *Body Shop compact face powder, The Body Shop pressed powder eyeshadows and blushes)*;
28  **PFIZER INC.** *(as a supplier of asbestos-containing talc)*; **PLAYTEX PRODUCTS, LLC**

1 │ f/k/a PLAYTEX PRODUCTS, INC. (sued individually and as successor-in-interest to
2 │ ESMARK INC. and MAX FACTOR & COMPANY) (*for asbestos-containing Max Factor*
3 │ *loose face powder, Max Factor compact face powder, Max Factor pressed powder*
4 │ *eyeshadows and blushes, Max Factor theatrical loose face powder, Max Factor theatrical*
5 │ *compact face powder and Max Factor theatrical pancake face powders*); **PRESPERSE**
6 │ **CORPORATION** (*as a supplier of asbestos-containing talc*); **PRESPERSE**
7 │ **INTERNATIONAL CORP** (*as a supplier of asbestos-containing talc*); **THE PROCTER**
8 │ **& GAMBLE COMPANY** (sued as successor-in-interest to THE SHULTON GROUP
9 │ and/or SHULTON INC., PLAYTEX PRODUCTS INC. and MAX FACTOR &
10 │ COMPANY) and as successor-in-interest to THE SHULTON GROUP and/or SHULTON
11 │ INC. (*for asbestos-containing Max Factor loose face powder, Max Factor compact face*
12 │ *powder, Max Factor pressed powder eyeshadows and blushes, Max Factor theatrical loose*
13 │ *face powder, Max Factor theatrical compact face powder, Max Factor theatrical pancake*
14 │ *face powder and Corn Silk pressed compact face powder*); **REVLON CONSUMER**
15 │ **PRODUCTS CORPORATION** (sued individually and as successor-in-interest to
16 │ PLAYTEX PRODUCTS INC., MAX FACTOR & COMPANY and CHARLES OF THE
17 │ RITZ) (*for asbestos-containing Almay loose face powder, Almay compact face powder*
18 │ *Almay pressed powder eyeshadows and blushes, Jean Nate talcum powder, Max Factor*
19 │ *loose face powder, Max Factor compact face powder, Max Factor pressed powder*
20 │ *eyeshadows and blushes, Max Factor theatrical loose face powder, Max Factor theatrical*
21 │ *compact face powder, Max Factor theatrical pancake face powder, Max Factor theatrical*
22 │ *loose face powder, Revlon loose face powder, Revlon compact face powder, Revlon pressed*
23 │ *powder eyeshadows and blushes*); **SPECIALTY MINERALS INC.** (sued individually and
24 │ as a subsidiary of MINERALS TECHNOLOGIES INC.) (*as a supplier of asbestos-*
25 │ *containing talc*); **UNILEVER UNITED STATES, INC.** formerly d/b/a RIMMEL
26 │ LONDON (*for asbestos-containing Rimmel loose face powder, Rimmel compact face*
27 │ *powder and Rimmel pressed powder eyeshadows and blushes*); **WHITTAKER CLARK &**
28 │ **DANIELS, INC.** (*as a supplier of asbestos-containing talc*); **WYETH HOLDINGS LLC**

1  f/k/a WYETH HOLDINGS CORPORATION f/k/a AMERICAN CYANAMID

2  COMPANY (sued individually and as successor-in-interest to THE SHULTON GROUP

3  and/or SHULTON INC.) (*for asbestos-containing Corn Silk pressed compact face powder*);

4                           **FIRST CAUSE OF ACTION**

5                                (Negligence)

6  PLAINTIFF COMPLAINS OF DEFENDANTS AND DOES 1-450, THEIR
   "ALTERNATE ENTITIES." AND EACH OF THEM, AND FOR A CAUSE OF ACTION
7  FOR NEGLIGENCE ALLEGES AS FOLLOWS:

8       4.    Plaintiff incorporates herein by reference, as though fully set forth therein, the

9  general allegations set forth above.

10      5.    At all times herein mentioned, each of the named Defendants and DOES 1

11 through 450 were the successor, successor-in-business, successor-in-product line or a portion

12 thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or

13 member in an entity researching, studying, manufacturing, fabricating, designing,

14 modifying, labelling, assembling, distributing, leasing, buying, offering for sale, supplying,

15 selling, inspecting, servicing, installing, contracting for installation, repairing, marketing,

16 warranting, re-branding, manufacturing for others, packaging and advertising raw asbestos

17 fiber of various kinds and grades, and/or asbestos-containing products, and/or asbestos-

18 containing talc and/or chalk, and/or other finished and unfinished asbestos-containing talcum

19 powder products, and/or any other powder-like product, and/or asbestos-containing

20 cosmetics including, but not limited to, those products identified in paragraph 3 above. Said

21 entities shall hereinafter collectively be called "alternate entities." Each of the herein named

22 Defendants is liable for the tortious conduct of each successor, successor-in-business,

23 successor-in-product line or a portion thereof, assign, predecessor in product line or a portion

24 thereof, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or

25 entity that it was a member of, or funded, that researched, repaired, marketed, warranted, re-

26 branded, manufactured for others and advertised raw asbestos fiber of various kinds and

27 grades, and/or asbestos-containing products, and/or asbestos-containing talc and/or chalk,

28 and/or other finished and unfinished asbestos-containing talcum powder products, and/or any.

1  other powder-like product, and/or asbestos-containing cosmetics.  The following
2  Defendants, and each of them, are liable for the acts of each and every "alternate entity." and
3  each of them, in that there has been a virtual destruction of Plaintiff's remedy against each
4  such "alternate entity"; Defendants, and each of them, have acquired the assets, product line,
5  or a portion thereof, of each such "alternate entity"; Defendants, and each of them, have
6  caused the destruction of Plaintiff's remedy against each such "alternate entity"; each such
7  Defendant has the ability to assume the risk-spreading role of each such "alternate entity";
8  and that each such Defendant enjoys the goodwill originally attached to each such "alternate
9  entity".

| DEFENDANT | ALTERNATE ENTITY |
| --- | --- |
| ALMAY, INC. | REVLON, INC. |
| BLOCK DRUG COMPANY, INC. | THE GOLD BOND STERILIZING POWDER COMPANY<br>THE GOLD BOND COMPANY |
| BLOCK DRUG CORPORATION | THE GOLD BOND STERILIZING POWDER COMPANY<br>THE GOLD BOND COMPANY |
| BRENNTAG NORTH AMERICA, INC. | MINERAL PIGMENT SOLUTIONS, INC<br>WHITTAKER, CLARK & DANIELS, INC. |
| BRENNTAG SPECIALTIES LLC | BRENNTAG SPECIALTIES, INC.<br>MINERAL PIGMENT SOLUTIONS, INC.<br>WHITTAKER, CLARK & DANIELS, INC. |
| BRISTOL-MYERS SQUIBB COMPANY | CHARLES OF THE RITZ<br>JEAN NATE |
| BUTH-NA-BODHAIGE, INC. | THE BODY SHOP<br>L'OREAL USA, INC.<br>NATURA INTERNATIONAL, INC. |

PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS
JA186

| | |
|---|---|
| CHATTEM, INC. | CHATTEM DRUG & CHEMICAL COMPANY |
| CLINIQUE LABORATORIES LLC | CLINIQUE LABORATORIES, INC. THE ESTEÉ LAUDER COMPANIES INC. |
| COLGATE-PALMOLIVE COMPANY | THE MENNEN COMPANY |
| COSMETIC SPECIALTIES, INC. | G&G SPECIALTY PRODUCTS CO. |
| COTY, INC. | RIMMEL LONDON RIMMEL INC. |
| ESTEÉ LAUDER, INC. | THE ESTEÉ LAUDER COMPANIES, INC. ESTEÉ LAUDER INTERNATIONAL, INC. |
| ESTEÉ LAUDER INTERNATIONAL, INC. | ESTEÉ LAUDER, INC. THE ESTEÉ LAUDER COMPANIES, INC. |
| THE ESTEÉ LAUDER COMPANIES, INC. | ESTEÉ LAUDER, INC. LEN-RON MANUFACTURING CO. INC. CLINIQUE LABORATORIES, INC. CLINIQUE LABORATORIES, LLC |
| GUERLAIN, INC. | LVMH FRAGRANCE BRANDS US LLC LVMH PERFUMES AND COSMETICS INC. LVMH PERFUMES & COSMETICS LLC |
| L'OREAL USA, INC. | LANCOME BUTH-NA-BODHAIGE, INC. NATURA INTERNATIONAL, INC. |
| NATURA INTERNATIONAL, INC. | BUTH-NA-BODHAIGE, INC. THE BODY SHOP L'OREAL USA, INC. |
| PLAYTEX PRODUCTS, LLC | PLAYTEX PRODUCTS, INC. ESMARK INC. MAX FACTOR & COMPANY |
| THE PROCTER & GAMBLE COMPANY | THE SHULTON GROUP SHULTON, INC. PLAYTEX PRODUCTS INC. MAX FACTOR & COMPANY |

11

1  REVLON CONSUMER PRODUCTS         PLAYTEX PRODUCTS INC.
   CORPORATION                       MAX FACTOR & COMPANY
2                                    CHARLES OF THE RITZ

3  SPECIALTY MINERALS INC.          MINERALS TECHNOLOGIES INC.

4  UNILEVER UNITED STATES, INC.     RIMMEL LONDON

5  WYETH HOLDINGS LLC               WYETH HOLDING CORPORATION
                                     AMERICAN CYANAMID COMPANY
6                                    THE SHULTON GROUP
                                     SHULTON INC.
7

8
        6.    At all times herein mentioned, Defendants, their "alternate entities," and each
9
   of them, were and are engaged in the business of researching, manufacturing, fabricating,
10
   designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale,
11
   supplying, selling, inspecting, servicing, installing, contracting for installation, repairing,
12
   renting, marketing, warranting, re-branding, manufacturing for others, packaging, and
13
   advertising raw asbestos fiber of various kinds and grades, and/or asbestos-containing
14
   products, and/or asbestos-containing talc and/or chalk, and/or other finished and unfinished
15
   asbestos-containing talcum powder products, and/or any other powder-like product, and/or
16
   asbestos-containing cosmetics (hereinafter collectively referred to as "Defendants'
17
   Products").
18
        7.    At all times herein mentioned, Defendants, their "alternate entities," and each
19
   of them singularly and jointly, negligently and carelessly researched, manufactured,
20
   fabricated, specified, designed, modified, tested or failed to test, abated or failed to abate,
21
   warned or failed to warn of the health hazards, failed to recall and/or retrofit, labeled,
22
   assembled, distributed, leased, bought, rented, offered for sale, supplied, sold, inspected,
23
   serviced, installed, contracted for installation, repaired, marketed, warranted, re-branded,
24
   manufactured for others, packaged, and advertised Defendants' Products including, but not
25
   limited to, those Products identified in paragraph 3 above, in that the Defendants' Products
26
   were unreasonably dangerous because they released respirable asbestos fibers which
27
   resulted in personal injuries to users, consumers, bystanders, household members, and
28

                                          12
                    PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS

                                        **JA188**

1  others, including Plaintiff BARBARA ALLOWAY herein (hereinafter collectively called
2  "exposed persons"). Defendants' Products were used at all times in a manner that was
3  reasonably foreseeable to Defendants, their "alternate entities," and each of them, thereby
4  rendering Defendants' Products unsafe and dangerous for use by "exposed persons".
5  Plaintiff BARBARA ALLOWAY alleges her exposures to Defendants' Products including,
6  but not limited to, those products identified in paragraph 3 above, were a substantial
7  contributing factor in the development of her mesothelioma and therefore proximately
8  caused Plaintiff's illnesses, injuries, disabilities, and damages.

9      8.    Defendants, their "alternate entities," and each of them, had a duty to exercise
10  reasonable care while engaging in the activities mentioned above and each Defendant
11  breached said duty of reasonable care in that Defendants, and each of them failed to safely
12  and adequately design, manufacture and/or sell Defendants' Products; failed to test
13  Defendants' Products; failed to investigate the hazards of Defendants' Products; failed to
14  warn "exposed persons," including Plaintiff BARBARA ALLOWAY, of the health hazards
15  of using Defendants' Products; failed to disclose the known or knowable dangers of using
16  Defendants' Products; failed to warn of the harmful exposures caused by the use of
17  Defendants' Products; failed to obtain suitable alternative materials to asbestos when such
18  alternatives were available; and as otherwise stated herein.

19      9.    Defendants' Products were and are hazardous to the health and safety of
20  Plaintiff, and others in Plaintiff's position personally using, applying, and in close proximity
21  to Defendants' Products, and since on or before 1930, the hazards and dangerous propensities
22  of Defendants' Products were both known and knowable to the Defendants, their "alternate
23  entities," and each of them, through the use of medical and/or scientific data and other
24  knowledge available to Defendants, their "alternate entities," and each of them, at the time
25  of Defendants' manufacture, distribution, sale, research, study, fabrication, design,
26  modification, labeling, assembly, leasing, buying, offering for sale, supply, inspection,
27  service, installation, contracting for installation, repair, marketing, warranting, re-branding,
28  re-manufacturing for others, packaging and advertising of Defendants' Products, which

1  clearly indicated the hazards and dangerous propensities of asbestos presented a substantial
2  danger to users, handlers, bystanders, and household members, including Plaintiff
3  BARBARA ALLOWAY, of Defendants' Products through the intended and reasonably
4  foreseeable use of Defendants' Products.

5      10.    Defendants, their "alternate entities," and each of them knew, or reasonably
6  should have known, that Defendants' Products were dangerous and were likely to be
7  dangerous when used in their intended and reasonably foreseeable manner.

8      11.    Defendants, their "alternate entities," and each of them knew, or reasonably
9  should have known, that Defendants' Products would be personally used, removed, mixed,
10 scraped, swept, broken, "ripped out," and/or otherwise disturbed in their ordinary, intended
11 and foreseeable use, resulting in the release of airborne hazardous and dangerous asbestos
12 fibers, and that through such activity, "exposed persons," including Plaintiff BARBARA
13 ALLOWAY herein, would be exposed to hazardous and dangerous asbestos fibers.
14 Defendants, their "alternate entities." and each of them knew or reasonably should have
15 known that users and bystanders such as Plaintiff BARBARA ALLOWAY, and others in
16 her position personally using, applying, or otherwise exposed to dust from Defendants'
17 Products would not realize or know the dangers. Defendants, their "alternate entities." and
18 each of them negligently failed to adequately warn or instruct of the dangers of Defendants'
19 Products and failed to recall and/or retrofit Defendants' Products. A reasonable designer,
20 manufacturer, distributor, seller, installer, buyer or supplier, under the same or similar
21 circumstances, would have warned of the dangers to avoid exposing others to a foreseeable
22 risk of harm.  The negligent failure of Defendants, their "alternate entities." and each of
23 them, to warn was a substantial factor in causing harm to Plaintiff BARBARA ALLOWAY,
24 the nature of which is set forth in Exhibit "B" which is attached hereto and incorporated by
25 reference herein.

26      12.    Plaintiff BARBARA ALLOWAY personally used, handled, applied, or was
27 otherwise exposed to asbestos from Defendants' Products referred to herein in California, as
28 well as other locations,  in a manner that was reasonably foreseeable to Defendants, and each

14
PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS

1   of them.  Plaintiff's exposure to Defendants' Products occurred at various locations set forth
2   in Exhibit "A." which is attached hereto and incorporated by reference herein.

3       13.   As a direct and proximate result of the conduct of the Defendants, their
4   "alternate entities." and each of them as aforesaid, Plaintiff BARBARA ALLOWAY's
5   exposures to asbestos from personally using Defendant's Products caused severe and
6   permanent injury to the Plaintiff, the nature of which along with the date of Plaintiff's
7   diagnosis and the date she learned such injuries were attributable to exposure to Defendants'
8   Products are set forth in Exhibit "B." which is attached hereto and incorporated by reference
9   herein.  Plaintiff is informed and believes, and thereon alleges, that progressive lung disease,
10  cancer and other serious diseases are caused by inhalation of asbestos fibers without
11  perceptible trauma and that said diseases result from exposure to Defendants' Products over
12  a period of time.

13      14.   Plaintiff  BARBARA  ALLOWAY  suffers  from  malignant  pleural
14  mesothelioma caused by exposure to asbestos from Defendants' Products and/or from the
15  use of Defendants' Products including those products identified in paragraph 3 above.
16  Plaintiff was not aware at the time of exposure that Defendants' Products presented any risk
17  of injury and/or disease.

18      15.   As a direct and proximate result of the aforesaid conduct of Defendants, their
19  "alternate entities" and each of them, Plaintiff BARBARA ALLOWAY has suffered and
20  will continue to suffer pain, discomfort, loss of weight, loss of appetite, fatigue, somnolence,
21  lethargy, dyspnea, dysphagia, and other physical symptoms, and the mental and emotional
22  distress attendant thereto, as Plaintiff's malignant mesothelioma progresses, all to her general
23  damage in a sum in excess of the jurisdictional limits of a limited civil case.

24      16.   As a direct and proximate result of the aforesaid conduct of the
25  Defendants, their "alternate entities." and each of them, Plaintiff BARBARA ALLOWAY
26  has incurred, is presently incurring, and will incur in the future liability for physicians,
27  surgeons, nurses, hospital care, medicine, hospices, X-rays and other medical treatment, the
28  true and exact amount thereof being presently unknown to Plaintiff, subject to proof at trial.

1      17.    As a further direct and proximate result of the said conduct of the Defendants,

2  their "alternate entities" and each of them, Plaintiff has incurred and will incur of income,

3  wages, profits and commissions, a diminishment of earning potential, and other pecuniary

4  losses, the true and exact amount thereof being presently unknown to Plaintiff, subject to

5  proof at trial.

6      18.    Plaintiff further alleges that Defendants, their "alternate entities" and each of

7  them also engaged in the following wrongful acts which support Plaintiff's prayer for

8  punitive damages:

9      (a)    Defendants, their "alternate entities." and each of them suppressed from all

10  users, handlers, bystanders, and household members, including Plaintiff BARBARA

11  ALLOWAY, medical and scientific information concerning the health hazards associated

12  with inhalation of asbestos, including the substantial risk of injury or death therefrom.

13  Although Defendants, and each of them knew of the substantial risks associated with

14  exposure to asbestos, they willfully and knowingly concealed such information of

15  Defendants' Products from users, handlers, bystanders, and household members in conscious

16  disregard of the rights, safety and welfare of "exposed persons." including Plaintiff

17  BARBARA ALLOWAY;

18      (b)    Defendants, their "alternate entities." and each of them, belonged to,

19  participated in, and financially supported industry organizations including, but not limited

20  to, the Cosmetic Toiletry and Fragrance Association (now Personal Care Products Council),

21  Gypsum Association, Asbestos Information Association, Industrial Hygiene Foundation and

22  others, which for and on behalf of Defendants, their "alternate entities" and each of them

23  actively promoted the suppression of information about the dangers of asbestos to users,

24  handlers, bystanders, and household members of Defendants' Products, thereby misleading

25  Plaintiff BARBARA ALLOWAY as to the safety of Defendants' Products. Through their

26  participation and association with such industry organizations, Defendants, and each of them

27  knowingly and deliberately concealed and suppressed the true information regarding

28  asbestos and its dangers, and propagated misinformation intended to instill in users,

1    handlers, bystanders, and household members of Defendants' Products a false security about

2    the safety of Defendants' Products. The Dust Control Committee, which changed its name

3    to the Air Hygiene Committee of the Asbestos Textile Institute, was specifically enlisted to

4    study the subject of dust control. Discussions in this committee were held many times

5    regarding the dangers inherent in asbestos and the dangers which arose from the lack of

6    control of dust, and such information was suppressed from public dissemination from 1946

7    to a date unknown to Plaintiff at this time;

8        (c)     Commencing in 1930 with the study of mine and mill workers at Asbestos and

9    Thetford Mines in Quebec, Canada, and the study of the workers at Raybestos-Manhattan

10   plants in Manheim and Charleston, South Carolina, Defendants, their "alternate entities."

11   and each of them knew and possessed medical and scientific information of the connection

12   between the inhalation of asbestos fibers and asbestosis, which information was

13   disseminated through the Asbestos Textile Institute and other industry organizations to all

14   other Defendants, their "alternate entities." and each of them herein. Between 1942 and

15   1950, the Defendants, their "alternate entities." and each of them failed to provide this

16   information to users, handlers, bystanders, and household members;

17        (d)     Defendants, their "alternate entities." and each of them, failed to warn Plaintiff

18   BARBARA ALLOWAY and others of the nature of Defendants' Products which were

19   dangerous when breathed and which could cause pathological effects without noticeable

20   trauma, despite the fact that Defendants, their "alternate entities." and each of them,

21   possessed knowledge and were under a duty to disclose that Defendants' Products were

22   dangerous and a threat to the health of persons coming into contact therewith;

23        (e)     Defendants, their "alternate entities." and each of them, failed to provide

24   Plaintiff BARBARA ALLOWAY with information concerning adequate protective masks

25   and other equipment devised to be used when personally using, applying, mixing, and/or

26   sweeping Defendants' Products and/or from the use of Defendants' Products, their "alternate

27   entities." and each of them, despite knowing that such protective measures were necessary,

28   and that they were under a duty to disclose that Defendants' Products were dangerous and

1 would result in injury to Plaintiff BARBARA ALLOWAY and others personally using and
2 applying such material;

3     (f)   Defendants, their "alternate entities." and each of them knew and failed to
4 disclose that Plaintiff BARBARA ALLOWAY and anyone similarly situated, upon
5 inhalation of asbestos would, in time, have a substantial risk of developing irreversible
6 conditions of pneumoconiosis, asbestosis, mesothelioma and/or cancer;

7     (g)   Defendants, their "alternate entities." and each of them failed to provide
8 information of the true nature of the hazards of Defendants' Products and that exposure to
9 Defendants' Products would cause pathological effects without noticeable trauma to the
10 public, including buyers, users, household members, and physicians employed by Plaintiff
11 BARBARA ALLOWAY, so that said physicians could not examine, diagnose, and treat
12 Plaintiff and others who were exposed to asbestos, despite the fact that Defendants, their
13 "alternate entities" and each of them were under a duty to so inform and said failure was
14 misleading.

15     19.   Defendants, their "alternate entities." and each of them, and their officers,
16 directors, and managing agents participated in, authorized, expressly and impliedly ratified,
17 and had full knowledge of, or should have known of, each of the acts set forth herein.
18 Defendants, their "alternate entities" and each of them are liable for the oppressive and
19 malicious acts of their "alternate entities" and each of them, and each Defendant's officers,
20 directors, and managing agents participated in, authorized, expressly and impliedly ratified,
21 and had full knowledge of or should have known of the acts of each of their "alternate
22 entities" as set forth herein.

23     20.   The herein-described conduct of said Defendants, their "alternate entities." and
24 each of them was and is willful, malicious, oppressive, outrageous, and in conscious
25 disregard and indifference to the safety and health of "exposed persons," including Plaintiff
26 BARBARA ALLOWAY, in that Defendants, and each of them continued to manufacture,
27 market and/or sell dangerous Defendants' Products known to cause asbestos to be released
28 and to cause severe, permanent injuries and death, despite possessing knowledge of the

1 | substantial hazards posed by use of Defendants' Products in order to continue to profit
2 | financially therefrom. Defendants, their "alternate entities." and each of them engaged in
3 | such conduct so despicable, contemptible, base, vile, miserable, wretched and loathsome as
4 | to be looked down upon and despised by ordinary people and justifies an award of punitive
5 | and exemplary damages pursuant to Civil Code Section 3294. Plaintiff, for the sake of
6 | example and by way of punishing said Defendants, seeks punitive damages according to
7 | proof.

8      21.    Defendants, and each of them, engaged in conduct which was intended by
9 | Defendants, and each of them to cause injury to the Plaintiff, and despicable conduct which
10 | was carried on by the Defendants with a willful and conscious disregard of the rights or
11 | safety of others, including Plaintiff BARBARA ALLOWAY.

12      22.    Defendants, and each of them, engaged in the despicable conduct described
13 | herein that subjected persons, including Plaintiff BARBARA ALLOWAY, to cruel and
14 | unjust hardship in the form of severe, debilitating and fatal diseases like asbestosis, lung
15 | cancer and mesothelioma, in conscious disregard of those persons' rights.

16      23.    As a direct and proximate result of such intentional conduct by Defendants,
17 | their "alternate entities." and each of them, Plaintiff BARBARA ALLOWAY sustained
18 | injuries, illnesses, disabilities, and damages alleges herein.

19      WHEREFORE, Plaintiff prays for judgment against Defendants, their "alternate
20 | entities." and each of them, as hereinafter set forth.

21 | **SECOND CAUSE OF ACTION**
(Strict Liability)

22 | AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF
23 | ACTION FOR STRICT LIABILITY, PLAINTIFF COMPLAINS OF DEFENDANTS,
DOES 1-450, THEIR "ALTERNATE ENTITIES." AND EACH OF THEM, AND
24 | ALLEGES AS FOLLOWS:

25      24.    Plaintiff incorporates herein by reference, as though fully set forth therein, each
26 | and every one of the general allegations and the allegations contained in the First Cause of
27 | Action herein.

28

19

1   25.   **Strict Liability - Manufacturing Defect**: All Defendants, and the 1st through
2   450th Doe Defendants, are strictly liable under manufacturing defect. Defendants and Does
3   manufactured, sold, supplied, designed, or distributed Defendants' Products. The defects
4   existed in all of Defendants' Products when they left the possession of the Defendants, their
5   "alternate entities." and each of them. These defects were a substantial factor in causing
6   harm to Plaintiff BARBARA ALLOWAY.

7   26.   **Strict Liability - Design Defect - Consumer Expectations**: All Defendants,
8   and the 1st through 450th Doe Defendants, are strictly liable under the consumer-
9   expectations test for placing defectively designed products into the stream of commerce and
10  ultimately exposing Plaintiff BARBARA ALLOWAY to asbestos from Defendants'
11  Products. First, Defendants designed, manufactured, supplied, marketed, distributed, and
12  sold Defendants' Products. Second, each Product did not perform as safely as an ordinary
13  consumer would have expected it to perform when used or misused in an intended or
14  reasonably foreseeable way, because each Product caused hazardous asbestos to become
15  airborne, exposing Plaintiff to asbestos. Third, Plaintiff developed mesothelioma. Fourth,
16  each Product's failure to perform safely was a substantial factor in causing Plaintiff's
17  mesothelioma.

18  27.   **Strict Liability – Design Defect – Risk/Benefit**: All Defendants, and the 1st
19  through 450th Doe Defendants, are strictly liable under risk/benefit. Defendants, their
20  alternate entities and Does manufactured, sold, supplied, designed, or distributed
21  Defendants' Products. These defects were a substantial factor in causing harm to the
22  Plaintiff.

23  28.   **Strict Liability – Failure to Warn**: Defendants, their "alternate entities." and
24  each of them sold Defendants' Products, which were defective in that they failed to
25  adequately warn or instruct of the known and knowable dangers and risks of the ordinary,
26  intended, and foreseeable use of Defendants' Products, which dangers and risks would not
27  have been and were not recognized by ordinary workers, users and consumers of the
28  Products, including Plaintiff BARBARA ALLOWAY, and the lack of sufficient instructions

PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS

**JA196**

1   and/or warnings was a substantial factor in causing harm to Plaintiff BARBARA
2   ALLOWAY and others in Plaintiff's position who were personally using, applying, and in
3   close proximity to Defendants' Products.

4       29.    Defendants' Products were defective and unsafe for their intended
5   purpose and foreseeable use in that when used, handled, swept, or otherwise disturbed,
6   Defendants' Products would result in the release, and therefore inhalation of, hazardous and
7   dangerous asbestos fibers by exposed persons, including Plaintiff BARBARA ALLOWAY.
8   These defects existed in all of Defendants' Products when they left the possession of the
9   Defendants, their "alternate entities." and each of them. At the time Defendants' Products
10  were used by Plaintiff BARBARA ALLOWAY and others in her position applying,
11  personally using and in close proximity to or otherwise exposed to dust from Defendants'
12  Products, Defendants' Products were substantially the same as when they left the possession
13  of the Defendants, their "alternate entities." and each of them, and/or any changes made to
14  Defendants' Products after they left the possession of Defendants, their "alternate entities."
15  and each of them were reasonably foreseeable to Defendants, their "alternate entities" and
16  each of them. Defendants' Products were used by Plaintiff BARBARA ALLOWAY and
17  others in her position applying, personally using and in close proximity to or otherwise
18  exposed to dust from Defendants' Products in a way that was reasonably foreseeable to
19  Defendants and each of them. The defect in Defendants' Products was a substantial factor
20  in causing harm and personal injuries to Plaintiff BARBARA ALLOWAY, including
21  malignant mesothelioma, while being used in a reasonably foreseeable manner, thereby
22  rendering Defendants' Products defective, unsafe, and unreasonably dangerous for their
23  ordinary and intended use.

24      30.    As a direct and proximate result of the actions and conduct outlined herein,
25  Plaintiff suffered the injuries, illness, disabilities and damages alleges herein.

26              **THIRD CAUSE OF ACTION**

27                  **(FRAUD)**

28

21

**JA197**

1        AS AND FOR A FURTHER THIRD, SEPARATE, AND DISTINCT CAUSE OF
ACTION FOR FRAUD, PLAINTIFF COMPLAINS OF DEFENDANTS, DOES 1-450,
2 THEIR "ALTERNATE ENTITIES." AND EACH OF THEM, AND ALLEGES AS
FOLLOWS:

3

4        31. **Fraudulent Misrepresentation**: All Defendants, Does 1-450, their "alternate

entities." and each of them, are liable for their fraudulent misrepresentations.
5

6        (a)     First, each of these Defendants, via its employees, agents, advertisements, or

7 any other authorized person or document, represented that certain facts were true when they

were not. The specific identities of these employees, agents, advertisements, or any other
8
authorized person or document are maintained in Defendants' records. Such records remain
9
10 in the exclusive control of Defendants pursuant to Defendants' respective document-

retention policies. While Plaintiff does not currently know all of the specific advertisements,
11
or the names of all of the employees, agents, or any other authorized person who made the
12
representations, Plaintiff will have access to this information once discovery has commenced
13
and will be able to specifically name the advertisements as well as the employees, agents, or
14
any other authorized persons.
15

16        (b)     Second, Defendants represented that the products they manufactured,

17 supplied, or specified for use were not hazardous to humans. These representations were

made before and during the years that Plaintiff and her family members purchased and
18
Plaintiff was exposed to asbestos from Defendants' Products. Such representations were
19
made either directly to Plaintiff and her family members, or to a third party intending and
20
reasonably expecting that the substance of those representations would be repeated to
21
Plaintiff and her family members.
22

23        (c)     Third, Defendants knew that the representations were false when they made

them, or they made the representations recklessly and without regard for their truth.
24

25        (d)     Fourth, Defendants intended that Plaintiff and her family members, and/or the

same class of person as Plaintiff and her family members, rely on the representations or their
26
substance.
27

28

PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS

**JA198**

1    (e)    Fifth, Plaintiff and her family members reasonably relied on Defendants'
2    representations or the substance of these representations.

3    (f)    Sixth, Plaintiff BARBARA ALLOWAY developed mesothelioma.

4    (g)    Seventh, Plaintiff and her family members's reliance on those representations
5    was a substantial factor in causing Plaintiff BARBARA ALLOWAY's mesothelioma and
6    the resulting damages thereto.

7    32.    **Fraudulent Concealment (Nondisclosure)**: All Defendant, Does 1-450, their
8    "alternate entities" and each of them, are liable for their fraudulent concealment
9    (nondisclosure).

10    (a)    First, each of these Defendants made affirmative statements that were so
11    misleading (e.g. misleading "half-truths") that they gave rise to a fraud cause of action even
12    in the absence of a specific relationship or transaction as between each Defendant and
13    Plaintiff and her family members. Specifically, Defendants stated that their products could
14    be used safely while concealing that they were in fact lethal because they contained and
15    released asbestos fibers.

16    (b)    Second, Defendants (i) had exclusive knowledge of material facts not known
17    to Plaintiff and her family members (as set forth above), (ii) actively concealed those material
18    facts from Plaintiff and her family members, (iii) made partial representations but also
19    suppressed material facts, as set forth above, and (iv) made factual representations, but did
20    not disclose material facts which qualified those representations. Such nondisclosures
21    included Defendants representing their products as safe when used as intended and as fit for
22    the particular purpose for which they were marketed, while not disclosing the facts that these
23    products contained asbestos that would become airborne during the intended and foreseeable
24    use of the products, rendering them dangerous and unfit for their intended purpose.

25    (c)    Third, each Defendant entered into a relationship and/or a transaction with
26    Plaintiff and her family members sufficient to give rise to a duty to disclose. For example,
27    Plaintiff BARBARA ALLOWAY and her family members used and otherwise encountered
28    Defendants' products that were purchased either directly from Defendants, Defendants'

23
PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS

**JA199**

1  authorized dealers or suppliers, or any other entity upon which Defendants derived a direct
2  monetary benefit directly from Plaintiff and her family members's purchase and use of the
3  products. As for another example, Defendants directly advertised their products to those in
4  California, Arizona and elsewhere as a symbol of freshness, cleanliness and purity.
5  Defendants advertised and marketed their products as being only the beacon of "freshness"
6  and "comfort," eliminating friction on the skin, absorbing "excess wetness," helping keep
7  skin feeling dry and comfortable, and "clinically proven gentle and mild." The Defendants
8  compelled individuals through advertisements to dust themselves with the products to mask
9  odors. Defendants derived direct monetary benefit from consumers' use of the products
10 because Plaintiff and her family members decided to purchase and use Defendants' products.

11      (d)     Fourth, Plaintiff and her family members did not know of the concealed
12 material facts.

13      (e)     Fifth, Defendants intended to deceive Plaintiff and her family members by
14 concealing material facts, and/or by making certain representations without disclosing
15 additional facts that would have materially qualified those representations.

16      (f)     Sixth, had the omitted information been disclosed, Plaintiff and her family
17 members reasonably would have behaved differently.

18      (g)     Seventh, Plaintiff BARBARA ALLOWAY developed mesothelioma.

19      (h)     Eighth, each Defendant's concealment was a substantial factor in causing
20 Plaintiff's mesothelioma and the resulting damages thereto.

21      33.     **Conspiracy to Commit Fraudulent Misrepresentation**: Plaintiff hereby
22 incorporates by reference the allegations of Paragraph 31 as if fully stated herein. All
23 Defendants, Does 1-450, their "alternate entities." and each of them, are liable for their
24 conspiracy to commit fraudulent misrepresentation.

25      (a)     First, Defendants were aware that their conspirators, which included all co-
26 Defendants and others, planned to commit fraudulent misrepresentation against Plaintiff
27 BARBARA ALLOWAY, and/or the same class of persons as Plaintiff.

28      (b)     Second, Defendants agreed with their conspirators and intended that the

24

fraudulent misrepresentation be committed.

    (c)    Third, Plaintiff BARBARA ALLOWAY developed mesothelioma.

    (d)    Fourth, each Defendant's participation in the conspiracy was a substantial factor in causing Plaintiff's mesothelioma and the resulting damages thereto.

    34.    **Conspiracy to Commit Fraudulent Concealment (Nondisclosure)**: Plaintiff hereby incorporates by reference the allegations of Paragraph 32 as if fully stated herein. All Defendants, Does 1-450, their "alternate entities." and each of them, are liable for their conspiracy to commit fraudulent concealment.

    (a)    First, Defendants were aware that their conspirators, which included all co-Defendants and others, planned to commit fraudulent concealment against Plaintiff BARBARA ALLOWAY, and/or the same class of persons as Plaintiff.

    (b)    Second, Defendants agreed with their conspirators and intended that the fraudulent concealment be committed.

    (c)    Third, Plaintiff BARBARA ALLOWAY developed mesothelioma.

    (d)    Fourth, each Defendant's participation in the conspiracy was a substantial factor in causing Plaintiff's mesothelioma and the resulting damages thereto.

    35.    **Knowledge of Hazards**: At all times pertinent hereto, all Defendants, Does 1-450, their "alternate entities." and each of them, owed Plaintiff BARBARA ALLOWAY a duty, as provided for in Civil Code sections 1708, 1709, and 1710, to abstain from injuring her person, property, or rights. In violation of that duty, these Defendants, and each of them, did do the acts and omissions, when a duty to act was imposed, as set forth herein, thereby proximately causing injury to Plaintiff. Such acts and omissions consisted of acts falling within Civil Code sections 1708, 1709, and 1710, and more specifically were (i) suggestions of fact which were not true and which the Defendants did not believes to be true, (ii) assertions of fact of that which were not true, which the Defendants had no reasonable ground for believing to be true, and (iii) the suppression of material facts when a duty existed to disclose them, all as are more fully set forth herein, and the violation of which as to any one

PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS

**JA201**

1 such item gave rise to a cause of action for violation of Plaintiff's rights as provided for in

2 the aforementioned Code sections.

3      36.    Since 1924, all of the Defendants have known and been in possession of the

4 true material facts (consisting of medical and scientific data and other knowledge) which

5 clearly indicated that the asbestos-containing products referred to herein were and are

6 hazardous to the health and safety of Plaintiff, and others similarly situated. Defendants

7 engaged in the following acts and omissions:

8     (a)    Did not label any of the aforementioned asbestos-containing products as to the hazards of said products to the health and safety of Plaintiff BARBARA

9         ALLOWAY, and others in her position using these products when the

10         knowledge of such hazards was existing and known to Defendants, and each of them, since 1924. By not labeling said products as to their said hazards.

11         Defendants, and each of them, caused to be suggested as a fact to Plaintiff that it was safe for her to use said products, when in fact these things were not true

12         and Defendants did not believe them to be true.

13

14     (b)    Suppressed information relating to the danger of using the aforementioned products by requesting the suppression of information to Plaintiff, Plaintiff's

15         class of persons, and the general public concerning the dangerous nature of the aforementioned products to all persons including users, bystanders and

16         household members, by not allowing such information to be disseminated in a manner which would give general notice to the public and knowledge of the

17         hazardous nature thereof when Defendants were bound to disclose such

18         information.

19     (c)    Sold the aforementioned products to the public, including Plaintiff, and

20         others in California and other states without advising them of the dangers of

21         use of said products to Plaintiff and to those persons' household members, when Defendants knew of such dangers, as set forth herein and above, and had

22         a duty to disclose such dangers. Thus, Defendants caused to be positively

23         asserted to Plaintiff and the public that which was not true and which Defendants had no reasonable ground for believing to be true, in a manner not

24         warranted by the information possessed by said Defendants, and each of them,

25         of that which was and is not true, to wit, that it was safe for Plaintiff to use said products and that they did not pose a risk of harm.

26

27     (d)    Suppressed and continue to suppress from everyone, including Plaintiff, medical, scientific data, and knowledge of the accurate results of studies

28         including, but not limited to, Waldemar C. Dreesen of the United States Public

Health Service's 1933 report to the National Safety Council, the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite, and the National Safety Council stated "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicéte of magnesium." in the September 1935 issue of National Safety News, in an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson. The article reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleges exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

(e) Belonged to, participated in, and financially supported the Industrial Hygiene Foundation, Asbestos Information Association, the Asbestos Textile Institute (ATI), and other industry organizations, including the Cosmetic, Toiletry, and Fragrance Association (now known as the Personal Care Products Council), which actively promoted the suppression of information of danger to users of the aforementioned products for and on behalf of Defendants, and each of them, thereby misleading Plaintiff BARBARA ALLOWAY to her prejudice through the suggestions and deceptions set forth above in this cause of action. ATI's Dust Control Committee, which changed its name to the Air Hygiene Committee of ATI, was specifically enjoined to study the subject of dust control; discussions in such committee were held many times regarding (i) the dangers inherent in asbestos and the dangers which arise from the lack of control of dust and (ii) the suppression of such information from 1946 to a date unknown to Plaintiff at this time.

(f) Knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis in 1930 with the study of mine and mill workers at the Thetford asbestos mines in Quebec, Canada, and the study of workers at the Raybestos-Manhattan plants in Manheim and Charleston, South Carolina. This information was disseminated through the ATI and other industry organizations to all other Defendants and each of them herein. Between 1942 and 1950, Defendants, and each of them knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and cancer, which information was disseminated through the ATI and other industry organizations to all other Defendants

PLAINTIFF'S ORIGINAL COMPLAINT -- ASBESTOS

**JA203**

herein. Thereby, Defendants suggested as material fact that which is not true and disseminated other facts likely to and which did mislead Plaintiff for want of communication of true facts, which consisted of the previously described medical and scientific data and other knowledge by not giving Plaintiff the true material facts concerning such knowledge of dangers, when Defendants were bound to disclose them.

(g)     Failed to warn Plaintiff and others similarly situated regarding the nature of Defendants' asbestos-containing products. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[all] of the 22 talcum products analyzed have a.. .fiber content. . . averaging 19%. The fibrous-material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits. Unknown significant amounts of such material in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al.; *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Ant Ind. Hyg. Assoc. J.350 (1968).] Defendants failed to warn Plaintiff and others similarly situated that their asbestos-containing products are, among other things, dangerous when breathed and cause pathological effects without noticeable trauma, although Defendants possessed knowledge that such products were dangerous and a threat to the health of persons coming into contact therewith and under a duty to disclose this information.

(h)     Concealed from Plaintiff BARBARA ALLOWAY and others similarly situated the true nature of her exposures, the fact that Defendants knew that exposure to respirable asbestos meant that Plaintiff would inhale this asbestos, significantly increasing her risk of developing asbestosis, lung cancer, and mesothelioma; that Plaintiff that had in fact been exposed to respirable asbestos; that the products to which Plaintiff was exposed would cause pathological effects in the human body without noticeable or perceptible trauma to warn him of injury; and Defendants engaged in these acts and omissions while under a duty to and bound to disclose this information.

(i)     Failed to provide information to the public at large and buyers, users and physicians of Plaintiff for the purpose of conducting physical examinations of anyone whom came in contact with asbestos as to the true nature of the hazards of asbestos, in order for such physicians to diagnose and treat individuals coming into contact with asbestos, in that the materials to which Plaintiff had been exposed would cause pathological effects without noticeable trauma, even though Defendants were under a duty to supply such information and such failure was and is likely to mislead persons, including Plaintiff, as to the dangers and risk of harm to which they were exposed.

1    (j)    Affirmatively misrepresented that asbestos-containing products were safe to
2           use and handle, when Defendants knew such statements were false when made,
            or made said false statements recklessly and without regard for whether the
3           statements were true.

4    37.    Each of the foregoing acts, suggestions, assertions, and forbearances to act
5    when a duty existed to act, the said Defendants, and each of them, having such knowledge,
6    knowing Plaintiff BARBARA ALLOWAY did not have such knowledge and Plaintiff would
7    breathe such asbestos from Defendants' Products innocently, was done falsely and
8    fraudulently and with full intent to induce Plaintiff to be in a dangerous environment and to
9    cause her to remain unaware of the true material facts, all in violation of Civil Code sections
10   1708, 1709, and 1710.

11                              **BASIS FOR PUNITIVE DAMAGES**

12   38.    **Malice, Oppression, and/or Fraud**: Plaintiff hereby incorporates by
13   reference the allegations of all causes of action as if fully stated herein. All Defendants,
14   Does 1-450, their "alternate entities," and each of them, are liable for punitive damages
15   because they engaged in the conduct that caused Plaintiff harm with malice, oppression, or
16   fraud.

17   (a)    First, these Defendants committed malice in that they acted with intent to harm
18   when they caused Plaintiff BARBARA ALLOWAY's asbestos exposures, and/or because
19   their conduct was despicable and/or was done with a willful and knowing disregard of the
20   rights and safety of others.

21   (b)    Second, these Defendants committed oppression in that their conduct was
22   despicable and subjected Plaintiff to cruel and unjust hardship in knowing disregard of her
23   rights.

24   (c)    Third, the Defendants committed fraud in that they intentionally and
25   fraudulently concealed and misrepresented material facts and did so intending to harm
26   Plaintiff, or with reckless disregard for whether their fraud would harm Plaintiff.

27   39.    These Defendants' conduct constituting malice, oppression, and fraud was
28   committed by, authorized by, and adopted by one or more officers, directors, and managing

                                           29

1 | agents within the corporate hierarchy of each Defendant, who acted on behalf of each
2 | Defendant.

3 |     40. As a direct and proximate result of such intentional conduct by Defendants,
4 | their "alternate entities." and each of them, Plaintiff BARBARA ALLOWAY sustained the
5 | injuries, illnesses, disabilities, and damages alleges herein.

6 |     41. WHEREFORE, Plaintiff prays for judgment against Defendants, their
7 | "alternate entities." and each of them, in an amount to be proved at trial in each individual
8 | case, as follows:

9 | Plaintiff BARBARA ALLOWAY:

10 | 1. For Plaintiff's general damages according to proof;

11 | 2. For Plaintiff's loss of income, wages, and earning potential according to proof;

12 | 3. For Plaintiff's medical and related expenses according to proof;

13 | 4. For Plaintiff's cost of suit herein;

14 | 5. For exemplary or punitive damages according to proof;

15 | 5. For Plaintiff's cost of suit herein;

16 | 6. For exemplary or punitive damages according to proof;

17 | 7. For such other and further relief as the Court may deem just and proper,
18 | including costs and prejudgment interest as provided in C.C.P. second 998.
19 | C.C.P. section 1032, and related provisions of law.

20 | DATED: April 25, 2022      SIMON GREENSTONE PANATIER, PC

22 | By: 

23 | Stuart J. Purdy
Attorneys for Plaintiff

30
PLAINTIFF'S ORIGINAL COMPLAINT – ASBESTOS
**JA206**

1

# DEMAND FOR JURY TRIAL

2

Plaintiff hereby demands trial by jury as to all issues so triable.

3

4    DATED: April 27, 2022                SIMON GREENSTONE PANATIER, PC

5

6                                    By: _____

7                                         Stuart J. Purdy
                                          Attorneys for Plaintiff
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

# EXHIBIT "A"

Plaintiff BARBARA ALLOWAY's exposure to Defendants' Products occurred at various locations within the States of California, Virginia, Wisconsin, New Mexico, Texas, New York and the country of England, but not limited to:

| Location of Exposure | Job Title | Exposure Dates |
|---|---|---|
| Various Residences and locations in: Los Angeles County, California; Orange County, California; Sacramento, California: Newport News, Virginia; Cashton, Wisconsin; San Jose, California; Roswell, New Mexico; Houston, Texas; Riverside, California; London, England; Orcutt, California; New York, New York | Personal use of talcum powder products; | Approximately 1942 – 2022 |

## EXPOSURE THROUGH HOUSEHOLD MEMBERS NELLIE ALLOWAY, DECEASED AND HILLARD ALLOWAY, DECEASED

| Location of Exposure | Job Title | Exposure Dates |
|---|---|---|
| Various Residences in: Sacramento, California; Newport News, Virginia; Cashton, Wisconsin; San Jose, California; Roswell, New Mexico; Houston, Texas; Riverside, California; Orcutt, California; London, England | Household members' use of asbestos-containing talcum powder products while in close proximity to Plaintiff | Approximately 1940s – 2004 |

## EXPOSURE THROUGH HOUSEHOLD MEMBER MARGARET JOAN WOOD

| Location of Exposure | Job Title | Exposure Dates |
|---|---|---|
| Personal Residences in London, England | Household member's use of asbestos-containing talcum powder products while in close proximity to Plaintiff | Approximately 1966 – 1980 |

32

1  **EXHIBIT "B"**

2      Plaintiff BARBARA ALLOWAY'S exposure to Defendants' Products caused severe

3  and permanent injury to Plaintiff BARBARA ALLOWAY including, but not limited to,

4  mesothelioma. Plaintiff was diagnosed with mesothelioma on or about August 31, 2021.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33

**Exhibit C**

Alloway Minute Order

67924146
Aug 11 2022
01:18PM

1    Stuart J. Purdy (State Bar No. 239878)
     **SIMON GREENSTONE PANATIER, PC**
2    3760 Kilroy Airport Way, Suite 680
     Long Beach, California 90806
3    Telephone: (562) 590-3400
     Facsimile: (562) 590-3412
4    E-mail: spurdy@sgptrial.com

5    Attorneys for Plaintiffs

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                  **FOR THE COUNTY OF LOS ANGELES**

10

11   Coordinated Proceeding            JCCP Case No. 4674
     Special Title (Rule 3.550)
12                                      Honorable Laura A. Seigle,
     **LAOSD ASBESTOS COORDINATED**    Department 15
13   **CASES**
                                        **NOTICE OF RULING RE:**
14                                      **SIMON GREENSTONE PANATIER, PC**
                                        **CASE MANAGEMENT CONFERENCE**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        1

1      TO THE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2      PLEASE TAKE NOTICE that on August 2, 2022, a regularly-scheduled Status

3 Conference came on for hearing at 1:45 p.m. before the Hon. Laura A. Seigle, in Department

4 15 of the Court located at 312 N Spring St, Los Angeles, CA 90012, regarding all Simon

5 Greenstone Panatier coordinated cases.  Plaintiffs were represented by, Stuart Purdy, Erica

6 Falkner, Robert Green, and Albert Oganesyan.  Defendants were represented by their

7 counsel of record.

8      The next Simon Greenstone Panatier Group Status Conference is scheduled for

9 December 14, 2022 at 1:45 p.m. in the above-referenced court in Department 15.

10      Plaintiffs hereby give notice of the orders reflected in the Minute Order attached as

11 **Exhibit A**.

12

13 DATED: August 11, 2022      SIMON GREENSTONE PANATIER, P.C.

14

15      By: _____

16      Stuart J. Purdy

     Attorneys for Plaintiffs



~ Exhibit A ~

JA213

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 15

| | |
|---|---|
| 37-2022-00018334-CU-AS-CTL | August 2, 2022 |
| KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS | 1:45 PM |
| CORPORATION, et al. | |

| | |
|---|---|
| Judge: Honorable Laura A. Seigle | CSR: None |
| Judicial Assistant: K. Sandoval | ERM: None |
| Courtroom Assistant: M. Torres | Deputy Sheriff: None |

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Status Conference RE: GROUP (SIMON GREENSTONE PANATIER, P.C.)

APPEARANCES:
PLAINTIFF'S COUNSEL: ERICA FALKNER; STUART J. PURDY; ALBERT OGANESYAN; TINA BARAVARIAN; AND ROBERT GREEN (X);
DEFENSE COUNSEL: CARLA CROCHET; JEREMY MILBRODT; OVSANNA THOMAS; HILDA AKOPYAN; REYNOLD M. MARTINEZ; JODY STEINBERG; WILLIAM COGGSHALL; ALINA MOORADIAN; EDWARD ULLOA; GAVIN J. ROONEY; TERENCE P. CARNEY; BRAD KAPLAN; BRYAN REYNOLDS; ANDREW CALDERON; DAVID UCHIDA; ROBERT ENDERS; JESSICA SOO KIM; MELISSA R. BADGETT; JOHN P. KATERNDAHL; KURT T. PUTNAM; STEPHANIE L. BOWLBY; ALAN KHLEVNOY; P.M. BESSETTE; PAUL A. CALFO; BRETT FOUNTAIN; WENDY QIU; DEAN OLSON; RACHEL ELLIS; NINA RABIN; VANTHARA MEAK; CAROLINE FAWLEY; COURTNEY PURITSKY; DAVID ASHDOWN; NYKEEMAH C. McCLENDON; AMY TALARICO; RUSSELL SCHATZ; JOHN LISTER; SALAM AWWAD; MATTHEW FOLLETT; SEAN C. McGAH; JEFF DEANE; SEEMA KADABA; DERRICK S. LOWE; KENDRA BRAY; ERIKA ASPERICUETA; KAREN GOLDBERG; JON C. JAMES; FRED B. LEE; EDWARD MARTINOVICH; DAVIT SHANTO; ERIN N. EMPTING; GAVIN J. ROONEY AND WILLIAM CHOI (X);

Conference is called for hearing.

The Status Conference RE: GROUP (SIMON GREENSTONE PANATIER, P.C.) scheduled for 08/02/2022 is 'Held' for cases 18STCV08786, 19STCV14191, 19STCV16553, 19STCV22015, 19STCV24616, 19STCV28395, 19STCV31844, 19STCV35819, 19STCV36635, 19STCV40955, 19STCV43228, 19STCV46475, 20STCV11975, 20STCV24355, 20STCV28921, 20STCV33346, 20STCV38697, 20STCV42059, 21STCV02704,

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 15

| | |
|---|---|
| **37-2022-00018334-CU-AS-CTL** | August 2, 2022 |
| **KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS** | 1:45 PM |
| **CORPORATION, et al.** | |

| | |
|---|---|
| Judge: Honorable Laura A. Seigle | CSR: None |
| Judicial Assistant: K. Sandoval | ERM: None |
| Courtroom Assistant: M. Torres | Deputy Sheriff: None |

21STCV16342, 21STCV22475, 21STCV23802, 21STCV24675, 21STCV29227, 21STCV36036, 21STCV36636, 22STCV00524, 22STCV02120, 22STCV03991, 22STCV05722, 22STCV06979, 22STCV07322, BC693884, BC698965, BC701665, BC708543, BC713775, BC720136, BC720153, and BC721318.

RE: ALLOWAY-22STCV14241

The Court sets the following:

Final Status Conference (ALLOWAY-22STCV14241) is scheduled for 08/28/2023 at 09:00 AM in Department 15 at Spring Street Courthouse on case 22STCV14241.

Jury Trial (ALLOWAY-22STCV14241) is scheduled for 09/11/2023 at 09:00 AM in Department 15 at Spring Street Courthouse on case 22STCV14241.

RE: AVDESIAN-20STCV38697

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Settlement) (AVDESIAN-20STCV38697) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case 20STCV38697.

RE: CIMINELLI-21STCV16342

Plaintiff's counsel will Amend the Complaint as a Wrongful Death Action this week.

RE: CRANDALL-19STCV43228

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Settlement) (CRANDALL-19STCV43228) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case 19STCV43228.

RE: DOTSON-19STCV31844

Court notes the Proposed Stipulation and Order to Continue Trial on file. Upon review, the Court DENIES the request and does not find good cause for reasons stated in open court. Counsel are advised to include a discovery plan if submit another Proposed Stipulation and Order.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 15

**37-2022-00018334-CU-AS-CTL**                                  August 2, 2022
**KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS**                            1:45 PM
**CORPORATION, et al.**

Judge: Honorable Laura A. Seigle            CSR: None
Judicial Assistant: K. Sandoval             ERM: None
Courtroom Assistant: M. Torres              Deputy Sheriff: None

RE: GONZALEZ, MARIA-22STCV03991

The Court sets the following:

Final Status Conference (GONZALEZ, MARIA-22STCV03991) is scheduled for 10/09/2023 at
09:00 AM in Department 15 at Spring Street Courthouse on case 22STCV03991.

Jury Trial (GONZALEZ, MARIA-22STCV03991) is scheduled for 10/23/2023 at 09:00 AM in
Department 15 at Spring Street Courthouse on case 22STCV03991.

RE: HANSEN-22STCV18922

The Court is advised plaintiff will be filing a Motion for Trial Preference sometime next week.

The Court sets the following:

Final Status Conference (HANSEN-22STCV18922) is scheduled for 05/01/2023 at 09:00 AM in
Department 15 at Spring Street Courthouse on case 22STCV18922.

Jury Trial (HANSEN-22STCV18922) is scheduled for 05/15/2023 at 09:00 AM in Department
15 at Spring Street Courthouse on case 22STCV18922.

RE: HAUSER-20STCV24355

The court notes this is not a Preference case.

The Court notes the pending Motion to Bifurcate set on 8/5/22. At request of counsel the Court
sets the following:

Informal Discovery Conference (IDC) (HAUSER-20STCV24355) is scheduled for 08/05/2022
at 09:00 AM in Department 15 at Spring Street Courthouse on case 20STCV24355. The IDC
will be held after the motion is heard.

The Court continues the following:

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 15

**37-2022-00018334-CU-AS-CTL**                                    August 2, 2022
**KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS**                        1:45 PM
**CORPORATION, et al.**

Judge: Honorable Laura A. Seigle          CSR: None
Judicial Assistant: K. Sandoval           ERM: None
Courtroom Assistant: M. Torres            Deputy Sheriff: None

On the Court's own motion, the Final Status Conference (Hauser-20STCV24355) scheduled for 08/08/2022 is continued to 08/22/2022 at 09:00 AM in Department 15 at Spring Street Courthouse for case 20STCV24355.

On the Court's own motion, the Jury Trial (Hauser-20STCV24355) scheduled for 08/22/2022 is continued to 08/29/2022 at 09:00 AM in Department 15 at Spring Street Courthouse for case 20STCV24355.

A USB drive containing all trial documents, including all remaining MILS and completed page and line designations (designation, objection, and response), must be submitted to the court by 08/22/22 at 4:30 p.m. For page and line designations, in the USB drive, the parties must include a report that addresses the following:

• Who are the remaining defendants?
• Are there any Berroteran or general hearsay objections to any transcripts that require the court's ruling? If so, provide the court with a list of the disputed transcripts, the Berroteran objection/s, and the designating party's response to that objection.
• An index of all page and line designations
• An index of only the plaintiff/s' and remaining defendants' "Tier 1" designations (i.e., only the designations that the parties will definitely read at trial).

The parties are ordered to update the court as soon as possible by email at stran1@lacourt.org if any of defendants resolve and/or if the parties have withdrawn any page and line designations.

Counsel are advised any Motions in Limine will be heard on 8/22/22.

RE: KERR-21STCV22475

The Court continues the following:

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Settlement) (KERR-21stcv22475) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case 21STCV22475.

RE: KRANZ 37-2022-00018334-cu-as-ctl

The Court orally orders this case coordinated into the JCCP Case Number JCCP4674.

**JA217**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Spring Street Courthouse, Department 15

| | |
|---|---|
| **37-2022-00018334-CU-AS-CTL** | August 2, 2022 |
| **KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS** | 1:45 PM |
| **CORPORATION, et al.** | |

| | |
|---|---|
| Judge: Honorable Laura A. Seigle | CSR: None |
| Judicial Assistant: K. Sandoval | ERM: None |
| Courtroom Assistant: M. Torres | Deputy Sheriff: None |

The Court sets the following:

Final Status Conference (KRANZ- 37-2022-00018334-cu-as-ctl) is scheduled for 09/05/2023 at 09:00 AM in Department 15 at Spring Street Courthouse on case 37-2022-00018334-CU-AS-CTL.

Jury Trial (KRANZ- 37-2022-00018334-cu-as-ctl) is scheduled for 09/18/2023 at 09:00 AM in Department 15 at Spring Street Courthouse on case 37-2022-00018334-CU-AS-CTL.

RE: LIGHT-20STCV42059

The Court continues the following:

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Settlement) (LIGHT-20STCV42059) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case 20STCV42059.

RE: MACIAS-20STCV33346

Court is advised by Attorney Tim Hodge that a Cross-Complaint may be filed in this action.

Counsel shall meet and confer regarding the Stay.

RE: McLELLAN-19STCV40955

The Court notes this is not a Preference Case.

The Court continues the following:

On the Court's own motion, the Final Status Conference (McLellan-19STCV40955) scheduled for 08/15/2022 is continued to 09/06/2022 at 09:00 AM in Department 15 at Spring Street Courthouse for case 19STCV40955.

On the Court's own motion, the Jury Trial (McLellan-19STCV40955) scheduled for 08/29/2022 is continued to 09/12/2022 at 09:00 AM in Department 15 at Spring Street Courthouse for case 19STCV40955.

**JA218**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 15

| | |
|---|---|
| **37-2022-00018334-CU-AS-CTL** | August 2, 2022 |
| **KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS** | 1:45 PM |
| **CORPORATION, et al.** | |

| | |
|---|---|
| Judge: Honorable Laura A. Seigle | CSR: None |
| Judicial Assistant: K. Sandoval | ERM: None |
| Courtroom Assistant: M. Torres | Deputy Sheriff: None |

Although the court has continued the trial date, deadlines for submission of all trial documents are still based on the 08/15/22 FSC date. A USB drive containing all trial documents, including all remaining MILS and completed page and line designations (designation, objection, and response), must be submitted to the court by 08/15/22 at 4:00 p.m. For page and line designations, in the USB drive, the parties must include a report that addresses the following:

• Who are the remaining defendants?
• Are there any Berroteran or general hearsay objections to any transcripts that require the court's ruling? If so, provide the court with a list of the disputed transcripts, the Berroteran objection/s, and the designating party's response to that objection.
• An index of all page and line designations
• An index of only the plaintiff/s' and remaining defendants' "Tier 1" designations (i.e., only the designations that the parties will definitely read at trial).

The parties are ordered to update the court as soon as possible by email at stran1@lacourt.org if any of defendants resolve and/or if the parties have withdrawn any page and line designations.

RE: MEREDITH-22STCV06979

The Court sets the following:

Final Status Conference (MEREDITH-22STCV06979) is scheduled for 05/08/2023 at 09:00 AM in Department 15 at Spring Street Courthouse on case 22STCV06979.

Jury Trial (MEREDITH-22STCV06979) is scheduled for 05/22/2023 at 09:00 AM in Department 15 at Spring Street Courthouse on case 22STCV06979.

RE: MYERS-BC720136

The Order to Show Cause set this date is discharged.

The Court notes the dismissal of entire action on file: 7/19/22 and orders the following:

[BC720136] Pursuant to the Request for Dismissal filed by Michelle Roedel on 07/19/2022, the Amended Complaint (2nd) filed by Doreen Myers, et al. on 06/25/2020 is dismissed without

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 15

**37-2022-00018334-CU-AS-CTL**                                              August 2, 2022
**KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS**                                  1:45 PM
**CORPORATION, et al.**

Judge: Honorable Laura A. Seigle              CSR: None
Judicial Assistant: K. Sandoval              ERM: None
Courtroom Assistant: M. Torres               Deputy Sheriff: None

prejudice.

RE: PASTUSAK-20STCV28921

The Court continues the following:

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Pastusak-20STCV28921) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case 20STCV28921.

RE: PERRY-19STCV46475

The Order to Show Cause set this date is discharged.

The Court notes the Request for Dismissal without prejudice as to the Entire Action on file 7/28/22. Therefore, this case was previously disposed of as of 7/28/22.

RE: REGAN-22STCV18841

The Court sets the following:

Final Status Conference (REGAN-22STCV18841) is scheduled for 08/07/2023 at 09:00 AM in Department 15 at Spring Street Courthouse on case 22STCV18841.

Jury Trial (REGAN-22STCV18841) is scheduled for 08/21/2023 at 09:00 AM in Department 15 at Spring Street Courthouse on case 22STCV18841.

RE: RODY-21STCV24675

Plaintiff's counsel will get deposition dates of the plaintiff out by end of September to defense counsel.

RE: SALAZAR-BC721318

The Court continues the following:

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Settlement)

**JA220**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 15

**37-2022-00018334-CU-AS-CTL**                                August 2, 2022
**KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS**                1:45 PM
**CORPORATION, et al.**

Judge: Honorable Laura A. Seigle          CSR: None
Judicial Assistant: K. Sandoval           ERM: None
Courtroom Assistant: M. Torres            Deputy Sheriff: None

(SALAZAR- BC721318) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case BC721318.

RE: SANCHEZ, EDNA-BC708543

The Court notes this is not a Preference Case.

The Court continues the following:

On the Court's own motion, the Final Status Conference (Sanchez, Edna-BC708543 scheduled for 08/08/2022 is continued to 08/29/2022 at 09:00 AM in Department 15 at Spring Street Courthouse for case BC708543.

On the Court's own motion, the Jury Trial (Sanchez, Edna-BC708543) scheduled for 08/22/2022 is continued to 09/06/2022 at 09:00 AM in Department 15 at Spring Street Courthouse for case BC708543.

Although the court has continued the trial date, deadlines for submission of all trial documents are still based on the 08/08/22 FSC date. A USB drive containing all trial documents, including all remaining MILS and completed page and line designations (designation, objection, and response), must be submitted to the court by 08/08/22 at 4:00 p.m. For page and line designations, in the USB drive, the parties must include a report that addresses the following:

• Who are the remaining defendants?
• Are there any Berroteran or general hearsay objections to any transcripts that require the court's ruling? If so, provide the court with a list of the disputed transcripts, the Berroteran objection/s, and the designating party's response to that objection.
• An index of all page and line designations
• An index of only the plaintiff/s' and remaining defendants' "Tier 1" designations (i.e., only the designations that the parties will definitely read at trial).

The parties are ordered to update the court as soon as possible by email at stran1@lacourt.org if any of defendants resolve and/or if the parties have withdrawn any page and line designations.

RE: SANCHEZ, NANCY

The Court continues the following:

**JA221**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 15

| | |
|---|---|
| **37-2022-00018334-CU-AS-CTL** | August 2, 2022 |
| **KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS** | 1:45 PM |
| **CORPORATION, et al.** | |

Judge: Honorable Laura A. Seigle          CSR: None
Judicial Assistant: K. Sandoval            ERM: None
Courtroom Assistant: M. Torres            Deputy Sheriff: None

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Settlement) (SANCHEZ-18STCV08786) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case 18STCV08786.

RE:SMETANA-20STCV11975

Counsel discuss Product Identification Witnesses on the record.

Counsel shall meet and confer re discovery schedule and proposed trial date, then submit a Proposed Stipulation and Order.

RE: SVORINICH-19STCV16553

Court notes this case was previously disposed of the entire action on 3/21/22. Therefore, no further action is necessary.

RE: WALKER-BC713775

The Court is advised of a settlement reached.

Accordingly, the Court vacates the following:

Pursuant to the request of plaintiff, the Jury Trial (Walker-BC713775) scheduled for 08/03/2022 is advanced to this date and vacated for case BC713775.

The Court sets the following:

Order to Show Cause Re: Dismissal (Settlement) (WALKER-BC713775) is scheduled for 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse on case BC713775.

RE: WHEELER- 19STCV14191

The Court continues the following:

Pursuant to the request of plaintiff, the Order to Show Cause Re: dismissal (Wheeler-19STCV14191) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Spring Street Courthouse, Department 15

| | |
|---|---|
| **37-2022-00018334-CU-AS-CTL** | August 2, 2022 |
| **KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS** | 1:45 PM |
| **CORPORATION, et al.** | |

| | |
|---|---|
| Judge: Honorable Laura A. Seigle | CSR: None |
| Judicial Assistant: K. Sandoval | ERM: None |
| Courtroom Assistant: M. Torres | Deputy Sheriff: None |

15 at Spring Street Courthouse for case 19STCV14191.

RE: YOO-BC693884

The Court continues the following:

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Settlement) (YOO-BC693884) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case BC693884.

RE: ZAVALA-21STCV02704

The Court continues the following:

Pursuant to the request of plaintiff, the Order to Show Cause Re: Dismissal (Settlement) (ZAVALA-21STCV02704) scheduled for 08/02/2022 is continued to 12/14/2022 at 01:46 PM in Department 15 at Spring Street Courthouse for case 21STCV02704.

RE: ZIMMERMAN-BC720153

This case was previously dismissed as to the entire action on 3/21/22. Accordingly, no further action is necessary.

Counsel shall review the cases with Orders to Show Cause regarding Dismissals to determine whether the case may be dismissed pursuant to Section 664.6 of the Code of Civil Procedure. Counsel are reminded that going forward be sure and include that provision in the future settlements.

Status Conference RE: GROUP (SIMON GREENSTONE PANATIER, PC) is scheduled for 12/14/2022 at 01:45 PM in Department 15 at Spring Street Courthouse on cases 18STCV08786, 19STCV14191, 19STCV22015, 19STCV24616, 19STCV28395, 19STCV31844, 19STCV35819, 19STCV40955, 19STCV43228, 20STCV11975, 20STCV24355, 20STCV28921, 20STCV33346, 20STCV38697, 20STCV42059, 21STCV02704, 21STCV16342, 21STCV22475, 21STCV23802, 21STCV24675, 21STCV29227, 21STCV36036, 21STCV36636, 22STCV00524, 22STCV02120, 22STCV03991, 22STCV05722, 22STCV06979, 22STCV07322, 22STCV14241, 22STCV18841, 22STCV18922, 37-2022-00018334-CU-AS-CTL, BC693884, BC698965, BC708543,

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 15

**37-2022-00018334-CU-AS-CTL**                                          August 2, 2022
**KENNETH KRANZ, et al. vs AIR & LIQUID SYSTEMS**                        1:45 PM
**CORPORATION, et al.**

| | |
|---|---|
| Judge: Honorable Laura A. Seigle | CSR: None |
| Judicial Assistant: K. Sandoval | ERM: None |
| Courtroom Assistant: M. Torres | Deputy Sheriff: None |

BC713775, and BC721318. All other cases are continued to the next Group Status Conference on 12/14/22 at 1:45 p.m. in this department.

Plaintiff's counsel are advised to remove the following disposed cases from the Status Report list: ABELL-19STCV36635; MYERS-BC720136; PERRY-19STCV46475; SVORINICH-19STCV16553; and ZIMMERMAN-BC720153.

The Court notes the previous dismissals on file as to the following:

[19STCV36635] Pursuant to the Request for Dismissal filed by Jenny Abell, Henry Mattei, Kip Abell on 03/21/2022, the Amended Complaint (1st) filed by Jenny Abell, et al. on 04/24/2020 is dismissed with prejudice.

[BC701665] Pursuant to the Request for Dismissal filed by Victoria Petas on 03/21/2022, the Complaint filed by VICTORIA PETAS on 04/11/2018 is dismissed with prejudice.

[19STCV16553] Pursuant to the Request for Dismissal filed by Stanko Svorinich, Josephine Svorinich, Bobby Svorinich, Joseph Svorinich on 03/21/2022, the Amended Complaint (1st) filed by Stanko Svorinich, et al. on 08/29/2019 is dismissed with prejudice.

[BC720153] Pursuant to the Request for Dismissal filed by Linda Zimmerman on 03/21/2022, the Complaint filed by LINDA ZIMMERMAN on 09/05/2018 is dismissed with prejudice.

Counsel for plaintiff to give notice.

A copy of this minute order will append to the following coordinated cases under JCCP4674: 18STCV08786, 19STCV14191, 19STCV22015, 19STCV24616, 19STCV28395, 19STCV31844, 19STCV35819, 19STCV40955, 19STCV43228, 19STCV46475, 20STCV11975, 20STCV24355, 20STCV28921, 20STCV33346, 20STCV38697, 20STCV42059, 21STCV02704, 21STCV16342, 21STCV22475, 21STCV23802, 21STCV24675, 21STCV29227, 21STCV36036, 21STCV36636, 22STCV00524, 22STCV02120, 22STCV03991, 22STCV05722, 22STCV06979, 22STCV07322, 22STCV14241, 22STCV18841, 22STCV18922, 37-2022-00018334-CU-AS-CTL, BC693884, BC698965, BC708543, BC713775, BC720136, and BC721318.

# PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )
COUNTY OF LOS ANGELES   )

I am employed in the County of Los Angeles, State of California.  I am over eighteen years of age and not a party to the within action; my business address is 3760 Kilroy Airport Way, Suite 680, Long Beach, California.  I am employed in Los Angeles County, California.

On the date set forth below, I served a true and correct copy of the foregoing document(s) described as:

- **NOTICE OF RULING RE: SIMON GREENSTONE PANATIER, PC CASE MANAGEMENT CONFERENCE**

On all interested parties in this action stated below via the following means of service:

**[XX]  BY E-SERVICE:**   I caused such document to be transmitted by electronic service via File&ServeXpress for the same day delivery to the offices of the addressee(s).  See File&ServeXpress Service List.

[]       BY MAIL:    I caused such envelope(s) to be deposited in the mail at Long Beach, California with postage thereon fully prepaid to the office of the addressee(s) as indicated above.  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

[]       BY FACSIMILE:    I caused a courtesy copy to be transmitted by facsimile to the facsimile number of the offices of the addressee(s) as indicated above and below (see service list).

I declare under penalty of perjury, under the laws of the State of California that the above is true and correct.  Executed on August 11, 2022 at Long Beach, California.

_____
Claudia Cortes

NOTICE OF RULING RE: SGP CASE MANAGEMENT CONFERENCE
**JA225**

**Exhibit D**

Payne Complaint

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF RICHLAND | ) | FOR THE FIFTH JUDICIAL CIRCUIT |

| | | |
|---|---|---|
| SHELBY PAYNE, | ) | C/A NO.  2022-CP-40-_____ |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | In Re: |
| 3M COMPANY | ) | Asbestos Personal Injury Litigation |
| | ) | Coordinated Docket |
| 4520 CORP., INC. | ) | |
| | ) | |
| ABB INC. | ) | |
| | ) | **SUMMONS** |
| AIR & LIQUID SYSTEMS CORPORATION | ) | |
| | ) | |
| ANCHOR/DARLING VALVE COMPANY | ) | |
| | ) | |
| ARMSTRONG INTERNATIONAL, INC. | ) | |
| | ) | |
| AVON PRODUCTS, INC. | ) | |
| | ) | |
| BAHNSON, INC. | ) | |
| | ) | |
| BEACON CMP CORPORATION | ) | |
| | ) | |
| BEATY INVESTMENTS, INC. | ) | |
| | ) | |
| BECHTEL CORPORATION | ) | |
| | ) | |
| BELK, INC. | ) | |
| | ) | |
| BRENNTAG NORTH AMERICA, INC. | ) | |
| | ) | |
| BRENNTAG SPECIALTIES, LLC | ) | |
| | ) | |
| CHANEL, INC. | ) | |
| | ) | |
| CHATTEM, INC. | ) | |
| | ) | |
| COLGATE-PALMOLIVE COMPANY | ) | |
| | ) | |
| COLOR TECHNIQUES, INC. | ) | |
| | ) | |

1

**JA227**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

CONOPCO, INC.                                          )
                                                      )
COTY INC.                                             )
                                                      )
COVIL CORPORATION                                     )
                                                      )
CRANE CO.                                             )
                                                      )
CVS HEALTH CORPORATION                               )
                                                      )
DANIEL INTERNATIONAL CORPORATION                     )
                                                      )
DILLARD'S, INC.                                       )
                                                      )
ELLINGTON INSULATION COMPANY, INC.                   )
                                                      )
ELIZABETH ARDEN, INC.                                )
                                                      )
ESTÉE LAUDER INC.                                    )
                                                      )
ESTÉE LAUDER INTERNATIONAL, INC.                     )
                                                      )
THE ESTÉE LAUDER COMPANIES, INC.                     )
                                                      )
FLOWSERVE US INC.                                    )
                                                      )
FLUOR CONSTRUCTORS                                   )
INTERNATIONAL                                        )
                                                      )
FLUOR CONSTRUCTORS                                   )
INTERNATIONAL, INC.                                  )
                                                      )
FLUOR DANIEL SERVICES CORPORATION                   )
                                                      )
FLUOR ENTERPRISES, INC.                              )
                                                      )
GENERAL ELECTRIC COMPANY                            )
                                                      )
THE GORMAN-RUPP COMPANY                             )
                                                      )
GOULDS PUMPS, INCORPORATED                          )
                                                      )
GREAT BARRIER INSULATION CO.                        )
                                                      )
GRINNELL LLC                                         )
                                                      )

**JA228**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

HARRIS TEETER, LLC                         )
                                           )
INTERNATIONAL PAPER COMPANY                )
                                           )
ITT LLC                                    )
                                           )
KENNEDY VALVE COMPANY                      )
                                           )
KIMBERLY-CLARK CORPORATION                 )
                                           )
THE KROGER CO.                             )
                                           )
L'ORÉAL USA, INC.                          )
                                           )
L'ORÉAL USA PRODUCTS, INC.                 )
                                           )
LOWCOUNTRY GROCERS LLC                     )
                                           )
MARY KAY INC.                              )
                                           )
MAYBELLINE LLC                             )
                                           )
METROPOLITAN LIFE INSURANCE                )
COMPANY                                    )
                                           )
NEW-INDY CATAWBA LLC                       )
                                           )
NEW-INDY CONTAINERBOARD LLC                )
                                           )
NOXELL CORPORATION                         )
                                           )
PALMETTO PAPER TRADING, INC.               )
                                           )
PARAMOUNT GLOBAL                           )
                                           )
PFIZER INC.                                )
                                           )
PRESNELL INSULATION CO., INC.              )
                                           )
THE PROCTER & GAMBLE COMPANY               )
                                           )
RESOLUTE FP US INC.,                       )
                                           )
REVLON CONSUMER PRODUCTS                   )
CORPORATION                                )
                                           )

3

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

REVLON, INC. )
)
RITE AID OF SOUTH CAROLINA, INC. )
)
RUST ENGINEERING & CONSTRUCTION, )
INC. )
)
RUST INTERNATIONAL INC. )
)
SEQUOIA VENTURES INC. )
)
SOUTHERN INSULATION, INC. )
)
SPIRAX SARCO, INC. )
)
STARR DAVIS COMPANY, INC. )
)
STARR DAVIS COMPANY OF S.C., INC. )
)
VALVES AND CONTROLS US, INC. )
)
VARIETY WHOLESALERS, INC. )
)
VELAN VALVE CORP. )
)
VI-JON, LLC )
)
VISTRA CORP. )
)
VISTRA INTERMEDIATE COMPANY LLC )
)
WALGREEN CO. )
)
WEYERHAEUSER COMPANY )
)
WHITTAKER, CLARK & DANIELS, INC. )
)
THE WILLIAM POWELL COMPANY )
)
WINN-DIXIE STORES, INC. )
)
WYETH HOLDINGS LLC )
)
ZURN INDUSTRIES, LLC )
)
_____Defendants._____ )

4

**JA230**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

)
)

## SUMMONS

TO DEFENDANTS ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the Plaintiff's counsel, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service.  If you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Respectfully submitted,

*/s/ Theile B. McVey*
Theile B. McVey (SC Bar No. 16682)
Jamie D. Rutkoski (SC Bar No. 103270)
**KASSEL MCVEY ATTORNEYS AT LAW**
1330 Laurel Street
Post Office Box 1476
Columbia, South Carolina 29202-1476
T: 803-256-4242
F: 803-256-1952
tmcvey@kassellaw.com
jrutkoski@kassellaw.com
Other email:  emoultrie@kassellaw.com

*and*

Rachel A. Gross (*to be admitted Pro Hac Vice*)
**DEAN OMAR BRANHAM SHIRLEY, LLP**
302 N. Market Street, Suite 300
Dallas, TX 75202
T: 214-722-5990
F: 214-722-5991
rgross@dobslegal.com

5

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Other email: tgilliland@dobslegal.com

**ATTORNEYS FOR PLAINTIFF**

**March 11, 2022**
**Columbia, South Carolina**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF RICHLAND** | ) | **FOR THE FIFTH JUDICIAL CIRCUIT** |

|   |   |   |
|---|---|---|
| **SHELBY PAYNE,** | ) | **C/A NO.  2022-CP-40-_____** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | In Re: |
| **3M COMPANY** | ) | Asbestos Personal Injury Litigation |
| f/k/a MINNESOTA MINING AND | ) | Coordinated Docket |
| MANUFACTURING COMPANY | ) | |
| | ) | Living Mesothelioma |
| **4520 CORP., INC.** | ) | |
| as successor-in-interest to BENJAMIN F. | ) | |
| SHAW COMPANY | ) | |
| | ) | **COMPLAINT** |
| **ABB INC.** | ) | |
| | ) | |
| **AIR & LIQUID SYSTEMS CORPORATION** | ) | (Jury Trial Demanded) |
| individually and as successor-in-interest to | ) | |
| BUFFALO PUMPS, INC. | ) | |
| | ) | |
| **ANCHOR/DARLING VALVE COMPANY** | ) | |
| | ) | |
| **ARMSTRONG INTERNATIONAL, INC.** | ) | |
| | ) | |
| **AVON PRODUCTS, INC.** | ) | |
| | ) | |
| **BAHNSON, INC.** | ) | |
| | ) | |
| **BEACON CMP CORPORATION** | ) | |
| | ) | |
| **BEATY INVESTMENTS, INC.** | ) | |
| f/k/a GUY M. BEATY & CO. | ) | |
| | ) | |
| **BECHTEL CORPORATION** | ) | |
| | ) | |
| **BELK, INC.** | ) | |
| | ) | |
| **BRENNTAG NORTH AMERICA, INC.** | ) | |
| individually and as successor-in-interest to | ) | |
| MINERAL AND PIGMENT SOLUTIONS, | ) | |
| INC. and WHITTAKER, CLARK & DANIELS, | ) | |
| INC. | ) | |

1

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

**BRENNTAG SPECIALTIES, LLC** )
individually and as successor-in-interest )
to MINERAL AND PIGMENT SOLUTIONS, )
INC., successor-in-interest to WHITTAKER, )
CLARK & DANIELS, INC. )
)
**CHANEL, INC.** )
)
**CHATTEM, INC.** )
)
**COLGATE-PALMOLIVE COMPANY** )
)
**COLOR TECHNIQUES, INC.** )
)
**CONOPCO, INC.** )
)
**COTY INC.** )
individually and as successor to COVERGIRL )
COSMETICS, INC. )
)
**COVIL CORPORATION** )
)
**CRANE CO.** )
)
**CVS HEALTH CORPORATION** )
)
**DANIEL INTERNATIONAL** )
**CORPORATION** )
)
**DILLARD'S, INC.** )
)
**ELLINGTON INSULATION COMPANY,** )
**INC.** )
)
**ELIZABETH ARDEN, INC.** )
)
**THE ESTÉE LAUDER COMPANIES INC.** )
individually and as successor to CLINIQUE )
)
**ESTÉE LAUDER INC.** )
individually and as successor to CLINIQUE )
)
**ESTÉE LAUDER INTERNATIONAL, INC.** )
individually and as successor to CLINIQUE )
)

2

**JA234**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

**FLOWSERVE US INC.**                                    )
individually and as successor-in-interest to            )
EDWARD VALVES, INC. and as successor-in-               )
interest to VOGT VALVE COMPANY                          )
                                                        )
**FLUOR CONSTRUCTORS**                                  )
**INTERNATIONAL**                                       )
f/k/a FLUOR CORPORATION                                 )
                                                        )
**FLUOR CONSTRUCTORS**                                  )
**INTERNATIONAL, INC.**                                 )
                                                        )
**FLUOR DANIEL SERVICES**                               )
**CORPORATION**                                         )
                                                        )
**FLUOR ENTERPRISES, INC.**                             )
                                                        )
**GENERAL ELECTRIC COMPANY**                            )
                                                        )
**THE GORMAN-RUPP COMPANY**                             )
                                                        )
**GOULDS PUMPS, INCORPORATED**                          )
                                                        )
**GREAT BARRIER INSULATION CO.**                        )
                                                        )
**GRINNELL LLC**                                        )
d/b/a GRINNELL CORPORATION                              )
                                                        )
**HARRIS TEETER, LLC**                                  )
                                                        )
**INTERNATIONAL PAPER COMPANY**                         )
individually and as successor-in-interest to            )
CHAMPION INTERNATIONAL                                  )
CORPORATION                                             )
                                                        )
**ITT LLC**                                             )
f/k/a ITT CORPORATION, ITT INDUSTRIES                   )
INC., ITT FLUID PRODUCTS CORP.,                         )
HOFFMAN SPECIALTY MFG. CORP., BELL                      )
and GOSSETT COMPANY, ITT MARLOW                         )
and KENNEDY VALVE COMPANY                               )
                                                        )
**KENNEDY VALVE COMPANY**                               )
a wholly owned subsidiary of MCWANE, INC.               )
                                                        )

3

**JA235**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

**KIMBERLY-CLARK CORPORATION**                )
                                              )
**THE KROGER CO.**                            )
d/b/a HARRIS TEETER SUPERMARKETS              )
                                              )
**L'ORÉAL USA, INC.**                         )
individually and as successor to YVES SAINT   )
LAURENT AMERICA, INC., LANCÔME and            )
MAYBELLINE                                    )
                                              )
**L'ORÉAL USA PRODUCTS, INC.**                )
individually and as successor to YVES SAINT   )
LAURENT AMERICA, INC., LANCÔME and            )
MAYBELLINE                                    )
                                              )
**LOWCOUNTRY GROCERS LLC**                    )
d/b/a PIGGLY WIGGLY                           )
                                              )
**MARY KAY INC.**                             )
                                              )
**MAYBELLINE LLC**                            )
                                              )
**METROPOLITAN LIFE INSURANCE**               )
**COMPANY**, a wholly-owned subsidiary of     )
METLIFE INC.                                  )
                                              )
**NEW-INDY CATAWBA LLC**                      )
                                              )
**NEW-INDY CONTAINERBOARD LLC**               )
as successor-in-interest to RESOLUTE FP US,   )
INC.                                          )
                                              )
**NOXELL CORPORATION**                        )
a subsidiary of COTY INC.                     )
                                              )
**PALMETTO PAPER TRADING, INC.**              )
                                              )
**PARAMOUNT GLOBAL**                          )
f/k/a VIACOMCBS INC., f/k/a CBS               )
CORPORATION, a Delaware corporation, f/k/a    )
VIACOM, INC., successor-by-merger to CBS      )
CORPORATION, a Pennsylvania corporation,      )
f/k/a WESTINGHOUSE ELECTRIC                   )
CORPORATION                                   )
                                              )
**PFIZER INC.**                               )

4

**JA236**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

individually and as successor-in-interest to          )
COTY, INC. and COTY INTERNATIONAL,                    )
INC.                                                  )
                                                      )
**PRESNELL INSULATION CO., INC.**                     )
                                                      )
**THE PROCTER & GAMBLE COMPANY**                      )
                                                      )
**RESOLUTE FP US INC.,**                              )
f/k/a BOWATER, INCORPORATED                           )
                                                      )
**REVLON CONSUMER PRODUCTS**                          )
**CORPORATION**                                       )
individually and as successor to REVLON               )
RESEARCH LABORATORIES, INC.,                          )
CHARLES OF THE RITZ INC., LAVIN-                      )
CHARLES OF THE RITZ, E.R. SQUIBB,                     )
SQUIBB CORP., and YVES SAINT LAURENT                  )
                                                      )
**REVLON, INC.**                                      )
individually and as successor to CHARLES OF           )
THE RITZ INC., LAVIN-CHARLES OF THE                   )
RITZ, E.R. SQUIBB, SQUIBB CORP., and                  )
YVES SAINT LAURENT                                    )
                                                      )
**RITE AID OF SOUTH CAROLINA, INC.**                  )
                                                      )
**RUST ENGINEERING &**                                )
**CONSTRUCTION, INC.**                                )
individually and as successor-in-interest to          )
SIRRINE ENVIRONMENTAL                                 )
CONSULTANTS, INC.                                     )
                                                      )
**RUST INTERNATIONAL INC.**                           )
individually and as successor-in-interest to          )
SIRRINE ENVIRONMENTAL                                 )
CONSULTANTS, INC.                                     )
                                                      )
**SEQUOIA VENTURES INC.**                             )
f/k/a BECHTEL CORPORATION                             )
                                                      )
**SOUTHERN INSULATION, INC.**                         )
                                                      )
**SPIRAX SARCO, INC.**                                )
                                                      )
**STARR DAVIS COMPANY, INC.**                         )

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

**STARR DAVIS COMPANY OF S.C., INC.**                    )
                                                         )
**VALVES AND CONTROLS US, INC.**                         )
f/k/a WEIR VALVES & CONTROLS USA                         )
INC. d/b/a ATWOOD & MORRILL CO., INC.                    )
                                                         )
**VARIETY WHOLESALERS, INC.**                            )
d/b/a ROSES                                              )
                                                         )
**VELAN VALVE CORP.**                                    )
                                                         )
**VI-JON, LLC**                                          )
f/k/a VI-JON, INC.                                       )
                                                         )
**VISTRA CORP.**                                         )
f/k/a VISTRA ENERGY CORP.                                )
individually and as successor-in-interest to CRS         )
SIRRINE a/k/a CRSS, as successor-in-interest to          )
J.E. SIRRINE                                             )
                                                         )
**VISTRA INTERMEDIATE COMPANY**                          )
**LLC**                                                  )
individually and as successor-in-interest to             )
CRSS INC.                                                )
                                                         )
**WALGREEN CO.**                                         )
                                                         )
**WEYERHAEUSER COMPANY**                                 )
                                                         )
**WHITTAKER, CLARK & DANIELS, INC.**                     )
                                                         )
**THE WILLIAM POWELL COMPANY**                           )
                                                         )
**WINN-DIXIE STORES, INC.**                              )
a subsidiary of BI-LO a subsidiary of                    )
SOUTHEASTERN GROCERS, INC.                               )
                                                         )
**WYETH HOLDINGS LLC**                                   )
f/k/a WYETH HOLDINGS CORPORATION,                        )
f/k/a AMERICAN CYANAMID COMPANY                          )
and individually and successor-it-interest-to            )
THE PROCTER & GAMBLE COMPANY                             )
                                                         )
**ZURN INDUSTRIES, LLC**                                 )
individually and as successor-in-interest to             )
ZURN INDUSTRIES, INC. and as successor-in-               )

6

**JA238**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

interest to ERIE CITY IRON WORKS     )
                                     )
          Defendants.            )
                                     )
                                     )
                                     )
                                     )

## **PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, SHELBY PAYNE (hereinafter "Plaintiff"), sues the named Defendants for compensatory and punitive damages, by and through her attorneys, and comes before this court and alleges as follows:

### **GENERAL ALLEGATIONS**

1.      Plaintiff Shelby Payne has been diagnosed with mesothelioma caused by exposure to asbestos dust and fibers. This exposure occurred as a result of her husband Kenneth F. Payne's work with and around asbestos-containing products, which caused asbestos containing dust to cover her husband's clothing, vehicle, and body which he brought home to Plaintiff Shelby Payne, who was then exposed to said asbestos dust and fibers.  Plaintiff's exposure also occurred as a result of her and her family's use of asbestos-containing talc products.

2.      This Court has personal jurisdiction over Defendants because Plaintiff's claims arise from Defendants' conduct in:

      (a)      Transacting business in this State, including the sale, supply, purchase, and/or use of asbestos and/or asbestos-containing products, within this State;

      (b)      Contracting to supply services or things in the State;

      (c)      Commission of a tortious act in whole or in part in this State;

      (d)      Having an interest in, using, or possessing real property in this State;

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

and/or

(e)    Entering into a contract to be performed in whole or in part by either party in this State.

3.    Each Defendant, or its predecessors in interest, that manufactured, sold, and/or distributed asbestos-containing products or raw asbestos materials for use in South Carolina and other states at times relevant to this action are referred to herein as "Product Defendants." At all times relevant to this action, the Product Defendants and the predecessors of the Product Defendants for whose actions the Product Defendants are legally responsible, were engaged in the manufacture, sale and distribution of asbestos-containing products and raw materials.

4.    Each Defendant, or its predecessors in interest, that owned and/or controlled the work sites where Plaintiff's husband, Kenneth F. Payne, experienced occupational exposure as a result of working with and around others working with asbestos and/or asbestos-containing products, materials, or equipment in their immediate vicinity are referred to herein as the "Premises Defendants."  At all times relevant to this action:

(a)    the Premises Defendants owned the property and approved the use of asbestos-containing materials on their premises.

(b)    the Premises Defendants invited Plaintiff's husband, Kenneth F. Payne, as a wholesale paper salesman and account manager, on to Defendant's premises to perform work for Defendant's benefit.  Plaintiff's husband was an invitee who had express permission to enter Defendant's premises for the purpose of benefitting the owner (Defendant).

(c)    the Premises Defendants owed a duty of due care to discover risks and take safety precautions to warn of and eliminate unreasonable risks.

(d)    the Premises Defendants' failure to warn of or eliminate the unreasonable risks associated with working on or around asbestos-containing materials on Defendants' premises was a substantial factor contributing to cause Plaintiff Shelby Payne's mesothelioma.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

5.    Each Defendant, or its predecessors in interest, that provided labor, materials, goods, and/or services as architects, consultants, engineers, draftsmen, technicians, surveyors, or otherwise in connection with the design and/or repairs at the work sites where Plaintiff's husband, Kenneth F. Payne, experienced occupational exposure as a result of working with and around others working with asbestos and/or asbestos-containing products, materials, or equipment, are referred to herein as the "Design Defendants."

6.    Plaintiff's claims against the Product Defendants, as defined herein, arise out of Defendants' purposeful efforts to serve directly or indirectly the market for their asbestos and/or asbestos-containing products in this State, either through direct sales or through utilizing an established distribution channel with the expectation that their products would be purchased and/or used within South Carolina.

7.    Plaintiff's claims against the Premises Defendants, as defined herein, arise out of Defendants' ownership and/or control of real property located in South Carolina and the purchase and use of asbestos-containing products on their premises located in South Carolina, with which Plaintiff's husband, Kenneth F. Payne, worked, and as a result was exposed to asbestos.

8.    Plaintiff's claims against the Design Defendants, as defined herein, arise out of Defendants', and/or Defendants' employees', direct and/or indirect purchase and use of asbestos and/or asbestos-containing products, materials, or equipment at the various industrial sites located in South Carolina where Plaintiff's husband, Kenneth F. Payne, experienced occupational exposure to lethal doses of asbestos as a result of working around others working with asbestos and/or asbestos-containing products, materials, or equipment. As a result of his exposures, he carried asbestos fibers to their homes in both North Carolina and South Carolina

9

Case 3:23-cv-10951-MBK Document 10-9 Filed 03/24/25 Page 249 of 1429 PageID: 607
Case 3:23-cv-10951-MBK Document 18-9 Filed 09/08/23 Page 249 of 1429 PageID: 607
Exhibit D - Payne Complaint    Page 17 of 123

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

on his person, clothing and vehicle. Plaintiff Shelby Payne was unaware of the hazards associated with the fibers carried home by her husband and interacted with him on a daily basis upon his return from Premises Defendants' properties. She routinely performed the family laundry which contained the work clothing worn by Kenneth F. Payne while at the named Premises which exposed her to airborne asbestos fibers. Neither Kenneth F. Payne or Shelby Payne were aware of the hazards associated with the fibers carried their homes in North Carolina and South Carolina on his clothing.

9.    All of the named Defendants are corporations who purposefully availed themselves of the privilege of doing business in this State, and whose substantial and/or systematic business in South Carolina exposed Plaintiff Shelby Payne to asbestos in this State, subjecting them to the jurisdiction of the South Carolina courts pursuant to the South Carolina Long-Arm Statute and the United States Constitution.

10.    Plaintiff Shelby Payne was exposed to asbestos and/or asbestos-containing cosmetic and body talc products from approximately the early 1950s to approximately 2021 through her personal use, and her family's use, of asbestos-containing makeup and body talc products throughout her life and her use and her family's use of asbestos-containing body talc products on her children. These asbestos-containing talcum products were designed, advertised, marketed, and sold as being appropriate for use in the ordinary course of business by the ASBESTOS TALC DEFENDANTS. It was foreseeable that Defendants' asbestos-containing makeup and body talc products would be sold for personal use by individuals like Plaintiff Shelby Payne on herself and/or her children. Plaintiff Shelby Payne was thereby exposed to defendants' asbestos-containing makeup and body talc products in the State of South Carolina.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

11.    Plaintiff Shelby Payne has suffered personal injuries as a proximate result of her regular and prolonged use of, inhalation, ingestion, absorption, and exposure to a variety of asbestos-containing products[1] where asbestos-containing talc was a constituent ingredient. Though they will be further described below, collectively, these cosmetic, body and ceramic products and the ingredient talc are the ASBESTOS TALC DEFENDANTS.

12.    Plaintiff Shelby Payne was exposed to asbestos through her personal daily use, and her family's use, of a variety of asbestos talc-based body products including, but not limited to, Avon body powders, Johnson and Johnson baby powder, Shower to Shower body powder, Cashmere Bouquet Dusting Powder and body powder, Chanel body powder, Coty body powders, Elizabeth Arden body powders, Estée Lauder body powders, Gold Bond body powders, Mary Kay body powders, Mennen body powders, Lancôme body powders, Old Spice body powders, Revlon body powders, and White Shoulders body powders, ("POWDER PRODUCTS") throughout her life.  These products were manufactured, marketed, sold and/or distributed by Defendants.

13.    Plaintiff Shelby Payne also used powdered makeup products, including but not limited to, loose and pressed face powders, eye shadows, blush, bronzers, and foundations by Avon, Chanel, Clinique, Coty, CoverGirl, Elizabeth Arden, Estée Lauder, Lancôme, L'Oréal, Mary Kay, Maybelline, and Revlon, ("MAKEUP PRODUCTS") multiple times daily throughout her life.  She bought these products directly and through Avon, Belk, Dillard's, Harris Teeter, Mary Kay, Rite Aid, Roses, Walgreens, and Winn-Dixie.

---

[1] As used throughout this complaint, the term "asbestos" shall be interpreted in the broadest sense and included, without limitation, non-regulated and. Non-commercial forms of asbestos (including non-fibrous asbestos), cleavage fragments, and transition/transitional fibers, without limitation as to fiber size, dimension, or ratio.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

14.     Plaintiff used the Makeup Products as part of her daily routine, putting on eye shadow, blush, foundation and face powder in the morning, and at various times to freshen up throughout the day and evening.

15.     Plaintiff Shelby Payne used the Powder Products from approximately the early 1950s continuously until approximately 2021.  She frequently and regularly dusted the Powder Products on various parts of her body which at varying times may have included amongst other areas: face, neck, shoulders, arms, armpits, legs, collarbones, décolletage, breasts, vagina, and perineum.  During this time she repeatedly inhaled, ingested, and was regularly exposed to asbestos dust emanating from the asbestos laden talc within the Powder Products permeating her person and clothes in her North Carolina and South Carolina homes.  Plaintiff also dusted Powder Products on her children while diapering them from the time they were born until recently, creating visible dust on each occasion, which she inhaled.

16.     Plaintiff also claims exposure from the Defendant talc suppliers, mines, mills, and labs named in her complaint that provided asbestos-containing talc as a constituent ingredient to the Powder Products and Makeup Products that she used.

17.     Each use of the Powder Products and Makeup Products was an intended and foreseeable use of the products based on the advertising, marketing and labeling of the products.

18.     In addition to being exposed to asbestos through her own use of asbestos-containing talc products, Plaintiff Shelby Payne was exposed to asbestos through asbestos dust and fibers brought home on her husband's work clothes, from asbestos dust in her husband's vehicle and asbestos dust on her husband's body including his hair, and from the dust being distributed and re-entrained in their home.  Her exposure to asbestos dust and fibers occurred through her husband's work clothing and person when greeting him at the end of his workday, through laundering his work clothing on a regular

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

basis, through spending time in his vehicle in which asbestos dust and fibers had been deposited, and through sharing a home contaminated with asbestos fibers that were constantly being stirred up and re-entrained in the air that they breathed throughout their family's homes in both North Carolina and South Carolina.

19.     Plaintiff's husband, Kenneth F. Payne, worked with, or in close proximity to others who worked with, asbestos-containing materials including but not limited to asbestos-containing products and other asbestos-containing materials manufactured and/or sold by the Product Defendants and used on property owned and controlled by the Premises Defendants. Plaintiff's husband, Kenneth F. Payne, brought asbestos home with him on his person and clothing, which caused Plaintiff Shelby Payne to be exposed to asbestos.

20.     Plaintiff Shelby Payne's cumulative exposure to asbestos as a result of acts and omissions of Defendants and their defective products, individually and together, was a substantial factor in causing Plaintiff Shelby Payne's mesothelioma and other related injuries and therefore under South Carolina law, is the legal cause of Plaintiff's injuries and damages.

21.     Neither Plaintiff, nor Plaintiff's husband Kenneth F. Payne, were aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease.

22.     Each of the named Defendants is liable for damages stemming from its own tortious conduct or the tortious conduct of an "alternate entity" as hereinafter defined. Defendants are liable for the acts of their "alternate entity" and each of them, in that there has been a corporate name change, Defendant is the successor by merger, by successor in interest, or by other acquisition resulting in a virtual destruction of Plaintiff's remedy against each such "alternate entity"; Defendants, each of them, have acquired the assets, product line, or a portion

13

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

thereof, of each such "alternate entity"; such "alternate entities" have acquired the assets,

product line, or a portion thereof of each such Defendant; Defendants, and each of them, caused

the destruction of Plaintiff's remedy against each such "alternate entity"; each such Defendant

has the ability to assume the risk-spreading role of each such "alternate entity;" and that each

such defendant enjoys the goodwill originally attached to each "alternate entity."

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| 3M COMPANY | MINNESOTA MINING AND MANUFACTURING COMPANY |
| 4520 CORP., INC. | BENJAMIN F. SHAW COMPANY |
| AIR & LIQUID SYSTEMS CORPORATION | BUFFALO PUMPS, INC. |
| BEATY INVESTMENTS, INC. | GUY M. BEATY & CO. |
| BRENNTAG NORTH AMERICA, INC. | MINERAL AND PIGMENT SOLUTIONS, INC. and WHITTAKER, CLARK & DANIELS, INC. |
| BRENNTAG SPECIALTIES, LLC | MINERAL AND PIGMENT SOLUTIONS, INC. and WHITTAKER, CLARK & DANIELS, INC. |
| COTY INC. | COVERGIRL COSMETICS, INC. |
| THE ESTÉE LAUDER COMPANIES INC. | CLINIQUE |
| ESTÉE LAUDER INC. | CLINIQUE |
| ESTÉE LAUDER INTERNATIONAL, INC. | CLINIQUE |
| FLOWSERVE US INC. | EDWARD VALVES, INC. and VOGT VALVE COMPANY |

14

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

| FLUOR CONSTRUCTORS INTERNATIONAL | FLUOR CORPORATION |
|---|---|
| GRINNELL LLC | GRINNELL CORPORATION |
| INTERNATIONAL PAPER COMPANY | CHAMPION INTERNATIONAL CORPORATION |
| ITT LLC | ITT CORPORATION, ITT INDUSTRIES INC., ITT FLUID PRODUCTS CORP., HOFFMAN SPECIALTY MFG. CORP., BELL and GOSSETT COMPANY, ITT MARLOW and KENNEDY VALVE COMPANY |
| KENNEDY VALVE COMPANY | MCWANE, INC. |
| THE KROGER CO. | HARRIS TEETER SUPERMARKETS |
| L'ORÉAL USA, INC. | YVES SAINT LAURENT AMERICA, INC., LANCÔME, and MAYBELLINE |
| L'ORÉAL USA PRODUCTS, INC. | YVES SAINT LAURENT AMERICA, INC., LANCÔME, and MAYBELLINE |
| LOWCOUNTRY GROCERS LLC | PIGGLY WIGGLY |
| METROPOLITAN LIFE INSURANCE COMPANY | METLIFE INC. |
| NEW-INDY CONTAINERBOARD LLC | RESOLUTE FP US, INC. |
| NOXELL CORPORATION | COTY INC. |
| PARAMOUNT GLOBAL | VIACOMCBS INC., CBS CORPORATION, a Delaware corporation, VIACOM, INC., CBS CORPORATION, a Pennsylvania corporation, WESTINGHOUSE ELECTRIC CORPORATION |

15

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

| PFIZER INC. | COTY, INC. and COTY INTERNATIONAL, INC. |
|---|---|
| RESOLUTE FP US INC. | BOWATER, INCORPORATED |
| REVLON CONSUMER PRODUCTS CORPORATION | REVLON RESEARCH LABORATORIES, INC., CHARLES OF THE RITZ INC., LAVIN-CHARLES OF THE RITZ, E.R. SQUIBB, SQUIBB CORP., and YVES SAINT LAURENT |
| REVLON, INC. | CHARLES OF THE RITZ INC., LAVIN-CHARLES OF THE RITZ, E.R. SQUIBB, SQUIBB CORP., and YVES SAINT LAURENT |
| RUST ENGINEERING & CONSTRUCTION, INC. | SIRRINE ENVIRONMENTAL CONSULTANTS, INC. |
| RUST INTERNATIONAL INC. | SIRRINE ENVIRONMENTAL CONSULTANTS, INC. |
| SEQUOIA VENTURES INC. | BECHTEL CORPORATION |
| VALVES AND CONTROLS US, INC. | WEIR VALVES & CONTROLS USA INC. and ATWOOD & MORRILL CO., INC. |
| VARIETY WHOLESALERS, INC. | ROSES |
| VI-JON, LLC | VI-JON, INC. |
| VISTRA CORP. | VISTRA ENERGY CORP., CRS SIRRINE a/k/a CRSS, and J.E. SIRRINE |
| VISTRA INTERMEDIATE COMPANY LLC | CRSS INC. |
| WINN-DIXIE STORES, INC. | BI-LO and SOUTHERN GROCERS, INC. |
| WYETH HOLDINGS LLC | WYETH HOLDINGS CORPORATION, AMERICAN CYANAMID COMPANY, and THE PROCTER & GAMBLE COMPANY |

16

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

| ZURN INDUSTRIES, LLC | ZURN INDUSTRIES, INC. and ERIE CITY IRON WORKS |
|---|---|

23.    Plaintiff has been informed and believes, and thereon alleges, that at all times herein mentioned, Defendants or their "alternate entities" were or are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of South Carolina, or the laws of some other state or foreign jurisdiction, and that said Defendants were and/or are authorized to do business in the State of South Carolina, and that said Defendants have regularly conducted business in the State of South Carolina.

24.    Plaintiff has been informed and believes, and thereon alleges, that progressive lung disease, mesothelioma and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a period of time.

25.    As a direct and proximate result of the conduct as alleged within, Plaintiff Shelby Payne has suffered permanent injuries, including, but not limited to, mesothelioma and other lung damage, as well as the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to his damage in the sum of the amount as the trier of fact determines is proper.

26.    As a direct and proximate result of the conduct as hereinafter alleged, Plaintiff Shelby Payne has incurred, and will incur, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time.  Plaintiff requests leave to supplement this Court and all

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

parties accordingly when the true and exact cost of Plaintiff Shelby Payne's medical treatment is ascertained.

27.     As a further direct and proximate result of the conduct as hereinafter alleged, Plaintiff Shelby Payne has incurred, and will incur, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiff.  Plaintiff prays leave to supplement this Court and all parties accordingly to conform to proof at the time of trial.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

**THE PARTIES**

28.     Plaintiff Shelby Payne is currently a resident of the State of North Carolina. Plaintiff Shelby was exposed to asbestos as a result of her husband Kenneth F. Payne's career at various job sites, including but not limited to, locations in South Carolina. Plaintiff owned homes in both North Carolina and South Carolina from approximately 1972-1993.  During this time, Plaintiff lived, shopped, and resided for significant periods of time in the State of South Carolina.  Plaintiff was exposed to asbestos dust and fibers taken home on her husband, from asbestos dust in her husband's vehicle, asbestos dust on her husband's body including his hair, and from the dust being distributed and re-entrained into both of their homes, including the home in South Carolina. Plaintiff Shelby Payne was also exposed to asbestos throughout her life through her and her family's use of asbestos-containing talc products in both North Carolina and South Carolina.

29.     Defendant, **3M COMPANY**, f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY, was and is a Delaware corporation with its principal place of business in Minnesota. At all times material hereto, 3M COMPANY mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, or products fraudulently marketed to prevent asbestos exposure including, but not limited to, 3M proofing tape, blankets, and other asbestos-containing products. 3M COMPANY is sued as a Product Defendant. Plaintiff's claims against 3M COMPANY arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

19

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

30.     Defendant, **4520 CORP., INC.**, as successor-in-interest to BENJAMIN F. SHAW COMPANY, was and is a Delaware corporation with its principal place of business in Oregon. At all times material hereto, 4520 CORP., INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. 4520 CORP., INC. is sued as a Product Defendant. 4520 CORP., INC. is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against 4520 CORP., INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

31.     Defendant, **ABB INC.**, was and is a Delaware corporation with its principal place of business in North Carolina. At all times material hereto, ABB INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing ITE circuit breakers and Bailey valves. ABB INC. is sued as a Product Defendant. Plaintiff's claims against ABB INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

32.     Defendant, **AIR & LIQUID SYSTEMS CORPORATION**, individually and as successor-in-interest to BUFFALO PUMPS, INC., was and is a Pennsylvania corporation with its principal place of business in Pennsylvania. At all times material hereto, AIR & LIQUID SYSTEMS CORPORATION mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Buffalo pumps. AIR & LIQUID SYSTEMS CORPORATION is sued as a Product Defendant. Plaintiff's claims against AIR & LIQUID SYSTEMS CORPORATION arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

33.     Defendant, **ANCHOR/DARLING VALVE COMPANY**, was and is a Pennsylvania corporation with its principal place of business in Texas. At all times material hereto, ANCHOR/DARLING VALVE COMPANY mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Darling valves. ANCHOR/DARLING VALVE COMPANY is sued as a Product Defendant. Plaintiff's claims against ANCHOR/DARLING VALVE COMPANY arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

34.     Defendant, **ARMSTRONG INTERNATIONAL, INC.**, was and is a Michigan corporation with its principal place of business in Michigan. At all times material hereto,

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

ARMSTRONG INTERNATIONAL, INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Armstrong steam traps and strainers. ARMSTRONG INTERNATIONAL, INC. is sued as a Product Defendant. Plaintiff's claims against ARMSTRONG INTERNATIONAL, INC. arise out of this Defendant's business activities in the State of South Carolina.   Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

35.    Defendant, **AVON PRODUCTS, INC.**, was and is a New York corporation with its principal place of business in New York. At all times material hereto, AVON PRODUCTS, INC. manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Avon Makeup Products, pressed and loose face powders, bronzers, eye shadows, and body Powder Products. AVON PRODUCTS, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against AVON PRODUCTS, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

36.    Defendant, **BAHNSON, INC.**, was and is a North Carolina corporation with its principal place of business in North Carolina. At all times material hereto, BAHNSON, INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout

22

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

the southeastern United States. BAHNSON, INC. is sued as a Product Defendant. BAHNSON, INC. is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against BAHNSON, INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

37.    Defendant, **BEACON CMP CORPORATION**, was and is a New Jersey corporation with its principal place of business in New Jersey. At all times material hereto, BEACON CMP CORPORATION mined, manufactured, processed, imported, converted, compounded, supplied, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products including, but not limited to, asbestos-containing talc. BEACON CMP CORPORATION is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against BEACON CMP CORPORATION arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

38.    Defendant, **BEATY INVESTMENTS, INC.**, f/k/a GUY M. BEATY & CO., was a North Carolina corporation with its principal place of business in North Carolina. At all times material hereto, BEATY INVESTMENTS, INC. manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. BEATY INVESTMENTS, INC. is

23

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

sued as a Product Defendant. BEATY INVESTMENTS, INC. is also sued for the work it did at

the various industrial sites in the southeastern United States which, during the actual operations

of Beaty Investments, Inc., exposed tens of thousands of people, including the Plaintiff and her

husband, Kenneth F. Payne, to lethal doses of asbestos.  Plaintiff's claims against BEATY

INVESTMENTS, INC. arise out of this Defendant's business activities in the State of South

Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's

exposure to Defendant's products in the state of South Carolina.

39.    Defendant, **BECHTEL CORPORATION**, was and is a Nevada corporation with

its principal place of business in Virginia. At all times material hereto, BECHTEL

CORPORATION mined, manufactured, processed, imported, converted, compounded, supplied,

installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or

asbestos-containing products, materials, or equipment, including, but not limited to, the

installation and removal of asbestos-containing thermal insulation and materials at numerous

jobsites throughout the southeastern United States. BECHTEL CORPORATION is sued as a

Product Defendant. BECHTEL CORPORATION is also sued for the work it did at the various

industrial sites in the southeastern United States which exposed tens of thousands of people,

including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's

claims against BECHTEL CORPORATION arise out of this Defendant's business activities in

the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result

of her husband's exposure to Defendant's products in the state of South Carolina.

40.    Defendant, **BELK, INC.**, was and is a Delaware corporation with its principal

place of business in North Carolina. At all times material hereto, BELK, INC. sold, distributed

and/or supplied substantial amounts of asbestos-containing talc products, including, but not

24

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

limited to, asbestos-containing Makeup Products and Powder Products. BELK, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against BELK, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff Shelby Payne's exposure to said Defendant's products in the State of South Carolina, as well as others.

41. Defendant, **BRENNTAG NORTH AMERICA, INC.**, individually and as successor-in-interest to MINERAL AND PIGMENT SOLUTIONS, INC., as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC., was and is a Delaware corporation with its principal place of business in Pennsylvania. At all times material hereto, BRENNTAG NORTH AMERICA, INC. mined, manufactured, processed, imported, converted, compounded, supplied, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products including, but not limited to, asbestos-containing talc. BRENNTAG NORTH AMERICA, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against BRENNTAG NORTH AMERICA, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

42. Defendant, **BRENNTAG SPECIALTIES, LLC**, individually and as successor-in-interest to MINERAL AND PIGMENT SOLUTIONS, INC., as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC., was and is a Delaware limited liability company with its principal place of business in New Jersey. At all times material hereto, BRENNTAG SPECIALTIES, LLC mined, manufactured, processed, imported, converted, compounded, supplied, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products including, but not limited to, asbestos-containing talc. BRENNTAG SPECIALTIES,

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

LLC is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against BRENNTAG SPECIALTIES, LLC arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

43.    Defendant, **CHANEL, INC.**, was and is a New York corporation with its principal place of business in New York. At all times material hereto, CHANEL, INC. manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, Makeup Products and Powder Products such as Chanel No. 5 dusting powder. CHANEL, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against CHANEL, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

44.    Defendant, **CHATTEM, INC.**, was and is a Tennessee corporation with its principal place of business in New Jersey. At all times material hereto, CHATTEM, INC. manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Gold Bond Powder Products. CHATTEM, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against CHATTEM, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

45.    Defendant, **COLGATE-PALMOLIVE COMPANY**, was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, COLGATE-PALMOLIVE COMPANY manufactured, sold and/or supplied substantial amounts

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

of asbestos-containing talc products, including, but not limited to, Powder Products such as asbestos-containing Cashmere Bouquet dusting and body powders. COLGATE-PALMOLIVE COMPANY is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against COLGATE-PALMOLIVE COMPANY arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

46.     Defendant, **COLOR TECHNIQUES, INC.**, was and is a New Jersey corporation with its principal place of business in New Jersey. At all times material hereto, COLOR TECHNIQUES, INC. mined, manufactured, processed, imported, converted, compounded, supplied, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products including, but not limited to, asbestos-containing talc. COLOR TECHNIQUES, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against COLOR TECHNIQUES, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

47.     Defendant, **CONOPCO, INC.**, was and is a New York corporation with its principal place of business in New Jersey. At all times material hereto, CONOPCO, INC. manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, Powder Products such as asbestos-containing White Shoulders body powder. CONOPCO, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against CONOPCO, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure said Defendant's products in the State of South Carolina, as well as others.

27

48.    Defendant, **COTY INC.,** individually and as successor to COVERGIRL COSMETICS, INC., was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, COTY INC. manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. COTY INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against COTY INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

49.    Defendant, **COVIL CORPORATION**, was a South Carolina corporation with its principal place of business in South Carolina. At all times material hereto, COVIL CORPORATION manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. COVIL CORPORATION is sued as a Product Defendant. COVIL CORPORATION is also sued for the work it did at the various industrial sites in the southeastern United States which, during the actual operations of Covil Corporation, exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against COVIL CORPORATION arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

28

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

50.     Defendant, **CRANE CO.**, was and is a Delaware corporation with its principal place of business in Connecticut. At all times material hereto, CRANE CO. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Crane valves, feed tanks, and pumps. CRANE CO. is sued as a Product Defendant. Plaintiff's claims against CRANE CO. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

51.     Defendant, **CVS HEALTH CORPORATION**, was and is a Delaware corporation with its principal place of business in Rhode Island. At all times material hereto, CVS HEALTH CORPORATION sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. CVS HEALTH CORPORATION is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against CVS HEALTH CORPORATION arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff Shelby Payne's exposure to said Defendant's products in the State of South Carolina, as well as others.

52.     Defendant, **DANIEL INTERNATIONAL CORPORATION**, was and is a South Carolina corporation with its principal place of business in South Carolina. At all times material hereto, DANIEL INTERNATIONAL CORPORATION mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing

29

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

thermal insulation and materials at numerous jobsites throughout the southeastern United States. DANIEL INTERNATIONAL CORPORATION is sued as a Product Defendant. DANIEL INTERNATIONAL CORPORATION is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against DANIEL INTERNATIONAL CORPORATION arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

53.      Defendant, **DILLARD'S, INC.**, was and is a Delaware corporation with its principal place of business in Arkansas. At all times material hereto, DILLARD'S, INC. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. DILLARD'S, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against DILLARD'S, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff Shelby Payne's exposure to said Defendant's products in the State of South Carolina, as well as others.

54.      Defendant, **ELLINGTON INSULATION COMPANY, INC.**, was a North Carolina corporation with its principal place of business in North Carolina. At all times material hereto, ELLINGTON INSULATION COMPANY, INC. manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. ELLINGTON

30

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

INSULATION COMPANY, INC. is sued as a Product Defendant. ELLINGTON INSULATION

COMPANY, INC. is also sued for the work it did at the various industrial sites in the

southeastern United States which, during the actual operations of Ellington Insulation Company,

Inc., exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F.

Payne, to lethal doses of asbestos.   Plaintiff's claims against ELLINGTON INSULATION

COMPANY, INC. arise out of this Defendant's business activities in the State of South Carolina.

Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to

Defendant's products in the state of South Carolina.

55.      Defendant, **ELIZABETH ARDEN, INC.**, was and is a Florida corporation with

its principal place of business in Florida. At all times material hereto, ELIZABETH ARDEN,

INC. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products,

including, but not limited to, Makeup Products and Powder products such as White Shoulders

body powder. ELIZABETH ARDEN, INC. is sued as a Product Defendant and as an Asbestos

Talc Defendant. Plaintiff's claims against ELIZABETH ARDEN, INC. arise out of this

Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to

said Defendant's products in the State of South Carolina, as well as others.

56.      Defendant, **THE ESTÉE LAUDER COMPANIES INC.**, individually and as

successor to CLINIQUE, was and is a Delaware corporation with its principal place of business in

New York. At all times material hereto, THE ESTÉE LAUDER COMPANIES INC. sold,

distributed and/or supplied substantial amounts of asbestos-containing talc products, including,

but not limited to, asbestos-containing Makeup Products and Powder Products. THE ESTÉE

LAUDER COMPANIES INC. is sued as a Product Defendant and as an Asbestos Talc

Defendant. Plaintiff's claims against THE ESTÉE LAUDER COMPANIES INC. arise out of this

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

57.    Defendant, **ESTÉE LAUDER INC.**, individually and as successor to CLINIQUE, was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, ESTÉE LAUDER INC. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products and as an Asbestos Talc Defendant. ESTÉE LAUDER INC. is sued as a Product Defendant. Plaintiff's claims against ESTÉE LAUDER INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

58.    Defendant, **ESTÉE LAUDER INTERNATIONAL, INC.**, individually and as successor to CLINIQUE, was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, ESTÉE LAUDER INTERNATIONAL, INC. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. ESTÉE LAUDER INTERNATIONAL, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against ESTÉE LAUDER INTERNATIONAL, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

59.    Defendant, **FLOWSERVE US INC.**, individually and as successor-in-interest to EDWARD VALVES, INC. and as successor-in-interest to VOGT VALVE COMPANY, was and is a Delaware corporation with its principal place of business in Texas. At all times material hereto, FLOWSERVE US INC. mined, manufactured, processed, imported, converted,

32

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Edward valves and Vogt valves. FLOWSERVE US INC**.** is sued as a Product Defendant. Plaintiff's claims against FLOWSERVE US INC**.** arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

60.     Defendant, **FLUOR CONSTRUCTORS INTERNATIONAL**, f/k/a/ FLUOR CORPORATION, was and is a California corporation with its principal place of business in Texas. At all times material hereto, FLUOR CONSTRUCTORS INTERNATIONAL mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. FLUOR CONSTRUCTORS INTERNATIONAL is sued as a Product Defendant. FLUOR CONSTRUCTORS INTERNATIONAL is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against FLUOR CONSTRUCTORS INTERNATIONAL arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

33

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

61.     Defendant, **FLUOR CONSTRUCTORS INTERNATIONAL, INC.**, was and is a California corporation with its principal place of business in Texas. At all times material hereto, FLUOR CONSTRUCTORS INTERNATIONAL, INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. FLUOR CONSTRUCTORS INTERNATIONAL, INC. is sued as a Product Defendant. FLUOR CONSTRUCTORS INTERNATIONAL, INC. is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against FLUOR CONSTRUCTORS INTERNATIONAL, INC. arise out of this Defendant's business activities in the State of South Carolina.   Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

62.     Defendant, **FLUOR DANIEL SERVICES CORPORATION**, was and is a Delaware corporation with its principal place of business in Texas. At all times material hereto, FLUOR DANIEL SERVICES CORPORATION mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. FLUOR DANIEL SERVICES CORPORATION is sued as a Product Defendant. FLUOR DANIEL SERVICES

34

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

CORPORATION is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against FLUOR DANIEL SERVICES CORPORATION arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

63.     Defendant, **FLUOR ENTERPRISES, INC.,** was and is a California corporation with its principal place of business in Texas. At all times material hereto, FLUOR ENTERPRISES, INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. FLUOR ENTERPRISES, INC. is sued as a Product Defendant. FLUOR ENTERPRISES, INC. is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against FLUOR ENTERPRISES, INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

64.     Defendant, **GENERAL ELECTRIC COMPANY**, was and is a New York corporation with its principal place of business in Massachusetts. At all times material hereto, GENERAL ELECTRIC COMPANY mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing General Electric electrical panels and wires. GENERAL ELECTRIC COMPANY is sued as a Product Defendant. Plaintiff's claims against GENERAL ELECTRIC COMPANY arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

65.    Defendant, **THE GORMAN-RUPP COMPANY**, was and is an Ohio corporation with its principal place of business in Ohio. At all times material hereto, THE GORMAN-RUPP COMPANY mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing air ejectors, distilling plants, and pumps. THE GORMAN-RUPP COMPANY is sued as a Product Defendant.  Plaintiff's claims against THE GORMAN-RUPP COMPANY arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

66.    Defendant, **GOULDS PUMPS, INCORPORATED**, was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, GOULDS PUMPS, INCORPORATED mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Goulds pumps.  GOULDS PUMPS, INCORPORATED is sued as a Product Defendant.  Plaintiff's claims against GOULDS PUMPS, INCOR ORATED arise out of

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

67.     Defendant, **GREAT BARRIER INSULATION CO.**, was a Florida corporation with its principal place of business in Alabama.  At all times material hereto, GREAT BARRIER INSULATION CO. manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. GREAT BARRIER INSULATION CO. is sued as a Product Defendant. GREAT BARRIER INSULATION CO. is also sued for the work it did at the various industrial sites in the southeastern United States which, during the actual operations of Great Barrier Insulation Co., exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against GREAT BARRIER INSULATION CO. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

68.     Defendant, **GRINNELL LLC**, d/b/a GRINNELL CORPORATION, was and is a Delaware limited liability with its principal place of business in Florida. At all times material hereto, GRINNELL LLC mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Grinnell valves, heaters, and boilers. GRINNELL LLC is sued as a Product

37

Defendant. Plaintiff's claims against GRINNELL LLC arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

69.     Defendant, **HARRIS TEETER, LLC**, was and is a North Carolina limited liability company with its principal place of business in North Carolina. At all times material hereto, HARRIS TEETER, LLC sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. HARRIS TEETER, LLC is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against HARRIS TEETER, LLC arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff Shelby Payne's exposure to said Defendant's products in the State of South Carolina, as well as others.

70.     Defendant, **INTERNATIONAL PAPER COMPANY**, individually and as successor-in-interest to CHAMPION INTERNATIONAL CORPORATION, was and is a New York corporation with its principal place of business in Tennessee. At all times material hereto, INTERNATIONAL PAPER COMPANY owned and/or controlled premises at which Plaintiff's husband, Kenneth F. Payne, was exposed to asbestos-containing products, equipment, and asbestos dust from said products at various facilities, including but not limited to, the Champion paper and pulp mill in Canton, NC. INTERNATIONAL PAPER COMPANY is sued as a Premises Defendant. Plaintiff's claims against INTERNATIONAL PAPER COMPANY arise out of this Defendant's business activities in the State of South Carolina.

71.     Defendant, **ITT LLC**, f/k/a ITT CORPORATION, ITT INDUSTRIES INC., ITT FLUID PRODUCTS CORP., HOFFMAN SPECIALTY MFG. CORP., BELL and GOSSETT COMPANY, ITT MARLOW, and KENNEDY VALVE COMPANY, was and is an Indiana

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

limited liability company with its principal place of business in New York. At all times material hereto, ITT LLC mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Bell & Gossett pumps and valves, Hoffman pumps and valves, and Kennedy valves. ITT LLC is sued as a Product Defendant. Plaintiff's claims against ITT LLC arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

72.     Defendant, **KENNEDY VALVE COMPANY**, a wholly owned subsidiary of MCWANE, INC., was and is a New York corporation with its principal place of business in New York. At all times material hereto, KENNEDY VALVE COMPANY mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Kennedy valves. KENNEDY VALVE COMPANY is sued as a Product Defendant. Plaintiff's claims against KENNEDY VALVE COMPANY arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

73.     Defendant, **KIMBERLY-CLARK CORPORATION**, was and is a Delaware corporation with its principal place of business in Tennessee. At all times material hereto, KIMBERLY-CLARK CORPORATION owned and/or controlled premises at which Plaintiff's husband, Kenneth F. Payne, was exposed to asbestos-containing products, equipment, and

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

asbestos dust from said products at various facilities, including but not limited to, the Kimberly-Clark Berkeley mill in Hendersonville, North Carolina. KIMBERLY-CLARK CORPORATION is sued as a Premises Defendant. Plaintiff's claims against KIMBERLY-CLARK CORPORATION arise out of this Defendant's business activities in the State of South Carolina.

74.     Defendant, **THE KROGER CO.**, d/b/a HARRIS TEETER SUPERMARKETS, was and is an Ohio corporation with its principal place of business in Ohio. At all times material hereto, THE KROGER CO. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. THE KROGER CO. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against THE KROGER CO. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff Shelby Payne's exposure to said Defendant's products in the State of South Carolina, as well as others.

75.     Defendant, **L'ORÉAL USA, INC.**, individually and as successor to YVES SAINT LAURENT AMERICA, INC., LANCÔME, and MAYBELLINE, was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, L'ORÉAL USA, INC. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. L'ORÉAL USA, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against L'ORÉAL USA, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

76.     Defendant, **L'ORÉAL USA PRODUCTS, INC.**, individually and as successor to YVES SAINT LAURENT AMERICA, INC., LANCÔME, and MAYBELLINE, was and is a

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Delaware corporation with its principal place of business in New York. At all times material hereto, L'ORÉAL USA PRODUCTS, INC. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. L'ORÉAL USA PRODUCTS, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against L'ORÉAL USA PRODUCTS, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

77.    Defendant, **LOWCOUNTRY GROCERS LLC**, d/b/a PIGGLY WIGGLY, was and is a South Carolina limited liability company with its principal place of business in South Carolina. At all times material hereto, LOWCOUNTRY GROCERS LLC sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. LOWCOUNTRY GROCERS LLC is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against LOWCOUNTRY GROCERS LLC arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff Shelby Payne's exposure to said Defendant's products in the State of South Carolina, as well as others.

78.    Defendant, **MARY KAY INC.**, was and is a Delaware corporation with its principal place of business in Texas. At all times material hereto, MARY KAY INC. manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Mary Kay Makeup Products and Powder Products. MARY KAY INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against MARY KAY INC. arise out of this Defendant's business activities in

Case 3:23-cv-01291-MBK Document 18-09 Filed 03/24/25 Page 281 of 1429 PageID:
Case 3:23-cv-01291-MBK Document 18-09 Filed 03/24/25 Page 281 of 1429 PageID:
689
Exhibit D - Payne Complaint    Page 49 of 123

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

79.     Defendant, **MAYBELLINE LLC**, was and is a New York limited liability company with its principal place of business in New York. At all times material hereto, MAYBELLINE LLC manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Maybelline Makeup Products and Powder Products. MAYBELLINE LLC is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against MAYBELLINE LLC arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

80.     Defendant, **METROPOLITAN LIFE INSURANCE COMPANY**, a wholly-owned subsidiary of METLIFE INC., was and is a New York corporation with its principal place of business in New York. METROPOLITAN LIFE INSURANCE COMPANY has done and does business in the State of South Carolina.  METROPOLITAN LIFE INSURANCE COMPANY is named as a conspiracy defendant.

81.     Defendant, **NEW-INDY CATAWBA LLC**, was and is a Delaware limited liability company with its principal place of business in South Carolina. At all times material hereto, NEW-INDY CATAWBA LLC owned and/or controlled premises at which Plaintiff's husband, Kenneth F. Payne, was exposed to asbestos-containing products, equipment, and asbestos dust from said products at various facilities, including but not limited to, the paper and pulp mill formerly known as Bowater paper mill in Catawba, South Carolina. NEW-INDY CATAWBA LLC is sued as a Premises Defendant. Plaintiff's claims against NEW-INDY CATAWBA LLC arise out of this Defendant's business activities in the State of South Carolina.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

82.      Defendant, **NEW-INDY CONTAINERBOARD LLC**, as successor-in-interest to RESOLUTE FP US, INC., was and is a Delaware limited liability company with its principal place of business in Massachusetts. At all times material hereto, NEW-INDY CONTAINERBOARD LLC owned and/or controlled premises at which Plaintiff's husband, Kenneth F. Payne, was exposed to asbestos-containing products, equipment, and asbestos dust from said products at various facilities, including but not limited to, the paper and pulp mill formerly known as Bowater paper mill in Catawba, South Carolina. NEW-INDY CONTAINERBOARD LLC is sued as a Premises Defendant. Plaintiff's claims against NEW-INDY CONTAINERBOARD LLC arise out of this Defendant's business activities in the State of South Carolina.

83.      Defendant, **NOXELL CORPORATION** a subsidiary of COTY INC., was and is a Maryland corporation with its principal place of business in Maryland. At all times material hereto, NOXELL CORPORATION manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing CoverGirl Makeup Products. NOXELL CORPORATION is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against NOXELL CORPORATION arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

84.      Defendant, **PALMETTO PAPER TRADING, INC.**, was and is a South Carolina corporation with its principal place of business in South Carolina. At all times material hereto, PALMETTO PAPER TRADING, INC. owned and/or controlled premises at which Plaintiff's husband, Kenneth F. Payne, was exposed to asbestos-containing products, equipment, and asbestos dust from said products at various facilities, including but not limited to, the

43

**JA275**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Palmetto Paper Trading mill in Fort Mill, South Carolina. PALMETTO PAPER TRADING, INC. is sued as a Premises Defendant. Plaintiff's claims against PALMETTO PAPER TRADING, INC. arise out of this Defendant's business activities in the State of South Carolina.

85.    Defendant, **PARAMOUNT GLOBAL**, f/k/a VIACOMCBS INC., f/k/a CBS CORPORATION, a Delaware corporation f/k/a VIACOM, INC., successor-by-merger to CBS CORPORATION, a Pennsylvania corporation, f/k/a WESTINGHOUSE ELECTRIC CORPORATION, was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, PARAMOUNT GLOBAL mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Westinghouse blowers and emergency generators. PARAMOUNT GLOBAL is sued as a Product Defendant. Plaintiff's claims against PARAMOUNT GLOBAL arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

86.    Defendant, **PFIZER INC.**, individually and as successor-in-interest to COTY, INC. and COTY INTERNATIONAL, INC., was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, PFIZER INC. mined, manufactured, processed, imported, converted, compounded, supplied, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, including, but not limited to, asbestos-containing talc and Coty Makeup Products and Powder Products. PFIZER INC. is sued as a Product Defendant and as an Asbestos Talc Defendant.  Plaintiff's claims against PFIZER INC. arise out of this Defendant's business activities in the State of South Carolina, as well as

44

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

87.     Defendant, **PRESNELL INSULATION CO., INC.,** was a North Carolina corporation with its principal place of business in North Carolina. At all times material hereto, PRESNELL INSULATION CO., INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. PRESNELL INSULATION CO., INC. is sued as a Product Defendant. PRESNELL INSULATION CO., INC. is also sued for the work it did at the various industrial sites in the southeastern United States which, during the actual operations of Presnell Insulation Co., Inc., exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against PRESNELL INSULATION CO., INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

88.     Defendant, **THE PROCTER & GAMBLE COMPANY**, was and is an Ohio corporation with its principal place of business in Ohio. At all times material hereto, THE PROCTER & GAMBLE COMPANY manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Shulton's Old Spice Powder Products. THE PROCTER & GAMBLE COMPANY is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against THE PROCTER & GAMBLE COMPANY arise out of this Defendant's business activities in the State of South

45

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

89.    Defendant, **RESOLUTE FP US INC.**, f/k/a BOWATER, INCORPORATED, was and is a South Carolina corporation with its principal place of business in Tennessee. At all times material hereto, RESOLUTE FP US INC. owned and/or controlled premises at which Plaintiff's husband, Kenneth F. Payne, was exposed to asbestos-containing products, equipment, and asbestos dust from said products at various facilities, including but not limited to, the paper and pulp mill formerly known as Bowater paper mill in Catawba, South Carolina. RESOLUTE FP US INC. is sued as a Premises Defendant. Plaintiff's claims against RESOLUTE FP US INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

90.    Defendant, **REVLON    CONSUMER    PRODUCTS    CORPORATION**, individually and as successor to REVLON RESEARCH LABORATORIES, INC., CHARLES OF THE RITZ INC., LAVIN-CHARLES OF THE RITZ, E.R. SQUIBB, SQUIBB CORP., and YVES SAINT LAURENT, was and is a Delaware corporation with its principal place of business in New York. At all times material hereto, REVLON CONSUMER PRODUCTS CORPORATION manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. REVLON CONSUMER PRODUCTS CORPORATION is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against REVLON CONSUMER PRODUCTS CORPORATION arise out of this Defendant's business activities in

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the
State of South Carolina, as well as others.

91.     Defendant, **REVLON, INC.**, individually and as successor to CHARLES OF
THE RITZ INC., LAVIN-CHARLES OF THE RITZ, E.R. SQUIBB, SQUIBB CORP., and
YVES SAINT LAURENT, was and is a Delaware corporation with its principal place of business
in New York. At all times material hereto, REVLON, INC. manufactured, sold and/or supplied
substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-
containing Makeup Products and Powder Products. REVLON, INC. is sued as a Product
Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against REVLON, INC. arise
out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's
exposure to said Defendant's products in the State of South Carolina, as well as others.

92.     Defendant, **RITE AID OF SOUTH CAROLINA, INC.**, was and is a South
Carolina corporation with its principal place of business in Pennsylvania. At all times material
hereto, RITE AID OF SOUTH CAROLINA, INC. sold, distributed and/or supplied substantial
amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing
Makeup Products and Powder Products. RITE AID OF SOUTH CAROLINA, INC. is sued as a
Product Defendant and as an Asbestos Talc Defendant.  Plaintiff's claims against RITE AID OF
SOUTH CAROLINA, INC. arise out of this Defendant's business activities in the State of South
Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South
Carolina, as well as others.

93.     Defendant, **RUST ENGINEERING & CONSTRUCTION, INC.**, individually
and as successor-in-interest to SIRRINE ENVIRONMENTAL CONSULTANTS, INC., was and is a
Delaware corporation with its principal place of business in Texas.  At all times material hereto,

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

RUST ENGINEERING & CONSTRUCTION, INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the design of facilities that included the use of asbestos-containing materials, and the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. RUST ENGINEERING & CONSTRUCTION, INC. is sued as a Product Defendant and a Design Defendant. RUST ENGINEERING & CONSTRUCTION, INC. is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against RUST ENGINEERING & CONSTRUCTION, INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products/contractors as a result of her husband's exposure to Defendant's products in the state of South Carolina.

94.    Defendant, **RUST INTERNATIONAL INC.,** individually and as successor-in-interest to SIRRINE ENVIRONMENTAL CONSULTANTS, INC., was and is a Delaware corporation with its principal place of business in Texas.  At all times material hereto, RUST INTERNATIONAL INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the design of facilities that included the use of asbestos-containing materials, and the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. RUST INTERNATIONAL INC. is sued as a Product Defendant

48

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

and a Design Defendant. RUST INTERNATIONAL INC. is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against RUST INTERNATIONAL INC. arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products/contractors as a result of her husband's exposure to Defendant's products in the state of South Carolina.

95. Defendant, **SEQUOIA VENTURES INC.**, f/k/a BECHTEL CORPORATION, was and is a Delaware corporation with its principal place of business in Virginia. At all times material hereto, SEQUOIA VENTURES INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. SEQUOIA VENTURES INC. is sued as a Product Defendant. SEQUOIA VENTURES INC. is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against SEQUOIA VENTURES INC. arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products/contractors as a result of her husband's exposure to Defendant's products in the state of South Carolina.

96. Defendant, **SOUTHERN INSULATION, INC.**, was a South Carolina corporation with its principal place of business in South Carolina. At all times material hereto,

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

SOUTHERN INSULATION, INC. manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation at numerous jobsites throughout the southeastern United States. SOUTHERN INSULATION, INC. is sued as a Product Defendant. SOUTHERN INSULATION, INC. is also sued for the work it did at the various industrial sites in the southeastern United States which, during the actual operations of Southern Insulation, Inc., exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against SOUTHERN INSULATION, INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products/contractors in the state of South Carolina.

97.     Defendant, **SPIRAX SARCO, INC.,** was and is a Delaware corporation with its principal place of business in South Carolina. At all times material hereto, SPIRAX SARCO, INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing steam traps and valves. SPIRAX SARCO, INC. is sued as a Product Defendant. Plaintiff's claims against SPIRAX SARCO, INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

98.     Defendant, **STARR DAVIS COMPANY, INC.,** was a North Carolina corporation with its principal place of business in North Carolina.  At all times material hereto,

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

STARR DAVIS COMPANY, INC. manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. STARR DAVIS COMPANY, INC. is sued as a Product Defendant. STARR DAVIS COMPANY, INC. is also sued for the work it did at the various industrial sites in the southeastern United States which, during the actual operations of Starr Davis Company, Inc., exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against STARR DAVIS COMPANY, INC. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products/contractors in the state of South Carolina.

99.    Defendant, **STARR DAVIS COMPANY OF S.C., INC.**, was a South Carolina corporation with its principal place of business in North Carolina.  At all times material hereto, STARR DAVIS COMPANY OF S.C., INC. manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. STARR DAVIS COMPANY OF S.C., INC. is sued as a Product Defendant. STARR DAVIS COMPANY OF S.C., INC. is also sued for the work it did at the various industrial sites in the southeastern United States which, during the actual operations of Starr Davis Company of S.C., Inc., exposed tens of thousands of people, including the Plaintiff and her husband, Kenneth F. Payne, to lethal doses of asbestos.

51

**JA283**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Plaintiff's claims against STARR DAVIS COMPANY OF S.C., INC. arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products/contractors in the state of South Carolina.

100.    Defendant, **VALVES AND CONTROLS US, INC.**, f/k/a WEIR VALVES & CONTROLS USA INC. d/b/a ATWOOD & MORRILL CO., INC., was and is a Texas corporation with its principal place of business in Oregon. At all times material hereto, VALVES & CONTROLS US, INC. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Atwood & Morrill valves. VALVES & CONTROLS US, INC. is sued as a Product Defendant. Plaintiff's claims against VALVES & CONTROLS US, INC. arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

101.    Defendant, **VARIETY WHOLESALERS, INC.**, d/b/a ROSES, was and is a North Carolina corporation with its principal place of business in North Carolina. At all times material hereto, VARIETY WHOLESALERS, INC. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. VARIETY WHOLESALERS, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against VARIETY WHOLESALERS, INC. arise out of this Defendant's business activities in the State of South

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Carolina, as well as Plaintiff Shelby Payne's exposure to said Defendant's products in the State of South Carolina, as well as others.

102.    Defendant, **VELAN VALVE CORP.**, was and is a Delaware corporation with its principal place of business in Vermont. At all times material hereto, VELAN VALVE CORP. mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Velan valves. VELAN VALVE CORP. is sued as a Product Defendant. Plaintiff's claims against VELAN VALVE CORP. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

103.    Defendant, **VI-JON, LLC**, f/k/a VI-JON, INC., was and is a Delaware limited liability company with its principal place of business in Missouri. At all times material hereto, VI-JON, LLC mined, manufactured, processed, imported, converted, compounded, supplied, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, including, but not limited to, asbestos-containing talc. VI-JON, LLC is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against VI-JON, LLC arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

104.    Defendant, **VISTRA CORP.** f/k/a VISTRA ENERGY CORP., individually and as successor-in-interest to CRS SIRRINE a/k/a CRSS, as successor-in-interest to J.E. SIRRINE, was and is a Delaware corporation with its principal place of business in Texas. At all times material hereto, VISTRA CORP. mined, manufactured, processed, imported, converted,

Case 3:23-cv-12051-MBK Document 18-09 Filed 03/24/25 Page 293 of 1429 PageID: 65143

Case 3:23-cv-12051-MBK Document 18-09 Filed 03/24/25 Page 293 of 1429 PageID: Exhibit D - Payne Complaint    Page 61 of 123

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the design of facilities that included the use of asbestos-containing materials, and the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. VISTRA CORP. is sued as a Product Defendant and a Design Defendant. VISTRA CORP. is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff's husband, Kenneth F. Payne, to lethal doses of asbestos. Plaintiff's claims against VISTRA CORP. arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products/contractors in the state of South Carolina.

105.    Defendant, **VISTRA INTERMEDIATE COMPANY LLC**, individually and as successor-in-interest to CRSS INC., was and is a Delaware limited liability corporation with its principal place of business in Texas. At all times material hereto, VISTRA INTERMEDIATE COMPANY LLC mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, the design of facilities that included the use of asbestos-containing materials, and the installation and removal of asbestos-containing thermal insulation and materials at numerous jobsites throughout the southeastern United States. VISTRA INTERMEDIATE COMPANY LLC is sued as a Product Defendant and a Design Defendant. VISTRA INTERMEDIATE COMPANY LLC is also sued for the work it did at the various industrial sites in the southeastern United States which exposed tens of thousands of people, including the Plaintiff's husband, Kenneth F. Payne, to lethal doses

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

of asbestos. Plaintiff's claims against VISTRA INTERMEDIATE COMPANY LLC arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products/contractors in the state of South Carolina.

106.    Defendant, **WALGREEN CO.**, was and is an Illinois corporation with its principal place of business in Illinois. At all times material hereto, WALGREEN CO. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. WALGREEN CO. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against WALGREEN CO. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

107.    Defendant, **WEYERHAEUSER COMPANY**, was and is a Washington corporation with its principal place of business in Washington. At all times material hereto, WEYERHAEUSER COMPANY owned and/or controlled premises at which Plaintiff's husband, Kenneth F. Payne, was exposed to asbestos-containing products, equipment, and asbestos dust from said products at various facilities, including but not limited to, the Weyerhaeuser paper mill in Florence, South Carolina. WEYERHAEUSER COMPANY is sued as a Premises Defendant. Plaintiff's claims against WEYERHAEUSER COMPANY arise out of this Defendant's business activities in the State of South Carolina.

108.    Defendant, **WHITTAKER, CLARK & DANIELS, INC.**, was and is a New Jersey corporation with its principal place of business in New Jersey. At all times material hereto, WHITTAKER, CLARK & DANIELS, INC. mined, manufactured, processed, imported,

55

**JA287**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

converted, compounded, supplied, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, including, but not limited to, asbestos-containing talc. WHITTAKER, CLARK & DANIELS, INC. is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against WHITTAKER, CLARK & DANIELS, INC. arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

109.    Defendant, **THE WILLIAM POWELL COMPANY**, was and is an Ohio corporation with its principal place of business in Ohio. At all times material hereto, THE WILLIAM POWELL COMPANY mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Powell valves. THE WILLIAM POWELL COMPANY is sued as a Product Defendant.  Plaintiff's claims against THE WILLIAM POWELL COMPANY arise out of this Defendant's business activities in the State of South Carolina.  Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

110.    Defendant, **WINN-DIXIE STORES, INC.** a subsidiary of BI-LO a subsidiary of SOUTHEASTERN GROCERS, INC., was and is a Florida corporation with its principal place of business in Florida. At all times material hereto, WINN-DIXIE STORES, INC. sold, distributed and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Makeup Products and Powder Products. WINN-DIXIE STORES, INC.is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against WINN-DIXIE STORES, INC. arise out of this Defendant's business activities in the

56

**JA288**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

State of South Carolina, as well as Plaintiff Shelby Payne's exposure to said Defendant's products in the State of South Carolina, as well as others.

111. Defendant, **WYETH HOLDINGS LLC**, f/k/a WYETH HOLDINGS CORPORATION, f/k/a AMERICAN CYANAMID COMPANY and individually and as successor-in-interest to THE PROCTER & GAMBLE COMPANY, was and is a Maine limited liability company with its principal place of business in New York. At all times material hereto, WYETH HOLDINGS LLC manufactured, sold and/or supplied substantial amounts of asbestos-containing talc products, including, but not limited to, asbestos-containing Old Spice Powder Products. WYETH HOLDINGS LLC is sued as a Product Defendant and as an Asbestos Talc Defendant. Plaintiff's claims against WYETH HOLDINGS LLC arise out of this Defendant's business activities in the State of South Carolina, as well as Plaintiff's exposure to said Defendant's products in the State of South Carolina, as well as others.

112. Defendant, **ZURN INDUSTRIES, LLC**, individually and as successor-in-interest to ZURN INDUSTRIES, INC. and as successor-in-interest to ERIE CITY IRON WORKS, was and is a Delaware limited liability company with its principal place of business in Wisconsin. At all times material hereto, ZURN INDUSTRIES, LLC mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, including, but not limited to, asbestos-containing Zurn boilers and Erie City boilers. ZURN INDUSTRIES, LLC is sued as a Product Defendant. Plaintiff's claims against ZURN INDUSTRIES, LLC arise out of this Defendant's business activities in the State of South Carolina. Plaintiff was exposed to Defendant's asbestos products as a result of her husband's exposure to Defendant's products in the state of South Carolina.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

113.    Plaintiff Shelby Payne was exposed through her husband, Kenneth F. Payne, as a result of him working with and around asbestos-containing equipment in his immediate vicinity at his work sites, the premises of Defendants INTERNATIONAL PAPER COMPANY; KIMBERLY-CLARK CORPORATION; NEW-INDY CATAWBA LLC; NEW-INDY CONTAINERBOARD LLC; PALMETTO PAPER TRADING, INC.; RESOLUTE FP US INC.; and WEYERHAEUSER COMPANY (collectively, hereinafter the "Premises Defendants"). All other Defendants, or their applicable predecessors in interest, (except for METROPOLITAN LIFE INSURANCE COMPANY) were engaged in the manufacture, sale, distribution and/or installation of asbestos-containing products or raw asbestos materials for use in South Carolina and other states at times relevant to this action. At all times relevant to this action, the Defendants and the predecessors of the Defendants, for whose actions the Defendants are legally responsible, were engaged in the manufacture, sale, distribution, and/or installation of asbestos-containing products and raw materials for use in South Carolina and other states at times relevant to this action.

## **BACKGROUND FACTS**

114.    Plaintiff Shelby Payne brings this action for monetary damages as a result of contracting an asbestos-related disease.

115.    Plaintiff Shelby Payne was diagnosed with mesothelioma on or about November 29, 2021.

116.    Plaintiff Shelby Payne's mesothelioma was caused by her exposure to asbestos through her personal use, and her family's use, of asbestos-containing talc Makeup Products and Powder Products throughout her life, and through the asbestos carried home on the clothing and

58

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

person of her husband as a result of his employment as a wholesale paper salesman and account manager.

117.    Plaintiff Shelby Payne used the Powder Products throughout her life from approximately the early 1950s continuously until about 2021.  She frequently and regularly dusted the Powder Products on various parts of her body which at varying times may have included amongst other areas: face, neck, shoulders, arms, armpits, legs, collarbones, décolletage, breasts, vagina, and perineum. During this time she repeatedly inhaled, ingested, and was regularly exposed to asbestos dust emanating from the asbestos laden talc within the Powder Products permeating her person and clothes in her Alabama, North Carolina, and South Carolina homes.  Plaintiff also dusted Powder Products on her children while diapering them from the time they were born through their childhoods, creating visible dust on each occasion, which she inhaled. All of these activities exposed Plaintiff to asbestos and asbestos-dust.

118.    Plaintiff also claims exposure from the Defendant talc suppliers, mines, mills, and labs named in her complaint that provided asbestos-containing talc as a constituent ingredient to the Powder Products and Makeup Products that she used.

119.    Each use of the Powder Products, Makeup Products was an intended and foreseeable use of the products based on the advertising, marketing and labeling of the product. It was foreseeable Defendants' asbestos-containing talc products would be sold for personal use by individuals like Plaintiff Shelby Payne on herself and/or her children. Plaintiff Shelby Payne was thereby exposed to defendants' asbestos-containing Powder Products and Makeup Products in the State of South Carolina and other states at times relevant to this action.

120.    Plaintiff Shelby Payne was further exposed as a result of her husband Kenneth F. Payne's employment as a wholesale paper salesman, during which he worked at various

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

industrial sites throughout the states of South Carolina and North Carolina from approximately the early 1960s to the mid 1990s. Plaintiff's husband was present throughout the facilities to observe operations in the mills and performed a variety of tasks throughout the facilities, and was further exposed through his work around various other trades, including, but not necessarily limited to, premises workers and maintenance workers, boilermakers, welders, mechanics, carpenters, iron workers, insulators, millwrights, and pipefitters, including but not limited to the following sites:

- Champion paper and pulp mill – Canton, NC;
- International Paper mills – Georgetown, SC, Charlotte, NC, and Eastover, SC;
- Palmetto Paper Trade mill – Fort Mill, SC;
- Delmar Printing Company – Charlotte, NC;
- Bowater Paper Mill in Rock Hill, South Carolina; and
- Weyerhaeuser mill – Florence, SC.

121.    While working at these various jobsites in the course of his employment, Plaintiff's husband Kenneth F. Payne wore his own clothes to work, was exposed to asbestos dust and fibers that were brought home on his work clothes, fell off in his vehicle and were on his body including his hair, that distributed and re-entrained in his vehicle and home which caused Plaintiff Shelby Payne to be exposed to said asbestos dust in sufficient amounts as to cause her to develop mesothelioma.

122.    Plaintiff Shelby Payne was exposed to asbestos dust and fibers from products, services, and goods manufactured, distributed and/or sold by Defendants for use at Plaintiff's husband Kenneth F. Payne's jobsites which Plaintiff came in contact with off premises by contact with her husband's work clothes, personal possessions and vehicle. Plaintiff's exposure

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

to asbestos dust and fibers occurred through her contact with her husband's work clothing and person when greeting him at the end of his workday, through laundering his work clothing on a regular basis, through spending time in her husband's vehicle in which asbestos dust and fibers had been deposited, and through sharing a home contaminated with asbestos fibers that were constantly being stirred up and re-entrained in the air that they breathed throughout their home.

123.    Plaintiff Shelby Payne's cumulative exposure to asbestos as a result of acts and omissions of Defendants and their defective products, individually and together, was a substantial factor in causing Plaintiff Shelby Payne's mesothelioma and other related injuries and therefore under South Carolina law, is the legal cause of Plaintiff's injuries and damages.

124.    Plaintiff and her husband Kenneth F. Payne were not aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease.

125.    Plaintiff is informed and believes, and thereon alleges, that progressive lung disease, mesothelioma and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a period of time.

126.    As a direct and proximate result of the conduct as alleged within, Plaintiff Shelby Payne suffered permanent injuries, including, but not limited to, mesothelioma and other lung damage, as well as the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to his damage in the sum of the amount as the trier of fact determines is proper.

127.    As a direct and proximate result of the conduct as hereinafter alleged, Plaintiff Shelby Payne has incurred liability for physicians, surgeons, nurses, hospital care, medicine,

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time.   Plaintiff requests leave to supplement this Court and all parties accordingly when the true and exact cost of Plaintiff Shelby Payne's medical treatment is ascertained.

128.    As a further direct and proximate result of the conduct as hereinafter alleged, Plaintiff incurred loss of profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiff. Plaintiff requests leave to supplement this Court and all parties accordingly to conform to proof at the time of trial.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

## FOR A FIRST CAUSE OF ACTION
### (Product Liability: Negligence)

**Plaintiff Complains of Defendants for a Cause of Action for Negligence Alleging as Follows:**

129.    Plaintiff incorporates herein by reference, as though fully set forth herein, each and every paragraph of the General Allegations above.

130.    At all times herein mentioned, each of the named Defendants were an entity and/or the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, or division of an entity, hereinafter referred to collectively as "alternate entities," engaged in the business of researching, studying, manufacturing, fabricating, designing, modifying, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos, products containing asbestos, asbestos-containing talc, and/or asbestos-containing talc products, manufactured for foreseeable use or exposure to individuals like Plaintiff Shelby Payne on herself and/or her children. Plaintiff was thereby exposed to Defendants' asbestos-containing talc products in the State of South Carolina.

131.    At all times herein mentioned, Defendants and/or their "alternate entities" singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, inadequately warned or failed to warn of the health hazards, failed to provide adequate use instructions for eliminating the health risks inherent in the use of the products, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed,

63

**JA295**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely products manufactured for foreseeable use with asbestos, asbestos-containing talc, and/or asbestos-containing talc products manufactured for foreseeable personal use by individuals like Plaintiff Shelby Payne, in that said products caused personal injuries to Plaintiff Shelby Payne and others similarly situated, (hereinafter collectively called "exposed persons"), while being used for their intended purpose and in a manner that was reasonably foreseeable.

132.    The asbestos, asbestos-containing products, asbestos-containing talc and talc products were defective and unsafe for their intended purpose in that there was an alternative for asbestos that could have been used as the product or as a component instead of asbestos within a normally asbestos-containing/utilizing product.   Said alternatives would have prevented Defendants' asbestos and asbestos-containing products, products from causing Plaintiff Shelby Payne's mesothelioma, due to an inability of any asbestos-alternative to penetrate the pleural lining of Plaintiff's lung, even if inhaled.  Said alternatives came at a comparable cost to each of the Defendants and/or their "alternate entities." Said alternatives were of comparable utility to the asbestos or asbestos-containing products of Defendants and/or their "alternate entities."  The gravity of the potential harm resulting from the use of Defendants' asbestos or asbestos-containing products, and the likelihood such harm would occur to users of its products, far outweighed any additional cost or marginal loss of functionality in creating and/or utilizing an alternative design, providing adequate warning of such potential harm, and/or providing adequate use instructions for eliminating the health risks inherent in the use of their products, thereby rendering the same defective, unsafe and dangerous for use by Plaintiff Shelby Payne and her husband, Kenneth F. Payne.  Defendants and/or their "alternate entities" had a duty to

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

exercise due care in the pursuance of the activities mentioned above and Defendants, each of them, breached said duty of due care.

133.    Defendants and/or their "alternate entities" knew or should have known, and intended that the aforementioned asbestos, asbestos-containing products, asbestos-containing talc and talc products would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to grinding sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling by exposed persons, including Plaintiff Shelby Payne and her husband, Kenneth F. Payne, would use or be in proximity to and exposed to said asbestos fibers.

134.    At all times relevant, Defendants and/or their "alternate entities" were aware of their asbestos, asbestos-containing products, asbestos-containing talc and talc products' defect but failed to adequately warn Plaintiff Shelby Payne, Plaintiff's family members or others in their vicinity, as well as failed to adequately warn others of the known hazards associated with their products and/or failed to recall or retrofit their products.  A reasonable manufacturer, distributor, or seller of Defendants' products would have, under the same or similar circumstances, adequately warned of the hazards associated with their products.

135.    Plaintiff Shelby Payne, Plaintiff's family members and others in their vicinity used, handled or were otherwise exposed to asbestos, asbestos-containing products, asbestos-containing talc and talc products referred to herein in a manner that was reasonably foreseeable.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Plaintiff's and her husband Kenneth F. Payne's exposure to asbestos and asbestos-containing products occurred at various locations as set forth in this Complaint.

136.    Plaintiff Shelby Payne suffers from mesothelioma, a cancer related to exposure to asbestos and asbestos-containing products. Plaintiff Shelby Payne and her husband Kenneth F. Payne were not aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury or disease.

137.    Defendants' conduct and defective products as described in this cause of action were a direct cause of Plaintiff Shelby Payne's injuries, and all damages thereby sustained by Plaintiff Shelby Payne. Plaintiff therefore seeks all compensatory damages in order to make her whole, according to proof.

138.    Furthermore, the conduct of Defendants and/or their "alternate entities" in continuing to market and sell products which they knew were dangerous to Plaintiff Shelby Payne and the public without adequate warnings or proper use instructions was done in a conscious disregard and indifference to the safety and health of Plaintiff Shelby Payne and others similarly situated.

139.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, failing to recall or retrofit, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products or products manufactured for foreseeable use with asbestos, asbestos-containing products, asbestos-containing talc and talc products, Defendants and/or their "alternate entities" did so with conscious disregard for the safety of "exposed persons" who came in contact with asbestos

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

and asbestos-containing products, in that Defendants and/or their "alternate entities" had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos, asbestos-containing products, asbestos-containing talc and talc products or products manufactured for foreseeable use with asbestos products, including, but not limited to, asbestosis, mesothelioma, lung cancer, and other lung damages. This knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of Defendants and/or their "alternate entities."

140.    Defendants and their "alternate entities" were aware that members of the general public and other "exposed persons," who would come in contact with their asbestos and asbestos-containing products, asbestos talc and/or asbestos talc products, had no knowledge or information indicating that asbestos, asbestos-containing products, asbestos-containing talc and talc products, or products manufactured for foreseeable use with asbestos products, could cause injury, and Defendants and their "alternate entities," each of them, knew that members of the general public and other "exposed persons," who came in contact with asbestos and asbestos-containing products or products manufactured for foreseeable use with asbestos products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health and human life.

141.    The above-referenced conduct of Defendants and their "alternate entities," was motivated by the financial interest of Defendants, their "alternate entities," and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, instructing, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos, asbestos-containing products

67

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

and products manufactured for foreseeable use with asbestos, asbestos-containing products, asbestos-containing talc and talc products. Defendants, their "alternate entities," and each of them consciously disregarded the safety of "exposed persons" in pursuit of profit. Defendants were consciously willing and intended to permit asbestos and asbestos-containing products to cause injury to "exposed persons" without warning them of the potential hazards and further induced persons to work with and be exposed thereto, including Plaintiff Shelby Payne.

142.    Plaintiff Shelby Payne and her husband, Kenneth F. Payne, and other exposed persons did not know of the substantial danger of using Defendants' asbestos, asbestos containing-products, and products manufactured for foreseeable use with asbestos products. The dangers inherent in the use of these products were not readily recognizable by Plaintiff Shelby Payne, her husband Kenneth F. Payne, or other exposed persons. Defendants and/or their "alternate entities" further failed to adequately warn of the risks to which Plaintiff and others similarly situated were exposed.

143.    Defendants and/or their "alternate entities" are liable for the fraudulent, oppressive, and malicious acts of their "alternate entities," and each Defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein.

144.    The herein-described conduct of Defendants and their "alternate entities," was and is willful, malicious, fraudulent, and outrageous and in conscious disregard and indifference to the safety and health of persons foreseeably exposed.  Plaintiff, for the sake of example and by way of punishing said Defendants, seek punitive damages according to proof against all defendants.

**JA300**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

### FOR A SECOND CAUSE OF ACTION
**(Product Liability: Strict Liability - S.C. Code Ann. § 15-73-10, et seq.)**

**As a Second and Distinct Cause of Action for Strict Liability, Plaintiff Complains of Defendants, and Alleges as Follows:**

145.    Plaintiff incorporates herein by reference, as though fully set forth herein, each of the preceding paragraphs.

146.    Plaintiff Shelby Payne has suffered from mesothelioma, a cancer related to exposure to asbestos, asbestos-containing products and products manufactured for foreseeable use with asbestos products. Plaintiff Shelby Payne was not aware at the time of exposure that asbestos, asbestos-containing products, asbestos-containing talc and talc products presented any risk of injury and/or disease.

147.    The Products Defendants' conduct and defective products as described above were a direct cause of Plaintiff Shelby Payne's injuries, and the injuries and damages thereby sustained by Plaintiff.

148.    Furthermore, the Defendants' conduct and that of their "alternate entities" in continuing to market and sell products which they knew were dangerous to Plaintiff Shelby Payne and the public without adequate warnings or proper use instructions, was done in a conscious disregard and indifference to the safety and health of Plaintiff Shelby Payne and others similarly situated.

149.    Defendants and/or their "alternate entities" knew or should have known, and intended that the aforementioned asbestos, asbestos-containing products, asbestos-containing talc and talc products would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing,

69

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

soundproofing, automotive, aircraft and/or other applications, including, but not limited to grinding, sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out," and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling, "exposed persons," including Plaintiff, would use or be in proximity to and exposed to said asbestos fibers.

150.   Plaintiff Shelby Payne, Plaintiff's family members, and others in their vicinity used, handled or were otherwise exposed to asbestos, asbestos-containing products, asbestos-containing talc and talc products, and products manufactured for foreseeable use with asbestos products, referred to herein in a manner that was reasonably foreseeable. Plaintiff Shelby Payne's exposure to asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products occurred at various locations as set forth in this Complaint.

151.   Defendants and/or their "alternate entities" knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

152.   The asbestos, asbestos-containing products, asbestos talc, and asbestos talc products were defective and unsafe for their intended purpose in that there was an alternative for asbestos and asbestos talc that could have been used as the product or as a component instead of asbestos within a normally asbestos-containing/utilizing product. Said alternatives would have prevented Defendants' asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products from causing Plaintiff Shelby Payne's mesothelioma, due to an inability of any asbestos-alternative to penetrate the pleural lining of Plaintiff's lung, even

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

if inhaled. Said alternatives came at a comparable cost to each of the Defendants and/or their "alternate entities." Said alternatives were of comparable utility to the asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products of Defendants and/or their "alternate entities." The gravity of the potential harm resulting from the use of Defendants' asbestos or asbestos-containing products, and the likelihood such harm would occur, far outweighed any additional cost or marginal loss of functionality in creating and/or utilizing an alternative design, providing adequate warning of such potential harm, and/or providing adequate use instructions for eliminating the health risks inherent in the use of their products, thereby rendering the same defective, unsafe and dangerous for use.

153.    The defect existed in the said products at the time they left the possession of defendants and/or their "alternate entities," and each of them. Said products were intended to reach the ultimate consumer in the same condition as it left defendants. Said products did, in fact, cause personal injuries, including mesothelioma, asbestosis, other lung damage, and cancer to "exposed persons," including Plaintiff Shelby Payne herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

154.    Plaintiff Shelby Payne, her husband Kenneth F. Payne, and other exposed persons did not know of the substantial danger of using Defendants' asbestos, asbestos-containing products, asbestos talc and asbestos talc products manufactured for foreseeable use with asbestos products. The dangers inherent in the use of these products were not readily recognizable by Plaintiff Shelby Payne, her husband Kenneth F. Payne, or other exposed persons. Said Defendants and/or their "alternate entities" further failed to adequately warn of the risks to which Plaintiff Shelby Payne and others similarly situated were exposed.

71

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

155.    Defendants' defective products as described above were a direct cause of Plaintiff Shelby Payne's injuries, and the damages thereby sustained.

156.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos, asbestos-containing products, asbestos talc and asbestos talc products, and products manufactured for foreseeable use with asbestos products, Defendants and/or their "alternate entities," and each of them, did so with conscious disregard for the safety of Plaintiff Shelby Payne, her husband Kenneth F. Payne, and other exposed persons who came in contact with the asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products, in that Defendants and/or their "alternate entities" had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products, including, but not limited to, mesothelioma, asbestosis, other lung damages and cancers. This knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of Defendants and/or their "alternate entities."

157.    Defendants and/or their "alternate entities" were aware that members of the general public and other exposed persons, who would come in contact with their asbestos, asbestos-containing products, asbestos talc and asbestos talc products had no knowledge or information indicating that asbestos or asbestos-containing products or products manufactured for foreseeable use with asbestos products could cause injury. Defendants and/or their "alternate entities" further knew that members of the general public and other exposed persons, who came

72

**JA304**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

in contact with asbestos, asbestos-containing products, asbestos talc, and asbestos talc products manufactured for foreseeable use with asbestos, asbestos-containing products, asbestos talc and talc products would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact exposure was extremely hazardous to health and human life.

158.    The above-referenced conduct of Defendants and/or their "alternate entities" motivated by the financial interest of Defendants, their "alternate entities," and each of them, in the continuing and uninterrupted research, design, modification, manufacture, fabrication, labeling, instructing, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products. Defendants and/or their "alternate entities" consciously disregarded the safety of "exposed persons" in their pursuit of profit and in fact consciously intended to cause injury to Plaintiff Shelby Payne and other exposed persons and induced persons to work with, be exposed to, and thereby injured by asbestos, asbestos-containing products, and products manufactured for foreseeable use with asbestos products.

159.    Defendants are liable for the fraudulent, oppressive, and malicious acts of their "alternate entities," and each Defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and knew, or should have known of, the acts of each of their "alternate entities" as set forth herein.

160.    The conduct of said defendants, their "alternate entities," and each of them as set forth in this Complaint, was and is willful, malicious, fraudulent, outrageous and in conscious

**JA305**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

disregard and indifference to the safety and health of exposed persons. Plaintiff, for the sake of example and by way of punishing said Defendants, seeks punitive damages according to proof against all defendants.

161.    At all times herein mentioned, each of the named Defendants, and/or their "alternate entities," was an entity and/or the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, or division of an entity, hereinafter referred to collectively as "alternate entities," engaged in the business of researching, studying, manufacturing, fabricating, designing, modifying, labeling, instructing, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, re-branding, manufacturing for others, packaging and advertising a certain product, namely asbestos, asbestos-containing products, asbestos talc and asbestos talc products and products manufactured for foreseeable use with asbestos products.

### FOR A THIRD CAUSE OF ACTION
**(Vicarious Liability of Defendants Based upon Respondeat Superior)**

**As a Third Distinct Cause of Action Against Defendants, Plaintiff Brings this Third Cause of Action for Vicarious Liability of Product and Premises Defendants Based upon Respondeat Superior and Alleges as Follows:**

**162.**    Plaintiff incorporates herein by reference, as though fully set forth herein, each of the preceding paragraphs.

163.    Prior to and during all relevant times Defendants and/or their "alternate entities" employed workers (hereinafter "employees") in areas where defendants owned, maintained, controlled, managed and/or conducted business activities where Plaintiff Shelby Payne's husband, Kenneth F. Payne, worked and/or spent time as alleged above.

74

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

164.    At all times herein mentioned, Defendants' employees frequently encountered asbestos-containing products, materials, and debris during the course and scope of their employment, and during their regular work activities negligently disturbed asbestos-containing materials to which Plaintiff Shelby Payne's husband Kenneth F. Payne was exposed.

165.    Employees handling and disturbing asbestos-containing products in Plaintiff Shelby Payne's husband Kenneth F. Payne's vicinity were the agents and employees of defendants and at all times relevant were subject to the control of Defendants with respect to their acts, labor, and work involving (a) the removal, transport, installation, cleaning, handling, and maintenance of asbestos-containing products, materials, and debris, and (b) the implementation of safety policies and procedures.  Defendants controlled both the means and manner of performance of the work of their employees as described herein.

166.    Employees handling and disturbing asbestos-containing products in Plaintiff Shelby Payne's husband Kenneth F. Payne's and others' vicinity received monetary compensation from Defendants in exchange for the work performed and these employees performed the work in the transaction and furtherance of Defendants' businesses.

167.    Harmful asbestos fibers were released during Defendants' employees' use, handling, breaking, or other manipulation of asbestos-containing products and materials.

168.    Once released, the asbestos fibers contaminated the clothes, shoes, skin, hair, and body parts of those exposed, including Plaintiff's husband Kenneth F. Payne, on which they were brought home, where further activity caused the fibers to once again be released into the air and inhaled by Plaintiff Shelby Payne.

169.    The asbestos and asbestos-containing materials were unsafe in that handling and disturbing products containing asbestos causes the release of asbestos fibers into the air onto

**JA307**

Case 3:23-cv-1095-JZ Document 18-1 Filed 09/08/23 Page 315 of 1429 PageID:
Case 3:23-cv-1095-JZ Document 18-1 Filed 03/24/25 Page 315 of 1429 PageID:
Exhibit D - Payne Complaint    Page 83 of 123

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

surrounding surfaces, and onto persons in the area.  The inhalation of asbestos fibers can cause serious disease and death.

170.    Defendants' employees' use, handling and manipulation of asbestos-containing materials, as required by their employment and occurring during the course and scope of their employment, did in fact, cause personal injuries, including mesothelioma and other lung damage, to exposed persons including Plaintiff Shelby Payne.

171.    Defendants' employees were negligent in their use, handling and manipulation of said products in that they failed to isolate their work with asbestos and/or to suppress asbestos fibers from being released into the air and surrounding areas. They also failed to take appropriate steps to learn how to prevent exposure to asbestos, failed to warn and/or adequately warn Plaintiff Shelby Payne or her husband Kenneth F. Payne that he, and as a result Plaintiff, was being exposed to asbestos, failed to adequately warn Plaintiff Shelby Payne or her husband Kenneth F. Payne of the harm associated with their exposure to asbestos, and provide them with protection to prevent their inhalation of asbestos.

172.    Defendants' employees knew or should have known that failure to take such steps would result in exposure to bystanders including Plaintiff's husband Kenneth F. Payne, and as a result Plaintiff.

173.    Defendants' employees owed Plaintiff and her husband, Kenneth F. Payne, a duty to exercise due care and diligence in their activities while he was lawfully on the premises so as not to cause them harm.

174.    Defendants' employees breached this duty of care as described above.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

175.    At all times mentioned, Plaintiff Shelby Payne and her husband, Kenneth F. Payne, were unaware of the dangerous condition and unreasonable risk of personal injury created by Defendants' employees' use of and work with asbestos-containing products and materials.

176.    As a direct result of the Defendants' employees conduct, Plaintiff Shelby Payne's and her husband Kenneth F. Payne's exposure to asbestos, asbestos-containing materials, and products manufactured for foreseeable use with asbestos products, each individually and together, caused severe and permanent injury to Plaintiff Shelby Payne and the damages and injuries as complained of herein by Plaintiff.

177.    The risks herein alleged and the resultant damages suffered by the Plaintiff Shelby Payne were typical of or broadly incidental to Defendants' business enterprises. As a practical matter, the losses caused by the torts of Defendants' employees as alleged were sure to occur in the conduct of Defendants' business enterprises.  Nonetheless, Defendants engaged in, and sought to profit by, their business enterprises without exercising due care as described in this Complaint, which, on the basis of past experience, involved harm to others as shown through the torts of employees.

178.    Based on the foregoing, Defendants as the employers of said employees are vicariously liable under the doctrine of respondeat superior for all negligent acts and omissions committed by their employees in the course and scope of their work that caused harm to Plaintiff Shelby Payne.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

### FOR A FOURTH CAUSE OF ACTION
### (Premises Liability: Negligence as to Premises Owner/Contractor)

**As a Fourth Distinct Cause of Action for General Negligence, Plaintiff Complains of Defendants, and Alleges as Follows:**

179.    Plaintiff incorporates by reference, the preceding paragraphs as if fully set forth herein.

180.    Prior to and during all relevant times, the Defendants and/or their "alternate entities" employed workers in areas where Defendants owned, maintained, controlled, managed and/or conducted business activities where Plaintiff Shelby Payne's husband, Kenneth F. Payne, worked and/or spent time.

181.    At all times herein mentioned, Defendants selected, supplied, and distributed asbestos-containing materials to their employees for use during their regular work activities, and said employees disturbed those asbestos-containing materials.

182.    Defendants were negligent in selecting, supplying, distributing and disturbing the asbestos-containing products and in that said products were unsafe.  Said products were unsafe because they released asbestos fibers and dust into air when used which would be inhaled by Plaintiff Shelby Payne's husband, Kenneth F. Payne, and settled onto his clothes, shoes, hands, face, hair, skin, and other body parts thus creating a situation whereby workers and by-standers including Plaintiff Shelby Payne would be exposed to dangerous asbestos dust beyond the present.

183.    The asbestos, asbestos-containing materials, and products manufactured for foreseeable use with asbestos products described herein were unsafe in that handling and disturbing products containing asbestos causes the release of asbestos fibers into the air, and the inhalation of asbestos fibers causes serious disease and death.  Here, the handling of the above-

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

described asbestos-containing materials by Defendants' employees, as required by their employment and occurring during the course and scope of their employment, did, in fact, cause personal injuries, including mesothelioma, lung cancer and other lung damage, to exposed persons, including Plaintiff.

184.    At all times herein mentioned, Defendants knew or should have known that their employees and bystanders thereto, including Plaintiff Shelby Payne and her husband, Kenneth F. Payne, frequently encountered asbestos-containing products and materials during the course and scope of their work activities.

185.    At all times herein mentioned, Defendants knew or should have known that the asbestos-containing materials encountered by its employees and bystanders thereto including Plaintiff Shelby Payne and her husband, Kenneth F. Payne, were unsafe in that harmful asbestos fibers were released during the use, handling, breaking, or other manipulation of asbestos-containing products and materials, and that once released, asbestos fibers can be inhaled, and can alight on the clothes, shoes, skin, hair, and body parts of those exposed, where further activity causes the fibers to once again be released into the air where they can be inhaled, all of which causes serious disease and/or death.

186.    At all times herein mentioned, Defendants, in the exercise of reasonable diligence, should have known that absent adequate training and supervision, their employees and bystanders thereto including Plaintiff Shelby Payne and her husband, Kenneth F. Payne, were neither qualified nor able to identify asbestos-containing products nor to identify the hazardous nature of their work activities involving asbestos-containing products.

79

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

187.    At all times herein mentioned, Plaintiff Shelby Payne and her husband, Kenneth F. Payne, were unaware of the dangerous condition and unreasonable risk of personal injury created by the presence and use of asbestos-containing products and materials.

188.    At all times herein mentioned, Defendants, in the exercise of reasonable diligence, should have known that workers and bystanders thereto, would bring dangerous dust home from the workplace and contaminate their family cars and homes, continuously exposing and potentially causing injury to others off the premises.

189.    At all times herein mentioned, Defendants had a duty to use due care in the selection, supply, distribution and disturbance of asbestos-containing products and materials to its employees, to adequately instruct, train, and supervise their employees and to implement adequate safety policies and procedures to protect workers and persons encountering those workers, including Plaintiff Shelby Payne, from suffering injury or death as a result of the asbestos hazards encountered and created by the work of Defendants' employees.

190.    Defendants' duties as alleged herein exist and existed independently of Defendants' duties to maintain their premises in reasonably safe condition, free from concealed hazards.

191.    Defendants negligently selected, supplied, and distributed the asbestos-containing materials and failed to adequately train or supervise their employees to identify asbestos-containing products and materials; to ensure the safe handling of asbestos-containing products and materials encountered during the course of their work activities; and to guard against inhalation of asbestos fibers and against the inhalation of asbestos fibers by those who would come into close contact with them after they had used, disturbed, or handled, said asbestos-

80

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

containing products and materials during the course and scope of their employment by Defendants.

192.    Defendants failed to warn their employees and bystanders thereto, including Plaintiff Shelby Payne and her husband, Kenneth F. Payne, of the known hazards associated with asbestos and the asbestos-containing materials they were using and/or disturbing.

193.    As a direct and proximate result of the conduct of Defendants in selecting, supplying, distributing and disturbing asbestos-containing materials or products manufactured for foreseeable use with asbestos products and failing to adequately train and supervise their employees and failing to adopt and implement adequate safety policies and procedures as alleged herein, Plaintiff Shelby Payne became exposed to and inhaled asbestos fibers, which was a substantial factor in causing Plaintiff Shelby Payne to develop asbestos-related disease mesothelioma, and to suffer all damages attendant thereto.

### FOR A FIFTH CAUSE OF ACTION
**(Negligence Per Se)**

**As a Fifth Distinct Cause of Action for Negligence Per Se, Plaintiff Complains of Defendants, and Alleges as Follows:**

194.    Plaintiff incorporates herein by reference, as though fully set forth herein, each of the preceding paragraphs.

195.    The actions of Defendants also constituted negligence per se.

196.    Defendants violated federal and state regulations relating to asbestos exposure. Such violations constitute negligence per se or negligence as a matter of law. Further, each such violation resulted in dangerous and unlawful exposures to asbestos for Plaintiff Shelby Payne. Plaintiff is not making any claims under federal law; instead, Plaintiff is simply using the violation of federal standards as proof of liability on her state-law theories. Further, the reference

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

to Federal regulations does not create a federal question. *See* Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804 (1986). Any removal on this basis will be met with an immediate motion for remand and for sanctions.

197.    The negligence per se of Defendants was a proximate cause of Plaintiff Shelby Payne's injuries.

## FOR A SIXTH CAUSE OF ACTION
### (Negligence as to Design Defendants)

**As a Sixth Distinct Cause of Action for Negligence, Plaintiff Complains of Design Defendants and Alleges as Follows:**

198.    Plaintiff incorporates herein by reference, as though fully set forth herein, each of the preceding paragraphs.

199.    The work performed by the Design Defendants was defective in all, but not limited to, the following particulars:

(a)    In failing and neglecting to properly inspect the building for defects in the construction, design, and defects in the asbestos-containing products, materials and/or equipment.

(b)    In failing and neglecting to properly train employees in the proper installation of asbestos-containing products, materials and/or equipment, including but not limited to asbestos.

(c)    In failing and neglecting to properly supervise employees, contractors, subcontractors, and/or suppliers in the proper installation of asbestos-containing products, materials and/or equipment, including but not limited to asbestos.

(d)    In failing and neglecting to employ careful contractors and/or employees.

(e)    In failing and neglecting to properly install asbestos-containing products, materials and/or equipment, including but not limited to asbestos.

(f)    In failing to properly install the asbestos-containing products, materials and/or equipment, including but not limited to asbestos.

Case 3:23-cv-01091-MBK Document 18-09 Filed 03/24/25 Page 322 of 1429 PageID: 680
Case 3:23-cv-01091-MBK Document 18-09 Filed 03/24/25 Page 322 of 1429 PageID:
Exhibit D - Payne Complaint    Page 90 of 123

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

    (g)    In failing to properly warn Plaintiff Shelby Payne and her husband, Kenneth Payne, of dangers and risks associated with the conditions of the material and work product which was being installed for use by Plaintiff's husband and others in his vicinity.

    (h)    By such other failures as will be proved at trial.

All of which is contrary to one or more of workmanlike practice; the plans, specifications, and other contract documents; manufacturers' recommendations and instructions; trade custom and usage; and applicable building codes.

200.    As a direct, proximate, and foreseeable result of the negligence of the Design Defendants, Plaintiff Shelby Payne suffered and incurred actual damages, as described hereinabove, and are entitled to recover such damages from the Design Defendants in such an amount as the trier of fact may find. The actions and omissions to act of the Design Defendants were willful, wanton, reckless and grossly negligent, so as to entitle the Plaintiff to recover punitive damages.

### FOR A SEVENTH CAUSE OF ACTION
**(Negligent Design Services Against Design Defendants)**

**As a Seventh Distinct Cause of Action for Negligent Design Services, Plaintiff Complains of Design Defendants and Alleges as Follows:**

201.    Plaintiff incorporates herein by reference, as though fully set forth herein, each of the preceding paragraphs.

202.    Design Defendants owed Plaintiff Shelby Payne a duty to perform professional design services, including construction administration, in accordance with professional standards obtained in South Carolina for the delivery and performance of such services.

203.    Design Defendants breached such professional standards in all, but not limited to, the following particulars:

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

(a)     In failing and neglecting to take reasonable care in the design of said building.

(b)     In failing and neglecting to properly design said building, to issue proper construction, to prevent continuous and substantial exposure to asbestos and/or asbestos-containing products.

(c)     In failing and neglecting to properly supervise the construction of said building.

(d)     In failing and neglecting to properly and reasonably design said building to eliminate exposure to asbestos and/or asbestos-containing products, including but not limited to asbestos-containing insulation.

(e)     In negligently specifying the use of inappropriate, improper and/or defective and deficient building systems, materials, and components, including but not limited to asbestos-containing insulation.

(a)     By such other failures as will be proved at trial.

204.    As a direct, proximate, and foreseeable result of the negligence of the Design Defendants, Plaintiff Shelby Payne suffered and incurred actual damages, as described hereinabove, and are entitled to recover such damages from the Design Defendants in such an amount as the trier of fact may find. The actions and omissions to act of the Design Defendants were willful, wanton, reckless and grossly negligent, so as to entitle the Plaintiff to recover punitive damages.

**FOR AN EIGHTH CAUSE OF ACTION**
**(Product Liability: Breach of Implied Warranties - S.C. Code Ann. § 36-2-314)**

**As an Eighth Distinct Cause Of Action for Breach of Implied Warranties, Plaintiff Complains of Defendants and Alleges as Follows:**

205.    Plaintiff incorporates herein by reference, as though fully set forth herein, each of the preceding paragraphs.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

206.    Each of the Defendants and/or their "alternate entities" impliedly warranted that their asbestos materials or asbestos-containing products were of good and merchantable quality and fit for their intended use.

207.    The implied warranty made by the Defendants, and/or their "alternate entities" that the asbestos, asbestos-containing products, asbestos-containing talc and talc products, were of good and merchantable quality and fit for the particular intended use, was breached.  As a result of that breach, asbestos was given off into the atmosphere where Plaintiff Shelby Payne and her family used asbestos-containing talc products and subsequently inhaled and ingested by Plaintiff and where Plaintiff's husband, Kenneth F. Payne, carried out his duties and was as a result inhaled by Plaintiff Shelby Payne through asbestos dust and fibers taken home on her husband's work clothes, from asbestos dust in his vehicle and asbestos dust on his body including his hair and from the dust being distributed and re-entrained.

208.    As a direct and proximate result of the breach of the implied warranty of good and merchantable quality and fitness for the particular intended use, Plaintiff Shelby Payne was exposed to Defendants' asbestos, asbestos-containing products, asbestos-containing talc and talc products, and/or products manufactured for foreseeable use with asbestos products and consequently developed mesothelioma, causing Plaintiff to suffer all damages attendant thereto.

85

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

## FOR A NINTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

**For a Ninth Distinct Cause of Action for Fraudulent Misrepresentation, Plaintiff Complains of Defendants, and Alleges as Follows:**

209.    Plaintiff repeats and re-alleges the portions of the above paragraphs where relevant.

210.    That during, before and after Plaintiff Shelby Payne's exposure to asbestos products manufactured by Defendants and/or their "alternate entities", the Defendants and/or their "alternate entities" falsely represented facts, including the dangers of asbestos exposure to Plaintiff Shelby Payne and her husband, Kenneth F. Payne, in the particulars alleged in the paragraphs above, while Defendants each had actual knowledge of said dangers of asbestos exposure to persons such as Plaintiff Shelby Payne. At the same time of these misrepresentations, Defendants each knew of the falsity of their representations and/or made the representations in reckless disregard of their truth or falsity.

211.    The foregoing representations were material conditions precedent to Plaintiff Shelby Payne's continued exposure to asbestos, asbestos-containing products, asbestos-containing talc and talc products.  Defendants and/or their "alternate entities" each intended that Plaintiff Shelby Payne and her husband, Kenneth F. Payne, act upon the representations by continuing his work around and their personal use of, and thereby exposure to, the asbestos products.  Plaintiff Shelby Payne and her husband, Kenneth F. Payne, were ignorant of the falsity of Defendants' representations and rightfully relied upon the representations.

212.    As a direct and proximate result Plaintiff Shelby Payne's and her husband Kenneth F. Payne's reliance upon Defendants' false representations, Plaintiff has suffered injury and damages as described herein.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

## FOR A TENTH CAUSE OF ACTION
**(Conspiracy, Concert of Action – Defendant Metropolitan Life Insurance Company)**

**For a Tenth Distinct Cause of Action for Fraudulent Misrepresentation, Plaintiff Complains of Defendant Metropolitan Life Insurance Company, and Alleges as Follows:**

213.    Plaintiff repeats and re-alleges the portions of the above paragraphs where relevant.

214.    Beginning in the late 1920's, conspirators including Defendant Metropolitan Life Insurance Company ("Met Life"), as well as Johns-Manville, Raybestos-Manhattan and others, undertook a duty to conduct research on asbestos-related health problems and to inform the public about any health risks that could be associated therewith.  In or about 1929, Met Life, through its agents and employees acting within the scope of their agency and employment, including but not limited to Dr. Anthony J. Lanza ("Lanza"), began an investigation of asbestos-related health hazards.  In 1935, this study was altered by Lanza, with the full knowledge of Met Life, at the request of and in concert with the asbestos industry in order to wrongly influence the United States Public Health Service, the United States medical community and various state legislatures.

215.    Thereafter, Defendant Met Life through the acts and omissions of its employees, most notably Lanza, undertook a series of activities with various members of the asbestos industry including but not limited to Johns-Manville, Raybestos-Manhattan/Raymark Industries, Inc., United States Gypsum, American Brake Blok/Abex, and others to suppress and misrepresent the dangers of exposure to asbestos dust to employees of Met Life's insureds and the general public and the medical community.

216.    The conspirators through their agent, Lanza of Met Life, made a concerted effort to discredit and to terminate the experiments of certain scientists who were developing data of

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

profound importance for the area of public health in relation to the cancer hazard which existed for workers and bystanders in the asbestos industry.

217.    As a direct and proximate result of Met Life's intentional publication of deceptive and misleading medical data and information, and other conspiratorial acts and omissions, Defendant caused asbestos to be used in the settings from which Plaintiff Shelby Payne and her husband, Kenneth F. Payne, were exposed to and breathed asbestos dust which resulted in Plaintiff Shelby Payne's injuries.  Defendant Met Life, through its agents and employees and officers, aided and abetted and gave substantial assistance to Johns-Manville and Raybestos-Manhattan in their tortious selling of asbestos products and voluntarily undertook a duty to warn the United States Public Health Service, the medical community, and others about the danger of asbestos and consciously and negligently misrepresented the dangers of asbestos to the United States Public Health Service, the medical community, and others, all to the ultimate harm of Plaintiff herein.

218.    Defendant Met Life rendered substantial aid and assistance to the manufacturers of asbestos-containing products to which Plaintiff Shelby Payne was exposed, and such assistance by Met Life aided and abetted the negligence and the marketing of unreasonably dangerous asbestos-containing products by such manufacturers which proximately caused Plaintiff Shelby Payne's illness.

219.    In both conducting tests and in publishing their alleged results, Met Life failed to exercise reasonable care to conduct or publish complete, adequate and accurate tests of the health effects of asbestos.  Met Life also caused to be published intentionally false, misleading, inaccurate and deceptive information about the health effects of asbestos exposure.

88

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

220.    Plaintiff Shelby Payne unwittingly and justifiably relied upon the thoroughness of Met Life's tests and information dissemination, the results of which Met Life published in leading medical journals.

221.    As a direct and proximate contributing result of Met Life's failures to conduct or accurately publish adequate tests or disseminate accurate and truthful information, after undertaking to do so; (i) the risk of harm to Plaintiff Shelby Payne from asbestos exposure was increased, and (ii) Plaintiff suffered the injuries described herein.

222.    In failing to test fully and adequately for the adverse health effects from exposure to asbestos; in delaying the publication of such results; and in falsely editing such results as were obtained; in suppressing relevant medical inquiry and knowledge about those hazards to promote the sale and distribution of asbestos as a harmless product; and in collaborating with the other Defendants materially to understate the hazards of asbestos exposure, all for its own profit and gain, Met Life acted recklessly, wantonly, and in calculated disregard for the welfare of the general public, including Plaintiff.

223.    Additionally and alternatively, as a direct and proximate result of Met Life's actions and omissions, Plaintiff Shelby Payne and her husband, Kenneth F. Payne, were caused to remain ignorant of all the dangers of asbestos resulting in Plaintiff, her husband, their co-workers, their family, and the general public to be unaware of the true and full dangers of asbestos, depriving Plaintiff Shelby Payne and her husband, Kenneth F. Payne, of the opportunity to decide for themselves whether they wanted to take the risk of being exposed to asbestos, denied Plaintiff and her husband the opportunity to take precautions against the dangers of asbestos and proximately caused Plaintiff's damages herein.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

224.    During the relevant time period the Plaintiff Shelby Payne and her husband Kenneth F. Payne were exposed to and did inhale and/or ingest asbestos dust, fibers, and particles, which dust, fibers, and particles came from the asbestos or asbestos-containing products which were mined, milled, manufactured, fabricated, supplied, and/or sold by the Johns Manville and/or Raybestos/Raymark.

225.    Defendant, Met Life, together with Manville, Raymark and other persons and entities, known and unknown at times relevant hereto, engages in a conspiracy or concert of action to inflict injury on the Plaintiff Shelby Payne, and to withhold, alter, suppress and misrepresent information about the health effects of asbestos exposure.  One or more of said conspirators did cause tortious injury to the Plaintiff Shelby Payne or her husband in the course of or as a consequence of the conspiracy of concert of action.  At least the following enumerated acts were undertaken by the conspirators in the course of and in furtherance of the conspiracy or concert of action:

(a)    In 1932, Met Life, through Lanza and others, assisted Manville with medical examinations of over 1,000 employees of Manville's factory in Manville, New Jersey.  The report of this study shows that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process.  This 1932 medical survey was not published in the medical literature and, therefore, was unavailable to scientists studying the issue of asbestos-related disease. Further collaboration between Manville and Met Life continued the cover-up.

(b)    Beginning in approximately 1934, Manville, through its agents, Vandiver Brown and Attorney J.C. Hobart, suggested to Lanza, Associate Director of Met Life, which was then insurer of Manville and Raymark, that Lanza publish a study on asbestosis in which Lanza would affirmatively misrepresent material facts about the health consequences of asbestos exposure. This was accomplished through intentional deletion of Lanza's description of asbestosis as 'fatal' and through other selective editing that affirmatively misrepresent asbestosis as a disease process less serious than it actually is and was known to be.  As a result, Lanza's study was published in the medical literature in this misleading fashion in 1935. The

90

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raymark, and Met Life as insurer. Furthermore, upon information and belief, it is alleged that Met Life, at all times relevant hereto, had substantial monetary investments in Manville and Raymark, among other asbestos product manufacturers and distributors.

(c)     In 1936, the conspirators or some of them entered into an agreement with the Saranac Laboratories. Under this agreement, these conspirators acquired the power to decide what information Saranac could publish about asbestos disease and to control in what form such publications would occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings.

(d)     By November 1948, or earlier, Manville, Met Life (acting through Lanza), Raymark, and others decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos products.

(e)     At a meeting on November 11, 1948, these conspirators and others intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensities of asbestos and the health effects of asbestos on humans and they determined that only an edited version would be published. These conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and to the class of persons exposed to asbestos, including the Plaintiff.

(f)     As a direct result of influence exerted by the above described conspirators, Dr. Arthur Vorwald published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks. The conspirators affirmatively and deliberately disseminated this misleading Vorwald

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

publication to universities, libraries, government officials, agencies and others.

(g)     Such action constituted a material affirmative misrepresentation of the material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was a less serious health concern than Dr. Gardner's unedited work indicated.

(h)     For many decades, Met Life, individually, jointly and in conspiracy with Manville and Raymark, have been in possession of medical and scientific data, literature, and test reports which clearly indicated that the inhalation of asbestos dust and fibers resulting from the ordinary foreseeable use of said asbestos-containing products and/or machinery requiring or calling for the use of asbestos or asbestos-containing products were unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly.

(i)     Despite the medical and scientific data, literature and test reports possessed by and available to Met Life, individually and in conspiracy with Manville and Raymark, Fraudulently, willfully and maliciously withheld, concealed and suppressed said medical and scientific data, literature and test reports regarding the risks of asbestosis, cancer, mesothelioma, and other illnesses and diseases from Plaintiff who using and being exposed to Manville or Raymark asbestos-containing products and/or machinery requiring or calling for the use of a s b e s t o s   a n d / o r asbestos-containing products; caused to be released, published and disseminated medical and scientific data, literature and test reports containing information and statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases, which Metropolitan, Manville and Raymark knew were either incorrect, incomplete, outdated and misleading; distorted the results of medical examinations conducted upon workers who were using asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products and being exposed to the inhalation of asbestos dust and fibers by falsely stating and/or concealing the nature and extent of the harm which workers suffered; and failed to adequately warn the Plaintiff of the dangers to which he was exposed when they knew of the dangers.

(j)     By the false and fraudulent representations, omissions, failures, and concealments set forth above, Met Life, Manville and Raymark, individually, jointly, and in conspiracy with each other, intended to induce the Plaintiff to rely upon said false and fraudulent representations, omissions, failures, and concealments, to continue to expose themselves to the dangers inherent in the use of and exposure to their asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products. Said misrepresentations

92

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

were false, incomplete, and misleading and constitute negligent misrepresentations as defined by Sections 311 and 522 of the Restatement (Second) of Torts.

226.    Plaintiff Shelby Payne and her husband, Kenneth F. Payne, reasonably and in good faith relied upon the false and fraudulent representations, omissions, failures, and concealments made by Met Life, Manville, and Raymark regarding the nature of their asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

227.    As a direct and proximate result of the conspiracy and concert of action between Met Life, Manville and Raymark, the Plaintiff Shelby Payne and her husband Kenneth Payne have been deprived of the opportunity of informed free choice and connection with the use of and exposure to Manville and Raymark's asbestos and asbestos-containing products, and therefore continued to work with and be exposed to the co-conspirator corporation's asbestos and asbestos-containing products and as a result brought home on his clothes, hair, shoes, and in his case asbestos dust or fibers contracted asbestos-related diseases and other conditions, and/or aggravated pre-existing conditions, as a result of which the Plaintiff has been damaged.

### FOR AN ELEVENTH CAUSE OF ACTION
**(Fraudulent Misrepresentation and Conspiracy/Concert Action as to Asbestos Talc Defendants)**

**For an Eleventh Distinct Cause of Action for Fraudulent Misrepresentation and Conspiracy/Concert Action, Plaintiff Complains of Defendants, and Allege as Follows:**

228.    Plaintiff repeats and re-alleges the portions of the above paragraphs where relevant.

229.    For decades, defendants manufactured products composed of talc that were sold and marketed as safe for daily use by consumers on their person to give off a pleasant smell, mask odors, prevent chaffing and/or absorb moisture. Defendants' products were advertised as

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

healthful for babies, children and adults and to be applied regularly to maintain freshness, keep skin soft, mask odors with a floral fragrance, prevent chaffing and/or absorb moisture.

230.    Defendants and the Cosmetic, Toiletry & Fragrance Association (n/k/a Personal Care Products Council) ("CTFA") made false statements to plaintiff, the general public, news media and government agencies that exercise regulatory authority over the cosmetic industry, including, but not limited to, the U.S. Food & Drug Administration ("FDA"), the National Institute of Occupational Health and Safety ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHS"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused plaintiff's harm through intentional efforts to deceive the general public as to the safety of and presence of carcinogens, including asbestos, in talc-containing products.

231.    Defendants and CTFA, for decades before Plaintiff Shelby Payne was born, possessed medical and scientific data that raised concerns regarding the presence of carcinogens, including asbestos, in talc and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products.

232.    Talc is a hydrous magnesium silicate, inorganic material that is mined from the earth. It is used in the manufacture of goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in defendants' products, talc is known as "talcum powder."

233.    Geologists, Defendants and CTFA—and their suppliers, experts, agents and advisors—have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. "Asbestos" is a commercial and legal term, rather than a geologic or scientific term, referring to six now-regulated magnesium silicate minerals that

94

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

occur in fibrous form, including the serpentine mineral chrysotile, and amphibole minerals such as actinolite, anthophyllite, tremolite, amosite and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

234.   Defendants, some of which have been and still are the largest talc producers and/or talc-containing product manufactures in the world, admit that they have long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that they have long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of carcinogens, including asbestos, in talc and talc deposits.

235.   Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, an ever-growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

236.   Defendants and their affiliates, employees, agents and/or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite, and the National Safety Council stated, "The results of the study seemed to indicate a relationship between the amount of dust inhaled

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National Safety News, an article entitled "No Halfway Measures in Dust Control" by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

237.    In 1936, the National Safety Council published an article entitled "Lesser Known Facts About Occupational Diseases" that found "exposure to asbestos fibers, present in the weaving and grinding of dry asbestos material, offers another type of dust which may cause fatalities among workers." In 1958, The New York Department of Labor published Industrial Code Rule No. 12 establishing regulations applying to all employees and employers relating to dangerous air contaminants and listing both asbestos and talc as such substances.

238.    In 1968, a study presented at the American Industrial Hygiene Conference & Exposition and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

unsuspected problem." L. J. Cralley, et al., Fibrous and Mineral Content of Cosmetic Talcum Products, 29 Am. Ind. Hyg. Assoc. J. 350-354 (1968). Defendants were aware of these findings.

239.    In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association. Defendants were aware of this study. The study revealed that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite and chrysotile. The study explained that such fibrous content was not unexpected because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some talcum powders contained asbestos, there is no evidence that positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public.

240.    A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., Consumer Talcums and Powders: Mineral and Chemical Characterization, 2 J. Toxicol. Environ. Health 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the New York Times and the Washington Post, and Defendants were aware of same.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

241.     In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on talc-containing products. Defendants and CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers (including asbestos hazards) associated with cosmetic talcum powder products, such as Defendants' products.

242.     In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction ("XRD") analysis, and found them to contain 5-25% tremolite and anthophyllite asbestos.

243.     Soon thereafter, a symposium was held in August of 1971 at the FDA to discuss the issue of asbestos content of talcum powders with the talc industry, government officials, and doctors and scientists from Mt. Sinai Hospital, which was then the epicenter of the medical and scientific study of asbestos. Among other statements, participants and attendees heard: that asbestos should be banned in talcum powders; models should be set up to measure the levels exposure to asbestos experienced by persons using talcum powder containing asbestos at the lowest level of microscopic detection; and that finding asbestos in talc and talcum powder is extremely difficult, and the only truly reliable way to determine the asbestos content of talc and talcum powder is through TEM and electron diffraction. Defendants and CTFA, aware of the foregoing and citing costs as well as their fear of the public learning talc was contaminated with asbestos, ignored and completely rejected any measures to meaningfully test talc products to make sure they were free from asbestos and other carcinogens.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

244.    After this 1971 symposium, Dr. Weissler of the FDA hired Dr. Seymour Z. Lewin to test commercially available talcum powders for asbestos. Dr. Lewin tested 195 samples and found asbestos of varying amounts in 43. Many of Dr. Lewin's positive results were eventually corroborated by Pfizer Inc. The results, however, were uncorroborated by two other laboratories, leading the FDA to the conclusion that XRD, optical and electron microscopy, and electron diffraction must be used to detect asbestos in talc and talcum powders.

245.    Dr. Lewin of New York University disclosed twice in 1972 that asbestos had been found in cosmetic talc. In a report to the FDA on August 3, 1972, Dr. Lewin reported that of 195 talc products, 20 had tremolite, 7 had chrysotile, 9 had both tremolite and chrysotile, and 7 had substantial percentages of one of both. XRD had been used as the first step in analysis and the presence of asbestos and was verified by the use of optical microscopy to disclose the presence of significant numbers of fibers. Shortly thereafter, Dr. Lewin reported to Whittaker, Clark & Daniels Inc. on September 30, 1972, that Italian talc 1615 contained about 2% tremolite and 0.5% chrysotile as determined with XRD and detailed microscopic exam. In a July 31, 1973, review of Dr. Lewin's testing of 195 talc samples, the FDA found "good semi-quantitative agreement" for tremolite on selected samples re-analyzed using optical microscope analysis by FDA and XRD by Pfizer. Agreement was not as good for chrysotile, but the review did warn that optical microscopy could "completely miss the presence of chrysotile if the fibers are submicroscopic, which may well be the case in finely-milled talc." In 1972, ES Laboratories reported that "1615" talc contained 1% chrysotile and that "4615" talc contained 3% chrysotile and 3% anthophyllite. An August 23, 1973, report by Johns-Manville on TEM analysis of commercial talcs reported that nine of fourteen samples contained chrysotile. Only five samples did not have detectable levels of chrysotile. Pages from the laboratory notebook of Colgate-

99

**JA331**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

Palmolive Co. scientist Paul Briscese from March 7, 1976, show that Old Regal (North Carolina) talc tested positive for tremolite, New Montana talc tested positive for anthophyllite and tremolite, and Italian talc tested positive for tremolite.

246.    A December 10, 1973, report of the CTFA's Talc Subcommittee disclosed that optical microscope analyses of talcs from the Italian, Montana I & II, Alabama, Vermont, and North Carolina mines had failed the proposed FDA's method because of elevated chrysotile concentrations. This December 10, 1973, CTFA report also showed that several laboratories had reported chrysotile in many of the talc samples sent by the CTFA for evaluation of analytical methods as well as the several identifications of asbestos in talc mentioned.

247.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, including many of the Defendants herein, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Defendants' products. On September 3, 1973, the FDA sent CTFA a letter regarding various means of measuring asbestos in talc, stating that "conventional methods employing X-ray diffraction or differential thermal analysis are not sufficiently reliable to produce quantitative results of the desired precision." The FDA further advised CTFA that it "has been exploring refractory optical microscopy as a means of measuring asbestos in talc." CTFA responded to the FDA's public notice on its proposed optical microscopy method on December 26, 1973. CTFA contended that the proposed method was not "reliable" for the detection of asbestos in talc, recommended a "collaborative effort between FDA and industry to develop such a method," and urged deferment of the proposed rule. Minutes of CTFA's Talc Subcommittee meeting on March

100

**JA332**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

15, 1976, indicate that the FDA's "Dr. Shaffner suggested the possibility of having industry report periodically on the results of its analysis to the FDA." Dr. Estrin of CTFA responded that "the subcommittee would give serious consideration to this suggestion."

248.     Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be completely free of asbestos. These were some of the same "grades" of talc used by Defendants.

249.     The talc industry's response, including that of the defendants, was swift and well-coordinated through CTFA, with which the defendants conspired and worked in concert to purposely create a flawed, voluntary testing and surveillance methodology for detecting asbestos in talc and block efforts to label and warn consumers regarding the dangers associated with the talc products, including defendants' products.

250.     Regarding the FDA's proposed 1972 rule-making, the FDA Director of Product Development and Cosmetics, Dr. Schaffner, invited representatives of the talc industry to a meeting in August of 1972 to discuss the results of Dr. Lewin's study and inform them that the FDA was preparing to release a "Proposed Statement of Policy On Asbestos in Cosmetics Containing Talc." Dr. Schaffner explained that he was duty-bound and must publicize the brand names of the talcum powders that contained asbestos. CTFA's president, Dr. Merritt, strongly objected to the FDA alerting the general public and publishing the brand names of the talcum powders, as it would cause the manufactures "economic hardship." Dr. Merritt also threatened to sue the FDA to prevent the disclosure of the brand names. As a result, the FDA, defendants and

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

CTFA never revealed or publicized the brand names of the talcum powders that contained asbestos, much to the detriment of the plaintiff and the general public.

251.    In 1973, CTFA created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for detecting asbestos in talc. Initially, CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite defendants then owning or having unfettered access to same.

252.    From there, the difference between what defendants and CTFA knew diverged from what they were representing to the FDA. Defendants, CTFA and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the prevailing, most economic analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

253.    Defendants and the CTFA also did not disclose to the FDA that the overwhelming majority of talcum powder manufacturers and sellers were not testing their products for asbestos,

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

and even if they were testing, it was done so superficially: only four or so grams per 20 tons of pre-shipment and pre-processed talc, as an example. Defendants and CTFA also failed to the inform the FDA that they were not testing off-the-shelf talc powder products, but rather old samples that were never from the end products themselves. They also failed to inform the FDA that they were limiting their testing of talc to only one type of asbestos fiber to the exclusion of all other fiber types that are commonly found in talc deposits. What is more, to the extent defendants found asbestos in their samples, these positive results were not reported to the FDA. Instead, on their behalf, CTFA sent letters to the FDA in March of 1976 fraudulently claiming that industry testing had shown all talcum powder products to be completely free of asbestos.

254.    Beginning in 1975 and 1976, researchers at New York Air Resources Board, Mt. Sinai School of Medicine, and the FDA became increasingly concerned that CTFA, defendants and the cosmetic industries were slow to address the issue of asbestos in talc and talcum powders. Defendants had not issued any recalls, provided consumer warnings, informed the FDA of any effort to ensure that talcum powders on the market did not contain asbestos, or developed a reliable methodology or protocol for ensuring that talc and talcum powder did not contain asbestos.

255.    Taking matters into their own hands, Mt. Sinai Hospital researchers published a follow-up article to Dr. Lewin's 1971 study that demonstrated that some of defendants' talcum powders contained over 20% asbestos. The researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." The results of

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

the Mount Sinai study were known to the defendants and published the same year by the New York Times and the Washington Post.

256.    Defendants and CTFA responded to these developments by falsely claiming that the industry was doing "everything" it could to solve the problem; issuing press releases falsely claiming that chrysotile had never been found in talcum powders; and intentionally suppressing data that showed tremolite was commonly found in talc and talcum powder.

257.    CTFA subsequently began in earnest to produce a voluntary protocol and methodology that would provide defendants cover from both lawsuits and regulation. Egregiously, as concerned media members, citizens and regulators began asking more questions about which other brands of talcum powder contained asbestos, defendants and CTFA falsely represented that talcum powders have never contained asbestos.

258.    Defendants and third parties collectively met with and corresponded with CTFA, as well as collectively met with the FDA and other government agencies, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed collectively by defendants and CTFA and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of the testing methods. Defendants and CTFA also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which Plaintiff Shelby Payne was exposed.

259.    In support of its voluntary XRD methodology, which was finally published in 1977, CTFA produced letters to the FDA written by its members, including defendants,

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

identifying tests conducted showing talcum powder products did not contain asbestos. CTFA, defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens.

260.    CTFA "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." CTFA met with and corresponded with defendants and third parties, to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM. This voluntary method was developed by CTFA and defendants, and was advocated to the FDA by CTFA and defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though CTFA and defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's own J4-1 method. There is no evidence that CTFA or defendants ever shared this remarkable failure with the FDA or the public.

261.    Minutes of CTFA's Talc Subcommittee from February 24, 1975, stated "It was agreed, however, that chrysotile is never found in cosmetic talcs, based on numerous analyses by several investigators…" When referring to the challenge of chrysotile detection, an article entitled "Talc" in the January/March 1976 CTFA Cosmetic Journal, states that "The only known

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

backup method for a positive identification in this event, is [TEM] with selected area diffraction." However, "despite many efforts, the committee had been unable to find a sample of cosmetic talc containing naturally occurring asbestos…it was asked, 'Why should we test for chrysotile if there isn't any?'" CTFA's Specification for Cosmetic Talc, revised on October 7, 1976, falsely represented that no fibrous asbestos was detected in cosmetic talc. Even after 1976, CTFA and defendants continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos and other carcinogens in the talc being used to manufacture cosmetic products. However, CFTA and defendants continued to represent that no asbestos was detected in cosmetic talc. These material representations adversely and directly impacted the FDA's attempt to adequately test consumer talc for asbestos and regulate cosmetics. The most sensitive method of identifying or detecting asbestos in cosmetic talc, TEM-SAED, was not used because CTFA represented that its "ultra-sensitivity could be a problem" and that it was too expensive to use. Instead, its J4-1 method relied on XRD alone for detection of asbestos at greater concentrations than 0.5%, a concentration that could allow more than a billion asbestos fibers per gram of talc to be passed off as "asbestos-free."

262. Defendants and CTFA made and published such representations, claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including plaintiff, that talc-containing products contained asbestos.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

263.    CTFA then published an article in 1979 stating it conducted over three thousand tests of talcum powders and none of them found chrysotile. The article and report failed to disclose whether the talcum powders tested contained tremolite, anthophyllite or any other form of asbestos. This publication of half-truths was conveyed to the FDA and the public with the purpose of preventing regulations of cosmetic products. Thereafter CTFA's methodology became the standard by which nearly all talc was analyzed by the entire industry, including talc used in cosmetic and hygiene products today.

264.    CTFA and defendants have represented to various news media outlets and the public at large that their products are "asbestos-free," when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" does not mean the product does not contain asbestos, but due to defendants' repeated conflation of the terms, the public has been led to erroneously believe talc products are safe. Furthermore, since defendants and CTFA did not have sufficient testing protocols in place to support the claims that talc products were safe or asbestos-free, such statements were recklessly made, as they had no reason to believe them.

265.    Between 1970 and the 1990s, tests conducted by and on behalf of defendants and the talc industry continued to show that talc and talcum powder products contained asbestos. None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of civil litigation.

266.    Defendants and CTFA's failure to disclose these positive results and the inadequacies of their testing protocols continued through the 1980s, 1990s and 2000s, even when various government agencies raised concerns about the safety of talc, including the issue of asbestos content.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

267.    To this day, many talc-containing products presently on the market contain asbestos. Instead of publicizing this fact, defendants and CTFA continue to deny all the above to protect their pecuniary interests, to the severe detriment of the public, including plaintiff.

268.    Since at least 1979, defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are, therefore, safe. Nothing could be further from the truth: the FDA has never been assigned a budget by Congress to regulate cosmetics, including asbestos and other carcinogens in talcum powders. Defendants' concerns for the safety of their products have always been voluntary and under the auspices of CTFA, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States. Indeed, as of today, asbestos-containing talc in cosmetics has not been banned or otherwise regulated by CTFA or the FDA.

269.    Defendants (and other entities in the talc industry and cosmetic industries, including the CTFA), individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in both their finished products as well as talc shipments from Talc Supplier Defendants and other sources that were used to produce finished products.

270.    Defendants, and even the outside laboratories, including McCrone Associates, sent letters to CTFA, to be and which were forwarded to the FDA, stating that results of testing of talc used by them after 1972 had not revealed the presence of amphibole or chrysotile asbestos, when in fact all of these entities had received or performed tests indicating the contrary when such false representations were made.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

271.    After 1976, defendants and CTFA continued to obtain and/or receive results of testing performed internally and externally indicating the presence of asbestos in talc.

272.    Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained carcinogens, including asbestos, at any point, up to and including the present, despite the clear hazard and direct information that their products did and continue to contain such carcinogens.

273.    Defendants and CTFA, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including plaintiff, regarding the hazards of exposure to carcinogens, including asbestos, from talc and talc-containing products.

274.    Defendants, through agreement and consciously parallel behavior, intentionally failed to warn potential users, including plaintiff, of the serious bodily harm and/or death which may result from the inhalation and/or ingestion of asbestos in their talc and talc-containing products.

275.    Defendants and CTFA, through agreement and consciously parallel behavior, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which Plaintiff Shelby Payne was exposed.

276.    Defendants and CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including plaintiff, of alarming medical and

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

scientific findings, many of which remained in their exclusive possession and under their exclusive control.

277.    Defendants and CTFA conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior:

    (a)    to withhold from users of their products—and from persons who they knew and should have known would be exposed thereto—information regarding the health risks of inhaling and/or ingesting asbestos and other carcinogens contained in talc and talcum powder products;

    (b)    to eliminate, suppress or prevent investigation into the health hazards of exposure to asbestos and other carcinogens in talc and talcum powder products;

    (c)    to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos and other carcinogens therein; and

    (d)    to falsely represent that talc and talcum powder products, including those of defendants, were safe and healthful for use by consumers.

278.    Plaintiff reasonably and in good faith relied upon the false and fraudulent representations made by defendants and CTFA regarding the hazards of talc and talcum powder products that contained asbestos and other carcinogens, and she was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

279.    CTFA, as well as defendants and other entities in the talc industry and cosmetic industries, individually and collectively, failed to report to the FDA tests performed both internally and by outside laboratories confirming the presence of asbestos in defendants' and other CTFA members' finished products as well as talc shipments from talc suppliers and other sources that were used to produce finished products. Instead, CTFA sent letters to the FDA stating that results of testing of talc used by the industry after 1972 had not revealed the presence of amphiboles or chrysotile, when in fact all of these entities had received or performed tests

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

indicating the contrary by 1976, when such intentionally false misrepresentations were made. CTFA and defendants made and published such representations claiming that their collective testing method was adequate, they were ensuring that talcum powder products were safe, and that their testing of talc reaching consumers was "safe," despite knowing the contrary.

280.    The FDA, and ultimately plaintiff, directly and/or indirectly relied upon CTFA's and defendants' false representations regarding the safety of cosmetic talc. In fact, an FDA letter dated January 11, 1979, states: "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding CTFA's and defendants' misrepresentations was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, on July 11, 1986, the FDA states that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole…" CTFA's J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos, continued to increase over the following decades as its advantages were applied to more matrices. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry, including defendants, continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

281.    CTFA and defendants, collectively and through explicit agreement and consciously parallel behavior, controlled industry standards regarding the testing, manufacture, sale, marketing, distribution and use of asbestos-containing talcum powder products, and

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

controlled the level of knowledge and information available to the public regarding the hazards

of exposure to asbestos and other carcinogens from talc and talc-containing products.

282.    CTFA and defendants, through agreement and consciously parallel behavior,

intentionally failed to warn potential users, including plaintiff and their family members, of the

serious bodily harm and/or death which may result from the inhalation and/or ingestion of

asbestos from their talc and talc-containing products.

283.    CTFA and defendants, through agreement and consciously parallel behavior,

knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated

and misleading scientific data, literature and test reports containing misinformation and false

statements regarding the health risks associated with the use of talc and talcum powder, and

specifically talc and talcum powder used in the production of products to which Plaintiff Shelby

Payne was exposed.

284.    CTFA and defendants, through agreement and consciously parallel behavior,

suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other

documents regarding the potential presence of asbestos and other carcinogens in talc and talc-

containing products, including defendants' products to which Plaintiff Shelby Payne was

exposed.

285.    As recently as 2016, Defendants made material misrepresentations to the FDA

regarding asbestos in its talcum powder products.

286.    For additional details regarding and supporting plaintiff's claim, see Bird T., et

al., "A Review of the Talc Industry's Influence on Federal Regulation and Scientific Standards

for Asbestos In Talc," New Solut., 2021 Aug; 31(2): 152-169.

287.    Revlon has known of the risk for asbestos in talc since at least the 1960s.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

288.    Revlon purchased hundreds of tons of Italian talc throughout the 1970s, 1980s, and 1990s, despite receiving test results in the early 1970s that its products containing said Italian talc tested positive for asbestos.

289.    Revlon had access to information regarding the natural occurrence of asbestos in talc mines during the 1960s and access to reports finding that 22 cosmetic talcum products purchased off the shelf had asbestos fiber contents ranging from 8 to 30% by count of the total talcum particulates, with an average of 19%.

290.    Revlon knew that in the early 1970s testing at New York University showed asbestos in its talc-containing products, such as Touch and Glow Face Powder, Revlon Intimate Perfumed Bath Powder, and Jean Naté Bath Powder.

291.    Revlon did not itself test any of its talcum powder products to determine whether they contained asbestos, nor did it place a warning on any of its talcum powder products. Revlon chose not to conduct any independent testing of the talc used to make its talc-containing products. Instead, in an effort to further conceal the asbestos content of its products, Revlon purported to shift this responsibility to its talc suppliers, who Revlon directed to utilize intentionally-inadequate, intentionally-dishonest testing methods and protocols and provided only sporadic "certificates of analysis" claiming, falsely, that the talc did not contain asbestos, and Revlon knew that said "certificates of analysis" were erroneous and that, in fact, the talc contained asbestos.

292.    What is more, Revlon did not start requiring the aforementioned "certificates of analysis" for talc until the early 1980s. Revlon dictated the limited information it wanted from its suppliers for these certificates and chose not to ask for the geographic location of the talc source mine even though mines in certain areas were known by Revlon to have asbestos.

113

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

293.    Revlon also elected not to ask its talc suppliers about the sensitivity of the testing methods they used and asked only the dishonest statement that the talc was "asbestos free," a phrase that Revlon used as a euphemism for allowing up to 0.49% asbestos.

294.    Revlon has been a member of the CTFA since the 1970s. The FDA proposed a detection limit of 0.1%, while the Committee proposed a detection limit of 0.5%. In 1977, a Revlon representative supported and voiced no objection to CTFA's proposal to oppose all testing of cosmetic talc. In 1978, Revlon expressed concern about contamination of asbestos in talc and requested information regarding the epidemiology of cosmetic talc.

295.    Revlon's directive for certificates of analysis for its talc required the CTFA's J4-1 testing method, despite Revlon knowing that the method could not detect the presence of asbestos less than 0.5% and not designed detect chrysotile (asbestos) at all. Nevertheless, Revlon continued to claim that its talc was "asbestos free," although it knew that asbestos was present in the talc below the 0.5% detection limit.

296.    Revlon represented to the consumers, including plaintiff, that its talc-containing products were safe and healthful to use despite knowing that they were contaminated with asbestos. When making these statements, Revlon intended to deceive the public and consumers, including, specifically, the plaintiff herein. Plaintiff relied on Revlon's representations that its talc-containing products were safe and healthful. As a result, plaintiff used Revlon's talc-containing products which resulted in exposure to asbestos.

297.    Defendants, both acting individually and in concert with others, including the CTFA, violated the common law duty of care owed to plaintiff or otherwise engaged in intentionally culpable activity that caused plaintiff to suffer severe injuries and damages.

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

298.    The actions and omissions of defendants, independently and collectively, constitute a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to plaintiff as described in this complaint.

299.    As a direct and proximate consequence of the foregoing acts and omissions by the defendants, Plaintiff Shelby Payne used or was otherwise exposed to defendants' products and inhaled and/or ingested asbestos resulting from the ordinary and foreseeable use thereof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays judgment, joint and several, against Defendants and/or their "alternate entities" in an amount to be proved at trial, as follows:

1.    For Plaintiff's actual damages according to proof, including pain and suffering, mental distress, as well as medical, surgical and hospital bills;

2.    For loss of income or earnings according to proof;

3.    For punitive damages according to proof;

4.    For Plaintiff's cost of suit herein;

5.    For damages for breach of implied warranty according to proof;

6.    For damages for fraudulent misrepresentation according to proof;

7.    For damages for conspiracy, concert of action (as to Defendant Metropolitan Life Insurance Company); and

8.    For such other and further relief as the Court may deem just and proper, including costs and prejudgment interest as provided by South Carolina law.

A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.

Respectfully submitted,

s/ Theile B. McVey
Theile B. McVey (SC Bar No. 16682)
Jamie D. Rutkoski (SC Bar No. 103270)
**KASSEL MCVEY ATTORNEYS AT LAW**
1330 Laurel Street
Post Office Box 1476
Columbia, South Carolina 29202-1476
T: 803-256-4242
F: 803-256-1952
tmcvey@kassellaw.com
jrutkoski@kassellaw.com
Other email:  emoultrie@kassellaw.com

*and*

Rachel A. Gross (*to be admitted Pro Hac Vice*)
**DEAN OMAR BRANHAM SHIRLEY, LLP**
302 N. Market Street, Suite 300
Dallas, TX 75202
T: 214-722-5990
F: 214-722-5991
rgross@dobslegal.com
Other email: tgilliland@dobslegal.com

**ATTORNEYS FOR PLAINTIFF**

**March 11, 2022**
**Columbia, South Carolina**

ELECTRONICALLY FILED - 2022 Mar 11 3:06 PM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

**JA348**

**Exhibit E**

Payne Trial Order

ELECTRONICALLY FILED - 2023 Mar 16 11:19 AM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281

| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| | ) | |
| COUNTY OF RICHLAND | ) | FOR THE FIFTH JUDICIAL CIRCUIT |
| | ) | |
| **KELLY PAYNE CLARK** and | ) | **C/A No.:** 2022-CP-40-01281 |
| **SHANNON PAYNE LANCASTER,** as | ) | |
| Co-Executors of the Estate of **SHELBY** | ) | In Re: |
| **LINVILLE PAYNE,** Deceased**,** | ) | Asbestos Personal Injury Litigation |
| | ) | Coordinated Docket |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **3M COMPANY** f/k/a **MINNESOTA** | ) | |
| **MINING AND MANUFACTURING** | ) | |
| **COMPANY,** et al., | ) | |
| | ) | |
| Defendants. | | |

## <u>CONSENT ORDER CONTINUING TRIAL TO AUGUST 2023</u>

This matter comes before me upon request of the parties to continue the trial of this matter beyond the February 2023 term of court.  The matter was not reached during the February term. Counsel for all parties' request that this matter be continued to the August 28, 2023 asbestos term of court at the end of the list of cases to be heard then. It appearing that this request is proper, it is

**ORDERED** that the parties' request for a continuance is hereby **GRANTED.**

[JUDGE'S E-SIGNATURE PAGE FOLLOWS]

ELECTRONICALLY FILED - 2023 Mar 16 11:19 AM - RICHLAND - COMMON PLEAS - CASE#2022CP4001281



### Richland Common Pleas

**Case Caption:**       Shelby  Payne vs   3M Company , defendant, et al

**Case Number:**       2022CP4001281

**Type:**               Order/Continuance

So Ordered

Jean H. Toal

Electronically signed on 2023-03-16 11:16:02     page 2 of 2

**JA351**

## Exhibit F

MSPA

**JA352**

A.Prot. 2003/479
dated December 8/9, 2003, and
A.Prot. 2003/477
dated December 6/7, 2003
of the Notary Stephan Cueni
at Basel/Switzerland

# NOTARIAL DEED

## MASTER SALE AND PURCHASE AGREEMENT

and

## REFERENCE DEED

concerning

the sale and purchase of the

## BRENNTAG AND INTERFER GROUPS

JA353

# TABLE OF CONTENTS

List of Schedules and Exhibits ................................................................ 6
List of Definitions ................................................................................ 15

A.  STATUS ................................................................................... 22

    1.  CURRENT STATUS ................................................................ 22

B.  SALE, PURCHASE AND ASSIGNMENT, PURCHASE PRICE ................. 30

    2.  SALE, PURCHASE AND ASSIGNMENT OF THE SHARES AND THE SOLD REAL
        ESTATE ........................................................................... 30
    3.  PURCHASE PRICE ................................................................ 35
    4.  TERMINATION OF INTERCOMPANY FINANCING ARRANGEMENTS ..... 45

C.  EFFECTIVE DATE BALANCE SHEET, SIGNING DATE, EFFECTIVE

    DATE, CLOSING DATE AND CLOSING ........................................ 50

    5.  EFFECTIVE DATE BALANCE SHEET AND ADJUSTMENT STATEMENT ... 50
    6.  SIGNING DATE, EFFECTIVE DATE, SCHEDULED CLOSING DATE, CLOSING
        DATE AND CLOSING ........................................................... 53

D.  GUARANTEES, REMEDIES, INDEMNITIES AND COVENANTS ........... 59

    7.   SELLERS' GUARANTEES ....................................................... 59
    8.   GUARANTEES OF PURCHASERS ............................................. 75
    9.   REMEDIES ....................................................................... 77
    10.  ENVIRONMENTAL INDEMNITY ............................................... 83
    11.  TAX INDEMNITY ............................................................... 91
    12.  ASBESTOS INDEMNITY ........................................................ 96
    13.  SELLERS' COVENANTS ........................................................ 102
    14.  EXPIRATION OF CLAIMS / LIMITATION OF CLAIMS ..................... 108

E.  MISCELLANEOUS ..................................................................... 111

    15.  PURCHASER'S COVENANTS ................................................... 111
    16.  PURCHASER'S INDEMNITY .................................................... 120
    17.  ADDITIONAL INDEMNITIES .................................................... 121
    18.  GUARANTEE OF SELLERS' GUARANTOR ................................... 123
    19.  NON-COMPETE UNDERTAKING ............................................... 123
    20.  RESTRICTION OF ANNOUNCEMENT / COOPERATION / CONFIDENTIALITY ... 124
    21.  NOTICES ......................................................................... 126
    22.  MISCELLANEOUS ............................................................... 127

A.Prot. 2003/479
dated December 8/9, 2003, of the Notary
Stephan Cueni, Basel (Switzerland)

## NOTARIAL DEED

## MASTER SALE AND PURCHASE AGREEMENT
## (BRENNTAG AND INTERFER GROUPS)

Negotiated at Basel/Switzerland this 8th (eighth) and 9th (ninth) day of December 2003
(two thousand and three).

Before me, the undersigned Notary Public

## STEPHAN CUENI

at Basel/Switzerland appeared today:

1.  **Mr. Matthias Reichel**, born June 4, 1961, German citizen, domiciled at DE-14532
    Kleinmachnow, Schleusenweg 36, identified by his passport,

    according to his declarations acting not in his own name, but in the name and on
    behalf of

    **Stinnes AG**, Leipziger Platz 9, 10117 Berlin, Germany, a German stock corporation
    registered with the Commercial Register at the Local Court of Berlin-Charlottenburg
    under No. HRB 89517,

    pursuant to a certified power of attorney dated December 3, 2003, the original of
    which has been submitted to the Notary and a hereby certified copy of which is
    attached to this Deed,

    - herein **"Seller 1"** -

2.  **Dr. Hans-Jörg Ziegenhain**, born August 9, 1961, attorney at law, German citizen,
    domiciled at DE-82166 Gräfelfing, Otilostrasse 17, known by person,

Case 3:23-cv-12051-AZ BK Q  Document 18-09/08/23 08/24/25 09/Page 363:01:1429 PageID:
Exhibit F - MSPA -72 Part 1    Page 5 of 75

- 2 -

according to his declarations acting not in his own name, but in the name and on behalf of

**Stinnes UK Limited**, Raynes Way, Derby, DE21 7BE, Great Britain, a company under the laws of England registered with the Companies House for England and wales under No. 1935041,

pursuant to two certified powers of attorney dated December 2, 2003, the originals of which have been submitted to the Notary and hereby certified copy of which are attached to this Deed,

- herein **"Seller 2"** -

3.  **Mr. Walter Bahous**, lic.iur., lawyer, born March 31, 1970, Swiss citizen, domiciled at CH 4056 Basel, Jungstrasse 29, known by person,

according to his declarations acting not in his own name, but without assuming any personal liability in the name and on behalf of

**Stinnes Corporation**, 120 White Plains Road, Tarrytown, NY 10591, USA,

pursuant to a power of attorney dated December 3, 2003, the original of which has been submitted to the Notary and a hereby certified copy of which is attached to this Deed,

and pursuant to a substitute power of attorney dated December 8, 2003, presented as faxcopy only, the original of which shall be submitted to the Notary as soon as possible and a copy of which then shall be attached to this Deed,

- herein **"Seller 3"** -

4.  **Dr. Tilman Kruse**, born November 15, 1971, attorney at law, German citizen, domiciled at DE-50670 Köln, Krefelder Wall 24, identified by his German Identity Card,

according to his declarations acting not in his own name, but in the name and on behalf of

**Brenntag Inc.**, Reading, Potsville Pike & Huller Lane, Reading, PA 19605,USA, a Delaware, USA, corporation,

**JA356**

Case 3:23-cv-12051-MBK Document 48-09/08/23 08/21/25 09/08/23 Page 364 of 1429 PageID:
Exhibit F - MSPA - Part 1    Page 6 of 75

- 3 -

pursuant to a power of attorney dated December 3, 2003, the original of which has been submitted to the Notary and a hereby certified copy of which is attached to this Deed,

- herein **"Seller 4"** -

5.   **Dr. Viola Sailer**, born November 20, 1973, attorney at law, German citizen, domiciled at DE-80538 München, St.-Anna-Strasse 13, identified by her passport,

according to her declarations acting not in her own name, but in the name and on behalf of

**Schenker-BTL, S.A.**, Avenida Fuentemar 31, Coslada, Spain, a company under Spanish law registered with the Commercial Register of Madrid, page 7467, folio 20, tome 1173, book 639 of Companies Section 2, Entry 1,

pursuant to a certified power of attorney dated December 3, 2003, accompanied by an English translation, the originals of which have been submitted to the Notary and hereby certified copies of which are attached to this Deed,

- herein **"Seller 5"** -

- Seller 1, Seller 2, Seller 3, Seller 4 and Seller 5 herein also referred to collectively as **"Sellers"** and individually as **"Seller"**-

6.   **Dr. Christoph Bohl**, born November 11, 1963, German citizen, domiciled at DE-14163 Berlin, Bülowstrasse 29, identified by his passport,

according to his declarations acting not in his own name, but in the name and on behalf of

**Deutsche Bahn Aktiengesellschaft**, Potsdamer Platz 2, 10785 Berlin, Germany, a German stock corporation registered with the Commercial Register at the Local Court of Berlin-Charlottenburg under No. HRB 5000,

pursuant to a certified power of attorney dated December 4, 2003, the original of which has been submitted to the Notary and a hereby certified copy of which is attached to this Deed,

- herein **"Sellers' Guarantor"** –

- 4 -

7.    **Dr. Jörg Kirchner**, born May 4, 1961, attorney at law, German citizen, domiciled at
DE-81479 Munich, Schieggstrasse 19B, known by person,

according to his declarations acting not in his own name, but in the name and on
behalf of

a)    **Blitz 03-1303 GmbH**, c/o Ashurst, Prinzregentenstraße 18, 80538 Munich,
Germany, a German limited liability company registered with the
Commercial Register at the Local Court of Munich under No. HRB 150016,

pursuant to a power of attorney dated December 1, 2003, the original of
which has been submitted to the Notary and a hereby certified copy of which
is attached to this Deed,

- herein **"Purchaser 1"**-

b)    **CM Komplementär 03-AP III. GmbH & Co. KG**, c/o Ashurst,
Prinzregentenstraße 18, 80538 Munich, Germany, a German limited
partnership registered with the Commercial Register at the Local Court of
Munich under No. HRA 82959,

pursuant to a power of attorney dated December 1, 2003, the original of
which has been submitted to the Notary and a hereby certified copy of which
is attached to this Deed,

- herein **"Purchaser 2"**

c)    **PASR Siebente Beteiligungsverwaltung GmbH**, Tuchlauben 17, 1014
Vienna, Austria, an Austrian limited liability company registered with the
Commercial Register at the Commercial Court of Vienna under No.
FN 239864 t,

pursuant to a power of attorney dated December 1, 2003, the original of
which has been submitted to the Notary and a hereby certified copy of which
is attached to this Deed,

- herein **"Purchaser 3"**

- 5 -

8.    **Dr. Meiko Zeppenfeld**, born February 18, 1969, attorney at law, German citizen, domiciled at DE-80538 München, Emil-Riedel-Strasse 4, identified by his German Identity Card,

according to his declarations acting not in his own name, but in the name and on behalf of

**Fireball Holding France SAS**, 23, rue du Roule, 75001 Paris, France, a French corporation registered with the Commercial Register of Paris under No. RCS 450 958 053,

pursuant to a power of attorney dated December 1, 2003, the original of which has been submitted to the Notary and a hereby certified copy of which is attached to this Deed,

- herein **"Purchaser 4"**

- Purchaser 1, Purchaser 2, Purchaser 3 und Purchaser 4 herein also referred to collectively as **"Purchasers"** and individually as **"Purchaser"**

- each of the Sellers and Purchasers herein also referred to individually as a **"Party"** and collectively as **"Parties"** –

The acting Notary Public has drawn the attention of the persons appearing to the fact, that - unless notarially certified - he could examine neither the authenticity of the signatures nor the representative capacity of the persons who purported to have signed the powers of attorney. Nevertheless the persons appearing insisted on the immediate notarization and released each party from submitting subsequently certified powers of attorney or other documents evidencing or supporting the representative capacity.

The persons appearing requested this Deed including its Exhibits to be recorded in the English language. The acting Notary Public who is in sufficient command of the English language ascertained that the persons appearing are also in command of the English language. After having been instructed by the acting Notary, the persons appearing waived the right to obtain the assistance of a sworn interpreter and to obtain a certified translation of this Deed including the Exhibits hereto.

Case 3:23-cv-12051-MBK   Document 18-09/08/23  Filed 03/24/25   09/08/23 67:01 1429 PageID:
Exhibit F - MSPA -725rt 1    Page 9 of 75

- 6 -

The persons appearing, acting as indicated, declared with request for notarial recording the following:

The parties have full knowledge of the Notarial Deed A.Prot. 2003/477 of the acting Notary of December 6/7, 2003 ("Reference Deed"). The parties hereby confirm the entire wording and content of the Reference Deed and the declarations made by Ms. Aline Collas on their behalf. The persons appearing waived the right to have the Reference Deed read aloud and to have it attached to this present Deed. The original of the Reference Deed was available for inspection during the present notarisation.

Any reference in the present Deed to a Schedule or Exhibit shall be deemed as a reference to the corresponding Schedule or Exhibit in the Reference Deed as far as such Schedule or Exhibit is not replaced, amended or altered in a Schedule or Exhibit to the present Deed.

Hereafter is set forth a list of the Exhibits and their source reference:

### List of Schedules and Exhibits

| Description | Content | Reference Deed | present Deed |
|---|---|---|---|
| Schedule 7.1.1 | Third Party Consents | x | -- |
| Schedule 7.1.2 | Existence and Capitalization of Companies; Ownership of Shares | x | -- |
| Schedule 7.1.3 | Bankruptcy or Judicial Composition Proceedings | x | -- |
| Schedule 7.1.4 | Enterprise Agreements | x | -- |
| Schedule 7.1.5 (i) through (xi) | Material Agreements | x | -- |
| Schedule 7.1.6 | Compliance with Material Agreements | x | -- |
| Schedule 7.1.7 | Material Intellectual Property Rights | x | -- |

- 7 -

| Schedule 7.1.8 | Proceedings Relating to Intellectual Property Rights | x | -- |
|---|---|---|---|
| Schedule 7.1.9 | Insurance | x | -- |
| Schedule 7.1.10-1 | Material Assets | x | -- |
| Schedule 7.1.10-2 | Encumbrances | x | -- |
| Schedule 7.1.11-1 | Real Property | x | -- |
| Schedule 7.1.11-2 | Ownership in Real Property | x | -- |
| Schedule 7.1.12 | Permits | x | -- |
| Schedule 7.1.13-1 | Litigation | x | -- |
| Schedule 7.1.13-2 | Investigations | x | -- |
| Schedule 7.1.15 | Employment Matters | x | -- |
| Schedule 7.1.16 | Shop Agreements/Collective Bargaining Agreements | x | -- |
| Schedule 7.1.17 | Labour Relations | x | -- |
| Schedule 7.1.18-1 | Employee Benefit Plans | x | -- |
| Schedule 7.1.18-2 | Post-Employment Benefits | x | -- |
| Schedule 7.1.21 | Compliance with Laws | x | -- |
| Schedule 7.1.22 | Conduct of Business | x | -- |
| Schedule 7.1.23 | Non-Consolidated Companies | x | -- |
| Exhibit 1.1 | Corporate Chart | x | -- |
| Exhibit 1.3 | Brenntag German Subsidiaries | x | -- |
| Exhibit 1.4.2 | CEE Subsidiaries | x | -- |

A.Prot. 2003/479 Cu

**JA361**

- 8 -

| Exhibit 1.4.5 | French Subsidiaries | x | -- |
| Exhibit 1.4.6-1 | Holding Subsidiaries | x | -- |
| Exhibit 1.4.6-2 | LAM Minority Shares | x | -- |
| Exhibit 1.5 | Brenntag UK Subsidiary | x | -- |
| Exhibit 1.6 | Brenntag LA Subsidiary | x | -- |
| Exhibit 1.8.1 | Spanish Subsidiaries | x | -- |
| Exhibit 1.9 | Interfer German Subsidiaries | x | -- |
| Exhibit 1.12.1 | Companies | x | -- |
| Exhibit 1.12.2 | Consolidated Companies | x | -- |
| Exhibit 1.12.3 | Non-Consolidated Companies | x | -- |
| Exhibit 2.7-1 and 2.7-2 | Minority Shares Transfer Agreements | x | -- |
| Exhibits 2.7-3 through 2.7-8 | French Sale and Transfer Agreements | x | -- |
| Exhibit 2.9-1 | Sold Real Estate Brenntag | x | replacement |
| Exhibit 2.9-2 | Brenntag Real Estate Sale and Transfer Agreement | x | amendment |
| Exhibit 2.10-1 | Sold Real Estate Interfer | x | replacement |
| Exhibit 2.10-2 | Interfer Real Estate Sale and Transfer Agreement | x | amendment |
| Exhibit 2.11-1 through 2.11-5 | US Asset Purchase Agreements | x | -- |
| Exhibit 2.11-6 | Subsidiaries of the Retained Subsidiaries | x | -- |
| Exhibit 3.1.2 | Foreign Exchange Swaps | x | -- |

| Exhibit 3.1.6 | Capital Expenditure Definition | x | -- |
| Exhibit 3.3 | Allocation of the Preliminary Purchase Price | -- | x |
| Exhibit 3.8 | Interfer Additional Purchase Price | x | -- |
| Exhibit 4.3.2 | Consent to Assignment of Sellers' Account Payable | x | -- |
| Exhibit 5.1-1 | Audit Report Certificate | -- | x |
| Exhibit 5.1-2 | Specific Accounting Principles | x | -- |
| Exhibit 5.2-1 | Release Letter | -- | x |
| Exhibit 5.2-2 | Hold Harmless Letter | -- | x |
| Exhibits 6.6.4-1 through 6.6.4-16 | Foreign Share Transfer Instruments | x | -- |
| Exhibit 6.6.8 | Billings Montana Lease Agreement | -- | x |
| Exhibit 7.3-1 | Persons Relevant for Best Knowledge of Sellers | x | -- |
| Exhibit 7.3-2 | Persons Relevant for Due Inquiry | -- | x |
| Exhibit 13.5.1 | Debt of Non-Consolidated Companies | x | -- |
| Exhibit 13.8 | Additional Services | -- | x |
| Exhibit 13.11 | Conditions Precedent – Senior Credit Facilities Agreement | x | -- |
| Exhibit 15.1-1 | Sellers' Bank Guarantees | x | -- |
| Exhibit 15.1-2 | Sample Bank Guarantee | -- | x |
| Exhibit 15.4 | Welfare Benefit Plans | x | -- |
| Exhibit 19.1 | Restricted Activities | x | -- |

A.Prot. 2003/479 Cu

**JA363**

- 10 -

| Exhibit 19.2 | Permitted Activities | -- | x |

Then the persons appearing, acting as indicated, asked for the Notarization of the following:

(continued on page 13)

A.Prot. 2003/479  Cu

**JA364**

- 13 -

# MASTER SALE AND PURCHASE AGREEMENT

by and between

1.  Stinnes AG, Leipziger Platz 9, 10117 Berlin, Germany

- herein **"Seller 1"** -

2.  Stinnes UK Limited, Raynes Way, Derby, DE21 7BE, Great Britain

- herein **"Seller 2"** -

3.  Stinnes Corporation, 120 White Plains Road, Tarrytown, NY 10591, USA

- herein **"Seller 3"** -

4.  Brenntag Inc., Potsville Pike & Huller Lane, Reading, PA 19605, USA

- herein **"Seller 4"** -

5.  Schenker-BTL, S.A., Avenida Fuentemar 31, Coslada, Spain

- herein **"Seller 5"** -

- Seller 1, Seller 2, Seller 3, Seller 4 and Seller 5 herein
also referred to collectively as **"Sellers"** and individually as **"Seller"**-

6.  Deutsche Bahn AG, Potsdamer Platz 2, 10785 Berlin, Germany

- herein **"Sellers' Guarantor"** –

A.Prot. 2003/479 Cu

**JA365**

- 14 -

7.     Blitz 03-1303 GmbH, c/o Ashurst, Prinzregentenstraße 18, 80538 Munich, Germany

- herein **"Purchaser 1"**-

8.     CM Komplementär 03-AP III. GmbH & Co. KG, c/o Ashurst, Prinzregentenstraße 18, 80538 Munich, Germany

- herein **"Purchaser 2"**

9.     PASR Siebente Beteiligungsverwaltung GmbH, Tuchlauben 17, 1014 Vienna, Austria

- herein **"Purchaser 3"**

10.    Fireball Holding France SAS, 23, rue du Roule, 75001 Paris, France

- herein **"Purchaser 4"**

- Purchaser 1, Purchaser 2, Purchaser 3 und Purchaser 4 herein also referred to collectively as **"Purchasers"** and individually as **"Purchaser"**

- each of the Sellers and Purchasers herein also referred to individually as a **"Party"** and collectively as **"Parties"** –

JA366

- 15 -

## DEFINITIONS

| | |
|---|---|
| Adjustment Amount | as defined in Section 4.4 |
| Adjustment Payment Date | as defined in Section 3.4.1 |
| Adjustment Statement | as defined in Section 5.1 |
| Affected Employee | as defined in Section 15.3.2 |
| Affiliate | any undertaking with the meaning of Section 15 German Stock Corporation Act (*AktG*) |
| Affiliated Party/Parties | as defined in Section 7.1.1 |
| Agreement | as defined in Recital (B) |
| Ancillary Agreements | as defined in Section 7.1.1 |
| Antitrust Clearances | as defined in Section 6.2.1 |
| Asbestos Claims | as defined in Section 12.4 |
| Assignment and Assumption Agreement | as defined in Section 6.6.7 |
| Bank Guarantee | as defined in Section 15.1 |
| Belgian Minority Shares | as defined in Section 1.4.1 |
| Best Knowledge of Sellers | as defined in Section 7.3 |
| Billings Montana Lease Agreement | as defined in Section 6.6.8 |
| Billings Montana Site | as defined in Section 6.6.8 |
| Bills of Sale | as defined in Section 6.6.7 |
| Brenntag Belgium | as defined in Section 1.4.1 |
| Brenntag Business | as defined in Recital (A) |
| Brenntag Central Europe | as defined in Section 1.4.2 |
| Brenntag Central Europe Share I | as defined in Section 2.5 |
| Brenntag Central Europe Share II | as defined in Section 2.5 |
| Brenntag France | as defined in Section 1.4.5 |
| Brenntag France Shares | as defined in Section 1.4.5 |
| Brenntag German Shares | as defined in Section 1.2 |
| Brenntag German Subsidiaries | as defined in Section 1.3 |
| Brenntag Germany | as defined in Section 1.2 |
| Brenntag Group Company/Companies | as defined in Section 1.12.7 |
| Brenntag Holding | as defined in Section 1.4.6 |
| Brenntag Inc. Subsidiaries | as defined in Section 1.7 |
| Brenntag LA Subsidiary | as defined in Section 1.6.1 |
| Brenntag Northeast | as defined in Section 1.7.3 |
| Brenntag Portugal | as defined in Section 1.4.3 |
| Brenntag Real Estate Purchase Price | as defined in Section 2.9 |
| Brenntag Real Estate Sale and Transfer Agreement | as defined in Section 2.9 |
| Brenntag Spain | as defined in Section 1.8.1 |
| Brenntag Switzerland | as defined in Section 1.4.7 |
| Brenntag Taiwan | as defined in Section 1.4.4 |

| | |
|---|---|
| Brenntag Trademark | as defined in Section 15.6 |
| Brenntag UK | as defined in Section 1.5 |
| Brenntag UK Subsidiary | as defined in Section 1.5 |
| Brenntag US Trademarks | as defined in Section 15.6 |
| Brenntag West | as defined in Section 2.11.1 |
| Brenntag West Indemnitees | as defined in Section 12.1.1 |
| Brenntag West's Account | as defined in Section 3.6 |
| Business | as defined in Recital (A) |
| CapEx 2003 Amount | as defined in Section 3.1.6 |
| CapEx Threshold Amount | as defined in Section 3.1.6 |
| Cash | as defined in Section 3.1.3 |
| CEE Subsidiaries | as defined in Section 1.4.2 |
| Closing | as defined in Section 6.6 |
| Closing Conditions | as defined in Section 6.2 |
| Closing Date | as defined in Section 6.1.4 |
| Closing Events | as defined in Section 6.6 |
| COBRA | as defined in Section 7.1.18 |
| Code | as defined in Section 7.1.18 |
| Company/Companies | as defined in Section 1.12.1 |
| Competing Business | as defined in Section 19.2 |
| Consistency Principle | as defined in Section 5.1 |
| Consolidated Brenntag Group Company/ | |
| Companies | as defined in Section 1.12.9 |
| Consent Contract | as defined in Section 13.13 |
| Consolidated Companies | as defined in Section 1.12.2 |
| Consolidated Interfer Group Company/ | |
| Companies | as defined in Section 1.12.10 |
| Contributing Purchaser Affiliate | as defined in Section 15.5.1 |
| Contribution Agreement | as defined in Section 1.9 |
| Consistency Principle | as defined in Section 5.1 |
| Corresponding Purchaser Permit | as defined in Section 13.13 |
| Crozier-Nelson | as defined in Section 2.11.4 |
| Crozier-Nelson's Account | as defined in Section 3.6 |
| Crozier-Nelson Indemnitees | as defined in Section 12.1.4 |
| De Minimis Claims | as defined in Section 14.3 |
| Deductible | as defined in Section 14.3 |
| Deferred Tax Benefit | as defined in Section 11.2.1 |
| Designated Nominee | as defined in Section 2.13 |
| Disclosure Schedules | as defined in Section 7.2 |
| Eastech | as defined in Section 2.11.3 |
| Eastech Indemnitees | as defined in Section 12.1.3 |
| Eastech's Account | as defined in Section 3.6 |
| Effective Date | as defined in Section 6.1.2 |
| Effective Date Balance Sheet | as defined in Section 5.1 |

- 17 -

| | |
|---|---|
| Employee Plans | as defined in Section 7.1.18 |
| Enterprise Value | as defined in Section 3.1.1 |
| Environmental Indemnity Deductible | as defined in Section 10.8 |
| Environmental Laws | as defined in Section 10.2.3 |
| Environmental Liabilities | as defined in Section 10.2.1 |
| Environmental Matters | as defined in Section 10.2.5 |
| ERISA | as defined in Section 7.1.18 |
| ERISA Affiliate | as defined in Section 7.1.18 |
| EURIBOR | as defined in Section 4.1 |
| Exchange Rates | as defined in Section 22.10 |
| Existing Environmental Condition | as defined in Section 10.2.2 |
| Final Intercompany Debt Balance Euro | as defined in Section 4.4 |
| Final Intercompany Debt Balances | as defined in Section 4.4 |
| Final Intercompany Debt Balance USD | as defined in Section 4.4 |
| Financial Debt | as defined in Section 3.1.2 |
| Financial Statements | as defined in Section 7.1.19 |
| Foreign Share Transfer Instruments | as defined in Section 6.6.4 |
| Foreign Shares | as defined in Section 1.12.4 |
| Former Sites | as defined in Section 10.9 |
| French Minority Shareholders | as defined in Section 1.4.5 |
| French Minority Shares | as defined in Section 1.4.5 |
| French Sale and Transfer Agreements | as defined in Section 2.7 |
| French Subsidiaries | as defined in Section 1.4.5 |
| Fund Flow Charts | as defined in Section 15.1 |
| German GAAP | as defined in Section 5.1 |
| German Shares | as defined in Section 1.12.5 |
| Hazardous Materials | as defined in Section 10.2.4 |
| Holding Subsidiaries | as defined in Section 1.4.6 |
| ICP | as defined in Section 15.4.9 |
| Immobilien GmbH | as defined in Section 1.10.1 |
| Indemnitees | as defined in Section 12.4 |
| Indemnified Losses | as defined in Section 10.9 |
| Institutional Controls | as defined in Section 10.10 |
| Insurance Net Claims | as defined in Section 13.10 |
| Insurance Receivables | as defined in Section 3.1.3 (vi) |
| Intercompany Debt Balance Euro | as defined in Section 4.2 |
| Intercompany Debt Balances | as defined in Section 4.2 |
| Intercompany Debt Balance USD | as defined in Section 4.2 |
| Intercompany Financing Arrangements | as defined in Section 4.1 |
| Interest Amount | as defined in Section 3.1.8 |
| Interfer Additional Purchase Price | as defined in Section 3.8 |
| Interfer Business | as defined in Recital (A) |
| Interfer German Subsidiaries | as defined in Section 1.9 |
| Interfer Germany | as defined in Section 1.9 |

- 18 -

| | |
|---|---|
| Interfer Group Company/Companies | as defined in Section 1.12.8 |
| Interfer Minority Shareholder | as defined in Section 1.10.3 |
| Interfer Real Estate Sale and Transfer Agreement | as defined in Section 2.10 |
| Interfer Real Estate Purchase Price | as defined in Section 2.10 |
| Interfer Trademark | as defined in Section 15.6 |
| ISRA | as defined in Section 10.10 |
| ISRA Sites | as defined in Section 10.10 |
| LAM Minority Shares | as defined in Section 1.4.6 |
| Legal Opinions | as defined in Section 13.11 |
| Liability Cap | as defined in Section 14.4 |
| LIBOR | as defined in Section 4.1 |
| Limited Partnership Interest | as defined in Section 1.11 |
| Losses | as defined in Section 9.1 |
| Material Adverse Change | as defined in Section 6.5.3 |
| Material Adverse Effect | as defined in Section 7.1.5 |
| Material Agreements | as defined in Section 7.1.5 |
| Material Assets | as defined in Section 7.1.10 |
| Material Breach of Guarantees | as defined in Section 6.5.1 |
| Material Breach of Covenants | as defined in Section 6.5.2 |
| Material Intellectual Property Rights | as defined in Section 7.1.7 |
| Max Baum GmbH | as defined in Section 1.10.2 |
| Minority Shares Transfer Agreements | as defined in Section 2.7 |
| Multiemployer Plans | as defined in Section 15.5 |
| Netting-Off | as defined in Section 4.2.5 |
| Neutral Auditor | as defined in Section 5.4 |
| New Hedges | as defined in Section 13.6 |
| New Stinnes Retirement Plans | as defined in Section 15.4.6 |
| Non-Consolidated Companies | as defined in Section 1.12.3 |
| Non-Retained Subsidiary Asbestos Claims | as defined in Section 12.3 |
| Objections | as defined in Section 5.4 |
| Obliged Company | as defined in Section 9.1 |
| Other German Interfer Shares | as defined in Section 1.10 |
| Other Jurisdictions | as defined in Section 6.2 |
| Other Seller 1 Brenntag Foreign Shares | as defined in Section 1.4 |
| Partner's Accounts | as defined in Section 2.3 |
| Party/Parties | shall mean Sellers and Purchasers |
| Permits | as defined in Section 7.1.12 |
| Permitted Activities | as defined in Section 19.2 |
| Portuguese Minority Share | as defined in Section 1.4.3 |
| Preliminary Intercompany Debt Balance Euro | as defined in Section 4.3 |
| Preliminary Intercompany Debt Balances | as defined in Section 4.3 |

A.Prot. 2003/479 Cu

**JA370**

- 19 -

| | |
|---|---|
| Preliminary Intercompany Debt Balance USD | as defined in Section 4.3 |
| Preliminary Purchase Price | as defined in Section 3.2 |
| | |
| Proprietary Information | as defined in Section 20.5 |
| Purchase Object | as defined in Section 3.1 |
| Purchase Price | as defined in Section 3.1 |
| Purchase Price Adjustment | as defined in Section 3.4 |
| Purchaser 1 | shall mean Blitz 03-1303 GmbH, registered with the commercial register of the local court of Munich under HR B 150016 |
| Purchaser 2 | shall mean CM Komplementär 03-AP III. GmbH & Co. KG, registered with the commercial register of the local court of Munich under HR A 82959 |
| Purchaser 3 | shall mean PASR Siebente Beteiligungsverwaltung GmbH, registered at the Commercial Court of Vienna under FN 239864 t |
| Purchaser 4 | shall mean Fireball Holding France SAS, registered at the Commercial Court of Paris under RCS Paris 450 958 053 |
| Purchaser/Purchasers | shall mean Purchaser 1, Purchaser 2, Purchaser 3 and Purchaser 4 individually and collectively |
| Purchaser Claim | as defined in Section 9.2 |
| Purchaser Losses | as defined in Section 9.1 |
| Purchasers' Account Euro | as defined in Section 3.7 |
| Purchasers' Account USD | as defined in Section 3.7 |
| Purchasers' Auditor | as defined in Section 5.2 |
| Purchasers' Guarantees | as defined in Section 8 |
| Purchaser Welfare Plans | as defined in Section 15.4.2 |
| Real Estate | as defined in Section 10.2.2 |
| Real Estate Affiliates | as defined in Section 2.9 |
| Real Estate Purchase Agreements | as defined in Section 10.5 |
| Real Estate Vendor | as defined in Section 10.5 |
| Real Property | as defined in Section 7.1.11 |
| Reporting Package | as defined in Section 3.1 |
| Restricted Activities | as defined in Section 19.1 |
| Retained Companies | as defined in Section 2.11 |
| Retained Subsidiaries | as defined in Section 2.11 |

A.Prot. 2003/479 Cu

- 20 -

| | |
|---|---|
| Retained Subsidiary Asbestos Claims | as defined in Section 12.2 |
| Revised Adjustment Statement | as defined in Section 5.3 |
| Revised Effective Date Balance Sheet | as defined in Section 5.3 |
| Scheduled Closing Date | as defined in Section 6.1.3 |
| Section 338(h)(10) Election | as defined in Section 11.8 |
| Securities | as defined in Section 15.1 |
| Seller 1 | shall mean Stinnes AG |
| | |
| Seller 2 | shall mean Stinnes UK Ltd. |
| Seller 3 | shall mean Stinnes Corporation |
| Seller 3 US Shares | as defined in Section 1.6 |
| Seller 4 | shall mean Brenntag Inc. |
| Seller 4 US Shares | as defined in Section 1.7 |
| Seller 5 | shall mean Schenker-BTL S.A. |
| Seller/Sellers | shall mean Seller 1, Seller 2, Seller 3, Seller 4 and Seller 5 individually and collectively |
| Seller Financing Payables Euro | as defined in Section 4.2.1 |
| Seller Financing Payables USD | as defined in Section 4.2.1 |
| Seller Financing Receivables Euro | as defined in Section 4.2.2 |
| Seller Financing Receivables USD | as defined in Section 4.2.2 |
| Sellers' Account Euro | as defined in Section 3.6 |
| Sellers' Account USD | as defined in Section 3.6 |
| Sellers' Affiliates | as defined in Section 4.1 |
| Sellers' Auditor | as defined in Section 5.1 |
| Sellers' Bank Guarantees | as defined in Section 15.1 |
| Sellers' Guarantees | as defined in Section 7.1 |
| Sellers' Guarantor | shall mean Deutsche Bahn AG |
| Shares | as defined in Section 1.12.6 |
| SIB Shares | as defined in Section 1.9 |
| Signing Date | as defined in Section 6.1.1 |
| SKA | as defined in Section 3.1.2 |
| Sold Real Estate Brenntag | as defined in Section 2.9 |
| Sold Real Estate Interfer | as defined in Section 2.10 |
| Sold US Business(es) | as defined in Section 2.11 |
| Spanish Shares | as defined in Section 1.8 |
| Spanish Subsidiaries | as defined in Section 1.8.1 |
| Specific Accounting Principles | as defined in Section 5.1 |
| Spin-Off Agreement | as defined in Section 1.2 |
| SSB Minority Share | as defined in Section 1.10.3 |
| Stinnes Corporation Retirement Plans | as defined in Section 15.4.6 |
| Stinnes Pension Plan | as defined in Section 15.4.6 |
| Stinnes Profit Sharing Plan | as defined in Section 15.4.6 |

- 21 -

| | |
|---|---|
| Stinnes Stahl Bremen | as defined in Section 1.10.3 |
| Straddle Period | as defined in Section 11.1 |
| Taxes | as defined in Section 11.1 |
| Tax Refunds | as defined in Section 11.5 |
| Third Party Claim | as defined in Section 9.5 |
| Third Party Sites | as defined in Section 10.9 |
| Time Limitations | as defined in Section 14.1 |
| Transfer Agreements | as defined in Section 7.4 |
| Transferred Employees | as defined in Section 15.3.1 |
| Transferred Retirement Plans | as defined in Section 15.4.7 |
| Transferred Trademarks | as defined in Section 15.7 |
| | |
| UK Shares | as defined in Section 1.5 |
| URS VEDDA Report | as defined in Section 9.3.6 |
| US Asset Purchase Agreement(s) | as defined in Section 2.11 |
| US Asset Purchaser(s) | as defined in Section 2.11 |
| US Business Permit | as defined in Section 13.13 |
| US Consolidated Companies | as defined in Section 7.1.18 |
| VAT Receivables | as defined in Section 3.1.3 |
| WCD | as defined in Section 2.11.2 |
| WCD Indemnitees | as defined in Section 12.1.2 |
| WCD's Account | as defined in Section 3.6 |
| | |
| Working Capital | as defined in Section 3.1.4 |
| Zweite Kommanditgesellschaft | as defined in Section 1.11 |

- 22 -

## RECITALS

(A)  **WHEREAS,** Sellers are, among other activities, through their direct and in-
direct subsidiaries engaged in (i) the worldwide mixing and blending, trading
and distribution of chemical substances including activities such as ware-
housing, tank farming, handling of chemicals (gases, liquids and solids), lo-
gistics, transportation and operation of laboratories (herein **"Brenntag Busi-
ness"**) and (ii) the processing (including, among others, the cutting, deform-
ing and edge and surface processing), the storage and the transport as well as
the national and international trade, the distribution, the import and the ex-
port of steel, metal, plastic and ferrous products (including flat steel, long
products and steel tubes), non-ferrous metals and their alloys, tools, ma-
chines, raw materials and chemicals as well as the rendering of advisory
services relating to the foregoing (herein **"Interfer Business"**). The Brenntag
Business and the Interfer Business are herein collectively referred to as
**"Business"**.

(B)  **WHEREAS,** Sellers and their ultimate shareholder, Sellers' Guarantor, after
a strategic review of their business portfolio, have concluded that they wish
to sell and transfer the Business to Purchasers upon the terms and conditions
of this master sale and purchase agreement (herein **"Agreement"**).

(C)  **WHEREAS,** Purchasers wish to purchase and acquire the Business from
Sellers upon the terms and conditions of this Agreement.

**NOW, THEREFORE, the Parties agree as follows:**

## A.    STATUS

### 1.    Current Status

1.1    The legal structure of the entities engaged in the Business held directly or in-
directly by Sellers is shown as of the Closing Date in Exhibit 1.1.

1.2    Brenntag Beteiligungs GmbH (ident. no. 4028) is a limited liability company
(*Gesellschaft mit beschränkter Haftung*) organized under the laws of Ger-
many, registered with the commercial register (*Handelsregister*) maintained
at the lower court (*Amtsgericht*) of Mülheim an der Ruhr under registration
number HRB 4918 and having its corporate domicile (*Sitz*) in Mülheim an
der Ruhr, Germany (herein **"Brenntag Germany"**). Seller 1 holds two (2)

- 23 -

shares (*Geschäftsanteile*) in the nominal amount of EUR 25,000.00 and EUR 4,975,000.00 (herein collectively **"Brenntag German Shares"**), representing 100 % of the nominal stated capital (*Stammkapital*) in Brenntag Germany in the aggregate amount of EUR 5,000,000.00. Under the notarial deed of the notary public Dr. Armin Hauschild, Düsseldorf, dated August 01, 2003 (deed roll N° H 2385/2003), (herein **"Spin-Off Agreement"**), Seller 1 spun off pursuant to Section 123 (3) no. 1 German Transformation Act (*UmwG*) the Brenntag Business as formerly conducted in Germany by Seller 1, including, but not limited to, the Brenntag German Subsidiaries (as defined in Section 1.3 below), into Brenntag Germany against issuance of new shares in Brenntag Germany (*Ausgliederung zur Aufnahme*). The spin-off was registered in the commercial register (*Handelsregister*) in which Seller 1 is registered on August 18, 2003.

1.3    Brenntag Germany in turn holds the direct and indirect shareholdings in the domestic subsidiaries listed in Exhibit 1.3 (herein collectively **"Brenntag German Subsidiaries"**).

1.4    In addition to the Brenntag German Shares, Seller 1 holds the following shareholdings in direct and indirect foreign subsidiaries pertaining to the Brenntag Business:

1.4.1    10,744 shares without par value, representing 96.04 % of the nominal stated capital in the aggregate amount of EUR 4,000,000.00 in BRENNTAG N.V. (ident. no. 3230), a stock corporation (*naamloze vennootschap*) organized under the laws of Belgium, registered under RPR number 0405.317.567 and having its corporate domicile in Deerlijk, Belgium (herein **"Brenntag Belgium"**). The remaining 443 shares in Brenntag Belgium without par value (herein **"Belgian Minority Shares"**), representing 3.96 % of the nominal stated capital of Brenntag Belgium, are held by Stinnes Belgium N.V., an Affiliate of Sellers;

1.4.2    all shares in the aggregate nominal amount of ATS 50,000,000.00, representing 100 % of the nominal stated capital in the aggregate amount of ATS 50,000,000.00 of NEUBER Gesellschaft m.b.H. (ident. no. 6818), a limited liability company organized under the laws of Austria, registered with the commercial register maintained at the Commercial Court of Vienna (*Handelsgericht Wien, Firmenbuch*) under registration number FN 93255 and having its corporate domicile in Vienna, Austria (herein **"Brenntag Central Europe"**). Brenntag Central Europe in turn holds the shareholdings in the direct and indirect subsidiaries listed in Exhibit 1.4.2 (herein collectively **"CEE Subsidiaries"**);

- 24 -

1.4.3   one (1) share in the nominal amount of EUR 6,470,625.00 repre-
senting 99.55 % of the nominal stated capital in the aggregate
amount of EUR 6,500,000.00 in BRENNTAG Portugal Produtos
Quimicos Lda. (ident. no. 2097), a limited liability company or-
ganized under the laws of Portugal, registered with the companies'
register of Sintra under registration number 12367/971024 and
having its corporate domicile in Sintra, Portugal (herein "**Brenntag
Portugal**"). The remaining one (1) share in Brenntag Portugal in
the nominal amount of EUR 29,375.00, representing 0.45 % of the
nominal stated capital in Brenntag Portugal is held by Brenntag AG
(as defined in Exhibit 1.3) (herein "**Portuguese Minority Share**");

1.4.4   26,500 shares with a par value of TWD 1,000.00 each, representing
100 % of the nominal stated capital in the aggregate amount of
TWD 26,500,000.00 in BRENNTAG (Taiwan) Co. Ltd. (ident. no.
1161), a limited liability company organized under the laws of the
Republic of China (Taiwan), registered in Taipei City under regis-
tration number (065)093917 and having its corporate domicile in
Taipei, Taiwan (R.O.C.) (herein "**Brenntag Taiwan**");

1.4.5   363,370 shares with a par value of EUR 162.00 each (herein
"**Brenntag France Shares**"), representing 99.99 % of the nominal
stated capital in the aggregate amount of EUR 58,867,560.00 in
Stinnes S.A., a joint stock corporation (*société anonyme à Direc-
toire et Conseil de Surveillance*) organized under the laws of
France, registered with the companies' register of Nanterre under
registration number RCS Nanterre B 572007599 and having its
corporate domicile in Gennevillieres, France (herein "**Brenntag
France**"). The remaining 10 (ten) shares in Brenntag France with a
par value of EUR 162.00 each (herein collectively "**French Mi-
nority Shares**") are held by Mr. Thomas Held (two (2) shares), Mr.
Marco Schröter (two (2) shares), Mrs. Inge Mölbert-Rusche (three
(3) shares), Mr. Hansjörg Rodi (one (1) share), Mr. Jöel Moebel
(one (1) share) and Mr. Paul Klugshertz (one (1) share) (herein
collectively "**French Minority Shareholders**"). Brenntag France
in turn holds shareholdings in the direct and indirect subsidiaries
listed in Exhibit 1.4.5 (herein "**French Subsidiaries**");

1.4.6   100 % of the issued share capital in the aggregate amount of
EUR 16,002,341.00 in BRENNTAG (Holding) N.V. (ident. no.
8601) (formerly "Holland Chemical International N.V."), a stock
corporation (*naamlose vennootschap*) organized under the laws of
The Netherlands, registered with the trade register of the Chamber

- 25 -

of Commerce of Amsterdam under registration number 33170581 and having its corporate domicile in Amsterdam, The Netherlands (herein **"Brenntag Holding"**). Brenntag Holding in turn holds shareholdings in the direct and indirect subsidiaries listed in Exhibit 1.4.6-1 (herein collectively **"Holding Subsidiaries"**). Certain minority shareholders hold minority shares in Holding Subsidiaries domiciled in Latin America as set forth in Exhibit 1.4.6-2 (herein "LAM Minority Shares"); and

1.4.7    100 % of the nominal stated capital in the aggregate amount of CHF 300,000.00 in Christ Chemie AG (ident. no. 5884), a stock corporation (*Aktiengesellschaft*) organized under the laws of Switzerland, registered in the companies' register of Kanton Basel-Landschaft under registration number CH280.3.918.556-1 and having its corporate domicile in Reinach, Switzerland (herein **"Brenntag Switzerland"**).

The shares held directly by Seller 1 in Brenntag Belgium, Brenntag Portugal, Brenntag Taiwan, Brenntag Holding and Brenntag Switzerland are herein collectively referred to as **"Other Seller 1 Brenntag Foreign Shares"**.

1.5    Seller 2, a wholly-owned subsidiary of Seller 1, holds 3,500,000 ordinary shares with a par value of GBP 1.00 each (herein **"UK Shares"**), representing 100 % of the issued share capital in the aggregate nominal amount of GBP 3,500,000.00 in BRENNTAG (U.K.) LIMITED (ident. no. 1156), a private company limited by shares organised under the laws of England and Wales, registered at Companies' House under company number 969040 and having its registered office at Ham Lane, Kingswinford, West Midlands, DY6 7JU (herein **"Brenntag UK"**). Brenntag UK in turn holds the participation listed in Exhibit 1.5 (herein **"Brenntag UK Subsidiary"**).

1.6    Seller 3, a wholly-owned indirect subsidiary of Seller 1, holds the following shareholdings in direct and indirect subsidiaries (herein collectively **"Seller 3 US Shares"**):

1.6.1    100 shares of common stock without par value, representing 100 % of the issued and outstanding shares in Brenntag Latin America, Inc. (ident. no. 8651) (formerly: "HCI Chemicals (USA), Inc."), a corporation organized under the laws of Delaware and having its principal place of business in Houston, Texas, USA. Brenntag Latin America, Inc. in turn holds the participation listed in Exhibit 1.6 (herein **"Brenntag LA Subsidiary"**); and

1.6.2    One (1) share of common stock with a par value of USD 10.00 representing 0.1% of the issued and outstanding shares in the aggre-

- 26 -

gate amount of USD 12,000 in Brenntag LA Subsidiary, a limited liability company organized under the laws of Bermuda and having is principal place of business in Hamilton, Bermuda. The remaining shares in Brenntag LA Subsidiary are held by Brenntag Latin America, Inc. and by Brenntag Mid-South, Inc.

1.7 Seller 4, a wholly-owned direct subsidiary of Seller 3, holds the following shareholdings in direct subsidiaries (herein collectively **"Brenntag Inc. Subsidiaries"**):

1.7.1 3,377 shares of common stock without par value per share, representing 100 % of the issued and outstanding shares (without par or aggregate value) in Brenntag Mid-South, Inc. (ident. no. 7027), a corporation organized under the laws of the Commonwealth of Kentucky and having its principal place of business in Henderson, Kentucky, USA.

1.7.2 61,698 shares of common stock with a par value of USD 0.10 each, representing 100 % of the issued and outstanding shares in Brenntag Southwest, Inc. (ident. no. 7028), a corporation organized under the laws of Texas and having its principal place of business in Longview, Texas, USA.

1.7.3 2,000 shares of common stock with a par value of USD 1.00 each, representing 100 % of the issued and outstanding shares in Brenntag Northeast, Inc. (ident. no. 7022), a corporation organized under the laws of Delaware and having its principal place of business in Reading, Pennsylvania, USA (herein **"Brenntag Northeast"**).

1.7.4 79,892 shares of common stock with a par value of USD 1.00 each, representing 100 % of the issued and outstanding shares in Brenntag Southeast, Inc. (ident. no. 7029), a corporation organized under the laws of North Carolina and having its principal place of business in Durham, North Carolina, USA.

The shares held directly by Seller 4 in the Brenntag Inc. Subsidiaries are herein collectively referred to as **"Seller 4 US Shares"**.

1.8 Seller 5, a wholly-owned direct subsidiary of Seller 1, holds shareholdings in the following direct and indirect subsidiaries:

1.8.1 100 % of the nominal stated capital in the aggregate amount of EUR 6,193,064.60, in BRENNTAG Quimica, S.A. (ident. no. 5300), a stock corporation (*sociedad anonima unipersonal*) organ-

- 27 -

ized under the laws of Spain, registered with Registro Mercantil de Sevilla under registration number 2599 (Libro O, Folio 23 de la Seccion 8a de Sociedades, Hoja SE-31365) and C.I.F. A-59/181537 and having its corporate domicile in Dos Hermanas (Sevilla), Spain (herein **"Brenntag Spain"**). Brenntag Spain in turn holds the shareholdings listed in Exhibit 1.8.1 (herein **"Spanish Subsidiaries"**).

1.8.2    100 % of the nominal stated capital in the aggregate amount of EUR 3,500.00 in Brenntag Specialities "Espana" S.L. (ident. no. 5531), a limited liability company organized under the laws of Spain, registered with Registro Mercantil de Sevilla under registration number Hoja SE-40.683, Folio 202 del Tomo 3.075 and C.I.F. B-91/058313 and having its corporate domicile in Dos Hermanas (Sevilla), Spain.

The shares held directly by Seller 5 in Brenntag Spain and Brenntag Specialities "Espana" S.L. are herein collectively referred to as **"Spanish Shares"**.

1.9    Seller 1 further holds two (2) shares (*Geschäftsanteile*) in the nominal amount of EUR 25,000.00 and EUR 9,975,000.00 (herein collectively **"SIB Shares"**), representing 100 % of the nominal stated capital (*Stammkapital*) in the aggregate amount of EUR 10,000,000.00 in Interfer Beteiligungsgesellschaft mbH (ident. no. 1215), a limited liability company (*Gesellschaft mit beschränkter Haftung*) organized under the laws of Germany, registered with the commercial register (*Handelsregister*) maintained at the lower court (*Amtsgericht*) of Mülheim an der Ruhr under registration number HRB 4917 and having its corporate domicile (*Sitz*) in Mülheim an der Ruhr, Germany (herein **"Interfer Germany"**). Under the notarial deed of the notary public Dr. Gregor Tapp, Mülheim an der Ruhr, dated March 31, 2003 (deed roll N° 261/ 2003 T) (herein **"Contribution Agreement"**), Seller 1 contributed against issuance of shares (*Sachkapitalerhöhung*) the Interfer Business as formerly conducted in Germany by Seller 1, including the Interfer German Subsidiaries (as defined below), into Interfer Germany. The capital increase in kind was registered in the commercial register (*Handelsregister*) on June 17, 2003. Interfer Germany in turn holds shareholdings in the domestic subsidiaries listed in Exhibit 1.9 (herein collectively **"Interfer German Subsidiaries"**):

1.10    In addition to the SIB Shares, Seller 1 holds the following shareholdings pertaining to the Interfer Business:

1.10.1    one (1) share in the nominal amount of EUR 25,000.00, representing 100 % of the nominal stated capital (*Stammkapital*) in the ag-

- 28 -

gregate amount of EUR 25,000.00 in Stinnes Interfer Immobilien Verwaltungsgesellschaft mbH (ident. no. 1221), a limited liability company (*Gesellschaft mit beschränkter Haftung*) organized under the laws of Germany, registered with the commercial register (*Handelsregister*) maintained at the lower court (*Amtsgericht*) of Mülheim an der Ruhr under registration number HRB 4916 and having its corporate domicile (*Sitz*) in Mülheim a. d. Ruhr, Germany (herein **"Immobilien GmbH"**).

1.10.2    one (1) share in the nominal amount of EUR 1,534,000.00, representing 100 % of the nominal stated capital (*Stammkapital*) in the aggregate amount of EUR 1,534,000.00 in Max Baum GmbH (ident. no. 5885), a limited liability company (*Gesellschaft mit beschränkter Haftung*) organized under the laws of Germany, registered with the commercial register (*Handelsregister*) maintained at the lower court (*Amtsgericht*) of Düsseldorf under registration number HRB 1044 and having its corporate domicile (*Sitz*) in Düsseldorf, Germany (herein **"Max Baum GmbH"**).

1.10.3    one (1) share (*Geschäftsanteil*) in the nominal amount of EUR 506,880.00, representing 99 % of the nominal stated capital (*Stammkapital*) in the aggregate amount of EUR 512,000.00 in Stinnes Stahl GmbH (ident. no. 5670), a limited liability company (*Gesellschaft mit beschränkter Haftung*) organized under the laws of Germany, registered with the commercial register (*Handelsregister*) maintained at the lower court (*Amtsgericht*) of Bremen under registration number HRB 11505 and having its corporate domicile (*Sitz*) in Bremen, Germany (herein **"Stinnes Stahl Bremen"**). The one (1) remaining share in Stinnes Stahl Bremen in the nominal amount of EUR 5,120.00 (herein **"SSB Minority Share"**) is held by Stinnes Immobiliendienst Verwaltungsgesellschaft mbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*) wholly owned by Seller 1 organized under the laws of Germany, registered with the commercial register (*Handelsregister*) maintained at the lower court (*Amtsgericht*) of Mülheim an der Ruhr under registration number HRB 583 and having its corporate domicile (*Sitz*) in Mülheim an der Ruhr, Germany (herein **"Interfer Minority Shareholder"**).

The shares held by Seller 1 in Immobilien GmbH, Max Baum GmbH and Stinnes Stahl Bremen are herein collectively referred to as **"Other German Interfer Shares"**.

**JA380**

- 29 -

1.11    Seller 1 further holds the only limited partnership interest (*Kommanditanteil*) (herein **"Limited Partnership Interest"**) representing the entire fixed capital (*Festkapital*) and the entire liability capital (*Haftsumme*) in the aggregate amount of EUR 86,919.62 in Zweite Kommanditgesellschaft Interfer Immobiliendienst GmbH & Co., Essen (ident. no. 5792), a limited partnership (*Kommanditgesellschaft*) organized under the laws of Germany, registered with the commercial register (*Handelsregister*) maintained at the lower court (*Amtsgericht*) of Essen under registration number HRA 6640 and having its corporate domicile (*Sitz*) in Essen, Germany (herein **"Zweite Kommanditgesellschaft"**). The sole general partner in Zweite Kommanditgesellschaft is Immobilien GmbH which does not hold a capital interest (*Kapitalanteil*) in the fixed capital (*Festkapital*) of Zweite Kommanditgesellschaft.

1.12    Companies, Consolidated Companies, Non-Consolidated Companies, Foreign Shares and Shares shall have the following meaning in this Agreement:

    1.12.1    **"Companies"** and each singly **"Company"** shall mean the companies listed in Exhibit 1.12.1;

    1.12.2    **"Consolidated Companies"** shall mean the Companies listed in Exhibit 1.12.2;

    1.12.3    **"Non-Consolidated Companies"** shall mean the Companies listed in Exhibit 1.12.3;

    1.12.4    **"Foreign Shares"** shall mean the Brenntag Central Europe Share I, the Brenntag Central Europe Share II (both as defined in Section 2.5 below), the Brenntag France Shares, the Other Seller 1 Brenntag Foreign Shares, the Belgian Minority Shares, the French Minority Shares, the UK Shares, the Seller 3 US Shares, the Seller 4 US Shares and the Spanish Shares;

    1.12.5    **"German Shares"** shall mean the Brenntag German Shares, the SIB Shares, the Other German Interfer Shares and the SSB Minority Share;

    1.12.6    **"Shares"** shall mean the German Shares and the Foreign Shares;

    1.12.7    **"Brenntag Group Companies"** and each singly **"Brenntag Group Company"** shall mean the Companies which conduct the Brenntag Business;

- 30 -

1.12.8 **"Interfer Group Companies"** and each singly **"Interfer Group Company"** shall mean the Companies which conduct the Interfer Business;

1.12.9 **"Consolidated Brenntag Group Companies"** and each singly **"Consolidated Brenntag Group Company"** shall mean the Brenntag Group Companies which belong to the Consolidated Companies; and

1.12.10 **"Consolidated Interfer Group Companies"** and each singly **"Consolidated Interfer Group Company"** shall mean the Interfer Group Companies which belong to the Consolidated Companies.

**B.    SALE, PURCHASE AND ASSIGNMENT, PURCHASE PRICE**

**2.    Sale, Purchase and Assignment of the Shares and the Sold Real Estate**

2.1    Seller 1, upon the terms and conditions of this Agreement, hereby sells with commercial effect (*mit wirtschaftlicher Wirkung*) as of the Effective Date (as defined in Section 6.1.2 below) and hereby assigns, subject to all of the Closing Conditions (as defined in Section 6.2 below) having been fulfilled or having been duly waived and all of the Closing Events listed in Sections 6.6.1 through 6.6.3 below having taken place or having been duly waived, with *in rem* effect (*mit dinglicher Wirkung*) as of the Closing Date (as defined in Section 6.1.4 below) to Purchaser 1 the Brenntag German Shares with all rights and obligations pertaining thereto. Purchaser 1 hereby purchases from Seller 1 the Brenntag German Shares and hereby accepts the assignment thereof in accordance with the foregoing sentence.

2.2    Seller 1, upon the terms and conditions of this Agreement, hereby sells with commercial effect (*mit wirtschaftlicher Wirkung*) as of the Effective Date and hereby assigns, subject to all of the Closing Conditions having been fulfilled or having been duly waived and all of the Closing Events listed in Sections 6.6.1 through 6.6.3 below having taken place or having been duly waived, with *in rem* effect (*mit dinglicher Wirkung*) as of the Closing Date to Purchaser 2 the SIB Shares and the Other German Interfer Shares with all rights and obligations pertaining thereto. Purchaser 2 hereby purchases from Seller 1 the SIB Shares and the Other German Interfer Shares and hereby accepts the assignment thereof in accordance with the foregoing sentence.

2.3    Seller 1, upon the terms and conditions of this Agreement, hereby sells with commercial effect (*mit wirtschaftlicher Wirkung*) as of the Effective Date and hereby assigns, subject to the fulfilment of all conditions precedent set out in the subsequent sentence, with *in rem* effect (*mit dinglicher Wirkung*)

- 31 -

as of the Closing Date to Purchaser 2 (i) the Limited Partnership Interest with all rights and obligations pertaining thereto, and (ii) all partner's accounts (*Gesellschafterkonten*) of Zweite Kommanditgesellschaft (herein collectively **"Partner's Accounts"**). The assignment (*dingliche Rechtsübertragung*) of the Limited Partnership Interest and the Partner's Accounts is subject to (x) all of the Closing Conditions having been fulfilled or having been duly waived, (y) all of the Closing Events listed in Sections 6.6.1 through 6.6.3 below having taken place or having been duly waived and (z) Purchaser 2 having been registered as successor in title to the Limited Partnership Interest (*Sonderrechtsnachfolgevermerk*) in the commercial register (*Handelsregister*) in which Zweite Kommanditgesellschaft is registered. Purchaser 2 hereby purchases from Seller 1 the Limited Partnership Interest and the Partner's Accounts and hereby accepts the assignment thereof in accordance with the foregoing sentences.

2.4    Seller 1, upon the terms and conditions of this Agreement, hereby sells with commercial effect (*mit wirtschaftlicher Wirkung*) as of the Effective Date to Purchaser 1 and undertakes to assign on the Scheduled Closing Date (as defined in Section 6.1.3 below) to Purchaser 1 or a Designated Nominee (as defined in Section 2.13 below) the Other Seller 1 Brenntag Foreign Shares with all rights and obligations pertaining thereto with *in rem* effect (*mit dinglicher Wirkung*) as from the Closing Date on the basis of the respective separate Foreign Share Transfer Instruments (as defined in Section 6.6.4 below). Purchaser 1 hereby purchases from Seller 1 the Other Seller 1 Brenntag Foreign Shares and hereby undertakes to accept (or cause the Designated Nominee to accept) the assignment thereof on the Scheduled Closing Date as provided for under the respective Foreign Share Transfer Instruments in accordance with the foregoing sentence.

2.5    Seller 1, upon the terms and conditions of this Agreement, hereby sells with commercial effect (*mit wirtschaftlicher Wirkung*) as of the Effective Date and undertakes to assign on the Scheduled Closing Date with *in rem* effect (*mit dinglicher Wirkung*) as from the Closing Date on the basis of a separate Foreign Share Transfer Instrument (i) to Purchaser 3 a share in Brenntag Central Europe in the nominal amount of ATS 49,950,000.00, corresponding to a stake of 99.9% in Brenntag Central Europe (herein **"Brenntag Central Europe Share I"**), and (ii) to Purchaser 1 a share in Brenntag Central Europe in the nominal amount of ATS 50,000.00, corresponding to a stake of 0.1% in Brenntag Central Europe (herein **"Brenntag Central Europe Share II"**), in each case with all rights and obligations pertaining thereto. Purchaser 3 hereby purchases from Seller 1 the Brenntag Central Europe Share I and hereby undertakes to accept the assignment thereof on the Scheduled Closing Date and Purchaser 1 hereby purchases from Seller 1 the Brenntag Central Europe Share II and hereby undertakes to accept the assignment thereof on

Case 3:23-cv-10951-MBK Document 18-09/08/23 Page 391 of 1429 PageID:
Case 3:23-cv-10951-MBK Document 18 Filed 03/24/25 Page 33 of 75
Exhibit F - MSPA - Part 1   Page 33 of 75

- 32 -

the Scheduled Closing Date, both as provided for under the respective Foreign Share Transfer Instruments in accordance with the foregoing sentence.

2.6    Seller 1, upon the terms and conditions of this Agreement, hereby sells with commercial effect (*mit wirtschaftlicher Wirkung*) as of the Effective Date to Purchaser 4 and undertakes to assign on the Scheduled Closing Date to Purchaser 4 the Brenntag France Shares with all rights and obligations pertaining thereto with *in rem* effect (*mit dinglicher Wirkung*) as from the Closing Date on the basis of a separate Foreign Share Transfer Instrument. Purchaser 4 hereby purchases from Seller 1 the Brenntag France Shares and undertakes to accept the assignment thereof on the Scheduled Closing Date as provided for under the relevant Foreign Share Transfer Instrument in accordance with the foregoing sentence.

2.7    Seller 1, upon the terms and conditions of this Agreement, hereby sells with commercial effect (*mit wirtschaftlicher Wirkung*) as of the Effective Date the Belgian Minority Shares to Purchaser 1 and the SSB Minority Share to Purchaser 2 and shall see to it that Stinnes Belgium N.V. shall assign on the Scheduled Closing Date to Purchaser 1 or a Designated Nominee the Belgian Minority Shares and that the Interfer Minority Shareholder shall assign to Purchaser 2 or a Designated Nominee the SSB Minority Share, in each case with all rights and obligations pertaining thereto and with *in rem* effect (*mit dinglicher Wirkung*) as from the Closing Date on the basis of separate share transfer agreements substantially in the form as attached hereto as Exhibit 2.7-1 and Exhibit 2.7-2 (herein "**Minority Shares Transfer Agreements**"). Purchaser 1 and Purchaser 2 hereby purchase from Seller 1 the Belgian Minority Shares and the SSB Minority Share (respectively) and hereby undertake to accept (or cause the Designated Nominee to accept) the assignment thereof from Stinnes Belgium N.V. and the Interfer Minority Shareholder (respectively) on the Scheduled Closing Date as provided for under the respective Minority Shares Transfer Agreement in accordance with the foregoing sentence. Seller 1 shall see to it that the French Minority Shareholders shall sell and assign on the Scheduled Closing Date to Purchaser 4 or one or more Designated Nominees the French Minority Shares with all rights and obligations pertaining thereto with *in rem* effect (*mit dinglicher Wirkung*) as from the Closing Date on the basis of separate share sale and transfer agreements substantially in the form as attached hereto as Exhibit 2.7-3 through Exhibit 2.7-8 (herein "**French Sale and Transfer Agreements**"). Purchasers hereby undertake to accept (or cause the Designated Nominees to accept) the sale and assignment thereof from the French Minority Shareholders on the Scheduled Closing Date as provided for under the respective French Sale and Transfer Agreement in accordance with the foregoing sentence.

2.8    Each of Seller 2, Seller 3, Seller 4 and Seller 5, upon the terms and conditions of this Agreement, hereby sells with commercial effect (*mit*

- 33 -

*wirtschaftlicher Wirkung*) as of the Effective Date to Purchaser 1 and each undertakes to assign on the Scheduled Closing Date to Purchaser 1 or a Designated Nominee the UK Shares, the Seller 3 US Shares, the Seller 4 US Shares and the Spanish Shares respectively with all rights and obligations pertaining thereto with *in rem* effect (*mit dinglicher Wirkung*) as from the Closing Date on the basis of separate Foreign Share Transfer Instruments. Purchaser 1 hereby purchases from each of Seller 2, Seller 3, Seller 4 and Seller 5 the UK Shares, the Seller 3 US Shares, the Seller 4 US Shares and the Spanish Shares respectively and hereby undertakes to accept (or cause the Designated Nominee to accept) the assignment thereof on the Scheduled Closing Date as provided for under the respective Foreign Share Transfer Instruments in accordance with the foregoing sentence.

2.9    Seller 1 shall see to it (*steht dafür ein*) that its Affiliates Zweite Kommanditgesellschaft Stinnes Immobiliendienst GmbH & Co. (Mülheim an der Ruhr) and Dritte Kommanditgesellschaft Stinnes Immobiliendienst GmbH & Co. (herein collectively "**Real Estate Affiliates**") shall sell (*verkaufen*) and transfer (*auflassen*) to Blitz 03-1404 GmbH, an Affiliate of Purchaser 1, the real estate and the heritable building rights (*Erbbaurechte*) pertaining to the Brenntag Business identified in Exhibit 2.9-1 (herein "**Sold Real Estate Brenntag**"). The sale and transfer of the Sold Real Estate Brenntag shall be effected on the Scheduled Closing Date on the basis of a separate sale and transfer agreement to be executed substantially in the form as attached hereto as Exhibit 2.9-2 (herein "**Brenntag Real Estate Sale and Transfer Agreement**") in consideration for an aggregate purchase price of EUR 21,040,864.00 (in words: Euro twenty-one million forty thousand eight hundred and sixty-four) plus VAT (herein "**Brenntag Real Estate Purchase Price**") as identified in the Brenntag Real Estate Sale and Transfer Agreement.

2.10    Seller 1 shall sell (*verkaufen*) and transfer (*auflassen*) to Purchaser 2 and shall see to it (*steht dafür ein*) that its Affiliate Zweite Kommanditgesellschaft Stinnes Immobiliendienst GmbH & Co. (Mülheim an der Ruhr) shall sell (*verkaufen*) and transfer (*auflassen*) to Purchaser 2 the Real Estate pertaining to the Interfer Business identified in Exhibit 2.10-1 (herein "**Sold Real Estate Interfer**"). The sale and transfer of the sold Real Estate Interfer shall be effected on the Scheduled Closing Date on the basis of a separate sale and transfer agreement to be executed substantially in the form as attached hereto as Exhibit 2.10-2 (herein "**Interfer Real Estate Sale and Transfer Agreement**") in consideration of an aggregate purchase price of EUR 23,140,000.00 (in words: EUR twenty-three million one hundred and forty thousand) plus VAT (herein "**Interfer Real Estate Purchase Price**") as identified in the Interfer Real Estate Sale and Transfer Agreement.

- 34 -

2.11 Seller 4 shall sell and transfer and shall see to it that its following direct or indirect subsidiaries

    2.11.1   Brenntag West, Inc., a corporation organized under the laws of Delaware having its principal place of business in Santa Fe Springs, California, USA (herein **"Brenntag West"**);

    2.11.2   Whittaker, Clark & Daniels, Inc., a corporation organized under the laws of New Jersey, having its principal place of business in South Plainfield, New Jersey, USA (herein **"WCD"**);

    2.11.3   Eastech Chemical, Inc., a corporation organized under the laws of Pennsylvania having its principal place of business in Philadelphia, Pennsylvania, USA (herein **"Eastech"**);

    2.11.4   Crozier-Nelson Sales, Inc., a corporation organized under the laws of Texas having its principal place of business in Houston, Texas, USA (herein **"Crozier-Nelson"**);

(herein collectively **"Retained Subsidiaries"**) shall sell and transfer to Purchaser 1 or one or several Designated Nominees (herein each a **"US Asset Purchaser"** and collectively **"US Asset Purchasers"**) under separate asset purchase agreements and related documents to be executed on the Scheduled Closing Date substantially in the form as attached hereto as Exhibits 2.11-1 through 2.11-5 (herein each a **"US Asset Purchase Agreement"** and collectively, the **"US Asset Purchase Agreements"**) certain tangible and intangible assets, contracts and liabilities, relating to the Business as conducted by each of Seller 4 and the Retained Subsidiaries (including the shares held by the Retained Subsidiaries in the subsidiaries listed in Exhibit 2.11-6) excluding, however, (i) the Brenntag Inc. Subsidiaries, which are sold pursuant to Section 2.8 above, (ii) any liabilities arising from or relating to any Asbestos Claims (as defined in Section 12.4 below), (iii) certain real estate of the Retained Subsidiaries, and (iv) other identified liabilities, and transfer certain employees of Seller 4 and the Retained Subsidiaries pertaining to the Sold US Businesses (as defined below) to the US Asset Purchasers. The businesses of each of Seller 4 and the Retained Subsidiaries as sold and transferred under the US Asset Purchase Agreements are herein referred to as the **"Sold US Business"** and collectively the **"Sold US Businesses"**. Seller 4 and the Retained Subsidiaries are herein collectively referred to as **"Retained Companies"**. Purchasers hereby undertake to cause the US Asset Purchasers to accept the sale and transfer of the Sold US Businesses from the Retained Companies on the Scheduled Closing Date as provided for under the US Asset Purchase Agreements in accordance with the foregoing sentences.

**JA386**

2.12 The sale of the Shares and the Limited Partnership Interest shall include the rights to any undistributed profits for any periods prior to and until the Effective Date.

2.13 Purchasers are entitled to designate Affiliates of Purchasers as additional purchasers, provided that (i) such additional purchasers assume towards the Sellers the joint liability for all obligations of Purchasers under this Agreement and (ii) Purchasers notify Sellers at least ten (10) business days before the Scheduled Closing Date, or in the case of an US Asset Purchaser, within ten (10) business days after the Signing Date, of the identity and corporate details of such additional purchaser (herein **"Designated Nominee"**). Upon written instruction by Purchasers, Sellers shall directly assign and transfer the respective Shares and assets at the Scheduled Closing Date to the respective Designated Nominee by executing the relevant agreements and transfer instruments referred to in Section 6.6.4 through 6.6.8 below with the respective Designated Nominee. For the avoidance of doubt, the Parties confirm that to the extent Purchasers make any payments which settle payment obligations of a Designated Nominee under this Agreement, such payments shall (i) be deemed to be made on behalf of the respective Designated Nominee and shall (ii) to such extent release the Designated Nominee from such obligations as if such payments had been made by the respective Designated Nominee.

## 3.    Purchase Price

3.1 The Purchase Price for (i) the Shares, (ii) the Limited Partnership Interest and the Partner's Accounts and (iii) the Sold US Businesses (herein collectively **"Purchase Object"**), excluding, for the avoidance of doubt, the Sold Real Estate Brenntag and the Sold Real Estate Interfer, to be paid by Purchasers (as joint and several debtors (*Gesamtschuldner*)) shall be the aggregate of:

    3.1.1 a fixed amount of EUR 1,280,819,136.00 (in words: EURO one billion two hundred eighty million eight hundred nineteen thousand one hundred thirty six), (herein **"Enterprise Value"**);

minus

    3.1.2 the consolidated nominal amount of the following financial debt obligations (*Finanzverbindlichkeiten*) of the Consolidated Companies and the Sold US Businesses:

- 36 -

(i)     long-term bank loans (*langfristige Bankschulden*) within the meaning of the so called "*Stinnes Konzernabschlussricht-linien*" being in effect on the Effective Date (herein "**SKA**") form 9100/line item 9060 040;

(ii)    short-term bank loans (*kurzfristige Bankschulden*) within the meaning of SKA form 9100/line item 9061 040;

(iii)   financing payables (*Finanzierungsverbindlichkeiten*) owed by the Consolidated Companies or (with respect to the Sold US Businesses) by the Retained Companies to Sellers or any Sellers' Affiliates (as defined in Section 4.1 below) or any Non-Consolidated Company within the meaning of (a) SKA form 9100/line item 9082 040 (*Verbindlichkeiten gegenüber konsolidierten verbundenen Unternehmen aus langfristigen Finanzierungen*), (b) SKA form 9100/line item 9083 040 (*Verbindlichkeiten gegenüber konsolidierten verbundenen Unternehmen aus kurzfristigen Finanzierungen*) and (c) SKA form 2812/line item 2742 000 (*Verbindlichkeiten gegenüber nichtkonsolidierten verbundenen Unternehmen aus Finan-zierungen*) including, for the avoidance of doubt, the Seller Financing Receivables Euro and the Seller Financing Re-ceivables USD (each as defined in Section 4.2.2 below) owed by all Consolidated Companies and (with respect to the Sold US Businesses) the Retained Companies;

(iv)   payables resulting from the acquisition of fixed assets within the meaning of SKA form 2801/line item 2875 000 (*Ver-bindlichkeiten aus dem Erwerb von Gegenständen des An-lagevermögens*);

(v)    other interest bearing liabilities within the meaning of (a) SKA form 2801/line item 2813 000 (*Sonstige verzinsliche Verbindlichkeiten - Mitgesellschafter*) and (b) SKA form 2801/line item 2820 000 (*Sonstige verzinsliche Verbind-lichkeiten – Sonstige*) up to a maximum aggregate amount of EUR 7,000,000.00 (in words: Euro seven million);

(vi)   accruals for pensions related to the Consolidated Interfer Group Companies within the meaning of SKA form 2601/line item 2611 000 (*Anwartschaften*) and SKA form 2601/line item 2615 000 (*laufende Pensionen*) and pensions coming from voluntary salary savings of employees *(Ge-haltsumwandlungen)* within the meaning of SKA form 2601

**JA388**

- 37 -

line item 2619000 and interim obligations between employment and retirement *(Überbrückungsgelder)* within the meaning of SKA form 2601 line item 2613000;

(vii)   negative fair market value (mark-to-market) of interest swaps and foreign exchange swaps related to financing only, except for the foreign exchange swaps identified in <u>Exhibit 3.1.2</u>; and

(viii)  the liability against Schoeder *(Schoeder Leibrente)* related to the Interfer Group,

(herein collectively **"Financial Debt"**), each existing on the Effective Date excluding, for the avoidance of doubt, any unfunded pension liabilities (except as provided for under subsection (vi) above) and any capital leases;

plus

3.1.3   the consolidated amount of the following items of cash and cash equivalents of the Consolidated Companies and the Sold US Businesses:

(i)     cash on hand within the meaning of SKA form 1602/line item 1872 000 *(Kasse)*;

(ii)    cheques within the meaning of SKA form 1602/line item 1871 000 *(Schecks)*, which, for the avoidance of doubt, are stated net of provisions;

(iii)   cash at national banks within the meaning of SKA form 1602/line item 1873 000 *(Guthaben bei Staatsbanken)* and cash at banks within the meaning of SKA form 1602/line item 1875 000 *(Guthaben bei Kreditinstituten)*;

(iv)    any outstanding capital contributions and/or unpaid capital *(ausstehende Einlagen)* owed to the Consolidated Companies by Sellers or any Sellers' Affiliate or any Non Consolidated Company, within the meaning of SKA form 2110/ line item 2110 030 (herein **"Outstanding Capital Contributions"**);

(v)     financing receivables *(Finanzforderungen)* owed to the Consolidated Companies or (with respect to the Sold US Businesses) to the Retained Companies by Sellers or any Sellers' Affiliate or any Non-Consolidated Company within the

- 38 -

meaning of (a) SKA form 1613/line item 1781 010 (*Forderungen gegenüber konsolidierten Unternehmen aus kurzfristigen Finanzierungen*), (b) SKA form 1614/line item 1781 060 (*Forderungen gegenüber konsolidierten Unternehmen aus langfristigen Finanzierungen*) and (c) SKA form 1615/line item 1740 000 (*Forderungen gegenüber nicht konsolidierten verbundenen Unternehmen aus Finanzierungen*), and loans *(Ausleihungen)* owed from Non-Consolidated Companies within the meaning of SKA form 1201/line item 1540 000 (*Ausleihungen an nicht konsolidierte verbundene Unternehmen*), line item 1550 000 (*Ausleihungen an Beteiligungsverhältnis Stinnes*), line item 1560 000 (*sonstige Ausleihungen*) including, for the avoidance of doubt, the Seller Financing Payables Euro and the Seller Financing Payables USD (each as defined in Section 4.2.1 below) of all Consolidated Companies and (with respect to the Sold US Businesses) the Retained Companies;

(vi)   receivables owed to the Consolidated Companies or (with respect to the Sold US Businesses) to the Retained Companies, by insurances within the meaning of SKA form 1602/line item 1833 000 (*Forderungen gegen Versicherungen*) if and to the extent the corresponding damages, losses, expenses have been paid for or otherwise remedied by the Consolidated Companies or (with respect to the Sold US Business) by the Retained Companies prior to the Effective Date or the corresponding damages, losses or expenses resulted in a reduction of the Working Capital or an increase of the Financial Debt as of the Effective Date (herein **"Insurance Receivables"**) excluding for the avoidance of doubt any claims against credit insurances related to the Interfer Business;

(vii)   receivables owed to the Consolidated Companies or (with respect to the Sold US Businesses), to the Retained Companies from the sale of fixed assets within the meaning of SKA form 1602/line item 1834 000 (*Forderungen aus dem Verkauf von Gegenständen des Anlagevermögens*), which, for the avoidance of doubt, are stated net of provisions; and

(viii)   securities treated as current assets within the meaning of SKA form 1602/line item 1863 000 (*Wertpapiere des Umlaufvermögens – Sonstige Wertpapiere*), which, for the avoidance of doubt, are stated net of provisions;

- 39 -

    (ix)    receivables owed to the Consolidated Companies or (with re-spect to the Sold US Businesses), to the Retained Companies by tax authorities for reimbursement of value added turn-over tax (*Umsatzsteuer*) within the meaning of SKA form 1602/line item 1811 000 and, being a subset thereof, within the meaning of SKA form 1618/line item 1816 000 (*For-derungen aus Umsatzsteuererstattungsansprüchen*), for the avoidance of doubt such subset comprising solely VAT re-ceivables (*Umsatzsteuerforderungen – Salden gegenüber den Finanzbehörden bei umsatzsteuerlichen Betriebsstätten im Ausland*) (herein **"VAT Receivables"**); and

    (x)    the positive fair market value (mark-to-market) of interest swaps and foreign exchange swaps related to financing only, except for the foreign exchange swaps identified in <u>Ex-hibit 3.1.2</u>;

(herein collectively **"Cash"**), each existing on the Effective Date;

minus

3.1.4    if any, the amount by which the balance of the consolidated amount of the following assets and liabilities of the Consolidated Compa-nies and the Sold US Businesses:

    (i)    the aggregate of (a) materials and supplies within the mean-ing of SKA form 1601/line items 1611 000 (*Roh-, Hilfs- und Betriebsstoffe*), (b) work in progress within the meaning of SKA form 1601/line item 1612 000 (*unfertige Erzeugnisse*), (c) finished goods within the meaning of SKA form 1601/line item 1613 000 (*fertige Erzeugnisse*) and (d) goods within the meaning of SKA form 1601/line item 1614 000 (*Waren*), which, for the avoidance of doubt, are in each case stated net of any inventory provisions permissible in accor-dance with the Specific Accounting Principles (as defined in Section 5.1 below), and (e) payments on accounts within the meaning of SKA form 1601/line item 1615 000 (*geleistete Anzahlungen für Vorräte*);

    (ii)    plus the trade accounts receivable (*Forderungen aus Lieferungen und Leistungen*) owed to the Consolidated Companies or (with respect to the Sold US Businesses), to the Retained Companies by third parties within the meaning of SKA form 1601/line item 1760 000 (*Forderungen aus Lieferungen und Leistungen*), which, for the avoidance of

**JA391**

- 40 -

doubt, are stated net of trade accounts receivable provisions in accordance with the Specific Accounting Principles;

(iii)   plus the trade accounts receivable (*Forderungen aus Lieferungen und Leistungen*) owed to the Consolidated Companies or (with respect to the Sold US Businesses), to the Retained Companies by Sellers, any Sellers' Affiliate or a Non-Consolidated Company within the meaning of (a) SKA form 1613/line item 1771 010 (*kurzfristige Forderungen an konsolidierte Unternehmen aus Lieferungen und Leistungen*), (b) SKA form 1614/line item 1771 060 (*langfristige Forderungen an konsolidierte Unternehmen aus Lieferungen und Leistungen*), (c) SKA form 1615/line item 1730 000 (*Forderungen an nicht konsolidierte verbundene Unternehmen aus Lieferungen und Leistungen*) and (d) SKA form 1615/line item 1796 000 (*Forderungen an sonstige Beteiligungen Stinnes*), which, for the avoidance of doubt, are stated net of trade accounts receivable provisions in accordance with the Specific Accounting Principles;

(iv)   plus creditors with debt balances within the meaning of SKA form 1602/line item 1831 000 (*Debitorische Kreditoren*);

(v)   plus commissions, discounts and bonuses within the meaning of SKA form 1602/line item 1835 000;

(vi)   less the trade accounts payable owed by the Consolidated Companies or (with respect to the Sold US Businesses), by the Retained Companies to third parties within the meaning of SKA form 9100/line item 9071 040 (*Verbindlichkeiten aus Lieferungen und Leistungen gegenüber Fremden*), including any outstanding bills of exchange payable to third parties within the meaning of SKA form 9100/line item 9076 040 (*Wechselverbindlichkeiten gegenüber Fremden*) and SKA form 2812/line item 2790 000 (*Verbindlichkeiten gegenüber sonstigen Beteiligungen Stinnes*);

(vii)   less the trade accounts payable (regardless of age) which are owed by the Consolidated Companies or (with respect to the Sold US Businesses), by the Retained Companies to Sellers, any Sellers' Affiliate or any Non-Consolidated Company within the meaning of (a) SKA form 9100/line item 9070 040 (*Verbindlichkeiten aus Lieferungen und Leistungen gegen sonstige Beteiligungen DB*), (b) SKA form 2810/line

JA392

- 41 -

item 2782 010 (*kurzfristige Verbindlichkeiten aus Lieferungen und Leistungen gegenüber konsolidierten Unternehmen*), (c) SKA form 2811/line item 2782 060 (*langfristige Verbindlichkeiten aus Lieferungen und Leistungen gegenüber konsolidierten Unternehmen*) and (d) SKA form 2812/line item 2732 000 (*Verbindlichkeiten aus Lieferungen und Leistungen gegenüber nicht konsolidierten Unternehmen*), including any outstanding bills of exchange owed to Sellers' Affiliates within the meaning of SKA form 9100/line item 9075 040 (*Wechselverbindlichkeiten sonstige Beteiligungen DB*);

(viii) less received payments on account from Sellers' Affiliates or third parties within the meaning of SKA form 9100/line items 9065 040 and 9066 040 (*erhaltene Anzahlungen von sonstigen Beteiligungen DB oder Fremden*);

(ix) less accruals for outstanding invoices (goods and bills of charge) within the meaning of SKA form 2601/line item 2643 000 (*Rückstellungen für ausstehende Rechnungen*);

(x) less debtors with credit balance (to the extent not included in trade accounts payables) within the meaning of SKA form 2801/line item 2872 000 (*kreditorische Debitoren*);

(xi) less custom duties due (*Verbindlichkeiten gegenüber Zollbehörden*) within the meaning of SKA form 2801/line item 2878 000;

(xii) less accruals for yearly bonus payments (*Jahresvergütungen*) within the meaning of SKA form 2601/line item 2651 000 up to a maximum amount of EUR 17,000,000.00 (in words: Euro seventeen million);

(xiii) less accruals for insurance premiums within the meaning of SKA form 2601/line item 2663 000 excluding, for the avoidance of doubt, any accruals relating to any Excluded Liabilities (within the meaning of the US Asset Purchase Agreement);

(herein "**Working Capital**"), each existing on the Effective Date, falls short of EUR 765,000,000.00 (in words: Euro seven hundred sixty-five million);

plus

A.Prot. 2003/479 Cu

**JA393**

- 42 -

3.1.5    if any, the amount by which the Working Capital as per the Effective Date exceeds EUR 765,000,000.00 (in words: Euro seven hundred sixty-five million);

plus

3.1.6    if any, the amount by which the aggregate capital expenditures (as defined in Exhibit 3.1.6) of the Brenntag Group Companies and the Interfer Group Companies incurred during the calendar year ending on the Effective Date (herein **"CapEx 2003 Amount"**) exceeds EUR 103,700,000.00 (in words: Euro one hundred three million seven hundred thousand) (herein **"CapEx Threshold Amount"**);

minus

3.1.7    if any, the amount by which the CapEx 2003 Amount falls below the CapEx Threshold Amount;

minus

3.1.8    the amount of any interest accrued or payable by any of the Consolidated Companies or (with respect to the Sold US Businesses) by any of the Retained Companies on the Seller Financing Receivables Euro and the Seller Financing Receivables USD each in the amounts existing on the Effective Date for the period from (and including) January 01, 2004 through (and including) January 31, 2004 (herein **"Interest Amount"**), it being, however, understood that interest accrued or payable on incremental Seller Financing Receivables Euro or Seller Financing Receivables USD amounts drawn by the Consolidated Companies or (with respect to the Sold US Businesses) by the Retained Companies after the Effective Date shall not form part of the foregoing Interest Amount;

plus

3.1.9    an amount equivalent to interest on the balance of the amounts calculated pursuant to Section 3.1.1 through 3.1.8 above at the rate of EURIBOR (as defined in Section 4.1 below) plus 225 basis points as from January 31, 2004 until, but not including, the payment dates for the Preliminary Purchase Price (as defined in Section 3.2 below) and the Purchase Price Adjustment, if any (as defined in Section 3.4 below)

(herein **"Purchase Price"**). If Purchasers are in default of payment as of the foregoing payment dates, the Preliminary Purchase Price and the Purchase

Price Adjustment owed by Purchasers, if any, shall bear interest as set forth in Section 3.5 below. Sellers have provided Purchasers prior to the Signing Date with a recent reporting package (*Formularabschluss*) (herein **"Reporting Package"**) as an illustration of the references to the SKA form and line items referred to in this Section 3.1.

3.2 On the Scheduled Closing Date, Purchasers shall pay to Sellers, free of costs and charges in immediately available funds by wire transfer into Sellers' Account Euro (as defined in Section 3.6 below) an amount (i) either determined in writing by the Parties in mutual agreement on the basis of an estimate of the Financial Debt, the Cash, the Working Capital, the CapEx 2003 Amount and the Interest Amount, or (ii) if such agreement cannot be reached until five (5) business days prior to the Scheduled Closing Date, an amount of EUR 645,000,000.00 (in words: Euro six hundred and forty-five million) (herein **"Preliminary Purchase Price"**), it being understood that the Parties shall as soon as practicable after the Effective Date use reasonable efforts in order to reach a mutual agreement on the Preliminary Purchase Price.

3.3 The Parties agree that the Preliminary Purchase Price shall be allocated to the Purchase Object as set out in Exhibit 3.3. For purposes of allocating the final Purchase Price to the Sold US Businesses, the amount of the Purchase Price Adjustment relating to the Sold US Businesses shall be converted from Euro to USD on the basis of the Euro/USD Exchange Rate as of the Closing Date.

3.4 If on the basis of the Effective Date Balance Sheet (as defined in Section 5.1 below), the Purchase Price is higher than the Preliminary Purchase Price, Purchasers shall pay to Sellers an amount equal to the amount by which the Purchase Price exceeds the Preliminary Purchase Price. If on the basis of the Effective Date Balance Sheet, the Preliminary Purchase Price is higher than the Purchase Price, Sellers shall pay to Purchasers an amount equal to the amount by which the Preliminary Purchase Price exceeds the Purchase Price plus interest on such balance at the rate set forth in Section 3.1 above from the Closing Date until, but not including, the day of payment by Sellers. Any such amount to be paid either by Purchasers or by Sellers (herein **"Purchase Price Adjustment"**) shall be paid as follows:

3.4.1 any Purchase Price Adjustment owed by Purchasers shall be paid by Purchasers free of costs and charges in immediately available funds by wire transfer ten (10) banking days (*Bankarbeitstage*) after the Effective Date Balance Sheet has become final and binding upon the Parties in accordance with Section 5 below (herein **"Adjustment Payment Date"**) into Sellers' Account Euro;

3.4.2 any Purchase Price Adjustment owed by Sellers shall be paid by Sellers on the Adjustment Payment Date free of costs and charges

- 44 -

in immediately available funds by wire transfer into Purchasers' Account Euro (as defined in Section 3.7 below); and

3.4.3    any Purchase Price Adjustment payable pursuant to this Section 3.4, including any amounts denominated as interest, shall be treated as adjustment to the Purchase Price for income tax purposes and Exhibit 3.3 shall be adjusted as soon as reasonably practicable after the Adjustment Payment Date in order to reflect the final allocation of the Purchase Price after determination of the Purchase Price Adjustment.

3.5    Except as herein provided otherwise, each of the Parties shall pay interest on any amounts becoming due and payable to the other Party, or Parties, as the case may be, under this Agreement as from the respective due date for payment until, but not including, the day of actual payment at the rate of 800 basis points over EURIBOR.

3.6    All payments in Euro owed by Purchasers to Sellers under this Agreement shall be paid by Purchasers by wire transfer to Seller 1's bank account kept with Dresdner Bank AG, Mülheim an der Ruhr, sort code (*Bankleitzahl*) 36280071, account number 3285522, International Bank Account Number (*Internationale Bankkontonummer*) DE 40362800710328552200, Bank Identifier Code (*Internationale Bankleitzahl*) DRES DE FF 362 (herein **"Sellers' Account Euro"**) and all payments in US Dollars owed by Purchasers to Sellers under this Agreement shall be paid by Purchasers by wire transfer to Seller 3's Bank Account which shall be specified by Sellers in writing five (5) days prior to the Scheduled Closing Date (herein **"Sellers' Account USD"**), except for (i) an amount of USD 44,326,000.00 (in words: US Dollars forty four million three hundred and twenty-sixthousand) which shall be paid into the account of Brenntag West kept with Citibank N.A. ABA# 021000089, account number 38531413 (herein **"Brenntag West's Account"**), (ii) an amount of USD 15,900,000.00 (in words: US Dollars fifteen million nine hundred thousand) which shall be paid into the account of WCD kept with Citibank N.A. ABA# 021000089, account number 40789026 (herein **"WCD's Account"**), (iii) an amount of USD 10,300,000.00 (in words: US Dollars ten million three hundred thousand) which shall be paid into the account of Eastech kept with Citibank N.A. ABA# 021000089, account number 40685745 (herein **"Eastech's Account"**) and (iv) an amount of USD 2,300,000.00 (in words: US Dollars two million three hundred thousand) which shall be paid into the account of Crozier-Nelson, kept with Citibank Delaware, ABA# 031100209, account number 38603851 (herein **"Crozier-Nelson's Account"**).

- 45 -

3.7    All payments in Euro owed by Sellers to Purchasers under this Agreement shall be paid by Sellers by wire transfer to the account which shall be specified by the Purchasers in writing five (5) days prior to the Scheduled Closing Date (herein **"Purchasers' Account Euro"**) and all payments in US Dollars owed by Sellers to Purchasers under this Agreement shall be paid by Sellers by wire transfer to the account which shall be specified by the Purchasers in writing five (5) days prior to the Scheduled Closing Date (herein **"Purchasers' Account USD"**).

3.8    In the event that the Interfer Business is sold to a third party by Purchaser 2 after the Closing Date, Seller 1 shall be entitled to an additional purchase price payment in accordance with, and subject to, the terms and conditions set out in <u>Exhibit 3.8</u> (herein **"Interfer Additional Purchase Price"**). The Interfer Additional Purchase Price shall be allocated solely to Seller 1. In the event that the Parties cannot agree on the calculation of the Interfer Additional Purchase Price within thirty (30) days after the completion (*Vollzug*) of the sale of the Interfer Business, such dispute shall be referred to the Neutral Auditor in accordance with Section 5.4 below, provided that the Neutral Auditor's decision shall be subject to review by the arbitration court pursuant to Section 22.11 below.

**4.    Termination of Intercompany Financing Arrangements**

4.1    Seller 1 shall procure the termination of all inter-company financing arrangements existing with any of the Consolidated Companies or (with respect to the Sold US Businesses) the Retained Companies on the one hand and any Seller or Affiliate of Sellers excluding any of the Companies and the Retained Companies (herein **"Sellers' Affiliates"**) on the other hand (herein **"Intercompany Financing Arrangements"**) on the Scheduled Closing Date with economic effect (*mit wirtschaftlicher Wirkung*) as of the Closing Date. It is agreed as between the Parties that any funds drawn by the Consolidated Companies or (with respect to the Sold US Businesses) the Retained Companies under the Intercompany Financing Arrangements or any funds extended thereunder by the Consolidated Companies or (with respect to the Sold US Businesses) the Retained Companies to Sellers or Sellers' Affiliates prior to, or on the Effective Date shall be for the account of Sellers, whereas any funds drawn by the Consolidated Companies or (with respect to the Sold US Businesses) the Retained Companies under the Intercompany Financing Arrangements or extended thereunder by the Consolidated Companies or (with respect to the Sold US Businesses) by the Retained Companies to Sellers or any Sellers' Affiliates after the Effective Date and prior to, or on the Closing Date, shall be for the account of Purchasers. Any Euro-amounts drawn by the Consolidated Companies or (with respect to the Sold US Businesses) the Retained Companies or extended to Sellers or Sellers' Affiliates under the Intercompany Financing Arrangements after the Effective Date shall bear

- 46 -

interest, payable in arrears at each month's end (i.e. the last banking day of
such month), at a p.a. rate of 225 basis points over the European inter-bank
offer rates for Euro deposits with interest periods of one (1) month quoted on
the Reuters Page EURIBOR= at 11.00 a.m. C.E.T. on the first banking day of
the relevant month (herein **"EURIBOR"**). Any US Dollar amounts drawn
by the Consolidated Companies or (with respect to the Sold US Businesses)
the Retained Companies or extended to Sellers or Sellers' Affiliates under
the Intercompany Financing Arrangements after the Effective Date shall bear
interest, payable in arrears at each month's end, at a p.a. rate of 225 basis
points over the London Inter-Bank offer rates for US Dollar deposits with
interest periods of one (1) month as quoted on the Reuters Page LIBOR01 at
11:00 a.m. London time on the first banking day of the relevant month
(herein **"LIBOR"**).

4.2    Seller 1 shall see to it that prior to, or on the Scheduled Closing Date

4.2.1    the outstanding balances (including interest accrued thereon) pay-
able to the Consolidated Companies or (with respect to the Sold US
Businesses) to the Retained Companies by Sellers or any Sellers'
Affiliate under the Intercompany Financing Arrangements in Euro
(herein **"Seller Financing Payables Euro"**) existing as per the
Closing Date shall be assigned (*abgetreten*) by the respective Con-
solidated Company to Brenntag Germany for due consideration and
the outstanding balances (including interest accrued thereon) pay-
able to the Consolidated Companies or (with respect to the Sold US
Businesses) the Retained Companies by Sellers or any Sellers' Af-
filiate under the Intercompany Financing Arrangements in US
Dollars (herein **"Seller Financing Payables USD"**) existing as per
the Closing Date shall be assigned (*abgetreten*) with effect as of the
Closing Date by the respective Consolidated Company or Retained
Company to Brenntag Northeast for due consideration; for the
avoidance of doubt the Seller Financing Payables Euro and the
Seller Financing Payables USD shall not include payables arising in
connection with intra group trading activities in the ordinary course
of business;

4.2.2    the outstanding balances (including interest accrued thereon) pay-
able by the Consolidated Companies under the Intercompany Fi-
nancing Arrangements or (with respect to the Sold US Businesses)
by the Retained Companies to Sellers or any Sellers' Affiliate in
Euro (herein **"Seller Financing Receivables Euro"**) existing as per
the Closing Date shall be assumed with effect as of the Closing
Date by Brenntag Germany, in exchange for an intercompany note
from each respective Consolidated Company or (with respect to the

- 47 -

Sold US Businesses) the respective US Asset Purchaser, with full release of the respective Consolidated Company and (with respect to the Sold US Businesses) both the Retained Companies and the US Asset Purchasers (*befreiende Schuldübernahme*) and the outstanding balances (including interest accrued thereon) payable by the Consolidated Companies or (with respect to the Sold US Businesses) by the Retained Companies to Sellers or any Sellers' Affiliate under the Intercompany Financing Arrangements in US Dollars (herein **"Seller Financing Receivables USD"**) existing as per the Closing Date shall be assumed with effect as of the Closing Date by Brenntag Northeast, in exchange for an intercompany note from each respective Consolidated Company or (with respect to the Sold US Businesses) the respective US Asset Purchaser, with full release of the respective Consolidated Company and (with respect to the Sold US Businesses) both the Retained Companies and the US Asset Purchasers (*befreiende Schuldübernahme*), providing in each case the consent of the respective creditor to such change of debtor (*Zustimmung des jeweiligen Gläubigers zum Schuldnerwechsel*); for the avoidance of doubt, the Seller Financing Receivables Euro and the Seller Financing Receivables USD shall not include receivables arising in connection with intra group trading activities in the ordinary course of business;

4.2.3    the outstanding Seller Financing Payables Euro existing as per the Closing Date payable by any Seller other than Seller 1 or by any Sellers' Affiliates to any of the Consolidated Companies or (with respect to the Sold US Businesses) to any Retained Company shall be assumed by Seller 1 and the outstanding Seller Financing Payables USD existing as per the Closing Date payable by any Seller other than Seller 3 or by any Sellers' Affiliates to any of the Consolidated Companies or (with respect to the Sold US Businesses) to any of the Retained Companies shall be assumed by Seller 3, in each case for due consideration and with full release of the respective Seller or Sellers' Affiliate (*befreiende Schuldübernahme*) and providing the consent of the respective creditor to such change of debtor (*Zustimmung des jeweiligen Gläubigers zum Schuldnerwechsel*);

4.2.4    the outstanding Seller Financing Receivables Euro existing as per the Closing Date payable by the Consolidated Companies or (with respect to the Sold US Businesses) by the Retained Companies to any Seller other than Seller 1 or to any Sellers' Affiliate shall be assigned (*abgetreten*) by the respective Seller or Sellers' Affiliate to Seller 1 for due consideration and the outstanding Seller Financing

Receivables USD existing as per the Closing Date payable by the Consolidated Companies or (with respect to the Sold US Businesses) by the Retained Companies to any Seller other than Seller 3 or any Sellers' Affiliate shall be assigned (*abgetreten*) by the respective Seller or Sellers' Affiliate to Seller 3 for due consideration; and

4.2.5    with effect as of the Closing Date, (i) the Seller Financing Payables Euro and the Seller Financing Receivables Euro so assigned to and assumed by Brenntag Germany and Seller 1 respectively shall be netted off against each other (*werden gegeneinander aufgerechnet*) at the level of Brenntag Germany on the one hand and Seller 1 on the other hand and (ii) the Seller Financing Payables USD and the Seller Financing Receivables USD so assigned to and assumed by Brenntag Northeast and Seller 3 respectively shall be netted off against each other (*werden gegeneinander aufgerechnet*) at the level of Brenntag Northeast on the one hand and Seller 3 on the other hand ((i) and (ii) herein "**Netting-Off**").

The balance owed after the Netting-Off by either Brenntag Germany to Seller 1 or Seller 1 to Brenntag Germany, as the case may be, shall be referred to as "**Intercompany Debt Balance Euro**" and the balance owed after the Netting-Off by either Brenntag Northeast to Seller 3 or Seller 3 to Brenntag Northeast shall be referred to as "**Intercompany Debt Balance USD**". The Intercompany Debt Balance Euro and the Intercompany Debt Balance USD shall be collectively referred to as "**Intercompany Debt Balances**".

4.3    Three (3) business days prior to the Scheduled Closing Date, Sellers shall deliver to Purchasers an estimate of the Intercompany Debt Balances existing on the Closing Date (herein "**Preliminary Intercompany Debt Balance Euro**" and "**Preliminary Intercompany Debt Balance USD**" and collectively "**Preliminary Intercompany Debt Balances**"). The Preliminary Intercompany Debt Balances shall be settled on the Scheduled Closing Date as follows:

4.3.1    in the event that the Preliminary Intercompany Debt Balance Euro and/or Preliminary Intercompany Debt Balance USD is in favour of Seller 1 and/or Seller 3, Purchasers shall, for the account of the Consolidated Companies and/or (with respect to the Sold US Businesses) both the Retained Companies and the US Asset Purchasers, pay the outstanding amounts free of costs and charges in immediately available funds by wire transfer into Sellers' Account Euro and/or Sellers' Account USD (as the case may be), with full release

- 49 -

of the Consolidated Companies and both the Retained Companies and the US Asset Purchasers (*mit schuldbefreiender Wirkung*); and

4.3.2    in the event that the Preliminary Intercompany Debt Balance Euro and/or Preliminary Intercompany Debt Balance USD is in favour of Brenntag Germany and/or Brenntag Northeast, (i) Seller 1 and/or Seller 3 shall pay the outstanding amounts free of costs and charges in immediately available funds by wire transfer into Purchasers' Account Euro and/or Purchasers' Account USD (as the case may be) or; alternatively, at the election of Sellers, the Preliminary Intercompany Debt Balance Euro and/or Preliminary Intercompany Debt Balance USD may be set off (*verrechnet*) against the Preliminary Purchase Price, and (ii) Purchaser 1 or, at the election of Purchasers, one or several Designated Nominees shall assume as per the Closing Date the corresponding outstanding accounts payable to Brenntag Germany and/or Brenntag Northeast from Seller 1 and /or Seller 3 with full release of Seller 1 and/or Seller 3 respectively (*mit schuldbefreiender Wirkung*), it being understood that Brenntag Germany and Brenntag Northeast shall consent to such change of debtor (*Schuldnerwechsel*) substantially in the format being attached hereto as Exhibit 4.3.2.

Failing agreement between the Parties on the Preliminary Purchase Price pursuant to Section 3.2 above, without prejudice to the provisions contained in Section 4.1 above and Section 4.4 below, the amount to be paid by Purchasers for settling the Preliminary Intercompany Debt Balances on the Scheduled Closing Date shall not exceed EUR 620,000,000.00 (in words: Euro six hundred and twenty million) minus (i) the amount of any financial debt owed to banks (*Bankverbindlichkeiten*) on the Scheduled Closing Date minus (ii) the amount by which the aggregate amount of any incremental Seller Financing Receivables Euro and/or Seller Financing Receivables USD drawn by the Consolidated Companies or (with respect to the Sold US Businesses) by the Retained Companies between the Effective Date and the Scheduled Closing Date falls short of EUR 26,000,000.00 (in words: Euro twenty-six million); it being understood that (a) the amounts referred to under (i) and (ii) shall be based on the estimates delivered by Sellers in accordance with this Section 4.3 above and (b) that if the amount calculated under (ii) is negative, the deduction shall be zero (0).

4.4    Without undue delay after the Closing Date, Sellers shall determine (i) the final balance of the Seller Financing Payables Euro and the Seller Financing Receivables Euro (herein **"Final Intercompany Debt Balance Euro"**) and (ii) the final balance of the Seller Financing Payables USD and the Seller Financing Receivables USD (herein **"Final Intercompany Debt Balance USD"**) ((i) and (ii) collectively **"Final Intercompany Debt Balances"**) as

- 50 -

per the Closing Date and (iii) the Interest Amount and shall deliver a statement to such effect to Purchasers within ten (10) business days (*Werktage*) after the Closing Date. To the extent Purchasers approve of the Final Intercompany Debt Balance including the Interest Amount or to the extent Purchasers do not object to it within two (2) weeks after delivery thereof, the Final Intercompany Debt Balances and the Interest Amount shall become binding as between the Parties. To the extent Purchasers object to the Final Intercompany Debt Balances including the Interest Amount within the aforesaid two (2) weeks period, such dispute shall be settled in accordance with the procedures laid out in Section 5.4 below. Upon any parts of the Final Intercompany Debt Balances becoming binding in accordance with the foregoing, any deviations between the Preliminary Intercompany Debt Balances and the Final Intercompany Debt Balances that become binding upon the Parties in accordance with the foregoing (herein **"Adjustment Amount"**) shall be settled as follows:

4.4.1    in the event that an Adjustment Amount shall be in favour of Seller 1 and/or Seller 3, Purchasers shall pay to Seller 1 and/or Seller 3 (as the case may be) such Adjustment Amount plus interest thereon at a p.a. rate of 225 basis points over EURIBOR or 225 basis points over LIBOR (as the case may be) as from and including the Closing Date until, but not including, the day of payment, by wire transfer into Sellers' Account Euro and/or Sellers' Account USD.

4.4.2    in the event that an Adjustment Amount shall be in favour of Brenntag Germany and/or Brenntag Northeast, Seller 1 and/or Seller 3 shall pay to Purchasers such Adjustment Amount plus interest thereon at a p.a. rate of 225 basis points over EURIBOR or 225 basis points over LIBOR (as the case may be) as from and including the Closing Date, until, but not including, the day of the payment, by wire transfer into Purchasers' Account Euro or Purchasers' Account USD.

C.    **EFFECTIVE DATE BALANCE SHEET, SIGNING DATE, EFFECTIVE DATE, CLOSING DATE AND CLOSING**

5.    **Effective Date Balance Sheet and Adjustment Statement**

5.1    The Financial Debt, the Cash, the Working Capital and the CapEx 2003 Amount for the Consolidated Companies and the Sold US Businesses, each existing as of the Effective Date, shall be determined on the basis of an audited and certified consolidated group balance sheet (*Gruppenbilanz*) for the Consolidated Companies, the Sold US Businesses, the Sold Real Estate

Brenntag and the Sold Real Estate Interfer including a reconciliation statement (*Überleitungsrechnung*) (herein "**Effective Date Balance Sheet**"). A statement listing the individual Financial Debt, Cash, Working Capital and CapEx 2003 Amount items set forth in Sections 3.1.2 through 3.1.7 above, including a separate break up of the Financial Debt, Cash, Working Capital and the CapEx 2003 Amount, allocated to the Purchase Object following the allocations set out in Exhibit 3.3 and containing the determination of the Purchase Price Adjustment (herein "**Adjustment Statement**"), shall be prepared by Sellers with the cooperation of the Consolidated Companies (and the Retained Companies respectively). The Effective Date Balance Sheet shall be audited and certified without qualifications in accordance with the audit report certificate (*Bescheinigung*) attached hereto as Exhibit 5.1-1 and the Adjustment Statement shall be reviewed (*prüferische Durchsicht gemäß PS 900*) by PwC Deutsche Revision AG, Düsseldorf, Germany (herein "**Sellers' Auditor**"). The Effective Date Balance Sheet and the Adjustment Statement shall each be prepared in accordance with generally accepted principles of accounting and preparation of annual accounts in Germany, as applicable on the Effective Date (herein "**German GAAP**"), subject to (i) utilizing and continuing the same capitalization, election rights, valuation and consolidation principles and the same interpretation of the SKA forms and line items consistently applied and as used in preparation of the Financial Statements (as defined in Section 7.1.19 below) (herein "**Consistency Principle**") and (ii) the specifically agreed upon accounting principles set out in Exhibit 5.1-2 (herein "**Specific Accounting Principles**"). In the event of conflicts between German GAAP, the Consistency Principle or the Specific Accounting Principles, the following shall apply for purposes of preparing the Effective Date Balance Sheet and the Adjustment Statement: (A) Specific Accounting Principles shall prevail over the Consistency Principle, except for cases where this would lead to an allocation of Financial Debt, Cash, Working Capital or, CapEx 2003 Amount positions to SKA form and line items which differs from the allocation provided for in Section 3.1 above or the Reporting Package; (B) Specific Accounting Principles shall prevail over German GAAP; (C) the Consistency Principle shall prevail over German GAAP. If and to the extent that (a) any breach(es) of Sellers' covenants contained in Section 13.2 sub-sections (i) or (v) below have reduced or increased, as the case may be, the Financial Debt or increased or decreased, as the case may be, the Cash or increased or decreased, as the case may be, the Working Capital or increased or decreased, as the case may be, the CapEx 2003 Amount (in each case as compared to without such breach of covenant(s)) and (b) such breach(es) of covenant(s) has/have been acknowledged by Sellers in writing, the Adjustment Statement shall be prepared as if such breach of Sellers' covenant(s) had not occurred. For the avoidance of doubt, the Parties confirm that for the purposes of the interpretation of the SKA form and line items referring to consolidated companies (*konsolidierte Un-*

- 52 -

*ternehmen*) the Effective Date Balance Sheet shall assume that the Consolidated Companies are part of the consolidated Stinnes group.

5.2    Sellers shall until the Closing Date, and Purchasers shall after the Closing Date, instruct the management of each of the Consolidated Companies and the Retained Companies to effectively assist Sellers' Auditor in the certification and review of the Effective Date Balance Sheet and the Adjustment Statement, in particular, by providing all information and documentation that (i) is relevant for reviewing the Effective Date Balance Sheet and the Adjustment Statement, and (ii) has been reasonably requested by Sellers. The Effective Date Balance Sheet and the Adjustment Statement shall be delivered to Ernst & Young AG, Eschborn, Germany, (herein **"Purchasers' Auditor"**), subject to execution by Purchasers and Purchasers' Auditor of a release letter and a hold harmless letter substantially in the formats attached hereto as Exhibit 5.2-1 and Exhibit 5.2-2, at the later of (a) forty-five (45) days after the Closing Date or (b) April 30, 2004. Purchasers' Auditor shall receive all necessary assistance and shall be given access to the management of the Consolidated Companies and the Retained Companies, and to all relevant documentation necessary for reviewing the Effective Date Balance Sheet and the Adjustment Statement, including the Reporting Package (*Formularab-schluss*) and the working papers of Sellers' Auditor.

5.3    The calculation of the Financial Debt, the Cash, the Working Capital and the CapEx 2003 Amount shall be based on the Effective Date Balance Sheet and the Adjustment Statement to the extent that Purchasers do not within forty-five (45) days after the receipt of the Effective Date Balance Sheet and the Adjustment Statement provide Sellers with a written report asserting that the Effective Date Balance Sheet and/or the Adjustment Statement received from Sellers do not meet the provisions of this Agreement by way of stating specific objections to that effect and provided that in such event a revised Effective Date Balance Sheet (herein **"Revised Effective Date Balance Sheet"**) and/or a revised Adjustment Statement (herein **"Revised Adjustment Statement"**) shall be prepared by Purchasers' Auditor and submitted to Sellers within the same forty-five (45) days' period mentioned above which shall take into account the changes that are necessary in Purchasers' Auditor's view. Sellers' Auditor shall receive all necessary assistance and shall be given access to the management of the Consolidated Companies and the Retained Companies and to all documentation relevant for reviewing the Revised Effective Date Balance Sheet and the Revised Adjustment Statement, including the working papers of Purchasers' Auditor. If no written objections are raised by Sellers within forty-five (45) days following the delivery of the Revised Effective Date Balance Sheet and the Revised Adjustment Statement by Purchasers' Auditor to Sellers, then the Revised Effective Date Balance

- 53 -

Sheet and the Revised Adjustment Statement shall be final and binding on the Parties.

5.4    If, after Sellers having raised in time and due form their objections against the Revised Effective Date Balance Sheet and/or the Revised Adjustment Statement (herein **"Objections"**), Sellers and Purchasers cannot agree on the changes to the Revised Effective Date Balance Sheet or the Revised Adjustment Statement within thirty (30) days following the delivery of the Objections, each of Sellers and Purchasers shall be entitled to request the "*Institut der Wirtschaftsprüfer in Deutschland e.V.*", Düsseldorf, to appoint an auditor to act as an arbitrator (*Schiedsgutachter*) (herein **"Neutral Auditor"**) to determine the correct amount of the Financial Debt, the Cash, the Working Capital and the CapEx 2003 Amount as at the Effective Date, if and to the extent such positions are in dispute between Sellers and Purchasers. The Neutral Auditor shall decide only on the specific line items in dispute in accordance with the principles set out in Section 5.1 above. The Neutral Auditor shall give Sellers and Purchasers adequate opportunity to present their views in writing and at a hearing or hearings to be held in the presence of Sellers and Purchasers and their advisors. The final decision of the Neutral Auditor must not fall beyond or outside the position taken by the Parties. The Neutral Auditor shall give reasons for its decision and on the specific line items in dispute between Sellers and Purchasers. The costs and expenses incurred by the Neutral Auditor shall be borne equally by Sellers on the one hand and Purchasers on the other hand. The Effective Date Balance Sheet and the Revised Adjustment Statement as determined by the Neutral Auditor shall be final and binding on the Parties subject to Section 319 German Civil Code.

6.    **Signing Date, Effective Date, Scheduled Closing Date, Closing Date and Closing**

6.1    Signing Date, Effective Date, Scheduled Closing Date and Closing Date shall each have the following meaning in this Agreement:

6.1.1    **"Signing Date"** (*Unterzeichnungsstichtag*) shall be the day on which this Agreement has been duly executed before a notary public;

6.1.2    **"Effective Date"** shall be December 31, 2003, 24:00 hrs;

6.1.3    **"Scheduled Closing Date"** shall be ten (10) business days (*Werktage*) after all of the Closing Conditions have been fulfilled or waived or any other day as agreed between the Parties; and

- 54 -

6.1.4 **"Closing Date"** shall be the day on which all, and not some only of the Closing Events shall have taken place or have been duly waived pursuant to Section 6.7 below.

6.2 The obligation to carry out the Closing (as defined in Section 6.6 below) shall be subject to the satisfaction of each of the following conditions:

6.2.1 the merger control clearances required under the applicable merger control provisions of the European Union, the United States of America, Canada, Poland, the Slovak Republic, South Africa, Romania, the Czech Republic and Cyprus have been obtained or the respective waiting periods have expired (herein collectively **"Antitrust Clearances"**);

6.2.2 the approval pursuant to Section 65 (3) German Budget Act (*Bundeshaushaltsordnung*) has been obtained;

6.2.3 the approval of the supervisory board (*Aufsichtsrat*) of Sellers' Guarantor has been obtained;

(herein collectively **"Closing Conditions"**). Sellers (jointly but not individually) and Purchasers (jointly but not individually) may waive jointly the occurrence of the Antitrust Clearances in the European Union, the United States of America, Canada or Poland whereas Purchasers may waive (jointly but not individually) the occurrence of the Antitrust Clearances in the Slovak Republic, South Africa, Romania, the Czech Republic or Cyprus (herein **"Other Jurisdictions"**) in their reasonable discretion.

6.3 The Parties undertake to use all reasonable endeavors and to render to each other all reasonably necessary support and cooperation to ensure that the Closing Conditions are fulfilled as soon as possible after the Signing Date. In particular, though each Party remains responsible for preparing and making its own required filings, Sellers and Purchasers shall cooperate with one another in preparing and doing the filings described in Section 6.2.1 above and in furnishing all information required in connection therewith. The Parties shall inform each other in writing without undue delay as soon as any or all of the Closing Conditions have been fulfilled. Purchasers shall undertake or cause to be undertaken all steps reasonably necessary to remove any impediments, restrictions, or conditions that may affect the Antitrust Clearances, including, but not limited to, Purchasers' selling or divesting of non-material tangible or intangible assets or business operations as necessary to receive the approval or clearance of competition or antitrust authorities in all jurisdictions referred to in Section 6.2.1 above, or to remove any decision,

- 55 -

order, decree, complaint, injunction, or other impediment or restriction which impedes or threatens to impede the Closing.

6.4    Either Sellers (jointly, but not individually) or Purchasers (jointly, but not individually) may withdraw (*zurücktreten*) from this Agreement by written notice to the other Party if the Closing Conditions subject to Section 6.2 final paragraph above shall not have been fulfilled at the latest three (3) months after the Signing Date unless the Party claiming such withdrawal is responsible for (*hat zu vertreten*) the non-fulfillment of the Closing Conditions. Such right to withdraw shall, however, not exist if some or all of the Antitrust Clearances relating to the Other Jurisdictions have not been obtained or the respective waiting periods have not expired and Purchasers have not waived the respective Antitrust Clearances in accordance with the final paragraph of Section 6.2 above prior to the aforementioned three (3) months' period. In such event either Sellers (jointly, but not individually) or Purchasers (jointly, but not individually) may only withdraw from this Agreement if not all of the Antitrust Clearances relating to the Other Jurisdictions have been obtained or are deemed to be obtained twelve (12) months after the Signing Date. Such withdrawal (*Rücktritt*) is only valid if the other Party (i.e. each Seller or each Purchaser) has received such written notice of withdrawal (*Rücktrittserklärung*) prior to the date on which the Closing Conditions have been fulfilled. In the event of a withdrawal, none of the Parties shall have any obligation or incur any liability towards the other Parties provided, however, that Sections 20, 21 and 22 of this Agreement shall survive and remain in full force and effect, and the Parties herewith waive all such claims they may have against each other in connection with such withdrawal, except for any liability of any Party for damages for willful breach of any covenant or other obligation under this Agreement.

6.5    With the exception of the withdrawal right under Section 6.4 above, Purchasers (jointly, but not individually) shall, until Closing has occurred, be entitled to withdraw (*zurücktreten*) from this Agreement with effect for all Parties if:

6.5.1    circumstances have arisen or become known on or prior to the Scheduled Closing Date which result in the Sellers' Guarantees having being breached in a manner which would be reasonably expected to result in Losses (as defined in Section 9.1 below) in the aggregate amount of more than EUR 100,000,000.00 (in words: Euro one hundred million) (herein "**Material Breach of Guarantees**");

6.5.2    circumstances have arisen or become known on or prior to the Scheduled Closing Date which result in a non-compliance by Sell-

- 56 -

ers with Sellers' covenants as provided for in Section 13 below in a manner which is reasonably likely to result in Losses in the aggregate amount of more than EUR 100,000,000.00 (in words: Euro one hundred million) (herein **"Material Breach of Covenants"**); or

6.5.3    any facts or circumstances shall have occurred or become known to the Purchasers between the Signing Date and the Scheduled Closing Date which, individually or in the aggregate, have or would reasonably be expected to have a material adverse effect on the assets, results of operation, financial condition or business of the acquired Business taken as a whole which could reasonably be expected to result in Losses in the aggregate exceeding an amount of EUR 100,000,000.00 (in words: Euro one hundred million) (herein **"Material Adverse Change"**), provided, however, that any such adverse effect shall not be deemed to constitute a Material Adverse Change if and to the extent it results from (i) a general down-turn in the economy or the market in which the Business operates or to which it is related, or (ii) general economic conditions or conditions in the financial markets, or (iii) the public announcement of entering into the transaction contemplated hereunder or (iv) actions of the Companies' customers and/or suppliers which could be reasonably expected as a result of the transaction contemplated hereunder, or (v) any loss, damage, cost, liability or effect to the extent that Purchasers have been compensated or indemnified for it by Sellers or which otherwise has been cured by Sellers as mutually agreed on by the Parties with respect to such cure or with regard to which the Parties have mutually agreed on a plan for the curing, or (vi) any changes in applicable laws or regulations.

Sellers (jointly but not individually) shall, until Closing has occurred, be entitled to withdraw (*zurücktreten*) from this Agreement with effect for all Parties if either (i) a Material Adverse Change or a Material Breach of Guarantees or a Material Breach of Covenants is present or (ii) the presence of a Material Adverse Change or a Material Breach of Guarantees or a Material Breach of Covenants is asserted by Purchasers; it being, however, understood that Sellers shall not have a right to withdraw from this Agreement in the event that the Material Breach of Guarantees or Material Breach of Covenants has been willfully (*vorsätzlich*) committed by Sellers. In the event that Purchasers and Sellers cannot agree whether or not a Party is entitled to withdraw from this Agreement under this Section 6.5, the Parties to this Agreement shall engage in amicable discussions for a period of fifteen (15) days starting on the Scheduled Closing Date with a view to arriving at a joint conclusion regarding the existence of a right to withdraw from this Agreement under this Section 6.5. After the expiry of the aforesaid period the

- 57 -

rights of the Parties to withdraw from this Agreement remain unaffected. The penultimate and last sentences of Section 6.4 above shall apply *mutatis mutandis* to a withdrawal pursuant to this Section 6.5.

6.6     The closing (*Vollzug*) of the transaction contemplated hereunder (herein **"Closing"**) shall occur on the Scheduled Closing Date. If for any reason the Closing does not occur on the Scheduled Closing Date, the Closing shall occur as soon as possible thereafter. On the Scheduled Closing Date the following events (herein **"Closing Events"**) shall take place at the offices of Freshfields Bruckhaus Deringer, Frankfurt am Main, Germany or at such place as agreed between the Parties:

6.6.1     payment of (i) the Preliminary Purchase Price into Sellers' Account Euro, Brenntag West's Account, WCD's Account, Eastech's Account and Crozier-Nelson's Account respectively in accordance with the allocation of the Preliminary Purchase Price shown in Exhibit 3.3 and (ii) the Brenntag Real Estate Purchase Price and the Interfer Real Estate Purchase Price into Sellers' Account Euro;

6.6.2     settlement of the Preliminary Intercompany Debt Balances pursuant to Section 4.3 above;

6.6.3     delivery by Purchasers of (i) evidence satisfactory to Sellers that the Sellers' Bank Guarantees (as defined in Section 15.1 below) provided by Sellers or Sellers' Affiliates in favor of the Business have been replaced or (ii) a bank guarantee in the aggregate amount of the Sellers' Bank Guarantees outstanding at the Scheduled Closing Date, in each case in accordance with the terms set out in Section 15.1 below;

6.6.4     with respect to the Foreign Shares, execution of share transfer agreements relating to the Foreign Shares and/or delivery of share certificates evidencing the Foreign Shares accompanied by stock transfer powers, such agreements or stock transfer powers being substantially in the form as set forth in Exhibits 6.6.4-1 through 6.6.4-16 (herein individually or collectively **"Foreign Share Transfer Instruments"**);

6.6.5     execution of the Minority Shares Transfer Agreements between (i) Stinnes Belgium N.V. and Purchaser 1 or the Designated Nominee and (ii) the Interfer Minority Shareholder and Purchaser 2, (iii) the French Sale and Transfer Agreements between the French Minority Shareholders and Purchaser 4 or the Designated Nominee(s), and

- 58 -

delivery of any approval necessary by the board of directors of Brenntag France of the French Sale and Transfer Agreements;

6.6.6  execution of the Brenntag Real Estate Sale and Transfer Agreement between the Real Estate Affiliates and Blitz 03-1404 GmbH and of the Interfer Real Estate Sale and Transfer Agreement between Seller 1, Zweite Kommanditgesellschaft Stinnes Immobiliendienst GmbH & Co., Mülheim a. d. R. and Purchaser 2;

6.6.7  execution and simultaneous consummation of the US Asset Purchase Agreements between each of the Retained Companies on the one hand, and the US Asset Purchaser(s) on the other hand, and of each related assignment and assumption agreement (Exhibit B to the US Asset Purchase Agreement, herein collectively **"Assignment and Assumption Agreements"**), and of each related bill of sale (Exhibit A to the US Asset Purchase Agreement, herein collectively **"Bills of Sale"**);

6.6.8  execution of a lease agreement (herein **"Billings Montana Lease Agreement"**) between Brenntag West and a US Asset Purchaser regarding the site located at Billings, Montana bordered by Klench Lane and Taylor Place, containing approximately seven (7) acres (herein **"Billings Montana Site"**) substantially on the terms attached hereto as Exhibit 6.6.8;

6.6.9  delivery of resignation letters of the individuals who are board members of any of the Companies and who are not employees of the Companies; and

6.6.10  execution and delivery of the documents listed in Sections A through F of Exhibit 13.11 and satisfaction of the conditions of Section G of Exhibit 13.11.

6.7  The Closing Events listed in Sections 6.6.1 through 6.6.3 above can be waived by Sellers. The Closing Events listed in Sections 6.6.4 through Sections 6.6.10 above can be waived by Purchasers. Section 6.4 shall apply *mutatis mutandis* in the event that not all of the Closing Events shall have been fulfilled thirty (30) days after the Scheduled Closing Date, provided, however, that in the event that all of the Closing Events are ready to be fulfilled or waived pursuant to this Section 6.7 by the Parties within the aforesaid thirty (30) days' period other than the delivery of the Legal Opinions (as defined in Section 13.11 below), the Parties may only withdraw from this Agreement if the Closing has not taken place thirty (30) days after the actual delivery of the Legal Opinions.

**D.    GUARANTEES, REMEDIES, INDEMNITIES AND COVENANTS**

**7.    Sellers' Guarantees**

7.1    Sellers hereby guarantee subject to any limitations contained in this Agreement, in particular, but not limited to, the remedies set out in Section 9 below, the Time Limitations (as defined in Section 14.1 below), the exclusion of De Minimis Claims (as defined in Section 14.3 below), the Deductible (as defined in Section 14.3 below) and the Liability Cap (as defined in Section 14.4 below) by way of an independent guarantee pursuant to Section 311 (1) German Civil Code (BGB) that the statements set forth hereinafter are true and correct as at the Signing Date and the Effective Date, unless expressly specified otherwise herein; provided, however, that the statements which are subject to the Best Knowledge of Sellers (as defined in Section 7.3 below) shall only be true as at the Signing Date (herein collectively **"Sellers' Guarantees"**):

      7.1.1    **Enforceability, No Conflict.** This Agreement has been duly executed by each of the Sellers and constitutes the legal, valid, and binding obligation of each such Seller. The Spin-Off Agreement, the Contribution Agreement, the Brenntag Real Estate Sale and Transfer Agreement, the Interfer Real Estate Sale and Transfer Agreement, the US Asset Purchase Agreements, the related Bills of Sale and the Assignment and Assumption Agreements, the Foreign Share Transfer Instruments and the Minority Share Transfer Agreements (herein collectively **"Ancillary Agreements"**), have been or shall have been as of the Closing Date duly executed by Sellers, the Real Estate Affiliates, the Retained Subsidiaries, Stinnes Belgium N.V. and the Interfer Minority Shareholder respectively (the Real Estate Affiliates, the Retained Subsidiaries, Stinnes Belgium N.V. and the Interfer Minority Shareholder herein collectively **"Affiliated Parties"** and each an **"Affiliated Party"**), and each constitute the legal, valid, and binding obligations of the respective Seller or Affiliated Party. This Agreement and the Ancillary Agreements, are enforceable under the respective governing laws against Sellers or the respective Affiliated Party (as the case may be) in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or affecting the rights of creditors generally, and except that the remedies of specific performance and injunctive relief and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefore may

- 60 -

be brought. Each Seller and each Affiliated Party (as the case may
be) has the right, power, authority, and capacity to execute this
Agreement or the respective Ancillary Agreements and to perform
its obligations under this Agreement or the respective Ancillary
Agreements (as the case may be), the execution and performance of
which have been duly authorized and approved by all necessary
corporate action by Sellers or the Affiliated Parties. Except for the
approvals required pursuant to Section 6.2 above and except as dis-
closed in Schedule 7.1.1, Sellers and the Affiliated Parties, as the
case may be, (i) are not required to give any notice to any person or
governmental or regulatory authority, or obtain any consent,
waiver, authorization or approval from any such person or govern-
mental or regulatory authorization, or (ii) have given such notice or
have obtained such consent, waiver, authorization or approval, in
each case in connection with (a) the execution of this Agreement by
Sellers and the performance by Sellers of their respective obliga-
tions hereunder and (b) the execution of the Ancillary Agreements
by Sellers and the Affiliated Parties concerned and the performance
by Sellers and the Affiliated Parties of their respective obligations
thereunder. The execution and performance by Sellers of this
Agreement or by the respective Affiliated Parties of the Ancillary
Agreements does not violate or conflict with any provision of the
charter or other organizational documents or by-laws of any of the
Sellers or the Affiliated Parties, as the case may be (or any resolu-
tion adopted by the respective supervisory board or boards of di-
rectors of the Sellers or any Affiliated Party) and does not violate
any provision of law, or any order, judgement or decree of any
court or other governmental or regulatory authority, nor violate nor
result in a breach of or constitute (with due notice or lapse of time
or both) a default under any material agreement or instrument to
which any Seller or Affiliated Party is a party or by which any of
them is bound, nor result in the creation or imposition of any lien,
charge or encumbrance of any kind whatsoever upon any of the
properties or assets of the Consolidated Companies or the Sold US
Businesses.

7.1.2    **Existence and Capitalization of Companies; Ownership of
Shares.** Except as disclosed in Schedule 7.1.2, (i) each of the Com-
panies and the Retained Companies is duly organized and validly
existing under the laws of its jurisdiction, (ii) each of the Compa-
nies and the Retained Companies has all requisite corporate power
and authority to own its respective properties and assets and to con-
duct its respective business substantially in the form as conducted
on the Signing Date, (iii) each of the Companies or (with respect to

A.Prot. 2003/479 Cu

- 61 -

the Sold US Businesses) each of the Retained Companies is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction where the character of the properties owned or leased by it or the nature of the business conducted by it makes such qualification necessary except where the failure to be so qualified or in good standing is not reasonably expected to result in a Material Adverse Effect (as defined in Section 7.1.5 below), (iv) the information provided in Section 1 regarding the ownership of shares (excluding, for the avoidance of doubt, any information which is not necessary in order to determine the aggregate share-holding in a Company such as the number, the nominal amounts and the percentages of individual shares) is correct and, subject to the foregoing limitations, none of the Companies or (with respect to the Sold US Businesses) none of the Retained Companies owns any interest in any corporation, partnership, joint venture or other busi-ness entity other than the shareholdings listed in Exhibit 1.1 or forming a part of the Excluded Assets under any of the US Asset Purchase Agreements, (v) the Shares and the Limited Partnership Interest as well as the shares held directly or indirectly by Sellers in the Companies or in the Retained Companies have been duly authorized and validly issued, and are fully paid-up and have not been repaid, are non-assessable and free and clear of any third party rights and owned directly or indirectly by Sellers and have not been pledged, assigned, charged or used as a security or otherwise en-cumbered, (vi) no outstanding options, warrants, agreements, con-version rights, preemptive rights or other similar rights exist, in each case for the benefit of third parties, to subscribe for, purchase or otherwise acquire any shares or equivalent equity interests in any of the Companies or (with respect to the Sold US Business) any of the Retained Companies, (vii) there are no silent partnerships, sub-shareholdings or similar arrangements and there are no sharehold-ers' resolutions on the redemption of shares in Companies which are directly or indirectly held by Sellers and (viii) no resolutions have been passed by the competent bodies to liquidate, dissolve or otherwise wind up any of the Companies or the Retained Compa-nies.

7.1.3    **Bankruptcy or Judicial Composition Proceedings**. As per the Closing Date, except as disclosed in <u>Schedule 7.1.3</u>, no bankruptcy or judicial composition proceedings concerning Sellers or a Con-solidated Company or a Retained Subsidiary have been applied for and, to the Best Knowledge of Sellers, no circumstances exist which would require the application for any bankruptcy or judicial composition proceedings under mandatory law and, to the Best

- 62 -

Knowledge of Sellers, no circumstances exist pursuant to any applicable bankruptcy laws which could justify the voidance of this Agreement or any of the Ancillary Agreements.

7.1.4    **Enterprise Agreements.** As per the Closing Date, except as disclosed in Schedule 7.1.4, none of the Consolidated Companies is a party to an enterprise agreement within the meaning of Sections 291 and 292 German Stock Corporation Act (*AktG*) or comparable agreements under other jurisdictions.

7.1.5    **Material Agreements.** To the Best Knowledge of Sellers, the Consolidated Companies or (with respect to the Sold US Businesses) the Retained Companies are not a party to any of the following agreements and commitments which have not yet been completely fulfilled (*nicht vollständig erfüllte Verträge*), the existence of which, or the termination of which, could have a Material Adverse Effect (herein collectively "**Material Agreements**") except, however, for the agreements and commitments (a) listed or disclosed in Schedule 7.1.5 (i) through (xi) or (b) otherwise referred to in this Agreement or (c) entered into amongst the Companies or (d) between a Company and a Retained Company:

7.1.5.1    With regard to the Consolidated Brenntag Group Companies or (with respect to the Sold US Businesses) the Retained Companies:

(i)    loan and credit agreements, or other agreements or instruments evidencing financial indebtedness of any of the Consolidated Brenntag Group Companies or (with respect to the Sold US Businesses) the Retained Companies (excluding, for the avoidance of doubt, obligations under any capital or financial lease and trade indebtedness) in excess of EUR 500,000.00 or securing such indebtedness such as pledges, guarantees, securities (*Bürgschaften*) or letters of comfort (*Patronatserklärungen*) extended by the Consolidated Brenntag Group Companies or (with respect to the Sold US Businesses) by the Retained Companies, to any third parties and that will continue in effect or with respect to which any of the Consolidated Brenntag Group Companies or (with respect to the Sold US Businesses) the US Asset Purchasers will have any liabilities after the Closing Date;

- 63 -

(ii) non-compete, restrictive covenants or other agreements that restrict any of the Consolidated Brenntag Group Companies or (with respect to the Sold US Businesses) the Retained Companies from operating the Business as conducted on the Signing Date except for vertical restrictions under distributorship, agency, license agreements and like agreements;

(iii) trademark and know how license agreements that involve annual royalties in excess of EUR 250,000.00;

(iv) agreements relating to toll manufacturing of any products belonging to third parties (*Lohnherstellung*), each agreement involving an amount in excess of EUR 1,000,000.00 p.a.;

(v) agreements, entered into in the last five (5) years, relating to the acquisition or disposition (whether by stock or asset purchase, merger or otherwise) of any business or any cooperation, partnership, association or other business organization or division thereof, which in each case involves payment obligations in excess of EUR 1,000,000.00;

(vi) lease, leasehold or hereditary building right agreements relating to real properties which, individually, provide for a net present value of EUR 2,500,000.00 or more;

(vii) to the extent not already covered by (v) above, contracts or other agreements relating to the construction or acquisition of fixed assets or other capital expenditures involving an amount in excess of EUR 2,500,000.00 p.a.;

(viii) contracts and other agreements to sell, lease or otherwise dispose of any assets owned by the Consolidated Brenntag Group Companies or (with respect to the Sold US Businesses) the Retained Companies other than in the ordinary course of

- 64 -

business involving an amount in excess of EUR 2,500,000.00 p.a.;

(ix)    raw material purchase agreements which involve payments in excess of EUR 10,000,000.00 p.a.;

(x)    contracts providing for expected sales volumes in the current business year in excess of EUR 500,000.00 p.a. that contain a clause which allows a termination or material amendment of the contract as consequence of the consummation of the transaction contemplated under this Agreement ("change-of-control-clause");

(xi)    any contract for any joint venture, partnership or similar arrangement or any agreement relating to holding, voting or transferring any equity interests in any entity by any Consolidated Brenntag Group Company or (with respect to the Sold US Businesses) by the Retained Companies;

7.1.5.2    With regard to the Consolidated Interfer Group Companies:

(i)    loan and credit agreements, or other agreements or instruments evidencing financial indebtedness of any of the Consolidated Interfer Group Companies (excluding, for the avoidance of doubt, obligations under any capital or financial lease and trade indebtedness) in excess of EUR 100,000.00 or securing such indebtedness such as pledges, guarantees, securities (*Bürgschaften*) or letters of comfort (*Patronatserklärungen*) extended by the Consolidated Interfer Group Companies to any third parties and that will continue in effect or with respect to which any of the Consolidated Interfer Group Companies will have any liabilities after the Closing Date;

(ii)    non-compete, restrictive covenants or other agreements that restrict any of the Consolidated Interfer Group Companies from operating the Business as conducted on the Signing Date except

Case 3:23-cv-10815-MBK Document 18-09/08/23 03/24/25 09 Page 424:01 1429 PageID: 782
Exhibit F - MSPA - Part 1 Page 66 of 75

- 65 -

for vertical restrictions under distributorship, agency, license agreements and like agreements;

(iii)    trademark and know how license agreements which involve annual royalties in excess of EUR 100,000.00;

(iv)    agreements relating to toll manufacturing of any product belonging to third parties (*Lohnherstellung*), each agreement involving an amount in excess of EUR 250,000.00 p.a.;

(v)    agreements, entered into in the last five (5) years, relating to the acquisition or disposition (whether by stock or asset purchase, merger or otherwise) of any business or any cooperation, partnership, association or other business organization or division thereof, which in each case involve payment obligations in excess of EUR 250,000.00;

(vi)    lease, leasehold or hereditary building right agreements relating to real properties which, individually, provide for a net present value of EUR 500,000.00 or more;

(vii)    to the extent not already covered by (v) above, contracts or other agreements relating to the construction or acquisition of fixed assets or other capital expenditures involving an amount in excess of EUR 500,000.00 p.a.;

(viii)  contracts and other agreements to sell, lease or otherwise dispose of any assets owned by the Consolidated Interfer Group Companies other than in the ordinary course of business involving an amount in excess of EUR 500,000.00 p.a.;

(ix)    raw material purchase agreements which involve payments in excess of EUR 1,000,000.00 p.a.;

(x)    contracts providing for expected sales volumes in the current business year in excess of EUR 250,000.00 p.a. that contain a clause which allows a termination or material amendment of the

- 66 -

contract as consequence of the consummation of the transaction contemplated under this Agreement ("change-of-control-clause");

(xi)   any contract for any joint venture, partnership or similar arrangement or any agreement relating to holding, voting or transferring any equity interests in any entity by any Consolidated Interfer Group Company;

For the purpose of this Agreement, **"Material Adverse Effect"** means any change or effect that results in Losses for Purchasers or for the Brenntag Group Companies or the Interfer Group Companies (in each case taken as a whole) in excess of EUR 4,000,000.00.

7.1.6   **Compliance with Material Agreements**. Except as disclosed in Schedule 7.1.6, to the Best Knowledge of Sellers, the Consolidated Companies and (with respect to the Sold US Businesses) the Retained Companies have complied with their obligations under the Material Agreements, except where the failure to do so would not cause a Material Adverse Effect. To the Best Knowledge of Sellers and except as disclosed in Schedule 7.1.6, none of the Material Agreements has been terminated by any party, nor has any party given written notice about its intention to terminate a Material Agreement.

7.1.7   **Material Intellectual Property Rights**. To the Best Knowledge of Sellers and except as it would not reasonably be expected to have a Material Adverse Effect, (i) the Consolidated Companies subject to the terms of the Transfer Agreements (as defined in Section 7.4 below) and (ii) (with respect to the Sold US Businesses) the Retained Companies, each own, or lawfully use all such patents, patent rights, trademarks, trade names, utility models, registered designs, copyrights, domain names and proprietary know-how which are material for carrying out the Business taken as a whole in substantially the same fashion and manner as conducted as at the Signing Date (herein collectively **"Material Intellectual Property Rights"**). Schedule 7.1.7 sets forth a list of registered patents and trademarks, which are comprised within the Material Intellectual Property Rights.

7.1.8   **Proceedings Relating to Material Intellectual Property Rights**. To the Best Knowledge of Sellers and except as disclosed in Schedule 7.1.8, (i) the Material Intellectual Property Rights are not

subject to any pending or threatened proceedings for opposition, cancellation, revocation or rectification, (ii) there are no restrictions affecting any Consolidated Company's use of the Material Intellectual Property Rights which would reasonably be expected to have a Material Adverse Effect and (iii) the use of the Material Intellectual Property Rights does not infringe any rights of third parties.

7.1.9    **Insurance**. To the Best Knowledge of Sellers and except as disclosed in Schedule 7.1.9, (i) the Consolidated Companies, subject to the terms of the Transfer Agreements, and, (ii) (with respect to the Sold US Businesses), the Retained Companies collectively maintain, in full force and effect, policies of insurance for their own benefit until the Closing Date against property damage, liability (*Haftpflicht*), including product liability, and other usually insured business risks except for such insurances the lack of which would not reasonably be expected to have a Material Adverse Effect.

7.1.10    **Material Assets**. To the Best Knowledge of Sellers, except as disclosed in Schedule 7.1.10-1, the Consolidated Companies and (with respect to the Sold US Businesses) the Retained Companies, each own, or hold lawful possession (including, for the avoidance of doubt lawful possession in accordance with the terms of the Transfer Agreements) of all fixed assets (*Anlagevermögen*), which are material for carrying out the Business (taken as a whole) in substantially the same fashion and manner as at the Signing Date, such fixed assets, other than the Real Property (as defined in Section 7.1.11 below) herein collectively being referred to as "**Material Assets**". To the Best Knowledge of Sellers, the Material Assets are not charged with any rights of third parties including the transfer for security purposes (*Sicherungsübereignungen*) except for (i) customary rights of retention of title (*handelsübliche Eigentumsvorbehalte*), liens, pledges or other security rights in favor of suppliers, mechanics, workers, landlords, carriers and the like; (ii) security rights granted to banks and other financial institutions in respect of debt reflected in the Financial Statements or in the Effective Date Balance Sheet; (iii) statutory security rights in favor of tax authorities or other governmental entities; and (iv) liens, mortgages or encumbrances (*Belastungen*) or other third party rights other than rights under (i) through (iii) above which would not reasonably be expected to have a Material Adverse Effect. To the Best Knowledge of Sellers, Schedule 7.1.10-2 sets forth a list of security rights granted to banks or other financial institutions in relation to any Material Assets for Financial Debt reflected in the Financial

- 68 -

Statements or in the Effective Date Balance Sheet. To the Best Knowledge of Sellers, the Material Assets are in a reasonably useable condition in order to continue the Business substantially in the same fashion and manner as conducted as at the Signing Date. The technical and other plant, machinery, fixtures, fittings and building parts (*Gebäudebestandteile*) which are material for the Business and owned by the Consolidated Companies are in good order and condition, taking into account normal wear and tear corresponding to their useful life, except for such defects which would not reasonably be expected to result in a Material Adverse Effect.

7.1.11    **Real Property**. To the Best Knowledge of Sellers, <u>Schedule 7.1.11-1</u> contains (except for the properties to be sold and transferred under the US Asset Purchase Agreements) a complete and accurate list of (i) all of the real property, equivalent rights (*grundstücksgleiche Rechte*) and, to the extent they are not located on the aforementioned real property or on the properties to which the aforementioned equivalent rights relate, buildings which are currently or will in future by virtue of any existing claims or obligations be legally or beneficially owned by any Consolidated Company, and (ii) the Sold Real Estate Brenntag and the Sold Real Estate Interfer. The properties listed in Schedule 7.1.11-1 and the properties to be sold and transferred under the US Asset Purchase Agreements are herein collectively referred to as **"Real Property"**. To the Best Knowledge of Sellers, except as disclosed in <u>Schedule 7.1.11-2</u>, each Consolidated Company or Retained Company or the respective seller of the Sold Real Estate Brenntag and the Sold Real Estate Interfer is the unrestricted legal and beneficial owner of the Real Property and the Real Property is not (a) encumbered with any land charges or mortgages (*Grundpfandrechte*), registered planning obligations, registered option rights or other registered encumbrances which in each case adversely affect the value of the Real Property or its suitability for the Business, (b) subject to any non-registered or otherwise pending assignment (*Auflassung*) or other disposition (*Verfügung*) or any sale, contribution or other contractual arrangement creating an obligation to assign any Real Property or to create, change or abolish any encumbrances, (c) subject to any restraints on disposal of such Real Property or (d) subject to any claims for restitution under the German Property Act (*Vermögensgesetz*) which have been asserted in writing against any of the Consolidated Companies, in each case with the exception of (x) rights covered under (a) through (d) above which would not reasonably be expected to have a Material Adverse Effect or (y) encumbrances or third party rights to be assumed under the Real Estate Sale and

- 69 -

Transfer Agreements. To the Best Knowledge of Sellers, there is no planning, zoning plan or similar legal provision, which would materially impede the extension or erection of buildings or plants on the Real Property required within the normal growth of the Business.

7.1.12    **Permits**. To the Best Knowledge of Sellers and except as disclosed in Schedule 7.1.12, (i) the Consolidated Companies are, subject to the terms of the Transfer Agreements, and (ii) the Retained Companies are, with respect to the Sold US Businesses, in possession of all material governmental approvals, licenses and permits necessary to operate the Business as it is conducted as of the Signing Date (herein collectively **"Permits"**) except where the absence of a Permit would not result in a Material Adverse Effect. To the Best Knowledge of Sellers, no circumstances exist which would reasonably be expected to result in, as a consequence of the implementation of this Agreement, (a) a revocation or limitation of the Permits or (b) the imposition of conditions to the Permits, in each case with the exception of such revocations, limitations or conditions which would not result in a Material Adverse Effect.

7.1.13    **Litigation**. The Consolidated Companies and (with respect to the Sold US Business) the Retained Companies are (i) not involved in court or administrative proceedings, including arbitration proceedings, either as plaintiff or defendant having a litigation value (*Streitwert*) exceeding EUR 500,000.00 in the individual case and, to the Best Knowledge of Sellers, no such proceedings have been threatened against any of them in writing and (ii) there are no product liability claims pending or threatened against any of them with a litigation value exceeding EUR 500,000.00 in each individual case and to the Best Knowledge of Sellers there are no product or service defects, which could give raise to any such claims, in each case except as disclosed in Schedule 7.1.13-1 and except for court or administrative proceedings and product liability claims which relate to Excluded Assets or Excluded Liabilities under the US Asset Purchase Agreements. To the Best Knowledge of Sellers, (a) no Consolidated Company and (with respect to the Sold US Business) no Retained Company is subject to any ongoing investigation (including investigations with respect to antitrust or health and safety) or enquiry in any jurisdictions and (b) no such investigation or inquiry has been threatened in writing by any governmental authority (including any national competition authority and the European Commission), in each case except as disclosed in Schedule 7.1.13-2 and except for investigations which relate to Excluded Assets or Excluded Liabilities under the US Asset Purchase Agreements. To

- 70 -

the Best Knowledge of Sellers, no matters exist which could give rise to such investigation or enquiry.

7.1.14    **Taxes.** All material tax returns or other material Tax related statements or filings required to be filed by the Consolidated Companies and (with respect to the Sold US Businesses) by the Retained Companies, on or before the Closing Date have been or will be duly filed. All Taxes (as defined in Section 11.1 below) shown as owing on such returns have been or will be paid prior to the Closing Date, except (i) for Taxes not yet due and payable or that are being contested in good faith or (ii) for Taxes with respect to which the statute of limitation has expired.

7.1.15    **Employment Matters.** Except as would not reasonably be expected to have a Material Adverse Effect and except as disclosed in Schedule 7.1.15, none of the Consolidated Companies nor (with respect to the Sold US Businesses) any of the Retained Companies (i) is in violation of applicable laws with respect to employment, employment practices, terms and conditions of employment and wages and hours, (ii) has any liability for any arrears of wages, or (iii) has any liability for any payment with respect to unemployment compensation benefits or social security contributions or any other amounts required by law or contract to be withheld with respect to wages, commissions, bonuses and other payments to its employees. Except as would not reasonably be expected to have a Material Adverse Effect, the Consolidated Companies and (with respect to the Sold US Businesses) the Retained Companies are substantially in compliance with all applicable state worker's compensation laws, including matters related to funding (if benefits are provided through self-funding) or payment of premiums (if benefits are insured).

7.1.16    **Shop Agreements/Collective Bargaining Agreements.** Schedule 7.1.16 includes all shop agreements (*Betriebsvereinbarungen*) and all collective bargaining agreements (*Tarifvereinbarungen*), be it in form of industry based collective bargaining agreements (*Verbandstarifverträge*) or company based collective bargaining agreements (*Firmentarifverträge*) which apply to a Consolidated Company or the Sold US Businesses, which contain (i) benefit or incentive plans that would be triggered by a change of control in a Consolidated Company, (ii) limitations to terminate employment agreements, including provisions for severance payments, or (iii) obligations of a Consolidated Company or (with respect to the Sold US Businesses) a Retained Company to make specific investments or to guarantee a

A.Prot. 2003/479 Cu

**JA422**

certain number of employees for periods extending beyond the Effective Date, in each case with the exception of such agreements which repeat mandatory statutory law only.

7.1.17    **Labour Relations**. Except as disclosed in <u>Schedule 7.1.17</u> and to the Best Knowledge of Sellers, as of the Signing Date, (i) no union organizational campaign or representation petition is pending or threatened with respect to any employees of the Consolidated Companies and/or the Sold US Businesses and (ii) there is no pending or threatened strike, slowdown, lockout or work stoppage involving any of the employees of the Consolidated Companies and/or the Sold US Businesses. To the Best Knowledge of Sellers, since January 1, 2002 no government agency, administrative tribunal or arbitrator has issued a judgment, order, decree, injunction, decision or award with respect to the employment or labour practices or policies of any of the Consolidated Companies and/or the Sold US Businesses, which in each case would reasonably be expected to have a Material Adverse Effect.

7.1.18    **Employee Benefit Plans**. <u>Schedule 7.1.18-1</u> lists each "employee benefit plan" as defined in Section 3 (3) of the US Employee Retirement Income Security Act of 1974, as amended (herein **"ERISA"**) and any other similar plan, agreement, policy or arrangement maintained at any of the Consolidated Companies or Sellers for the benefit of any current or former employee of the Consolidated Companies or the Sold US Businesses or under which the Consolidated Companies or (with respect to the Sold US Businesses) any Retained Company has any present or future obligation or liability (herein collectively **"Employee Plans"**). Except as would not reasonably be expected to have a Material Adverse Effect, all required contributions and premiums under the Employee Plans prior to the Effective Date have been made or paid in accordance with the terms of such Employee Plans. To the Best Knowledge of Sellers, each of the Employee Plans and the funds established thereunder has been operated, administered and invested in accordance with its terms and the terms of any applicable collective bargaining agreements and all applicable laws, and, as of the Signing Date, there are no outstanding, or to the Best Knowledge of Sellers, pending complaints, claims, actions, investigations or proceedings by any current or former employee of the Consolidated Companies and/or the Sold US Businesses or by any governmental body, relating to any of the Employee Plans which could reasonably be expected to have a Material Adverse Effect, other than claims for benefits in the ordinary course of business. In the past

- 72 -

three (3) years, all pensions provided by any Consolidated Company have been adjusted, to the Best Knowledge of Sellers, regularly as required by Section 16 German Company Pension Act (*BetrAVG*) or, where applicable, equivalent provisions of foreign law or contractual provisions. The requirements of Section 4980B of the US Internal Revenue Code of 1986, as amended (herein **"Code"**) and Part 6 of Subtitle B of Title I of ERISA (herein **"COBRA"**) have been met in all material respects by Sellers, the Consolidated Companies domiciled in the US (herein **"US Consolidated Companies"**) and each entity that, together with any Seller or any US Consolidated Company, is considered a single employer under Section 414 of the Code (herein each an **"ERISA Affiliate"**). Except as set forth on <u>Schedule 7.1.18-2</u>, none of Sellers, the US Consolidated Companies or any ERISA Affiliate has any obligation to provide post-employment health or other welfare-type benefits to any person other than pursuant to COBRA. Each Employee Plan relating to the US Consolidated Companies and/or Sold US Businesses that is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Code has received a determination from the US Internal Revenue Service that such Employee Plan is so qualified, and, to the Best Knowledge of Sellers, there are no facts or circumstances that would reasonably be expected to adversely affect the qualified status of any such Employee Plan, and none of the Sellers, Consolidated Companies or any ERISA Affiliate is bound by any contract or any agreement or has any obligation or liability described in Section 4204 of ERISA that has not been satisfied in full. None of Sellers, the US Consolidated Companies or any ERISA Affiliate has incurred any liability on account of a "partial withdrawal" or a "complete withdrawal" (within the meaning of Sections 4205 and 4203 of ERISA) from any multiemployer plan as such term is defined in Section 3(37) of ERISA). To the Best Knowledge of Sellers, no such liability has been asserted that has not been satisfied in full, and, except with respect to the sale of the assets of the Retained Companies as contemplated under this Agreement, there are no events or circumstances that could reasonably be expected to result in any such partial or complete withdrawal. None of Sellers, and to the Best Knowledge of Sellers, none of the US Consolidated Companies or any ERISA Affiliate has incurred any liability under Title IV of ERISA that would reasonably be expected to become a liability of the US Consolidated Companies.

7.1.19   **Financial Statements.** Sellers have heretofore furnished to Purchasers a copy of the certified (*bescheinigte*) consolidated group

- 73 -

accounts (*Gruppenjahresabschlüsse*) of the Consolidated Brenntag Group Companies (including the Retained Companies) and the Consolidated Interfer Group Companies, each as of December 31, 2002 certified (*bescheinigt*) by PwC Deutsche Revision AG, Düsseldorf, together with the related consolidated statements of income (*Gewinn- und Verlustrechnung*), stockholders equity (*Entwicklung des Eigenkapitals*) and cash flow (*Kapitalflussrechnung*) for the financial year ending on December 31, 2002 and the explanations (*Erläuterungen*) thereto, accompanied by the certificate (*Bescheinigung*) of such public accountants (herein collectively **"Financial Statements"**). The Financial Statements present, subject to German GAAP, fairly in all material respects the assets, liabilities and results of the operations (*Vermögens, Finanz- und Ertragslage*) of the Consolidated Companies (including the Sold US Businesses) as a whole and have been prepared in accordance with German GAAP applied on a consistent basis throughout the periods covered thereby.

7.1.20    **Management Accounts.** To the Best Knowledge of Sellers, (i) the management accounts of the Consolidated Brenntag Group Companies (including the Retained Companies) and the Consolidated Interfer Group Companies, each as of September 30, 2003, year-to-date have been prepared following the total cost methodology (*Gesamtkostenverfahren*) with due care and attention, (ii) present fairly in all material respects the results of the operations (*Ertragslage*) of the Consolidated Companies (including the Sold US Businesses) taken as a whole for the period in respect of which they have been prepared and the levels of working capital and capital expenditure for such a period and (iii) have been prepared on a basis substantially consistent with the Financial Statements with the exception of usual year end adjustments and reclassifications determined consistent with past practice which are not yet reflected in such management accounts.

7.1.21    **Compliance With Laws.** Except as disclosed in Schedule 7.1.21, the Business of the Consolidated Companies (subject to the terms of the Spin-Off Agreement), and the Sold US Businesses have been since January 1, 1998, unless and to the extent having been rectified or cured prior to, or on the Effective Date, and are conducted and will be conducted at the Effective Date substantially in compliance with all applicable laws and Permits, except where the failure so to comply would not reasonably be expected to have a Material Adverse Effect.

- 74 -

7.1.22  **Conduct of Business**. Except as disclosed in <u>Schedule 7.1.22</u>, the Consolidated Companies and (with respect to the Sold US Businesses) the Retained Companies, have continued to conduct their respective business operations in all material respects in the ordinary course of business in a manner consistent with past practice during the period from December 31, 2002 until the Effective Date.

7.1.23  **Non-Consolidated Companies**. Except as set forth in <u>Schedule 7.1.23</u>, the Non-Consolidated Companies have not incurred any financial debt outside the ordinary course of business nor have they incurred any liabilities or obligations which are reasonably expected to have a Material Adverse Effect.

7.1.24  **Finders' Fees**. None of the Consolidated Companies has any obligation or liability to pay any fees to any broker, finder or agent with respect to this Agreement and its implementation.

7.1.25  **Asbestos Claims**. To the Best Knowledge of Sellers, (i) none of the Sellers or any of the Companies domiciled, or conducting business in, the United States has liability for any Asbestos Claims and (ii) none of the Retained Subsidiaries has liability for any Asbestos Claims relating to any of the other Retained Subsidiaries or any of the Companies.

7.2  All Schedules referred to in Section 7.1 above are collectively referred to as the **"Disclosure Schedules"**. For the avoidance of doubt, any fact or item referenced in or disclosed in a specific Disclosure Schedule, shall be deemed to be disclosed also with respect to any other Sellers' Guarantee whether or not a cross-reference appears, if the relevance of such disclosed fact or item under any other Disclosure Schedule is reasonably apparent. Sellers do not give or assume any guarantees other than those set forth in Section 7.1 above and none of the Sellers' Guarantees shall be construed as a guarantee or representation with respect to the quality of the Purchase Object within the meaning of Sections 276 (1), 443 German Civil Code (*Garantie für die Beschaffenheit der Sache*).

7.3  For the purpose of this Agreement, **"Best Knowledge of Sellers"** shall mean the actual knowledge (*positive Kenntnis*) of the members of the management board (*Vorstand*) of Seller 1 and the persons listed in <u>Exhibit 7.3-1</u> that they obtained as of the Signing Date after due inquiry from the persons listed in <u>Exhibit 7.3-2</u> in relation to Sellers' Guarantees contained in Section 7.1 above.

- 75 -

7.4   If and to the extent the Spin-Off Agreement, the Contribution Agreement, the US Asset and Purchase Agreements, the Brenntag Real Estate Sale and Transfer Agreement or the Inferfer Real Estate Sale and Transfer Agreement (herein collectively "**Transfer Agreements**") provide for the exclusion or limitation of representations and warranties, such exclusion or limitation shall not exclude or limit the applicability of Sellers' Guarantees.

**8.   Guarantees of Purchasers**

Purchasers' guarantee as of the Signing Date and the Effective Date (herein collectively "**Purchasers' Guarantees**"):

8.1   **Enforceability, No Conflict.** Purchaser 1 is a limited liability company (*Gesellschaft mit beschränkter Haftung*) duly organized and validly existing under the laws of Germany registered with the commercial register (*Handelsregister*) maintained at the lower court (*Amtsgericht*) of Munich under registration number HRB 150016. Purchaser 2 is a limited partnership (*Kommanditgesellschaft*) duly organized and validly existing under the laws of Germany, registered with the commercial register (*Handelsregister*) maintained at the lower court (*Amtsgericht*) of Munich under the registration number HRA 82959. Purchaser 3 is a limited liability company (*Gesellschaft mit beschränkter Haftung*) duly organized and validly existing under the laws of Austria, registered in the commercial register maintained at the Commercial Court of Vienna (*Handelsgericht Wien, Firmenbuch*) under registration number FN 239864 T. Purchaser 4 is a simplified stock corporation (*société anonyme simplifié*) duly organized and validly existing under the laws of France, registered at the Commercial Court of Paris under RCS Paris 450 958 053. This Agreement, the US Asset Purchase Agreements, the Bills of Sale, the Assignment and Assumption Agreements, the Brenntag Real Estate Sale and Transfer Agreement and the Interfer Real Estate Sale and Transfer Agreement each constitute the legal, valid and binding obligation of Purchasers, and/or the relevant Designated Nominees (as the case may be), enforceable against Purchasers, and/or the relevant Designated Nominees (as the case may be) in accordance with their respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors generally and except that the remedy of specific performance and injunctive relief and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefore may be brought. Purchasers, and/or (with respect to US Asset Purchase Agreements, the Bills of Sale, the Assignment and Assumption Agreements, the Brenntag Real Estate Sale and Transfer Agreement and the Interfer Real Estate Sale and Transfer Agreement) the respective Designated Nominees, have the absolute and unrestricted right, power, authority, and ca-

**JA427**

pacity to execute and deliver this Agreement and the Ancillary Agreements and to perform their obligations under this Agreement or the respective Ancillary Agreement, which actions have been duly authorized and approved by all necessary corporate action of Purchasers. Except for the Antitrust Clearances, Purchasers are not required to give any notice to any person or obtain any consent or governmental authorization in connection with the execution of this Agreement or the Ancillary Agreements by Purchasers, and/or the relevant Designated Nominees. Neither the execution of this Agreement nor the consummation or performance of any of the transactions contemplated thereby will directly or indirectly violate the certificate of incorporation or by-laws or any contract of Purchasers and/or Purchaser's Designated Nominees or violate any applicable law, rule, regulation, judgment, injunction, order or decree in any jurisdiction concerned under this Agreement.

8.2   **Litigation.** There is no action, suit, investigation or proceeding pending against, or to the knowledge of Purchasers, as of the Signing Date, threatened against or affecting Purchasers before any court or arbitrator or governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereunder.

8.3   **Financial Capability.** Purchasers have duly executed a credit facility agreement, a true and accurate copy of which has been delivered to Sellers on the Signing Date.

8.4   **Finders' Fees.** Purchasers do not have any obligation or liability to pay any fees or commissions to any broker, finder or agent with respect to the transaction contemplated hereunder for which Sellers could become wholly or partly liable.

8.5   **Investment Intent and Limitation on Dispositions.** Purchasers and any Designated Nominees are acquiring the Shares, the Limited Partnership Interest and the Sold US Businesses for their own account for investment only and have no intention of selling or distributing the Shares, the Limited Partnership Interest, the Sold US Businesses or any arrangement or understanding with any other person or entity regarding the sale or distribution of the Shares, the Limited Partnership Interest or the Sold US Businesses except pursuant to a registration, or an exemption from registration, under the United States Securities Act of 1933 (as amended).

8.6   **Information and Risk.** Purchasers and any Designated Nominees have requested, received, reviewed and considered all information the Purchaser deems relevant in making an informed decision to purchase the Shares, the Limited Partnership Interest and the Sold US Businesses. Purchaser and any Designated Nominees have had an opportunity to discuss the Business, and

its management and financial affairs with Sellers and also had an opportunity to ask questions to officers of the Sellers and the Companies that were answered to their satisfaction. Purchasers and any Designated Nominees (a) recognize that an investment in the Shares, the Limited Partnership Interest and the Sold US Businesses involves a high degree of risk, including a risk of total loss of their investment, (b) are able to bear the economic risk of holding the Shares and the Limited Partnership Interest and the Sold US Businesses for an indefinite period, (c) have knowledge and experience in the financial and business matters such that they are capable of evaluating the risks of the investment in the Shares, the Limited Partnership Interest and the Sold US Businesses, (d) have in connection with their decision to purchase the Shares, the Limited Partnership Interest and the Sold US Businesses, not relied upon any representations, guarantees or other information (whether oral or written) with respect to the Purchase Object other than as set forth in Section 7 hereof, (e) have, with respect to all matters relating to this Agreement and the purchase of the Purchase Object, relied solely upon the advice of their own counsel and have not relied upon or consulted counsel to the Sellers and (f) understand that the Sellers are relying on the statements contained herein to establish an exemption from registration under United States federal and state securities laws.

**9.    Remedies**

9.1    In the event of any breach or non-fulfillment by Sellers of any of Sellers' Guarantees or Sellers' covenants contained in this Agreement Sellers shall be liable as joint and several debtors (*Gesamtschuldner*) for putting Purchasers, or at the election of Sellers, the respective Company, or Purchasers' Affiliate into the same position that it would have been in if the Sellers' Guarantees or Sellers' covenants contained in this Agreement had been correct or had not been breached (*Naturalrestitution*), or, at the election of Sellers, to pay damages for non-performance (*kleiner Schadenersatz*) it being agreed that for purposes of determining the liability of Sellers for any breach or non-fulfillment by Sellers of any of Sellers' Guarantees or Sellers' covenants under this Agreement (except where a Seller has wilfully *(vorsätzlich)* breached its covenants under this Agreement) only the actual losses incurred by the respective Company or Purchaser shall be taken into account excluding (i) any consequential damages (*Folgeschäden*) except to the extent such consequential damages are covered by the specific purpose of a Sellers' Guarantee (*vom Sinn und Zweck einer Garantie umfasst*), (ii) lost profits (*entgangener Gewinn*) incurred by Purchasers or any of Purchasers' Affiliates except for Purchaser Losses (as defined below), and (iii) lost profits incurred by the Companies unless such lost profits are covered by the specific purpose of a Sellers' Guarantee (*vom Sinn und Zweck einer Garantie umfasst*), (iv) any po-

tential or actual reduction (*Minderung*) in value of the Companies, (v) damages incidental to any breach or non-fulfillment of the independent guarantees (*Schäden anlässlich einer Verletzung einer selbständigen Garantie*) and (vi) any internal costs and expenses incurred by the Companies or Purchasers (herein **"Losses"**). **"Purchaser Losses"** herein shall mean lost profits (*entgangener Gewinn*) incurred by Purchasers if and to the extent (a) such lost profits are incurred by Purchasers as a result of a breach of the Sellers' Guarantee contained in Section 7.1.19 above (Financial Statements), and (b) such breach of such Sellers' Guarantee is caused by a recurring event existing on the Closing Date (for the avoidance of doubt excluding any extraordinary or one-off events) which on or after the Closing Date results in a material and sustainable reduction (*wesentliche und nachhaltige Minderung*) of the EBITDA of the Companies taken as a whole. For the avoidance of doubt, the Parties confirm that the amount equal to 5.8 times the impact on EBITDA shall constitute the Losses to be compensated as Purchaser Losses. If and to the extent indemnification for any Loss is paid to any of the Companies, such payments shall be constructed and deemed as contributions (*Einlagen*) made by Purchasers into the respective Company and shall be treated as a reduction of the Purchase Price as between the Parties. If and to the extent a breach of a Sellers' Guarantee relates to a Company in which Sellers hold less than 100% of the total equity, the amount of Losses to be paid by Sellers hereunder shall be the total amount of Losses incurred by the respective Company multiplied by Sellers' direct or indirect shareholding percentage, unless any of the other Companies (herein **"Obliged Company"**) is subject to an obligation to make an additional contribution (*Nachschusspflicht*) into such Company in which event Sellers shall also be liable for the amount of such additional contribution in exchange for (*Zug um Zug*) the assignment of any recourse claims (*Ausgleichsansprüche*) the Obliged Company may have with regard to such additional contribution against any of the third party shareholders.

9.2     In the event of any breach or non-fulfillment by Sellers of any of Sellers' Guarantees or Sellers' covenants contained in this Agreement (herein **"Purchaser Claim"**), Purchasers will give Sellers notice of such breach or non-fulfillment, such notice stating the nature thereof and the amount involved, to the extent that such amount has been determined at the time when such notice is given promptly following discovery of such breach or non-fulfillment. Without prejudice to the validity of the Purchaser Claim or alleged claim in question, Purchasers shall allow, and shall cause the Companies to allow, Sellers and their accountants and their professional advisors to investigate the matter or circumstance alleged to give rise to such Purchaser Claim, and whether and to what extent any amount is payable in respect of such Purchaser Claim and, for such purpose, Purchasers shall give and shall cause the Companies to give, subject to their being paid their reasonable out-of-pocket

Case 3:23-cv-12051-MBK Document 18-09/08/23 03/24/25 09/08/23 Page 438 of 1429 PageID:
Exhibit F - MSPA - Part 2    Page 5 of 72

- 79 -

costs and expenses, such information and assistance, including reasonable access to the Companies' premises and personnel and including the right to examine any assets, accounts, documents and records, as Sellers or their accountants or professional advisors may reasonably request, unless this would result in a breach by Purchasers or any Company of any confidentiality obligations towards a third party, provided, however, that Purchasers shall use reasonable efforts to obtain the consent of such third parties to grant Sellers the aforementioned information and access rights.

9.3    Sellers shall not be liable for, and Purchasers shall not be entitled to bring any Purchaser Claim or any other claim under or in connection with this Agreement if and to the extent that:

9.3.1    the matter and the corresponding amount to which the Purchaser Claim relates has been taken into account in the Financial Statements by way of a provision (*Rückstellung*), or depreciation (*Abschreibung*), or exceptional depreciation (*außerplanmäßige Abschreibung*), or depreciation to reflect lower market values (*Abschreibung auf den niedrigeren beizulegenden Wert*);

9.3.2    the matter and the corresponding amount to which the Purchaser Claim relates (i) has been taken into account in the Effective Date Balance Sheet and (ii) reduced the Cash, Working Capital or CapEx 2003 Amount or increased the Financial Debt;

9.3.3    the amount of the Purchaser Claim is recovered from a third party or under an insurance policy in force on the Effective Date, it being understood that Purchasers shall use reasonable efforts to make recovery from any third party or under an insurance policy in respect of any matter to which a Purchaser Claim relates to the extent Purchasers are entitled to make such recovery unless such recovery would have a material detrimental effect on its customer or supplier relations;

9.3.4    the payment or settlement of any item giving rise to a Purchaser Claim results in a tax benefit of the Companies or Purchasers, it being understood that the tax benefit shall be calculated at its net present value discounted at a rate of EURIBOR plus 300 basis points on the basis of a combined tax rate (corporate income tax, solidarity surcharge, trade tax) of 40 %;

9.3.5    the Purchaser Claim results from a failure of Purchaser or the Companies to mitigate damages pursuant to Section 254 of the German Civil Code;

- 80 -

9.3.6    the matter to which the Purchaser Claim relates, was known by any
         Purchaser as of the Signing Date (Section 442 Sentence 1 German
         Civil Code), taking into account that Purchasers, prior to entering
         into this Agreement, had the opportunity to thoroughly review the
         condition of the Companies under commercial, technical, organiza-
         tional, financial, environmental and legal aspects and, in this con-
         nection, to hold discussions with the management of the Compa-
         nies, and to inspect the Real Estate (as defined in Section 10.2.2
         below); without limiting the generality of the foregoing, Purchasers
         shall be deemed to have knowledge of all matters contained in (i)
         the Information Memoranda relating to the Brenntag Group and the
         Interfer Group prepared by B. Metzler GmbH, dated May/June
         2003, (ii) the written answers to information requests of Purchasers,
         (iii) the Financial Vendor Due Diligence Reports relating to the
         Brenntag Group and the Interfer Group prepared by Pricewater-
         houseCoopers dated June 2003, (iv) the Summary Report of the
         Vendor Environmental Due Diligence Assessment "Project Bril-
         liant" dated June 06, 2003 and the Summary Report of the Vendor
         Environmental Due Diligence Assessment "Project Interfer" dated
         June 20, 2003, including in each case its appendices both prepared
         by URS Deutschland GmbH (herein collectively **"URS VEDDA
         Report"**), regardless of whether the matter was disclosed in the
         URS VEDDA Report as a known or potential fact, matter or cir-
         cumstance, (v) any due diligence reports prepared in respect of the
         transaction contemplated in the Agreement by employees of Pur-
         chasers or Purchasers' Affiliates, and, to the extent delivered to any
         of the Purchasers or Purchasers' Affiliates, by its representatives or
         advisors prior to the Signing Date.

9.3.7    the Purchaser Claim results from or is increased by the passing of,
         or any change in, after the Effective Date, any law, statute, ordi-
         nance, rule, regulation, common law rule or administrative practice
         of any government, governmental department, agency or regulatory
         body including (without prejudice to the generality of the forego-
         ing) any increase in the rates of Taxes or any imposition of Taxes
         or any withdrawal or relief from Taxes not actually (or prospec-
         tively) in effect at the Effective Date;

9.3.8    the procedures set forth in Sections 9.2 above or 9.5 below were not
         observed by Purchasers or the Companies unless Sellers were not
         prejudiced by the non-compliance with such procedures.

9.4    Sellers shall not be liable for any Purchaser Claim if and to the extent either Purchasers or the Companies have caused (*verursacht oder mitverursacht*) such Purchaser Claim after the Closing Date. When calculating the amount of the liability of Sellers under this Agreement all advantages in connection with the relevant matter shall be taken into account (*Vorteilsausgleich*) and Sellers shall not be liable under this Agreement in any respect of any Purchaser Claim for any Losses suffered by Purchasers or the Companies to the extent of any corresponding savings by or net benefit to the Purchasers or any Affiliate of Purchasers arising therefrom.

9.5    If (i) an order of any governmental authority is issued or threatened to be issued against Purchasers or the Companies or (ii) the Companies or Purchasers are sued or threatened to be sued by a third party, including without limitation any government agencies or supra-governmental authorities, or if the Companies or Purchasers are subjected to any audit or examination by any tax authority which may give rise to a Purchaser Claim (herein **"Third Party Claim"**), Purchasers shall give Sellers prompt notice of such Third Party Claim. Purchasers shall ensure that Sellers shall be provided with all materials, information and assistance relevant in relation to the Third Party Claim, be given reasonable opportunity to comment or discuss with Purchasers any measures which Sellers propose to take or to omit in connection with a Third Party Claim, and in particular Sellers shall be given an opportunity to comment on, participate in, and review any reports and all relevant tax and social security audits or other measures and receive without undue delay copies of all relevant orders (*Bescheide*) of any authority. No admission of liability shall be made by or on behalf of the Purchasers or the Companies and the Third Party Claim shall not be compromised, disposed of or settled without the prior written consent of the Sellers which shall not be unreasonably withheld or delayed. Further, in the event that (a) the Sellers acknowledge to the reasonable satisfaction of Purchasers (in a legally binding manner) that to the extent such Third Party Claim will be successful they are liable to the Purchaser in respect of such Third Party Claim pursuant to this Agreement and (b) the Purchaser Claim for which they are liable is in excess of 50 % of the amount in dispute, Sellers shall be entitled at their own discretion to take such action (or cause the Purchaser or the Companies to take such action to the extent Sellers for legal reasons cannot take such action) as they shall deem necessary to avoid, dispute, deny, defend, resist, appeal, compromise or contest such Third Party Claim (including making counter claims or other claims against third parties) in the name of and on behalf of Purchasers or the Companies concerned and Purchasers will give and cause the Companies to give, subject to them being paid all reasonable out-of-pocket costs and expenses, all such information and assistance, as described above, including reasonable access to premises and personnel and including the right to examine and copy or photograph any assets, accounts, documents

- 82 -

and records for the purpose of avoiding, disputing, denying, defending, resisting, appealing, compromising or contesting any such claim or liability as Sellers or their professional advisors may reasonably request. Sellers agree to use all such information confidentially only for such purpose. To the extent that Sellers are in breach of a Sellers' Guarantee or covenant, all costs and expenses reasonably incurred by Sellers in defending such Third Party Claim shall be borne by Sellers.

9.6    Sections 9.1 through 9.5 shall apply *mutatis mutandis* to the remedies, if any, of Purchasers, Brenntag Germany, Interfer Germany, Purchasers' Affiliates or Designated Nominees under the Ancillary Agreements. Purchaser shall see to it that Brenntag Germany, Interfer Germany, Purchasers' Affiliates and any Designated Nominees shall comply at all times with the provisions of this Section 9 in connection with any claims arising under the Ancillary Agreements.

9.7    Sections 9.1, 9.2, 9.4 and 9.5 shall apply *mutatis mutandis* to any breach or non-fulfilment of any Purchasers' Guarantee or any Purchasers' covenants under this Agreement.

9.8    The ability of Purchasers to make recovery as referred to in Section 9.3.3 shall not delay any payment or settlement by Sellers of, or in respect of, a Purchaser Claim, but if Sellers make any such payment or settlement to Purchasers and Purchasers subsequently recover an amount from a third party (including interest) in respect of such Purchaser Claim, Purchasers shall repay such amount (including interest) to Sellers, less any costs and expenses incurred in such recovery, up to a maximum of the payment or settlement made by Sellers to Purchasers.

9.9    Sections 9.2 through 9.8 shall not apply to any claims arising in connection with the violation of Sellers' covenants contained in Sections 13.4 through 13.14 or Section 19 below and Section 9.1 shall apply provided (*mit der Maßgabe*) that Sellers shall be liable for Indemnified Losses as defined in Section 10.9 below. In relation to the Sellers' covenants contained in Sections 13.7 and 13.8 below, the foregoing sentence shall only apply in relation to the breach of any primary obligations (*Hauptleistungspflichten*). For the avoidance of doubt, the Parties confirm that this Section 9 shall also not apply to Sections 11, 12, Sections 17.1, 17.2 and 17.3 which constitute separate indemnities, except to the extent that special reference is made to Section 9 or any subsections thereof. As regards the violation of Section 6.3 above, the statutory provisions of the German Civil Code (*BGB*) shall apply.

JA434

## 10. Environmental Indemnity

10.1 Sellers shall as joint and several debtors (*Gesamtschuldner*), subject to the Time Limitations, the exclusion of De Minimis Claims, the Environmental Indemnity Deductible (as defined in Section 10.8 below), the Liability Cap and Section 12.7 below, indemnify and hold harmless Purchasers and/or the Companies and/or Purchasers' Affiliates from and against all Environmental Liabilities (as defined in Section 10.2.1 below) resulting from:

(i) a final (*bestandskräftig*) or enforceable (*vollziehbar*) order, decree, directive or equivalent demand or claim, in each case issued by any governmental authority (*Behörde*), or a public law contract (*öffentlich-rechtlicher Vertrag*), provided that such contract was concluded (a) prior to the Closing Date or (b) after the Closing Date with the consent of Seller 1, which shall not be unreasonably withheld; or

(ii) an immediate danger to the well-being or health (*unmittelbare Gefahr für Leib oder Leben*) or an immediate and significant danger to the environment (*unmittelbare erhebliche Gefahr für die Umwelt*) or an equivalent condition (*vergleichbarer Tatbestand*) existing under applicable Environmental Laws (as defined in Section 10.2.3 below) outside the Federal Republic of Germany which is to be eliminated or remedied under Environmental Laws even in the absence of a final or enforceable order, decree, directive or demand or claim; or

(iii) a final court judgment, including an injunctive relief (*einstweilige Verfügung*), rendered in connection with a private party claim.

The penultimate and final sentences of Section 9.1 above shall apply *mutatis mutandis*.

10.2 Environmental Liabilities, Existing Environmental Condition, Environmental Laws, Hazardous Materials, Environmental Matters shall each have the following meaning:

10.2.1 **"Environmental Liabilities"** means all Losses (within the meaning of Section 9.1 above) reasonably incurred by any of the Companies or the Sold US Businesses arising under Environmental Laws relating to an Existing Environmental Condition in connection with

(i) the investigation (*Maßnahmen der Gefahrerkundung, Untersuchungsmaßnahmen*) in connection with or in anticipation of a remediation of an Existing Environmental Condition (as defined in Section 10.2.2 below);

- 84 -

    (ii)   a clean up (*Sanierung*) within the meaning of Section 2 (7) Federal Soil Protection Act (*Bundesbodenschutzgesetz*) and, outside the Federal Republic of Germany, any other equivalent measures provided for under any other applicable Environmental Laws relating in each case to an Existing Environmental Condition;

    (iii)  securing measures (*Sicherungsmaßnahmen*), or protective containment measures (*Schutz- und Beschränkungsmaßnahmen*) pursuant to Section 4 (3) Federal Soil Protection Act or equivalent measures pursuant to other applicable Environmental Laws outside the Federal Republic of Germany relating in each case to an Existing Environmental Condition;

    (iv)  measures to eliminate, reduce or otherwise remedy an immediate danger to health or well-being (*Maßnahmen zur Abwehr von unmittelbaren Gefahren für Leib und Leben*) or an immediate and significant danger to the environment resulting from an Existing Environmental Condition;

    (v)  any claims by private parties (excluding Asbestos Claims which shall be subject to the indemnification provided for in Section 12 below), internal compensation payments pursuant to Section 24 (2) Federal Soil Protection Act, omission claims (*Unterlassungsansprüche*) for personal injury, property damage, or otherwise in connection with a private party claim within the meaning of Section 10.1 Subsection (iii) above, in each case relating to an Existing Environmental Condition.

10.2.2    **"Existing Environmental Condition"** means (i) the pollution or contamination of the soil (*schädliche Bodenveränderungen*) within the meaning of Section 2 (3) of the Federal Soil Protection Act (*Bundesbodenschutzgesetz*) (or, outside Germany, any comparable Environmental Laws) of the real estate owned, operated or leased by the Companies on the Closing Date or transferred under the US Asset Purchase Agreements (herein **"Real Estate"**) existing on or prior to the Closing Date or (ii) historical pollution (*Altlast*) as defined in Section 2 para. 5 of the Federal Soil Protection Act (or outside Germany, any comparable Environmental Laws) existing on the Real Estate on or prior to the Closing Date or (iii) the presence of Hazardous Materials (as defined in Section 10.2.4 below) on or prior to the Closing Date in the soil, soil air (*Bodenluft*) or ground-

water beneath, or the surface water, land surface or buildings or other structures on the Real Estate or on any other real property if and to the extent such Hazardous Materials have migrated onto such real property from the Real Estate on or prior to the Closing Date or (iv) any release of Hazardous Materials on, at or from the Real Estate on or prior to the Closing Date.

10.2.3  **"Environmental Laws"** means all applicable laws, all common law and, to the extent they are legally binding, ordinances, rules, regulations relating directly to Environmental Matters (as defined in Section 10.2.5 below) and being applicable as at the Closing Date in the respective jurisdiction in which the respective Company or Sold US Business operates.

10.2.4  **"Hazardous Materials"** means any pollutants, contaminants, hazardous or toxic substances that are defined as such in the Environmental Laws.

10.2.5  **"Environmental Matters"** means any matter relating to pollution or contamination or protection of the soil, soil air, ground water, surface water or land surface.

10.3  Any Environmental Liability for which Purchasers may claim indemnification under this Section 10 shall, subject to the provisions contained in Section 14 below (for the avoidance of doubt other than the Deductible), be pro rated between Purchasers and Sellers as follows:

| Year after Effective Date | Purchasers | Sellers |
| --- | --- | --- |
| Year 1 | 20 % | 80 % |
| Year 2 | 35 % | 65 % |
| Year 3 | 50 % | 50 % |
| Year 4 | 65 % | 35 % |
| Year 5 | 80 % | 20 % |
| Year 6 | 90 % | 10 % |
| Further years | 100 % | 0 |

The relevant time for determining the foregoing pro rated liability of each Party shall be the time when the Environmental Liability is first asserted by Purchasers and notified to Sellers provided, however, that the costs and expenses in relation to the Environmental Liability must actually be incurred by Purchasers within the subsequent twelve (12) months after the notification of Sellers of the respective Environmental Liability. To the extent such costs are not incurred within the said twelve month period, the decisive year for the

foregoing sharing obligation of the Parties shall be the earlier of (i) the year in which the costs and expenses in relation to the Environmental Liability have actually been incurred by Purchasers or (ii) the year in which a final and enforceable order, decree, demand or court judgement has been issued with regard to such Environmental Liability.

10.4    Sellers' obligation to indemnify and hold harmless Purchasers, the Companies or Purchasers' Affiliates pursuant to Section 10.1 above shall be excluded if and to the extent the respective Environmental Liability:

10.4.1    is recovered from a third party or under an insurance policy in force on the Effective Date, it being understood that Purchasers shall use reasonable efforts to make recovery from any third party or under an insurance policy in respect of any matter to which an Environmental Liability relates to the extent Purchasers are entitled to make such recovery unless such recovery would have a material detrimental effect on its customer or supplier relations;

10.4.2    is incurred (i) as a result of expansion activities or construction activities carried out by or on behalf of the Companies unless such measures would have been reasonably taken by a prudent businessman in light of the business objectives of the respective Company on whose behalf such activities were undertaken; or (ii) as a result of any change of use (e.g. to a non-industrial unit), cessation of business activities on or the abandonment of the Real Estate; or (iii) as a result of investigations, preparatory or exploratory measures or notifications after the Closing Date which the Companies or (with respect to the Sold US Business) the owner of the Sold US Business was not obliged to carry out under the Environmental Laws applicable at the time when the respective Environmental Liability was incurred unless such measures would have been reasonably taken by a prudent businessman in light of environmental policies generally recognized in the jurisdictions where the Real Estate is located of the respective Company on whose behalf such activities where undertaken;

10.4.3    is incurred as a consequence after the Closing Date of (i) grossly negligent omissions to take actions required to be taken by the Companies or (with respect to the Sold US Businesses) the owner of the Sold US Businesses under Environmental Laws applicable at the time when the respective Environmental Liability was incurred, or (ii) grossly negligent activities outside of the ordinary course of business of the Companies or the owner of the Sold US Businesses (as conducted as of the Closing Date) after the Closing Date, or (iii)

any grossly negligent act or omission of an employee or other representative of, or service provider to, the Companies or the owner of the Sold US Businesses after the Closing Date;

10.4.4   with respect to (i) Real Estate located in the Federal Republic of Germany, results from any failure to take state-of-the-art measures to minimize risks (*dem jeweiligen Stand der Technik entsprechende Maßnahmen der Gefahrenabwehr*) or to apply state-of-the-art environmental and safety standards (*dem jeweiligen Stand der Technik entsprechende Umwelt- und Sicherheitsstandards*) or (ii) Real Estate located outside the Federal Republic of Germany, results from any failure to implement environmental risk management and environmental and safety policies and procedures consistent with prevailing industry and regulatory standards, which, in each case (i) and (ii) above, should reasonably have been taken by a prudent businessman after the Closing Date; but in no event shall any of the Companies be obliged to take any measures or to comply with any standards which exceed the measures or standards applied prior to the Effective Date unless required otherwise by mandatory Environmental Laws as applicable from time to time; for the avoidance of doubt the Parties confirm that this Section 10.4.4 shall only apply to the extent the measures or the compliance with standards could reasonably serve to mitigate Environmental Liabilities;

10.4.5   results from the coming into force of, or the change in, any Environmental Laws after the Closing Date;

10.4.6   results from the non-compliance with the procedures set forth in Section 10.6 and Section 10.7, to the extent Sellers were prejudiced by the non-compliance with such procedures;

10.4.7   results from a failure of Purchasers, Purchasers' Affiliates, the Companies or the US Asset Purchasers to mitigate damages pursuant to Section 254 German Civil Code;

10.4.8   was disclosed in the URS VEDDA Report as a known or potential fact, matter or circumstance giving rise to a potential Environmental Liability.

10.5   With regard to Real Estate which (i) has been acquired by any of the Companies from a third party or which (ii) is owned by a Company which has been acquired by its current shareholders or partners from a third party (any third party described in (i) and (ii) above herein being referred to as "**Real Estate Vendor**") under any real estate purchase agreements or share or partnership interest purchase agreements containing indemnification provisions with re-

- 88 -

spect to any Environmental Liabilities (herein collectively **"Real Estate Purchase Agreements"**), the obligation to indemnify and hold harmless Purchasers, Purchasers' Affiliates and the Companies pursuant to Section 10.1 above shall further only apply if and to the extent that Purchasers and/or the Company concerned (a) have used reasonable efforts to seek indemnification from the respective Real Estate Vendor under the respective Real Estate Purchase Agreement and (b) no indemnification under the respective Real Estate Purchase Agreement could reasonably be obtained by Purchasers or the Company concerned. All costs and expenses reasonably incurred by Purchasers or any of the Companies in connection with this Section 10.5 shall be borne by Sellers to the extent not being recovered from the Real Estate Vendors under the third party indemnities.

10.6    If Purchasers are or become aware of any circumstances which might give rise to an Environmental Liability of Sellers under Section 10.1 above (unless Sellers were aware of such circumstances prior to or on the Closing Date) or Section 10.9 below, then Purchasers shall inform Sellers in writing thereof without undue delay (*unverzüglich*) and any investigation and/or clean-up measures shall be conducted solely in consultation with Sellers, unless required otherwise under mandatory Environmental Laws or otherwise necessary in order to avoid an immediate danger to the health or wellbeing (*unmittelbare Gefahr für Leib oder Leben*) or an immediate and significant danger to the environment. Sellers shall be given access at their own expense to the Real Estate and the books and records of Purchasers (or their respective successors, as the case may be) to the extent that such access is reasonably necessary to assess any Environmental Liability being incurred. Purchasers shall ensure that for as long as Sellers may be held liable under Section 10.1 above or Section 10.9 below, copies of all documents relating to the Real Estate which, as of the Effective Date are in the possession of the Companies or the Retained Companies will be kept available for inspection by Sellers at the premises of the Companies upon Sellers' reasonable request.

10.7    Provided that Sellers acknowledge to the reasonable satisfaction of Purchasers in a legally binding manner that to the extent a government or private party claim is successful, they are liable to Purchasers in respect of the relevant Environmental Liabilities pursuant to this Section 10, Purchasers shall ensure that Sellers are given all reasonable opportunities to defend or avoid at their sole expense any third-party claims which are brought against any of the Companies after the Closing Date and which might give rise to any Environmental Liabilities. In particular, Sellers shall be given reasonable opportunity to comment on, participate in and review any reports on relevant investigations, reports, correspondence, orders or other measures which may with reasonable likelihood give rise to an Environmental Liability and Purchasers shall ensure that Sellers receive without undue delay copies of all

JA440

- 89 -

such documents. Purchasers shall ensure that, upon the reasonable request of Sellers, objections are filed and if reasonable under the circumstances legal proceedings instituted and conducted against any governmental or court decision in accordance with Sellers' direction and at Sellers' expense, as described in more detail in Section 9.5 above, it being, however, understood that the foregoing obligations of Purchasers shall not apply if and to the extent there exists good cause (*wichtiger Grund*) for Purchasers not to comply with such obligations with a view to material business interests of the Companies prevailing (*überwiegen*) over the justified interests of Sellers.

10.8   No liability shall attach to Sellers under this Section 10 for De Minimis Claims (as defined in Section 14.3 below). In addition, no liability shall attach to Sellers under this Section 10 until the aggregate amount of such claims, excluding any De Minimis Claims, exceeds EUR 15,000,000.00 (in words: Euro fifteen million) (herein "**Environmental Indemnity Deductible**"). If the aggregate liability of Sellers under this Section 10 is greater than the Environmental Indemnity Deductible, Sellers' liability shall be the excess above the Environmental Indemnity Deductible subject to Section 14.4 below.

10.9   In addition to the other indemnification obligations of Sellers hereunder and notwithstanding anything to the contrary in this Agreement or the Exhibits or Schedules thereto, Sellers shall as joint and several debtors (*Gesamtschuldner*), indemnify and hold harmless Purchasers and the Companies from and against any liabilities, expenses, losses and any other damages to be compensated pursuant to Sections 249 to 252 German Civil Code (herein "**Indemnified Losses**") arising from, resulting from or relating to (i) any real estate formerly owned, operated or leased by the Companies or (with respect to the Sold US Businesses) by the Retained Companies which is neither owned, operated nor leased by the Companies or (with respect to the Sold US Businesses) by the Retained Companies on the Closing Date (herein "**Former Sites**") or (ii) any third party property which the Companies or (with respect to the Sold US Businesses) the Retained Companies have used, prior to the Closing Date, for the storage, transport, disposal or treatment of Hazardous Materials or to which the Companies or (with respect to the Sold US Businesses) the Retained Companies have transferred or delivered Hazardous Materials prior to the Closing Date (herein "**Third Party Sites**") or (iii) the Billings Montana Site. Sellers' obligation to indemnify and hold harmless Purchasers and the Companies from and against all Environmental Liabilities resulting from Former Sites or Third Party Sites or the Billings Montana Site shall not be subject to any of the terms or conditions set forth in Sections 10.1 through 10.5 and Section 10.8 or Sections 14.1 through 14.4 of this Agreement, unless specifically provided otherwise under the Billings Montana Lease Agreement.

**JA441**

10.10  If the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. (herein **"ISRA"**) is applicable to the subject transaction, Sellers, prior to and after the Closing Date, shall be responsible for taking all necessary actions to comply with the requirements of ISRA with respect to the transaction, including, but not limited to, submitting all necessary forms and conducting any required investigation and remediation. Purchasers shall cooperate with Sellers with respect to such compliance, including but not limited to, (i) providing Sellers and its representatives and consultants with reasonable access after the Closing Date to any real property owned by the US Consolidated Companies or any US Asset Purchaser and subject to ISRA by reason of the transactions contemplated by this Agreement (herein **"ISRA Sites"**), in order to undertake actions required pursuant to ISRA and (ii) executing any ISRA forms requiring the Purchasers' signature. Sellers shall provide Purchasers or the respective US Consolidated Company or US Asset Purchaser with reasonable advance notice prior to entering the ISRA Sites and the Purchasers shall have the right to monitor Sellers' representatives and consultants in connection with any work performed at the ISRA Sites. To the extent Sellers are able to reduce their costs for compliance with ISRA by agreeing to deed restrictions, engineering controls or institutional controls (including, without limitation, a classification exception area for groundwater (herein collectively **"Institutional Controls"**), Purchasers agree to accept and see to it that the respective US Consolidated Company or US Asset Purchaser accepts such Institutional Controls and executes any documents related thereto as may reasonably be requested by Sellers, and to be responsible for compliance with such Institutional Controls and the implementation of any operations and maintenance obligations with respect thereto (subject to reimbursement from Sellers of any one-time direct costs associated therewith), provided, that Purchasers and/or the respective US Consolidated Company or US Asset Purchaser is under no obligation to agree to such Institutional Controls if this will unreasonably interfere with the Purchasers' and/or the respective US Consolidated Company's or US Asset Purchaser's operation of the ISRA Sites. If Purchasers desire to use the ISRA Sites for a purpose or in a manner that is inconsistent with the operations at the ISRA Sites as of the Closing Date and is inconsistent with reducing Sellers' costs for compliance with ISRA based on the use of Institutional Controls, Purchasers shall assume responsibility for incremental costs and expenses associated with compliance with ISRA arising as a result of such change in use. Sellers' obligation to comply with ISRA at the ISRA Sites is limited to the transaction contemplated by this Agreement. Sellers shall provide Purchasers with advance copies of all correspondence and documents to be filed in connection with ISRA and shall consider, but not be required to incorporate, all reasonable comments provided by Purchasers. Sellers shall make reasonable commercial efforts to ensure that any of the activities that they conduct pursuant to ISRA will not interfere with the Purchasers' operations at the ISRA Sites. Purchasers shall be re-

sponsible for their own costs and expenses in connection with monitoring Sellers' compliance with ISRA.

10.11 This Section 10 operates as *lex specialis* in relation to any remedies arising in connection with any actual or alleged breach of the Sellers' Guarantees contained in Sections 7.1.10 (Material Assets), 7.1.11 (Real Property), 7.1.12 (Permits), 7.1.13 (Litigation) or Section 7.1.21 (Compliance with Laws), to the extent such breaches also result in Environmental Liabilities.

10.12 The Parties shall use reasonable efforts after the Signing Date to agree on reasonable rules of procedure which shall ensure that Sellers shall be involved in any investigations or clean-up plans relating to or arising in connection with an Environmental Liability in a timely and appropriate manner.

## 11. Tax Indemnity

11.1 Sellers shall as joint and several debtors (*Gesamtschuldner*) subject to the Time Limitations indemnify and hold harmless Purchasers and/or the Companies and/or Purchasers' Affiliates against any Taxes (as defined below) imposed under the applicable laws and relating to the Companies and/or the Sold US Businesses for periods (*Zeiträume*) (or portions thereof) ending on or before the Effective Date. "**Taxes**" shall mean (i) any tax or other tax like assessment or charge within the meaning of Section 3 para 1 German Tax Code (*Abgabenordnung*) or similar provisions under applicable foreign law, including but not limited to all taxes on income, profits, gains, turnover, value added taxes, taxes on net wealth or assets, payroll withholding and other withholding taxes, (ii) any ancillary charges referred to in Section 3 para 4 German Tax Code (*Abgabenordnung*) as well as fines or penalties relating to any of the aforementioned items and (iii) all social security contributions imposed by any governmental authority responsible for the imposition of such contributions. Sellers shall indemnify Purchasers and the Companies from any secondary liability of any Companies for any Taxes for which Sellers or any of their Affiliates (excluding the Companies) are liable (*Steuerschuldner*) including, without limitation, any Taxes pursuant to U.S. Treasury Regulations, Section 1.1502-6 or any analogous or similar state, local or non-U.S. law or regulation. For the avoidance of doubt, the Parties state that deferred taxes are not Taxes within the meaning of the above definitions. Any liabilities of Sellers arising under this Section 11 shall become due and payable within five (5) business days following the receipt by Sellers of a notification that the respective Tax has become due and payable. The penultimate and final sentences of Section 9.1 shall apply *mutatis mutandis*. In the case of any taxable period that includes (but does not end on) the Effective Date (herein "**Straddle Period**"), the amount of any Taxes based on or measured by income or receipts for the portion of such period ending on

- 92 -

the Effective Date shall be determined based on an interim closing of the books as of the end of the Effective Date, and the amount of other Taxes for a Straddle Period which relate to a portion of such period ending on the Effective Date shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Effective Date and the denominator of which is the number of days in such Straddle Period.

11.2  In relation to tax releases, tax benefits and changes in accounting practices the following shall apply:

11.2.1  If the Companies or their Affiliates are entitled to any benefits by refund, set-off or reduction of Taxes as the result of an adjustment or payment giving rise to a claim for indemnification of Taxes, then the corresponding benefit shall reduce the claim for indemnification of any such Tax in the amount of its net present value discounted at a rate of EURIBOR plus 300 basis points on the basis of a combined tax rate applicable in the respective jurisdiction as at the Effective Date. This shall in particular but without limitation apply to any Tax benefits after the Effective Date resulting from the lengthening of any amortization or depreciation periods, higher depreciation allowances or carry forwards of losses or deductions. Where the net present value cannot be determined since the tax benefit shall arise at a point in time which is not known at the time when the Tax arises, such deferred tax benefit (herein **"Deferred Tax Benefit"**) shall be accounted for, or reimbursed to Sellers pursuant to Section 11.5 below when it actually arises. Purchasers shall and shall see to it that the Companies shall provide Sellers at all times with all reasonable information relating to any Deferred Tax Benefits.

11.2.2  Sellers shall not be responsible for any Tax liabilities attributable to periods ending on or before the Effective Date resulting from any change in the accounting and taxation principles or practices of the Companies (including methods of submitting taxation returns) introduced after the Effective Date, except if required under mandatory law and provided that past practice has been in line with the respective tax law.

11.2.3  Sellers shall not be responsible for any Tax liabilities, if and to the extent the amount of the Taxes is recovered by Purchasers, any Designated Nominee or any of the Companies from a third party. Purchasers agree, as a condition to their right to indemnification for Taxes reasonably likely to be recovered from a third party, to use

Case 3:23-cv-1095-4-BJMQ Document 1-18-09/08/23 03/24/25 09/Page 2452:01:1429 PageID:
Exhibit F - MSPA - Part 2    Page 19 of 72

- 93 -

commercially reasonable efforts to secure such recovery. Sellers shall indemnify Purchasers and the Companies for the reasonable costs of such recovery.

11.3 Any additional profit and loss allocations resulting from any tax audit relating to taxable periods ending on or before the Effective Date shall not increase or reduce the Purchase Price and shall not entitle Sellers to any additional profit distribution nor Purchasers or Sellers to any Purchase Price Adjustment. For the avoidance of doubt, this does not apply with respect to tax liabilities resulting from any additional profit allocation due to a tax field audit, which shall be treated in accordance with the provisions of this Section 11.

11.4 Purchasers shall inform Sellers without undue delay of and keep Sellers fully informed regarding the commencement of any audit or other proceeding which may give rise to a claim under Section 11.1 above. Sections 9.2, 9.3.8 and 9.5 shall apply *mutatis mutandis*.

11.5 Sellers shall be entitled to any refunds of Taxes and Deferred Tax Benefits relating to the Business received by Purchasers, any Designated Nominee, any of the Companies or any of Purchasers' Affiliates attributable to any periods ending on or before the Effective Date (herein **"Tax Refunds"**), except for Tax Refunds resulting from accruals for restructuring of the Interfer Group Consolidated Companies within the meaning of SKA form 2601/line item 2660 000 and SKA form 2601/line item 2654 000 entered for the first time into the year-end accounts for the fiscal year ending on December 31, 2003 of the Interfer Group Consolidated Companies. The final sentence of Section 11.2.1 applies *mutatis mutandis*. Any Tax Refunds become due and payable ten (10) business days (*Werktage*) after receipt (by means of refund or set-off) of the Tax Refund by Purchasers, the Designated Nominee, the Company or Purchasers' Affiliate, as the case may be. Similarly, Purchasers shall be entitled to any refunds of Taxes with respect to any Tax liabilities paid by Purchasers to Sellers pursuant to Section 11.6.3 below. Any Tax Refunds shall be considered to be realized for purposes of this Agreement at the time it is received in cash or as some other cash equivalent (including, but not limited to, credit against or a reduction of Taxes otherwise payable) by the respective party, as the case may be. The respective party shall notify the other party without undue delay (*unverzüglich*) of any Tax Refunds to which the other party is entitled under this Section 11.5.

11.6 In relation to the preparation of tax returns the following shall apply:

11.6.1 Sellers shall duly file (or cause the Companies to duly file) all tax returns which (i) are due to be filed by Sellers or by the Companies

or the Retained Subsidiaries on or before the Closing Date, or (ii) are filed on a consolidated, combined or unitary basis and which include the Companies for taxable periods ending on or before the Closing Date. Purchasers shall file (or cause the Designated Nominees or Companies to file) all tax returns other than those referred to in the preceding sentence.

11.6.2    Purchasers shall have the right to review and comment on any tax return to be filed by Sellers or the Companies and Sellers shall provide copies of such return to Purchasers no later than sixty (60) days prior to the relevant due date of such tax return, except with respect to tax returns due less than sixty (60) days after the date of this Agreement, copies of which shall be provided as soon as reasonably practicable. Sellers shall have the right to review and comment on any tax return to be filed by Purchasers relating to a period beginning before the Closing Date and Purchasers shall provide copies of such return to Sellers no later than sixty (60) days prior to the relevant due date of such tax return.

11.6.3    With respect to any tax return to be filed by Sellers or the Retained Companies which include any period ending after the Effective Date, Purchasers shall pay Sellers no later than ten (10) days prior to the due date of such return an amount equal to its tax liability with respect to such return. Purchasers' tax liability with respect to such a tax return shall be the tax liability of or with respect to the applicable Company or Sold US Business for the portion of such period beginning after the Effective Date computed as if such Company or Sold US Business was not owned by the Sellers during such period. Section 11.1 last sentence shall apply *mutatis mutandis*.

11.7    The Parties agree to fully cooperate with each other in connection with any matter relating to Taxes including the preparation of any tax return, conduct of any audit, investigation or contest each at its own cost. Such cooperation shall include, without limitation, providing or making available all relevant books, records and documentation and the assistance of officers and employees. Purchasers agree to retain all books, records and documentation relating to the Companies that may be relevant in connection with any audit or investigation for which Sellers may be responsible hereunder until the expiration of any applicable statute of limitation. Further, Purchasers shall cause their Affiliates and the Companies to furnish to Sellers all such information as may be necessary or helpful for Sellers to prepare any tax return to be filed after the Closing Date, consistent with prior practice of the Sellers. Sellers and Sellers' Affiliates shall give Purchasers and the Companies the opportunity to comment on, participate in and review any reports and discussions

with any authority relating to Taxes for the period prior to the Effective Date if such reports and discussions could reasonably be expected to have a material negative impact on Taxes of the Companies in any period after the Effective Date. No settlement (*Vergleich*) of any matters relating to Taxes for the period prior to the Effective Date which shall have a material negative impact on Taxes of the Companies on any period after the Effective Date shall be made by Sellers or Sellers' Affiliates without the prior written consent of Purchasers.

11.8    Seller 3 and the relevant Designated Nominee, and Seller 4 and the relevant Designated Nominee, shall join in making elections under the U.S. Internal Revenue Code Section 338(h)(10) (and any corresponding elections under state, local, or foreign tax law) (collectively the "**Section 338(h)(10) Elections**") with respect to the purchase and sale of the stock of the Brenntag Latin America, Inc. and any of its subsidiaries, in the case of Seller 3, and each of the Brenntag Inc. Subsidiaries and any of their subsidiaries, in the case of Seller 4. For the purpose of making the Section 338(h)(10) Election, on or prior to the Closing Date, the relevant Designated Nominee and each of Seller 3 and Seller 4 shall execute two copies of Internal Revenue Service Form 8023 (or successor form) as appropriate. Seller 3 and Seller 4 will pay any Tax imposed on gain arising from the deemed sale of assets attributable to the making of the Section 338(h)(10) Elections and will indemnify Purchaser (or a U.S. nominee of Purchaser), its affiliates, the Brenntag Latin America, Inc. and any of its subsidiaries, and each of the Brenntag Inc. Subsidiaries and their subsidiaries against such Taxes. Seller 3 and Seller 4 will each also pay any state, local, or non-U.S. Tax (and indemnify Purchasers and the relevant Designated Nominee, its Affiliates, the Brenntag Latin America, Inc. and its subsidiaries, and each of the Brenntag Inc. Subsidiaries and their subsidiaries, respectively, against any such Tax) imposed on gain arising from the deemed sale of assets attributable to an election under state, local, or non-U.S. law similar to the election available under Code Section 338(g) (or which results from the making of an election under Code Section 338(g)) with respect to the purchase and sale of the stock of the Brenntag Latin America, Inc. and its subsidiaries, in the case of Seller 3, and each of the Brenntag Inc. Subsidiaries and any of their subsidiaries, in the case of Seller 4.

11.9    The Parties agree that the purchase price for and the liabilities of the Brenntag Latin America, Inc. and its subsidiaries (plus other relevant items) and each of the Brenntag Inc. Subsidiaries and their subsidiaries (plus other relevant items) will be allocated to the assets of the respective US entity and its subsidiaries for all purposes (including Tax and financial accounting purposes) in a manner consistent with Sections 338 and 1060 and the regulations thereunder, as reasonably determined by the Parties. Purchasers and/or the Designated Nominee, the Brenntag Latin America, Inc. and its subsidiaries

and Seller 3, on the one hand, and Purchasers and/or the Designated Nominee, each of the Brenntag Inc. Subsidiaries and their subsidiaries and Seller 4, on the other hand, shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

11.10 This Section 11 provides, subject to Section 7.1.14 in connection with Section 9.1, the sole remedy for any Tax related matters.

11.11 Section 14.3 and Section 14.4 below shall not apply to this Section 11.

12.  **Asbestos Indemnity**

12.1 In relation to any Asbestos Claims (as defined in Section 12.4 below) the following shall apply:

12.1.1 Seller 4 shall see to it that Brenntag West shall indemnify and hold harmless the US Asset Purchasers, the Companies, Purchasers, Purchasers' Affiliates and each of their respective successors, assigns, officers, directors, managers, employees and agents (herein collectively **"Brenntag West Indemnitees"**) from and against any Indemnified Losses incurred in connection with any present or future Retained Subsidiary Asbestos Claims (as defined in Section 12.2 below) relating to Brenntag West or any alleged corporate predecessor-in-interest thereof. This provision is expressly limited to any such indemnified Retained Subsidiary Asbestos Claims and does not in any way relate to other products or other hazardous substances that may have been manufactured, distributed, sold or used by Brenntag West or any Sellers, or any of the Companies, or any alleged predecessors of any of these aforementioned entities in the conduct of any business prior to the Effective Date. Seller 4 shall be the guarantor of the indemnification provided by Brenntag West described in the preceding sentences to the Brenntag West Indemnitees. In the event that Seller 4 is unable to financially satisfy any claims made by any Brenntag West Indemnitee pursuant to the guarantee provided in the preceding sentence, then Seller 3 shall be the guarantor with respect to any such claims made by the Brenntag West Indemnitee under the indemnification provided by Brenntag West described in this Section 12.1.1.

12.1.2 Seller 4 shall see to it that WCD shall indemnify and hold harmless the US Asset Purchasers, the Companies, Purchasers, Purchasers' Affiliates and each of their respective successors, assigns, officers, directors, managers, employees and agents (herein collectively

"**WCD Indemnitees**") from and against any Indemnified Losses incurred in connection with any present or future Retained Subsidiary Asbestos Claims relating to WCD or any alleged corporate predecessor-in-interest thereof. This provision is expressly limited to any such indemnified Retained Subsidiary Asbestos Claims and does not in any way relate to other products or other hazardous substances that may have been manufactured, distributed, sold or used by WCD or any of the Sellers, or any of the Companies, or any alleged predecessors of any of these aforementioned entities in the conduct of any business prior to the Effective Date. Seller 4 shall be the guarantor of the indemnification provided by WCD described in the preceding sentences to the WCD Indemnitees. In the event that Seller 4 is unable to financially satisfy any claims made by any WCD Indemnitee pursuant to the guarantee provided in the preceding sentence, then Seller 3 shall be the guarantor with respect to any such claims made by any WCD Indemnitee under the indemnification provided by WCD described in this Section 12.1.2.

12.1.3    Seller 4 shall see to it that Eastech shall indemnify and hold harmless the US Asset Purchasers, the Companies, Purchasers, Purchasers' Affiliates and each of their respective successors, assigns, officers, directors, managers, employees and agents (herein collectively "**Eastech Indemnitees**") from and against any Indemnified Losses incurred in connection with present or future Retained Subsidiary Asbestos Claims relating to Eastech or any alleged corporate predecessor-in-interest thereof. This provision is expressly limited to any such indemnified Retained Subsidiary Asbestos Claims and does not in any way relate to other products or other hazardous substances that may have been manufactured, distributed, sold or used by Eastech or any of the Sellers, or any of the Companies, or any alleged predecessors or any of these aforementioned entities in the conduct of any business prior to the Effective Date. Seller 4 shall be the guarantor of the indemnification provided by Eastech described in the preceding sentences to the Eastech Indemnitees. In the event that Seller 4 is unable to financially satisfy any claims made by any Eastech Indemnitee pursuant to the guarantee provided in the preceding sentence, then Seller 3 shall be the guarantor with respect to any such claims made by the Eastech Indemnitee under the indemnification provided by Eastech described in this Section 12.1.3.

12.1.4    Seller 4 shall see to it that Crozier-Nelson shall indemnify and hold harmless the US Asset Purchasers, the Companies, Purchasers, Purchasers' Affiliates and each of their respective successors, assigns, officers, directors, managers, employees and agents (herein collec-

tively "**Crozier-Nelson Indemnitees**") from and against any Indemnified Losses incurred in connection with present or future Retained Subsidiary Asbestos Claims relating to Crozier-Nelson or any alleged corporate predecessor-in-interest thereof. This provision is expressly limited to any such indemnified Retained Subsidiary Asbestos Claims and does not in any way relate to other products or other hazardous substances that may have been manufactured, distributed, sold or used by Crozier-Nelson or any of the Sellers, or any of the Companies, or any alleged predecessors or any of these aforementioned entities in the conduct of any business prior to the Effective Date. Seller 4 shall be the guarantor of the indemnification provided by Crozier-Nelson described in the preceding sentences to the Crozier-Nelson Indemnitees. In the event that Seller 4 is unable to financially satisfy any claims made by any Crozier-Nelson Indemnitee pursuant to the guarantee provided in the preceding sentence, then Seller 3 shall be the guarantor with respect to any such claims made by the Crozier-Nelson Indemnitee under the indemnification provided by Crozier-Nelson described in this Section 12.1.4.

12.1.5    Seller 3 and Seller 4 shall as joint and several debtors (*Gesamtschuldner*) indemnify and hold harmless the US Asset Purchasers, the Companies, Purchasers, Purchasers' Affiliates and each of their respective officers, directors, managers, employees and agents from and against any Indemnified Losses incurred in connection with present or future Non-Retained Subsidiary Asbestos Claims (as defined in Section 12.3 below). This provision is expressly limited to any such indemnified Non-Retained Subsidiary Asbestos Claims and does not in any way relate to other products or other hazardous substances that may have been manufactured, distributed, sold or used by Sellers, or any of the Companies or any alleged predecessors entity in the conduct of the Business prior to the Effective Date.

The Parties are in agreement that the term "Indemnified Losses" within the meaning of this Section 12.1 shall not encompass or include lost profits incurred by the Companies, Purchasers' Affiliates or any of their respective successors or assigns resulting from the fact that an initial public offering of the Companies or a trade sale cannot be accomplished, or can only be accomplished at terms which are less favorable as a result of any Asbestos Claims pending against the Companies, the US Asset Purchasers, Purchasers or any of Purchasers' Affiliates or their respective successors or assigns.

12.2    "**Retained Subsidiary Asbestos Claims**" shall mean any claim, action, law suit, litigation, arbitration or other legal proceeding in a court or tribunal of

any kind, regardless of the legal or equitable theory alleged, including without limitation, any of the foregoing which are pending or threatened as of the date hereof (whether or not identified on any Disclosure Schedule hereto), seeking to recover damages (including without limitation damages for personal injuries or property damage) allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any Retained Subsidiary or by any alleged predecessor entity of any Retained Subsidiary or by any other entity (other than Sellers or the Companies) to whose liabilities any Retained Subsidiary has become subject either contractually or by operation of law prior to the Closing Date, in the conduct of any business prior to the Effective Date.

12.3    **"Non-Retained Subsidiary Asbestos Claims"** shall mean any claim, action, law suit, litigation, arbitration or other legal proceeding in a court or tribunal of any kind, regardless of the legal or equitable theory alleged, including without limitation, any of the foregoing which are pending or threatened as of the date hereof (whether or not identified on any Disclosure Schedule hereto) seeking to recover damages (including without limitation damages for personal injuries or property damage) allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by Sellers or any of the Companies, or any alleged predecessor entity or by any other entity (other than the Retained Subsidiaries) to whose liabilities Sellers or the Companies have become subject either contractually or by operation of law prior to the Closing Date, in the conduct of any business prior to the Effective Date.

12.4    The respective obligations of Brenntag West, WCD, Eastech, Crozier-Nelson, Seller 3 and Seller 4 to indemnify and hold harmless the US Asset Purchasers, the Companies, Purchasers, Purchasers' Affiliates and each of their respective successors, assigns, officers, directors, managers, employees and agents (herein collectively **"Indemnitees"**) from and against any otherwise indemnified Retained Subsidiary Asbestos Claims or Non-Retained Subsidiary Asbestos Claims (herein collectively **"Asbestos Claims"**) shall be excluded if and solely to the extent:

12.4.1    the relevant Asbestos Claim is compensated for or made good by any third party to any of the Indemnitees, in particular but without limitation, by insurance companies under applicable insurance policies, it being understood that nothing in this Section 12.4.1 shall impose any obligation on Purchasers or the US Asset Purchasers to pursue any such compensation from any third party (including any insurance companies) beyond taking actions reasonably requested

Case 3:23-cv-12051-MBK Document 18-09/08/23 03/24/25 09 Page 459 of 1429 PageID: 871
Exhibit F - MSPA - Part 2    Page 26 of 72

- 100 -

by Sellers to facilitate Sellers' pursuit of such compensation (including providing waivers of rights to such compensation as necessary);

12.4.2    the relevant Asbestos Claim results from the wilful misconduct or gross negligence of any Indemnitee after the Closing Date;

12.4.3    the procedures set forth in Section 12.5 have not been complied with, unless Sellers are not materially prejudiced by the non-compliance with such procedures, either in the defense of any Asbestos Claims or in obtaining any relevant insurance coverage otherwise applicable to said claims;

12.4.4    the respective Asbestos Claim results from a failure of any Purchaser or any Company to mitigate damages pursuant to Section 254 German Civil Code.

12.5    Purchasers shall notify the relevant indemnitor in writing within ten (10) days after learning of any Asbestos Claim instituted after the Effective Date for which Purchasers intend to seek indemnification under any terms of this Section 12 by providing such notice to Seller 3 or to such other designee as the relevant indemnitor shall designate in writing except that Purchasers' right to indemnification hereunder shall not be affected by failure to provide notice within such period except to the extent the relevant indemnitor is actually prejudiced by such failure. Such notice shall describe any such Asbestos Claim in reasonable detail and Purchasers shall also provide copies of any summons, complaints or other legal pleadings, correspondence or any other documents received in connection with each Asbestos Claim as soon as practicable after any Purchaser's receipt of the same. The relevant indemnitor or its designee, to whom authority may be given in writing, shall have the sole and exclusive right to defend and/or to settle any Asbestos Claim and Sellers shall be entitled at their own discretion to take such action (or cause the Purchasers, the US Asset Purchasers or the Companies to take such action to the extent Sellers for legal reasons cannot take such action) as they shall deem necessary to avoid, dispute, deny, defend, resist, appeal, compromise or contest such Asbestos Claim (including making counter claims or other claims against third parties) in the name of and on behalf of the Purchasers, the US Asset Purchasers or the Companies concerned and the Purchasers will give and cause the Companies and US Asset Purchasers to give, subject to them being paid all reasonable out-of-pocket costs and expenses, all such information and assistance, as described above, including reasonable access to premises and personnel and including the right to examine and copy or photograph any assets, accounts, documents and records for the purpose of avoiding, disputing, denying, defending, resisting, appealing, compromising or contesting any such claim or liability as Sellers or their profes-

sional advisors may reasonably request; provided that the relevant Indemni-
tee shall have the right to participate in such defense if the claims against
such Indemnitee involve successor liability theories; and provided, further,
that if any claims of successor liability theories are brought which, if ad-
versely determined, would serve to bind the Indemnitees are not being de-
fended by the relevant indemnitor (or its designee), then such Indemnitee
shall have the right to defend and/or, with the relevant indemnitor's prior
written consent which shall not be unreasonably withheld, to settle any such
claims, and shall be entitled to take such action as it shall deem necessary to
avoid, dispute, deny, defend, resist, appeal, compromise or contest such
claims (including making counter claims or other claims against third par-
ties), provided, that in such case the relevant indemnitor (or its designee)
shall have the right to continue to participate in the defense of such claims.

12.6    In the event that a trust fund or similar mechanism is established by the U.S.
government to compensate persons exposed to asbestos, Seller 3, Seller 4
and the Retained Subsidiaries shall, as is appropriate, make all payments re-
quired by the U.S. government on account of any asbestos-related claims or
liabilities and take all other actions required with respect thereto. Purchasers
shall cooperate with Seller 3 and Seller 4 in making any necessary disclo-
sures required by the U.S. government and shall knowingly take no action
outside the ordinary course of business that would increase the amount of
payments required under such trust fund. In the event and solely to the extent
such a trust fund or similar mechanism is established eliminating recourse to
the courts for asbestos-related claims (and Seller 3, Seller 4 and the Retained
Subsidiaries comply with all things required to cause such recourse to be
eliminated), the obligations of Brenntag West, WCD, Eastech, Crozier-
Nelson, Seller 3 and Seller 4 or any of their respective Affiliates (where ap-
plicable) under this Section 12 as to matters to which such recourse has been
eliminated shall be limited to the amount owed by Seller 3, Seller 4 and/or
the Retained Subsidiaries to the U.S. government-established trust or similar
mechanism and complying with all actions required with respect thereto ex-
cept that each of Brenntag West, WCD, Eastech, Crozier-Nelson, Seller 3
and Seller 4 shall retain responsibility with respect to any or all such claims
and indemnify the US Asset Purchasers, the Companies, Purchasers, Pur-
chasers' Affiliates and each of their respective officers, directors, managers,
employees and agents pursuant to otherwise applicable portions of this Sec-
tion 12, in the event that, through a subsequent change in law, a subsequent
successful challenge to any law or any other means, recourse against such
entities is restored.

12.7    This Section 12 provides the sole remedy for any matters related to Asbestos
Claims. Section 14.3 and Section 14.4 shall not apply to this Section 12.

12.8    The indemnification set forth in this Section 12 is solely for the benefit of the parties specifically identified herein, and no right to indemnification or payment of any kind is hereby created in any other person or entity.

## 13.    Sellers' Covenants

13.1    For the period between the Signing Date and the Closing Date, Sellers shall use best reasonable efforts that the Companies or Sellers' Affiliates, as the case may be, shall (i) preserve their customer relationships, (ii) preserve the Material Assets and the Real Property of the Business in good working condition, reasonable wear and tear excepted, (iii) keep the necessary insurance for the Business in place which shall survive the Closing Date, (iv) maintain accounting procedures consistent with past practice and (v) conduct their respective business operations in all material respects in the ordinary course of business in a manner consistent with past practice.

13.2    For the period between the Signing Date and the Closing Date, Sellers shall ensure that each of the Companies or the Sellers' Affiliates, as the case may be, will not without the consent of Purchasers, except (i) in the ordinary course of business and consistent with past practice or (ii) to the extent required to implement the final target structure set forth in Exhibit 1.1:

(i)     permit any of its Material Assets or its Real Property to be sold or otherwise disposed of or subjected to any mortgage, pledge, lien, security, interest, encumbrance, restriction, or charge of any kind, except for those arising by operation of law or necessary in the ordinary course of business in accordance with past practice;

(ii)    make any material capital expenditure (i.e. exceeding an amount of EUR 2,000,000.00 (in words: Euro two million)) or commitment therefore or enter into any material contract, agreement or commitment with onerous terms which are not consistent with past practices;

(iii)   grant any increase in wages, salaries, bonus or other remuneration of any employee with an annual remuneration exceeding EUR 250,000.00;

(iv)    incur any interest bearing debt with third parties, other than revolving credit advances in the ordinary course of business;

(v)     make any material deferral or acceleration or materially change any deferrals or accelerations, in each case affecting the Working Capital inconsistent with past practice;

**JA454**

- 103 -

(vi)   adopt any changes in the articles of association of the Companies;

(vii)  merge any Company with another person or effect any other reorganization within the scope of the German Merger Act (*UmwG*) or any similar provision of foreign law;

(viii) sell, lease, license, encumber or otherwise dispose of any shares or business of the Companies or any assets with a market value in excess of EUR 2,000,000.00;

(ix)   pay any dividends or make any declarations to pay any dividends (a) for periods beginning after the Effective Date or (b) resolved prior to or on the Effective Date for periods up to and including the Effective Date but not paid out prior to or on the Effective Date;

(x)    commence or settle any litigation or arbitration proceedings with a value in dispute in excess of EUR 500,000.00;

(xi)   reduce the existing insurance coverage;

(xii)  terminate any Material Agreements;

(xiii) adopt any shareholders' resolutions or enter into any enterprise agreements within the scope of Sections 291 et seq. German Stock Corporation Act (*AktG*); and

(xiv)  agree, whether or not in writing, to do any of the foregoing.

13.3  Sellers shall, and shall see to it, that the Companies shall, as from the Signing Date, provide Purchasers and their advisors with such access to properties, documents and information in relation to the Business which Purchasers reasonably request in order to prepare the consummation of this acquisition.

13.4  For the period between the Signing Date and the Closing Date Sellers shall disclose to Purchasers in writing without undue delay events of which Sellers obtain actual knowledge which are or which may constitute a Material Breach of Guarantees, a Material Breach of Covenants or a Material Adverse Change.

13.5  Sellers jointly and severally covenant and undertake to Purchasers:

13.5.1  not to extend during the period between the Signing Date and the Closing Date any additional loans to any of the Non-Consolidated Companies beyond those detailed on Exhibit 13.5.1 and not to alter

the current terms and conditions of the existing loans after the Signing Date or the Closing Date;

13.5.2   to pay upon first demand any Outstanding Capital Contributions which increased the Cash amount within the meaning of Section 3.1.3 above, it being agreed that Purchasers may set-off, contrary to the provisions contained in Section 22.9 below, any unpaid Outstanding Capital Contributions against the Purchase Price payment obligations hereunder (such set-off releasing Sellers or the respective Sellers' Affiliate from its obligation to make the Outstanding Capital Contribution);

13.5.3   to reimburse the amount of any VAT Receivables which after the exhaustion of all reasonable remedies cannot be collected (by means of refund or set-off) from the Tax Authorities and which increased the Cash amount within the meaning of Section 3.1.3 above;

13.5.4   to reimburse the amount of any Insurance Receivables which, after the exhaustion of all reasonable remedies, cannot be collected from the insurances and which increased the Cash amount within the meaning of Section 3.1.3 above;

13.5.5   to not cause any circumstances after the Signing Date which would require accruals for restructuring of the Interfer Group Consolidated Companies within the meaning of SKA form 2601/line item 2660 000 and SKA form 2601/line item 2654 000 to be entered for the first time into the year-end accounts for the fiscal year ending on December 31, 2003 of the Interfer Group Consolidated Companies and which are recognized for tax purposes in the year end accounts of the Interfer Group Consolidated Companies;

13.5.6   not to settle or pay for after the Effective Date any Excluded Liabilities within the meaning of the US Asset Purchase Agreements other than out of any Excluded Assets within the meaning of the US Asset Purchase Agreements or any proceeds therefrom.

In relation to Section 13.5.4, Section 9.5 shall apply *mutatis mutandis*.

13.6   For the period between the Signing Date and the Closing Date, Sellers shall see to it that the Consolidated Companies (i) shall not enter into any interest swaps arrangements and (ii) continue the FX hedging policy for operational topics as it was prior to Signing Date until the Closing Date. Sellers shall further see to it that any existing interest rate swaps are terminated prior to the Effective Date, it being understood that in the event that the interest

swaps are terminated prior to the Effective Date, such interest swaps shall not be included in the calculation of the Financial Debt within the meaning of Section 3.1.2 (vii) above and/or the calculation of the Cash within the meaning of Section 3.1.3 (x) above. Until the Closing Date Seller 1 shall continue to act as counter party for the Consolidated Companies for such FX hedging of operational topics, subject to the FX hedges not expiring later than three (3) months following the Closing Date and the overall volume base being consistent with past practice. For the avoidance of doubt, the hedges that are in place at Closing Date shall not be terminated at that date but shall mature on the originally agreed maturity date for each hedge. Sellers shall cause the Consolidated Companies not to enter into additional FX hedges (FX hedges being hedges of the kind and nature set out in Exhibit 3.1.2) or extend existing FX hedges for any additional or rolled-over intercompany financing agreement where such additional or extended FX hedges for intercompany financing purposes expire after the Effective Date. Sellers may decide that the Consolidated Companies shall extend all or a portion of FX hedges for any additional intercompany financing commencing after the Effective Date (herein "**New Hedges**") until the Closing Date. Sellers shall see to it that on the Closing Date the Consolidated Companies shall terminate any and all outstanding New Hedges. Sellers shall put the Consolidated Companies into the financial position they would have been in had the New Hedges not been extended provided that the Consolidated Companies terminate the New Hedges in coordination with Sellers. For the avoidance of doubt, Sellers shall be entitled to any positive net results resulting from the New Hedges.

13.7    Sellers undertake that, unless otherwise agreed in writing between Sellers and Purchasers with respect to specific intra-group agreements, all intra-group agreements between Sellers or Sellers' Affiliates (other than the Companies) on the one hand and the Companies on the other hand (except for arms' length trading or transactions in the ordinary course of business) shall continue until the Closing Date and shall be terminated by Sellers with effect as of the Closing Date or shall be split up by Sellers in a manner that the Company affected will cease to be a party to such intra-group agreement with effect as of the Closing Date.

13.8    Sellers undertake to provide to the Consolidated Companies such services which they have provided to the Companies prior to the Signing Date upon written request of Purchasers on the same terms and conditions, same quality and costs (subject to past practice escalation) for a period up to 180 days after the Closing Date. In addition, Sellers shall provide the services identified in Exhibit 13.8 in accordance with the terms and conditions specified in Exhibit 13.8 provided that Purchasers shall see to it that the respective Companies shall negotiate final agreements in relation to such services in good faith within sixty (60) days after the Closing Date.

- 106 -

13.9 Sellers shall see to it that, contrary to the provisions contained in Section 2.3 of the Spin-Off Agreement, Brenntag Germany shall have the right to determine the net value of the assets and liabilities (such net value in no event exceeding the Purchase Price allocated to the German Brenntag Business pursuant to Exhibit 3.3) which form part of the spin-off of the German Brenntag Business into Brenntag Germany in the year-end financial statements 2003, it being, however, understood that Purchasers shall see to it that (i) Brenntag Germany shall notify Sellers in writing about the intended determination of value and shall grant Sellers access to all books, records and other information necessary in order to assess the tax consequences of such determination for Sellers and that (ii) Brenntag Germany shall not be entitled to make such determination of value if and to the extent Sellers object for reasonable cause (*aus angemessenem Grund*) in writing to such determination within ten (10) business days following receipt of such notification. In such event the provisions contained in Section 2.3 of the Spin-Off Agreement shall apply.

13.10 Sellers shall for any claims which have been notified by Purchasers to Sellers in good faith within a period of twenty-four (24) months after the Closing Date assign to Purchasers or a Designated Nominee all insurance claims net of any deductibles and the amount of any increased premiums resulting from the respective occurrences (herein **"Insurance Net Claims"**) which result from insured events occurred in relation to the Business prior to the Closing Date. Sellers shall take all other steps reasonably necessary for Purchasers or the Designated Nominee to collect the Insurance Net Claims, in particular provide Purchasers or the relevant Designated Nominee with all benefits of the Insurance Net Claims which are not assignable. In the event that either the amount of the deductibles or the increase of premiums result from circumstances other than relating to the Business, the amount of deductibles and premium increases shall be allocated as between the Business related insurance claims and other insurance claims on a *pro rata* basis.

13.11 Sellers shall, and shall use their reasonable efforts to cause the Companies to, execute and deliver all documents and make all other statements necessary for the fulfilment of the Closing Events listed in Exhibit 13.11, which are required for the consummation of the Senior Credit Facilities Agreement and the Mezzanine Facility Agreement of even date relating to the acquisition of the Brenntag Business and Interfer Business provided that Purchasers shall use their reasonable efforts to have such Closing Events waived under Section 4.1 of the Senior Credit Facilities Agreement which can not reasonably be fulfilled on or prior to the Scheduled Closing Date. Purchasers shall use their best efforts to cause the legal opinions referred to in Exhibit 13.11 under Section E (herein **"Legal Opinions"**) to be delivered to the relevant lenders prior to or on the Scheduled Closing Date.

**JA458**

- 107 -

13.12  Sellers shall procure (i) that as from the Closing Date, Seller 4 shall change its firm name from "Brenntag, Inc." and (ii) that as from the Closing Date such name (or similar or comparable firm name, including any abbreviations or parts of such names) shall not be sold, transferred, or assigned to any of Sellers' Affiliates or any third party and (iii) that such name (or similar or comparable firm name, including abbreviations or parts of such names) shall no longer be used by Sellers of Sellers' Affiliates within twelve (12) months after the Closing Date. Sellers shall procure that within twelve (12) months from the Closing Date, the Retained Subsidiaries shall change their respective firm names from "Brenntag West, Inc.", "Whittaker, Clark & Daniels, Inc.", "Eastech Chemical, Inc." and "Crozier-Nelson Sales, Inc.", and that such names (or similar or comparable names, including any abbreviations or parts of such names) shall no longer be used by Sellers or any Affiliates, nor sold, transferred, or assigned to any of Sellers' Affiliates or any third party.

13.13  With respect to the transfer of each Sold US Business pursuant to the relevant US Asset Purchase Agreement, the Parties undertake to use all reasonable efforts and to render to each other all reasonably necessary support to obtain, with due business haste, whether before or after the Closing Date: (i) consent from all parties to contracts comprising part of such Sold US Business which require consent for assignment (herein each a "**Consent Contract**"); and (ii) consent from the relevant authorities for the transfer or assignment of each permit used in such Sold US Business (herein each a "**US Business Permit**") or, if such US Business Permit cannot be assigned or transferred, a corresponding US Business Permit issued in the name of or for the benefit of the relevant US Asset Purchaser (or its nominee) (herein each a "**Corresponding Purchaser Permit**"). Nothing in this Section 13.13 shall require the Sellers or their Affiliates to make any payment or provide any other economic incentive to obtain such consents or permits. The US Asset Purchaser(s) shall, among other things, offer reasonable assurances to any counterparty to a Consent Contract, or the entity issuing any US Business Permit as to the conduct of the relevant Sold US Business after the Closing Date. To the extent that consent to assignment or transfer for a Consent Contract or a US Business Permit is not obtained prior to the Closing Date, Seller 3 and Seller 4 shall, to the extent permissible under such Consent Contract or US Business Permit, use reasonable efforts to provide to the US Asset Purchaser(s) the benefits of such Consent Contract or US Business Permit, provided that the US Asset Purchaser(s) shall perform for the benefit of Seller 3 or Seller 4, as the case may be, all obligations required to be performed under such Consent Contract or US Business Permit by Seller 3 and Seller 4; and provided, further, that Purchasers and the US Asset Purchasers shall indemnify and hold harmless Seller 3 and Seller 4 (or their Affiliates) and their respective officers, directors, employees, and representatives from and against any and all liabilities incurred in connection with Seller 3's or Seller 4's (or their Affiliates') continued performance under any Consent Contracts and

- 108 -

US Business Permits, except to the extent such liabilities result from the gross negligence or willful misconduct of Seller 3 or Seller 4 (or their Affiliates') or their respective officers, directors, employees, or representatives.

13.14 Sellers undertake to transfer or assign the LAM Minority Shares to a nominee reasonably acceptable to Purchasers prior to or on the Scheduled Closing Date, and, if any such LAM Minority Shares are not so transferred, shall use all reasonable efforts to effect such transfer with due business haste after the Closing Date.

## 14.    Expiration of Claims / Limitation of Claims

14.1    All claims of Purchasers arising under this Agreement shall be time-barred eighteen (18) months after the Effective Date. Exempted herefrom are:

14.1.1    all claims of Purchasers arising under Section 10 (Environmental Indemnity) (other than claims arising under Section 10.9 above) which shall be time-barred on the sixth (6th) anniversary of the Effective Date;

14.1.2    all claims of Purchasers in respect of Indemnified Losses relating to Former Sites and Third Party Sites which shall be time-barred on the thirtieth (30th) anniversary of the Effective Date;

14.1.3    all claims of Purchasers arising under Section 11 (Tax Indemnity) which shall be time barred for each Tax three (3) months after the date of the final, non-appealable assessment concerning the respective Tax;

14.1.4    all claims of Purchasers arising under Section 12 (Asbestos Indemnity) which shall be time-barred for each Asbestos Claim three (3) months after the date of the final, non-appealable court judgment or settlement agreement concerning the respective Asbestos Claim;

14.1.5    all claims of Purchasers in respect of liabilities for defects of title arising from a breach in respect of Section 7.1.2 above which shall be time-barred on the fifteenth (15th) anniversary of the Effective Date;

14.1.6    all claims of Purchasers arising under Section 17.1 below which shall be time-barred on August 18, 2008;

- 109 -

14.1.7     all claims of Purchasers in respect of liabilities arising under Section 17.2 below which shall be time-barred (i) three (3) months after the date of the final, non-appealable court judgment or the settlement agreement concerning the respective Third Party Claims or (ii) when the underlying Third Party Claims become time-barred in accordance with statutory laws;

14.1.8     all claims of Purchasers in respect of liabilities arising under Section 17.3 below which shall be time-barred on the fifteenth (15th) anniversary of the Effective Date; and

14.1.9     all claims of Purchasers arising as a result of willful or intentional breaches of Sellers' obligations under this Agreement which shall be time barred in accordance with the statutory rules in Sections 195, 199 German Civil Code;

(herein collectively "**Time Limitations**"). All claims of Sellers arising under this Agreement shall be time-barred eighteen (18) months after the Effective Date.

14.2     The expiry period for any claims of Purchasers under this Agreement shall be tolled (*gehemmt*) pursuant to Section 209 German Civil Code by any timely notification of Sellers subject to Section 9.2, Section 10.6, Section 11.4 or Section 12.5 above, as the case may be. Section 203 German Civil Code shall apply. This Section 14.2 shall apply *mutatis mutandis* to all claims of Sellers arising under Sections 8 and 9.7 above.

14.3     Except as explicitly provided otherwise in this Agreement or the Ancillary Agreements, no liability shall attach to Sellers or Sellers' Affiliates under this Agreement or the Ancillary Agreements where the individual claim or the aggregate of claims resulting from (i) an identical event (*von dem identischen Umstand herrühren*) is less than EUR 250,000.00 (in words: Euro two hundred and fifty thousand) and resulting from (ii) a breach or non-fulfilment by Sellers of Section 7.1.20 above (Management Accounts), is less than EUR 4,000,000.00 (in words: Euro four million) (herein "**De Minimis Claims**") and until the aggregate amount of claims (excluding the De Minimis Claims), is more than EUR 15,000,000.00 (in words: Euro fifteen million) (*Freibetrag*) (herein "**Deductible**"). If the aggregate liability of Sellers or Sellers' Affiliates under this Agreement and the Ancillary Agreements is greater than EUR 15,000,000.00 (in words: Euro fifteen million) Sellers' or Sellers' Affiliates' liability shall be the excess above EUR 15,000,000.00 subject to the other provisions of this Section 14. The Deductible shall not apply to any liability resulting from a breach in respect of Section 7.1.1, second and third sentence, and Section 7.1.2 above.

- 110 -

14.4 Except as explicitly provided otherwise in this Agreement, the aggregate liability of Sellers under this Agreement (including, for the avoidance of doubt, any liability of Sellers or Sellers' Affiliates under the Ancillary Agreements) shall not exceed ten (10) % of the Enterprise Value (herein **"Liability Cap"**). The Liability Cap shall not apply to any liability resulting from a breach in respect of Section 7.1.1, second and third sentence and Section 7.1.2 above for which Sellers shall be liable up to a maximum amount equal to the Purchase Price.

14.5 The Parties are in agreement that the remedies that Purchasers, Purchasers' Affiliates, any Designated Nominees or any of the Companies, may have against Sellers for breach of obligations set forth in this Agreement or any of the Ancillary Agreements are solely governed by this Agreement, and the remedies provided for by this Agreement shall be the exclusive remedies available to Purchasers, Purchasers' Affiliates, the Designated Nominees or the Companies. Apart from the rights of Purchasers under Section 6.4, Section 6.5, Section 6.7, Section 9, Section 10, Section 11 and Section 12 above (i) any right of Purchasers to withdraw (*zurücktreten*) from this Agreement or to require the winding up of the transaction contemplated hereunder (e.g. by way of *großer Schadenersatz* or *Schadenersatz statt der Leistung*), (ii) any claims for breach of pre-contractual obligations (*culpa in contrahendo,* including but not limited to claims arising under Sections 241 (2), 311 (2) (3) German Civil Code) or ancillary obligations (*positive Forderungsverletzung,* including but not limited to claims arising under Sections 280, 282 German Civil Code), (iii) frustration of contract pursuant to Section 313 German Civil Code (*Störung der Geschäftsgrundlage*), (iv) all remedies of Purchasers for defects of the Purchase Object under Sections 437 through 441 German Civil Code and (v) any and all other statutory rights and remedies, if any, are hereby expressly excluded and waived (*verzichtet*) by Purchasers, except claims for willful deceit (*arglistige Täuschung*) and other intentional breaches of pre-contractual obligations (*vorsätzliche vorvertragliche Pflichtverletzungen*) or intentional breaches of contract (*vorsätzliche Vertragsverletzungen*). The Parties are in agreement that any liability of Sellers resulting from intentional breaches of obligations of whatsoever nature or intentional conduct of any individuals assisting Sellers in the preparation of this transaction (*Erfüllungsgehilfen/Verhandlungsgehilfen*) except for the persons (i) listed in Exhibit 7.3-1, (ii) employees and advisors of Sellers' Guarantor and (iii) employees and advisors of Sellers' Affiliates is herewith excluded. The Parties are further in agreement that Sellers' Guarantees are only designed for the specific remedies of Purchasers set forth in Section 9 above and the restrictions contained in this Section 14 and that Sellers' Guarantees shall not serve to provide Purchasers with any other claims than those set forth in this Agreement. The Parties are further in agreement that Section 444 German Civil Code shall not apply to any of the provisions on liability in this Agree-

- 111 -

ment because Sellers have only given independent guarantees, but no representations with respect to the quality of the purchase object (*Garantie für die Beschaffenheit der Sache*) within the meaning of Section 444 German Civil Code. As no established case law relating to the newly introduced Section 444 German Civil Code exists and in light of the fact that, in case the statutory provisions regarding Seller's liability for defects of the purchase object, Sellers would not have assumed any representations or guarantees with respect to the quality of the purchase object within the meaning of Section 444 German Civil Code and would have given no or only very limited other guarantees, Purchasers by way of precaution explicitly waive the right to invoke the statutory provisions on the liability of a seller for defects of the purchase object and any claims that would be available to Purchasers in case of the applicability of Section 444 German Civil Code and/or the statutory provisions regarding Seller's liability for defects of the purchase object, if and to the extent such rights and/or remedies are specifically excluded under this Agreement.

14.6    This Section 14 shall also apply to any claims of Purchasers, Brenntag Germany, Interfer Germany, Purchasers' Affiliates or Designated Nominees under the Ancillary Agreements. Purchasers shall see to it that Brenntag Germany, Interfer Germany, Purchasers' Affiliates and the Designated Nominees shall comply at all times with the terms of this Section 14 in connection with any claims arising under the Ancillary Agreements.

14.7    Sections 14.3, 14.4 shall not apply to (i) Sections 6.3, 10.9, 11, 12, 13.4 through 13.14, Section 19 and any liability resulting from a wilful breach of Sellers obligations hereunder, and (ii) Sections 17.1 and 17.3.

E.    **MISCELLANEOUS**

15.    **Purchaser's Covenants**

15.1    With effect as of the Closing Date, Purchasers (a) hereby assume the guarantees, comfort letters and other securities of any kind (herein **"Securities"**) listed in Exhibit 15.1-1 which Sellers or any of their Affiliates (other than the Companies) have provided in favour of the Companies or any Securities provided for between the Signing Date and the Closing Date in the ordinary course of business with respect to the Business, to banks, other financial institutions, suppliers, customers or other third parties (herein collectively **"Sellers' Bank Guarantees"**), and (b) shall indemnify and hold harmless Sellers and their Affiliates from all obligations and liabilities arising out of or in connection with the Sellers' Bank Guarantees. Purchasers shall further,

prior to or on the Scheduled Closing Date, either

(i)     replace the Sellers' Bank Guarantees to the extent that the underlying liabilities are not settled in accordance with the Fund Flow Chart (as defined below) on the Closing Date by Purchasers, so that Sellers and their Affiliates are fully released from such Sellers' Bank Guarantees as of the Closing Date; or

(ii)    provide, on or prior to the Scheduled Closing Date, an unconditional bank guarantee (issued by a first class German, US or UK bank) payable upon first demand, substantially in the form set forth in Exhibit 15.1-2 (herein **"Bank Guarantee"**) for each of the relevant Sellers' Bank Guarantees in an aggregate amount equal to the aggregate amount of the outstanding obligations secured by the Sellers' Bank Guarantees as notified to Purchasers by Sellers at least ten (10) business days (*Werktage*) before the Scheduled Closing Date, except for the amount in which the underlying liabilities are settled in accordance with the Fund Flow Chart on the Closing Date by Purchasers.

Purchasers shall provide Sellers at least nine (9) business days (*Werktage*) prior to the Scheduled Closing Date with a fund flow chart (herein **"Fund Flow Chart"**) which, *inter alia*, shall show the amounts to be repaid to third party creditors underlying the Sellers' Bank Guarantees. Purchasers shall inform Sellers twenty (20) days prior to the Expiry Date (as defined in Exhibit 15.1-2) of the Bank Guarantee of the pending expiration of such Bank Guarantee and the amount of the Sellers' Bank Guarantees outstanding on the Expiry Date.

15.2    Purchaser undertakes and covenants to procure insurance coverage for the Business effective from the Closing Date, it being understood that such coverage shall be commensurate to the insurance coverage existing for the Business until the Closing Date.

15.3    Purchasers (as joint and several debtors) agree and undertake to see to it:

15.3.1    that individuals who are employees of the Retained Companies (which shall mean active employees as well as those who are on vacation, authorized leave of absence, short-term disability, maternity leave or other approved absence as of the Closing Date) shall be offered employment by the US Asset Purchasers or one or more Affiliates of the US Asset Purchasers, effective on the Closing Date, at substantially the same salaries and wages (including incentive programs) and on terms and conditions of employment that are no less favorable in the aggregate as those in effect immediately prior to the Closing Date, provided that the foregoing shall not be

construed to modify the "at-will" employment status of any employee. Those employees who accept Purchasers' offer of employment shall be referred to as the **"Transferred Employees"**;

15.3.2    that individuals who are employees of the Companies (including active employees as well as those employees who are on vacation, leave of absence, disability, maternity leave or other approved absence) as of the Closing Date (herein each an **"Affected Employee"**) shall continue to be employed by the Companies following the Closing Date at substantially the same salaries and wages (including incentive programs) and on substantially the same terms and conditions as those in effect immediately prior to the Closing Date, provided that the foregoing shall not be construed to modify the "at-will" employment status of any employee;

15.3.3    that for a period of no less than one (1) year immediately following the Closing Date, the coverages and benefits provided to Transferred Employees and Affected Employees pursuant to employee benefit plans, policies, programs or arrangements maintained by Purchasers, any Affiliates of Purchasers or the Companies shall be, in the aggregate, no less favorable than those provided to such employees immediately prior to the Closing Date;

15.3.4    that the Companies or any other Affiliates of Purchasers give Transferred Employees and Affected Employees full credit for such employees' service with the Consolidated Companies or any Affiliate of the Consolidated Companies for purposes of eligibility and vesting but not for purposes of benefit accrual, except to the extent required by law, and determination of the level of benefits under any employee benefit plans, policies, programs or arrangements maintained by Purchasers, any Affiliate of Purchasers or the Companies to the same extent recognized by Seller 3, the Consolidated Companies or the Retained Companies, as the case may be, immediately prior to the Closing Date; and

15.3.5    that the Companies or any other Affiliates of Purchasers (i) waive all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to Transferred Employees and Affected Employees under any welfare benefit plans that such employees may be eligible to participate in after the Closing Date, other than limitations or waiting periods that are already in effect with respect to such employees and that have not been satisfied as of the Closing Date under any welfare plan maintained for Transferred Employees and Affected Employees immediately prior to the Closing Date, and (ii) provide

- 114 -

each Transferred Employee and Affected Employee with credit for any co-payments and deductibles paid prior to the Closing Date for the plan year in which the Closing Date occurs in satisfying any applicable deductible or out-of-pocket requirements under any welfare plans that such employees are eligible to participate in after the Closing Date.

15.4    With respect to certain employee benefit plans, the following shall apply:

15.4.1    Purchasers acknowledge and agree that they shall, or shall cause one or more of their respective Affiliates to, effective as of the Closing Date, adopt and assume the welfare benefit plans listed in Exhibit 15.4.

15.4.2    Prior to the Effective Date, Seller 3 shall take all actions as may be necessary to establish, effective as of January 1, 2004, one or more employee welfare benefit plans that shall provide the Transferred Employees and the Affected Employees with medical, dental, short-term and long-term disability, life, accidental death and dismemberment insurance and cafeteria and flexible spending account benefits, as well as stop-loss insurance coverage for the medical and dental benefits, that shall "mirror" the analogous Employee Plans (herein **"Purchaser Welfare Plans"**). In the event that such plans have not been established as of January 1, 2004, Seller 3 shall use its best efforts to provide that such plans shall be established prior to the Closing Date. On the Closing Date, Purchasers shall, or shall cause one or more of their respective Affiliates to, adopt and assume the Purchaser Welfare Plans.

15.4.3    Seller 3 shall assume sole responsibility for all claims incurred by Transferred Employees and Affected Employees and any other current or former employee of any of the US Consolidated Companies, the Retained Companies (and any eligible dependants and beneficiaries thereof) prior to the Effective Date (regardless of when such claims are reported) under the Stinnes Corporation self-insured health plan (including, for the avoidance of doubt, claims for medical, dental, prescription drug, hospitalization, and other benefits covered thereunder). For this purpose, a claim for benefits will be deemed to have been incurred on the date on which the related service or material was rendered to or received by the individual claiming such benefit.

15.4.4    Purchasers agree that they or one or more of their respective Affiliates shall be solely liable for satisfying the continuation coverage requirements for periods commencing on and after the Closing Date

**JA466**

for group health plans under COBRA for all current and former employees of the US Consolidated Companies and the Retained Companies (and eligible dependents and beneficiaries thereof) who are receiving COBRA continuation coverage as of the Closing Date or who are entitled to elect such coverage on account of a qualifying event, whether such event occurred prior to, on or following the Closing Date.

15.4.5   Purchasers and Sellers hereby agree that any Transferred Employee or Affected Employee who as of the Closing Date is receiving or entitled to receive short-term disability benefits under any Employee Plan and who directly following the termination of such short-term disability benefits becomes eligible to receive long-term disability benefits shall be provided such long-term disability benefits under a Sellers' long-term disability plan unless the insurance company underwriting long-term disability coverage under the Purchaser Welfare Plan established pursuant to Section 15.4.2 above that provides such coverage has expressly agreed to provide long-term disability benefits to any such Transferred Employee or Affected Employee. Purchasers and their Affiliates and Seller 3 shall cooperate to ensure that each such Transferred Employee or Affected Employee is provided long-term disability coverage under the appropriate long-term disability benefit plan as specified in this Section 15.4.5.

15.4.6   With respect to the Stinnes Corporation Profit Sharing Plan (herein the "**Stinnes Profit Sharing Plan**") and the Stinnes Corporation Pension Plan (herein the "**Stinnes Pension Plan**" and, together the "**Stinnes Corporation Retirement Plans**"), Seller 3 shall take all necessary actions to: (i) provide that the account balances of the Transferred Employees and the Affected Employees who participate therein shall be fully vested as of the Effective Date; and (ii) effective as of January 1, 2004, "spin off" (within the meaning of and in accordance with Section 414(l) of the Code) the accounts under the Stinnes Corporation Retirement Plans attributable to the Transferred Employees and the Affected Employees who participate therein (1) in the case of the accounts under the Stinnes Profit Sharing Plan, to a new defined contribution "401(k)"-type pension plan and (2) in the case of the accounts under the Stinnes Pension Plan, to a new defined contribution "money purchase"-type pension plan, in each case, to be sponsored by Brenntag Northeast the terms of each such plan to be identical in all material respects to the terms of the respective Stinnes Corporation Retirement Plan (herein collectively the "**New Stinnes Retirement Plans**"). In the event that such transactions shall not have been completed as of January 1,

2004, Seller 3 shall use its best efforts to ensure that such transactions shall be completed prior to the Closing Date. Except to the extent mutually agreed by Purchasers and Seller 3, the assets transferred pursuant to such spin-offs shall be in cash or in kind, including any cash equivalents (except that promissory notes evidencing participant loans under the Stinnes Corporation Retirement Plans shall be transferred in kind); it being understood that the funds available under the New Stinnes Retirement Plans shall mirror the funds under the Stinnes Corporation Retirement Plans, and, in connection with such spin-offs, assets being transferred from the Stinnes Profit Sharing Plan and the Stinnes Pension Plan will be mapped to such identical funds maintained under the New Stinnes Retirement Plans.

15.4.7  Purchasers acknowledge and agree that they shall, or shall cause one or more of their respective Affiliates to, effective as of the Closing Date, adopt and assume the New Stinnes Retirement Plans, the Coastal Chemical Co., L.L.C. Employee 401(k) Savings Plan, the Brenntag Southwest, Inc. Salary Deferral and Profit Sharing Plan, the Brenntag Southeast, Inc. 401(k) Profit Sharing Plan, the Brenntag Mid-South, Inc. Employees' 401(k) Savings Plan, and the Brenntag Latin American Employee 401(k) Savings Plan (herein collectively, the **"Transferred Retirement Plans"**). As of the Closing Date, Purchasers or one or more of their respective Affiliates shall assume all liabilities for all accrued benefits under the Transferred Retirement Plans, and Sellers and the Retained Subsidiaries shall be relieved of all liabilities for such accrued benefits. Purchasers and their respective Affiliates and Seller 3 shall cooperate in the filing of any documents or taking of other actions required to effect the transfer of the Transferred Retirement Plans described herein.

15.4.8  Notwithstanding anything in this Section 15.4: (i) in the event that Seller 3 has not yet established the Purchaser Welfare Plans and New Stinnes Retirement Plans effective as of January 1, 2004, the Transferred Employees and Affected Employees shall continue to participate in the analogous Employee Plans under the terms and conditions applied generally to participants in such Employee Plans until the earlier of the Closing Date and the date on which the Purchaser Welfare Plans and New Stinnes Retirement Plans are effective; and (ii) in the event that Purchasers and their respective Affiliates are not as of the Closing Date able to provide any or all of the employee benefits contemplated under Section 15.3 or this Section 15.4 to any Transferred Employee or Affected Employee (or any eligible dependant or beneficiary thereof) or to any other individual

as contemplated hereunder, Seller 3 and/or one or more of its Affiliates shall provide such benefits for a transition period of such length as is reasonably necessary for Purchasers or their Affiliates to establish and provide such benefits (and in any case which shall extend for a period of at least six (6) months following the Closing Date, unless earlier terminated at the election of Purchasers) and in consideration of such remuneration as shall be mutually agreed to in good faith by Seller 3 and Purchasers - with such remuneration not to exceed the actual costs incurred by Sellers for the benefits provided - in a transition services agreement to be entered into as of or prior to the Closing Date.

15.4.9   Prior to the Closing Date, Seller 3 shall provide Purchasers with such reasonable documentation and information as Purchasers shall request in order to determine whether Purchasers shall, in their sole discretion, elect to assume (or to have one or more of their Affiliates assume) any liabilities on account of any Transferred Employee or Affected Employee under the Stinnes Corporation Incentive Compensation Plan (herein the "**ICP**"). In the event Purchasers do, in their sole discretion, elect to assume (or to have one or more of their Affiliates assume) any such liabilities under the ICP, Seller 3 shall cooperate with Purchasers to effect such assumption and shall, if requested by Purchasers, transfer to Purchasers or their Affiliates any life insurance policies maintained in connection with such liabilities pursuant to the ICP.

15.5   With respect to the "Teamsters Local 641 Health, Welfare and Pension Fund", "The Western Conference of Teamsters Pension Trust Fund" and the "Teamsters Union Local No. 115 Pension Plan" (herein collectively the "**Multiemployer Plans**"), the following provisions shall apply after the Closing Date:

15.5.1   Purchasers agree that they will cause one or more of their respective Affiliates (herein "**Contributing Purchaser Affiliate**") to make contributions to each Multiemployer Plan in accordance with all collective bargaining agreements relating thereto and shall contribute to such plan with respect to such operations for substantially the same number of contribution base units for which the relevant Retained Subsidiary had an obligation to contribute to such plan;

15.5.2   unless and until a variance or exemption is obtained in accordance with Section 4204(c) of ERISA with respect to a Multiemployer Plan, Purchasers agree that a US Asset Purchaser or one of Purchasers' Affiliates will provide to such Multiemployer Plan, for a period of five (5) plan years commencing with the first plan year

beginning after the Closing Date, a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to such Multiemployer Plan, or such other security as may be permitted under Section 4204(a)(1)(B) of ERISA or regulations thereunder, in an amount equal to the greater of (i) the average annual contribution required to be made by the Retained Subsidiary to such Multiemployer Plan with respect to the operations thereunder for the three (3) plan years preceding the plan year in which the Closing occurs, or (ii) the annual contribution that the Retained Subsidiary was required to make with respect to the operations under the Multiemployer Plan for the last plan year before the plan year in which the Closing occurs, which bond or escrow shall be paid to a Multiemployer Plan if any Contributing Purchaser Affiliate withdraws from such Multiemployer Plan, or fails to make a contribution to a Multiemployer Plan when due, at any time during the first five (5) plan years beginning after the Closing Date;

15.5.3   if any Contributing Purchaser Affiliate withdraws from a Multiemployer Plan in a complete withdrawal or a partial withdrawal with respect to the union employees within the period referred to in Section 15.5.2 above, Sellers agree to see to it that each relevant Retained Subsidiary is secondarily liable (and Seller 3 shall be jointly and severally liable with each Retained Subsidiary) for any withdrawal liability such Retained Subsidiary would have had at the Closing Date to such Multiemployer Plan, but for the application of Section 4204 of ERISA, if the withdrawal liability of Contributing Purchaser Affiliate with respect to such Multiemployer Plan is not paid;

15.5.4   if all, or substantially all, of any Retained Subsidiary's assets are distributed, or any Retained Subsidiary is liquidated before the end of the first five plan years beginning after Closing, then, except as may otherwise be required by law, Seller 3 shall, or shall cause such Retained Subsidiary to, provide a bond, an amount in escrow or such other security as may be permitted under Section 4204(a)(1)(B) of ERISA or regulations thereunder, equal to the present value of the withdrawal liability such Retained Subsidiary would have had but for the application of Section 4204 of ERISA, which bond, amount in escrow or other security may be applied toward the satisfaction of such Retained Subsidiary's secondary liability described in Section 15.5.3 above; and

- 119 -

15.5.5    Purchasers shall, or shall cause their respective Affiliates to, as
soon as reasonably practicable after the receipt thereof, furnish each
Retained Company with a copy of any notice of withdrawal liabil-
ity it may receive with respect to a Multiemployer Plan, together
with all pertinent details. In the event that any such withdrawal li-
ability shall be assessed against Purchasers or any of their respec-
tive Affiliates, Purchasers agree that they shall, or shall cause the
relevant Affiliates to, provide each Retained Company with reason-
able advance notice of any intention on the part of the relevant
Contributing Purchaser Affiliate not to make full payment of any
withdrawal liability when the same shall become due.

15.6    Seller 1 owns the IR-mark, registration number 721 702, with priority date of
June 02, 1999 and territorial scope for the Benelux countries, Switzerland,
France, Great Britain, Italy, Poland and Portugal with protection for the
goods and services of the classes 1, 2, 3, 4, 39, 40, 42 in accordance with the
list of goods and services contained in the trademark registers (herein
**"Brenntag Trademark"**). Seller 1 further applied in the United States of
America on August 23, 1999 for registration of the national marks number
75 782 263, number 75 782 264, number 75 782 262, number 75 782 261,
number 75 782 265, number 75 782 259, number 75 782 258, number
75 782 257, number 75 782 256 as well as number 75 782 255 with scope of
protection in accordance with the list of goods and services listed therein
(herein **"Brenntag US Trademarks"**). Some of the Brenntag US Trade-
marks have not yet been registered in the United States. Seller further owns
the trademark registration number 399 11 741, with priority date of March
01, 1999 and territorial scope for Germany with protection for the goods and
services of the classes 6, 7, 8, 11, 19, 39, 42 in accordance with the list of
goods and services contained in the trademark registers (herein **"Interfer
Trademark"**). Purchasers intend to apply after the Closing Date for national
and international marks with the same content as the Brenntag Trademark,
the Brenntag US Trademarks and the Interfer Trademark in each case with-
out the element "*Stinnes*", and have them registered in the respective juris-
dictions. Sellers shall endure such applications and registrations without the
element "*Stinnes*", and shall not take any action against the Companies
and/or Purchasers on the basis of the existing Brenntag Trademark and/or
Brenntag US Trademarks and/or Interfer Trademark. Purchasers shall see to
it that any of the foregoing applications shall be made explicitly without the
element "*Stinnes*". Sellers shall refrain from using the Brenntag Trademark,
the Brenntag US Trademarks and the Interfer Trademark actively as from the
Closing Date. Further, Sellers shall see to it that the unregistered applications
for the Brenntag US Trademarks shall be withdrawn and the registered
Brenntag US Trademarks shall be deleted. Sellers shall further see to it that
the Brenntag Trademark and the Interfer Trademark shall not be extended in

- 120 -

terms of protection period beyond the existing time periods. Any costs incurred with the defense of the Brenntag Trademark, the Brenntag US Trademarks and/or the Interfer Trademark, in particular against attacks or infringements of third parties until the expiry of the protection period shall be borne by Purchasers as from the Effective Date. Sellers and Purchasers shall keep each other informed about any attacks or infringements in relation to the Brenntag Trademark and the Interfer Trademark and shall coordinate any measures to be taken in this regard. Seller shall, at his own discretion, grant power of attorney to Purchaser in order to defend or enforce the Brenntag Trademark and the Interfer Trademark.

15.7   Purchasers shall refrain, and shall see to it that Purchasers' Affiliates, the Designated Nominees and the Companies shall within twelve (12) months from the Closing Date refrain from using the words "*Stinnes*" with or without the German national mark 399 10 767 which was transferred to Brenntag Germany under the Spin Off Agreement (herein **"Transferred Trademarks"**) in whatsoever manner as from the Closing Date, it being understood that such partial use of the Transferred Trademark without the words "*Stinnes*" does not qualify as a maintaining use (*schutzerhaltende Nutzung*) within the meaning of Section 25 German Trademark Act (*MarkenG*).

15.8   After the Closing Date, Purchasers shall refrain, and shall see to it that Purchasers' Affiliates and the US Asset Purchasers shall refrain from using the firm names (*Firmenbezeichnungen*) "*Brenntag West Inc.*", "*Whittaker Clark & Daniels, Inc.*", "*Crozier-Nelson Sales Inc.*", and/or "*Eastech Chemicals Inc.*" or any similar or comparable firm names (including abbreviations or parts of such names) as firm names or trade names (*Handelsbezeichnungen*), it being understood that nothing in this Agreement shall prevent Purchasers to use (i) the name "*Brenntag*" in accordance with the terms of Sections 15.6 and 15.7 above or (ii) the name "*Whittaker*" as a trade name (*Handelsbezeichnung*) for product lines of the relevant Sold US Business. Purchasers shall further refrain, and shall see to it that their Affiliates (including for the avoidance of doubt the Companies) shall refrain from using the element "*Stinnes*" in any firm names (*Firmenbezeichnungen*) or domain names or trade names (*Handelsbezeichnungen*) after the expiry of twelve (12) months after the Closing Date.

16.   **Purchaser's Indemnity**

If Sellers and/or any Affiliated Party are held liable for any liability arising in connection with the conduct of the Business by a third party, including but not limited to any liability in connection with any Environmental Matter or any employee claims, then Purchasers (as joint and several debtors) shall in-

- 121 -

demnify and hold harmless Sellers and the Affiliated Parties in respect of the relevant liability, unless and to the extent Purchasers have the right to claim indemnification from Sellers in respect of the relevant liability under the terms of this Agreement. Purchasers shall in particular indemnify and hold harmless Sellers, the Affiliated Parties and their respective Affiliates, officers, directors, shareholders, employees and agents against any and all liability, loss, damage or injury, together with all reasonable out-of-pocket costs and expenses relating thereto, including reasonable legal fees, expenses and disbursements, arising out of, connected with, or resulting from any such third party claim. Section 9.5 shall apply *mutatis mutandis*. Purchasers' indemnity under this Section 16 shall only be excluded to the extent any claims against Sellers or the Companies are based on wilful *(vorsätzliches)* or fraudulent behaviour by Sellers, any of the Companies or their representatives.

## 17.    Additional Indemnities

17.1    Sellers shall indemnify and hold harmless

17.1.1    Purchaser 1 or, at Purchaser 1's discretion, Brenntag Germany from any Indemnified Losses arising from or in connection with the joint liability of Brenntag Germany pursuant to Section 133 para. 1 and 3 German Merger Act *(gesamtschuldnerische Haftung gemäß § 133 Abs. 1, 3 UmwG)* for any liabilities of Seller 1 which do not relate to the Brenntag Business and which have not been allocated *(zugewiesen)* to Brenntag Germany under the Spin-Off Agreement pursuant to Section 133 para. 3 German Merger Act;

17.1.2    Purchasers, the US Asset Purchasers and the Companies with respect to any Excluded Liabilities as defined in the US Asset Purchase Agreements and any claim caused by the Excluded Liabilities, or where the proceeds were used to satisfy any Excluded Liabilities, in each case other than those which are indemnified under this Agreement, in particular under Sections 10, 11, 12 above, it being understood that these indemnifications operate as *lex specialis* and shall pre-empt *(ausschließen)* the applicability of this Section 17.1.2;

17.1.3    Purchasers and the Companies with respect to any loans between Sellers or Sellers' Affiliates extended to the Non-Consolidated Companies exceeding on the Closing Date the loans and amounts detailed on Exhibit 13.5.1 in the aggregate by more than EUR 1,000,000.00 (in words: Euro one million) or which have been extended prior to the Closing Date in breach of Section 13.5.1 above.

JA473

- 122 -

Sections 14.3 and 14.4 above shall not apply to this Section 17.1.

17.2    Sellers shall further, subject to the provisions contained in Section 14 above, indemnify and hold harmless Purchasers or, at Purchasers' discretion, any of the Companies from any Losses (within the meaning of Section 9.1 above) arising from or in connection with the following:

17.2.1    Any investigation by the French competition authorities or any third party claims against Brenntag S.A. in relation to alleged competition law offences committed prior to the Closing Date with respect to practices existing prior to the Closing Date regarding pricing, deposits, tariff, contracts and invoicing.

17.2.2    The investigation by the Canadian competition authorities or any third party claims against Brenntag Canada, Inc. in relation to alleged violations of the Canadian Competition Act regarding bid-rigging and conspiracy charges related to the supply of chlorine to the City of Toronto between the years 1991 and 1998.

17.2.3    The investigation by the Austrian competition authorities or any third party claims against NEUBER Gesellschaft m.b.H. in relation to alleged competition law offences committed prior to the Closing Date with respect to practices existing prior to the Closing Date regarding price fixing, market and customer allocation and bid rigging.

17.2.4    Any funding liabilities (*Nachschusspflichten*) arising from the negative equity (in the amounts existing as per the Closing Date) of the Companies referred to in <u>Schedule 7.1.3</u>.

Sections 9.2, 9.3.8 and 9.5 shall apply *mutatis mutandis*.

17.3    Sellers shall further indemnify and hold harmless Purchasers or any of the Companies or Purchasers' Affiliates from any Indemnified Losses (within the meaning of Section 10.9 above) arising from the failure to transfer title of Seller 1 and/or the Real Estate Affiliates to Blitz 03-1404 GmbH or Purchaser 2, as the case may be, with regard to the Sold Real Estate Brenntag and/or the Sold Real Estate Interfer under the Brenntag Real Estate Sale and Transfer Agreement and the Interfer Real Estate Sale and Transfer Agreement, as the case may be. Sections 14.3 and 14.4 above shall not apply.

JA474

18.   **Guarantee of Sellers' Guarantor**

Sellers' Guarantor hereby guarantees to Purchaser the due performance of Sellers' payment obligations arising out of Section 17.1.1 above. This guarantee shall only apply if and to the extent Purchasers have sought payment from Sellers and, after exhaustion of all remedies and legal steps reasonably to be taken, no payment could be obtained from Sellers, provided that Sellers´ Guarantor shall reimburse to Purchasers all losses, including legal fees and expenses Purchasers incurred as a result of the exhaustion of all remedies and legal steps.

19.   **Non-Compete Undertaking**

19.1   Sellers agree not to engage, directly or indirectly through Sellers' direct or indirect subsidiaries, as a proprietor, shareholder, partner, employee, independent contractor or otherwise in competition with the Business in regard to certain activities as set forth in Exhibit 19.1 (herein **"Restricted Activities"**), for two (2) years from the Closing Date. Sellers further agree not to do any of the following for a period of two (2) years from the Closing Date: (i) directly or indirectly through Sellers' direct or indirect subsidiaries solicit or otherwise contact within the scope of the Restricted Activities any present customers of the Business, for themselves or any other person, firm or corporation, for the purpose of obtaining business in competition with the products of the Business within the scope of the Restricted Activities as they exist on the date hereof or (ii) directly or indirectly through Sellers' direct or indirect subsidiaries solicit, interfere with or endeavor to entice away from Purchasers any person, firm or corporation dealing or doing business with Purchasers, or any management employee of the Purchasers or the Business with respect to both the Business or products of the Business within the scope of the Restricted Activities.

19.2   Nothing in Section 19.1 above shall prohibit Sellers (i) from holding ownership of an equity interest not greater than 25 % of any class of securities in a publicly held company engaged in a business in competition with the Business as conducted by Sellers and the Companies on the Closing Date (herein **"Competing Business"**), (ii) from offering employment to any key employee of any customer of the Business, (iii) from offering employment to any key employee of the Companies if such person contacts any Seller without any solicitation on the part of such Seller or if such person responds to a general solicitation or advertisement by Sellers, or (iv) from engaging outside of the Restricted Activities, in particular in the activities described in Exhibit 19.2 (herein **"Permitted Activities"**). Nothing in Section 19.1 above shall prevent Sellers from acquiring, directly or indirectly, shares in or assets of any com-

pany or undertaking which carries on a Competing Business if the Sellers shall cease to carry on or have such interest in the Competing Business or the company carrying on the same within eighteen (18) months from completion of the relevant acquisition, but nothing in Section 19.1 shall require the Sellers to cease to carry on the Competing Business or to dispose of the same or such interest within aforesaid eighteen (18) months if (a) such Competing Business or interest therein is acquired by the Sellers and the turnover properly attributable to the Competing Business did not at the date of acquisition amount to more than fifteen (15) % of the turnover of the Brenntag Business or the Interfer Business respectively; or (b) the Competing Business or interest is offered for sale on reasonable commercial terms but a buyer cannot be found.

19.3   Purchasers shall notify Seller 1 of any alleged breach of Section 19.1 above without undue delay (*unverzüglich*). If and to the extent Seller 1 shall cure, rectify or otherwise remedy an alleged or actual breach of Section 19.1 above within a thirty (30) days' period after having been notified by Purchasers in accordance with the foregoing sentence, Sellers shall not incur any liability of whatsoever nature towards Purchasers under this Section 19.

## 20.    Restriction of Announcement / Cooperation / Confidentiality

20.1   Each of the Parties undertakes that prior to the Closing Date it will not make an announcement in connection with this Agreement unless required by applicable mandatory law or share exchange regulations unless the other Parties hereto have given their respective consent to such announcement, including the form of such announcement, which consents may not be unreasonably withheld and may be subject to conditions. If and to the extent any announcement or disclosure of information regarding the subject matter of this Agreement is to be made under applicable mandatory laws, in particular any applicable share exchange rules, the Party being concerned shall, to the extent legally permissible, not disclose any such information without prior consultation with the other Parties.

20.2   Upon and after the Closing Date, Sellers and Purchasers shall each use their best efforts to execute and deliver or procure to be done, executed and delivered all such further acts, deeds, documents, instruments of conveyance, assignment and transfer that may be reasonably necessary to implement the terms of this Agreement.

20.3   The Parties understand and agree that all Proprietary Information (as defined in Section 20.5 below) shall be treated as confidential unless otherwise required by law. The receiving Party shall use the same degree of care as it uses with regard to its own Proprietary Information to prevent disclosure, use

or publication of the disclosing Party's Proprietary Information. Proprietary Information of the originating Party shall be held confidential by the receiving Party above unless it is, has been or shall be:

20.3.1   obtained legally and freely from a third party without restriction;

20.3.2   independently developed by or known to the receiving Party at a prior time or in a separate and distinct manner without benefit of any of the Proprietary Information of the disclosing Party, and documented to be as such;

20.3.3   made available by the disclosing Party for general release independent of the receiving Party;

20.3.4   made public as required by law, applicable regulations or court proceedings or share exchange requirements;

20.3.5   within the public domain or later becomes part of the public domain as a result of acts by someone other than the receiving Party and through no fault or wrongful act of the receiving Party.

20.4   A receiving Party may disclose Proprietary Information of a disclosing Party to directors, officers, and employees of the receiving Party or agents of the receiving Party including their respective brokers, lenders, insurance carriers or prospective purchasers who have specifically agreed in writing to nondisclosure of the terms and conditions hereof or who are bound by professional secrecy obligations. Any disclosure hereof required by legal process pursuant to this Section shall only be made after providing the disclosing Party with notice thereof in order to permit the disclosing Party to seek an appropriate protective order or exemption. Violation by a Party, its directors, officers, employees or its agents of the foregoing provisions shall entitle the disclosing Party, at its option, to obtain injunctive relief without a showing of irreparable harm or injury and without bond. The provisions of this Section will be effective for a period of two (2) years after the Closing Date.

20.5   **"Proprietary Information"** shall mean the information created, transferred, recorded or employed as part of, or otherwise resulting from the activities undertaken pursuant to this Agreement or the Disclosure Schedules and Exhibits hereto which constitutes the confidential, proprietary or trade secret information of the disclosing Party. Such information may be of, but not limited to, a business, organizational, technical, financial, marketing, operational, regulatory or sales nature and shall include, without limitation, any and all source codes and information relating to services, methods of operation, price lists, customer lists, technology, designs, specifications or other

proprietary information of the business or affairs of a Party or its Affiliates. Proprietary Information may either be in a written form, with notices of its proprietary nature affixed, or in an oral form, reduced to writing and affixed with appropriate notice of proprietary nature within seven days of oral presentation, and distributed to both Parties for the matter of record, but indicated as such at the time of presentation in an oral fashion.

20.6  Notwithstanding anything to the contrary contained in this Agreement, the Parties to this Agreement (and each Affiliate and person acting on behalf of any such Party) agree that each Party (and each employee, representative, and other agent of such Party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to such Party or such person relating to such tax treatment and tax structure, except to the extent such non-disclosure is necessary to comply with any applicable US federal or state securities laws; provided, however, that such disclosure may not be made until the earlier of date of the public announcement of discussions relating to the transaction, the date of the public announcement of the transaction, or the date of the execution of an agreement to enter into the transaction. This authorization is not intended to permit disclosure of any other information including (without limitation) (i) any portion of any materials to the extent not related to the tax treatment or tax structure of the transaction (ii) the identities of participants or potential participants in the transaction, (iii) the existence or status of any negotiations, (iv) any privilege or financial information except to the extent related to the tax treatment or tax structure of the transaction), or (v) any other term or detail not relevant to the tax treatment or the tax structure of the transaction.

**21.  Notices**

All notices and other communications hereunder shall be made in writing and shall be delivered or sent by registered mail or courier to the addresses below or to such other addresses which may be specified by any Party to the other Parties in the future in writing:

If to Sellers:

Deutsche Bahn AG
Leiter/in der Rechtsabteilung
Potsdamer Platz 2
10785 Berlin
Germany

Case 3:23-cv-01095-VAB   Document 18-09/08/23   03/24/25   09/08/23 486:01   1429   Page ID:
Exhibit F - MSPA - Part 2    Page 53 of 72

- 127 -

with a copy to:

Freshfields Bruckhaus Deringer
Dr. Hans-Jörg Ziegenhain
Prannerstraße 10
80333 München
Germany

If to Purchasers:

Bain Capital Ltd.
6th Floor, Devonshire House
Mayfair Place
W1J 8AJ London
United Kingdom

with a copy to:

Ashurst
Dr. Jörg Kirchner
Prinzregentenstr. 18
80538 München
Germany

## 22.    Miscellaneous

22.1    All expenses, costs, fees and charges in connection with the transactions
contemplated under this Agreement, including without limitation, fees for le-
gal services, shall be borne by the Party commissioning the respective costs,
fees and charges. All notarial fees incurred with the notarization of this
Agreement as well as all official fees charged by the cartel authorities in
connection with the merger clearances required under this Agreement shall
be borne by Purchasers. Purchasers shall be responsible for the payment of
any sales, transfer or stamp taxes, or other similar charges, payable by reason
of the transactions contemplated by this Agreement. Purchasers shall also be
responsible for all costs and fees incurred after the Closing Date with the
registration, re-registration and/or maintenance of the Brenntag Trademarks.
In the event that (i) the approval of the supervisory board of Sellers' Guar-
antor as set forth in Section 6.2.3 above shall have been finally declined or
that any Party shall have withdrawn (*zurücktreten*) from this Agreement in
accordance with Section 6.4 above due to the fact that such approval has not
been obtained within the deadlines set forth in Section 6.4 above and (ii) an
agreement on the sale and transfer of the Brenntag Business or the Interfer

- 128 -

Business has been entered into with a third party within three (3) months after such decline or withdrawal, Sellers as joint and several debtors shall, upon reasonable proof submitted to Sellers by Purchasers, reimburse to Purchasers an amount equal to the costs and expenses reasonably incurred by Purchasers or Purchasers' Affiliates in connection with this Agreement and the transaction contemplated hereunder between May 01, 2003 and the date of such decline or withdrawal up to an amount of EUR 5,000,000.00 (in words: Euro five million).

22.2    All Exhibits and Disclosure Schedules to this Agreement constitute an integral part of this Agreement and are incorporated herein by reference.

22.3    Subject to Section 22.7 this Agreement and the Ancillary Agreements and the Exhibits and Disclosure Schedules referred to under Section 22.2 above comprise the entire agreement between the Parties concerning the subject matter hereof and supersede and replace all oral and written declarations of intention made by the Parties in connection with the contractual negotiations. Changes or amendments to this Agreement (including this Section 22.3) must be made in writing by the Parties or in any other legally required form, if so required.

22.4    Except as set forth in Section 2.13 above, no Party shall be entitled to assign any rights or claims under this Agreement or any of the Ancillary Agreements without the written consent of the other Parties, except for the assignment of any rights under this Agreement by Purchasers (i) to the certain lenders in connection with the financing of the transactions contemplated by this agreement or any subsequent refinancing, and (ii) to any of its Affiliates, provided that Purchasers shall be obliged to make such assignment subject to the condition subsequent (*auflösende Bedingung*) that such Affiliate ceases to be an Affiliate of Purchasers. In the event that any Affiliate of Purchasers to which Purchaser shall have assigned any rights and/ or claims in accordance with the foregoing sentence shall cease to be an Affiliate of Purchasers, all such rights and/ or claims shall in any case automatically and without the necessity of any further action or statement by such Affiliate or by Purchasers revert to the relevant Purchaser with immediate effect, except where such Affiliate jointly with one or several other Affiliates is transferred to a third party in the course of (a) the sale of all or substantially all (i.e. 95% of total revenues of the last completed fiscal year preceding such sale) of the Business, (b) a sale of all or substantially all (i.e. 95% of total revenues of the last completed fiscal year preceding such sale) of the Interfer Business, (c) a sale of all or substantially all of the Brenntag Business conducted in the United States or (d) the sale of all or substantially all (i.e. 95% of total revenues of the last completed fiscal year preceding such sale) of the total

Case 3:23-cv-12051-AJKQ Document 7 Filed 09/08/23 08/24/25 09/Page 3488:01 1429 PageID:
Exhibit F - MSPA - 846t 2    Page 55 of 72

- 129 -

Brenntag Business except for the Brenntag Business conducted in the United States.

22.5    Interest payable under any provision of this Agreement or any of the Ancillary Agreements shall be calculated on the basis of actual days elapsed divided by 360.

22.6    Business days (*Werktage*) (including, for the avoidance of doubt, Saturdays) and banking days (*Bankarbeitstage*) shall be those prevailing in Frankfurt am Main.

22.7    Neither this Agreement nor any of the Ancillary Agreements shall grant any rights to, or is intended to operate for, the benefit of third parties unless otherwise explicitly provided for herein. Wherever under this Agreement any party, other than Purchasers is to be indemnified by Sellers, such other parties are not entitled to bring any claims for indemnification against Sellers (*kein echter Vertrag zugunsten Dritter*). This also applies to additional agreements consisting of (i) a Guaranty Agreement, (ii) an Indemnity Agreement and (iii) a Letter Agreement, into which certain of the Parties to this Agreement will enter.

22.8    In this Agreement the headings are inserted for convenience only and shall not affect the interpretation of this Agreement; where a German term has been inserted in quotation marks and/or italics it alone (and not the English term to which it relates) shall be authoritative for the purpose of the interpretation of the relevant English term in this Agreement.

22.9    No Party, except as provided otherwise herein or in the respective Ancillary Agreement, shall be entitled (i) to set-off (*aufrechnen*) any rights and claims it may have against any rights or claims any other Party may have under this Agreement or under any of the Ancillary Agreements or (ii) to refuse to perform any obligation it may have under this Agreement or under any of the Ancillary Agreements on the grounds that it has a right of retention (*Zurückbehaltungsrecht*) unless the rights or claims of the relevant Party claiming a right of set-off (*Aufrechnung*) or retention (*Zurückbehaltung*) have been acknowledged (*anerkannt*) in writing by the relevant other Party/Parties or have been confirmed by final decision of a competent court (*Gericht*) or arbitration court (*Schiedsgericht*).

22.10   Any currency conversions shall be determined using (i) the European Central Bank fixing rates for the respective date which are published both by electronic market information providers (e.g. Reuters page ECB37) and on the ECB's website www.ecb.int shortly after 2.15 p.m. CET or, (ii) in the event such rates are not available on such date, Reuters world spot rates (mid rate

- 130 -

on page FX=) taken as close as possible to 2.15 p.m. CET shall be used ((i) or (ii), as the case may be, herein **"Exchange Rates"**).

22.11 This Agreement shall be governed by, and be construed in accordance with, the laws of the Federal Republic of Germany, without regard to principles of conflicts of laws and without regard to the UN Convention on the Sale of Goods. All disputes arising in connection with this Agreement or its validity shall be finally settled by three arbitrators in accordance with the Arbitration Rules of the German Institution of Arbitration e.V. (*DIS*) without recourse to the ordinary courts of law. The venue of the arbitration shall be Frankfurt. The language of the arbitral proceedings shall be English.

22.12 Purchasers shall each maintain at all times a duly appointed (joint) agent in Germany, which may be changed upon ten (10) days prior written notice to the Sellers, for the service of any process or summons in connection with any issue, litigation, action or proceeding brought in any such court or arbitral tribunal in connection with this Agreement. Any such process or summons may also be served on the Purchasers by mailing a copy of such process or summons to it at its address set forth, and in the manner provided in Section 21 above. Purchasers hereby irrevocably consent to the exclusive personal jurisdiction and venue of any court or arbitral tribunal of competent jurisdiction in Germany in any action, claim or proceeding arising out of or in connection with this Agreement and agrees not to commence or prosecute any action, claim or proceeding or to enforce an arbitration decision in any other court. Each of the Purchasers hereby expressly and irrevocably waives and agrees not to assert and undertakes to cause any Designated Nominee to waive the defense of lack of personal jurisdiction, *forum non conveniens* or any similar defense with respect to the maintenance of any such action or proceeding in Germany.

22.13 In the event that any terms or provisions of the Ancillary Agreements conflict with the terms or provisions of this Agreement, the terms and provisions of this Agreement shall prevail, unless specifically provided for otherwise in the Ancillary Agreements.

22.14 In the event that one or more provisions of this Agreement shall, or shall be deemed to, be invalid or unenforceable, the validity and enforceability of the other provisions of this Agreement shall not be affected thereby. In such case, the Parties hereto agree to recognize and give effect to such valid and enforceable provision or provisions which correspond as closely as possible with the commercial intent of the Parties. The same shall apply in the event that the Agreement contains any gaps (*Vertragslücken*).

(continued on next page)

**IN WITNESS THEREOF** this Notarial Deed including the Exhibits hereto

- with the exception of certain lists of items, titles, rights and obligations contained in Exhibits 2.9-1 and 2.10-1, in respect of which the persons appearing waived the right to have them read aloud and which instead have been presented to the persons appearing, were acknowledged and signed on each page by the persons appearing,

has been read aloud to the persons appearing and this Notarial Deed including the Exhibits hereto was confirmed and approved by the persons appearing. The persons appearing then signed this Deed. All this was done at the days herebelow written in the presence of me, the Notary Public, who also signed this Deed and affixed my official Seal.

Basel, this 8th (eighth) and 9th (ninth) day of December 2003 (two thousand and three)

_____
(Matthias Reichel)

_____
(Dr. Hans-Jörg Ziegenhain)

_____
(Walter Bahous)

_____
(Dr. Tilman Kruse)

(Dr. Viola Sailer)

(Dr. Christoph Bohl)

(Dr. Jörg Kirchner)

(Dr. Meiko Zeppenfeld

(Stephan Cueni, Notary Public)

A.Prot. 2003/4789

2

**Exhibit 1.12.1**

**Companies**

- 1 -

## BRENNTAG GROUP

| | |
|---|---|
| Agrobest AS | Norway |
| Aktieselskabet af 1. Januar 1987 | Denmark |
| Alcafood B.V. | Netherlands |
| ASESORIAS TRANSTEC Y CIA. LTDA. | Guatemala |
| BBG-Berlin-Brandenburger Lager- und Distributionsgesellschaft Biesterfeld Brenntag mbH | Germany |
| BGL Logistics, Inc. | USA |
| BIELAC Lagerdienstleistungs GmbH & Co. KG | Germany |
| BIELAC Lagerdienstleistungs-Verwaltungs GmbH | Germany |
| Biesterfeld Chemiedistributie B.V. | Netherlands |
| Biesterfeld Chemiedistribution GmbH & Co. KG | Germany |
| Biesterfeld Chemiedistribution Verwaltungs GmbH | Germany |
| Biesterfeld, Graen GmbH & Co. KG | Germany |
| Biesterfeld, Graen Verwaltungs GmbH | Germany |
| BRENNTAG Aktiengesellschaft | Germany |
| Brenntag Beteiligungsgesellschaft mbH | Germany |
| Brenntag Biosector A/S | Denmark |
| Brenntag Bolivia S.R.L. | Bolivia |
| BRENTAG Bulgaria Ltd. | Bulgaria |
| BRENNTAG CANADA, INC. | Canada |
| Brenntag Caribe S.A. | Dominican Republic |
| Brenntag Chile Comercial y Industrial Ltda. | Chile |
| Brenntag Colombia S.A. | Colombia |
| Brenntag CR s.r.o. | Czech Republic |
| BRENNTAG ECUADOR S.A. | Ecuador |
| BRENNTAG ESPECIALIDADES LTDA. | Brasil |
| BRENNTAG Eurochem International GmbH | Germany |
| BRENNTAG GmbH | Germany |
| Brenntag Great Lakes L.L.C. | USA |
| BRENNTAG (Holding) N.V. | Netherlands |
| BRENNTAG HOLDING S.p.A. | Italy |

- 2 -

| BRENNTAG HRVATZKA d.o.o. | Croatia |
| Brenntag Hungaria Kft. | Hungary |
| BRENNTAG International Chemicals GmbH | Germany |
| Brenntag Latin America, Inc. | USA |
| SIA "BRENNTAG" LATVIA Limited Liability Company | Lettland |
| BRENNTAG LJUBLJANA d.o.o. | Slovenia |
| Brenntag Mexico S.A. de C.V. | Mexico |
| Brenntag Mid-South, Inc. | USA |
| BRENNTAG N.V. | Belgium |
| Brenntag Nederland B.V. | Netherlands |
| Brenntag Nordic A/S | Denmark |
| Brenntag Nordic AB | Sweden |
| Brenntag Nordic AS | Norway |
| Brenntag Nordic Holding A/S | Denmark |
| Brenntag Nordic Holding AB | Sweden |
| Brenntag Nordic Investment AB | Sweden |
| Brenntag Nordic Oy | Finland |
| Brenntag Northeast Inc. | USA |
| Brenntag Peru S.A.C. | Peru |
| BRENNTAG Polska sp.z.o.o. | Poland |
| BRENNTAG Portugal Produtos Quimicos Lda. | Portugal |
| Brenntag Quimica Brasil Ltda. | Brasil |
| BRENNTAG Quimica S.A. | Spain |
| S. C. Brenntag Romania s.r.l. | Romania |
| BRENNTAG S.A. | France |
| BRENNTAG S.p.A. | Italy |
| BRENNTAG SLOVAKIA s.r.o. | Slovakia |
| Brenntag Southeast, Inc. | USA |
| Brenntag Southwest, Inc. | USA |
| Brenntag Specialities B.V. | Netherlands |
| Brenntag Specialities "Espana" S.L. | Spain |
| Brenntag Specialities Latin America, LLC | USA |
| BRENNTAG (Taiwan) Co. Ltd | Taiwan |



- 3 -

| BRENNTAG (UK) LIMITED | Great Britain |
|---|---|
| BRENNTAG WEST S. DE R.L. DE C.V. | Mexico |
| CANYTAM LIMITADA | Colombia |
| CENTRO QUIMICO DE EL SALVADOR S.A. de C.V. | El Salvador |
| CENTRO QUIMICO S.A. | Guatemala |
| Chemische Industrielle Gesellschaft mit beschränkter Haftung | Germany |
| Chemische Industrielle GmbH & Co KG | Germany |
| Chemproha Chemical Distributors B.V. | Netherlands |
| Chemproha Chemiepartner B.V. | Netherlands |
| Christ Chemie AG | Switzerland |
| CLG Lagerhaus GmbH | Germany |
| CLG Lagerhaus GmbH & Co. KG | Germany |
| Coastal Chemical Company, L.L.C. | USA |
| COMPANIA COMERCIAL E INDUSTRIAL DE COLOMBIA LTDA. | Colombia |
| Compania Hondurena de Terminales S.A. | Honduras |
| Contifood Smith & Son AB i.L. | Sweden |
| Crest Chemicals (Proprietary) Limited | South Africa |
| CVB Albert Carl GmbH & Co. KG | Germany |
| CVH Chemie-Vertrieb GmbH & Co. Hannover KG | Germany |
| CVH Chemie-Vertrieb Verwaltungsgesellschaft mbH | Germany |
| CVM Chemie-Vertrieb Magdeburg GmbH & Co. KG | Germany |
| CVP Chemie-Vertrieb Berlin GmbH | Germany |
| De Stefani S.r.l. | Italy |
| DEVON CHEMICALS, S.A. | Spain |
| Drechthave Vastgoed B.V. | Netherlands |
| EAST-CHEM, Inc | Canada |
| ETS Jean Marce et Cie  S.A.R.L. | France |
| Eurochimie, S.A.R.L. | Maroc |
| HCI ARGENTINA S.A. | Argentina |
| HCI Central Europe Holding B.V. | Netherlands |
| HCI CHEMCENTRAL DE CHILE LIMITADA | Chile |
| HCI Chemcentral de Colombia E.U. | Colombia |

- 4 -

| HCI CHEMCENTRAL DE COSTA RICA, S.A. | Costa Rica |
|---|---|
| HCI CHEMCENTRAL DEL ECUADOR; S.A. | Ecuador |
| HCI CHEMCENTRAL DE HONDURAS, S.A. de C.V. | Honduras |
| HCI CHEMCENTRAL DE NICARAGUA, S.A. | Nicaragua |
| HCI CHEMCENTRAL DE PANAMA, S.A. | Panama |
| HCI CHEMCENTRAL DEL PERU, S.A.C. | Peru |
| HCI CHEMCENTRAL DOM. REP., S.A. | Dominican Republic |
| HCI CHEMCENTRAL S.A. ARGENTINA | Argentina |
| HCI Chemicals (FSC) Ltd. | Bermuda |
| HCI Chemicals Benelux B.V. | Netherlands |
| HCI CR. s.r.o | Czech Republic |
| H.C.I. Chemicals Nederland B.V. | Netherlands |
| H.C.I (CURACAO) NV | Netherlands Antilles |
| HCI Deutschland GmbH | Germany |
| HOLLAND CHEMICAL INTERNATIONAL HOLDING LTDA. | Brasil |
| HCI Hong Kong Limited | Hong Kong |
| HCI Hungaria Kft. | Hungary |
| HCI Logistica Ltda. | Brasil |
| HCI Ltd. | Bermuda |
| HCI Polska sp. z.o.o. | Poland |
| HCI Shipping N.V. | Netherlands Antilles |
| HCI Slovakia, s.r.o | Slovakia |
| HCI U.S.A. Holdings B.V. | Netherlands |
| Holanda-Panama S.A. | Panama |
| HOLANDA VENEZUELA C.A. | Venezuela |
| Holland Chemical International (Services) B.V. | Netherlands |
| INVERSIONES HCI CHEMCENTRAL de Venezuela, C.A. | Venezuela |
| INVERSIONES QUIMICAS S.A. de C.V. | Honduras |
| JLC-Chemie Handels GmbH | Austria |
| Kvarta spol.s.r.o. | Czech Republic |
| Nederlandsche Benzol Maatschappij B.V | Netherlands |

5 -

| Nederlandscbe Brenntag Maatschappij Export B.V. | Netherlands |
| NEUBER Ges.m.b.H. | Austria |
| Pelican Chemical Traders Ltd. | Bermuda |
| Phathani Chemicals (Proprietary) Limited | South Africa |
| PROVEEDORA DE LA CAMARA REGIONAL DE ACEITES DE OCCIDENTE S.A. de C.V. | Mexico |
| PT Dharmala HCI i.L. | Indonesia |
| QUIMICOS BARCELONA, C.A. | Venezuela |
| QUIMICOS HOLANDA COSTA RICA S.A. | Costa Rica |
| QUIMICOS HOLANDA NICARAGUA S.A. | Nicaragua |
| ReTaki Atervinning AB | Sweden |
| Romana Chimici S.p.A. | Italy |
| ROSEA Grundstücks-Vermietungsgesellschaft mbH & Co. Objekt Hüttenheim KG | Germany |
| Sachsen Chemie GmbH Chemiehandelsgesellschaft | Germany |
| Société Commerciale Tardy et Cie. S.a.r.l. | France |
| Staub & Co. Chemiehandelsgesellschaft mbH | Germany |
| Stinnes S.A. | France |
| TR Humberside Limited | Great Britain |
| UAB "BRENNTAG LIETUVA" | Lithuania |
| Viking Traders Ltd. | Bermuda |

**INTERFER GROUP**

| Hans Hee Stahlrohr GmbH | Germany |
| Hüllinde & Boudon GmbH | Germany |
| Interfer Metall GmbH | Germany |
| Interfer Stahl Aktiengesellschaft | Germany |
| Max Baum GmbH | Germany |

- 6 -

| Michael Friess GmbH Stahl – Heizung – Sanitär – Bedarf | Germany |
|---|---|
| Petrofer GmbH | Germany |
| Schöder Stahl GmbH | Germany |
| SHG Saarländische Handelsgesellschaft mbH Stahl, Logistik, Industriebedarf | Germany |
| Stahlex Metall GmbH | Germany |
| Stinnes Interfer Beteiligungsgesellschaft mbH | Germany |
| Stinnes Interfer GmbH | Germany |
| Stinnes Interfer Immobilien Verwaltungsgesellschaft mbH | Germany |
| Stinnes Rohrunion GmbH | Germany |
| Stinnes Stahl GmbH, Bremen | Germany |
| Stinnes Stahl GmbH, Dortmund | Germany |
| Toepfer Stahl GmbH | Germany |
| Treibacher Schleifmittel Deutschland GmbH | Germany |
| Walter Patz GmbH | Germany |
| Willems Stahl GmbH | Germany |
| Zweite Kommanditgesellschaft Interfer Immobiliendienst GmbH & Co. KG, Essen | Germany |

**Exhibit 1.12.2**

**Consolidated Companies**

– 1 –

## BRENNTAG GROUP

| | |
|---|---|
| Aktieselskabet af 1. Januar 1987 | Denmark |
| Alcafood B.V. | Netherlands |
| ASESORIAS TRANSTEC Y CIA. LTDA. | Guatemala |
| BBG – Berlin Brandenburger Lager- und Distributionsgesellschaft Biesterfeld Brenntag mbH | Germany |
| BGL Logistics, Inc. | USA |
| Biesterfeld Chemiedistributie B.V. | Netherlands |
| Biesterfeld Chemiedistribution GmbH & Co. KG | Germany |
| Biesterfeld, Graen GmbH & Co. KG | Germany |
| BRENNTAG Aktiengesellschaft | Germany |
| Brenntag Beteiligungsgesellschaft mbH | Germany |
| Brenntag Biosector A/S | Denmark |
| Brenntag Bolivia S.R.L. | Bolivia |
| BRENNTAG Bulgaria Ltd. | Bulgaria |
| BRENNTAG CANADA, INC. | Canada |
| Brenntag Caribe S.A. | Dominican Republic |
| Brenntag Chile Comercial y Industrial Ltda. | Chile |
| Brenntag Colombia S.A. | Colombia |
| Brenntag CR s.r.o. | Czech Republic |
| BRENNTAG ECUADOR S.A. | Ecuador |
| BRENNTAG ESPECIALIDADES LTDA. | Brasil |
| BRENNTAG Eurochem International GmbH | Germany |
| BRENNTAG GmbH | Germany |
| Brenntag Great Lakes L.L.C. | USA |
| BRENNTAG (Holding) N.V. | Netherlands |
| BRENNTAG HOLDING S.p.A. | Italy |
| BRENNTAG HRVATZKA d.o.o. | Croatia |
| Brenntag Hungaria Kft. | Hungary |
| BRENNTAG International Chemicals GmbH | Germany |
| Brenntag Latin America, Inc. | USA |
| SIA "BRENNTAG" LATVIA Limited Liability Company | Lettland |

- 2 -

| | |
|---|---|
| BRENNTAG LJUBLJANA d.o.o. | Slovenia |
| Brenntag Mexico S.A. de C.V. | Mexico |
| Brenntag Mid-South, Inc. | USA |
| BRENNTAG N.V. | Belgium |
| Brenntag Nederland B.V. | Netherlands |
| Brenntag Nordic A/S | Denmark |
| Brenntag Nordic AB | Sweden |
| Brenntag Nordic AS | Norway |
| Brenntag Nordic Holding A/S | Denmark |
| Brenntag Nordic Holding AB | Sweden |
| Brenntag Nordic Investment AB | Sweden |
| Brenntag Nordic Oy | Finland |
| Brenntag Northeast Inc. | USA |
| Brenntag Peru S.A.C. | Peru |
| BRENNTAG Polska sp.z.o.o. | Poland |
| BRENNTAG Portugal Produtos Quimicos Lda. | Portugal |
| Brenntag Quimica Brasil Ltda. | Brasil |
| BRENNTAG Quimica S.A. | Spain |
| S. C. Brenntag Romania s.r.l. | Romania |
| BRENNTAG S.A. | France |
| BRENNTAG S.p.A. | Italy |
| BRENNTAG SLOVAKIA s.r.o. | Slovakia |
| Brenntag Southeast, Inc. | USA |
| Brenntag Southwest, Inc. | USA |
| Brenntag Specialities B.V. | Netherlands |
| Brenntag Specialities "Espana" S.L. | Spain |
| Brenntag Specialities Latin America, LLC | USA |
| BRENNTAG (Taiwan) Co. Ltd. | Taiwan |
| BRENNTAG (UK) LIMITED | Great Britain |
| BRENNTAG WEST S. DE R.L. DE C.V. | Mexico |
| CANYTAM LIMITADA | Colombia |
| CENTRO QUIMICO DE EL SALVADOR S.A. de C.V. | El Salvador |

- 3 –

| CENTRO QUIMICO S.A. | Guatemala |
|---|---|
| Chemische Industrielle GmbH & Co KG | Germany |
| Chemproha Chemical Distributors B.V. | Netherlands |
| Chemproha Chemiepartner B.V. | Netherlands |
| Christ Chemie AG | Switzerland |
| CLG Lagerhaus GmbH & Co. KG | Germany |
| Coastal Chemical Company, L.L.C. | USA |
| COMPANIA COMERCIAL E INDUSTRIAL DE COLOMBIA LTDA. | Colombia |
| Compania Hondurena de Terminales S.A. | Honduras |
| CVB Albert Carl GmbH & Co. KG | Germany |
| CVH Chemie-Vertrieb GmbH & Co. Hannover KG | Germany |
| CVM Chemie-Vertrieb Magdeburg GmbH & Co. KG | Germany |
| De Stefani S.r.l. | Italy |
| DEVON CHEMICALS, S.A. | Spain |
| Drechthave Vastgoed B.V. | Netherlands |
| Ets Jean Marce et Cie S.A.R.L. | France |
| Eurochimie, S.A.R.L. | Maroc |
| HCI ARGENTINA S.A. | Argentina |
| HCI Central Europe Holding B.V. | Netherlands |
| HCI CHEMCENTRAL DE CHILE LIMITADA | Chile |
| HCI Chemcentral de Colombia E.U. | Colombia |
| HCI CHEMCENTRAL DE COSTA RICA, S.A. | Costa Rica |
| HCI CHEMCENTRAL DEL ECUADOR; S.A. | Ecuador |
| HCI CHEMCENTRAL DE HONDURAS, S.A. de C.V. | Honduras |
| HCI CHEMCENTRAL DE NICARAGUA, S.A. | Nicaragua |
| HCI CHEMCENTRAL DE PANAMA, S.A. | Panama |
| HCI CHEMCENTRAL DEL PERU, S.A.C. | Peru |
| HCI CHEMCENTRAL DOM. REP., S.A. | Dominican Republic |
| HCI CHEMCENTRAL S.A. ARGENTINA | Argentina |
| HCI Chemicals (FSC) Ltd. | Bermuda |
| HCI Chemicals Benelux B.V. | Netherlands |

– 4 –

| H.C.I (CURACAO) NV | Netherlands Antilles |
|---|---|
| HCI CR. s.r.o | Czech Republic |
| H.C.I Chemicals Nederland B.V. | Netherlands |
| HCI Deutschland GmbH | Germany |
| HOLLAND CHEMICAL INTERNATIONAL HOLDING LTDA. | Brasil |
| HCI Hong Kong Limited | Hong Kong |
| HCI Hungaria Kft. | Hungary |
| HCI Logistica Ltda. | Brasil |
| HCI Ltd. | Bermuda |
| HCI Polska sp. z.o.o. | Poland |
| HCI Shipping N.V. | Netherlands Antilles |
| HCI Slovakia, s.r.o. | Slovakia |
| HCI U.S.A Holdings B.V. | Netherlands |
| Holanda-Panama S.A. | Panama |
| HOLANDA VENEZUELA C.A. | Venezuela |
| Holland Chemical International (Services) B.V. | Netherlands |
| INVERSIONES HCI CHEMCENTRAL de Venezuela, C.A. | Venezuela |
| INVERSIONES QUIMICAS S.A. de C.V. | Honduras |
| JLC-Chemie Handels GmbH | Austria |
| Kvarta spol.s.r.o. | Czech Republic |
| Nederlandsche Benzol Maatschappij B.V. | Netherlands |
| Nederlandsche Brenntag Maatschappij Export B.V. | Netherlands |
| NEUBER Ges.m.b.H. | Austria |
| Pelican Chemical Traders Ltd. | Bermuda |
| PROVEEDORA DE LA CAMARA REGIONAL DE ACEITES DE OCCIDENTE S.A. de C.V. | Mexico |
| PT Dharmala HCI i.L. | Indonesia |
| QUIMICOS BARCELONA, C.A. | Venezuela |
| QUIMICOS HOLANDA COSTA RICA S.A. | Costa Rica |
| QUIMICOS HOLANDA NICARAGUA S.A. | Nicaragua |
| Romana Chimici S.p.A. | Italy |

– 5 –

| Société Commerciale Tardy et Cie. S.a.r.l. | France |
| Staub & Co. Chemiehandelsgesellschaft mbH | Germany |
| Stinnes S.A. | France |
| UAB "BRENNTAG LIETUVA" | Lithuania |
| Viking Traders Ltd. | Bermuda |

– 6 –

## INTERFER GROUP

| | |
|---|---|
| Hans Hee Stahlrohr GmbH | Germany |
| Hollinde & Boudon GmbH | Germany |
| Interfer Stahl Aktiengesellschaft | Germany |
| Interfer Metall GmbH | Germany |
| Max Baum GmbH | Germany |
| Michael Friess GmbH Stahl – Heizung – Sanitär – Bedarf | Germany |
| Petrofer GmbH | Germany |
| Schöder Stahl GmbH | Germany |
| SHG Saarländische Handelsgesellschaft mbH Stahl, Logistik, Industriebedarf | Germany |
| Stahlex Metall GmbH | Germany |
| Stinnes Interfer Beteiligungsgesellschaft mbH | Germany |
| Stinnes Interfer GmbH | Germany |
| Stinnes Interfer Immobilien Verwaltungsgesellschaft mbH | Germany |
| Stinnes Rohrunion GmbH | Germany |
| Stinnes Stahl GmbH, Bremen | Germany |
| Stinnes Stahl GmbH, Dortmund | Germany |
| Toepfer Stahl GmbH | Germany |
| Walter Patz GmbH | Germany |
| Willems Stahl GmbH | Germany |
| Zweite Kommanditgesellschaft Stinnes Interfer Immobiliendienst GmbH & Co. KG, Essen | Germany |

**Exhibit G**

2004 Soco APA

US ASSET PURCHASE AGREEMENT

by and between

BRENNTAG PACIFIC, INC.

and

BRENNTAG WEST, INC.,

dated as of

**FEB 27**, 2004

## US ASSET PURCHASE AGREEMENT

THIS US ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of Feb 27, 2004 by and between Brenntag West, Inc., a Delaware corporation (the "Seller"), and Brenntag Pacific, Inc., a Delaware corporation (the "Buyer"). Capitalized terms used but not defined herein shall have the meanings set forth in the Master Sale and Purchase Agreement regarding the sale and purchase of the Brenntag and Interfer Groups, dated December 8 and 9, 2003, among the Purchasers (as defined therein), Stinnes AG, a German stock corporation, Stinnes UK, Ltd, a United Kingdom private limited company, Stinnes Corporation, a Delaware corporation, Brenntag Inc., a Delaware corporation, and Schenker-BTL S.A., a Spanish stock corporation (the "Sale and Purchase Agreement").

WHEREAS, Section 2.11 of the Sale and Purchase Agreement provides that on the Scheduled Closing Date, the Seller shall enter into this Agreement with the Buyer, whereby the Seller shall sell and transfer certain assets, contracts and liabilities to the Buyer;

WHEREAS, upon the terms and subject to the conditions of this Agreement and the Sale and Purchase Agreement, the Buyer desires to purchase and acquire, and the Seller desires to sell, transfer and assign, only the Purchased Assets (as defined herein);

WHEREAS, upon the terms and subject to the conditions of this Agreement and the Sale and Purchase Agreement, the Buyer is willing to assume, and the Seller desires to assign to the Buyer, only the Assumed Liabilities (as defined herein); and

WHEREAS, the Buyer shall not assume the Excluded Liabilities (as defined herein);

NOW, THEREFORE, in consideration of the representations, warranties and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller and the Buyer hereby agree as follows:

## ARTICLE I

### PURCHASE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 1.1    Purchased Assets. The Buyer hereby purchases from the Seller, and the Seller hereby assigns, transfers and conveys to the Buyer, good, valid and marketable title (free and clear of all title defects, conflicting or adverse claims of ownership, mortgages, hypothecations, security interests, liens, pledges, claims, rights of first refusal, options, charges, settlements, attachments or any other encumbrances of any nature whatsoever, whether or not perfected (the "Encumbrances")) to all property, assets, agreements, goodwill and business as a going concern of every kind, nature and

description, real, personal or mixed, tangible or intangible, wherever situated, which is owned or leased by the Seller (the "Purchased Assets"); provided, that the Purchased Assets shall not include the assets set forth on Schedule 1.1 (the "Excluded Assets"). The Seller shall not sell, assign, transfer or convey to the Buyer, and the Buyer shall not assume, any right, title or interest in, the Excluded Assets pursuant to this Agreement.

Section 1.2    Assumed Liabilities. The Buyer hereby assumes, and is obligated to pay when due, and will indemnify and hold harmless the Seller its affiliates and their respective officers and directors from and against, any and all Liabilities (as defined below) relating to, arising out of, or in connection with the Seller as in existence on the date hereof (collectively, the "Assumed Liabilities"); provided, that the Assumed Liabilities shall not include the Liabilities set forth on Schedule 1.2 (the "Excluded Liabilities"), which Excluded Liabilities will be retained and fully discharged by the Seller or its successors. "Liabilities" shall mean any and all liabilities, obligations or expenses of any nature or kind, and whether based in common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential, now existing or arising at or after the date hereof.

Section 1.3    Purchase Price. In consideration for the sale, assignment, transfer and conveyance of the Purchased Assets set forth in Section 1.1, simultaneously herewith, the Purchaser shall:

(a)    assume the Assumed Liabilities; and

(b)    pay to the Seller USD 44,326,000.00 (in words: US Dollars forty four million three hundred and twenty six thousand) in immediately available funds by wire transfer as set forth in Section 3.6 of the Sale and Purchase Agreement.

Section 1.4    Closing. The closing of the transactions contemplated by this Agreement shall take place on the date hereof at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 or at such other place as may be agreed upon by the parties hereto.

(a)    Deliveries by Seller. Simultaneously herewith, the Seller is delivering to the Buyer the following:

(i)    a Bill of Sale substantially in the form of Exhibit A hereto (the "Bill of Sale") duly executed by the Seller;

(ii)    an Assignment and Assumption Agreement substantially in the form of Exhibit B hereto (the "Assignment Agreement") duly executed by the Seller; and

(iii)    all other assignments and other instruments or documents reasonably necessary to evidence the sale, assignment, transfer and conveyance by the Seller of the Purchased Assets and the Assumed Liabilities in accordance with the terms of this Agreement.

2

JA502

(b)    Deliveries by Buyer. Simultaneously herewith, the Buyer is delivering to the Seller the following:

(i)    the cash amounts set forth in Section 1.3 hereof in immediately available funds;

(ii)    the Bill of Sale duly executed by the Buyer;

(iii)    the Assignment Agreement duly executed by the Buyer; and

(iv)    all other instruments of assumption, duly executed by Buyer, as may be necessary to assume, or evidence the assumption of, the Purchased Assets and Assumed Liabilities pursuant to the terms of this Agreement.

## ARTICLE II

## MISCELLANEOUS

Section 2.1    Notices. All notices, requests, consents and other communications hereunder shall be made in accordance with Section 20 of the Sale and Purchase Agreement provided that the provisions for notices to Sellers (as defined therein) shall also apply for notices to the Seller.

Section 2.2    Amendments. Any term of this Agreement may be amended or waived only with the written consent of the Seller and the Buyer.

Section 2.3    Headings. The headings of the various sections of this Agreement are for convenience of reference only and shall not be deemed to be part of this Agreement.

Section 2.4    Severability. In the event that any provision in this Agreement is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

Section 2.5    Governing Law and Forum. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law provisions thereof, and the federal law of the United States of America. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts of the State of Delaware with respect to the interpretation of this Agreement or for the purposes of any action arising out of or related to this Agreement.

Section 2.6    Counterparts. This Agreement may be executed in two counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument. In the event that any signature is delivered via facsimile transmission, such signature shall create a valid and binding obligation of the

3

party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature page were an original hereof.

Section 2.7    Exclusion of Remedies, Priority of the Sale and Purchase Agreement.  Except as specifically set forth herein and in such other agreements entered into on the date hereof between the Seller and the Purchaser, neither the Seller nor the Buyer makes any representation, warranty, covenant or undertaking with respect to the subject matter of this Agreement. The remedies that the Buyer may have regarding the Sold US Businesses acquired from the Seller, the Purchased Assets and the Assumed Liabilities shall be solely governed by the Sale and Purchase Agreement and German law and such other agreements entered into between the Seller and the Purchasers on the date hereof.  In the case of conflict or inconsistency between any provision of this Agreement and the Sale and Purchase Agreement, the Sale and Purchase Agreement shall take precedence, including, but not limited to, the treatment of Working Capital, Financial Debt, Intercompany Financing Arrangements, remedies and indemnification.

Section 2.8    Expenses.  Each party hereto shall pay all costs and expenses incurred by it in connection with the execution, delivery and performance of this Agreement, including, but not limited to, fees of legal counsel.

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized representatives as of the day and year first above written.

BRENNTAG WEST, INC.

By: _____

Name: R. Zimbardo

Title: Director

BRENNTAG PACIFIC, INC.

By: _____

Name:

Title:

5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized representatives as of the day and year first above written.

BRENNTAG WEST, INC.

By:_____

    Name:

    Title:

BRENNTAG PACIFIC, INC.

By_____

    Name: Paul Edgerley

    Title: Director

5

## Schedule 1.1
## Excluded Assets

1.  The corporate names Brenntag West, Inc., Lynch, Soco-Lynch, Western Chemical, Western Chemical and Manufacturing, Soco-Western, AJ Lynch, Stinnes-Western Chemical, Stinnes-Western, Crown Chemical, Dyce Chemical and Holchem and the trade names "Wedco" and "Wedco Weld", and any and all intellectual property including all such names or derivatives thereof, except the trade name "Brenntag" (it being understood that the inclusion of a name in this section does not imply that Seller has any interest in or right to use any such name).

2.  The corporate charter and all qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance and existence of the Seller as a corporation.

3.  Tax receivables (excluding VAT receivables).

4.  Asbestos-related insurance receivables and insurance receivables related to environmental expenses and liabilities with respect to Excluded Assets.

5.  Any agreements which may not be assigned without the consent of the other party or parties thereto, unless such consent has been obtained.

6.  Any permits which, by their terms or applicable law, can not be assigned.

7.  Property in Billings, Montana, bordered in part by Klench Lane and Taylor Place containing approximately 7 acres, including the land, buildings, tank farm, installed pumps and similar fixtures associated therewith (the "Billings Property").

8.  Property at 3270 E. Washington Boulevard, Los Angeles, CA (the "Washington Boulevard Property").

9.  Property at 13540 & 13546 Desmond Street, Pacoima, CA (the "Desmond Street Property").

10. All insurance policies.

11. For the avoidance of doubt, the lease associated with the property at 500 Pier A Place, Wilmington, CA (the "Pier A Place Lease").

12. The interests as a beneficiary in the assets of an Irrevocable Trust established by and between HDI Industrie Versicherung AG and Wachovia Bank of Delaware, National Association, under the name "Asbestos Settlement Irrevocable Trust".

13.    Any claims for indemnification or insurance coverage with respect to Retained Subsidiary Asbestos Claims and Non-Retained Subsidiary Asbestos Claims.

JA508

**Schedule 1.2**
**Excluded Liabilities**

1.  Any and all Liabilities relating to or arising from any of the Excluded Assets, including, but not limited to, any environmental liabilities relating to the Billings Property, the Washington Boulevard Property, the Desmond Street Property and the property leased under the Pier A Place Lease.

2.  Any and all Liabilities relating to or arising from any Retained Subsidiary Asbestos Claims and Non-Retained Subsidiary Asbestos Claims (as defined in the Sale and Purchase Agreement).

3.  Any and all Liabilities relating to or arising from the litigation known as Hugh Weiss et al. v. Brenntag Inc., Brenntag West, Inc., Stinnes Corp., Brenntag Holding NV, Beall Trailers of Montana, Inc., Kuck Trucking, Inc., et al., U.S.D.C., MT (Billings Division).

4.  Any Taxes for which "Sellers" have responsibility pursuant to Section 11 of the Sale and Purchase Agreement.

5.  Any and all Environmental Liabilities relating to or arising from Former Sites or Third Party Sites.

6.  For the avoidance of doubt, the Pier A Place Lease.

iii

# Exhibit H

2004 WCD APA

US ASSET PURCHASE AGREEMENT

by and between

MINERAL AND PIGMENT SOLUTIONS, INC.

and

WHITTAKER, CLARK & DANIELS, INC.,

dated as of

_____ \_\_\_, 2004

## US ASSET PURCHASE AGREEMENT

THIS US ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of _____ ___, 2004 by and between Whittaker, Clark & Daniels, Inc., a New Jersey corporation (the "Seller"), and Mineral and Pigment Solutions, Inc., a Delaware corporation (the "Buyer"). Capitalized terms used but not defined herein shall have the meanings set forth in the Master Sale and Purchase Agreement regarding the sale and purchase of the Brenntag and Interfer Groups, dated December 8 and 9, 2003, among the Purchasers (as defined therein), Stinnes AG, a German stock corporation, Stinnes UK, Ltd, a United Kingdom private limited company, Stinnes Corporation, a Delaware corporation, Brenntag Inc., a Delaware corporation, and Schenker-BTL S.A., a Spanish stock corporation (the "Sale and Purchase Agreement").

WHEREAS, Section 2.11 of the Sale and Purchase Agreement provides that on the Scheduled Closing Date, the Seller shall enter into this Agreement with the Buyer, whereby the Seller shall sell and transfer certain assets, contracts and liabilities to the Buyer;

WHEREAS, upon the terms and subject to the conditions of this Agreement and the Sale and Purchase Agreement, the Buyer desires to purchase and acquire, and the Seller desires to sell, transfer and assign, only the Purchased Assets (as defined herein);

WHEREAS, upon the terms and subject to the conditions of this Agreement and the Sale and Purchase Agreement, the Buyer is willing to assume, and the Seller desires to assign to the Buyer, only the Assumed Liabilities (as defined herein); and

WHEREAS, the Buyer shall not assume the Excluded Liabilities (as defined herein);

NOW, THEREFORE, in consideration of the representations, warranties and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller and the Buyer hereby agree as follows:

## ARTICLE I

## PURCHASE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 1.1    Purchased Assets. The Buyer hereby purchases from the Seller, and the Seller hereby assigns, transfers and conveys to the Buyer, good, valid and marketable title (free and clear of all title defects, conflicting or adverse claims of ownership, mortgages, hypothecations, security interests, liens, pledges, claims, rights of first refusal, options, charges, settlements, attachments or any other encumbrances of any nature whatsoever, whether or not perfected (the "Encumbrances")) to all property, assets, agreements, goodwill and business as a going concern of every kind, nature and

description, real, personal or mixed, tangible or intangible, wherever situated, which is owned or leased by the Seller (the "Purchased Assets"); provided, that the Purchased Assets shall not include the assets set forth on Schedule 1.1 (the "Excluded Assets"). The Seller shall not sell, assign, transfer or convey to the Buyer, and the Buyer shall not assume, any right, title or interest in, the Excluded Assets pursuant to this Agreement.

Section 1.2    Assumed Liabilities. The Buyer hereby assumes, and is obligated to pay when due, and will indemnify and hold harmless the Seller its affiliates and their respective officers and directors from and against, any and all Liabilities (as defined below) relating to, arising out of, or in connection with the Seller as in existence on the date hereof (collectively, the "Assumed Liabilities"); provided, that the Assumed Liabilities shall not include the Liabilities set forth on Schedule 1.2 (the "Excluded Liabilities"), which Excluded Liabilities will be retained and fully discharged by the Seller or its successors. "Liabilities" shall mean any and all liabilities, obligations or expenses of any nature or kind, and whether based in common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential, now existing or arising at or after the date hereof.

Section 1.3    Purchase Price. In consideration for the sale, assignment, transfer and conveyance of the Purchased Assets set forth in Section 1.1, simultaneously herewith, the Purchaser shall:

(a)    assume the Assumed Liabilities; and

(b)    pay to the Seller USD 15,900,000.00 (in words: US Dollars fifteen million nine hundred thousand) in immediately available funds by wire transfer as set forth in Section 3.6 of the Sale and Purchase Agreement.

Section 1.4    Closing. The closing of the transactions contemplated by this Agreement shall take place on the date hereof at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 or at such other place as may be agreed upon by the parties hereto.

(a)    Deliveries by Seller. Simultaneously herewith, the Seller is delivering to the Buyer the following:

(i)    a Bill of Sale substantially in the form of Exhibit A hereto (the "Bill of Sale") duly executed by the Seller;

(ii)    an Assignment and Assumption Agreement substantially in the form of Exhibit B hereto (the "Assignment Agreement") duly executed by the Seller; and

(iii)    all other assignments and other instruments or documents reasonably necessary to evidence the sale, assignment, transfer and conveyance by the Seller of the Purchased Assets and the Assumed Liabilities in accordance with the terms of this Agreement.

2

**JA513**

          (b)    Deliveries by Buyer. Simultaneously herewith, the Buyer is delivering to the Seller the following:

          (i)    the cash amounts set forth in Section 1.3 hereof in immediately available funds;

          (ii)    the Bill of Sale duly executed by the Buyer;

          (iii)    the Assignment Agreement duly executed by the Buyer; and

          (iv)    all other instruments of assumption, duly executed by Buyer, as may be necessary to assume, or evidence the assumption of, the Purchased Assets and Assumed Liabilities pursuant to the terms of this Agreement.

## ARTICLE II

## MISCELLANEOUS

    Section 2.1    Notices. All notices, requests, consents and other communications hereunder shall be made in accordance with Section 20 of the Sale and Purchase Agreement provided that the provisions for notices to Sellers (as defined therein) shall also apply for notices to the Seller.

    Section 2.2    Amendments. Any term of this Agreement may be amended or waived only with the written consent of the Seller and the Buyer.

    Section 2.3    Headings. The headings of the various sections of this Agreement are for convenience of reference only and shall not be deemed to be part of this Agreement.

    Section 2.4    Severability. In the event that any provision in this Agreement is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

    Section 2.5    Governing Law and Forum. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law provisions thereof, and the federal law of the United States of America. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts of the State of Delaware with respect to the interpretation of this Agreement or for the purposes of any action arising out of or related to this Agreement.

    Section 2.6    Counterparts. This Agreement may be executed in two counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument. In the event that any signature is delivered via facsimile transmission, such signature shall create a valid and binding obligation of the

3

party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature page were an original hereof.

Section 2.7    Exclusion of Remedies, Priority of the Sale and Purchase Agreement. Except as specifically set forth herein and in such other agreements entered into on the date hereof between the Seller and the Purchaser, neither the Seller nor the Buyer makes any representation, warranty, covenant or undertaking with respect to the subject matter of this Agreement. The remedies that the Buyer may have regarding the Sold US Businesses acquired from the Seller, the Purchased Assets and the Assumed Liabilities shall be solely governed by the Sale and Purchase Agreement and German law and such other agreements entered into between the Seller and the Purchasers on the date hereof. In the case of conflict or inconsistency between any provision of this Agreement and the Sale and Purchase Agreement, the Sale and Purchase Agreement shall take precedence, including, but not limited to, the treatment of Working Capital, Financial Debt, Intercompany Financing Arrangements, remedies and indemnification.

Section 2.8    Expenses. Each party hereto shall pay all costs and expenses incurred by it in connection with the execution, delivery and performance of this Agreement, including, but not limited to, fees of legal counsel.

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized representatives as of the day and year first above written.

WHITTAKER, CLARK & DANIELS, INC.

By: _____
Name: R. Eimberdv
Title: Director

MINERAL AND PIGMENT SOLUTIONS, INC.

By: _____
Name:
Title:

5

JA516

## Schedule 1.1
## Excluded Assets

1.  The corporate name "Whittaker Clark & Daniels, Inc." and any and all intellectual property including such name or derivatives thereof, except each of "Whittaker" and "WCD" as a trade name, trademark, and/or as (or part of) any product name, domain name and/or product line name.

2.  The corporate charter and all qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance and existence of the Seller as a corporation.

3.  Tax receivables (excluding VAT receivables).

4.  All the shares of Crozier-Nelson Sales, Inc.

5.  All the shares of WCD International  SarL.

6.  Asbestos-related insurance receivables and insurance receivables related to environmental expenses and liabilities with respect to Excluded Assets.

7.  Any agreements which may not be assigned without the consent of the other party or parties thereto, unless such consent has been obtained.

8.  Any permits which, by their terms or applicable law, can not be assigned.

9.  All insurance policies.

10. All of the shares of Whittaker, Clark & Daniels Foreign Sales Corporation.

11. The interests as a beneficiary in the assets of an Irrevocable Trust established by and between HDI Industrie Versicherung AG and Wachovia Bank of Delaware, National Association, under the name "Asbestos Settlement Irrevocable Trust".

12. For the avoidance of doubt, the lease associated with the property at 13540 and 13546 Desmond Street, Pacoima, CA (the "Desmond Street Lease").

13. Any claims for indemnification or insurance coverage with respect to Retained Subsidiary Asbestos Claims and Non-Retained Subsidiary Asbestos Claims.

**Schedule 1.2**
**Excluded Liabilities**

1.    Any and all Liabilities relating to or arising from any of the Excluded Assets and, for the avoidance of doubt, the Desmond Street Property.

2.    Any and all Liabilities relating to or arising from any Retained Subsidiary Asbestos Claims and Non-Retained Subsidiary Asbestos Claims (as defined in the Sale and Purchase Agreement).

3.    Any Taxes for which "Sellers" have responsibility pursuant to Section 11 of the Sale and Purchase Agreement.

4.    Any and all Environmental Liabilities relating to or arising from Former Sites or Third Party Sites.

5.    Liabilities arising from obligations imposed pursuant to the New Jersey Industrial Site Recovery Act.

6.    For the avoidance of doubt, the Desmond Street Lease.

JA518

# **Exhibit I**

Brilliant APA

US ASSET PURCHASE AGREEMENT

by and between

BRENNTAG NORTH AMERICA, INC.

and

BRENNTAG, INC.,

dated as of

FEB 2 7 , 2004

## US ASSET PURCHASE AGREEMENT

THIS US ASSET PURCHASE AGREEMENT (this "Agreement") is
made and entered into as of    FEB 2 7    , 2004 by and between Brenntag Inc., a
Delaware corporation (the "Seller"), and Brenntag North America, Inc., a  Delaware
corporation (the "Buyer").  Capitalized terms used but not defined herein shall have the
meanings set forth in the Master Sale and Purchase Agreement regarding the sale and
purchase of the Brenntag and Interfer Groups, dated December 8 and 9, 2003, among the
Purchasers (as defined therein), Stinnes AG, a German stock corporation, Stinnes UK,
Ltd, a United Kingdom private limited company, Stinnes Corporation, a Delaware
corporation, Seller and Schenker-BTL S.A., a Spanish stock corporation (the "Sale and
Purchase Agreement").

WHEREAS, Section 2.11 of the Sale and Purchase Agreement provides
that on the Scheduled Closing Date, the Seller shall enter into this Agreement with the
Buyer, whereby the Seller shall sell and transfer certain assets, contracts and liabilities to
the Buyer;

WHEREAS, upon the terms and subject to the conditions of this
Agreement and the Sale and Purchase Agreement, the Buyer desires to purchase and
acquire, and the Seller desires to sell, transfer and assign, only the Purchased Assets (as
defined herein);

WHEREAS, upon the terms and subject to the conditions of this
Agreement and the Sale and Purchase Agreement, the Buyer is willing to assume, and the
Seller desires to assign to the Buyer, only the Assumed Liabilities (as defined herein);
and

WHEREAS, the Buyer shall not assume the Excluded Liabilities (as
defined herein);

NOW, THEREFORE, in consideration of the representations, warranties
and agreements set forth herein and other good and valuable consideration, the receipt
and sufficiency of which is hereby acknowledged, the Seller and the Buyer hereby agree
as follows:

### ARTICLE I

### PURCHASE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 1.1   Purchased Assets.  The Buyer hereby purchases from the
Seller, and the Seller hereby assigns, transfers and conveys to the Buyer, good, valid and
marketable title (free and clear of all title defects, conflicting or adverse claims of
ownership, mortgages, hypothecations, security interests, liens, pledges, claims, rights of
first refusal, options, charges, settlements, attachments or any other encumbrances of any
nature whatsoever, whether or not perfected (the "Encumbrances")) to all property,
assets, agreements, goodwill and business as a going concern of every kind, nature and

444964.02-New York Server 5A - MSW

description, real, personal or mixed, tangible or intangible, wherever situated, which is owned or leased by the Seller (the "Purchased Assets"); provided, that the Purchased Assets shall not include the assets set forth on Schedule 1.1 (the "Excluded Assets"). The Seller shall not sell, assign, transfer or convey to the Buyer, and the Buyer shall not assume, any right, title or interest in, the Excluded Assets pursuant to this Agreement.

Section 1.2    Assumed Liabilities. The Buyer hereby assumes, and is obligated to pay when due, and will indemnify and hold harmless the Seller its affiliates and their respective officers and directors from and against, any and all Liabilities (as defined below) relating to, arising out of, or in connection with the Seller as in existence on the date hereof (collectively, the "Assumed Liabilities"); provided, that the Assumed Liabilities shall not include the Liabilities set forth on Schedule 1.2 (the "Excluded Liabilities"), which Excluded Liabilities will be retained and fully discharged by the Seller or its successors. "Liabilities" shall mean any and all liabilities, obligations or expenses of any nature or kind, and whether based in common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential, now existing or arising at or after the date hereof.

Section 1.3    Purchase Price. In consideration for the sale, assignment, transfer and conveyance of the Purchased Assets as set forth in Section 1.1, simultaneously herewith the Purchaser shall assume the Assumed Liabilities, and shall pay to the Seller the Preliminary Purchase Price as contemplated in the Sale and Purchase Agreement.

Section 1.4    Closing. The closing of the transactions contemplated by this Agreement shall take place on the date hereof at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 or at such other place as may be agreed upon by the parties hereto.

(a)    Deliveries by Seller. Simultaneously herewith, the Seller is delivering to the Buyer the following:

(i)    a Bill of Sale substantially in the form of Exhibit A hereto (the "Bill of Sale") duly executed by the Seller;

(ii)    an Assignment and Assumption Agreement substantially in the form of Exhibit B hereto (the "Assignment Agreement") duly executed by the Seller; and

(iii)    all other assignments and other instruments or documents reasonably necessary to evidence the sale, assignment, transfer and conveyance by the Seller of the Purchased Assets and the Assumed Liabilities in accordance with the terms of this Agreement.

2

(b)    Deliveries by Buyer. Simultaneously herewith, the Buyer is delivering to the Seller the following:

(i)    the Bill of Sale duly executed by the Buyer;

(ii)    the Assignment Agreement duly executed by the Buyer; and

(iii)    all other instruments of assumption, duly executed by Buyer, as may be necessary to assume, or evidence the assumption of, the Purchased Assets and Assumed Liabilities pursuant to the terms of this Agreement.

## ARTICLE II

## MISCELLANEOUS

Section 2.1    Notices. All notices, requests, consents and other communications hereunder shall be made in accordance with Section 20 of the Sale and Purchase Agreement provided that the provisions for notices to Sellers (as defined therein) shall also apply for notices to the Seller.

Section 2.2    Amendments. Any term of this Agreement may be amended or waived only with the written consent of the Seller and the Buyer.

Section 2.3    Headings. The headings of the various sections of this Agreement are for convenience of reference only and shall not be deemed to be part of this Agreement.

Section 2.4    Severability. In the event that any provision in this Agreement is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

Section 2.5    Governing Law and Forum. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law provisions thereof, and the federal law of the United States of America. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts of the State of Delaware with respect to the interpretation of this Agreement or for the purposes of any action arising out of or related to this Agreement.

Section 2.6    Counterparts. This Agreement may be executed in two counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument. In the event that any signature is delivered via facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature page were an original hereof.

444964.02-New York Server 5A - MSW

3

Section 2.7    Exclusion of Remedies, Priority of the Sale and Purchase Agreement.  Except as specifically set forth herein and in such other agreements entered into on the date hereof between the Seller and the Purchaser, neither the Seller nor the Buyer makes any representation, warranty, covenant or undertaking with respect to the subject matter of this Agreement. The remedies that the Buyer may have regarding the Sold US Businesses acquired from the Seller, the Purchased Assets and the Assumed Liabilities shall be solely governed by the Sale and Purchase Agreement and German law and such other agreements entered into between the Seller and the Purchasers on the date hereof.  In the case of conflict or inconsistency between any provision of this Agreement and the Sale and Purchase Agreement, the Sale and Purchase Agreement shall take precedence, including, but not limited to, the treatment of Working Capital, Financial Debt, Intercompany Financing Arrangements, remedies and indemnification.

Section 2.8    Expenses.  Each party hereto shall pay all costs and expenses incurred by it in connection with the execution, delivery and performance of this Agreement, including, but not limited to, fees of legal counsel.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized representatives as of the day and year first above written.

BRENNTAG, INC.

By: _____

    Name: Dr. Henning Maier
    Title:   Director

BRENNTAG NORTH AMERICA, INC.

By: _____

    Name:
    Title:

**JA525**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized representatives as of the day and year first above written.

BRENNTAG, INC.

By:_____

    Name:

    Title:

BRENNTAG NORTH AMERICA, INC.

By:_____

    Name: Paul Edgerley

    Title: Director

5

## Schedule 1.1
## Excluded Assets

1. The shares of stock in subsidiaries of Seller 4 which are the subject of Section 2.5 of the Sale and Purchase Agreement.

2. The corporate charter and all qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance and existence of the Seller as a corporation.

3. Tax receivables (excluding VAT receivables).

4. Asbestos-related insurance receivables and insurance receivables related to environmental expenses and liabilities with respect to Excluded Assets.

5. Any agreements which may not be assigned without the consent of the other party or parties thereto, unless such consent has been obtained.

6. Any permits which, by their terms or applicable law, can not be assigned.

7. All securities of the Retained Subsidiaries held by Brenntag Inc.

8. All insurance policies.

9. All of the shares of Burco Petroleum Co.

10. Any claims for indemnification or insurance coverage with respect to Retained Subsidiary Asbestos Claims and Non-Retained Subsidiary Asbestos Claims.

i

## Schedule 1.2
## Excluded Liabilities

1.     Any and all Liabilities relating to or arising from any of the Excluded
       Assets.

2.     Any and all Liabilities relating to or arising from any Retained Subsidiary
       Asbestos Claims and Non-Retained Subsidiary Asbestos Claims (as
       defined in the Sale and Purchase Agreement).

3.     Any and all Liabilities relating to or arising from the litigation known as
       Hugh Weiss et al. v. Brenntag Inc., Brenntag West, Inc., Stinnes Corp.,
       Brenntag Holding NV, Beall Trailers of Montana, Inc., Kuck Trucking,
       Inc., et al., U.S.D.C., MT (Billings Division).

4.     Any Taxes for which "Sellers" have responsibility pursuant to Section 11
       of the Sale and Purchase Agreement.

5.     Any and all Environmental Liabilities relating to or arising from Former
       Sites or Third Party Sites.

**Exhibit J**

2007 SPA

---

## STOCK PURCHASE AGREEMENT

---

Between

STINNES CORPORATION

and

NATIONAL INDEMNITY COMPANY

Dated as of November 7, 2007

MER00020412

## TABLE OF CONTENTS

Page

### ARTICLE I

### DEFINITIONS

SECTION 1.01. Certain Defined Terms......................................................... 1
SECTION 1.02. Definitions....................................................................... 8
SECTION 1.03. Interpretation and Rules of Construction ................................ 9

### ARTICLE II

### PURCHASE AND SALE

SECTION 2.01. Purchase and Sale of the Shares........................................... 11
SECTION 2.02. Purchase Price ................................................................. 11
SECTION 2.03. Closing .......................................................................... 11
SECTION 2.04. Closing Deliveries by the Seller........................................... 11
SECTION 2.05. Closing Deliveries by the Purchaser...................................... 12
SECTION 2.06. Post-Closing Adjustment of Purchase Price ............................ 13

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES
### OF THE SELLER

SECTION 3.01. Organization, Authority and Qualification of the Seller.................... 18
SECTION 3.02. Organization, Authority and Qualification of the Companies ........... 19
SECTION 3.03. Subsidiaries .................................................................... 19
SECTION 3.04. Capitalization .................................................................. 20
SECTION 3.05. Corporate Books and Records............................................... 21
SECTION 3.06. No Conflict...................................................................... 21
SECTION 3.07. Governmental Consents and Approvals.................................... 22
SECTION 3.08. Financial Information; Books and Records ................................ 22
SECTION 3.09. Operations of the Companies and Retained Subsidiaries; Assets; Absence
              of Undisclosed Liabilities..................................................... 22
SECTION 3.10. Master Sale and Purchase Agreement...................................... 23
SECTION 3.11. Absence of Certain Changes................................................. 23
SECTION 3.12. Litigation ....................................................................... 25
SECTION 3.13. Compliance with Laws....................................................... 26
SECTION 3.14. Real Property................................................................... 26
SECTION 3.15. Assets ........................................................................... 27
SECTION 3.16. Certain Interests .............................................................. 27
SECTION 3.17. Taxes ........................................................................... 28
SECTION 3.18. Insurance ....................................................................... 28

i

MER00020412

SECTION 3.19. Brokers ................................................................................ 28
SECTION 3.20. Pending Indemnification Claims .......................................... 29
SECTION 3.21. Employees ............................................................................ 29

ARTICLE IV

REPRESENTATIONS AND WARRANTIES
OF THE PURCHASER

SECTION 4.01. Organization and Authority of the Purchaser ...................... 29
SECTION 4.02. No Conflict ........................................................................... 29
SECTION 4.03. Governmental Consents and Approvals ............................... 30
SECTION 4.04. Investment Purpose .............................................................. 30
SECTION 4.05. Brokers ................................................................................. 30
SECTION 4.06. Financial Information; Books and Records ......................... 30

ARTICLE V

ADDITIONAL AGREEMENTS

SECTION 5.01. Conduct of Business Prior to the Closing ........................... 30
SECTION 5.02. Access to Information ........................................................... 31
SECTION 5.03. Confidentiality ..................................................................... 32
SECTION 5.04. Regulatory and Other Authorizations; Notices and Consents ......... 32
SECTION 5.05. Notice of Developments ....................................................... 33
SECTION 5.06. XL Insurance Policy and Options ....................................... 33
SECTION 5.07. Intercompany Arrangements ................................................ 33
SECTION 5.08. Billings Montana Superfund Site Litigation ....................... 33
SECTION 5.09. A.M. Best Rating .................................................................. 34
SECTION 5.10. Modifications of MSPA ....................................................... 34
SECTION 5.11. Environmental Letters of Credit .......................................... 34
SECTION 5.12. Employees ............................................................................. 34
SECTION 5.13. Further Action ...................................................................... 35

ARTICLE VI

TAX MATTERS

SECTION 6.01. Indemnity .............................................................................. 35
SECTION 6.02. Returns and Payments .......................................................... 36
SECTION 6.03. Contests ................................................................................ 37
SECTION 6.04. Time of Payment .................................................................. 38
SECTION 6.05. Tax Cooperation and Exchange of Information ................... 38
SECTION 6.06. Conveyance Taxes ................................................................ 39
SECTION 6.07. Miscellaneous ....................................................................... 39



ii

MER00020412

# ARTICLE VII

## CONDITIONS TO CLOSING

SECTION 7.01. Conditions to Obligations of the Seller .................................................................. 40
SECTION 7.02. Conditions to Obligations of the Purchaser .......................................................... 40

# ARTICLE VIII

## INDEMNIFICATION

SECTION 8.01. Survival of Representations and Warranties ......................................................... 41
SECTION 8.02. Indemnification by the Seller .............................................................................. 42
SECTION 8.03. Indemnification by the Purchaser ....................................................................... 43
SECTION 8.04. Limits on Indemnification ................................................................................... 44
SECTION 8.05. Notice of Loss; Third Party Claims ..................................................................... 44
SECTION 8.06. Remedies .......................................................................................................... 46
SECTION 8.07. Right of Set-off .................................................................................................. 46

# ARTICLE IX

## TERMINATION

SECTION 9.01. Termination ....................................................................................................... 47
SECTION 9.02. Effect of Termination ......................................................................................... 48

# ARTICLE X

## GENERAL PROVISIONS

SECTION 10.01. Expenses .......................................................................................................... 48
SECTION 10.02. Notices ............................................................................................................. 49
SECTION 10.03. Public Announcements ...................................................................................... 50
SECTION 10.04. Severability ...................................................................................................... 50
SECTION 10.05. Entire Agreement ............................................................................................. 50
SECTION 10.06. Assignment ...................................................................................................... 51
SECTION 10.07. Amendment ...................................................................................................... 51
SECTION 10.08. Waiver ............................................................................................................. 51
SECTION 10.09. No Third Party Beneficiaries ............................................................................. 51
SECTION 10.10. Governing Law ................................................................................................. 51
SECTION 10.11. Dispute Resolution ........................................................................................... 51
SECTION 10.12. Currency .......................................................................................................... 52
SECTION 10.13. Counterparts ..................................................................................................... 53

iii



MER00020412

EXHIBITS

1.01(a)         XL Insurance Assignment Agreement
2.06(a)(i)      Specific Accounting Principles
5.03            Confidentiality Agreements
7.01(e)         Forms of Opinions
8.02(c)         Administrative and Operating Expenses

iv



MER00020412

**JA534**

STOCK PURCHASE AGREEMENT, dated as of November 7, 2007, between STINNES CORPORATION, a Delaware corporation (the "Seller") and NATIONAL INDEMNITY COMPANY, a Nebraska corporation (the "Purchaser").

WHEREAS, the Seller owns (a) all the issued and outstanding shares (the "BNS Shares") of common stock, $250 par value per share (the "BNS Common Stock"), of Brilliant National Services, Inc., a Delaware corporation ("BNS") and (b) all the issued and outstanding shares (the "LAT Shares" and, together with the BNS Shares, the "Shares") of common stock, no par value per share (the "LAT Common Stock"), of LA Terminals Inc., a California corporation ("LAT", and together with BNS, the "Companies");

WHEREAS, BNS owns all of the outstanding capital stock of each of Eastech Chemical Inc. ("Eastech"), Whittaker, Clark & Daniels, Inc. ("WCD") and Soco West, Inc. ("West" and, together with Eastech and WCD, the "Retained Subsidiaries").

WHEREAS, the Seller wishes to sell to the Purchaser, and the Purchaser wishes to purchase from the Seller, the Shares, upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Seller and the Purchaser hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01. Certain Defined Terms. For purposes of this Agreement:

"Action" means any claim, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agreement" or "this Agreement" means this Stock Purchase Agreement between the parties hereto (including the Exhibits hereto and the Disclosure Schedule) and all amendments hereto made in accordance with the provisions of Section 10.07.

"Ancillary Agreements" means the XL Insurance Assignment Agreement and any other agreements between the Seller and/or any Affiliate thereof, on the one hand, and the Purchaser and/or any Affiliate thereof, on the other hand, that is entered into in connection with the transactions contemplated hereby and identified by its terms as an "Ancillary Agreement" of this Agreement.

"Asbestos Claims" means (i) Claims for Losses (including without limitation damages for personal injuries or property damage) allegedly caused by asbestos, asbestiform

MER00020412

minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any of the Companies or Retained Subsidiaries or by any alleged predecessor entity of any Company or any Retained Subsidiary or by any other entity (other than a Seller Indemnified Party) to whose Liabilities any Company or any Retained Subsidiary has become subject either contractually or by operation of law and (ii) Claims with respect to the indemnification obligations referred to in Sections 8.03(c) and 8.03(d) without duplication of those Claims contained in clause (i) of this definition.

"Assets" means the assets and properties of the Companies and the Retained Subsidiaries.

"Billings Montana Superfund Site Litigation" means the following lawsuits:

(i)      United States Fidelity and Guaranty Company, Plaintiff, and Continental Insurance Company, Plaintiff-Intervenor, vs. Soco West, Inc., Brilliant National Services, Inc., Stinnes Corporation, Brenntag (Holding) NV, Defendants, US District Court, Montana, Billings Division (CV-04-29-BLG-RFC);

(ii)      United States Fidelity and Guaranty Company, Plaintiff-Appellee, vs. Soco West, Inc., Defendant-Appellant, and Stinnes Corporation, Brilliant National Services, Inc., Brenntag (Holding) NV, Defendants, vs. Continental Insurance Company, Plaintiff-Intervenor-Appellee, Ninth Circuit Court of Appeals (No. 07-35591);

(iii)      Londa Burbank, Sheila Cole, Brian Hinman, Karen Hinman, Fred Jorgensen, Yvonne Jorgensen, Fred Jorgensen, Jr., Tammy Smith, Steve Weiss, Nancy MacKay, Shari MacKay, Michelle Thomas, individually and on behalf of Holly Shorten, James Hudson and Kristi H. Hudson dba JR Hudson Company, and Harvey Karch, Plaintiffs, vs. Brenntag West, Inc., as successor in interest to Dyce Chemical, Inc., Brenntag, Inc., as successor in interest to HCI USA Distribution Companies, Inc., Stinnes Corporation, as successor in interest to HCI Americas, Inc., Holland Chemical International NV, Beall Trailers of Montana, Inc., Beall Corporation, Kuck Trucking, Inc., Ankrum Trucking, Inc., Keller Trucking, Inc., and John Doe corporations, individuals or agencies 1-10, Defendants, Montana 13th Judicial District Court, Yellowstone County (DV05-0048); and

(iv)      Hugh Weiss and Sandy Weiss, husband and wife, Bruce Baracker, Shirley Akin, Floyd Harper, John and Sharon Smith, husband and wife, Gail Holmes, Joel Leite, Frank Dvorak and Mary Lou Dvorak, husband and wife, and dba AJ Gravel, Jim Mollersteun, individually and dba Stor-It-Mini Warehouse, Dan Whitby, individually and on behalf of Dan Whitby Jr and Matthew Whitby, minors, on behalf of themselves and all others similarly situated, Plaintiffs, vs. Dyce Chemical, Inc., HCI USA Distribution Companies, Inc., HCI Americas, Inc., Holland Chemical International NV, Beall Trailers of Montana, Inc., Kuck Trucking, Inc. and John Doe corporations, individuals or agencies 1-20,

2

MER00020412

Defendants, Montana 13th Judicial District Court, Yellowstone County (DR 07-0443).

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in The City of New York, New York or in Omaha, Nebraska.

"Brenntag Business" means the "Brenntag Business" as defined in the Master Sale and Purchase Agreement.

"Brenntag Group Companies" means (a) the Companies, (b) the Retained Subsidiaries, (c) any predecessors and former subsidiaries of the Companies or the Retained Subsidiaries and (d) any former Affiliates of the Companies or the Retained Subsidiaries involved in operating the Brenntag Business.

"Claims" means any and all administrative, regulatory or judicial actions, suits, petitions, appeals, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations, proceedings, consent orders or consent agreements.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Supplemental Nondisclosure Agreement and Confidentiality Agreement between Navigant Capital Advisors, LLC, acting on behalf of the Seller, and the Purchaser, dated as of June 3, 2007, as amended as of June 14, 2007.

"Contract" means any legally binding note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, letter of credit, franchise, commitment, undertaking or other instrument or arrangement, whether written or oral.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Conveyance Taxes" means all sales, use, value added, transfer, stamp, stock transfer, real property transfer and similar Taxes; and it is mutually understood and agreed by all parties to this Agreement that the term "Conveyance Taxes" shall not include any kind of income, capital gains and/or similar Taxes.

"Disclosure Schedule" means the Disclosure Schedule attached hereto, dated as of the date hereof, delivered by the Seller to the Purchaser in connection with this Agreement.

"Effective Date" means June 30, 2007.

"Encumbrance" means any security interest, pledge, hypothecation, mortgage, lien (including environmental and tax liens, except for liens with respect to Taxes (i) not yet due

3

MER00020412

and payable or (ii) the validity or amount of which is being contested in good faith by appropriate proceedings for which adequate reserves have been reflected in the Financial Statements), violation, charge, lease, license, encumbrance, servient easement, adverse claim, reversion, reverter, preferential arrangement, restrictive covenant, condition or restriction of any kind, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership.

"Environmental Agencies" means each of (i) the California Department of Toxic Substances Control, Sacramento Div., and (ii) the New Jersey Department of Environmental Protection.

"Environmental Claims" means (i) Claims for Losses (including without limitation damages for personal injuries or property damage and/or requested injunctive relief to direct or require the Purchaser's compliance with any relevant environmental Law(s) or regulation(s)) arising out of the actual or threatened or alleged release, discharge or escape, whether into soil, air or water, of any hazardous wastes or substances at (a) Former Sites (as defined in the Master Sale and Purchase Agreement), (b) Third Party Sites (as defined in the Master Sale and Purchase Agreement), (c) the Billings Montana Site (as defined in the Master Sale and Purchase Agreement), (d) the LAT Site, (e) the Pacoima, CA Site and (f) the Vernon, CA Site and (ii) Claims with respect to the indemnification obligations referred to in Sections 8.03(e) and 8.03(f) without duplication of those Claims contained in clause (i) of this definition.

"Environmental Letters of Credit" means each of the following letters of credit: (i) Letter of Credit issued by NORD/LB on behalf of West for the benefit of the California Department of Toxic Substances Control, Sacramento Div., in the amount of $130,300.00; (ii) Letter of Credit issued by NORD/LB on behalf of BNS for the benefit of the New Jersey Department of Environmental Protection, in the amount of $100,000.00; and (iii) Letter of Credit issued by NORD/LB on behalf of WCD for the benefit of the New Jersey Department of Environmental Protection, in the amount of $100,000.00.

"Excluded Taxes" means Taxes payable with respect to taxable periods beginning after the date of Closing, and that portion of Taxes payable with respect to a Straddle Period (determined in accordance with Section 6.01(b) hereof) as are attributable to the portion of a taxable period occurring after the date of Closing.

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governmental Authority" means any federal, national, supranational, state, provincial, local, or similar government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Indebtedness" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money, (b) all obligations of such Person for the

MER00020412

deferred purchase price of property or services, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the Seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Indebtedness of others referred to in clauses (a) through (g) above guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (I) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (II) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss, (III) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered), or (IV) otherwise to assure a creditor against loss, and (i) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance on property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Indemnified Party" means a Purchaser Indemnified Party or a Seller Indemnified Party, as the case may be.

"Indemnifying Party" means the Seller pursuant to Section 8.02 or the Purchaser pursuant to Section 8.03, as the case may be.

"LAT Site" means the site leased by LAT pursuant to Permit No. 530 Granted by the City of Los Angeles, dated August 9, 1984 (the "Permit"), located at Los Angeles, California, and described in the Permit as follows: the premises designated as Parcels Nos. 1 and 2, as delineated and more particularly described as Drawing No. 5-4744 (Rev. 8/83) and Berths 148-151 as shown on Drawing No. 5-4745 (Rev. 3/84) on file at the Chief Harbor Engineer of the Harbor Department of the City of Los Angeles.

"Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Leased Real Property" means the real property leased by any Company or any Retained Subsidiary as tenant, together with, to the extent leased by any Company or any Retained Subsidiary, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of any

5

MER00020412

Company or any Retained Subsidiary attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any contract, agreement, arrangement, commitment or undertaking.

"Master Sale and Purchase Agreement" means the Master Sale and Purchase Agreement by and between Seller, Parent, Blitz 03-1303 GmbH and the other purchasers and sellers thereunder, dated as of December 8/9, 2003, as amended February 26, 2004.

"Material Adverse Effect" means any circumstance, change or effect that, individually or in the aggregate, is or is reasonably likely to be materially adverse to the business, operations, assets or liabilities (including contingent liabilities), results of operations or the condition (financial or otherwise) of the Companies or the Retained Subsidiaries taken as a whole (other than any circumstances relating to, changes due to or effects of Asbestos Claims or Environmental Claims) or materially adverse to the ability of Seller to perform its obligations hereunder.

"Owned Real Property" means the real property in which any Company or any Retained Subsidiary has fee title (or equivalent) interest, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of any Company or any Retained Subsidiary attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"Pacoima, CA Site" means the site owned by West and located at Pacoima, California, having the street address of 13540-13546 Desmond Street, Pacoima, California and containing approximately 2 acres.

"Parent" means Deutsche Bahn AG, a German stock corporation and the indirect parent company of the Seller.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Post-Closing Period" means any taxable period (or portion thereof) beginning after the date of the Closing.

"Pre-Closing Period" means any taxable period (or portion thereof) ending on or prior to the date of the Closing.

"Real Property" means the Leased Real Property and the Owned Real Property.

6

MER00020412

"Qualified Actuary" means an actuary that is a fellow in good standing of the Casualty Actuarial Society.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"Retained Subsidiary Asbestos Claims" shall have the meaning ascribed to such term in the Master Sale and Purchase Agreement.

"Seller Group" means the Seller, the Seller's current Affiliates and any former Affiliate of Seller not included within the Brenntag Group Companies.

"Six-Months LIBOR" means the reference London Interbank Offered Rate published by the British Bankers Association for six-month maturities on the day of determination.

"Straddle Period" means any taxable period beginning on or prior to and ending after the date of the Closing.

"Tax Returns" means any return, declaration, report, election, claim for refund or information return or other statement or form relating to, filed or required to be filed with any Tax authority, including any schedule or attachment thereto or any amendment thereof.

"Taxes" means any and all taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any government or taxing authority, including taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; license, registration and documentation fees; and customs' duties, tariffs, and similar charges.

"Vernon, CA Site" means the site owned by West and located at Vernon, California having the street address of 3720 East Washington Blvd., Vernon, California, and containing approximately 3.3 acres.

"XL Insurance Assignment Agreement" means the Assignment Agreement and Consent to Assignment to be executed by Parent and Purchaser or an Affiliate of the Purchaser simultaneously with the delivery of all other documents required to be delivered pursuant to Section 2.04 and Section 2.05 with respect to the XL Insurance Policy, in the form of Exhibit 1.01(a) hereto.

"XL Insurance Policy" means that certain Liability Occurrence Policy, policy no. XLFSI DBAG 02 01, between XL Insurance (Bermuda) Ltd and Parent effective as of October 1, 2002, with respect to claims against the Retained Subsidiaries.

7



MER00020412

"XL Option Contracts" means the two option contracts effective as of October 1, 2002, granted by XL Insurance (Bermuda) Ltd to Parent for the purchase of insurance in addition to the XL Insurance Policy, such additional insurance being essentially based on the terms and conditions of the XL Insurance Policy.

SECTION 1.02.  Definitions.  The following terms have the meanings set forth in the Sections set forth below:

| Definition | Location |
|---|---|
| "Aggregate Asbestos Adjustment Amount" | 2.06(e) |
| "Aggregate Environmental Adjustment Amount" | 2.06(d) |
| "Aggregate Asbestos Adjustment Amount" | 2.06(e) |
| "Aggregate Environmental Adjustment Amount" | 2.06(d) |
| "Annual Report" | 2.06(a) |
| "Appointed Actuary" | 2.06(i)(i) |
| "Asbestos Claims Amount" | 2.06(a) |
| "Asbestos Claims Threshold" | 2.06(a) |
| "Asbestos Liability Amount" | 2.06(a) |
| "Asbestos Payment Amount" | 2.06(a) |
| "BNS" | Recitals |
| "BNS Common Stock" | Recitals |
| "BNS Shares" | Recitals |
| "Brenntag Group Companies" | 1.01(a) |
| "Closing" | 2.03 |
| "Companies" | Recitals |
| "Company Leases" | 3.14(b) |
| "December 2006 Balance Sheet" | 3.08 |
| "Dedicated Funds" | 3.09(b) |
| "Disclosed Provisions" | 3.10 |
| "Dispute" | 10.11(a) |
| "Eastech" | Recitals |
| "Employees" | 3.21 |
| "Environmental Claims Amount" | 2.06(b) |
| "Environmental Claims Threshold" | 2.06(b) |
| "Environmental Liability Amount" | 2.06(b) |
| "Environmental Payment Amount" | 2.06(b) |
| "Final Liability Report" | 2.06(i)(ii) |
| "Financial Statements" | 3.08(a) |
| "Fundamental Representations" | 7.02(a)(ii) |
| "German Ministry of Transport Approval" | 3.07 |
| "Indefinite Survival Representations" | 8.01 |
| "June 2007 Balance Sheet" | 3.08 |
| "Liability Report" | 2.06(b) |
| "LAT" | Recitals |
| "LAT Common Stock" | Recitals |

8

MER00020412

| Definition | Location |
|---|---|
| "LAT Shares" | Recitals |
| "Loss" | 8.02 |
| "MSPA Closing" | 3.09 |
| "Notice of Disagreement" | 2.06(c)(ii) |
| "Notice of Refund Disagreement" | 2.06(g)(ii) |
| "Preliminary Asbestos Liability Amount" | 2.06(a) |
| "Preliminary Asbestos Liability Claim" | 2.06(a) |
| "Preliminary Environmental Liability Amount" | 2.06(b) |
| "Preliminary Environmental Liability Claim" | 2.06(b) |
| "Preliminary Liability Claim" | 2.06(b) |
| "Preliminary Refund Amount" | 2.06(f) |
| "Purchase Price" | 2.02 |
| "Purchaser" | Preamble |
| "Purchaser December 2006 Balance Sheet" | 4.06 |
| "Purchaser Financial Statements" | 4.06 |
| "Purchaser Indemnified Party" | 8.02 |
| "Purchaser June 2007 Balance Sheet" | 4.06 |
| "Purchaser Ratings Condition" | 5.09 |
| "Reconciliation Period" | 2.06(c)(ii) |
| "Refund Notice" | 2.06(f) |
| "Refund Review Period" | 2.06(f)(ii) |
| "Report Period" | 2.06(a) |
| "Retained Subsidiaries" | Recitals |
| "Review Period" | 2.06(c)(ii) |
| "Rules" | 10.11(a) |
| "Scheduled Closing Date" | 2.03 |
| "Seller" | Preamble |
| "Seller Indemnified Party" | 8.03 |
| "Shares" | Recitals |
| "Specific Accounting Principles" | 2.06(a)(i) |
| "Statutory Accounting Principles" | 2.06(a)(i) |
| "Transaction Costs" | 10.01 |
| "Third Party Claim" | 8.05(b) |
| "WCD" | Recitals |
| "West" | Recitals |
| "XL Insurance Option Cash Value" | 3.18 |

SECTION 1.03. Interpretation and Rules of Construction. (a) In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(i)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

9



MER00020412

(ii)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(iii)    whenever the words "include", "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(iv)    the words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(v)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(vi)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(vii)    any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor Laws;

(viii)    references to a Person are also to its successors and permitted assigns; and

(ix)    the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

(b)    This Agreement is the product of negotiation by the parties hereto.  Each of the parties shall be deemed to be sophisticated parties who have relied upon advice of their own counsel and other advisors as they deemed appropriate.  The parties hereto intend that this Agreement not be construed more strictly with regard to one party than with regard to the others.  Without limitation, where the language of this Agreement is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant terms and conditions (without regard to authorship of the language, without any presumption or interpretation or construction in favor of any party hereto, without reference to the "reasonable expectations" of any party hereto or to contra proferentem and without reference to parol or other extrinsic evidence).

10

MER00020412

ARTICLE II

PURCHASE AND SALE

SECTION 2.01.  Purchase and Sale of the Shares.  Upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to the Purchaser, the Shares, and the Purchaser shall purchase the Shares.

SECTION 2.02.  Purchase Price.  Subject to the adjustments set forth in Section 2.06, the purchase price for the Shares shall be $1.00 (the "Purchase Price").

SECTION 2.03.  Closing.  Subject to the terms and conditions of this Agreement, the sale and purchase of the Shares contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York at 10:00 A.M. New York time on the fifth Business Day following the satisfaction or waiver of all conditions to the obligations of the parties set forth in Section 7.01(b) (the "Scheduled Closing Date"), subject to the satisfaction or waiver as of such date of the other conditions to the obligations of each party hereto set forth in Article VII and to the delivery of documents pursuant to Sections 2.04 and 2.05 or at such other place or at such other time or on such other date as the Seller and the Purchaser may mutually agree upon in writing.

SECTION 2.04.  Closing Deliveries by the Seller.  At the Closing, the Seller shall deliver or cause to be delivered to the Purchaser:

(i)      stock certificates evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank, in form satisfactory to the Purchaser and with all required stock transfer tax stamps affixed;

(ii)     executed counterparts of each Ancillary Agreement to which the Seller or Parent is a party;

(iii)    a receipt for the Purchase Price;

(iv)     a true and complete copy, certified by the Secretary or an Assistant Secretary of the Seller, of the resolutions duly and validly adopted by the Board of Directors (or the executive committee thereof to which such authority has been duly and validly delegated) of the Seller evidencing its authorization of the execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby;

(v)      a certificate of a duly authorized officer of the Seller certifying as to the matters set forth in Section 7.02(a) and the receipt of the German Ministry of Transport Approval;

(vi)     the resignations, effective as of the Closing, of all of the directors and officers of each Company and each Retained Subsidiary;

11

MER00020412

(vii)    the XL Insurance Option Cash Value by wire transfer in immediately available funds to a bank account designated in writing by the Purchaser no later than five Business Days prior to the Scheduled Closing Date;

(viii)    a copy of (A) the Certificates of Incorporation (or similar organizational documents), as amended, of each Company and of each Retained Subsidiary, accompanied by a certificate of the Secretary or Assistant Secretary of each such entity, dated as of the Closing, stating that no amendments have been made to such Certificate of Incorporation (or similar organizational documents) since its date, and (B) the By-laws (or similar organizational documents) of each Company and of each Retained Subsidiary, certified by the Secretary or Assistant Secretary of each such entity;

(ix)    a certificate of non-foreign status pursuant to Section 1.1445-2(b)(2) of the Regulations; and

(x)    a true and complete copy, certified by the Secretary or an Assistant Secretary of the Parent, of the resolutions duly and validly adopted by each of the Management Board and the Supervisory Board of the Parent evidencing their respective approvals of this Agreement, and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby.

SECTION 2.05.  Closing Deliveries by the Purchaser.  At the Closing, the Purchaser shall deliver to the Seller:

(i)    the Purchase Price in cash;

(ii)    executed counterparts of each Ancillary Agreement to which the Purchaser is a party;

(iii)    a true and complete copy, certified by the Secretary or an Assistant Secretary of the Purchaser, of the resolutions duly and validly adopted by the Board of Directors (or the executive committee thereof to which such authority has been duly and validly delegated) of the Purchaser evidencing its authorization of the execution and delivery of this Agreement and the Ancillary Agreements to which the Purchaser is a party and the consummation of the transactions contemplated hereby and thereby; and

(iv)    a receipt for the XL Insurance Option Cash Value;

(v)    a certificate of a duly authorized officer of the Purchaser certifying as to the matters set forth in Section 7.01(a);

(vi)    the legal opinions set forth in Section 7.01(e); and

(vii)    an amount in cash equal to the severance costs incurred or to be incurred by Seller in terminating the four employees of BNS, up to $800,000; provided, that, not later than five Business Days prior to the Scheduled Closing Date, Seller shall provide Purchaser with a calculation of the actual amount of such costs and the bank account to which such payment shall be made.

12

MER00020412

SECTION 2.06. <u>Post-Closing Adjustment of Purchase Price</u>. The Purchase Price shall be subject to adjustment after the Closing as specified in this Section 2.06:

(a)     <u>Annual Report</u>. Not later than March 31 of every year commencing March 31, 2010, Purchaser shall prepare and deliver to Seller a detailed report (the "<u>Annual Report</u>") setting forth, for the year ended immediately preceding the date of such Annual Report (the "<u>Report Period</u>"; <u>provided</u> that the first Report Period shall be from the date of the Closing through December 31, 2009), the following:

(i)     the status of Asbestos Claims, including (A) the number of Asbestos Claims pending at the end of the Report Period, (B) the number of Asbestos Claims initiated during the Report Period (C) the number of Asbestos Claims settled or otherwise resolved during the Report Period and the aggregate amounts paid by or on behalf of the Companies and the Retained Subsidiaries for Asbestos Claims in such Report Period, and (D) an actuarial determination prepared in accordance with the Statutory Accounting Principles established by the National Association of Insurance Commissioners (the "<u>Statutory Accounting Principles</u>") as modified by the specific accounting principles attached hereto as Exhibit 2.06(a)(i) (the "<u>Specific Accounting Principles</u>"), of the aggregate amount of the Companies' and Retained Subsidiaries' consolidated Liabilities for Asbestos Claims incurred but not reported as of the end of the Report Period (the "<u>Asbestos Liability Amount</u>"), showing the calculation of the Asbestos Liability Amount in reasonable detail and including a supporting actuarial report and (subject to the execution of customary release letters) work papers related thereto, if any, used in determining such amount, but not the notes related thereto; and

(ii)     the status of Environmental Claims, including (A) the number of Environmental Claims pending at the end of the Report Period, (B) the number of Environmental Claims initiated during the Report Period, (C) the number of Environmental Claims settled or otherwise resolved during the Report Period and the aggregate amounts paid by or on behalf of the Companies and the Retained Subsidiaries in such Report Period for Environmental Claims, and (D) an actuarial determination, prepared in accordance with the Statutory Accounting Principles, of the aggregate amount of the Companies' and Retained Subsidiaries' consolidated Liabilities for Environmental Claims, and/or for compliance with applicable environmental Laws and regulations due to pre-Closing pollution at any sites then owned or leased by a Company or a Retained Subsidiary that were owned or leased by a Company or a Retained Subsidiary on the date of Closing, incurred but not reported as of the end of the Report Period (the "<u>Environmental Liability Amount</u>"), showing the calculation of the Environmental Liability Amount in reasonable detail and including an individual estimate for each major item of projected expense resulting from any Environmental Claim(s) and/or compliance with applicable environmental Laws and regulations at any sites then owned or leased by a Company or a Retained Subsidiary that were owned or leased by a Company or a Retained Subsidiary on the date of Closing, and including a supporting environmental consultants' and actuarial report and (subject to the execution of customary release letters) work papers related thereto, if any, used in determining such amount, but not the notes related thereto.

13

MER00020412

(b)     The Asbestos Liability Amount and the Environmental Liability Amount shall each be consistent with the amounts used in the preparation of Purchaser's balance sheet as of the end of the Report Period unless and to the extent such amounts, with respect to Asbestos Claims, are inconsistent with the amounts calculated using the Specific Accounting Principles. The Purchaser shall make available, upon the reasonable request of the Purchaser, (i) a copy of each Asbestos Claim or Environmental Claim initiated during a Report Period and (ii) copies of any settlement agreements, invoices and/or judgments related to the Environmental Claims and Asbestos Claims settled or otherwise resolved during any Report Period; provided such access shall be consistent with the restrictions contained in Section 5.02.

(c)     Preliminary Determination of Asbestos Claims Amount.  If at any time following the delivery of an Annual Report, the Purchaser makes a good faith determination that the sum of (i) the aggregate amount paid by or on behalf of the Companies and the Retained Subsidiaries for Asbestos Claims following the Closing through the end of the most recent Report Period (the "Asbestos Payment Amount") and (ii) the Asbestos Liability Amount (together with the Asbestos Payment Amount, the "Asbestos Claims Amount") exceeds $165.0 million (the "Asbestos Claims Threshold"), then the Purchaser may deliver to the Seller a written claim for payment pursuant to Section 2.06(g) (a "Preliminary Asbestos Liability Claim") setting forth (x) the Asbestos Payment Amount and (y) the Asbestos Liability Amount as set forth in the most recent Annual Report (the "Preliminary Asbestos Liability Amount").

(d)     Preliminary Determination of Environmental Claims Amount.  If at any time following the delivery of an Annual Report, the Purchaser makes a good faith determination that the sum of (i) the aggregate amount paid by or on behalf of the Companies and the Retained Subsidiaries following the Closing through the end of the most recent Report Period for Environmental Claims (the "Environmental Payment Amount") and (ii) the Environmental Liability Amount (together with the Environmental Payment Amount, the "Environmental Claims Amount") exceeds $65.0 million (the "Environmental Claims Threshold"), then the Purchaser may deliver to the Seller a written claim for payment pursuant to Section 2.06(f) (a "Preliminary Environmental Liability Claim", and each Preliminary Environmental Liability Claim and each Preliminary Asbestos Liability Claim referred to herein as a "Preliminary Liability Claim") setting forth (x) the Environmental Payment Amount and (y) the Environmental Liability Amount as set forth in the most recent Annual Report (the "Preliminary Environmental Liability Amount").

(e)     Preliminary Determination Disputes.

(i)     During the 90 calendar days immediately following the Seller's receipt of a Preliminary Liability Claim (a "Review Period"), the Seller and its officers, employees, agents, accountants, counsel and representatives shall be permitted to review the non-privileged work papers of the Purchaser and/or the Purchaser's advisors, attorneys or consultants, if any, retained by the Purchaser and/or its advisors, attorneys or consultants in connection with the preparation of such Preliminary Liability Claim and the pertinent Annual Reports, together with all documentation and records of the Purchaser, the Companies, the Retained Subsidiaries and/or their respective Affiliates relevant to the claims, liabilities or payments referenced in and/or the subject of any such report.

14

MER00020412

(ii)     The Seller shall give notice to the Purchaser in writing (a "Notice of Disagreement") prior to the expiration of the applicable Review Period if the Seller disagrees with any one or more of the line items of the applicable Preliminary Liability Claim and/or disagrees with any other aspect(s) of the calculations and estimations relevant to the Preliminary Liability Claim's conclusions with respect to either an Asbestos Claims Amount or an Environmental Claims Amount. The Notice of Disagreement shall set forth in reasonable detail the basis for such dispute, the amounts involved to the extent possible and the Seller's own determination of the Environmental Claims Amount and the Asbestos Claims Amount with reasonable detail with respect to the Seller's calculation of any such amount(s). If the Seller delivers a Notice of Disagreement to the Purchaser prior to the expiration of the Review Period, only the specific portions and/or percentages of any Asbestos Claims Amount or any Environmental Claims Amount or matters identified as being in dispute in such Notice of Disagreement shall be deemed to be in dispute, and all other portions and/or percentages of any Asbestos Claims Amount or any Environmental Claims Amount or the matters set forth in the Purchaser's Preliminary Liability Claim shall be deemed to be final, conclusive and binding upon the parties hereto. If no Notice of Disagreement is delivered to the Purchaser prior to the expiration of the Review Period, then the applicable Preliminary Liability Claim shall be deemed to have been accepted by the Seller and shall become final, conclusive and binding upon the parties.

(iii)     If a Notice of Disagreement is delivered by the Seller to the Purchaser prior to the expiration of the Review Period, the Seller and the Purchaser shall attempt to reconcile their differences for a period of 30 calendar days (the "Reconciliation Period"), and any resolution by them as to any disputed amount shall be final, conclusive and binding on the parties hereto. If the Seller and the Purchaser are unable to reach a resolution with such effect during the Reconciliation Period, the Seller and the Purchaser shall submit such dispute to an Appointed Actuary pursuant to Section 2.06(k).

(f)     Payment of Environmental Claims Adjustment Amount. If the Environmental Claims Amount as finally determined pursuant to paragraph (e) or (k) of this Section 2.06 exceeds the Environmental Claims Threshold then the Seller shall, within five Business Days of such final determination of an Environmental Claims Amount, whether by agreement of the parties prior to or during the Reconciliation Period or by decision of an Appointed Actuary, pay to the Purchaser by wire transfer in immediately available funds the amount of such excess less any amounts previously paid to the Purchaser pursuant to this Section 2.06(f) (net of any refunds) (the aggregate of all such amounts actually paid pursuant to this 2.06(f) (net of any refunds) being the "Aggregate Environmental Adjustment Amount"); provided that the maximum Aggregate Environmental Adjustment Amount payable, under any circumstances whatsoever, by the Seller pursuant to this Section 2.06(f) (net of any refunds) shall be $15.0 million.

(g)     Payment of Asbestos Claims Adjustment Amount. If the Asbestos Claims Amount as finally determined pursuant to paragraph (e) or (k) of this Section 2.06 exceeds the Asbestos Claims Threshold then the Seller shall, within five Business Days of such final determination of an Asbestos Claims Amount, whether by agreement of the parties prior to or

15

MER00020412

during the Reconciliation Period or by decision of an Appointed Actuary, pay to the Purchaser by wire transfer in immediately available funds the amount of such excess less any amounts previously paid to the Purchaser pursuant to this 2.06(g) (net of any refunds) (the aggregate of all such amounts actually paid pursuant to this 2.06(g) (net of any refunds) being the "Aggregate Asbestos Adjustment Amount"); provided that the maximum Aggregate Asbestos Adjustment Amount payable, under any circumstances whatsoever, by the Seller pursuant to this Section 2.06(g) (net of any refunds) shall be $30.0 million.

(h)    Preliminary Determination of Refund for Excess Payments.  If at any time following the payment by the Seller of any amount pursuant to Section 2.06(f) or 2.06(g) and within 90 days following the receipt of any Annual Report the Seller determines in good faith that either the Asbestos Claims Amount or the Environmental Claims Amount is less than the Asbestos Claims Amount or Environmental Claims Amount used to determine a payment made pursuant to Section 2.06(f) or 2.06(g), respectively, then the Seller may send the Purchaser a refund notice (a "Refund Notice") setting forth the Seller's estimate of the reduction in the Environmental Claims Amount or the Asbestos Claims Amount, as the case may be (the "Preliminary Refund Amount"), and setting forth in reasonable detail the Seller's calculation of such amount. In calculating the Preliminary Refund Amount, it is agreed that the settlement or payment of Asbestos Claims or Environmental Claims shall be taken into account in calculating the Asbestos Claims Amount or the Environmental Claims Amount, respectively; provided such settlement or payment is also taken into account in determining the Asbestos Payment Amount and the Environmental Payment Amount, respectively.

(i)    Refund Disputes.

(i)    During the 90 calendar days immediately following the Purchaser's receipt of a Refund Notice (a "Refund Review Period"), the Purchaser and its officers, employees, agents, accountants, counsel and representatives shall be permitted to review the non-privileged work papers of the Seller and/or the Seller's advisors, attorneys or consultants, if any, retained by the Seller or its advisors, attorneys or consultants in connection with the preparation of such Refund Notice.

(ii)    The Purchaser shall give notice to the Seller in writing (a "Notice of Refund Disagreement") prior to the expiration of the applicable Refund Review Period if the Purchaser disagrees with any one or more of the line items of the applicable Refund Notice. The Notice of Refund Disagreement shall set forth in reasonable detail the basis for such dispute, the amounts involved and the Purchaser's determination of the Environmental Claims Amount or the Asbestos Claims Amount, as the case may be. If the Purchaser delivers a Notice of Refund Disagreement to the Seller prior to the expiration of the Refund Review Period, only those specific portion(s) and/or percentages of any Asbestos Claims Amount or any Environmental Claims Amount or matters that are specified as being in dispute in such Notice of Refund Disagreement shall be deemed to be in dispute, and all other remaining portion(s) and/or percentages of any Asbestos Claims Amount or any Environmental Claims Amount or matters shall be final, conclusive and binding upon the parties hereto. If no Notice of Refund Disagreement is delivered to the Seller prior to the expiration of the Refund Review Period, then the

16

MER00020412

applicable Refund Notice shall be deemed to have been accepted by the Purchaser and shall become final, conclusive and binding upon the parties.

(iii)    If a Notice of Refund Disagreement is delivered by the Purchaser to the Seller prior to the expiration of the applicable Refund Review Period, the Seller and the Purchaser shall attempt to reconcile their differences during a Reconciliation Period, and any resolution by them as to any disputed amount shall be final, conclusive and binding on the parties hereto.

(iv)    If the Seller and the Purchaser are unable to reach a resolution with such effect during the Reconciliation Period, the Seller and the Purchaser shall submit such dispute to an Appointed Actuary pursuant to Section 2.06(k).

(j)    Payment of Refund for Excess Payments.  The Purchaser shall refund to the Seller the amount of the Preliminary Refund Amount as finally determined pursuant to paragraph (i) or (k) of this Section 2.06 plus interest on such amount borne from the day such payment of such amount was made to the Purchaser pursuant to Section 2.06(f) or 2.06(g) through the date of payment by the Purchaser at a rate equal to the Six-Months LIBOR determined as of the date such payment was made by the Purchaser;  provided that the aggregate amount of all such refunds (excluding interest) shall not exceed the Aggregate Asbestos Adjustment Amount previously paid by the Seller (net of any refunds) to the extent the applicable Refund Notice relates to Asbestos Claims, and the Aggregate Environmental Adjustment Amount previously paid by the Seller (net of any refunds) to the extent the applicable Refund Notice relates to Environmental Claims.

(k)    Submission to Appointed Actuary.

(i)    If the Seller and the Purchaser are unable to resolve a dispute within the applicable Reconciliation Period, then the Seller and the Purchaser shall appoint an independent Qualified Actuary or a consulting firm that employs practicing Qualified Actuaries mutually acceptable to both parties (the "Appointed Actuary") to determine the Asbestos Claims Amount, the Environmental Claims Amount or the Preliminary Refund Amount, as the case may be; provided that in the event the parties are unable to agree upon an Appointed Actuary within 30 calendar days following the expiration of the applicable Reconciliation Period, an independent arbitrator will be appointed, and such arbitrator will select the Appointed Actuary, in each case acting pursuant to the American Arbitration Association's Commercial Rules.  If (i) the Appointed Actuary becomes unable to serve or (ii) Purchaser or Seller shall in good faith discover a conflict with the Appointed Actuary subsequent to the date of this Agreement, they shall notify the other party within 5 days of discovering such conflict, then Seller and Purchaser shall be required to mutually agree within 10 days on another Appointed Actuary that is neutral and impartial.  If the Purchaser and the Seller are unable to select such other Appointed Actuary within 10 days, either Party may request the American Arbitration Association to appoint, within 10 days from the date of such request, an Appointed Actuary with significant arbitration experience related to the subject matter of the dispute.  In acting under this Agreement, the Appointed Actuary shall be entitled to the privileges and immunities of arbitrators.  Any determination or award of the Appointed Actuary

17

MER00020412

pursuant to this Section may be entered and enforced in any court of competent jurisdiction. Each party agrees to execute a reasonable engagement letter if requested by the Appointed Actuary.

(ii)     At the request of either Purchaser or Seller, the Appointed Actuary may engage the services of an independent environmental consulting firm to advise the Appointed Actuary as to the valuation of all Environmental Claims.

(iii)    Within 40 calendar days or as soon as reasonably practicable following the final submission by either the Purchaser or the Seller (or, if applicable, the independent environmental consulting firm) of the last documentation or written materials to the Appointed Actuary (in accordance with any schedule either agreed by the parties and the Appointed Actuary or set by the Appointed Actuary if the parties are unable to agree on the schedule), the Appointed Actuary shall determine and report to the Seller and the Purchaser in writing (such report being a "Final Liability Report") the Asbestos Claims Amount, the Environmental Claims Amount or the Preliminary Refund Amount as the case maybe and such Final Liability Report shall be final, conclusive and binding on the Seller and the Purchaser. With respect to each disputed line item, such determination, if not in accordance with the position of either the Seller or the Purchaser, shall not be in excess of, or lower than, the highest and lowest amounts respectively advocated by the Purchaser in the applicable Preliminary Liability Claim or Notice of Refund Disagreement, or the Seller in the Refund Notice or Notice of Disagreement.

(iv)    The fees and disbursements of the Appointed Actuary (and independent environmental consulting firm, if any) shall be allocated between the Seller and the Purchaser in the same proportion that the aggregate amount of such remaining disputed items so submitted to the Appointed Actuary that is unsuccessfully disputed by each such party (as finally determined by the Appointed Actuary) bears to the total amount of such remaining disputed items so submitted.

ARTICLE III

REPRESENTATIONS AND WARRANTIES
OF THE SELLER

As an inducement to the Purchaser to enter into this Agreement, the Seller hereby represents and warrants to the Purchaser as follows:

SECTION 3.01.  Organization, Authority and Qualification of the Seller.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all necessary power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed or qualified and in good standing would not adversely affect the ability of the Seller to carry out its

18

MER00020412

obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is party. The execution and delivery by the Seller of this Agreement and the Ancillary Agreements to which it is a party, the performance by the Seller of its obligations hereunder and thereunder and the consummation by the Seller of the transactions contemplated hereby and thereby (i) have been duly authorized by all requisite action on the part of the Seller and its direct and indirect stockholders, other then the approval of the Supervisory Board of Parent and (ii) upon such receipt of the approval of the Supervisory Board of Parent shall have been duly authorized by all requisite action on the part of the Seller and its direct and indirect stockholders. This Agreement has been, and upon their execution the Ancillary Agreements to which it is a party shall have been, duly executed and delivered by the Seller, and (assuming due authorization, execution and delivery by the Purchaser) this Agreement constitutes, and upon their execution the Ancillary Agreements to which it is party shall constitute, legal, valid and binding obligations of the Seller enforceable against the Seller in accordance with their respective terms, except to the extent enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors and subject to general equity principles.

SECTION 3.02. <u>Organization, Authority and Qualification of the Companies</u>. Each Company is a corporation duly organized, validly existing and, except as set forth in Section 3.02 of the Disclosure Schedule, in good standing under the laws of the jurisdiction of its incorporation and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business of winding up the Brenntag Business as it has been and is currently conducted. Each Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it makes such licensing or qualification necessary or desirable. All corporate actions taken by the Companies have been duly authorized, and none of the Companies has taken any action that in any respect conflicts with, constitutes a default under, or results in a violation of, any provision of its Certificate of Incorporation or By-laws (or similar organizational documents). True and correct copies of the Certificate of Incorporation and By-laws (or similar organizational documents) of each Company, each as in effect on the date hereof, have been made available to the Purchaser.

SECTION 3.03. <u>Subsidiaries</u>. (a) Section 3.03(a) of the Disclosure Schedule sets forth a true and complete list of the Retained Subsidiaries, listing for each Retained Subsidiary its name, type of entity, the jurisdiction and date of its incorporation, its authorized capital stock, the number and type of its issued and outstanding shares of capital stock, and the current ownership of such shares.

(b)    Other than the Retained Subsidiaries, there are no other corporations, partnerships, joint ventures, associations or other entities in which the Companies or any Retained Subsidiary owns, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same. Other than the Retained Subsidiaries, none of the Companies nor any Retained Subsidiary is a member of (nor is any part of the business of the Companies or the Retained Subsidiaries conducted through) any partnership nor is any Company or any Retained Subsidiary a participant in any joint venture or similar arrangement.

19

MER00020412

    (c)     Each Retained Subsidiary is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, (ii) has all necessary power and authority to own, operate or lease the properties and assets owned, operated or leased by such Retained Subsidiary and to carry on its business of winding up the Brenntag Business as it has been and is currently conducted by such Retained Subsidiary and (iii) is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it makes such licensing or qualification necessary or desirable.

    (d)     All corporate actions taken by each Retained Subsidiary have been duly authorized and no Retained Subsidiary has taken any action that in any respect conflicts with, constitutes a default under or results in a violation of any provision of its Certificate of Incorporation or By-laws (or similar organizational documents). True and complete copies of the Certificate of Incorporation and By-Laws (or similar organizational documents), in each case as in effect on the date hereof, of each Retained Subsidiary have been delivered by the Seller to the Purchaser.

    SECTION 3.04.  <u>Capitalization.</u> (a)  The authorized capital stock of BNS consists of 3,000 shares of BNS Common Stock. As of the date hereof, 2,000 shares of BNS Common Stock are issued and outstanding, all of which are validly issued, fully paid and nonassessable. The authorized capital stock of LAT consists of 1,000,000 shares of LAT Common Stock. As of the date hereof, 100 shares of LAT Common Stock are issued and outstanding, all of which are validly issued, fully paid and nonassessable. None of the issued and outstanding shares of BNS Common Stock or LAT Common Stock was issued in violation of any preemptive rights. Except as set forth in Section 3.04(a) of the Disclosure Schedule, there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to, or obligating either the Seller or any Company to issue or sell, any shares of BNS Common Stock or LAT Common Stock, or any other interest in, any Company. There are no outstanding contractual obligations of any Company to repurchase, redeem or otherwise acquire any shares of BNS Common Stock or LAT Common Stock or to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise) in, any other Person. The Shares constitute all of the issued and outstanding capital stock of the Companies and are owned of record and beneficially by the Seller free and clear of all Encumbrances, except as set forth in Section 3.04(a) of the Disclosure Schedule. Upon consummation of the transactions contemplated by this Agreement and registration of the Shares in the name of the Purchaser in the stock records of the Companies, the Purchaser will own all the issued and outstanding capital stock of the Companies free and clear of all Encumbrances. Upon consummation of the transactions contemplated by this Agreement, the Shares will be fully paid and nonassessable. There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Shares or of any other interests in either Company, except as set forth in Section 3.04(a) of the Disclosure Schedule.

    (b)     The stock register of each Company accurately records: (i) the name and address of each Person owning Shares and (ii) the certificate number of each certificate evidencing shares of capital stock issued by such Company, the number of shares evidenced by each such certificate, the date of issuance thereof and, in the case of cancellation, the date of cancellation.

<div align="center">20</div>

MER00020412

(c)     All the outstanding shares of capital stock of each Retained Subsidiary are validly issued, fully paid, nonassessable and free of preemptive rights and are owned by BNS, whether directly or indirectly, free and clear of all Encumbrances, except as set forth in Section 3.04(c) of the Disclosure Schedule.  Except as set forth in Section 3.04(c) of the Disclosure Schedule, (i) there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of any Retained Subsidiary or obligating the Seller, either Company or any Retained Subsidiary to issue or sell any shares of capital stock of, or any other interest in, any Retained Subsidiary and (ii) there are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any shares of capital stock of or any other interests in any Retained Subsidiary.

(d)     The stock register of each Retained Subsidiary accurately records:  (i) the name and address of each Person owning shares of capital stock of such Retained Subsidiary and (ii) the certificate number of each certificate evidencing shares of capital stock issued by such Retained Subsidiary, the number of shares evidenced by each such certificate, the date of issuance thereof and, in the case of cancellation, the date of cancellation.

SECTION 3.05.  Corporate Books and Records.  The minute books of the Companies and the Retained Subsidiaries contain accurate records of all meetings held since March 1, 2004 and accurately reflect all other actions taken since March 1, 2004 by the stockholders, Boards of Directors and all committees of the Boards of Directors of the Companies and the Retained Subsidiaries.  Copies of all such minute books (which are complete and accurate since March 1, 2004), and complete and accurate copies of the stock register of each Company and each Retained Subsidiary have been made available by the Seller to the Purchaser.

SECTION 3.06.  No Conflict.  Assuming that all consents, approvals, authorizations and other actions described in Section 3.07 have been obtained, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller do not and will not (a) violate, conflict with or result in the breach of any provision of the Certificate of Incorporation or By-Laws (or similar organizational documents) of the Seller, the Companies or any Retained Subsidiary, (b) conflict with or violate (or cause an event which could have a Material Adverse Effect as a result of) any Law or Governmental Order applicable to the Seller, any Company, any Retained Subsidiary or any of their respective assets, properties or businesses, or (c) except as set forth in Section 3.06 of the Disclosure Schedule, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the Shares or any of the assets of any Company or any Retained Subsidiary pursuant to, any Contract to which any Company or any Retained Subsidiary is a party or by which any of the Shares or any of such assets or properties is bound or affected, except, in the case of clause (c), to the extent that such conflicts, breaches, defaults or other matters would not (i) adversely affect the ability of the Seller to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary

21



MER00020412

Agreements, or (ii) adversely affect the ability of the Companies and the Retained Subsidiaries to conduct their respective businesses of winding up the Brenntag Business.

SECTION 3.07.  Governmental Consents and Approvals.  The execution, delivery and performance of this Agreement and each Ancillary Agreement by the Seller do not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority, except the requisite approval of the German Ministry of Transport as required by Section 65(3) German Budget Act (Bundeshaushaltsordnung) (the "German Ministry of Transport Approval").  The Seller knows of no reason why all the consents, approvals and authorizations necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements will not be received.

SECTION 3.08.  Financial Information; Books and Records.  (a)  True and complete copies of  the unaudited consolidated balance sheets of the Companies and the Retained Subsidiaries as of December 31, 2006 (the "December 2006 Balance Sheet") and June 30, 2007 (the "June 2007 Balance Sheet" and, together with the December 2006 Balance Sheet, the "Financial Statements") are set forth in Section 3.08 of the Disclosure Schedule.  The Financial Statements (i) were prepared in accordance with the books of account and other financial records of the Companies and the Retained Subsidiaries, (ii) present fairly the consolidated financial condition of the Companies and the Retained Subsidiaries as of the dates thereof, and (iii) have been prepared in accordance with GAAP applied on a basis consistent with the past practices of the Companies and the Retained Subsidiaries except that reserves and accruals for Environmental Claims and Asbestos Claims may not fairly present  future liabilities for Environmental Claims and Asbestos Claims. The parties agree that any Claim in respect of a breach of this Section 3.08 relating to the amount of Environmental Claims or Asbestos Claims shall be limited to the procedures and amount set forth in Section 2.06.

(b)    The books of account and other financial records of the Companies and the Retained Subsidiaries: (i) reflect all items of income and expense and all assets and Liabilities required to be reflected therein in accordance with GAAP, applied on a basis consistent with the past practices of the Companies and the Retained Subsidiaries, respectively, and (ii) have been maintained in accordance with good business and accounting practices.

SECTION 3.09.  Operations of the Companies and Retained Subsidiaries; Assets; Absence of Undisclosed Liabilities.  (a) Since the consummation of the transactions contemplated by the Master Sale and Purchase Agreement on February 27, 2004 (the "MSPA Closing"), the Companies and the Retained Subsidiaries have not carried on any business or conducted any operations other than the performance of any obligations under the Master Sale and Purchase Agreement and any activities incident to the winding up of the Brenntag Business. Except as set forth in Section 3.09(a) of the Disclosure Schedule, there are no assets or Liabilities of any Company or any Retained Subsidiary, other than (i) those assets and Liabilities reflected or reserved against on the June 2007 Balance Sheet, and (ii) those assets held and Liabilities incurred in the ordinary course of conducting the business of winding up the Brenntag Business.

(b)    On the Effective Date, the Companies and the Retained Subsidiaries were capitalized based on the application of GAAP with combined cash or cash equivalents within the

22

MER00020412

meaning of GAAP in an amount not less than $129,026,104, which was represented by intercompany indebtedness owed by Seller to the Companies and/or the Retained Subsidiaries (the "Dedicated Funds").

(c)    Except for the Company Leases, the Disclosed Provisions or as set forth in Section 3.09(c) of the Disclosure Schedule, there are no Contracts of the Companies or the Retained Subsidiaries and there are no Contracts of the Seller or its Affiliates that are binding on or relating to the Companies or the Retained Subsidiaries or any of their assets or properties and (i) require aggregate payments of more than $10,000 per year or (ii) otherwise restrict any Company, any Retained Subsidiary or any of their Affiliates from conducting its respective business.

SECTION 3.10.    Master Sale and Purchase Agreement.    The provisions of the Master Sale and Purchase Agreement attached hereto as Section 3.10 of the Disclosure Schedule (the "Disclosed Provisions") are a true and complete copy of all the provisions of the Master Sale and Purchase Agreement that relate to the Purchaser's obligations hereunder, including all relevant defined terms used in such provisions. None of the Seller or its Affiliates has waived or otherwise modified any rights under the Master Sale and Purchase Agreement related to Asbestos Claims or Environmental Claims.

SECTION 3.11.    Absence of Certain Changes.    Since the Effective Date, the business of winding up the Brenntag Businesses of the Companies and the Retained Subsidiaries has been conducted in the ordinary course and consistent with past practice except as set forth in Section 3.11 of the Disclosure Schedule. As amplification and not limitation of the foregoing, since the Effective Date, none of the Companies nor any Retained Subsidiary has:

(a)    amended, modified or restated its certificate or articles of incorporation, bylaws or other organizational documents;

(b)    merged with, entered into a consolidation with or acquired an interest in any Person or acquired any assets or business of any Person;

(c)    sold, transferred, pledged, leased, subleased, licensed or otherwise disposed of any material portion of any of its properties or assets, real, personal or mixed (including leasehold interests and intangible property), other than the payment of liabilities in the ordinary course of the business of winding up the Brenntag Business;

(d)    incurred any Indebtedness, other than the obligations under the Disclosed Provisions and payable in the ordinary course of the business of winding up the Brenntag Business, in excess of $10,000.00 in the aggregate or made any loan to, or guaranteed any Indebtedness of, any Person;

(e)    issued or sold any capital stock, notes, bonds or other securities, or any option, warrant or other right to acquire the same, of any Company or any Retained Subsidiary;

(f)    split, combined, reclassified or redeemed any shares of its capital stock or declared, made, paid or set aside any sum for any dividend or other distribution (whether in cash,

23

MER00020412

securities or other property, any combination thereof or otherwise) to the holders of capital stock of any Company or any Retained Subsidiary or otherwise, other than dividends, distributions and redemptions declared, made or paid by any Retained Subsidiary solely to a Company or another Retained Subsidiary;

      (g)     adopted a plan of complete or partial liquidation, dissolution, rehabilitation, merger, consolidation, restructuring, recapitalization, redomestication or other reorganization;

      (h)     entered into or amended, modified or consented to the termination of any Contract or transaction or any Company's or any Retained Subsidiary's rights thereunder with any party;

      (i)     (i) adopted a new employee benefits plan or amend any employee benefits plan or increased or promised to increase any benefits under any employee benefits plan or (ii) except in the ordinary course of the business of winding up the Brenntag Business, granted any increase, or announced any increase, in the wages, salaries, compensation, bonuses, incentives, pension or other benefits payable by any Company or any Retained Subsidiary to any of its employees, including any increase or change pursuant to any employee benefits plan.

      (j)     terminated any employee benefits plan;

      (k)     other than in the ordinary course of the business of winding up the Brenntag Business, entered into any commitment, contractual obligation or transaction which either calls for aggregate payments in excess of $250,000 and which does not expire or is not terminable without cost or penalty at a Company's or a Subsidiary's option within a 365 day period;

      (l)     made, authorized or committed to any capital expenditures in excess of $250,000 in the aggregate;

      (m)     (i) made or changed any material Tax election, entered into, amended, terminated or otherwise restructured any agreements relating to Taxes, changed an annual accounting period, adopted or changed any material accounting method, consented to any extension or waiver of the limitation period applicable to any material claim relating to Taxes or assessment relating to the Companies or the Retained Subsidiaries, if such election, adoption, change, consent or other action would have the effect of increasing the Tax liability of the Companies or the Retained Subsidiaries or (ii) settled or compromised any liability with respect to Taxes of any Company or any Retained Subsidiary;

      (n)     entered into any agreement or settlement of any claim against a Company or a Retained Subsidiary which would require or may result in aggregate payments in excess of $50,000.00 with respect to a claim for damages allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products or in excess of $50,000.00 with respect to a claim for damages arising out of the actual or threatened or alleged release, discharge or escape of any hazardous wastes or substances, regardless of the timing of such payments before or after Closing;

24

MER00020412

(o)     amended or commuted, nor has Parent amended or commuted, any policy of insurance which provides insurance to a Company or a Retained Subsidiary (including the XL Insurance Policy) with respect to Losses indemnifiable by the Purchaser under Section 8.03 of this Agreement, except to amend a commutation date until February 28, 2008 and to change the related notice provision of the XL Insurance Policy;

(p)     permitted or allowed any of the assets of any Company or any Retained Subsidiary to be subjected to any Encumbrance;

(q)     revalued any of the Assets other than in the ordinary course of business consistent with past practice and in accordance with GAAP;

(r)     made any change in any method of accounting or accounting practice or policy used by any Company or any Retained Subsidiary;

(s)     amended, terminated, cancelled or compromised any material claims of any Company or any Retained Subsidiary or waived any other rights of substantial value to any Company or any Retained Subsidiary;

(t)     failed to pay any creditor any material amount owed to such creditor when due;

(u)     (i) allowed any permit that was issued to or relates to any Company or any Retained Subsidiary or otherwise relates to their respective businesses to lapse or terminate or (ii) failed to renew any permit that is scheduled to terminate or expire within 45 calendar days of the Closing;

(v)     expended or otherwise used the Dedicated Funds other than in the ordinary course of business of winding up the Brenntag Business and otherwise in a manner consistent with the restrictions in this Section 3.11; or

(w)     agreed, whether in writing or otherwise, to take any of the actions specified in this Section 3.11 or granted any options to purchase, rights of first refusal, rights of first offer or any other similar rights or commitments with respect to any of the actions specified in this Section 3.11, except as expressly contemplated by this Agreement and the Ancillary Agreements.

SECTION 3.12.  Litigation.  Except as set forth in Section 3.12 of the Disclosure Schedule (which, with respect to each Action set forth therein, sets forth the parties, nature of the proceeding, date and method commenced, amount of charges or other relief sought and, if applicable, paid or granted), as of the date hereof there are no Actions by or against any Company or any Retained Subsidiary (or by or against the Seller or any Affiliate thereof and relating to any Company or any Retained Subsidiary) or affecting any of their respective assets or properties pending before any Governmental Authority (or, to the best knowledge of the Seller after due inquiry, threatened to be brought by or before any Governmental Authority).  None of the matters set forth in Section 3.12 of the Disclosure Schedule has affected or could affect the

25

MER00020412

legality, validity or enforceability of this Agreement, any Ancillary Agreement or the consummation of the transactions contemplated hereby or thereby.

SECTION 3.13.  Compliance with Laws.  (a)  Except as set forth in Section 3.13(a) of the Disclosure Schedule, the Companies and the Retained Subsidiaries have each conducted and continue to conduct their respective businesses in accordance with all applicable Laws and Governmental Orders, and neither the Companies nor any Retained Subsidiary is in violation of any such Law or Governmental Order, except for Laws relating to environmental matters.

(b)  No Governmental Order applicable to any Company, any Retained Subsidiary or their respective assets could affect the legality, validity or enforceability of this Agreement, any Ancillary Agreement or the consummation of the transactions contemplated hereby or thereby.

SECTION 3.14.  Real Property.

(a)  Section 3.14(a) of the Disclosure Schedule lists as of the date hereof:  (i) the street address of each parcel of Owned Real Property and (ii) the current owner of each parcel of Owned Real Property.  The Sellers have made available to the Purchaser true and complete copies of each deed for each parcel of Owned Real Property and all the title insurance policies, title reports, surveys, certificates of occupancy, environmental reports and audits, appraisals, permits, easements and other Encumbrances and any other documents materially relating to or otherwise affecting the Owned Real Property or the current uses and operations thereof which are in their possession.

(b)  Section 3.14(b) of the Disclosure Schedule lists as of the date hereof:  (i) the street address of each parcel of Leased Real Property, and (ii) the identity of the lessor, lessee and current occupant (if different from lessee) of each such parcel of Leased Real Property. Section 3.14(b) of the Disclosure Schedule sets forth a true and complete list of any Company's or any Retained Subsidiary's leases, subleases and license agreements pertaining to the Leased Real Property (the "Company Leases") as of the date hereof.  All such leases are in full force and effect, and with respect to each of such leases, (i) there are no existing monetary defaults or material non-monetary defaults by the Sellers, any Company, any Retained Subsidiary or their respective Affiliates, (ii) no event has occurred which (with notice, lapse of time or both) would constitute an uncured monetary default or material non-monetary default by the Sellers, any Company, any Retained Subsidiary or their respective Affiliates and (iii) to the extent in the possession of any Company, any Retained Subsidiary or any Seller or the their respective Affiliates, the Sellers have made available to the Purchaser true and complete copies of the Company Leases and any other material ancillary documents pertaining thereto.  The rental amount set forth in each Company Lease is the actual rental amount being paid, and except for lease amendments or rent side letters which have been provided to the Purchaser, there are no separate agreements or understandings with respect to the same.

(c)  All existing water, sewer, steam, gas, electricity, telephone and other utilities required for the use, occupancy, and maintenance of each parcel of the Real Property are, in all material respects, adequate for the conduct of the winding up of the Brenntag Business as it

26



MER00020412

has heretofore been conducted and as presently planned to be conducted by any Company or any Retained Subsidiary in the future.

(d)    None of the Companies nor any Retained Subsidiary has leased any parcel or any portion of any parcel of Real Property to any other Person and no other Person has any rights to the use, occupancy or enjoyment thereof pursuant to any lease, sublease, license, occupancy or other agreement to which any Company or any Retained Subsidiary is a party.

(e)    Each parcel of the Real Property currently has access to public roads or valid easements over private streets or private property for such ingress to and egress from such parcel in each case as is necessary for the conduct of the winding up of the Brenntag Business as it has heretofore been conducted and as presently planned to be conducted by any Company and any Retained Subsidiary in the future.

SECTION 3.15.  Assets.  (a) A Company or a Retained Subsidiary, as the case may be, owns, leases or has the legal right to use all the properties and assets owned, leased or used by the Companies and the Retained Subsidiaries, and, with respect to Contract rights, is a party to and enjoys the right to the benefits of all Contracts used by any Company or any Retained Subsidiary or in or relating to the conduct of winding up the Brenntag Business of the Companies and the Retained Subsidiaries following the MSPA Closing.  A Company or a Retained Subsidiary, as the case may be, has good and marketable title to, or, in the case of leased Assets, valid and subsisting leasehold interests in, all the assets of the Companies and the Retained Subsidiaries, free and clear of all Encumbrances.

(b)    The assets of the Companies and the Retained Subsidiaries constitute all the properties, assets and rights forming a part of, used, held or intended to be used in, and all such properties, assets and rights as are necessary in the conduct of, winding up the Brenntag Business of the Companies and the Retained Subsidiaries following the MSPA Closing.

SECTION 3.16.  Certain Interests.  (a) No stockholder, officer or director of the Seller, any Company or any Retained Subsidiary and no relative or spouse (or relative of such spouse) who resides with, or is a dependent of, any such stockholder, officer or director:

(i)    owns, directly or indirectly, in whole or in part, or has any other interest in, any tangible or intangible property that any Company or any Retained Subsidiary uses or has used in the conduct of its respective business of otherwise; or

(ii)    has outstanding any Indebtedness to any Company or any Retained Subsidiary.

(b)    There are no Contracts between or among the Seller or any of its Affiliates (other than the Companies and the Retained Subsidiaries), on the one hand, and any of the Companies or any of the Retained Subsidiaries, on the other hand, except as set forth in Section 3.16(b) of the Disclosure Schedule, all of which will be terminated at or before the Closing except as otherwise agreed in writing between Seller and Purchaser.

27

MER00020412

(c)     None of the Seller, any Company or any Retained Subsidiary has any Liability of any nature whatsoever to any officer, director or stockholder of any Company or any Retained Subsidiary or to any relative or spouse (or relative of such spouse) who resides with, or is a dependent of, any such officer, director or stockholder.

SECTION 3.17.  Taxes.  Except as set forth in Section 3.17 of the Disclosure Schedule, (i) all income and all other material Tax Returns required to be filed by or with respect to each Company and each Retained Subsidiary (including any consolidated federal income Tax Return of the Seller and any state, local or other Tax Return that includes any Company or any Retained Subsidiary on a consolidated, combined or unitary basis) have been timely filed; (ii) all Taxes required to be shown on such Tax Returns or otherwise due in respect of the Company or any Retained Subsidiary have been timely paid; (iii) all such Tax Returns are true, correct and complete in all material respects; (iv) no adjustment relating to such Tax Returns has been proposed in writing by any Governmental Authority (insofar as such adjustment either relates to the activities or income of the Company or any Retained Subsidiary or could result in liability of any Company or any Retained Subsidiary on the basis of joint and/or several liability); (v) there are no pending Actions for the assessment or collection of Taxes against any Company or any Retained Subsidiary; (vi) none of the Companies nor any Retained Subsidiary has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code; (vii) the Companies and the Retained Subsidiaries have each properly and timely withheld, collected and deposited all Taxes that are required to be withheld, collected and deposited under applicable Law; (viii) none of the Companies nor any Retained Subsidiary is doing business in or engaged in a trade or business in any jurisdiction in which it has not filed all required Tax Returns, and no notice or inquiry has been received from any jurisdiction in which Tax Returns have not been filed by any Company or any Retained Subsidiary to the effect that the filing of Tax Returns may be required.

SECTION 3.18.  Insurance.  Parent currently is the policyholder under, and shall continue until Closing to be the policyholder under, the XL Insurance Policy and such policy has not been endorsed to another party.  The XL Insurance Policy is currently in effect and provides remaining coverage of up to a maximum potential amount of $88.0 million; although the actual amount of coverage available at any future point is always subject to the XL Insurance Policy's terms and conditions.  The combined cash surrender value of the two XL Option Contracts is $5.65 million (the "XL Insurance Option Cash Value").  Parent has paid all premiums when due and otherwise performed all obligations with respect to the XL Insurance Policy.  The Parent has not purchased any other "wraparound" insurance policies from any other companies or from XL Insurance (Bermuda) Ltd similar in nature or structure to the XL Insurance Policy with respect to any Company or any Retained Subsidiary and their respective assets and properties with respect to any Losses arising from Asbestos Claims or Environmental Claims. The Seller has provided the Purchaser with true and complete copies of the XL Insurance Policy.

SECTION 3.19.  Brokers.  Except for Navigant Capital Advisors, LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Agreements

MER00020412

based upon arrangements made by or on behalf of the Seller.  The Seller and the Parent are solely responsible for the fees and expenses of Navigant Capital Advisors, LLC.

SECTION 3.20.  Pending Indemnification Claims.  Except as set forth in Section 3.20 of the Disclosure Schedule, as of the date hereof, there are no Claims for indemnification pending against a Seller Indemnified Party pursuant to the Master Sale and Purchase Agreement that give rise or could give rise to a Claim for indemnification by a Seller Indemnified Party pursuant to any of Section 8.03(c), (d), (e) or (f) of this Agreement.

SECTION 3.21.  Employees.  Section 3.21 of the Disclosure Schedule lists the current employees of the Companies and the Retained Subsidiaries as of the date hereof (the "Employees"), including those Employees who are on vacation, leave of absence, short-term disability or another approved leave with a right to reemployment.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES
## OF THE PURCHASER

As an inducement to the Seller to enter into this Agreement, the Purchaser hereby represents and warrants to the Seller as follows:

SECTION 4.01.  Organization and Authority of the Purchaser.  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Nebraska and has all necessary corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Purchaser.  This Agreement has been, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall have been, duly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by the Seller and receipt of the requisite approvals of Parent) this Agreement constitutes, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except to the extent enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors and subject to general equity principles.

SECTION 4.02.  No Conflict.  Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in Section 4.03, the execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party do not and will not (a) violate, conflict with or result in the breach of any provision of the Certificate of Incorporation or By-laws of the Purchaser, (b) conflict with or violate any Law or Governmental Order applicable to the Purchaser, or (c) conflict with, or result in any breach of, constitute a default (or event which with the giving of

29

MER00020412

notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Purchaser is a party, which would adversely affect the ability of the Purchaser to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement or the Ancillary Agreements.

SECTION 4.03.  Governmental Consents and Approvals.  The execution, delivery and performance by the Purchaser of this Agreement and each Ancillary Agreement to which the Purchaser is a party do not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to any Governmental Authority.

SECTION 4.04.  Investment Purpose.  The Purchaser is acquiring the Shares solely for the purpose of investment and not with a view to, or for offer or sale in connection with, any distribution thereof.

SECTION 4.05.  Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of the Seller.

SECTION 4.06.  Financial Information; Books and Records.  True and complete copies of the (i) statutory-basis statements of admitted assets, liabilities and capital and surplus of the Purchaser as of December 31, 2006, together with all related notes and schedules thereto, accompanied by the report thereon of the Purchaser's independent auditors (the "Purchaser December 2006 Balance Sheet"), and (ii) the unaudited Quarterly Statement of the Condition and Affairs of the Purchaser as of June 30, 2007, together with all related notes and schedules thereto, accompanied by the reports thereon of the Company's Accountants (the "Purchaser June 2007 Balance Sheet" and, together with the Purchaser December 2006 Balance Sheet, the "Purchaser Financial Statements"), as filed with the insurance department of its state of domicile, have been delivered by the Purchaser to the Seller. The Purchaser Financial Statements (i) were prepared in accordance with the books of account and other financial records of the Purchaser, (ii) present fairly, in all material respects, the admitted assets, liabilities and capital and surplus of the Purchaser as of the dates thereof and (iii) have been prepared in accordance with the accounting practices prescribed or permitted by the Insurance Department of the State of Nebraska, subject, in the case of the Purchaser June 2007 Balance Sheet, to potential year-end audit adjustments which are not expected to be material.

ARTICLE V

ADDITIONAL AGREEMENTS

SECTION 5.01.  Conduct of Business Prior to the Closing.  (a) The Seller covenants and agrees that, between the date hereof and the time of the Closing, none of the Companies, nor any Retained Subsidiary shall conduct its business of winding up the Brenntag Business other than in the ordinary course and consistent with such Company's and such Retained Subsidiary's prior practice.  Without limiting the generality of the foregoing, the Seller

30

MER00020412

shall cause Parent and/or each Company and each Retained Subsidiary, as the case may be, to: (i) continue in full force and effect without material modification the XL Insurance Policy and the XL Insurance Options and all other existing policies or binders of insurance currently maintained in respect of each Company, each Retained Subsidiary and their respective businesses, (ii) preserve their current relationships with any Persons with which they have had significant business relationships; and (iii) not engage in any practice, take any action, fail to take any action or enter into any transaction which would cause any representation or warranty of the Seller to be untrue or result in a breach of any covenant made by the Seller in this Agreement.

(b)    The Seller covenants and agrees that, between the date hereof and the time of the Closing, without the prior written consent of the Purchaser, none of the Companies nor any Retained Subsidiary will do any of the things specified in the second sentence of Section 3.11.

SECTION 5.02.  Access to Information.  (a) From and after the date hereof until the Closing, the Seller shall and shall cause the Companies and the Retained Subsidiaries and each of the Seller's, the Companies' and the Retained Subsidiaries' respective Affiliates, officers, directors, employees, agents, representatives, accountants and counsel to: (i) make available to Purchaser and its officers, employees, agents, accountants, counsel and representatives all information, including the books and records of each Company and each Retained Subsidiary, in Seller's or any of the Companies and Retained Subsidiaries or their Affiliates possession with respect to the Companies and the XL Insurance Policy and XL Option Contracts, any Claims against the Companies or any of the Retained Subsidiaries as shall be reasonably necessary for Purchaser to evaluate the transaction and to assume, as of the Closing, ownership and control of the Companies and the Retained Subsidiaries and the conduct of the business of winding up the Brenntag Business and (ii) afford reasonable access, during normal business hours, to the properties, plants, and other facilities of the Companies and the Retained Subsidiaries, including access to enter upon such properties, plants and facilities to investigate and collect air, surface water, groundwater and soil samples or to conduct any other type of environmental assessment, and those officers, directors, employees, agents, accountants and counsel, of the Seller, of each Company and Retained Subsidiary and their Affiliates who have any knowledge relating to any Company or any Retained Subsidiary and (iii) furnish to the officers, employees, agents, accountants, counsel and representatives of the Purchaser such additional financial and operating data and other information regarding the assets, properties, liabilities and goodwill of the Companies and the Retained Subsidiaries as the Purchaser may from time to time reasonably request.

(b)    In order to facilitate the resolution of any Claims made against or incurred by the Seller, after the Closing the Purchaser shall (i) retain the books and records relating to the Companies and the Retained Subsidiaries relating to periods prior to the Closing in a manner reasonably consistent with the prior practice of the Companies and the Retained Subsidiaries and (ii) upon reasonable notice, afford the officers, employees, agents and representatives of the Seller reasonable access (including the right to make, at the Seller's expense, photocopies), during normal business hours, to information, including the books and records of the Companies and the Retained Subsidiaries, in Purchaser's possession reasonably necessary for the Seller to

31

MER00020412

monitor the Purchaser's compliance with this Agreement and to complete and file the Tax
Returns required by Section 6.02.

(c)     In order to facilitate the resolution of any Claims made by or against or
incurred by the Purchaser, any Company or any Retained Subsidiary after the Closing or for any
other reasonable purpose the Seller shall (i) retain the books and records of the Seller which
relate to the Companies and the Retained Subsidiaries, their respective businesses and their
operations for periods prior to the Closing and which shall not otherwise have been delivered to
the Purchaser, any Company or any Retained Subsidiary and (ii) upon reasonable notice, afford
the officers, employees, agents and representatives of the Purchaser, any Company or any
Retained Subsidiary reasonable access (including the right to make, at the Purchaser's expense,
photocopies), during normal business hours, to information, including the books and records of
the Companies and the Retained Subsidiaries, in Seller's possession reasonably necessary for
Purchaser to monitor Seller's compliance with this Agreement, to pursue all insurance recoveries
potentially available to any Company or any Retained Subsidiary and complete and file the Tax
Returns required by Section 6.02.

SECTION 5.03.  Confidentiality.  The terms of the Confidentiality Agreement are
hereby incorporated herein by reference and shall continue in full force and effect until the
Closing, at which time such Confidentiality Agreement and the obligations of the Purchaser and
Seller under this Section 5.03 shall terminate; provided, however, that notwithstanding anything
in the Confidentiality Agreement to the contrary, neither this Section 5.03 nor the Confidentiality
Agreement shall prohibit any member of the Seller Group from disclosing the terms of this
Agreement to Bain Capital, LLC or any of its Affiliates or any subsequent purchaser of the
Brenntag Group Companies, subject to the terms of the confidentiality agreements between
Deutsche Bahn AG and Bain Capital Limited, dated October 22, 2007 and between Deutsche
Bahn AG and BC Partner Beteiligungsberatung GmbH dated October 22, 2007 and attached
hereto as Exhibit 5.03.  If this Agreement is, for any reason, terminated prior to the Closing, the
Confidentiality Agreement shall nonetheless continue in full force and effect.

SECTION 5.04.  Regulatory and Other Authorizations; Notices and Consents.  (a)
Each of the Purchaser and the Seller shall use its reasonable best efforts to obtain (or cause the
Companies and the Retained Subsidiaries to obtain) all authorizations, consents, orders and
approvals of all Governmental Authorities and officials that may be or become necessary for its
execution and delivery of, and the performance of its obligations pursuant to, this Agreement and
the Ancillary Agreements and will cooperate fully with the other party in promptly seeking to
obtain all such authorizations, consents, orders and approvals.

(b)     The Seller shall, or shall cause the Companies and the Retained
Subsidiaries to, give promptly such notices to third parties and use its or their reasonable best
efforts to obtain such third party consents as the Purchaser may in its sole discretion deem
necessary or desirable in connection with the transactions contemplated by this Agreement.

(c)     The Purchaser shall cooperate and use all reasonable efforts to assist the
Seller in giving such notices and obtaining such consents; provided, however, that the Purchaser
shall have no obligation to give any guarantee or other consideration of any nature in connection
with any such notice or consent or to consent to any change in the terms of any agreement or

32

MER00020412

arrangement which the Purchaser in its sole discretion may deem adverse to the interests of the Purchaser, any Company, any Retained Subsidiary or their respective businesses.

SECTION 5.05. <u>Notice of Developments</u>. Prior to the Closing, the Seller shall promptly notify the Purchaser in writing of (a) all events, circumstances, facts and occurrences arising subsequent to the date of this Agreement which could result in any breach of a representation or warranty or covenant of the Seller in this Agreement or which could have the effect of making any representation or warranty of the Seller in this Agreement untrue or incorrect in any respect and (b) all other material developments affecting the assets, Liabilities, business, financial condition, operations, or results of operations of any Company or any Retained Subsidiary.

SECTION 5.06. <u>XL Insurance Policy and Options</u>. On or prior to the Closing, Seller shall cause Parent to enter into the XL Insurance Assignment Agreement. The Seller acknowledges, on behalf of Parent, that the Purchaser shall have the right following the Closing to commute the XL Insurance Policy in accordance with its terms and conditions and, upon written request of the Purchaser, shall use reasonable best efforts to assist the Purchaser in commuting the XL Insurance Policy. In lieu of assigning the XL Option Contracts to the Purchaser at Closing, Seller shall cause the Parent to pay to the Purchaser an amount equal to the XL Insurance Option Cash Value at Closing.

SECTION 5.07. <u>Intercompany Arrangements</u>. Prior to the Closing, the Seller shall cause any contract or arrangement that is disclosed (or should have been disclosed) in Section 3.16(b) of the Disclosure Schedule to be terminated or otherwise amended to exclude any Company and any Retained Subsidiaries as a party thereto.

SECTION 5.08. <u>Billings Montana Superfund Site Litigation</u>. From the date hereof until the Closing, the Seller shall and shall cause the Companies and the Retained Subsidiaries and their respective officers, employees, agents, counsel, affiliates and other representatives to permit the Purchaser to participate in the Billings Montana Superfund Site Litigation; <u>provided</u>, <u>however</u>, that the Purchaser shall participate in the Billings Montana Superfund Site Litigation at its own cost. In furtherance of the foregoing, from the date hereof until the Closing, the Seller shall, and shall cause the Companies and the Retained Subsidiaries and their respective officers, employees, agents, counsel, affiliates and other representatives, to:

(a)    promptly notify the Purchaser of any developments in the Billings Montana Superfund Site Litigation;

(b)    promptly notify the Purchaser of any communication it or any of its Affiliates receives from any Governmental Authority or third party relating to the Billings Montana Superfund Site Litigation and permit the Purchaser to review in advance any proposed communication by such party to any Governmental Authority or other third party;

(c)    agree to participate in any meeting, settlement negotiation or proceeding related to the Billings Montana Superfund Site Litigation with any Governmental Authority or third party only if it consults with the Purchaser in advance and, to the extent permitted by such

33

MER00020412

Governmental Authority, gives the Purchaser the opportunity to attend and participate at such meeting or proceeding;

(d)     provide the Purchaser with copies of all correspondence, filings, pleading or communications between the such parties or their respective representatives, on the one hand, and any Governmental Authority or members of its staff or other third party, on the other hand, with respect to the Billings Montana Superfund Site Litigation; and

(e)     subject to the Confidentiality Agreement, afford the officers, employees, agents, accountants, counsel, and representatives of the Purchaser reasonable access, during normal business hours, to its counsel in order to assess the Billings Montana Superfund Site Litigation and its prospects, including providing a limited waiver of the attorney client privilege with respect to such matters; provided, however, that the parties recognize that there is a common interest among them related to the litigation and agree this shall not operate as a general waiver of the attorney client privilege.

(f)     not take any action, or forego any opportunity to take action, with respect to the Billings Montana Superfund Site Litigation which has or is reasonably likely to have an adverse effect on the Purchaser, the Companies or the Retained Subsidiaries without the prior written consent of Purchaser.

SECTION 5.09. A.M. Best Rating. From the date hereof until the Closing, the Purchaser shall promptly notify the Seller of (a) any downgrade or announcement of an actual or potential downgrade in the A.M. Best rating of the Purchaser, which shall include for purposes of this Agreement: (i) any announcement that the A.M. Best rating of the Purchaser is under review other than any customary periodic reviews, (ii) any announcement that the A.M. Best rating of the Purchaser has been or may be assigned a negative outlook and (iii) any announcement that the Purchaser is under credit watch by A.M. Best and (b) any written communication from A.M. Best stating that A.M. Best is considering a rating downgrade (collectively, a "Purchaser Ratings Condition").

SECTION 5.10. Modifications of MSPA. Following the date hereof, the Seller agrees that it shall not, and it shall cause its Affiliates not to, amend, modify or waive any terms or conditions of the Master Sale and Purchase Agreement that relate to the Purchaser's indemnification obligations contained in Sections 8.03(c), (d), (e) and (f) without the prior written consent of the Purchaser.

SECTION 5.11. Environmental Letters of Credit. The Seller shall use its commercially reasonable efforts to cause the Environmental Agencies to return and surrender the Environmental Letters of Credit to the Seller and to release the Seller at the Closing from all of its obligations in connection with the Environmental Letters of Credit. The Purchaser shall use commercially reasonable efforts to cooperate with the Seller in connection with the foregoing, including replacing the Environmental Letters of Credit with new letters of credit or with corresponding insurance.

SECTION 5.12. Employees. In compliance with applicable Law, effective no later than the Closing, Seller shall cause the employment of each of the Employees to be terminated.

34

MER00020412

Between the date hereof and the Closing, Seller and the Purchaser shall negotiate in good faith to determine if any alternative arrangement is feasible, it being understood that Purchaser shall not have any obligation to incur costs or expenses in excess of the amount referred to in Section 2.05(vii). Notwithstanding the above, nothing in this Section 5.12 is intended to constitute a promise of future benefits or a contract of employment.

SECTION 5.13. Further Action. Each of the parties hereto shall use all reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and the Ancillary Agreements to which it is a party and consummate and make effective the transactions contemplated hereby and thereby.

<center>ARTICLE VI</center>

<center>TAX MATTERS</center>

SECTION 6.01. Indemnity. (a) The Seller agrees to indemnify and hold harmless the Purchaser, each Company and each Retained Subsidiary against all Taxes other than Excluded Taxes and, except as otherwise provided in Section 6.03, against any loss, damage, liability or expense, including reasonable fees for attorneys and other outside consultants actually incurred in contesting, any such Taxes. The Purchaser agrees to indemnify and hold harmless the Seller and its Affiliates against all Excluded Taxes and, except as otherwise provided in Section 6.03, against any loss, damage, liability or expense, including reasonable fees for attorneys and other outside consultants actually incurred in contesting, any such Excluded Taxes.

(b)    In the case of Taxes that are payable with respect to a Straddle Period, the portion of any such Tax that is allocable to the portion of the Straddle Period ending on the date of the Closing shall be:

(i)    in the case of Taxes that are either (x) based upon or related to income or receipts, or (y) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible) (other than conveyances pursuant to this Agreement, as provided under Section 6.06), deemed equal to the amount which would be payable if the taxable year ended on the date of the Closing; and

(ii)    in the case of Taxes imposed on a periodic basis with respect to the assets of any Company or any Retained Subsidiary or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of calendar days in the period ending on the date of the Closing and the denominator of which is the number of calendar days in the entire Straddle Period. Any credit or refund resulting from an overpayment of Taxes for a Straddle Period shall be prorated based upon the method employed in this paragraph (b) taking into account the type of the Tax

<center>35</center>

MER00020412

to which the refund relates. In the case of any Tax based upon or measured by capital (including net worth or long-term debt) or intangibles, any amount thereof required to be allocated under this Section 6.01(b) shall be computed by reference to the level of such items on the date of the Closing. All determinations necessary to effect the foregoing allocations shall be made in a manner consistent with prior practice of the Companies and the Retained Subsidiaries.

SECTION 6.02. <u>Returns and Payments</u>. (a) From the date of this Agreement through and after the Closing, the Seller shall prepare and file or otherwise furnish in proper form to the appropriate Governmental Authority (or cause to be prepared and filed or so furnished) in a timely manner all Tax Returns relating to the Companies and the Retained Subsidiaries that are due on or before or relate to any taxable period ending on or before the date of the Closing (and the Purchaser shall do the same with respect to any taxable period ending after the Closing). Tax Returns of the Companies and the Retained Subsidiaries not yet filed for any taxable period that begins before the date of the Closing shall be prepared in a manner consistent with past practices employed with respect to the Companies and the Retained Subsidiaries (except to the extent that counsel for the Seller or any Company renders a legal opinion that there is no reasonable basis in law therefor or determines that a Tax Return cannot be so prepared and filed without being subject to penalties). With respect to any such Tax Return required to be filed by the Purchaser or the Seller, the filing party shall provide the other party and its authorized representatives with a copy of such completed Tax Return and, if applicable, a statement certifying the amount of Tax shown on such Tax Return that is allocable to such other party pursuant to Section 6.01(b), together with appropriate supporting information and schedules at least 20 Business Days prior to the due date (including any extension hereof) for the filing of such Tax Return, and such other party and its authorized representatives shall have the right to review and comment on such Tax Return and statement prior to the filing of such Tax Return. Within ten (10) days following the non-filing party's receipt of the draft of such Tax Return, the non-filing party shall have the right reasonably to object by written notice to the filing party to the information contained in such Tax Return and supporting information and schedules. If the non-filing party does not so object within such time period, such Tax Return and supporting information and schedules shall be deemed to have been accepted and agreed upon, and shall be final and conclusive, for purposes of this Section 6.02(a). If the non-filing party objects to such Tax Return or supporting information or schedules, the non-filing party shall notify the filing party of such disputed item or items and the basis of its objection, in such written notice, and the filing party and the non-filing party shall act in good faith to resolve any such dispute as promptly as practicable. If the filing party and the non-filing party cannot reach agreement regarding such dispute, the dispute shall be presented to a nationally-recognized, mutually-agreed-upon accounting firm, whose determination shall be binding upon both the filing party and the non-filing party, provided, however, that the filing party and the non-filing party shall require such accounting firm to make a determination within ten (10) days but in no event later than five days prior to the due date for the filing of such Tax Return. Notwithstanding any provision of this Agreement to the contrary, all costs and expenses of such accounting firm with respect to resolution of any dispute pursuant to this Section 6.02(a) shall be allocated between the Seller and the Purchaser in the same proportions that the aggregate amount of remaining disputed items submitted to such accounting firm that is unsuccessfully disputed by

36

MER00020412

each such party (as finally determined by the accounting firm) bears to the total amount of such remaining disputed items so submitted.

(b)     The Seller shall pay, or cause to be paid, when due and payable all Taxes with respect to the Companies and the Retained Subsidiaries for any Pre-Closing Period, and the Purchaser shall so pay or cause to be paid Taxes for any Post-Closing Period, with the liability for Straddle Period Taxes borne as described in Section 6.01(b).

SECTION 6.03.  Contests. (a) After the Closing, the Purchaser shall promptly notify the Seller in writing of any written notice of a proposed assessment or claim in an audit or administrative or judicial proceeding of the Purchaser or any of the Companies and the Retained Subsidiaries which, if determined adversely to the taxpayer, would be grounds for indemnification under this Article VI; provided, however, that the failure to give such notice will not affect the Purchaser's right to indemnification under this Article VI except to the extent, if any, that, but for such failure, the Seller could have avoided all or a portion of the Tax liability in question.

(b)     In the case of an audit or administrative or judicial proceeding that relates to Pre-Closing Periods, provided that, and only to the extent that, the Seller acknowledges in writing its liability under this Agreement to hold the Purchaser, the Companies and the Retained Subsidiaries harmless against the full amount of any adjustment which may be made as a result of such audit or proceeding that relates to Pre-Closing Periods (or, in the case of any Straddle Period, against an adjustment allocable under Section 6.01(b) to the portion of such Straddle Period ending on or before the date of the Closing), the Seller shall have the right at its expense to participate in and control the conduct of such audit or proceeding; the Purchaser also may participate in any such audit or proceeding and, if the Seller does not assume the defense of any such audit or proceeding, the Purchaser may defend the same in such manner as it may deem appropriate, including settling such audit or proceeding after five days prior written notice to the Seller setting forth the terms and conditions of settlement.  In the event that issues relating to a potential adjustment for which the Seller has acknowledged its liability are required to be contested in the same audit or proceeding as separate issues relating to a potential adjustment for which the Purchaser would be liable, the Purchaser shall have the right, at its expense, to control the audit or proceeding with respect to the latter issues.

(c)     With respect to issues relating to a potential adjustment for which both the Seller (as evidenced by its written acknowledgement under this Section 6.03) and the Purchaser or any Company or any Retained Subsidiary could be liable, (i) both the Seller and the Purchaser may participate in the audit or proceeding and (ii) the audit or proceeding shall be controlled by that party which would bear the burden of the greater portion of the potential adjustment.  The principle set forth in this Section 6.03(c) also shall govern for purposes of deciding any issue that must be decided jointly (including choice of judicial forum) in situations in which separate issues are otherwise controlled under this Article VI by the Purchaser and the Seller.

(d)     With respect to any Tax audit or proceeding for a taxable period that begins before the date of the Closing, neither the Purchaser nor the Seller shall enter into any compromise or agree to settle any claim pursuant to such audit or proceeding which would adversely affect the other party for such taxable period or a subsequent taxable period without

37

MER00020412

the written consent of the other party, which consent may not be unreasonably withheld. The Purchaser and the Seller agree to cooperate, and the Purchaser agrees to cause the Companies and the Retained Subsidiaries to cooperate, in the defense against or compromise of any claim in any such audit or proceeding.

SECTION 6.04.  Time of Payment.  Payment by the Seller or the Purchaser of any amounts due under this Article VI in respect of Taxes shall be made (a) within five Business Days after such amounts are determined under Section 6.02(a), together with interest at Six-Months LIBOR per annum from the date of payment of any disputed amount by the filing party to any Taxing authority to the date such disputed amount was resolved unsuccessfully to the non-filing party, or (b) within five Business Days following an agreement between the Seller and the Purchaser that an indemnity payment is payable or following a "determination" as defined in Section 1313(a) of the Code.  If liability under this Article VI is in respect of costs or expenses, as determined in good faith, other than Taxes, payment of any amounts due under this Article VI shall be made within five Business Days after the date when the non-filing party has been notified by the filing party that the non-filing party has a liability for a determinable amount under this Article VI  and is provided with calculations or other materials reasonably supporting such liability.

SECTION 6.05.  Tax Cooperation and Exchange of Information.  The Seller and the Purchaser shall provide each other with such cooperation and information as either of them reasonably may request of the other (and the Purchaser shall cause the Companies and the Retained Subsidiaries to provide such cooperation and information) in (a) filing any Tax Return, amended Tax Return or claim for refund, (b) determining a liability for Taxes or a right to a refund of Taxes, (c) participating in or conducting an audit or other proceeding in respect of Taxes, or (d) furnishing information to parties subsequently desiring to purchase any Company or any Retained Subsidiaries from the Purchaser.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with related work papers and documents relating to rulings or other determinations by taxing authorities.  The Seller and the Purchaser shall make themselves (and their respective employees) reasonably available on a mutually convenient basis to provide explanations of any documents or information provided under this Section 6.05.  Notwithstanding anything to the contrary in Section 5.02, each of the Seller and the Purchaser shall retain all Tax Returns, work papers and all material records or other documents in its possession (or in the possession of its Affiliates) relating to Tax matters of any Company or any Retained Subsidiary for any taxable period that includes the date of the Closing and for all prior taxable periods until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions and (ii) six years following the due date (without extension) for such Tax Returns.  After such time, before the Seller or the Purchaser shall dispose of any such documents in its possession (or in the possession of its Affiliates), the other party shall be given an opportunity, after 90 days prior written notice, to remove and retain all or any part of such documents as such other party may select (at such other party's expense).  Any information obtained under this Section 6.05 shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting an audit or other proceeding.

38



MER00020412

SECTION 6.06.  Conveyance Taxes.  The Seller shall be liable for and shall hold the Purchaser harmless against any Conveyance Taxes which become payable in connection with the transactions contemplated by this Agreement.  The Seller, after the review and consent by the Purchaser, shall file such applications and documents as shall permit any such Conveyance Taxes to be assessed and paid on or prior to the Closing in accordance with any available pre-sale filing procedure.  The Purchaser shall execute and deliver all instruments and certificates necessary to enable the Seller to comply with the foregoing.  The Purchaser shall complete and execute a resale or other exemption certificate with respect to the inventory items sold hereunder, and shall provide the Seller with an executed copy thereof.

SECTION 6.07.  Miscellaneous.  (a) The Seller and the Purchaser agree to treat all payments made by either of them to or for the benefit of the other under this Agreement as adjustments to the Purchase Price for all Tax purposes.  No party shall take any position to the contrary to the foregoing on any Tax Return or otherwise, except to the extent that the Laws of a particular jurisdiction require otherwise.

(b)  All payments payable under any tax sharing agreement or arrangement between the Seller and any Company or any Retained Subsidiary for any taxable period ending on or prior to the date of the Closing shall be calculated on a basis consistent with past practice and shall be paid in full prior to the Closing.  Any such tax sharing agreement or arrangement between the Seller and any Company or any Retained Subsidiary shall be terminated prior to the Closing.

(c)  Notwithstanding any provisions in this Agreement to the contrary, the obligations of the Seller to indemnify and hold harmless the Purchaser, the Companies and the Retained Subsidiaries pursuant to this Article VI shall terminate at the close of business on the 120th day following the expiration of the applicable statute of limitations with respect to the Tax liabilities in question (giving effect to any waiver, mitigation or extension thereof).

(d)  From and after the date of this Agreement, the Seller shall not, without the prior written consent of the Purchaser (which may, in its sole and absolute discretion, withhold such consent), make, or cause or permit to be made, any Tax election that would affect any of the Companies or any of the Retained Subsidiaries.

(e)  For purposes of this Article VI, "the Purchaser" and "the Seller," respectively, shall include each member of the affiliated group of corporations of which it is or becomes a member (other than the Companies and the Retained Subsidiaries, except to the extent expressly referenced).

(f)  Notwithstanding anything to the contrary in this Agreement, the rights and obligations of the parties with respect to indemnification for any and all Tax matters shall be governed solely by this Article VI.

39

MER00020412

# ARTICLE VII

## CONDITIONS TO CLOSING

SECTION 7.01.  <u>Conditions to Obligations of the Seller</u>.  The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or written waiver by Seller, at or prior to the Closing, of each of the following conditions:

(a)  <u>Representations, Warranties and Covenants</u>.  (i) The representations and warranties of the Purchaser contained in this Agreement shall have been true and correct when made and shall be true and correct in as of the Closing with the same force and effect as if made as of Closing, except to the extent such representations and warranties are as of another date, in which case, such representations and warranties shall be true and correct as of that date, except, in each case or in the aggregate, where the breach(es) of the representations and warranties would not have a material adverse effect on the ability of the Purchaser to perform its obligations hereunder and (ii) the covenants and agreements contained in this Agreement to be complied with by the Purchaser on or before the Closing shall have been complied with in all respects except, in each case or in the aggregate, where the breach(es) of such covenants and agreements would not have a material adverse effect on the ability of the Purchaser to perform its obligations hereunder;

(b)  <u>German Ministry of Transport; Supervisory Board Approval</u>.  The German Ministry of Transport Approval and the approval of the Parent's supervisory board of this Agreement and the Ancillary Agreements, and the transactions contemplated hereby and thereby shall have been received;

(c)  <u>No Proceeding or Litigation</u>.  No Action shall have been commenced by or before any Governmental Authority against either the Seller or the Purchaser, seeking to restrain or materially and adversely alter the transactions contemplated by this Agreement which is likely to render it impossible or unlawful to consummate such transactions; <u>provided</u>, <u>however</u>, that this Section 7.01(c) shall not apply if the Seller or Parent has directly or indirectly solicited or encouraged any such Action;

(d)  <u>Ratings</u>.  Since the date of this Agreement, there shall not have occurred a Purchaser Ratings Condition; and

(e)  <u>Legal Opinions</u>.  The Purchaser shall have delivered to the Seller legal opinions, in the form attached hereto as Exhibit 7.01(e), rendered by Shearman & Sterling LLP and Forrest N. Krutter.

SECTION 7.02.  <u>Conditions to Obligations of the Purchaser</u>.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or written waiver by the Purchaser, at or prior to the Closing, of each of the following conditions:

40

MER00020412

(a)     <u>Representations, Warranties and Covenants</u>.

(i)     The representations and warranties of the Seller contained in this Agreement (other than the Fundamental Representations) shall have been true and correct when made and shall be true and correct as of the Closing with the same force and effect as if made as of the Closing, except to the extent such representations and warranties are as of another date, in which case, such representations and warranties shall be true and correct as of that date except, in each case or in the aggregate, to the extent the breach(es) of such representations and warranties would not have a Material Adverse Effect;

(ii)    The representations and warranties of the Seller contained in Sections 3.01(other than the second sentence), and 3.10 of this Agreement (the "<u>Fundamental Representations</u>") shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing with the same force and effect as if made as of the Closing except to the extent such representations and warranties are as of another date, in which case, such representations and warranties shall be true and correct in all material respects as of that date; and

(iii)   the covenants and agreements contained in this Agreement to be complied with by the Seller on or before the Closing shall have been complied with in all respects except, in each case or in the aggregate, where the breach(es) of such covenants and agreements would not have a Material Adverse Effect.

(b)     <u>No Proceeding or Litigation</u>.  No Action shall have been commenced by or before any Governmental Authority against either the Seller, the Parent or the Purchaser, seeking to restrain or materially and adversely alter the transactions contemplated by this Agreement which is likely to render it impossible or unlawful to consummate such transactions or which could have a Material Adverse Effect; <u>provided, however</u>, that this Section 7.02(b) shall not apply if the Purchaser has directly or indirectly solicited or encouraged any such Action; and

(c)     <u>German Ministry of Transport; Supervisory Board Approval</u>.  The German Ministry of Transport Approval and the approval of the Parent's Supervisory Board of this Agreement and the Ancillary Agreements, and the transactions contemplated hereby and thereby shall have been received.

<div align="center">ARTICLE VIII</div>

<div align="center">INDEMNIFICATION</div>

SECTION 8.01.  <u>Survival of Representations and Warranties</u>.  (a)  The representations and warranties of the Seller contained in this Agreement shall survive the Closing until 18 months after the Closing; <u>provided, however</u>, that (i) the representations and warranties made pursuant to Sections 3.01, 3.02, 3.03, 3.04, 3.09(b), 3.10, 3.19 and, to the extent of indemnification pursuant to the proviso in Section 8.02(a), Sections 3.06 and 3.09(c) (the "<u>Indefinite Survival Representations</u>") shall survive indefinitely and (ii) the representations and warranties contained in Section 3.17 shall survive until 120 days after the expiration of the

<div align="center">41</div>

MER00020412

relevant statute of limitations for the Tax liabilities in question. Neither the period of survival nor the liability of the Seller with respect to the Seller's representations and warranties shall be reduced by any investigation made at any time by or on behalf of the Purchaser. If written notice of a claim has been given prior to the expiration of the applicable representations and warranties by the Purchaser to the Seller, then the relevant representations and warranties shall survive as to such claim, until such claim has been finally resolved; provided that such claim shall terminate as provided in Sections 8.02 and 8.03.

(b)     The representations and warranties of the Purchaser contained in this Agreement shall survive the Closing until 18 months after the Closing; provided, however, that the representations and warranties made pursuant to Section 4.01 and 4.05 shall survive indefinitely. Neither the period of survival nor the liability of the Purchaser with respect to the Purchaser's representations and warranties shall be reduced by any investigation made at any time by or on behalf of the Seller. If written notice of a claim has been given prior to the expiration of the applicable representations and warranties by the Seller to the Purchaser, then the relevant representations and warranties shall survive as to such claim, until such claim has been finally resolved.

SECTION 8.02.   Indemnification by the Seller. The Purchaser and its Affiliates, including the Companies and the Retained Subsidiaries, and their respective officers, directors, employees, agents, successors and assigns (each a "Purchaser Indemnified Party") shall be indemnified and held harmless by the Seller for and against any and all Liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including attorneys' and consultants' fees and expenses) actually suffered or incurred by them (including any Action brought or otherwise initiated by any of them) (hereinafter a "Loss") arising out of or resulting from:

(a)     the breach of any representation or warranty made by the Seller contained in this Agreement or any certificate delivered pursuant hereto; provided that, for purposes of this Section 8.02(a), Sections 3.04(a), 3.04(c) and 3.06 of the Disclosure Schedule, and the last entry on Section 3.09(c) of the Disclosure Schedule, shall be disregarded.

(b)     the breach of any covenant or agreement by the Seller contained in this Agreement;

(c)     all Liabilities of the Companies and the Retained Subsidiaries, whether arising before or after the Closing, which arise from or relate to the ownership or actions or inactions of the Seller or any of its Affiliates, any Company or any Retained Subsidiary or the conduct of their respective businesses prior to the Closing, except (i) to the extent of the $3.8 million accrual on the June 2007 Balance Sheet less amounts spent by the Companies and the Retained Subsidiaries between the Effective Date and the Closing in discharging said accruals, (ii) to the extent that such Liabilities represent the ordinary administrative and operating costs (but not Transaction Costs) of the Companies or the Retained Subsidiaries with respect to operating the business after June 30, 2007 and prior to the Closing not in excess of the amounts set forth in Exhibit 8.02 (c) and (iii) Liabilities for which Purchaser has agreed to indemnify Seller Indemnified Parties pursuant to Section 8.03(c), (d), (e) and (f).

42

MER00020412

Notwithstanding Section 8.01, any claim made pursuant to this Section 8.02 shall terminate upon the later of (i) one year after a written notice of such claim is delivered to the Seller (in the case of a claim that is not a Third Party Claim), or one year after resolution with the third party of a Third Party Claim, and (ii) the expiration of the applicable survival period contained in the first sentence of Section 8.01(a) (in the case of a claim under Section 8.02(a)), unless, prior to the expiration of such period, (x) such claim is agreed between Purchaser and Seller or (y) the Purchaser commences an arbitration with respect to such claim pursuant to Section 10.11; provided, further that with respect to claims for a breach of an Indefinite Survival Representation or a claim pursuant to Section 8.02(b) or (c), such claim shall terminate one year after a written notice of such claim is delivered to the Seller (in the case of a claim that is not a Third Party Claim), or one year after resolution with the third party of a Third Party Claim.

SECTION 8.03. Indemnification by the Purchaser. The Seller and its Affiliates, and their respective officers, directors, employees, agents, successors and assigns (each a "Seller Indemnified Party") shall be indemnified and held harmless by the Purchaser for and against any and all Losses arising out of or resulting from:

(a)    the breach of any representation or warranty made by the Purchaser contained in this Agreement or any certificate delivered pursuant hereto; or

(b)    the breach of any covenant or agreement by the Purchaser contained in this Agreement;

(c)    the Seller's or Seller's Affiliates' indemnification obligations for Retained Subsidiary Asbestos Claims as defined in, and pursuant to, Section 12 of the Master Sale and Purchase Agreement whether arising before or after the date hereof;

(d)    Claims against the Seller or its Affiliates seeking to recover, under any theory that such party is liable for the acts or financial obligations of any Company or Retained Subsidiary, Losses allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any of the Companies or Retained Subsidiaries or by any alleged predecessor entity of any Company or Retained Subsidiary or by any other entity (other than a Seller Indemnified Party) to whose Liabilities any Company has become subject either contractually or by operation of Law;

(e)    the Seller's or the Seller's Affiliates' indemnification obligations under Section 10.9 of the Master Sale and Purchase Agreement, except to the extent that the operations of the Seller Group contributed to the underlying Claim, in which case, the Purchaser's indemnification obligation shall be limited to the pro rata share of such Losses attributable to or allocated as a consequence of the operations of the Brenntag Group Companies; and

(f)    Claims against the Seller or the Seller's Affiliates seeking to recover, under any theory, that the Seller or the Seller's Affiliates are liable for Losses (i) as a result of any draw-down or use of the Environmental Letters of Credit or (ii) arising out of the actual or threatened or alleged release, discharge or escape, whether into soil, air or

43

MER00020412

water of any hazardous wastes or substances at (i) Former Sites (as defined in the Master Sale and Purchase Agreement), (ii) Third Party Sites (as defined in the Master Sale and Purchase Agreement), (iii) the Billings Montana Site (as defined in the Master Sale and Purchase Agreement), (iv) the LAT Site, (v) the Pacoima, CA Site and (vi) the Vernon, CA Site, except to the extent that the operations of the Seller Group contributed to the underlying Claim, in which case, the Purchaser's indemnification obligation shall be limited to the pro rata share of such Losses attributable to or allocated as a consequence of the operations of the Brenntag Group Companies.

Any claim made pursuant to this Section 8.03 shall terminate one year after a written notice of such claim is delivered to the Purchaser (in the case of a claim that is not a Third Party Claim), or one year after resolution with the third party of a Third Party Claim unless, prior to the expiration of such one year period, (x) such claim is agreed between Purchaser and Seller or (y) the Seller commences an arbitration with respect to such claim pursuant to Section 10.11.

SECTION 8.04. <u>Limits on Indemnification</u>. (a) Notwithstanding anything to the contrary contained in this Agreement (i) an Indemnifying Party shall not be liable for any claim for indemnification pursuant to Section 8.02(a) or 8.03(a), unless and until the aggregate amount of indemnifiable Losses which may be recovered from the Indemnifying Party exceeds $375,000 whereupon the Indemnifying Party shall be entitled to indemnification only for the aggregate amount of those Losses exceeding $375,000, (ii) an Indemnifying Party shall not be liable for any claim for indemnification pursuant to Section 8.02(b) or (c) unless and until the aggregate amount of indemnifiable Losses which may be recovered from the Indemnifying Party exceeds $300,000 whereupon the Indemnifying Party shall be entitled to indemnification only for the aggregate amount of those Losses exceeding $300,000, and (iii) no Losses may be claimed under Section 8.02(a) or Section 8.03(a) by any Indemnified Party or shall be reimbursable by or shall be included in calculating the aggregate Losses set forth in clause (i) above other than Losses in excess of $25,000 resulting from any single claim or aggregated claims arising out of the same facts, events or circumstances. The provisions of this Section 8.04 shall not apply with respect to (x) indemnification for Taxes, (y) indemnification as a result of the proviso in Section 8.02(a) or (z) indemnification for claims made pursuant to 8.03(b), 8.03(c), 8.03(d), 8.03(e) or 8.03 (f).

(b)      Notwithstanding anything to the contrary contained in this Agreement, the Purchaser shall not be liable for any claim for indemnification pursuant to Section 8.03(c), 8.03(d), 8.03(e) or 8.03 (f) to the extent that such claim was actually pending as of the date hereof and the Parent, the Seller, any of the Companies, or any of the Retained Subsidiaries had knowledge of such claim, but failed to disclose such claim in Section 3.20 of the Disclosure Schedule.

SECTION 8.05. <u>Notice of Loss; Third Party Claims</u>. (a) An Indemnified Party shall give the Indemnifying Party prompt notice of any matter that an Indemnified Party has determined has given or could give rise to a right of indemnification under this Agreement, stating the amount of the Loss, if known, and method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises; <u>provided, however</u>, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article VIII except to the extent that the Indemnifying Party is prejudiced by such failure; <u>provided, further</u> that the Indemnifying

44

MER00020412

Party shall have no obligation to indemnify the Indemnified Party for any expenses incurred with respect to such matter prior to the receipt by the Indemnifying Party of such notice.

(b)    If an Indemnified Party shall receive notice of any Action, audit, demand or assessment (each, a "Third Party Claim") against it or which could give rise to a claim for Loss under this Article VIII, within 30 days of the receipt of such notice, the Indemnified Party shall give the Indemnifying Party notice of such Third Party Claim; provided, however, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article VIII except to the extent that the Indemnifying Party is prejudiced by such failure; provided, further that the Indemnifying Party shall have no obligation to indemnify the Indemnified Party for any expenses incurred with respect to such matter prior to the receipt by the Indemnifying Party of such notice. Except as provided in this Section 8.05(b), no admission, offer, promise or payment shall be made or given by or on behalf of any Indemnified Party in respect of a Third Party Claim. The Indemnifying Party shall assume and control the defense of such Third Party Claim at its expense and through counsel of its choice, it being agreed that Seller shall assume and/or retain control over the defense of the Third Party Claims set forth in Part 1 of Section 3.12 of the Disclosure Schedule and from and after the Closing Purchaser shall assume control over the prosecution of the matters set forth in Parts 2 and 3 of Section 3.12 of the Disclosure Schedule. If the Indemnifying Party undertakes any such defense against a Third Party Claim, the Indemnifying Party shall not be obliged to reimburse the Indemnified Party in respect of its own legal and defense costs incurred after the Indemnifying Party assumes and controls the defense of such Third Party Claim and the Indemnified Party may participate in such defense at its own expense. In the event the Indemnifying Party fails to assume and control the defense of any such Third Party Claim within 10 days following such notice from the Indemnified Party, the Indemnified Party shall be entitled to assume and control the defense of such Third Party Claim at the expense of the Indemnifying Party.

(c)    The Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto and provide all other assistance in the Indemnified Party's power as is reasonably required by the Indemnifying Party. Similarly, in the event the Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Indemnified Party. The Indemnifying Party shall have the right to settle any Third Party Claim for which it obtains a full release of the Indemnified Party in respect of such Third Party Claim or to which settlement the Indemnified Party consents in writing, such consent not to be unreasonably withheld. If the Indemnified Party assumes the defense of any such claims or proceeding pursuant to this Section 8.05 and proposes to settle such claims or proceeding prior to a final judgment thereon or to forgo any appeal with respect thereto, then the Indemnified Party shall give the Indemnifying Party prompt written notice thereof and the Indemnifying Party shall have the right to participate in the settlement or assume or reassume the defense of such claims or proceeding. In the event the Indemnifying Party fails to assume and control the defense of

45

MER00020412

any such Third Party Claim within 10 days following such notice of the Indemnified Party's intention to settle such Third Party Claim, the Indemnified Party shall be entitled to settle such claim at the expense of the Indemnifying Party.

      (d)    Notwithstanding anything in this Agreement to the contrary, an Indemnifying Party shall not be liable to indemnify an Indemnified Party for (i) any Loss finally determined by a court in a final non-appealable judgment to have been proximately caused by any criminal act or omission on the part of the Indemnified Party or (ii) any Loss on account of bodily injury or property damage finally determined by a court in a final non-appealable judgment to have been caused by intentional and material misstatements of fact by the Indemnified Party. Notwithstanding the requirement in the foregoing sentence of a final judgment, the Indemnifying Party shall have the right to settle any claim alleging such criminal act or omission or intentional and material misstatements of fact by the Indemnified Party (provided that such settlement must consist of nothing more than a fixed monetary penalty paid by the Indemnifying Party or obligations assumed by the Indemnifying Party) and seek reimbursement through an arbitration to determine whether, if the claim had not been settled, the claimant would have been found in a final non-appealable judgment, to be entitled to judgment against the Indemnified Party by reason of a Loss proximately caused by a criminal act or omission or any award of damages on account of bodily injury or property damage caused by any intentional and material misstatements of fact by the Indemnified Party.

      SECTION 8.06. Remedies. The Purchaser and the Seller acknowledge and agree that following the Closing, the indemnification provisions of Section 8.02 and Section 8.03 and Article VI shall be the sole and exclusive remedies of the Purchaser and the Seller for any breach by the other party of the representations and warranties in this Agreement and for any failure by the other party to perform and comply with any covenants and agreements in this Agreement, except that if any of the provisions of this Agreement are not performed in accordance with their terms or are otherwise breached, the parties shall be entitled to specific performance of the terms thereof in addition to any other remedy at law or equity. Each party hereto shall take all reasonable steps to mitigate its Losses upon and after becoming aware of any event which could reasonably be expected to give rise to any Losses.

      SECTION 8.07. Right of Set-off. Seller agrees and acknowledges that the Purchaser shall be entitled to offset any amount owed by the Purchaser to the Seller or any Seller Indemnified Party pursuant to this Agreement against any amount owed pursuant to a valid claim by the Seller or any Seller Indemnified Party to the Purchaser or a Purchaser Indemnified Party pursuant to this Agreement. Purchaser agrees and acknowledges that the Seller shall be entitled to offset any amount owed by the Seller to the Purchaser, or any Purchaser Indemnified Party pursuant to this Agreement against any amount owed pursuant to a valid claim by the Purchaser or any Purchaser Indemnified Party to the Seller or a Seller Indemnified Party pursuant to this Agreement.

      SECTION 8.08. Insurance. Purchaser shall cause the Companies and/or the Retained Subsidiaries to make available to Seller the policies of insurance held by the Companies and/or the Retained Subsidiaries for the payment of all matters required to be indemnified by Seller hereunder, and shall (i) cooperate with the pursuit of claims in respect of such insurance directly against the insurers thereunder and (ii) take all other action reasonably requested by Seller

46

MER00020412

in connection with pursuing such claims; provided, however, that such cooperation and action shall be at Seller's cost; provided, further, that Purchaser shall not be obligated to so assist Seller and such insurance policies shall not be made available to Seller to the extent it would be reasonably likely to result in an adverse effect on Purchaser or on the aggregate coverage available under such policies for Asbestos Claims and Environmental Claims.

<div align="center">ARTICLE IX</div>

<div align="center">TERMINATION</div>

SECTION 9.01.  Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)     by the Purchaser if, between the date hereof and the Closing:  (i) any of the conditions to the obligations of the Purchaser to consummate the transactions contemplated by this Agreement as set forth in Section 7.02(a) of this Agreement have not been satisfied or waived by the Purchaser at Closing or the timely satisfaction of any condition to such obligations has become impossible (other than as a result of any failure on the part of the Purchaser to comply with or perform any covenant or obligation of the Purchaser set forth in this Agreement), or (ii) the Seller, any Company or any Retained Subsidiary makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against the Seller, any Company or any Retained Subsidiary seeking to adjudicate any of them as bankrupt or insolvent, or seeking any of their liquidation, winding up or reorganization, or seeking any arrangement, adjustment, protection, relief or composition of any of their debts under any Law relating to bankruptcy, insolvency or reorganization;

(b)     by the Seller if, between the date hereof and the Closing:  (i) any of the conditions to the obligations of the Seller to consummate the transactions contemplated by this Agreement as set forth in Section 7.01(a) of this Agreement have not been satisfied or waived by the Seller at Closing or the timely satisfaction of any condition to such obligations has become impossible (other than as a result of any failure on the part of the Seller to comply with or perform any covenant or obligation of the Purchaser set forth in this Agreement), or (ii) the Purchaser makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against the Purchaser seeking to adjudicate any of them as bankrupt or insolvent, or seeking any of their liquidation, winding up or reorganization, or seeking any arrangement, adjustment, protection, relief or composition of any of their debts under any Law relating to bankruptcy, insolvency or reorganization;

(c)     by either the Seller or the Purchaser if the Closing shall not have occurred by March 31, 2008; provided, however, that the right to terminate this Agreement under this Section 9.01(c) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date;

<div align="center">47</div>

MER00020412

(d)     by either the Purchaser or the Seller in the event that any Governmental Authority shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable;

(e)     by the Purchaser if the condition to the obligations of the Purchaser to consummate the transactions contemplated by this Agreement set forth in Section 7.02(c) of this Agreement has not been satisfied by March 31, 2008 or waived by the Purchaser provided, however, the right to terminate this Agreement under this Section 9.01(e) shall not be available to the Purchaser to the extent its failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure to obtain the approvals set out in Section 7.02(c) by such date; or

(f)     by the mutual written consent of the Seller and the Purchaser.

SECTION 9.02.  Effect of Termination.  (a)  In the event of termination of this Agreement as provided in Section 9.01, this Agreement shall forthwith become void and there shall be no liability on the part of either party hereto except (i) as set forth in Section 10.01 and 9.02(b) and (ii) that nothing herein shall relieve either party from liability for any breach of this Agreement.

(b)     If the Purchaser terminates this Agreement pursuant to Section 9.01(e), then the Seller shall pay to the Purchaser upon termination of this Agreement a fee of $500,000, which amount shall be payable in immediately available funds.  Notwithstanding anything in this Agreement to the contrary, (i) the right of the Purchaser to receive payment of such fee in accordance herewith shall be the sole and exclusive remedy of the Purchaser against the Seller and any of its Affiliates for any loss or damage suffered or that may be suffered as a result of the failure of the condition in Section 7.02(c) (it being understood that while the Purchaser's actual damages might be greater or less than such amount, such damages would be difficult to ascertain or prove and that such amount is a reasonable estimate of the anticipated probable harm to the Purchaser in such event) and (ii) upon payment of such fee, none of the Seller nor any of its Affiliates shall have any further liability or obligation based upon, relating to or arising out of this Agreement or the negotiation, execution or performance of this Agreement (including any tort claim), except in the case of fraud or intentional breach.

ARTICLE X

GENERAL PROVISIONS

SECTION 10.01.  Expenses.  Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement ("Transaction Costs") shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.  The Seller agrees to pay the fees (without premium) and expenses of outside counsel to Purchaser rendering the legal opinions set

48

MER00020412

forth in Section 7.01(e). The Seller will cause the Companies and the Retained Subsidiaries not to incur any out-of-pocket expenses in connection with this Agreement.

SECTION 10.02. Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

(a)     if to the Seller:

Stinnes Corporation
120 White Plains Road, 6th floor
Tarrytown, NY 10591
Facsimile: (914) 366-3228
Attention: Dr. Henning Maier

with copies to:

Deutsche Bahn AG
Potsdamer Platz 2
10785 Berlin
Germany
Facsimile: 011-4930-297-61952
Attention: Dr. Christoph Bohl

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036
Facsimile: (917) 777-2760
Attention: Stephen M Banker, Esq.

and

Hengeler Mueller
Leopoldstrasse 8-10
D-80802 Munich
Germany
Facsimile: 011-49-89-383388333
Attention: Dr. Hans-Joerg Ziegenhain

49

MER00020412

    (b)    if to the Purchaser:

          Berkshire Hathaway Group
          100 First Stamford Place
          Stamford, CT 06902
          Facsimile: (203)-363-5221
          Attention: General Counsel

          with copies to (which shall not constitute notice):

          National Indemnity Company
          3024 Harney Street
          Omaha, NE 68131
          Attention: President

          and

          Shearman & Sterling LLP
          599 Lexington Avenue
          New York, NY 10022-6069
          Facsimile: (212) 848-7179
          Attention: Christa A. D'Alimonte, Esq.

      SECTION 10.03.  Public Announcements.  None of the parties hereto shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party unless otherwise required by Law or applicable stock exchange regulation, and the parties hereto shall cooperate as to the timing and contents of any such press release, public announcement or communication.

      SECTION 10.04.  Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

      SECTION 10.05.  Entire Agreement.  This Agreement, the Confidentiality Agreement, and the Ancillary Agreements constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, between the Seller, the Parent and the Purchaser with respect to the subject matter hereof and thereof.

<div align="center">50</div>

MER00020412

SECTION 10.06.  <u>Assignment</u>.  This Agreement may not be assigned by operation of law or otherwise without the express written consent of the Seller and the Purchaser (which consent may be granted or withheld in the sole discretion of the such parties) and any such assignment or attempted assignment without such consent shall be void; <u>provided</u>, <u>however</u>, that the Purchaser may assign this Agreement or any of its rights and obligations hereunder to one or more Affiliates of the Purchaser without the consent of the Seller; <u>provided</u>, <u>further</u> that Purchaser shall remain liable for the performance of all of its obligations hereunder.

SECTION 10.07.  <u>Amendment</u>.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the parties hereto or (b) by a waiver in accordance with Section 10.08.

SECTION 10.08.  <u>Waiver</u>.  Any party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto, or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of either party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.  All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

SECTION 10.09.  <u>No Third Party Beneficiaries</u>.  Except for the provisions of Article VIII relating to indemnified parties, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any union or any employee or former employee of the Seller, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 10.10.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that State, without regard to the conflict of laws principles of such State that would mandate the application of the laws of another jurisdiction.

SECTION 10.11.  <u>Dispute Resolution</u>.  (a) Any dispute, controversy or claim arising out of or in connection with this Agreement or the breach, termination or validity hereof ("<u>Dispute</u>") shall be finally settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "<u>Rules</u>") then in effect, except as modified herein.

(b)    The arbitration shall be held, and the award shall be rendered, in London, England, in the English language.

(c)    There shall be three arbitrators of whom the Purchaser on the one hand and the Seller on the other hand each shall nominate one in accordance with the Rules.  The two

51

MER00020412

party-nominated arbitrators shall nominate the third arbitrator within 30 calendar days of the nomination of the second arbitrator. If any arbitrator has not been nominated within the time limits specified herein and in the Rules, such appointment shall be made by the International Court of Arbitration of the International Chamber of Commerce upon the written request of any party, within 30 calendar days of such request.

(d)     In addition to monetary damages, the arbitral tribunal shall be empowered to award declaratory relief, including, but not limited to specific performance of any obligation under this Agreement. The arbitral tribunal shall apply the law chosen by the parties to the substance of the Dispute and shall not under any circumstances assume the powers of an amiable compositeur or decide the Dispute ex aequo et bono. The arbitral tribunal is not empowered to award damages in excess of compensatory damages, and each party hereby irrevocably waives any right to recover punitive, exemplary or similar damages with respect to any Dispute. The parties hereby expressly agree that Section 45 and Section 69 of the Arbitration Act 1996 shall be excluded.

(e)     By agreeing to arbitration, the parties do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of arbitration proceedings or the enforcement of any award. Without prejudice to such provisional remedies that may be granted by a national court, the arbitral tribunal shall have full authority to grant provisional remedies, to order a party to seek modification or vacation of an injunction issued by a national court, and to award damages for the failure of any party to respect the arbitral tribunal's orders to that effect.

(f)     The award shall be final and binding upon the parties as from the date rendered, and shall be the sole and exclusive remedy between the parties regarding any claims, counterclaims, issues, or accounting presented to the arbitral tribunal. Judgment upon any award may be entered in any court having jurisdiction thereof.

(g)     In order to facilitate the comprehensive resolution of related Disputes, all claims between any of the parties to this Agreement that arise under or in connection with this Agreement may be brought in a single arbitration. Upon the request of any party, the arbitral tribunal for such proceeding shall consolidate any arbitration proceeding constituted under this Agreement with any other arbitration proceeding constituted under this Agreement, if the arbitral tribunal determines that (i) there are issues of fact or law common to the proceedings so that a consolidated proceeding would be more efficient than separate proceedings and (ii) neither party to this Agreement would be unduly prejudiced as a result of such consolidation through undue delay or otherwise. In the event of different rulings on this question by the arbitral tribunal constituted hereunder and another arbitral tribunal constituted under this Agreement, the ruling of the arbitral tribunal constituted first in time shall control, and such arbitral tribunal shall serve as the tribunal for any consolidated arbitration.

SECTION 10.12. <u>Currency</u>. Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

MER00020412

SECTION 10.13.  <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile transmission) in counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

53

MER00020412

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this
Agreement to be executed as of the date first written above by their respective officers thereunto
duly authorized.

STINNES CORPORATION

By:_____

Name:  Dr. Henning Maier
Title:  President and Chief Executive Officer

NATIONAL INDEMNITY COMPANY

By:_____

Name:  Forrest N. Krutter
Title:  Senior Vice President

MER00020412

(Page 2)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Case Management Order

---

| | |
|---|---|
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC.,<br><br>      Plaintiffs,<br><br>v.<br><br>BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000,<br><br>      Defendants. | **Order Filed on October 12, 2023 by Clerk U.S. Bankruptcy Court District of New Jersey**<br><br><br><br><br><br>Adv. Proc. No. 23-01245 (MBK) |

<u>**CASE MANAGEMENT ORDER**</u>

The relief set forth on the following pages, numbered three (3) through six (6), is

**ORDERED**.

**DATED: October 12, 2023**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com<br><br>-and-<br><br>**COLE SCHOTZ P.C.**<br>Seth Van Aalten, Esq. (admitted *pro hac vice*)<br>Anthony De Leo, Esq.<br>1325 Avenue of the Americas, 19th Floor<br>New York, NY 10019<br>Telephone: (212) 752-8000<br>Facsimile: (212) 752-8393<br>svanaalten@coleschotz.com<br>adeleo@coleschotz.com<br><br>-and-<br><br>**COLE SCHOTZ P.C.**<br>G. David Dean, Esq. (admitted *pro hac vice*)<br>Andrew J. Roth-Moore, Esq. (admitted *pro hac vice*)<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801<br>Telephone: (302) 652-3131<br>Facsimile: (302) 652-3117<br>ddean@coleschotz.com<br>aroth-moore@coleschotz.com<br><br>*Counsel for Debtors and*<br>*Debtors-in-Possession* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>                           Debtors.[1] | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Case Management Order

---

This matter coming before the Court on the *Motion of the Official Committee of Talc Claimants for Entry of Case Management Order* [Adv. Dkt. 24] (the "**Motion**"); and the Court having considered the Motion, the Debtors' objection to the relief requested in the Motion [Adv. Dkt. 35] (the "**Objection**"),[2] and the TCC's reply in further support of the Motion and in response to the Objection [Adv. Dkt. 37]; and the Court having found and determined that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C. § 157(b), (iii) venue is proper in this district pursuant to 28 U.S.C. § 1409, and (iv) implementation of the case management procedures set forth herein with respect to this Adversary Proceeding is (a) fair and reasonable, (b) consistent with the Bankruptcy Code, the Bankruptcy Rules, the applicable Federal Rules, and the Local Rules, (c) appropriate under the circumstances, and (d) in the best interests of the Debtors and their estates and creditors; and upon the record of the hearings to consider the relief requested in the Motion conducted on October 3, 2023 and October 6, 2023,

**IT IS HEREBY ORDERED THAT:**

1.      The parties to this Adversary Proceeding (each, a "**Party**" collectively, the "**Parties**") consent to the TCC intervening in this Adversary Proceeding as a Defendant pursuant to Federal Rule 24 and Bankruptcy Rule 7024.

2.      The hearing on the Summary Judgment Motion with respect to Counts I and IV of the Complaint will go forward on **December 5, 2023 at 11:00 a.m. (ET)**.  The deadline for any Party to file a statement or other pleading in support of the Summary Judgment Motion with respect

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the Objection, as applicable.

(Page 4)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Case Management Order

---

to Counts I and IV shall be **November 8, 2023**. The deadline for any Party to file a responsive pleading to the Summary Judgment Motion with respect to Counts I and IV shall be **November 22, 2023**. The deadline for any Party to submit a reply in further support of the Summary Judgment Motion with respect to Counts I and IV shall be **November 29, 2023**.

      3.     The hearing on the Summary Judgment Motion with respect to Count II of the Complaint, as well as the hearing on the Preliminary Injunction Motion (the "**Hearing**"), shall be continued and shall be subject to the process set forth in Paragraphs 4 through 6 of this Order, as applicable.

      4.     All discovery in this Adversary Proceeding shall be stayed pending the Court's adjudication of the Summary Judgment Motion with respect to Counts I and IV of the Complaint; *provided*, *however*, that: (i) the Debtors shall promptly produce to the TCC copies of the approximately 1,500 complaints referenced in Paragraph 38 of the Complaint; (ii) counsel for the Debtors and counsel for the TCC shall promptly meet and confer to identify any relevant, execution-version closing documents related to the 2004 Transactions or the 2007 NICO Equity Sale that are missing from the Debtors' prior productions, which the Debtors shall promptly produce to the extent such documents are within the Debtors' possession, custody, or control following a reasonable search; and (iii) the Debtors shall make Mohsin Y. Meghji available for a deposition to testify solely with respect to the issues raised in Counts I and IV of the Complaint on or before **November 3, 2023**. The Debtors and the TCC shall meet and confer regarding the scope of such deposition on or before the date that is three (3) business days prior to same and shall promptly raise any issues with the Court.

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Case Management Order

5.      Notwithstanding any other provision of this Order, this Order (i) does not constitute a ruling on whether any discovery provided or to be provided to the Committee is sufficient for the Court to gran the Summary Judgment Motion and (ii) reserves all rights of the Committee to demonstrate that the Summary Judgment Motion should be denied on any grounds, including without limitation that the Debtors have not provided sufficient discovery or that the Court does not have sufficient record before it.  For the avoidance of doubt, nothing in this Order shall act as a stay of discovery in the main bankruptcy case.

6.      Subsequent to oral argument, the Court shall reserve on its decision with respect to the Summary Judgment Motion until January 31, 2024.  Prior to this date, the Parties are to engage in good faith settlement discussions through mediation.  Within thirty (30) days of the entry of this Order, the Parties are to meet and confer with respect to a consensual selection of a mediator and a proposed mediation order which identifies the mediation parties[1], the scope of the mediation, and such other terms as warranted.  To the extent the Parties cannot reach agreement on the selection of a mediator, the Court will designate and appoint a mediator of its choosing.

7.      The Court may extend the above-referenced mediation period and its hold on issuance of a ruling on the Summary Judgment Motion based on the recommendation of the mediator and/or the consent of the parties.

8.      In the event the mediator advises the Court that the mediation has been suspended or terminated, the Court will conduct a case management conference to discuss the entry of a new Case Management Order.

---

[1] At a minimum, the parties to the proposed mediation should include the Debtors, the Official Committee of Talc Claimants, the Future Claims Representative, and the Brenntag entities.

**JA593**

(Page 6)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Case Management Order

9.      In the event the Court grants the Summary Judgment Motion with respect to either Count I or IV, the Preliminary Injunction Motion shall be withdrawn and the Summary Judgment Motion shall be withdrawn as to Count II.

10.      Nothing in this Order shall prejudice the Debtors' right to seek an emergency temporary restraining order at any time.

11.      The Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

12.      The terms and conditions of this Order shall be effective immediately upon its entry.

13.      The Court shall have exclusive jurisdiction over this Order and any and all matters arising from or relating to the implementation, interpretation, or enforcement of this Order.

Form order − ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  Whittaker, Clark & Daniels, Inc.
Debtor

Case No.: 23−13575−MBK
Chapter 11

Whittaker, Clark & Daniels, Inc.
Plaintiff

v.

Brenntag AG
Defendant

Adv. Proc. No. 23−01245−MBK                    Judge: Michael B. Kaplan

## NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

       Please be advised that on October 12, 2023, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 52
CASE MANAGEMENT ORDER. Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. Signed on 10/12/2023. (wiq)

       Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: October 12, 2023
JAN: wiq

Jeanne Naughton
Clerk

**JA595**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
Andrew J. Roth-Moore, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
aroth-moore@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

       Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND PIGMENT
SOLUTIONS, INC., THOSE PARTIES LISTED ON
APPENDIX A TO THE COMPLAINT, and JOHN
AND JANE DOES 1-1,000,

       Defendants.

Adv. Proc. No. 23-01245 (MBK)

## DEBTORS' MOTION FOR ENTRY OF AN ORDER:
## (I) TEMPORARILY ENJOINING CERTAIN ACTIONS AGAINST
## NON-DEBTORS; AND (II) APPROVING PROCEDURES FOR
## SEEKING EXTENSIONS OF TEMPORARY RESTRAINING ORDER

TO THE HONORABLE MICHAEL B. KAPLAN,
CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT:

       Whittaker, Clark & Daniels, Inc. ("**WCD**") and its debtor affiliates (together with WCD,

the "**Debtors**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases

(collectively, the "**Chapter 11 Cases**") and plaintiffs in the above-captioned adversary proceeding

(this "**Adversary Proceeding**"),[2] by and through their undersigned counsel, hereby submit this

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in: (i) the complaint initiating this Adversary Proceeding [Adv. Proc. Docket No. 1] (the "**Complaint**"); (ii) the Debtors' motion for a preliminary injunction [Adv. Proc. Docket No. 2] (the "**Preliminary Injunction Motion**"); and (iii) the Debtors' motion for summary judgment [Adv. Proc. Docket No. 3] (the "**Summary Judgment Motion**"), as applicable.

motion (the "**Motion**") for entry of an Order, substantially in the form attached hereto as **Exhibit A**

(the "**Temporary Restraining Order**"): (i) temporarily enjoining certain actions against certain

non-Debtors that are approaching trial or dispositive hearing; and (ii) approving procedures for

periodic extensions of the Temporary Restraining Order and the addition of other actions.  In

support of this Motion, the Debtors submit the *Declaration of Mohsin Y. Meghji, Chief*

*Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Debtors' Motion for Entry*

*of an Order: (I) Temporarily Enjoining Certain Actions Against Non-Debtors; and (II) Approving*

*Procedures for Seeking Extensions of Temporary Restraining Order* attached hereto as **Exhibit B**

(the "**Declaration**") and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors commenced this Adversary Proceeding to resolve two narrow and

predominantly legal issues: whether the Successor Liability Claims are property of the Debtors'

estates and whether such claims are subject to the automatic stay.  The goal in these Chapter 11

Cases – the negotiation of a fair, efficient, and comprehensive resolution of all valid liabilities –

cannot be achieved unless and until these threshold issues are timely adjudicated. The Debtors can

only prosecute or compromise claims that belong to their estates and expect the key parties,

including the TCC and the Protected Parties, to engage meaningfully in global settlement

discussions following these threshold determinations.

2.      The Court recently entered a CMO[3] that provides for an expedient summary

judgment hearing on these threshold issues and a mediation process designed to promote global

settlement discussions.  The underlying claims at issue seek to establish liability against non-

debtors for Tort Claims against the Debtors, including on the grounds that such non-debtors are

---

[3] *See Case Management Order* [Adv. Proc. Docket No. 52] (the "**CMO**").

3

successors to, or alter egos of, the Debtors, and therefore require an initial determination of the Debtors' asbestos and environmental liabilities. The continued prosecution of Successor Liability Claims in the tort system therefore risks irreparable harm to the Debtors' estates under doctrines of *res judicata* and collateral estoppel, as well as by potentially triggering indemnification obligations owed to Brenntag in connection with the 2004 Transactions and requiring the Debtors to expend estate resources participating in those proceedings.

3.      To preserve the status quo pending the results of the mediation process and, if necessary, the Court's adjudication of this Adversary Proceeding, the Debtors request that this Court issue the Temporary Restraining Order, temporarily enjoining the prosecution and settlement of Successor Liability Claims against Brenntag in the limited actions listed on <u>Exhibit 1</u> to the proposed Temporary Restraining Order filed contemporaneously herewith (the "**Schedule**").

4.      Importantly, the Debtors do not seek a broad injunction of all pending Successor Liability Claims against Brenntag at this time. Nor do the Debtors seek to enjoin claimants from filing new Successor Liability Claims against Brenntag or discovery in any pending actions. Rather, as set forth in the Schedule, the Debtors are seeking to temporarily enjoin a narrow, targeted list of actions for which a trial on the merits has been scheduled within 28 days from the date of the hearing to consider this Motion (the "**TRO Hearing**"). The first of these trials is scheduled for November 27, 2023. The Debtors further propose to establish a process to deal with requests to extend the Temporary Restraining Order for an additional 28 days and supplement the Schedule with additional actions with similarly imminent trials or hearings to adjudicate a Tort Claimant's motion for summary judgment (which, if granted, could bind the Debtors or otherwise fix liabilities against them) in accordance with the proposed procedures set forth herein.

4

**JA599**

5.      For these reasons and those described below, the Debtors respectfully request entry of the Temporary Restraining Order.

## FACTUAL BACKGROUND

6.      The Debtors commenced this Adversary Proceeding on September 7, 2023, seeking: (i) a declaration that Successor Liability Claims are property of the Debtors' estates, which the Debtors have sole standing to pursue and compromise while the Chapter 11 Cases are pending; (ii) a declaration that Successor Liability Claims, as property of the Debtors' estates, are automatically stayed; (iii) a declaration that the stay extends to Successor Liability Claims against the Protected Parties to the extent not automatically stayed; and (iv) a preliminary injunction enjoining the commencement, continuation, and settlement of Successor Liability Claims while these Chapter 11 Cases are pending.  The Debtors filed the Preliminary Injunction Motion and Summary Judgment Motion contemporaneously with the Complaint.

7.      On October 12, 2023, the Court entered the CMO in this Adversary Proceeding. Per the CMO, the hearing to consider the Summary Judgment Motion solely with respects to Counts I and IV of the Complaint (seeking a declaration that Successor Liability Claims are property of the Debtors' estates subject to the automatic stay) is scheduled for December 5, 2023 at 11:00 a.m. (ET).  CMO, ¶ 2.  The CMO further provides that the Court will reserve judgment on the Summary Judgment Motion with respect to Counts I and IV until January 31, 2024 to afford the parties time to engage in good faith settlement negotiations through mediation, which reservation and mediation period may be extended by the Court.  CMO, ¶¶ 6, 7.  In the event mediation is suspended or terminated, the Court will hold a status conference to discuss entry of a new Case Management Order to govern the next stage of this Adversary Proceeding.  CMO, ¶ 8.

**JA600**

8.      The CMO expressly preserves the Debtors' right to "seek an emergency temporary restraining order at any time."  CMO, ¶ 10.

9.       In light of the timeline set forth in the CMO, which does not contemplate adjudication of the Summary Judgment Motion until January 31, 2024 at the *earliest*, and which requires the parties to engage in good faith mediation while the Court reserves its decision on the merits of Counts I and IV of the Complaint, the Debtors seek a Temporary Restraining Order to enjoin the Successor Liability Claims in the actions listed on the Schedule for 28 days, subject to further extension in accordance with the proposed procedures set forth herein.

10.      Additional factual background regarding, among other things, the Debtors' corporate history (including relevant corporate transactions), as well as the Tort Claims against the Debtors and Successor Liability Claims against Brenntag, are set forth in the Complaint, Preliminary Injunction Motion, and Summary Judgment Motion.  This factual background is incorporated into this Motion as if fully set forth herein.

## ARGUMENT

### I.      The Court has Subject Matter Jurisdiction

11.      "Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." *In re LTL Mgmt., LLC*, 640 B.R. 322, 332 (Bankr. D.N.J. 2022) (citations omitted). "The first three categories are considered 'core' proceedings, whereas the fourth category, 'related to' proceedings, are considered 'non-core' proceedings." *Id.* (citations omitted).  "A bankruptcy court has the power to hear, decide and enter final orders and judgments in the first three categories of proceedings." *Id.* (citations omitted).

12.     "Arising under" jurisdiction "describe[s] those proceedings that involve a cause of action created or determined by a statutory provision of title 11." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987). "Arising in" jurisdiction is "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Id.* at 97; *Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003).

13.     This Court has "arising under" jurisdiction to determine that section 362(a) of the Bankruptcy Code prohibits the commencement, continuation, or settlement of Successor Liability Claims, and that Successor Liability Claims are property of the Debtors' estates under section 541(a) of the Bankruptcy Code that the Debtors have sole standing to pursue or compromise while these Chapter 11 Cases are pending.  *See e.g.*, *In re LTL Mgmt., LLC*, 638 B.R. 291, 302-03 (Bankr. D.N.J. 2022) (adversary proceeding seeking extension of automatic stay and injunction was core proceeding because it invokes section 362 of the Bankruptcy Code); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999-1000 (4th Cir. 1986); *In re Brier Creek Corp. Ctr. Assocs. Ltd.*, 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013).

14.     The Debtors' request for injunctive relief "arises in" the Chapter 11 Cases because it "would have no existence outside of the bankruptcy." *See Bergstrom v. Dalkon Shield Claimants (In re A.H. Robins Co.)*, 86 F.3d 364, 372 (4th Cir. 1996); *LTL Mgmt.*, 638 B.R. at 302 ("A proceeding 'arise[s] in' a case when it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").  Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to "enjoin parties other than the bankrupt from commencing or continuing litigation" during the bankruptcy case where such litigation will undermine the debtor's reorganization. *Robins*, 788 F.2d at 1002 (internal quotations omitted); *see also LTL Mgmt.*, 638 B.R. at 319 (noting that section 105 of the Bankruptcy Code authorizes the Court to issue an injunction).

15.     An injunction to protect the very integrity of the bankruptcy case obviously would not exist but for the bankruptcy case itself.  As such, "the [D]ebtors would not be entitled to a § 105 injunction but for the existence of their bankruptcy cases." *Brier Creek*, 486 B.R. at 685. "[C]ommon sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay, then it has jurisdiction over a related motion for preliminary injunctive relief." *In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at \*5 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012).

16.     This is a core proceeding over which this Court can exercise jurisdiction. *See LTL Mgmt.*, 638 B.R. at 302–03.  Even were this not the case, this Court has subject matter jurisdiction over the request for an injunction under section 105 because but-for the bankruptcy case, the Debtors would have no basis to pursue a section 105 injunction.

17.     Alternatively, even if it were determined that the instant proceeding is not "core," the Court nonetheless has "related to" jurisdiction over the Successor Liability Claims at issue in this proceeding such that it may issue the requested Temporary Restraining Order.  "[A] proceeding is 'related to' a bankruptcy case if 'the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'" *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006), *as amended* (Mar. 17, 2006) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).  In other words, "an action is 'related to' bankruptcy 'if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *In re Broad Street Media LLC*, Adv. Pro. No. 17-1450 (JNP), 2017 WL 5624879, at \*4 (Bankr. D. N.J. Nov. 20, 2017) (quoting *Pacor*, 743 F.2d at 994) (emphasis omitted).

8

**JA603**

18. Here, the continued prosecution and settlement of Successor Liability Claims outside the Chapter 11 Cases would negatively affect the Debtors' estates in a number of ways. First, Successor Liability Claims are premised on the Debtors' operations prior to the sale of substantially all of their operating assets in 2004 such that any determination regarding Successor Liability Claims will require a court to make an initial determination of the Debtors' asbestos and environmental liabilities. Second, Brenntag may have indemnification rights against the Debtors under common law or contract for some or all of the Successor Liability Claims at issue, meaning that resolution of Successor Liability Claims may give rise to Indemnification Claims in the Chapter 11 Cases. Accordingly, the Court plainly has subject matter jurisdiction over the claims in this Adversary Proceeding such that it has the power to issue the Temporary Restraining Order.

## II.    **The Requirements for a Temporary Restrainer Order are Satisfied**

19. The Debtors seek a Temporary Restraining Order to stay the continued prosecution and settlement of the Successor Liability Claims listed on the Schedule pending the results of the mediation process and, if necessary, the Court's adjudication of the declaratory and injunctive relief sought by this Adversary Proceeding.

20. Rule 65 of the Federal Rules of Civil Procedure (the "**Federal Rules**"), made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7065, authorizes a court to issue a temporary restraining order to prevent irreparable harm to a movant.

21. A temporary restraining order preserves "the status quo" between the parties while the merits of the case are explored through litigation. *J.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 273 (3d Cir. 2002) (citations omitted). In other recent cases, this Court has entered temporary restraining orders against outside litigation for 28 days—the same duration sought here—to preserve the status quo prior to preliminary injunction hearings. *See, e.g., BlockFi Inc. v. Greene*,

Adv. Pro. No. 23-1071 (MBK) (Bankr. D.N.J.), Docket No. 10 (entering a temporary restraining

order lasting 28 days); *see also LTL Mgmt. LLC v. Does*, Adv. Pro. No. 23-1092 (MBK) (Bankr.

D.N.J.), Docket Nos. 10, 16, 20 (entering a series of ex parte temporary restraining orders each

lasting 28 days).

22.     The standard for granting a temporary restraining order is the same as that for

issuing a preliminary injunction. *See Pileggi v. Aichele*, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012)

(citing *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994)); *Kale v. Mayorkas*, No. CV 21-

08095 (FLW), 2021 WL 2652124, at *3 (D.N.J. June 28, 2021).  The Court should review four

factors to determine whether an injunction is appropriate: (i) whether the movant has shown a

reasonable probability of success on the merits; (ii) whether the movant will be irreparably injured

by denial of the relief; (iii) whether granting preliminary relief will result in even greater harm to

the nonmoving party; and (iv) whether granting the preliminary relief will be in the public interest.

*McTernan v. City of York, Pa.*, 577 F.3d 521, 526 (3d Cir. 2009) (quoting *U.S. v. Bell*, 414 F.3d

474, 478 n.4 (3d Cir. 2005)). The Debtors meet all four factors here.

### A.     A Successful Outcome in the Chapter 11 Cases is Likely

23.     "In the bankruptcy context, reasonable likelihood of success is equivalent to the

debtor's ability to successfully reorganize." *In re Union Tr. Phila., LLC,* 460 B.R. 644, 660 (E.D.

Pa. 2011) (quoting *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752–53 (Bankr. E.D. Pa. 1986)).

Courts have held that, in this context, a "successful reorganization" includes the confirmation of a

plan of liquidation.  *In re Soundview Elite Ltd.*, 543 B.R. 78, 119 (Bankr. S.D.N.Y.) ("Although

any reorganization plan the Trustee might propose would almost certainly be a liquidating plan,

that does not foreclose this Court from finding the requisite likelihood of success.") (citing

*Myerson & Kuhn v. Brunscwock Assocs. Ltd. P'Ship (In re Myerson & Kuhn)*, 121 B.R. 145, 153–

54 (Bankr. S.D.N.Y 1990) ("Section 105 grants bankruptcy courts ample power to enjoin actions

excepted from the automatic stay which might interfere in the rehabilitative process, whether in a liquidation or in a reorganization case.") (citations omitted)); *see also The Lautenberg Foundation v. Picard (In re Bernard L. Madoff Inv. Sec., LLC),* 512 Fed. Appx. 18, 20 (2d Cir.2013) (granting preliminary injunction under section 105(a) in liquidation under SIPA); *McHale v. Alvarez (In re The 1031 Tax Grp., LLC),* 397 B.R. 670, 686 (Bankr.S.D.N.Y.2008) (issuing preliminary injunction under section 105(a) to aid chapter 11 process even though chapter 11 trustee was pursuing chapter 11 liquidation plan).

24.    "[T]o demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty." *LTL Mgmt.*, 638 B.R. at 320; *see also In re Bestwall LLC*, 606 B.R. 243, 254 (Bankr. D. Del. 2019); *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1097 (9th Cir. 2007) ("[I]t is not a high burden to show a reasonable likelihood of success"); *see also In re Phila. Newspapers, LLC*, 407 B.R. 606, 617 (E.D. Pa. 2009) (noting the speculative nature of the inquiry into the likelihood of success in the early stages of a case).

25.    The Debtors' prospects of success in the Chapter 11 Cases are strong.  Since filing these cases, the Debtors obtained the appointment of a future claims representative and have been working towards a comprehensive resolution of the Chapter 11 Cases.  Indeed, this Adversary Proceeding and the Temporary Restraining Order sought herein are vital to the Debtors' efforts to foster global settlement negotiations.  *Accord Federal-Mogul Glob.*, 684 F.3d 355, 359 (3d Cir. 2012) ("Bankruptcy has proven an attractive alternative to the tort system for corporations [facing mass tort claims] because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably."); S. Elizabeth Gibson, Judicial

Management of Mass Tort Bankruptcy Cases, Federal Judicial Center, at 1 (2005), https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that "bankruptcy courts have become a forum for companies seeking the resolution of pending and threatened mass tort litigation" and that, as of the publication date, "over seventy companies, motivated primarily by their desire to reach a final resolution of their mass tort liabilities, have sought bankruptcy protection").

26.     The Debtors have sufficient assets to (i) fund the Chapter 11 Cases, (ii) fund claims trusts that will be governed by procedures that efficiently and fairly review claims and compensate current and future claimants, and (iii) otherwise satisfy the requirements necessary to qualify for section 105(a) and 524(g) relief.  As set forth in the Debtors' *Schedules of Assets and Liabilities*, the Debtors had combined cash and cash equivalents of approximately $76 million as of the Petition Date.  *See* Docket Nos. 134, 135, 136, 137.  The Debtors intend to use these funds, as well as any funds contributed as part of a comprehensive resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims, to fund these Chapter 11 Cases, including through a plan that equitably and finally resolves the Debtors' asbestos and environmental liabilities.

27.     Opposition from Tort Claimants, including the TCC, to the Debtors' Chapter 11 Cases does not undermine the Debtors' ability to satisfy this factor, as objecting parties may later change their minds once negotiations commence in earnest.  *See*, *e.g.*, *In re Aldrich Pump LLC*, No. 20-03041 (JCW), 2021 WL 3729335, at *35 (Bankr. W.D.N.C. Aug. 23, 2021) (rejecting the argument that success was unlikely because "the asbestos claimants will never agree to a Plan" and explaining that, "[h]aving sat on two other hotly contested and apparently irreconcilable asbestos bankruptcy cases that wound up with consensual plans as between these same constituencies . . . this Court is unable to conclude that our parties cannot reach an agreement, as

12

**JA607**

well"); *In re Purdue Pharm., L.P.*, 619 B.R. 38, 58 (S.D.N.Y. 2020) (affirming section 105 injunction enjoining mass tort claims against non-debtors despite claimants arguing that success was unlikely because claimants intended to oppose the currently proposed chapter 11 plan).

28.     The Temporary Restraining Order sought herein is necessary to preserve the status quo while the threshold issues regarding ownership of the Successor Liability Claims are resolved. A final determination of this dispute is necessary to bring the necessary parties (including the Debtors, the TCC, the FCR, and Brenntag) together to negotiate a global resolution that will form the basis of a confirmable chapter 11 plan and successful outcome in these cases. Accordingly, this factor is satisfied.

**B.     Failure to Issue a Temporary Restraining Order Would Irreparably Harm the Debtors**

29.     In analyzing irreparable harm, the key question is "whether the litigation . . . 'would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan[.]'" *In re W.R. Grace & Co.*, 115 F. App'x 565, 570 (3d Cir. 2004) (first quoting *Robins*, 828 F.2d at 1025, then quoting *In re Johns-Manville Corp.*, 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983) (vacated in part on other grounds)).

30.     Recent Third Circuit authority establishes that the irreparable harm prong of the test for injunctive relief can be satisfied by a showing of potential harm or the risk of harm. *See ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *2 (3d Cir. Apr. 21, 2022). Indeed, this Court has recently clarified that "the mere risk of a potentially adverse impact on a debtor's bankruptcy can be sufficient to support a preliminary injunction" and the "plaintiff's theory that the debtor would not suffer an adverse impact should not be tested at the debtor's peril." *See LTL Mgmt.*, 640 B.R. at 337 (stating that a movant may be entitled to a preliminary injunction if movant

13

**JA608**

demonstrates that "the risk of future harm [is] anything other than speculative") (quoting *ADP, Inc. v. Levin*, 2022 WL 1184202, at *3).

31.     In *LTL Management*, this Court determined that the debtor would suffer irreparable harm absent an injunction of talc litigation against non-debtor related parties because of: (i) the debtor's liability for the underlying talc claims; (ii) the debtor's indemnification obligations; and (iii) the potential disruption that continued litigation could cause to the funding of a trust.  *See* 638 B.R. at 320.

32.     Similarly, continued prosecution of Successor Liability Claims will cause irreparable harm to the Debtors and the Chapter 11 Cases.  Successor Liability Claims are premised on the Debtors' operations prior to the sale of substantially all of their operating assets pursuant to the 2004 Transactions.  As such, the adjudication of these claims requires an initial determination of the Debtors' liability on account of stayed Tort Claims and would require the Debtors to defend themselves outside of these Chapter 11 Cases.

33.     Moreover, the Debtors may have significant indemnification obligations in favor of Brenntag with respect to Successor Liability Claims.  Any adverse judgment or settlement of Successor Liability Claims could potentially result in significant Indemnification Claims against the Debtors.

34.     The Debtors also face significant risk that state court findings and judgments on Successor Liability Claims could bind the Debtors or impact their liability on Tort Claims under the doctrines of collateral estoppel and *res judicata*.  This risk is underscored by the fact that collateral estoppel has been applied offensively by litigants who were not parties to the prior litigation. *See*, *e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331–32 (1979) (allowing offensive use of collateral estoppel to prevent a corporation from defending against the stockholder

14

class action of plaintiffs who were not parties to prior SEC litigation against the corporation).  Tort Claimants may seek to use adverse judgments or settlements of Successor Liability Claims to establish liability against the Debtors for Tort Claims.  Under these circumstances, the Debtors would be required to actively defend Successor Liability Claims, even as they attempt to simultaneously negotiate a comprehensive resolution of such claims in these Chapter 11 Cases.

35.     Courts have consistently concluded that the risks of collateral estoppel and *res judicata* warrant an injunction of third-party litigation that thwarts the purposes of the automatic stay.  *See*, *e.g.*, *LTL Mgmt.*, 638 B.R. at 313-17 ("Debtor contends that permitting continued litigation against the Protected Parties 'creates risks of binding the Debtor through res judicata and collateral estoppel . . . The Court agrees."); *see also Bestwall*, 606 B.R. at 256 (determining that the risks posed by the doctrines of res judicata and collateral estoppel, among other factors, warrant a preliminary injunction of litigation against non-debtor affiliates); *In re Sudbury, Inc.*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850-55 (Bankr. D. Del. 1994) (staying claims against debtor's directors and holding that a potential finding of liability against such directors would be based on acts undertaken by directors as agents of the debtor and therefore would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions).

36.     In *LTL Management*, after reviewing the case law on these issues, this Court held that the debtor's indemnification obligations gave rise to collateral estoppel concerns.  638 B.R. at 315.  Moreover, while the parties opposing the injunction in *LTL Management* argued that there was no risk of collateral estoppel because claims against the debtor were subject to the automatic

stay, and therefore the debtor would not have had a full and fair opportunity to litigate the underlying claims, this Court cautioned that the law regarding collateral estoppel under these circumstances is unclear and therefore "this theory should not be tested at the debtor's peril." *Id.* at 314.

37.     The same concerns warrant a Temporary Restraining Order here.  If allowed to pursue Successor Liability Claims, the Defendants would litigate the same key facts—involving the same products, time periods, and alleged injuries—related to the Debtors' asbestos and environmental liabilities that are at issue with respect to the Tort Claims.  Accordingly, any rulings or findings regarding Successor Liability Claims may bind the Debtors with respect to Tort Claims. This result would frustrate the Debtors' efforts to resolve the Tort Claims and Successor Liability Claims in the Chapter 11 Cases and would undermine the effect of the automatic stay.

38.     Finally, the continued prosecution of Successor Liability Claims minimizes the incentive for all parties to participate in a comprehensive resolution of these Chapter 11 Cases, as evidenced by the Tort Claimants' continued efforts to pursue Successor Liability Claims against Brenntag in the tort system.  Continued prosecution and piecemeal settlements of Successor Liability Claims would also divert funds and resources towards defense costs and diminish funds available to comprehensively resolve the Tort Claims, Successor Liability Claims, and Indemnification Claims.  *Cf. LTL Mgmt.*, 638 B.R. at 307; First Day Declaration, ¶ 43 ("The Debtors' goal in these chapter 11 cases is to negotiate and ultimately confirm a plan that would, among other things, establish and fund claims trusts to resolve current and future Liabilities pursuant to sections 524(g) and 105(a) of the Bankruptcy Code.").  Accordingly, the Debtors have demonstrated irreparable harm absent the requested Temporary Restraining Order.

**C.    The Irreparable Harm that the Debtors Would Suffer in the Absence of a Temporary Restraining Order Substantially Outweighs Any Prejudice to Claimants**

39.    As described above, the Debtors would suffer substantial and irreversible harm if injunctive relief is not granted.  Prosecution of Successor Liability Claims outside of this Court may liquidate claims against the Debtors and bind the Debtors with respect to rulings and judgments established in those cases.  It would also compromise the protections of the automatic stay.  One of the overriding goals of the bankruptcy process is to ensure that all similarly situated claims are evaluated and treated in a uniform manner.  That goal would be compromised if claimants could seek to liquidate and collect on account of Successor Liability Claims outside of the Chapter 11 Cases.  *See Bestwall*, 606 B.R. at 257 ("The very purpose of the Debtor's Chapter 11 case would be defeated if litigation of the Bestwall Asbestos Claims against the Protected Parties is permitted.").

40.    Tort Claimants also may be prejudiced if the Court does not issue a Temporary Restraining Order. Through litigation of Successor Liability Claims, holders of current Tort Claims could receive recoveries that differ from the recoveries that would be realized by other current or future claimants.  By contrast, one or more trusts established by the Debtors in the Chapter 11 Cases would "provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims." *Bestwall*, 606 B.R. at 257.  Continued prosecution and piecemeal settlement of Successor Liability Claims would thwart the Debtors' ability to resolve their asbestos, environmental, and indemnification liabilities through one or more bankruptcy trusts, eliminating any possibility of a more efficient means of recovery to current and future Tort Claimants.

41.    In contrast, the prejudice caused to the Defendants by a Temporary Restraining Order would be minimal, to the extent it would exist at all.  The issuance of a Temporary

**JA612**

Restraining Order will not permanently deprive the Defendants of an opportunity to pursue Successor Liability Claims. Instead, it will merely halt those claims, giving the Debtors time to reach consensus on a comprehensive resolution of these Chapter 11 Cases. Moreover, the narrow, targeted nature of the Temporary Restraining Order, which only seeks to enjoin actions for which there is an imminent trial within 28 days of the TRO Hearing, ensures that any prejudice to Defendants is limited to that which is absolutely necessary to preserve the status quo while the threshold legal issues in this Adversary Proceeding are resolved, either through mediation or a ruling of this Court. Finally, the Defendants would still be permitted to proceed against, and collect from, any alleged tortfeasors on account of claims that do not constitute Successor Liability Claims.

42.     Thus, the requested Temporary Restraining Order will place claimants that seek to litigate the Successor Liability Claims outside of this Court in the appropriate position: on a level playing field with all other current and future claimants. Moreover, "it is well established that mere delay is insufficient to prevent the issuance of an injunction." *Bestwall*, 606 B.R. at 257; *see also In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997) (finding that delay to the enjoined party from pursuing remedies was heavily outweighed by potential harm to debtor's efforts in its bankruptcy case). Accordingly, for the reasons set forth above, the balance of harms weighs in favor of the Debtors and this Court's issuance of the requested Temporary Restraining Order.

### D.     The Public Interest Favors the Requested Temporary Restraining Order

43.     Courts have consistently recognized the public interest in a successful chapter 11 case. *See*, *e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983); *Sudbury*, 140 B.R. at 465; *see also Johns-Manville*, 26 B.R. at 428 ("[T]he goal of removing all obstacles to plan

**JA613**

formulation [is] eminently praiseworthy and [this court] supports every lawful effort to foster this goal while protecting the due process rights of all constituencies.").

44.     A global resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims particularly serves the public interest in the mass tort context. *In re W.R. Grace*, 386 B.R. 17, 36 (Bankr. D. Del. 2008) (extending injunction to cover a non-debtor where bankruptcy would "resolv[e] thousands of claims in a uniform and equitable manner."). It is in the public interest that "the bankruptcy process [is] utilized to the fullest extent" to resolve claims against the Debtors—a result made possible by the requested Temporary Restraining Order. *Id.*

45.     It also is in the public interest to promote justice in the court system through the equitable treatment of all holders of current and future Tort Claims. Inconsistent judgments are not a desirable means of resolving a dispute with nationwide implications. *In re Dow Corning I*, 211 B.R. 545, 588 (Bankr. E.D.M. 1997) ("[I]t is anything but just when presenting the identical proofs, one plaintiff suffering nearly identical injuries or illness[] wins a multimillion dollar verdict against a defendant while another takes nothing."). The Debtors respectfully submit that an equitable outcome can only be achieved in this Court, by utilizing bankruptcy-specific tools geared towards encouraging efficient and fair resolution of the Debtors' asbestos and environmental liabilities. *See In re Congoleum Corp.*, 362 B.R. 198, 201 (Bankr. D.N.J. 2007) ("Section 524 was created to provide a comprehensive resolution to asbestos liabilities both present and future."). Allowing the Successor Liability Claims to proceed in the tort system, however, would undermine public interests by allowing for different recoveries for similarly situated Tort Claimants.

46.     Accordingly, for the foregoing reasons, each of the four factors clearly weighs in favor of this Court issuing a Temporary Restraining Order prohibiting Defendants from continuing and settling Successor Liability Claims in the actions listed on the Schedule.

19

**JA614**

## III.    The Debtors' Proposed Extension Procedures are Appropriate

47.    Under Federal Rule 65(b)(2), a court may extend a temporary restraining order "for good cause" or with the parties' consent.  Fed. R. Civ. P. 65(b)(2).  The CMO contemplates the Court deciding the Summary Judgment Motion as to Counts I and IV of the Complaint on or after January 31, 2023 (approximately 90 days from the date hereof) at the earliest.

48.    To conserve the Debtors' and the Court's resources, and to avoid the need for unnecessary motion practice and hearings, the Debtors propose the following procedures (collectively, the "**Extension Procedures**"), pursuant to which the Debtors may request extensions of the Temporary Restraining Order:

i.    The Debtors shall be permitted to file requests to extend the Temporary Restraining Order for 28 days (each, an "**Additional Request**"), which shall attach a proposed extension order (an "**Extension Order**"), as well as an amended or supplemented Schedule of actions sought to be enjoined  and a blackline of such Schedule marked against the previously filed Schedule.

ii.    Additional Requests shall be served by regular mail and email (where known) on counsel for the TCC, counsel for the FCR, counsel for Brenntag, and counsel for any individual claimant identified on the Schedule (as amended or supplemented) (each, a "**Notice Party**" and collectively, the "**Notice Parties**") within one (1) business day of its filing.

iii.    Objections, if any, to an Additional Request (each, an "**Objection**") shall be filed and served on counsel for the Debtors within ten (10) days of service of such Additional Request.

iv.    Any Notice Party that fails to timely file an Objection shall be deemed to consent to the relief requested in the Additional Request, and the Court will enter the proposed Extension Order as to such Notice Party.

v.    In the event a Notice Party timely files an Objection, the Debtors and the applicable Notice Party shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Objection at a hearing to be scheduled.

49.    Any Additional Requests will continue to be narrowly tailored to preserve the status quo while the threshold issues regarding ownership of the Successor Liability Claims are resolved.

**JA615**

The Debtors may seek to add actions through an Additional Request only to the extent such actions have a scheduled trial, summary judgment hearing, or other hearing, ruling, or proceeding that may have a similar dispositive result within 28 days from the date of the Extension Order.

50.     The Debtors submit that these Extension Procedures are a reasonable and efficient means of ensuring the Debtors will timely obtain extensions of the Temporary Restraining Order without prejudice to litigants' rights to object to same. The Debtors will serve a copy of this Motion and the Temporary Restraining Order on counsel for the TCC, FCR, Brenntag, and *all* counsel for the Tort Claimants listed on Appendix A to the Complaint regardless of whether their clients are currently listed on the Schedule. These parties will have a full and fair opportunity to object to the relief requested herein (including the Extension Procedures). Thereafter, any Additional Requests will be served on counsel for the TCC, FCR, Brenntag, and the counsel for the Tort Claimants listed on the Schedule. These parties will then have another opportunity to object to the Debtors' requested extension of the Temporary Restraining Order as to the specific claims sought to be enjoined.

51.     Accordingly, the Extension Procedures are not prejudicial to any party in this Adversary Proceeding, and the Court should enter the Temporary Restraining Order and approve the Extension Procedures proposed herein.

## **NO BOND REQUIRED**

52.     Pursuant to Federal Rule of Bankruptcy Procedure 7065, in adversary proceedings, a temporary restraining order or preliminary injunction "may be issued on application of a debtor, trustee, or debtor in possession without" posting a bond. *In re Team Sys. Int'l, LLC*, No. 22-10066 (CTG), 2023 WL 1428572, at *13 (Bankr. D. Del. Jan. 31, 2023) (entering an injunction without requiring a bond).

**JA616**

**NOTICE**

53.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel for all known Defendants in this Adversary Proceeding; (iii) counsel for the TCC; (iv) counsel for the FCR; and (v) the parties listed on the Core Service List.  The Debtors submit that no other or further notice of this Motion need be provided.

*[**Concluded on the following page**]*

22

## CONCLUSION

For the reasons discussed above, the Court should enter the Temporary Restraining Order

and grant the Debtors such other and further relief as the Court deems just and proper.

Dated: October 31, 2023

<div style="margin-left:40%">

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com

-and-

Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Email:     svanaalten@coleschotz.com
           adeleo@coleschotz.com

-and-

G. David Dean, Esq. (admitted *pro hac vice*)
Andrew J. Roth-Moore, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Email:     ddean@coleschotz.com
           aroth-moore@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

</div>

**JA618**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
Andrew J. Roth-Moore, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
aroth-moore@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al*., | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

      Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND PIGMENT
SOLUTIONS, INC., THOSE PARTIES LISTED ON
APPENDIX A TO THE COMPLAINT, and JOHN
AND JANE DOES 1-1,000,

      Defendants.

Adv. Proc. No. 23-01245 (MBK)

**HEARING DATE AND TIME:**
**November 21, 2023 at 11:00 a.m. (ET)**

**ORAL ARGUMENT WAIVED UNLESS
OBJECTIONS TIMELY FILED**

## NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER: (I) TEMPORARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS; AND (II) APPROVING PROCEDURES FOR SEEKING EXTENSIONS OF TEMPORARY RESTRAINING ORDER

**PLEASE TAKE NOTICE** that on **November 21, 2023 at 11:00 a.m. (ET)**, or as soon thereafter as counsel can be heard, the above-captioned debtors and debtors-in-possession (the "**Debtors**") by and through their undersigned counsel, shall move (the "**Motion**") before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, New Jersey 08608 (the "**Bankruptcy Court**"), for entry of an Order temporarily enjoining certain actions against non-Debtors and approving procedures for seeking extensions of the temporary restraining order.

2

PLEASE TAKE FURTHER NOTICE that the Motion sets forth the relevant legal and factual bases upon which the relief requested therein should be granted. A proposed order granting the relief requested in the Motion is also submitted herewith.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the relief requested in the Motion shall: (i) be in writing, (ii) state with particularity the basis of the objection; and (iii) be filed with the Clerk of the Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the (a) *Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 67] (the "**Case Management Order**") and (b) *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "**General Order**") and the *Commentary Supplementing Administrative Procedures* dated as of March 2004 (the "**Supplemental Commentary**") (the General Order, the Supplemental Commentary, and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the Case Management Order, the General Order, and the Supplemental Commentary, so as to be received no later than seven (7) days before the hearing date set forth above.

PLEASE TAKE FURTHER NOTICE that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto, Inc. at https://cases.stretto.com/whittaker. You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**JA621**

**PLEASE TAKE FURTHER NOTICE** that, unless responses are timely and properly filed and served, the Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d), and the relief requested may be granted without further notice or hearing.

Dated: October 31, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

-and-

Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone:  (212) 752-8000
Email:      svanaalten@coleschotz.com
            adeleo@coleschotz.com

-and-

G. David Dean, Esq. (admitted *pro hac vice*)
Andrew J. Roth-Moore, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Email:      ddean@coleschotz.com
            aroth-moore@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

## EXHIBIT A

**Temporary Restraining Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
Andrew J. Roth-Moore, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
aroth-moore@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

(Page 2)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

WHITTAKER, CLARK & DANIELS, INC., BRILLIANT
NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and
SOCO WEST, INC.,

      Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG
GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC.,
BRENNTAG NORTH AMERICA, INC., BRENNTAG
NORTHEAST, INC., BRENNTAG PACIFIC, INC.,
BRENNTAG SOUTHEAST, INC., BRENNTAG
SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL
CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC.,
THOSE PARTIES LISTED ON APPENDIX A TO THE
COMPLAINT, and JOHN AND JANE DOES 1-1,000,

      Defendants.

Adv. Proc. No. 23-01245 (MBK)

## **TEMPORARY RESTRAINING ORDER**

The relief set forth on the following pages, numbered three (3) through six (6), is

**ORDERED**.

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

---

This matter coming before the Court on the *Debtors' Motion for Entry of an Order (I) Temporarily Enjoining Certain Actions Against Non-Debtors; and (II) Approving Procedures for Seeking Extensions of Temporary Restraining Order* [Adv. Dkt. __] (the "**Motion**");[2] and the Court having found and determined that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C. § 157(b), (iii) venue is proper in this district pursuant to 28 U.S.C. § 1409, and (iv) entry of the Temporary Restraining Order and approval of the Extension Procedures is (a) fair and reasonable, (b) consistent with the Bankruptcy Code, the Bankruptcy Rules, the applicable Federal Rules, and the Local Rules, (c) appropriate under the circumstances, and (d) in the best interests of the Debtors and their estates and creditors; and upon the record of the hearing to consider the relief requested in the Motion conducted on November 21, 2023 (the "**Hearing**"), the Court hereby finds and determines that:

A.      The Debtors seek, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 7065 of the Federal Rules of Bankruptcy Procedure, a temporary restraining order prohibiting continued prosecution and settlement of Successor Liability Claims against Brenntag in the lawsuits identified on <u>Exhibit 1</u> attached hereto (the "**Actions**").

B.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  Venue for this matter is proper in this District pursuant to 28 U.S.C. § 1409.

C.      A denial of the Debtors' request for a temporary restraining order would cause the very harm that the Debtors seek to prevent by the Complaint, PI Motion, Summary Judgement

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

**JA626**

(Page 4)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

---

Motion, and Motion in this matter.  Without immediate injunctive relief, it is expected that the Debtors will be irreparably harmed.

D.    This Court finds good cause to extend, and hereby extends, the temporary restraining order for the maximum period allowed under Federal Rule of Civil Procedure 65 – 28 days.

E.    The Extension Procedures are fair and reasonable and do not unfairly prejudice any party to this Adversary Proceeding

F.    The legal and factual basis set forth in the Motion, the Declaration, and at the Hearing establish just cause for the relief granted herein.

Based on the foregoing findings and conclusions, **IT IS HEREBY ORDERED that:**

1.    Defendants are temporarily restrained from prosecuting or settling any Successor Liability Claims in the Actions listed on the schedule attached hereto as <u>Exhibit 1</u> (the "**Schedule**"), through and including the date that is 28 days from the date of entry of this Order.

2.    The Debtors shall serve a copy of this Order, including the Schedule, on all parties to this Adversary Proceeding via regular mail within one (1) business day of entry of this Order.

3.    The following Extension Procedures are hereby **APPROVED**:

  i.    The Debtors shall be permitted to file requests to extend the Temporary Restraining Order for 28 days (each, an "**Additional Request**"), which shall attach a proposed extension order (an "**Extension Order**"), as well as an amended or supplemented Schedule of Actions sought to be enjoined and a blackline of such Schedule marked against the previously filed Schedule.

  ii.   Additional Requests shall be served by regular mail and email (where known) on counsel for the TCC, counsel for the FCR, counsel for Brenntag, and counsel for any individual claimant identified on the Schedule (as amended or supplemented) (each, a "**Notice Party**" and collectively, the "**Notice Parties**") within one (1) business day of its filing.

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

      iii.   Objections, if any, to an Additional Request (each, an "**Objection**") shall be filed and served on counsel for the Debtors within ten (10) days of service of the Additional Request.

      iv.   Any Notice Party that fails to timely file an Objection shall be deemed to consent to the relief requested in the Additional Request, and the Court shall enter the proposed Extension Order as to such Notice Party.

      v.   In the event a Notice Party timely files an Objection, the Debtors and the applicable Notice Party shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Objection at a hearing to be scheduled.

4.     Brenntag is authorized and directed to file this Order, and any similar future Order(s) of this Court in this Adversary Proceeding, on the docket of the Actions listed on the Schedule within three (3) business days of its entry.

5.     Pursuant to Federal Bankruptcy Rule 7065, the Debtors are relieved from posting bond under Federal Rule 65(c).

6.     The requirement set forth in D.N.J. LBR 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

7.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

8.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

9.     The terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

(Page 6)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

10.    The Court retains jurisdiction with respect to all matters arising from or relating to

the interpretation, implementation, or enforcement of this Order.

## **EXHIBIT 1**

**[Schedule of Actions]**

| | Case Name | Case No. | Jurisdiction | Plaintiff's Counsel | Date | Event |
|---|---|---|---|---|---|---|
| 1. | *Michael Pryor & Karen Pryor v. Avon Products, Inc., et al.* | MID-L-000022-21 | New Jersey | Simon Greenstone | 11/27/2023 | Trial |
| 2. | *Beth Solomon v. Avon Products, Inc., et al.* | CV-21-964799 | Ohio | Simon Greenstone | 11/27/2023 | Trial |
| 3. | *Katherine M. Komer, as Special Administrator for the Estate of DONALD E. SWEENEY, deceased, and ROBERTA S. SWEENEY v. Belden Wire & Cable Company LLC, et al.* | 22 LA 724; HRVA No. 1011684 | Illinois | Maune | 12/4/2023 | Trial |
| 4. | *JACKI MCALLISTER, Individually and as Special Administrator of the Estate of JAMES O. MCALLISTER, deceased v A.O. SMITH CORPORATION, et al.* | 21 L 870; HRVA No. 1010395 | Illinois | Maune | 12/4/2023 | Trial |
| 5. | *LORA M. HOWARD, as Administrator CTA for the Estate of MICHAEL S. FIELDS, deceased v. American International Industries, et al.* | 20 L 447; HRVA No. 1008294 | Illinois | Maune | 12/4/2023 | Trial |
| 6. | *Gayle Braun, Executor for Estate of James M. Braun Jr., deceased, v. Air & Liquid Systems Corporation, et al.* | 22 LA 1010; HRVA No. 1011947 | Illinois | Maune | 12/4/2023 | Trial |
| 7. | *GWENDOLYN J. MUKOMELA, Individually and as Special Administrator for the Estate of KENNETH D. MUKOMELA, deceased v. AGCO CORPORATION, et al.* | 22 LA 962; HRVA No. 1011932 | Illinois | Maune | 12/4/2023 | Trial |
| 8. | *Patricia Bvumbe v. Charles B. Chrystal Company, Inc., et al.* | MID-L-007546-20 | New Jersey | Simon Greenstone | 12/4/2023 | Trial |
| 9. | *Sharon Spinks v. Johnson & Johnson, et al.* | 62-CV-17-526 | Minnesota | Karst | 12/4/2023 | Trial |
| 10. | *Irma M. Infante v. Barretts Minerals, Inc., et al.* | 190137/2022 | New York | Lanier | 12/5/2023 | Jury selection with trial to proceed in due course |

| | Case Name | Case No. | Jurisdiction | Plaintiff's Counsel | Date | Event |
|---|---|---|---|---|---|---|
| 11. | *G. Jyles Eaves as Special Administrator for Frances Eaves, Deceased v. Kolmar Laboratories, Inc., et al.* | 190112/2021 | New York | Simmons | 12/5/2023 | Jury selection with trial to proceed in due course |
| 12. | *Bonita Wintersteen and Robert Wintersteen v. Alticore, Inc., et al* | 190034/2022 | New York | Simmons | 12/5/2023 | Jury selection with trial to proceed in due course |
| 13. | *Jose Chavez, Administrator ad Prosequendum of the Estate of Luis Chavez, Deceased and Maria and J. Santana Chavez v. 3M Company, et al.* | MID-L-006436-19 | New Jersey | Simon Greenstone | 12/11/2023 | Trial |
| 14. | *Linda Oubre, individually and as Administratrix and Administratrix ad Prosequendum of the Estate of Betty Holtschneider, Deceased, and Stanley Holtschneider v. Brenntag North America, et al.* | MID-L-003009-16 | New Jersey | Simon Greenstone | 12/11/2023 | Trial |
| 15. | *Wendy Reynolds v. AT & T Corp. et al.* | CT FBT-CV21-6103802-S | Connecticut | Simon Greenstone | 12/12/2023 | Trial |
| 16. | *Kunigar Haney v. Avon Products, Inc., et al.* | 23STCV06726 | California | Simon Greenstone | 12/18/2023 | Trial |
| 17. | *Bernice Hallam v. Arkema, Inc.* | 23STCV11756 | California | Simon Greenstone | 12/18/2023 | Trial |

**JA632**

# EXHIBIT B

## Declaration of Mohsin Y. Meghji

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
Andrew J. Roth-Moore, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
aroth-moore@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al*., | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

     Plaintiffs,

v.

     Adv. Proc. No. 23-01245 (MBK)

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND PIGMENT
SOLUTIONS, INC., THOSE PARTIES LISTED ON
APPENDIX A TO THE COMPLAINT, and JOHN
AND JANE DOES 1-1,000,

     Defendants.

### DECLARATION OF MOHSIN Y. MEGHJI, CHIEF RESTRUCTURING OFFICER OF WHITTAKER, CLARK & DANIELS, INC., IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER: (I) TEMPORARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS; AND (II) APPROVING PROCEDURES FOR SEEKING EXTENSIONS OF TEMPORARY RESTRAINING ORDER

I, Mohsin Y. Meghji, hereby declare under penalty of perjury:

### Introduction

1.     I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and plaintiffs in the above-captioned adversary proceeding (the "**Adversary Proceeding**") and a Managing Partner of M3 Partners, LP ("**M3 Partners**"), the Debtors' restructuring advisor.

2

2.      I submit this declaration (this "**Declaration**") in support of the *Debtors' Motion for Entry of an Order: (I) Temporarily Enjoining Certain Actions Against Non-debtors; and (II) Approving Procedures for Seeking Extensions of Temporary Restraining Order* (the "**TRO Motion**") filed by the Debtors in the Adversary Proceeding contemporaneously herewith.

3.      As Chief Restructuring Officer, I am generally familiar with the Debtors' historical businesses, financial condition, policies and procedures, claims management operations, books and records, and Chapter 11 Cases, as well as the Tort Claims asserted against the Debtors and the Successor Liability Claims asserted against Brenntag.  The statements in this Declaration are based upon my personal knowledge, information, and belief.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      On the Petition Date, I submitted the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "**First Day Declaration**").[2]  On September 8, 2023, I submitted the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Debtors' Summary Judgment and Preliminary Injunction Motions* [Adv. Proc. Docket No. 4] (the "**September 8 Declaration**").  The First Day Declaration and September 8 Declaration also supports the TRO Motion, and I incorporate them by reference herein.  I now submit this Declaration to provide additional support for the TRO Motion.

---

[2]  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the complaint initiating this Adversary Proceeding [Adv. Proc. Docket No. 1] (the "**Complaint**"), First Day Declaration, and TRO Motion, as applicable.

3

Case 23-04091-KLP Doc 6-1 Filed 03/01/25 Page 547 of 1429 PageID: 1003
Case 23-cv-1491-MFK Document 8 Filed 10/31/23 Page 5 of 7
Exhibit B - Declaration of Mohsin Y. Meghji    Page 5 of 7

**The Imminent Actions**

5.        In light of the timeline set forth in the *Case Management Order* [Adv. Proc. Docket No. 52] (the "**CMO**"), which contemplates adjudication of the Summary Judgment Motion on or after January 31, 2024, and which requires the parties to engage in good faith mediation while the Court reserves its decision on the merits of Counts I and IV of the Complaint, the Debtors believe it is appropriate to request a Temporary Restraining Order to enjoin the Successor Liability Claims pending against Brenntag in actions with a scheduled trial within 28 days of the hearing to consider the TRO Motion (collectively, the "**Imminent Actions**"), and prior to the Court's ruling on the Summary Judgment Motion with respect to Counts I and IV of the Complaint.  The Imminent Actions are listed on Exhibit 1 to the Temporary Restraining Order and are a subset of actions listed in Appendix A to the Complaint.

6.        Plaintiffs have continued to prosecute the Imminent Actions against Brenntag during the pendency of these Chapter 11 Cases.  Based on a review of the Imminent Actions performed at my direction and under my supervision, each names Brenntag as a defendant based on a theory that it is an alleged successor to, or alter ego of, the Debtors, and is scheduled for trial before December 19, 2023.

**The Debtors' Need for Temporary Injunctive Relief**

7.        The relief sought in the TRO Motion is appropriate and necessary to preserve the status quo while the threshold issues regarding ownership of the Successor Liability Claims are resolved.

8.        The Debtors' prospects of success in the Chapter 11 Cases are strong.  Since commencing their Chapter 11 Cases, the Debtors have defeated a motion to dismiss the Chapter

4

11 Cases (*see* Docket No. 211)[3] and obtained the appointment of a future claims representative (*see* Docket No. 231).  The Debtors are committed to engaging with claimant representatives and key stakeholders to consensually resolve the Chapter 11 Cases, including through a mediation process.

9.      The Debtors have sufficient assets to (i) fund the Chapter 11 Cases, (ii) fund claims trusts that will be governed by procedures that efficiently and fairly review claims and compensate current and future claimants, and (iii) otherwise satisfy the requirements necessary to qualify for section 105(a) and 524(g) relief.  The Debtors intend to use these funds, as well as any funds contributed as part of a comprehensive resolution of the Tort Claims, Successor Liability Claims, and Indemnification Claims, to fund these Chapter 11 Cases, including through a plan that equitably and finally resolves the Debtors' asbestos and environmental liabilities.  Accordingly, I believe there is a strong likelihood of a successful outcome in these cases.

10.      The continued prosecution and settlement of Successor Liability Claims outside the Chapter 11 Cases would negatively affect the Debtors' estates in a number of ways.  First, Successor Liability Claims are premised on the Debtors' operations prior to the sale of substantially all of their operating assets pursuant to the 2004 Transactions, and involve the same key facts—involving the same products, time periods, and alleged injuries—related to the Debtors' asbestos and environmental liabilities that are at issue with respect to the Tort Claims.  Any determination regarding Successor Liability Claims will require a court to make an initial determination of the Debtors' asbestos and environmental liabilities.  The Debtors face significant risk that state court findings and judgments on Successor Liability Claims could bind the Debtors or impact their liability on Tort Claims under the doctrines of collateral estoppel and *res judicata*.

---

[3] The Order denying the motion to dismiss is currently on appeal.  *See* Docket Nos. 246, 247, 248.

Second, Brenntag may have indemnification rights against the Debtors under common law or contract for some or all of the Successor Liability Claims at issue. Any adverse judgment or settlement of Successor Liability Claims could potentially result in significant Indemnification Claims against the Debtors. Third, the continued prosecution of Successor Liability Claims minimizes the incentive for all parties to participate in a comprehensive resolution of these Chapter 11 Cases, including during the mediation ordered under the CMO.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 31, 2023                          /s/ Mohsin Meghji
                                                 Mohsin Meghji
                                                 Chief Restructuring Officer
                                                 Brilliant National Services, Inc.

6

**JA639**

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** <br><br> **COOLEY LLP** <br> Cullen D. Speckhart (admitted *pro hac vice*) <br> Michael Klein (admitted *pro hac vice*) <br> Evan M. Lazerowitz <br> Jeremiah P. Ledwidge (admitted *pro hac vice*) <br> 55 Hudson Yards <br> New York, NY 10001 <br> Tel: (212) 479-6000 <br> Email:  cspeckhart@cooley.com <br> mklein@cooley.com <br> elazerowitz@cooley.com <br> jledwidge@cooley.com <br><br> *Lead Counsel to the* <br> *Official Committee of Talc Claimants* | **SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.** <br> Arthur J. Abramowitz <br> Ross J. Switkes <br> 308 Harper Drive, Suite 200 <br> Moorestown, NJ 08057 <br> Tel: (856) 662-0700 <br> Email:  aabramowitz@shermansilverstein.com <br> rswitkes@shermansilverstein.com <br><br> *Local Counsel to the* <br> *Official Committee of Talc Claimants* |
| **CAPLIN & DRYSDALE, CHARTERED** <br> Kevin C. Maclay (*pro hac vice* pending) <br> Todd E. Phillips (admitted *pro hac vice*) <br> Serafina A. Concannon (admitted *pro hac vice*) <br> One Thomas Circle, NW, Suite 1100 <br> Washington, DC 20005 <br> Tel: (202) 862-5000 <br> Email:  kmaclay@capdale.com <br> tphillips@capdale.com <br> sconcannon@capdale.com <br><br> *Special Asbestos Counsel to the* <br> *Official Committee of Talc Claimants* | |
| In re: <br><br> WHITTAKER, CLARK & DANIELS, INC., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Case No. 23-13575 (MBK) <br><br> (Jointly Administered) <br><br> Honorable Michael B. Kaplan, U.S.B.J., Chief |

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

     Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND
PIGMENT SOLUTIONS, INC., THOSE PARTIES
LISTED ON APPENDIX A TO THE
COMPLAINT, and JOHN AND JANE
DOES 1-1,000,

     Defendants.

Adv. Proc. No. 23-01245 (MBK)

## LIMITED OPPOSITION OF THE OFFICIAL COMMITTEE
## OF TALC CLAIMANTS TO DEBTORS' MOTION FOR ENTRY OF
## AN ORDER: (I) TEMPORARILY ENJOINING CERTAIN ACTIONS
## AGAINST NON-DEBTORS; AND (II) APPROVING PROCEDURES
## FOR SEEKING EXTENSIONS OF TEMPORARY RESTRAINING ORDER

The Official Committee of Talc Claimants (the "Committee") of Whittaker, Clark & Daniels, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), by and through its undersigned counsel, respectfully submits this limited opposition (the "Limited Opposition") to the Debtors' *Motion for Entry of an Order: (i) Temporarily Enjoining Certain Actions Against Non-Debtors; and (ii) Approving Procedures for Seeking Extensions of Temporary Restraining Order* [Adv. Dkt. No. 61] (the "Motion").[1]

## LIMITED OBJECTION

1.      The Debtors seek entry of a Temporary Restraining Order that would enjoin the prosecution and settlement of certain Successor Liability Claims against Brenntag that are set for trial on the merits within 27 days from the TRO Hearing.  Although the relief sought in the Motion is circumscribed, it nonetheless implicates many, if not all, of the same issues that are currently before the Court pursuant to the Debtors' pending Summary Judgment Motion.  Those issues include the Debtors' contention that **all** Successor Liability Claims against Brenntag and others are derivative claims and thus property of the estate, and that solely the Debtors have standing to settle those claims.  Those weighty and contested issues—which will be fully adjudicated in the Adversary Proceeding—are also subsumed in the multi-party mediation ordered by the Court on October 12, 2023, that is anticipated to commence shortly.

2.      Notwithstanding the Committee's good faith disputes with the Debtors regarding whether the Successor Liability Claims are all direct or derivative claims and, if so, who has standing to prosecute them, the Committee agrees that the most reasonable path forward is to maintain the status quo in all pending successor liability cases set for trial in the near term.  And

---

[1]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the Committee does not object to a Temporary Restraining Order that serves this limited purpose.

The Debtors' request for relief, however, goes further than is warranted to maintain the status quo

in two important respects.

      3.    **Brenntag's Independent Liability**: Despite the Debtors' acknowledgement that

they have "no issue with the commencement, continuation, or settlement of claims against

Brenntag that are independent of its association with the Debtors (*i.e.*, claims alleging injury

resulting from business operations conducted by Brenntag following the 2004 Transactions for

which the Debtors do not owe indemnification obligations,")[2] the Temporary Restraining Order

arguably applies with equal effect to pending claims against Brenntag arising from its own

independent conduct. To the extent this result is unintended, it flows from the Debtors' erroneous

conclusion that none of the Imminent Actions on the Schedule include independent claims against

Brenntag. *See Decl. of Brian J. Griffith*, Adv. Dkt. No. 65-1 ¶ 5; *see also Decl. of Moshin Y.*

*Meghji*, Adv. Dkt. No. 4 ¶ 16. For example, in the matter of *Kunigar Haney v. Avon Products,*

*Inc., et al.* (number 16 on the Schedule) (the "**Haney Action**"), Brenntag admits that the plaintiff

has sued it both as a successor and "in its individual capacity,"[3] and the plaintiff has averred that

"Brenntag's liability is separate and apart from any association it may have or had with WCD.

Records produced in this case identify Brenntag as the supplier of talc to which Plaintiff was

exposed."[4] It is therefore beyond dispute that any stay of the forthcoming trial in the Haney Action

---

[2]   Complaint ¶ 38.

[3]   *See Kunigar Haney v. Avon Products, Inc., et al.*, Case No. JCCP 4674, *Defendant Brenntag Specialties, LLC's Opposition to Motion to Compel Responses to Special Interrogatories* (Sup. Ct. Ca. Nov. 2, 2023) at 3, attached hereto as **Exhibit A**. The Committee respectfully requests that the Court take judicial notice of this and other court filings referenced in this Limited Opposition. *See* Federal Rule of Evid. 201; *Roche v. Aetna, Inc.*, No. 122CV00607NLHEAP, 2023 WL 3173394, at *3 (D.N.J. May 1, 2023) ("The state court filings are matters of public record, and as such this Court may take judicial notice of them.").

[4]   *See Kunigar Haney v. Avon Products, Inc., et al.*, Case No. JCCP 4674, *Plaintiff's Reply in Support of Her Motion to Compel Defendant Brenntag Specialties, LLC's Further Responses to Special Interrogatories* (Sup. Ct. Ca. Nov. 8, 2023) at 4, attached hereto as **Exhibit B**.

would enjoin the prosecution of claims against Brenntag that indisputably have no impact on the estates.

4. Moreover, to the extent that the complaints in the Imminent Actions seek damages from Brenntag for exposure to asbestos after the 2004 Transactions, then they are not Successor Liability Claims against Brenntag and are wholly unrelated to these chapter 11 cases. Consistent with the Debtors' own request for relief, the Temporary Restraining Order should (i) not extend to the Haney Action's forthcoming trial; and (ii) explicitly state that it does not enjoin the prosecution of any claims against Brenntag arising from its own independent liability, regardless of whether the Imminent Actions are currently set forth on the Schedule or later added through an Additional Request.

5. **No Preclusive Findings of Fact**: Given the limited nature and purpose of the Temporary Restraining Order, any order entered by the Court must explicitly maintain the status quo, and should not include any issue-preclusive findings of facts or conclusions of law that prejudice the parties in any manner. *See, e.g.*, "On the Merits"—Discretionary or Limited Remedies, 18A Fed. Prac. & Proc. Juris. § 4445 (3d ed.) ("Grant or denial of interlocutory injunctions clearly does not foreclose further litigation in the same proceeding, so long as decision rested on mere preliminary estimates of the merits or discretionary remedial grounds."). As will be more fully set forth in its opposition to the Summary Judgment Motion and in any timely-filed response to the Debtors' request for a preliminary injunction, the Committee disputes the factual assertions and legal conclusions upon which the Debtors' requests for relief are founded. Nothing in the interlocutory order granting the Debtors' request for a Temporary Restraining Order should impact the Committee's (or other third parties') ability to fully present those arguments on a complete record, or the Debtors' ability to refute them.

6.     The Temporary Restraining Order also provides for renewal of the Temporary

Restraining Order upon submission of an Additional Request by the Debtors.  The Temporary

Restraining Order should provide that the rights of all parties in interest to object to an Additional

Request on any grounds are expressly preserved.

## **RESERVATION OF RIGHTS**

7.     This Limited Objection is submitted without prejudice to, and with a full

reservation of, the Committee's rights, claims, defenses, and remedies, including the right to

amend, modify, or supplement this Limited Objection to raise additional objections and to

introduce evidence at any hearing relating to the Motion, and without in any way limiting any other

rights of the Committee to further respond to the Motion, on any grounds, as may be appropriate

## **CONCLUSION**

8.     For the foregoing reasons, the Committee respectfully requests that the Court only

grant the Motion with the modifications set forth herein, and grant such other and further relief as

is just.

Dated:  November 14, 2023          _/s/ Arthur J. Abramowitz_
                                   **SHERMAN, SILVERSTEIN,**
                                   **KOHL, ROSE & PODOLSKY, P.A.**
                                   Arthur J. Abramowitz
                                   Ross J. Switkes
                                   308 Harper Drive, Suite 200
                                   Moorestown, NJ 08057
                                   Tel: (856) 662-0700
                                   Email: aabramowitz@shermansilverstein.com
                                          rswitkes@shermansilverstein.com

                                   **COOLEY LLP**
                                   Cullen D. Speckhart (admitted _pro hac vice_)
                                   Michael Klein (admitted _pro hac vice_)
                                   Evan M. Lazerowitz
                                   Jeremiah P. Ledwidge (admitted _pro hac vice_)
                                   55 Hudson Yards
                                   New York, NY 10001

Tel: (212) 479-6000
Email: cspeckhart@cooley.com
      mklein@cooley.com
      elazerowitz@cooley.com
      jledwidge@cooley.com

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (*pro hac vice* pending)
Todd E. Phillips (admitted *pro hac vice*)
Serafina A. Concannon (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Email: kmaclay@capdale.com
      tphillips@capdale.com
      sconcannon@capdale.com

*Co-Counsel to the*
*Official Committee of Talc Claimants*

## EXHIBIT A

***Kunigar Haney v. Avon Products, Inc., et al.*, Case No. JCCP 4674,**
***Defendant Brenntag Specialties, LLC's Opposition to Motion to Compel***
***Responses to Special Interrogatories* (Sup. Ct. Ca. Nov. 2, 2023)**

Electronically FILED by
Superior Court of California,
County of Los Angeles
11/02/2023 5:34 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By L. Smith, Deputy Clerk

KENDRA BRAY, State Bar No. 285743
kbray@wfbm.com
REYNOLD MARTINEZ, State Bar No. 184774
rmartinez@wfbm.com
WFBM, LLP
19900 MacArthur Blvd., Suite 1150
Irvine, California 92612-2445
Telephone:      (714) 634-2522
Facsimile:      (714) 634-0686

Attorneys for Defendant BRENNTAG
SPECIALTIES, LLC f/k/a BRENNTAG
SPECIALTIES, INC., f/k/a MINERAL
PIGMENT SOLUTIONS, INC., individually and
incorrectly sued as Successor-in-Interest to
WHITTAKER, CLARK, & DANIELS, INC.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES

| | |
|---|---|
| KUNIGAR HANEY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>AVON PRODUCTS, INC.; et al.,<br><br>　　　　Defendants. | Case No. JCCP 4674<br><br>(LASC Case No. 23STCV06726)<br><br>Assigned to:　Hon. Laura A. Seigle<br>Dept:　　　　15<br><br>**DEFENDANT BRENNTAG SPECIALTIES, LLC'S OPPOSITION TO MOTION TO COMPEL RESPONSES TO SPECIAL INTERROGATORIES**<br><br>[Filed Concurrently with Brenntag Specialties, LLC's Response to Plaintiff's Separate Statement of Disputed Questions and Answers; Declaration of Reynold Martinez in Support of Combined Opposition; Exhibits in Support Of Declaration of Reynold Martinez]<br><br>Date:　　　　November 16, 2023<br>Time:　　　　9:00 a.m.<br>Dept.:　　　　Dept. 15<br><br>Action Filed:　　March 27, 2023<br>Trial Date:　　December 18, 2023 |

## I.　　Introduction

　　This is the second formal hearing brought on this issue.  Brenntag Specialties, LLC

("BSL") has received the Court's Order on Plaintiff's previous motions to compel its

deposition and production of documents, and has informed plaintiff's counsel that it is willing to stipulate that the October 26, 2023 Order be extended to Brenntag Specialties' responses to Special Interrogatories as well. BSL has also represented that accordingly, it will amend its responses to Special Interrogatories. (See Declaration of Reynold Martinez filed and served herewith and Exhibit C thereto). At this time, the parties have not reduced an agreement to writing, and Brenntag Specialties submits this Opposition in anticipation of arguing on the merits should the parties fail to agree.

Plaintiff has served Brenntag Specialties, LLC ("BSL") BSL with various discovery, including Requests for Production, a Notice of Deposition for its Person Most Qualified, and Special Interrogatories. BSL has objected to this various discovery on the grounds that discovery should not proceed against it in this matter. This case is the subject of bankruptcy proceedings and actions against BSL as successor to Whittaker, Clark & Daniels ("WCD") thwart those proceedings. Moreover, the claims against BSL individually, and the actions against BSL as successor to WCD are the same, and the theories against each BSL and WCD cannot be divided for the purposes of discovery. As a result, the noticed deposition of BSL's person most qualified should not proceed and BSL should not be compelled to produce documents.

## II.  **The Bankruptcy Filing**

On April 26, 2023, WCD filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101-1532 ("Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (Third Circuit) (the "Bankruptcy Court"). The bankruptcy is captioned *In re Whittaker, Clark & Daniels, Inc.*, Case No. 23-13575 (MBK) (Bankr. D.N.J. 2023) (the "WCD Bankruptcy Case"), and on April 28, 2023, WCD filed a notice of bankruptcy in this action (the "WCD Notice of Bankruptcy"). To date, there is no order entered by the Bankruptcy Court granting relief to any party to this action from the automatic stay imposed pursuant to Bankruptcy Code section 362(a). Further, the WCD bankruptcy case is still actively ongoing, and in its infancy.

Plaintiff has sued Brenntag Specialties, LLC (BSL) both in its individual capacity and as the alleged successor-in-interest to WCD.  (See Complaint, attached as Exhibit A to Martinez Declaration.) The claims asserted in this case are stayed under the Bankruptcy Code, including 11 U.S.C. § 362 because it constitutes, *inter alia*, an attempted continuation of a proceeding before WCD, an act to assess or recover on a claim against WCD, and/or an act to control the property of WCD's estates.  Alternatively, BSL should not be required to respond as there is a stay, and a pending motion for preliminary injunction to extend the automatic stay or clarify that this stay applies to exactly this type of action.  Therefore the document requests and deposition notice are legally improper, premature, unreasonably overbroad, unduly burdensome oppressive, and harassing.  *See* Whittaker*, Clark & Daniels, Inc. v. Brenntag AG*, Adv. Proc. No. 23-01245 (MBK) (Bankr. D.N.J.)."  WCD's current action is to stay this litigation which ***in whole or in part*** is predicated on claims that there is liability as against BSL resulting from its alleged status as successor-in-interest to WCD.  (See Debtor's Verified Complaint for Injunctive Relief, attached as Exhibit B to Martinez Declaration).

In addition to the original bankruptcy filing, the above action seeks a "declaration that section 362(a) of the Bankruptcy Code prohibits the commencement, continuation, or settlement of any action by the defendants in the Adversary Proceeding (collectively, the "Defendants")" including BSL.  (See Debtor's Complaint at paragraph 4, Exhibit B to Martinez Declaration).  Moreover, WCD is pursuing a finding that the successor liability claims belong to the debtors estates and, in fact, are "key assets that must be preserved for the benefit of all creditors in these cases rather than pursued by individual plaintiffs for their own private benefit."  (See Debtor's Complaint at paragraph 5, Exhibit B to Martinez Declaration).

The continuation of this litigation against BSL would undermine the organized resolution of WCD's liabilities through the bankruptcy process, as WCD would have an

obligation to indemnify BSL[1] – the result is not different from if the action was brought against WCD itself.  Because of the relatedness of the case brought by Ms. Haney to WCD's bankruptcy, this action is included in the initial stay as to actions against WCD -- an implied fact WCD seeks to make express through its Declaratory Relief action.  This position is supported by applicable Ninth Circuit law.

The Ninth Circuit has adopted the "Pacor test"—whether outcome of a proceeding could affect a bankruptcy case. (*In re Fietz* (9th Cir. 1988) 852 F2d 455, 457.)  Under the *Pacor* test, a court has "related to" jurisdiction if "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." (*Pacor, Inc. v. Higgins* (3rd Cir. 1984); *In re Fietz, supra,* 852 F2d at 457.)

An action is "related to" bankruptcy if the outcome could alter "the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and … in any way impacts upon the handling and administration of the bankrupt estate." (*In re Fietz, supra*, 852 F2d at 457; see also, *In re Wilshire Courtyard* (9th Cir. 2013) 729 F3d 1279, 1287— "bankruptcy court's 'related to' jurisdiction is very broad, including nearly every matter directly or indirectly related to the bankruptcy" (internal citation omitted).)

The proceeding need not be against the debtor or debtor's property to be "related." Even where not directly against the debtor, the proceeding may affect the estate's obligation to creditors whose claims are before the court. (*Kaonohi Ohana, Ltd. v Sutherland* (9th Cir. 1989) 873 F2d 1302, 1307 – creditor's suit against nondebtor-noncreditor was related; *In re American Hardwoods, Inc.* (9th Cir. 1989) 885 F2d 621, 623-624—action to enjoin creditor from enforcing state court judgments against debtor's principals deemed "related to" bankruptcy case.)

Here, piecemeal settlement of Successor Liability Claims would divert funds and resources and reduce funds available for a global resolution of the tort claims, successor

---

[1] Brenntag Specialties, LLC is the beneficiary of a indemnification and hold-harmless agreement to the burden of the bankruptcy Debtors.  (See Debtor's Verified Complaint for Injunctive Relief, at ¶ 26 attached as Exhibit B to Martinez Declaration).

liability claims, and indemnification claims in these Chapter 11 Cases. Piecemeal litigation also circumvents the bankruptcy process and will disrupt WCD's efforts to resolve its liability.

### III. Ms. Haney's Action

Plaintiff's complaint makes clear that BSL is sued not only in its own capacity, but also as successor-in-interest to WCD. Indeed, in the caption of the case BSL is "sued individually and as successor-in-interest to Whittaker Clark & Daniels, Inc." This identification of BSL as successor to WCD is reiterated at page three, four, seven, and generally throughout the Complaint. In no instance does Plaintiff differentiate between the claims made against BSL individually, and the claims against BSL as the alleged successor to WCD. (Complaint, attached as Exhibit A to Martinez Declaration).

Rather, plaintiff expressly groups the actions of BSL along with its alleged "alternate entities". For example, in stating facts they believe support punitive damages, plaintiff states that "Defendants, **their 'alternate entities'**, and each of them suppressed from all users. handlers, bystanders, and household members, including Plaintiff, medical and scientific information concerning the health hazards…." (Complaint at page 12, attached as Exhibit A to Martinez Declaration).

Plaintiff similarly does not differentiate in her allegations for strict liability "plaintiff complains of defendants…**their 'alternate entities'**, and each of them, and allege as follows:….[t]he defects existed in all of Defendants' Products when they left the possession of the Defendants, **their "alternate entities"**, and each of them." (Complaint at page 16, attached as Exhibit A to Martinez Declaration). This pattern continues throughout the Complaint. On no occasions are actions by BSL differentiated from actions of its alleged "alternate entities."

Given the nature of the pleading and the applicable law, the "independent" claims and the "successor" claims cannot be dissected from each other. Rather, the claims are that all of the exposures together caused the disease and the finder of fact must determine where there is a substantial contributing factor in that causation. In addition to grouping

BSL together with WCD, plaintiff groups *all the defendants' alleged contributions* together as a cause of the disease. Only after a determination that there is an asbestos-related disease does plaintiff continue -- to establish that either BSL's or WCD's product was a *substantial factor* in bringing about the injury[2]. Until that point, however, BSL will be required to defend both itself and the undivided claims against it as successor to WCD.

In addition to traditional asbestos tort law, guidance can also be found in the workers' compensation setting. In a 2015 case, the Court of Appeal noted with regard to take home exposure to a product, that "The most that can be said is that his home exposure likely contributed to the disease along with his workplace exposure. But under workers' compensation principles, the contribution of his home exposure does not create a divisible, separate injury." *Melendrez v. Ameron Internat. Corp.*, 240 Cal. App. 4th 632, 641–42, 193 Cal. Rptr. 3d 23, 33 (2015). Discovery as to BSL will necessarily and improperly involve and implicate both the claims brought against BSL individually and brought against BSL as the alleged successor to WCD.

IV.     **Conclusion**

This case is the subject of a bankruptcy stay which includes all claims against BSL as an alleged successor to WCD. WCD is currently bringing an action against BSL to have that made express. Otherwise, the action against BSL will work in the same manner as an action brought against WCD directly, thwarting the intent of orderly bankruptcy proceedings. For the reasons described above, it is not practical or legally supportable to cleave the discovery against BSL into successor liability and independent claims for discovery purposes. BSL therefore respectfully submits that given the current posture with the bankruptcy court, it would be improper to move forward with discovery against it.

---

[2] In an asbestos-related cancer case, the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it contributed to the plaintiff or decedent's *risk* of developing cancer. (Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th 953, 982, (1997), as modified on denial of reh'g (Oct. 22, 1997)).

Dated:  November 2, 2023

WFBM, LLP

By: _____

KENDRA BRAY
REYNOLD MARTINEZ
Attorneys for Defendant BRENNTAG
SPECIALTIES, LLC f/k/a BRENNTAG
SPECIALTIES, INC., f/k/a MINERAL PIGMENT
SOLUTIONS, INC., individually and incorrectly
sued as Successor-in-Interest to WHITTAKER,
CLARK, & DANIELS, INC.

**PROOF OF SERVICE**

***Kunigar Haney v. Avon Products***
**LASC Case No. 23STCV06726**

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is 255 California Street, Suite 525, San Francisco, CA 94111-4928.

On October 13, 2023, I served true copies of the following document(s) described as **DEFENDANT BRENNTAG SPECIALTIES, LLC'S OPPOSITION TO MOTION TO COMPEL RESPONSES TO SPECIAL INTERROGATORIES** on the interested parties in this action as follows:

**BY ELECTRONIC SERVICE:** I electronically served the document(s) described above via File & ServeXpress, on the recipients designated on the Transaction Receipt located on the File & ServeXpress website (https://secure.fileandservexpress.com) pursuant to the Court Order establishing the case website and authorizing service of documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 2, 2023, at San Francisco, California.

_____

Melissa Stern

# EXHIBIT B

*Kunigar Haney v. Avon Products, Inc., et al.*, **Case No. JCCP 4674,**
*Plaintiff's Reply in Support of Her Motion to Compel Defendant Brenntag*
*Specialties, LLC's Further Responses to Special Interrogatories* **(Sup. Ct. Ca. Nov. 8, 2023)**

71364566
Nov 08 2023
04:23PM

1  Erica L. Falkner, CA Bar No. 286007
   **SIMON GREENSTONE PANATIER, PC**
2  3760 Kilroy Airport Way, Suite 680
   Long Beach, California 90806
3  Telephone: (562) 590-3400
   Facsimile: (562) 590-3412
4  E-mail: efalkner@sgptrial.com

Electronically FILED by
Superior Court of California,
County of Los Angeles
11/08/2023 4:32 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By C. Perez, Deputy Clerk

5  Attorney for Plaintiff

6

7

8        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9           **FOR THE COUNTY OF LOS ANGELES**

10

11 | Coordinated Proceeding            J.C.C.P. No. 4674
     Special Title (Rule 3.550)
12 |                                  Los Angeles County Superior Court
     **LAOSD ASBESTOS CASES**         Case No. 23STCV06726
13 | _____
                                      Coordination Trial Judge
14 | **KUNIGAR HANEY**,               The Honorable Laura A. Seigle,
                                      Dept. 15
15 |            Plaintiff,
                                      **PLAINTIFF'S REPLY IN SUPPORT
16 |    vs.                           OF HER MOTION TO COMPEL
                                      DEFENDANT BRENNTAG
17 | **AVON PRODUCTS, INC.**, *et al*., SPECIALTIES, LLC'S FURTHER
                                      RESPONSES TO SPECIAL
18 |            Defendants.           INTERROGATORIES**

19                                    Filed Concurrently with:
                                        1.  *Declaration of Erica L. Falkner*
20
                                      Date:    November 16, 2023
21                                    Time:    9:00 a.m.
                                      Dept.:   SSC-15
22
                                      Action Filed:   March 27, 2023
23                                    Trial Date:     December 18. 2023

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Two similar motions regarding Requests for Production of Documents and the deposition of Defendant's PMQ were heard and <u>granted</u> by this Court on October 26, 2023. Brenntag Specialties, LLC ("Brenntag") was ordered to "serve verified responses to the requests for production and deposition notice, produce responsive documents, and make a PMQ witness available" by November 15, 2023. (Ex. C attached to Falkner Dec.) While there has been communication between the parties regarding the Court's order, Brenntag has yet to:

- produce documents;
- identify when it will produce documents;
- identify how many documents there are;
- serve amended, verified responses to Plaintiff's Request for Production;
- confirm the date for the deposition of Brenntag's PMQ witness. (Falkner Dec. ¶5.)

Accordingly, at this time, Plaintiff cannot ascertain whether Brenntag will comply with the Court's order to participate in discovery. To protect her interests, Plaintiff must leave the present motion on calendar until she receives further responses to special interrogatories. Brenntag should provide amended responses to the four (4), straightforward special interrogatories propounded by Plaintiff prior to this hearing. A Court order should not be required; however, should a hearing on this motion be necessary, Plaintiff's Motion to Compel and her request for sanctions against Brenntag and/or its counsel of record should be granted in its entirety. The Court has made clear that Brenntag is an active defendant and must participate in discovery as there is no stay in effect. Brenntag's refusal to respond to Special Interrogatories absent a Motion to Compel and Court order is without excuse and has frustrated Plaintiff's ability to prepare for trial.

1

**II.**

2

**ARGUMENT**

3

**A. Brenntag is an Active Defendant and Must Participate in Discovery.**

4 It cannot be stated enough: There is <u>no stay</u> in place as to Brenntag. Whittaker, Clark

5 & Daniels Inc. ("WCD") has filed a motion for preliminary injunction to extend its automatic

6 stay to *successor-in-interest claims only*. While that motion is pending, this case is racing

7 towards its preferential trial date. Plaintiff's efforts to prepare for trial have been thwarted

8 by Brenntag's selective refusal to participate in discovery. Brenntag refuses to provide

9 responses to discovery but took no issue with appearing at and actively participating in the

10 deposition of defendant Clinical Formula LLC. (Falkner Dec. ¶6.) Brenntag cannot have it

11 both ways.

12 Brenntag's opposition is nothing more than a back door attempt to obtain a protective

13 order; however, there is no statutory authority for a court limiting discovery on its own

14 motion. Both California Code of Civil Procedure sections 2017.020(a) and 2019.030(b)

15 require a "motion" by the party affected. To date, Brenntag has not filed any motion for a

16 protective order and instead seeks relief from this Court via its opposition to Plaintiff's

17 motion. Furthermore, to succeed on such a motion, Brenntag would have to show "good

18 cause" exists to limit Plaintiff's discovery. "Generally, a deponent seeking a protective order

19 will be required to show that the burden, expense, or intrusiveness involved in [the discovery

20 procedure] clearly outweighs the likelihood that the information sought will lead to the

21 discovery of admissible evidence." (*Emerson Electric Co. v. Superior Court (Grayson)*

22 (1997) 16 Cal.4th 1101, 1110.) Brenntag has not and cannot meet this standard as the

23 discovery sought here is routine and highly relevant to Plaintiff's claims. Accordingly, the

24 Court should not grant Brenntag's procedurally improper request to limit Plaintiff's

25 discovery.

26

27

28

**B. Brenntag's Argument is Contradictory to Its Longstanding Position that Brenntag is Not a Successor-in-Interest to WCD.**

Brenntag consistently takes the position that it is separate and apart from WCD. Brenntag's Answer to Plaintiff's Complaint states as much – "Defendant BRENNTAG SPECIALTIES, LLC., f/k/a "BRENNTAG SPECIALTIES INC., f/k/a MINERAL PIGMENT SOLUTIONS, INC., and incorrectly named as Successor-in-Interest to WHITTAKER, CLARK, & DANIELS, INC." (hereafter "defendant"), answers plaintiff's Complaint for Personal Injury – Asbestos (hereafter "complaint") as follows: … TWENTY SEVENTH AFFIRMATIVE DEFENSE 27. Defendant is not the successor-in-interest or formerly-known-as Whittaker, Clark & Daniels." (Ex. A attached to Falkner Dec.) Its responses to Standard Interrogatories state "[Brenntag] was incorporated in December 2003 and began its operation as a distributor of specialty chemicals and ingredients on March 1, 2004. [Brenntag] did not exist before then." (Ex. B attached to Falkner Dec.) Now, only when it is convenient for Brenntag, does it seek to attach itself to WCD. Brenntag's argument is clearly contradictory to its longstanding position in asbestos litigation that it's unrelated to WCD and should be treated as such.

Here, Brenntag's liability *is* separate and apart from any association it may have or had with WCD. Records produced in this case identify *Brenntag* as the supplier of talc to which Plaintiff was exposed. Plaintiff is entitled to discovery to further develop her case against Brenntag for these exposures.

**C. Sanctions**

For all the reasons stated in Plaintiff's moving papers, sanctions are necessary to deter Brenntag's discovery abuse. Brenntag's refusal to participate in discovery is without justification. Plaintiff has been forced to expend significant resources. Accordingly, Plaintiff requests this Court order sanctions against Brenntag and/or its attorney of record, WFBM, LLP, in the reasonable amount of $2,625.

**III.**

1    **CONCLUSION**

2        Based on the foregoing, Plaintiff respectfully requests the Court grant Plaintiff's

3    Motion to Compel in its entirety and enter appropriate sanctions against Brenntag to curb its

4    discovery abuse.

5    DATED: November 8, 2023        **SIMON GREENSTONE PANATIER, PC**

6

7                    By: *Erica L. Falkner*

8                        Erica L. Falkner
                         Attorney for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **PROOF OF SERVICE**

2

3    STATE OF CALIFORNIA          )
                                   )
4    COUNTY OF LOS ANGELES   )

5           I am employed in the County of Los Angeles, State of California.  I am over eighteen
     years of age and not a party to the within action; my business address is 3760 Kilroy Airport
6    Way, Suite 680, Long Beach, California.  I am employed in Los Angeles County, California.

7           On the date set forth below, I served a true and correct copy of the foregoing
     document(s) described as:

8                 **PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION TO COMPEL**
     **DEFENDANT BRENNTAG SPECIALTIES, LLC'S FURTHER RESPONSES TO**
9                        **SPECIAL INTERROGATORIES**

10          On all interested parties in this action stated below via the following means of
     service:
11

12   **[XX]  BY E-SERVICE:**   I caused such document to be transmitted by electronic service
              via File&ServeXpress for the same day delivery to the offices of the addressee(s).
13            See File&ServeXpress Service List).

14          I declare under penalty of perjury, under the laws of the State of California that the
     above is true and correct.

15          Executed November 8, 2023 at Long Beach, California.

16

17                                             _____

18                                             Jenna Sanchez

19

20

21

22

23

24

25

26

27

28

(Page 2)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order



| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC., | |
|---|---|
| Plaintiffs, | **Order Filed on November 22, 2023 by Clerk U.S. Bankruptcy Court District of New Jersey** |
| v. | Adv. Proc. No. 23-01245 (MBK) |
| BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000, | |
| Defendants. | |

## <u>TEMPORARY RESTRAINING ORDER</u>

The relief set forth on the following pages, numbered three (3) through six (5), is

**ORDERED**.

MICHAEL B. KAPLAN,
USBJ

11/22/2023

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

This matter coming before the Court on the *Debtors' Motion for Entry of an Order (I) Temporarily Enjoining Certain Actions Against Non-Debtors; and (II) Approving Procedures for Seeking Extensions of Temporary Restraining Order* [Adv. Dkt. __] (the "**Motion**");[1] and the Court having found and determined that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C. § 157(b), (iii) venue is proper in this district pursuant to 28 U.S.C. § 1409, and (iv) entry of the Temporary Restraining Order and approval of the Extension Procedures is (a) fair and reasonable, (b) consistent with the Bankruptcy Code, the Bankruptcy Rules, the applicable Federal Rules, and the Local Rules, (c) appropriate under the circumstances, and (d) in the best interests of the Debtors and their estates and creditors; and upon the record of the hearing to consider the relief requested in the Motion conducted on November 21, 2023 (the "**Hearing**"), the Court hereby finds and determines that:

A.      The Debtors seek, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 7065 of the Federal Rules of Bankruptcy Procedure, a temporary restraining order prohibiting continued prosecution and settlement of Successor Liability Claims against Brenntag in the lawsuits identified on Exhibit 1 attached hereto (the "**Actions**").

B.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  Venue for this matter is proper in this District pursuant to 28 U.S.C. § 1409.

C.      Without immediate injunctive relief, it is expected that the Debtors will be irreparably harmed.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion. The term "Successor Liability Claims" shall have the meaning defined in the Motion, which incorporates by reference the definition of Successor Liability Claims in the complaint initiating this Adversary Proceeding [Adv. Proc. Docket No. 1].

**JA664**

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

     D.    This Court finds good cause to extend, and hereby extends, the temporary restraining order for the maximum period allowed under Federal Rule of Civil Procedure 65 – 28 days.

     E.    The Extension Procedures are fair and reasonable and do not unfairly prejudice any party to this Adversary Proceeding.

     F.    The legal and factual basis, and the parties' representations on the record, set forth in the Motion, the Declaration, and at the Hearing establish just cause for the relief granted herein.

Based on the foregoing findings and conclusions, **IT IS HEREBY ORDERED that:**

     1.    Defendants are temporarily restrained from prosecuting or settling any Successor Liability Claims in the Actions listed on the schedule attached hereto as Exhibit 1 (the "**Schedule**"), through and including the date that is 28 days from the date of entry of this Order. For the avoidance of doubt, this Order does not restrain Defendants from prosecuting or settling claims that are not Successor Liability Claims, including without limitation direct claims against Brenntag not arising out of conduct of the Debtors, and for which there can be no indemnification claims asserted by Brenntag against Debtors. In this regard, the Court authorizes the following two actions:

- Kunigar Haney v. Avon Products, Inc. et al., 23-STCV-06-726;
- Sharon Spinks v. Johnson & Johnson, et al., 67-CV-17-526

to proceed, only to the extent Plaintiffs in these actions have: (1) dismissed with prejudice all claims against Brenntag entities as successors in interest, alter egos, or other comparable capacities premised upon their alleged relationships to the Debtors; and (2) stipulated that no factual or legal issues relative to the Debtors' conduct will be adjudicated at trial. At this juncture, no other actions identified on Exhibit 1 may go forward.

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

Absent further Order of this Court or the expiration of this Temporary Restraining Order, the

restraints and the foregoing requirements will apply to all other actions which are identified on

Exhibit 1.

2.      The Debtors shall serve a copy of this Order, including the Schedule, on all parties

to this Adversary Proceeding via regular mail within one (1) business day of entry of this Order.

3.      The following Extension Procedures are hereby **APPROVED**:

i.      The Debtors shall be permitted to file requests to extend the Temporary
        Restraining Order for 28 days (each, an "**Additional Request**"), which shall
        attach a proposed extension order (an "**Extension Order**"), as well as an
        amended or supplemented Schedule of Actions sought to be enjoined and a
        blackline of such Schedule marked against the previously filed Schedule.

ii.     Additional Requests shall be served by regular mail and email (where known)
        on counsel for the TCC, counsel for the FCR, counsel for Brenntag, and counsel
        for any individual claimant identified on the Schedule (as amended or
        supplemented) (each, a "**Notice Party**" and collectively, the "**Notice Parties**")
        within one (1) business day of its filing.

iii.    Objections, if any, to an Additional Request (each, an "**Objection**") shall be
        filed and served on counsel for the Debtors within ten (10) days of service of
        the Additional Request.

iv.     All parties in interest shall have the right to timely object to an Additional
        Request on any grounds.

v.      Any Notice Party that fails to timely file an Objection shall be deemed to
        consent to the relief requested in the Additional Request, and the Court shall
        enter the proposed Extension Order as to such Notice Party.

vi.     In the event a Notice Party timely files an Objection, the Debtors and the
        applicable Notice Party shall meet and confer in an attempt to resolve the
        Objection, and, in the absence of such resolution, the Court shall resolve the
        Objection at a hearing to be scheduled.

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

4.     Brenntag is authorized and directed to file this Order, and any similar future Order(s) of this Court in this Adversary Proceeding, on the docket of the Actions listed on the Schedule within three (3) business days of its entry.

5.     Pursuant to Federal Bankruptcy Rule 7065, the Debtors are relieved from posting bond under Federal Rule 65(c).

6.     The requirement set forth in D.N.J. LBR 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

7.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

8.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

9.     The terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

10.    Nothing in this Order or the interim relief associated therewith shall be construed as a binding finding of fact or conclusion of law or preclude any party's ability to litigate these facts on a complete record, or otherwise prejudice the parties as to any further proceedings in any manner.

11.    The Court retains jurisdiction with respect to all matters arising from or relating to the interpretation, implementation, or enforcement of this Order.

**EXHIBIT 1**

[Schedule of Actions]

| | Case Name | Case No. | Jurisdiction | Plaintiff's Counsel | Date | Event |
|---|---|---|---|---|---|---|
| 1. | *Michael Pryor & Karen Pryor v. Avon Products, Inc., et al.* | MID-L-000022-21 | New Jersey | Simon Greenstone | 11/27/2023 | Trial |
| 2. | *Beth Solomon v. Avon Products, Inc., et al.* | CV-21-964799 | Ohio | Simon Greenstone | 11/27/2023 | Trial |
| 3. | *Katherine M. Komer, as Special Administrator for the Estate of DONALD E. SWEENEY, deceased, and ROBERTA S. SWEENEY v. Belden Wire & Cable Company LLC, et al.* | 22 LA 724; HRVA No. 1011684 | Illinois | Maune | 12/4/2023 | Trial |
| 4. | *JACKI MCALLISTER, Individually and as Special Administrator of the Estate of JAMES O. MCALLISTER, deceased v A.O. SMITH CORPORATION, et al.* | 21 L 870; HRVA No. 1010395 | Illinois | Maune | 12/4/2023 | Trial |
| 5. | *LORA M. HOWARD, as Administrator CTA for the Estate of MICHAEL S. FIELDS, deceased v. American International Industries, et al.* | 20 L 447; HRVA No. 1008294 | Illinois | Maune | 12/4/2023 | Trial |
| 6. | *Gayle Braun, Executor for Estate of James M. Braun Jr., deceased, v. Air & Liquid Systems Corporation, et al.* | 22 LA 1010; HRVA No. 1011947 | Illinois | Maune | 12/4/2023 | Trial |
| 7. | *GWENDOLYN J. MUKOMELA, Individually and as Special Administrator for the Estate of KENNETH D. MUKOMELA, deceased v. AGCO CORPORATION, et al.* | 22 LA 962; HRVA No. 1011932 | Illinois | Maune | 12/4/2023 | Trial |
| 8. | *Patricia Bvumbe v. Charles B. Chrystal Company, Inc., et al.* | MID-L-007546-20 | New Jersey | Simon Greenstone | 12/4/2023 | Trial |
| 9. | *Irma M. Infante v. Barretts Minerals, Inc., et al.* | 190137/2022 | New York | Lanier | 12/5/2023 | Jury selection with trial to proceed in due course |

| | Case Name | Case No. | Jurisdiction | Plaintiff's Counsel | Date | Event |
|---|---|---|---|---|---|---|
| 10. | G. Jyles Eaves as Special Administrator for Frances Eaves, Deceased v. Kolmar Laboratories, Inc., et al. | 190112/2021 | New York | Simmons | 12/5/2023 | Jury selection with trial to proceed in due course |
| 11. | Bonita Wintersteen and Robert Wintersteen v. Alticore, Inc., et al | 190034/2022 | New York | Simmons | 12/5/2023 | Jury selection with trial to proceed in due course |
| 12. | Jose Chavez, Administrator ad Prosequendum of the Estate of Luis Chavez, Deceased and Maria and J. Santana Chavez v. 3M Company, et al. | MID-L-006436-19 | New Jersey | Simon Greenstone | 12/11/2023 | Trial |
| 13. | Linda Oubre, individually and as Administratrix and Administratrix ad Prosequendum of the Estate of Betty Holtschneider, Deceased, and Stanley Holtschneider v. Brenntag North America, et al. | MID-L-003009-16 | New Jersey | Simon Greenstone | 12/11/2023 | Trial |
| 14. | Wendy Reynolds v. AT & T Corp. et al. | CT FBT-CV21-6103802-S | Connecticut | Simon Greenstone | 12/12/2023 | Trial |
| 15. | Bernice Hallam v. Arkema, Inc. | 23STCV11756 | California | Simon Greenstone | 12/18/2023 | Trial |

Form order − ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  Whittaker, Clark & Daniels, Inc.
Debtor

                                      Case No.: 23−13575−MBK
                                      Chapter 11

Whittaker, Clark & Daniels, Inc.
Plaintiff

v.

Brenntag AG
Defendant

Adv. Proc. No. 23−01245−MBK                        Judge: Michael B. Kaplan

## NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

      Please be advised that on November 22, 2023, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 89 − 61
Temporary Restraining Order (Related Doc # 61). Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. See BNC Certificate of Notice. Signed on 11/22/2023. (dmi)

      Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: November 22, 2023
JAN: dmi

                                            Jeanne Naughton
                                            Clerk

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

C    C m    D N   LBR

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota   coleschotz.com
wusatine   coleschotz.com
fyudkin   coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten   coleschotz.com
adeleo   coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean   coleschotz.com

*Counsel for Debtors and
Debtors-in-Possession*

**Order Filed on August 26, 2024
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

In re:                                    Chapter 11

WHITTAKER, CLARK & DANIELS, INC., *et al.*,    Case No. 23-13575 (MBK)

Debtors.[1]                    (Jointly Administered)

## NINTH ORDER EXTENDING TEMPORARY RESTRAINING ORDER

**DATED: August 26, 2024**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

**JA672**

(Page 2)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Ninth Order Extending Temporary Restraining Order

---

| | |
|---|---|
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC., | |
|        Plaintiffs, | |
| v. | Adv. Proc. No. 23-01245 (MBK) |
| BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000, | |
|        Defendants. | |

## NINT ORDER EXTENDING TEMPORARY RESTRAINING ORDER

The relief set forth on the following page, numbered three (3), is **ORDERED**.

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Ninth Order Extending Temporary Restraining Order

This matter coming before the Court on the *Debtors' Ninth Request for Extension of Temporary Restraining Order* Adv. Proc. Docket No. 254 (the **R**        );[2] and the Court having found and determined that (i) the Court has jurisdiction to consider the Request pursuant to 28 U.S.C.     157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C.    157(b), (iii) venue is proper in this district pursuant to 28 U.S.C.     1409, and (iv) entry of an Order extending the TRO[3] as to the Actions listed on the Amended Schedule in accordance with the previously approved Extension Procedures is (a) fair and reasonable, (b) consistent with the Bankruptcy Code, the Bankruptcy Rules, the applicable Federal Rules, and the Local Rules, (c) appropriate under the circumstances, and (d) in the best interests of the Debtors and their estates and creditors; and the Court having considered any objections to the Request and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, **IT IS   EREBY ORDERED T   AT:**

1.      The terms and conditions of the TRO shall be extended through and including **S    m        ,      ** and shall encompass the Actions listed on the Amended Schedule attached hereto as **E         **.

2.      The terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

3.      The Court retains jurisdiction with respect to all matters arising from or relating to the interpretation, implementation, or enforcement of this Order.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Request.

[3] The findings of fact and conclusions of law set forth in the TRO are incorporated into this Order as if fully set forth herein.

## EX  IBIT

**[Am       S       ]**

| | C N m | C N | | P C | D | E |
|---|---|---|---|---|---|---|
| 1. | *Michael Pryor & Karen Pryor v. Avon Products, Inc., et al.* | MID-L-000022-21 | New Jersey | Simon Greenstone | 11/27/2023 | Trial |
| 2. | *Katherine M. Komer, as Special Administrator for the Estate of DONALD E. SWEENEY, deceased, and ROBERTA S. SWEENEY v. Belden Wire & Cable Company LLC, et al.* | 22 LA 724; HRVA No. 1011684 | Illinois | Maune | 12/4/2023 | Trial |
| 3. | *JACKI MCALLISTER, Individually and as Special Administrator of the Estate of JAMES O. MCALLISTER, deceased v A.O. SMITH CORPORATION, et al.* | 21 L 870; HRVA No. 1010395 | Illinois | Maune | 12/4/2023 | Trial |
| 4. | *LORA M. HOWARD, as Administrator CTA for the Estate of MICHAEL S. FIELDS, deceased v. American International Industries, et al.* | 20 L 447; HRVA No. 1008294 | Illinois | Maune | 12/4/2023 | Trial |
| 5. | *Gayle Braun, Executor for Estate of James M. Braun Jr., deceased, v. Air & Liquid Systems Corporation, et al.* | 22 LA 1010; HRVA No. 1011947 | Illinois | Maune | 12/4/2023 | Trial |
| 6. | *GWENDOLYN J. MUKOMELA, Individually and as Special Administrator for the Estate of KENNETH D. MUKOMELA, deceased v. AGCO CORPORATION, et al.* | 22 LA 962; HRVA No. 1011932 | Illinois | Maune | 12/4/2023 | Trial |
| 7. | *Irma M. Infante v. Barretts Minerals, Inc., et al.* | 190137/2022 | New York | Lanier | 12/5/2023 | Jury selection with trial to proceed in due course |
| 8. | *G. Jyles Eaves as Special Administrator for Frances Eaves, Deceased v. Kolmar Laboratories, Inc., et al.* | 190112/2021 | New York | Simmons | 12/5/2023 | Jury selection with trial to proceed in due course |
| 9. | *Bonita Wintersteen and Robert Wintersteen v. Alticore, Inc., et al* | 190034/2022 | New York | Simmons | 12/5/2023 | Jury selection with trial to proceed in due course |
| 10. | *Linda Oubre, individually and as Administratrix and Administratrix ad Prosequendum of the Estate of Betty Holtschneider, Deceased, and Stanley Holtschneider v. Brenntag North America, et al.* | MID-L-003009-16 | New Jersey | Simon Greenstone | 12/11/2023 | Trial |
| 11. | *Bernice Hallam v. Arkema, Inc.* | 23STCV11756 | California | Simon Greenstone | 12/18/2023 | Trial |

65977/0001-48222737v3

| | C    N m | C    N | | P C | D | E |
|---|---|---|---|---|---|---|
| 12. | *Sharon Hofmaister v. Johnson & Johnson* | 23CV033743 | California | Kazan | 1/29/2024 | Trial |
| 13. | *Shelly Yerkes v. Avon Products* | 23CV032102 | California | Kazan | 1/29/2024 | Trial |
| 14. | *DORCAS G. CONWAY, Individually and as Special Administrator of the Estate of THOMAS P. CONWAY, Deceased v. Air & Liquid Systems Corporation, et al.* | 21 L 1012; HRVA No. 1010535 | Illinois | Maune | 2/5/2024 | Trial |
| 15. | *Michael David Link, et al. v. 3M Company, et al.* | 2022-CP-40-05543 | South Carolina | Dean Omar | 2/12/2024 | Trial |
| 16. | *Heather Donaghy, as Personal Representative of the Estate of Shirley Smiley Potter, deceased v. 4520 Corp, Inc., et al.* | 2023-CP-40-03108 | South Carolina | Dean Omar | 2/12/2024 | Trial |
| 17. | *Nicholas Barone and Kathryn Barone v. Blue M et al.* | CT FBT-CV-22-6116587-S | Connecticut | Early | 2/27/2024 | Trial |
| 18. | *Karen A. Kreitel, Adminstrator of Estate of Janice Markuson v. Brenntag North America* | MID-L0003589-20 | New Jersey | Simon Greenstone | 3/18/2024 | Trial |
| 19. | *Mauricio Tellez v. Avon Products, et al.* | MID-L-000054-19 | New Jersey | Simon Greenstone | 4/8/2024 | Trial |
| 20. | *AMANDA RIGGINS; KOBE GREEN, an Adult Child; BOBBY CLINTON, A Minor Child, and JUSTICE CAUSEY, A Minor Child, By Their Natural Guardian Ad Litem v. BRENNTAG SPECIALTIES, INC., f/k/a MINERAL PIGMENT SOLUTIONS, INC., as successor-in-interest to WHITTAKER CLARK & DANIELS, ICN., et al.* | MID-L-002337-19 | New Jersey | Simon Greenstone | 4/15/2024 | Trial |
| 21. | *MARY JACKSON, Individually and as Administratrix and Administratrix ad Prosequendum of the Estate of JOHNNIE JACKSON, Deceased, and on behalf of Decedent's survivors, Johnny Jackson, Gwendolyn Jackson, and Dameon Williams vs. BARRETTS MINERALS INC., et als.* | MID-L-006778-20 | New Jersey | Maune | 4/15/2024 | Trial |

2

| | C    N  m | C    N | | P C | D | E |
|---|---|---|---|---|---|---|
| 22. | *LINDA JOHNSON-BRETT and BRADFORD BRETT vs. A.O. SMITH CORPORATION., et als.* | E2022002698 | New York | Meirowitz & Wasserberg | 4/18/2024 | Jury selection with trial to proceed in due course |
| 23. | *KYUNG H. LEE and JOE J. LEE vs. BI-MART CORPORATION, et als.* | 23CV40369 | Oregon | Dean Omar | 4/29/2024 | Trial |
| 24. | *Tina Cooney v. Avon Products Inc.* | MID-L-002992-22 | New Jersey | Maune | 4/29/2024 | Trial |
| 25. | *Donna Calawa, Personal Representative for the Estate of Ronald Messenger v. Advance Atores Company, Inc. et al.* | FBT-CV-22-6115647-S | Connecticut | Early | 4/30/2024 | Trial |
| 26. | *Evan C. Plotkin and Martha Barry-Plotkin v. Johnson & Johnson, et al.* | FBT-CV21-6109520-S | Connecticut | Dean Omar | 4/30/2024 | Trial |
| 27. | *JAMES D. HUFF, Individually and as Administrator and Administrator ad Prosequendum of the Estate of LINDA KAY HUFF v. ARKEMA, INC. f/k/a PENNWALT CORPORATION and ELF ATOCHEM NORTH AMERICA, INC.* | MID-L-002818-17 | New Jersey | Simon Greenstone | 5/13/2024 | Trial |
| 28. | *DAVID HULTIN v. 3M COMPANY, et al.* | CV089355 | New York | Meirowitz & Wasserberg, LLP | 5/23/2024 | Jury selection with trial to proceed in due course |
| 29. | *NEIL BATHGATE, individually and as Representative of the Estate of JOSEPHINE BATHGATE v. AVON PRODUCTS, INC. et al.,* | 190125/2022 | New York | Simon Greenstone | 5/29/2024 | Jury selection with trial to proceed in due course |
| 30. | *RACHELLE JANE CLEARY and JOANNE BURGESS, as Personal Representative of the Estate of MONICA DRAYNER, v. AVON PRODUCTS, INC. et al.* | 190124/2022 | New York | Simon Greenstone | 5/29/2024 | Jury selection with trial to proceed in due course |
| 31. | *MARIA JAUREGUI v. AVON PRODUCTS, INC. et al.* | 190189/2022 | New York | Meirowitz & Wasserberg, LLP | 5/29/2024 | Jury selection with trial to proceed in due course |
| 32. | *AOIFE MCATEER, v. AVON PRODUCTS, INC., et al.* | 782000/2017 | New York | Simon Greenstone | 5/29/2024 | Jury selection with trial to proceed in due course |

3

| | C   N m | C   N | | P C | D | E |
|---|---|---|---|---|---|---|
| 33. | *TESA ALAINE BURCH, as Administrator of the Estate of DENA VEE POWELL, f/k/a DENA V. BURCH v. AVON PRODUCTS, INC., et al.* | 190122/2022 | New York | Meirowitz & Wasserberg, LLP | 5/29/2024 | Jury selection with trial to proceed in due course |
| 34. | *LISA THOMAS and JEFFRY SCHROEPFER, Individually and as Administrators of the Estate of CAROLYN SCHROEPFER v. AVON PRODUCTS, INC., et al.* | 190281/2022 | New York | Simon Greenstone | 5/29/2024 | Jury selection with trial to proceed in due course |
| 35. | *BARRY WILLIAM WALSH, Individually and as Administrator of the Estate of Lillian Margaret Walsh v. AVON PRODUCTS, INC., et al.* | 190123/2022 | New York | Simon Greenstone | 5/29/2024 | Jury selection with trial to proceed in due course |
| 36. | *KIM GRAY v. JOHNSON & JOHNSON, et al.* | MID-L-005932-19 | New Jersey | Levy Konigsberg, LLP | 6/20/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 37. | *EVELYN ISRAEL, as Administrator and Administrator ad Prosequendum for the Estate of HELEN WALTERS, Deceased, MARK WORTHINGTON and CHARLES WORTHINGTON v. CLINIQUE LABORATORIES, LLC, et al.* | MID-L-004313-19 | New Jersey | Simon Greenstone | 6/20/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 38. | *CAROLE SEGEDIE and KENNETH SEGEDIE v. COLGATE-PALMOLIVE COMPANY, et al.* | 22CV019385 | California | Kazan | 6/24/2024 | Trial |
| 39. | *MARK JAMES SORUM and BARBARA SORUM v. ALBERTSONS COMPANIES, INC., et al.* | 23CV031203 | California | Kazan | 07/08/2024 | Trial |
| 40. | *EDWARD ROTHLEIN and SHARON ROTHLEIN v. AMERICAN INTERNATIONAL INDUSTRIES, et al.* | 190374/2016 | New York | Levy Konigsberg, LLP | 07/16/2024 | Jury selection with trial to proceed in due course |
| 41. | *Vicki Robbins v. Avon Products, Inc., et al.* | MID-L-001231-22 | New Jersey | Simmons | 7/5/2024 | Deadline to file MSJ or waive ability to contest successor liability |

4

| | C    N m | C    N | | P C | D | E |
|------|----------|--------|------------|----------|----------|---------|
| 42. | *Barry Webster v. BASF Corp., et al.* | MID-L-001410-22 | New Jersey | Weitz | 7/5/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 43. | *Kimberly C. Harris and Michael Harris v. Avon Products, Inc., et al.* | MID-L-004711-21 | New Jersey | Weitz | 7/19/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 44. | *Nicole Stone and Joshua Stone v. Barretts Minerals, Inc., et al.* | MID-L-001972-22 | New Jersey | Weitz | 7/19/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 45. | *Renee Cavalluzzi a/k/a Renee A. Cavaluzzi, Individually and as Executrix of the Estate of John Cavalluzzi, deceased v. Barretts Minerals, Inc., et al.* | MID-L-002519-22 | New Jersey | Weitz | 7/19/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 46. | *Virginia Harrington v. Johnson & Johnson, et al.* | MID-L-006733-20 | New Jersey | Levy | 7/19/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 47. | *Barbara J. Mizer and George A. Mizer v. Aisin USA Mfg, Inc., et al.* | MID-L0004279-22 | New Jersey | Maune | 7/19/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 48. | *Tari Curtis, Individually and as Administrator and Administrator ad Prosequendom of the Estate of Erik Curtis, Deceased, and Angel Curtis, a Minor Child, Amber Curtis, a Minor child, Cesar Curtis, a Minro child, Blake Curtis, a Minor child, and Mason Curtis, a Minor child, by their Natural Guardian ad litem v. Avon Products, Inc., et al.* | MID-L-006225-20 | New Jersey | Simon Greenstone | 7/19/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 49. | *Briana M. Santos v. Brenntag Specialties, Inc., et al.* | MID-L-005026-22 | New Jersey | Maune | 7/19/2024 | Deadline to file MSJ or waive ability to contest successor liability |

5

| | C  N m | C  N | | P C | D | E |
|---|---|---|---|---|---|---|
| 50. | *Logan J. Windram, Individually and as Executor and Executor Ad Prosequendum of the Estate of Jennifer Windram v. Johnson & Johnson, et al.* | MID-L-003103-21 | New Jersey | Maune | 7/19/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 51. | *Kimberly O. Aikens v. Arkema Inc., et al.* | 2023-017836-CA-42 | Florida | Ferraro | N/A | Proposed Brenntag Settlement |
| 52. | *Cheryl R. Weeks and Gregory W. Weeks vs. Barretts Minerals Inc., et al.* | CACE-23-004434 | Florida | Maune | 8/5/2024 | Trial |
| 53. | *Amanda Lairson, as Administrator and Administrator ad Prosequendum of the Estate of Larry Lairson v. Advance Auto Parts, Inc., et al.* | MID-L-006673-18 | New Jersey | Simon Greenstone | 8/5/2024 | Trial |
| 54. | *Susan W. Berris and Bruce C. Berris vs. Brenntag North America, Inc., et al.* | 62-CV-23-257 | Minnesota | Maune | 8/12/2024 | Trial |
| 55. | *Henry D. Barratt, Jr. Individually and as Executor and Executor ad Prosequendum of the Estate of Madelin Barratt, Deceased v. Brenntag North America, Inc.* | MID-L-008016-19 | New Jersey | Simon Greenstone | 8/2/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 56. | *Michelle Cooper v. Johnson & Johnson, et al.* | MID-L-001326-21 | New Jersey | Levy | 8/2/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 57. | *Jane Davis, as Executrix and Executrix ad Prosequendum for the Estate of John Synowicki, Deceased v. Beacon CMP Corp., et al.* | MID-L-005034-22 | New Jersey | Simon Greenstone | 8/2/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 58. | *KRAIG KAATZ and ARLENE KAATZ, his wife, vs. 84 LUMBER COMPANY, et al.* | 2023-L-008335 | Illinois | Simmons Hanly Conroy | 8/13/2024 | Trial |
| 59. | *John Kerley, Individually and as Administrator and Administrator ad Prosequendom of the Estate of Beverly Kerley, Deceased, and John B. Kerley v. Brenntag North America, Inc., et al.* | MID-L-006612-20 | New Jersey | Simon Greenstone | 8/16/2024 | Deadline to file MSJ or waive ability to contest successor liability |

6

**JA681**

| | C     N  m | C     N | | P C | D | E |
|-----|------------|---------|---|-----|---|---|
| 60. | *Jack LaSalle and Dianne LaSalle v. American International Industries, Inc.* | 23-2-08165-0 SEA | Washington | Kazan | N/A | Proposed Brenntag Settlement |
| 61. | *Emge v. 3M Company, et al.* | 24-2-05155-0 | Washington | Lanier | N/A | Proposed Brenntag Settlement |
| 62. | *Graham v. Brenntag North America, Inc., et al.* | 23CV34505 | Oregon | Dean Omar | N/A | Proposed Brenntag Settlement |
| 63. | *Ballesteros v. Albertson's Companies, Inc., et al.* | 23STCV06710 | California | Frost | N/A | Proposed Brenntag Settlement |
| 64. | *Meade v. Barretts Minerals Inc., et al.* | 23STCV23517 | California | Simmons | N/A | Proposed Brenntag Settlement |
| 65. | *Patricia Sneider v. Avon Products, Inc., et al.* | 23STCV25951 | California | Simon Greenstone | 8/26/2024 | Trial and Proposed Brenntag Settlement |
| 66. | *Lisa L. Frank, Individually and as Personal Representative and as Personal Representative Ad Prosequendum of the Estate of Judith Wilma Blankschaen v. Johnson & Johnson, et al.* | MID-L-008377-18AS | New Jersey | Levy Konigsberg, LLP | 8/30/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 67. | *Bernard P. Bowers Jr. and Jeanne Bowers v. A.W. Chesterton Company, et al.* | 210902481 | Pennsylvania | Weitz & Luxenberg | 9/9/2024 | Trial |
| 68. | *Josefina Alvarez v. Barretts Minerals Inc., et al.* | 2023L005583 | Illinois | Maune | 9/10/2024 | Trial |
| 69. | *Candace Rego as Executrix and Executrix ad Prosequendum for the Estate of Samantha Leigh Gentle and Ashley Rego v. Avon Products, Inc., et al.* | MID-L-7729-20AS | New Jersey | Simon Greenstone | 9/13/2024 | Deadline to file MSJ or waive ability to contest successor liability |
| 70. | *Shawn Jones, Individually and as Administrator and Administrator ad Prosequendum of the Estate of Sheila Ryan v. Avon Products, Inc., et al.* | MID-L-04589-19AS | New Jersey | Simon Greenstone | 9/13/2024 | Deadline to file MSJ or waive ability to contest successor liability |

7

| | C      N m | C    N | | P C | D | E |
|---|---|---|---|---|---|---|
| 71. | *Lilo Cooper and Leslie Cooper v. Arkema, Inc., et al.* | 23STCV15823 | California | Simon Greenstone | NA | Proposed Brenntag Settlement |
| 72. | *Frank M. Finch and Ruth E. Finch v. Barretts Minerals, Inc., et al.* | MID-L-005051-22 | New Jersey | Maune | 9/9/2024 | Trial |

8

Form order − ntcorder

## UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  Whittaker, Clark & Daniels, Inc.
Debtor

|  |  |
|---|---|
|  | Case No.: 23−13575−MBK |
|  | Chapter 11 |

Whittaker, Clark & Daniels, Inc.
Plaintiff

v.

Brenntag AG
Defendant

Adv. Proc. No. 23−01245−MBK                    Judge: Michael B. Kaplan

### NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

        Please be advised that on August 26, 2024, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 288 − 250
NINTH ORDER EXTENDING TEMPORARY RESTRAINING ORDER (related document:250 EIGHTH ORDER EXTENDING TEMPORARY RESTRAINING ORDER (related document:89 Temporary Restraining Order (Related Doc 61). Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. See BNC Certificate of Notice. Signed on 11/22/2023. (dmi), 237 Document re: Debtors' Eighth Request for Extension of Temporary Restraining Order (related document:89 Order (Generic)) filed by Michael D. Sirota on behalf of Whittaker, Clark & Daniels, Inc.. (Attachments: # 1 Notice re Eighth Request to Extend TRO # 2 Exhibit A − Proposed Extension Order # 3 Exhibit B − Blackline of Amended Schedule # 4 Exhibit C − Keale Declaration # 5 Exhibit D − De Leo Declaration) (Sirota, Michael) *** REVIEWED BY CHIEF JUDGE KAPLAN *** TEXT/Modified on 7/9/2024 . filed by Plaintiff Whittaker, Clark & Daniels, Inc.). (km). Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. Signed on 8/26/2024. (wiq)

        Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: August 26, 2024
JAN: wiq

                                                    Jeanne Naughton
                                                    Clerk

**JA684**

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** |  |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com | **Order Filed on August 28, 2024**<br>**by Clerk**<br>**U.S. Bankruptcy Court**<br>**District of New Jersey** |

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEBTORS ON COUNTS I AND IV OF THE COMPLAINT

**DATED: August 28, 2024**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Case 3:24-cv-01519-MAS-JBD   Document 105   Filed 08/28/24   Page 2 of 7   PageID: 693
Case 3:24-cv-01519-MAS-JBD   Doc 792   Filed 03/13/25   Page 693 of 1429   PageID:
Document 105   Page 2 of 7

(Page 2)

Debtors: Whittaker, Clark & Daniels, Inc., *et al.*

Case No. 23-01245 (MBK)

Caption of Order: Order Granting Summary Judgment in Favor of the Debtors on Counts I and IV
of the Complaint

---

| | |
|---|---|
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC., | |
|      Plaintiffs, | |
| v. | Adv. Proc. No. 23-01245 (MBK) |
| BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000, | |
|      Defendants. | |

## ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF
## THE DEBTORS ON COUNTS I AND IV OF THE COMPLAINT

The relief set forth on the following pages, numbered three (3) through seven (7), is

**ORDERED**.

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors on Counts I and IV
of the Complaint

This matter coming before the Court on the *Debtors' Motion for Summary Judgment With Respect to Counts I, II, and IV of the Complaint* [Adv. Proc. Docket No. 3] (the "**Motion**");[2] and the Court having found and determined that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C. § 157(b), and (iii) venue is proper in this District pursuant to 28 U.S.C. § 1409; and the Court having considered the submissions of the parties, the Motion, the Meghji Declaration (including the incorporated First Day Declaration), the responses, objections and replies in respect of the Motion, and the evidence submitted by the parties, including declarations, testimony and exhibits filed with or presented to the Court, and *The Official Committee of Talc Claimants' Motion to Strike Hearsay and Other Inadmissible Testimony in the First Day Declaration and the Declaration of Mohsin Y. Meghji* [Adv. Proc. Docket No. 91] (the "**Motion to Strike**") filed by the Official Committee of Talc Claimants (the "**Committee**"), and upon all of the proceedings had before the Court, and the Court having issued an opinion setting forth its reasoning in granting the Motion [Adv. Proc. Docket No. 268] (the "**Opinion**") and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT**:

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

(Page 4)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors on Counts I and IV
of the Complaint

___

as such.  To the extent any of the following conclusions of law constitute findings of fact, they are

adopted as such.

B.     This Order constitutes a final appealable order within the meaning of 28 U.S.C. §

158(a).  Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by

Bankruptcy Rule 7054(a), the Court expressly finds that there is no just reason for delay in the

implementation of this Order, and expressly directs entry of this Order as to Counts I and IV of

the Complaint as set forth herein without regard to any stay or delay in its implementation.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY
ORDERED THAT:**

1.     The findings of fact and conclusions of law set forth in the Opinion are incorporated

into this Order by reference as if fully set forth herein.

2.     Summary judgment is **GRANTED** in favor of the Debtors with respect to Counts

I and IV of the Complaint filed in the Adversary Proceeding for the reasons set forth in the Opinion.

All objections to the relief granted herein are **OVERRULED**.

3.     The Motion to Strike is hereby **DENIED**.

4.     The Court finds and declares that Successor Liability Claims constitute property of

the Debtors' estates pursuant to sections 541(a)(1) and 541(a)(7) of the Bankruptcy Code.  For

purposes of this Order, the term "**Successor Liability Claim**" shall mean, consistent with the

Complaint, Motion and Opinion, any claim against a non-Debtor entity seeking to establish such

entity's liability for Tort Claims on any grounds, including, without limitation, that such entities

are successors to, or alter egos of, the Debtors.   For purposes of this Order, the term "**Tort Claim**"

shall mean, consistent with the Opinion: (1) claims alleging injuries resulting from exposure to

**JA688**

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors on Counts I and IV
of the Complaint

products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors

or their predecessors in interest; and (2) environmental litigation claims against the Debtors

relating to the production or handling of hazardous materials which allegedly contaminated certain

properties.

5.      The Debtors have exclusive standing to prosecute and seek to compromise

Successor Liability Claims, absent further order of this Court.

6.      Pursuant to the automatic stay set forth in section 362(a)(3) of the Bankruptcy

Code, the commencement, continued prosecution, or settlement of any Successor Liability Claims,

or any amendment or alteration of any Successor Liability Claims in an attempt to circumvent this

Order, by a party other than the Debtors is expressly prohibited during the pendency of the Chapter

11 Cases, absent further order of this Court.

7.      The Debtors and/or any Protected Party that is a party to an action asserting a

Successor Liability Claim are authorized to file this Order on the docket in such action.

8.      In the event of a dispute as to whether a claim in an action outside this Court

constitutes a Successor Liability Claim or whether any action or conduct is otherwise prohibited

by the automatic stay, any party in interest may file and serve a motion seeking this Court's

resolution of such dispute on counsel for each of the Debtors, the Committee, the FCR, the

Protected Parties, the United States Trustee, and the applicable Tort Claimant.  Any further

proceedings against any Protected Party in such action shall be prohibited while such dispute is

pending.

9.      In the event of an appeal of this Order, the Debtors, the Committee, the Berkshire

Entities, the Orange County Water District, and Brenntag shall negotiate and file an agreed upon

(Page 6)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors on Counts I and IV
of the Complaint

joint certification for a direct appeal to the Third Circuit Court of Appeals pursuant to 28 U.S.C. §

158(d)(2)(A) and Rule 8006(c) of the Federal Rules of Bankruptcy Procedure in connection with

such appeal.  If the parties cannot reach an agreement on a form of certification, the Court shall

resolve the parties' dispute(s) upon the filing of an appropriate pleading.

10.     The Debtors shall cause a copy of this Order to be served via e-mail or first class

mail on counsel for the known Defendants, counsel for the Committee, counsel for the Protected

Parties, the Office of the United States Trustee, and the parties listed on the Core Service List (as

defined in the Case Management Order entered in the Chapter 11 Cases [Docket No. 67]) within

three business days of its entry on the Court's docket.

11.     The requirement set forth in D.N.J. LBR 9013-1(a)(3) that any motion be

accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion

or otherwise waived.

12.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order.

13.     Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by

such notice.

14.     The terms and conditions of this Order shall be effective immediately upon its

entry.

15.     This Court shall have exclusive jurisdiction over this Order and any and all matters

arising from or relating to the implementation, interpretation, or enforcement of this Order,

including, without limitation, any and all determinations as to whether a claim constitutes a

(Page 7)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245 (MBK)
Caption of Order: Order Granting Summary Judgment in Favor of the Debtors on Counts I and IV
       of the Complaint

Successor Liability Claim and whether an action in respect of a Successor Liability Claim is

subject to the automatic stay.

Case 3:24-cv-10914-BRM Document 12-1 Filed 03/21/25 Page 699 of 1429 PageID:
Case 23-01245-MBK Doc 292-1 Filed 08/28/24 Entered 08/28/24 10:43:29 Page 1
Notice of Order Entry    Page 1 of 1

Form order − ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  Whittaker, Clark & Daniels, Inc.
Debtor

Case No.: 23−13575−MBK
Chapter 11

Whittaker, Clark & Daniels, Inc.
Plaintiff

v.

Brenntag AG
Defendant

Adv. Proc. No. 23−01245−MBK                    Judge: Michael B. Kaplan

## NOTICE OF JUDGMENT OR ORDER
## Pursuant to Fed. R. Bankr. P. 9022

      Please be advised that on August 28, 2024, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 292 − 3
ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEBTORS ON COUNTS I AND IV OF THE COMPLAINT (Related Doc # 3). Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. Signed on 8/28/2024. (wiq)

      Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: August 28, 2024
JAN: wiq

                              Jeanne Naughton
                              Clerk

**JA692**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, Debtors.[1] | Case No. 23-13575 (MBK) |
| | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

| | |
|---|---|
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC., | |
| Plaintiffs, | Adv. Proc. No. 23-01245 (MBK) |
| v. | |
| BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000, | |
| Defendants. | |

**DEBTORS' MOTION FOR (I) AN ORDER EXTENDING THE AUTOMATIC STAY TO AND/OR PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS PENDING ENTRY OF A FINAL, NON-APPEALABLE ORDER REGARDING THE DEBTORS' PROPOSED SETTLEMENT AND (II) A TEMPORARY RESTRAINING ORDER ENJOINING SUCH CLAIMS PENDING THE COURT'S DECISION ON THE DEBTORS' REQUEST FOR SUCH INJUNCTIVE RELIEF**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 2

JURISDICTION AND VENUE ................................................................................... 7

FACTUAL BACKGROUND ...................................................................................... 7

RELIEF REQUESTED.............................................................................................. 17

BASIS FOR RELIEF ................................................................................................ 17

  I.  The Court has Subject Matter Jurisdiction to Issue the Requested Stay/Injunction ......... 18

  II.  Extension of the Automatic Stay to the Brenntag Enjoined Claims is Warranted Under the Circumstances ................................................................................................. 21

    A.  There is an Identity of Interest Between the Debtors and Brenntag with Respect to the Brenntag Enjoined Claims ................................................................................. 22

    B.  The Continuation, Amendment, and Settlement of Brenntag Enjoined Claims Will Adversely Impact the Debtors .......................................................................... 24

  III.  The Court Should Exercise its Authority Under Section 105(a) of the Bankruptcy Code to Enjoin the Continuation, Amendment, and Settlement of Brenntag Enjoined Claims Pending a Resolution of the Settlement Motion .............................................................. 28

    A.  A Successful Outcome in the Chapter 11 Cases is Likely ........................................ 30

    B.  Failure to Enjoin the Brenntag Enjoined Claims Pending Resolution of the Settlement Motion Would Irreparably Harm the Debtors ...................................................... 33

    C.  The Irreparable Harm that the Debtors Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to Plaintiffs............................................. 37

    D.  The Public Interest Favors the Requested Injunction ............................................. 40

  IV.  The Court Should Approve the Procedures ................................................................. 40

REQUEST FOR TEMPORARY RESTRAINING ORDER................................................. 43

NO BOND REQUIRED ........................................................................................... 44

NOTICE ................................................................................................................ 45

CONCLUSION....................................................................................................... 45

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986) .........................................................................21, 27

*Acands, Inc. v. Travelers Cas. & Sur. Co.*,
    435 F.3d 252 (3d Cir. 2006).............................................................................20

*ADP, Inc. v. Levin*,
    No. 21-2187, 2022 WL 1184202 (3d Cir. Apr. 21, 2022) ......................................32

*In re Aldrich Pump LLC*,
    No. 20-03041 (JCW), 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021) .......................31

*In re Am. Film Techs., Inc.*,
    175 B.R. 847 (Bankr. D. Del. 1994) ...............................................................24

*In re Bestwall LLC*,
    606 B.R. 243 (Bankr. W.D.N.C. 2019)........................................................... *passim*

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005)................................17, 18

*In re Denby-Peterson*,
    941 F.3d 115 (3d Cir. 2019).............................................................................20

*In re Dow Corning I*,
    211 B.R. 545 (Bankr. E.D.M. 1997) ...............................................................38

*In re Excel Innovations*,
    502 F.3d 1086 (9th Cir. 2007) .......................................................................29

*FPSDA II, LLC v. Larin (In re FPSDA I)*,
    No. 12-08032, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) .....................18

*In re G-I Holdings, Inc.*,
    420 B.R. 216 (D.N.J. 2009) ...........................................................................28

*In re Johns-Manville Corp.*,
    26 B.R. 420 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984) ...............24, 26, 38

*In re LTL Mgmt., LLC*,
    640 B.R. 322 (Bankr. D.N.J. 2022) ...............................................................32

**JA696**

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*,
    Case No. CV 21-20252 (FLW), 2022 WL 190673 (D.N.J. Jan. 21, 2022) ..................... *passim*

*McCartney v. Integra Nat. Bank N.*,
    106 F.3d 506 (3d Cir. 1997)...........................................................................20, 21

*McHale v. Alvarez (In re The 1031 Tax Grp., LLC)*,
    397 B.R. 670 (Bankr.S.D.N.Y.2008) (Glenn, J.) ................................................29

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979).........................................................................................23

*In re Philadelphia Newspapers, LLC*,
    407 B.R. 606 (E.D. Pa. 2009) ......................................................21, 27, 28, 29

*In re Purdue Pharms., L.P.*,
    619 B.R. 38 (S.D.N.Y. 2020) ...........................................................................31

*In re Roggio*,
    612 B.R. 655 (Bankr. M.D. Pa. 2020) ..............................................................18

*In re Soundview Elite Ltd.*,
    543 B.R. 78 (Bankr. S.D.N.Y.) .........................................................................29

*Stoe v. Flaherty*,
    436 F.3d 209 (3d Cir. 2006), *as amended* (Mar. 17, 2006) .................................17

*In re Sudbury, Inc.*,
    140 B.R. 461 (Bankr. N.D. Ohio 1992) .......................................................24, 38

*The Lautenberg Foundation v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*,
    512 Fed. Appx. 18 (2d Cir.2013) .....................................................................29

*In re Union Tr. Philadelphia, LLC*,
    460 B.R. 644 (E.D. Pa. 2011) .........................................................................29

*In re United Health Care Org.*,
    210 B.R. 228 (S.D.N.Y. 1997)..........................................................................37

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983).........................................................................................38

*In re VistaCare Grp.*,
    LLC, 678 F.3d 218 (3d Cir. 2012) .....................................................................27

*In re W.R. Grace & Co.*,
    115 F. App'x 565 (3d Cir. 2004) ..................................................................26, 32

*In re W.R. Grace & Co.,*
    475 B.R. 34 (D. Del. 2012) ........................................................27

*In re W.R. Grace & Co.,*
    591 F.3d 164 (3d Cir. 2009) ....................................................17

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),*
    386 B.R. 17 (Bankr. D. Del. 2008) ............................... *passim*

**Statutes**

11 U.S.C. § 105(a) ........................................................ *passim*

11 U.S.C. § 362 .........................................................18, 20, 27

28 U.S.C. § 157 ................................................................6

28 U.S.C. § 1334 ..........................................................6, 17

28 U.S.C. § 1409 ..............................................................6

**Other Authorities**

Fed. R. Bankr. P. 7001 .......................................................6

Fed. R. Bankr. P. 7008 .......................................................6

Fed. R. Bankr. P. 7065 .......................................................6

Federal R. Civ. P. 65 .........................................................40

Local Rule 7065-1.........................................................1, 6

S. Elizabeth Gibson, *Judicial Management of Mass Tort Bankruptcy Cases,*
    Federal Judicial Center, at 1 (2005), available at
    https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf ...................30

TO THE HONORABLE MICHAEL B. KAPLAN,
CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT:

Whittaker, Clark & Daniels, Inc. ("**WCD**") and its debtor affiliates (together with WCD, the "**Debtors**" or "**Plaintiffs**"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") and plaintiffs in the above-captioned adversary proceeding (this "**Adversary Proceeding**"), by and through their undersigned counsel, hereby submit this motion (the "**Motion**"), pursuant to sections 105(a) and 362(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 7065-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**"), for entry of: (i) an Order, substantially in the form attached hereto as **Exhibit A** (the "**Preliminary Injunction Order**"), (a) extending the automatic stay to, and/or preliminarily enjoining the continuation, amendment, and settlement of, any Cause of Action against the Brenntag Releasees that is not a Debtor Released Estate Cause of Action and which (x) includes allegations of exposure to talc/asbestos prior to February 27, 2004 or (y) does not identify the year plaintiff was first allegedly exposed to talc/asbestos in the underlying complaint (such Cause of Action, a "**Brenntag Enjoined Claim**") pending this Court's entry of (1) a final, non-appealable Order granting the Settlement Motion or (2) an Order denying the Settlement Motion,[2] and (b) approving procedures pursuant to which (x) the Debtors may seek to amend the Schedule (as defined herein) to add Brenntag Enjoined Claims (the "**Schedule Amendment Procedures**") and (y) plaintiffs may seek to have their actions removed from the Schedule (the "**Schedule Removal Procedures**" and,

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1297] (the "**Settlement Motion**").

together with the Schedule Amendment Procedures, the "**Procedures**"); and (ii) a temporary restraining order, substantially in the form attached hereto as **Exhibit B** (the "**Temporary Restraining Order**"), enjoining the Brenntag Enjoined Claims pending the Court's decision on this Motion.[3]  In support of this Motion, the Debtors submit the *Declaration of Lathrop B. Nelson, III*, attached hereto as **Exhibit C** (the "**Declaration**"),[4] and respectfully state as follows:

### PRELIMINARY STATEMENT[5]

1.      The Debtors have worked tirelessly since the outset of these cases to achieve a value-maximizing, efficient, and equality-driven resolution for the benefit of all of their stakeholders.  Aided by the Court's recent Summary Judgment Opinion and Order, the Debtors were able to successfully complete negotiations of the Settlement Agreement, through which the Debtors propose to resolve all Estate Causes of Action, including Successor Liability Claims, for $535 million *plus* a release of any and all claims of the Contributing Parties against the Debtors, including potential indemnification claims.

2.      Prior to this monumental achievement, the Debtors sought a narrow and circumscribed TRO enjoining fewer than 75 actions against Brenntag that had impending trials or other dispositive hearings.  The purpose of this TRO was to preserve the status quo pending the Court's issuance of the Summary Judgment Order and to facilitate negotiations amongst the Debtors' key stakeholders on a path forward in these cases.  During this process, certain plaintiffs sought to circumvent the TRO by strategically dismissing the successor liability components of

---

[3] Contemporaneously with this Motion, the Debtors are filing an application to shorten time with respect to their request for entry of the Temporary Restraining Order, as well as the relief requested in the *Debtors' Motion for Leave to File an Amended Complaint* [Adv. Proc. Docket No. 298] (the "**Motion to Amend**").

[4] A chart identifying all known Brenntag Enjoined Claims that are currently pending is attached to the Declaration as Exhibit 1 (the "**Schedule**").

[5] Capitalized terms used in this Preliminary Statement but not defined herein shall have the meanings ascribed to such terms in this Motion.

their claims against Brenntag, in an effort to pursue direct claims against Brenntag that were nevertheless premised on allegations of pre-2004 talc/asbestos exposure and therefore implicated the Debtors' conduct, operations, and potential indemnification obligations to Brenntag. These efforts compelled the Debtors to seek this Court's intervention on multiple occasions to resolve the parties' disputes over the scope of the TRO.

3.      In its initial TRO Opinion, the Court explicitly recognized that "even direct claims against Brenntag can give rise to indemnification claims depending on the conduct alleged, the timeframes implicated, and the products involved" and therefore "direct claims against Brenntag are not categorically excepted from the relief sought by way of the Adversary Proceeding and the [TRO] Motion."[6] Accordingly, the Court's subsequent decisions addressing the scope of the TRO struck a balance among, on the one hand, the Debtors' interests in preserving the status quo pending the Court's determination of ownership of Successor Liability Claims and, with respect to claims against Brenntag that are not Successor Liability Claims, their interests in avoiding having to litigate Brenntag's potential indemnification rights in the tort system,[7] and, on the other hand, the plaintiffs' interests in prosecuting direct claims against Brenntag.

4.      To these ends, the Court permitted the plaintiff in the Haney Action to proceed to trial on direct claims against Brenntag on the basis that such action had no impact on these estates given the substantiated absence of any connection between plaintiff's alleged talc-related injuries and the Debtors' pre-2004 conduct and business operations. In contrast, the Court determined that the Lee, Cooper, and Sneider Actions fell within the scope of the TRO because the facts underlying

---

[6] TRO Opinion, at p. 9 n. 2.

[7] The Debtors dispute Brenntag's purported entitlement to indemnification with respect to claims that are not Successor Liability Claims and reserve all rights.

those claims implicated the Debtors' conduct in view of the allegations and evidence of plaintiffs' pre-2004 talc/asbestos exposure.

5.        At the August 22, 2024 hearing on the Debtors' ninth request to extend the TRO, the Court expressed its desire for the Debtors to present an "exit strategy" for these cases in conjunction with any future requests for injunctive relief.  The Debtors have satisfied this condition.  The Settlement Agreement, if approved on a final basis, would resolve all Successor Liability Claims and other Estate Causes of Action, as well as any potential indemnification claims of Brenntag, and provide substantial value to the Debtors' estates and creditors.  The Settlement Agreement also provides for the construct of a confirmable chapter 11 plan as set forth in the Plan Term Sheet, which the Contributing Parties have agreed to support.  Moreover, the Settlement Agreement does not seek to impair, compromise, or release any direct claims against Brenntag that could be asserted by plaintiffs.

6.        With a viable exit strategy for these cases now in place, an expanded injunction, encompassing all claims against Brenntag premised on talc/asbestos exposure during time periods that could implicate the Debtors' conduct and trigger potential indemnification claims against them, is both reasonable and appropriate.  Although the Settlement Agreement is not conditioned on the Court granting the injunctive relief sought herein, such relief will maintain the status quo and preserve the value of the resolution proposed by the Settlement Agreement pending its adjudication.  Accordingly, the Debtors file this Motion to preliminarily enjoin and/or extend the automatic stay to the 684 Brenntag Enjoined Claims listed on the Schedule attached to the Declaration as Exhibit 1, pending this Court's entry of (i) a final, non-appealable Order granting the Settlement Motion or (ii) an Order denying the Settlement Motion.

7.      Significantly, 657 of the Brenntag Enjoined Claims (approximately 96%) are expressly pled as Successor Liability Claims and, therefore, are presently subject to the automatic stay pursuant to the Summary Judgment Order.   The stay and injunction requested herein is necessary, however, to prevent plaintiffs from attempting to circumvent the Summary Judgment Order through procedural machinations similar to those employed by the plaintiffs in the Lee, Cooper, and Sneider Actions, or some new variation thereof.

8.      The remaining 27 Brenntag Enjoined Claims are not pled as Successor Liability Claims, but either contain express allegations of pre-2004 talc/asbestos exposure in the underlying complaint or, in two instances, do not plead sufficient information for the Debtors to identify the year in which the respective plaintiffs were first allegedly exposed to talc/asbestos in order to reasonably assess their impact on these estates.   These Brenntag Enjoined Claims are substantially similar to the claims asserted against Brenntag in the Lee, Cooper, and Sneider Actions following those plaintiffs' dismissals of their Successor Liability Claims and should be enjoined for the same reasons the Court extended the TRO to those actions.

9.      For the avoidance of doubt, the Debtors are not aware of any Brenntag Enjoined Claim that asserts purely direct claims against Brenntag based solely on post-2004 talc/asbestos exposure, as was the case in the Haney Action which the Court declined to enjoin.   The Debtors encourage any affected plaintiff who believes that his or her claim against Brenntag constitutes a purely direct claim based solely on post-2004 talc/asbestos exposure to contact the Debtors' undersigned counsel in advance of the applicable objection deadlines.   The Debtors will work in good faith with such plaintiffs and Brenntag to informally resolve any dispute, if possible, and remove such action from the Schedule, as appropriate.   To that end, any party who wishes to

examine or copy the documents summarized in the Schedule can do so by contacting the Debtors' undersigned counsel to obtain access to a data room containing such documents.

10. A preliminary injunction and/or extension of the automatic stay of the Brenntag Enjoined Claims will maximize the value of the resolution proposed by the Settlement Agreement. Approval of the Settlement Agreement pursuant to a final, non-appealable Order would resolve all Estate Causes of Action against the Contributing Parties, including Successor Liability Claims against Brenntag, and would provide the Debtors with a release from any and all potential indemnification claims that could be asserted by Brenntag. As such, the Settlement Agreement, if approved on a final basis, would provide a clear path for plaintiffs to pursue direct claims against Brenntag in the future.

11. In contrast, absent the stay extension and/or injunction requested herein, plaintiffs would undoubtedly continue their efforts to circumvent the Summary Judgment Order in order to prosecute direct claims against Brenntag notwithstanding any potential adverse impact on these estates. In that event, the Debtors would be compelled to participate in tort system litigation and expend substantial resources defending their actions and Brenntag's potential indemnification claims or suffer the consequences of adverse judgments and litigation prejudice of *res judicata*, collateral estoppel, and record taint. Importantly, whereas the automatic stay bars plaintiffs from seeking to establish Brenntag's liability for injuries resulting from pre-2004 talc/asbestos exposure (*i.e.*, Successor Liability Claims) following entry of the Summary Judgment Order, nothing would prevent Brenntag from introducing evidence of such exposure at trial for the purpose of reducing its liability apportionment (which a jury could then apportion to the Debtors) and/or asserting potential indemnification claims against the Debtors in connection with litigation of direct claims

6

**JA704**

of plaintiffs that involve pre-2004 talc/asbestos exposure.  The Debtors' request for a preliminary injunction should be granted to prevent such harm to the Debtors' estates.

12.     The Debtors also seek entry of a Temporary Restraining Order on shortened notice to enjoin the Brenntag Enjoined Claims until the Court renders its decision on the Debtors' request for a preliminary injunction and/or extension of the automatic stay.  The Debtors submit that such interim relief is necessary to avoid intervening attempts by plaintiffs to plead around the Summary Judgment Order in an effort to pursue direct claims against Brenntag that implicate the Debtors' conduct, operations, and potential indemnification obligations to Brenntag.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this Adversary Proceeding and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Bankruptcy Rule 7008, the Debtors consent to the entry of final orders or a final judgment by this Court in this Adversary Proceeding.

14.     Venue of this proceeding is proper in this District pursuant to 28 U.S.C. § 1409.

15.     The statutory predicates for the relief requested herein are sections 105(a) and 362(a) of the Bankruptcy Code, Bankruptcy Rules 7001(7) and 7065, and Local Rule 7065-1.

## FACTUAL BACKGROUND

### A.     The Adversary Proceeding and Summary Judgment Motion

16.     On September 7, 2023, the Debtors commenced this Adversary Proceeding by filing a complaint [Adv. Proc. Docket No. 1] (the "**Complaint**") seeking: (i) a declaration that Successor Liability Claims are property of the Debtors' estates, which the Debtors have sole standing to pursue and compromise while the Chapter 11 Cases are pending; (ii) a declaration that Successor Liability Claims, as property of the Debtors' estates, are automatically stayed; (iii) a declaration that the stay extends to Successor Liability Claims against the Protected Parties to the

extent not automatically stayed; and (iv) a preliminary injunction enjoining the commencement, continuation, and settlement of Successor Liability Claims while these Chapter 11 Cases are pending.

17.     Contemporaneously with the filing of the Complaint, the Debtors filed: (i) a motion seeking to preliminarily enjoin the commencement, continuation and settlement of Successor Liability Claims while these Chapter 11 Cases remain pending [Adv. Proc. Docket No. 2] (the "**PI Motion**"); and (ii) a motion for summary judgment on Counts I, II, and IV of the Complaint [Adv. Proc. Docket No. 3] (the "**Summary Judgment Motion**").

18.     On October 12, 2023, the Court entered the *Case Management Order* [Adv. Proc. Docket No. 52] (the "**CMO**") in this Adversary Proceeding, pursuant to which the Court scheduled the hearing to consider the Summary Judgment Motion solely with respect to Counts I and IV of the Complaint (seeking a declaration that Successor Liability Claims are property of the Debtors' estates and thus subject to the automatic stay) for December 5, 2023 at 11:00 a.m. (ET).  CMO, ¶ 2.

19.     Pursuant to the CMO, the Court reserved judgment on the Summary Judgment Motion with respect to Counts I and IV to afford the parties time to engage in good faith settlement negotiations through mediation.  CMO, ¶¶ 6, 7.

20.     On November 15, 2023, the Court entered an Order appointing The Honorable Robert E. Gerber (Ret.) as mediator "to attempt to reach a comprehensive resolution of any and all issues, including, but not limited to, in conjunction with a potential section 524(g) plan, including: (a) environmental claims against the Debtors, including any contribution, indemnification, guarantee, subrogation claims, or other related claims; (b) claims related to personal injury in any way related to asbestos, talc, or other compounds or substances in connection with the Debtors'

historical business operations or products, including any contribution, indemnification, guarantee, subrogation claims, or other related claims; (c) successor liability or alter ego claims in connection with the Debtors' historical business operations or products; (d) the resolution of disputes over the obligations of certain insurers that issued insurance policies that cover or arguably cover the above claims; and (e) any other matters agreed to among the Mediation Parties or as otherwise directed by further order of the Court (collectively, the "**Mediation Matters**")."[8]  The Mediation Parties entered into three Court-approved stipulations extending mediation.[9]

21.     Ultimately, mediation did not result in a resolution of the Mediation Matters. Accordingly, on June 2, 2024, the Debtors filed a letter requesting that the Court issue its decision on the Summary Judgment Motion.[10]  On June 10, 2024, the Committee filed a responsive letter requesting that the Court terminate mediation and decline to render a decision on the Summary Judgment Motion.[11]  At a hearing held on June 17, 2024, the Court indicated its intent to rule on the Summary Judgment Motion and requested supplemental briefing from the parties.[12]  The Court declined the TCC's request to terminate mediation.[13]

22.     On August 13, 2024, following the completion of the requested supplemental briefing, the Court issued its decision on the Summary Judgment Motion [Adv. Proc. Docket No. 268] (the "**Summary Judgment Opinion**") holding that Successor Liability Claims are property of the Debtors' estates subject to the automatic stay provisions set forth in section 362(a) of the

---

[8] *See* Docket No. 654 at ¶ 5.

[9] The Mediation Parties included the Debtors, the Committee, the FCR, Brenntag, the Berkshire Entities, and DB US Holding Corp.  The mediation stipulations and orders approving same can be found at Docket Nos. 813, 814, 917, 922, 1057, 1059.

[10] *See* Adv. Proc. Docket No. 214.

[11] *See* Adv. Proc. Docket No. 216.

[12] Hearing Tr. 27:25-28:7 (Jun. 17, 2024).

[13] *Id.* at 29:13-20.

Bankruptcy Code. The Court entered an order incorporating its Summary Judgment Opinion on August 28, 2024 [Adv. Proc. Docket No. 292] (the "**Summary Judgment Order**"). Pursuant to the CMO, and as a result of the Summary Judgment Order, the PI Motion filed with the Complaint was withdrawn.

23. The Summary Judgment Order does not address Counts II and III of the Complaint (seeking to extend the automatic stay to, and preliminarily enjoin, the commencement, continuation, and settlement of, Successor Liability Claims while these Chapter 11 Cases are pending, respectively). Accordingly, the Court scheduled a status conference for September 18, 2024 to discuss Counts II and III of the Complaint (the "**Status Conference**").

24. Contemporaneously with the filing of this Motion, the Debtors filed the Motion to Amend, pursuant to which the Debtors request this Court's leave to amend Counts II and III of the Complaint to seek to extend the automatic stay to, and preliminarily enjoin, all Brenntag Enjoined Claims pending the Court's entry of (a) a final, non-appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion, consistent with the relief requested herein.

**B.     The TRO**

25. In light of the timeline for decision on the Summary Judgment Motion set forth in the CMO, on October 31, 2023, the Debtors filed a motion [Adv. Proc. Docket No. 61] (the "**TRO Motion**") seeking a temporary restraining order to enjoin further prosecution of Successor Liability Claims that had an impending trial or other dispositive hearing, coupled with procedures to extend the TRO on a rolling basis every 28 days (the "**Extension Procedures**").

26. The Court issued an opinion [Adv. Proc. Docket No. 88] (the "**TRO Opinion**") and entered an Order [Adv. Proc. Docket No. 89] (the "**TRO**") granting the TRO Motion on November

22, 2023.[14]  The Court excluded the Haney Action[15] (discussed *infra*) from the TRO based on (i) Ms. Haney's counsel's representation that the claims asserted against Brenntag in the Haney Action were purely direct claims based solely on post-2004 exposure to talc/asbestos supplied by Brenntag and which had no connection to the Debtors, and (ii) Brenntag's confirmation of this representation.  Accordingly, the Court permitted the Haney Action to proceed against Brenntag only to the extent that Ms. Haney: (a) dismissed with prejudice all claims against Brenntag as successors in interest, alter egos, or other comparable capacities premised upon their alleged relationships to the Debtors; and (b) stipulated that no factual or legal issues relative to the Debtors' conduct would be adjudicated at trial.[16]

27.  Pursuant to the Extension Procedures approved in the TRO, the Debtors filed periodic requests to extend the TRO and amend the accompanying schedule to include additional actions asserting Successor Liability Claims against Brenntag with impending trials and other dispositive hearings, all of which the Court granted.[17]

28.  On April 15, 2024, the Debtors filed a motion to enforce the TRO [Adv. Proc. Docket No. 162] (the "**Motion to Enforce TRO**") against plaintiffs in the Lee Action[18] (discussed *infra*), who attempted to circumvent the TRO by dismissing Successor Liability Claims against Brenntag in order to proceed on their direct claims.

29.  On April 17, 2024, in connection with its response to the Motion to Enforce TRO, Brenntag filed its own motion [Adv. Proc. Docket No. 166] ("**Brenntag's TRO Motion**") seeking

---

[14] *See* Adv. Proc. Docket No. 89 (Order granting TRO Motion).

[15] *Haney v. Avon Products. Inc., et al.*, Case No. 23STCV06726 (Cal. Sup. Ct.)  (the "**Haney Action**").

[16] TRO at ¶ 1.

[17] To date, the Debtors have sought and obtained nine extensions of the TRO.  *See* Adv. Proc. Docket Nos. 112, 118, 121, 129, 133, 139, 147, 153, 157, 172, 190, 206, 210, 218, 226, 237, 250, 254, 288.

[18] *Lee v. Bi-Mart Corp., et al.*, Case No. 23CV40369 (Or. Cir. Ct.) (the "**Lee Action**").

to expand the TRO to cover all Successor Liability Claims, as well as any other claims that might give rise to potential indemnification claims against the Debtors, regardless of whether such claims were scheduled for trial or some other dispositive hearing in the near term.[19]

30.    The Debtors filed their reply in support of the Motion to Enforce TRO, which included a response to Brenntag's TRO Motion, on April 25, 2024.[20]  In that reply, the Debtors explained that they had intentionally sought a narrow and circumscribed TRO limited to actions against Brenntag that were approaching trial or some other dispositive hearing in an effort to balance the interests of Brenntag and the Tort Claimants while the parties engaged in mediation.[21]

31.    On April 26, 2024, the Court granted the Motion to Enforce TRO on grounds that an adverse judgment in the Lee Action could potentially trigger Brenntag's assertion of an indemnification claim against the Debtors – notwithstanding plaintiffs' purported dismissal of Successor Liability Claims – given the extensive allegations of pre-2004 talc exposure and the relationship between the Debtors and Brenntag set forth in the underlying complaint.[22]

32.    The Court denied Brenntag's request to expand the TRO at a hearing held on May 15, 2024, except in one respect.  The Court determined that Brenntag, as a non-debtor co-defendant, could not secure an expansion of the TRO without the support of an estate fiduciary arguing that such expansion is needed to protect the interests of the bankruptcy estate.[23]  However, the Court determined it was appropriate to modify the TRO to allow Brenntag to seek to settle any Successor Liability Claims asserted against it, subject to a 28-day notice period to the Debtors and

---

[19] Brenntag's Motion for Clarification, ¶ 49.

[20] *See* Adv. Proc. Docket No. 182.

[21] *See id.* at ¶ 1.

[22] *See* Adv. Proc. Docket No. 185; *see also* Hearing Tr. at 40:13-43:10 (Apr. 26, 2024).

[23] *See* Hearing Tr. at 44:23-45:20 (May 15, 2024).

the Committee, during which the parties could seek to expand the TRO to such claim.[24]  The Court

entered an Order so modifying the TRO on May 23, 2024.[25]

33.     The Debtors filed their ninth request to extend the TRO on July 31, 2024.[26]  On

August 12, 2024, the plaintiffs in the Cooper and Sneider Actions (discussed *infra*)[27] filed

objections to the Ninth TRO Request.  Cooper and Sneider argued that their actions were outside

the scope of the TRO because, prior to the TRO being extended to such actions, they dismissed all

Successor Liability Claims against Brenntag and stipulated not to introduce evidence regarding

the Debtors' conduct at trial.[28]

34.     The Court announced its decision regarding the Ninth TRO Request at a hearing

conducted on August 22, 2024.  The Court determined that, while the claims at issue in the Cooper

and Sneider Actions were not Successor Liability Claims (as such claims were previously

dismissed), the actions nonetheless fell within the scope of the TRO because plaintiffs' claims

against Brenntag could potentially impact the Debtors' bankruptcy estates given that discovery in

the actions adduced evidence of pre-2004 exposure to WCD talc products.[29]  In rendering its

decision, the Court emphasized that it would extend the TRO for a limited time and that the Debtors

would be expected to show the Court an "exit strategy" for these cases in order to obtain any

---

[24] *See id.* at 46:7-18.

[25] *See* Adv. Proc. Docket No. 208.

[26] *See* Adv. Proc. Docket No. 254 (the "**Ninth TRO Request**").

[27] *Cooper v. Arkema, Inc., et al.*, Case No. 23STCV15823 (Cal. Super. Ct.) (the "**Cooper Action**") and *Sneider v. Avon Products Inc., et al.*, Case No. 23STCV25951 (Cal. Super. Ct.) (the "**Sneider Action**").

[28] *See* Adv. Proc. Docket Nos. 266, 267 (the "**TRO Objections**").

[29] *See* Hearing Tr. 23:18-24 (Aug. 22, 2024).

further extension.[30]  Accordingly, the Court granted the Ninth TRO Request by Order dated August 26, 2024.[31]

### C.     The Settlement

35.     On September 3, 2024, the Debtors filed the Settlement Motion, through which the Debtors seek approval of a settlement agreement (the "**Settlement Agreement**")[32] by and among the Debtors, Brenntag, NICO, and DB US Holding Corp.[33]  The Settlement Agreement proposes to resolve all Estate Causes of Action against the Contributing Parties and their Related Parties (including Successor Liability Claims) as of the Effective Date of the Settlement Agreement, in exchange for a Settlement Payment of $535 million and a mutual release of all Causes of Action of the Contributing Parties against the Debtors, including, without limitation, potential indemnification claims of Brenntag.[34]

36.     The Settlement Agreement (i) provides for the release of any and all indemnification claims of Brenntag against the Debtors, and (ii) does *not* provide for the release

---

[30] *See id.* at 29:7-15.

[31] *See* Adv. Proc. Docket No. 288.

[32] A copy of the Settlement Agreement is attached as Exhibit 1 to the proposed order attached to the Settlement Motion as Exhibit A.

[33] "**Brenntag**" is defined in the Settlement Agreement to include: (i) Brenntag Canada, Inc., (ii) Brenntag Great Lakes, LLC; (iii) Brenntag Mid-South, Inc.; (iv) Brenntag North America, Inc.; (v) Brenntag Northeast, LLC; (vi) Brenntag Pacific, Inc.; (vii) Brenntag Southwest, Inc.; (viii) Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc. and as Mineral and Pigment Solutions, Inc.); and (ix) Coastal Chemical Co., LLC.

"**NICO**" is defined in the Settlement Agreement to include: (i) Berkshire Hathaway, Inc.; (ii) BH Columbia Inc.; (iii) Columbia Insurance Company; (iv) National Indemnity Company; (v) Resolute Management, Inc.; (vi) Ringwalt & Liesche Co.; and (vii) National Liability & Fire Insurance Company.

The Settlement Agreement defines Brenntag, NICO, and DB US Holding Corp. collectively as the "**Contributing Parties**".

[34] *See* Settlement Agreement, ¶¶ 2-3, 5-10.  The Settlement Agreement provides that up to $50 million of the Settlement Payment will be provided to the Debtors as part of a post-petition delayed draw term loan facility (the "**DIP Facility**") upon the Court's entry of an Order approving the DIP Facility.  The Debtors filed a motion seeking this Court's approval of the DIP Facility on September 3, 2024.  *See* Docket No. 1302.

**JA712**

of plaintiffs' direct claims against the Contributing Parties, including any direct claims against Brenntag for injuries arising from Brenntag's independent post-February 2004 operations.

37. The Settlement Agreement also provides for the construct of a confirmable chapter 11 plan in these cases, as memorialized in the Plan Term Sheet attached to the Settlement Agreement as Exhibit B (the "**Plan Term Sheet**"), which the Contributing Parties have agreed to support.

### D. The Brenntag Enjoined Claims and the Need for the Relief Requested Herein

38. The Brenntag Enjoined Claims sought to be stayed and/or enjoined pursuant to this Motion consist of all Causes of Action against the Brenntag Releasees (*i.e.*, Brenntag and its Related Parties) that are not Debtor Released Estate Causes of Action, and which (i) include allegations of exposure to talc/asbestos prior to February 27, 2004 (*i.e.*, the closing date for the sale of substantially all of the Debtors' operating assets to Brenntag) or (ii) do not identify the year plaintiff was first allegedly exposed to talc/asbestos in the underlying complaint. In other words, a Brenntag Enjoined Claim is a talc/asbestos claim that seeks to establish Brenntag's direct liability for injuries resulting from Brenntag's independent conduct post-2004—and which therefore is not subject to the automatic stay pursuant to the Summary Judgment Order—but which also contains allegations of pre-2004 talc/asbestos exposure and therefore implicates the Debtors' conduct, operations, and potential indemnification obligations to Brenntag, or which does not provide sufficient information in the underlying complaint for the Debtors to identify the year in which plaintiff was first allegedly exposed to talc/asbestos and therefore make a reasonable determination as to the impact on these estates.

39. The Schedule identifying all known Brenntag Enjoined Claims that are currently pending is attached to the Declaration as Exhibit 1. In addition to providing basic identifying

information for each subject talc/asbestos action, the Schedule also provides the following
information for each such action: (i) whether Brenntag was identified as a successor to one or more
Debtors in the underlying complaint (from which it may be reasonably inferred that the claim
includes allegations of pre-2004 talc/asbestos exposure); (ii) whether the underlying complaint
contains express allegations of plaintiff's pre-2004 talc/asbestos exposure, as well as a citation to
such allegations in the underlying complaint; (iii) the year of plaintiff's initial alleged talc/asbestos
exposure or an indication that the year of plaintiff's initial alleged exposure cannot be determined
from the face of the underlying complaint; and (iv) whether the plaintiff and Brenntag entered into
a stipulation to bifurcate claims against the Debtors from claims against Brenntag (from which it
also may be reasonably inferred that the claim includes allegations of pre-2004 talc/asbestos
exposure).

40.     The Debtors submit that the Schedule contains more than sufficient evidence
demonstrating that each Brenntag Enjoined Claim is properly within the scope of the
stay/injunction requested herein.  The Debtors intend to admit the Schedule into the record of this
Motion as a summary of voluminous documents under Rule 1006 of the Federal Rules of Evidence.
Any party who wishes to examine or copy the documents summarized in the Schedule can do so
by contacting the Debtors' undersigned counsel to obtain access to a data room containing such
documents.

41.     Notably, approximately 657 of the 684 actions listed on the Schedule (*i.e.* 96% of
such actions) are expressly pled as Successor Liability Claims against Brenntag.  Plaintiffs in the
remaining 27 actions listed on the Schedule expressly allege talc/asbestos exposure prior to 2004
in their complaints or, in two cases, the underlying complaint does not allege sufficient information
for the Debtors to determine plaintiffs' exposure timeline.  The Debtors are not aware of any

Brenntag Enjoined Claim listed on the Schedule that consists solely of direct claims against Brenntag for its independent conduct post-2004 (as was the case in the Haney Action the Court excluded from the TRO).

42.     The Debtors file this Motion seeking to extend the automatic stay to and/or enjoin the continuation, amendment, or settlement of the Brenntag Enjoined Claims pending this Court's entry of (a) a final, non-appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion, as well as to obtain a Temporary Restraining Order enjoining such claims pending the Court's decision.  For the reasons set forth herein, the injunctive relief sought by this Motion is necessary to maintain the status quo while the Court considers the Settlement Agreement, final approval of which would clear a path for plaintiffs to proceed against Brenntag on direct claims relating solely to their post-2004 talc/asbestos exposure without subjecting the Debtors to the significant risks discussed herein.

## RELIEF REQUESTED

43.     By this Motion, the Debtors seek entry of: (i) the Preliminary Injunction Order (a) extending the automatic stay to, and/or enjoining the continuation, amendment, or settlement of, all Brenntag Enjoined Claims pending the entry of (x) a final, non-appealable Order granting the Settlement Motion or (y) an Order denying the Settlement Motion and (b) approving the Procedures; and (ii) the Temporary Restraining Order enjoining such claims pending the Court's decision.

## BASIS FOR RELIEF

44.     In *In re LTL Management, LLC*, this Court concluded "that [section] 362(a), [section] 105(a), or a court's inherent powers can each serve as independent bases for extension of a stay or injunction to nondebtor third parties." 638 B.R. 291, 300 (Bankr. D.N.J. 2022).  However, because certain courts in this Circuit still view the source of authority for such relief as an open-

ended question, the Court adopted the following three-prong test to determine whether such relief

was appropriate: (i) whether the Court has jurisdiction to issue the injunction; (ii) whether

extension of the automatic stay under § 362(a) to the non-debtors is appropriate; and (iii) whether

the Court should, in its discretion, issue the injunction. *See id.* at 301 (citing *In re Philadelphia*

*Newspapers, LLC*, 407 B.R. 606, 611 (E.D. Pa. 2009)). The Debtors satisfy each prong of this

test.

45.     Accordingly, for the reasons set forth herein, the Court should enter an order

extending the automatic stay to, and/or enjoining the continuation, amendment, and settlement of,

Brenntag Enjoined Claims pending this Court's entry of (a) a final, non-appealable Order granting

the Settlement Motion or (b) an Order denying the Settlement Motion.

I.     **The Court has Subject Matter Jurisdiction to Issue the Requested Stay/Injunction**

46.     Section 1334 of title 28 of the U.S. Code provides that the Bankruptcy Court has

subject matter jurisdiction over the following matters: (i) cases under title 11; (ii) proceedings

arising under title 11; (iii) proceedings arising in a case under title 11; and (iv) proceedings related

to a case under title 11. *See* 28 U.S.C. § 1334(b); *see also In re Combustion Eng'g, Inc.*, 391 F.3d

190, 225 (3d Cir. 2004), *as amended* (Feb. 23, 2005). "The category of cases 'under' title 11

'refers merely to the bankruptcy petition itself.'" *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir.

2006), *as amended* (Mar. 17, 2006) (citation omitted). "A case 'arises under' title 11 'if it invokes

a substantive right provided by title 11.'" *Id.* "Proceedings 'arise in' a bankruptcy case, 'if they

have no existence outside of the bankruptcy.'" *Id.* "Finally, a proceeding is 'related to' a

bankruptcy case if 'the outcome of that proceeding could conceivably have any effect on the estate

being administered in bankruptcy.'" *Id.* (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d

Cir.1984)). When a jurisdictional issue is before a court, "[w]hat will or will not be sufficiently

related to a bankruptcy to warrant the exercise of subject matter jurisdiction is a matter than must

18

be developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d 164, 174 n. 9 (3d Cir. 2009).

47.     "Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings." *Combustion Eng'g, Inc.*, 391 F.3d at 225. "A bankruptcy court has the power to hear, decide and enter final orders and judgments in" core proceedings, but does not have the same authority in non-core proceedings. *In re Roggio*, 612 B.R. 655, 659-60 (Bankr. M.D. Pa. 2020) (citing *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999)).

48.     The Third Circuit has not addressed whether a request for an injunction qualifies as a core proceeding. However, in *LTL Management*, the district court held that such a proceeding is core because the request for relief is rooted in sections 105 and 362 of the Bankruptcy Code. *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, Case No. CV 21-20252 (FLW), 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022). Other courts have reached the same conclusion. *See, e.g., FPSDA II, LLC v. Larin (In re FPSDA I)*, No. 12-08032, 2012 WL 6681794, at *1, *5 (Bankr. E.D.N.Y. Dec. 21, 2012) (finding "arising under" jurisdiction over motion to extend a section 362 automatic stay and issue a section 105 injunction covering claims against non-debtor third parties, which therefore qualified as a "core" proceeding). Thus, this Court has "core" subject matter jurisdiction to issue the injunction and stay requested in this Motion and Adversary Proceeding.

49.     Alternatively, even if it were determined that the instant proceeding is not "core," the Court nonetheless has "related to" jurisdiction over the Brenntag Enjoined Claims at issue in this proceeding such that it may issue the requested injunction and stay. As noted above, a

proceeding is "related to" a bankruptcy case if it has a "conceivable effect" on the debtor's estate.

In other words, "an action is 'related to' bankruptcy 'if the outcome could alter the debtor's rights,

liabilities, options, or freedom of action (either positively or negatively) and which in any way

impacts upon the handling and administration of the bankrupt estate." *In re Broad Street Media

LLC*, Adv. Pro. No. 17-1450 (JNP), 2017 WL 5624879, at *4 (Bankr. D. N.J. Nov. 20, 2017)

(quoting *Pacor*, 743 F.2d at 994) (emphasis omitted).

50.     Here, the continued prosecution, amendment, or settlement of Brenntag Enjoined

Claims in the tort system prior to a final ruling on the Settlement Motion would negatively impact

the Debtors' estates because the Brenntag Enjoined Claims either include allegations of a

claimant's pre-2004 talc/asbestos exposure or do not provide sufficient information in the

underlying complaint for the Debtors to identify the year in which plaintiff was first allegedly

exposed to talc/asbestos.  As a result, such claims implicate the Debtors' operations prior to the

sale of substantially all of their operating assets to Brenntag, or do not plead sufficient facts for the

Debtors to reasonably assess their impact on these estates, and therefore could result in potential

liability against the Debtors through the assertion of indemnification claims or liability

apportionment in the tort system.[35]

51.     Importantly, this remains true even in the event that a plaintiff decides to withdraw

allegations of pre-2004 talc/asbestos exposure or otherwise stipulates not to introduce evidence of

such exposure at trial.  That is because nothing prohibits Brenntag from introducing at trial

evidence of the Debtors' conduct and plaintiff's pre-2004 talc/asbestos exposure for the purpose

of reducing its liability apportionment and/or asserting potential indemnification claims against

the Debtors.

---

[35] *See* Hearing Tr. at 25:7-12 (Aug. 22, 2024).

52.     Accordingly, the Court plainly has subject matter jurisdiction to issue the stay/injunction sought by this Motion.

**II.     Extension of the Automatic Stay to the Brenntag Enjoined Claims is Warranted Under the Circumstances**

53.     Section 362(a) of the Bankruptcy Code provides for an automatic stay of, among other things, the commencement or continuation of a proceeding against the debtor that was or could have been commenced prepetition, or to recover a claim against the debtor that arose prepetition, as well as any act to obtain possession of or control over property of the debtor's estate. *See* 11 U.S.C. § 362(a)(1), (3).  The Third Circuit has held that the purpose of the automatic stay is:

> (1) to protect the debtor, by stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a respite from creditors and a chance 'to attempt a repayment or reorganization plan or simply be relieved of the financial pressures that drove him [or her] into bankruptcy;' and (2) to protect 'creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors.'

*In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) (citations omitted); *see also McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 511 (3d Cir. 1997) (one purpose of section 362 is "to centralize all prebankruptcy civil claims against a debtor in the bankruptcy court.").

54.     "Although the scope of the automatic stay is broad, its protections typically apply only to debtors, not nondebtor defendants."  *See LTL Mgmt., LLC*, 638 B.R. at 299; *see also Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006) ("The scope of the automatic stay is broad and covers all proceedings against a debtor, including arbitration.").

55.     Nonetheless, bankruptcy courts have entered orders extending the automatic stay to non-debtors in "unusual circumstances" such as where "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or

(ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." *Philadelphia Newspapers*, 407 B.R. at 616; *see also McCartney*, 106 F.3d at 510-11; *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986).

56.     Each of these "unusual circumstances" is present here.  An identity of interest between the Debtors and Brenntag exists with respect to the Brenntag Enjoined Claims given that such claims either involve allegations of a claimant's pre-2004 talc/asbestos exposure and therefore implicate the Debtors' conduct prior to the sale of substantially all of their operating assets to Brenntag or do not plead sufficient facts for the Debtors to reasonably assess their impact on these estates.  These "unusual circumstances" are described more fully below.

**A.     There is an Identity of Interest Between the Debtors and Brenntag with Respect to the Brenntag Enjoined Claims**

57.     An identity of interest "arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Robins*, 788 F.2d at 999; *accord McCartney*, 106 F.3d at 510-11 (concluding that the automatic stay extended to enjoin an action against a non-debtor third party where the debtor "was, in essence, the real party in interest" in the pursuit of a deficiency judgment against the third party).

58.     In *LTL Management*, this Court held that there was an identity of interest between the debtor in that case and the non-debtor co-defendants such that the talc claims sought to be stayed were effectively suits against the debtor because "the talc claims against the Protected Parties involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor."  638 B.R. at 306; *see also W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17, 36 (Bankr. D. Del. 2008) (finding an identity of interest between a

debtor and a non-debtor where the debtor's conduct or product was "at the core of the issues raised" in actions against the non-debtor).

59.     Here, the Brenntag Enjoined Claims either involve allegations of a claimant's pre-2004 talc/asbestos exposure and therefore implicate the Debtors' conduct prior to the sale of substantially all of their operating assets to Brenntag or do not plead sufficient facts for the Debtors to reasonably assess their impact on these estates.  As such, the adjudication of these claims prior to a final order on the Settlement Motion could implicate the Debtors' own tort liabilities and would compel the Debtors to participate in tort system litigation and expend scarce estate resources (including proceeds of the DIP Facility, if approved) to defend themselves against claims which may be fully and finally resolved under the Settlement Agreement.[36]

60.     The Debtors' potential indemnification obligations also give rise to an identity of interest with Brenntag.  Importantly, the indemnification claims need not be "absolute" but, as this Court explained in *LTL Management*, "the mere possibility of indemnification obligations warrants extension of the automatic stay."  638 B.R. at 312-13.  Absent final approval of the Settlement Agreement, and the resulting release of potential indemnification claims by Brenntag, any adverse judgment or settlement of the Brenntag Enjoined Claims could potentially trigger the Debtors' indemnification obligations to Brenntag and give rise to claims against the Debtors in these cases.

61.     Accordingly, there is an identity of interest between the Debtors and Brenntag with respect to the Brenntag Enjoined Claims.

---

[36] *See* Hearing Tr. 25:21-26:3 (Aug. 22, 2024).

**B.    The Continuation, Amendment, and Settlement of Brenntag Enjoined Claims Will Adversely Impact the Debtors**

62.    "[A] critical factor in deciding whether to extend the stay is the potential adverse impact on a debtor's estate[.]" *LTL Mgmt.*, 638 B.R. at 306.  In *LTL Management*, this Court held that "continued litigation against the Protected Parties would liquidate pending tort claims, as well as indemnification claims, against Debtor outside of chapter 11 . . . frustrating the purpose of the automatic stay." *Id.* at 307.

63.    Similarly, many of the same facts that give rise to an identity of interest between the Debtors and Brenntag demonstrate the adverse impact on the Debtors' estates posed by the continuation, amendment, and settlement of Brenntag Enjoined Claims.  For instance, any adverse judgment or settlement of direct claims against Brenntag that potentially implicate the Debtors' conduct, operations, and potential indemnification obligations to Brenntag may give rise to the assertion of potential indemnification claims against the Debtors.

64.    Moreover, the continued prosecution of Brenntag Enjoined Claims would distract the Debtors and Brenntag from their efforts to obtain this Court's approval of the Settlement Agreement, which agreement is a key component of the Debtors' exit strategy in these cases.  Continued prosecution of Brenntag Enjoined Claims would also force the Debtors to defend themselves in the tort system, thereby diminishing funds available to plaintiffs through the Settlement Agreement, against potential claims and obligations that would be fully and finally resolved by the Settlement Agreement.  *Cf. LTL Mgmt.*, 638 B.R. at 307.

65.    In the event the Debtors were to decide not to participate in tort system litigation of the Brenntag Enjoined Claims, the Debtors would face significant risk that findings of fact with respect to a claimant's pre-2004 talc/asbestos exposure could bind the Debtors or result in the Debtors' own tort liability under the doctrines of collateral estoppel and *res judicata*.  This risk is

24

**JA722**

underscored by the fact that collateral estoppel has been applied offensively by litigants who were not parties to the prior litigation. *See, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (allowing offensive use of collateral estoppel to prevent a corporation from defending against the stockholder class action of plaintiffs who were not parties to prior SEC litigation against the corporation).

66.     Courts have consistently concluded that the risks of collateral estoppel and *res judicata* warrant a stay of third-party litigation that thwarts the purposes of the automatic stay. *See, e.g., LTL Mgmt.*, 638 B.R. at 313-17 ("Debtor contends that permitting continued litigation against the Protected Parties 'creates risks of binding the Debtor through res judicata and collateral estoppel, and creating an evidentiary record that prejudices the Debtor.' The Court agrees."); *see also In re Bestwall LLC*, 606 B.R. 243, 256 (Bankr. W.D.N.C. 2019), *aff'd*, No. 3:20-CV-103-RJC, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168 (4th Cir. 2023), *aff'd*, No. 3:20-CV-105-RJC, 2022 WL 68763 (W.D.N.C. Jan. 6, 2022), *and aff'd*, 71 F.4th 168 (4th Cir. 2023) (determining that the risks posed by the doctrines of *res judicata* and collateral estoppel, among other factors, warrant a preliminary injunction of litigation against non-debtor affiliates) (subsequent history omitted); *In re Sudbury, Inc.*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); *In re Johns-Manville Corp.*, 26 B.R. 420, 435-37 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984), and *vacated on other grounds*, 41 B.R. 926 (S.D.N.Y. 1984) (concluding that the risk of collateral estoppel would irreparably injure the estate and, thus, issuance of a stay of claims against non-debtors was warranted); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850-55 (Bankr. D. Del. 1994) (staying claims against debtor's directors and holding that

a potential finding of liability against such directors would be based on acts undertaken by directors as agents of the debtor and therefore would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions).

67.     While plaintiffs are barred by the automatic stay from pursuing Brenntag for pre-2004 talc/asbestos exposure (*i.e.*, Successor Liability Claims), absent the stay/injunction requested herein, there is nothing to prevent plaintiffs from amending their complaints to abandon the successor liability portions of their claims in order to pursue direct claims against Brenntag that nevertheless include allegations of pre-2004 talc/asbestos exposure and thereby implicate the Debtors' conduct, operations, and potential indemnification obligations, or which are not pled with sufficient detail for the Debtors to rule out pre-2004 exposure and the concomitant risk to these estates.  Likewise, there is nothing to prevent Brenntag from introducing evidence of plaintiffs' pre-2004 talc/asbestos exposure at trial for the purpose of reducing its own liability apportionment (which a jury could then apportion to the Debtors) or establishing potential indemnification claims against the Debtors.

68.     Accordingly, any rulings or findings regarding Brenntag Enjoined Claims may bind the Debtors or impact their liability.  Under these circumstances, the Debtors would be compelled to expend scarce estate resources defending such actions, even as they work to obtain approval of the Settlement Agreement which provides for Brenntag's release of any and all claims against the Debtors, including any potential indemnification claims.  This result would undermine the intended purpose of the automatic stay.

69.     Beyond the potential consequences of collateral estoppel and *res judicata*, litigation of Brenntag Enjoined Claims would allow parties to use statements, testimony and other evidence generated in those proceedings with respect to a claimant's pre-2004 talc/asbestos exposure to

establish the factual predicate for the Debtors' tort liabilities. The burden of protecting against evidentiary prejudice was part of the justification for extending the automatic stay in *LTL Management*. *See* 638 B.R. at 317 ("As stated previously, the risk that litigation against the Protected Parties could result in adverse consequences for Debtor-such as record taint-weighs in favor of extending the automatic stay.").

70. In support of this conclusion, the Court cited favorably to a number of Third Circuit decisions and bankruptcy cases within the Third Circuit. *See, e.g., In re W.R. Grace & Co.*, 115 F. App'x 565, 569 n.4 (3d Cir. 2004) (citing *In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) and acknowledging a risk that the evidentiary record created in a case against a nondebtor could later be used in a case against the debtor); *Healthcor Offshore Master Fund, L.P. v. Mallinckrodt plc (In re Mallinckrodt PLC)*, Adv. Pro. No. 20-50850-JTD, 2021 WL 5275781, at *2 (D. Del. Nov. 10, 2021) (denying leave to file interlocutory appeal of order extending preliminary injunction because bankruptcy court appropriately performed "unusual circumstances" test and held that continued proceedings created "significant risk" of, among other thing, record taint); *W.R. Grace & Co.*, 386 B.R. at 35 ("Under this 'broader view of the potential impact on the debtor,' this court takes into account the risks of collateral estoppel and record taint.").

71. Based on the foregoing, an extension of the automatic stay to prohibit the continuation, amendment, and settlement of Brenntag Enjoined Claims pending the Court's entry of (a) a final, non-appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion, is warranted under the unusual circumstances present in these Chapter 11 Cases.

### III. The Court Should Exercise its Authority Under Section 105(a) of the Bankruptcy Code to Enjoin the Continuation, Amendment, and Settlement of Brenntag Enjoined Claims Pending a Resolution of the Settlement Motion

72. Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This includes "ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process" of a bankruptcy case. *Johns-Manville*, 26 B.R. at 425 (citing 2 COLLIER ON BANKRUPTCY § 362.05 (15th Ed.)).

73. Under section 105(a), courts have broad authority "to enjoin parties other than the bankrupt from commencing or continuing litigation." *Robins*, 788 F.2d at 1002 (quoting *In re Otero Mills, Inc.*, 25 B.R. 1018, 1020 (D.N.M. 1982)); *see also In re VistaCare Grp.*, LLC, 678 F.3d 218, 231 n.11 (3d Cir. 2012) ("Bankruptcy courts have broad powers (in addition to 11 U.S.C. § 362) to protect the property of the estate. For example, under 11 U.S.C. § 105(a), a bankruptcy court may issue injunctive relief."). An injunction as to third-party litigation is appropriate where, among other things, the third-party litigation is likely to negatively impact a successful outcome in the debtor's bankruptcy proceeding. *See W.R. Grace*, 386 B.R. at 30; *Philadelphia Newspapers*, 407 B.R. at 616-17. In such cases, an injunction allows the debtor to receive the benefits of the automatic stay imposed by section 362 of the Bankruptcy Code, which aims to:

> protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan[.]

*Robins*, 788 F.2d at 998; *see also In re W.R. Grace & Co.*, 475 B.R. 34, 147 (D. Del. 2012) (quoting *Robins*).

28

**JA726**

74. Acting under the broad authority granted by section 105(a), courts have consistently enjoined claims against non-debtor entities, both in mass tort and non-mass tort bankruptcies, to maintain the integrity of the debtor's estate and fully effectuate the protections of the automatic stay. *See Bestwall*, 606 B.R. at 254 ("Injunctions of the type requested by the Debtor have previously and uniformly been issued in numerous [] asbestos-related cases[.]"); *W.R. Grace & Co.*, 386 B.R. at 34 (enjoining actions against a third-party railroad that transported the debtor's asbestos-containing products).

75. Courts considering the propriety of an injunction under section 105(a) typically apply the traditional four-pronged test for injunctions, as modified for the bankruptcy context. *See In re G-I Holdings, Inc.*, 420 B.R. 216, 281 (D.N.J. 2009); *Philadelphia Newspapers*, 407 B.R. at 616–17 (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)). The four elements, as tailored to a bankruptcy case, are: (i) the debtor's reasonable likelihood of a successful reorganization; (ii) the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; (iii) the balance of harms between the debtor and its creditors; and (iv) whether the public interest weighs in favor of an injunction. *G-I Holdings*, 420 B.R. at 281; *see also Bestwall*, 606 B.R. at 253.

76. "In considering a request for an injunction, these four factors are not weighed simultaneously against one another. Rather, the Court determines whether the first two threshold prongs are established, and if so, only then does it proceed to consider the third and fourth factors." *Philadelphia Newspapers*, 423 B.R. at 106 n.11 (citing *Tenafly*, 309 F.3d at 157).

77. Here, as set forth below, the Debtors have satisfied the threshold showing because the Debtors' prospects of obtaining approval of the Settlement Agreement, which in turn provides a source of substantial funding for creditor distributions, are strong. In addition, as set forth below,

the balance of the harms and consideration of public interests both weigh in favor of the requested relief.

### A.    A Successful Outcome in the Chapter 11 Cases is Likely

78.    "In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC,* 460 B.R. 644, 660 (E.D. Pa. 2011) (quoting *In re Monroe Well Serv., Inc.,* 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986)). Courts have held that, in this context, a "successful reorganization" includes the confirmation of a plan of liquidation. *In re Soundview Elite Ltd.,* 543 B.R. 78, 119 (Bankr. S.D.N.Y.) ("Although any reorganization plan the Trustee might propose would almost certainly be a liquidating plan, that does not foreclose this Court from finding the requisite likelihood of success."); *Myerson & Kuhn v. Brunscwock Assocs. Ltd. P'Ship (In re Myerson & Kuhn)*, 121 B.R. 145, 154 (Bankr. S.D.N.Y 1990) ("Section 105 grants bankruptcy courts ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process, whether in a liquidation or in a reorganization case.") (citations omitted); *see also The Lautenberg Foundation v. Picard (In re Bernard L. Madoff Inv. Sec., LLC),* 512 Fed. Appx. 18, 20 (2d Cir.2013) (granting preliminary injunction under section 105(a) in liquidation under Securities Investor Protection Act); *McHale v. Alvarez (In re The 1031 Tax Grp., LLC),* 397 B.R. 670, 686 (Bankr.S.D.N.Y.2008) (issuing preliminary injunction under section 105(a) to aid chapter 11 process even though chapter 11 trustee was pursuing chapter 11 liquidation plan).

79.    "[T]o demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty." *LTL Mgmt.*, 638 B.R. at 320; *see also Bestwall*, 606 B.R. at 254-55; *In re Excel Innovations*, 502 F.3d 1086, 1097 (9th Cir. 2007) ("[I]t is not a high burden to show a reasonable likelihood of success");

JA728

*see also Philadelphia Newspapers*, 407 B.R. at 617 (noting the speculative nature of the inquiry
into the likelihood of success in the early stages of a case).

80.    The Debtors' prospects of success in these cases are strong.  For more than a year,
the Debtors have worked diligently to reach a consensual, efficient, and value maximizing outcome
in these cases.  Through the Settlement Agreement, the Debtors have successfully negotiated to
resolve their Estate Causes of Action against Brenntag, DB US, and NICO in exchange for
payment of $535 million and the mutual release of any and all claims against the Debtors by these
parties.  In the event the Settlement Agreement is approved on a final basis, the Debtors will have
sufficient assets to fund claims trusts to be governed by procedures that will provide a fair and
efficient process for creditor distributions.

81.    Absent the stay/injunction requested herein, plaintiffs will undoubtedly seek to
circumvent the Summary Judgment Order, just as they did with respect to the TRO, by strategically
amending their complaints to withdraw the successor liability portions of their claims in order to
pursue direct claims against Brenntag that potentially implicate the Debtors' conduct and factually
overlap with claims to be resolved by the Settlement Agreement.[37]  Moreover, the requested
injunction will ensure that the funds obtained for the benefit of these estates through the Settlement
Agreement will be used to satisfy creditor claims, rather than to pay for defense and other litigation
costs in the event the Brenntag Enjoined Claims are allowed to proceed, and the Debtors are forced
to defend themselves in the tort system.

---

[37] *Accord In re Fed.-Mogul Glob.*, 684 F.3d 355, 359 (3d Cir. 2012) ("Bankruptcy has proven an attractive alternative
to the tort system for corporations [facing mass tort claims] because it permits a global resolution and discharge of
current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future
earnings to compensate similarly situated tort claimants equitably."); S. Elizabeth Gibson, Judicial Management of
Mass    Tort    Bankruptcy    Cases,    Federal    Judicial    Center,    at    1    (2005),    available    at
https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that "bankruptcy courts have become a forum for
companies seeking the resolution of pending and threatened mass tort litigation" and that, as of the publication date,
"over seventy companies, motivated primarily by their desire to reach a final resolution of their mass tort liabilities,
have sought bankruptcy protection").

31

82.     To be sure, opposition from tort plaintiffs to the Debtors' Chapter 11 Cases does not undermine the Debtors' ability to satisfy this factor, as objecting parties may later change their minds once negotiations commence in earnest. *See, e.g.*, *In re Aldrich Pump LLC*, No. 20-03041 (JCW), 2021 WL 3729335, at *35 (Bankr. W.D.N.C. Aug. 23, 2021) (rejecting the argument that success was unlikely to success because "the asbestos claimants will never agree to a Plan" and explaining that, "[h]aving sat on two other hotly contested and apparently irreconcilable asbestos bankruptcy cases that wound up with consensual plans as between these constituencies . . . this Court is unable to conclude that our parties cannot reach an agreement, as well"); *In re Purdue Pharms., L.P.*, 619 B.R. 38, 58 (S.D.N.Y. 2020) (affirming section 105 injunction enjoining mass tort claims against non-debtors despite plaintiffs arguing that success was unlikely because plaintiffs intended to oppose the currently proposed chapter 11 plan).

83.     For more than six months, the Debtors participated in Court-ordered mediation with the Contributing Parties, the Committee, and the FCR in a good faith effort to reach a consensual, global, and workable resolution for the benefit of all the Debtors' stakeholders. That did not happen. Nevertheless, the Debtors remain open to discussions with the Committee and the FCR and remain hopeful that a fully consensual deal can be reached. The injunctive relief requested by this Motion, if granted, would further promote negotiations towards a fully consensual resolution in tandem with the Debtors' and Contributing Parties' efforts to obtain approval of the Settlement Agreement, which currently provides the most value-maximizing, efficient, and equitable outcome for the benefit of *all* of the Debtors' stakeholders in these cases. Accordingly, this factor is satisfied.

**JA730**

**B.      Failure to Enjoin the Brenntag Enjoined Claims Pending Resolution of the Settlement Motion Would Irreparably Harm the Debtors**

84.     In analyzing irreparable harm, the key question is "whether the litigation . . . 'would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan[.]'" *In re W.R. Grace & Co.*, 115 F. App'x 565, 570 (3d Cir. 2004) (first quoting *Robins*, 828 F.2d at 1025, then quoting *Johns-Manville*, 26 B.R. at 436).

85.     Recent Third Circuit authority establishes that the irreparable harm prong of the test for injunctive relief can be satisfied by a showing of potential harm or the risk of harm. *See ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *3 (3d Cir. Apr. 21, 2022).  Indeed, this Court has recently clarified that "the mere risk of a potentially adverse impact on a debtor's bankruptcy can be sufficient to support a preliminary injunction" and the "plaintiff's theory that the debtor would not suffer an adverse impact should not be tested at the debtor's peril." *See In re LTL Mgmt., LLC*, 640 B.R. 322, 337 (Bankr. D.N.J. 2022) (stating that a movant may be entitled to a preliminary injunction if movant demonstrates that "the risk of future harm [is] anything other than speculative") (quoting *ADP, Inc. v. Levin*, 2022 WL 1184202, at *3).

86.     In *LTL Management*, this Court determined that the debtor would suffer irreparable harm absent an injunction of talc litigation against non-debtor related parties because of: (i) the debtor's liability for the underlying talc claims; (ii) the debtor's indemnification obligations; and (iii) the potential disruption that continued litigation could cause to the funding of a trust. *See* 638 B.R. at 320.

87.     Similarly, continued prosecution of Brenntag Enjoined Claims will cause irreparable harm to the Debtors.  Because the Brenntag Enjoined Claims either include allegations of pre-2004 talc/asbestos exposure or do not provide sufficient information in the underlying

33

**JA731**

complaint for the Debtors to identify the year in which plaintiff was first allegedly exposed to talc/asbestos, such claims implicate the Debtors' operations prior to the sale of substantially all of their operating assets to Brenntag or do not plead sufficient facts for the Debtors to reasonably assess their impact on these estates.  As such, the adjudication of these claims will require the Debtors to expend scarce estate resources participating in tort system litigation or risk collateral estoppel, *res judicata*, and record taint in such actions.

88.     Moreover, an adverse judgment against Brenntag in connection with a Brenntag Enjoined Claim may give rise to potential claims against the Debtors, either through liability apportionment or by triggering potential indemnification claims.  The Court has already determined that these concerns warrant injunctive relief in its decisions resolving the various disputes in connection with the TRO.

89.     In the TRO Opinion, the Court explicitly recognized that "even direct claims against Brenntag can give rise to indemnification claims depending on the conduct alleged, the timeframes implicated, and the products involved" and therefore "direct claims against Brenntag are not categorically excepted from the relief sought by way of the Adversary Proceeding and the [TRO] Motion."[38]

90.     Following the Court's entry of the TRO, several tort plaintiffs attempted to circumvent the TRO by dismissing the successor liability portions of their claims against Brenntag in actions that include allegations and/or evidence of pre-2004 talc/asbestos exposure and therefore implicate the Debtors' conduct, operations, and potential indemnification obligations to Brenntag. The Court rejected these attempts.

---

[38] TRO Opinion, at p. 9 n. 2.

91.     The plaintiffs in the Lee Action attempted to withdraw all claims and allegations
against Brenntag North America, Inc. as successor to the Debtors following the addition of the Lee
Action to the TRO.  In response, the Debtors filed the Motion to Enforce TRO on an emergency
basis, which the Court granted.

92.     In enforcing the TRO against the plaintiffs in the Lee Action, the Court determined
that a plaintiff may not circumvent the TRO by purporting to withdraw Successor Liability Claims
against Brenntag when the complaint in the underlying action includes allegations regarding the
Debtors' conduct and plaintiff's exposure to talc/asbestos that pre-dates the 2004 Transaction.  In
its decision, the Court explained that the TRO is not limited to claims expressly predicated on
theories of successor or alter ego liability, but instead encompasses all claims that implicate the
Debtors' conduct:

> The TRO entered by this Court attempted to clearly bar continued
> litigation of claims, not just based on successor liability.
>
> Yes, the summary judgment motion that's pending in the adversary
> proceeding focuses on ownership of … the successor liability
> claims. *But the TRO that was put in place addressed a broader
> array of claims and it included claims relevant, that spoke to the
> conduct of the Debtors* and claims for which there could be possibly
> indemnification claims asserted by Brenntag against the Debtors.
>
> So, *those could arise both from the affirmative prosecution of
> claims or through the assertion of defenses by Brenntag.*[39]

93.     Subsequently, the plaintiffs in the Cooper and Sneider Actions attempted to
preemptively circumvent the TRO by dismissing "successor liability claims only" against
Brenntag shortly before such actions were added to the TRO.  In extending the TRO to the Cooper
and Sneider Actions, the Court made two observations.  *First*, the Court noted that plaintiffs'
claims against Brenntag were not Successor Liability Claims within the meaning of the Summary

---

[39] Hearing Tr. 40:13-41:1 (Apr. 26, 2024) (emphasis supplied).

Judgment Opinion because plaintiffs dismissed those claims with prejudice and, following such dismissal, were only pursuing direct claims against Brenntag for its own post-2004 conduct.[40]

94.    *Second*, the Court noted that the claims asserted in the Cooper and Sneider actions potentially impacted the Debtors and therefore still fell within the scope of the TRO.[41]  The Court noted that, "although the claims in the Sneider action are now limited to Brenntag's independent conduct, the facts of the case remain the same, and the potential impact on the Debtors' estate[s] still exists, warranting the debtor to have to decide whether or not to participate and expend resources in defending the action."[42]

95.    The Court analogized the Sneider Action to the Lee Action and held that Ms. Sneider's claims against Brenntag were "precisely the types of claims that were intended to be covered by the initial TRO" given that an adverse judgment in the Sneider Action may give rise to indemnification claims against the Debtors.[43]  The Court also noted that a jury could apportion liability for plaintiffs' injuries to the Debtors given the evidence of pre-2004 talc/asbestos exposure in the record.[44]  Applying the same analysis to the Cooper Action, the Court extended the TRO to both the Cooper and Sneider Actions.

96.    The Court should apply that same logic here with respect to all of the Enjoined Brenntag Claims.  The actions underlying the Enjoined Brenntag Claims either involve allegations of a claimant's pre-2004 talc/asbestos exposure and therefore implicate the Debtors' conduct prior to the sale of substantially all of their operating assets to Brenntag or do not plead sufficient facts

---

[40] Hearing Tr. 24:2-17 (Aug. 22, 2024).

[41] *Id.* at 23:21-24.

[42] *Id.* at 25:21-26:1.

[43] *Id.* at 27:14-18.

[44] *See id.* at 25:13-20.

for the Debtors to reasonably assess their impact on these estates. These actions therefore potentially implicate the Debtors' conduct and operations prior to the sale of substantially all of their assets to Brenntag and would require the Debtors to expend scarce resources defending such actions or risk litigation prejudice through *res judicata*, collateral estoppel, and record taint. Likewise, an adverse judgment against Brenntag may subject the Debtors to liability, either through apportionment by a jury or through the assertion of potential indemnification claims by Brenntag.

97. The requested injunction is necessary to avoid this irreparable harm. The Settlement Agreement, if approved, resolves Brenntag's liability for the Debtors' conduct and provides for a release of any potential indemnification claims against the Debtors, thereby clearing a path for claimants to pursue Brenntag for direct claims resulting from its independent conduct post-2004 without impacting the Debtors' estates. Accordingly, this factor is satisfied.

## C. The Irreparable Harm that the Debtors Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to Plaintiffs

98. As described above, the Debtors would suffer substantial and irreversible harm if the requested injunctive relief is not granted. Prosecution of Brenntag Enjoined Claims prior to entry of (a) a final, non-appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion may liquidate claims against the Debtors (whether through liability apportionment or potential indemnification claims) and subject the Debtors' estates to substantial defense costs or bind the Debtors with respect to rulings, judgments and evidentiary records established in those cases. It would also compromise the protections of the automatic stay.

99. In contrast, any prejudice to the plaintiffs caused by an injunction would be minimal, to the extent any would exist at all. As an initial matter, 657 of the 684 actions listed on the Schedule of Enjoined Brenntag Claims (*i.e.* 96% of such actions) are expressly pled as

Successor Liability Claims against Brenntag. These claims are already subject to the automatic stay pursuant to the Summary Judgment Order. Therefore, entry of the Temporary Restraining Order and Preliminary Injunction Order as to the overwhelming majority of Brenntag Enjoined Claims would serve only to prevent plaintiffs from strategically amending their claims to circumvent the Summary Judgment Order in a manner similar to the unsuccessful attempts made by the plaintiffs in the Lee, Cooper, and Sneider Actions with respect to the TRO.

100.    Plaintiffs in the remaining 27 actions listed on the Schedule also will not suffer substantial harm because those plaintiffs are similarly situated to the plaintiffs in the Lee, Cooper, and Sneider Actions. Although these plaintiffs do not expressly allege Successor Liability Claims against Brenntag, the complaints in all but two of these actions contain express allegations of pre-2004 talc/asbestos exposure, and therefore clearly implicate the Debtors' conduct and business operations, warranting their injunction. The two actions[45] that are not expressly pled as Successor Liability Claims and do not specifically allege pre-2004 talc/asbestos exposure do not plead sufficient information for the Debtors to identify the year plaintiffs were first allegedly exposed to talc/asbestos in order to reasonably assess their impact on these estates. The Debtors included these actions on the Schedule as Brenntag Enjoined Claims based on the potential for such claims to subject the Debtors to indemnification risk and litigation prejudice.

101.    "[I]t is well established that mere delay is insufficient to prevent the issuance of an injunction." *Bestwall*, 606 B.R. at 257; *see also In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997) (finding that delay to the enjoined party from pursuing remedies was heavily outweighed by potential harm to debtor's efforts in its bankruptcy case). In its August 22 bench

---

[45] These two actions are styled (i) *Granchelli v Asral Health & Beauty, Inc., et al.*, Case No. MID-L-002784-23 (N.J. Super Ct.) and (ii) *Olson-Rizzo v. American Art Clay Co., Inc.*, Case No. 190018/2022 (N.Y. Sup. Ct.).

ruling extending the TRO to the Sneider and Cooper Actions, the Court made clear that it was not willing to extend the TRO indefinitely, and any further extensions must be tied to an "exit strategy" for these Chapter 11 Cases.[46]

102.     By the injunctive relief sought herein, the Debtors are not seeking to permanently enjoin plaintiffs from prosecuting direct claims against Brenntag for Brenntag's independent post-2004 conduct.  To the contrary, the Debtors are merely seeking to temporarily halt those claims (all of which either include allegations of pre-2004 talc/asbestos exposure or are silent as to when plaintiff was first allegedly exposed) while the Debtors seek final approval of the Settlement Agreement.  If approved on a final basis, the Settlement would fully resolve Brenntag's liability for the Debtors' pre-2004 conduct in exchange for a substantial contribution to these estates, release any potential indemnification claims against the Debtors, and clear a path for plaintiffs to proceed against Brenntag on direct claims relating to their post-2004 talc/asbestos exposure.

103.     The Schedule Removal Procedures proposed herein further alleviate any burden imposed on plaintiffs through the requested stay/injunction.  That is because any plaintiff who believes his or her claim against Brenntag does not constitute a Brenntag Enjoined Claim—either because (i) such claim constitutes a purely direct claim based solely on plaintiff's post-2004 talc/asbestos exposure or (ii) plaintiff has dismissed all claims against Brenntag, including direct claims, with prejudice—may utilize the Schedule Removal Procedures to seek to have his or her claim removed from the Schedule.

104.     Accordingly, for the reasons set forth above, the balance of harms weighs in favor of the Debtors and this Court's issuance of the requested injunction.

---

[46] *See* Hearing Tr. at 28:4-29:15 (Aug. 22, 2024).

**JA737**

**D.**     **The Public Interest Favors the Requested Injunction**

105.     Courts have consistently recognized the public interest in a successful chapter 11 case. *See*, *e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983); *Sudbury*, 140 B.R. at 465; *see also Johns-Manville*, 26 B.R. at 428 ("[T]he goal of removing all obstacles to plan formulation [is] eminently praiseworthy and [this court] supports every lawful effort to foster this goal while protecting the due process rights of all constituencies.").

106.     Here, the requested injunction will allow the Debtors and Brenntag to focus their efforts on obtaining final Court approval of the Settlement Agreement, which agreement would provide a source of substantial funding for a confirmable chapter 11 plan that maximizes the value of the Debtors' assets (including Estate Causes of Action) and provides equitable distributions to the Debtors' creditors. *W.R. Grace*, 386 B.R. at 36 (extending injunction to cover a non-debtor where bankruptcy would "resolv[e] thousands of claims in a uniform and equitable manner."); *In re Dow Corning I*, 211 B.R. 545, 588 (Bankr. E.D. Mich. 1997) ("[I]t is anything but just when presenting the identical proofs, one plaintiff suffering nearly identical injuries or illness[] wins a multimillion dollar verdict against a defendant while another takes nothing.").

107.     Accordingly, for the foregoing reasons, each of the four factors clearly weighs in favor of this Court issuing a preliminary injunction prohibiting Defendants from continuing, amending, and settling of Brenntag Enjoined Claims pending the Court's entry of (a) a final, non-appealable Order granting the Settlement Motion or (b) an Order denying the Settlement Motion.

**IV.**     **The Court Should Approve the Procedures**

108.     The Debtors anticipate that additional actions asserting Brenntag Enjoined Claims will be commenced following the Court's entry of the Preliminary Injunction Order (in the event the Motion is granted).  To conserve the Debtors' and the Court's resources, and to avoid the need for unnecessary motion practice and hearings, the Debtors propose the following Schedule

Amendment Procedures, pursuant to which the Debtors may seek to amend the Schedule to stay/enjoin additional Brenntag Enjoined Claims:

i. So long as the Preliminary Injunction Order remains in effect, the Debtors shall be permitted to file on the docket in the Adversary Proceeding a request to amend or supplement the Schedule to add additional Brenntag Enjoined Claims (a "**Request to Amend Schedule**"), which shall attach (a) a proposed order amending the Schedule (an "**Order Approving Amendment**"), (b) an amended or supplemented Schedule that identifies the additional actions sought to be stayed/enjoined (such actions, "**Additional Actions**"), (c) a blackline of such Schedule marked against the previously filed Schedule, and (d) a copy of the operative complaint and any bifurcation stipulation filed in each Additional Action.

ii. Any Request to Amend Schedule shall be served by regular mail and email (where known) on counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and counsel for any individual plaintiff identified on the Schedule (as amended or supplemented) (each, an "**Amendment Notice Party**" and collectively, the "**Amendment Notice Parties**") within one (1) business day of its filing.

iii. Objections, if any, to a Request to Amend Schedule, which shall be limited to arguing that the plaintiff's claims against Brenntag in the relevant Additional Action constitute purely direct claims based solely on plaintiff's post-2004 talc/asbestos exposure (each, an "**Objection**"), shall be filed and served by first class mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US within ten (10) days of service of the applicable Request to Amend Schedule.

iv. Any Amendment Notice Party that fails to timely file an Objection shall be deemed to consent to entry of the Order Approving Amendment as to the Additional Action(s) identified in the applicable Request to Amend Schedule.

v. In the event an Amendment Notice Party timely files an Objection, the parties shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Objection at a hearing to be scheduled.

109. The Debtors appreciate that certain plaintiffs may believe their claims against Brenntag do not constitute Brenntag Enjoined Claims, either because (i) such claims constitute purely direct claims based solely on plaintiff's post-2004 talc/asbestos exposure, or (ii) plaintiff has dismissed all of his or her claims against Brenntag, including direct claims, with prejudice. To

avoid any prejudice to such plaintiffs, the Debtors propose the following Schedule Removal Procedures, which are substantially similar to the Schedule Amendment Procedures:

    i.    So long as the Preliminary Injunction Order remains in effect, any plaintiff whose action is listed on the Schedule and (i) who has dismissed with prejudice all claims against Brenntag, including direct claims, in the subject action; or (ii) whose claims against Brenntag constitute purely direct claims based solely on such plaintiff's post-2004 talc/asbestos exposure, either because (a) plaintiff's initial exposure to talc/asbestos occurred after February 27, 2004 or (b) prior to February 28, 2024, plaintiff was exposed to talc/asbestos supplied solely by parties other than the Debtors, shall be permitted to file on the docket in the Adversary Proceeding a request to remove his or her action from the Schedule (a "**Removal Request**"), which shall (x) identify the specific action plaintiff seeks to remove from the Schedule and (y) provide evidence sufficient to establish that plaintiff satisfies one of the above conditions.

    ii.    Any Removal Request shall be served by regular mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US (each, a "**Removal Notice Party**" and collectively, the "**Removal Notice Parties**") within one (1) business day of its filing.

    iii.    Objections, if any, to a Removal Request (each, an "**Objection**"), shall be filed and served by first class mail and email (where known) on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and counsel for the applicable plaintiff within ten (10) days of service of the applicable Removal Request.

    iv.    Any Removal Notice Party that fails to timely file an Objection shall be deemed to consent to the removal of the action identified in the applicable Removal Request from the Schedule.

    v.    In the event a Removal Notice Party timely files an Objection, the parties shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Objection at a hearing to be scheduled.

110.    The Debtors submit that these Procedures are a reasonable and efficient means to provide the Debtors with the ability to seek periodic amendments to the Schedule as needed without prejudice to the applicable plaintiffs' rights to object to same, and to provide plaintiffs with the ability to seek expeditious relief from the Preliminary Injunction Order.

111.    The Debtors will serve a copy of this Motion and the Preliminary Injunction Order on counsel for the TCC, FCR, Brenntag, NICO, DB US, and *all* counsel for the Tort Claimants listed on Appendix A to the Amended Complaint regardless of whether their clients are currently listed on the Schedule.  These parties will have a full and fair opportunity to object to the relief requested herein (including with respect to the Procedures).  Thereafter, any Request to Amend Schedule will be served on counsel for the TCC, FCR, Brenntag, NICO, DB US, and counsel for the additional plaintiffs listed on the Schedule.

112.    Accordingly, the Procedures are not prejudicial to any party in this Adversary Proceeding, and the Court should enter the Preliminary Injunction Order and approve the Procedures proposed herein.

## REQUEST FOR TEMPORARY RESTRAINING ORDER

113.    The Debtors request this Court's entry of the Temporary Restraining Order enjoining the Brenntag Enjoined Claims pending the Court's decision on the preliminary injunction sought by this Motion.  As discussed *supra*, the overwhelming majority of Brenntag Enjoined Claims are already subject to the automatic stay pursuant to the Summary Judgment Order.  A Temporary Restraining Order is necessary to prevent plaintiffs from preemptively amending their complaints (all of which either include allegations of pre-2004 talc/asbestos exposure or are silent as to when plaintiff was first allegedly exposed) to circumvent the Summary Judgment Order and injunctive relief sought herein.

114.    The small minority of Brenntag Enjoined Claims that are not expressly pled as Successor Liability Claims either contain allegations of pre-2004 talc/asbestos exposure in the underlying complaint or do not provide sufficient information in the underlying complaint for the Debtors to identify the year in which plaintiff was first allegedly exposed to talc/asbestos and therefore make a reasonable determination as to the impact on these estates.  Accordingly, these

43

**JA741**

actions fit squarely within the scope of the Court's rulings subjecting the Lee, Cooper, and Sneider Actions to the TRO.

115.    Now that the Debtors have reached a proposed resolution of their Estate Causes of Action against Brenntag and the other Contributing Parties by way of the Settlement Agreement, a Temporary Restraining Order pending a ruling on the injunctive relief requested herein is both reasonable and appropriate.  In the event the Settlement Agreement is approved on a final basis, Brenntag's indirect liability for the Debtors' conduct will be fully resolved in exchange for a substantial contribution to these estates and Brenntag's mutual release of claims (including potential indemnification claims) against the Debtors.  Accordingly, a Temporary Restraining Order of all Brenntag Enjoined Claims pending the Court's decision on this Motion is necessary to avoid the same irreparable harm to the Debtors' estates that supports the entry of the Preliminary Injunction Order.

116.    Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure (made applicable to this Adversary Proceeding by Rule 7065 of the Federal Rules of Bankruptcy Procedure), the Debtors request that the Court schedule a combined hearing on the Debtors' request for a preliminary injunction pursuant to this Motion with the trial on Counts II and III of the Complaint (as amended by the Amended Complaint) before the expiration of the Temporary Restraining Order.

### NO BOND REQUIRED

117.    Pursuant to Federal Rule of Bankruptcy Procedure 7065, in adversary proceedings, a temporary restraining order or preliminary injunction "may be issued on application of a debtor, trustee, or debtor in possession without" posting a bond.  *In re Team Sys. Int'l, LLC*, No. 22-10066 (CTG), 2023 WL 1428572, at *13 (Bankr. D. Del. Jan. 31, 2023) (entering an injunction without requiring a bond).

## NOTICE

118. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel for all known Defendants in this Adversary Proceeding; (iii) counsel for the Committee; (iv) counsel for the FCR; and (v) the parties listed on the Core Service List. The Debtors submit that no other or further notice of this Motion need be provided.

## CONCLUSION

**WHEREFORE**, the Debtors request that the Court: (i) enter the Preliminary Injunction Order, substantially in the form attached hereto as **Exhibit A**, (a) enjoining the continuation, amendment, and settlement of Brenntag Enjoined Claims pending (x) a final, non-appealable Order granting the Settlement Motion or (y) an Order denying the Settlement Motion and (b) approving the Procedures; (ii) enter the Temporary Restraining Order, substantially in the form attached hereto as **Exhibit B**, enjoining such claims pending the Court's decision on this Motion; and (iii) grant the Debtors such other and further relief as the Court deems just and proper.

**[***Remainder of page intentionally left blank***]**

Dated: September 11, 2024

/s/ Michael D. Sirota
--------------------------------

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com

-and-

Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Email:     svanaalten@coleschotz.com
           adeleo@coleschotz.com

-and-

G. David Dean, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Email:     ddean@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

# EXHIBIT A

## Preliminary Injunction Order

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com<br><br>-and-<br><br>**COLE SCHOTZ P.C.**<br>Seth Van Aalten, Esq. (admitted *pro hac vice*)<br>Anthony De Leo, Esq.<br>1325 Avenue of the Americas, 19th Floor<br>New York, NY 10019<br>Telephone: (212) 752-8000<br>Facsimile: (212) 752-8393<br>svanaalten@coleschotz.com<br>adeleo@coleschotz.com<br><br>-and-<br><br>**COLE SCHOTZ P.C.**<br>G. David Dean, Esq. (admitted *pro hac vice*)<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801<br>Telephone: (302) 652-3131<br>Facsimile: (302) 652-3117<br>ddean@coleschotz.com<br><br>*Counsel for Debtors and*<br>*Debtors-in-Possession* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.,*<br><br>                            Debtors.[1] | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC., BRILLIANT
NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and
SOCO WEST, INC.,

      Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG
GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC.,
BRENNTAG NORTH AMERICA, INC., BRENNTAG
NORTHEAST, INC., BRENNTAG PACIFIC, INC.,
BRENNTAG SOUTHEAST, INC., BRENNTAG
SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL
CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC.,
THOSE PARTIES LISTED ON APPENDIX A TO THE
COMPLAINT and JOHN AND JANE DOES 1-1,000,

      Defendants.

Adv. Proc. No. 23-01245 (MBK)

## ORDER EXTENDING THE AUTOMATIC STAY TO AND
## PRELIMINARILY ENJOINING BRENNTAG ENJOINED CLAIMS

    The relief set forth on the following pages, numbered three (3) through seven (7), is

**ORDERED**.

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Extending the Automatic Stay to and Preliminarily Enjoining Brenntag
Enjoined Claims

This matter coming before the Court on the (a) *Debtors' Amended Verified Complaint for Declaratory and Injunctive Relief (I) Declaring that the Automatic Stay Applies to Successor Liability Claims Against Non-Debtors, (II) Extending the Automatic Stay to Brenntag Enjoined Claims, (III) Preliminarily Enjoining Brenntag Enjoined Claims, and (IV) Declaring that Successor Liability Claims are Property of the Debtors' Estates* [Adv. Proc. Docket No. ___] (the "**Amended Complaint**") and (b) *Debtors' Motion for (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors Pending Entry of a Final, Non-Appealable Order Regarding the Debtors' Proposed Settlement and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision on the Debtors' Request for Injunctive Relief* [Adv. Proc. Docket No. ___] (the "**Motion**")[2] seeking, among other relief, an extension of the automatic stay to, and preliminary injunction preventing the continuation, amendment, and settlement of, the Brenntag Enjoined Claims; and the Court having found and determined that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C. § 157(b), and (iii) venue is proper in this District pursuant to 28 U.S.C. § 1409; and the Court having considered the submissions of the parties, the Motion, the Declaration, the responses, objections and replies in respect of the Motion, and the evidence submitted by the parties, including declarations, testimony and exhibits filed with or presented to the Court; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED that:**

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

(Page 4)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Extending the Automatic Stay to and Preliminarily Enjoining Brenntag
Enjoined Claims

1.    The Motion is **GRANTED** as set forth herein, and the Adversary Proceeding is resolved in favor of the Debtors.  All objections to the relief granted herein are **OVERRULED**.

2.    The Defendants are hereby stayed pursuant to section 362 of the Bankruptcy Code and enjoined from continuing to prosecute, amending, and settling the Brenntag Enjoined Claims identified on the schedule attached to this Order as **Exhibit 1** (the "**Schedule**") pending this Court's entry of (i) a final, non-appealable Order granting the Settlement Motion or (ii) an Order denying the Settlement Motion.

3.    This Order shall terminate immediately upon this Court's entry of (i) a final, non-appealable Order granting the Settlement Motion or (ii) an Order denying the Settlement Motion.

4.    The Debtors are authorized to amend or supplement the Schedule to stay and enjoin additional actions asserting Brenntag Enjoined Claims pursuant to the following procedures, which are hereby approved:

   i.    So long as the stay and injunction provided by this Order remain in effect, the Debtors shall be permitted to file on the docket in the Adversary Proceeding a request (a "**Request to Amend Schedule**"), which shall attach (a) a proposed order amending the Schedule (an "**Order Approving Amendment**"), (b) an amended or supplemented Schedule that identifies the additional actions sought to be stayed/enjoined (such actions, "**Additional Actions**"), (c) a blackline of such Schedule marked against the previously filed Schedule, and (d) a copy of the operative complaint and any bifurcation stipulation filed in each Additional Action.

   ii.    Any Request to Amend Schedule shall be served by regular mail and email (where known) on counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and counsel for any individual plaintiff identified on the Schedule (as amended or supplemented) (each, a "**Amendment Notice Party**" and collectively with counsel for the Debtors, the "**Amendment Notice Parties**") within one (1) business day of its filing.

   iii.    Objections, if any, to a Request to Amend Schedule, which shall be limited to arguing that the plaintiff's claims against Brenntag in the relevant Additional Action constitute purely direct claims based solely on plaintiff's post-2004

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Extending the Automatic Stay to and Preliminarily Enjoining Brenntag
Enjoined Claims

talc/asbestos exposure (each, an "**Objection**"), shall be filed and served by first class mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US within ten (10) days of service of the applicable Notice of Amended Schedule.

iv.   Any Amendment Notice Party that fails to timely file an Objection shall be deemed to consent to entry of the Order Approving Amendment as to the Additional Action(s) identified in the applicable Request to Amend Schedule.

v.   In the event an Amendment Notice Party timely files an Objection, the parties shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Objection at a hearing to be scheduled.

5.   The following Schedule Removal Procedures are hereby approved:

i.   So long as the Preliminary Injunction Order remains in effect, any plaintiff whose action is listed on the Schedule and (i) who has dismissed with prejudice all claims against Brenntag, including direct claims, in the subject action; or (ii) whose claims against Brenntag constitute purely direct claims based solely on such plaintiff's post-2004 talc/asbestos exposure, either because (a) plaintiff's initial exposure to talc/asbestos occurred after February 27, 2004 or (b) prior to February 28, 2024, plaintiff was exposed to talc/asbestos supplied solely by parties other than the Debtors, shall be permitted to file on the docket in the Adversary Proceeding a request to remove his or her action from the Schedule (a "**Removal Request**"), which shall (x) identify the specific action plaintiff seeks to remove from the Schedule and (y) provide evidence sufficient to establish that plaintiff satisfies one of the above conditions.

ii.   Any Removal Request shall be served by regular mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US (each, a "**Removal Notice Party**" and collectively, the "**Removal Notice Parties**") within one (1) business day of its filing.

iii.   Objections, if any, to a Removal Request (each, an "**Objection**"), shall be filed and served by first class mail and email (where known) on counsel for the Debtors, counsel for the Committee, counsel for the FCR,  counsel for Brenntag, counsel for NICO, counsel for DB US, and counsel for the applicable plaintiff within ten (10) days of service of the applicable Removal Request.

iv.   Any Removal Notice Party that fails to timely file an Objection shall be deemed to consent to the removal of the action identified in the applicable Removal Request from the Schedule.

(Page 6)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Extending the Automatic Stay to and Preliminarily Enjoining Brenntag
Enjoined Claims

     v.    In the event a Removal Notice Party timely files an Objection, the parties shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Objection at a hearing to be scheduled.

6.    Any party in interest is authorized to file a copy of this Order and any applicable Order Approving Amendment on the docket of the actions listed on the Schedule (including any Additional Actions added to the Schedule pursuant to a Request to Amend Schedule in accordance with the foregoing procedures).

7.    Pursuant to Bankruptcy Rule 7065, the Debtors are relieved from posting any security in connection with this Order pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

8.    The Debtors shall cause a copy of this Order to be served via first class mail and e-mail (where known) on counsel for the known Defendants, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and the Office of the United States Trustee within three (3) business days of its entry on the Court's docket.

9.    The requirement set forth in D.N.J. LBR 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

10.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

11.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

(Page 7)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Extending the Automatic Stay to and Preliminarily Enjoining Brenntag Enjoined Claims

12.    The terms and conditions of this Order shall be effective immediately upon its entry.

13.    This Court shall have exclusive jurisdiction over this Order and any and all matters arising from or relating to the implementation, interpretation, or enforcement of this Order, including, without limitation, any and all determinations as to whether a claim constitutes a Brenntag Enjoined Claim and whether an action in respect of a Brenntag Enjoined Claim is subject to this Order.

## EXHIBIT 1

[Schedule of Brenntag Enjoined Actions]

Any party who wishes to examine or copy the documents summarized in the below Schedule can do so by contacting the Debtors' undersigned counsel by email to **adeleo@coleschotz.com** and **jaberasturi@coleschotz.com** in order to obtain access to a data room containing such documents. The number in the No. column of the below Schedule refers to the folder number for the applicable claim in the data room.

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Acevedo | Yolanda | Yolanda Acevedo and Noe Acevedo v Avon Products, Inc et al | MID-L-003625-23 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1990's | Complaint, ¶ 2 | No |
| 2 | Adams | Jennifer | Jennifer E Adams and Jon S Adams v Brenntag North America, Inc et al | MID-L-004465-23 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Suzanne M. Ratcliffe | Yes | Yes | 1972 | Complaint, ¶ 2 | No |
| 3 | Adams | Jacqueline | Jacqueline Adams and David Adams v Sumitomo Corporation of America et al | 1900172024 | New York | New York | The Lanier Law Firm, PLLC | Brendan J. Tully | Yes | Unclear based on fact of complaint | Unclear based on face of complaint | NA | NA | No |
| 4 | Adams | Sheri | Sheri Adams v Alberto Culver USA Inc et al | 190233/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Unclear based on fact of complaint | Unclear based on face of complaint | NA | NA | No |
| 5 | Aikens | Kimberly | Kimberly O. Aikens v. Public Supermarkets, Inc. | 2023-017836-CA01 | Miami-Dade | Florida | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1976 | Amended Complaint, ¶ 11-12 | No |
| 6 | Akins | Shirley | Shirley Akins and Charles Akins vs. Avon Products, Inc.; Brenntag Specialties LLC and Brenntag North America, et al | 2021-80721-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Paterson | Yes | Yes | 1954 | Second Amended Complaint, ¶ 31 | No |
| 7 | Akins | Theresa | Theresa Akins vs. Brenntag Specialties LLC, et al | 2022-57520-ASB | Harris | Texas | Nachawati Law Group | Steven S. Schulte | Yes | Yes | 1970s | Second Amended Petition, ¶ 23 | Yes |
| 8 | Al'Saud | Newal | Dan Albany, as Trustee of the Estate of Newal Al Saud, and Tina Mohammad v. Barretts Minerals, Inc, et al. | 190902/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Yes | 1955 | Complaint, Plaintiff's Initial Fact Sheet, 6. | No |
| 9 | Alber | Zachary Michael | Alber, Rebecca, Estate of Zachary Michael Alber, Pltf. v. Johnson & Johnson, et al | MID-L-000955-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1983 | Second Amended Complaint, ¶ 2 | No |
| 10 | Alegre | Jorge | Jorge M Alegre and Luz Alegre v Arkema, Inc et al | MID-L-001861-23 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1937 | Third Amended Complaint, ¶ 2 | No |
| 11 | Alexander-Jones | Ruth | G. RUTH ALEXANDER-JONES and JAMES R. JONES v. AVON PRODUCTS, INC. et al. | 22-2-18669-1 SEA | King | Washington | Maune Raichle Hartley French & Mudd, LLC | Brian F. Ladenburg | Yes | Yes | 1966 | Complaint, ¶ 9 | Yes |
| 12 | Alicea | Maria | Maria Alicea v. Avon Products, Inc., et al. | 23-1551 | Middlesex (MA) | Massachusetts | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Unclear based on fact of complaint | Unclear based on face of complaint | NA | NA | No |
| 14 | Aloisio | Roman | Roman Aloisio v Avon Products, Inc et al | 190239/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on fact of complaint | Unclear based on face of complaint | NA | NA | No |
| 15 | Alvarado | Alvaro | Maria Del Rosario Tobias, Ind. and as Personal Rep. of the Estate of Alvaro Alvarado, Deceased, and in bf of L.A., a Minor vs. Avon Products, Inc., Brenntag Specialties LLC, et al | 2021-73332-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1990 | Second Amended Petition, ¶ 17 | Yes |
| 16 | Alvarez | Josefina | Josefina Alvarez v. Barretts Minerals Inc., et al | 23 L 5583 | Cook | Illinois | Maune Raichle Hartley French & Mudd, LLC | Bethany Gaspersic | Yes | Yes | 1988 | Complaint, ¶ 7 | No |
| 17 | Alvarez | Maria | Alvarez, Miguel, Executor of Estate of Maria Alvarez, Pltf. v. Johnson & Johnson, et al | MID-L-005353-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1963 | Third Amended Complaint, ¶ 1 | Yes |
| 18 | Amenova | Elaine | Elaine M. Amenova v Amerfum Inc., et al | EFCA2023-002100 | Oneida | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1961 | Second Amended Complaint, ¶ 5 | Yes |
| 19 | Anderson | Gina | GINA ANDERSON v. AVON PRODUCTS, INC. et al | 21-2-14042-1 SEA | King | Washington | Maune Raichle Hartley French & Mudd, LLC | Robert Green | Yes | Yes | 1986 | Complaint, ¶ 5 | Yes |
| 20 | Anderson | Carolyn | Carolyn S. Anderson v. Avon Products, Inc., et al. | MID-L-02533-18 AS | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 21 | Anderton | William | William Anderton and Margie Anderton v Brenntag North America and Brenntag Specialties, Inc. | MID-L-005866-18 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1956 | First Amended Complaint, ¶ 4 | Yes |
| 22 | Anzona | Richard | Juan Anzona, as Executor of the Estate of Richard Anzona v. 3M Co. et al | 190069/2016 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Unclear based on fact of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 23 | Armstrong | Terry | Terry Armstrong and Katherine Armstrong vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-38902-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Paterson | Yes | Yes | 1955 | First Amended Complaint, ¶ 71 | No |
| 24 | Arvelo | Donna | Arvelo, Donna, M., Pltf. vs. Andesite Corporation, Ltd., et al | MID-L-006588-17 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1951 | Fifth Amended Complaint, ¶ 2 | Yes |
| 25 | Askdown | Janet | Janet Anderson's Sumitomo Corporation of America et al | 1900182024 | New York | New York | The Lanier Law Firm, PLLC | Brendan J. Tully | Yes | Unclear based on fact of complaint | Unclear based on face of complaint | NA | NA | No |
| 26 | Ashelford | John | Susan Ashelford, as Personal Representative of the Estate of John Ashelford, Deceased v. Barretts Minerals, Inc., et al | 23-002356 CA27 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vincent | Yes | Yes | 1967 | Complaint, ¶ 36 | No |
| 27 | Ashoori | Shanaz | Shanaz Ashoori and Jehangir Ashoori v. All, et al. | MID-L-001341-24 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1984 | First Amended Complaint, ¶ 2 | No |
| 739 | Backelin | Brent | Brent W. Backelin v. 84 Lumber Company, et al. | 190172/2012 | New York | New York | The Early Law Firm, LLC | Brian Francis Early | No | Yes | 1966 | Complaint, ¶ 5 | No |
| 29 | Basin | Alicia | Alicia Basin & Kenneth Basin v Avon Products, Inc et al | 190069/2023 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | Unclear based on face of complaint | NA | No |

JA754

Case 23-01245-MBK   Doc 299-1   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit A - Proposed Preliminary Injunction Order   Page 11 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 663 | Bagley | Patricia | Patricia Bagley v. Chanel, Inc., et al. | 1901227024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 672 | Balas | Sandra | Sandra Balas and Anthony Balas v. Wegmans Food Markets, Inc., et al. | 811759/2024 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | Late 1960s | Complaint, Statement Sheet, No 8 | No |
| 31 | Ballesteros | Irma | Irma Ballesteros v. ALBERTSONS COMPANIES, INC. et al. | 23STCV06710 | California | Los Angeles | Friol Law Firm, PC | Andrew Seitz | Yes | Yes | 1970s | First Amended Complaint, Exhibit A | No |
| 32 | Barker | Maureen | Georgina Jane Barker, Individually and as administrator of the estate of Maureen Barker v Christian Dior, Inc et al. | 190299/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 33 | Barnhart | Melissa | Melissa Barnhart and Christopher Barnhart v Avon Products, Inc et al | MID-L-002649-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1973 | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 34 | Barone | Nicholas | Nicholas Barone and Kathryn Barone v. Blue.M, et al | FBT-CV-22-6116587-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1960 | Complaint ¶ 5 | Yes |
| 35 | Barratt | Madelin | Barratt, Madelin and Henry Barratt, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 24-0880116-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 4 | Yes |
| 36 | Bartlett | Deborah Lee | Deborah Bartlett and Shawn Bartlett v. Avon Products, Inc. et al. | 24STCV04012 | California | Los Angeles | Simon Greenstone Panatier, PC | Robert Green | Yes | Yes | 1970s | Complaint, Exhibit A | No |
| 37 | Barton | Harold | Harold Barton, et al. v. Avon Products, Inc. et al | CV21955385 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeHaven | Yes | Yes | 1973 | Complaint, Brochure, p. 3-6 | Yes |
| 38 | Basili | Gina | Gina F. Basili v. Avon Products, Inc. et al. | 23-0784 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Yes | 1975 | Fourth Amended Complaint, ¶ 37 | Yes |
| 39 | Basser | Carol | Carol Basser v. All, et al. | MID-L-000432-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Gaslow | Yes | Yes | 1942 | Fourth Amended Complaint, ¶ 2 | Yes |
| 40 | Bast | Donna J. | DONNA J. BAST and LARRY A. BAST v. AVON PRODUCTS, INC. et al. | 23-2-15056-2 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton | Yes | Yes | 1958 | First Amended Complaint at 11-13 | No |
| 41 | Batey | Mary | William Batey Jr., Individually and as Administrator and Administratrix and Prosependium for the Estate of Mary Batey, et al vs Avon Products, Inc., et al | MID-L-001565-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1953 | Complaint, ¶ 8 | Yes |
| 42 | Bathgate | Josephine | Josephine Bathgate v Avon Products, Inc et al. | 190125/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 43 | Belanger | Stacy | PETER BELANGER, individually and as successor in interest to STACY BELANGER, Deceased; CHRISTOPHER BELANGER, LUKE BELANGER, and LILY BELANGER, Individually, vs. RALPHS GROCERY COMPANY et al. | 22STCV08775 | California | Los Angeles | Waters Kraus & Paul | Kevin M. Loew | Yes | Yes | 1970 | Second Amended Complaint, Exhibit A | Yes |
| 712 | Bell | Judy Kay | Scott Bell, as Personal Representative for the Estate of Judy Kay Bell v. Almay, Inc. et al | 190090/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 44 | Bennett-Turner | Alan | Alan Bennett-Turner v Avon Products, Inc. et al | 190118/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 45 | Berris | Susan W. | SUSAN W. BERRIS and BRUCE C. BERRIS, vs. BRENNTAG NORTH AMERICA, INC., et al. | 62-CV-23-257 | Minnesota | Ramsey | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960 | First Amended Complaint, ¶ 3 | No |
| 46 | Berry | Sara | Sara Berry and Sean Berry v Sumitomo Corporation of the Americas et al. | 190274/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 47 | Besse | Jodi | Besse, Jodi & George Besse, Pltfs. v. Duval's Pharmacy, et al. | 1900102021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1970s | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 48 | Best | Edna | Edna Best v. Avon Products, Inc., et al. | MID-L-007546-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950 | Complaint, ¶ 2 | Yes |
| 735 | Betts | Susan | Susan Betts v. Avon Products, Inc., et al. | 1901119/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 49 | Bezanilla | Bernadette | Bernadette A. Bezanilla and Leopolda G. Bezanilla v. Avon Products, Inc., et al | CACE-23-003072 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiRoma | Yes | Yes | 1970s | Third Amended Complaint, ¶ 5 | No |
| 695 | Biggers | Walter | Walter A. Biggers and Janet L. Biggers vs. Arkema, Inc., F/K/A Pennsalt Corporation, et al. | 2024-LA-000830 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Steven D. Rinsberg | No | Yes | Prior to 1969 | Complaint, ¶ 7 | No |
| 50 | Biljetina | Jolyne | Jolyne Biljetina and Eric Biljetina, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190024/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |

Case 23-01245-MBK    Doc 299-1    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit A - Proposed Preliminary Injunction Order    Page 12 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Delauru in Complaint? | Allegation of Pre-2004 Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | Bill | Lorraine | Bill, Lorraine & Thomas South, Phfs. v. Avon Products, Inc., et al. | 190065/22 | New York | New York | Weitz & Luxenberg P.C. | James Plastiras | Yes | Yes | 1960s | Amended Complaint, ¶ 81 | No |
| 677 | Biondo | Nancy | Peter Biondo, as Administrator of the Estate of Nancy Biondo, Deceased v. Avon Products, Inc., et al | 190199/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier | Yes | Yes | 1988 | Amended Complaint, Initial 1st Fact Sheet, 5 | No |
| 52 | Bisceglio | James | Bisceglio, James, Phf. v. Johnson & Johnson, et al. | MID-L-003835-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1952 | First Amended Complaint, ¶ 2 | Yes |
| 53 | Biswas | Roman | Rohan Biswas and Jaclyn Biswas v. Aramis Distributors New York, Inc et al. | 190004/2021 | New York | New York | | Daniel Wasserberg | Yes | Unclear on face of complaint | NA | NA | Yes |
| 54 | Black | Edward | Tameem S. Gilis, Incl. and as Special Administrator for the heirs and Estate of Edward L. Black Sr. and Wanda Jo Black vs. Brenntag Specialties LLC, et al | 2018-59007-ASB | Texas | Texas | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | Yes |
| 55 | Black | Mary | Mary Black, Phf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190016/2017 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | Yes |
| 673 | Blackwell | Mary Kathryn | Mary Kathryn Blackwell vs. Avon Products, Inc. et al. | CACE-24-010680 | Broward | Florida | Simmons Hanly Conroy LLP | Juan P. Bauta, II | Yes | Yes | 1964 | Complaint, ¶11 | No |
| 56 | Blinkhouma | Judith | Blinkhoum, Robert and Karen Blinkinsop, etc, Phfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | MID-L-008377-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1944 | Second Amended Complaint, ¶ 4 | Yes |
| 57 | Bloomberg | Jac | Bloomberg, Ellen, for the Estate of Jac M. Bloomberg, Phf. v. Barretts Minerals, Inc. et al. | MID-L-002608-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | F Alexander Eulett | Yes | Unclear on face of complaint | 1972 | Third Amended Complaint, ¶ 4 | No |
| 58 | Blue | Vertis | Blue, Vertis, Phf. v. Avon Products, Inc., et al. | MID-L-002677-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1955 | Amended Complaint, ¶ 4 | Yes |
| 59 | Boatright | Angela | Boatright, Angela, Phf. v. Avon Products, Inc., et al | 190154/2021 | New York | New York | Simon Greenstone Panater, PC | Brendan J. Tully | Yes | Yes | Prior to 1980 | Complaint at ¶ 1 | Yes |
| 685 | Bogler | Eriza | Wolfgang Bogler, as Administrator of the Estate of Eriza Bogler, and Wolfgang Bogler, Individually v. Avon Products, Inc., et al. | 814805/2024 | Suffolk | New York | Weitz & Luxenberg P.C. | Sean Kerley | Yes | Yes | 1960s | Amended Complaint, No. 97 | No |
| 60 | Boice | Denise K. | DEBBIE A. BOICE, as Personal Representative of the Estate of DENISE K. BOICE v. AVON PRODUCTS, INC., et al. | 23-2-22519-8 SEA | Washington | Washington | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton | No | Yes | 1975 | Amended Complaint, ¶ 15 | No |
| 61 | Boiten | Barbara Ellen | Poland-Stornock, DeAnna and Estate of Barbara Ellen Boiten, Phf. v. Brenntag North America, Inc. Conferencing Specialties, Inc. et al. | MID-L-000404-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1974 | Third Amended Complaint, ¶ 4 | No |
| 62 | Borthwick | Anne | Anne Borthwick and David Borthwick v. Suntronno Corporation of Americas, et al. | 190031/2024 | New York | New York | Simon Greenstone Panater, PC | Brendan J. Tully | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | No |
| 63 | Bowers | Bernard | Bowers, Bernard P. and Jeanne Bowers, Phfs. v. A.W. Chesterton Company, et al. | 21-09-02481 | Philadelphia | Pennsylvania | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1970 | Amended Complaint, ¶ 5 | No |
| 728 | Bradford | Claire | Shawn Englerth, as Personal Representative of the Estate of Claire Bradford v. Bayer Healthcare LLC, et al. | 2405-00433 | Philadelphia | Pennsylvania | Brockman, Rosenberg, Brown and Sandler | Steven J. Cooperstein | Yes | Yes | 1940s | Amended Complaint, Schedule 1 | No |
| 64 | Brand | Karen | Brand, Karen & Ronald Brand, Phfs. vs. Avon Products, Inc., et al. | 190206/2021 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | Yes |
| 65 | Brannon | Billy | Billy Brannon and Wilma Brannon vs. Avac, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2023-15536-ASB | Harris | Texas | Simon Greenstone Panater, PC | Holly C. Peterson | Yes | Yes | 1955 | Third Amended Complaint, ¶ 48 | No |
| 66 | Brantley | William | Kelly Brantley and Sara Brantley v. 3M Company a/k/a Minnesota Mining & Manufacturing Company, et al. | C-717978 32 | East Baton Rouge Parish 19th JDC | Louisiana | Getys Law Group, APLC Simon Greenstone Panater, PC | Lawrence G. Gettys Holly C. Peterson | Yes | Yes | 1979 | Amended Complaint, ¶ 4 | No |
| 67 | Braun | James | Gayle Braun, as Executor for the Estate of James M. Braun Jr., deceased v. Air & Liquid Systems Corporation, successor-by-merger to Buffalo Pumps, Inc., et al | 2022LA001010 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Eric Poplonski | Yes | Yes | 1969 | Complaint, ¶ 7 | Yes |
| 68 | Brewer | Rebecca | Rebecca Brewer v. Avon Products, Inc., et al | 190367/2016 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | Yes |
| 69 | Brown | Leroy | Leroy Brown v 3M Company et al | 23-11-03107 | Philadelphia | Pennsylvania | Meirowitz & Wasserberg, LLP | Jason P. Yarmolsky | Yes | Yes | 1984 | Amended Complaint, Schedule 1 | No |
| 71 | Buehler | Roger | Buehler, Eva, Individually and as Executor of the Estate of Roger D. Buehler, deceased, Phf. vs Air & Liquid Systems Corporation, et al | MID-L-002905-20 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Cody Greenes | Yes | Yes | 1976 | Amended Complaint, ¶ 2 | Yes |
| 72 | Buhlig | Marcella | Buhlig, Marcella and William Buhlig, etc., Phfs. vs. American International Industries, Inc., et al | MID-L-007725-19 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 73 | Burchette | Kimberly | Kimberly Burchette & Anne Burchette v. Avon Products, Inc. et al. | MID-L-004582-22 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1971 | Second Amended Complaint, ¶ 3 | No |
| 74 | Bus | Laura | Laura Bus and Mark Bus v Barretts Minerals, Inc et al | MID-L-003086-22 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1998 | Fourth Amended Complaint, ¶ 2 | No |

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 75 | Byrd | Richard | RICHARD L. BYRD and MARLIE G. BYRD v. Brenntag, Inc., et al | 23-LA-1670 | Illinois | Madison | Maune Raichel Hartley French & Mudd LLC | Celena F. Bevard | Yes | Yes | 1965 | First Amended Compliant, ¶ 6 | No |
| 76 | Caro | Nancy | Frank J. Caro, Jr. Individually and as Executor and Executor Ad Prosequendum of the Estate of Nancy Cairo v. AII, et al. | MID-L-000-14AS | New Jersey | Middlesex (NJ) | Szaferman, Lakind, Blumstein & Blader, P.C. | Moshe A. Marmor | Yes | Yes | 1968 | Third Amended Complaint, ¶ 4 | Yes |
| 77 | Calabrese | Thomas | Thomas Calabrese v Arkema, inc et al | 190328/2023 | New York | New York | Weitz & Luxenberg P.C. | Sean Kelly | Yes | Yes | 1950s | Amended Compliant, ¶ 15 | No |
| 78 | Cali | Julie | Julie Cali v. Arkema, Inc f/k/a Pennsalt Corp., et al | c-705579 '25 | Louisiana | East Baton Rouge Parish 19th JDC | East Baton Rouge Landry & Swart, LLC Fears Nachawati PLLC | Mickey P. Landry Frank J. Swart Matthew C. Clark Darren McDowel | Yes | Yes | 1973 | Compliant, ¶ 15 | Yes |
| 79 | Cammalleri | Emilio | Cammalleri, Emilio and Claudette Cammalleri, H/W, Phila. vs. American International Industries, Inc., et al. | MID-L-007266-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 4 | Yes |
| 80 | Campbell-Wright | Lorna | Lorna Campbell-Wright & Rodrick Wright v Avon Products, Inc. et al. | 190228/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Yes | 1950s | NA | No |
| 81 | Cantu | Juan | Cantu, Juan & Laura, Phila. v. Barrett Minerals, Inc., et al. | MID-L-000572-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1973 | Amended Complaint, ¶ 5 | No |
| 82 | Cantelora | Carolyn | Carolyn Cantelora vs. C and D Pharmacy, LLC, et al. | 21-0738 | Louisiana | St Bernard Parish / 34th JDC | Landry & Swart, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry Frank J. Swart Matthew C. Clark Holly C. Peterson | Yes | Yes | 1945 | First Amended Compliant, ¶ 5 | Yes |
| 83 | Carlson | Connie M. | CONNIE M. CARLSON v. BARRETTS MINERALS, INC. et al. | 22-2-03149-2 KNT | Washington | King | Bergman Oslund Udo Little, PLLC | Brendan Little | Yes | Yes | Mid-1960s | Compliant, 3 | Yes |
| 84 | Carlson | Peggy | Peggy Carlson and John Carlson, Phila. vs. Brenntag, Inc., DBA | MID-L-003572-17 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1957 | Compliant, ¶ 2 | Yes |
| 86 | Casaravilla | Walter | Casaravilla, Walter M. and Tammar Casaravilla, Phila. v. Avon Products, et al. | 190296/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tambini | Yes | Yes | 1970 | Compliant, ¶ 120 | Yes |
| 88 | Catt | Helen | Helen Catt and Donald Catt, Phila. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-001410-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Leah Kagan | Yes | Yes | 1988 | Amended Compliant, ¶ 7 | No |
| 89 | Cavallozzi | Ron | Cavallozzi, John and Rene Cavallozzi, Phila. v. Barretts Minerals, Inc., et al. | MID-L-002519-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | James Andrew Plaisted | Yes | Yes | Late 1970s | Third Amended Compliant, ¶ 4 | No |
| 90 | Cayer | Robert | Robert Cayer and Elizabeth Cayer v. Ajax Tocco Magnafomic Corporation, et al | PC:2023-00731 | Rhode Island | Bristol | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | No | Yes | 1962 | Compliant, ¶ 5 | Yes |
| 91 | Ceraso | Vincent | Ceraso, Vincent, Phil. v. Amchem Pharmacy, Inc et al. | 190603-22 | New York | New York | Weitz & Luxenberg P.C. | Chris Romanelli | Yes | Yes | 1977 | Compliant, 129 | Yes |
| 93 | Chamberlain | Jennifer | Jennifer Chamberlain v Allison Pharmacy, Inc et al. | 23-013029 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta | Yes | Yes | 1974 | Compliant, ¶ 106 | Yes |
| 94 | Chapman | Rita Ann | RITA ANN CHAPMAN and GARY CHAPMAN v. AVON PRODUCTS, INC. et al. | 22STCV03968 | California | Los Angeles | Dean Omar Branham Shirley, LLP | Ben Adams | Yes | Yes | Mid-1950s | Compliant, Exhibit A | Yes |
| 95 | Chason Gregory | Amanda | Amanda Chason Gregory v. Publix Super Markets, Inc., et al. | 24-002569 CA27 | Florida | Broward | Simmons Hanly Conroy LLP | Rebecca Vincent | Yes | Yes | 1980s | Compliant ¶34 | No |
| 96 | Chefitz | Michael | Chefitz, Michael, Phil. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | 190110/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathanael N. Fukla | Unclear based on face of complaint | Yes | Unclear based on face of complaint | NA | No |
| 97 | Chelkowsky | Jeanne | Laura Mackey as executor of the Jeanne Chelkowsky v Avon Products et al. | MID-L-000292-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Cody Greenes | Yes | Yes | 1970s | Compliant, ¶ 4 | No |
| 99 | Clark | Sharilyn | Sharilyn Clark v. Brenntag North America, et al. | 190162/2018 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 100 | Clawson | Linda | Linda Clawson and Billy Clawson v Avon Products, Inc et al | 190157/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Yes | Unclear based on face of complaint | NA | No |
| 101 | Cline | Susan | Susan Cline & Patrick Cline v Acme Markets, Inc. LLP | 23-012897 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta | Yes | Yes | 1962 | Compliant, ¶ 138 | No |
| 102 | Clinton (Regona) | Amanda | Amanda Clinton, Phil. v. Avon Products, Inc., et al. | MID-L-002337-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1985 | First Amended Compliant, ¶ 2 | No |
| 103 | Cody | Laura | Cody, Laura and William Cody, Phila. v. Rite Aid of New York City, Inc., et al | 60335622 | New York | Nassau | Weitz & Luxenberg P.C. | Amber Jae Brandii | Yes | Yes | 1952 | Third Amended Complaint, ¶15 | No |
| 104 | Cohen | Connie | Cohen, Connie, Phil. v. Johnson & Johnson, et al. | MID-L-004448-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1958 | Third Amended Complaint, ¶2 | Yes |
| 105 | Cole | Roberta | Roberta Cole and John Cole v. Johnson & Johnson, et al | MID-L-007272-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1942 | Fifth Amended Compliant, ¶2 | Yes |
| 106 | Consell | Ann | Ann Consell and George Consell v. Barretts Minerals Inc., et al. | 21-1734 | Massachusetts | Middlesex (MA) | Cooly Law Firm and Duffy Law LLC | Edward Paul Cooly | Yes | Yes | 1950 | Compliant ¶ 8 | Yes |

JA757

Case 23-01245-MBK   Doc 299-1   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit A - Proposed Preliminary Injunction Order   Page 14 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107 | Conti | Carmela | Jeanne Conti as Executrix of the Estate of Carmela Conti v Avon Products, Inc et al | MID-L-003823-23 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1960 | First Amended Complaint, ¶ 4 | No |
| 108 | Conway | Thomas | DORCAS G. CONWAY, individually and as Special Administrator of the Estate of THOMAS P. CONWAY, Deceased v. Air & Liquid Systems Corporation, et al | 2021L001012 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | A. Gentry Smith | Yes | Yes | 1960s | First Amended Complaint, ¶ 7 | Yes |
| 109 | Cooney | Tim | Cooney, Tina v Avon Products, Inc. et al. | MID-L-002992-22 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1988 | Third Amended Complaint, ¶ | No |
| 110 | Cooper | Lilo | LILO COOPER and LESLIE COOPER v. Arkema, Inc. F/K/A Pennwalt Corporation And Elf Atochem North America, Inc. et al. | 23STCV15823 | Los Angeles | California | Simon Greenstone Panatier, PC | Albert Oguneyson | Yes | Yes | 1948 | Complaint, Exhibit A | No |
| 111 | Cooper | Michelle | Michelle Cooper vs Johnson & Johnson, et al. | MID-L-001326-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1967 | Third Amended Complaint, ¶ 2 | Yes |
| 112 | Cooper | Frederick | Frederick Cooper and Janneen Cooper v Arkema, inc et al. | 22-12-00021 | Philadelphia | Pennsylvania | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner | Yes | Yes | 1963 | Second Amended Complaint, ¶ 4a | No |
| 113 | Corin | Paula | Paula Corin v. Arkema, Inc. et al. | 23STCV26571 | Los Angeles | California | Simon Greenstone Panatier, PC | Marc Willick | Yes | Yes | 1955 | Complaint, Exhibit A | No |
| 114 | Coronado | Mario | Coronado, Mario & Melania Porras, PhS. v. Johnson & Johnson, et al. | MID-L-004460-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1992 | Third Amended Complaint, ¶ 4 | Yes |
| 115 | Corum | Scott | Scott, Scott and Greta Corum, PHs. v. Arkema, Inc., et al. | MID-L-001294-22 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1971 | Third Amended Complaint, ¶ 2 | No |
| 116 | Coss | Roger | Coss, Roger and Susan Coss, PhS., vs. 3M Company, Inc., et al. | MID-L-005031-19 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1954 | First Amended Complaint, ¶ 2 | Yes |
| 664 | Costigan | Irene | Irene Costigan and Andrew Costigan v. Chanel, Inc., et al. | 190120/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 696 | Cothurn | Cynthia | Cynthia Cothurn vs. Safeway, Inc. et al. | 24STCV15934 | Los Angeles | California | Brown Kelly LLP | Matt J Willick | Yes | Yes | 1960s | First Amended Complaint, Exhibit A | No |
| 117 | Craft | Cherie | Cherie A. Craft v. Ahold Delhaize USA, Inc., et al | 24-X-24-000005 | Baltimore City | Maryland | Brown Kelly LLP | Matthew E. Kelly | Yes | Yes | 1971 | Complaint, ¶ 8 | No |
| 118 | Crawford Starr | Taloa | Taloa L Crawford Starr v. Janssen Pharmaceuticals, Inc., et al | MID-L-001278-24 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | Early 1960s | Complaint, ¶ 2 | No |
| 119 | Crosby | Mary | Crosby, David as Executor of the Estate of Mary Crosby, PhS. v. Avnet, Inc., et al. | E2023-0467CV | Steuben | New York | Levy Konigsberg LLP | John P. Guinan | Yes | Yes | 1978 | Third Amended Complaint, ¶ 4 | No |
| 120 | Cross | Margaret | Margaret M Cross v Barretts Minerals, Inc et al | 190155/2023 | New York | New York | Weitz & Luxenberg P.C. | John P. Guinan | Yes | Yes | 1943 | Amended Complaint, ¶ 93. | No |
| 121 | Crozier | Beverly | Beverly Crozier and Donald Crozier v. Avon Products, Inc., et al. | 190385/2016 | New York | New York | Levy Konigsberg LLP | John P. Guinan | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 122 | Cubberley | Gladys | Gladys Cubberley v. Publix Super Markets, Inc., et al | 23-020045 CA 27 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1980s | First Amended Complaint ¶ 3 | No |
| 124 | Cupps | Catherine | Cupps, Catherine and Clifton Cupps, PhS. vs Brenning North America, Inc. and Brenning Specialties, Inc., et al | MID-L-002853-20 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | No |
| 125 | Curtis | Erik | Curtis, Erik and Tari Curtis, PhS. v. Avon Products, Inc., et al. | MID-L-006225-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1970s | First Amended Complaint, ¶ 9 | No |
| 127 | Davies | Michael | Davies, Lynn, individually and as Executrix of the Estate of Michael Davies, PhS. vs. Brenning North America, Inc. and Brenning Specialties, Inc., et al | 190348/2017 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | Unclear based on face of complaint | NA | Yes |
| 128 | Davis | Janel | JANEL DAVIS, VS. ALBERTSON'S LLC, individually and its successor-in-interest to ALPHA BETA et al. | RG21112811 | Alameda | California | Simmons Hanly Conroy LLP | Deborah Rosenthal | Yes | Yes | 1970 | Complaint, ¶ 2 | Yes |
| 129 | Deadman | Jane | Anthony Deadman, Individually and as Personal Representative of the Estate of Overseer of Decedent Jane Deadman, Deceased v. L'Oreal Travel Retail Americas, Inc., et al | 23-022397CA27 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1965 | Complaint ¶ 42 | No |
| 130 | Deal | Michael | Deal, Michael and Christine Deal, PHS. v. Arkema, Inc., et al | MID-L-000551-22 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1976 | Fourth Amended Complaint, ¶ 2 | No |
| 131 | Dean | James | James Bryan Dean and Lisa Dean v. 3M Company, a/k/a Minnesota Mining and Manufacturing | 2023-CP-40-03441 | Richland | South Carolina | Meirowitz & Wasserberg, LLP | Kaih Shukla | Yes | Yes | 1987 | Second Amended Complaint ¶ 153 | No |
| 132 | Decembrino | Richard | Richard Decembrino and Diana Decembrino v 3M Company et al. | 23-10-03193 | Philadelphia | Pennsylvania | Meirowitz & Wasserberg, LLP | Clark P. Rosengarten | Yes | Yes | 1960s | Second Amended Complaint, Schedule 1 | No |
| 133 | Deems | Daniel | Deems, Daniel and Jennifer Deems, PHS., vs. Avon Products, Inc., et al | 190394/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 134 | DeGannett | Paul | DeGannett, Paul II and Mary Ann DeGannett, PhS. v. Barretts Minerals, Inc., et al. | MID-L-000179-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1979 | Amended Complaint, ¶ 4 | No |

JA758

Case 23-01245-MBK    Doc 299-1    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit A - Proposed Preliminary Injunction Order    Page 15 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 135 | Doerboi | Peggy | Peggy J. Hudock Docetboi v. Avon Products, Inc., et al | 2023-021157-CA-01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1934 | First Amended Complaint, ¶ 70 | No |
| 136 | Delgado | Ana | ANA M. DELGADO v. AVON PRODUCTS, INC., et al | 24L/03182 | Illinois | St. Clair | Menges Law Firm | Menges Law: Carson Menges; Kanti & Von Oiste, LLP (Of Counsel) Jason Minsinelli | Yes | Yes | 1960s | Complaint, ¶ 1 | No |
| 137 | Deng | Jian Kang | Jian Kang Deng and Li Ying Deng v Barretts Minerals, Inc et al. | 190114/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 138 | Denham | Ann | Ann Denham v. Sumitomo Corporation of Americas, et al. | 190067/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 139 | Denk | William | ROSEMARY DENK, Individually and as Successor-in-Interest to WILLIAM J. DENK, Deceased v. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al | 23STCV01707 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1960 | First Amended Complaint, Exhibit A | Yes |
| 140 | DeSaussure | Vashti | Vashti DeSaussure v 3M Company et al. | MD-L-00713-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grishman | Yes | Yes | 1960 | Third Amended Complaint, ¶ 1 | No |
| 141 | Diaz | Walter | TAMMY EVETT DIAZ, individually and as successors-in-interest to WALTER NESTOR DIAZ, and HOLLY DIAZ, v. AVON PRODUCTS, INC. et al. | 22CV022885 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Real | Yes | Yes | 1980s | Complaint at 4:27-5:9 | No |
| 142 | DiRidio | Audia | Audia Diridio and James Guy v Barrett Minerals, Inc et al | MD-L-001282-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1976 | Third Amended Complaint, ¶ 1 | No |
| 145 | Dietzman | Heather | HEATHER R. DIETZMAN v. AVON PRODUCTS, INC., et al | 23-LA-001587 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | A. Gentry Smith | Yes | Yes | Mid-1980s | Complaint, ¶ 6 | No |
| 146 | Dobbs | Sheryl | Sheryl Dobbs v. Avon Products, Inc., et al. | MD-L-002426-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | Mid-1970s | Complaint, ¶ 2 | Yes |
| 147 | Doboe | Scott | Connors Doboe, Jocelyn, Individually and as Personal Representative for the Estate of Scott M. Doboe, PHI. vs. Avon Products, Inc., etc., et al. | 190305/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 148 | Dominguez | Gloria | Rubio, Nellie, for the Estate of Gloria Dominguez, PHI. v. Avon Products, Inc., et al. | 190227/21 | New York | New York | Weitz & Luxenberg P.C. | Clark Rosengarten (Since Jeff Weitz) | Yes | Yes | 1970s | Amended Complaint, 45 | No |
| 149 | Donnatin | John | PAULA M. DONNATIN, individually and as Special Administrator of the Estate of JOHN C. DONNATIN, deceased, CHARLES DONNATIN, an individual, and HALEY HASTIE, an individual; as legal heirs of JOHN C. DONNATIN, deceased, v. ARIZONA INC., F/K/A PENNWALT CORPORATION, v. | 24STCV09543 | California | Los Angeles | Dean Omar Braham Shirley, LLP | Leonard Sandoval | Yes | Yes | 1966 | Complaint, ¶ 18 | No |
| 150 | Doonan | Elizabeth | Elizabeth Doonan v Christian Dior, Inc et al | 190190/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 151 | Dotson | Ronald | Dotson, Ronald & Rosita Dotson, Phls. v. Johnson & Johnson, et al | MD-L-005986-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1950 | Second Amended Complaint, ¶ 2 | Yes |
| 152 | Dozier | Verna | Dozier, Verna L.P., Phf. vs. Avon Products, Inc. | MD-L-08467-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 153 | Dreyner | Monica | Monica Dreyner v Avon Products et al | 190124/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 154 | Dubois | Timothy | Timothy E. Dubois & Linda Dubois v. 3M Company, et al | 49D13-2404-CT-015028 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1956 | Complaint, ¶ 8 | No |
| 156 | Dugan | Edward | Edward Dugan and Paula Dugan v. Johnson & Johnson et al | 23-1762 | Massachusetts | Middlesex (MA) | Duffy Law LLC | Christopher P. Duffy | Yes | Yes | 1974 | First Amended Complaint ¶ 10 | No |
| 690 | Durkan | Ashling | Ashling Durkan v. Avon Products, Inc., et al. | 64929/2024 | New York | Westchester | Maune Raichle Hartley French & Mudd, LLC | Jessica Bissanola | Yes | Yes | 197k | Complaint, Initial Fact Sheet A | No |
| 157 | Dussia | Evan | Evan & Phyllis Dussia v. Whitaker, Clark, and Daniels, Inc. et al. | MD-L-003967-15 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Jacob Jordan | Yes | Yes | 1961 | Complaint, ¶ 2 | No |
| 158 | Dvir | Jessica | Jessica Dvir & Athoshiai Dvir v Avon Products Inc et al | 190247/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |



JA759

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Bretemg Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 159 | Eaves | Frances | Eaves, G. Tykes, Administrator for Frances Eaves, Phf. v. Kolmar Laboratories, Inc., et al. | 19011/2/2021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 160 | Ebua | Regina | Joy Ebua, as Personal Representative of the Estate of Regina Ebua v. Avon Products, Inc., et al. | 23-1980 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Yes | 1984 | Complaint ¶ 18 | No |
| 161 | Egert | Ilene | Egert, Lewis, as Personal Representative of the Estate of Ilene G. Egert and Lewis Egert, Individually, Pltfs. v. Barretts Minerals, Inc., et al. | 190204/2021 | New York | New York | Weitz & Luxenberg P.C. | Erik Jacobs | Yes | Yes | 1950s | Amended Complaint, ¶ 33 (page 20) | No |
| 162 | Eichler | Joy | Joy Eichler and Helene Eichlers v Block Drug Company, inc et al. | MID-L-000394-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Amended Complaint ¶ 26 | No |
| 163 | El-Abbasi | Patricia | MOHAMMAD EL-ABBASI, On His Own Behalf and on the Behalf of All Other Statutory Beneficiaries of PATRICIA ANNE EL-ABBASI, deceased v. AVON PRODUCTS, INC., et al. | CV2023-013113 | Arizona | Maricopa | Maune Raichle Hartley French & Mudd, LLC | Meghan K. McGlynn | Yes | Yes | 1968 | Complaint, ¶ 26 | No |
| 164 | Elasqua | Ann Marie | Ann Marie Elasqua and Michael Kaminsky v Avon Products, Inc et al. | EF2023-275144 | New York | Rensselaer | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1952 | Second Amended Complaint, ¶ 3. | No |
| 165 | Elmer | Denise | Denise Elmer v Avon Products, Inc et al. | MID-L-000656-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella | Yes | Yes | 1955 | Complaint, Initial Fact Sheet ¶ 5 | No |
| 166 | Elmer | Robert | Elmer, Robert, Pltf. v. Charles B. Chrystal Company, Inc., et al. | EFC-2022-0597 | New York | Oswego | Weitz & Luxenberg P.C. | Thomas M. Comerford | Yes | Yes | 1985 | Second Amended Complaint, 107. | No |
| 167 | Emge | Alfons | EMGE EMGE, in her capacity as Personal Representative of the Estate of ALFONS EMGE v. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al. | 24-2-05155-0 | Washington | Pierce | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1971 | Complaint at 16:1 | No |
| 168 | Enciso | Hortensia | Hortensia Enciso, Ind. and a/n/f of NVE, a minor vs Nuterra International, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-40593-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Fra | Yes | 1970s | Second Amended Complaint, ¶ 41 | No |
| 694 | Engebos | Gregory | Leo R. Frank, As Personal Representative For The Estate Of Gregory J. Engebos, vs. Ajax Steel Company LLC, Et. al. | 2024-LA-854 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Brian Ukman | No | Yes | Late 1960s | Complaint, ¶ 6 | No |
| 169 | Engelhardt | Thomas | Engelhardt, Thomas and Catherine, Pltfs. v. Kolmar Laboratories, Inc., et al. | 190260/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 170 | Engelman | Alice | Alice Engelman v American International Industries et al. | MID-L-007011-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1977 | Complaint, Initial Fact Sheet ¶ 5 | No |
| 171 | England | Carolyn | Carolyn England and David England v Sunstomo Corporation of America, et al. | 190250/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 172 | English | Linda | Linda English and Patricia Rase v. Avon Products, Inc. et al. | 190346/2018 | New York | New York | Simmons Hanly Conroy LLP | Valeri L. Nassif | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 173 | Epstein | Ira | IRA J. EPSTEIN v. ALBERTSONS COMPANIES, INC. Individually and as successor-in-interest to American Stores Company, f/k/a Skaggs Companies, Inc., as successor-in-interest to Jewel Companies, Inc., et al | 2023L010467 | Illinois | Cook | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960s | First Amended Complaint, ¶ 6 | No |
| 174 | Escobar | Rosario | Rosario Escobar vs. Avon Products, et al. | MID-L-002313-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Guthman | Yes | Yes | 1970s | Third Amended Complaint, ¶ 4 | Yes |
| 175 | Esqueda | Guillermo | Esqueda, Guillermo C. and Roberto Esqueda, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-001185-7-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1967 | Second Amended Complaint, ¶ 4 | No |
| 176 | Eulau | Alan | Eulau, Alan and Barbara Eulau, Pltfs. vs Avon Products Inc., et al. | 190211/2020 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1960s | Second Amended Complaint, ¶ 72 | No |
| 177 | Evans | Dolores | CHRYSTAL EVANS-BOWMAN, individually and as successor-in-interest to DOLORES EVANS, vs. JOHNSON & JOHNSON et al | 23CV043499 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid | Yes | Yes | 1950s | Complaint at 5:11-14 | No |
| 178 | Everest | Martha | Everest, Martha, Pltf. v. AMP Bowling Centers, Inc., et al. | MID-L-007151-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1959 | Second Amended Complaint, ¶ 4 | Yes |
| 179 | Feldman | Geoffrey Robert | Pamela Frolo-Feldman, individually and as representative of estate of Geoffrey Robert Feldman v Bayer Consumer Care Holdings et al. | MID-L-000091-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1998 | Complaint, ¶ 4 | No |
| 180 | Feldman-Nagel | Sharon | Sharon Feldman-Nagel & Christopher Nagel v Acme Markets, Inc et al. | 190191/2022 | New York | New York | Weitz & Luxenberg P.C. | Amber Jae Brandis | Yes | Yes | 1960s | Fourth Amended Complaint, ¶ [239] | No |

Case 23-01245-MBK    Doc 299-1    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit A - Proposed Preliminary Injunction Order    Page 17 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 181 | Feldt | Carolyn | KIMBERLY Y. DRONEN, as Special Administrator for the Estate of CAROLYN K. FELDT, deceased v. AMADA AMERICA, INC., et al | 23-LA-1382 | Madison | Illinois | Maune Raciel Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960s | Complaint, ¶ 6 | No |
| 182 | Ferrara | Angela | Ferrara, Angela, PHI. v. Avon Products, Inc., et al. | 190219/2020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1950s | Fourth Amended Complaint, ¶ 214 | Yes |
| 713 | Ferris | Julie | Julie Ferris v. Avon Products, Inc., et al. | 190906/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 183 | Fielder | Frazier | Frazier Fielder & Mary Fielder v. Block Drug Company, Inc., et al. | MID-L-002315-24 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1961 | Complaint, ¶ 3 | No |
| 184 | Fields | Michael | LORA M. HOWARD, as Administrator CTA for the Estate of MICHAEL S. FIELDS, deceased v. AMERICAN INTERNATIONAL INDUSTRIES, et al | 2020-L-000447 | Madison | Illinois | Maune Raciel Hartley French & Mudd, LLC | James Merrow & Jon R. Neumann | Yes | Yes | 1980 | First Amended Complaint, ¶ 10 | Yes |
| 185 | Filip | Sharon | Sharon Filip and John Filip v Barretts Minerals et al | EFC A2022001356 | Broome | New York | Weitz & Luxenberg P.C. | Peter Tambini | Yes | Yes | 1960 | Third Amended Complaint, ¶ 64. | No |
| 186 | Finch | Frank | Frank Finch & Ruth Finch v Barrett Minerals Inc. | MID-L-005951-22 | Middlesex (NJ) | New Jersey | Maune Raciel Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1980 | Third Amended Complaint, ¶ 2 | No |
| 720 | Fisher | Cynthia | Cynthia Fisher and Bruce Fisher, her husband vs. American International Industries Individually and As successor-in-interest to Pinaud, Inc., Barbara Alice, Inc., Ed Pinaud, Inc. d/b/a Ed Pinaud, and Neslco d-Mar Company; All for The Clubman Line of Products | 24-0005907-ca27 | Broward | Florida | Dean Omar Branham Shirley, LLP | Shawna Forbes-King | No | Yes | 1960s | Complaint, ¶ 18 | No |
| 187 | Fitch | John | Deborah J Fitch individually and as personal representative of the Estate of John Fitch v Block Drug Co, Inc et al | MID-L-005992-23 | Middlesex (NJ) | New Jersey | Maune Raciel Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1963 | Complaint, ¶ 4 | No |
| 188 | Fitzpatrick | Patricia | Richard Fitzpatrick III individually and as executor of the estate of Patricia Fitzpatrick v Chanel, Inc et al | 911855-23 | Albany | New York | Lipsitz Green Scime Cambria LLP | Brendan J. Tully | Yes | Yes | 1950s | Complaint, Plaintiff's Statement, ¶ 8 | No |
| 189 | Flanagan | Richard | Marilyna Keahn for the Estate of Richard Flanagan vs. Barretts Minerals, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-00174-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | No | Yes | 1961 | First Amended Complaint, ¶ 23 | No |
| 190 | Flater | Rose | Rose Flater and Bobbic Joe Flater vs. Albi Enterprises, et al | MID-L-003559-16 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 191 | Flennin | Joanne | Joanne Flennin and John Flennin v. Arkema, Inc. f/k/a Pennwalt Corp., et al | 21-022203 CA27 | Broward | Florida | Flint Cooper, LLC | Rebecca Vinocur | Yes | Yes | 1974 | Seventh Amended Complaint, ¶ 34 | Yes |
| 192 | Fogel | Leslie | Leslie Fogel and Catherine Fogel, PHS. v. American International Industries for Clubman, et al Whittaker, Clark, and Daniels, Inc. et al. | 190093/2016 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1956 | Complaint, ¶ 34 | Yes |
| 723 | Forsland | Carla | Carla Forsland and Blake Forsland v. Beacon Cmp Co., Inc. et al. | MID-L-00028/79-24 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah C. Kagan | Yes | Yes | 1956 | Complaint, ¶ 2 | No |
| 193 | Friedmann | Ilana | Ilana Friedman and Arthur Fridman v. ABC Supply Co., Inc. et al. | 190283/2015 | Middlesex (NJ) | New Jersey | The Lanier Law Firm, PLLC | Darren Berquist | Yes | Yes | 1961 | Initial Fact Sheet, 6. | No |
| 195 | Frissora | Annette | Frissora, Annette, PHI. v. Avon Products, Inc., et al | MID-L-004867-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 196 | Frith | Marjorie | TRACEI SHORE, as representative of the estate of MARJORIE FRITH, and as surviving daughter and on behalf of decedent's other surviving statutory beneficiaries, and SHERI GRAY and CHRISTINA FRITH, v. BRENNTAG SPECIALTIES, INC. et al. | CV2020/094998 | Maricopa | Arizona | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1956 | Complaint, ¶ 6. | Yes |
| 197 | Fruzsky | Vikki | Vikki Fruzsky v 3M Company et al. | 190607/2024 | New York | New York | Levy Konigsberg LLP | Denise S. Perssampieri | Yes | Yes | 1973 | Complaint, Initial Fact Sheet, ¶ 6. | No |
| 198 | Fulmore | Catherine | Catherine O'Neal, Denise, for the Estate of Catherine Fulmore, Plt. vs Avon Products Inc., et al. | 190157/2020 | New York | New York | Weitz & Luxenberg P.C. | Jeffrey S. Kanca | Yes | Yes | 1975 | Amended Complaint, ¶ 75. | Yes |
| 199 | Galan | Melvin | Galan, Melvin & Louise, Pltfs. v. Kolmer Laboratories, et al. | 190287/2020 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1956 | Complaint, ¶ 2 | No |
| 691 | Galledar | Roya | Roya Owlad Gallehdar and Abdul Hassan Owlad Gallehdar vs. Avon Products | 2024CP404185 | Richland | South Carolina | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | 1980s | Plaintiff's Complaint, ¶ 4 | No |
| 200 | Gallo | John | Dana Farris, ind and as fiduciary of the Estate of John Gallo v Avon Products, Inc., et al | 190027/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 201 | Garces | Laura | LAURA GARCES vs. AVON PRODUCTS, INC. et al. | 23CV032898 | Alameda | California | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1965 | Complaint, Exhibit A | No |

Case 23-01245-MBK    Doc 299-1    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit A - Proposed Preliminary Injunction Order    Page 18 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 203 | Gardener | John | John Gardener and Vivienne Gardener v. Brenntag North America, Inc., used individually and as successor-in-interest to Mineral Pigment Solutions, Inc., and as successor-in-interest to Whitaker Clark & Daniels, Inc., et al | 22-012299 CA27 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1960 | First Amended Complaint ¶ 8 | Yes |
| 204 | Garnes | Rosa | Garnes, Rosa & David Rodney Garnes, Phila. v. 3M Company, et al. | EF2022-00000051 | Jefferson (NY) | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | Late 1960s | Complaint, ¶. 5. | Yes |
| 206 | Garton | Barbara | Watkins, Dana, as Administrator and Administrator Ad Prosequendum of the Estate of Barbara Garton, PBL v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002423-22 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1970s | Second Amended Complaint, ¶ 5 | No |
| 208 | Gartone | Peggy | Peggy B. Gartone and Peter Gartone, etc., v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | MID-L-003039-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Third Amended Complaint, ¶ 2 | Yes |
| 209 | Gee | Margaret | Margaret Gee v Avon Products, Inc et al | 1900766/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | NA | NA | No |
| 210 | Geittmann | Peter | PETER R. GEITTMANN, M.D. and MARGARET M. GEITTMANN v. ARKEMA, INC., f/k/a Pennwalt Corporation, et al | 24-L-1848 | Cook | Illinois | Maune Raschl Hartley French & Mudd, LLC | Dawn Bessesman | Yes | Yes | 1970s | First Amended Complaint, ¶ 7 | No |
| 211 | Gentle | Samantha Leigh | Bigel, Carleen, for the Estate of Samantha Leigh Gentle, Phf. v. Avon Products, Inc., et al | MID-L-007729-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1965 | Complaint, ¶ 5 | Yes |
| 212 | Gerken | Anna | Andrew T. Gerken, individually and as Personal Representative of the Estate of Anna Mattel L. Gerken, deceased, v. Avon Products, Inc., et al. | 2023-CP-40-00611 | Richland | South Carolina | Dean Omar Branham Shirley, LLP | Mark Bisha | Yes | Yes | 1944 | First Amended Complaint ¶ 2 | No |
| 213 | Gesualdi | Shannon | Gary Mazorito, Individually and as Administrator for the Estate, Shannon Gesualdi v. Barretts Minerals, Inc., et al. | PC-2023-01861 | Bristol | Rhode Island | Medley Rice LLC | Vincent L. Greene | No | Yes | 1990s | First Amended Complaint ¶ 1 | No |
| 214 | Geter | Rebecca | Geter, Rebecca, Phf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003039-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Second Amended Complaint, ¶ 4 | Yes |
| 215 | Geyer | Ellen | Ellen Geyer v. Brenntag North America, Inc. & Brenntag Specialties, Inc. et al | MID-L-003463-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Kimberly Russell | Yes | Yes | 1955 | Second Amended Complaint, ¶ 5 | No |
| 216 | Gibbs | Elaine | Elaine Gibbs and John Gibbs v Avon Products, Inc et al | 190221/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 217 | Gibbs | Danny | Michelle Gibbs, individually and as administratrix of estate of Danny Gibbs v Arkema, Inc et al. | 23-1-02901 | Philadelphia | Pennsylvania | Meirowitz & Wasserberg, LLP | Nedin Wilson | Yes | Yes | 1996 | Complaint, Schedule 1 | No |
| 218 | Gilbride | Ellyn | Gilbride, Ellyn, Phf. v. Johnson & Johnson, et al. | MID-L-002548-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1940s | Second Amended Complaint, ¶ 2 | Yes |
| 219 | Girrer | Glenda | Glanda R. Girrer and Dale Girrer vs. Anco Insulations, Inc., et al. | C-745104 | East Baton Rouge Parish 19th JDC | Louisiana | Landry & Swarr, LLC/Dean Omar Branham Shirley, LLP | Mickey P. Landry/Frank J. Swarr/Matthew C. Clark/Jordan Bollinger | Yes | Yes | 1940s | First Supplemental and Amended Petition, ¶ 10 | No |
| 220 | Goffreda | Karen | Goffreda, Karen, Phf. v. Avon Products, Inc., et al. | MID-L-000274-21 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1954 | First Amended Complaint, ¶ 5 | Yes |
| 221 | Goldstein | Lia | Goldstein, Lia, Phf. v. Chanel, Inc., et al. | 1901082/2022 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 222 | Gomez | Maria | Maria Gomez v. Arkema, Inc. f/k/a Pennwalt Corp., et al | CACE-21-002366 | Broward | Florida | Simon Greenstone Panatier, PC | Frank Walton | Yes | Yes | 1977 | Complaint ¶15 | Yes |
| 223 | Gomez | Dolores | Gomez Dolores, Phf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | 1901118/2020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1961 | Complaint, ¶ 91 | Yes |
| 224 | Gonzales | Susan | ALEXANDER GONZALES, Individually, and ALEXANDER GONZALES as Personal Representative of the Estate of SUSAN GONZALES, Deceased v. AUTOZONE, INC., et al. | 2021CV32313 | Denver | Colorado | Simon Greenstone Panatier, PC | Robert A. Green, Dierdre E. Ostrowski, Esq | Yes | Yes | 1951 | Complaint, ¶ 48 | Yes |
| 225 | Gonzalez | Linda | Linda Gonzalez v. Whitaker, Clark, and Daniels, Inc., et al. | 1900742/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 226 | Goode-Evans | Dorothy | Dorothy Goode-Evans and Herbert Evans v. Avon Products, Inc., et al | 23-2731 | Middlesex (MA) | Massachusetts | Thornton Law Firm LLP | Andrea Landry | Yes | Yes | 1950s | First Amended Complaint ¶ 12 | Yes |
| 228 | Graham | Elsie Louise | GRAHAM, CHATELLO, as Personal Representative of the ESTATE OF ELSIE LOUISE GRAHAM, v. BRENNTAG NORTH AMERICA, INC., et al. | 21CV34505 (3:23-cv-01399-HZ) | Multnomah | Oregon | Dean Omar Branham Shirley, LLP | Jessica Dean/Jordan Hinsenfeld-James | Yes | Yes | Early 1950s | Complaint ¶ 13 | No |

Case 23-01245-MBK    Doc 299-1    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit A - Proposed Preliminary Injunction Order    Page 19 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 230 | Grandchelli | Georgia | Georgia Grandchelli and Gordon Grandchelli v. Axeal Health & Beauty, Inc., et al. | MID-L-002784-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella | No | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 232 | Gray | Kim | Gray, Kim, PHI. vs. Johnson & Johnson, et al. | MID-L-005932-19 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1967 | Sixth Amended Complaint, ¶ 2 | Yes |
| 233 | Greenage | William | William Greenage v Avon Products, Inc et al. | 190093/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 234 | Gref | Brian | Gref, Brian, Ph. vs American International Industries, et al. | 190178/2020 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1982 | Second Amended Complaint, ¶ 1 | Yes |
| 235 | Griffith | Richard | Richard Griffith & Dee Griffith's Barretts Minerals, et al. | MID-L-000154-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1982 | Fourth Amended Complaint, ¶ 4 | Yes |
| 236 | Grigoli | Salvatore | Salvatore Grigoli and Vincenza Grigoli v 3M Company et al. | 190200/2023 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | Mid-1950s | Complaint, Initial Fact Sheet, ¶ 6 | No |
| 237 | Grimes - Love | Toni | Grimes-Love, Toni R., PHI. v. Akorn Cosmetics, Inc., et al. | MID-L-001991-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eidos | Yes | Yes | 1950s | Second Amended Complaint, ¶ 4 | No |
| 238 | Guffey | William | William P Guffey and Brenda L Guffey v Amerihan, Inc., et al. | MID-L-006146-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1953 | First Amended Complaint, ¶ 4 | No |
| 239 | Guild | Gregory | Gregory Guild and Nancy Guild Phfs. vs. Brenntag North America, et al. | MID-L-03527-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1960 | Fourth Amended Complaint, ¶ 4 | No |
| 240 | Gumpert | Esther | Gumpert, Esther and Gary Gumpert, Phfs. v. Avon Products, Inc., et al. | 190056/2022 | New York | New York | Weitz & Luxenberg P.C. | Amber Jae Brandi | Yes | Yes | 1950s | Fourth Amended Complaint, ¶ 176 | No |
| 241 | Guith Cook | Denise J | Denise J. Guith Cook v. Advance Stores Company, Incorporated, et al. | CACE-24-003818 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1960s | Complaint, ¶ 5 | No |
| 242 | Haas | Beverly | Haas, Charles, Administrator for the Estate of Beverly Haas, Laurie Welch and Stephen Haas, PHfs. v. Abnay, Inc., et al. | MID-L-03339-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1946 | Complaint, ¶ 6 | Yes |
| 243 | Habib | Nagwa | Habib, Nagwa N., Phf. v. Barretts Minerals Inc., et al. | 2021-2381 | New York | Schenectady | Weitz & Luxenberg P.C. | Thomas M. Comerford | Yes | Yes | 1982 | Second Amended Complaint, 78 | No |
| 244 | Haghani | Mahtab | Mahtab Haghani & Martin Haghani v Avon Products Inc et al. | 190263/2022 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | Unclear based on face of complaint | NA | No |
| 245 | Hagwood | Steven | Hagwood, Steven R., PHI. v. Avon Products, Inc., et al. | MID-L-001267-22 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Erin M. Boyle | Yes | Yes | 1973 | Third Amended Complaint, ¶ 2 | Yes |
| 247 | Hammond | Jane | Jane Hammond and Colin HAmmond v Avon Products, Inc et al. | 190162/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 727 | Haney | Verda | Verda Haney v. Advance Stores Co., Inc., et al. | 49D13-2404-CT-019200 | Indiana | Marion | Dean Omar Branham Shirley, LLP | Sarah Broderick | Yes | Yes | 1955 | Complaint ¶ 6 | No |
| 249 | Harper | Charleen | Meridith Harper, as Trustee for the next-of-kin of Charlene Harper, Deceased, v. Target Brands, Inc. et al. | 62-CV-23-2656 | Minnesota | Ramsey | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1950s | First Amended Complaint, ¶ 3 | No |
| 250 | Harrell | Helen | Helen Harrell & David Odell v IRNA, et al. | MID-L-002525-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1971 | Second Amended Complaint, ¶ 5 | No |
| 251 | Harrington | Virginia | Harrington, Virginia, PHI. v. Johnson & Johnson, et al. | MID-L-006673-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1985 | Second Amended Complaint, ¶ 2 | Yes |
| 252 | Harris | Kimberly | Harris, Kimberly C. and Michael Harris, PHfs. v. Avon Products, Inc., et al. | MID-L-004711-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1970s | Second Amended Complaint, ¶ 3 | Yes |
| 714 | Hart | Theresa | Theresa L. Hart & Thomas Hart v. Avon Products, Inc., et al. | MID-L-003399-24 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne Ratcliffe | Yes | Yes | 1970s | Amended Complaint, ¶ 2 | No |
| 253 | Hartman | Robert | Hartman, Robert and Karen Hartman, PHfs. v. Akiyama International, et al. | MID-L-000953-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1980 | Fifth Amended Complaint, ¶ 1 | No |
| 254 | Hatcher | Kimberly | KIMBERLY HATCHER v. ALBERTSON'S LLC et al. | 22CV021209 | California | Alameda | Simmons Hanly Conroy LLP | Christine A. Renken | Yes | Yes | 1962 | Complaint, ¶ 2 | Yes |
| 255 | Hathaway | Todd | Todd Hathaway & Fayda Hathaway v Avon | 808575/2023 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1975 | Complaint, Plaintiff's Statement, No. 8 | No |
| 256 | Haas | Elizabeth | Elizabeth Haas and Emery Haas vs Avon Products, Inc., et al. | MID-L-000895-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Leah Kagan | Yes | Yes | 1971 | Complaint, ¶ 2 | Yes |
| 257 | Hawkins | Terrance | Terrance Hawkins and Ona Brouch v Adema, Inc. et al. | 190028/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 665 | Heard | Marlane | Marlane Heard v. Charles B. Chrystal Company, Inc., et al. | 190123/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | Unclear based on face of complaint | NA | No |
| 258 | Helms | Patrick | Mary Helms individually and as Administrator of the estate of Patrick Helms v Brenntag Specialties, Inc et al | MID-L-006343-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1999 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 259 | Helmuth | Leland | Leland J. Helmuth v. 3M Company, et al. | 49D13-2402-CT-003670 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1950s | Complaint, ¶ 5 | No |

Case 23-01245-MBK   Doc 299-1   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit A - Proposed Preliminary Injunction Order   Page 20 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 260 | Henkel | Nancy | Pfister, Peggy/Estate of Nancy Ann Hempel, Pltf. v. Avon Products, Inc., et al. | 49D13-2108-MI-029127 | Marion | Indiana | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 261 | Henderson | Jeannine | Jeannine Henderson vs. Taylor-Seidenbach, Inc., et al. | 2022-10279 | Orleans Parish CDC | Louisiana | Philip C. Hoffman, LLC; Dan Omar Branham Shirley, LLP | Philip C. Hoffman; Jessica Dean; Samuel J. Ishak | Yes | Yes | 1950's | Complaint, ¶ 7 | Yes |
| 262 | Herman | Elaine & Jacob | Elaine Adelfa Hickey Herman and Jacob Russell Herman, Sr. v. American Honda Motor Co. Inc., et al | FBT-CV-23-6124687-S | Fairfield at Bridgeport | Connecticut | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1950s | First Amended Complaint, ¶ 81 | No |
| 263 | Heston | Raymond | Heston, Raymond and Sandra, Pltfs. v. Avon Products, Inc., et al. | MID-L-007187-20 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Complaint, ¶ 2 | Yes |
| 264 | Hicks | Teresa | Frank Hicks & Est of Teresa Hicks v Avon Products et al | 190014/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 265 | Hidvegi | Naba | Naba Hidvegi v. Publix Super Markets, Inc., et al | 24-000642-CA-01 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Rebecca Vincent | Yes | Yes | 1950s | Complaint, ¶ 39 | No |
| 266 | Higginbotham | Robert | Robert and Linda Higginbotham vs. 3M Company, B Brenntag Specialties LLC, et al | 2019-59841-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1946 | Amended Complaint, ¶ 15 | Yes |
| 707 | Higgins | Wendi | Wendi Higgins vs. The Bargain Barn, Inc. et al | 2024-CP-40-03642 | Richland | South Carolina | Maune Raichle Hartley French & Mudd, LLC | Joshua Cagle | Yes | Yes | 1960s | Plaintiff's Complaint ¶ 6 | No |
| 267 | Hildebrandt | Martin | SARAH HILDEBRANDT, as representative of the estate of MARTIN HILDEBRANDT, and as surviving Spouse and on behalf of decedent's other surviving statutory beneficiaries, and KARA HILDEBRANDT JORDON, v. 3M COMPANY a/k/a MINNESOTA MINING & MANUFACTURING COMPANY, et al. | CV202b-093091 | Maricopa | Arizona | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1954 | Complaint, ¶ 10 | Yes |
| 736 | Hill | Duane | Duane Hill v. Sumitomo Corporation of Americas, et al. | 190094/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 269 | Hinkle | Sandra | Sandra L. Hinkle v Arkema, Inc et al | 23-04-01956 | Philadelphia | Pennsylvania | Maune Raichle Hartley French & Mudd, LLC | Brian M. Uleman | Yes | Yes | 1950s | Amended Complaint, ¶ 4c | No |
| 270 | Hodge | Pauline | Gary Hodge, individually and as representative of the Estate of Pauline Hodge v. Avon Products, Inc. et al. | LACL151100 | Polk | Iowa | Simon Greenstone Panatier, PC | Frank J. Wathen; James H. Cook | Yes | Yes | 1954 | Second Amended Petition, ¶ 7. | Yes |
| 271 | Hoeppner | Gerald | GERALD R. HOEPPNER and THERESA HOEPPNER v. A.O. SMITH CORPORATION, et al | 23-LA-1697 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Michael V. Oltmann | Yes | Yes | 197b | Complaint, ¶ 6 | No |
| 273 | Hoffman | Vanessa | Hoffman, Vanessa, Pltf. v. Barrett Minerals, Inc., et al | MID-L-003244-21 | Middlesex (NJ) | New Jersey | Karen McClain Satterley & Greenwood | Erin M. Boyle | Yes | Yes | 1967 | Second Amended Complaint, ¶ | No |
| 274 | Hofmeister | Sharon | SHARON HOFMEISTER v. JOHNSON & JOHNSON, et al. | 23CV037743 | Alameda | California | Simon Greenstone Panatier, PC | Michael T. Stewart | Yes | Yes | Early 1960s | Second Amended Complaint, ¶ 4:18-22 | No |
| 275 | Hogue | Tamie | Lucy Hogue, Ind. and as Personal Rep. of Tamie Hogue, Deceased, Jennifer Clyburn vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2021-53353-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1954 | Second Amended Complaint, ¶ 31 | No |
| 276 | Hohing | Winnette | Winnette A. Hohing v. Avon Products, Inc., et al. | MID-L-002758-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1981 | Amended Complaint, ¶ 2 | No |
| 277 | Hollmann | Karlene | Hollmann, Karlene, Pltf., vs. Avon Products, Inc., et al | 190077/2018 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 278 | Holley | Luther Roy | Holley, Gladys Elaine, Individually and as Executrix of the estate of Luther Roy Holley, Deceased, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002858-19 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | Mid-1960s | Complaint, ¶ 2 | Yes |
| 279 | Hollifield | Pattie | Brenda Best individually and as executor of the estate of Pattie Hollifield v Conepco, Inc et al | 190295/2023 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 280 | Holloway | James | JAMES L. HOLLOWAY and GAIL M. HOLLOWAY v. AIRK INC., Individually and as successor-in-interest to I-T-E Imperial Company, f/k/a I-T-E Circuit Breaker Company, et al | 2024LA000200 | Madison | Illinois | Weitz & Luxenberg P.C. | Thomas Gibbons | Yes | Yes | 1963 | Complaint, ¶ 6 | No |
| 281 | Holmes | Agnes | Agnes A. Holmes v. Avon Products, Inc. | MID-L-005412-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ | Yes |
| 282 | Holtermann | Patrice | Holtermann, Alisa, Administrix for the Estate of Patrice Holtermann, Pltf. v. American International Industries, et al. | 190058/2021 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1983 | Amended Complaint, ¶ 66 | Yes |

Case 23-01245-MBK    Doc 299-1    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit A - Proposed Preliminary Injunction Order    Page 21 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Exposure? | Year of Initial Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 283 | Holtschneider | Betty | Holtschneider, Betty and Stanley Holtschneider, Pltfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003009-16 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 285 | Horsch-Nusbaum | Ruth | Horsch-Nusbaum, Ruth, Plt. vs Avon Products Inc., et al. | MID-L-006015-20 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 286 | Howard | Elizabeth | Christopher L. Lewis, individually and as Personal Representative of the Estate of Elizabeth A. Howard, Deceased v. Asbestos Corporation Limited, et al. | 2024-CP-40-00458 | Richland | South Carolina | Dean Omar Branham Shirley, LLP | Aaron Chapman | Yes | Yes | 1963 | Complaint, ¶ 14 | No |
| 675 | Hucknall | Victoria | Victoria Hucknall and Simon Hucknall vs. L'Oreal Travel Retail Americas Inc d/b/a Lancome, L'Oreal, L'Oreal Paris | 2024-01 6277-CA,01 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | Late 1970s | Complaint, ¶24 | No |
| 288 | Huff | Linda | Linda D. Huff, Individually and as Administrator and Administrator at Prosependam of the Estate of Linda Key Huff, Deceased v. Arkema, Inc., et al. | MID-L-002818-17 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1956 | Fifth Amended Complaint, ¶ 4 | Yes |
| 289 | Hug | Monique | Hug, Monique G. and Jean Philipp Hug, Pltfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004862-15 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 291 | Hunter | Jaqueline | Jacqueline Hunter v. Brenntag North America et al. | MID-L-007131-23 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1960 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 292 | Hutchings | Catherine | Catherine Hutchings v Avon Products, Inc et al. | 190115/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 666 | Huxley | Aleksandra | Aleksandra Huxley and Howard Huxley v. Conepco, Inc., et al. | 190116/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 293 | Iacovangelo | Jean | Jean Iacovangelo and Frank Iacovangelo v Arkema, Inc et al. | E2023005779 | Monroe | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1941 | Complaint, 3. | No |
| 294 | Izzo | Deborah Kaye | Nicole Godano, Individually and APR the estate of Deborah Kaye Izzo v HNA et al. | MID-L-004147-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | James Andrew Pluymert | Yes | Yes | 1976 | Third Amended Complaint, ¶ 4 | No |
| 295 | Infante | Irma | Irma M Infante v Barretts Minerals et al. | 190137/2022 | New York | New York | Lanier Law Firm PLLC | Darron Berquist | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 676 | Islin | David | David Islin vs. L'Oreal Travel Retail Americas, Inc. sued individually and as successor-in-interest to Helena Rubinstein, Inc. and d/b/a Helena Rubinstein | 2024-04 6273-CA,01 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | 1950s | Complaint, ¶26 | No |
| 296 | Jack | Mary | Mary L. Jack and David L. Doyen v. Brenntag Specialties, Inc., et al. | 190035/2024 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 297 | Jackson | Johnnie | Jackson, Johnnie & Mattie, Pltfs. v. Barretts Minerals Inc., et al. | MID-L-006778-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 5 | Yes |
| 298 | Jacoby | Lisa | Jacoby, Lisa and William Jacoby, Pltfs. v. Barretts Minerals Inc. et al. | 190174/2021 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Hatshijan | Yes | Yes | 1971 | Third Amended Complaint, ¶ 161 | Yes |
| 299 | Jacenia | Lamona | Joseph Anthony Jacenia, Individually and as executor and executor at Prosependam of the Estate of Lamona Jacenia, Pltfs. vs 3M Company, etc., et al. | MID-L-002995-17 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1953 | Second Amended Complaint, ¶ 5 | Yes |
| 300 | James | Suzanne | James, Suzanne, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003078-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950 | Second Amended Complaint, ¶ 5 | No |
| 301 | Jarvis | Patricia | Patricia Jarvis v. L'Oreal Travel Retail Americas, Inc., d/b/a Lancome, et al. | 23-015081 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1960s | Complaint, ¶31 | No |
| 302 | Jatros | Kathy | Kathy Jatros and James Jatros vs. Johnson & Johnson, et al. | MID-L-002260-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Jacob Jordan | Yes | Yes | 1962 | Fifth Amended Complaint, ¶ 4 | Yes |
| 303 | Jaurega | Maria | Maria Jauregui v. Avon Products, Inc et al. | 190189/2022 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 304 | Jimenez | Luis | Luis Jimenez and Maria Jimenez v. Johnson & Johnson, et al. | 23-L-011613 | Cook | Illinois | Beasley Allen Law Firm | Ganatra Trial Lawyers, LLC - Joshua A. Edelson; Edelson/Vogelzang - Christian Lucatino | No | Yes | 1997 | Complaint, ¶11 | No |
| 305 | Johnson | Gregory S. | Gregory's S. Johnson and Barbara J. Johnson v. American International Industries, et al. | 2025CP04006819 | Richland | South Carolina | Dean Omar Branham Shirley, LLP | Rachel Gross | Yes | Yes | 1960s | Complaint, ¶48 | No |
| 306 | Johnson | Neil | Neil Johnson and Carol Johnson v General Electric Company et al. | 190266/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor in Interest (in Defendants) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 751 | Johnson | Elaine | ELAINE JOHNSON v. 3M COMPANY, et al. | 241.3829 | Cook | Illinois | Vogeltang Law | Michelle T. Pawlowski | Yes | Yes | 1931 | Complaint, Exhibit II | No |
| 307 | Johnson-Brett | Linda | Johnson-Brett, Linda and Bradford Brett, Pltfs. v. A.O. Smith Corporation, et al. | E202200208 | Monroe | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N.A. | Yes |
| 308 | Jones | Walter | Walter and Billie Jones vs. 3M Company, Brenntag Specialties LLC, et al. | 21-05236-E | Harris | Texas | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1967 | Complaint, ¶ 55 | No |
| 701 | Jones | Janet | Janet Jones v. Avon Products, Inc., et al. | MID-L-003693-24 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1954 | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 309 | Jordan | Judith | Judith Jordan, Pltf. v. Brenntag Specialties, Inc., et al. | 190072/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Unclear based on face of complaint | Unclear based on face of complaint | N.A. | Yes |
| 669 | Jovanovich | Sam | Sam Jovanovich, Jr. v. BASF Catalysts LLC, et al. | 2024LA000509 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Michael V. Oltmann | No | Yes | 1960s | Complaint - Count I, ¶ 6 | No |
| 674 | Jurist | Gail | Gail Jurist and David Jurist v. Colgate-Palmolive, et al. | 190202/2024 | New York | New York | Weitz & Luxenberg P.C. | Sam Kerley | Yes | Yes | 1940s | First Amended Complaint, ¶ 51 | No |
| 310 | Katz | Kraig | KRAIG KAATZ and ARLENE KAATZ, his wife v. 84 LUMBER COMPANY, et al. | 2023L000335 | Cook | Illinois | Simmons Hanly Conroy LLP | Taylor L. Kerns | Yes | Yes | 1972 | Complaint ¶ 2 | No |
| 689 | Kaestzig | Steven | Linda Kaestzig, Individually and as Executrix and Proposed Administrator of the Estate of Steven Kaestzig v. Brenntag Specialties, LLC, et al. | MID-L-003928-24 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber Long | Yes | Yes | 1967 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 311 | Kantor | William | Debra A. Kantor and William L. Kantor v. A.O. Smith Corporation, et al. | 2024L002627 | Cook | Illinois | Vogeltang | Michelle Pawlowski | Yes | Yes | 1953 | Complaint, page 13 | No |
| 312 | Kelso | Constance | Constance Kelso v. Aekma, Inc., et al. | CV21949769 | Cuyahoga | Ohio | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | Early 1970s | Complaint, ¶ 34 | No |
| 313 | Kelz | Robin | Robin Kelz v Bobbi Brown Cosmetics et al. | MID-L-006153-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960 | Third Amended Complaint, ¶ 2 | No |
| 314 | Kendrick | Wendy | Wendy Kendrick and Charlella Kendrick v. Avon Products, Inc., et al. | CACE-21-014417 | Broward | Florida | Flint Cooper, LLC | Rebecca Vinocur | Yes | Yes | 1982 | First Amended Complaint, ¶ 26 | Yes |
| 315 | Kerley | Beverly | Kerley, Beverly & John Kerley, Pltfs. v. Brenntag Specialties, Inc., et al. | MID-L-00661/2-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 5 | No |
| 316 | Kernahan | Louise | Louise Kernahan and Martin Kernahan v Santonno Corp of America et al | 190283/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | N.A. | No |
| 317 | Kershner | Barbara | Christa Ruth Machado individually and representative of estate of Barbara Kershner v Avon Products, Inc et al | MID-L-007200-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Matthew Adam Grubman | Yes | Yes | 1961 | Complaint, ¶ 4 | No |
| 319 | Kieboom | Carol | Carol Kieboom and Herman Kieboom v Avon Products Co et al | 190157/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | N.A. | No |
| 320 | Kier | Edward | Johnny Mize, Ind. and as Personal Rep. of the Estate of Edward Kier, Deceased vs. Brookshire Grocery Co., Brenntag Specialties LLC and Brenntag North America, et al | 2022-55642-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1976 | Complaint, ¶ 32 | No |
| 321 | King | Elizabeth | Stanley E. King, as Personal Representative of the Estate of Elizabeth H. King, Deceased v. Avon Products, Inc., et al. | 23-017495 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Bosserman | Yes | Yes | 1967 | Complaint, ¶ 5 | No |
| 725 | King | Martha | Martha McCrocklin King and Justin W. King v. Allstate, Inc., et al. | CACE-22-4005989 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Bosserman | No | Yes | 1970s | Complaint - See Exposure Sheet | No |
| 323 | Keiler | Leonard | Leonard Keiler vs. Breaux Mart Supermarkets, Inc. | 2021-07239 | Orleans Parish CDC | Louisiana | Landry & Swarr, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry, Frank J. Swarr, Matthew C. Clark, Holly C. Peterson | Yes | Yes | 1953 | Petition, ¶ 4 | No |
| 324 | Kirnberg | Frederick | Carol Kirnberg individually and as Administrator of estate Frederick Kirnberg v Avcatis, Inc., et al. | MID-L-005204-23 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1980 | Complaint, ¶ 4 | No |
| 325 | Kirkwood | Bernice | Chatman, Latoya, Estate of Bernie Annette Kirkwood, Pltf. v. Avon Products, Inc., et al. | MID-L-008746-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1958 | Complaint, ¶ 7 | Yes |
| 326 | Kittrel | Linnie | Mary Ann Kittrell, Individually and as Personal Representative of the Estate of Linnie P. Kittrell v. Bell & Gossett Company, et al. | 19-035889 | Miami-Dade | Florida | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1963 | Complaint ¶ 14 | No |
| 327 | Klar | Iliona | Ilona Klar and Ronald Graney v American International Industries, et al. | MID-L-000176-24 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1968 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 328 | Klayman | Hope | Hope Klayman and Mark Steven Klayman v. American International Industries Inc., et al. | MID-L-004994-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Fifth Amended Complaint, ¶ 1 | Yes |
| 329 | Kleinman | Kenneth | Kenneth Kleinman and Marian Reppolo vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-08588-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1988 | Second Amended Complaint, ¶ 27 | Yes |

13

JA766

Case 23-01245-MBK    Doc 299-1    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit A - Proposed Preliminary Injunction Order    Page 23 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 330 | Klinker | Leah | Leah C. Klinker v. Avon Products, Inc., et al | 334021414 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1999 | Complaint, ¶73 | No |
| 708 | Klitus | Nancy | Nancy Klitus v. Block Drug Co., Inc., et al. | MDL-L-003530-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | John W. Stevenson | No | Yes | 1944 | Complaint, ¶ 2 | No |
| 331 | Knight | Julie | Julie Knight v/s Avon Products, Inc. et al | 190173/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 332 | Knohmayer | Joel | Cheryl Knohmayer, Individually and as Proposed Administrator of the Estate of Joel Knohmayer, Deceased v. All, et al. | MID-L-000981-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1960s | Amended Complaint, ¶ 4 | No |
| 333 | Knox | Margaret | Kimberly Milligan, as Independent Administrator of the Estate of Margaret Knox, Deceased v. Cosmetic Specialties, Inc., et al. | MID-L-000786-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1972 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 678 | Kobel | Audrey | JENNIFER BARBINGER, individually and as successor-in-interest to AUDREY KOBEL and JODY CULVER v. BRENNTAG SPECIALTIES, LLC, sued individually, and as successor-in-interest, parent, alter ego, and equitable trustee to BRENNTAG SPECIALTIES, INC., (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC., and as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC., et al. | 24CV084604 | California | Alameda | Kazan McClain Satterley & Greenwood | Akinyemi Ajayi | Yes | Yes | Early 1960s | Complaint at 4:17-20 | No |
| 334 | Koebel | Renee | Renee Koebel and Donovan Koebel v Avon Products, Inc., et al. | MID-L-002945-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1965 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 335 | Kopel | Robert | Cynthia L. Kelley, Personal Representative of the Estate of Robert S. Kopel, Deceased v. Bayer Healthcare, LLC, et al | CACE-23-19145 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiBona | Yes | Yes | 1943 | First Amended Complaint, ¶3 | No |
| 336 | Kopp | John | Kopp, John R. and Christine Kopp, Plfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 609596/2020 | New York | Suffolk | Weitz & Luxenberg P.C. | Andrew Guyone | Yes | Yes | 1955 | Third Amended Complaint, ¶ 82 | Yes |
| 337 | Kral | Janet | JANET F. KRAL and LINUS B. KRAL v. AVON PRODUCTS, INC., et al | 2023-LA-001419 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Terah Bielec | Yes | Yes | 1950s | Complaint, ¶ 6 | No |
| 339 | Kulcavage | Edward | Shirley Kulcavage, Individually and as Personal Representative of the Estate of Edward Kulcavage v. Barrett Process Inc., et al. | E202100637 | New York | Monroe | The Lanier Law Firm, PLLC | Darren Berquist | Yes | Yes | 1960 | Initial Fact Sheet, ¶¶ 16 - 17. | Yes |
| 340 | Kurth | Gail | Gail Kurth and Zev Primer v Arkema, Inc et al | 190280/2022 | New York | New York | Weitz & Luxenberg P.C. | Sam Karley | Yes | Yes | 1950s | Amended Complaint, 47 | No |
| 341 | Larson | Larry | Larry Larson and Stephanie Larson v. Advance Auto Parts, Inc., et al. | MID-L-006673-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1968 | Second Amended Complaint, ¶ 5 | No |
| 342 | Lambert | Charles R. | Whitney Lambert, and as successor in interest to Charles R. Lambert, deceased; Nell Ann Burnhart; Brenda Corbello; Sheila Laberge; Greg Lambert; Vicki Lambert; Angel Tedraquist v. Albertson Companies, Inc. et al. | 23STCV27302 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1940s | Complaint, Exhibit A | No |
| 343 | Lane | Thurman D. | Thurman D. Lane and Deborah L. Lane v. Block Drug Company, Inc., et al. | MID-L-005938-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1943 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 344 | Lambert | Tanya | Tanya Lambert vs. H.E.B. LP, Brenntag Specialties LLC and Brenntag North America, et al. | 2022C15485 | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1962 | First Amended Complaint, ¶22 | No |
| 722 | Langston | Randall | David Hardaway, as executor of the estate of Randal Langston v/s. H-E-B, L.P. Also d/b/a H.E. Butt Grocery Company, for its Hill Country Essentials Line of Products, et al. | 2024C300664 | Texas | Bexar | Simon Greenstone Panatier, PC | Greyson ackerman | Yes | Yes | 1975 | First Amended Complaint, ¶ 40 | No |
| 345 | LaPlant | Lynn | David LaPlant, Individually and as Personal Representative of the Estate of Lynn Ann LaPlant v. Avon Products, Inc., et al. | 23-CA-012151 | Florida | Hillsborough | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1960s | Amended Complaint, ¶ 12 | No |
| 346 | Larson | Lillian | Larson, Lillian, Plff. vs Brenntag North America, Inc. and Brenntag Specialties, Inc.; et al. | MID-L-002729-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Third Amended Complaint, ¶ 3 | Yes |
| 347 | LaSalle | Jack | JACK LASALLE and DIANNE LASALLE v. AMERICAN INTERNATIONAL INDUSTRIES et al. | 23-2-08165-0 SEA | Washington | King | Kazan McClain Satterley & Greenwood | Joseph Satterley | Yes | Yes | 1955 | First Amended Complaint at 4:12 | No |
| 348 | Latterell-Rice | Rebecca | Rebecca Latterell-Rice and Clair Brian Rice, her husband, v. Albiece, Inc. / Avon Products, Inc. et al. | 62-CV-24-545 | Minnesota | Ramsey | Karst & von Oiste LLP | Erik P. Karst | Yes | Unclear based on face of complaint | Unclear based on face of complaint | No |
| 349 | Laudig | Kathleen | Elizabeth Laudig as representative of the estate of Kathleen Laudig v Avon Products, Inc., et al. | 49D1-3-2312-CT-050425 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1950s | Amended Complaint, ¶ 6 | No |
| 350 | Laughlin | Dennis | Dennis Laughlin vs Avon Products, Inc., et al. | MID-L-007603-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | Mid-1950s | Third Amended Complaint, ¶ 5 | Yes |
| 351 | Lazette | Dianne | LaZette, Diane and Christopher LaZette, Plfs. v. Bardel Minerals, Inc. et al. | MID-L-007561-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Amended Complaint, ¶3 | Yes |



JA767

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 352 | Lee | Machaelen | Michelle F. Felton, Executrix of the Estate of Michaelsen Lee, deceased, v. Acme Markets, Inc. | GD-23-008855 | Allegheny | Pennsylvania | Dan Omar Branham Shirley, LLP | Cori J Kapusta | Yes | Yes | Late-1940s | Complaint, ¶ 66 | No |
| 353 | Lee | Kyung H. | KYUNG H. LEE and JOE J. LEE v. BI-MART CORPORATION et al | 23CV40369 | Multnomah | Oregon | Dan Omar Branham Shirley, LLP | Jessica Dean Sarah E. Gibson | Yes | Yes | 1973 | Third Amended Complaint, Ex A | No |
| 729 | Lee | Cynthia | Cynthia Ann Lee v. Avon Products, Inc., et al. | E2024006160 | Monroe | New York | Maune Raichle Hartley French & Madd, LLC | Andrew M. Grossi | Yes | Yes | 1970s | Second Amended Complaint, ¶ 3 | No |
| 354 | Letizia | Joseph | Letizia, Joseph and Donna Letizia, Plffs. v. Barretts Minerals, Inc., et al. | MID-L-002232-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1955 | Third Amended Complaint, ¶ 3 | No |
| 355 | Levine | Joanna | Levine, Joanne & Timothy Spahr, Plffs. v. Kolmer Laboratories, et al. | 190251/2020 | New York | New York | Levy Konigsberg LLP | Amber Jae Brandis | Yes | Yes | 1970s | Initial Fact Sheet, ¶ 6 | Yes |
| 356 | Linde | Stuart | Eileen Linde, as Administratrix for the Estate of Ethan Linde, deceased Charles Linde, Individually Charles B. Chrystal Co., Inc., et al. | 190127/23 | New York | New York | Levy Konigsberg LLP | Amber Jae Brandis | Yes | Yes | 1966 | Second Amended Complaint, 124. | No |
| 357 | Link | Michael | Michael David Link and Sandra Strickland Link v. 3M Company, et al. | 2022CP4005543 | Richland | South Carolina | Dan Omar Branham Shirley, LLP | Jonathan Holder | Yes | Yes | 1950s | Plaintiff's Complaint ¶ 125 | No |
| 358 | Little | Robert | Robert A. K. Little and Irene K. Little v. American Honda Motor Co., Inc., et al | 23-020780 | Broward | Florida | Maune Raichle Hartley French & Madd, LLC | Dawn Besserman | Yes | Yes | 1960s | Complaint, Information Form | No |
| 359 | Little | Christopher | Christopher Little v Barretts Minerals, Inc., et al. | MID-L-003868-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1979 | Amended Complaint, ¶ 2 | No |
| 360 | Lock | Judith | Lock, Judith, Plff., v. Barrett Minerals, Inc., etc., et al | 190223/2019 | New York | New York | Weitz & Luxenberg P.C. | Justin J. Weitz | Yes | Yes | 1962 | Complaint, 86. | Yes |
| 361 | Locotnic | Barbaram | Locotnic, Barbaram, Plff. v. Annnco, LLC, et al. | 190289/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tambini | Yes | Yes | 1964 | Amended Complaint, 7 | Yes |
| 362 | Lodovico | Cynthia | Cynthia Lodovico v Barretts Minerals, Inc., et al. | MID-L-001418-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1966 | Third Amended Complaint, ¶ 4 | No |
| 363 | LoGiudice | Keri | Logiudice, Keri and Joseph Logiudice, Plfs., vs. Babcock & Wilcox Co., et al. | 190253/2014 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1979 | Initial Fact Sheet, 6 | Yes |
| 364 | Lorenzo | Richard | Lorenzo, Elizabeth, Individually and as Executrix of the Estate of Richard Lorenzo, Deceased, Plff. v. Barretts Minerals, Inc., et al. | MID-L-001187-22 | New York | New York | Weitz & Luxenberg P.C. | F Alexander Eiden | Yes | Yes | 1970 | Fourth Amended Complaint, ¶ 4 | No |
| 365 | Lowe | Celia | Celia Lowe and Bryan Lowe v. L'Oreal Travel Retail Americas, Inc., et al | 23-022591CA27 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1950s | Complaint, ¶ 41 | No |
| 366 | Lowis | Barbara | Barbara Lowis & Trevor Lowis v Avon Products, Inc. et al. | 190234/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 368 | Lupton | Johnnic | Phyllis Johnson, Margaret Rowell, Johnnic Lupton, Jr., Leslie Lupton, Gene Lupton, Joseph Lupton, Stuart Lupton, and Eleanor Lupton, Sr., Deceased vs. Louisiana Steam Equipment, LLC, et al. | C-148470 | Lafourche Parish 17th JDC | Louisiana | Landry & Swarr, LLC Simon Greenstone Panatier, PC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Holly C. Peterson | Yes | Yes | 1950s | Second Amended Petition, ¶ 4(i) | No |
| 369 | Mauren | Marilyn | Marilyn Mauren v Maybelline, LLC, et al. | 190214/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 370 | Madlik | Marilyn | Madlik, Donald C., as Representative of the Estate of Marilyn M. Madlik Plff. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 191139/2020 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1960s | Complaint, ¶ 69 | Yes |
| 371 | Mager | Jenifer | Jenifer Mager and John Mandraschia v. American International Industries et al | 23STCV09956 | Los Angeles | California | Frost Law Firm, PC | Andrew Seitz | Yes | Yes | 1980s | Complaint, Exhibit A | No |
| 372 | Maloney-Najjar | Kelley | Kelley Maloney-Najjar and Talib Najjar v Arkema, Inc et al | MID-L-03906-22 | Middlesex (NJ) | New Jersey | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Yes | 1971 | Complaint, ¶ 2 | Yes |
| 373 | Manning | Patricia | Manning, Patricia v. Avon Products, Inc., et al. | 190052/2020 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burnham | Yes | Yes | 1960s | Third Amended Complaint, ¶ 88. | Yes |
| 374 | Marcana | Deborah | Deborah Marcana and Timothy Marcana v Avon Products, Inc., et al. | MID-L-004127-23 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1969 | Complaint, Initial Fact Sheet, ¶ 1 | No |
| 376 | Marinelli | Nicole | Nicole Marinelli vs. Charten, Inc., et al. | 2022-07702 | Orleans Parish CDC | Louisiana | Boling Law Firm | Jeremiah Boling Caroline Boling Benjamin Rumph LaCroix McAllister | Yes | Yes | 1984 | Second Amended Petition, ¶ 10 | No |
| 377 | Markusen | Janice | Markusen, Janice & Milton, Plfs. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003589-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1958 | First Amended Complaint, ¶ 6 | No |
| 378 | Maresco | Raffaella | Emilia C. Brady, Administrator for the Estate of Raffaella Maresco, et al vs Fisher Scientific Company, et al. | 161103253 | Philadelphia | Pennsylvania | Weitz & Luxenberg P.C. | Joseph J. Mandia | Yes | Yes | 1974 | Amended Complaint, ¶ 5 | Yes |
| 379 | Martin | Gerald | Gerald K Martin and Beverly E Martin v Buyer Healthcare et al. | MID-L-003576-23 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Madd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1960 | Third Amended Complaint, ¶ 4 | No |

15

JA768

Case 23-01245-MBK   Doc 299-1   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit A - Proposed Preliminary Injunction Order   Page 25 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor in Interest (in Debtors) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 380 | Martin | James | Linda B Martin, individually and as Proposed estate representative of James P Martin v Block Drug Company, et al | MID-L-006575-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1969 | Amended Complaint, ¶ 4 | No |
| 381 | Martin | Sheila | Jeffrey Martin, as Administrator ad Prosequendum for the Estate of Sheila Martin and as Guardian of John Doe, et al v Brenntag North America, Inc., et al | MID-L-007808-19 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1962 | Complaint, ¶ 7 | No |
| 382 | Martinez | Ottavio | Antonella Bouchard individually and as executor of the Estate of Ottavio Martinez and Maria Martinez v American International Industries, et al | MID-L-000371-24 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Joshua Kristal | Yes | Yes | Early-1970s | Complaint, ¶ 4 | No |
| 383 | Martinez | Mary | Mary Martinez and Michael Martinez, her husband v. American International Industries, et al | 22-018794 CA27 | Broward | Florida | Dan Omar Ibraham Shirley, LLP | Rebecca Vinocur | Yes | Yes | 1980s | Third Amended Complaint, ¶ 89 | No |
| 384 | Mask | Mary | Linda K. Trimble, Individually and as Executrix of the Estate of Mary Mask v. Brenntag North America, Inc. & Brenntag Specialties, Inc., et al | MID-L-002559-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1960s | Fourth Amended Complaint, ¶ 3 | Yes |
| 385 | Masterson | Leo | Leo Masterson and Leo Masterson v. Avon Products, Inc., et al. | 190172/2023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1957 | Third Amended Complaint, 126. | No |
| 386 | Matsch | Sandra A | SANDRA A. MATSCH v. BAYER HEALTHCARE, LLC, et al. | 23 LA 1528 | Madison | Illinois | Maune Raichel Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1959 | Complaint, ¶ 6 | No |
| 387 | Maute | Tucker | Tucker D. Maute, D.O. and Olivia N. Maute, M.D. v. Barretts Minerals, Inc., et al | CACE-22-008590 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1992 | Second Amended Complaint, ¶ 27 | Yes |
| 388 | Mayville | Arlene | Claire Day as Special Administratrix for the Estate of Arlene Jane Mayville v Avon Products, Inc., et al | MID-L-000258-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 737 | Mazonski | Chloe | Chloe Mazonski, Individually and as Executrix and Executive Ad Prosequendum of the Estate of Michael Mazonski v. American Honda Motor Co., Inc., et al. | MID-L-004556-24 | Middlesex (NJ) | New York | Levy Konigsberg LLP | Denise Presumpieri | No | Yes | 1953 | Complaint, ¶ 4 | No |
| 742 | Mazzei | Norbert | Norberto Ramon Mazzei et al v. Alco Industries, Inc. et al | 190317/2020 | New York | New York | Maune Raichel Hartley French & Mudd, LLC | Nathaniel N. Fakla | Unclear based on face of complaint | Unclear based on face of complaint | NA | | Yes |
| 389 | McAllister | James | JACKI MCALLISTER, Individually and as Special Administrator for the Estate of JAMES O. MCALLISTER, deceased v. A.O. SMITH CORPORATION, et al | 2021L000870 | Madison | Illinois | Maune Raichel Hartley French & Mudd, LLC | A. Gentry Smith | Yes | Yes | 1950s | Third Amended Complaint, ¶ 6 | Yes |
| 390 | McAteer | Aoife | McAteer, Aoife v Avon Products, Inc., et al | 782000/2017 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 391 | McBride | Ronald | McBride, Ronald & Michelle, Phfs. v. American International Industries, Inc., et al | 49D1-3-2110-MF-034781 Indiana | Marion | Indiana | DOBS & Farnan, LLP | Kathleen A. Farnan | Yes | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 392 | McCallum | Beverlie | Beverlie McCallum v Avon Products, Inc., et al. | MID-L-004678-22 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1944 | Third Amended Complaint, ¶ 2 | No |
| 393 | McDonough | Colleen | Colleen McDonough v Johnson & Johnson, et al. | MID-L-001512-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1972 | Second Amended Complaint, ¶ 2 | No |
| 394 | McGowan | Carole Lee | CATHLEEN BELTZ, individually and as successor in interest to CAROLE LEE MCGOWAN, LESHA CLARK, STEVEN SPRAGUE, KELLY SPRAGUE; and DIANE SPRAGUE, v. L'OREAL USA, INC., et al | 24CV070599 | Alameda | California | Kazan McClain Satterley & Greenwood | Michael Reid | Yes | Yes | 1950s | Complaint at 5:26-6:1 | No |
| 395 | McGuire | Kevin | Kevin McGuire and Mary Jane McGuire v Barrett Minerals, et al | 190154/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 396 | McKnight-Foster | Carol | Carol Foster, as Executor of the Estate of Carol McKnight-Foster, Phf. v. Johnson & Johnson, et al | MID-L-000312-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1951 | Third Amended Complaint, ¶ 1 | Yes |
| 397 | McLoughlin | Carmel | Carmel H McLoughlin v Brenntag North America, Inc. | 190302/2023 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Jessica A. Bisnovich | Yes | Yes | 1969 | Plaintiff's Initial Fact Sheet, 6 | No |
| 399 | McMahon | Anne | Anne McMahon and Stephen McMahon v Sunstone Corporation, et al. | 190304/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 400 | Meade | Jody Kay | Jody Kay Meade and Arthur Meade v. Barretts Minerals Inc., et al | 23STCV23517 | Los Angeles | California | Simmons Hanly Conroy LLP | Deborah Rosenthal | Yes | Yes | 1980 | Complaint, Exhibit A | No |
| 679 | Mann | Elena F | Elena F. Mann v. 3M Company, et al | 24-1988 | Middlesex (MA) | Massachusetts | Bellick & Fox, LLP | Joseph W. Bellick | Yes | Yes | 1950s | First Amended Complaint ¶ 30 | No |
| 401 | Megariotis | Joanna | Megariotis, Joanna, Phf. v. Bristol Myers Squibb, et al. | MID-L-001970-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 402 | Messenger | Ronald | Donna Calsoa, Personal Representative of the Estate of Ronald Messenger v. Advance Stores Company, Inc., et al | FBT-CV-22-6115647-S | Fairfield at Bridgeport | Connecticut | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1943 | Amended Complaint, ¶ 4 | Yes |

JA769

Case 23-01245-MBK   Doc 299-1   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit A - Proposed Preliminary Injunction Order   Page 26 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor in Interest (Defendant) in Complaint? | Allegation of Pre-2004 Talc Exposure? | Year of Initial Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 404 | Meyer | Carol | Carol J Meyer and Tommy Meyer v. Avon Products, Inc., et al. | MID-L-001860-23 | New Jersey | Middlesex (NJ) | Maune Raschle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1956 | Second Amended Complaint, ¶ 2 | No |
| 405 | Milan | Elizabeth | Elizabeth Milan v. Brenntag North America and Brenntag Specialties, Inc., et al. | 190354/2018 | New York | New York | Weitz & Luxenberg P.C. | Pietr L tom Burchym | Yes | Yes | 1955 | Amended Complaint, 113. | Yes |
| 730 | Milford | Louise | Louise Milford and Christopher Milford v. Chanel, Inc., et al. | 190128/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 406 | Miller | Ann | Miller, Ann and Jeffrey, PHS, v. Barrett Minerals, Inc., et al. | MID-L-002710-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1961 | Amended Complaint, ¶ 2 | No |
| 407 | Miller | Dale | Guy Miller individually and as administrator of the estate of Dale Miller v Block Drug Company, et al. | MID-L-005935-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Guhman | Yes | Yes | 1974 | Amended Complaint, ¶ 4 | No |
| 408 | Miller | Veronica | Ronald Raymond Miller, Individually and as Personal Representative and Personal Representative at Prosequendum of the Estate of Veronica Miller, Deceased vs. Brenntag North America, et al. | MID-L-005972-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1946 | Third Amended Complaint, ¶ 4 | Yes |
| 409 | Miller | Stephanie | Robert Jaret, Executrix of the Estate of Stephanie Miller, PhF, vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190188/2017 | New York | New York | Levy Konigsberg LLP | Arthur R. Long | Unclear based on face of complaint | Unclear based on face of complaint | NA | | Yes |
| 410 | Mirochin | Helen | Helen Mirochin v Barretts Minerals, Inc., et al. | 190185/2023 | New York | New York | Weitz & Luxenberg P.C. | Michael P Fanelli | Yes | Yes | 1943 | Amended Complaint, ¶ 94 | No |
| 411 | Mizer | Barbara | Barbara J Mizer and George A Mizer v Avon USA Manufacture, et al. | MID-L-004279-22 | New Jersey | Middlesex (NJ) | Maune Raschle Hartley French & Mudd, LLC | Keith Hinder | Yes | Yes | 1960s | Second Amended Complaint, ¶ 2 | No |
| 680 | Mohammed | Hameedah | Rita-reza Mohammed, Individually and as Executor of the Estate of Hameedah Mohammed, Deceased v. Avon Products, Inc., et al. | 190189/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 412 | Monroe | Joan | Joan Davis and Est of Joan Monroe v Avon Products, Inc., et al. | EC2023-55161 | Washington | Washington | Levy Konigsberg LLP | Arthur R. Long | Yes | Yes | 1988 | Third Amended Complaint, ¶ 5. | No |
| 413 | Montesano | Laura J | Laura Montesano v Brenntag North America, Inc., et al. | MID-L-005265-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1962 | Amended Complaint, ¶ 2 | No |
| 415 | Moore | Scott | Lori Lee Campbell, individually and as representative of estate of Scott Moore v Bayer Healthcare, LLC, et al. | 23-12-02561 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern | Yes | Yes | 1970s | Amended Complaint, Schedule 1 | No |
| 416 | Moreno | Amelia | Amelia L Moreno v Avon Products, et al. | MID-L-003387-22 | New Jersey | Middlesex (NJ) | Maune Raschle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1987 | Third Amended Complaint, ¶ 2. | No |
| 686 | Moreno | Sonia | Sonia Moreno v. Avon Products, Inc., et al. | MID-L-004040-24 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella | Yes | Yes | 1960 | First Amended Complaint, Initial Fact Sheet ¶ 5 | No |
| 417 | Morgan | Colin | Colin Morgan v. L'Oreal Travel Retail Americas, Inc., et al. | 23-021465 | Florida | Broward | Maune Raschle Hartley French & Mudd, LLC | Rebecca Vescovi | Yes | Yes | 1965 | Complaint * $45 | No |
| 418 | Morgan | Sandra | Sandra Morgan v. Avon Products, Inc., et al. | CACE-23-001329 | Florida | Broward | Maune Raschle Hartley French & Mudd, LLC | Dawn Bosserman | Yes | Yes | 1960s | Complaint - see exposure sheet | No |
| 419 | Morgan | June Rose | June Rose Morgan v Brenntag North America, et al. | MID-L-003262-23 | New Jersey | Middlesex (NJ) | Maune Raschle Hartley French & Mudd, LLC | Jenna Egnor | Yes | Yes | 1950s | Amended Complaint, ¶ 2. | No |
| 420 | Morrison | Carolyn | Carolyn Morrison v Avon Products, Inc., Inc., et al. | MID-L-006026-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M Boyle | Yes | Yes | 1950s | Amended Complaint, ¶ 4 | No |
| 422 | Mota | Maritza | Mota, Maritza, Phf. v. Johnson & Johnson, et al. | MID-L-005753-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1967 | Third Amended Complaint, ¶ 2 | No |
| 423 | Mounce | Gina | Gina Mounce and Raymond Mounce v 3M Co., et al. | 23-11-02558 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Nedra Wilson | Yes | Yes | 1945 | Amended Complaint, Schedule 1 | No |
| 424 | Makomela | Kenneth | GWENDOLYN J. MUKOMELA, Individually and as Special Administrator for the Estate of KENNETH MUKOMELA, deceased v. AGCO CORPORATION, et al. | 2022LA000962 | Illinois | Madison | Maune Raschel Hartley French & Mudd, LLC | Michael T. Fischs Jr. | Yes | Yes | 1955 | Complaint, ¶ 7 | Yes |
| 425 | Mullan | Robert | Robert Mullan and Tracy Mullan v. Sumitomo Corporation of Americas, et al. | 190066/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 426 | Mullet | Anne Marie | Anne Marie Mullet and Ronald Mullet v Arkema, Inc., et al. | MID-L-000929-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Arthur R. Long | Yes | Yes | 1954 | Third Amended Complaint, ¶ 2. | No |
| 697 | Munoz | Renate | PETE T. MUNOZ, Individually and as Successor in Interest of the Estate of RENATE MUNOZ, Deceased, and JOHN CANTY, Individually, vs. Avon Products, Inc., et al. | 24STCV15955 | California | Los Angeles | Simon Greenstone Panatier, PC | Stuart J. Purdy | Yes | Yes | 1960s | Complaint, Exhibit A | No |
| 427 | Murphy | Geraldine | Murphy, Geraldine, PHF, v. Brenntag North America, Inc. and Brenntag North Specialties, Inc., et al. | MID-L-004429-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1962 | Fourth Amended Complaint, ¶ 4 | Yes |
| 428 | Mustor | Sophia | Sophia Mustor & John Mustor v Avon Products, Inc., et al. | MID-L-005232-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Guhman | Yes | Yes | 1967 | Third Amended Complaint, ¶ 3 | Yes |
| 744 | Muzzipapa | Lucy | Lucy Muzzipapa v. American International Industries, et al. | 190213/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel J. Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |

17

JA770

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Debtors Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Affected by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 429 | Myers | Beverly | Myers, Beverly and Timothy Myers, Phfs. vs. Aventis Inc., et al. | 21-12-01748 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern | Yes | Yes | 1966 | Amended Complaint, ¶ 6 | No |
| 430 | Naar | Yelba | Yelba Naar & Deborah Naar v Barretts Minerals, Inc., et al. | 190066/2023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1985 | Second Amended Complaint, ¶ 87 | No |
| 431 | Nathan | Frada | Nathan, Frada & Yochanan Nathan, Phfs. v. Johnson & Johnson, et al. | MID-L-006101-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Arthur R. Long | Yes | Unclear based on face of complaint | 1960s | Sixth Amended Complaint, ¶ 4 | Yes |
| 667 | Navaretta | Josephine | Josephine Navaretta and John Navaretta v. Sumitomo Corporation of America, et al. | 190117/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J Tully | Yes | Unclear based on face of complaint | NA | NA | No |
| 432 | Nelson | Sarah Sue | Nelson, Sarahsue, Phf. v. American International Industries, et al. | MID-L-001023-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960 | Second Amended Complaint, ¶ 2 | No |
| 433 | Nicholson | Harold | Nicholson, Nathan, Estate of Harold Nicholson, Phf. v. Barrett Minerals, Inc., et al. | MID-L-004403-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Amended Complaint, ¶ 2 | No |
| 434 | Nutt | Charles | Nutt, N. Nutt, Individually and as Executor for the Estate of Charles J. Nutt v. Avon Products, Inc., et al. | 22-2455 | Massachusetts | Middlesex (MA) | Dalfy Law LLC | Christopher Duffy | Yes | Yes | 1982 | Complaint, ¶ 8 | No |
| 435 | Oakenfold | Sheila | Sheila Oakenfold v Christian Dior, Inc., et al. | 190238/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 438 | O'Brien | Karen | Karen C. O'Brien v. Air & Liquid Systems Corporation, et al. | CV-23-234 | Maine | Cumberland | Hallett Whipple Weyrens | David A. Weyrens | Yes | Yes | Late 1940s | Complaint ¶ 5 | No |
| 439 | Odum | Charles | Odum, Charles, Phf. v. Barrett Minerals, Inc., et al. | MID-L-004851-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1950s | First Amended Complaint, ¶ 2 | Yes |
| 440 | Olson-Rizzo | Deborah | Olson-Rizzo, Deborah and Thomas Rizzo, Phfs. v. American Art City Company, Inc., et al. | 190018/2022 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | No | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 441 | Orloff | John | James Maynard as executor of estate of John Orloff v. Baxter Healthcare Corporation, et al. | MID-L-004578-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eulen | Yes | Yes | 1966 | Second Amended Complaint, ¶ 1 | No |
| 682 | Pace | Verginio | Verginio Pace vs. American International Industries, et al. | 24CV060231 | California | Alameda | Simon Greenstone Panatier, PC | Koch Shukla | Yes | Yes | 1960s | Amended Complaint at 7:11-25 | No |
| 442 | Pagano-Michels | Cynthia | Cynthia Pagano-Michels and Thomas Michels vs Barretts Minerals, Inc., et al. | MID-L-006234-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1968 | Complaint, ¶ 2 | Yes |
| 443 | Pallotta | Josephine | Josephine Pallotta and James Pallotta v Avon Products, Inc., et al. | MID-L-003512-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1960s | Second Amended Complaint, ¶ 4 | No |
| 683 | Palomino | Maria | Maria F. Palomino vs. Avon Products, Inc. et al. | 2024L001179 | Illinois | Cook | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Yes | 1966 | Exhibit 2 to Amended Complaint, ¶ 2 | No |
| 444 | Palumbo | Frank | Frank Palumbo & Liz Palumbo v 3M Company, et al. | E2023003380 | New York | Monroe | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 445 | Parker | Pauline | Pauline Parker and James Parker v Barretts Minerals, et al. | 190186/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 446 | Parvin | Janice | Janice Parvin v AII, et al. | MID-L-003126-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joseph J. Mandia | Yes | Yes | 1962 | Second Amended Complaint, ¶ 4 | No |
| 447 | Passmore-Meyer | Kathryn | Kathryn A. Passmore-Meyer and spouse John G. Meyer, Sr. v. Avon Products Inc., et al. | CJ-2022-6281 | Oklahoma | Oklahoma | Dean Omar Branham Shirley, LLP | Jordan Ballinger | Yes | Yes | 1978 | Complaint, ¶ 50 | No |
| 448 | Patrimonio | Marilyn | Melissa Shackelford, Individually, and Marilou Leboeuf, Individually and on Behalf of Marilyn T. Patrimonio vs. Tingy Cadillac Chevrolet, Inc., et al. | C66683.25 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC / Damon J Baldone & Associates - APLC / Simon Greenstone Panatier, PC | Mickey P. Landry / Frank J. Swarr / Matthew C. Clark / Damon J. Baldone / Holly C. Peterson / Christian E. Manasso | Yes | Yes | 1960 | Amended Complaint, ¶ 5 | Yes |
| 449 | Payne | Clark | Payne, Clark and Barbara A. Payne, Phfs. vs. AM International, Inc., et al. | 190307/2019 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathanel N. Fukla | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 450 | Peddle | Gregory | Gregory A Peddle and Dorothy Peddle v Janssen Pharmaceuticals, Inc., et al. | MID-L-006625-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joshua Kristal | Yes | Yes | Early-1960s | Complaint, ¶ 3 | No |
| 451 | Pelley | Stephanie | Stephanie Pelley, Individually and as Parent, Guardian, and Next Friend of Minor Children, A.C.P. and A.T.P. v. American International Industries, et al. | 234473 | Massachusetts | Middlesex (MA) | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P Kenney | Yes | Yes | Pre-1985 | Complaint ¶¶ 10, 12 | No |
| 453 | Peltz | Judith | Peltz, Judith and Benjamin Peltz, Phfs. v. Avon Products, Inc., et al. | 193142/2021 | New York | New York | Lanier Law Firm PLLC | Darron Berquist | Yes | Yes | 1949 | Initial Fact Sheet, ¶ 6. | Yes |



JA771

18

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 717 | Peltz | Judith | Benjamin Peltz, Individually and as Co-Personal Representative of the Estate of Judith Peltz, and Dennis C. Brown, as Co-Personal Representative of the Estate of Judith Peltz v. Brenntag North America, Inc., et al. | 23-11612 | Massachusetts | Middlesex (MA) | Thornton Law Firm LLP | Leslie-Anne Taylor | Yes | Yes | 1939 | Second Amended Complaint, ¶ 12. | Yes |
| 454 | Pena | Jacklyn | Pena, Jacklyn, PHI. v. Barretts Minerals, Inc., et al. | MID-L-002573-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1992 | Second Amended Complaint, ¶ 3 | No |
| 455 | Penny | Sherry | Penny, Sherry, PHI. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-000918-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1979 | Third Amended Complaint, ¶ 4 | No |
| 456 | Perez | Maria Elena | Johanna Ortiz, and as successor in interest to Maria Elena Perez, deceased; Alejandrina Leon, as legal heir to Maria Elena Perez, deceased v. Albertson's LLC et al. | 23STCV14552 | California | Los Angeles | Simmons Hanly Conroy LLP | Crystal G. Foley | Yes | Yes | 1965 | Complaint, ¶ 2 | No |
| 457 | Perkins | Lorraine | Lorraine A. Perkins and Julia A. Knox v. Avon Products, Inc., et al. | 24-L-003861 | Illinois | Cook | Maune Raichle Hartley French & Mudd, LLC | Christine Kim | No | Yes | 1960 | First Amended Complaint, ¶ 7 | No |
| 458 | Perkins | Barbara | BARBARA PERKINS v. BARRETTS MINERALS, INC. et al. | CGC-23-277164 | California | San Francisco | Frost Law Firm, PC | Ronald J. Shingler | Yes | Yes | 1950s | Complaint, Exhibit A | No |
| 459 | Perl | Rosemarie | Perl, Rosemarie, PHI. v. Avon Products, Inc., et al. | 190087-21 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn | Yes | Yes | 1950s | Amended Complaint, ¶ 95. | Yes |
| 461 | Petitjohn | Eileen | Petitjohn, Eileen and De David Petitjohn, PHs. v. Barretts Minerals, Inc. et al. | MID-L-005203-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Second Amended Complaint, ¶ 5 | No |
| 462 | Petty | Brenda | Petty, Barbara and Curtis Petty, PHs. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002217-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1953 | Second Amended Complaint, ¶ 3 [sic] | Yes |
| 463 | Phelan | Marlene Theresa | Marlene Theresa Phelan v. Arkema Inc., et al. | FBT-CV-23-6124450-S | Connecticut | Fairfield a Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1950s | Second Amended Complaint, ¶ 60 | No |
| 464 | Phillips | Patricia | Patricia Phillips and David Phillips v Avon Products, Inc., et al. | 190111/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 465 | Phipps | Maria | Maria Phipps v Avon Products, Inc., et al. | MID-L-003953-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1959 | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 745 | Picard | Carol | Carol A. Picard and Gerard R. Picard v. Avon Products, Inc., et al. | 2481cv1674 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika O'Donnell | Yes | Yes | 1960s | Complaint, ¶ 27 | No |
| 466 | Picherri | Mary | Mary Picherri and John Picherri v. Avon Products, Inc., et al. | 20x2681 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 467 | Pickard | James | JAMES PICKARD 3M COMPANY f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY; AIR & LIQUID SYSTEMS CORPORATION et al. | 22STCV18682 | California | Los Angeles | Frost Law Firm, PC | Andrew Seitz | No | Yes | 1963 | Complaint, Exhibit A | No |
| 468 | Pickering | Michelle | Michelle Pickering v. Arkema, Inc. et al. | 23STCV19273 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oguneyon | Yes | Yes | 1988 | Complaint, Exhibit A | No |
| 469 | Pidge | Pamela | Pidge, Raymond, Individually and as Administrator of the Estate of Pamela K. Pidge, Deceased, PHI. v. Barrett Minerals, Inc., et al. | MID-L-001497-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F. Alexander Eiden | Yes | Yes | 1962 | Third Amended Complaint, ¶ 4 | No |
| 470 | Pilcher | John | John Pilcher and Carolyn Pilcher v Union Carbide Corp., et al. | 190159/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1949 | Amended Complaint, ¶ 51A. | No |
| 471 | Pleskin | Evan | Evan C. Pleskin and Martha Barry-Pleskin v. Johnson & Johnson, et al. | FBT-CV21-6109520-S | Connecticut | Fairfield a Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1950s | Sixth Amended Complaint ¶ 5 | Yes |
| 472 | Portosi | Herbert | Portosi, Marjorie, Individually and as Proposed Administrator for the Estate of Herbert Portosi, PHI v Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004551-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1960s | Second Amended Complaint, ¶ 2 | Yes |
| 746 | Possley | Madelon | Possley, Individually and as Personal Representative of the Estate of Madelon Possley, Deceased v. Avon Products, Inc., et al. | MID-L-004237-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Complaint, ¶ 4 | No |
| 473 | Potter | Shirley | Heather Donaghy, as Personal Representative of the Estate of Shirley Shirley Potter, deceased v. -6520 Corp., Inc., et al. | 2023-CP-40-03108 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Aaron Chapman | Yes | Yes | 1960s | Second Amended Plaintiff's Complaint ¶ 103 | No |
| 474 | Poubon | Catherine | Poubon, Catherine and David Poubon, PHs. v. Barretts Minerals, Inc. et al. | 190094/2022 | New York | New York | Maune Raichle Hartley French & Mudd LLC | Suzanne M. Ratcliffe | Yes | Yes | 1961 | Initial Fact Sheet, ¶ 6. | Yes |
| 698 | Poutain | Marquan | Marquan Poutain and Charles Pountain v. Avon Products, Inc., et al. | MID-L-003694-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | No | Yes | 1955 | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 475 | Powell | Katherine | Katherine Powell, as Personal Representative of the Estate of Amy Janelle Sold, Deceased v. Avon Products, Inc., et al. | 23-021560 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1978 | Complaint, ¶69 | No |

JA772

Case 23-01245-MBK    Doc 299-1    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit A - Proposed Preliminary Injunction Order    Page 29 of 29

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Bremtag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 476 | Powell | Dena Vee (f/k/a Dena V. Burch) | Tesa A Burch & Est of Dena Powell v Avon, et al. | 1901222022 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N/A | No |
| 479 | Pryor | Carolyn | Pryor, Carolyn, Plt. vs Johnson & Johnson, et al. | MID-L-002649-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1960 | Third Amended Compliant, ¶ 4 | Yes |
| 480 | Pryor | Michael | Pryor, Michael and Karen, Plts., v Avon Products, Inc., et al. | MID-L-000022-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1970 | Compliant, ¶ 2 | Yes |
| 481 | Przekop | Charles | Przekop, Charles and Delphine Przekop, Pltfs. v. Johnson & Johnson, et al. | MID-L-003328-21 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M Ratcliffe | Yes | Yes | Mid-1950s | Third Amended Compliant, ¶ 4 | No |
| 482 | Purvis | Evangeline | Purvis, Nichelle, for the Estate of Angeline Purvis, Pltf. v. Bristol Myers Squibb, et al. | MID-L-001749-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1980 | Amended Complaint, ¶ 1 | Yes |
| 483 | Ramirez | Irma | Irma Ramirez vs. Advanced Auto Parts., Bremtag Specialties LLC, et al | 2019-63770-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1955 | Petition, ¶ 28 | Yes |
| 688 | Ramos | Jim | Jim Ramos & Lilian Ramos v. Bayer Healthcare, LLC, et al. | MID-L-003840-24 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1964 | Complaint, ¶ 2 | No |
| 484 | Rand | Charlene | Charlene Rand and Jason Rand v Block Drug Company, Inc et al. | MID-L-007160-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1977 | Complaint, ¶ 3 | No |
| 485 | Randolph | Bernice | Rhoda Concepcion individually and as administrator of the Estate of Bernice Randolph v Metropolitan Life insurance Company et al. | MID-L-000059-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden | Yes | Yes | Early 1960s | Fourth Amended Complaint, ¶ 4 | No |
| 747 | Reed | Wesley | Wesley Reed et al v. Sammons Corporation of Americas, et al. | 004170/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1960s | Complaint, Plaintiff's Statement, No. 12 | No |
| 487 | Rego | John | RAYMOND BROWN, Individually and as Special Administrator for the Estate of JOHN H. REGO, deceased v. BLOCK DRUG COMPANY, INC., Individually and as successor-in-interest to The Gold Bond Sterilizing Powder Company, a/k/a The Gold Bond Company; et al | 2024LA000030 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1980s | Complaint, ¶ 6 | No |
| 488 | Rentko | Marilyn | Rentko, Marilyn Ann and John, Plts. v. ACME Markets, Inc., et al | 190267-20 | New York | New York | Weitz & Luxenberg P.C. | Amber Jae Brooks | Yes | Yes | 1942 | Fourth Amended Complaint, ¶ 218 | Yes |
| 489 | Renwick | Joyce | Joyce Renwick and Samuel Solin v. Avon Products, Inc., et al | 23-011345-CA-01 | Florida | Miami-Dade | Dean Omar Branham Shirley, LLP | Rebecca Vinocur | Yes | Yes | 1960s | First Amended Complaint, ¶ 66 | No |
| 490 | Reshad | Ghazali | Mary Reshad, Individually and as executor of estate of Ghulam Reshad's Bayer Consumer Care Holdings, LLC Company et al | 628415/2023 | New York | Suffolk | Weitz & Luxenberg P.C. | Sean Kelley | Yes | Yes | 1978 | Amended Complaint, ¶ 72 | No |
| 491 | Reyes | Ezequiel | MARCELA REYES, LESLEY REYES, HOMAR REYES, GISELLE REYES, ERICK REYES, ESEQUIEL REYES and CRYSTAL REYES, as the Surviving Heirs of EZEQUIEL REYES, Deceased v. 3M COMPANY et al | 2222-CC09327 | Missouri | St. Louis | Simmons Hanly Conroy LLP | Randy S. Cohn | Yes | Yes | 1976 | Fifth Amended Petition, ¶ 9 | No |
| 492 | Reyes | Lida | Julio Mendoza, Ind. and as Rep. of the Estate of Lidia Reyes (Deceased), Antonio Reyes & Nidia Reyes, Ind. vs. Avon Products, Inc., Bremtag Specialties LLC, et al | 2019-55560-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1969 | First Amended Petition, ¶ 21 | Yes |

20



JA773

# EXHIBIT B

## Temporary Restraining Order

Case 3:24-cv-14091-MEF-JBC Document 18-9 Filed 03/21/25 Page 2 of 27 PageID: 782
Case 3:24-cv-14091-RQ Document 18-9 Filed 09/11/24 Entered 09/11/24 Page 2 of 27 PageID:
Exhibit B - Proposed Temporary Restraining Order    Page 2 of 27

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC., BRILLIANT
NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and
SOCO WEST, INC.,

       Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG
GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC.,
BRENNTAG NORTH AMERICA, INC., BRENNTAG
NORTHEAST, INC., BRENNTAG PACIFIC, INC.,
BRENNTAG SOUTHEAST, INC., BRENNTAG
SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL
CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC.,
THOSE PARTIES LISTED ON APPENDIX A TO THE
COMPLAINT and JOHN AND JANE DOES 1-1,000,

       Defendants.

Adv. Proc. No. 23-01245 (MBK)

## TEMPORARY RESTRAINING ORDER

The relief set forth on the following pages, numbered three (3) through five (5), is

**ORDERED**.

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Temporary Restraining Order

This matter coming before the Court on the *Debtors' Motion for (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors Pending Entry of a Final, Non-Appealable Order Regarding the Debtors' Proposed Settlement and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision on the Debtors' Request for Injunctive Relief* [Adv. Proc. Docket No. __] (the "**Motion**");[2] and the Court having found and determined that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C. § 157(b), (iii) venue is proper in this district pursuant to 28 U.S.C. § 1409, and (iv) entry of the Temporary Restraining Order is (a) fair and reasonable, (b) consistent with the Bankruptcy Code, the Bankruptcy Rules, the applicable Federal Rules, and the Local Rules, (c) appropriate under the circumstances, and (d) in the best interests of the Debtors and their estates and creditors; and upon the record of the hearing to consider the relief requested in the Motion conducted on September __, 2023 (the "**Hearing**"), the Court hereby finds and determines that:

A.    The Debtors seek, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 7065 of the Federal Rules of Bankruptcy Procedure, a temporary restraining order prohibiting the continued prosecution, amendment, and settlement of Enjoined Brenntag Claims against Brenntag in the lawsuits identified on Exhibit 1 attached hereto (the "**Actions**").

B.    Without immediate injunctive relief, it is expected that the Debtors will be irreparably harmed.

C.    The legal and factual basis, and the parties' representations on the record, set forth in the Motion, the Declaration, and at the Hearing establish just cause for the relief granted herein.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Based on the foregoing findings and conclusions, **IT IS HEREBY ORDERED that:**

1.      Defendants are temporarily restrained from prosecuting, amending, or settling any Brenntag Enjoined Claims in the Actions listed on the schedule attached hereto as Exhibit 1 (the "**Schedule**") pending the Court's entry of an Order in connection with the Motion.

2.      The Debtors shall serve a copy of this Order, including the Schedule, on all parties to this Adversary Proceeding via regular mail within one (1) business day of entry of this Order.

3.      Brenntag is authorized to file this Order on the docket of the Actions listed on the Schedule.

4.      Pursuant to Federal Bankruptcy Rule 7065, the Debtors are relieved from posting bond under Federal Rule 65(c).

5.      Any objections to the preliminary injunction sought by the Motion shall be filed on or before _____ __, 2024 and served on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and the Office of the United States Trustee by electronic mail.  Any reply papers in support of the Motion or in response to any objections shall be filed on or before _____ __, 2024 and served on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, counsel for any objecting party, and the Office of the United States Trustee by electronic mail.  Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure (made applicable to this Adversary Proceeding by Rule 7065 of the Federal Rules of Bankruptcy Procedure), a combined hearing to consider the preliminary injunction requested in the Motion and the trial on Counts II and III of the Amended Complaint shall be held  on _____ __, 2024 at __:__ _.m. (ET) before the Honorable Chief Judge Michael B. Kaplan,

Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8,

Trenton, New Jersey 08608.

6.    The requirement set forth in D.N.J. LBR 9013-1(a)(3) that any motion be

accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion

or otherwise waived.

7.    The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order.

8.    Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by

such notice.

9.    The terms and conditions of this Order shall be effective immediately upon its

entry.

10.    Nothing in this Order or the interim relief associated therewith shall be construed

as a binding finding of fact or conclusion of law or preclude any party's ability to litigate these

facts on a complete record, or otherwise prejudice the parties as to any further proceedings in any

manner.

11.    This Court shall have exclusive jurisdiction over this Order and any and all matters

arising from or relating to the implementation, interpretation, or enforcement of this Order,

including, without limitation, any and all determinations as to whether a claim constitutes a

Brenntag Enjoined Claim and whether an action in respect of a Brenntag Enjoined Claim is subject

to this Order.

<u>**EXHIBIT 1**</u>

[Schedule of Brenntag Enjoined Actions]

Any party who wishes to examine or copy the documents summarized in the below Schedule can do so by contacting the Debtors' undersigned counsel by email to <u>adeleo@coleschotz.com</u> and <u>jaberasturi@coleschotz.com</u> in order to obtain access to a data room containing such documents. The number in the No. column of the below Schedule refers to the folder number for the applicable claim in the data room.

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Acevedo | Yolanda | Yolanda Acevedo and Noe Acevedo v Avon Products, Inc et al | MID-L-003625-23 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1990's | Complaint, ¶ 2 | No |
| 2 | Adams | Jennifer | Jennifer E Adams and Jon S Adams v Brenntag North America, Inc et al | MID-L-004465-23 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1972 | Complaint, ¶ 2 | No |
| 3 | Adams | Jacqueline | Jacqueline Adams and David Adams v Sumitomo Corporation of America et al | 190017/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 4 | Adams | Sheri | Sheri Adams v Alberto Culver USA Inc et al | 190233/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 5 | Aikens | Kimberly | Kimberly O. Aikens v. Public Supermarkets, Inc. | 2023-017836-CA01 | Miami-Dade | Florida | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1976 | Amended Complaint, ¶ 11-12 | No |
| 6 | Akins | Shirley | Shirley Akins and Charles Akins vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2021-80721-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1954 | Second Amended Complaint, ¶ 31 | No |
| 7 | Akins | Theresa | Theresa Akins vs. Brenntag Specialties LLC, et al | 2022-57520-ASB | Harris | Texas | Naduavari Law Group | Steven S. Schulte | Yes | Yes | 1970s | Second Amended Petition, ¶ 23 | No |
| 8 | Al Saud | Newal | Dan Albaury, as Trustee of the Estate of Newal Al Saud, and Tina Mohammad v. Barretts Minerals, Inc, et al. | 190602/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Yes | 1955 | Complaint, Plaintiff's Initial Fact Sheet, 6 | No |
| 9 | Alber | Zachary Michael | Alber, Rebecca, Estate of Zachary Michael Alber, Phil v. Johnson & Johnson, et al | MID-L-000955-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1983 | Second Amended Complaint, ¶ 2 | No |
| 10 | Alegre | Jorge | Jorge M Alegre and Luz Alegre v Arkema, Inc et al | MID-L-001861-23 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1937 | Third Amended Complaint, ¶ 2 | No |
| 11 | Alexander-Jones | Ruth | G. RUTH ALEXANDER-JONES and JAMES R. JONES v. AVON PRODUCTS, INC. et al. | 2:22-18669-1 SEA | King | Washington | Maune Raichle Hartley French & Mudd, LLC | Brian F. Ladenburg | Yes | Yes | 1966 | Complaint, ¶ 9 | Yes |
| 12 | Alicea | Maria | Maria Alicea v. Avon Products, Inc., et al. | 23-1551 | Middlesex (MA) | Massachusetts | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 14 | Aloisio | Roman | Roman Aloisio v Avon Products, Inc et al | 190239/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 15 | Alvarado | Alvaro | Maria Del Rosario Tobias, Ind. and as Personal Rep. of the Estate of Alvaro Alvarado, Deceased, and is/of of L.A., a Minor vs. Avon Products, Inc., Brenntag Specialties LLC, et al. | 2021-73332-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1990 | Second Amended Petition, ¶ 17 | Yes |
| 16 | Alvarez | Josefina | Josefina Alvarez v. Barretts Minerals Inc., et al | 23 L 5583 | Cook | Illinois | | Bethany Gasperin | Yes | Yes | 1968 | Complaint, ¶ 7 | No |
| 17 | Alvarez | Maria | Alvarez, Miguel, Executor of Estate of Maria Alvarez, Phil v. Johnson & Johnson, et al | MID-L-005353-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1963 | Third Amended Complaint, ¶ 1 | Yes |
| 18 | Amenosa | Elaine | Elaine M. Amenosa v Amerihan Inc, et al | EFCA2023-002100 | Oneida | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1961 | Second Amended Complaint, 5 | Yes |
| 19 | Anderson | Gina | GINA ANDERSON v. AVON PRODUCTS INC, et al. | 21-2-14042-1 SEA | King | Washington | Simon Greenstone Panatier, PC | Robert Green | Yes | Yes | 1986 | Complaint, ¶ 5 | Yes |
| 20 | Anderson | Carolyn | Carolyn S. Anderson v. Avon Products, Inc., et al. | MID-L-02533-18 AS | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 21 | Anderton | William | William Anderton and Margie Anderton v. Brenntag North America and Brenntag Specialties, Inc. | MID-L-005866-18 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1956 | First Amended Complaint, ¶ 4 | Yes |
| 22 | Anzoza | Richard | Juan Anzoza, as Executor of the Estate of Richard Anzoza v. 3M Co. et al. | 190069/2016 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 23 | Armstrong | Terry | Terry Armstrong and Katherine Armstrong vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-38902-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1955 | First Amended Complaint, ¶ 71 | No |
| 24 | Arvelo | Donna | Arvelo, Donna, M., Phil vs. Arden Corporation, Ltd., et al | MID-L-006588-17 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1951 | Fifth Amended Complaint, ¶ 2 | Yes |
| 25 | Askdrom | Janet | Janet Anderson's Sumitomo Corporation of America et al | 190018/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 26 | Ashelford | John | Susan Ashelford, as Personal Representative of the Estate of John Ashelford, Deceased v. Barretts Minerals, Inc., et al | 23-002356 CA27 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1967 | Complaint, ¶ 36 | No |
| 27 | Ashoori | Shanaz | Shanaz Ashoori and Jahangir Ashoori v. All, et al. | MID-L-001341-24 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | No | 1984 | Complaint, ¶ 2 | No |
| 739 | Backelin | Brent | Brent W. Backelin v. 84 Lumber Company, et al. | 190172/2012 | New York | New York | The Early Law Firm, LLC | Brian Francis Early | Yes | Yes | 1966 | Complaint, ¶ 5 | No |
| 29 | Bascin | Alicia | Alicia Bascin & Kenneth Bascin v Avon Products, Inc et al | 190069/2023 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |

JA781

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 663 | Bagley | Patricia | Patricia Bagley v. Chanel, Inc., et al. | 190122/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 672 | Balas | Sandra | Sandra Balas and Anthony Balas v. Wegmans Food Markets, Inc., et al. | 811759/2024 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | Late 1960s | Complaint, Statement Sheet, No 8 | No |
| 31 | Ballesteros | Irma | Irma Ballesteros v. ALBERTSONS COMPANIES, INC. et al. | 23STCV06710 | California | Los Angeles | Frost Law Firm, PC | Andrew Seitz | Yes | Yes | 1970s | First Amended Complaint, Exhibit A | No |
| 32 | Barker | Maureen | Georgina Jane Barker, Individually and as administrator of the estate of Maureen Barker v Christian Dior, Inc et al | 190299/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 33 | Barnhart | Melissa | Melissa Barnhart and Christopher Barnhart v Avon Products, Inc et al | MID-L-002649-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1973 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 34 | Barone | Nicholas | Nicholas Barone and Kathryn Barone v. Blue.M, et al | FBT-CV-22-6116557-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1960 | Complaint ¶ 5 | Yes |
| 35 | Barratt | Madelin | Barratt, Madelin and Henry Barratt, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008016-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 4 | Yes |
| 36 | Bartlett | Deborah Lee | Deborah Bartlett and Shawn Bartlett v. Avon Products, Inc. et al. | 24STCV04012 | California | Los Angeles | Simon Greenstone Panatier, PC | Robert Green | Yes | Yes | 1970s | Complaint, Exhibit A | No |
| 37 | Barton | Harold | Harold Barton, et al. v. Avon Products, Inc. et al. | CV21955385 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeRose | Yes | Yes | 1973 | Complaint, Brochure, p. 36 | Yes |
| 38 | Basili | Gina | Gina F. Basili v. Avon Products, Inc. et al. | 23-0784 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Yes | 1975 | Fourth Amended Complaint, ¶ 37 | Yes |
| 39 | Basser | Carol | Carol Basser v AII, et al. | MID-L-000432-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Gabriel | Yes | Yes | 1942 | Fourth Amended Complaint, ¶ 2 | Yes |
| 40 | Bast | Donna J. | DONNA J. BAST and LARRY A. BAST v. AVON PRODUCTS, INC. et al. | 23-2-15056-2 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton | Yes | Yes | 1958 | First Amended Complaint at 11:13 | No |
| 41 | Batcy | Mary | William Batcy Jr., Individually and as Administrator and Administrator ad Prosequendum for the Estate of Mary Batcy, et al vs Avon Products, Inc., et al | MID-L-001565-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1953 | Complaint, ¶ 8 | Yes |
| 42 | Bathgate | Josephine | Josephine Bathgate v Avon Products, Inc et al. | 190125/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 43 | Belanger | Stacy | PETER BELANGER, individually and as successor in interest to STACY BELANGER, Deceased; CHRISTOPHER BELANGER, LUKE BELANGER, and LILY BELANGER, Individually, vs. RALPHS GROCERY COMPANY et al. | 22STCV08775 | California | Los Angeles | Waters Kraus & Paul | Kevin M. Loew | Yes | Yes | 1970 | Second Amended Complaint, Exhibit A | Yes |
| 712 | Bell | Judy Kay | Scott Bell, as Personal Representative for the Estate of Judy Kay Bell v. Almay, Inc. et al. | 190090/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 44 | Bennett-Turner | Alan | Alan Bennett-Turner v Avon Products, Inc et al | 190118/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 45 | Berris | Susan W. | SUSAN W. BERRIS and BRUCE C. BERRIS, vs. BRENNTAG NORTH AMERICA, INC., et al. | 62-CV-23-257 | Minnesota | Ramsey | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960 | First Amended Complaint, ¶ 3 | No |
| 46 | Berry | Sara | Sara Berry and Sean Berry v Santonno Corporation of the Americas et al. | 190274/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 47 | Besse | Jodi | Besse, Jodi & George Besse, Pltfs. v. Duval's Pharmacy, et al. | 190010/2021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1970s | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 48 | Best | Edna | Edna Best v. Avon Products, Inc., et al. | MID-L-007546-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950 | Complaint, ¶ 2 | No |
| 735 | Betts | Susan | Susan Betts v. Avon Products, Inc., et al. | 190119/2024 | New York | New York | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 49 | Bezanilla | Bernadette | Bernadette A. Bezanilla and Leopoldo G. Bezanilla v. Avon Products, Inc., et al | CACE-23-003072 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiRosa | Yes | Yes | 1970s | Third Amended Complaint ¶ 5 | No |
| 695 | Biggars | Walter | Walter A. Biggars and Janet L. Biggars vs. Arkema, Inc., F/K/A Penwalt Corporation, et al. | 2024-LA-000830 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Steven D. Rinberg | No | Yes | Prior to 1969 | Complaint, ¶ 7 | No |
| 50 | Biljetina | Jolyene | Jolyene Biljetina and Eric Biljetina, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190024/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 10 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Delbruck) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | Bill | Lorraine | Bill, Lorraine & Thomas South, Plfs. v. Avon Products, Inc., et al. | 19006522 | New York | New York | Weitz & Luxenberg P.C. | James Plastiras | Yes | Yes | 1960s | Amended Complaint, ¶ 81 | No |
| 677 | Biondo | Nancy | Peter Biondo, as Administrator of the Estate of Nancy Biondo, Deceased v. Avon Products, Inc., et al | 190199/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier | Yes | Yes | 1988 | Amended Complaint, Initial Fast Sheet, 5 | No |
| 52 | Biseglio | Janice | Biseglio, Janice, Plf. v. Johnson & Johnson, et al. | MID-L-003853-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1952 | First Amended Complaint, ¶ 2 | Yes |
| 53 | Biswas | Roman | Rohan Biswas and Jaclyn Biswas v Aramis Distributors New York, Inc et al. | 190004/2023 | New York | New York | Weitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear on face of complaint | NA | NA | Yes |
| 54 | Black | Edward | Tameron S. Gills, Ind. and as Special Administrator for the heirs and Estate of Edward E. Black Sr. and Wanda Jo Black vs. Brenntag Specialties LLC, et al | 2018-59007-ASB | Texas | Harris | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | Yes |
| 55 | Black | Mary | Mary Black, Plf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190016/2017 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 673 | Blackwell | Mary Kathryn | Mary Kathryn Blackwell vs. Avon Products, Inc. et al | CACE-24-010680 | Florida | Broward | Simmons Hanly Conroy LLP | Juan P. Bauta, II | Yes | Yes | 1964 | Complaint, ¶ 11 | No |
| 56 | Blinkinsop | Judith | Blinkinsop, Robert and Karen Blinkinsop, etc., Plfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008377-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1944 | Second Amended Complaint, ¶ 4 | Yes |
| 57 | Bloomberg | Jac | Bloomberg, Ellen, for the Estate of Jac M. Bloomberg, Plf. v. Barretts Minerals, Inc. et al. | MID-L-002608-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eulett | Yes | Yes | 1972 | Third Amended Complaint, ¶ 4 | No |
| 58 | Blue | Vertis | Blue, Vertis, Plf. v. Avon Products, Inc., et al. | MID-L-02677-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1955 | Amended Complaint, ¶ 4 | Yes |
| 59 | Boatright | Angela | Boatright, Angela, Plf. v. Avon Products, Inc., et al | 190154/2021 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | Prior to 1980 | Complaint at ¶ 1 | Yes |
| 685 | Bogler | Eriza | Wolfgang Bogler, as Administrator of the Estate of Eriza Bogler, and Wolfgang Bogler, Individually v. Avon Products, Inc., et al. | 814005/2024 | New York | Suffolk | Weitz & Luxenberg P.C. | Sean Kelley | Yes | Yes | 1960s | Amended Complaint, No. 97 | No |
| 60 | Bosce | Denise K. | DEBBIE A. BOSCE as Personal Representative of the Estate of DENISE K. BOSCE v. AVON PRODUCTS, INC., et al | 23-2-22519-8 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton | No | Yes | 1975 | Amended Complaint, ¶ 15 | No |
| 61 | Boden | Barbara Ellen | Poland-Stamock, DeAnna and Estate of Barbara Ellen Boden, Plf. v. Brenntag North America, Inc. Conferencing Speciesto, Inc., et al | MID-L-000404-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1974 | Third Amended Complaint, ¶ 4 | No |
| 62 | Borthwick | Anne | Anne Borthwick and David Borthwick v. Suntronno Corporation of Americas, et al. | 190031/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | No |
| 63 | Bowers | Bernard | Bowers, Bernard P. and Jeanne Bowers, Plfs. v. A.W. Chesterton Company, et al. | 21-09-02481 | Pennsylvania | Philadelphia | Weitz & Luxenberg P.C. | Matthew Adam Grubman | Yes | Yes | 1970 | Amended Complaint, ¶ 5 | No |
| 728 | Bradford | Claire | Sharon Englerth, as Personal Representative of the Estate of Clara Bradford v. Bayer Healthcare LLC, et al. | 2405-00433 | Pennsylvania | Philadelphia | Brookman, Rosenberg, Brown and Sandler | Steven J. Cooperstein | Yes | Yes | 1940s | Amended Complaint, Schedule 1 | No |
| 64 | Brand | Karen | Brand, Karen & Ronald Brand, Plfs. vs. Avon Products, Inc., et al. | 190206/2021 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | Yes |
| 65 | Brannon | Billy | Billy Brannon and Wilma Brannon vs. Atsc, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2023-15536-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1955 | Third Amended Complaint, ¶ 48 | No |
| 66 | Bradley | William | Kelly Brantley and Sara Brantley v. 3M Company a/k/a Minnesota Mining & Manufacturing Company, et al | C-717978 32 | Louisiana | East Baton Rouge Parish 19th JDC | Getys Law Group, APLC Simon Greenstone Panatier, PC | Lawrence G. Getys Holly C. Peterson | Yes | Yes | 1979 | Amended Complaint, ¶ 4 | Yes |
| 67 | Braun | James | Gayle Braun, as Executor for the Estate of James M. Braun Jr., deceased v. Air & Liquid Systems Corporation, successor-by-merger to Buffalo Pumps, Inc., et al | 2022LA001010 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Eric Peplonski | Yes | Yes | 1969 | Complaint, ¶ 7 | Yes |
| 68 | Brewer | Rebecca | Rebecca Brewer v. Avon Products, Inc., et al | 190367/2016 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | No |
| 69 | Brown | Leroy | Leroy Brown v 3M Company et al | 23-11-03107 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Jason P. Yampolsky | Yes | Yes | 1984 | Amended Complaint, Schedule 1 | No |
| 71 | Buehler | Roger | Buehler, Eva, Individually and as Executor of the Estate of Roger D. Buehler, deceased, Plf. vs A& R Liquid Systems Corporation, et al | MID-L-002905-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Cody Greenes | Yes | Yes | 1976 | Amended Complaint, ¶ 2 | Yes |
| 72 | Bublig | Marcella | Bublig, Marcella and William Bublig, etc., Plfs. vs. American International Industries, Inc., et al. | MID-L-007726-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 73 | Burchette | Kimberly | Kimberly Burchette & Jarrett Burchette v Avon Products, Inc et al. | MID-L-004452-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1971 | Second Amended Complaint, ¶ 3 | No |
| 74 | Bus | Laura | Laura Bus and Mark Bus v Barretts Minerals, Inc et al | MID-L-003086-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1998 | Fourth Amended Complaint, ¶ 2 | No |

JA783

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 75 | Byrd | Richard | RICHARD L. BYRD and MARLIE G. BYRD v. Brenntag, Inc., et al | 23-LA-1670 | Madison | Illinois | Maune Raichel Hartley French & Mudd LLC | Celena F. Bevard | Yes | Yes | 1965 | First Amended Compliant, ¶ 6 | No |
| 76 | Caro | Nancy | Frank J. Caro, Jr. Individually and as Executor and Executor Ad Prosequendum of the Estate of Nancy Cairo v. AII, et al. | MID-L-900-14AS | Middlesex (NJ) | New Jersey | Szaferman, Lakind, Blumstein & Blader, P.C. | Moshe A. Maimon | Yes | Yes | 1968 | Third Amended Compliant, ¶ 4 | Yes |
| 77 | Calabrese | Thomas | Thomas Calabrese v Arkema, Inc. et al. | 190328/2023 | New York | New York | Weitz & Luxenberg P.C. | Sean Kelley | Yes | Yes | 1950s | Amended Compliant, ¶ 15 | No |
| 78 | Cali | Julie | Julie Cali v. Arkema, Inc. f/k/a Pennsalt Corp., et al | C-705579 '25 | East Baton Rouge Parish 19th JDC | Louisiana | Landry & Swarr, LLC Fears Nachawati PLLC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Darren McDowell | Yes | Yes | 1973 | Compliant, ¶ 15 | Yes |
| 79 | Cammalleri | Emilio | Cammalleri, Emilio and Claudette Cammalleri, H/W, Plfs. vs. American International Industries, Inc., et al. | MID-L-007266-19 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Compliant, ¶ 4 | Yes |
| 80 | Campbell-Wright | Lorna | Lorna Campbell-Wright & Rodrick Wright v Avon Products, Inc. et al. | 190228/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 81 | Cantu | Juan | Cantu, Juan & Laura, Plfs. v. Barrett Minerals, Inc., et al. | MID-L-000572-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1973 | Amended Compliant, ¶ 4 | No |
| 82 | Cantelora | Carolyn | Carolyn Cantelora vs. C and D Pharmacy, LLC, et al. | 21-0738 | St. Bernard Parish / 34th JDC | Louisiana | Landry & Swarr, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Holly C. Peterson | Yes | Yes | 1945 | First Amended Compliant, ¶ 5 | Yes |
| 83 | Carlson | Connie M. | CONNIE M. CARLSON v. BARRETTS MINERALS, INC. et al. | 22-2-03149-2 KNT | King | Washington | Bergman Oslund Udo Little, PLLC | Brendan Little | Yes | Yes | Mid-1960s | Compliant, 3 | Yes |
| 84 | Carlson | Peggy | Peggy Carlson and John Carlson, Plfs. vs. Brenntag Specialties, Inc., et al. | MID-L-003572-17 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1957 | Compliant, ¶ 2 | Yes |
| 86 | Casarsville | Walter | Casarsville, Walter M. and Tammar Casarsville, Plfs. v. Avon Products, et al. | 190296/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tamburo | Yes | Yes | 1970 | Compliant, ¶ 120, | Yes |
| 88 | Catt | Helen | Helen Catt and Donald Catt, Plfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-001410-19 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1988 | Amended Compliant, ¶ 7 | No |
| 89 | Cavalluzzi | John | Cavalluzzi, John and Rene Cavalluzzi, Plfs. v. Barretts Minerals, Inc., et al. | MID-L-002510-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | James Andrew Plaisted | Yes | Yes | Late 1970s | Third Amended Compliant, ¶ 4 | No |
| 90 | Cayer | Robert | Robert Cayer and Elizabeth Cayer v. Ajax Tocco Magnathermic Corporation, et al. | PC-2023-00731 | Bristol | Rhode Island | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | No | Yes | 1962 | Compliant, ¶ 5 | Yes |
| 91 | Ceraso | Vincent | Cerasso, Vincent, Plf. v. Arrchem Pharmacy, Inc et al. | 190003-22 | New York | New York | Weitz & Luxenberg P.C. | Chris Romanelli | Yes | Yes | 1977 | Compliant, 129, | Yes |
| 93 | Chamberlain | Jennifer | Jennifer Chamberlain v Albion Pharmacy, Inc et al. | 23-013029 | Allegheny | Pennsylvania | Dean Omar Branham Shirley, LLP | Cori J Kapusta | Yes | Yes | 1974 | Compliant, ¶ 106 | Yes |
| 94 | Chapman | Rita Ann | RITA ANN CHAPMAN and GARY CHAPMAN v. AVON PRODUCTS, INC. et al. | 22STCV03968 | Los Angeles | California | Dean Omar Branham Shirley, LLP | Ben Adams | Yes | Yes | Mid-1950s | Compliant, Exhibit A | No |
| 95 | Chason Gregory | Amanda | Amanda Chason-Gregory v. Publix Super Markets, Inc., et al. | 24-002569 CA27 | Broward | Florida | Simmons Hanly Conroy LLP | Rebecca Vincent | Yes | Yes | 1980s | Compliant ¶24 | No |
| 96 | Cheifetz | Michael | Cheifetz, Michael, Plf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190110/2020 | New York | New York | Maune Raichel Hartley French & Mudd, LLC | Nathaniel N. Fakla | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 97 | Chelkowsky | Jeanne | Laura Mackey as executor of Jeanne Chelkowsky v. Avon Products et al. | MID-L-000292-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Cody Greenes | Yes | Yes | 1970s | Compliant, ¶ 4 | No |
| 99 | Clark | Sharilyn | Sharilyn Clark v. Brenntag North America, et al. | 190162/2018 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 100 | Clawson | Linda | Linda Clawson and Billy Clawson v Avon Products, Inc et al. | 190157/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 101 | Cline | Susan | Susan Cline & Patrick Cline v Acme Markets, Inc. LLP | 23-012897 | Allegheny | Pennsylvania | Dean Omar Branham Shirley, LLP | Cori J Kapusta | Yes | Yes | 1962 | Compliant, ¶ 138 | No |
| 102 | Clinton (Regina) | Amanda | Amanda Clinton, Plf. v Avon Products, Inc., et al. | MID-L-002337-19 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1985 | First Amended Compliant, ¶ 2 | Yes |
| 103 | Cody | Laura | Cody, Laura and William Cody, Plfs. v. Rite Aid of New York City, Inc. et al. | 603356/22 | Nassau | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis | Yes | Yes | 1952 | Third Amended Compliant, 115 | No |
| 104 | Cohen | Connie | Cohen, Connie, Plf. v. Johnson & Johnson, et al. | MID-L-004448-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1958 | Third Amended Compliant, ¶ 2 | Yes |
| 105 | Cole | Roberta | Roberta Cole and John Cole v. Johnson & Johnson, et al. | MID-L-007272-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1942 | Fifth Amended Compliant, ¶ 2 | No |
| 106 | Connell | Ann | Ann Connell and George Connell v. Barretts Minerals Inc., et al. | 21-1714 | Middlesex (MA) | Massachusetts | Cooley Law Firm and Duffy Law LLC | Edward Paul Cooly | Yes | Yes | 1950 | Compliant ¶ 8 | Yes |

JA784

Case 23-01245-MBK     Doc 299-2     Filed 09/12/24     Entered 09/12/24 00:24:45     Desc
Exhibit B - Proposed Temporary Restraining Order     Page 12 of 27

JA785

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Dehtex) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107 | Conti | Carmela | Jeanne Conti as Executrix of the Estate of Carmela Conti v Avon Products, Inc et al. | MID-L-003823-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1960 | First Amended Compliant, ¶ 4 | No |
| 108 | Conway | Thomas | DORCAS G. CONWAY, individually and as Special Administrator of the Estate of THOMAS P. CONWAY, Deceased v. Air & Liquid Systems Corporation, et al | 2021L001012 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | A. Gentry Smith | Yes | Yes | 1960s | First Amended Compliant, ¶ 7 | Yes |
| 109 | Cooney | Tina | Cooney, Tina v Avon Products, Inc. et al. | MID-L-002992-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1988 | Third Amended Compliant, ¶ | No |
| 110 | Cooper | Lilo | LILO COOPER and LESLIE COOPER v. Arkema, Inc. F/K/A Pennwalt Corporation And Elf Atochem North America, Inc. et al. | 23STCV15823 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oguejesunam | Yes | Yes | 1948 | Complaint, Exhibit A | No |
| 111 | Cooper | Michelle | Michelle Cooper vs Johnson & Johnson, et al. | MID-L-001326-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1967 | Third Amended Compliant, ¶ 2 | Yes |
| 112 | Cooper | Frederick | Frederick Cooper and Janeen Cooper v Arkema, inc et al | 22-12-00021 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner | Yes | Yes | 1963 | Second Amended Complaint, ¶ 4a | No |
| 113 | Corin | Paula | Paula Corin v. Arkema, Inc. et al. | 23STCV26571 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc Willick | Yes | Yes | 1955 | Complaint, Exhibit A | No |
| 114 | Coronado | Mario | Coronado, Mario & Melania Porras, Plfs. v. Johnson & Johnson, et al. | MID-L-004460-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1992 | Third Amended Compliant, ¶ 2 | Yes |
| 115 | Corum | Scott | Scott Corum and Greta Corum, Plfs. vs. Arkema, Inc., et al. | MID-L-001294-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1971 | Third Amended Compliant, ¶ 2 | No |
| 116 | Coss | Roger | Coss, Roger and Susan Coss, Plfs., vs. 3M Company, etc, et al. | MID-L-005031-19 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1954 | First Amended Compliant, ¶ 2 | Yes |
| 664 | Costigan | Irene | Irene Costigan and Andrew Costigan v. Chanel, Inc., et al. | 190120/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Yes | Unclear based on face of complaint | NA | No |
| 696 | Coburn | Cynthia | Cynthia Coburn vs. Safeway, Inc., et al | 24STCV15934 | California | Los Angeles | Brown Kelly LLP | Marc I Willick | Yes | Yes | 1960s | First Amended Compliant, Exhibit A | No |
| 117 | Craft | Cherie | Cherie A. Craft v. Ahold Delhaize USA, Inc., et al | 24-X-24-000005 | Maryland | Baltimore City | Brown Kelly LLP | Matthew E. Kelly | Yes | Yes | 1971 | Compliant, ¶ 8 | No |
| 118 | Crawford Starr | Taloa | Taloa J. Crawford Starr v. Janssen Pharmaceuticals, Inc. et al | MID-L-001278-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | Early 1960s | Second Amended Complaint, ¶ 2 | Yes |
| 119 | Crosby | Mary | Crosby, David as Executor of the Estate of Mary Crosby, Plf., v. Avon Products, Inc., et al. | E2022-0467CV | New York | Steuben | Levy Konigsberg LLP | John P. Guinan | Yes | Yes | 1978 | Third Amended Compliant, ¶ 4 | No |
| 120 | Cross | Margaret | Margaret M Cross v Barretts Minerals, Inc et al | 190155/2023 | New York | New York | Weitz & Luxenberg P.C. | John P. Guinan | Yes | Yes | 1943 | Amended Compliant, ¶ 93. | No |
| 121 | Crozier | Beverly | Crozier, Beverly Cecior and Donald Crozier v. Avon Products, Inc., et al. | 190385/2016 | New York | New York | Levy Konigsberg LLP | John P. Guinan | Unclear based on face of complaint | Yes | Unclear based on face of complaint | NA | Yes |
| 122 | Calberley | Gladys | Gladys Calberley v. Publix Super Markets, Inc., et al | 23-020045 CA 27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1980s | First Amended Compliant, ¶ 47 | No |
| 124 | Capps | Catherine | Capps, Catherine and Clifton Capps, Plfs. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002853-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 125 | Curtis | Erik | Curtis, Erik and Tari Curtis, Plfs. v. Avon Products, Inc., et al. | MID-L-006225-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1970s | First Amended Compliant, ¶ 9 | Yes |
| 127 | Davies | Michael | Davies, Lynn, individually and as Executrix of the Estate of Michael Davies, Plfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190348/2017 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Unclear based on face of complaint | Yes | Unclear based on face of complaint | NA | Yes |
| 128 | Davis | Janel | JANEL DAVIS, VS. ALBERTSONS LLC, individually and as successor-in-interest to ALPHA BETA et al | RG21112811 | California | Alameda | Simmons Hanly Conroy LLP | Deborah Rosenthal | Yes | Yes | 1970 | Compliant, ¶ 2 | Yes |
| 129 | Doudman | Jane | Anthony Doudman, Individually and as Personal Representative of the Estate of Survivors of Decedent Jane Doudman, Deceased v. L'Oreal Travel Retail Americas, Inc., et al | 23-022397CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1965 | Compliant, ¶ 42 | No |
| 130 | Deal | Michael | Deal, Michael and Christine Deal, Plfs. v. Arkema, Inc., et al. | MID-L-000551-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1976 | Fourth Amended Compliant, ¶ 2 | No |
| 131 | Dean | James | James Bryan Dean and Lisa Dean v. 3M Company, a/k/a Minnesota Mining and Manufacturing Company, et al. | 2023-CP-40-03441 | South Carolina | Richland | Meirowitz & Wasserberg, LLP | Kash Shakila | Yes | Yes | 1987 | Second Amended Compliant, ¶ 153 | No |
| 132 | Decembrino | Richard | Richard Decembrino and Diana Decembrino v 3M Company et al | 23-10-03193 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Clark P. Rosengarten | Yes | Yes | 1960s | Second Amended Compliant, Schedule 1 | No |
| 133 | Deems | Daniel | Deems, Daniel and Jennifer Deems, Plfs., vs. Avon Products, Inc., et al. | 190394/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Unclear based on face of complaint | Yes | Unclear based on face of complaint | NA | Yes |
| 134 | DeGannett | Paul | DeGannett, Paul II and Mary Ann DeGennett, Plfs. v. Barretts Minerals, Inc., et al. | MID-L-000179-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1979 | Amended Compliant, ¶ 4 | No |

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 13 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 135 | Dezelboi | Peggy | Peggy J. Hadeak Dezelboi v. Avon Products, Inc., et al | 2023-021157-CA-01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1934 | First Amended Complaint, ¶ 70 | No |
| 136 | Delgado | Ana | ANA M. DELGADO v. AVON PRODUCTS, INC., et al | 24L402/82 | Illinois | St. Clair | Menges Law Firm | Menges Law; Carson Menges, Kanri & Von Oiste, LLP (Of Counsel); Jason Minnizelli | Yes | Yes | 1960s | Complaint, ¶ 1 | No |
| 137 | Deng | Jian Kang | Jian Kang Deng and Li Ying Deng v Barretts Minerals, Inc et al | 190114/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 138 | Denham | Ann | Ann Denham v. Sumitomo Corporation of Americas, et al. | 190067/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 139 | Denk | William | ROSEMARY DENK, Individually and as Successor-in-Interest to WILLIAM J. DENK, Deceased vs. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al. | 23STCV01707 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1960 | First Amended Complaint, Exhibit A | Yes |
| 140 | DeSaussure | Vashti | Tewanna Tucker as administrator of the estate of Vashti DeSaussure v 3M Company et al | MD1-L-005713-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grebman | Yes | Yes | 1960 | Third Amended Complaint, ¶ 4 | No |
| 141 | Diaz | Walter | TAMMY EVETT DIAZ, individually and as successors-in-interest to WALTER NESTOR DIAZ, and HOLLY DIAZ, v. AVON PRODUCTS, INC. et al. | 22CV022885 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid | Yes | Yes | 1980s | Complaint at 4:27-5:9 | Yes |
| 142 | DiRello | Audra | Audra DiRello and James Guy v Barrett Minerals, Inc et al | MD1-L-001282-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1976 | Third Amended Complaint, ¶ 4 | No |
| 145 | Dietzman | Heather | HEATHER R. DIETZMAN v. AVON PRODUCTS, INC., et al | 23-LA-001587 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | A. Grieny Smith | Yes | Yes | Mid-1980s | Complaint, ¶ 6 | No |
| 146 | Dobbs | Sheryl | Sheryl Dobbs v. Avon Products, Inc., et al | MD1-L-005426-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | Mid-1970s | Complaint, ¶ 2 | No |
| 147 | Doboc | Scott | Connors-Doboc, Jocelyn, Individually and as Personal Representative for the Estate of Scott M. Doboc, PHC vs. Avon Products, Inc., etc., et al. | 190305/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 148 | Dominguez | Gloria | Rubio, Neillie, for the Estate of Gloria Dominguez, PHC v. Avon Products, Inc., et al | 190227/21 | New York | New York | Weitz & Luxenberg P.C. | Clark Rosengarten (Since Jeff Weitz) | Yes | Yes | 1970s | Amended Complaint, 45 | No |
| 149 | Donnatin | John | PAULA M. DONNATIN, individually and as Special Administrator of the Estate of JOHN C. DONNATIN, deceased, CHARLES DONNATIN, an individual, and HALEY HASTIE, an individual; as legal heirs of JOHN C. DONNATIN, deceased, v. ARKEMA INC., f/k/a PENNWALT CORPORATION, et al | 24STCV09343 | California | Los Angeles | Dean Omar Branham Shirley, LLP | Leonard Sandoval | Yes | Yes | 1966 | Complaint, ¶ 18 | No |
| 150 | Doonan | Elizabeth | Elizabeth Doonan v Christian Dior, Inc et al | 190190/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 151 | Doxon | Ronald | Doxon, Ronald & Rosita Doxon, Plff. v Johnson & Johnson, et al. | MD1-L-005986-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1950 | Second Amended Complaint, ¶ 2 | Yes |
| 152 | Dozier | Verna | Dozier, Verna L.P., Plff. vs. Avon Products, Inc. | MD1-L-05467-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 153 | Drepner | Monica | Monica Drepner v Avon Products et al | 190124/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 154 | Dubois | Timothy | Timothy E. Dubois & Linda Dubois v. 3M Company, et al | 49D13-2404-CT-015028 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1956 | Complaint, ¶ 8 | No |
| 156 | Dugan | Edward | Edward Dugan and Paula Dugan v. Johnson & Johnson et al | 23-1762 | Massachusetts | Middlesex (MA) | Duffy Law LLC | Christopher P. Duffy | Yes | Yes | 1974 | First Amended Complaint ¶ 10 | No |
| 690 | Durkan | Ashling | Ashling Durkan v. Avon Products, Inc., et al. | 64929/2024 | New York | Westchester | Maune Raichle Hartley French & Mudd L | Jessica Bissaundat | Yes | Yes | 197x | Complaint, Initial Fact Sheet, A | No |
| 157 | Dussia | Evan | Evan & Phyllis Dussia v. Whitaker, Clark, and Daniels, Inc. et al | MD1-L-003947-15 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Jacob Jordan | Yes | Yes | 1961 | Complaint, ¶ 2 | No |
| 158 | Dvir | Jessica | Jessica Dvir & Athoshai Dvir v Avon Products Inc et al | 190247/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |

JA786

Case 23-01245-MBK   Doc 299-2   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit B - Proposed Temporary Restraining Order   Page 14 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 159 | Eaves | Frances | Eaves, G. Tykes, Administrator for Frances Eaves, Phf. v. Kolmar Laboratories, Inc., et al. | 1901112/2021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 160 | Ebua | Regina | Joy Ebua, as Personal Representative of the Estate of Regina Ebua v. Avon Products, Inc., et al. | 23-1980 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, PC | Erika A. O'Donnell | Yes | Yes | 1984 | Complaint ¶ 18 | No |
| 161 | Egert | Ilene | Egert, Lewis, as Personal Representative of the Estate of Ilene G. Egert and Lewis Egert, Individually, Pltfs. v. Barretts Minerals, Inc., et al. | 190204/2021 | New York | New York | Weitz & Luxenberg P.C. | Erik Jacobs | Yes | Yes | 1950s | Amended Complaint, ¶ 13 (page 20) | No |
| 162 | Eichler | Joy | Joy Eichler and Helene Eichler v Black Drug Company, inc et al. | MID-L-000394-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Amended Complaint, ¶ 26 | No |
| 163 | El-Abbasi | Patricia | MOHAMMAD EL-ABBASI, On His Own Behalf and on the Behalf of All Other Statutory Beneficiaries of PATRICIA ANNE EL-ABBASI, deceased v. AVON PRODUCTS, INC. et al. | CV2023-013113 | Arizona | Maricopa | Maune Raudcke Hartley French & Mudd, LLC | Meghan K. McGlynn | Yes | Yes | 1968 | Complaint, ¶ 26 | No |
| 164 | Elaqqua | Ann Marie | Ann Marie Elaqqua and Michael Kaminsky v Avon Products, Inc et al. | EF2023-275144 | New York | Rensselaer | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1952 | Second Amended Complaint, ¶ 3 | No |
| 165 | Elmer | Denise | Denise Elmer v Avon Products, Inc et al. | MID-L-000656-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella | Yes | Yes | 1955 | Complaint, Initial Fact Sheet ¶ 5 | No |
| 166 | Elmer | Robert | Elmer, Robert, Pltf. v. Charles B. Chrystal Company, Inc., et al. | EFC-2022-0597 | New York | Oswego | Weitz & Luxenberg P.C. | Thomas M. Comerford | Yes | Yes | 1985 | Second Amended Complaint, 107 | No |
| 167 | Emge | Alfons | Emge, Alfons, in his capacity as Personal Representative of the Estate of ALFONS EMGE v. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al. | 24-2-05155-0 | Washington | Pierce | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1971 | Complaint at 16:1 | No |
| 168 | Enciso | Hortensia | Hortensia Enciso, Ind. and a/n/f of MVE, a minor vs. Naterra International, Inc.: Brenntag Specialties LLC and Brenntag North America, et al | 2022-40593-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Fra | Yes | 1970s | Second Amended Complaint, ¶ 41 | No |
| 694 | Engebos | Gregory | Leo R. Frank, As Personal Representative For The Estate Of Gregory J. Engebos, vs. Ajax Steel Company LLC, D, et al. | 2024-LA-854 | Illinois | Madison | Maune Raudcke Hartley French & Mudd, LLC | Brian Ukman | No | Yes | Late 1960s | Complaint, ¶ 6 | No |
| 169 | Engelhardt | Thomas | Engelhardt, Thomas and Catherine, Pltfs. v. Kolmar Laboratories, Inc., et al. | 190260/2020 | New York | New York | Maune Raudcke Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 170 | Engelman | Alice | Alice Engelman v American International Industries et al | MID-L-007011-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1977 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 171 | England | Carolyn | Carolyn England and David England v Sunstorno Corporation of America, et al. | 190250/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 172 | English | Linda | Linda English and Patricia Rase v. Avon Products, Inc. et al. | 190346/2018 | New York | New York | Simmons Hanly Conroy LLP | Valeri L. Nassif | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 173 | Epstein | Ira | IRA J. EPSTEIN v. ALBERTSONS COMPANIES, INC. Individually and as successor-in-interest to American Stores Company, f/k/a Skaggs Companies, Inc., as successor-in-interest to Jewel Companies, Inc., et al | 2023L010467 | Illinois | Cook | Maune Raudcke Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960s | First Amended Complaint, ¶ 6 | No |
| 174 | Escobar | Rosario | Rosario Escobar vs. Avon Products, et al. | MID-L-002313-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Guthman | Yes | Yes | 1970s | Third Amended Complaint, ¶ 4 | Yes |
| 175 | Esqueda | Guillermo | Esqueda, Guillermo C. and Roberto Esqueda, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-001187-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1967 | Second Amended Complaint, ¶ 4 | No |
| 176 | Eulau | Alan | Eulau, Alan and Barbara Eulau, Pltfs. vs Avon Products Inc., et al. | 19021/2020 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1960s | Second Amended Complaint, ¶ 72 | No |
| 177 | Evans | Dolores | CHRYSTAL EVANS-BOWMAN, individually and as successor-in-interest to DOLORES EVANS, vs. JOHNSON & JOHNSON et al | 23CV043499 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid | Yes | Yes | 1950s | Complaint at 5:11-5:14 | No |
| 178 | Everett | Martha | Everest, Martha, Pltf. v. AMF Bowling Centers, Inc., et al. | MID-L-007151-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1939 | Second Amended Complaint, ¶ 4 | Yes |
| 179 | Feldman | Geoffrey Robert | Pamela Frolio-Feldman, individually and as representative of estate of Geoffrey Robert Feldman v Bayer Consumer Care Holdings et al. | MID-L-000091-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1998 | Complaint, ¶ 4 | No |
| 180 | Feldman-Nagel | Sharon | Sharon Feldman-Nagel & Christopher Nagel v Acme Markets, Inc et al. | 190191/2022 | New York | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis | Yes | Yes | 1960s | Fourth Amended Complaint, ¶ 1239 | No |

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 15 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to (Debtors) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 181 | Feldt | Carolyn | KIMBERLY Y DRONEN, as Special Administrator for the Estate of CAROLYN K. FELDT, deceased v. AMADA AMERICA, INC., et al | 23-LA-1382 | Illinois | Madison | Maune Rachel Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960s | Complaint, ¶ 6 | No |
| 182 | Ferrara | Angela | Ferrara, Angela, PHC v. Avon Products, Inc., et al. | 190219/2020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1950s | Fourth Amended Complaint, ¶ 214 | Yes |
| 713 | Ferris | Julie | Julie Ferris v. Avon Products, Inc., et al. | 190908/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 183 | Fielder | Frazier | Frazier Fielder & Mary Fielder v. Block Drug Company, Inc., et al | MID-L-002315-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1961 | Complaint, ¶ 3 | No |
| 184 | Fields | Michael | LORA M. HOWARD, as Administrator CTA for the Estate of MICHAEL S. FIELDS, deceased v. AMERICAN INTERNATIONAL INDUSTRIES, et al | 2020-L-000447 | Illinois | Madison | Maune Rachel Hartley French & Mudd, LLC | James Merrow & Jon R. Neumann | Yes | Yes | 1980 | First Amended Complaint, ¶ 10 | Yes |
| 185 | Filip | Sharon | Sharon Filip and John Filip v Barretts Minerals et al | LFC A2022001356 | New York | Broome | Weitz & Luxenberg P.C. | Peter Tambini | Yes | Yes | 1960 | Third Amended Complaint, 164 | No |
| 186 | Finch | Frank | Frank Finch & Ruth Finch v Barrett Minerals Inc. | MID-L-005951-22 | New Jersey | Middlesex (NJ) | Maune Rachle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1980 | Third Amended Complaint, ¶ 2 | No |
| 720 | Fisher | Cynthia | Cynthia Fisher and Bruce Fisher her husband vs. American International Industries Individually and As successor-in-interest to Pineud, Inc., Barbara Alice, Inc., Ed Pineud, Inc. d/b/a Ed Pineud, and Needed-A-Mar Company, All for The Clubman Line of Products | 24-0005907 ca27 | Florida | Broward | Dino Omar Brudham Shirley, LLP | Shawna Forbes-King | No | Yes | 1960s | Complaint, ¶ 18 | No |
| 187 | Fitch | John | Deborah J Fitch individually and as personal representative of the Estate of John Fitch v Block Drug Co, Inc et al | MID-L-005992-23 | New Jersey | Middlesex (NJ) | Maune Rachel Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1963 | Complaint, ¶ 4 | No |
| 188 | Fitzpatrick | Patricia | Richard Fitzpatrick III individually and as executor of the estate of Patricia Fitzpatrick v Chanel, Inc et al | 911855-23 | New York | Albany | Lipsitz Green Scime Cambria LLP | Brendan J. Tully | Yes | Yes | 1950s | Complaint, Plaintiff's Statement, ¶ 8 | No |
| 189 | Flanagan | Richard | Marilyna Keahn for the Estate of Richard Flanagan vs Barretts Minerals, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-00174-ASH | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1961 | First Amended Complaint, ¶ 23 | No |
| 190 | Flater | Rose | Rose Flater and Bobbie Joe Flater vs. Albi Enterprises, et al | MID-L-003559-16 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 191 | Flemmin | Joanne | Joanne Flemmin and John Flemmin v. Adamu, Inc. f/k/a Pennrock Corp., et al | 21-022203 CA27 | Florida | Broward | Flint Cooper, LLC | Rebecca Vinocur | Yes | Yes | 1974 | Seventh Amended Complaint, ¶ 34 | Yes |
| 192 | Fogel | Leslie | Leslie Fogel and Catherine Fogel, PHA v. American International Industries for Clubman, et al Whitaker, Clark, and Daniels, Inc. et al | 190093/2016 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1956 | Amended Complaint, ¶ 14 | Yes |
| 723 | Forsland | Carla | Carla Forsland and Blake Forsland v. Beacon Crup | MID-L-00002879-24 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah C. Kagan | Yes | Yes | 1956 | Complaint, ¶ 2 | No |
| 193 | Friedman | Ilana | Ilana Friedman and Arthur Fridman v. ABC Supply Co, Inc, et al | 190283/2015 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Yes | 1961 | Initial Fact Sheet, 6 | No |
| 195 | Frissora | Annette | Frissora, Annette, PHC v. Avon Products, Inc., et al | MID-L-004867-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 196 | Frith | Marjorie | TRACEI SHORE, as representative of the estate of MARJORIE FRITH, and as surviving daughter and on behalf of decedent's other surviving statutory beneficiaries, and SHERI GRAY and CHRISTINA FRITH, v. BRENNTAG SPECIALTIES, INC., et al | CV2020/094998 | Arizona | Maricopa | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1956 | Complaint, ¶ 2 | Yes |
| 197 | Fruzkey | Vikki | Vikki Fruzkey v 3M Company et al. | 190007/2024 | New York | New York | Levy Konigsberg LLP | Denise S. Persampieri | Yes | Yes | 1973 | Complaint, Initial Fact Sheet, ¶ 6 | No |
| 198 | Fullmore | Catherine | Testator O'Neal, Denise, for the Estate of Catherine Fullmore, Phc vs Avon Products Inc., et al. | 190157/2020 | New York | New York | Weitz & Luxenberg P.C. | Jeffrey S. Kanca | Yes | Yes | 1975 | Amended Complaint, ¶ 75 | Yes |
| 199 | Galan | Melvin | Galan, Melvin & Louise, Phfc v. Kolmer Laboratories, et al. | 190287/2020 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 691 | Gallabdar | Roya | Roya Owlad Gallabdar and Abdul Hassan Owlad Gallabdar vs. Avon Products | 2024CP404185 | South Carolina | Richland | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | 1980s | Plaintiff's Complaint, ¶ 4 | No |
| 200 | Gallo | John | Diana Farris, ind and as fiduciary of the Estate of John Gallo v Avon Products, Inc., et al | 190027/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 201 | Garces | Laura | LAURA GARCES vs. AVON PRODUCTS, INC. et al. | 23CV032898 | California | Alameda | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1965 | Complaint, Exhibit A | No |

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 16 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 203 | Gardener | John | John Gardener and Vivienne Gardener v. Brenntag North America, Inc., sued individually and as successor-in-interest to Mineral Pigment Solutions, Inc. and as successor-in-interest to Whitaker Clark & Daniels, Inc., et al | 22-012299 CA27 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1960 | First Amended Complaint ¶ 8 | Yes |
| 204 | Garnes | Rosa | Garnes, Rosa & David Rodney Garnes, Phh. v. 3M Company, et al. | EF2022-00000051 | New York | Jefferson (NY) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | Late 1960s | Complaint ¶, 5. | Yes |
| 206 | Garton | Barbara | Watkins, Dena, as Administrator and Administrator Ad Prosequendum of the Estate of Barbara Garton, PH. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002423-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1970s | Second Amended Complaint, ¶ 5 | No |
| 208 | Gattone | Peggy | Peggy B. Gattone and Peter Gattone, etc., v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003039-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Third Amended Complaint, ¶ 2 | Yes |
| 209 | Gee | Margaret | Margaret Gee v Avon Products, Inc et al | 190076/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 210 | Geittmann | Peter | PETER R. GEITTMANN, M.D. and MARGARET M. GEITTMANN v. ARKEMA, INC., f/k/a Pennwalt Corporation, et al | 244-1848 | Illinois | Cook | Maune Rachel Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1970s | First Amended Complaint, ¶ 7 | No |
| 211 | Gentle | Samantha Leigh | Riggs, Candace, for the Estate of Samantha Leigh Gentle, Phf. v. Avon Products, Inc. et al | MID-L-007729-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1965 | Complaint ¶ 5 | Yes |
| 212 | Gerken | Anna | Andrew T. Gerken, individually and as Personal Representative of the Estate of Anna Marie L. Gerken, deceased, v. Avon Products, Inc., et al. | 2023-CP-40-00611 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Mark Bisha | Yes | Yes | 1944 | First Amended Complaint ¶ 2 | No |
| 213 | Gesualdi | Shannon | Gary Marcotte, Individually and as Administrator for the Estate; Shannon Gesualdi v. Barretts Minerals, Inc., et al. | PC-2023-01861 | Rhode Island | Bristol | Motley Rice LLC | Vincent L. Greene | No | Yes | 1990s | First Amended Complaint ¶ 1 | Yes |
| 214 | Geter | Rebecca | Geter, Rebecca, Phf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003870-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Second Amended Complaint, ¶ 4 | Yes |
| 215 | Geyer | Ellen | Ellen Geyer v. Brenntag North America, Inc. & Brenntag Specialties, Inc. et al | MID-L-003463-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Kimberly Russell | Yes | Yes | 1955 | Second Amended Complaint, ¶ 5 | Yes |
| 216 | Gibbs | Elaine | Elaine Gibbs and John Gibbs v Avon Products, Inc. et al. | 190221/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 217 | Gibbs | Danny | Michelle Gibbs, individually and as administratrix of estate of Danny Gibbs v Arkema, Inc et al. | 23-1-02901 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Nedin Wilson | Yes | Yes | 1996 | Complaint, Schedule 1 | No |
| 218 | Gilbride | Ellyn | Gilbride, Ellyn, Phf. v. Johnson & Johnson, et al. | MID-L-002848-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1940s | Second Amended Complaint, ¶ 2 | Yes |
| 219 | Girter | Glenda | Glanda R. Girter and Dale Girter vs. Anco Insulations, Inc., et al. | C-745104 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC / Dean Omar Branham Shirley, LLP | Mickey P. Landry / Frank J. Swarr / Matthew C. Clark / Jordan Bollinger | Yes | Yes | 1940s | First Supplemental and Amended Petition, ¶ 10 | No |
| 220 | Goffreda | Karen | Goffreda, Karen, Phf. v. Avon Products, Inc., et al. | MID-L-000274-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1954 | First Amended Complaint, ¶ 5 | Yes |
| 221 | Goldstein | Lin | Goldstein, Lin, Phf. v. Chanel, Inc., et al | 190108/2022 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 222 | Gomez | Maria | Maria Gomez v. Arkema, Inc. f/k/a Pennwalt Corp., et al | CACE-21-002366 | Florida | Broward | Simon Greenstone Panatier, PC | Frank Walton | Yes | Yes | 1977 | Complaint ¶ 15 | Yes |
| 223 | Gomez | Dolores | Gomez Dolores, Phf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 1901182020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1961 | Complaint ¶ 91 | Yes |
| 224 | Gonzales | Susan | ALEXANDER GONZALES, Individually, and ALEXANDER GONZALES as Personal Representative of the Estate of SUSAN GONZALES, Deceased, v. AUTOZONE, INC, et al. | 2021CV32313 | Colorado | Denver | Simon Greenstone Panatier, PC | Robert A. Green; Deirdre E. Ostrowski, Esq | Yes | Yes | 1951 | Complaint ¶ 48 | Yes |
| 225 | Gonzalez | Linda | Linda Gonzalez v. Whitaker, Clark, and Daniels, Inc., et al. | 190074/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 226 | Goode-Evans | Dorothy | Dorothy Goode-Evans and Herbert Evans v. Avon Products, Inc., et al | 23-2731 | Massachusetts | Middlesex (MA) | Thornton Law Firm LLP | Andrea Landry | Yes | Yes | 1950s | First Amended Complaint ¶ 12 | Yes |
| 228 | Graham | Elise Louise | GLEN CHATELL as Personal Representative of the ESTATE OF ELSIE LOUISE GRAHAM v. BRENNTAG NORTH AMERICA, INC, et al. | 21CV34505 (3:23-cv-01399-HZ) | Oregon | Multnomah | Dean Omar Branham Shirley, LLP | Jessica Dean / Jordan Hinsenfeld-James | Yes | Yes | Early 1950s | Complaint ¶ 13 | No |

Case 3:24-cv-10914-ZNQ    Document 18-1    Filed 03/21/25    Page 797 of 1429 PageID: 1155

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 17 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Breunig Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 230 | Grandchelli | Georgia | Georgia Grandchelli and Gordon Grandchelli v. Axial Health & Beauty, Inc., et al. | MD1-L-002784-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella | No | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 232 | Gray | Kim | Gray, Kim, PHf, vs. Johnson & Johnson, et al. | MD1-L-005932-19 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1967 | Sixth Amended Complaint, ¶ 2 | Yes |
| 233 | Greenage | William | William Greenage v Avon Products, Inc et al. | 190953/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 234 | Gref | Brian | Gref, Brian, Ph. vs American International Industries, et al. | 190178/2020 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1982 | Second Amended Complaint, ¶ 1. | Yes |
| 235 | Griffith | Richard | Richard Griffith & Dee Griffith v Barretts Minerals | MD1-L-000154-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Gishman | Yes | Yes | 1982 | Fourth Amended Complaint, ¶ 4 | No |
| 236 | Grigoli | Salvatore | Salvatore Grigoli and Vincenza Grigoli v 3M Compan et al | 190200/2023 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | Mid-1950s | Complaint, Initial Fact Sheet, ¶ 6. | No |
| 237 | Grimes - Love | Toni | Grimes-Love, Toni R., PHf, v. Aberric Cosmetics, Inc., et al. | MD1-L-001991-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F. Alexander Eiden | Yes | Yes | 1950s | Second Amended Complaint, ¶ 4 | No |
| 238 | Guffey | William | William P Guffey and Brenda L Guffey v Amerhart, Inc., et al. | MD1-L-006146-23 | New Jersey | Middlesex (NJ) | Maune Raackle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1953 | First Amended Complaint, ¶ 4 | No |
| 239 | Guild | Gregory | Gregory Guild and Nancy Guild, PHb, vs. Brenntag North America, et al. | MD1-L-03527-17 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1960 | Fourth Amended Complaint, ¶ 4 | No |
| 240 | Gumpert | Esther | Gumpert, Esther and Gary Gumpert, PHb, v. Avon Products, Inc., et al. | 190056/2022 | New York | New York | Weitz & Luxenberg P.C. | Amber Jae Brandis | Yes | Yes | 1950s | Fourth Amended Complaint, ¶ 176. | No |
| 241 | Guith Cook | Denise J | Denise J. Guith Cook v. Advance Stores Company, Incorporated, et al. | CACE-24-003818 | Florida | Broward | Maune Raackle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1960s | Complaint ¶5 | No |
| 242 | Haas | Beverly | Haas, Charles, Administrator for the Estate of Beverly Haas, Lauri Welch and Stephen Haas, PHb, v. Abray, Inc., et al. | MD1-L-03339-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1946 | Complaint, ¶ 6 | Yes |
| 243 | Habib | Nagwa | Habib, Nagwa N., Phf, v. Barretts Minerals Inc., et al | 2021-2381 | New York | Schenectady | Weitz & Luxenberg P.C. | Thomas M. Comerford | Yes | Yes | 1982 | Second Amended Complaint, 78 | No |
| 244 | Haghani | Mahtab | Mahtab Haghani & Martin Haghani v Avon Products Inc et al | 190263/2022 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 245 | Hagwood | Steven | Hagwood, Steven R., PHf, v. Avon Products, Inc., et al. | MD1-L-001267-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1973 | Third Amended Complaint, ¶ 2. | Yes |
| 247 | Hammond | Jane | Jane Hammond and Colin HAmmond v Avon Products, Inc et al. | 190162/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 727 | Haney | Verda | Verda Haney v. Advance Stores Co., Inc., et al | 49D13-2404-CT-019200 | Indiana | Marion | Dean Omar Branham Shirley, LLP | Sarah Broderick | Yes | Yes | 1955 | Complaint ¶6 | No |
| 249 | Harper | Charlene | Mendith Harper, as Trustee for the next of kin of Charlene Harper, Deceased, v. Target Brands, Inc. et al | 62-CV-23-2656 | Minnesota | Ramsey | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1950s | First Amended Complaint, ¶ 3 | No |
| 250 | Harrell | Helen | Helen Harrell & David Odell v IRNA, et al. | MD1-L-002525-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg LLP | Michelle C. Martha | Yes | Yes | 1971 | Second Amended Complaint, ¶ 5 | No |
| 251 | Harrington | Virginia | Harrington, Virginia, PHf, v. Johnson & Johnson, et al. | MD1-L-006673-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1985 | Second Amended Complaint, ¶ 2. | Yes |
| 252 | Harris | Kimberly | Harris, Kimberly C. and Michael Harris, PHb, v. Avon Products, Inc., et al. | MD1-L-004711-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1970s | Second Amended Complaint, ¶ 3. | No |
| 714 | Hart | Theresa | Theresa L. Hart & Thomas Hart v. Avon Products, Inc.,et al | MD1-L-003399-24 | New Jersey | Middlesex (NJ) | Maune Raackle Hartley French & Mudd, LLC | Suzanne Ratcliffe | Yes | Yes | 1970s | Amended Complaint, ¶ 2 | No |
| 253 | Hartman | Robert | Hartman, Robert and Karen Hartman, PHb, v. Akiyama International, et al. | MD1-L-000953-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1980 | Fifth Amended Complaint, ¶ 1 | No |
| 254 | Hatcher | Kimberly | KIMBERLY HATCHER v. ALBERTSON'S LLC et al. | 22CV021209 | California | Alameda | Simmons Hanly Conroy LLP | Christine A. Renken | Yes | Yes | 1962 | Complaint, ¶ 2 | Yes |
| 255 | Hathaway | Todd | Todd Hathaway & Fayda Hathaway v Avon | 808575/2023 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1975 | Complaint, Plaintiff's Statement, No. 8 | No |
| 256 | Haus | Elizabeth | Elizabeth Haus and Emery Haus vs Avon Products, Inc., et al. | MD1-L-000895-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1971 | Complaint, ¶ 2 | Yes |
| 257 | Hawkins | Terrance | Terrance Hawkins and Ona Hawkins & Adams, Inc., et al. | 190028/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 665 | Heard | Marlane | Marlane Heard v. Charles B. Chrystal Company, Inc., et al. | 190123/2024 | New York | New York | Simmons Hanly Conroy LLP | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 258 | Helms | Patrick | Mary Helms individually and as Administrator of the estate of Patrick Helms v Brenntag Specialties, Inc et al. | MD1-L-006342-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1999 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 259 | Helmuth | Leland | Leland J. Helmuth v. 3M Company, et al. | 49D13-2402-CT-003670 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1950s | Complaint, ¶ 5 | No |

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 18 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor in Default(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 260 | Hembd | Nancy | Pfister, Peggy/Estate of Nancy Ann Hembd, Pltf. v. Avon Products, Inc., et al. | 49D13-2108-MI-029217 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N/A | Yes |
| 261 | Henderson | Jeannine | Jeannine Henderson vs. Taylor-Seidenbach, Inc., et al. | 2022-10279 | Orleans Parish CDC | Louisiana | Philip C. Hoffman, LLC; Dan Omar Branham Shirley, LLP | Philip C. Hoffman; Jessica Dean; Samuel I. Iola | Yes | Yes | 1950's | Complaint, ¶ 7 | Yes |
| 262 | Herman | Elaine & Jacob | Elaine Adella Hickey Herman and Jacob Russell Herman, Sr. v. American Honda Motor Co. Inc., et al | FBT-CV-23-6124687-S | Fairfield at Bridgeport | Connecticut | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1950s | First Amended Complaint, ¶ 81 | No |
| 263 | Heston | Raymond | Heston, Raymond and Sandra, Pltfs. v. Avon Products, Inc., et al. | MID-L-007187-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Erin M. Boyle | Yes | Yes | 1950s | Complaint, ¶ 2 | No |
| 264 | Hicks | Teresa | Frank Hicks & Est of Teresa Hicks v Avon Products et al | 190014/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | Complaint, ¶ 2 | No |
| 265 | Hidvegi | Nuha | Nuha Hidvegi v. Publix Super Markets, Inc., et al | 24-000642-CA-01 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1950s | Complaint, ¶ 39 | No |
| 266 | Higginbotham | Robert | Robert and Linda Higginbotham vs. 3M Company, B Brenntag Specialties LLC, et al | 2019-39841-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1946 | Amended Complaint, ¶ 15 | Yes |
| 707 | Higgins | Wendi | Wendi Higgins vs. The Bargain Barn, Inc. et al | 2024-CP-4043642 | Richland | South Carolina | Maune Raichle Hartley French & Mudd, LLC | Joshua Cagle | Yes | Yes | 1960s | Plaintiff's Complaint ¶ 6 | No |
| 267 | Hildebrandt | Martin | SARAH HILDEBRANDT, as representative of the estate of MARTIN HILDEBRANDT, and as surviving Spouse and on behalf of decedent's other surviving statutory beneficiaries, and KARA HILDEBRANDT JORDON, v. 3M COMPANY a/k/a MINNESOTA MINING & MANUFACTURING COMPANY, et al. | CV2020-093091 | Maricopa | Arizona | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1954 | Complaint, ¶ 10 | Yes |
| 736 | Hill | Duane | Duane Hill v. Sumitomo Corporation of Americas, et al. | 190094/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N/A | No |
| 269 | Hinkle | Sandra | Sandra L. Hinkle v. Arkema, Inc.et al | 23-04-01956 | Philadelphia | Pennsylvania | Maune Raichle Hartley French & Mudd, LLC | Brian M. Ulmen | Yes | Yes | 1950s | Amended Complaint, ¶ 4c | No |
| 270 | Hodge | Pauline | Gary Hodge, individually and as representative of the Estate of Pauline Hodge v. Avon Products, Inc. et al | LACL151100 | Polk | Iowa | Simon Greenstone Panatier, PC | Frank J. Wathen; James H. Cook | Yes | Yes | 1954 | Second Amended Petition, ¶ 7. | Yes |
| 271 | Hoeppner | Gerald | GERALD R. HOEPPNER and THERESA HOEPPNER v. A.O. SMITH CORPORATION, et al | 23-LA-1697 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Michael V. Oltmann | Yes | Yes | 197s | Complaint, ¶ 6 | No |
| 273 | Hoffman | Vanessa | Hoffman, Vanessa, Pltf. v. Barrett Minerals, Inc., et al | MID-L-003244-21 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Erin M. Boyle | Yes | Yes | 1967 | Second Amended Complaint, ¶ 2 | No |
| 274 | Hofmeister | Sharon | SHARON HOFMEISTER v. JOHNSON & JOHNSON et al. | 23CV033743 | Alameda | California | Kazan McClain Satterley & Greenwood | Michael T. Stewart | Yes | Yes | Early 1960s | Second Amended Complaint, ¶ 18-22 | No |
| 275 | Hogue | Tamie | Tami Hogue, Ind. And as Personal Rep. of Tamie Hogue, Deceased, Jennifer Clyburn vs. Avon Products, Inc., Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 2021-53353-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1954 | Second Amended Complaint, ¶ 31 | No |
| 276 | Holsing | Winette | Winnette A. Holsing v. Avon Products, Inc., et al. | MID-L-002558-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1981 | Amended Complaint, ¶ 2 | No |
| 277 | Holtmann | Karlene | Holtmann, Karlene, Pltf., vs. Avon Products, Inc., et al. | 190077/2018 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N/A | Yes |
| 278 | Holley | Luther Roy | Holley, Gladys Elaine, Individually and as Executrix of the estate of Luther Roy Holley, Deceased, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002858-19 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | Mid-1960s | Complaint, ¶ 2 | Yes |
| 279 | Hollifield | Pattie | Brenda Bost individually and as executor of the estate of Pattie Hollifield v Conopco, Inc et al | 190295/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N/A | No |
| 280 | Holloway | James | JAMES L. HOLLOWAY and GAIL M. HOLLOWAY v. ABB, INC., Individually and as successor-in-interest to I-T-E Imperial Company, f/k/a I-T-E Circuit Breaker Company, et al | 2024LA000200 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Thomas Gibbons | Yes | Yes | 1963 | Complaint, ¶ 6 | No |
| 281 | Holmes | Agnes | Agnes A. Holmes v. Avon Products, Inc. | MID-L-005412-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | No | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 282 | Holtermann | Patrice | Holtermann, Alisa, Administrix for the Estate of Patrice Holtermann, Pltf. v. American International Industries, et al. | 190058/2021 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1983 | Amended Complaint, ¶ 66 | Yes |

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Breining Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 283 | Holtschneider | Betty | Holtschneider, Betty and Stanley Holtschneider, Pltfs. vs. Breuning North America, Inc. and Breuning Specialties, Inc. et al. | MID-L-003009-16 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 285 | Horsch-Nusbaum | Ruth | Horsch-Nusbaum, Ruth, Pltf. vs Avon Products Inc., Breuning North America, Inc., et al. | MID-L-006015-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 286 | Howard | Elizabeth | Christopher L. Lewis, individually and as Personal Representative of the Estate of Elizabeth A. Howard, Deceased v. Asbestos Corporation Limited, et al. | 2024-CP-40-00458 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Aaron Chapman | Yes | Yes | 1963 | Complaint, ¶ 14 | No |
| 675 | Hucknall | Victoria | Victoria Hucknall and Simen Hucknall vs. L'Oreal Travel Retail Americas Inc d/b/a Lancome, L'Oreal, L'Oreal Paris | 2024:04:04277-CA,01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | Late 1970s | Complaint, ¶24 | No |
| 288 | Huff | Linda | John D. Huff, Individually and as Administrator and Administrator ad Prosequendum of the Estate of Linda Key Huff, Deceased v. Arkema, Inc., et al. | MID-L-002818-17 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1956 | Fifth Amended Complaint, ¶ 4 | Yes |
| 289 | Hug | Monique | Hug, Monique G. and Jean Philipp Hug, Pltfs. vs. Breuning North America, Inc. and Breuning Specialties, Inc. et al. | MID-L-004862-15 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 291 | Hunter | Jaqueline | Jacqueline Hunter v Breuning North America et al. | MID-L-007131-23 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1960 | Complaint, Initial Fact Sheet, ¶ 15 | No |
| 292 | Hutchings | Catherine | Catherine Hutchings v Avon Products, Inc et al. | 190115/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 666 | Huxley | Aleksandra | Aleksandra Huxley and Howard Huxley v. Conopco, Inc., et al. | 190116/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 293 | Iacovangelo | Jean | Jean Iacovangelo and Frank Iacovangelo v Arkema, Inc et al | E2023005779 | New York | Monroe | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1941 | Complaint, 3. | No |
| 294 | Izzi | Deborah Kaye | Nicole Godeau, Individually and APR the estate of Deborah Kaye Izzi v HNA et al | MID-L-004147-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg PC | James Andrew Pfister | Yes | Yes | 1976 | Third Amended Complaint, ¶ 4 | No |
| 295 | Infante | Irma | Irma M Infante v Barretts Minerals et al. | 190137/2022 | New York | New York | Lanier Law Firm PLLC | Darron Berquist | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 676 | Islin | David | David Islin vs. L'Oreal Travel Retail Americas, Inc. sued individually and as successor-in-interest to Helena Rubinstein, Inc. and d/b/a Helena Rubinstein | 2024:04:04273-CA,01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | 1950s | Complaint, ¶26 | No |
| 296 | Jack | Mary | Mary L. Jack and David L. Doyen v. Breuning Specialties, Inc. et al. | 190035/2024 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 297 | Jackson | Johnnie | Jackson, Johnnie & Mattie, Pltfs. v. Barretts Minerals Inc., et al. | MID-L-006778-20 | New York | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 5 | Yes |
| 298 | Jacoby | Lisa | Jacoby, Lisa and William Jacoby, Pltfs. v. Barretts Minerals Inc., et al. | 190174/2021 | New Jersey | New York | Weitz & Luxenberg P.C. | Patti Lynn Hatchikjan | Yes | Yes | 1971 | Third Amended Complaint, ¶ 161 | Yes |
| 299 | Jacomia | Lamona | Joseph Anthony Jacomia, Individually and as executor and executor ad Prosequendum of the Estate of Lamona Jacomia, Pltfs. vs 3M Company, etc. et al. | MID-L-002995-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1953 | Second Amended Complaint, ¶ 5 | Yes |
| 300 | James | Suzanne | James, Suzanne, Pltf. vs. Breuning North America, Inc. and Breuning Specialties, Inc., et al. | MID-L-002078-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950 | Second Amended Complaint, ¶ 5 | No |
| 301 | Jarvis | Patricia | Patricia Jarvis v. L'Oreal Travel Retail Americas, Inc. d/b/a Lancome, et al. | 23-015081 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1960s | Complaint, ¶31 | No |
| 302 | Jams | Kathy | Kathy Jams and James Jams vs. Johnson & Johnson, et al. | MID-L-002260-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Jacob Jordan | Yes | Yes | 1962 | Fifth Amended Complaint, ¶ 4 | Yes |
| 303 | Jauregui | Maria | Maria Jauregui v. Avon Products, Inc et al. | 190189/2022 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 304 | Jimenez | Luis | Luis Jimenez and Maria Jimenez v. Johnson & Johnson, et al | 23-L-011613 | Illinois | Cook | Beasley Allen Law Firm | Ganatra Trial Lawyers, LLC - Joshua A. Edelson / Edelson/Vogelzang - Christian Lucano | No | Yes | 1997 | Complaint, ¶11 | No |
| 305 | Johnson | Gregory S. | Gregory S. Johnson and Barbara J. Johnson v. American International Industries, et al. | 2025CP40006819 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Rachel Gross | Yes | Yes | 1960s | Complaint, ¶48 | No |
| 306 | Johnson | Neil | Neil Johnson and Carol Johnson v General Electric Company et al. | 190266/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |

12

JA792

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 20 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to (Debtors) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 751 | Johnson | Elaine | ELAINE JOHNSON v. 3M COMPANY, et al. | 241.3829 | Cook | Illinois | Vogeltang Law | Michelle T. Pawlowski | Yes | Yes | 1931 | Complaint, Exhibit H | No |
| 307 | Johnson-Brett | Linda | Johnson-Brett, Linda and Bradford Brett, Pltfs. v. A.O. Smith Corporation, et al. | E202200698 | Monroe | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N/A | Yes |
| 308 | Jones | Walter | Walter and Billie Jones vs. 3M Company, Brenntag Specialties LLC, et al. | 21-05316-E | Harris | Texas | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1967 | Complaint, ¶ 55 | No |
| 701 | Jones | Janet | Janet Jones v. Avon Products, Inc., et al. | MD-L-003693-24 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1954 | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 309 | Jordan | Judith | Judith Jordan, Pltf. v. Brenntag Specialties, Inc., et al. | 190072/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Unclear based on face of complaint | Unclear based on face of complaint | N/A | No |
| 669 | Jovanovich | Sam | Sam Jovanovich, Jr. v. BASF Catalysts LLC, et al. | 2024LA000509 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Michael V. Oltmann | Yes | Yes | 1960s | Complaint - Count 1, ¶ 6 | No |
| 674 | Jurist | Gail | Gail Jurist and David Jurist v. Colgate-Palmolive Co., et al. | 190202/2024 | New York | New York | Weitz & Luxenberg P.C. | Sam Kerley | Yes | Yes | 1940s | First Amended Complaint, ¶ 51 | No |
| 310 | Kaatz | Kraig | KRAIG KAATZ and ARLENE KAATZ, his wife v. 84 LUMBER COMPANY, et al. | 2023L008335 | Cook | Illinois | Simmons Hanly Conroy LLP | Taylor L. Kerns | Yes | Yes | 1972 | Complaint ¶ 2 | No |
| 689 | Kaestrig | Steven | Linda Kaestrig, Individually and as Executrix and Proponent of the Estate of Steven Kaestrig v. Brenntag Specialties, LLC, et al. | MD-L-003928-24 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber Long | Yes | Yes | 1967 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 311 | Kantor | William | Debra A. Kantor and William L. Kantor v. A.O. Smith Corporation, et al. | 2024L002627 | Cook | Illinois | Vogeltang | Michelle Pawlowski | Yes | Yes | 1953 | Complaint, page 13 | No |
| 312 | Kelso | Constance | Constance Kelso v. Arkema, Inc., et al. | CV21949769 | Cuyahoga | Ohio | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | Early 1970s | Complaint, page 34 | No |
| 313 | Kelz | Robin | Robin Kelz v Bobbi Brown Cosmetics et al. | MD-L-006353-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960 | Third Amended Complaint, ¶ 2 | No |
| 314 | Kendrick | Wendy | Wendy Kendrick and Charlella Kendrick v. Avon Products, Inc., et al. | CACE-21-014417 | Broward | Florida | Flint Cooper, LLC | Rebecca Vinecar | Yes | Yes | 1982 | First Amended Complaint, ¶ 26 | Yes |
| 315 | Kerley | Beverly | Kerley, Beverly & John Kerley, Pltfs. v. Brenntag Specialties, Inc., et al. | MD-L-000661/2-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 5 | No |
| 316 | Kernahan | Louise | Louise Kernahan and Martin Kernahan v Sumitomo Corp of America et al. | 190283/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | N/A | No |
| 317 | Kershner | Barbara | Christa Ruth Machado individually and representative of estate of Barbara Kershner v Avon Products, Inc et al. | MD-L-007200-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Matthew Adam Grubman | Yes | Yes | 1961 | Complaint, ¶ 4 | No |
| 319 | Kieboom | Carol | Carol Kieboom and Herman Kieboom v Avon Products Co et al. | 190157/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | N/A | No |
| 320 | Kier | Edward | Johnny Mire, Ind. and as Personal Rep. of the Estate of Edward Kier, Deceased vs. Brookfather Grocery Co., Brenntag Specialties LLC and Brenntag North America, et al. | 2022-55642-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1976 | Complaint, ¶ 32 | No |
| 321 | King | Elizabeth | Stanley E. King, as Personal Representative of the Estate of Elizabeth H. King, Deceased v. Avon Products, Inc., et al. | 23-017495 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Bosserman | Yes | Yes | 1967 | Complaint ¶ 5 | No |
| 725 | King | Martha | Martha Micawber King and Justin W. King v. Allstate, Inc., et al. | CACE-24-005989 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Bosserman | No | Yes | 1970s | Complaint - See Exposure Sheet | No |
| 323 | Keisler | Leonard | Leonard Keisler vs. Breaux Mart Supermarkets, Inc. | 2021-07239 | Orleans Parish CDC | Louisiana | Landry & Swarr, LLC | Mickey P. Landry, Frank J. Swarr, Matthew C. Clark, Holly C. Peterson | Yes | Yes | 1953 | Petition, ¶ 4 | No |
| 324 | Kirchberg | Frederick | Carol Kirchberg individually and as Administrator of estate Frederick Kirchberg v Avcatric, Inc., et al. | MD-L-005204-23 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1980 | Complaint, ¶ 4 | No |
| 325 | Kirkwood | Bernice | Chatman, Latoya, Estate of Bernie Annette Kirkwood, Pltf. v. Avon Products, Inc., et al. | MD-L-008746-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1958 | Complaint, ¶ 7 | Yes |
| 326 | Kittel | Linnie | Mary Ann Kittrell, Individually and as Personal Representative of the Estate of Linnie P. Kittrell v. Bell & Gossett Company, et al. | 19-035889 | Miami-Dade | Florida | The Ferraro Law Firm P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1963 | Complaint ¶ 14 | No |
| 327 | Klar | Ilona | Ilona Klar and Peter Klar v. American International Industries, Inc., et al. | MD-L-000176-24 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1968 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 328 | Klayman | Hope | Hope Klayman and Mark Steven Klayman v. American International Industries Inc, et al. | MD-L-004994-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Fifth Amended Complaint, ¶ 4 | Yes |
| 329 | Kleinman | Kenneth | Kenneth Kleinman and Marian Reppolo vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al. | 2022-08588-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1988 | Second Amended Complaint, ¶ 27 | Yes |

13

JA793

Case 23-01245-MBK     Doc 299-2     Filed 09/12/24     Entered 09/12/24 00:24:45     Desc
Exhibit B - Proposed Temporary Restraining Order     Page 21 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 330 | Klinker | Leah | Leah C. Klinker v. Avon Products, Inc., et al | 33-021414 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1999 | Complaint, ¶ 73 | No |
| 708 | Klitus | Nancy | Nancy Klitus v. Block Drug Co., Inc., et al. | MDL-1-003530-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | John W. Stevenson | No | Yes | 1944 | Complaint, ¶ 2 | No |
| 331 | Knight | Julie | Julie Knight vs Avon Products, Inc., et al | 190173/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 332 | Knollmayer | Joel | Cheryl Knollmayer, Individually and as Proposed Administrator of the Estate of Joel Knollmayer, Deceased v. A II., et al. | MID-L-000981-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1960s | Amended Complaint, ¶ 4 | No |
| 333 | Knox | Margaret | Kimberly Milligan, as Independent Administrator of the Estate of Margaret Knox, Deceased v. Cosmetic Specialties, Inc., et al. | MID-L-000706-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1972 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 678 | Kobel | Audrey | JENNIFER BARRINGER, individually and as successor-in-interest to AUDREY KOBEL; and JODY CULVER v. BRENNTAG SPECIALTIES, LLC, sued individually, and as successor-in-interest, parent, alter ego, and equitable trustee to BRENNTAG SPECIALTIES, INC. (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC., and as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC., et al | 24CV084604 | California | Alameda | Kazan McClain Satterley & Greenwood | Akinyemi Ajayi | Yes | Yes | Early 1960s | Complaint at 4:17-20 | No |
| 334 | Koeberl | Renee | Renee Koeberl and Donovan Koeberl v Avon Products, Inc., et al. | MID-L-002945-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1965 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 335 | Kopel | Robert | Cynthia L. Kelley, Personal Representative of the Estate of Robert S. Kopel, Deceased v. Bayer Healthcare, LLC, et al. | CACE-23-019145 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney Dillona | Yes | Yes | 1943 | First Amended Complaint, ¶ 3 | No |
| 336 | Kopp | John | Kopp, John R. and Christine Kopp, Phlis. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 609596/2020 | New York | Suffolk | Weitz & Luxenberg P.C. | Andrew Guyono | Yes | Yes | 1955 | Third Amended Complaint, ¶ 82. | Yes |
| 337 | Kral | Janet | JANET KRAL and LINUS R. KRAL v. AVON PRODUCTS, INC., et al. | 2023-LA-001419 | Illinois | Madison | Maune Rachel Hartley French & Mudd, LLC | Tenah Bielke | Yes | Yes | 1950s | Complaint, ¶ 6 | No |
| 339 | Kukavanga | Edward | Shirley Kukavanga, Individually and as Personal Representative of the Estate of Edward Kukavanga v. Barnett Process Equipment Co., et al. | E2021009637 | New York | Monroe | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Yes | 1960 | Initial Fact Sheet, ¶¶ 16 - 17. | Yes |
| 340 | Kureh | Gail | Gail Kureh and Zev Primer v Arkema, Inc et al. | 190280/2022 | New York | New York (NY) | Weitz & Luxenberg P.C. | Sam Kerley | Yes | Yes | 1950s | Amended Complaint, 47. | No |
| 341 | Lairson | Larry | Larry Lairson and Stephanie Lairson v. Advance Auto Parts, Inc., et al. | MDL-L-006673-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1968 | Second Amended Complaint, ¶ 5 | No |
| 342 | Lambert | Charles R. | Whitney Lambert, and as successor in interest to Charles R. Lambert, deceased; Nell Ann Burchartt; Brenda Corbello; Sheila Laborge; Greg Lambert; Vicki Lambert; Angel Tsekoupa v. Albertson Companies, Inc. et al. | 23STCV27302 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1940s | Complaint, Exhibit A | No |
| 343 | Lane | Thurman D. | Thurman D. Lane and Deborah L. Lane v. Block Drug Company, Inc., et al. | MDL-L-005938-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1943 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 344 | Lanehart | Tanya | Tanya Lanehart vs. H.E.B. LP, Brenntag Specialties LLC and Brenntag North America, et al | 2022C31485 | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1962 | First Amended Complaint, ¶ 22 | No |
| 722 | Langston | Randall | David Hardaway, as executor of the estate of Randall Langston v. H-E-B, L.P. Also d/b/a H.E. Butt Grocery Company, for its Hill Country Essentials Line of Products, et al. | 2024CI00664 | Texas | Bexar | Simon Greenstone Panatier, PC | Greyson ackerman | Yes | Yes | 1975 | First Amended Complaint, ¶ 40 | No |
| 345 | LaPlant | Lynn | David LaPlant, Individually and as Personal Representative of the Estate of Lynn Ann LaPlant v. Avon Products, Inc., et al. | 23-CA-012151 | Florida | Hillsborough | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1960s | Amended Complaint, ¶ 12 | No |
| 346 | Larson | Lillian | Larson, Lillian, PbE vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | MID-L-002729-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Third Amended Complaint, ¶ 3 | Yes |
| 347 | LaSalle | Jack | JACK LASALLE and DIANNE LASALLE v. AMERICAN INTERNATIONAL INDUSTRIES et al. | 23-2-08165-0 SEA | Washington | King | Kazan McClain Satterley & Greenwood | Joseph Satterley | Yes | Yes | 1955 | First Amended Complaint at 4:12 | No |
| 348 | Latterell-Rice | Rebecca | Rebecca Latterell-Rice and Clair Brian Rice, her husband, v. Allieoc Inc / Avon Products, Inc. et al. | 62-CV-24-545 | Minnesota | Ramsey | Karst & von Oiste LLP | Erik P. Karst | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | No |
| 349 | Laudig | Kathleen | Elizabeth Laudig as representative of the estate of Kathleen Laudig v Avon Products, Inc., et al | 49D1-3-2312-CT-050425 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1950s | Amended Complaint, ¶ 6 | No |
| 350 | Laughlin | Dennis | Dennis Laughlin vs Avon Products, Inc., et al. | MID-L-007603-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | Mid-1950s | Third Amended Complaint, ¶ 3 | Yes |
| 351 | Lazette | Dianne | LaZette, Diane and Christopher LaZette, Phlis. v. Barnett Minerals, Inc., et al. | MID-L-007561-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Amended Complaint, ¶ 3 | Yes |

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 22 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 352 | Lee | Machaelee n | Michelle F. Felton, Executrix of the Estate of Michaeleen Lee, deceased, v. Acme Markets, Inc. | GD-23-008055 | Allegheny | Pennsylvania | Dean Omar Branham Shirley, LLP | Cori J Kapusta | Yes | Yes | Late-1940s | Complaint, ¶ 66 | No |
| 353 | Lee | Kyeng H. | KYUNG H. LEE and JOE J. LEE v. IHARART CORPORATION et al | 23CV40369 | Multnomah | Oregon | Dean Omar Branham Shirley, LLP | Jessica Dean Sarah E. Gibson | Yes | Yes | 1973 | Third Amended Complaint, Ex A | No |
| 729 | Lee | Cynthia | Cynthia Jane Lee v. Avon Products, Inc., et al. | E2024006160 | Monroe | New York | Maune Raschle Hartley French & Mudd, LLC | Andrew M. Grous | Yes | Yes | 1970s | Second Amended Complaint, ¶ 3 | No |
| 354 | Letizia | Joseph | Letizia, Joseph and Donna Letizia, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-002232-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1955 | Third Amended Complaint, ¶ 3 | No |
| 355 | Levine | Joanna | Levine, Joanne & Timothy Spahr, Pltfs. v. Kolmer Laboratories, et al. | 190251/2020 | New York | New York | Levy Konigsberg LLP | Amber Jae Brandis | Yes | Yes | 1970s | Initial Fact Sheet, ¶ 6 | Yes |
| 356 | Linde | Stuart | Eileen Linde, as Administratrix for the Estate of Brian Linde, Deceased, Individually & Charles B. Chrystal Co., Inc., et al | 190127/23 | New York | New York | Levy Konigsberg LLP | Amber Jae Brandis | Yes | Yes | 1966 | Second Amended Complaint, 124 | No |
| 357 | Link | Michael | Michael David Link and Sandra Strickland Link v. Talc Company, et al. | 2022CP4005543 | Richland | South Carolina | Dean Omar Branham Shirley, LLP | Jonathan Holder | Yes | Yes | 1950s | Plaintiff's Complaint ¶ 125 | No |
| 358 | Little | Robert | Robert A. K. Little and Irene K. Little v. American Honda Motor Co., Inc., et al | 23-020780 | Broward | Florida | Maune Raschle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1960s | Complaint, Information Form | No |
| 359 | Little | Christopher | Christopher Little v Barretts Minerals, Inc., etc, et al | MID-L-003868-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1979 | Amended Complaint, ¶ 2 | No |
| 360 | Lock | Judith | Lock, Judith, Pltf. v. Barrett Minerals, Inc., etc., et al | 190223/2019 | New York | New York | Weitz & Luxenberg P.C. | Justin J. Weitz | Yes | Yes | 1962 | Complaint, 86 | No |
| 361 | Locotto | Barbarann | Locotto, Barbarann, Pltf. v. Annaco, LLC, et al. | 190289/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tamburri | Yes | Yes | 1964 | Amended Complaint, 7 | Yes |
| 362 | Lodovico | Cynthia | Cynthia Lodovico v Barretts Minerals, Inc., et al. | MID-L-001418-23 | New York | New York | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1966 | Third Amended Complaint, ¶ 4 | No |
| 363 | LoGiudice | Keri | Logiudice, Keri and Joseph Logiudice, Pltfs., vs. Avon Products, Inc., et al | 190253/2014 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1979 | Initial Fact Sheet, 6 | Yes |
| 364 | Lorenzo | Richard | Lorenzo, Elizabeth, Individually and as Executrix of the Estate of Richard Lorenzo, Deceased, Pltf. v. Barretts Minerals, Inc., et al | MID-L-001187-22 | New York | New York | Weitz & Luxenberg P.C. | F Alexander Eiden | Yes | Yes | 1970 | Fourth Amended Complaint, ¶ 4 | Yes |
| 365 | Lowe | Celia | Celia Lowe and Brian Lowe v. L'Oreal Travel Retail Americas, Inc., et al | 23-022591CA27 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1950s | Complaint, ¶ 41 | No |
| 366 | Lowis | Barbara | Barbara Lowis & Trevor Lowis v Avon Products, Inc., et al | 190234/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 368 | Lupton | Johnnie | Phyllis Johnson, Margaret Rowell, Johnnie Lupton, Jr., Leslie Lupton, Gene Lupton, Joseph Lupton, Stuart Lupton, and Johnnie Lupton, Sr., Deceased vs. Louisiana Steam Equipment, LLC, et al. | C-148470 | Lafourche Parish 17th JDC | Louisiana | Landry & Swarr, LLC Simon Greenstone Panatier, PC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Holly C. Peterson | Yes | Yes | 1950s | Second Amended Petition, ¶ 4(b) | No |
| 369 | Maurer | Marilyn | Marilyn Mauren v Maybelline, LLC, et al | 190214/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 370 | Madlik | Marilyn | Madlik, Donald C. as Representative of the Estate of Marilyn M. Madlik Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190137/2020 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1960s | Complaint, ¶ 69 | No |
| 371 | Mager | Jenifer | Jenifer Mager and John Mandraschia v. American International Industries et al | 23STCV09956 | Los Angeles | California | Frost Law Firm, PC | Andrew Seitz | Yes | Yes | 1980s | Complaint, Exhibit A | No |
| 372 | Maloney-Najjar | Kelley | Kelley Maloney-Najjar and Talib Najjar v Arkema, Inc et al | MID-L-03900-22 | Middlesex (NJ) | New Jersey | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Yes | 1971 | Complaint, ¶ 2 | Yes |
| 373 | Manning | Patricia | Manning, Patricia v. Avon Products, Inc., et al | 190052/2020 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Barshays | Yes | Yes | 1960s | Third Amended Complaint, 88 | Yes |
| 374 | Marcana | Deborah | Deborah Marcana and Timothy Marcana v Avon Products, Inc., et al | MID-L-004127-23 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1969 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 376 | Marinelli | Nicole | Nicole Marinelli vs. Charen, Inc., et al | 2022-07702 | Orleans Parish CDC | Louisiana | Boling Law Firm | Jeremiah Boling Caroline Boling Benjamin Rumph Lance McAllister | Yes | Yes | 1984 | Second Amended Petition, ¶ 10 | No |
| 377 | Markson | Janice | Markson, Janice & Milton, Pltfs. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003589-20 | Middlesex (NJ) | New York | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1958 | First Amended Complaint, ¶ 6 | No |
| 378 | Maresco | Raffaella | Emilia C. Brady, Administrator for the Estate of Raffaella Maresco, et al vs Fisher Scientific Company, et al | 161103253 | Philadelphia | Pennsylvania | Weitz & Luxenberg P.C. | Joseph J. Mandia | Yes | Yes | 1974 | Amended Complaint, ¶ 5 | Yes |
| 379 | Martin | Gerald | Gerald K Martin and Beverly E Martin v Bayer Healthcare et al | MID-L-003576-23 | Middlesex (NJ) | New Jersey | Maune Raschle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1960 | Third Amended Complaint, ¶ 4 | No |

15

JA795

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 23 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 380 | Martin | James | Linda B Martin, individually and as Proposed estate representative of James P Martin v Block Drug Company, et al. | MID-L-006575-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1969 | Amended Complaint, ¶ 4 | No |
| 381 | Martin | Sheila | Jeffrey Martin, as Administrator ad Prosequendum for the Estate of Sheila Martin and as Guardian of John Doe, et al v Brenntag North America, Inc., et al. | MID-L-007808-19 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1962 | Complaint, ¶ 7 | No |
| 382 | Martinez | Otravio | Antonella Bouchard individually and as executor of the Estate of Otravio Martinez and Moira Martinez v American International Industries, et al | MID-L-000371-24 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Joshua Kristal | Yes | Yes | Early-1970s | Complaint, ¶ 4 | No |
| 383 | Martinez | Mary | Mary Martinez and Michael Martinez, her husband v. American International Industries, et al | 22-018794 CA27 | Broward | Florida | Dan Omar Branham Shirley, LLP | Rebecca Vinocur | Yes | Yes | 1980s | Third Amended Complaint, ¶ 89 | No |
| 384 | Mask | Mary | Linda K. Trimble, Individually and as Executrix of the Estate of Mary Mask v. Brenntag North America, Inc. & Brenntag Specialties, Inc., et al. | MID-L-002359-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1960s | Fourth Amended Complaint, ¶ 3 | Yes |
| 385 | Masterson | Leo | Leo Masterson and Lori Masterson v. Avon Products, Inc., et al. | 1901722023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1957 | Third Amended Complaint, ¶ 126 | No |
| 386 | Matsch | Sandra A | SANDRA A. MATSCH v. BAYER HEALTHCARE, LLC, et al | 23 LA 1528 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1959 | Complaint, ¶ 6 | No |
| 387 | Maute | Tucker | Tucker D. Maute, D.O. and Olivia W. Maute v. Barretts Minerals, Inc., et al | CACE-22-008590 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1992 | Second Amended Complaint, ¶ 27 | Yes |
| 388 | Mayville | Arlene | Claire Day as Special Administratrix for the Estate of Arlene Jane Mayville v Avon Products, Inc., et al | MID-L-005285-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 737 | Mazonski | Chloe | Chloe Mazonski, Individually and as Executrix and Prosequendum of the Estate of Michael Mazonski v. American Honda Motor Co., Inc., et al. | MID-L-004556-24 | Middlesex (NJ) | New York | Levy Konigsberg LLP | Denise Presumprci | No | Yes | 1953 | Complaint, ¶ 4 | No |
| 742 | Mazrei | Norbert | Norberto Ramon Mazrei et al v. Aico Industries, Inc. et al | 1901172020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Fakta | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 389 | McAllister | James | JACKI McALLISTER, Individually and as Special Administrator for the Estate of JAMES O. McALLISTER, deceased v. A.O. SMITH CORPORATION, et al | 2021L000870 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | A. Gerety Smith | Yes | Yes | 1950s | Third Amended Complaint, ¶ 6 | Yes |
| 390 | McAteer | Aoife | McAteer, Aoife v Avon Products, Inc., et al | 782000/2017 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 391 | McBride | Ronald | McBride, Ronald & Michelle, Phfs. v. American International Industries, Inc., et al. | 49D13-2110-MF-034781 | Marion | Indiana | DOBS & Farrias, LLP | Kathleen A. Furnas | Yes | Unclear based on face of complaint | 1944 | NA | Yes |
| 392 | McCallum | Beverlie | Beverlie McCallum v Avon Products, Inc., et al. | MID-L-004678-22 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1950s | Third Amended Complaint, ¶ 2 | No |
| 393 | McDonough | Colleen | Colleen McDonough v Johnson & Johnson, et al. | MID-L-001512-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1972 | Second Amended Complaint, ¶ 2 | No |
| 394 | McGowan | Carole Lee | CATHLEEN HELTZ, individually and as successor in interest to CAROLE LEE McGOWAN; LESHA CLARK; STEVEN SPRAGUE; KELLY SPRAGUE; and DIANE SPRAGUE, v. L'OREAL USA, INC., et al. | 24CV019599 | Alameda | California | Kazan McClain Satterley & Greenwood | Michael Reid | Yes | Yes | 1950s | Complaint at 5:26-6:1 | No |
| 395 | McGuire | Kevin | Kevin McGuire and Mary Jane McGuire v Barrett Minerals, et al. | 1901542023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 396 | McKnight-Foster | Carol | Foster, Edwin, as Executor of the Estate of Carol McKnight-Foster, Phf. v. Johnson & Johnson, et al | MID-L-000312-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1951 | Third Amended Complaint, ¶ 1 | Yes |
| 397 | McLoughlin | Carmel | Carmel H McLoughlin v Brenntag North America, et al. | 1903022023 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Jessica A. Bisnocith | Yes | Yes | 1969 | Plaintiff's Initial Fact Sheet, ¶ 6 | No |
| 399 | McMahon | Anne | Anne McMahon and Stephen McMahon v Startstone Corporation, et al. | 1903042023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 400 | Meade | Jody Kay | Jody Kay Meade and Arthur Meade v. Barretts Minerals Inc, et al. | 23STCV23517 | Los Angeles | California | Simmons Hanly Conroy LLP | Deborah Rosenthal | Yes | Yes | 1980 | Complaint, Exhibit A | No |
| 679 | Mann | Elena F. | Elena F. Mann v. 3M Company, et al. | 24-1988 | Middlesex (MA) | Massachusetts | Belluck & Fox, LLP | Joseph W. Belluck | Yes | Yes | 1950s | First Amended Complaint ¶ 10 | No |
| 401 | Megariotis | Joanna | Megariotis, Joanna, Phf. v. Bristol Myers Squibb, et al. | MID-L-001970-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 402 | Messenger | Ronald | Dorris Calesta, Personal Representative of the Estate of Ronald Messenger v. Advance Stores Company, Inc et al. | FBT-CV-22-6115647-S | Fairfield at Bridgeport | Connecticut | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1943 | Amended Complaint, ¶ 4 | Yes |

16

JA796

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 24 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 404 | Meyer | Carol | Carol J Meyer and Tommy Meyer v. Avon Products, Inc., et al. | MID-L-001860-23 | New Jersey | Middlesex (NJ) | Maune Raschle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1956 | Second Amended Complaint, ¶ 2 | No |
| 405 | Milan | Elizabeth | Elizabeth Milan v. Brenntag North America and Brenntag Specialties, Inc., et al. | 190154/2018 | New York | New York | Weitz & Luxenberg P.C. | Patti L Lyon Burchym | Yes | Yes | 1955 | Amended Complaint, 113. | Yes |
| 730 | Milford | Louise | Louise Milford and Christopher Milford v. Chanel, Inc., et al. | 190128/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 406 | Miller | Ann | Miller, Ann and Jeffrey, PHS, v. Barrett Minerals, Inc., et al. | MID-L-002710-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1961 | Amended Complaint, ¶ 2 | No |
| 407 | Miller | Dale | Guy Miller individually and as administrator of the estate of Dale Miller v Block Drug Company, et al. | MID-L-005953-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1974 | Amended Complaint, ¶ 4 | No |
| 408 | Miller | Veronica | Ronald Raymond Miller, Individually and as Personal Representative and Prosequendum of the Estate of Veronica Miller, Deceased vs. Brenntag North America, et al. | MID-L-005972-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1946 | Third Amended Complaint, ¶ 4 | Yes |
| 409 | Miller | Stephanie | Robert Miller, Executrix of the Estate of Stephanie Miller, PHC, vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190188/2017 | New York | New York | Levy Konigsberg LLP | Arthur R. Long | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 410 | Minshin | Helen | Helen Minshin v Barretts Minerals, Inc., et al. | 190185/2023 | New York | New York | Weitz & Luxenberg P.C. | Michael P Fanelli | Yes | Yes | 1943 | Amended Complaint, ¶ 94 | No |
| 411 | Mizer | Barbara | Barbara J Mizer and George A Mizer v Asan USA Manufacturing, et al. | MID-L-004279-22 | New Jersey | Middlesex (NJ) | Maune Raschle Hartley French & Mudd, LLC | Keith Hinkler | Yes | Yes | 1960s | Second Amended Complaint, ¶ 2 | No |
| 680 | Mohammed | Hamedah | Bux-ur-k Mohammed, Individually and as Executor of the Estate of Hamedah Mohammed, Deceased v. Avon Products, Inc., et al. | 190189/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 412 | Monroe | Joan | Joan Monroe and Est of Joan Monroe v Avon Products, Inc., et al. | EC2023-35161 | Washington | Washington | Levy Konigsberg LLP | Arthur R. Long | Yes | Yes | 1968 | Third Amended Complaint, 5. | No |
| 413 | Montesano | Laura J | Laura Montesano v Brenntag North America, Inc., et al. | MID-L-005265-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1962 | Amended Complaint, ¶ 2 | No |
| 415 | Moore | Scott | Lori Lee Campbell, individually and as representative of estate of Scott Moore v Bayer Healthcare, LLC, et al. | 23-12-02561 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern | Yes | Yes | 1970s | Amended Complaint, Schedule 1 | No |
| 416 | Moreno | Amelia | Amelia L Moreno v Avon Products, et al. | MID-L-003387-22 | New Jersey | Middlesex (NJ) | Maune Raschle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1987 | Third Amended Complaint, ¶ 2. | No |
| 686 | Moreno | Sonia | Sonia Moreno v. Avon Products, Inc., et al. | MID-L-004040-24 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella | Yes | Yes | 1960 | First Amended Complaint, Initial Fact Sheet ¶ 5 | No |
| 417 | Morgan | Colin | Colin Morgan v. L'Oreal Travel Retail Americas, Inc., et al. | 23-021465 | Florida | Broward | | Rebecca Vinocur | Yes | Yes | 1965 | Complaint *945 | No |
| 418 | Morgan | Sandra | Sandra Morgan v. Avon Products, Inc., et al. | CACE-24-001329 | Florida | Broward | | Dawn Bresserman | Yes | Yes | 1960s | Complaint - see exposure sheet | No |
| 419 | Morgan | June Rose | June Rose Morgan v Brenntag North America, et al. | MID-L-003262-23 | New Jersey | Middlesex (NJ) | Maune Raschle Hartley French & Mudd, LLC | Jenna Egner | Yes | Yes | 1950s | Amended Complaint, ¶ 2 | No |
| 420 | Morrison | Carolyn | Carolyn Morrison v Avon Products, Inc, Inc., et al. | MID-L-006026-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Amended Complaint, ¶ 4 | No |
| 422 | Mota | Maritza | Mota, Maritza, PHC v. Johnson & Johnson, et al. | MID-L-005753-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1967 | Third Amended Complaint, ¶ 2 | No |
| 423 | Mounce | Gina | Gina Mounce and Raymond Mounce v 3M Co., et al. | 23-11-02558 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Nedra Wilson | Yes | Yes | 1945 | Amended Complaint, Schedule 1 | No |
| 424 | Makomela | Kenneth | GWENDOLYN J. MUKOMELA, Individually and as Special Administrator for the Estate of KENNETH H. MUKOMELA, deceased v. AGCO CORPORATION, et al. | 2022LA000962 | Illinois | Madison | Maune Rachel Hartley French & Mudd, LLC | Michael T. Flachs Jr. | Yes | Yes | 1955 | Complaint, ¶ 7 | Yes |
| 425 | Mullan | Robert | Robert Mullan and Tracy Mullan v. Sumitomo Corporation of Americas, et al. | 190066/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 426 | Mullet | Anne Marie | Anne Marie Mullet and Ronald Mullet v Arkema, Inc., et al. | MID-L-000929-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Arthur R. Long | Yes | Yes | 1954 | Third Amended Complaint, ¶ 2 | No |
| 697 | Munoz | Renate | PETE T. MUÑOZ, Individually and as Successor in Interest of the Estate of RENATE MUÑOZ, Deceased, and JOHN CANTY, Individually, vs. Avon Products, Inc., et al. | 24STCV15955 | California | Los Angeles | Simon Greenstone Panatier, PC | Stuart J. Purdy | Yes | Yes | 1960s | Complaint, Exhibit A | No |
| 427 | Murphy | Geraldine | Murphy, Geraldine, PHC v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004429-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1962 | Fourth Amended Complaint, ¶ 4 | Yes |
| 428 | Muster | Sophia | Sophia Muster & John Muster v Avon Products, Inc., et al. | MID-L-005232-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1967 | Third Amended Complaint, ¶ 3 | Yes |
| 744 | Muzzpapa | Lucy | Lucy Muzzpapa v. American International Industries, et al. | 190213/2024 | New York | New York | Weitz & Luxenberg P.C. | Daniel J. Wasserberg | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |

17

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 25 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Remains Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Enforced by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 429 | Myers | Beverly | Myers, Beverly and Timothy Myers, Phfs. vs. Aventis Inc., et al. | 21-12-01748 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern | Yes | Yes | 1966 | Amended Complaint, ¶ 6 | No |
| 430 | Nasr | Yehia | Yehia Nasr & Deborah Nasr v Barretts Minerals, Inc., et al. | 190066/2023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1985 | Second Amended Complaint, ¶ 87 | No |
| 431 | Nathan | Frank | Nathan, Frank & Yochanan Nathan, Phfs. v. Johnson & Johnson, et al. | MID-L-006101-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1960s | Sixth Amended Complaint, ¶ 4 | Yes |
| 667 | Navaretta | Josephine | Josephine Navaretta and John Navaretta v. Sumitomo Corporation of Americas, et al. | 190117/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J Tully | Yes | Unclear based on face of complaint | NA | NA | No |
| 432 | Nelson | Sarah Sue | Nelson, Sarahsue, Phf. v. American International Industries, et al. | MID-L-001023-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960 | Second Amended Complaint, ¶ 2 | No |
| 433 | Nicholson | Harold | Nicholson, Nathan, Estate of Harold Nicholson, Phf. v. Barrett Minerals, Inc., et al. | MID-L-004403-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Amended Complaint, ¶ 2 | No |
| 434 | Nutt | Charles | Nutt, Charles M. Individually and as Executor for the Estate of Charles J. Nutt v. Avon Products, Inc., et al. | 22-2455 | Massachusetts | Middlesex (MA) | Duffy Law LLC | Christopher Duffy | Yes | Yes | 1982 | Complaint, ¶ 8 | No |
| 435 | Oakenfold | Sheila | Sheila Oakenfold v Christian Dior, Inc., et al. | 190238/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 438 | O'Brien | Karen | Karen C. O'Brien v. Air & Liquid Systems Corporation, et al. | CV-23-234 | Maine | Cumberland | Hallett Whipple Weyrens | David A. Weyrens | Yes | Yes | Late 1960s | Complaint ¶ 5 | No |
| 439 | Odum | Charles | Odum, Charles, Phf. v. Barrett Minerals, Inc., et al. | MID-L-004851-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1950s | First Amended Complaint, ¶ 2 | No |
| 440 | Okson-Rizzo | Deborah | Okson-Rizzo, Deborah and Thomas Rizzo, Phfs. v. American Art Clay Company, Inc., et al. | 190018/2022 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | No | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 441 | Orloff | John | James Maynard as exector of estate of John Orloff v Baxter Healthcare Corporation, et al. | MID-L-004578-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eulen | Yes | Yes | 1966 | Second Amended Complaint, ¶ 1 | No |
| 682 | Paes | Virginio | Virginio Paes vs. American International Industries, et al. | 24CV066231 | California | Alameda | Kazan & Wasserberg, LLP | Kosh Shukla | Yes | Yes | 1960s | Amended Complaint at 7/11/25 | No |
| 442 | Pagano-Michels | Cynthia | Cynthia Pagano-Michels and Thomas Michels vs Barretts Minerals, Inc., et al | MID-L-006234-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Leah Kagan | Yes | Yes | 1968 | Complaint, ¶ 2 | Yes |
| 443 | Pallotta | Josephine | Josephine Pallotta and James Pallotta v Avon Products, Inc., et al. | MID-L-003512-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1960s | Second Amended Complaint, ¶ 4 | No |
| 683 | Palomino | Maria | Maria F. Palomino vs. Avon Products, Inc. et. al. | 2024L001179 | Illinois | Cook | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Yes | 1966 | Exhibit 2 to Amended Complaint, ¶ 2 | No |
| 444 | Palumbo | Frank | Frank Palumbo & Liz Palumbo v 3M Company, et al. | E2023003380 | New York | Monroe | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 445 | Parker | Pauline | Pauline Parker and James Parker v Barretts Minerals, et al. | 190186/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 446 | Parvin | Janice | Janice Parvin v AII, et al. | MID-L-003126-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joseph J. Mandia | Yes | Yes | 1962 | Second Amended Complaint, ¶ 4 | No |
| 447 | Passmore-Meyer | Kathryn | Kathryn A. Passmore-Meyer and spouse John G. Meyer, Jr. v. Avon Products Inc., et al | CJ-2022-6281 | Oklahoma | Oklahoma | Dean Omar Branham Shirley, LLP | Jordan Ballinger | Yes | Yes | 1978 | Complaint, ¶ 50 | No |
| 448 | Patemostro | Marilyn | Melissa Shackelford, Marilyn Broussard, and Marlene Leboeuf, Individually and on Behalf of Marilyn T. Patemostro vs. Tinpy Cadillac Chevrolet, Inc., et al. | C66683.25 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC Damon J Baldone & Associates APLC Simon Greenstone Panatier, PC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Damon J. Baldone Holly C. Peterson Christian E. Manasco | Yes | Yes | 1960 | Amended Complaint, ¶ 5 | Yes |
| 449 | Payne | Clark | Payne, Clark and Barbara A. Payne, Phfs. vs. AM International, Inc., et al. | 190307/2019 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Falda | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 450 | Peddle | Gregory | Gregory A Peddle and Dorothy Peddle v Janssen Pharmaceuticals, Inc. et al | MID-L-006625-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joshua Kristal | Yes | Yes | Early-1960s | Complaint, ¶ 3 | No |
| 451 | Pelley | Stephanie | Stephanie Pelley, Individually and as Parent, Guardian, and Next Friend of Minor Children, A.C.P. and A.T.P. v. American International Industries, et al. | 2344473 | Massachusetts | Middlesex (MA) | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | Pre-1985 | Complaint ¶¶ 10, 12 | No |
| 453 | Peltz | Judith | Peltz, Judith and Benjamin Peltz, Phfs. v. Avon Products, Inc., et al. | 193142/2021 | New York | New York | Lanier Law Firm PLLC | Darron Berquist | Yes | Yes | 1949 | Initial Fact Sheet, ¶ 6. | Yes |

JA798

Case 23-01245-MBK   Doc 299-2   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit B - Proposed Temporary Restraining Order   Page 26 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 717 | Peltz | Judith | Benjamin Peltz, Individually and as Co-Personal Representative of the Estate of Judith Peltz, and Dennis C. Brown, as Co-Personal Representative of the Estate of Judith Peltz v. Brenntag North America, Inc., et al. | 21-1612 | Massachusetts | Middlesex (MA) | Thornton Law Firm LLP | Leslie-Anne Taylor | Yes | Yes | 1939 | Second Amended Complaint, ¶ 12. | Yes |
| 454 | Pena | Jaxklyn | Pena, Jaxklyn, PHt. v. Barretts Minerals, Inc., et al. | MID-L-002573-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1992 | Second Amended Complaint, ¶ 3 | No |
| 455 | Penny | Sherry | Penny, Sherry, PHf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-000918-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1979 | Third Amended Complaint, ¶ 4 | No |
| 456 | Perez | Maria Elena | Johanna Ortiz, and as successor in interest to Maria Elena Perez, deceased; Aljandrina Leon, as legal ... v. Albertson's LLC et al. | 23STCV14552 | California | Los Angeles | Simmons Hanly Conroy LLP | Crystal G. Foley | Yes | Yes | 1965 | Complaint, ¶ 2 | No |
| 457 | Perkins | Lorraine | Lorraine A. Perkins and Julia A. Knox v. Avon Products, Inc., et al. | 24-L-003861 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | Christine Kim | No | Yes | 1960 | First Amended Complaint, ¶ 7 | No |
| 458 | Perkins | Barbara | BARBARA PERKINS v. BARRETTS MINERALS, INC. et al. | CGC-23-277164 | California | San Francisco | Frost Law Firm, PC | Ronald J. Shingler | Yes | Yes | 1950s | Complaint, Exhibit A | No |
| 459 | Perl | Rosemarie | Perl, Rosemarie, PHf. v. Avon Products, Inc., et al. | 190087:21 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn | Yes | Yes | 1950s | Amended Complaint, ¶ 95. | Yes |
| 461 | Petijohn | Eileen | Petijohn, Eileen and Dr. David Petijohn, PHs. v. Barretts Minerals, Inc., et al. | MID-L-005303-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Second Amended Complaint, ¶ 5 | No |
| 462 | Petty | Brenda | Petty, Barbara and Curtis Petty, PHs. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002217-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1953 | Second Amended Complaint, ¶ 3 [sic] | Yes |
| 463 | Phelan | Marlene Theresa | Marlene Theresa Phelan v. Arkema Inc., et al. | FBT-CV-23-6124450-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisedohen, LLC | Brian P. Kenney | Yes | Yes | 1950s | Second Amended Complaint, ¶ 60 | No |
| 464 | Phillips | Patricia | Patricia Phillips and David Phillips v Avon Products, Inc., et al. | 190111/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 465 | Phipps | Maria | Maria Phipps v Avon Products, Inc., et al. | MID-L-003953-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1959 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 745 | Picard | Carol | Carol A. Picard and Gerard R. Picard v. Avon Products, Inc., et al. | 2481ev1674 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika O'Donnell | Yes | Yes | 1960s | Complaint, ¶ 27 | No |
| 466 | Picherri | Mary | Mary Picherri and John Picherri v. Avon Products, Inc., et al. | 23v2681 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 467 | Pickard | James | JAMES PICKARD v. 3M COMPANY f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY; AIR & LIQUID SYSTEMS CORPORATION et al. | 23STCV18682 | California | Los Angeles | Frost Law Firm, PC | Andrew Seitz | No | Yes | 1963 | Complaint, Exhibit A | No |
| 468 | Pickering | Michelle | Michelle Pickering v. Arkema, Inc. et al. | 23STCV19273 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oganeyzan | Yes | Yes | 1988 | Complaint, Exhibit A | No |
| 469 | Pidge | Pamela | Pidge, Raymond, Individually and as Administrator of the Estate of Pamela K. Pidge, Deceased, PHt. v. Barrett Minerals, Inc., et al. | MID-L-001407-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F. Alexander Eiden | Yes | Yes | 1962 | Third Amended Complaint, ¶ 4 | No |
| 470 | Pilcher | John | John Pilcher and Carolyn Pilcher v Union Carbide Corp., et al. | 190159/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1949 | Amended Complaint, ¶ 51A | No |
| 471 | Pilcher | Evan | Evan C. Pitelkin and Martha Barry-Pitelkin v. Johnson & Johnson, et al. | FBT-CV21-6109520-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisedohen, LLC | Brian P. Kenney | Yes | Yes | 1950s | Sixth Amended Complaint ¶ 5 | No |
| 472 | Portnoi | Herbert | Portnoi, Marjorie, Individually and as Proposed Administrator for the Estate of Herbert Portnoi, PHt v Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004551-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1960s | Second Amended Complaint, ¶ 2 | Yes |
| 746 | Pousley | Madelon | Pousley, Individually and as Personal Representative of the Estate of Madelon Pousley, Deceased v. Avon Products, Inc., et al. | MID-L-004237-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Complaint, ¶ 4 | No |
| 473 | Potter | Shirley | Heather Donaghy, as Personal Representative of the Estate of Shirley Potter, Deceased v. Avon Products, Inc., et al. | 2023-CP-40-03108 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Aaron Chapman | Yes | Yes | 1960s | Second Amended Plaintiffs Complaint ¶ 103 | No |
| 474 | Poulton | Catherine | Poulton, Catherine and David Poulton, PHs. v. Barretts Minerals, Inc., et al. | 190094/2022 | New York | New York | Maune Raichel Hartley French & Mudd, LLC | Suzanne M. Ratcliff | Yes | Yes | 1961 | Initial Fact Sheet, ¶ 6. | Yes |
| 698 | Pountain | Margam | Margam Pountain and Charles Pountain v. Avon Products, Inc., et al. | MID-L-003694-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | No | Yes | 1955 | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 475 | Powell | Katherine | Katherine Powell, as Personal Representative for the Estate of Amy Janelle-Szil, Deceased v. Avon Products, Inc., et al. | 23-021560 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1978 | Complaint, ¶69 | No |

Case 3:24-cv-10914-ZNQ    Document 18-1    Filed 03/21/25    Page 807 of 1429 PageID: 1165

Case 23-01245-MBK    Doc 299-2    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit B - Proposed Temporary Restraining Order    Page 27 of 27

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 476 | Powell | Dena Vee (f/k/a Dena V. Burch) | Tess A Burch & Est of Dena Powell v Avon, et al. | 1901.22.0022 | New York | New York | Merovitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N/A | No |
| 479 | Pryor | Carolyn | Pryor, Carolyn, Plt. vs Johnson & Johnson, et al. | MDL-002649-20 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1960 | Third Amended Complaint, ¶ 4 | Yes |
| 480 | Pryor | Michael | Pryor, Michael and Karen, Plfts., v Avon Products, Inc., et al. | MDL-L-000022-21 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1970 | Complaint, ¶ 2 | Yes |
| 481 | Prokop | Charles | Prokop, Charles and Delphine Prokop, Plfts. v. Johnson & Johnson, et al. | MDL-L-003328-21 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | Mid-1950s | Third Amended Complaint, ¶ 4 | No |
| 482 | Purvis | Evangeline | Purvis, Nichelle, for the Estate of Angeline Purvis, Plt. v. Bristol Myers Squibb, et al. | MDL-L-001749-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1980 | Amended Complaint, ¶ 1 | Yes |
| 483 | Ramirez | Irma | Irma Ramirez vs. Advanced Auto Parts, Brenntag Specialties LLC, et al | 2019-63370-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1955 | Petition, ¶ 28 | Yes |
| 688 | Ramos | Jim | Jim Ramos & Lilian Ramos v. Bayer Healthcare, LLC, et al. | MDL-L-003840-24 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1964 | Complaint, ¶ 2 | No |
| 484 | Rand | Charlene | Charlene Rand and Jason Rand v Block Drug Company, Inc et al. | MDL-L-007160-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Matthew Adam Grebman | Yes | Yes | 1977 | Complaint, ¶ 3 | No |
| 485 | Randolph | Bernice | Rhonda Concepcion individually and as administrator of the Estate of Bernice Randolph v Metropolitan Life insurance Company et al. | MDL-L-000059-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | F Alexander Eidon | Yes | Yes | Early 1960s | Fourth Amended Complaint, ¶ 4 | No |
| 747 | Reed | Wesley | Wesley Reed et al v. Saminvest Corporation of Americas, et al. | 604170/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1960s | Complaint, Plaintiff's Statement, No. 12 | No |
| 487 | Rego | John | RAYMOND BROWN, Individually and as Special Administrator for the Estate of JOHN H. REGO, deceased v. BLOCK DRUG COMPANY, INC., Individually and as successor-in-interest to The Gold Bond Sterilizing Powder Company, a/k/a The Gold Bond Company; et al | 2024LA000030 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1980s | Complaint, ¶ 6 | No |
| 488 | Rankin | Marilyn | Rankin, Marilyn Ann and John, Plfts. v. ACME Markets, Inc., et al | 190267-20 | New York | New York | Weitz & Luxenberg P.C. | Amber Jae Brandi | Yes | Yes | 1942 | Fourth Amended Complaint, ¶ 218 | Yes |
| 489 | Renwick | Joyce | Joyce Renwick and Samuel Solin v. Avon Products, Inc., et al. | 23-011345-CA-01 | Miami-Dade | Florida | Dean Omar Branham Shirley, LLP | Rebecca Vinecour | Yes | Yes | 1960s | First Amended Complaint, ¶ 66 | No |
| 490 | Rashad | Ghualam | Mary Roshal, Individually and as executor of estate of Ghulam Roshal's Bayer Consumer Care Holdings, LLC Company et al. | 828415/2023 | Suffolk | New York | Weitz & Luxenberg P.C. | Sean Kelly | Yes | Yes | 1978 | Amended Complaint, ¶ 72 | No |
| 491 | Reyes | Ezequiel | MARCELA REYES, LESLEY REYES, HOMAR REYES, GISELLE REYES, ERICK REYES, ESEQUIEL REYES and CRYSTAL REYES, as the Surviving Heirs of EZEQUIEL REYES, Deceased v. 3M COMPANY et al | 2222-CC09327 | St. Louis | Missouri | Simmons Hanly Conroy LLP | Randy S. Cohn | Yes | Yes | 1976 | Fifth Amended Petition, ¶ 9 | No |
| 492 | Reyes | Lidia | Julio Mendoza, Ind. and as Rep. of the Estate of Lidia Reyes (Deceased), Antonio Reyes & Nidia Reyes, Ind. vs. Avon Products, Inc., Brenntag Specialties LLC, et al | 2019-55560-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1969 | First Amended Petition, ¶ 21 | Yes |

JA800

Case 3:24-cv-01451-MBK Document 89-3 Filed 09/11/24 Filed 03/21/25 Page 808 of 1429 PageID:
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion    Page 1 of 26
5066

# EXHIBIT C

## Nelson Declaration

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>**WHITTAKER, CLARK & DANIELS, INC.,** *et al.,*<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 23-13575 (MBK)**<br><br>**(Jointly Administered)** |
| **WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000,**<br><br>Defendants. | **Adv. Proc. No. 23-01245 (MBK)** |

### DECLARATION OF LATHROP B. NELSON, III IN SUPPORT OF DEBTORS' MOTION FOR (I) AN ORDER EXTENDING THE AUTOMATIC STAY TO AND/OR PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS PENDING ENTRY OF A FINAL, NON-APPEALABLE ORDER REGARDING THE DEBTORS' PROPOSED SETTLEMENT AND (II) A TEMPORARY RESTRAINING ORDER ENJOINING SUCH CLAIMS PENDING THE COURT'S DECISION ON THE DEBTORS' REQUEST FOR SUCH INJUNCTIVE RELIEF

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

Case 3:24-cv-01409-MBXQN Doc 2022-3 enFiled 109/T2e/d 03/21/625d 0P/age 28100c24.4229 PageD:
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion    Page 3 of 26
ID: 6068

I, Lathrop B. Nelson, III, hereby declare under penalty of perjury:

1.      I am a partner of the law firm of Montgomery McCracken Walker & Rhoads LLP, co-counsel to Brenntag[2] in the above-captioned bankruptcy case in which this adversary proceeding is pending (the "Adversary Proceeding").  I have also served historically as national coordinating counsel for talc litigation and regional counsel to certain Brenntag entities named in the cases listed on Exhibit 1 attached hereto (the "Brenntag Enjoined Claims").

2.      I submit this declaration (this "Declaration") in support of *Debtors' Motion for (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors Pending Entry of a Final, Non-Appealable Order Regarding The Debtors' Proposed Settlement and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision on the Debtors' Request for Such Injunctive Relief* (the "Motion").[3]

3.      I am generally familiar with each of the Brenntag Enjoined Claims, including how the causes of action asserted in the Brenntag Enjoined Claims are pled and the allegations of exposure in the Brenntag Enjoined Claims.  I have personal knowledge of the matters set forth herein.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      In connection with the Debtors' request in the Motion to preliminarily enjoin certain Causes of Action, the Debtors worked with Brenntag to identify the Brenntag Enjoined Claims, *i.e.*, each pending Causes of Action against the Brenntag Releasees that is not a Debtor Released Estate Cause of Action and that (a) includes allegations of exposure to talc/asbestos prior

---

[2]    Brenntag AG, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, and Mineral and Pigment Solutions, Inc. are referred to collectively herein as "Brenntag."

[3]    Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Motion.

to February 27, 2004 or (b) does not identify the year plaintiff was first allegedly exposed to talc/asbestos in the underlying complaint.  In connection with that exercise, Brenntag sought to identify all Causes of Action (i) in which Brenntag is named as a defendant in the action as the alleged successor to WCD or is alleged in the operative complaint to be the successor to WCD, (ii) involving allegations of pre-2004 exposure to talc/asbestos as reflected in the operative complaint, and/or (iii) where the claims asserted against Brenntag have been bifurcated by agreement of the plaintiff in the action pending a determination of liability as to WCD.

5.     I personally oversaw the process of identifying the Brenntag Enjoined Claims that have been served on Brenntag, for which I understand the Debtors request that the Court enter an order (i) extending the automatic stay to such Causes of Action, and/or (ii) preliminarily enjoining the continuation, amendment, and settlement of such Causes of Action.  In order to identify the Brenntag Enjoined Claims, I directed applicable local or regional counsel for Brenntag to review case files for the pending Causes of Action against Brenntag, including operative complaints and bifurcation stipulations, to the extent applicable, to determine that the Brenntag Enjoined Claims satisfied the above criteria.  The operative complaint and bifurcation stipulation, if any, in each of the Brenntag Enjoined Claims were obtained from the relevant court records filed in the underlying actions, compiled, and provided to me and to Latham & Watkins LLP, as counsel to Brenntag in the Chapter 11 Cases.  I was directly involved in a further effort to confirm that, based on review of the work performed by local and regional counsel and the documents provided, the Schedule attached hereto as Exhibit 1 contains an accurate summary of the content of the operative complaints and bifurcation stipulations described therein.  As part of the effort to confirm that Exhibit 1 includes only Brenntag Enjoined Claims, I and others acting at my direction reviewed the case documents compiled to exclude any cases that did not meet the above criteria, including

3

cases that had been dismissed with or without prejudice against Brenntag, cases in which amended complaints had been filed that removed Brenntag as a defendant, or cases where the claims were premised exclusively on post-2004 exposure.  Accordingly, I believe the Causes of Action on Exhibit 1 represents an accurate list of pending Brenntag Enjoined Claims.  I also believe that Exhibit 1 represents an accurate list of bifurcation stipulations entered into in connection with the applicable Brenntag Enjoined Claims.

6.      Exhibit 1 summarizes the complaints in 684 actions, as well as 215 bifurcation stipulations.  Based on my review of these documents, I believe they constitute voluminous writings that cannot be conveniently examined in court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 11, 2024                    _/s/Lathrop B. Nelson, III_____
Philadelphia, Pennsylvania                   **Lathrop B. Nelson, III**
                                             **Co-Counsel to Brenntag**

4

## EXHIBIT 1

### [Schedule of Brenntag Enjoined Actions]

Any party who wishes to examine or copy the documents summarized in the below Schedule can do so by contacting the Debtors' undersigned counsel by email to **adeleo@coleschotz.com** and **jaberasturi@coleschotz.com** in order to obtain access to a data room containing such documents. The number in the No. column of the below Schedule refers to the folder number for the applicable claim in the data room.

Case 23-01245-MBK  Doc 299-3  Filed 09/12/24  Entered 09/12/24 00:24:45  Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion  Page 7 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Acevedo | Yolanda | Yolanda Acevedo and Noe Acevedo v Avon Products, Inc et al | MID-L-003625-23 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1990's | Complaint, ¶ 2 | No |
| 2 | Adams | Jennifer | Jennifer E Adams and Jon S Adams v Brenntag North America, Inc et al | MID-L-004465-23 | Middlesex (NJ) | New Jersey | Maune Raiche Hartley French & Mahl, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1972 | Complaint, ¶ 2 | No |
| 3 | Adams | Jacqueline | Jacqueline Adams and David Adams v Sumitomo Corporation of America et al | 190017/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | NA | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 4 | Adams | Sheri | Sheri Adams v Alberto Culver USA Inc et al | 190233/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | NA | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 5 | Aikens | Kimberly | Kimberly O. Aikens v. Public Supermarkets, Inc., et al | 2023-017836-CA01 | Miami-Dade | Florida | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1976 | Amended Complaint, ¶11-12 | No |
| 6 | Akins | Shirley | Shirley Akins and Charles Akins vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2021-80721-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Paterson | Yes | Yes | 1954 | Second Amended Complaint, ¶ 31 | No |
| 7 | Akiti | Theresa | Theresa Akins vs. Brenntag Specialties LLC, et al | 2022-57520-ASB | Harris | Texas | Nadsawat Law Group | Steven S. Schulte | Yes | Yes | 1970s | Second Amended Petition, ¶ 23 | Yes |
| 8 | Al Saud | Newal | Dan Albany, as Trustee of the Estate of Newal Al Saud, and Tina Mohammad v. Barretts Minerals, Inc. et al | 190902/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Yes | 1955 | Complaint, Plaintiff's Initial Fact Sheet, 6. | No |
| 9 | Alber | Zachary Michael | Alber, Rebecca, Estate of Zachary Michael Alber, Dec'd v. Johnson & Johnson, et al | MID-L-000955-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1983 | Second Amended Complaint, ¶ 2 | No |
| 10 | Alegre | Jorge | Jorge M Alegre and Luz Alegre v Arkema, Inc et al | MID-L-001861-23 | Middlesex (NJ) | New Jersey | Maune Raiche Hartley French & Mahl, LLC | Phan Alvarado | Yes | Yes | 1937 | Third Amended Complaint, ¶ 2 | Yes |
| 11 | Alexander-Jones | Ruth | G. RUTH ALEXANDER-JONES and JAMES R. JONES v. AVON PRODUCTS, INC. et al. | 22-2-18669-1 SEA | King | Washington | Maune Raiche Hartley French & Mahl, LLC | Brian F. Ladenburg | Yes | Yes | 1966 | Complaint, ¶ 9 | Yes |
| 12 | Alicea | Maria | Maria Alicea v. Avon Products, Inc., et al. | 23-1551 | Middlesex (MA) | Massachusetts | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 14 | Aloisio | Roman | Roman Aloisio v Avon Products, Inc et al | 190239/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 15 | Alvarado | Alvaro | Maria Del Rosario Tobias, Ind. and as Personal Rep. of the Estate of Alvaro Alvarado, Deceased, and in/of of L.A., a Minor vs. Avon Products, Inc., Brenntag Specialties LLC, et al | 2021-73332-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1990 | Second Amended Petition, ¶ 17 | Yes |
| 16 | Alvarez | Josefina | Josefina Alvarez v. Barretts Minerals Inc., et al | 23 L 5583 | Cook | Illinois | Maune Raiche Hartley French & Mahl, LLC | Bethany Gasperin | Yes | Yes | 1988 | Complaint, ¶ 7 | No |
| 17 | Alvarez | Maria | Alvarez, Miguel, Executor of Estate of Maria Alvarez, DEC v. Johnson & Johnson, et al | MID-L-001553-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1963 | Third Amended Complaint, ¶ 1 | Yes |
| 18 | Amerosa | Elaine | Elaine M. Amerosa v Amerilion Inc., et al | EFC A2023-002100 | Oneida | New York | Maune Raiche Hartley French & Mahl, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1961 | Second Amended Complaint, ¶ 5. | No |
| 19 | Anderson | Gina | GINA ANDERSON v. AVON PRODUCTS, INC. et al. | 21-2-14042-1 SEA | King | Washington | Maune Raiche Hartley French & Mahl, LLC | Robert Green | Yes | Yes | 1986 | Complaint, ¶ 5 | Yes |
| 20 | Anderson | Carolyn | Carolyn S. Anderson v. Avon Products, Inc., et al. | MID-L-02253-18 AS | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 21 | Anderton | William | William Anderton and Margie Anderton v. Brenntag North America and Brenntag Specialties, Inc. | MID-L-005866-18 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1956 | First Amended Complaint, ¶ 4 | Yes |
| 22 | Anzoza | Richard | Juan Anzoza, as Executor of the Estate of Richard Anzoza v. 3M Co, et al | 190969/2016 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 23 | Armstrong | Terry | Terry Armstrong and Katherine Armstrong vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-38902-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Paterson | Yes | Yes | 1955 | First Amended Complaint, ¶ 71 | No |
| 24 | Arvelo | Donna | Arvelo, Donna, M., Pltf. vs. Asbestos Corporation, Ltd., et al | MID-L-000588-17 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1951 | Fifth Amended Complaint, ¶ 2 | Yes |
| 25 | Ashdown | Janet | Janet Ashdown v Sumitomo Corporation of America et al | 190018/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | NA | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 26 | Ashefield | John | Susan Ashefield, as Personal Representative of the Estate of John Ashefield, Deceased v. Barretts Minerals, Inc., et al | 23-002556 CA27 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vincent | Yes | Yes | 1967 | Complaint, ¶36 | No |
| 27 | Ashoori | Shanaz | Shanaz Ashoori and Jahangir Ashoori v. Afl, et al. | MID-L-001341-24 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1984 | Complaint, ¶2 | No |
| 739 | Backofen | Brent | Brent W. Backofen v. 84 Lumber Company, et al. | 190172/2012 | New York | New York | The Early Law Firm, LLC | Brian Francis Early | Yes | No | 1966 | Complaint, ¶5 | No |
| 29 | Bacsin | Alicia | Alicia Bacsin & Kenneth Bacsin v Avon Products, Inc et al | 190969/2023 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |

Case 23-01245-MBK    Doc 299-3    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion    Page 8 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 663 | Bagley | Patricia | Patricia Bagley v. Chanel, Inc., et al. | 1901227024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 672 | Balas | Sandra | Sandra Balas and Anthony Balas v. Wegmans Food Markets, Inc., et al. | 811759/2024 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | Late 1960s | Compliant, Statement Sheet, No 8 | No |
| 31 | Ballesteros | Irma | Irma Ballesteros v. ALBERTSONS COMPANIES, INC. et al. | 23STCV06710 | California | Los Angeles | Fried Law Firm, PC | Andrew Seitz | Yes | Yes | 1970s | First Amended Compliant, Exhibit A | No |
| 32 | Barker | Maureen | Georgia Jane Barker, Individually and as administrator of the estate of Maureen Barker v Christian Dior, Inc et al | 190299/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 33 | Barnhart | Melissa | Melissa Barnhart and Christopher Barnhart v Avon Products, Inc et al | MID-L-002649-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1973 | Compliant, Initial Fact Sheet, ¶ 5 | No |
| 34 | Barone | Nicholas | Nicholas Barone and Kathryn Barone v. Bliss M, et al | FBT-CV-22-6116587-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1960 | Complaint ¶ 5 | Yes |
| 35 | Barratt | Madelin | Barratt, Madelin and Henry Barratt, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | MID-L-008016-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 4 | Yes |
| 36 | Bartlett | Deborah Lee | Deborah Bartlett and Shawn Bartlett v. Avon Products, Inc. et al. | 24STCV04012 | California | Los Angeles | Simon Greenstone Panatier, PC | Robert Green | Yes | Yes | 1970s | Compliant, Exhibit A | No |
| 37 | Barton | Harold | Harold Barton, et al. v. Avon Products, Inc. et al. | CV21955385 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeRose | Yes | Yes | 1973 | Compliant, Brochure, p. 36 | Yes |
| 38 | Basili | Gina | Gina F. Basili v. Avon Products, Inc. et al. | 23-0784 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Yes | 1975 | Fourth Amended Complaint, ¶ 37 | Yes |
| 39 | Basser | Carol | Carol Basser v All, et al. | MID-L-000432-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Graham | Yes | Yes | 1942 | Fourth Amended Complaint, ¶ 2 | Yes |
| 40 | Bast | Donna J. | DONNA J. BAST and LARRY A. BAST v. AVON PRODUCTS, INC. et al. | 23-2-15056-2 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton | Yes | Yes | 1958 | First Amended Compliant at 11:13 | No |
| 41 | Batey | Mary | William Batey Jr., Individually and as Administrator and Administratrix and Prosequendum for the Estate of Mary Batey, et al vs Avon Products, Inc., et al | MID-L-001565-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1953 | Compliant, ¶ 8 | Yes |
| 42 | Bathgate | Josephine | Josephine Bathgate v Avon Products, Inc et al. | 190125/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 43 | Belanger | Stacy | PETER BELANGER, individually and as successor to interest to STACY BELANGER, Deceased, CHRISTOPHER BELANGER, LUKE BELANGER, and LILY BELANGER, Individually, vs. RALPHS GROCERY COMPANY et al. | 23STCV08775 | California | Los Angeles | Waters Kraus & Paul | Kevin M. Loew | Yes | Yes | 1970 | Second Amended Complaint, Exhibit A | Yes |
| 712 | Bell | Judy Kay | Scott Bell, as Personal Representative for the Estate of Judy Kay Bell v. Almay, Inc. et al. | 190090/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 44 | Bennett-Turner | Alan | Alan Bennett-Turner v. Avon Products, Inc. et al. | 190118/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 45 | Berris | Susan W. | SUSAN W. BERRIS and BRUCE C. BERRIS, vs. BRENNTAG NORTH AMERICA, INC., et al. | 62-CV-23-257 | Minnesota | Ramsey | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960 | First Amended Complaint, ¶ 3 | No |
| 46 | Berry | Sara | Sara Berry and Sean Berry v Sumitomo Corporation of the Americas et al. | 190274/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 47 | Besse | Jodi | Besse, Jodi & George Besse, Pltfs. v. Duval's Pharmacy, et al. | 1900/10/2021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1970s | Compliant, Initial Fact Sheet, ¶ 5 | Yes |
| 48 | Best | Edna | Edna Best v. Avon Products, Inc., et al. | MID-L-007546-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950 | Complaint, ¶ 2 | Yes |
| 735 | Betts | Susan | Susan Betts v. Avon Products, Inc., et al. | 190119/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 49 | Bezanilla | Bernadette | Bernadette A. Bezanilla and Leopoldo G. Bezanilla v. Avon Products, Inc., et al | CACE-23-003072 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiSoua | Yes | Yes | 1970s | Third Amended Complaint, ¶ 5 | No |
| 695 | Biggins | Walter | Walter A. Biggars and Janet L. Biggers vs. Arkema, Inc., F/K/A Pennsalt Corporation, et al. | 2024-LA-000830 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Steven D. Rineberg | No | Yes | Prior to 1969 | Complaint, ¶ 7 | No |
| 50 | Biljetina | Jolyene | Jolyene Biljetina and Eric Biljetina, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | 190024/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |

Case 23-01245-MBK    Doc 299-3    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion    Page 9 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | Bill | Lorraine | Bill, Lorraine & Thomas South, Plfs. v. Avon Products, Inc., et al. | 19006522 | New York | New York | Weitz & Luxenberg P.C. | James Plastiras | Yes | Yes | 1960s | Amended Complaint, ¶ 81 | No |
| 677 | Biondo | Judith | Peter Biondo, as Administrator of the Estate of Nancy Biondo, Deceased v. Avon Products, Inc., et al. | 190199/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier | Yes | Yes | 1988 | Amended Complaint, Initial Fact Sheet, 5 | No |
| 52 | Bisceglio | Jamie | Bisceglio, Jamie, Plf. v. Johnson & Johnson, et al. | MID-L-003855-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1952 | First Amended Complaint, ¶ 2 | Yes |
| 53 | Biswas | Roman | Rohan Biswas and Jaclyn Biswas v. Aramis Distributors New York, Inc et al. | 190004/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear on face of complaint | NA | NA | Yes |
| 54 | Black | Edward | Tameron S. Gills, Ind. and as Special Administrator for the heirs and Estate of Edward L. Black Sr. and Wanda Jo Black vs. Brenntag Specialties LLC, et al | 2018-50007-ASH | Texas | Texas | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Unclear on face of complaint | Unclear based on face of complaint | NA | Yes |
| 55 | Black | Mary | Mary Black, Plf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190016/2017 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 673 | Blackwell | Mary Kathryn | Mary Kathryn Blackwell vs. Avon Products, Inc. et al. | CACE-24-010680 | Broward | Florida | Simmons Hanly Conroy LLP | Juan P. Bauta, II | Yes | Yes | 1964 | Complaint, ¶ 11 | No |
| 56 | Blankenhorn | Judith | Blankenhorn, Robert and Karen Blankenhorn, etc., Plfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008377-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1944 | Second Amended Complaint, ¶ 4 | Yes |
| 57 | Bloomberg | Jac | Bloomberg, Ellen, for the Estate of Jac M. Bloomberg, Plf. v. Barretts Minerals, Inc. et al. | MID-L-002608-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | F. Alexander Eulitt | Yes | Yes | 1972 | Third Amended Complaint, ¶ 4 | No |
| 58 | Blue | Vertis | Blue, Vertis, Plf. v. Avon Products, Inc., et al. | MID-L-02627-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1955 | Amended Complaint, ¶ 4 | Yes |
| 59 | Boatright | Angela | Boatright, Angela, Plf. v. Avon Products, Inc., et al. | 190154/2021 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | Prior to 1980 | Complaint at ¶ 1 | Yes |
| 685 | Bogler | Eriza | Wolfgang Bogler, as Administrator of the Estate of Eriza Bogler, and Wolfgang Bogler, Individually v. Avon Products, Inc., et al. | 814805/2024 | Suffolk | New York | Weitz & Luxenberg P.C. | Sean Kelley | Yes | Yes | 1960s | Amended Complaint, No. 97 | No |
| 60 | Bosce | Denise K. | DEBBIE A. BOSCE, as Personal Representative of the Estate of DENISE K. BOSCE v. AVON PRODUCTS, INC. et al. | 23-2-22519-8 SEA | Washington | Washington | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton | No | Yes | 1975 | Amended Complaint, ¶ 15 | No |
| 61 | Boden | Barbara Ellen | Poland-Sternock, DeAnna and Estate of Barbara Ellen Boden, Plf. v. Brenntag North America, Inc. Conglomerate, et al. | MID-L-000404-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1974 | Third Amended Complaint, ¶ 4 | No |
| 62 | Borthwick | Anne | Anne Borthwick and David Borthwick v. Santromo Corporation of Americas, et al. | 190031/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 63 | Bowers | Bernard | Bowers, Bernard P. and Jeanne Bowers, Plfs. v. A.W. Chesterton Company, et al. | 21-09-02481 | Philadelphia | Pennsylvania | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1970 | Amended Complaint, ¶ 5 | No |
| 728 | Bradford | Claire | Sharon Engleth, as Personal Representative of the Estate of Claire Bradford v. Bayer Healthcare LLC, et al. | 2405-00433 | Philadelphia | Pennsylvania | Brockman, Rosenberg, Brown and Sandler | Steven J. Cooperstein | Yes | Yes | 1940s | Amended Complaint, Schedule 1 | No |
| 64 | Brand | Karen | Brand, Karen & Ronald Brand, Plfs. vs. Avon Products, Inc., et al. | 190206/2021 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 65 | Brannon | Billy | Billy Brannon and Wilma Brannon vs. Atec, Inc., Brenntag Specialties LLC and Brenntag North America, et al. | 2023-15536-ASB | Texas | Texas | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1955 | Third Amended Complaint, ¶ 48 | Yes |
| 66 | Brantley | William | Kelly Brantley and Sara Brantley v. 3M Company a/k/a Minnesota Mining & Manufacturing Company, et al. | C-717978 32 | East Baton Rouge Parish 19th JDC | Louisiana | Getrys Law Group, APLC Simon Greenstone Panatier, PC | Lawrence G. Getrys Holly C. Peterson | Yes | Yes | 1979 | Amended Complaint, ¶ 4 | Yes |
| 67 | Braun | James | Gayle Braun, as Executor for the Estate of James M. Braun Jr., deceased v. Air & Liquid Systems Corporation, successor-by-merger to Buffalo Pumps, Inc., et al | 2022LA001010 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Eric Poplonski | Yes | Yes | 1969 | Complaint, ¶ 7 | Yes |
| 68 | Brewer | Rebecca | Rebecca Brewer v. Avon Products, Inc., et al. | 190367/2016 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 69 | Brown | Leroy | Leroy Brown v 3M Company et al | 23-11-03107 | Philadelphia | Pennsylvania | Meirowitz & Wasserberg, LLP | Jason P. Yampolsky | Yes | Yes | 1984 | Amended Complaint, Schedule 1 | No |
| 71 | Buehler | Roger | Buehler, Eva, Individually and as Executor of the Estate of Roger D. Buehler, deceased, Plf. vs Air & Liquid Systems Corporation, et al | MID-L-002905-20 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Cody Greenes | Yes | Yes | 1976 | Amended Complaint, ¶ 2 | Yes |
| 72 | Buhlig | Marcella | Buhlig, Marcella and William Buhlig, etc., Plfs. v. American International Industries, Inc. et al. | MID-L-007726-19 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 73 | Burchette | Kimberly | Kimberly Burchette & Janet Burchette v Avon Products, Inc et al. | MID-L-004452-22 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1971 | Second Amended Complaint, ¶ 3 | No |
| 74 | Bus | Laura | Laura Bus and Mark Bus v Barretts Minerals, Inc et al | MID-L-003086-22 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1998 | Fourth Amended Complaint, ¶ 2 | No |

Case 3:24-cv-10914-ZNQ   Document 18-1   Filed 03/21/25   Page 817 of 1429 PageID: 1175

Case 23-01245-MBK   Doc 299-3   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion   Page 10 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 75 | Byrd | Richard | RICHARD L. BYRD and MARLIE G. BYRD v. Brenntag, INC., et al | 23-LA-1670 | Madison | Illinois | Maune Raichel Hartley French & Mudd LLC | Celina F. Bevard | Yes | Yes | 1965 | First Amended Compliant, ¶ 6 | No |
| 76 | Caro | Nancy | Frank J. Caro, Jr., Individually and as Executor and Executor Ad Prosequendum of the Estate of Nancy Cairo v. AII, et al. | MID-L-900-14AS | Middlesex (NJ) | New Jersey | Szaferman, Lakind, Blumstein & Blader, P.C. | Moshe A. Maimon | Yes | Yes | 1988 | Third Amended Compliant, ¶ 4 | Yes |
| 77 | Calabrese | Thomas | Thomas Calabrese v Arkema, Inc. et al | 190328/2023 | New York | New York | Weitz & Luxenberg P.C. | Sean Kelly | Yes | Yes | 1950s | Amended Compliant, 96. | No |
| 78 | Cali | Julie | Julie Cali v. Arkema, Inc. f/k/a Pennsalt Corp., et al | C-705579 25 | East Baton Rouge Parish 19th JDC | Louisiana | Landry & Swarr P.C.; Fears Nachawati PLLC | Mickey P. Landry; Frank J. Swarr; Matthew C. Clark; Darren McDowel | Yes | Yes | 1973 | Compliant, ¶ 15 | Yes |
| 79 | Cammalleri | Emilio | Cammalleri, Emilio and Claudette Cammalleri, H/W, Pltfs. vs. American International Industries, et al. | MID-L-007266-19 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ 4 | Yes |
| 80 | Campbell-Wright | Lorna | Lorna Campbell-Wright & Rodrick Wright v Avon Products, Inc. et al. | 190328/2022 | New York | New York | Simon Greenstone Panatier, PC | Erin M. Boyle | Unclear based on face of complaint | Yes | Unclear based on face of complaint | NA | No |
| 81 | Cantu | Juan | Cantu, Juan & Laura, Pltfs. v. Barrett Minerals, Inc., et al. | MID-L-000572-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1973 | Amended Complaint, ¶ 4 | No |
| 82 | Cantarana | Carolyn | Carolyn Cantarana vs. C and D Pharmacy, LLC, et al. | 214738 | St Bernard Parish / 34th JDC | Louisiana | Landry & Swarr, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry; Frank J. Swarr; Matthew C. Clark; Holly C. Peterson | Yes | Yes | 1945 | First Amended Compliant, ¶ 5 | Yes |
| 83 | Carlson | Connie M. | CONNIE M. CARLSON v. BARRETTS MINERALS, INC. et al. | 22-2-03149-2 KNT | King | Washington | Bergman Oslund Udo Little, PLLC | Brendan Little | Yes | Yes | Mid-1960s | Compliant, 3 | Yes |
| 84 | Carlson | Peggy | Peggy Carlson and John Carlson, Pltfs. vs. Brenntag, Inc., DBA .. | MID-L-003572-17 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1957 | Compliant, ¶ 2 | Yes |
| 86 | Casatavilla | Walter | Casatavilla, Walter M. and Tammar Casatavilla, Pltfs. v. Avon Products, et al. | 190296/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tambini | Yes | Yes | 1970 | Compliant, ¶ 120. | Yes |
| 88 | Catt | Helen | Helen Catt and Donald Catt, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-001410-19 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1988 | Amended Compliant, ¶ 7 | No |
| 89 | Cavalluzzi | John | Cavalluzzi, John and Rene Cavalluzzi, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-002519-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | James Andrew Plaisted | Yes | Yes | Late 1970s | Third Amended Complaint, ¶ 4 | No |
| 90 | Cayer | Robert | Robert Cayer and Elizabeth Cayer v. Ajax Tocco Magnethermic Corporation, et al. | PC-2023-00731 | Bristol | Rhode Island | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | No | Yes | 1962 | Compliant, ¶ 5 | Yes |
| 91 | Ceraso | Vincent | Vincent Ceraso, Pltf. v. Amchem Products, Inc., et al. | 190003-22 | New York | New York | Weitz & Luxenberg P.C. | Chris Romanelli | Yes | Yes | 1977 | Compliant, 129. | Yes |
| 93 | Chamberlain | Jennifer | Jennifer Chamberlain v Albson Pharmacy, Inc et al. | 23-013029 | Allegheny | Pennsylvania | Dean Omar Branham Shirley, LLP | Cori J Kapusta | Yes | Yes | 1974 | Compliant, ¶ 106 | Yes |
| 94 | Chapman | Rita Ann | RITA-ANN CHAPMAN and GARY CHAPMAN v. AVON PRODUCTS, INC. et al. | 22STCV03968 | Los Angeles | California | Dean Omar Branham Shirley, LLP | Ben Adams | Yes | Yes | Mid-1950s | Compliant, Exhibit A | Yes |
| 95 | Chason Gregory | Amanda | Amanda Chason-Gregory v. Publix Super Markets, Inc., et al. | 24-002569 CA27 | Broward | Florida | Simmons Hanly Conroy LLP | Rebecca Vincent | Yes | Yes | 1980s | Compliant ¶24 | No |
| 96 | Cheifetz | Michael | Cheifetz, Michael, Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190110/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathanel N. Fukla | Unclear based on face of complaint | Yes | Unclear based on face of complaint | NA | No |
| 97 | Chelikowsky | Jeanne | Laura Mackey as executor of the Estate of Jeanne Chelikowsky v. Avon Products et al. | MID-L-000292-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Cody Greenes | Yes | Yes | 1970s | Compliant, ¶ 4 | No |
| 99 | Clark | Sharilyn | Sharilyn Clark v. Brenntag North America, et al. | 190162/2018 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin | Yes | Yes | Unclear based on face of complaint | NA | Yes |
| 100 | Clawson | Linda | Linda Clawson and Billy Clawson v Avon Products, Inc et al | 190157/2023 | New York | New York | Merewitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 101 | Cline | Susan | Susan Cline & Patrick Cline v Acme Markets, Inc. | 23-012897 | Allegheny | Pennsylvania | Dean Omar Branham Shirley, LLP | Cori J Kapusta | Yes | Yes | 1962 | Compliant, ¶ 138 | No |
| 102 | Clinton (Regina) | Amanda | Amanda Clinton, Pltf. v Avon Products, Inc., et al. | MID-L-002337-19 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1985 | First Amended Compliant, ¶ 2 | Yes |
| 103 | Cody | Laura | Cody, Laura and William Cody, Pltfs. v. Rite Aid of New York City, Inc. et al. | 60335622 | Nassau | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis | Yes | Yes | 1952 | Third Amended Compliant, ¶ 15 | No |
| 104 | Cohen | Connie | Cohen, Connie, Pltf. v. Johnson & Johnson, et al. | MID-L-004448-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1958 | Third Amended Compliant, ¶ 2 | Yes |
| 105 | Cole | Roberta | Roberta Cole and John Cole v. Johnson & Johnson, et al. | MID-L-007272-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1942 | Fifth Amended Compliant, ¶ 2 | Yes |
| 106 | Connell | Ann | Ann Connell and George Connell v. Barretts Minerals Inc., et al. | 21-1714 | Middlesex (MA) | Massachusetts | Cooly Law Firm and Duffy Law LLC | Edward Paul Cooly | Yes | Yes | 1950 | Compliant ¶ 8 | Yes |

JA810

Case 23-01245-MBK  Doc 299-3  Filed 09/12/24  Entered 09/12/24 00:24:45  Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion  Page 11 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Deburn(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107 | Conti | Carnula | Jeanne Conti as Executrix of the Estate of Carnula Conti v Avon Products, Inc et al. | MID-L-003823-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1960 | First Amended Complaint, ¶ 4 | No |
| 108 | Conway | Thomas | DOROT A.S.G. CONWAY, individually and as Special Administrator of the Estate of THOMAS P. CONWAY, Deceased v. Air & Liquid Systems Corporation, et al | 2021L001012 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | A. Gentry Smith | Yes | Yes | 1960s | First Amended Complaint, ¶ 7 | Yes |
| 109 | Cooney | Tim | Cooney, Tim v Avon Products, Inc, et al. | MID-L-002992-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1988 | Third Amended Complaint, ¶ 2 | No |
| 110 | Cooper | Lilo | LILO COOPER and LESLIE COOPER v. Arkema, Inc. F/K/A Pennwalt Corporation And Elf Atochem North America, Inc. et al | 23STCV15823 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oganeyan | Yes | Yes | 1948 | Complaint, Exhibit A | No |
| 111 | Cooper | Michelle | Michelle Cooper vs Johnson & Johnson, et al. | MID-L-001326-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1967 | Third Amended Complaint, ¶ 2 | Yes |
| 112 | Cooper | Frederick | Frederick Cooper and Janeen Cooper v Arkema, inc et al | 22-12-00021 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner | Yes | Yes | 1963 | Second Amended Complaint, ¶ 4a | No |
| 113 | Corin | Paula | Paula Corin v. Arkema, Inc. et al. | 23STCV26571 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc Willick | Yes | Yes | 1955 | Complaint, Exhibit A | No |
| 114 | Coronado | Mario | Coronado, Mario & Melanisa Porras, Phls. v. Johnson & Johnson, et al. | MID-L-004460-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1992 | Third Amended Complaint, ¶ 4 | Yes |
| 115 | Corum | Scott | Corum, Scott and Greta Corum, Phls. v. Arkema, Inc., et al. | MID-L-001294-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1971 | Third Amended Complaint, ¶ 2 | No |
| 116 | Coss | Roger | Coss, Roger and Susan Coss, Phls., vs. 3M Company, etc. et al. | MID-L-005031-19 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1954 | First Amended Complaint, ¶ 2 | Yes |
| 664 | Costigan | Irene | Irene Costigan and Andrew Costigan v. Chanel, Inc., et al. | 190120/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 696 | Cothurn | Cynthia | Cynthia Cothurn vs. Safeway, Inc., et al | 24STCV15934 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc I Willick | Yes | Yes | 1960s | First Amended Complaint, Exhibit A | No |
| 117 | Craft | Cherie | Cherie A. Craft v. Ahold Delhaize USA, Inc., et al | 24-X-24-000005 | Maryland | Baltimore City | Brown Kelly LLP | Matthew E. Kelly | Yes | Yes | 1971 | Complaint, ¶ 8 | No |
| 118 | Crawford Starr | Taloa | Taloa J. Crawford Starr v. Janssen Pharmaceuticals, Inc., et al. | MID-L-001278-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | Early 1960s | Complaint, ¶ 2 | No |
| 119 | Crosby | Mary | Crosby, David an Executor of the Estate of Mary Crosby, Phl. v. Altayo, Inc., et al | E2022-6467CV | New York | Steuben | Levy Konigsberg LLP | John P. Guinan | Yes | Yes | 1978 | Third Amended Complaint, ¶ 4 | No |
| 120 | Cross | Margaret | Margaret M Cross v Barretts Minerals, Inc et al | 190155/2023 | New York | New York | Weitz & Luxenberg P.C. | John P. Guinan | Yes | Yes | 1943 | Amended Complaint, ¶ 93 | No |
| 121 | Crozier | Beverly | Davies, Lynn, individually and as Executrix of the Estate of Beverly Crozier and Donald Crozier v. Avon Products, Inc. et al | 190385/2016 | New York | New York | Levy Konigsberg LLP | John P. Guinan | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 122 | Culberley | Gladys | Gladys Culberley v. Publix Super Markets, Inc., et al | 23-020045 CA 27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vincour | Yes | Yes | 1980s | First Amended Complaint ¶ 5 | No |
| 124 | Cupps | Catherine | Cupps, Catherine and Clifton Cupps, Phls. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | MID-L-002853-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 125 | Curtis | Erik | Curtis, Erik and Tari Curtis, Phls. v. Avon Products, Inc., et al | MID-L-006225-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1970s | First Amended Complaint, ¶ 9 | Yes |
| 127 | Davies | Michael | Davies, Lynn, individually and as Executrix of the Estate of Michael Davies, Phls. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | 190348/2017 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Unclear based on face of complaint | Unclear based on face of complaint | NA | Amended Complaint, ¶ 93 | Yes |
| 128 | Davis | Janel | JANEL DAVIS, VS. ALBERTSON'S LLC, individually and as successor-in-interest to ALPHA BETA et al. | RG21112811 | California | Alameda | Simons Hanly Conroy LLP | Deborah Rosenthal | Yes | Yes | 1970 | Complaint, ¶ 2 | Yes |
| 129 | Deadman | Jane | Anthony Deadman, Individually and as Personal Representative of the Estate of Observees of Decedent Jane Deadman, Deceased v. L'Oreal Travel Retail Americas, Inc., et al | 23-023597CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vincour | Yes | Yes | 1965 | Complaint ¶ 42 | No |
| 130 | Deal | Michael | Deal, Michael and Christine Deal, Phls. v. Arkema, Inc., et al | MID-L-000551-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1976 | Fourth Amended Complaint, ¶ 2 | No |
| 131 | Dean | James | James Bryan Dean and Lisa Dean v. 3M Company, a/k/a Minnesota Mining and Manufacturing Company, et al. | 2023-CP-40-03441 | South Carolina | Richland | Meirowitz & Wasserberg, LLP | Kash Shukla | Yes | Yes | 1987 | Second Amended Complaint ¶ 153 | No |
| 132 | Decembrino | Richard | Richard Decembrino and Diana Decembrino v 3M Company et al | 23-10-03193 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Clark P. Rosengarten | Yes | Yes | 1960s | Second Amended Complaint, Schedule 1 | No |
| 133 | Deems | Daniel | Deems, Daniel and Jennifer Deems, Phls., vs. Avon Products, Inc., et al | 190304/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 134 | DeGannett | Paul | DeGannett, Paul II and Mary Ann DeGennett, Phls. v. Barretts Minerals, Inc., et al. | MID-L-000179-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1979 | Amended Complaint, ¶ 4 | No |

Case 23-01245-MBK   Doc 299-3   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit C - Declaration of Lathrop B. Nelson   III in Support of Motion   Page 12 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 135 | Desrboi | Peggy | Peggy J. Hathcik Desrrboi v. Avon Products, Inc., et al | 2023-421157-CA-OH | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1934 | First Amended Complaint, ¶ 70 | No |
| 136 | Delgado | Ana | ANA M. DELGADO v. AVON PRODUCTS, INC., et al | 24LA0282 | Illinois | St. Clair | Menges Law Firm | Menges Law: Carson Menges, Kanti & Von Oiste, LLP Of Counsel) Jason Minniti(li) | Yes | Yes | 1960s | Complaint, ¶ 1 | No |
| 137 | Deng | Jian Kang | Jian Kang Deng and Li Ying Deng v Barretts Minerals, Inc et al. | 190114/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 138 | Denham | Ann | Ann Denham v. Sumitomo Corporation of Americas, et al. | 190067/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 139 | Denk | William | ROSEMARY DENK, Individually and as Successor-in-Interest to WILLIAM J. DENK, Deceased vs. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al | 23STCV01707 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1960 | First Amended Complaint, Exhibit A | Yes |
| 140 | DeSaussure | Vashti | Tewana Tinker as administrator of the estate of Vashti DeSaussure v 3M Company et al | MD1-L-005713-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grinberg | Yes | Yes | 1960 | Third Amended Complaint, ¶ 4 | No |
| 141 | Diaz | Walter | TAMMY EVETT DIAZ, individually and as successor-in-interest to WALTER NESTOR DIAZ, and HOLLY DIAZ, v. AVON PRODUCTS, INC. et al. | 22CV022885 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Real | Yes | Yes | 1980s | Complaint at 4:27-5:9 | No |
| 142 | DiHello | Audu | Audu Dihello and James Guy v Barrett Minerals, Inc et al | MD1-L-001282-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1976 | Third Amended Complaint, ¶ 4 | No |
| 145 | Dietzman | Heather | HEATHER R. DIETZMAN v. AVON PRODUCTS, INC., et al | 23-LA-001587 | Illinois | Madison | Maune Rachel Hartley French & Mudd, LLC | A. Gentry Smith | Yes | Yes | Mid-1980s | Complaint, ¶ 6 | No |
| 146 | Dobbs | Sheryl | Sheryl Dobbs v. Avon Products, Inc., et al | MD-L-005426-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | Mid-1970s | Complaint, ¶ 2 | No |
| 147 | Dobac | Scott | Connors-Dobac, Jocelyn, Individually and as Personal Representative for the Estate of Scott M. Dobac, PHL vs. Avon Products, Inc., etc., et al. | 190305/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 148 | Dominguez | Gloria | Rubio, Nellie, for the Estate of Gloria Dominguez, PHL v. Avon Products, Inc., et al. | 190227/21 | New York | New York | Weitz & Luxenberg P.C. | Clark Rosengarten (Since Jeff Weitz) | Yes | Yes | 1970s | Amended Complaint, 45. | No |
| 149 | Donnatin | John | PAULA M. DONNATIN, individually and as Special Administrator of the Estate of JOHN C. DONNATIN, deceased, CHARLES DONNATIN, an individual, and HALEY HASTIE, an individual; as legal heirs of JOHN C. DONNATIN, deceased, v. ARIZONA INC., f/k/a PENNWALT CORPORATION v. | 24STCV09343 | California | Los Angeles | Dean Omar Branham Shirley, LLP | Leonard Sandoval | Yes | Yes | 1966 | Complaint, ¶ 18 | No |
| 150 | Doonan | Elizabeth | Elizabeth Doonan v Christian Dior, Inc et al | 190190/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 151 | Doison | Ronald | Doison, Ronald & Rosita Doison, PHL v. Johnson & Johnson, et al | MD1-L-005986-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1950 | Second Amended Complaint, ¶ 2 | Yes |
| 152 | Dozier | Verna | Dozier, Verna L.P., PHL vs. Avon Products, Inc. | MD1-L-08467-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 153 | Drayner | Monica | Monica Drayner v Avon Products et al | 190124/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 154 | Dubois | Timothy | Timothy E. Dubois & Linda Dubois v. 3M Company, et al | 49D13-2404-CT-015028 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1956 | Complaint, ¶ 8 | No |
| 156 | Dugan | Edward | Edward Dugan and Paula Dugan v. Johnson & Johnson et al | 23-1762 | Massachusetts | Middlesex (MA) | Duffy Law LLC | Christopher P. Duffy | Yes | Yes | 1974 | First Amended Complaint ¶ 10 | No |
| 690 | Durkan | Ashling | Ashling Durkan v. Avon Products, Inc., et al. | 64929/2024 | New York | Westchester | Maune Raichle Hartley French & Mudd, LLC | Jessica Biosanidi | Yes | Yes | 197x | Complaint, Initial Fact Sheet, A | No |
| 157 | Dussia | Evan | Evan & Phyllis Dussia v. Whitaker, Clark, and Daniels, Inc. et al. | MD1-L-003947-15 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Jacob Jordan | Yes | Yes | 1961 | Complaint, ¶ 2 | No |
| 158 | Dvir | Jessica | Jessica Dvir & Athoshai Dvir v Avon Products Inc et al | 190247/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |

Case 23-01245-MBK    Doc 299-3    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion    Page 13 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 159 | Eaves | Frances | Eaves, G. Tykes, Administrator for Frances Eaves, Phf. v. Kolmar Laboratories, Inc., et al. | 19011/2021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Unclear based on face of complaint | NA | NA | Yes |
| 160 | Ebua | Regina | Joy Ebua, as Personal Representative of the Estate of Regina Ebua v. Avon Products, Inc., et al. | 23-1980 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Yes | 1984 | Complaint ¶ 18 | No |
| 161 | Egert | Ilene | Egert, Ilene, as Personal Representative of the Estate of Ilene G. Egert and Lewis Egert, Individually, Pltfs. v. Barretts Minerals, Inc., et al. | 190204/2021 | New York | New York | Weitz & Luxenberg P.C. | Erik Jacobs | Yes | Yes | 1950s | Amended Complaint, ¶ 33 (page 20) | No |
| 162 | Eichler | Joy | Joy Eichler and Helene Eichlers v Block Drug Company, inc et al. | MID-L-000394-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Amended Complaint, ¶ 5 | No |
| 163 | El-Abbasi | Patricia | MOHAMMAD EL-ABBASI, On His Own Behalf and on the Behalf of All Other Statutory Beneficiaries of PATRICIA ANNE EL-ABBASI, deceased v. AVON PRODUCTS, INC., et al. | CV2023-013113 | Arizona | Maricopa | Maune Raichle Hartley French & Mudd, LLC | Meghan K. McGlynn | Yes | Yes | 1968 | Complaint, ¶ 26 | No |
| 164 | Elaequa | Ann Marie | Ann Marie Elaequa and Michael Kaminsky v Avon Products, Inc et al. | EF2023-275144 | New York | Rensselaer | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1952 | Second Amended Complaint, ¶ 3 | No |
| 165 | Elmer | Denise | Denise Elmer v Avon Products, Inc et al. | MID-L-000656-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella | Yes | Yes | 1955 | Complaint, Initial Fact Sheet ¶ 5 | No |
| 166 | Elmer | Robert | Elmer, Robert, Phf. v. Charles B. Chrystal Company, Inc., et al. | EFC-2022-0597 | New York | Oswego | Weitz & Luxenberg P.C. | Thomas M. Comerford | Yes | Yes | 1985 | Second Amended Complaint, 107. | No |
| 167 | Emge | Alfons | EMGE EMGE, in her capacity as Personal Representative of the Estate of ALFONS EMGE v. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al. | 24-2-05155-0 | Washington | Pierce | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1971 | Complaint at 16:1 | No |
| 168 | Enciso | Hortensia | Hortensia Enciso, Ind. and a/n/f of MVE, a minor vs Natrem International, Inc., Brenting Specialties LLC and Brenntag North America, et al | 2022-60593-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1970s | Second Amended Complaint, ¶ 41 | No |
| 694 | Engebos | Gregory | Lori R. Frank, As Personal Representative For The Estate Of Gregory J. Engebos, vs. Ajax Steel Company LLC, f/l, al. | 2024-LA-854 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Brian Ukman | No | Yes | Late 1960s | Complaint, ¶ 6 | No |
| 169 | Engelhardt | Thomas | Engelhardt, Thomas and Catherine, Pltfs. v. Kolmar Laboratories, Inc., et al. | 190260/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 170 | Engelman | Alice | Alice Engelman v American International Industries et al. | MID-L-007011-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1977 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 171 | England | Carolyn | Carolyn England and David England v Sunstream Corporation of Americas, et al. | 190250/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 172 | English | Linda | Linda English and Patricia Raso v. Avon Products, Inc. et al. | 190346/2018 | New York | New York | Simmons Hanly Conroy LLP | Valeri L. Nassif | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 173 | Epstein | Ira | IRA I. EPSTEIN v. ALBERTSONS COMPANIES, INC. Individually and as successor-in-interest to American Stores Company, f/k/a Skaggs Companies, Inc., as successor-in-interest to Jewel Companies, Inc., et al | 2023L010467 | Illinois | Cook | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960s | First Amended Complaint, ¶ 6 | No |
| 174 | Escobar | Rosario | Rosario Escobar vs. Avon Products, et al. | MID-L-002313-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Guthman | Yes | Yes | 1970s | Third Amended Complaint, ¶ 4 | Yes |
| 175 | Esqueda | Guillermo | Esqueda, Guillermo C. and Roberto Esqueda, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-001185-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1967 | Second Amended Complaint, ¶ 4 | No |
| 176 | Eulau | Alan | Eulau, Alan and Barbara Eulau, Pltfs. vs Avon Products Inc., et al. | 190211/2020 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1960s | Second Amended Complaint, ¶ 72 | No |
| 177 | Evans | Dolores | CHRYSTAL EVANS-BOWMAN, individually and as successor-in-interest to DOLORES EVANS, vs. JOHNSON & JOHNSON et al. | 23CV043499 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid | Yes | Yes | 1950s | Complaint at 5:11-5:14 | No |
| 178 | Everest | Martha | Everest, Martha, Phf. v. AMP Bowling Centers, Inc., et al. | MID-L-007151-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1939 | Second Amended Complaint, ¶ 4 | Yes |
| 179 | Feldman | Geoffrey Robert | Pamela Frolio-Feldman, individually and as representative of the Estate of Geoffrey Robert Feldman v Bayer Consumer Care Holdings et al. | MID-L-000091-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1998 | Complaint, ¶ 4 | No |
| 180 | Feldman-Nagel | Sharon | Sharon Feldman-Nagel & Christopher Nagel v Acme Markets, Inc et al. | 190191/2022 | New York | New York | Weitz & Luxenberg P.C. | Amber Jae Brandis | Yes | Yes | 1960s | Fourth Amended Complaint, ¶ 239 | No |

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 181 | Feldt | Carolyn | KIMBERLY Y DRONEN, as Special Administrator for the Estate of CAROLYN K. FELDT, deceased v. AMADA AMERICA, INC., et al | 23-LA-1382 | Madison | Illinois | Maune Rachel Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1960s | Complaint, ¶ 6 | No |
| 182 | Ferrara | Angela | Ferrara, Angela, PHI v. Avon Products, Inc., et al. | 190219/2020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1950s | Fourth Amended Complaint, ¶ 214 | Yes |
| 713 | Ferris | Julie | Julie Ferris v. Avon Products, Inc., et al. | 190008/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 183 | Fielder | Frazier | Frazier Fielder & Mary Fielder v. Block Drug Company, Inc., et al. | MID-L-002315-24 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1961 | Complaint, ¶ 3 | No |
| 184 | Fields | Michael | LORI A.M. HOWARD, as Administrator CTA for the Estate of MICHAEL S. FIELDS, deceased v. AMERICAN INTERNATIONAL INDUSTRIES, et al | 2020-L-000447 | Madison | Illinois | Maune Rachel Hartley French & Mudd, LLC | James Morrow & Jon R. Neumann | Yes | Yes | 1980 | First Amended Complaint, ¶ 10 | Yes |
| 185 | Filip | Sharon | Sharon Filip and John Filip v Barretts Minerals et al | LFC-A2022001356 | Broome | New York | Weitz & Luxenberg P.C. | Peter Tambini | Yes | Yes | 1960 | Third Amended Complaint, 164. | No |
| 186 | Finch | Frank | Frank Finch & Ruth Finch v Barrett Minerals Inc. | MID-L-005951-22 | Middlesex (NJ) | New Jersey | Maune Rachle Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1980 | Third Amended Complaint, ¶ 2 | No |
| 720 | Fisher | Cynthia | Cynthia Fisher and Howard Fisher, her husband vs. American International Industries Individually and As successor-in-interest to Pinaud, Inc., Barbara Alice, Inc., Ed Pinaud, Inc. d/b/a Ed Pinaud, and Nestlé-Le Mur Company, All for The Clubman Line of Products | 24-0005907-ca27 | Broward | Florida | Dane Omar Brotham Shirley, LLP | Shawna Forbes-King | No | Yes | 1960s | Complaint, ¶ 18 | No |
| 187 | Fitch | John | Deborah J Fitch individually and as personal representative of the Estate of John Fitch v Block Drug Co, Inc et al | MID-L-003992-23 | Middlesex (NJ) | New Jersey | Maune Rachel Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1963 | Complaint, ¶ 4 | No |
| 188 | Fitzpatrick | Patricia | Richard Fitzpatrick III individually and as executor of the estate of Patricia Fitzpatrick v Chanel, Inc et al | 911055-23 | Albany | New York | Lipsitz Green Scime Cambria Simons Panatier, LLP | Brendan J. Tully | Yes | Yes | 1950s | Complaint, Plaintiff's Statement, ¶ 8 | No |
| 189 | Flanagan | Richard | Marilyna Keahn for the Estate of Richard Flanagan vs. Barretts Minerals, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-00174-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1961 | First Amended Complaint, ¶ 23 | No |
| 190 | Flater | Rose | Rose Flater and Bobbie Joe Flater vs. Albi Enterprises, et al | MID-L-003559-16 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 191 | Flemmin | Joanne | Joanne Flemmin and John Flemmin v. Askemu, Inc. f/k/a Pennraik Corp., et al | 21-022203 CA27 | Broward | Florida | Flint Cooper, LLC | Rebecca Vinocur | Yes | Yes | 1974 | Seventh Amended Complaint, ¶34 | Yes |
| 192 | Fogel | Leslie | Leslie Fogel and Catherine Fogel, PHA v. American International Industries for Clubman, et al Whittaker, Clark, and Daniels, Inc. et al. | 190093/2016 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Unclear based on face of complaint | 1956 | NA | No |
| 723 | Forstland | Carla | Carla Forstland and Blake Forstland v. Beacon Cmp Corp., et al | MID-L-00002879-24 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah C. Kagan | Yes | Yes | 1956 | Complaint, ¶ 2 | No |
| 193 | Friedman | Ilana | Ilana Friedman and Arthur Friedman v. ABC Supply Co, Inc, et al | 190283/2015 | New York | New York | The Lanier Law Firm, PLLC | Darren Berquist | Yes | Yes | 1961 | Initial Fact Sheet, 6. | No |
| 195 | Frissora | Annette | Frissora, Annette, PHI v. Avon Products, Inc., et al. | MID-L-004867-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 196 | Frith | Marjorie | TRACEI SHORE, as representative of the estate of MARJORIE FRITH, and as surviving daughter and on behalf of decedent's other surviving statutory beneficiaries, and SHERI GRAY and CHRISTINA FRITH v. BRENNTAG SPECIALTIES, INC., et al. | CV2020-094998 | Maricopa | Arizona | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1956 | Complaint, ¶ 2. | Yes |
| 197 | Frackley | Vikki | Vikki Frackley v 3M Company et al. | 190007/2024 | New York | New York | Levy Konigsberg LLP | Denise S. Perungmeri | Yes | Yes | 1973 | Complaint, Initial Fact Sheet, ¶ 6. | No |
| 198 | Fullmore | Catherine | Fullmore O'Neal, Denise, for the Estate of Catherine Fulmore, Phi. vs Avon Products Inc., et al. | 190157/2020 | New York | New York | Weitz & Luxenberg P.C. | Jeffrey S. Kanca | Yes | Yes | 1975 | Amended Complaint, ¶ 75. | Yes |
| 199 | Galan | Melvin | Galan, Melvin & Louise, Phi. v. Kohner Laboratories, et al. | 190287/2020 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 691 | Gallobdar | Roya | Roya Owlad Gallobdar and Abdul Hassan Owlad Gallobdar vs. Avon Products, | 2024CP404185 | Richland | South Carolina | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | 1980s | Plaintiff's Complaint, ¶ 4 | No |
| 200 | Gallo | John | Diana Farris, ind and as fiduciary of the Estate of John Gallo v Avon Products, Inc., et al | 190027/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 201 | Garces | Laura | LAURA GARCES vs. AVON PRODUCTS, INC. et al. | 23CV032898 | Alameda | California | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1965 | Complaint, Exhibit A | No |

Case 23-01245-MBK   Doc 299-3   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion   Page 15 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 203 | Gardener | John | John Gardener and Vivienne Gardener v. Brenntag North America, Inc., used individually and as successor-in-interest to Mineral Pigment Solutions, Inc. and as successor-in-interest to Whitaker Clark & Daniels, Inc., et al | 22-012299 CA27 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1960 | First Amended Complaint ¶ 8 | Yes |
| 204 | Garnes | Rosa | Garnes, Rosa & David Rodney Garnes, Phila. v. 3M | EF2022-00000051 | Jefferson (NY) | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | Late 1960s | Complaint, ¶, 5. | Yes |
| 206 | Garton | Barbara | Watkins, Dana, as Administrator and Administrator Ad Prosequendum of the Estate of Barbara Garton, PBI, v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002423-22 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1970s | Second Amended Complaint, ¶ 5 | No |
| 208 | Gattone | Peggy | Peggy B. Gattone and Peter Gattone, etc., v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003039-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Third Amended Complaint, ¶ 2 | Yes |
| 209 | Gee | Margaret | Margaret Gee v Avon Products, Inc et al | 190076/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 210 | Geittmann | Peter | PETER B. GEITTMANN, M.D. and MARGARET M. GEITTMANN v. ARKEMA, INC., f/k/a Pennwalt Corporation, et al | 24-L-1848 | Cook | Illinois | Maune Raschel Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1970s | First Amended Complaint, ¶ 7 | No |
| 211 | Gentle | Samantha Leigh | Riggs, Cynthia, for the Estate of Samantha Leigh Gentle, Phil. v. Avon Products, Inc. et al | MID-L-007729-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1965 | Complaint, ¶ 5 | Yes |
| 212 | Gerken | Anna | Andrew T. Gerken, individually and as Personal Representative of the Estate of Anna Marie L. Gerken, deceased v. Avon Products, Inc., et al. | 2023-CP-40-00611 | Richland | South Carolina | Dean Omar Branham Shirley, LLP | Mark Bisha | Yes | Yes | 1944 | First Amended Complaint ¶ 2 | No |
| 213 | Geraldi | Shannon | Gary Marcotte, Individually and as Administrator for the Estate, Shannon Geraldi v. Barretts Minerals Inc., et al. | PC-2023-01861 | Bristol | Rhode Island | Motley Rice LLC | Vincent L. Greene | No | Yes | 1990s | First Amended Complaint ¶ 1 | No |
| 214 | Geter | Rebecca | Geter, Rebecca, Phil. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003819-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Second Amended Complaint, ¶ 4 | Yes |
| 215 | Geyer | Ellen | Ellen Geyer v. Brenntag North America, Inc. & Brenntag Specialties, Inc., et al | MID-L-003463-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Kimberly Russell | Yes | Yes | 1955 | Second Amended Complaint, ¶ 5 | Yes |
| 216 | Gibbs | Elaine | Elaine Gibbs and John Gibbs v Avon Products, Inc et al. | 190221/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 217 | Gibbs | Danny | Michelle Gibbs, individually and as administratrix of estate of Danny Gibbs v Arkema, Inc et al. | 23-1-2-02901 | Philadelphia | Pennsylvania | Meirowitz & Wasserberg, LLP | Nedra Wilson | Yes | Yes | 1996 | Complaint, Schedule 1 | No |
| 218 | Gilbride | Ellyn | Gilbride, Ellyn, Phil. v. Johnson & Johnson, et al. | MID-L-002848-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1940s | Second Amended Complaint, ¶ 2 | Yes |
| 219 | Girrer | Glenda | Glenda R. Girrer and Dale Girrer vs. Anco Insulations, Inc., et al. | C-745104 | East Baton Rouge Parish 19th JDC | Louisiana | Landry & Swarr, LLC / Dean Omar Branham Shirley, LLP | Mickey P. Landry / Frank J. Swarr / Matthew C. Clark / Jordan Bollinger | Yes | Yes | 1940s | First Supplemental and Amended Petition, ¶ 10 | No |
| 220 | Goffreda | Karen | Goffreda, Karen, Phil. v. Avon Products, Inc., et al. | MID-L-000274-21 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1954 | First Amended Complaint, ¶ 5 | Yes |
| 221 | Goldstein | Lin | Goldstein, Lin, Phil. v. Chanel, Inc., et al. | 1901082022 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 222 | Gomez | Maria | Maria Gomez v. Arkema, Inc. f/k/a Pennwalt Corp., et al | CACE-21-002366 | Broward | Florida | Simon Greenstone Panatier, PC | Frank Walton | Yes | Yes | 1977 | Complaint ¶ 15 | Yes |
| 223 | Gomez | Dolores | Gomez Dolores, Phil. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | 1901182020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1961 | Complaint, ¶ 91 | Yes |
| 224 | Gonzales | Susan | ALEXANDER GONZALES, Individually, and ALEXANDER GONZALES as Personal Representative of the Estate of SUSAN GONZALES, Deceased v. AUTOZONE, INC, et al. | 2021CV32313 | Denver | Colorado | Simon Greenstone Panatier, PC | Robert A. Green, Deirdre E. Ostrowski, Esq | Yes | Yes | 1951 | Complaint, ¶ 48 | Yes |
| 225 | Gonzalez | Linda | Linda Gonzalez v. Whitaker, Clark, and Daniels, Inc., et al. | 190074/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 226 | Goode-Evans | Dorothy | Dorothy Goode-Evans and Herbert Evans v. Avon Products, Inc., et al | 23-2731 | Middlesex (MA) | Massachusetts | Thornton Law Firm LLP | Andrea Landry | Yes | Yes | 1950s | First Amended Complaint ¶ 12 | No |
| 228 | Graham | Elise Louise | ELISE CHATFIELD, as Personal Representative of the ESTATE OF ELSIE LOUISE GRAHAM, v. BRENNTAG NORTH AMERICA, INC., et al. | 21CV34505/21-CV-01399-HZ | Multnomah | Oregon | Dean Omar Branham Shirley, LLP | Jessica Dean / Jordan Hinnenfeld-James | Yes | Yes | Early 1950s | First Amended Complaint ¶ 13 | No |

JA815

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 230 | Grandachelli | Georgia | Georgia Grandachelli and Gordon Grandachelli v Axcel Health & Beauty, Inc., et al. | MID-L-002784-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella | No | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 232 | Gray | Kim | Gray, Kim, Phil. vs. Johnson & Johnson, et al. | MID-L-005932-19 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1967 | Sixth Amended Complaint, ¶ 2 | Yes |
| 233 | Greenage | William | William Greenage v Avon Products, Inc et al. | 190095/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 234 | Gref | Brian | Gref, Brian, Ph. vs American International Industries, et al. | 190178/2020 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1982 | Second Amended Complaint, ¶ 1 | Yes |
| 235 | Griffith | Richard | Richard Griffith & Dee Griffith v Barretts Minerals Inc, et al. | MID-L-000154-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Graham | Yes | Yes | 1982 | Fourth Amended Complaint, ¶ 4 | Yes |
| 236 | Grigoli | Salvatore | Salvatore Grigoli and Vincenza Grigoli v 3M Company et al. | 190200/2023 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | Mid-1950s | Complaint, Initial Fact Sheet, ¶ 6 | No |
| 237 | Grimes - Lowe | Toni | Grimes-Lowe, Toni R., Phil. v. Abertec Cosmetics, Inc., et al. | MID-L-001991-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F. Alexander Eulen | Yes | Yes | 1950s | Second Amended Complaint, ¶ 4 | No |
| 238 | Guffey | William | William P Guffey and Brenda L Guffey v Amerihan, Inc, et al. | MID-L-006146-23 | New Jersey | Middlesex (NJ) | Maune Raiche Hartley French & Mudd, LLC | Phan Alvarado | Yes | Yes | 1953 | First Amended Complaint, ¶ 4 | No |
| 239 | Guild | Gregory | Gregory Guild and Nancy Guild, Phfs. vs. Brenntag North America, et al. | MID-L-003527-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1960 | Fourth Amended Complaint, ¶ 4 | No |
| 240 | Gumpert | Esther | Gumpert, Esther and Gary Gumpert, Phfs. v. Avon Products, Inc, et al. | 190056/2022 | New York | New York | Weitz & Luxenberg P.C. | Amber Jae Brandis | Yes | Yes | 1950s | Fourth Amended Complaint, 176 | No |
| 241 | Guith Cook | Denise J. | Denise J. Guith Cook v. Advance Stores Company, Incorporated, et al. | CACE-24-003818 | Florida | Broward | Maune Raiche Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1960s | Complaint, ¶ 5 | No |
| 242 | Haas | Beverly | Haas, Charles, Administrator for the Estate of Beverly Haas, Deceased, and Stephen Haas, Phfs. v. Abtray, Inc., et al. | MID-L-03339-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1946 | Complaint, ¶ 6 | Yes |
| 243 | Habib | Nagwa | Habib, Nagwa N., Phil. v. Barretts Minerals Inc., et al. | 2021-2381 | New York | Schenectady | Weitz & Luxenberg P.C. | Thomas M. Comerford | Yes | Yes | 1982 | Second Amended Complaint, 78 | No |
| 244 | Haghani | Mahtab | Mahtab Haghani & Martin Haghani v Avon Products Inc et al. | 190263/2022 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 245 | Hagwood | Steven | Hagwood, Steven R., PHL v. Avon Products, Inc., et al. | MID-L-001265-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1973 | Third Amended Complaint, ¶ 2 | Yes |
| 247 | Hammond | Jane | Jane Hammond and Colin Hammond v Avon Products, Inc et al. | 190162/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 727 | Haney | Verda | Verda Haney v. Advance Stores Co., Inc., et al | 49D13-2404-CT-019200 | Indiana | Marion | Dean Omar Branham Shirley, LLP | Sarah Broderick | Yes | Yes | 1955 | Complaint ¶ 6 | No |
| 249 | Harper | Charlene | Mereduth Harper, as Trustee for the next-of-kin of Charlene Harper, Deceased, v. Target Brands, Inc. et al. | 62-CV-23-2656 | Minnesota | Ramsey | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1950s | First Amended Complaint, ¶ 3 | No |
| 250 | Harrell | Helen | Helen Harrell & David Odell v IRNA, et al. | MID-L-002525-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1971 | Second Amended Complaint, ¶ 5 | No |
| 251 | Harrington | Virginia | Harrington, Virginia, Phf. v. Johnson & Johnson, et al. | MID-L-006733-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1985 | Complaint, ¶ 2 | Yes |
| 252 | Harris | Kimberly | Harris, Kimberly C. and Michael Harris, Phfs. v. Avon Products, Inc., et al. | MID-L-004711-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1970s | Second Amended Complaint, ¶ 3 | No |
| 714 | Hart | Theresa | Theresa L. Hart & Thomas Hart v. Avon Products, Inc., et al. | MID-L-003399-24 | New Jersey | Middlesex (NJ) | Maune Raiche Hartley French & Mudd, LLC | Suzanne Ratcliffe | Yes | Yes | 1970s | Amended Complaint, ¶ 2 | No |
| 253 | Harman | Robert | Harman, Robert and Karen Harman, Phfs. v. Akyema International, et al. | MID-L-000953-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1980 | Fifth Amended Complaint, ¶ 1 | No |
| 254 | Hatcher | Kimberly | KIMBERLY HATCHER v. ALBERTSON'S LLC et al. | 22CV021209 | California | Alameda | Simmons Hanly Conroy LLP | Christina A. Renken | Yes | Yes | 1962 | Complaint, ¶ 2 | Yes |
| 255 | Hathaway | Todd | Todd Hathaway & Fayda Hathaway v Avon | 809575/2023 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1975 | Complaint, Plaintiff's Statement, No. 8 | No |
| 255 | Haus | Elizabeth | Elizabeth Haus and Emery Haus vs Avon Products, Inc., et al. | MID-L-000895-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Leah Kagan | Yes | Yes | 1971 | Complaint, ¶ 2 | Yes |
| 257 | Hawkins | Terrance | Terrance Hawkins and Ona Brandt v Ademu, Inc. et al. | 190028/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 665 | Heard | Marlane | Marlane Heard v. Charles B. Chrystal Company, Inc., et al. | 190123/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 258 | Helm | Patrick | Mary Helm individually and as Administrator of the estate of Patrick Helm v Brenntag Specialties, Inc et al | MID-L-006342-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1999 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 259 | Helmuth | Leland | Leland J. Helmuth v. 3M Company, et al. | 49D13-2402-CT-003670 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1950s | Complaint, ¶ 5 | No |

JA816

Case 23-01245-MBK    Doc 299-3    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion    Page 17 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor in Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 260 | Herstel | Nancy | Pfister, Peggy/Estate of Nancy Ann Hempel, Phf. v. Avon Products, Inc., et al. | 49D13-2108-MI-029127 | Marion | Indiana | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 261 | Henderson | Jeannine | Jeannine Henderson vs. Taylor-Seidenbush, Inc., et al. | 2022-10279 | Orleans Parish CDC | Louisiana | Philip C. Hoffman, LLC; Dam Omar Brasham Shirley, LLP | Philip C. Hoffman; Joshua Dam; Samuel J. Isla | Yes | Yes | 1950's | Complaint, ¶ 7 | Yes |
| 262 | Herman | Elaine & Jacob | Elaine Adella Hickey Herman and Jacob Russell Herman, Sr. v. American Honda Motor Co. Inc., et al. | FBT-CV-23-6124687-S | Fairfield at Bridgeport | Connecticut | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1950s | First Amended Complaint, ¶ 81 | No |
| 263 | Heston | Raymond | Heston, Raymond and Sandra, Pltfs. v. Avon Products, Inc., et al. | MID-L-007187-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Erin M. Boyle | Yes | Yes | 1950s | Complaint, ¶ 2 | Yes |
| 264 | Hicks | Teresa | Frank Hicks & Est of Teresa Hicks v Avon Products et al | 190014/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 265 | Hidvegi | Nubia | Nubia Hidvegi v. Publix Super Markets, Inc., et al | 24-0006-Z-CA-01 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Rebecca Vincour | Yes | Yes | 1950s | Complaint, ¶ 39 | No |
| 266 | Higginbotham | Robert | Robert and Linda Higginbotham vs. 3M Company, B Brenntag Specialties LLC, et al | 2019-59941-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1946 | Amended Complaint, ¶ 15 | Yes |
| 707 | Higgins | Wendi | Wendi Higgins vs. The Bargain Barn, Inc. et al | 2024-CP-40-03642 | Richland | South Carolina | Maune Raichle Hartley French & Mudd, LLC | Joshua Cagle | Yes | Yes | 1960s | Plaintiff's Complaint ¶ 6 | No |
| 267 | Hildebrandt | Martin | SARAH HILDEBRANDT, as representative of the estate of MARTIN HILDEBRANDT, and as surviving Spouse and on behalf of decedent's other surviving statutory beneficiaries, and KARA HILDEBRANDT JORDON, v. 3M COMPANY a/k/a MINNESOTA MINING & MANUFACTURING COMPANY, et al. | CV202b-09399J | Maricopa | Arizona | Simon Greenstone Panatier, PC | Erica Falkner | Yes | Yes | 1954 | Complaint, ¶ 10 | Yes |
| 736 | Hill | Duane | Duane Hill v. Sumitomo Corporation of Americas, et al. | 190094/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 269 | Hinkle | Sandra | Sandra L Hinkle v Arkema, Inc et al | 23-04-01956 | Philadelphia | Pennsylvania | Maune Raichle Hartley French & Mudd, LLC | Brian M. Uleman | Yes | Yes | 1950s | Amended Complaint, ¶ 4e | No |
| 270 | Hodge | Pauline | Gary Hodge, individually and as representative of the Estate of Pauline Hodge v. Avon Products, et al. | L6CL151100 | Polk | Iowa | Simon Greenstone Panatier, PC | Frank J. Wathen; James H. Cook | Yes | Yes | 1954 | Second Amended Petition, ¶ 7 | Yes |
| 271 | Hoeppner | Gerald | GERALD R. HOEPPNER and THERESA HOEPPNER v. A.O. SMITH CORPORATION, et al | 23-LA-1697 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Michael V. Ohlmann | Yes | Yes | 197s | Complaint, ¶ 6 | No |
| 273 | Hoffman | Vanessa | Hoffman, Vanessa, Phf. v. Barrett Minerals, Inc., et al | MID-L-0032-44-21 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Erin M. Boyle | Yes | Yes | 1967 | Second Amended Complaint, ¶ 6 | No |
| 274 | Hofmaister | Sharon | SHARON HOFMAISTER v. JOHNSON & JOHNSON, et al. | 23CV033743 | Alameda | California | Karen McClain Satterley & Greenwood | Michael T. Stewart | Yes | Yes | Early 1960s | Complaint, ¶ 18-22 | No |
| 275 | Hogue | Tamie | Lucy Hogue, Ind. and as Personal Rep. of Tamie Hogue, Deceased, Jennifer Clyborn vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2021-53353-ASB | Harris | Texas | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1954 | Second Amended Complaint, ¶ 31 | No |
| 276 | Hsheng | Womette | Womette A. Hsheng v. Avon Products, Inc., et al | MID-L-002758-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1981 | Amended Complaint, ¶ 2 | No |
| 277 | Holloman | Karlene | Holloman, Karlene, Phf., vs. Avon Products, Inc., et al | 190077/2018 | New York | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 278 | Holley | Luther Roy | Holley, Gladys Elaine, Individually and as Executrix of the estate of Luther Roy Holley, Deceased, Phf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002858-19 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | Mid-1960s | Complaint, ¶ 2 | Yes |
| 279 | Hollifield | Pattie | Brenda Best individually and as executor of the estate of Pattie Hollifield v Conepco, Inc et al | 190295/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 280 | Holloway | James | JAMES L. HOLLOWAY and GAIL M. HOLLOWAY v. ABB, INC., Individually and as successor-in-interest to ITE Imperial Company, f/k/a I-T-E Circuit Breaker Company, et al | 2024LA000200 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Thomas Gibbons | Yes | Yes | 1963 | Complaint, ¶ 6 | No |
| 281 | Holmes | Agnes | Agnes A. Holmes v. Avon Products, Inc. | MID-L-005412-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ 6e | Yes |
| 282 | Holtermann | Patrice | Holtermann, Alisa, Administrix for the Estate of Patrice Holtermann, Phf. v. American International Industries, et al. | 190058/2021 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1983 | Amended Complaint, ¶ 66 | Yes |

11

JA817

Case 23-01245-MBK   Doc 299-3   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion   Page 18 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Exposure? | Year of Initial Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 283 | Hollschnacher | Betty | Hollschnacher, Betty and Stanley Hollschnacher, 786, vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MJD-L-003009-16 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 285 | Horsch-Nusbaum | Ruth | Horsch-Nusbaum, Ruth, Plt. vs Avon Products Inc., et al. | MJD-L-006015-20 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | No | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 286 | Howard | Elizabeth | Christopher L. Lewis, individually and as Personal Representative of the Estate of Elizabeth A. Howard, Deceased v. Asbestos Corporation Limited, et al. | 2024-CP-40-00458 | Richland | South Carolina | Dean Omar Branham Shirley, LLP | Aaron Chapman | Yes | Yes | 1963 | Complaint, ¶ 14 | No |
| 675 | Hucknall | Victoria | Victoria Hucknall and Simon Hucknall vs. L'Oreal Travel Retail Americas Inc d/b/a Lancome, L'Oreal, L'Oreal USA | 2024-01427-CA,01 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | Late 1970s | Complaint, ¶24 | No |
| 288 | Huff | Linda | Johncie D. Huff, Individually and as Administrator and Administrator ad Prosequendum of the Estate of Linda Kay Huff, Deceased v. Arkema, Inc., et al. | MJD-L-002818-17 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1956 | Fifth Amended Complaint, ¶ 4 | Yes |
| 289 | Hug | Monique | Hug, Monique G. and Jean Phillip Hug, Plfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MJD-L-004862-15 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Complaint, ¶ 2 | Yes |
| 291 | Hunter | Jaqueline | Jacqueline Hunter v Brenntag North America et al. | MJD-L-007131-23 | New York | New York | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1960 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 292 | Hutchings | Catherine | Catherine Hutchings v Avon Products, Inc et al. | 190115/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 666 | Huxley | Aleksandra | Aleksandra Huxley and Howard Huxley v. Conopco, Inc., et al. | 190116/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 293 | Iacovangelo | Jean | Jean Iacovangelo and Frank Iacovangelo v Arkema, Inc et al | E2023005779 | Monroe | New York | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1941 | Complaint, 3. | No |
| 294 | Izzi | Deborah Kaye | Nicole Godena, Individually and APR the estate of Deborah Kaye Izzi v HNA et al. | MJD-L-004147-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | James Andrew Plastiras | Yes | Yes | 1976 | Third Amended Complaint, ¶ 4 | No |
| 295 | Infante | Irma | Irma M Infante v Barretts Minerals et al. | 190137/2022 | New York | New York | Lanier Law Firm PLLC | Darron Berquist | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 676 | Islin | David | David Islin vs. L'Oreal Travel Retail Americas, Inc. used individually and as successor-in-interest to Helena Rubinstein, Inc. and d/b/a Helena Rubinstein | 2024-014273-CA,01 | Miami-Dade | Florida | Simon Greenstone Panatier, PC | Brendan Tully | Yes | Yes | 1950s | Complaint, ¶26 | No |
| 296 | Jack | Mary | Mary L. Jack and David L. Duyen v. Brenntag Specialties, Inc., et al. | 190035/2024 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 297 | Jackson | Johnnie | Jackson, Johnnie & Mattie, Plfs. v. Barretts Minerals Inc., et al. | MJD-L-006778-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 5 | No |
| 298 | Jacoby | Lisa | Jacoby, Lisa and William Jacoby, Plfs. v. Barretts Minerals Inc., et al. | 190174/2021 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Patti Lynn Hawkins | Yes | Yes | 1971 | Third Amended Complaint, ¶ 16 | Yes |
| 299 | Jacomia | Lamona | Joseph Anthony Jacomia, Individually and as executor and executrix of the Estate of Lamona Jacomia, Plfs. vs 3M Company, etc., et al. | MJD-L-002995-17 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1953 | Second Amended Complaint, ¶ 5 | Yes |
| 300 | James | Suzanne | James, Suzanne, Plf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MJD-L-002078-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950 | Second Amended Complaint, ¶ 5 | No |
| 301 | Jarvis | Patricia | Patricia Jarvis v. L'Oreal Travel Retail Americas, Inc., d/b/a Lancome, et al. | 23-015081 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vincour | Yes | Yes | 1960s | Complaint, ¶31 | No |
| 302 | Jams | Kathy | Kathy Jarns and James Jarns vs. Johnson & Johnson, et al. | MJD-L-002260-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Jacob Jordan | Yes | Yes | 1962 | Fifth Amended Complaint, ¶ 4 | Yes |
| 303 | Jauregui | Maria | Maria Jauregui v Avon Products, Inc et al. | 190189/2022 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 304 | Jimenez | Luis | Luis Jimenez and Maria Jimenez v. Johnson & Johnson, et al | 23-L-01613 | Cook | Illinois | Bexley Allen Law Firm | Gunaris Trial Lawyers, LLC - Joshua A. Edelson / Edelson/Vogelzang - Christian Lucarno | No | Yes | 1997 | Complaint, ¶11 | No |
| 305 | Johnson | Gregory S. | Gregory S. Johnson and Barbara J. Johnson v. American International Industries, et al. | 2025CP4006919 | Richland | South Carolina | Dean Omar Branham Shirley, LLP | Rachel Gross | Yes | Yes | 1960s | Complaint, ¶48 | No |
| 306 | Johnson | Neil | Neil Johnson and Carol Johnson v General Electric Company et al. | 190266/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |

12

JA818

Case 23-01245-MBK   Doc 299-3   Filed 09/12/24   Entered 09/12/24 00:24:45   Desc
Exhibit C - Declaration of Lathrop B. Nelson   III in Support of Motion   Page 19 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Doherty in Complaint? | Allegations of Pre-Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 751 | Johnson | Elaine | ELAINE JOHNSON v. 3M COMPANY, et al. | 241,3829 | Cook | Illinois | Vogeltang Law | Michelle T. Pawlowski | Yes | Yes | 1931 | Complaint, Exhibit II | No |
| 307 | Johnson-Brett | Linda | Johnson-Brett, Linda and Bradford Brett, Pltfs. v. A.O. Smith Corporation, et al. | E202200269B | Monroe | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N.A. | Yes |
| 308 | Jones | Walter | Walter and Billie Jones vs. 3M Company, Brenntag Specialties LLC, et al | 21-05236-E | Harris | Texas | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1967 | Complaint, ¶ 55 | No |
| 701 | Jones | Janet | Janet Jones v. Avon Products, Inc., et al. | MID-L-003693-24 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1954 | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 309 | Jordan | Judith | Judith Jordan, Pltf. v. Brenntag Specialties, Inc., et | 190072/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N.A. | Yes |
| 669 | Jovanovich | Sam | Sam Jovanovich, Jr. v. BASF Catalysts LLC, et al | 2024LA000509 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | Michael V. Oltmann | Yes | Yes | 1960s | Complaint - Count I, ¶ 6 | No |
| 674 | Jurrist | Gail | Gail Jurrist and David Jurrist v. Colgate-Palmolive Co., et al. | 190302/2024 | New York | New York | Weitz & Luxenberg P.C. | Sam Kerley | Yes | Yes | 1940s | First Amended Complaint, ¶ 51 | No |
| 310 | Katz | Kraig | KRAIG KAATZ and ARLENE KAATZ, his wife v. 84 LUMBER COMPANY, et al. | 2023L006335 | Cook | Illinois | Simmons Hanly Conroy LLP | Taylor L. Kerns | Yes | Yes | 1972 | Complaint ¶ 2 | No |
| 689 | Kautzig | Steven | Linda Kautzig, Individually and as Executrix and Executrix Ad Prosequendum of the Estate of Steven Kautzig v. Brenntag Specialties, LLC, et al. | MID-L-003928-24 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber Long | Yes | Yes | 1967 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 311 | Kantor | William | Debra A. Kantor and William L. Kantor v. A.O. Smith Corporation, et al | 2024L002627 | Cook | Illinois | Vogeltang | Michelle Pawlowski | Yes | Yes | 1953 | Complaint, page 13 | No |
| 312 | Kelso | Constance | Constance Kelso v. Atkema, Inc., et al. | CV21949769 | Cuyahoga | Ohio | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | Early 1970s | Complaint, page 34 | No |
| 313 | Kelz | Robin | Robin Kelz v Bobbi Brown Cosmetics et al. | MID-L-006153-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960 | Third Amended Complaint, ¶ 2 | No |
| 314 | Kendrick | Wendy | Wendy Kendrick and Charlella Kendrick v. Avon Products, Inc., et al. | CACE-21-014417 | Broward | Florida | Flint Cooper, LLC | Rebecca Vinecor | Yes | Yes | 1982 | First Amended Complaint, ¶ 26 | Yes |
| 315 | Kerley | Beverly | Beverly N. & John Kerley, Pltfs. v. Brenntag Specialties, Inc., et al. | MID-L-00661/2-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1950s | Second Amended Complaint, ¶ 5 | No |
| 316 | Kernahan | Louise | Louise Kernahan and Martin Kernahan v Sumitomo Corp of America et al. | 190283/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | Unclear based on face of complaint | N.A. | No |
| 317 | Kershner | Barbara | Christa Ruth Machado individually and representative of estate of Barbara Kershner v Avon Products, Inc et al. | MID-L-007200-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1961 | Complaint, ¶ 4 | No |
| 319 | Kieboom | Carol | Carol Kieboom and Herman Kieboom v Avon Products Co et al. | 190157/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | N.A. | No |
| 320 | Kier | Edward | Johnny Mire, Ind. and as Personal Rep. of the Estate of Edward Kier, Deceased vs. Brookshire Grocery Co., Brenntag Specialties LLC and Brenntag North America, et al | 2022,55642-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1976 | Complaint, ¶ 32 | No |
| 321 | King | Elizabeth | Stanley E. King, as Personal Representative of the Estate of Elizabeth H. King, Deceased v. Avon Products, Inc., et al. | 23-017495 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Bosserman | Yes | Yes | 1967 | Complaint ¶ 5 | No |
| 725 | King | Martha | Martha Moracchini King and Justin W. King v. Allstate, Inc., et al. | CACE-24-005989 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Bosserman | No | Yes | 1970s | Complaint - See Exposure Sheet | No |
| 323 | Keiler | Leonard | Leonard Keiler vs. Breaux Mart Supermarkets, Inc., et al | 2021-07239 | Orleans Parish CDC | Louisiana | Landry & Swarr, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry, Frank J. Swarr, Matthew C. Clark, Holly C. Peterson | Yes | Yes | 1953 | Petition, ¶ 4 | No |
| 324 | Kirstberg | Frederick | Carol Kirstberg individually and as Administrator of estate Frederick Kirstberg v Avcarto, Inc., et al. | MID-L-005204-23 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1980 | Complaint, ¶ 4 | No |
| 325 | Kirkwood | Bernice | Chatman, Lanya, Estate of Bernie Annette Kirkwood, Pltf., v. Avon Products, Inc., et al | MID-L-008746-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1958 | Complaint, ¶ 7 | Yes |
| 326 | Kittel | Linnie | Mary Ann Kittel, Individually and as Personal Representative of the Estate of Linnie P. Kittell v. Bell & Gossett Company, et al | 19-035889 | Miami-Dade | Florida | The Ferraro Law Firm P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1963 | Complaint¶14 | No |
| 327 | Klar | Ilona | Ilona Klar and Robert Klar v American International Industries, Inc., et al. | MID-L-000176-24 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1968 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 328 | Klayman | Hope | Hope Klayman and Mark Steven Klayman v. American International Industries Inc, et al. | MID-L-004994-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Fifth Amended Complaint, ¶ 4 | Yes |
| 329 | Kleinman | Kenneth | Kenneth Kleinman and Marsha Reppato vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022,08588-ASH | Harris | Texas | Simon Greenstone Panatier, PC | Frank J. Wathen | Yes | Yes | 1988 | Second Amended Complaint, ¶ 27 | Yes |

JA819

13

Case 23-01245-MBK    Doc 299-3    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion    Page 20 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 330 | Klinker | Leah | Leah C. Klinker v. Avon Products, Inc., et al | 23-021414 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1999 | Complaint, ¶73 | No |
| 708 | Klitus | Nancy | Nancy Klitus v. Block Drug Co., Inc., et al. | MID-L-003530-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | John W. Stevenson | No | Yes | 1944 | Complaint, ¶2 | No |
| 331 | Knight | Julie | Julie Knight vs Avon Products, Inc., et al | 190173/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 332 | Knollmeyer | Joel | Cheryl Knollmeyer, Individually and as Proposed Administrator of the Estate of Joel Knollmeyer, Deceased v. All, et al. | MID-L-000981-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grabman | Yes | Yes | 1960s | Amended Complaint, ¶4 | No |
| 333 | Knox | Margaret | Kimberly Milligan, as Independent Administrator of the Estate of Margaret Knox, Deceased v. Cosmetic Specialties, Inc., et al. | MID-L-000786-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1972 | Complaint, Initial Fact Sheet, ¶5 | No |
| 678 | Kobel | Audrey | JENNIFER BARBINGER, individually and as successor-in-interest to AUDREY KOBEL and JODY CULVER, v. BRENNTAG SPECIALTIES, LLC; sued individually, and as successor-in-interest; parent, alter ego, and equitable trustee to BRENNTAG SPECIALTIES, INC. (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC., and as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC., et al. | 24CV884604 | California | Alameda | Kazan McClain Satterley & Greenwood | Akinyemi Ajayi | Yes | Yes | Early 1960s | Complaint at 4:17-20 | No |
| 334 | Koebel | Renee | Renee Koebel and Donovan Koebel v Avon Products, Inc., et al | MID-L-002945-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1965 | Complaint, Initial Fact Sheet, ¶5 | No |
| 335 | Kopel | Robert | Cynthia L. Kelley, Personal Representative of the Estate of Robert S. Kopel, Deceased v. Bayer Healthcare, LLC, et al | CACE-23-19145 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiBona | Yes | Yes | 1943 | First Amended Complaint, ¶3 | No |
| 336 | Kopp | John | Kopp, John R. and Christine Kopp, PHs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | 6/9596/2020 | New York | Suffolk | Weitz & Luxenberg P.C. | Andrew Gayoso | Yes | Yes | 1955 | Third Amended Complaint, ¶82 | Yes |
| 337 | Kral | Janet | JANET J. KRAL and LINUS B. KRAL v. AVON PRODUCTS, INC., et al | 2023-LA-001419 | Illinois | Madison | Maune Rachel Hartley French & Mudd, LLC | Tenah Brirke | Yes | Yes | 1950s | Complaint, ¶6 | No |
| 339 | Kukuvuga | Edward | Shirley Kukuvuga, Individually and as Personal Representative of the Estate of Edward Kukuvuga vs Burnett Process Inc., et al | E2021009637 | New York | Monroe | The Lanier Law Firm, PLLC | Darren Berquist | Yes | Yes | 1960 | Initial Fact Sheet, ¶¶ 16-17 | No |
| 340 | Kureh | Gail | Gail Kureh and Zev Primer v Arkema, Inc et al | 190280/2022 | New York | New York | Weitz & Luxenberg P.C. | Sam Keeley | Yes | Yes | 1950s | Amended Complaint, 47 | No |
| 341 | Larson | Larry | Larry Larson and Stephanie Larson v. Advance Auto Parts, Inc., et al | MID-L-006673-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1968 | Second Amended Complaint, ¶9 | No |
| 342 | Lambert | Charles R. | Whitney Lambert, and as successor in interest to Charles R. Lambert, deceased; Nell Ann Burnhart; Brenda Corbello; Sheila Labarge; Greg Lambert; Vicki Lambert; Angel Tedoroppo; v. Albertson Companies, Inc. et al | 23STCV27302 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder | Yes | Yes | 1940s | Complaint, Exhibit A | No |
| 343 | Lane | Thurman D. | Thurman D. Lane and Deborah L. Lane v. Block Drug Company, Inc., et al | MID-L-005938-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1943 | Complaint, Initial Fact Sheet, ¶5 | No |
| 344 | Lanehart | Tanya | Tanya Lanehart vs. H.E.B. L.P. Brenntag Specialties LLC and Brenntag North America, et al | 2022C01545 | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1962 | First Amended Complaint, ¶22 | No |
| 722 | Langston | Randall | David Hardaway, as executor of the estate of Randal Langston v. H-E-B L.P. Also d/b/a H.E. Butt Grocery Company, for his Hill Country Essentials Line of Products, et al | 2024C00664 | Texas | Bexar | Simon Greenstone Panatier, PC | Greyson Ackerman | Yes | Yes | 1975 | First Amended Complaint, ¶40 | No |
| 345 | LaPlant | Lynn | David LaPlant, Individually and as Personal Representative of the Estate of Lynn Ann LaPlant v. Avon Products, Inc., et al | 23-CA-012151 | Florida | Hillsborough | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. | Yes | Yes | 1960s | Amended Complaint, ¶12 | No |
| 346 | Larson | Lillian | Larson, Lillian, PHf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | MID-L-002729-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Third Amended Complaint, ¶3 | Yes |
| 347 | LaSalle | Jack | JACK LASALLE and DIANNE LASALLE v. AMERICAN INTERNATIONAL INDUSTRIES et al | 23-2-08165-0 SEA | Washington | King | Kazan McClain Satterley & Greenwood | Joseph Satterley | Yes | Yes | 1955 | First Amended Complaint at 4:12 | No |
| 348 | Latterell-Rice | Rebecca | Rebecca Latterell-Rice and Clair Brian Rice, her husband, v. Allscot, Inc., Avon Products, Inc. et al | 62-CV-24-545 | Minnesota | Ramsey | Karst & von Oiste LLP | Erik P. Karst | Yes | Unclear based on face of complaint | Unclear based on face of complaint | Complaint, ¶6 | No |
| 349 | Laudig | Kathleen | Elizabeth Laudig as representative of the estate of Kathleen Laudig v Avon Products, Inc., et al | 49D1-3-2312-CT-050425 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas | Yes | Yes | 1950s | Amended Complaint, ¶6 | No |
| 350 | Laughlin | Dennis | Dennis Laughlin vs Avon Products, Inc., et al. | MID-L-007603-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | Mid-1950s | Third Amended Complaint, ¶3 | Yes |
| 351 | Lazette | Dianne | LaZette, Diane and Christopher LaZette, PHs. v. Barrett Minerals, Inc. et al | MID-L-007561-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Amended Complaint, ¶3 | Yes |

14

JA820

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 352 | Lee | Michaelen | Michelle F. Felton, Executrix of the Estate of Michaelen Lee, deceased, v. Acme Markets, Inc. | GD-23-008855 | Allegheny | Pennsylvania | Dani Omar Ibrahim Shirley, LLP | Cori J Kapusta | Yes | Yes | Late-1940s | Complaint, ¶ 66 | No |
| 353 | Lee | Kyung H. | KYUNG H. LEE and JOE J. LEE v. BI-MART CORPORATION et al | 23CV40369 | Multnomah | Oregon | Dani Omar Ibrahim Shirley, LLP | Jessica Dean Sarah E. Gibson | Yes | Yes | 1973 | Third Amended Complaint, Ex A | No |
| 729 | Lee | Cynthia | Cynthia Jane Lee v. Avon Products, Inc., et al. | E2024006160 | Monroe | New York | Maune Raicie Hartley French & Mudd, LLC | Andrew M. Grous | Yes | Yes | 1970s | Second Amended Complaint, ¶ 3 | No |
| 354 | Letizia | Joseph | Letizia, Joseph and Donna Letizia, Pltfs. v. Barretts Minerals, Inc., et al | MID-L-002232-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1955 | Third Amended Complaint, ¶ 3 | No |
| 355 | Levine | Joanna | Levine, Joanne & Timothy Spahr, Pltfs. v. Kolmer Laboratories, et al. | 190251/2020 | New York | New York | Levy Konigsberg LLP | Amber Jae Brandis | Yes | Yes | 1970s | Initial Fact Sheet, ¶ 6 | No |
| 356 | Linde | Stuart | Eileen Linde, as Administratrix for the Estate of John Linde, Deceased and Eileen Linde, Individually, v. Charles B. Chrystal Co., Inc., et al. | 190127/23 | New York | New York | Levy Konigsberg LLP | Amber Jae Brandis | Yes | Yes | 1966 | Second Amended Complaint, 124. | No |
| 357 | Link | Michael | Michael David Link and Sandra Strickland Link v. ... | 2022CP400543 | Richland | South Carolina | Dani Omar Ibrahim Shirley, LLP | Jonathan Holder | Yes | Yes | 1950s | Plaintiff's Complaint ¶ 125 | Yes |
| 358 | Little | Robert | Robert A. K. Little and Irene K. Little v. American Honda Motor Co., Inc., et al | 23-020780 | Broward | Florida | Maune Raicie Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1960s | Complaint, Information Form | No |
| 359 | Little | Christopher | Christopher Little v Barretts Minerals, Inc., et al. | MID-L-003868-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1979 | Amended Complaint, ¶ 2 | No |
| 360 | Lock | Judith | Lock, Judith, Pltf., v. Barrett Minerals, Inc., etc., et al | 190223/2019 | New York | New York | Weitz & Luxenberg P.C. | Justin J. Weitz | Yes | Yes | 1962 | Complaint, 86. | Yes |
| 361 | Locotro | Barbaran | Locotte, Barbaran, Pltf. v. Annco, LLC, et al. | 190289/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tamburi | Yes | Yes | 1964 | Amended Complaint, 7 | Yes |
| 362 | Lodovico | Cynthia | Cynthia Lodovico v Barretts Minerals, Inc., et al. | MID-L-001418-23 | Middlesex (NJ) | New York | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1966 | Third Amended Complaint, ¶ 4 | No |
| 363 | LoGiudice | Keri | Legiudice, Keri and Joseph Logiudice, Pltfs., vs. American Talc Co., Inc., et al. | 190253/2014 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1979 | Initial Fact Sheet, 6. | Yes |
| 364 | Lorenzo | Richard | Lorenzo, Elizabeth, Individually and as Executrix of the Estate of Richard Lorenzo, Deceased, Pltf. v. Barretts Minerals, Inc., et al. | MID-L-001187-22 | New York | New York | Weitz & Luxenberg P.C. | F Alexander Eiden | Yes | Yes | 1970 | Fourth Amended Complaint, ¶ 4. | Yes |
| 365 | Lowe | Celia | Celia Lowe and Brian Lowe v. L'Oreal Travel Retail Americas, Inc., et al | 23-022591CA27 | Broward | Florida | Simon Greenstone Panatier, PC | Rebecca Vinocur | Yes | Yes | 1950s | Complaint, ¶ 41 | No |
| 366 | Lowis | Barbara | Barbara Lowis & Trevor Lowis v Avon Products, Inc., et al | 190234/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Yes | Unclear based on face of complaint | N/A | No |
| 368 | Lupton | Johnnic | Phyllis Johnson, Margaret Rowell, Johnnie Lupton, Jr., Leslie Lupton, Gene Lupton, Joseph Lupton, Mathew C. Lupton and Tony G. Lupton, Sr., Deceased vs. Louisiana Steam Equipment, LLC, et al. | C-148470 | Lafourche Parish 17th JDC | Louisiana | Landry & Swarr, LLC Simon Greenstone Panatier, PC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Holly C. Peterson | Yes | Yes | 1950s | Second Amended Petition, ¶ 4(b) | No |
| 369 | Maaren | Marilyn | Marilyn Maaren v Maybelline, LLC, et al. | 190214/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | Unclear based on face of complaint | N/A | No |
| 370 | Madlik | Marilyn | Madlik, Donald C. as Representative of the Estate of Marilyn M. Madlik Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190137/2020 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman | Yes | Yes | 1960s | Complaint, ¶ 69 | No |
| 371 | Mager | Jenifer | Jenifer Mager and John Mandraschia v. American International Industries et al | 23STCV09956 | Los Angeles | California | Frost Law Firm, PC | Andrew Seitz | Yes | Yes | 1980s | Complaint, Exhibit A | No |
| 372 | Maloney-Najiar | Kelley | Kelley Maloney-Najiar and Faith Najiar v Arkema, Inc et al | MID-L-03900-22 | Middlesex (NJ) | New Jersey | The Lanier Law Firm, PLLC | Darron Berquist | Yes | Yes | 1971 | Complaint, ¶ 2 | No |
| 373 | Manning | Patricia | Manning, Patricia v. Avon Products, Inc., et al. (Pltfs., including Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190052/2020 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn | Yes | Yes | 1960s | Third Amended Complaint, 88. | Yes |
| 374 | Marcona | Deborah | Deborah Marcona and Timothy Marcona v Avon Products, Inc., et al. | MID-L-004127-23 | Middlesex (NJ) | New Jersey | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1969 | Complaint, Initial Fact Sheet, ¶ 3 | No |
| 376 | Marinelli | Nicole | Nicole Marinelli vs. Charter, Inc., et al | 2022-07702 | Orleans Parish CDC | Louisiana | Boling Law Firm | Jeremiah Boling Caroline Boling Benjamin Rumph LaCrisia McAllister | Yes | Yes | 1984 | Second Amended Petition, ¶ 10 | No |
| 377 | Markuson | Janice | Markuson, Janice & Milton, Pltfs. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003589-20 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1958 | First Amended Complaint, ¶ 6 | No |
| 378 | Maresco | Raffaella | Emilia C. Brady, Administrator for the Estate of Raffaella Maresco, et al vs Fisher Scientific Company, et al. | 161103253 | Philadelphia | Pennsylvania | Weitz & Luxenberg P.C. | Joseph J. Mandia | Yes | Yes | 1974 | Amended Complaint, ¶ 5 | Yes |
| 379 | Martin | Gerald | Gerald K Martin and Beverly E Martin v Bayer Healthcare et al | MID-L-003576-23 | Middlesex (NJ) | New Jersey | Maune Raicie Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1960 | Third Amended Complaint, ¶ 4 | No |

15

JA821

Case 23-01245-MBK    Doc 299-3    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit C - Declaration of Lathrop B. Nelson    III in Support of Motion    Page 22 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to Debtor(s) in Complaint? | Allegations of Pre-Exposure Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Differentiated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 380 | Martin | James | Linda B Martin, individually and as Proposed estate representative of James P Martin v Block Drug Company, et al. | MID-L-006575-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1969 | Amended Complaint, ¶ 4 | No |
| 381 | Martin | Sheila | Jeffrey Martin, as Administrator ad Prosequendum for the Estate of Sheila Martin and as Guardian of John Doe, et al v Brenntag North America, Inc., et al | MID-L-007808-19 | Middlesex (NJ) | New Jersey | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1962 | Complaint, ¶ 7 | No |
| 382 | Martinez | Ottavio | Antonella Bouchard individually and as executor of the Estate of Ottavio Martinez and Maria Martinez v. American International Industries, et al | MID-L-000371-24 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Joshua Kristal | Yes | Yes | Early-1970s | Complaint, ¶ 4 | No |
| 383 | Martinez | Mary | Mary Martinez and Michael Martinez, her husband v. American International Industries, et al | 22-018794 CA27 | Broward | Florida | Dan Omar Ibraham Shirley, LLP | Rebecca Vinocur | Yes | Yes | 1980s | Third Amended Complaint, ¶ 89 | Yes |
| 384 | Mask | Mary | Linda K. Trimble, Individually and as Executrix of the Estate of Mary Mask v. Brenntag North America, Inc. & Brenntag Specialties, Inc., et al | MID-L-002359-18 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1960s | Fourth Amended Complaint, ¶ 3 | Yes |
| 385 | Masterson | Leo | Leo Masterson and Leo Masterson v. Avon Products, Inc., et al. | 190172/2023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1957 | Third Amended Complaint, 126. | No |
| 386 | Matsch | Sandra A | NANDRA A. MATSCH v. BAYER HEALTHCARE, LLC, et al | 23 LA 1528 | Madison | Illinois | Maune Raichel Hartley French & Mudd, LLC | Jon R. Neumann | Yes | Yes | 1950 | Complaint, ¶ 6 | No |
| 387 | Maute | Tucker | Tucker D. Maute, D.O. and Olivia N. Mantzea, M.D. v. Barretts Minerals, Inc., et al | CACE-22-008500 | Broward | Florida | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1992 | Second Amended Complaint, ¶ 27 | Yes |
| 388 | Mayville | Arlene | Claire Day as Special Administratrix for the Estate of Arlene Jane Mayville v Avon Products, Inc., et al | MID-L-005255-18 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 737 | Mazonski | Chloe | Chloe Mazonski, Individually and as Executrix and Executor of the Estate of Michael Mazonski v. American Honda Motor Co., Inc., et al | MID-L-004556-24 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Denise Presumpieri | No | Yes | 1953 | Complaint, ¶ 4 | No |
| 742 | Mazrei | Norbert | Norberto Ramon Mazrei et al v. Alco Industries, Inc. et al | 190317/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Fukla | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 389 | McAllister | James | JACKI McALLISTER, Individually and as Special Administrator for the Estate of JAMES O. McALLISTER, deceased v. A.O. SMITH CORPORATION, et al | 2021L000870 | Madison | Illinois | Maune Raichle Hartley French & Mudd, LLC | A. Gentry Smith | Yes | Yes | 1950s | Third Amended Complaint, ¶ 6 | Yes |
| 390 | McAteer | Aoife | McAteer, Aoife v Avon Products, Inc., et al | 782900/2017 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 391 | McBride | Ronald | McBride, Ronald & Michelle, Phils. v. American International Industries, Inc., et al | 49D13-2110-MF-034781 | Indiana | Indiana | DOBS & Farnas, LLP | Kathleen A. Farnas | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 392 | McCallum | Beverlee | Beverlee McCallum v Avon Products, Inc., et al. | MID-L-004678-22 | Middlesex (NJ) | New Jersey | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1944 | Third Amended Complaint, ¶ 3 | No |
| 393 | McDonough | Colleen | Colleen McDonough v Johnson & Johnson, et al. | MID-L-001512-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1972 | Second Amended Complaint, ¶ 2 | No |
| 394 | McGowan | Carole Lee | CATHLEEN BELTZ, individually and as successor in interest to CAROLE LEE McGOWAN; LESHIA CLARK, STEVEN SPRAGUE; KELLY SPRAGUE; and DUANE SPRAGUE; v. L'OREAL USA, INC., et al | 24CV070599 | Alameda | California | Kazan McClain Satterley & Greenwood | Michael Reid | Yes | Yes | 1950s | Complaint at 5.26-6.1 | Yes |
| 395 | McGuire | Kevin | Kevin McGuire and Mary Jane McGuire v Barrett Minerals, et al | 190154/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 396 | McKnight-Foster | Carol | Foster, Edwin, as Executor of the Estate of Carol McKnight-Foster, Phf. v. Johnson & Johnson, et al | MID-L-000312-21 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1951 | Third Amended Complaint, ¶ 1 | Yes |
| 397 | McLoughlin | Carmel | Carmel H McLoughlin v Brenntag North America, et al | 190302/2023 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Jessica A. Bessenich | Yes | Yes | 1969 | Plaintiff's Initial Fact Sheet, 6 | No |
| 399 | McMahen | Anne | Anne McMahen and Stephen McMahen v Samstone Corporation, et al | 190304/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 400 | Meade | Jody Kay | Jody Kay Meade and Arthur Meade v. Barretts Minerals Inc, et al | 23STCV23517 | Los Angeles | California | Simmons Hanly Conroy LLP | Deborah Rosenthal | Yes | Yes | 1980 | Complaint, Exhibit A | No |
| 679 | Mann | Elena F. | Elena F. Mann v. 3M Company, et al | 24-1988 | Middlesex (MA) | Massachusetts | Bellick & Fox, LLP | Joseph W. Bellick | Yes | Yes | 1950s | First Amended Complaint ¶ 30 | No |
| 401 | Megariotis | Joanna | Megariotis, Joanna, Phf. v. Brenntag North America, et al | MID-L-001970-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1950s | Second Amended Complaint, ¶ 2 | Yes |
| 402 | Messenger | Ronald | Dawn Cabera, Personal Representative of the Estate of Ronald Messenger v. Advance Stores Company, Inc et al | FBT-CV-22-6115647-S | Fairfield at Bridgeport | Connecticut | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1943 | Amended Complaint, ¶ 4 | Yes |

16

JA822

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | County/Jurisdiction | State | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 404 | Meyer | Carol | Carol J Meyer and Tommy Meyer v. Avon Products, Inc., et al. | MID-L-001860-23 | Middlesex (NJ) | New Jersey | Maune Raschle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1956 | Second Amended Complaint, ¶ 2 | No |
| 405 | Milan | Elizabeth | Elizabeth Milan v. Brenntag North America and Brenntag Specialties, Inc., et al. | 190154/2018 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn | Yes | Yes | 1955 | Amended Complaint, 113. | Yes |
| 730 | Milford | Louise | Louise Milford and Christopher Milford v. Chanel, Inc., et al. | 190128/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Yes | Unclear based on face of complaint | NA | No |
| 406 | Miller | Ann | Miller, Ann and Jeffrey, PHS, v. Barrett Minerals, Inc., et al. | MID-L-002710-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1961 | Amended Complaint, ¶ 2 | No |
| 407 | Miller | Dale | Guy Miller individually and as administrator of the estate of Dale Miller v Block Drug Company, et al. | MID-L-005933-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Matthew Adam Grubman | Yes | Yes | 1974 | Amended Complaint, ¶ 4 | No |
| 408 | Miller | Veronica | Ronald Raymond Miller, Individually and as Personal Representative and Personal Representative at Prosequendum of the Estate of Veronica Miller, Deceased vs. Brenntag North America, et al. | MID-L-005972-17 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1946 | Third Amended Complaint, ¶ 4 | Yes |
| 409 | Miller | Stephanie | Sharon Janet, Executrix of the Estate of Stephanie Miller, PHC, vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190188/2017 | New York | New York | Levy Konigsberg LLP | Arthur R. Long | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | Yes |
| 410 | Minohin | Helen | Helen Minohin v Barretts Minerals, Inc., et al. | 190185/2023 | New York | New York | Weitz & Luxenberg P.C. | Michael P. Fanelli | Yes | Yes | 1943 | Amended Complaint, ¶ 94 | No |
| 411 | Mizer | Barbara | Barbara J Mizer and George A Mizer v Asian USA Manufacturer, et al. | MID-L-004279-22 | Middlesex (NJ) | New Jersey | Maune Raschle Hartley French & Mudd, LLC | Keith Binder | Yes | Yes | 1960s | Second Amended Complaint, ¶ 2 | No |
| 680 | Mohammed | Hamedah | Rico-rick Mohammed, Individually and as Executer of the Estate of Hamedah Mohammed, Deceased v. Avon Products, Inc., et al. | 190189/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 412 | Monroe | Joan | Joan Davis and Est of Joan Monroe v Avon Products, Inc., et al. | EC2023-35161 | Washington | Pennsylvania | Levy Konigsberg LLP | Arthur R. Long | Yes | Yes | 1968 | Third Amended Complaint, 5. | No |
| 413 | Montesano | Laura | Laura Montesano v Brenntag North America, Inc., et al. | MID-L-002565-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1962 | Amended Complaint, ¶ 2 | No |
| 415 | Moore | Scott | Lori Lee Campbell, individually and as representative of estate of Scott Moore v Bayer Healthcare, LLC, et al. | 23-12-02561 | Philadelphia | Pennsylvania | The Halpern Firm | David Halpern | Yes | Yes | 1970s | Amended Complaint, Schedule 1 | No |
| 416 | Moreno | Amelia | Amelia L Moreno v Avon Products, et al. | MID-L-003387-22 | Middlesex (NJ) | New Jersey | Maune Raschle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1987 | Third Amended Complaint, ¶ 2. | No |
| 686 | Moreno | Sonia | Sonia Moreno v. Avon Products, Inc., et al. | MID-L-004040-24 | Middlesex (NJ) | New Jersey | Cohen, Placitella & Roth, PC | Jared M. Placitella | Yes | Yes | 1960 | First Amended Complaint, Initial Fact Sheet ¶ 5 | No |
| 417 | Morgan | Colin | Colin Morgan v. L'Oreal Travel Retail Americas, Inc., et al. | 23-021465 | Broward | Florida | Maune Raschle Hartley French & Mudd, LLC | Rebecca Vescera | Yes | Yes | 1965 | Complaint *§45 | No |
| 418 | Morgan | Sandra | Sandra Morgan v. Avon Products, Inc., et al. | CACE-24-001329 | Broward | Florida | Maune Raschle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1960s | Complaint – see exposure sheet | No |
| 419 | Morgan | June Rose | June Rose Morgan v Brenntag North America, et al. | MID-L-003262-23 | Middlesex (NJ) | New Jersey | Maune Raschle Hartley French & Mudd, LLC | Jenna Egnor | Yes | Yes | 1950s | Amended Complaint, ¶ 2 | No |
| 420 | Morrison | Carolyn | Carolyn Morrison v Avon Products, Inc, Inc., et al. | MID-L-006026-23 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1950s | Amended Complaint, ¶ 4 | No |
| 422 | Mota | Maritza | Mota, Maritza, PHC v. Johnson & Johnson, et al. | MID-L-005753-21 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1967 | Third Amended Complaint, ¶ 2 | No |
| 423 | Meence | Gina | Gina Meence and Raymond Meence v 3M Co., et al. | 23-11-02558 | Philadelphia | Pennsylvania | Meirowitz & Wasserberg, LLP | Nedra Wilson | Yes | Yes | 1945 | Amended Complaint, Schedule 1 | No |
| 424 | Makomela | Kenneth | GWENDOLYN J. MUKOMELA, Individually and as Special Administrator for the Estate of KENNETH MUKOMELA, deceased v. AGCO CORPORATION, et al. | 2022LA000962 | Madison | Illinois | Maune Raschle Hartley French & Mudd, LLC | Michael T. Flachs Jr. | Yes | Yes | 1955 | Complaint, ¶ 7 | Yes |
| 425 | Mullan | Robert | Robert Mullan and Tracy Mullan v. Sumitomo Corporation of Americas, et al. | 190066/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |
| 426 | Mullet | Anne Marie | Anne Marie Mullet and Ronald Mullet v Asbestos, Inc., et al. | MID-L-000929-24 | Middlesex (NJ) | New Jersey | Levy Konigsberg LLP | Arthur R. Long | Yes | Yes | 1954 | Third Amended Complaint, ¶ 2 | No |
| 697 | Munoz | Renate | PETE T MUNOZ, Individually and as Successessor of the Estate of RENATE MUNOZ, Deceased, and JOHN CANTY, Individually, vs. Avon Products, Inc., et al. | 24STCV19955 | Los Angeles | California | Simon Greenstone Panatier, PC | Stuart J. Purdy | Yes | Yes | 1960s | Complaint, Exhibit A | No |
| 427 | Murphy | Geraldine | Murphy, Geraldine, PHC v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004429-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1962 | Fourth Amended Complaint, ¶ 4 | No |
| 428 | Muster | Sophia | Sophia Muster & John Muster v Avon Products, Inc., et al. | MID-L-05232-22 | Middlesex (NJ) | New Jersey | Weitz & Luxenberg P.C. | Matthew Adam Grubman | Yes | Yes | 1967 | Third Amended Complaint, ¶ 3 | Yes |
| 744 | Muzzipapa | Lucy | Lucy Muzzipapa v. American International Industries, et al. | 190213/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel J. Wasserberg | Unclear based on face of complaint | Unclear based on face of complaint | NA | NA | No |

17

JA823

Case 23-01245-MBK    Doc 299-3    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit C - Declaration of Lathrop B. Nelson III in Support of Motion    Page 24 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Debtors Identified as Successor to Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Effectuated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 429 | Myers | Beverly | Myers, Beverly and Timothy Myers, Phfs. vs. Aventis Inc., et al. | 21-12-01748 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern | Yes | Yes | Unclear based on face of complaint | Amended Complaint, ¶ 6 | No |
| 430 | Nasr | Yehia | Yehia Nasr & Deborah Nasr v Barretts Minerals, Inc., et al | 190066/2023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman | Yes | Yes | 1985 | Second Amended Complaint, ¶ 87 | No |
| 431 | Nathan | Frank | Nathan, Frank & Yochanan Nathan, Phfs. v. Johnson & Johnson, et al. | MID-L-006101-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Unclear based on face of complaint | 1960s | Sixth Amended Complaint, ¶ 4 | Yes |
| 667 | Navaretta | Josephine | Josephine Navaretta and John Navaretta v. Sumitomo Corporation of Americas, et al. | 190117/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J Tully | Yes | Unclear based on face of complaint | NA | NA | No |
| 432 | Nelson | Sarah Sue | Nelson, Sarahsue, Phf. v. American International Industries, et al. | MID-L-001025-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960 | Second Amended Complaint, ¶ 2 | No |
| 433 | Nicholson | Harold | Nicholson, Nathan, Estate of Harold Nicholson, Phf. v. Barrett Minerals, Inc., et al. | MID-L-004403-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Amended Complaint, ¶ 2 | No |
| 434 | Nutt | Charles | Nutt, C. Nut, Individually and as Executor for the Estate of Charles J. Nutt v. Avon Products, Inc., et al. | 22-2455 | Massachusetts | Middlesex (MA) | Duffy Law LLC | Christopher Duffy | Yes | Yes | 1982 | Complaint, ¶ 8 | No |
| 435 | Oakenfold | Sheila | Sheila Oakenfold v Christian Dior, Inc., et al. | 190238/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | NA | NA | No |
| 438 | O'Brien | Karen | Karen C. O'Brien v. Air & Liquid Systems Corporation, et al. | CV-23-234 | Maine | Cumberland | Hallatt Whipple Weyens | David A. Weyens | Yes | Yes | Late 1940s | Complaint, ¶ 5 | No |
| 439 | Odum | Charles | Odum, Charles, Phf. v. Barrett Minerals, Inc., et al | MID-L-004851-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1950s | First Amended Complaint, ¶ 2 | No |
| 440 | Olson-Rizzo | Deborah | Olson-Rizzo, Deborah and Thomas Rizzo, Phfs. v. American Art Clay Company, Inc., et al. | 190018/2022 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | NA | NA | Yes |
| 441 | Orloff | John | James Maynard as exector of estate of John Orloff v Baxter Healthcare Corporation, et al | MID-L-004578-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eulen | Yes | Yes | 1966 | Second Amended Complaint, ¶ 1 | No |
| 682 | Paes | Verginio | Verginio Paes vs. American International Industries, et al. | 24CV060231 | California | Alameda | Kazan, McClain, Satterley & Greenwood | Koch Shukla | Yes | Yes | 1960s | Amended Complaint at 7;11;25 | No |
| 442 | Pagano-Michels | Cynthia | Cynthia Pagano-Michels and Thomas Michels vs Barretts Minerals, Inc., et al | MID-L-006234-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1968 | Complaint, ¶ 2 | Yes |
| 443 | Pallotta | Josephine | Josephine Pallotta and James Pallotta v Avon Products, Inc., et al. | MID-L-003512-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha | Yes | Yes | 1960s | Second Amended Complaint, ¶ 4 | No |
| 683 | Palomino | Maria | Maria F. Palomino vs. Avon Products, Inc. et al. | 2024L003179 | Illinois | Cook | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Yes | 1966 | Exhibit 2 to Amended Complaint, ¶ 2 | No |
| 444 | Palumbo | Frank | Frank Palumbo & Liz Palumbo v 3M Company, et al. | E2023003380 | New York | Monroe | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 445 | Parker | Pauline | Pauline Parker and James Parker v Barretts Minerals, et al. | 190186/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 446 | Parvin | Janice | James Parvin v AII, et al. | MID-L-003126-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joseph J. Mandia | Yes | Yes | 1962 | Second Amended Complaint, ¶ 4 | No |
| 447 | Passmore-Meyer | Kathryn | Kathryn A. Passmore-Meyer and spouse John G. Meyer, Jr. v. Avon Products, Inc., et al. | CJ-2022-6281 | Oklahoma | Oklahoma | Dean Omar Branham Shirley, LLP | Jordan Ballinger | Yes | Yes | 1978 | Complaint, ¶ 50 | No |
| 448 | Paternostro | Marilyn | Paternostro Michael, Individually, and Marilyn, and Marilyn Leboeuf, Individually and on Behalf of Marilyn T. Paternostro vs. Tripp Cadillac Chevrolet, Inc., et al. | C666833.25 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC, Damon J Baldone & Associates - APLC, Simon Greenstone Panatier, PC | Mickey P. Landry, Frank J. Swarr, Matthew C. Clark, Damon J. Baldone, Holly C. Peterson, Christian E. Manasco | Yes | Yes | 1960 | Amended Complaint, ¶ 5 | Yes |
| 449 | Payne | Clark | Payne, Clark and Barbara A. Payne, Phfs. vs. AM International, Inc., et al. | 190307/2019 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathanel N. Fukla | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | Yes |
| 450 | Peddle | Gregory | Gregory A Peddle and Dorothy Peddle v Janssen Pharmaceuticals, Inc., et al. | MID-L-006625-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joshua Kristal | Yes | Yes | Early-1960s | Complaint, ¶ 3 | No |
| 451 | Pelley | Stephanie | Stephanie Pelley, Individually and as Parent, Guardian, and Next Friend of Minor Children, A.C.P and A.T.P. v. American International Industries, et al. | 23-0473 | Massachusetts | Middlesex (MA) | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P Kenney | Yes | Yes | Pre-1985 | Complaint ¶¶ 10, 12 | No |
| 453 | Peltz | Judith | Peltz, Judith and Benjamin Peltz, Phfs. v. Avon Products, Inc., et al. | 193142/2021 | New York | New York | Lanier Law Firm PLLC | Darron Berquist | Yes | Yes | 1949 | Initial Fact Sheet, ¶ 6. | Yes |

18

JA824



| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor to or Debtor(s) in Complaint? | Allegation of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 717 | Peltz | Judith | Benjamin Peltz, Individually and as Co-Personal Representative of the Estate of Judith Peltz, and Dennis C. Brown, as Co-Personal Representative of the Estate of Judith Peltz v. Brenntag North America, Inc., et al. | 21-i1612 | Massachusetts | Middlesex (MA) | Thornton Law Firm LLP | Leslie-Anne Taylor | Yes | Yes | 1939 | Second Amended Complaint, ¶ 12. | Yes |
| 454 | Pena | Jacklyn | Pena, Jacklyn, Pltf. v. Barretts Minerals, Inc., et al. | MID-L-002573-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1992 | Second Amended Complaint, ¶ 3 | No |
| 455 | Penny | Sherry | Penny, Sherry, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-000918-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long | Yes | Yes | 1979 | Third Amended Complaint, ¶ 4 | No |
| 456 | Perez | Maria Elena | Johanna Ortiz, and as successor in interest to Maria Elena Perez, deceased; Alejandrina Leon, as legal heir to Maria Elena Perez, deceased v. Albertson's LLC, et al. | 23STCV14552 | California | Los Angeles | Simmons Hanly Conroy LLP | Crystal G. Foley | Yes | Yes | 1965 | Complaint, ¶ 2 | No |
| 457 | Perkins | Lorraine | Lorraine A. Perkins and Julia A. Knox v. Avon Products, Inc., et al. | 24-L-003861 | Illinois | Cook | Maune Raichle Hartley French & Mudd, LLC | Christine Kim | No | Yes | 1960 | First Amended Complaint, ¶ 7 | No |
| 458 | Perkins | Barbara | BARBARA PERKINS v. BARRETTS MINERALS, INC. et al. | CGC-23-277164 | California | San Francisco | Frost Law Firm, PC | Ronald J. Shingler | Yes | Yes | 1950s | Complaint, Exhibit A | No |
| 459 | Perl | Rosemarie | Perl, Rosemarie, Pltf. v. Avon Products, Inc., et al. | 190087:21 | New York | New York | Weitz & Luxenberg P.C. | Pntti Lynn Burshtyn | Yes | Yes | 1950s | Amended Complaint, ¶ 95. | Yes |
| 461 | Pettijohn | Eileen | Pettijohn, Eileen and Dr. David Pettijohn, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-005203-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1960s | Second Amended Complaint, ¶ 5 | No |
| 462 | Petty | Brenda | Petty, Barbara and Curtis Petty, Pltfs. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002217-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1953 | Second Amended Complaint, ¶ 3 [sic] | Yes |
| 463 | Phelan | Marlene Theresa | Marlene Theresa Phelan v. Arkema Inc., et al. | FBT-CV-23-6124450-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1950s | Second Amended Complaint, ¶ 60 | No |
| 464 | Phillips | Patricia | Patricia Phillips and David Phillips v. Avon Products, Inc., et al. | 190111/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | Unclear based on face of complaint | NA | No |
| 465 | Phipps | Maria | Maria Phipps v Avon Products, Inc., et al. | MID-L-003953-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | Yes | Yes | 1959 | Complaint, Initial Fact Sheet, ¶ 5 | No |
| 745 | Picard | Carol | Carol A. Picard and Gerard R. Picard v. Avon Products, Inc., et al. | 2481e10/74 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika O'Donnell | Yes | Yes | 1960s | Complaint, ¶ 27 | No |
| 466 | Picherri | Mary | Mary Picherri and John Picherri v. Avon Products, Inc., et al. | 21v2681 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell | Yes | Yes | Unclear based on face of complaint | NA | Yes |
| 467 | Pickard | James | JAMES PICKARD v. 3M COMPANY f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY; AIR & LIQUID SYSTEMS CORPORATION et al. | 22STCV18682 | California | Los Angeles | Frost Law Firm, PC | Andrew Seitz | No | Yes | 1963 | Complaint, Exhibit A | No |
| 468 | Pickering | Michelle | Michelle Pickering v. Arkema, Inc. et al. | 23STCV19273 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oguneraye | Yes | Yes | 1988 | Complaint, Exhibit A | No |
| 469 | Pidge | Pamela | Pidge, Raymond, Individually and as Administrator of the Estate of Pamela K. Pidge, Deceased, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-001407-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F. Alexander Eiden | Yes | Yes | 1962 | Third Amended Complaint, ¶ 4 | No |
| 470 | Pitcher | John | John Pitcher and Carolyn Pitcher v Union Carbide Corp., et al. | 190159/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1949 | Amended Complaint, ¶ 51A | No |
| 471 | Plotkin | Evan | Evan C. Plotkin and Martha Barry-Plotkin v. Johnson & Johnson, et al. | FBT-CV21-6109520-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney | Yes | Yes | 1950s | Sixth Amended Complaint ¶ 5 | No |
| 472 | Portnoi | Herbert | Portnoi, Marjorie, Individually and as Proposed Administrator of the Estate of Herbert Portnoi, Pltf. v Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004551-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha | Yes | Yes | 1960s | Second Amended Complaint, ¶ 2 | Yes |
| 746 | Pousley | Madelon | Pousley, Individually and as Personal Representative of the Estate of Madelon Pousley, Deceased v. Avon Products, Inc., et al | MID-L-004237-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1960s | Complaint, ¶ 4 | No |
| 473 | Potter | Shirley | Heather Donaghy, as Personal Representative of the Estate of Shirley Potter, Deceased v. Avon Corp., Inc., et al. | 2023-CP-40-03108 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Aaron Chapman | Yes | Yes | 1960s | Second Amended Plaintiffs Complaint ¶ 103 | No |
| 474 | Poulton | Catherine | Poulton, Catherine and David Poulton, Pltfs. v. Barretts Minerals, Inc., et al. | 190094/2022 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | 1961 | Initial Fact Sheet, ¶ 6. | Yes |
| 698 | Poulton | Margaux | Margaux Poulton and Charles Pountain v. Avon Products, Inc., et al. | MID-L-003694-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer | No | Yes | 1955 | Complaint, Initial Fact Sheet, ¶ 5 | Yes |
| 475 | Powell | Katherine | Katherine Powell, as Personal Representative of the Estate of Amy Janell Sisk, Deceased v. Avon Products, Inc., et al. | 23-021560 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen | Yes | Yes | 1978 | Complaint, ¶69 | No |

JA825

Case 23-01245-MBK    Doc 299-3    Filed 09/12/24    Entered 09/12/24 00:24:45    Desc
Exhibit C - Declaration of Lathrop B. Nelson    III in Support of Motion    Page 26 of 26

| No. | Plaintiff Last Name | Plaintiff First Name | Case Caption | Case Number | State | County/Jurisdiction | Plaintiff Counsel | Plaintiff Counsel Attorney Name | Brenntag Identified as Successor (to Deltrex) in Complaint? | Allegations of Pre-2004 Talc/Asbestos Exposure? | Year of Initial Talc/Asbestos Exposure | Source of Pre-2004 Talc/Asbestos Exposure Allegations | Bifurcated by Stipulation? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 476 | Powell | Dana Vee (f/k/a Dana V. Burch) | Tena A Burch & Est of Dena Powell v Avon, et al. | 1901.22.0322 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg | Yes | Unclear based on face of complaint | Unclear based on face of complaint | NA | No |
| 479 | Pryor | Carolyn | Pryor, Carolyn, Plt. vs Johnson & Johnson, et al. | MDL-002649-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon | Yes | Yes | 1960 | Third Amended Complaint, ¶ 4 | Yes |
| 480 | Pryor | Michael | Pryor, Michael and Karen, Plts., v Avon Products, Inc., et al. | MDL-000022-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1970 | Complaint, ¶ 2 | Yes |
| 481 | Przekop | Charles | Przekop, Charles and Delphine Przekop, Plts. v. Johnson & Johnson, et al. | MDL-003328-21 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe | Yes | Yes | Mid-1950s | Third Amended Complaint, ¶ 4 | No |
| 482 | Purvis | Evangeline | Purvis, Nichelle, for the Estate of Angeline Purvis, Plt. v. Bristol Myers Squibb, et al. | MDL-001749-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle | Yes | Yes | 1980 | Amended Complaint, ¶ 1 | Yes |
| 483 | Ramirez | Irma | Irma Ramirez vs. Advanced Auto Parts, Brenntag Specialties LLC, et al | 2019-67370-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1955 | Petition, ¶ 28 | Yes |
| 688 | Ramos | Jim | Jim Ramos & Lilian Ramos v. Bayer Healthcare, LLC, et al. | MDL-003840-24 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan | Yes | Yes | 1964 | Complaint, ¶ 2 | No |
| 484 | Rand | Charlene | Charlene Rand and Jason Rand v Block Drug Company, Inc et al | MDL-007160-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grebman | Yes | Yes | 1977 | Complaint, ¶ 3 | No |
| 485 | Randolph | Bernie | Rhonda Concepcion individually and as administrator of the Estate of Bernice Randolph v Metropolitan Life insurance Company et al. | MDL-000059-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden | Yes | Yes | Early 1960s | Fourth Amended Complaint, ¶ 4 | No |
| 747 | Reed | Wesley | Wesley Reed et al v. Saminons Corporation of Americas, et al. | 004170/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully | Yes | Yes | 1960s | Complaint, Plaintiff's Statement, No. 12 | No |
| 487 | Rego | John | RAYMOND BROWN, Individually and as Special Administrator for the Estate of JOHN H. REGO, deceased v. BLOCK DRUG COMPANY, INC., Individually and as successor-in-interest to The Gold Bond Sterilizing Powder Company, a/k/a The Gold Bond Company; et al | 2024LA000030 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman | Yes | Yes | 1980s | Complaint, ¶ 6 | No |
| 488 | Rentko | Marilyn | Rentko, Marilyn Ann and John, Plts. v. ACME Markets, Inc., et al | 190267-20 | New York | New York | Weitz & Luxenberg P.C. | Amber Jae Brandis | Yes | Yes | 1942 | Fourth Amended Complaint, ¶ 218 | Yes |
| 489 | Renwick | Joyce | Joyce Renwick and Samuel Solin v. Avon Products, Inc., et al | 23-011345-CA-01 | Florida | Miami-Dade | Dean Omar Branham Shirley, LLP | Rebecca Vinocur | Yes | Yes | 1960s | First Amended Complaint, ¶ 66 | No |
| 490 | Reshad | Ginajani | Mary Reshad, Individually and as executor of estate of Ghulam Reshad's Bayer Consumer Care Holdings, LLC Company et al | 628415/2023 | New York | Suffolk | Weitz & Luxenberg P.C. | Sean Kelley | Yes | Yes | 1978 | Amended Complaint, ¶ 72 | No |
| 491 | Reyes | Ezequiel | MARCELA REYES, LESLEY REYES, HOMAR REYES, GISELLE REYES, ERICK REYES, ESEQUIEL REYES and CRYSTAL REYES, as the Surviving Hiers of EZEQUIEL REYES, Deceased v. 3M COMPANY et al | 2222-CC09327 | Missouri | St. Louis | Simmons Hanly Conroy LLP | Randy S. Cohn | Yes | Yes | 1976 | Fifth Amended Petition, ¶ 9 | No |
| 492 | Reyes | Lida | Julio Mendoza, Ind. and as Rep. of the Estate of Lidia Reyes (Deceased), Antonio Reyes & Nidia Reyes, Ind. vs. Avon Products, Inc., Brenntag Specialties LLC, et al | 2019-55560-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson | Yes | Yes | 1969 | First Amended Petition, ¶ 21 | Yes |

20

JA826

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b) | **COOLEY LLP** |
| | Cullen D. Speckhart (admitted *pro hac vice*) |
| **SHERMAN, SILVERSTEIN,** | Michael Klein (admitted *pro hac vice*) |
| **KOHL, ROSE & PODOLSKY, P.A.** | Evan M. Lazerowitz |
| Arthur J. Abramowitz | Jeremiah P. Ledwidge (admitted *pro hac vice*) |
| Ross J. Switkes | 55 Hudson Yards |
| 308 Harper Drive, Suite 200 | New York, NY 10001 |
| Moorestown, NJ 08057 | Tel: (212) 479-6000 |
| Tel: (856) 662-0700 | Email:  cspeckhart@cooley.com |
| Email:  aabramowitz@shermansilverstein.com | mklein@cooley.com |
| rswitkes@shermansilverstein.com | elazerowitz@cooley.com |
| | jledwidge@cooley.com |
| | |
| *Local Counsel to the* | *Lead Counsel to the* |
| *Official Committee of Talc Claimants* | *Official Committee of Talc Claimants* |
| **CAPLIN & DRYSDALE, CHARTERED** | |
| Kevin C. Maclay (admitted *pro hac vice*) | |
| Todd E. Phillips (admitted *pro hac vice*) | |
| Kevin M. Davis (admitted *pro hac vice*) | |
| Serafina A. Concannon (admitted *pro hac vice*) | |
| Shahriar M. Raafi (admitted *pro hac vice*) | |
| One Thomas Circle, NW, Suite 1100 | |
| Washington, DC 20005 | |
| Tel: (202) 862-5000 | |
| Email:  kmaclay@capdale.com | |
| tphillips@capdale.com | |
| kdavis@capdale.com | |
| sconcannon@capdale.com | |
| sraafi@capdale.com | |
| | |
| *Special Asbestos Counsel to the* | |
| *Official Committee of Talc Claimants* | |
| In re: | Chapter 11 |
| | |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| | |
| Debtors. | (Jointly Administered) |
| | |
| | Honorable Michael B. Kaplan, U.S.B.J., Chief |

DOC# 10242247

| | |
|---|---|
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L. A. TERMINALS, INC., and SOCO WEST, INC., | Adv. Pro. No. 23-01245 (MBK) |
| Plaintiffs, | |
| v. | |
| BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000, | |
| Defendants. | |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS TO (I) DEBTORS' MOTION FOR A TEMPORARY RESTRAINING ORDER ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS PENDING THE COURT'S DECISION ON THE DEBTORS' REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF AND (II) DEBTORS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT**

# TABLE OF CONTENTS

Preliminary Statement .................................................................................................. 1

I.   The Court's Summary Judgment Ruling Moots the Debtors' Request for Relief as to Successor Liability Claims ..................................................................... 2

II.  The Court Does Not Have Subject Matter Jurisdiction to Enjoin Direct Claims Against Brenntag ..................................................................................... 3

III. The Debtors Have Failed to Meet the Standard for a TRO on Direct Claims Against Brenntag .................................................................................................. 10

     A.   The Debtors Have Failed to Show That a Successful Reorganization is Likely or That They Have a Plan to Address Brenntag's Direct Liability In This Bankruptcy .......................................................................... 11

     B.   Denial of the Motion Does Not Present Risk of Any Harm to the Estates, Let Alone Irreparable Harm .................................................................. 13

          1.   The Debtors have no indemnity obligations for direct claims against Brenntag and such obligations would not create irreparable harm in any event ........................................................................ 14

          2.   There is no risk of collateral estoppel, res judicata or record taint that warrants enjoining direct claims against Brenntag ........................... 17

     C.   The Balance of Harms Decisively Weighs in Favor of Denying the Motion ............ 19

     D.   The Public Interest Decisively Weighs Against Granting the Motion ..................... 21

IV.  Alternatively, Even If the Court Were to Grant the Motion, It Should Adopt a Different Process for Exempting Actions From the TRO .................................................. 22

V.   The Court Should Deny Leave to File an Amended Complaint ......................................... 27

Conclusion .................................................................................................................. 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ...............................................................8, 9

*ACME Fast Freight v. U.S.*,
135 F. Supp. 823 (D. Del. 1955)...........................................................15

*In re Aearo Techs. LLC*,
642 B.R. 891 (Bankr. S.D. Ind. 2022) ..................................................17

*In re All Seasons Resorts*,
79 B.R. 901 (Bankr. C.D. Cal. 1987)......................................................9

*In re Bestwall LLC*,
606 B.R. 243 (Bankr. W.D.N.C. 2019)..................................................20

*Biogen Int'l GmbH v. Amneal Pharms. LLC*,
487 F. Supp. 3d 254 (D. Del. 2020).......................................................17

*Bondex Int'l v. Ott*,
774 N.E.2d 82 (Ind. Ct. App. 2002).......................................................18

*Bullock v. Carney*,
463 F. Supp. 3d 519 (D. Del. 2020)........................................................15

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004).........................................................4, 6, 13

*In re Conf. of African Union First Colored Methodist Protestant Church*,
184 B.R. 207 (Bankr. D. Del. 1995) .....................................................25

*Cook v. Blazer*,
No. 7:15CV456, 2016 WL 3453663 (W.D. Va. June 20, 2016) ............18

*In re CRM Int'l, Inc.*,
No. ADV 05-6271 (MBK), 2009 WL 1545818 (Bankr. D.N.J. May 28, 2009)
(Kaplan, J.).............................................................................................27

*Cushman & Wakefield, Inc. v. Backos*,
129 B.R. 35 (E.D. Pa. 1991) .................................................................25

*Dent v. Cunningham*,
786 F.2d 173 (3d Cir. 1986)...................................................................22

ii

**JA830**

*Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.*,
   54 B.R. 353 (Bankr. W.D. Wis. 1985) ...................................................................14

*In re Drexel Burnham Lambert Grp., Inc.*,
   146 B.R. 92 (S.D.N.Y. 1992) ...............................................................................15

*In re Eagleston*,
   236 B.R. 183 (Bankr. D. Md. 1999) ....................................................................19

*In re Fed.-Mogul Glob., Inc.*,
   300 F.3d 368 (3d Cir. 2002) ..................................................................................5

*In re G-I Holdings, Inc.*,
   420 B.R. 216 (D.N.J. 2009) ..................................................................................10

*Gold v. Johns-Manville Sales Corp.*,
   723 F.2d 1068 (3d Cir. 1983) ..................................................................5, 9, 25

*Gov't of Virgin Islands v. Fahie*,
   419 F.3d 249 (3d Cir. 2005) .................................................................................24

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ..............................................................................................22

*Harrington v. Purdue Pharma L. P.*,
   144 S. Ct. 2071 (2024) ..........................................................................................13

*In re Homaidan*,
   640 B.R. 810 (Bankr. E.D.N.Y. 2022) ................................................................15

*Hope v. Warden York Cnty. Prison*,
   956 F.3d 156 (3d Cir. 2020) ...................................................................................3

*Hulmes v. Honda Motor Co.*,
   924 F. Supp. 673 (D.N.J. 1996) ...........................................................................17

*In re Imerys Talc Am., Inc.*,
   No. 19-MC-103 (MN), 2019 WL 3253366 (D. Del. July 19, 2019), *aff'd*, 571
   F. App'x 139 (3d Cir. 2014) ...................................................................................6

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
   882 F.2d 797 (3d Cir. 1989) .................................................................................10

*In re Johns-Manville Corp.*,
   26 B.R. 420 (Bankr. S.D.N.Y. 1983) ...................................................................21

*Jurista v. Amerinox Processing, Inc.*,
   492 B.R. 707 (D.N.J. 2013) ..................................................................................15

iii

**JA831**

*Keystone Drill Servs., Inc. v. Davey Kent, Inc.*,
   No. 3:21- CV-30, 2022 WL 819280 (W.D. Pa. Feb. 22, 2022)............................................24

*In re Kmart Corp.*,
   285 B.R. 679 (Bankr. N.D. Ill. 2002) ..............................................................................19, 26

*In re Lower Bucks Hosp.*,
   488 B.R 303 (E.D. Pa. 2013) ..............................................................................................6

*In re LTL Management, LLC*,
   638 B.R. 291 (Bankr. D.N.J. 2022) ..............................................................................3, 8, 16

*Maritime Elec. Co. v. United Jersey Bank*,
   959 F.2d 1194 (3d Cir. 1991)..............................................................................................24

*Mattyasovszky v. W. Towns Bus Co.*,
   330 N.E.2d 509 (Ill. 1975) ..................................................................................................20

*In re Mid-Atl. Handling Sys., LLC*,
   304 B.R. 111 (Bankr. D.N.J. 2003) .....................................................................................24

*Millar v. Bay Area Rapid Transit Dist.*,
   236 F. Supp. 2d 1110 (N.D. Cal. 2002) ..............................................................................28

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)............................................................................................................10

*Nassimos v. Bd. of Examiners of Master Plumbers*,
   No. 94-1319(MLP), 1995 WL 862138 (D.N.J. Mar. 31, 1995)............................................28

*NutraSweet Co. v. Vit-Mar Enters., Inc.*,
   176 F.3d 151 (3d Cir. 1999)................................................................................................10

*Pacor, Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984)..........................................................................................5, 6, 7

*Papera v. Pa. Quarried Bluestone Co.*,
   948 F.3d 607 (3d Cir. 2020)................................................................................................24

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979)............................................................................................................18

*In re Phar-Mor, Inc. Sec. Litig.*,
   164 B.R. 903 (W.D. Pa. 1994)...........................................................................................10

*In re Phar-Mor, Inc. Sec. Litig.*,
   166 B.R. 57 (W.D. Pa. 1994)..............................................................................................14

iv

*Poulis v. State Farm Fire & Cas. Co.*,
   747 F.2d 863 (3d Cir. 1984)...................................................................................24

*Queenie, Ltd. v. Nygard Int'l*,
   321 F.3d 282 (2d Cir. 2003).................................................................................18

*Rukoro v. Fed. Republic of Germany*,
   363 F. Supp. 3d 436 (S.D.N.Y. 2019)...................................................................27

*In re Saxby's Coffee Worldwide*,
   440 B.R. 369 (Bankr. E.D. Pa. 2009) ...................................................................15

*Schultz v. United States Dep't of State*,
   No. CV 22-00059 LEK-WRP, 2022 WL 1749098 (D. Haw. May 31, 2022) .......28

*Shearin v. Doe 1 through 10*,
   No. CIV.A. 03-503-JJF, 2007 WL 4365621 (D. Del. Dec. 11, 2007)...................20

*Stanford v. Foamex L.P.*,
   No. CIV. A. 07-4225, 2009 WL 1033607 (E.D. Pa. Apr. 15, 2009) ................18, 24

*In re Sudbury, Inc.*,
   140 B.R. 461 (Bankr. N.D. Ohio 1992)................................................................21

*In re Uni-Marts, LLC*,
   399 B.R. 400 (Bankr. D. Del. 2009) .......................................................................9

*In re United Health Care Org.*,
   210 B.R. 228 (S.D.N.Y. 1997)..............................................................................20

*United States v. Whiting Pools, Inc.*,
   462 U.S. 198 (1983).............................................................................................21

*Van Buskirk v. Carey Canadian Mines, Ltd.*,
   760 F.2d 481 (3d Cir. 1985)...................................................................................9

*In re W.R. Grace & Co.*,
   591 F.3d 164 (3d Cir. 2009)........................................................................4, 5, 11

*W.R. Grace & Co. v. Chakarian* (*In re W.R. Grace & Co.*),
   386 B.R. 17 (Bankr. D. Del. 2008) .................................................................10, 11

*Williford v. Armstrong World Industries, Inc.*,
   715 F.2d 124 (4th Cir. 1983) ................................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................................10, 13

v

**JA833**

*In re World Trade Ctr. Disaster Site Litig.*,
    503 F.3d 167 (2d Cir. 2007)................................................................22

**Statutes**

11 U.S.C. § 502(e)(1)(B) ......................................................................15

11 U.S.C. § 524(g) ...........................................................................12, 13

11 U.S.C. § 1301 ...................................................................................16

Ariz. Rev. Stat. Ann. § 14-3110 ..........................................................20

Fla. Stat. Ann. § 768.21 ......................................................................20

Idaho Code § 5-327(2) ........................................................................20

The Official Committee of Talc Claimants ("**Committee**") of Whittaker, Clark & Daniels, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned bankruptcy cases (collectively, "**Debtors**") hereby submits this Objection ("**Objection**") to (1) *Debtors' Motion for a Temporary Restraining Order Enjoining Certain Actions Against Non-Debtors Pending the Court's Decision on the Debtors' Request for Preliminary Injunctive Relief* (Adv. Docket No. 299)[1] (the "**Motion**"), and (2) *Debtors' Motion For Leave to File an Amended Complaint* (Adv. Docket No. 298) ("**Motion For Leave**").  In support of the Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     The Debtors have spent the last year seeking to capture, control, and compromise Successor Liability Claims and delay, devalue, and at times destroy Indemnification Claims, all for the benefit of non-debtors and at the expense—and against the will—of claimants.  Even against that background, the Debtors' Motion is a clear overreach.[2]  The Debtors now seek a new, expanded temporary restraining order ("**TRO**") that would enjoin **direct claims** against Brenntag for Brenntag's post-2004 products and conduct.  That is, the Debtors seek to enjoin claims that do not seek any finding of liability or recovery against the Debtors and for which there is no evidence that the Debtors would owe any indemnification.

2.     Consequently, the Motion is inconsistent with the Debtors' representation, oft-repeated until recently, that they "have no issue with the commencement, continuation, or settlement of claims against Brenntag that are independent of its association with the Debtors (i.e., claims alleging injury resulting from business operations conducted by Brenntag following the

---

[1]     References to "Docket No." are to docket entries in Case No. 23-13575, and references to "Adv. Docket No." are to docket entries in Adv. Proceeding No. 23-01245.

[2]     Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

2004 Transactions for which the Debtors do not owe indemnification obligations.").[3]   It is, however, precisely such claims that the Debtors now seek to enjoin.

3.   In addition, the Motion falls glaringly short of the Court's mandate that any further TRO be accompanied with an explanation for how such direct claims against Brenntag will be encompassed in a plan or other resolution.  Instead, and on the contrary, the Motion concedes that the Debtors do not intend that their bankruptcy cases will ultimately affect those direct claims against Brenntag.[4]

4.   Not that they could in any event under the law, as the Court has no jurisdiction over these direct claims against Brenntag.[5]  Consequently, the Court is without jurisdiction to enjoin such claims now.  Moreover, the Motion does not satisfy any of the four factors that the law requires for the issuance of injunctive relief.  For example, the Debtors argue that the prosecution of direct claims against Brenntag will irreparably harm the Debtors by potentially triggering indemnification obligations despite a total lack of evidence that any exist.  In fact, the Debtors dispute the existence of any such indemnification obligations in the Motion.

5.   The Motion goes too far in its request for relief and falls woefully short of this Court's instructions and the controlling law of this Circuit.  The Motion should be denied.

# I.   THE COURT'S SUMMARY JUDGMENT RULING MOOTS THE DEBTORS' REQUEST FOR RELIEF AS TO SUCCESSOR LIABILITY CLAIMS

6.   The Debtors assert that 657 of the 684 claims they seek to enjoin "are expressly pled as Successor Liability Claims."  Motion ¶ 6-7.  This Court, however, has already ruled that

---

[3]   Complaint ¶ 38, Adv. Docket No. 1.

[4]   Motion ¶ 102 (conceding that "the Debtors are not seeking to permanently enjoin plaintiffs from prosecuting direct claims against Brenntag for Brenntag's independent post-2004 conduct" and asserting that approval of Settlement Agreement will "clear a path for plaintiffs to proceed against Brenntag on direct claims relating to their post-2004 talc/asbestos exposure").

[5]   The Court's lack of jurisdiction over direct claims against Brenntag also warrants denying leave to amend the Complaint as futile.

2

the "Successor Liability Claims constitute property of the Debtors' estates" and therefore the automatic stay prohibits the "commencement, continued prosecution, or settlement of any Successor Liability Claims." Summary Judgment Order ¶¶ 4, 6. The Debtors even concede that those 657 Successor Liability Claims are "presently subject to the automatic stay pursuant to the Summary Judgment Order." Motion ¶ 7. Consequently, an additional injunction of these actions would be wholly superfluous and, moreover, would contravene the well-established and controlling principle that a temporary restraining order must be dissolved once the Court addresses the ultimate relief sought.[6]

7.       Nonetheless, the Debtors insist that such claims must be doubly enjoined "to prevent plaintiffs from attempting to circumvent the Summary Judgment Order through procedural machinations similar to those employed by [other] plaintiffs[.]" Motion ¶ 7. The Debtors do not provide any reasoning for why this is the case or any precedent supporting enjoining claims already subject to the automatic stay. Indeed, in *LTL Management*, which the Debtors rely on throughout their Motion, this Court only enjoined claims to the extent that the automatic stay did not already apply to them. *In re LTL Management, LLC*, 638 B.R. 291, 324 (Bankr. D.N.J. 2022). The requested injunction of Successor Liability Claims on top of the automatic stay is unnecessary, legally unsupportable, and should be denied.

## II.     THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION TO ENJOIN DIRECT CLAIMS AGAINST BRENNTAG

8.       Contrary to the Debtors' assertion, this Court does not have bankruptcy jurisdiction to enjoin direct claims against Brenntag. Motion ¶¶ 46-52. A bankruptcy court does not have the jurisdiction to "enjoin proceedings between third parties unless those proceedings arise in or under

---

[6]     *See, e.g.*, *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 159 (3d Cir. 2020) ("[T]emporary restraining orders are of short duration and terminate with a ruling on the preliminary injunction . . . ." (citation omitted)).

3

or are related to the underlying bankruptcy." *In re W.R. Grace & Co.*, 591 F.3d 164, 175 (3d Cir. 2009). Accordingly, to grant the Debtors' Motion, this Court must have jurisdiction over non-debtor claimants' actions against non-debtor Brenntag for Brenntag's post-2004 products and conduct.

9.     Accordingly, the Debtors' assertion that its request for an injunction is a "core" proceeding, Motion ¶ 48, is irrelevant. Whether this Court has jurisdiction to entertain the Motion is a distinct question from whether it ultimately has jurisdiction to enjoin direct claims against Brenntag. *See W.R. Grace*, 591 F.3d at 175 ("If it were the case that a bankruptcy court's jurisdiction over an adversary proceeding was sufficient in and of itself to give it jurisdiction to enjoin third parties . . . the Supreme Court's entire analysis of related-to jurisdiction in *Celotex* would have been superfluous. Clearly it was not."). Were it otherwise, bankruptcy courts would have limitless jurisdiction to enjoin any action in the world pursuant to a request to do so under section 105 regardless of whether the action had any relation whatsoever to a debtor or its estate.

10.     It is axiomatic that non-debtor state-law personal injury and wrongful death claims against a non-debtor, such as the direct claims against Brenntag here, neither arise under the Bankruptcy Code nor arise in a bankruptcy proceeding. In fact, most if not all of these claims existed before the Debtors filed for bankruptcy. Consequently, for the court to grant the Motion it must have "related to" jurisdiction over these claims. And it does not.

11.     The Third Circuit has held that a bankruptcy court does not have "related to" jurisdiction over "third-party claims involving asbestos or asbestos-containing products supplied by the debtor when the third-party claim d[oes] not directly result in liability for the debtor." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 227, 231 (3d Cir. 2004) (bankruptcy court did not have jurisdiction over "non-derivative asbestos claims against non-debtors" where "potential

indemnification and contribution claims against . . . [the debtor] had not yet accrued and would require another lawsuit before they could affect . . . [the debtors'] bankruptcy estate"); *see also In re W.R. Grace & Co.*, 591 F.3d at 173 (the Third Circuit has "stated and restated that, in order for a bankruptcy court to have related-to jurisdiction to enjoin a lawsuit, that lawsuit must affect the bankruptcy without the intervention of yet another lawsuit"); *In re Fed.-Mogul Glob., Inc.*, 300 F.3d 368, 382 (3d Cir. 2002) ("The test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit."). Those cases are determinative here.

12.      *Pacor, Inc. v. Higgins* (related to the *Johns-Manville* bankruptcy), the seminal case on "related to" jurisdiction in this Circuit, held that "an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." 743 F.2d 984 (3d Cir. 1984). There, the court addressed whether the bankruptcy court had "related to" jurisdiction over a third-party personal injury suit against a non-debtor for damages allegedly caused by asbestos supplied by the non-debtor but manufactured by the debtor. *Id.* at 986. Even though debtor Johns–Manville manufactured the asbestos giving rise to the third-party claim, the Third Circuit found no "related to" jurisdiction because the "primary action"— i.e., the suit between the two non-debtors—would not, itself, result in an indemnification claim against the debtor. *Id.* at 995 ("[T]he primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate . . . At best, it is a mere precursor to the *potential third party claim for indemnification*." (emphasis added)).

5

**JA839**

13.     Under the *Pacor* test, "[t]o show indemnification sufficient for 'related-to' jurisdiction, a party must establish that the 'right to indemnification is clearly established and has accrued upon a filing of a civil action.'" *In re Imerys Talc Am., Inc.*, No. 19-MC-103 (MN), 2019 WL 3253366, at *3 (D. Del. July 19, 2019) (quoting *In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013)), *aff'd*, 571 F. App'x 139 (3d Cir. 2014).   A right is not clearly established or accrued in a situation where "the 'primary action' . . . would not, *itself*, result in an indemnification claim against the debtor." *In re Combustion Eng'g, Inc.*, 391 F.3d at 231 (emphasis added).   In other words, "where the right to indemnification is contingent on a factual finding in an action not involving the bankruptcy debtor and requires the commencement of another lawsuit to establish that right, there is no effect on the bankruptcy estate and thus no 'related to' jurisdiction." *In re Lower Bucks Hosp.*, 488 B.R. at 314.

14.     *Imerys Talc America*, 2019 WL 3253366, is instructive.   There, nondebtor Johnson & Johnson asked the court to fix venue for roughly 2,400 talc actions[7] in the District of Delaware on the ground that Johnson & Johnson held indemnity rights against the *Imerys* debtors—who had active chapter 11 cases in the District of Delaware—with respect to those talc actions.   *Id.* at *1-2.   The Delaware District Court held that the bankruptcy court did not have "related to" jurisdiction over the claims asserted against Johnson & Johnson because Johnson & Johnson failed to show that "the right to indemnification was vested upon the filing of Plaintiffs' claims."   *Id.*   Here, the Debtors have failed even to show any right to indemnification exists in the first place as to the

---

[7]     Those actions were "filed against Johnson & Johnson in various state courts alleging that [Johnson & Johnson]: (1) are *directly* liable for placing asbestos-containing talc products into the stream of commerce, (2) failed to warn customers against known risks, (3) breached express and implied warranties, and (4) acted intentionally and/or negligently leading to the development of ovarian and non-ovarian cancers." *Imerys Talc Am.*, 2019 WL 3253366, at *1 (emphasis added).

direct claims against Brenntag, much less one that is vested. The position in the Motion is thus unsupportable and contrary to the controlling Third Circuit precedent set forth above.

15.       The instant circumstances thus do not permit the conclusion that "related to" jurisdiction exists with regard to direct claims against Brenntag. Here, the Debtors have made no showing (because they cannot) that adjudication of direct claims against Brenntag will trigger any indemnification obligation, much less one that is clearly established. Rather, the Debtors have resorted to speculation that Brenntag *may try* to assert indemnity rights against them in connection with direct claims where the evidentiary record *may* contain some evidence of pre-2004 exposure. *See, e.g.*, Motion ¶ 50. But, of course, the Debtors' position concedes that a separate lawsuit or a proceeding in this bankruptcy would need to be commenced to adjudicate whether the Debtors owe any indemnifications on account of such direct claims. What is more, the Debtors themselves "dispute Brenntag's purported entitlement to indemnification with respect to claims that are not Successor Liability Claims[,]"[8] which further buttresses the point that Brenntag's right to indemnification does not accrue upon the filing or adjudication of a direct claim.

16.       Furthermore, as discussed *infra* § II(B)(I), the responsibility for any indemnification that the Debtors actually owe to Brenntag has shifted to DBUS and/or NICO, who are required to backstop the Debtors if they are financially unable to satisfy Brenntag's indemnification claims. Consequently, even if there were some evidence (there is none) that the Debtors owe indemnification obligations to Brenntag for Brenntag's direct, post-2004 liability, the accrual of such obligations would not have any effect on the Debtors' estates; non-debtors NICO and/or DBUS would simply have to pay more funds to satisfy those obligations. Under *Pacor* and

---

8       *See* Motion ¶ 3 n.7.

its progeny, this falls far short of establishing "related to" jurisdiction over direct claims against Brenntag.

17.     Moreover, and contrary to the Debtors' assertion, no "identity of interest" between the Debtors and Brenntag exists with respect to direct claims against Brenntag that would provide any basis for the Court to enjoin such claims.  *See* Motion ¶¶ 57-61.  Debtors' own cited case provides that an "illustration of . . . [an unusual] situation [where there is an 'identity of interest' between a debtor and nondebtors] would be a suit against a third-party who is entitled to *absolute indemnity by the debtor* on account of any judgment that might result against them in the case." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (emphasis added).[9]  The fact pattern here stands in stark contrast to the example mentioned by the *Robins* court.  The claims at issue here seek to hold Brenntag directly liable for talc mined, processed, or distributed by Brenntag— as opposed to claims that seek to hold Brenntag derivatively liable for talc mined processed, or distributed by the Debtors under a successor-in-interest or related theory.  Put differently, the direct claims seek to hold Brenntag liable for conduct or talc products that are not attributable to the Debtors.

18.     Even if the evidentiary record or the complaint in a direct claim contains allegations pertaining to the Debtors' pre-2004 talc, the Debtors have not alleged (because they cannot) that any adverse judgment against Brenntag on account of Brenntag's post-2004 conduct would result in an *absolute indemnity* obligation by the Debtors.  The instant circumstances do not come close

---

[9]     *LTL Management* is readily distinguishable from the instant circumstances. Motion ¶ 58.  In *LTL*, the debtor had assumed sole responsibility for its nondebtor affiliates' talc liabilities pursuant to a prepetition divisional merger. *LTL Management*, 638 B.R. at 297.  In other words, there was a one-to-one relationship between the LTL debtor's asserted liability and the claims against the nondebtor affiliates.  Accordingly, this Court found that there was an identity of interest between the LTL debtor and its nondebtor affiliates because the "talc claims against the . . . [nondebtor affiliates] involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor."  *Id.* at 306.  In contrast, there is no similar one-to-one relationship between Brenntag and the Debtors. Moreover, the direct claims against Brenntag do not implicate the products, time periods, alleged injuries, and evidence as claims against Debtors.

to meeting the "unusual circumstances" needed for a finding of "identity of interest" under the *Robins* test. *See, e.g.*, *In re Uni-Marts, LLC*, 399 B.R. 400, 416 (Bankr. D. Del. 2009) (concluding that indemnification obligation did not constitute "unusual circumstances" where it did not threaten reorganization); *see also In re All Seasons Resorts*, 79 B.R. 901, 904 (Bankr. C.D. Cal. 1987) ("Although there is a closeness between debtor and co-defendants by reason of their officer and agent status and their right to indemnification . . . the magnitude of the harm to debtor if no stay is in force does not approach the scope of the potential injuries besetting the debtors in *Robins*.").

19.     Relatedly, it bears noting that the Third Circuit has held that a chapter 11 filing by an asbestos debtor does not provide grounds to stay tort actions against the debtor's codefendants, who are being sued on account of the same asbestos products that led to the debtor's bankruptcy filing. *See Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1070–76 (3d Cir. 1983) (declining to stay claims against the debtor Johns-Manville's codefendants who are manufacturers, suppliers, and distributors of the asbestos products that led to Johns-Manville's bankruptcy filing despite the fact that "[p]articular defendants might be handicapped in particular cases because Johns-Manville assumed the lead in amassing the evidentiary material necessary to defend itself and its co-defendants in the upcoming litigation"); *see also Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 486 n.2 (3d Cir. 1985) (holding that the "balance of hardship" weighed against holding the entire appeal in abeyance where one appellee was subject to a bankruptcy stay, even though some issues common to the debtor and non-debtor appellees would be decided).

20.     Here, the direct claims at issue do not seek to hold Brenntag liable for the talc products that WCD historically supplied prior to 2004. Accordingly, there is no basis to hold that

the Court has "related to" jurisdiction over direct claims against Brenntag based on a purported

"identity of interest" between the Debtors and Brenntag or otherwise.

## III.   THE DEBTORS HAVE FAILED TO MEET THE STANDARD FOR A TRO ON DIRECT CLAIMS AGAINST BRENNTAG

21.     As the Court has observed, "[a] preliminary injunction is an 'extraordinary remedy,

which should be granted only in limited circumstances.'"   Adv. Docket No. 88 at 5 (citation

omitted) ("**TRO Opinion**"); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165

(2010) ("[I]njunction is a drastic and extraordinary remedy, which should not be granted as a

matter of course."); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.

1989) ("[An injunction is an] 'extraordinary remedy, which should be granted only in limited

circumstances.'" (citation omitted)).

22.     Courts considering whether to grant interim injunctive relief apply the four

traditional factors.   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *In re G-I

Holdings, Inc.*, 420 B.R. 216, 281 (D.N.J. 2009).   The four factors, as tailored to a bankruptcy

case, are: (i) the debtor's reasonable likelihood of a successful reorganization; (ii) the imminent

risk of irreparable harm to the debtor's estate in the absence of an injunction; (iii) the balance of

harms between the debtor and its creditors; and (iv) whether the public interest weighs in favor of

an injunction.   *G-I Holdings*, 420 B.R. at 281.   To be successful, the movant must establish all four

of these elements by clear and convincing circumstances.   *In re Phar-Mor, Inc. Sec. Litig.*, 164

B.R. 903, 907 (W.D. Pa. 1994); *see also NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151,

153 (3d Cir. 1999) ("Failure to establish any element in . . . [the plaintiff's] favor renders a

preliminary injunction inappropriate.").   Here, the Debtors cannot satisfy any of the elements.[10]

---

[10]   Debtors cite to *W.R. Grace & Co. v. Chakarian* (*In re W.R. Grace & Co.*), 386 B.R. 17 (Bankr. D. Del. 2008)
throughout their papers in support of their "identity of interest" argument and their request for a preliminary injunction.
*See* Motion ¶¶ 58, 70, 73, 74, and 106.   However, that case is completely inapposite to the fact pattern presented here.

**A.      The Debtors Have Failed to Show That a Successful Reorganization is Likely or That They Have a Plan to Address Brenntag's Direct Liability In This Bankruptcy**

23.      The first factor, generally speaking, refers to the likelihood of a successful reorganization.  In connection with extending the TRO "on a limited basis" at the August 22 hearing, this Court made clear that, going forward, the TRO "cannot be and will not [be extended] indefinite[ly.]"  Hr'g Tr. at 28:7-12, Aug. 22, 2024.  At that hearing, the Court stated that any further extensions of the TRO would be conditioned upon the Debtors demonstrating how they will confirm a plan or reach a resolution that addresses direct claims against Brenntag. Specifically, the Court stated:

> The debtor has the burden to come into -- before this Court to demonstrate that the balance of harms continue to weigh in favor of continued injunction and that the likelihood of success, meaning a meaningful reorganization, in which the debtors can show that the claims held by Ms. Sneider and others will be successfully addressed as part of a plan . . . The Court needs to understand **how this debtor will confirm a plan or reach a resolution which encompasses these very direct claims**.  Otherwise, this Court – it will not be inclined to extend the TRO further.

*Id.* at 28:13-29:12-15 (emphasis added).

24.      On September 3, 2024, the Debtors filed a motion seeking approval of a settlement agreement they entered into with Brenntag, DBUS, and NICO to settle the Successor Liability Claims in exchange for $535 million ("**Settlement Agreement**").  *See* Docket No. 1297 ("**Settlement Motion**").  In the Settlement Motion, the Debtors contend that the Settlement Agreement neither addresses nor affects claimants' ability to assert direct claims against Brenntag. *See id.* ¶ 4 ("[T]he Settlement Agreement does not prohibit claimants from pursuing any direct claims they may have against the Contributing Parties, including any claims against Brenntag for

---

In *W.R. Grace*, the debtors moved to enjoin claims that sought to hold certain third parties derivatively liable for the debtors' conduct and products.  *W.R. Grace*, 386 B.R. at 23-24.  Here, the Debtors are attempting to enjoin claims against Brenntag that seek to hold Brenntag liable for its own independent conduct and products.

11

**JA845**

liabilities arising from Brenntag's own post-February 2004 operations."); *see also id.* ¶ 81 ("[N]othing in the Settlement Agreement releases Brenntag from independent, direct liability for its own conduct after the sale of the Debtors' assets to Brenntag in February 2004"). The Debtors also attached a "Plan Term Sheet" to the Settlement Motion, which conspicuously omits any information on how the Debtors would address direct claims against Brenntag in their proposed plan of reorganization. *See* Docket No. 1297-3; *see also* Motion ¶ 36 ("The Settlement Agreement . . . does *not* provide for the release of plaintiffs' direct claims against the Contributing Parties, including any direct claims against Brenntag for injuries arising from Brenntag's independent post-February 2004 operations."). Indeed, the Debtors' disclaim in the Motion that they are seeking any permanent relief with regard to such direct claims against Brenntag.[11]

25.     In short, according to the Debtors, their proposed resolution of these cases neither seeks to address nor resolves direct claims against Brenntag. As such, the Debtors have failed to satisfy this Court's explicit condition (i.e., showing how they "will confirm a plan or reach a resolution which encompasses … direct claims [against Brenntag]")[12] for any further injunctive relief enjoining claims against Brenntag. The Court should deny the Motion on this basis alone.

26.     Additionally, the Debtors cannot make a showing that a successful reorganization in this bankruptcy is likely. The Settlement Agreement is a conflicted deal between and among the Debtors, their controlling affiliate NICO, DBUS, and Brenntag. It seeks to release the asbestos liabilities of numerous nondebtor entities on a nonconsensual basis and outside the contours of section 524(g). The idea that co-defendant tortfeasors can "settle" among themselves to cut off claims against them by their asbestos victims is absurd and manifestly inequitable on its face.

---

[11]     Motion ¶ 102 ("[T]he Debtors are not seeking to permanently enjoin plaintiffs from prosecuting direct claims against Brenntag for Brenntag's independent post-2004 conduct.").

[12]     *See supra* ¶ 23.

Moreover, in asbestos-driven reorganizations like these, the only way to obtain releases for the asbestos liabilities of nondebtors while also safeguarding the constitutional due process rights of asbestos claimants is to comply with the requirements of section 524(g) of the Code. *See In re Combustion Eng'g Inc.*, 391 F.3d at 236-37 ("Because § 524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction—and sets out the specific requirements that must be met in order to permit inclusion—the general powers of § 105(a) . . . [could] not be used to achieve a result not contemplated by the more specific provisions of § 524(g)."). The Supreme Court's recent decision in *Purdue Pharma* further underscores that any plan which purports to provide nonconsensual releases to NICO and other nondebtors for asbestos liability would not pass muster under the Code. *See Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2074 (2024) ("The bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants.").

27.     In short, the Debtors' proposed path forward in these cases is unlikely to lead to a successful reorganization. Thus, this factor weighs in favor of denying the Motion.

## B.     Denial of the Motion Does Not Present Risk of Any Harm to the Estates, Let Alone Irreparable Harm

*28.*     As the Supreme Court has emphasized, "plaintiffs seeking preliminary relief . . . [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* And this Court has stated that the "threatened harm cannot be speculative," and "the party seeking preliminary relief must produce affirmative evidence of the potential harm." TRO Opinion at 6 (citation

omitted). The Debtors have failed to establish that the injunction they seek is necessary to prevent any harm to the estates, much less imminent irreparable harm.

> 1. *The Debtors have no indemnity obligations for direct claims against Brenntag and such obligations would not create irreparable harm in any event*

29. To satisfy the irreparable harm prong, the Debtors rely mainly on the claim that Brenntag might assert that the Debtors owe them indemnity obligations that would be triggered if direct claims against Brenntag are allowed to proceed. *See, e.g.*, Motion ¶¶ 87-93. But there is no evidence that such indemnity obligations exist and, even if they did, such obligations would nonetheless be insufficient to establish any risk of irreparable harm to the estates.

30. The Debtors have not presented any evidence showing that they owe indemnity obligations for direct claims against Brenntag. "[W]hen it is alleged that irreparable harm to the debtor's reorganization will result it is necessary to present strict proof of the facts and circumstances proving the irreparable harm. Speculative and conclusory allegations are clearly insufficient." *Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.*, 54 B.R. 353, 358 (Bankr. W.D. Wis. 1985); *see also In re Phar-Mor, Inc. Sec. Litig.*, 166 B.R. 57, 62-63 (W.D. Pa. 1994) (in denying request for injunction, finding that allegation that pursuit of action against debtors' auditor would delay reorganization was "mere speculation . . . [that did] not constitute the type of proof required to entitle the Debtors to an injunction").

31. Here, the Debtors do not even have conclusory or speculative allegations. Indeed, they make no allegation (because they cannot) that the indemnification obligations under the 2004 MSPA[13]—the only indemnification between the Debtors and Brenntag—cover direct claims

---

[13] "**2004 MSPA**" refers to that certain Master and Sale Purchase Agreement dated Dec. 9, 2003, available at Adv. Docket Nos. 4-6, 4-7.

against Brenntag for Brenntag's post-2004 products and conduct.[14]   Instead, the Debtors

themselves "dispute Brenntag's purported entitlement to indemnification with respect to claims

that are not Successor Liability Claims and reserve all rights."  Motion ¶ 3 n.7.  As such, the mere

adjudication of a direct claim against Brenntag would not result in the accrual of an indemnity

claim against the estates.  Of course, any party can *assert* a right to be indemnified, but that hardly

establishes the merits of such an assertion or presents irreparable harm.

32.    But even assuming that direct claims against Brenntag could trigger any indemnity

obligation of the Debtors (they cannot), they still would not pose a threat of irreparable harm to

the Debtors' estates.   Brenntag would simply have one contingent prepetition claim for

indemnification under § 502(e)(1)(B).[15]   Moreover, Brenntag's claim would be subject to

subordination or disallowance under section 502(e)(1)(B) of the Bankruptcy Code.  Section 502(e)

demonstrates that Congress contemplated that debtors like those here would face indemnification

claims, and thus the mere prospect of such claims cannot supply the basis for finding a likelihood

of irreparable harm.  If Congress believed that indemnification claims against debtors were enough

to require an injunction to prevent irreparable harm to the estate, Congress could have enacted a

---

[14]    Courts in this Circuit and elsewhere require parties requesting a preliminary injunction or temporary restraining order to provide such specificity.  *See Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 778 (D.N.J. 2013) (denying injunction and stating that "our Court of Appeals has previously recognized that 'an injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief'" (citation omitted)); *Bullock v. Carney*, 463 F. Supp. 3d 519, 523 (D. Del. 2020) (denying temporary restraining order and stating that "[l]ike a preliminary injunction, a temporary restraining order is 'an extraordinary and drastic remedy . . . that should not be granted unless the movant, by a clear showing, carries the burden of persuasion'" (alterations in original) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997))); *In re Saxby's Coffee Worldwide*, 440 B.R. 369, 380 (Bankr. E.D. Pa. 2009) ("The determination whether to grant or deny a § 105 injunction is intensely fact driven."); *ACME Fast Freight v. U.S.*, 135 F. Supp. 823, 825 (D. Del. 1955) (vacating temporary restraining order and noting that "[t]he parties seeking a temporary restraining order or a preliminary injunction must not only allege facts as to which there is no serious dispute but also indicate such facts which show that the moving party has a reasonable probability of success upon final hearing"); *In re Homaidan*, 640 B.R. 810, 831 (Bankr. E.D.N.Y. 2022) ("To obtain an injunction or a temporary restraining order, the movant must identify specific, real-word facts" in support of its motion).

[15]    *See In re Drexel Burnham Lambert Grp., Inc.*, 146 B.R. 92, 96 (S.D.N.Y. 1992) (stating that "it is well-established that contingent claims for indemnity are covered by § 502(e)(1)(B) where the claimant is co-liable with the debtor on the underlying claim").

15

stay to protect nondebtors in chapter 11 cases, just as it enacted a stay shielding nondebtor individuals in chapter 13. *See* 11 U.S.C. § 1301. It did not and neither should this Court.[16]

33.    What is more, the Debtors' estates would not be diminished even if Brenntag's indemnification claim could not be subordinated or disallowed. As this Court knows, the Debtors' indemnity obligations to Brenntag are backstopped by two solvent nondebtors (namely, NICO and DBUS) and those backstop obligations are triggered when the Debtors become "financially unable to satisfy" their indemnity obligations.[17]   The Debtors have already asserted that they are financially unable to satisfy their own administrative expenses.[18]   The Debtors thus cannot argue that they are financially able to satisfy their indemnity obligations.

34.    Accordingly, every new dollar of indemnity liability (if any) that the Debtors accrue will be borne by NICO and/or DBUS through the backstop. Indeed, it is telling that under the Debtors' proposed Settlement Agreement, the consideration to settle the Successor Liability Claims against Brenntag is being paid exclusively by NICO—an implicit acknowledgement that NICO is the party ultimately on the hook here.[19]   Under these circumstances, allowing direct claims against Brenntag to proceed would not lead to any depletion of estate assets and, consequently,

---

[16]    The Debtors' reliance on *LTL* in support of the irreparable harm prong is misplaced. *See* Motion ¶ 86.  *LTL* was a "Texas Two-Step" case in which the debtor had purportedly assumed and held sole responsibility for talc-related liabilities as a result of pre-petition divisional mergers. *LTL Management*, 638 B.R. at 297 ("As a result of the restructuring, LTL assumed responsibility for all of Old JJCI's talc-related liabilities."). The LTL debtor sought to enjoin or stay litigation that would hold non-debtor affiliates liable for tort liabilities which were *exclusively* held by the debtor. *Id.* at 297-98 (seeking stay or injunction of litigation against third parties on "talc-related claims," for which court found debtor had sole responsibility). *LTL* is not analogous to the present circumstances. In *LTL*, the debtor was seeking to enjoin clearly *derivative* claims against its affiliates, whereas the Debtors here seek to enjoin *direct* claims against a nondebtor who holds indemnity rights against the Debtors for derivative liability only. According to the Court, the potential for irreparable harm existed in *LTL* because an adverse ruling against the nondebtor affiliates would clearly result in an indemnity claim against LTL's estate. In contrast, Brenntag does not have indemnity rights against the Debtors with respect to direct claims against Brenntag.

[17]    *See* Adv. Docket No. 197 ¶¶ 16-17; *see also* Adv. Docket No. 90 ¶¶ 18-19.

[18]    *See* Docket No. 1302 ¶ 4 (Debtors stating that they "likely need to convert their chapter 11 cases to cases under chapter 7 of the Bankruptcy Code" absent approval of financing since they "have limited cash flows from interest on fixed assets, and finite assets that are only being depleted as these chapter 11 cases proceed[.]").

[19]    *See* Docket No. 1297-2 (showing that Settlement Payment is being "funded in Cash by NICO or its designee").

would not lead to any likely irreparable harm. *See In re Aearo Techs. LLC*, 642 B.R. 891, 907 (Bankr. S.D. Ind. 2022) (declining to stay actions against nondebtor third parties because "there is no threat of inequitable distribution of insurance proceeds here as the Funding Agreement operates as a complete, uncapped backstop to the insurance policies," such that "tapping the insurance policies to cover any liability incurred in the Pending Actions does not affect the amount of money Aearo can pay its creditors because the Funding Agreement covers all claims arising from the Pending Actions in the absence or exhaustion of the applicable insurance").

> 2. *There is no risk of collateral estoppel, res judicata or record taint that warrants enjoining direct claims against Brenntag*

35.     The Debtors contend that permitting the continued prosecution of direct claims against Brenntag would "require the Debtors to expend scarce resources defending such actions or risk litigation prejudice through *res judicata*, collateral estoppel, and record taint."  Motion ¶ 96. Not so.  It is only if the Debtors become parties to such actions that any risk of such litigation prejudice could arise. *Hulmes v. Honda Motor Co.*, 924 F. Supp. 673, 682 n.12 (D.N.J. 1996) ("In order for the doctrine of res judicata, or claim preclusion, to bar a subsequent action, the following requirements must be met:  (1) the judgment in the prior action must be valid, final, and on the merits; (2) *the parties in the later action must be identical to or in privity with those in the prior action*; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one."  (emphasis added)); *Biogen Int'l GmbH v. Amneal Pharms. LLC*, 487 F. Supp. 3d 254, 258 (D. Del. 2020) ("Under Third Circuit law, collateral estoppel applies when: (1) the identical issue was previously adjudicated, (2) that issue was actually litigated, (3) the previous determination was necessary to the decision and (4) *the party being precluded from relitigating the issue was fully represented in the prior action*."  (emphasis added)) (citing *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006)).  As non-parties,

17

**JA851**

the Debtors are not subject to any risk of res judicata or collateral estoppel, including from any potential liability apportionment. *See, e.g.*, *Bondex Int'l v. Ott*, 774 N.E.2d 82, 87 (Ind. Ct. App. 2002) ("[A]ny allocation of fault to the bankrupt nonparties could not be used against them in a subsequent legal action through application of the collateral estoppel doctrine. . . . First, there is no judgment entered against nonparties. Additionally, collateral estoppel could not be invoked against the bankrupt nonparties because, as nonparties, they would not have had a full and fair opportunity to defend themselves in the underlying suit.").

36.     In addition, courts routinely refuse to stay actions against non-debtors regardless of the "apprehended later use [of] . . . collateral estoppel or the precedential effect of an adverse decision" as doing so would cause a "vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants." *Cook v. Blazer*, No. 7:15CV456, 2016 WL 3453663, at *1 (W.D. Va. June 20, 2016) (citations omitted); *see also Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003) (refusing to "extend" automatic stay to two non-debtor codefendants in copyright litigation, noting that it had "not located any decision applying the stay to a non-debtor solely because of an apprehended later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision"); *Stanford v. Foamex L.P.*, No. CIV. A. 07-4225, 2009 WL 1033607, at *1 (E.D. Pa. Apr. 15, 2009) (refusing to extend automatic stay to co-defendants of debtor even where debtor and other co-defendants had all been sued for violation of ERISA before the petition date and claims against the co-defendants were factually and legally related to claims against debtors).

37.     Moreover, even if *res judicata* or collateral estoppel were invoked against the Debtors in the future, this Court would retain discretion to reject the application of *res judicata* and collateral estoppel as inequitable to the Debtors. *See, e.g.*, *Parklane Hosiery Co. v. Shore*, 439

U.S. 322, 331 (1979) (courts have "broad discretion to determine" whether offensive collateral estoppel "should be applied"). Courts have rejected the application of those doctrines when invoked against a debtor who was in bankruptcy when the relevant adverse judgment was rendered. *In re Eagleston*, 236 B.R. 183 (Bankr. D. Md. 1999) (refusing to give collateral estoppel effect to a judgment that had been entered against the debtor's professional corporation in a non-bankruptcy action after the debtor had entered bankruptcy); *see also In re Kmart Corp.*, 285 B.R. 679, 689 (Bankr. N.D. Ill. 2002) (agreeing to lift the stay where a plaintiff "agreed to stipulate that it will not use any findings derived from the trial against [the debtor] Kmart, and this [c]ourt has authority under § 105 to prevent such use by either party").

38.     In sum, the Debtors have not established that the TRO is necessary to prevent irreparable harm to these estates.

## C.     The Balance of Harms Decisively Weighs in Favor of Denying the Motion

39.     As explained in Section II(B) *supra*, the purported harms to the Debtors' estates are speculative at best and illusory at worst. On the other hand, granting the Motion would have real and tragic consequences for innocent tort victims. The case of Ms. Patricia Sneider is instructive. She is a 61-year-old woman who was diagnosed with mesothelioma, a terminal cancer, from exposure to Brenntag's talc. Adv. Docket No. 266 ¶ 1. Due to her rapidly deteriorating health and a medical diagnosis that she likely will not survive beyond six months, the California state court granted her "trial preference status" in order provide her with a "chance to actively and meaningfully participate in the trial of her case." *Id.* ¶ 3. Granting the Motion would irreparably harm and prejudice Ms. Sneider and many other similarly situated talc victims dying from a terminal disease, depriving them of their day in court.

40.     Many of the claimants enjoined under the TRO would inevitably die during the delay.[20]  The death of a claimant will result in lost legal rights and compensation because some states limit the causes of action or damages a decedent's estate or personal representative may assert.[21]  For example, compensation for pain and suffering—often valued in the millions of dollars—may not be available to a decedent's estate.[22]  A lengthy delay also presents the risk of critical evidence being lost, as aging witnesses die or their memories fade while discovery and depositions are stayed.[23]

41.     In *Williford v. Armstrong World Industries, Inc.*, for example, the Fourth Circuit affirmed the denial of a litigation stay in part because of the harm and manifest injustice that would be inflicted on an asbestos plaintiff.  715 F.2d 124 (4th Cir. 1983).  In doing so, the Fourth Circuit gave greater weight to "the needs of a plaintiff in declining health as opposed to the practical problems imposed by the proceedings in bankruptcy, which very well could be pending for a long period of time."  *Id.* at 128.  Indeed, the Fourth Circuit recognized that a stay of litigation against non-debtors "under such circumstances would work manifest injustice to the claimant."  *Id.*  So too here.

---

[20]    The cases Debtors cite for the proposition that "mere delay is insufficient to prevent the issuance of an injunction" (Motion ¶ 101) are based on considerations that are absent here.  *See In re Bestwall LLC*, 606 B.R. 243, 255-57 (Bankr. W.D.N.C. 2019) (granting injunction as to debtors' *affiliates* where debtor's "indemnity obligations . . . would make judgments against the Protected Parties . . . tantamount to judgments against the Debtor"); *see also In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997) (upholding injunction as to claims against debtors' "principals and officers" who had agreed to fund estate settlement, because absent injunction, non-debtors would be "prevent[ed] [] from obtaining the funds necessary to bring about the settlement").

[21]    *See, e.g.*, FLA. STAT. ANN. § 768.21 (specifying damages available to decedent's estate or personal representative); *see also Mattyasovszky v. W. Towns Bus Co.*, 330 N.E.2d 509, 510 (Ill. 1975) (holding that punitive damages may not be recovered in an action under the Illinois Survival Act).

[22]    *See, e.g.*, ARIZ. REV. STAT. ANN. § 14-3110 (providing that damages for pain and suffering do not survive death of tort victim); IDAHO CODE § 5-327(2) (specifying limited damages available in survival actions).

[23]    *See, e.g.*, *Shearin v. Doe 1 through 10*, No. CIV.A. 03-503-JJF, 2007 WL 4365621, at *2 (D. Del. Dec. 11, 2007) ("The lengthy passage of time involves the risk of loss of evidence or the fading of memory.").

42.     Phantom indemnification claims and amorphous concepts like "record taint"

simply will not harm the Debtors, and they certainly will not harm them more than the TRO would

harm the sick and dying individuals forced to delay and possibly forego their claims and recoveries

against Brenntag.

### D.     The Public Interest Decisively Weighs Against Granting the Motion

43.     To satisfy the public interest prong, the Debtors rely exclusively on the general

proposition that there is a "public interest in a successful reorganization."  Motion ¶¶ 105-107.

But these are not your typical chapter 11 cases.  As this Court has recognized, these Debtors

"ha[ve] not operated since 2004[,]" there are no operating companies to salvage, and they do not

have any employees, customers, or other stakeholders who would be adversely impacted absent a

successful restructuring.  *See* Hr'g Tr. at 23:24-25:1, Sept. 12, 2024.  These Debtors thus stand in

stark contrast to those in cases the Debtors cite in which courts found the public interest would be

advanced by a successful reorganization.  *See United States v. Whiting Pools, Inc.*, 462 U.S. 198,

203 (1983) ("By permitting reorganization, Congress anticipated that the business would continue

to provide jobs, to satisfy creditors' claims, and to produce a return for its owners."); *In re Sudbury,*

*Inc.*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (discussing employees' continued, post-petition

work in "manag[ing] financial, tax and other business-wide functions" of the debtor); *In re Johns-*

*Manville Corp.*, 26 B.R. 420, 422 (Bankr. S.D.N.Y. 1983) ("Manville continues to operate its

business and manage its property as a debtor-in-possession under Sections 1107 and 1108 of the

Code.").  No such public interest exists here.

44.     Instead, the public interest here favors the tort victims' due process rights and

ability to obtain compensation for their direct claims against solvent, nondebtor tortfeasors.

Nondebtor Brenntag is a highly profitable corporate conglomerate that bought a talc business in

2004 and has continued to operate that same business.  Its conduct and products have harmed

21

**JA855**

countless innocent Americans nationwide. As such, there is a strong public interest in allowing claimants to continue pursuing Brenntag for its independent liability in the tort system without delay.[24] And unnecessary delay here would be particularly offensive to claimants such as Ms. Patricia Sneider who are terminally ill from exposure to Brenntag's post-2004 talc, and were given trial preference status under state law on account of being in an advanced state of a terminal disease.[25]

45.     On the other hand, there is zero public interest in allowing tortfeasors like Brenntag to escape litigation on their own, direct liability simply by threatening to sue for indemnification (without evidence of any right to indemnification) or threatening to blame the Debtors for Brenntag's own conduct (again, without evidence that it could actually do so). Any defendant in any action could make these same baseless threats. Indeed, if direct claims against Brenntag could harm the Debtors (as explained above, they cannot), it would be because of the actions of Brenntag, not of the claimants.

46.     As the Debtors fail to meet any of the elements for a TRO on the direct claims against Brenntag and those claims are outside of the Court's jurisdiction, the Motion should be denied as to those claims.

## IV.     ALTERNATIVELY, EVEN IF THE COURT WERE TO GRANT THE MOTION, IT SHOULD ADOPT A DIFFERENT PROCESS FOR EXEMPTING ACTIONS FROM THE TRO

47.     Since the May 15 hearing, the Debtors have taken a hardline position that they will not remove actions from the TRO schedule (or any proposed amendment to the TRO schedule)

---

[24]     *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (discussing "public interest in deterrence of unlawful conduct and in compensation of victims"); *Dent v. Cunningham*, 786 F.2d 173, 176-77 (3d Cir. 1986) (noting that New Jersey courts have long recognized a significant public interest in compensating their injured domicilliaries).

[25]     *See* Adv. Docket No. 266 ¶ 2; *see also In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (recognizing public interest in having persons "who might be entitled to recovery receive compensation while still living and able to use it to cover medical costs and improve the quality of their lives").

unless the relevant claimant dismisses all claims against Brenntag that are subject to the TRO with prejudice and stipulates that no factual or legal issues relative to the Debtors' conduct will be adjudicated at trial.[26]  Likewise, the Debtors now assert that they will only permit a claimant to be removed from the TRO schedule if the "plaintiff has dismissed all claims against Brenntag, including direct claims, with prejudice[.]"  Motion ¶ 103.

48.    This, of course, goes too far, as the Debtors' requested TRO does not encompass all direct claims against Brenntag.  Regardless, if the Court decides to grant the Motion, it should make clear that any affected claimants who dismiss their relevant claims against Brenntag *without prejudice* will not have the remainder of their actions subject to the TRO.  Indeed, under this Court's ruling that the Successor Liability Claims are estate property, dismissing such claims with prejudice under the Debtors' requested course of action would essentially amount to destruction of valuable estate property.

49.    In addition, requiring that a claimant must dismiss their claims against Brenntag with prejudice in order to proceed against other defendants would effectively force talc victims to choose between two inequitable options: (i) dismiss their claims against Brenntag with prejudice in order to advance the litigation against its co-defendants (resulting in a permanent forfeiture of

---

[26]    On several occasions before the May 15 hearing, the Debtors removed actions in which claimants elected to dismiss claims without prejudice from their proposed TRO schedule.  (1) *Compare* Adv. Docket No. 121-3 (second request for TRO extension showing that Debtors sought to add *Feudi* action to TRO schedule), *with* Adv. Docket No. 133 (second order extending TRO showing that *Feudi* action was not added to TRO schedule), *and* Stipulation of Discontinuance Without Prejudice, *Feudi v. Avon Prods., Inc.*, No. 190151/2021 (Sup. Ct. N.Y. Jan. 8, 2024), Docket No. 120 (showing that plaintiffs in *Feudi* dismissed claims against Brenntag without prejudice); (2) *Compare* Adv. Docket No. 121-3 (second request for TRO extension showing that Debtors sought to add *Dyson* action to TRO schedule), *with* Adv. Docket No. 133 (second order extending TRO showing that *Dyson* action was not added to TRO schedule), *and* Stipulation of Discontinuance Without Prejudice, *Dyson v. Barretts Minerals, Inc.*, No. 190170/2022 (Sup. Ct. N.Y. Jan. 8, 2024), Docket No. 59 (showing that plaintiff in *Dyson* dismissed claims against Brenntag without prejudice); (3) *Compare* Adv. Docket No. 121-3 (second request for TRO extension showing that Debtors sought to add *Mende* action to TRO schedule), *with* Adv. Docket No. 133 (second order extending TRO showing that *Mende* action was not added to TRO schedule), *and* Stipulation of Discontinuance Without Prejudice, *Mende v. Brenntag North America, Inc.*, No. 190237/2017 (Sup. Ct. N.Y. Jan. 8, 2024), Docket No. 60 (showing that plaintiffs in *Mende* dismissed claims against Brenntag without prejudice).

valuable claims) or (ii) wait for an indefinite period to advance claims against co-defendants until

the TRO is lifted (resulting in delay for individuals who are dying and/or in dire need of

compensation). Such an outcome is highly wasteful and prejudicial to the claimants and the

Debtors' estates, and, thus, should be avoided.

50.     Regardless of whether the claim at issue is a direct claim or a Successor Liability

Claim, dismissal with prejudice is an extreme and inappropriate option in this context where the

Court can merely stay the claims posing any concern while the Settlement Motion is resolved or

the injunction remains in effect.  *See, e.g.*, *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863,

867-68 (3d Cir. 1984) ("We reiterate what we have said on numerous occasions: that dismissals

with prejudice or defaults are drastic sanctions, termed 'extreme' by the Supreme Court."); *see

also Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 258 (3d Cir. 2005) (noting that "the extreme

sanction of dismissal [with prejudice] is reserved for the instances in which it is justly merited");

*Papera v. Pa. Quarried Bluestone Co.*, 948 F.3d 607, 611 (3d Cir. 2020) ("A dismissal with

prejudice 'operates as an adjudication on the merits,' so it ordinarily precludes future claims."

(citation omitted)).  At the same time, forcing talc claimants who choose not to dismiss Brenntag

with prejudice to give up their remedies against other defendants is improper when it is well

established in this Circuit that claimants may continue to litigate against "non-bankrupt co-

defendants of a debtor even if they are in a similar legal or factual nexus with the debtor." *Maritime

Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir. 1991); *Stanford v. Foamex L.P.*,

2009 WL 1033607, at *1 (citing *Maritime* for the same); *In re Mid-Atl. Handling Sys., LLC*, 304

B.R. 111, 128 (Bankr. D.N.J. 2003) (same); *Keystone Drill Servs., Inc. v. Davey Kent, Inc.*, No.

3:21- CV-30, 2022 WL 819280, at *8 (W.D. Pa. Feb. 22, 2022) (same).

51.     To be sure, the Third Circuit and other courts within it have not required dismissal of any kind for claimants to proceed with claims against parties that are not protected by the relevant injunction or stay.  For example, in *Johns-Manville Sales Corp.*, even though Johns-Manville was the alleged "principal defendant" and had "assumed the lead in amassing the evidentiary material necessary to defend itself and its co-defendants in the upcoming litigation," the Third Circuit deemed staying or severing claims against Johns-Manville sufficient to permit litigation to move forward against other defendants.  723 F.2d at 1071, 1076; *see also Cushman & Wakefield, Inc. v. Backos*, 129 B.R. 35, 37-38 (E.D. Pa. 1991) (holding that severance of a defendant subject to a bankruptcy stay and continued litigation against its co-defendants was appropriate and aligned with "equity and good conscience"); *In re Conf. of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 214 (Bankr. D. Del. 1995) ("[I]t is common practice for a non-bankruptcy court where an action is pending against the debtor and others to sever the action and proceed . . . .").

52.     Requiring dismissal of claims without prejudice is more akin to the solution of severing and staying of claims against protected parties—which actually preserves the status quo—than is dismissal with prejudice.  Dismissal of claims without prejudice would stop their litigation, but would at least preserve those claims and their value.  On the other hand, requiring dismissal with prejudice would effectively destroy the value of the subject claims.

53.     The Committee made a similar proposal in its opposition to Brenntag's request to expand the TRO.  *See* Adv. Docket No. 197 ¶ 34.  And at the May 15, 2024 hearing, the Debtors and Brenntag both expressed support for the Committee's proposal.  *See* Hr'g Tr. at 23:11-19, May 15, 2024 (Debtors' counsel: "If that works for the parties as a resolution, I think the debtors would support it."); *id.* at 21:18-23 (Brenntag's counsel:  Brenntag "would not take issue with claimants

dismissing claims on a without-prejudice basis in order to proceed with those matters."). The Court also suggested, although it did not rule on the issue, that removing actions in which claims subject to the TRO are dismissed without prejudice from the TRO schedule would be an acceptable arrangement. Specifically, the Court stated that the parties are "always free to come up with their own mechanism that has been discussed as far as dismissals without prejudice." *Id.* at 47:14-18. Brenntag and the Debtors have thus acknowledged the appropriateness of dismissal with prejudice.

54.    In addition, if an affected claimant dismisses the claims against Brenntag that are subject to the TRO, requiring the claimant to also stipulate that no issues concerning the Debtors' conduct will be adjudicated at trial is not necessary to protect the estates. As discussed above, *supra* III.B.2, even under the remote chance that any issues relating to the Debtors would be adjudicated at a trial from which the Debtors are absent, any resulting adverse ruling would not be binding on the Debtors under principles of res judicata or collateral estoppel.

55.    However, insofar as the Court determines that a stipulation of some type is necessary to protect the Debtors against the potential precedential effect of any adverse rulings, it would be more appropriate to require a stipulation in which the claimant affirmatively agrees to waive any right to use such adverse rulings or findings against the Debtors in any future litigation. Courts have approved similar stipulations in analogous circumstances. *See, e.g.*, *In re Kmart Corp.*, 285 B.R. at 689 (agreeing to lift the stay where a plaintiff "agreed to stipulate that it will not use any findings derived from the trial against [the debtor] Kmart"); *see also* Stipulation Between the Debtors and the Non-MDL Municipal Plaintiffs Regarding an Abatement and Stay of Litigation ¶ 16, *Insys Therapeutics, Inc., v. Ariz.*, No. 19-50261 (KG), (Bankr. D. Del. July 12, 2019), Docket No. 59-1 (stipulation between debtors and opioid claimants providing that "Debtors shall not be prejudiced or bound, whether through estoppel, preclusion, law of the case, or any

other doctrine, by any judgment or ruling made in the Litigation during the period that the Litigation is stayed under the terms of this Stipulation.").

## V.      THE COURT SHOULD DENY LEAVE TO FILE AN AMENDED COMPLAINT

56.      In conjunction with their request for a new TRO, the Debtors also seek leave to amend Counts II and III of the Complaint so that the amended counts would request "an extension of the automatic stay to, and/or a preliminary injunction of the continuation, amendment, and settlement of [direct claims against Brenntag] pending a final decision on the Settlement Motion." Motion For Leave ¶ 18.  In the Third Circuit, a court may deny leave to amend a complaint where the requested amendment: "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation or (4) is futile."  *In re CRM Int'l, Inc.*, No. ADV 05-6271 (MBK), 2009 WL 1545818, at *2 (Bankr. D.N.J. May 28, 2009) (Kaplan, J.).  Here, the Court should deny the Motion For Leave because the requested amendment is futile and is sought in bad faith.

57.      As discussed above, *supra* Section II, the Court lacks jurisdiction to grant the relief sought by the Debtors in their proposed Counts II and III—i.e., request to extend the automatic stay to, or to enjoin, direct claims against Brenntag.  And courts in this and other circuits routinely deny leave to amend a complaint as futile where the court does not have jurisdiction over the claims the movant seeks to add to the complaint.  *See, e.g.*, *CRM Int'l, Inc.*, 2009 WL 1545818, at *2 (Kaplan, J.) ("Even were this Court to ignore the obvious prejudice and burdens occasioned by Movant's delay, the request to amend the answer would be denied as being futile, given the Court's lack of jurisdiction over the indemnification dispute."); *see also Rukoro v. Fed. Republic of Germany*, 363 F. Supp. 3d 436, 452-53 (S.D.N.Y. 2019) ("[L]eave to amend must be denied as futile" because the facts alleged are "insufficient to give rise to subject matter jurisdiction.").

58.     Furthermore, the Debtors' requested amendments to Counts II and III have no valid purpose.  Through the amendments, the Debtors are seeking to enjoin claims that have no relationship to the Debtors and that the Debtors have no intention of addressing or resolving in the Settlement Agreement or their proposed plan of reorganization.  *See supra* §§ III(A), and III(B).  Moreover, the Debtors have until recently repeatedly underscored that they neither have any concern about, nor any intention of enjoining or otherwise impacting, direct claims against Brenntag (*see supra* ¶ 2).  Accordingly, their newfound desire to enjoin these claims and to tie the duration of that injunction to the duration of the Settlement Agreement proceedings appears to be little more than a ploy to gain inappropriate leverage over talc claimants in such proceedings.  That outcome is sought in bad faith.[27]

59.     The Debtors' Motion For Leave should, therefore, be denied.  And, if it is, the Debtors' request for the TRO must be denied as well, as preliminary injunctive relief must correspond to, and be consistent with, the relief sought in a plaintiff's complaint.  *See, e.g.*, *Nassimos v. Bd. of Examiners of Master Plumbers*, No. 94-1319(MLP), 1995 WL 862138, at *4 n.7 (D.N.J. Mar. 31, 1995) ("Since this Court herein has resolved the issue set forth in plaintiffs' complaint in favor of defendants, there is no basis upon which to grant plaintiffs' request for injunctive relief."  (citations omitted)); *see also Schultz v. United States Dep't of State*, No. CV 22-00059 LEK-WRP, 2022 WL 1749098, at *4 (D. Haw. May 31, 2022) (holding that plaintiff's request for a preliminary injunction is "moot in light of the dismissal of the Complaint").

---

[27]     *See, e.g.*, *Millar v. Bay Area Rapid Transit Dist.*, 236 F. Supp. 2d 1110, 1113 (N.D. Cal. 2002) (noting that "[f]actors that could support denial of leave to amend include . . . bad-faith motive on the part of the plaintiff (for example, use of the motion to postpone the trial date, impose additional expense on the opposing party, or gain additional leverage in settlement negotiations)").

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court deny the

Motion and the Motion For Leave, or in the alternative, clarify that actions in which claimants

dismiss claims subject to the TRO without prejudice are exempt from the TRO, and grant such

other relief as may be just and proper.

Dated:   September 17, 2024

/s/ Arthur J. Abramowitz

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email:  aabramowitz@shermansilverstein.com
          rswitkes@shermansilverstein.com

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
Michael Klein (admitted *pro hac vice*)
Evan M. Lazerowitz
Jeremiah P. Ledwidge (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Email:  cspeckhart@cooley.com
          mklein@cooley.com
          elazerowitz@cooley.com
          jledwidge@cooley.com

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Kevin M. Davis (admitted *pro hac vice*)
Serafina A. Concannon (admitted *pro hac vice*)
Shahriar M. Raafi (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Email:  kmaclay@capdale.com
          tphillips@capdale.com

29

**JA863**

kdavis@capdale.com
sconcannon@capdale.com
sraafi@capdale.com

*Co-Counsel to the*
*Official Committee of Talc Claimants*

```
                UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEW JERSEY

IN RE:                      .   Case No. 23-13575(MBK)
                            .
WHITTAKER, CLARK &          .
DANIELS, INC.,              .   402 East State
                            .   Trenton, NJ 08608
         Debtor.            .
. . . . . . . . . . . . . . .
                            .
WHITTAKER, CLARK &          .   Adversary No. 23-01245(MBK)
DANIELS, INC., et al.,      .
                            .
         Plaintiffs,        .
     v.                     .
                            .
BRENNTAG SPECIALTIES,       .
LLC, et al,                 .
                            .   September 18, 2024
         Defendants.        .   1:01 p.m.
. . . . . . . . . . . . . . .
```

        TRANSCRIPT OF APPLICATION TO SHORTEN TIME RELATED TO DEBTORS'
     MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT, DEBTOR'S MOTION
      FOR ORDER EXTENDING AUTOMATIC STAY AND TEMPORARY RESTRAINING
     ORDER, DEBTORS' MOTION TO EXTEND EXISTING SERVICE PROCEDURES TO
                       ADDITIONAL TALC CLAIMANTS
             [ADV. PROC. DOCKET NOS. 298, 299, AND 300]

                BEFORE THE HONORABLE MICHAEL B. KAPLAN
             UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES ON NEXT PAGE.

Audio Operator:          Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

                   **J&J COURT TRANSCRIBERS, INC.**
                       **268 Evergreen Avenue**
                      **Hamilton, New Jersey 08619**
                   **E-mail:  jjcourt@jjcourt.com**

            **(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES VIA ZOOM VIDEO CONFERENCE:

For the Debtor:              Cole Schotz P.C.
                             By:  G. DAVID DEAN, ESQ.
                             500 Delaware Avenue
                             Suite 1410
                             Wilmington, DE 19801

Counsel to Official          Caplin & Drysdale
Committee of Talc            By:  KEVIN M. DAVIS, ESQ.
Claimants:                   1200 New Hampshire Avenue NW
                             8th Floor
                             Washington, DC 20036

For Brenntag                 Latham & Watkins LLP
Specialties, Inc.:           By:  AMY C. QUARTAROLO, ESQ.
                             355 South Grand Avenue
                             Suite 100
                             Los Angeles, CA 90071

For Kunigar Haney:           Simon Greenstone Panatier, PC
                             By:  LEAH C. KAGAN, ESQ.
                             Bank of America Plaza
                             901 Main Street
                             Suite 5900
                             Dallas, TX 75202

                          - - -

3

**INDEX**

| DEBTORS' EXHIBITS | ID. | EVD. |
|---|---|---|
| No. 1 - Declaration of Lathrop B. Nelson, III | 11 | 15 |

4

1                    (Proceedings commenced at 1:01 p.m.)

2              THE COURT:  Okay.  Good afternoon, everyone.  This is

3    Judge Kaplan.  I'll give panelists an opportunity to adjust

4    their videos.

5              All right.  We are here again in our favorite case,

6    involving our favorite issues, Whittaker, Clark & Daniels.  We

7    have three matters, I believe, on the document:  Motion for

8    leave to file an amended complaint; the motion seeking the

9    entry of preliminary injunction and an order extending the

10   automatic stay; as well as a motion to extend existing service

11   procedures.

12             As is the norm, I'll call on counsel for the movant

13   and respondents.  Those who wish to be heard and who I have not

14   called upon, please make use of the raise-hand function, if you

15   can, to get my attention.  I'll do my best to keep a lookout.

16             I have some questions.  I've read the motion papers

17   and the objection that was filed.  Let me turn to first

18   debtors' counsel.

19             Mr. Dean, good afternoon.

20             MR. DEAN:  Good afternoon, Your Honor.  Can you hear

21   me okay?

22             THE COURT:  I can.  Thank you.

23             MR. DEAN:  Thank you, Your Honor.  For the record,

24   David Dean of Cole Schotz on behalf of the debtors.

25             THE COURT:  Now your mic is off.

5

1          MR. DEAN:  I got a note that said the host muted me.

2  I've turned it back on again.

3          THE COURT:  Okay.

4          MR. DEAN:  Is that -- can you hear me okay?

5          THE COURT:  Now we can hear you, yep.

6          MR. DEAN:  Okay, thank you.

7          As Your Honor mentioned, we have three motions on

8  today's agenda, the TRO motion at Docket Number 299, the motion

9  to amend Counts 2 and 3 of the complaint at Docket 298, and the

10  motion to extend the service procedures found at Docket 300.

11          The TCC filed an omnibus objection to that, the TRO

12  motion and the motion to amend the complaint yesterday, that's

13  at Docket 310, and that was filed pursuant to the Court's order

14  scheduling today's hearing on shortened notice.  And, as I'm

15  sure Your Honor is aware, we did not have an opportunity to

16  file a reply, so I'll detail some of these issues today in

17  argument that we otherwise would have put in a reply.

18          No other objections to the motions were filed, and

19  the TCC did not object to the service procedures motion per se,

20  Your Honor.

21          So I would propose that we take up the service

22  procedures issue last because that sort of like drives off of

23  everything else and, unless the Court has a preference, I'd

24  suggest we begin with the TRO motion given that, in reviewing

25  the TCC's objection to the TRO, that really forms the basis of

6

1  its objection to the motion to amend.  So I think, if we

2  resolve the TRO motion, the other two motions are sort of going

3  to flow from there.

4          THE COURT:  That's acceptable, unless I hear or see

5  objections, and I don't see any raised hands.

6          So let's have it.  All right, thank you.

7          MR. DEAN:  Thank you, Your Honor.

8          Now, through the PI and TRO motion, Your Honor, the

9  debtors seek to enjoin what we've defined in the motion as the

10  Brenntag enjoined claims.  And before we get into the details

11  about the exact relief sought -- and I heard Your Honor has

12  some questions about that -- I'd like to just give some context

13  to the motion by briefly addressing three preliminary points.

14          First, Your Honor, the injunctive relief sought by

15  the motion is not a condition to the settlement agreement.  So

16  just to be clear, were Your Honor to deny this relief, whether

17  at the TRO or the PI stage, the settlement would still move

18  forward.  The purpose of the injunctive relief being sought

19  here today is not to get us to a settlement, but rather to

20  maximize its value in the event it's ultimately approved, and

21  I'll explain what I mean by that.

22          The settlement, Your Honor, which critically for

23  purposes of the instant motion provides for the full release by

24  Brenntag of any and all indemnification claims against the

25  debtor.  That agreement would be effective upon entry of a

7

1  final non-appealable order granting the summary judgment motion

2  and the settlement motion.  The TCC, Your Honor, as Your Honor

3  is aware, has already appealed the summary judgment order and

4  so, while we continue to remain hopeful that the parties might

5  arrive at some point in these cases to a fully consensual

6  resolution, there's very good reason to believe that they will

7  not, and, likewise, reason to believe that litigation will

8  continue before this settlement, even if ultimately approved by

9  the Court, would take effect.

10      And so this motion is about maximizing the value of

11  the settlement as litigation over Your Honor's summary judgment

12  order, and potentially a settlement approval order to be heard

13  in December continues, by minimizing the costs the debtors

14  would need to bear on claims in the tort system, and the

15  potential indemnification claims of Brenntag, claims that

16  significantly would be released under the terms of the proposed

17  settlement.  And minimizing these costs and potential claims

18  against the debtor, importantly, is even more critical at this

19  stage of the case, Your Honor, because, as you've now seen

20  through our DIP motion, these cases will no longer be funded on

21  unencumbered and state cash.

22      The second point preliminarily that I'd like to

23  raise, Your Honor, is just to confirm that we are not seeking

24  to join direct claims against Brenntag based solely on post-

25  2004 talc or asbestos exposure, such as the Kunigar Haney claim

8

1  Your Honor carved out from the TRO, nor are we seeking to

2  permanently enjoin plaintiffs from pursuing Brenntag on direct

3  claims that straddle both the pre- and 2004 exposure, claims we

4  referred to at prior hearings as the straddle claims.

5         Direct claims against Brenntag, Your Honor, are

6  completely untouched by the settlement agreement.  Upon its

7  effective date, there will be a clear path by which injunctive

8  relief we're presently seeking would terminate, and plaintiffs

9  would be free to pursue those claims in the tort system.

10        The third preliminary point, Your Honor, is that the

11 claims at issue in this motion, the Brenntag enjoined claims,

12 as we have defined them, present a risk of indemnification

13 claims by Brenntag.  It is that risk, among other things, Your

14 Honor, that we believe warrants the injunctive relief sought by

15 the motion.  We understand that from Brenntag's perspective the

16 involvement of pre-2004 exposure alone may trigger potential

17 indemnification obligations on the part of the debtors, that's

18 regardless of whether these claims fall within the Court's

19 definition of a successor liability claim because from their

20 perspective, as they outlined it to us, it's about the exposure

21 timeline.

22        So, to be clear, Your Honor, that position is one

23 that the debtors dispute and for which we reserve our rights.

24 And again, Your Honor, the settlement agreement, if approved on

25 a final basis, would resolve this issue through the full

9

1  release of these claims that could be asserted by Brenntag

2  against the debtors.

3          So with those preliminary comments, Your Honor, I'd

4  like to now turn to the substance of the motion itself.

5          The relief requested today, Your Honor, substantially

6  broadens the number of actions to be temporarily enjoined.

7  Prior to the Court's summary judgment ruling, and in light of

8  the open ownership questions presented by summary judgment and

9  the parties' mediation efforts, the debtors sought a narrow and

10 circumscribed TRO that ultimately enjoined fewer than 75

11 actions against Brenntag that had impending trial or other

12 dispositive motions scheduled or, as later determined, were the

13 subject of a pending settlement.  This was, from our

14 perspective, a balanced approach and the right one for these

15 cases at the time.

16         And Your Honor will certainly recall Brenntag's

17 intervening motion to expand the TRO filed back in April, which

18 the debtors did not support and which the Court declined to

19 grant with one exception limited to potential settlements.  The

20 purpose of the TRO this Court approved was limited to

21 maintaining the status quo pending the summary judgment

22 decision and facilitate discussions around a consensual

23 resolution of these cases.  The debtors, despite what the TCC

24 says in their opposition, have never strayed from that, Your

25 Honor.  Nevertheless, certain plaintiffs took actions to

10

1  intentionally circumvent the TRO by strategically dismissing

2  the successor liability components of their claims against

3  Brenntag in an effort to pursue direct claims that were still

4  premised on allegations or evidence of pre-2004 exposure, and

5  therefore implicated the debtors' own tort liabilities and

6  potential indemnification obligations to Brenntag.

7          And so, Your Honor, by this motion before the Court

8  today the debtors seek to extend the stay and/or preliminarily

9  enjoin -- and for today's purposes, just to be clear, to obtain

10 a TRO against the continuation amendment settlement of 683

11 Brenntag enjoined claims pending entry of a final non-

12 appealable order granting the settlement motion, or entry of an

13 order denying.

14         Now, Your Honor, we did file an amended declaration

15 from Mr. Nelson the day following the filing of our motion,

16 that amended declaration is at Adversary Docket Number 305, and

17 it had a schedule attached to it.  Earlier this morning, we

18 emailed chambers and copied the TCC, we filed a notice of an

19 amended schedule to his declaration, which is filed at Docket

20 317, with a blackline so that everyone can see the changes to

21 the schedule that was attached to the declaration.

22         This was primarily filed to remove one action from

23 the schedule, this was Number 453, the Peltz action in New York

24 that was dismissed last week on September 13th, so of course no

25 injunction would be needed and we could take them off the list,

11

1   and to correct information, mostly just clarifying some

2   exposure years and complaint citations for some of the other

3   actions.  None of the other changes, Your Honor, were impactful

4   and none of them warranted taking any of the claims off the

5   chart.  We were simply trying to provide the Court the most

6   updated information we had before the hearing.

7           And if Mr. Nelson were called to testify today, he

8   would confirm, and he has confirmed with us, that the changes

9   made to the revised schedule filed this morning are consistent

10  with his review of the relevant pleadings described in the

11  declaration, including the removal of the Peltz action.

12          Now, the actions listed on the schedule filed with

13  that declaration and as updated this morning are what we've

14  defined as the Brenntag enjoined claims.  These are actions

15  that either presently assert direct claims or which could

16  potentially be amended to assert direct claims against

17  Brenntag, and which either include allegations of pre-2004

18  exposure on the face of the complaints or which don't identify

19  the year plaintiff was first allegedly exposed to the

20  underlying talc or asbestos in the complaint, thereby creating

21  the risk that liability against the debtors will be fixed prior

22  to the settlement agreement being approved on a final basis,

23  either as a result of apportionment by a jury or the triggering

24  of potential indemnification obligations to Brenntag.

25          And so, Your Honor, with that background at this time

12

1 and coupled with the proffer on the amended schedule filed this

2 morning at Docket 317, I'd like to offer Mr. Nelson's amended

3 declaration into evidence, along with the updated schedule

4 filed this morning at Docket 317.

5        And I don't know whether anyone intends to cross Mr.

6 Nelson.  We did ask the committee about this yesterday because

7 their papers did not take any issue with the evidence that was

8 filed with the motion other than to say we haven't met our

9 burden, they indicated that they did not think they would, but

10 they wanted to reserve their rights.  So I don't know for sure

11 whether the committee plans to say anything about this or not,

12 but I wanted to just inform the Court that Mr. Nelson is

13 present today on Zoom and available for any questions or cross-

14 examination, to the extent there may be any.

15        THE COURT:  All right.  Well, let me turn to

16 committee's counsel.  Mr. Davis, good afternoon.

17        MR. DAVIS:  Good afternoon, Judge Kaplan.  For the

18 record, Kevin Davis for the committee.  We do not intend to

19 cross the declarant, nor do we have an objection to entry of

20 the declaration itself into evidence.

21        That said, we do object to the admission of the

22 exhibit.  Our understanding is that this is being proffered

23 under Federal Rule of Evidence 1006, and the Third Circuit has

24 held that in order for something to be so admitted it has to

25 accurately represent what it purports to summarize and, given

13

1  the amendments that have taken place, we have questions about

2  that accuracy.  And there is additional case law, this is from

3  the Seventh Circuit, <u>Fidelity National Title Insurance</u>, 412

4  F.3d 745, which specifically says that summary evidence should

5  not be admitted when it is provided just short of trial and the

6  other side has not had the ability to actually check its

7  accuracy.

8          So we would object to the exhibit be entered at this

9  time, if anything, for an accommodation for the committee to

10  actually be able to review this document that was amended and

11  filed I think an hour and a half ago.

12          THE COURT:  All right.  Mr. Dean?

13          MR. DEAN:  Thank you, Your Honor.

14          I certainly understand that there were some

15  nonmaterial changes to the declaration that the committee

16  probably has not had a chance to look at yet.  So I would

17  propose a couple of things, Your Honor.  One, I didn't hear any

18  objection to the admission of the first exhibit that was

19  attached to the declaration, with the caveat that there may be

20  some changes, and we certainly we could just go with that for

21  now.  I just wanted to make sure the Court understood the more

22  accurate information.

23          We could also admit the amended chart subject to the

24  committee's right to double check the changes that were made

25  this morning.  And we certainly could re-file a new declaration

14

1  with an updated chart in advance of the PI hearing, if we ever

2  got there, so they could reserve the right to object to that

3  later on at the PI hearing with respect to any changes that

4  were made, Your Honor.

5       We're not trying to sandbag the committee at all.  We

6  thought these changes were quite minor other than the actual

7  acknowledgment by us that one of the actions was dismissed and

8  should have been removed.

9       THE COURT:  Mr. Davis, your thoughts?

10      MR. DAVIS:  I mean, implicit in my objection is an

11  objection to the original, which, as debtors' counsel just

12  proffered, is inaccurate, the reason for the amendment.  So we

13  do not -- we object to presenting what is, according to

14  debtors' counsel, an incorrect summary into the record as

15  evidence.  And, again, without having had the ability to

16  actually look at these changes, and to determine whether or not

17  they are accurate or material, we would object to entering the

18  amended table at this time as well.

19      THE COURT:  All right, thank you.

20      I'm going to admit the declaration, as well as the

21  amended schedule, subject to the committee's right to challenge

22  at any subsequent hearing, as required.  The exhibit summarizes

23  close to 700 different actions and a couple hundred

24  stipulations, it's unwieldy and would be burdensome to the

25  Court at this juncture for purposes of today's hearing to

15

1  review those materials.  To the extent there is a challenge to

2  the contents of the exhibit at a later hearing, at any hearing

3  in this matter, the Court will hear those challenges and will

4  afford the committee or any other party an opportunity to

5  review the documents in total, but for purposes of today's

6  hearing, it is deemed admitted, and only for purposes of

7  today's hearing.  Thank you.

8  (Declaration of Lathrop B. Nelson, III admitted into evidence)

9          MR. DAVIS:  Understood, Your Honor.

10          THE COURT:  All right.

11          MR. DEAN:  Thank you, Your Honor.

12          The debtors don't have any other evidence to present

13  for the purpose of today's hearing.  So, before we get to

14  argument, I don't know if the Court wants to ask any other

15  parties if they wish to present any evidence today.  I'll defer

16  to the Court how to handle that issue.

17          THE COURT:  Well, what I'm hearing is that the debtor

18  is -- the record on behalf of the debtors is closed as far as

19  evidence.  I hear the committee is not intending to cross-

20  examine the declarant.

21          Let me turn to Mr. Davis.  Does the committee intend

22  to introduce any evidence on its own in support of its

23  objection?

24          MR. DAVIS:  No, Your Honor.

25          THE COURT:  All right.  Then we're at a point where

16

1 the record is closed as far as today, for today's hearing.  The

2 declaration, which I'll mark as D-1 with the attached exhibit,

3 is the evidence in total, I believe, and we'll turn to oral

4 argument.

5         And, again, Mr. Dean, let me turn to you, but let me

6 start you off with a question.

7         Needless to say, the Court's outlook on these issues

8 has and continues to evolve.  There are turns that are being

9 taken it seems almost weekly, and where we started is not

10 necessarily where we're at at this moment.  But it struck me as

11 odd -- and this was partly raised by the committee in their

12 objection -- as to the need for an injunction with respect to

13 those claims of the 684, I believe 657 of them include --

14 claims against Brenntag, let me be clear -- I believe those

15 include successor liability claims.  And there is no dispute

16 that the Court -- the Court's reasoning may be disputed and is

17 on appeal, I recognize that, but the Court has ruled that those

18 claims for successor liability are actually claims of the

19 bankruptcy estate to be pursued, resolved, settled by the

20 estate, and, thus, they are protected under the Code by the

21 automatic stay.

22         The fear, I understand, is that by -- on behalf of

23 the debtor, and possibly Brenntag and others, is that the

24 plaintiffs will do what has been done in amending the

25 complaints in those cases, eliminate the successor liability

17

1   claims, and focus strictly on the direct claims against

2   Brenntag, but in these situations -- but in all of these 657-

3   odd complaints, these are what we've been calling straddle, and

4   that they involve exposure both pre-2005 and subsequent to the

5   closing of the transaction in 2004.  And, therefore, there

6   could be -- it does implicate -- that's the position the debtor

7   takes -- it does implicate the debtors' liability and

8   indemnification obligations.

9           But my question goes to the ability to amend these

10  complaints to eliminate the successor liability claims,

11  wouldn't that be barred by the automatic stay, Section

12  362(a)(3)?  Isn't that an exercise in control over property of

13  the estate?  The successor liability claims are property of the

14  estate and to dismiss, especially dismiss with prejudice, may

15  impact the estate's rights in these claims.

16          If I'm correct -- and I may be wrong, I learn a lot

17  in this case from you all, but if the automatic stay does apply

18  to these claims and even bars without stay relief an amendment

19  to these claims to dismiss them, why do we need an injunction?

20          MR. DEAN:  So, Your Honor, thank you for that

21  question, and I will -- I'll give you the short answer now and

22  then I would weave that into some of the comments I was going

23  to make at argument.  But the short answer is, we agree that

24  you're right about that, Your Honor, that the automatic stay

25  would in fact, should in fact bar the amendment or dismissal of

18

1  these particular claims, but given the uncertainty and the fact

2  that we think plaintiffs may attempt to do this anyway, we are

3  seeking this injunction in an abundance of caution.

4         And one of the issues that I'll raise at argument on

5  harm goes to this, and that is that this injunction may not

6  actually be harmful at all because it's more, with respect to

7  those claims, potentially belt-and-suspenders to have a

8  specific order in place that directly bars and enjoins those

9  claims, so we can get these things on file with the state court

10 and make it really clear with this list of -- this list of

11 cases that they're enjoined.  We need to communicate very

12 clearly with the state courts and have an order that would

13 actually impose an injunction with an actual list, which we did

14 not have before until we filed this motion.

15        So I don't necessarily disagree with Your Honor that

16 anyone who attempts to do what we're trying to prevent here may

17 also be in violation of the automatic stay, so that -- this

18 particular motion with respect to those, from our standpoint,

19 number one, would not be harmful at all because the claims are

20 already stayed and they'd have to get relief from the automatic

21 stay in the first place, but second, Your Honor, we also would

22 like to stave off a slew of motions for relief from the

23 automatic stay that would try to do this in the future, and set

24 a clear precedent as to how long these claims are going to be

25 subject to an injunction.  And I'll discuss some of this a

19

1  little bit more as I go through the argument, but that's a

2  short answer to your question, Your Honor.

3        THE COURT:  All right.  Thank you.  And, obviously,

4  I'll hear from Mr. Davis and others on this, but why don't you

5  continue with your argument, and then we'll turn to the

6  objections.

7        MR. DEAN:  Okay.  Your Honor, just beginning with the

8  initial TRO opinion, this Court recognized that even direct

9  claims against Brenntag could give rise to indemnification

10 claims and therefore prejudice the debtors, depending on the

11 conduct alleged, the time frame implicated, and the product

12 involved.  And so Your Honor made it clear from the onset that

13 direct claims against Brenntag are not categorically excepted

14 from the TRO.  And, on several occasions thereafter, the Court

15 was asked to intervene and determine the scope of the TRO with

16 respect to different types of purported direct claims against

17 Brenntag, the first was the Kunigar Haney action, which Your

18 Honor excluded from the TRO based on the substantiated absence

19 of any relevant pre-2004 exposure.  Then came the Lee, and then

20 the Cooper and Sneider actions, which Your Honor did not

21 exclude from TRO in view of the allegations and evidence of the

22 plaintiffs' potential relevant pre-2004 exposure.

23        And as we were just discussing, Your Honor, it is

24 these type of claims, not the claims of the Kunigar Haney

25 variety, that we now seek to enjoin by the TRO and the PI

20

1  motion.

2         Now, as we were alluding to a minute ago, the core

3  purpose of this motion is to prevent any attempt -- although it

4  may be a stay violation too, to prevent the procedural

5  machinations that the Court previously addressed with a defined

6  list and defined instructions to a state court to essentially

7  try to dismiss or walk away from the successor liability claims

8  to pursue solely the direct claims against Brenntag.

9         And, as the Court observed and as we said in our

10 papers, the vast majority of the cases -- and it's now 683,

11 just to be precise, because the one was taken off with the

12 amended schedule, 90 -- almost 96 percent of these complaints

13 plead successor liability claims, as we cite in the motion, and

14 are already stayed by the summary judgment decision, unless the

15 plaintiff takes strategic action to circumvent the automatic

16 stay.

17        And one other point that I'll raise in answering Your

18 Honor's question is we have -- if you look at the exhibit, we

19 have described whether the complaints plead name -- or

20 specifically names Brenntag a successor.  Your Honor has heard

21 various variations of arguments about whether something in a

22 complaint is actually a successor liability claim.  And so if

23 the injunction were granted, we could also avoid a number of

24 one-off arguments down the road as to whether something is

25 actually a successor liability claim or not in these particular

1  complaints.

2         So, Your Honor, it is our view that, with a clear and

3  viable exit strategy for these cases now in place, an expanded

4  injunction encompassing all the claims against Brenntag

5  premised on exposure during time periods that could implicate

6  the debtors' conduct and trigger potential indemnification is

7  both reasonable and appropriate.  While this relief, as I

8  mentioned, is not a condition to the settlement, it will

9  preserve its value by eliminating the need for the debtors to

10 have to decide whether to participate in the tort system or

11 subject themselves to the risk of *res judicata*, collateral

12 estoppel, record taint, or the assertion of indemnification

13 claims by Brenntag who, as the Court heard at the hearing on

14 Sneider, we cannot prevent from taking positions in the tort

15 system designed to allocate to the debtors as much liability as

16 possible with respect to exposure alleged to have occurred

17 prior to 2004 transaction.

18        Now, these potential indemnification claims, Your

19 Honor, would be fully and finally released under the settlement

20 agreement, which if approved on a final basis would provide a

21 clear path for the plaintiffs to pursue all direct claims

22 against Brenntag, including the so-called straddle claims.

23        The TCC's objection, Your Honor, in large part, filed

24 yesterday, rests on the incorrect proposition that the debtors

25 didn't satisfy their so-called burden to establish the

22

1  existence of ironclad indemnification claims by Brenntag.

2          To start, the TCC contends, surprisingly, that this

3  Court lacks subject matter jurisdiction to enjoin direct claims

4  against Brenntag but nevertheless impact the debtors'

5  liabilities, on our view the strained theory that the debtors

6  have and have not satisfied the purported evidentiary burden to

7  effectively prove up Brenntag's indemnification claims against

8  them.  And they advance this argument notwithstanding our clear

9  position, which has remained constant since the very onset of

10 these cases despite what they say, that we're not conceding

11 Brenntag's indemnification rights and would, to the extent

12 necessary, defend ourselves against them.  The fact that

13 Brenntag has potential contractual indemnification rights

14 against the debtors, it's one that's undisputed and has

15 permeated these cases from the very start, and one that's never

16 been disputed by the TCC or any other party.

17          THE COURT:  But doesn't --

18          MR. DEAN:  And as this --

19          THE COURT:  -- their objection -- aren't they

20 pointing out that the obligation to indemnify that they're

21 contesting is related simply to direct claims only?

22          MR. DEAN:  That is correct, Your Honor --

23          THE COURT:  Right, and --

24          MR. DEAN:  -- and Brenntag has taken the -- Brenntag

25 has taken --

 1              THE COURT:  Right, and post-2005 exposure.  And the

 2    debtor doesn't assert an indemnification right against -- I'm

 3    sorry, Brenntag doesn't assert indemnification rights against

 4    the debtor for post-closing exposure, correct?

 5              MR. DEAN:  Well, I'll let Brenntag speak to that

 6    specifically, but our understanding, Your Honor, is that it

 7    becomes complicated when the trial goes forward even if the

 8    claims -- even if the pre-2004 allegations were to be

 9    dismissed, as we discussed at the prior hearing on Lee and

10    Sneider, if evidence were still introduced at trial showing a

11    potential link to a WCD product, even if the plaintiffs

12    committed to walk away from the pre-2004 allegations, that

13    would give Brenntag the potential right to try to assert an

14    allocable right of liability in a potential indemnification

15    claim with respect to the dates of exposure.

16              So that's why this becomes more difficult and that's

17    why we said with respect to the Haney matter,  where there was

18    definitive proof that there was no exposure prior to the

19    transaction, we're not seeking to enjoin those particular

20    claims, it's the straddle claims that become problematic.

21              So, Your Honor, I would just continue by saying that,

22    as this Court has already held in previous TRO hearings, the

23    risk of indemnification to the estates is sufficient to warrant

24    injunctive relief, and certainly sufficient to establish this

25    Court's jurisdiction to grant it.  This is indisputably

24

1 consistent with the District Court's decision in LTL

2 Management, which rejected the argument that absolute indemnity

3 is a prerequisite to extending the automatic stay.  That

4 citation is 638 B.R. at 312.  And I just mention this because

5 this is one of the things I would have told you in a reply, but

6 because we didn't file one, I just wanted to give the Court

7 that citation today.

8         And in that decision, Your Honor, the District Court

9 cited to a number of cases supporting the proposition that the

10 potential for indemnification is sufficient to warrant

11 injunctive relief, including the Third Circuit's decision in

12 W.R. Grace and the Eastern District of Pennsylvania's decision

13 in Philadelphia Newspaper.

14         The TCC's argument, Your Honor, which ignores this

15 Court's and these other courts' analyses and the consideration

16 of the risk of indemnification, obligates the debtors to

17 concede their indemnification obligations to Brenntag and waive

18 all defenses in order to establish this Court's subject matter

19 jurisdiction.  That would be absurd, Your Honor, and in direct

20 conflict with LTL and Your Honor's prior orders in these cases.

21 It is undisputed that Brenntag has contractual indemnification

22 rights against the debtors, and that Brenntag has maintained

23 and preserved its rights to assert those claims against the

24 debtors throughout this case with respect to the very cases

25 that we're talking about today.

1           And, as we've said repeatedly, the debtors dispute

2    the applicability of the indemnification to the claims at issue

3    here, and no such waiver was required by the Court in

4    connection with the debtors' prior TRO request, and, perhaps

5    most tellingly, no such argument was advanced by the TCC in

6    that context.  The case law from other courts does not support

7    this proposed evidentiary burden for the purposes of

8    establishing this Court's subject matter jurisdiction because

9    it's obviously patently self-defeating and counterproductive

10   for a debtor-in-possession to undertake such a burden that

11   would effectively require them to admit liability.

12          Now, the debtors have also met their burden on all

13   four TRO prongs, Your Honor.  On the likelihood of success

14   prong, the TCC contends that there's no reasonable likelihood

15   of success that we will achieve a confirmed plan.  They attack

16   the plan's term sheet silence concerning what happens to direct

17   claims against Brenntag post-confirmation, but as the

18   settlement motion and agreement make perfectly clear -- and

19   I'll do it again now -- the plaintiffs would be permitted to

20   proceed with these direct claims upon the agreement's

21   effectiveness, which would also result in a waiver of

22   Brenntag's indemnification claims.

23          The TCC also rests on 524(g) arguments that they

24   claim will doom the plan.  We dispute those arguments, Your

25   Honor, and as we previously did in the motion for summary

26

1 judgment context and in other contexts, but they're of course

2 matters for another day and certainly no reason today to

3 conclude that a plan would fail for purposes of weighing this

4 particular prong of the TRO standard.

5          The Court should also find that the irreparable harm

6 prong favors issuing the TRO.  The TCC contests this prong on

7 indemnification grounds similar to those that form the basis of

8 the subject matter jurisdiction argument that we just

9 discussed, but again, as noted, Your Honor, the case law and

10 particularly the law of this do not require the debtors to

11 establish or concede Brenntag's indemnification obligations or

12 waive defenses to it in order to obtain injunctive relief

13 against the plaintiffs or to satisfy this particular factor of

14 the test.  That would again be absurd to place that type of

15 burden on the debtor.

16          And as for the TCC's position that Brenntag's claim

17 for indemnification might be the subject of a claim objection

18 for subordination or disallowance down the road, this is a

19 different flavor of the same argument, Your Honor.  The

20 possibility of a successful claim objection does not at this

21 time remove the risk created by allowing these lawsuits to

22 continue prior to a final decision on settlement, which

23 significantly, if ultimately approved, would moot these issues

24 entirely in any event.

25          Now, the TCC next argues, Your Honor, that the

27

1  debtors' indemnification obligations to Brenntag are irrelevant

2  because NICO may be required to backstop any such claim against

3  the debtors that they themselves can't satisfy.

4        Now, Your Honor, I'm certain, will recall that this

5  argument by the TCC is recycled from the opposition to summary

6  judgment in certain prior proceedings on the TROs.  It didn't

7  work there and it doesn't work here, Your Honor.  The debtors

8  are, as the TCC effectively concedes, primarily liable for any

9  successful indemnification claims asserted against them.  And

10 even if NICO were ultimately required to backstop any such

11 indemnification claims, that would merely result in NICO,

12 rather than Brenntag, asserting a claim against these estates

13 based on the theory of subrogation.

14        What does all this mean, Your Honor?  As they say,

15 there's no free lunch here for the debtors no matter how it's

16 sliced, and for these reasons the TCC's contention that the

17 debtors have failed to demonstrate the required harm should be

18 rejected, especially in view of the settlement which would

19 entirely resolve these claims against the debtors if approved.

20        Turning finally to the balance of harms, Your Honor.

21 I just want to start by saying that we certainly are

22 sympathetic to the fact that we're asking plaintiffs to wait

23 pending effectiveness of the settlement, but as Your Honor

24 pointed out at the beginning of this hearing, they may have to

25 wait anyway with respect to almost all of these claims in light

28

1  of the summary judgment decision, and I think that also

2  balances the harm in our -- in favor of granting the TRO.  But

3  the filing of the settlement motion, Your Honor, was a

4  monumental step towards a resolution of these cases that

5  warrants the broader injunction being proposed today,

6  particularly as it resolves all indemnification claims that

7  could be asserted against the debtors.

8        Now, when considering that most of the cases are

9  already stayed, as we've discussed, because they involve

10 successor liability claims, and the fact that the plaintiffs'

11 rights to pursue Brenntag for all direct claims are fully

12 preserved, coupled with the removal procedures that we proposed

13 in the PI order to ensure that any purely direct claims similar

14 to the Haney claim would be swiftly removed from the

15 injunction, we believe that the requested relief appropriately

16 balances the harms, and furthers the strong public interest of

17 confirming a plan and getting money that's being paid in

18 through the proposed settlement into the pockets of creditors.

19       Accordingly, Your Honor, we would ask that the Court

20 today enter a TRO as to the Brenntag enjoined claims pending

21 further hearing on the debtors' request for a PI and, if the

22 Court is inclined to grant the TRO today after hearing from the

23 parties, we would request that the hearing be set on the PI in

24 the next 28 days.  And I just would note, the Court may decide

25 that October 15th is a good date because I note that that date

1  would work for our 28-day window and I believe it's a hearing

2  that's already set aside for this case.  But whatever date the

3  Court would select, at that hearing, if the TRO is granted

4  today, we would intend, as we said in the motion, to ask the

5  Court to enjoin those same claims pending either a final non-

6  appealable order approving the settlement motion or an order

7  denying the motion.

8           I want to mention a couple other things about the

9  committee's positions and the alternative argument that they

10 made.

11          Your Honor, if the Court is inclined to agree with us

12 and enter a TRO today, we did want to just address this

13 alternative quickly.  After considering the committee's request

14 to change one of the showings in the removal procedures that we

15 propose from a dismissal of all claims against Brenntag with

16 prejudice to a dismissal of all claims against Brenntag without

17 prejudice, I just want to confirm that we would agree to make

18 that change in the PI order.  While the procedures weren't

19 proposed in the TRO because we're just seeking an injunction

20 for 28 days pending the TRO hearing and it wouldn't kick in

21 until approval of the PI order, we're prepared today to commit

22 to making that change at the appropriate time, provided that

23 any action that's dismissed against Brenntag without prejudice

24 not be re-filed while the injunction remains pending, which

25 they would be prohibited from doing under its proposed terms in

30

1  any event.

2          Additionally, Your Honor, we would also agree to

3  modify the TRO and PI order to allow any party asserting a

4  Brenntag enjoined claim to take reasonable steps to perpetuate

5  the testimony of any person who isn't expected to survive the

6  duration of the orders, or who is otherwise expected to be

7  unable to provide testimony, if the testimony isn't perpetuated

8  during the duration of the orders.  This would protect against

9  loss of evidence due to the injunction.

10          And finally, Your Honor, on the form of order, as

11 noted earlier, we would need to replace the schedule to the

12 order to remove the one action that we noted today, and just to

13 eliminate the issue about the details in the chart for purposes

14 of the order itself, we would -- in a revised form of order, we

15 would just attach the list of the cases, as opposed to all the

16 detail and analysis that was provided to the Court as a summary

17 exhibit for the purposes of today's hearing.  We think that

18 would give us just a simpler and cleaner, non-confrontational

19 schedule to accompany the TRO.

20          So with all of that, Your Honor, we would again ask

21 for the Court to grant the motion and issue a TRO.  Unless the

22 Court has any other questions for me on the TRO motion itself,

23 I can do this in one of two ways:  I can either turn to the

24 motion to amend now and just handle all the motions together,

25 or I can cede the podium to others, if the Court prefers to

31

1  address the motions one by one.  So I'll defer to the Court on

2  how you'd like to handle that.

3          THE COURT:  Let's keep our focus on this motion at

4  this time.  I see a couple of hands raised, Ms. Kagan and Ms.

5  Quartarolo.  I'm deciding whether -- I assume Brenntag's

6  counsel wishes to be heard on this as well.

7          MS. QUARTAROLO:  Correct, just briefly, Your Honor.

8          THE COURT:  So I think it's better to hear from

9  Brenntag, and then parties can respond probably to both.

10         So let me hear from Brenntag's counsel.

11         MS. QUARTAROLO:  Perfect.  Thank you, Your Honor.

12  Just for the record, Amy Quartarolo from Latham & Watkins on

13  behalf of the Brenntag entities.

14         I wanted to start with the question that you posed to

15  Mr. Dean at the outset.  We certainly agree with Mr. Dean that

16  Your Honor's summary judgment ruling on the successor liability

17  ownership issues provides guidance as to the application of the

18  automatic stay; however, I would note that that guidance is

19  more general in nature, and I think the TRO and the PI

20  ultimately will serve to provide more specific guidance as to

21  which specific claims are subject to any stay or enjoined from

22  being prosecuted, again, for this limited window with this

23  period that the debtors are seeking.  And ultimately is, as I'm

24  sure Your Honor can appreciate, having greater clarity and

25  guidance for the state courts will help not only the state

32

1    courts, but the litigants before them in terms of understanding

2    and having specific guidance as to whether specific claims are

3    allowed to proceed or not to proceed at this time.  I just

4    wanted to add that point.

5         Circling back to a few points that Mr. Dean touched

6    on, Brenntag -- to the extent it's not clear, Brenntag has and

7    continues to assert broad indemnification claims against WCD

8    and other indemnifying parties.  That issue, we think, has been

9    briefed in this case and acknowledged by this Court in several

10   of its prior rulings, including the prior TRO opinion, which

11   I'll get to in just a moment.

12        As Mr. Dean noted, at least certain of Brenntag's

13   indemnification rights are among the claims that are being

14   compromised and settled in the settlement motion that has been

15   put before the Court, and in its objection the committee relies

16   on the fact that the debtors dispute the indemnification

17   obligations or the scope of those indemnification obligations.

18   And, while that is true, we really think that that is beside

19   the point.  What is important is that there's a live dispute at

20   this time as to the scope of the indemnification obligations,

21   and given that open issue and whether it applies to all claims

22   or only a portion of those claims, there is a good basis to

23   stay the claims because there's a risk that indemnification

24   obligations follow from those claims.

25        And, specifically, at the risk of quoting Your

33

1    Honor's words back to you of an understanding that -- thinking

2    it may evolve, in Your Honor's TRO letter opinion, which is

3    Adversary Docket Number 88, in footnote 2, Your Honor said,

4    "Indeed, even direct claims against Brenntag can give rise to

5    indemnification claims, depending on the conduct alleged, the

6    time frames implicated, and the products involved."

7           And the Court again reiterated this reasoning at the

8    August 22nd hearing just a few weeks ago when addressing claims

9    specific to the Sneider matter.  And Your Honor said, "So, to

10   sum up, the Court is in agreement that the initial TRO was

11   always intended to cover a broader array of claims than the

12   mere successor liability claims as defined in the complaint."

13          The Court went on to note that "such claims do of

14   course impact, or have the potential to impact, the bankruptcy

15   estate and, therefore, they fall within the scope of the TRO,

16   as explained in the prior decisions of this Court."

17          For these reasons, we think that the claims against

18   Brenntag that are pending in the tort system do and risk impact

19   on the debtors' estates and, thus, are within the scope of the

20   Court's related-to jurisdiction.

21          And just one final point, Your Honor, and echoing

22   certain of Mr. Dean's prior comments, what is being proposed is

23   not an indefinite stay.  This is a -- what is before the Court

24   today is a TRO that is effectively a bridge order to get to a

25   hearing within the next 28 days, but even at the preliminary

34

1  injunction stage what the debtors are seeking would also be

2  limited in duration, lasting only through the point where

3  there's a final non-appealable order on the settlement motion,

4  and at that point any claims that have not been compromised and

5  are not subject to that order can be pursued against Brenntag,

6  and the risk of whether such claims would impact the debtors'

7  estates would no longer follow after that date.  And so we

8  think that that is consistent with applicable case law and this

9  Court's prior rulings in this case and others.

10          THE COURT:  All right.  Thank you, Ms. Quartarolo.

11          Ms. Kagan?  Good afternoon.

12          MS. KAGAN:  Good afternoon, Your Honor.  I am sure

13  you love seeing me complain about my client's need to have her

14  day in court every -- every couple of weeks, and as much as I

15  enjoy being here, today's argument from Mr. Dean and now Ms.

16  Quartarolo, gives me more concern than I have had this far

17  about my client's chance of being alive to see her day in

18  court.  She was supposed to start trial August 26th and now

19  we're here on September 18th.  And the reason we're here on the

20  Sneider matter on September 18th is because Your Honor on

21  August 22nd entered a bridge order.  And Your Honor's

22  determination I think was very clear with respect to Ms.

23  Sneider and also Ms. Cooper.  Your Honor -- and this is at the

24  transcript from the August 22nd hearing at page 23, line 19 --

25  Your Honor stated, "The Court determined that the claims

35

1  asserted in the Sneider and Cooper actions are not successor

2  liability claims as that term is defined in the complaint."

3       So I just want to make sure that, again, we are clear

4  with respect to Ms. Sneider and Ms. Cooper, the only active

5  claim that exists is an independent post-'04 claim against

6  Brenntag.

7       Now, the Court determined that because of the

8  disputed indemnification, contractual indemnification, that the

9  debtors' estate might be affected if the Sneider and Cooper

10 matters are permitted to proceed.  But, again, the Court made a

11 very clear comment and instruction to the debtors, and this is

12 at page 28, Line 8, but while the Court does have concerns for

13 Ms. Sneider's ability to pursue her rights and in light of her

14 condition, the Court also agrees with the debtors that an

15 extension of the TRO on a limited basis is appropriate.  It

16 cannot be and will not be indefinite.  The debtor has the

17 burden to come into before this Court to demonstrate that the

18 balance of harms continue to weigh in favor of continued

19 Sneider, and that the likelihood of success, meaning a

20 meaningful reorganization in which the debtors can show that

21 the claims held by Ms. Sneider and others will be successfully

22 addressed as part of a plan, that burden is placed upon the

23 debtors and must happen in the short term.

24       And the Court then made clear on page 29 at line 7,

25 "This Court is going to extend the TRO only through September

36

1   18th of 2024.  The burden is on the debtor, as I've indicated,

2   to come before the Court to attempt to persuade the Court that

3   there is a reason to extend it further and, as part of that,

4   this Court needs to see in effect the exit strategy.  The Court

5   needs to understand how this debtor will confirm a plan or

6   reach a resolution which encompasses these very direct claims;

7   otherwise, this Court will not be inclined to extend the TRO

8   further."

9        In the interim, the debtor has not filed anything to

10  show that it will resolve Ms. Sneider and Ms. Cooper's direct

11  claims in this bankruptcy.  In fact, what Mr. Dean said was

12  that the bankruptcy was not going to resolve these direct

13  claims with Brenntag.  The submissions for the settlement plan

14  exclude the direct claims.

15       And so all Ms. Cooper and Ms. Sneider have right now

16  are these very direct claims.  And I understand Brenntag's

17  position that they maintain this indemnity and Whittaker

18  disputes this indemnity, but the indemnity can only occur if

19  there is actually a finding by a court that would trigger that

20  indemnity.  So we are literally preventing Ms. Sneider and Ms.

21  Cooper from having their day in court for claims this Court has

22  determined are independent, that are not successor liability

23  claims, for a plan that excludes the resolution of those claims

24  for the potential possibility that an indemnity right might be

25  triggered, and that is disputed by the debtor, but could only

37

1  be actually argued if we got a verdict.

2          And so by holding Ms. Sneider and Ms. Cooper hostage,

3  this potential resolution can never actually happen.  We would

4  have to either have a settlement with Brenntag or a verdict

5  against Brenntag for Brenntag to even begin to argue that the

6  debtor is somehow responsible for it.  And, again, I urge Your

7  Honor, under California law, there is no indemnity right.

8  There cannot be on the verdict form, if 90 percent of the

9  liability is apportioned to Whittaker, Clark & Daniels, nothing

10 happens, I lose 90 percent of my verdict, and Brenntag cannot

11 go get indemnification for that because it's not for their

12 liability.  The jury has apportioned ten percent to Brenntag

13 for Brenntag's own individual conduct, that is what the jury

14 will hear.  Brenntag can't then say, Whittaker, you owe us this

15 ten percent of this verdict for something you didn't do, that a

16 jury determined only Brenntag did.

17         And so again, Your Honor, I plead with you that the

18 debtor has failed to show you that there would be any

19 meaningful reorganization in this bankruptcy that would

20 actually account for and allow for resolution of Ms. Sneider

21 and Ms. Cooper's direct post-'04 claims against Brenntag.  And

22 really what Brenntag is asking Your Honor to do is they're

23 asking Your Honor to make the debtor pay for their direct

24 liability.  This bankruptcy, whatever -- whether or not it

25 happens, whether or not a trust is open, the debtor has been

38

1  clear they're not paying for Brenntag's independent liability,

2  and yet that's what Brenntag is asking this Court to do and I'm

3  not sure under what legal theory or basis.

4          So, again, because the debtor has failed to show this

5  Court that Ms. Sneider's independent direct claim against

6  Brenntag can in any way be resolved in this bankruptcy, and in

7  fact have shown that it won't, I plead with Your Honor to

8  please let these two women dying of mesothelioma have their day

9  in court.

10         Thank you.

11         THE COURT:  Thank you, Ms. Kagan.

12         Mr. Davis, do you wish to --

13         MR. DAVIS:  Yes, Your Honor.

14         THE COURT:  -- take your turn?  Thank you.

15         MR. DAVIS:  It's kind of difficult to know exactly

16 where to start with all of the problems with the TRO that's

17 being requested and the arguments that have been made by the

18 debtors and Brenntag's counsel.  I actually think that Ms.

19 Kagan's comments are a perfect place to start, which is that

20 this Court circumscribed what it meant to show the potential

21 likelihood of success, and that was some way to resolve these

22 claims that they seek to enjoin.  And, as Ms. Kagan said, not

23 only have they failed to make that showing, they have actively

24 disclaimed that they will do anything with these claims.

25         And, you know, the debtors try and skirt this in

39

1  their pleading by saying, well, we might have a plan of

2  reorganization.  That's not sufficient.  The mere fact that you

3  can have a plan of reorganization says nothing about whether

4  you have success on these claims that you are attempting to

5  preliminarily enjoin.

6       And I think it's instructive to look at the Supreme

7  Court's seminal decision on preliminary injunctions, Winter,

8  which is cited in our papers for the -- the standard for a

9  preliminary injunction.  In that case, the person seeking the

10 preliminary injunction had filed a complaint asking the U.S.

11 Navy to file an environmental impact study on sonar training,

12 and they sought a preliminary injunction to stop the sonar

13 training.  And the Supreme Court said, well, you're not asking

14 to enjoin the sonar training, you're not seeking to permanently

15 enjoin it, you're asking for something different.

16      So there's no likelihood of success because you're

17 not even asking for the thing that you want on your preliminary

18 injunction.  So too here.  They say in this motion they have no

19 intention of permanently enjoining these claims, not under a

20 plan.  They have no basis for saying that they are involved in

21 this settlement agreement, they actively disclaimed that.

22 There is no likelihood of success that can be had here.  There

23 is nothing that they even want to do with these claims.  And I

24 think it shows the disingenuousness of this process that we're

25 here talking about enjoining claims that the debtor is going to

40

1  just leave out of its proceeding completely.

2          Now, let me address a couple of things that Mr. Dean

3  said up-front about how this all plays in or the context in

4  which he's asking for this.  And I found it actually kind of

5  interesting because a lot of the things that Mr. Dean said are

6  exactly what I would say for why this preliminary -- or, excuse

7  me, this TRO is completely unnecessary and is completely

8  inappropriate.  The first we just touched on, which is that the

9  injunctive relief is not a condition to the settlement

10 agreement, it's not resolved in the settlement agreement -- or,

11 excuse me, the -- yeah, the injunctive relief they're seeking

12 for these independent claims is not a condition to the

13 settlement agreement.  There's no resolution of these direct

14 claims in the settlement agreement.

15         What he says is this maximizes the value of the

16 settlement agreement.  That boggles my mind because they have

17 put a settlement agreement that is signed in front of Your

18 Honor which doesn't have any kind of variation in it.  And in

19 fact, if -- it's not like if there's no indemnification claims

20 between now and six months from now there's a bigger number or

21 lower number.  There's nothing that could happen with these

22 indemnification that would affect that number.  In fact,

23 Brenntag has already agreed to release all the indemnification

24 claims.  So when these claims were to spring up after their

25 proposed injunctive relief, Brenntag would be on the hook for

41

1  them anyway.

2        So I don't understand how we're maximizing anything

3  other than the time that Brenntag gets on a payment holiday on

4  these claims for Brenntag's conduct, for injuries that Brenntag

5  caused from Brenntag products post-2004.

6        Next, we talked about -- he said we're not enjoining,

7  we're not trying to enjoin claims that are solely post-2004

8  claims.  Yes, they are.  Yes, they are.  The idea that I make a

9  claim that says you are liable because I was injured from my

10 exposure to your product post-2004, Brenntag, that claim does

11 not change based on whether I have allegations in my complaint

12 that say something about pre-2004.  The only claim that can be

13 answered in that case is for post-2004 liability.  There is no

14 liability that can be assessed on the pre-2004 and, you know,

15 even if there is -- we'll get to that -- it is not an issue

16 that this Court needs to concern itself with.

17       Then we get to the risk of indemnification.  And,

18 again, I think that we can avoid even talking about the

19 indemnification because the debtor has clearly failed to show

20 likelihood of success, and the debtor has clearly failed to

21 actually link this injunctive relief with any permanent

22 injunctive relief that it's seeking, whether in the motion, in

23 the settlement agreement, in this plan term sheet that they've

24 sent around.

25       Mr. Dean takes issue with the fact that they should

42

1  have to prove jurisdiction.  That's a new one to me.  It's

2  their motion, they have the burden for jurisdiction.  The idea

3  that they would need to show that this indemnity link actually

4  exists to get jurisdiction is also not one that is out of line.

5  That is what happens in order to get jurisdiction over these

6  third party, non-debtor claims against non-debtors.  If they

7  want you to exercise jurisdiction over those, then, yes, they

8  need to show that indemnification exists.

9       And I'll get to this point that Mr. Dean made about

10 having to waive defenses, and I think it's important because it

11 distinguishes the cases that he talked about, the <u>Chakarian</u>

12 case, which is the <u>W.R. Grace</u> case, as well as <u>Philadelphia</u>

13 <u>Newspapers</u>.

14      In <u>Philadelphia Newspapers</u>, the court does use the

15 term potential indemnification claims, but it also talks about

16 how there was evidence that there was contractual

17 indemnification for certain of the entities, and that the --

18 there was also evidence that the debtor had a long history of

19 providing indemnification to employees even where there might

20 have been a dispute about whether or not there was actual

21 indemnification.  Furthermore, the related-to jurisdiction

22 there was also based on the fact that there were other

23 theories, derivative liability theories like respondeat

24 superior and all of that sort of stuff that linked the cases

25 against employees and directors, et cetera, to the debtor.

43

1          Moving to the W.R. Grace case, the Chakarian case,

2    there the court actually notes that the Ninth Circuit has

3    specifically held that the mere assertion of an indemnity is

4    not enough to create related-to jurisdiction or to provide a

5    harm that is for preliminary injunction.  That's in the Excel

6    Innovations case, which I can get a cite of that to Your Honor.

7          In W.R. Grace, the court says we recognize what the

8    Ninth Circuit did here, and in fact heavily relies on the Ninth

9    Circuit opinion when it goes through its reasoning.

10         What it says, though, is that this case, W.R. Grace,

11   is distinguishable from what happened in Excel Innovations

12   because here, there are 15 separate contracts for indemnity.

13   And the fact that the debtor says it has defenses to those

14   indemnities doesn't mean the indemnities don't exist.  What

15   we're talking about here is an indemnity that does not exist.

16   There is no evidence that there is any indemnification for

17   these post-2004 claims.  There is no evidence that the mere

18   invocation of exposure to Whittaker's talc pre-2004 gives rise

19   to an indemnification claim from Brenntag.

20         And I think it bears noting that when you look at the

21   jurisdiction cases -- Pacor, Grace, Combustion Engineering --

22   all of them required there to be an actual link between the

23   third party's liability and the debtor's liability.  They rely

24   a lot on LTL.  They talk a lot about the Chakarian case again.

25   In both of those cases, the liability that was being considered

44

1  was derivative; here, it is direct.  And again, here, it's not

2  just that there's a dispute as to whether the debtor would

3  ultimately have to pay the indemnification.  There's no

4  evidence that the indemnification exists.  And not holding the

5  debtor to their burden on that -- I mean, I don't know what to

6  say.

7          Moving forward, I want to talk for a minute more

8  about jurisdiction just because I want it to be clear that our

9  jurisdictional argument is in reference to all of the relief

10  that's being sought in the amended complaint.  I know that the

11  TRO is being sought under 105.  So we believe that the cases

12  involving 105 -- and the fact that it does not, in and of

13  itself, create subject matter jurisdiction, but rather, there

14  must be subject matter jurisdiction over the action that they

15  are seeking to enjoin.  That's made clear by the Third Circuit

16  in Grace and also the Supreme Court in Celotex.

17          I would also note that the mere fact -- and this is

18  where the strategy of pleading really comes in -- I should note

19  that what Mr. Dean calls, I guess, intentionally circumventing

20  the automatic stay is what the Third Circuit would call

21  complying with the automatic stay.  But we'll leave that alone

22  for the moment.  The -- by saying that they want to extend the

23  automatic stay, that does not convert this into a core

24  proceeding over which the Court has jurisdiction.  Again,

25  whether something is within or without the context of the

45

1  automatic stay is something that the Court has jurisdiction to

2  decide.  That does not mean that the Court therefore has

3  jurisdiction to enjoin something that wouldn't otherwise be

4  subject to it.  Furthermore, although this is termed an

5  extension of the automatic stay, courts from the circuits there

6  on down, including recently the District of Delaware, and I

7  believe also other courts within this jurisdiction, have said

8  that, you know, the extension of the automatic stay -- what it

9  really is.  And if you look at Robins, which is the progenitor

10 of this, this is what happens.  It is not "362 now applies to

11 this."  It is the Court acting under 105 to enjoin something

12 that would not otherwise be joined under 362.  So I just want

13 to make that clear because that was brought up in the debtor's

14 paper.  I wanted to make sure that we got to that argument

15 about jurisdiction as well.

16      Bear with me a moment, Your Honor.  I'm going a

17 little bit out of order.

18      THE COURT:  No problem.

19      MR. DAVIS:  Oh, I should also note, it was not clear

20 to me in the debtor's paper whether or not they were raising

21 identity of interest as a basis for jurisdiction.  But I did

22 want to note that again, where identity of interest has been

23 found, identity of interest is a -- is found where it is the

24 debtor's conduct that is at issue, where there is a derivative

25 liability -- again, this is Brenntag's liability -- direct

46

1  liability.  There is nothing derivative of the debtor.  And

2  again, there is no proof that there is any indemnification.

3          We already talked about the failure to show

4  likelihood of success on the actual prongs here of preliminary

5  injunctive relief.  They've completely failed that, 100

6  percent.  They've completely failed it.  The request for

7  injunctive relief is out of line.

8          Going to irreparable harm -- I know Your Honor has

9  heard a lot about the indemnification already -- the phantom

10 indemnification, that may or may not exist.  Again, and I can

11 give you the cite here for Excel Innovations, 502 F.3d 1086 --

12 the mere fact that Brenntag says, "Well, I'm going to try and

13 get indemnity from you," simply cannot be enough to increase

14 this Court's jurisdiction.  I mean, and what -- that could

15 happen in any situation.  You know, anyone could say, Well, I'm

16 going to sue the debtor for indemnity.  That's what happened in

17 Excel Innovations.  Someone said, Well, I'm going to try and go

18 after you for indemnification.  The Court was like, Prove it.

19 And that's exactly what we're saying here.  Brenntag can't say,

20 Well, we might have an indemnification claim, or We'll assert

21 indemnification claim.  Can't just threaten the estate and

22 assume that that will get them off of the -- get them off the

23 hook of this litigation process.

24         And again -- and I think Ms. Kagan said this well --

25 the Third Circuit has said that you cannot use these sort of

47

1  conclusory or speculative allegations to support your

2  irreparable harm.  What's more speculative than somebody might

3  try and sue me for an indemnity that I dispute its existence?

4        I'll also say that the Code clearly -- this is the

5  point about -- that we were making under 502(e).  The

6  Bankruptcy Code clearly understands that these types of

7  indemnification claims, if they exist, will actually accrue

8  during the course of a bankruptcy and provides a method for

9  dealing with them.  Chapter 13 specifically stays those from

10 arising; Chapter 11 does not.  Okay.

11       And then we can also talk about the backstop of the

12 indemnity.  Notably, the debtor doesn't disclaim that they have

13 a backstop for their indemnity.  They merely state that -- oh,

14 yeah, you got another -- I find it interesting that they are

15 willing to rely on Brenntag's assertion of indemnity, which has

16 no evidence, as a threat to this estate, and yet the actual

17 contractual indemnity that it has with NICO is somehow this

18 amorphous thing that cannot be relied on.  I just find that to

19 be -- I find that to be an interesting position for the estate.

20       Let me turn very quickly to litigation prejudice,

21 because I know that this is the other thing that the Court

22 mentioned at the last hearing.  Collateral -- the Supreme Court

23 has held collateral estoppel, res judicata -- these things do

24 not apply to non-parties.  They cannot.  It's inequitable.  It

25 doesn't happen.  The Third Circuit has held that.  The District

48

1   of New Jersey has held that.  The only way that these debtors

2   have a problem with litigation prejudice is if they go get

3   involved in these cases, which they have absolutely no reason

4   to do.  If they get involved in these cases, that's where the

5   risk arises.  We're happy with them to just sit right where

6   they are and not have any litigation prejudice.  Nobody's

7   asking them to get involved; it doesn't make sense for them to

8   get involved.  The only way that the prejudice exists is if

9   they do.

10           I also wanted to speak more specifically about what

11  Ms. Kagan raised with regard to comparative fault and

12  allocation of liability.  This was clearly something that the

13  Court had questions about and concerns about; so I wanted to

14  address it.  In these states in which comparative fault or

15  liability apportionment is permitted against a non-party, it

16  is, as far as we can tell, universal that either through case

17  law or through the statute providing for the liability

18  allocation itself, not only that you cannot use a liability

19  allocation for res judicata or collateral estoppel against a

20  non-party, but then, you actually cannot use it in any other

21  proceeding for any reason whatsoever.

22           If you look at Texas, the Texas Appellate Court in

23  2012 -- this is El Apple Inc., 362 S.W.3d 154, which says,

24  "Granting a motion for leave to designate a responsible third

25  party or finding a fault against a designated party does not

49

1  impose liability upon that person.  Neither may be used in any

2  other proceeding on the basis of res judicata, collateral

3  estoppel, or any other legal theory to impose liability upon

4  that person.

5        Same is true for California, as Ms. Kagan mentioned.

6  And I believe that she mentioned the <u>Bostic</u> case in our

7  previous argument.  There, the California Appellate Court

8  rejected the attempted use of collateral estoppel of the

9  apportionment of liability to a non-party, because the

10  non-party did not participate.

11       Pennsylvania law, by statute -- you cannot use the

12  liability allocation or comparative fault against the non-party

13  in any other proceeding for any reason.

14       Indiana, the same thing.  Courts have, in fact, found

15  that a party attempting to blame a debtor is not violative of

16  the automatic stay because there's absolutely no way for a

17  liability allocation to be used against the debtor in any other

18  proceeding.  Same is true for Georgia.  Same is true for

19  Michigan.  Seems like swing states are really where this is

20  popular, but --

21       So there's no litigation prejudice.  There is no

22  chance of there being litigation prejudice against these

23  debtors.

24       And again, even with regard to their indemnification,

25  if this indemnification exists, they've already settled it,

50

1  they've already put his dollar amount on it.  So there's --

2  they're purporting to think that that is reasonable.  We

3  dispute that the settlement as a whole is reasonable, but it's

4  very weird for them to say, we need to stay this so that the

5  settlement can go forward, even though we've already priced in

6  this and all future potential indemnifications.

7          Balance of harms -- I don't even know how much I need

8  to talk about this.  The debtors have no operations.  They have

9  no employees.  They have no cash.  They have no interest or

10 relationship with the direct claims against Brenntag.  They

11 have no ability to be harmed by a single one of these cases.

12 On the other side, I have literally dying constituents seeking

13 some sliver of justice from Brenntag for Brenntag's conduct.

14 There's no argument that depriving them of these imminent trial

15 dates or delaying their litigation creates very real harm to

16 them.  And that harm is not only more than what the debtors

17 assert they would actually have, this harm actually exists.

18 That should be taken into account.  This is real harm.  This is

19 all hypothetical harm, which I don't even think exists

20 hypothetically.  And I won't repeat, but you know, Ms. Kagan

21 talked about Ms. Sneider.  And I think that, you know,

22 depriving a terminal person of their Court date because

23 Brenntag -- who has everything to lose by that trial going

24 forward -- says, "Well, I'm going to threaten the estate unless

25 you stop it" -- I think that that's -- well, it's unacceptable

1  under the balance of harms.

2         And this bleeds into public interest as well.  What

3  is the public interest of delaying actions that this debtor has

4  absolutely no thought about?  There's no attempt, and they have

5  actually disclaimed that they will attempt, to resolve a single

6  one of these claims.  And yet here we are, and they want to

7  delay them.  For what?  What is the interest that anyone has in

8  that?  There's zero.  Certainly not the public's interest.

9         The public's interest should swing the other way,

10 which is allowing people who have been wronged to go against

11 non-debtor tortfeasors who wronged them, without delay,

12 especially when there's literally no possibility that there

13 will be any prejudice to this estate.  Even if the prejudice to

14 the estate that Mr. Dean or Ms. Quartaralo say could exist

15 springs up, it is still -- on the balance of harms and public

16 interest, it is in favor of denying this motion.  The harms are

17 so picayune.  You have someone who can go -- you're saying,

18 Don't go to the well and drink, because somebody might throw

19 some more sand in this desert over here.  That's where you've

20 got to put your effort.  It's inappropriate.

21        Your Honor, I did want to talk very briefly about the

22 question that you started with, about successful liability

23 claims.  I certainly agreed with one of the premises of Your

24 Honor's question, which is that the automatic stay protects

25 these claims.  What are we doing here, putting an additional

52

1  injunction on them?

2          I do dispute that dismissal of these claims,

3  especially without prejudice, would be violative of the stay.

4  The Third Circuit has held that dismissal without prejudice of

5  claims, certainly, against the debtor are not violative of the

6  automatic stay.  I would say to the extent that the Court has

7  concerns about dismissal with or without prejudice impacting

8  the estate because these are protected under 362(a)(3),

9  severance is also a remedy that courts have looked favorably

10 upon for allowing non-enjoined litigation to move forward,

11 severing the claims that are subject to the automatic stay.  So

12 there are plenty of less aggressive remedies here for the

13 successor liability claims than making them subject to this

14 additional level of TRO and preliminary injunction.

15         I would note -- I take issue with Ms. Quartaralo's

16 concept that the summary judgment motion provides guidance but

17 that there needs to be something more concrete.  The automatic

18 stay is the automatic stay.  We're all lawyers, we're all

19 adults; we know how to navigate that.  There's case law out

20 there, there's the statute itself.  And I would say that, you

21 know, if the TRO or the preliminary injunction that was being

22 requested were consistent with the automatic stay -- which it's

23 not -- it was consistent with the automatic stay, this might be

24 a different conversation, although I would still say that it's

25 completely superfluous and could create very strange situations

53

1  if, in fact, this preliminary injunction were still in place,

2  if the Court's summary judgment ruling were overturned, where

3  now there would be a finding that the automatic stay doesn't

4  prevent anything on these claims, yet this injunction would

5  still exist.  It would be confusing, unnecessarily so.

6           But what they are requesting -- and I recognize that

7  Mr. Dean has made some concessions to our alternative requests

8  for how the TRO or the preliminary injunction would work -- but

9  you know, they have a requirement in here that you dismiss all

10 of your claims against Brenntag with prejudice, to get rid of

11 this injunction.  The automatic stay doesn't require that.  In

12 fact, under this Court's summary judgment ruling, that would be

13 anathema to the automatic stay; you're destroying estate

14 property at that point.  So I think that the successor

15 liability claims -- we understand your -- Court's ruling.

16 There doesn't need to be some sort of, you know, double secret

17 injunction on these on these claims that claimants would have

18 to navigate.

19           Let me speak very, very quickly to the alternatives.

20 I recognize that Mr. Dean has accepted that dismissal without

21 prejudice would be acceptable.  And insofar as the Court

22 grants, the TRO, we could work to come up with some system with

23 dismissal without prejudice.

24           I also want to note that the stipulation that this

25 Court has required, which is that there be no issues being

54

1  raised at the trial that would impact the conduct of the

2  debtors -- I think that, you know, the committee has not

3  previously objected to that stipulation.  But now we're in a

4  different situation, where I feel as though Brenntag is

5  actively exploiting the need for that stipulation in order to

6  prevent litigation from moving forward against it.  That is to

7  say, Brenntag is threatening -- and I will say not even

8  committing -- they're threatening to bring up things about the

9  debtor if these -- if this litigation goes forward.  I think

10  Ms. Kagan aptly showed at the last hearing that that's almost

11  an impossibility.  But they haven't even committed to doing it;

12  they've just threatened to do it.  And I think it is a way to

13  exploit the need for the plaintiffs to sign the stipulation.

14         So, again, I don't think that the Court has

15  jurisdiction to enter this injunctive relief.  I don't think

16  that the debtors meet any of the prongs for injunctive relief,

17  especially with regard to likelihood of success, and the fact

18  that the injunctive relief needs to match some ultimate relief

19  they're seeking, which it doesn't.  But insofar as this TRO was

20  entered, we would suggest that the stipulation should simply be

21  a waiver of the ability to use any rulings or findings

22  concerning the debtors at these proceedings against the debtors

23  in any future proceeding, including this bankruptcy.  I think

24  that that would that would suffice to calm Your Honor's

25  concerns about litigation prejudice.  Although, again, because

55

1  of the case law on collateral estoppel, res judicata, the law

2  on liability apportionment, there is no actual risk of that

3  coming to fruition.

4       With that Your Honor, unless you have any additional

5  questions for me, I will cede my time.

6       THE COURT:  All right.  Thank you, Mr. Davis.

7       Mr. Dean, do you wish to respond?

8       MR. DEAN:  I do, Your Honor.  Thank you.  I'll just

9  start by addressing some of the arguments raised at the onset

10  by Ms. Kagan.  I just -- what Sneider and Lee did to end-run

11  the potential ruling that was pending before the Court, before

12  the TRO was made applicable to them, actually illustrates why

13  we need this TRO.  They attempted to walk away from these

14  allegations prior to the injunction being applicable to them,

15  and argued that the claims weren't successor liability claims

16  under the Court's -- under our definition and under the Court's

17  decision and that they didn't have to abide by the automatic

18  stay.

19       If they had tried to do that today, I would submit

20  that the automatic stay clearly would've been violated.  But

21  that's not the only way that a plaintiff could try to end-run

22  the Court's decision unless guidance with a specific list

23  either as to the applicability of the automatic stay as to the

24  entire lawsuit and/or extension of the stay to any direct

25  claims that are also coupled in that lawsuit is issued to give

56

1  guidance to the state courts.  They could also not dismiss

2  those claims but take the position that they're only pursuing

3  direct claims and just let those claims sit without dismissing

4  them at all and argue that they don't violate the automatic

5  stay by doing that.

6        If I had more time to think about this Your Honor, I

7  could probably come up with multiple different other ways that

8  they could try to do this, but it's evident by what has already

9  been done that they're thinking about this.  And the point of

10 this TRO is to try to stop that.  And whether the Court wants

11 to put a provision in the TRO that either confirms that the

12 automatic stay applies to the 657 actions but not just to the

13 successor liability claims that are clearly established to be

14 in those actions, and any direct claims that may not be subject

15 to the automatic stay as well that are also coupled in those

16 actions, and that the other small number of remaining claims

17 are also subject to the stay extension injunction is not of

18 concern to us.  Our only concern is to get an order that

19 actually provides that these actions cannot continue under any

20 circumstances without relief from this Court.

21        And so, Your Honor, I agree with counsel for

22 Brenntag, that the summary judgment decision was general.  And

23 I remember standing in front of Your Honor at the hearing on

24 summary judgment, when we had the argument live before Your

25 Honor.  And I told you that -- at that time, we did not need to

57

1   go through all of these claims and apply specifically on a

2   claim-by-claim analysis to get general guidance as to whether a

3   successor liability claim as we defined in the complaint was

4   property of the estate.

5           Now that we have the ruling, however, and we have the

6   list, and we've established that 657 of these 683 claims

7   actually plead successor liability, now we would like to

8   directly apply the Court's ruling, whether it's a -- that the

9   automatic stay applies to some all of those 657 claims within

10  those lawsuits, and/or that the stay should be extended to any

11  other such direct claims within those lawsuits, and to the

12  other remaining small number of 4 percent of claims on the

13  chart is fine with us.  But we do think that providing that

14  guidance for the state courts and for the parties and for the

15  plaintiff's would be very helpful and useful and provide

16  clarity as to what cases actually apply to the ruling, and if

17  they don't apply to the ruling, whether the stay would be

18  extended or otherwise enjoined pending the outcome of the

19  settlement, Your Honor.

20          With respect to the arguments that Ms. Kagan made on

21  California law with respect to the contractual -- with respect

22  to the lack of indemnification, I'm not going to repeat all

23  that, because as Your Honor may recall, we went through that

24  ad nauseam at the Sneider hearing, and we indicated that there

25  were still contractual issues to deal with.  And there are

58

1   obviously states other than California involved here, Your

2   Honor.

3          As for some of the arguments raised by counsel for

4   the committee, on the issue of the fact that the settlement

5   doesn't maximize -- that the injunction would maximize the

6   value of the settlement because the settlement's already on

7   file -- I think the committee misses the mark, Your Honor.  The

8   point that we're making is very clear, I thought, today.  But

9   we're trying to reduce the fees and costs associated with

10  having to continue to deal with this, decide whether to be

11  involved in those cases, or risk liability or indemnification

12  claims by Brenntag so that we could actually maximize the value

13  of the estate and return more money to creditors as opposed to

14  spending it on these continued TRO and plaintiffs' side

15  litigations.  That's number one, Your Honor.

16         I just want to address the point that counsel

17  continues to hammer home, that we have failed to meet our

18  burden with respect to indemnification.  What you didn't hear

19  from them is that we have failed to establish a -- that

20  Brenntag has contractual indemnification rights against us.

21  Nor could they actually say that with a straight face, Your

22  Honor, because at the November 21st hearing, the committee

23  actually put the 2004 MSPA with the indemnification contract

24  provisions into evidence, and it -- and they cross-cited our

25  summary judgment motion at Docket Number 4-7.  So that document

59

1  is in the record, and we didn't feel the need to re-put it in

2  the record today, Your Honor, because this has already been

3  submitted by the committee in this adversary proceeding.  And

4  the Court can take judicial notice of that and accept that for

5  the purposes of this hearing to the extent that the committee

6  could possibly be arguing that we failed to meet our burden

7  because we didn't establish the possibility of an

8  indemnification right.  But the contract is actually in the

9  record in this case, as it was actually submitted, moved into

10 evidence by the committee themselves.  So that's the first

11 point, Your Honor.

12       To the extent that Mr. Davis is arguing that we had

13 to do more than put -- rely on the contractual rights and the

14 clear statements from Brenntag and the continued assertion by

15 Brenntag that they're going to hold us to that -- and by the

16 way, the Court heard that from Brenntag itself at the Sneider

17 hearing when we were having a discussion about the fact that

18 they wouldn't waive their rights to assert indemnification

19 certain indemnification claims against us as a result of the

20 Sneider trial.

21       So I think that we've done enough to establish the

22 risk of indemnification, and that is all, from our perspective,

23 that the case law requires us to do, to establish subject

24 matter jurisdiction and the need for injunctive relief, either

25 under 105 or it's 362, in the alternative.

60

1          Next, Your Honor, I want to address Mr. Davis's point

2    that we've got a secret injunctive relief that matches to

3    something that we're ultimately seeking in the case.  In a

4    typical linear litigation outside of Bankruptcy Court,

5    injunctive relief is usually sought in the form of a TRO and a

6    PI to lead to a cause of action later on down the road that

7    would permanently enjoin or have some type of directive to the

8    defendant.

9          That is not what we have here, and that's not what is

10   required, because not only does the 105 case law that we cited

11   in our papers allow us to get a casewide injunction pending a

12   plan of reorganization, but what he missed also was that the

13   motion also alternatively seeks injunctive relief in the form

14   of an extension of the stay under Section 362, which we --

15   outside of this adversary proceeding, conceivably could have

16   been done by motion.

17         So there are two separate statutory bases.  It's not

18   just a 105 request; it's an alternative request under 362.  And

19   we did that on purpose to make sure that we covered all of our

20   bases.  But the case law on Section 362 clearly allows us to

21   get an extension of the stay of litigation against non-debtor

22   parties, at least on a temporary basis, pending the outcome of

23   the settlement.  And 105 does too, based on the fact that we

24   have a settlement that would lead to a plan on the table, Your

25   Honor.

61

1          On the res judicata, collateral estoppel record

2    taint, which is only one of the two harms that are discussed --

3    the other is the indemnification, that I've already addressed.

4    But on that point, Your Honor, I appreciated the state survey

5    of select states that was provided during argument, but we have

6    a number of other states.  There's certainly still a risk here,

7    and this survey of selected states does not support the

8    argument that there is, as Mr. Davis said, no risk of

9    litigation prejudice, and that argument, based on what was said

10   today, should be rejected out of hand.  I think the recitation

11   of all the different states and the way that they handle it

12   differently -- and I won't even get into the risk of the cases

13   that were cited -- shows that this is an uncertain issue and

14   one that should be taken seriously in evaluating the factors.

15   And as I mentioned, that only deals with res judicata,

16   collateral estoppel record taint.  We still have the

17   indemnification issue, notwithstanding any of this.

18          And lastly, Your Honor, again, I want to just note

19   for the record that we do have sympathy for these plaintiffs.

20   We understand that this is not a perfect situation.  The

21   debtors -- as we have constantly done throughout this case, in

22   rejecting many of the Brenntag requests previously, as the

23   Court heard, to add all of these plaintiffs to an injunction

24   much earlier in the case, before we had a clear path forward.

25   So we have constantly tried to balance the needs of the parties

62

1  throughout this case, and I think that we are to the point

2  where this injunction is appropriate.  It is -- as

3  Ms. Quartaralo noted, it is a very temporary situation and that

4  there -- we now have a clear path.  And I think the temporary

5  nature of it and the fact that we have a clear path to a

6  resolution, where these plaintiffs could go off and prosecute

7  the direct portions of these claims later, after the settlement

8  is approved on a final basis -- all shows, Your Honor, that

9  we're trying to do the best we can for the estate to balance

10 the needs of all of the parties and to try to keep everybody on

11 track to getting a deal done that would ultimately result in

12 creditors getting as much money in their pockets as possible,

13 Your Honor.

14        So with that, unless the Court has any other

15 questions for me, we would respectfully request that the TRO be

16 entered today, Your Honor.

17        THE COURT:  All right.  Thank you, Mr. Dean.

18        Let's move to the motion as well for the -- to amend

19 the complaint.  I assume much of the arguments have been

20 referenced, but to the extent it provides for different issues,

21 let's have that argument.

22        MR. DEAN:  I'll deal with that quickly, Your Honor.

23        THE COURT:  Thank you, Mr. Dean.

24        MR. DEAN:  Just for context, through the motion to

25 amend, we seek to amend the original adversary proceeding,

1    specifically with Counts 2 and 3.  Those counts previously

2    sought to extend the automatic stay too and preliminarily

3    enjoin successor liability claims in the event that the Court

4    did not find that such claims were property of the estate --

5    which it did in summary judgment, of course.  Those counts were

6    not addressed by the summary judgment order, which, as the

7    Court knows, only concern Counts 1 and 4.

8         Successor liability claims, by virtue of the Court's

9    summary judgment order, are, as we all know now, automatically

10   stayed.  So for the purposes of this amendment, we are

11   attempting to adjust Counts 2 and 3 to the current

12   circumstances following this Court's summary judgment order.

13   And as we discussed several weeks ago at the ninth TRO

14   extension hearing, for the purposes of efficiency and to ensure

15   that there was no gap between the respective TROs, it makes

16   sense for us to amend the existing complaint, which we've done,

17   as opposed to commence a new adversary proceeding.  We think

18   that's even more appropriate now that the TCC has appealed the

19   summary judgment order that Your Honor entered.

20        And so what we've done with the proposed amendment is

21   to substitute what we've defined as the Brenntag enjoined

22   claims for successor liability claims in terms of the

23   injunctive relief being sought.  And we've talked a lot of

24   today about what those are; so I won't get into that.  But in

25   summary, Your Honor we would respectfully submit that the

64

 1    relief is perfectly appropriate under the Third Circuit's

 2    liberal standard governing pleading amendments and Rule 15,

 3    because the proposed amendment won't in any way prejudice the

 4    plaintiffs, who will and have had a whole opportunity today,

 5    but will have another opportunity to respond to the merits as

 6    to Counts 2 and 3, through an objection or other response to

 7    the motion if the TRO is granted today.

 8         Now, the TCC objects to the motion to amend primarily

 9    on futility grounds, asserting that no subject matter

10    jurisdiction exists.  And obviously, I'm not going to repeat

11    all the reasons why we don't think that's true, Your Honor, but

12    that's really the cornerstone of the basis to deny the motion

13    to amend.  So if the Court agrees with us that subject matter

14    jurisdiction exists on the TRO, we think that argument of

15    futility actually falls off.

16         And then we're just left with this final argument,

17    which has no basis whatsoever, which is premised on speculation

18    that we filed this motion to gain some unfair advantage against

19    the plaintiffs in these cases.  I don't think this argument

20    warrants much of a response at all other than the point out

21    that it's obvious, based on everything said today and in our

22    papers and the history of the case and the record in this case,

23    that we did this in good faith.  We are not doing this in -- to

24    prejudice the plaintiffs in any way.  We're doing it to balance

25    the needs and the harms of the case, which I have already laid

65

1    out, Your Honor.  There's zero evidence of any ill motive for

2    this.  And we would submit that if the Court finds subject

3    matter jurisdiction exist, there really are no other viable

4    arguments to denying the motion to amend.  So we would ask that

5    the motion to amend also be granted as well, Your Honor.

6              THE COURT:  Thank you, Mr. Dean.

7              Mr. Davis.

8              MR. DAVIS:  Thank you, Your Honor.  Well, I agree, at

9    least, with Mr. Dean on -- that we make two arguments about the

10   motion to amend.  And I will say that the first argument is, in

11   fact, coming back to jurisdiction.  I recognize we're on a

12   different motion, but Mr. Dean is correct, that these -- this

13   is interrelated to the Court's jurisdiction and the TRO and the

14   preliminary injunction.

15             I would say Mr. Dean's put a lot of -- has taken a

16   lot off of what the Supreme Court puts on his shoulders in

17   terms of burden and put it onto the committee in terms of

18   jurisdiction, in terms of harm, et cetera.  We just note that

19   the Third Circuit says in Pacor:  "to show indemnification

20   sufficient for related-to jurisdiction, the party must

21   establish that the right to indemnification is clearly

22   established and has accrued upon a filing of a civil action."

23             The idea that we're going to say that this is clearly

24   established, when the debtor disputes its existence, is odd to

25   me.  The committee did put into evidence at a previous hearing,

66

the 2004 MSPA, which, of course, talks about indemnity for
pre-2004 liability -- it's not what we're talking about at all.
We're talking about post-2004 liability.  If anything, the
introduction of the MSPA is evidence that there is no post-2004
indemnity, because certainly, the parties would've put that
into the agreement had they wanted it to; they certainly knew
how to protect themselves for pre-2004 liability.

        And then, let me come to bad faith.  Bad faith is not
something that I personally throw around lightly.  But when we
were looking at what the debtor was doing here, we were stymied
as to what the purpose of this was.  Again, it's delaying cases
that they say, Well, after we're done with these proceedings,
you can just go do them.  We need to be protected against this
indemnification that's already priced into the settlement that
we're providing, and to which we don't even agree that it
exists.  We need to protect against res judicata or collateral
estoppel.  We need to know whether or not we need to get
involved in these cases.

        A lot of these cases have been proceeding through
pretrial under this Court's previous TRO, which only limited
cases that were heading to a determination.  The debtor never
got involved in any of those.  Like, the idea that they're
going to step up and do that now, especially when jumping in is
what would prejudice them, I think is just a complete red
herring.  So we were concerned -- we wondered, Why are they

67

1   asking for this?  Why?  They have no -- they have nothing to do

2   with these claims.  They don't want anything to do with these

3   claims.  They're going to pass them through.  What are we

4   waiting for?  And so the only thing that we could think about

5   was that this has to be some ploy likely to get the committee

6   and its constituency to agree to a shorter timetable for the

7   settlement agreement, or maybe to capitulate to the settlement

8   agreement.

9           You know, it sort of Occam's razor:  When there's

10  no -- you know, when there's no other solution, maybe the most

11  straightforward one is what we're looking at.  And I think that

12  this is just a litigation ploy to seek an unfair litigation

13  advantage by seeking to enjoin claims that literally have

14  nothing to do with this estate -- under the Third Circuit's

15  law, under the facts here.

16          And so that's why we're left with this bad faith.

17  And I think for that purpose, you know, the -- if we don't want

18  to term it bad faith, we can at least say that there's a lack

19  of a valid purpose for this amendment.  So not only is it

20  outside of the Court's jurisdiction, but there is literally no

21  purpose to this injunctive relief.  The idea that we're going

22  to maximize the value of this estate because the debtor's not

23  going to have to deal with this TRO anymore -- I have a

24  solution for that:  Don't enter the TRO.  Won't have to deal

25  with it anymore, and the debtor's not going to have to

68

1 participate in any of these tort cases. No one is anticipating

2 that anything untoward would occur if they don't. And so --

3 and I would also just -- just on that point, we did provide a

4 number of states. I would note that California is where

5 Ms. Sneider's case is pending, and we show that there is no

6 risk of collateral estoppel or res judicata or use of any

7 liability apportionment against the debtor.

8      But it's not my burden to show that they will

9 absolutely not be harmed. It's Mr. Dean's burden to show that

10 they will be irreparably harmed. I've not seen one single

11 citation -- I haven't seen an allegation that liability

12 apportionment can be used against them. I haven't seen a

13 single admission on their part that there is a clearly

14 established indemnification relationship for post-2004 claims.

15      So, again, we come to what is the purpose of this

16 injunction? The only thing that I can think of is that it's to

17 provide a litigation advantage with regards to settlement. And

18 so, therefore, you know, we said it has no valid purpose; we

19 think that that's bad faith. With that, Your Honor, we would

20 ask that you deny the leave to file the amended complaint. And

21 in conjunction with that, if you deny the motion to amend the

22 complaint, even if it is not on jurisdictional grounds, we

23 think that you have to deny the TRO because there would no

24 longer be any injunctive relief whatsoever requested in the

25 complaint.

69

 1          And, again, the predicate for preliminary injunctive

 2   relief is that there be on the horizon some permanent

 3   injunctive relief.  And the fact that the debtors are

 4   foreseeing this simply as a temporary thing indicates to me

 5   that what they're looking for here is simply a 105

 6   injunction -- i.e., an extension of the stay -- did not ask to

 7   say that the stay actually applies under its own terms.  And if

 8   they did, then they're -- then the caveats and procedures that

 9   they would put on all of this preliminary injunction would not

10   actually make any sense.

11          So with that, Your Honor, we think that the motion

12   to -- for leave to file the amended complaint should be denied,

13   and as such, the TRO should also be denied.

14          THE COURT:  All right.  Thank you, Mr. Davis.

15          I have a follow-up question, just a brief question,

16   that I'm going to direct to Mr. Dean.  It's probably -- relates

17   more to the prior motion than the TRO, and it's one simply to

18   help inform the Court as to possible ramifications if actions,

19   such as the direct actions, direct claims against Brenntag were

20   to continue.

21          I haven't heard any mention or reference to insurance

22   coverage or policies.  And maybe that there's a factual issue

23   with that.  But I am curious as to whether there is the

24   potential for any impact on insurance coverage held by

25   Whittaker Clark if direct claims against Brenntag were to go

70

1  forward.  Does that have any bearing at all?  Mr. Dean, I'll

2  direct it to you.

3        MR. DEAN:  Oh, I'm sorry, Your Honor.  I had it on

4  mute.  I will -- I do not know the answer to that personally.

5  I'm not involved in the insurance aspects, and I wasn't

6  thinking that you might ask that.  So we -- if it's important

7  to Your Honor's --

8        THE COURT:  I didn't know I was going to ask it; it

9  came upon me.  So --

10        MR. DEAN:  Yeah, we can certainly follow up if it's

11  important to the Court to know, but I don't have any knowledge

12  of that off the top of my head.  So I apologize.

13        THE COURT:  All right.  Mr. Davis, I don't know if

14  you want to weigh in it.  It just struck me that in other

15  cases, such as LTL, insurance coverage has always been rated --

16  in other mass tort cases -- the impact on insurance coverage.

17  And defenses -- usually when there's coverage disputes, and the

18  defenses are impacted by steps taken in the bankruptcy.  So I

19  was wondering if there's any --

20        MR. DAVIS:  Well, like Mr. Dean, I'm not smart enough

21  to be an insurance lawyer.  So no -- no aspersions on Mr. Dean.

22        THE COURT:  Yeah, then I have company in the club.

23  All right.

24        MR. DAVIS:  But I will say that the -- I -- standing

25  here, I am unaware of any insurance coverage, and I can't

71

1  contemplate what the purpose would be of Whittaker holding

2  insurance coverage, or actions by Brenntag after its operations

3  were sold to Brenntag in 2004.  In fact, I would think that it

4  would not be possible for them to ensure the operations and

5  products of another company in which they no longer have an

6  interest.  But that said, Your Honor, I do not know for sure.

7  I would think it's very doubtful that there's insurance at

8  issue here.  It certainly is not raised in the motion.

9            THE COURT:  All right.  Thank you.

10           And thank you, counsel.

11           All right.  Just bear with me one moment.  All right.

12  **Court's going to address both motions together, and I'll give

13  you the conclusion, and then go through the explanations.  I'm

14  going to enter a TRO through October 15th.  I'm going to allow

15  the amendment of the complaint as complying with Rule 15.  That

16  having been said, I do not anticipate that the injunction,

17  necessarily, will extend beyond the 15th.  I think there are

18  some steps that need to be taken, some language that has to be

19  crafted to ensure that all parties from Brenntag through the

20  Court -- claimant's rights are preserved.

21           The litigation, with respect to the settlement, is

22  going to go through December; we know that.  And I'm sure it'll

23  be aggressively litigated, and who knows, it may extend beyond

24  that.  I don't think it's appropriate to hold the tort

25  claimants hostage to the settlement.  But having said that, the

72

 1    settlement does, in this Court's view, at least provide a

 2    pathway and meet the initial concern of the Court, that there

 3    be a possible exit strategy that would impact these direct

 4    claims.

 5            No, the settlement does not resolve the direct

 6    claims.  In fact, the settlement -- I believe it's been quite

 7    clear -- would allow the direct claims to go through once

 8    indemnification issues are resolved.  But the settlement does

 9    resolve the impact on this bankruptcy estate by addressing the

10    indemnification concerns and the obligations owing by the

11    debtor to Brenntag.  So the Court views the proposed settlement

12    framework not -- and I'm not addressing the substance -- but as

13    far as the mechanism as a positive step in at least seeing if

14    there is a possible exit for the debtor.

15            Now, let's address jurisdiction -- subject matter

16    jurisdiction.  I continue to hold, as I did in LTL, and I -- as

17    I've done in other similar mass tort proceedings, that the

18    Court has both core and non-core -- the Court has jurisdiction

19    with respect to the injunctive relief requests, and that when

20    the injunctive relief is tethered to a request to extend the

21    automatic stay under 362(a), which it has been -- which has

22    been done here -- the automatic stay is a substantive right

23    provided by the Code, and thus because the proceeding invokes a

24    substantive right, the underlying proceeding under the

25    Bankruptcy Code, and is a proceeding by its very nature that

73

1  could arise only in the context of a bankruptcy case, the Court

2  views it as appropriate to exercise jurisdiction, and considers

3  the matter a core proceeding.  But the Court has in the past

4  and will continue to always fall back on the fact that, at a

5  bare minimum, there is related-to jurisdiction.

6          The parties who've opposed the Chapter 11 going

7  forward, the tort claimants, have made it clear, in appealing

8  to the Third Circuit, that they wished the bankruptcy

9  dismissed.  There has also been questions raised as to whether

10  or not the plan proffered -- or the possibilities of a plan and

11  the proposed settlement proffered by the debtor can be put into

12  action and is appropriate.  It is not clear whether or not this

13  case will move forward past December, or whether the Third

14  Circuit will weigh in and reverse the District Court and the

15  Bankruptcy Court, and the case goes away.

16          With that background, I don't see how the debtor can

17  ignore its responsibilities to protect itself in the ongoing

18  state court litigations by ensuring that there is not a

19  liquidation of claims against them that will occur or that,

20  either through allocation or through indemnification claims

21  that are being raised by Brenntag, that they can sit idly by

22  and rest on the thought that a jury won't ascribe certain

23  liability to the debtor.

24          And it is unclear as to whether or not there remains

25  a litigation prejudice in all situations.  But what is clear is

74

1   that the debtor would need to make a decision, and likely make

2   a decision, to actively participate in these various state

3   court matters.  And that would pose an administrative and

4   economic burden on the debtor, and it would certainly undercut

5   the very benefits of the automatic stay that the debtor sought

6   in filing the Chapter 11.  What I'm saying is that, in effect,

7   I'm not confident that the debtor will -- can or should sit

8   idly by and let matters proceed in state court, with Brenntag

9   making it clear that they will pursue indemnification rights,

10  and leaving it to a jury to decide the proper allocation of

11  liability between pre-2005 and post-2005, or the source of the

12  injury and the responsibility for the injuries to any tort

13  claimants.

14          Having said so, given the administrative -- potential

15  administrative burden and the possibility of liquidation of

16  claims, including resolution of indemnification claims

17  certainly under the Pacor test, this Court believes it has

18  related-to jurisdiction in that the exercise of the continued

19  prosecution of these cases certainly would and could have a

20  bearing on the rights -- liabilities of the debtor in this

21  bankruptcy proceeding.

22          Having found jurisdiction, that applies both to the

23  motion to amend as well as the motion for the TRO.  Now, the

24  standards for the TRO are well known.  Courts apply the same

25  standard when considering whether to impose interim injunctive

75

1  relief.  Regardless of whether there's a request for temporary

2  restraining order or a preliminary injunction, we look to see

3  the probability of success.  We look to see whether the movant

4  will be irreparably harmed, whether granting the injunctive

5  relief will pose greater harm to the non-moving party, and

6  whether the injunctive relief would be in the public interest.

7         I've already touched on what I believe is a strong

8  probability of success in that the debtor has demonstrated,

9  through the pursuit of a settlement, the ability to reorganize,

10 and the irreparable harm that I believe can come from the

11 debtor not being compelled to take an active role in the state

12 court litigations.  I appreciate that the balancing harms is

13 very difficult here in the public interest.  I think these can

14 be addressed in other ways.

15        As I've indicated -- that I expect the TRO to go

16 through the 15th.  I do not see a need for a TRO with respect

17 to successor liability claims.  And those claims, the 657 -- or

18 I'm sorry -- 651 claims that assert -- at the present time,

19 assert successor liability as the cause of action against

20 Brenntag -- I do believe, based on my ruling, that they are

21 property of the bankruptcy estate, protected by the automatic

22 stay, Section 362(a)(3), and to exercise control over those

23 litigations, including the dismissal.  And I'm cognizant of the

24 Third Circuit law that Mr. Davis referenced.  But these are

25 actual assets of the debtor, these claims, and the -- exercise

76

1  control over those assets, in my view, does implicate Section

2  362(a)(3) and thus the automatic stay is in effect.

3          I do not see a need for a TRO.  I do not have a

4  problem -- in fact, I would suggest that it appropriate that in

5  the order that will come from this Court, in which I will grant

6  the TRO as to the remaining direct claims and any other claims

7  that are brought against Brenntag, as -- that involve pre-2005

8  exposure, that the order include clarity -- language that

9  clarifies that the automatic stay of the Code applies to those

10 successor liability claims, that the dismissal or other

11 modification of the complaint to dismiss those claims would be

12 violative of Section 362(a)(3).  And I believe that language

13 should assist the state courts in understanding the

14 ramifications.

15         That doesn't mean there can't be stay relief in the

16 appropriate situation.  We'll talk about how to remove

17 yourself -- how tort claims can be removed from the TRO -- the

18 Exhibit 1.  But that doesn't mean that there can't be relief in

19 certain situations to allow for the dismissal of the claim and

20 for the case to go forward, but we need to have certain

21 safeguards in place in that regard.  So as to -- of the, I

22 guess, 683 claims -- 651 -- I don't believe requires a TRO.  Of

23 the remaining claims that are strictly direct claims, but

24 that -- but those that implicate pre-2005 exposure, I do

25 believe a TRO is appropriate.

1              Now I've indicated I don't believe they should be
2  held hostage to the settlement process in which, at the end of
3  the day, they would be allowed to go forward.  I do not see
4  why -- number one, I certainly agree that in order to remove
5  the action from the TRO, a stipulation that it's removed
6  without prejudice is appropriate as opposed to it's prejudice.
7  I appreciate the debtor's efforts to stipulate as to the
8  perpetuation of testimony; I think that's a good thing.  But
9  even before I got to the end of the tort committee's opposition
10 and saw their suggestion on stipulations, I had started to pen
11 language.  In effect, I do not see why there cannot be a
12 stipulation included in which Brenntag's ability to pursue
13 indemnification is preserved in this case -- or in this court
14 or in other courts, as appropriate -- but at the same time, why
15 there could not be language which would ensure that any factual
16 findings or apportionment made in the state courts' findings or
17 rulings could not be used by either the plaintiffs or any of
18 the defendants as against the debtor in any manner in the
19 current proceeding or future proceedings.

20             In other words, there should be logical language that
21 would ensure against the litigation prejudice we've been
22 discussing.  And as long as Brenntag's rights to pursue
23 indemnification at a point in this Court down the road are
24 preserved, I don't see why that should be a bar to allowing the
25 direct claims to go forward.  I'm put -- I'm agreeing to a TRO

78

1  to allow the parties to try to come up with sensible language

2  that would meet the needs of the parties who hold direct

3  actions -- direct claims against Brenntag.

4         We will -- I will ask the parties to try to meet and

5  confer and come upon a TRO language that is acceptable.  The

6  TRO will take effects from a bench order today, subject to the

7  entry of language that's appropriate.  I want to make sure

8  there's no holes anywhere or any concerns.

9         We will have a final hearing on the 15th.  If

10 necessary, we will have opposition due on the 8th and replies

11 due on the 11th.  For purposes of the record, the Court does

12 make a finding that as to the direct claims against Brenntag,

13 which include or reference pre-2005 exposure, the debtor has

14 met the burden in satisfying the TRO and the four prongs that

15 I've laid out.  Again, I think these can be addressed -- the

16 concerns can be addressed with language.

17        Let me ask the parties or counsel if there are any

18 questions at this point?

19        MR. DEAN:  Just one question from us, Your Honor.

20 When you're mentioning pre-2005, I'm not sure if you're just

21 using that loosely.  I think we were talking about pre-2004 or

22 pre-2004 transactions.  So I just --

23        THE COURT:  Well --

24        MR. DEAN:  -- because the rulings --

25        THE COURT:  Prior to the closing date, you can

79

1  certainly refine it.

2          MR. DEAN:  Okay.  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. DEAN:  And then, at some point, I just wanted to

5  also just confirm that the Court would be prepared to issue the

6  order on service procedures, which was not objected to.  We

7  didn't -- we never quite got there, but I assume the Court

8  would be okay with that, since the committee had not objected

9  to it.  But just for the record, we would propose to submit

10 that order after, for entry.

11         THE COURT:  I am.  I'll grant the motion.

12         Mr. Davis?

13         MR. DAVIS:  My question was the same as Mr. Dean's

14 regarding the pre-2005 versus pre-2004.  So thank you.

15         THE COURT:  So I was in inartful with my wording.

16 I'll let you-all clean it up.

17         MR. DAVIS:  Mr. Dean brought it up first.  Just

18 wanted to point --

19         THE COURT:  All right.

20         MR. DEAN:  That's because I have the burden.

21         THE COURT:  Ms. Kagan, I didn't know if you wanted to

22 be heard?

23         MS. KAGAN:  Yes, Your Honor.  I have to report back

24 to Judge Dillon what the status of the Sneider and Cooper cases

25 are.  And so just to be clear, I am reporting that there is a

80

1  continuation of the temporary restraining order until

2  October 15th.

3           THE COURT:  Through the 15th.  If the parties can't

4  reach language, I'll either come up with language or I'll

5  decide that it should be continued further.  I leave all

6  options open, but I'm suggesting that there could be -- there

7  should be language that can address the -- these concerns in

8  these limited cases.

9           MS. KAGAN:  Thank you, Your Honor.

10          THE COURT:  All right.  All right, then.  It's been a

11 long afternoon.  Thank you-all.

12          MR. DAVIS:  Thank you, Your Honor.  Have a great day.

13          THE COURT:  You too.  Take care.

14          MR. DEAN:  Thank you, Your Honor.

15          DEPUTY CLERK:  We're off.  We're off.

16          THE COURT:  We're off.  I don't know.  We --

17                         * * * * *

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
C        C m         D N    LBR

Order Filed on September 25, 2024
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In Re: <br><br> Whittaker, Clark & Daniels, Inc. | Case No.: 23-13575 (MBK) <br><br> Hearing Date: n/a |
| Whittaker, Clark & Daniels, Inc. <br><br><br> Plaintiff(s) <br> v. <br> Brenntag AG, et al. <br><br><br> Defendant(s) | Adv. No.: 23-01245 (MBK) <br><br> Judge: Michael B. Kaplan |

## ORDER CERTIFYING DIRECT APPEAL TO T E
## NITED STATES CO RT OF APPEALS FOR T E T IRD CIRC IT

The relief set forth on the following pages, numbered two (2) through _____3_____ is
hereby **ORDERED**.

**DATED: September 25, 2024**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

This matter comes before the Court pursuant to the Joint Certification to the Court of Appeals by all parties in this case (ECF No. 329) (the   Joint Certification ), filed by appellants the Official Committee of Talc Claimants, Sarah Plant, Shelly Yerkes, Tara Valentine, on behalf of Patricia Krempecki, Deceased, Brian Bradford, Individually and as Personal Representative of the Estate of Eileen Pettijohn, Deceased, and appellees Whittaker, Clark & Daniels, Inc., Brilliant National Services, Inc., L. A. Terminals, Inc., Soco West, Inc., Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc. and as Mineral and Pigment Solutions, Inc.), Coastal Chemical Co., LLC, Berkshire Hathaway Inc., National Indemnity Company, National Liability & Fire Insurance Company, Columbia Insurance   Company, BH Columbia Inc., Ringwalt & Liesche Co., and Resolute Management, Inc., who are all the appellants and all the appellees; and the Court having reviewed the Joint Certification; and the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C.     157 and 1334, and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.); (b) venue is proper in this district pursuant to 28 U.S.C.     1408 and 1409; (c) this is a core proceeding pursuant to 28 U.S.C.     157(b); (d) notice of the Joint Certification was sufficient under the circumstances and no further notice is necessary; the Court further finds and concludes as follows:

1.  A Notice of Appeal (ECF No. 297) was filed in the above-captioned chapter 11 case by the Appellants challenging the *Memorandum Opinion* (ECF No. 268) and *Order Granting Summary Judgment in Favor of the Debtors on Counts I and IV of the Complaint* (ECF No. 292) (together, the   Summary Judgment Order ).

2. All of the Appellants and the Appellees agreed in the Joint Certification that a circumstance specified in 28 U.S.C.   158(d)(2) exists because judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for this circuit or of the Supreme Court of the United States, or involves a matter of public importance; and an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

3. The Joint Certification was properly filed pursuant to 28 U.S.C.   158(d)(2)(A).

4. The Court agrees with the Appellants and Appellees that the conditions of 28 U.S.C. 158(d)(2) have been met; more specifically, that the Summary Judgment Order involves a matter of public importance and an immediate appeal from the Summary Judgment Order may materially advance the progress of the case or proceeding in which the appeal is taken;

5. Consistent with Rule 8006(c)(2) of the Federal Rules of Bankruptcy Procedure, the Court submits the following statement expressing its agreement that the Summary Judgment Order merits certification:  Given the extensive record and briefing produced during hearings on this issue, the Court finds that there is no need for further development in the district court. Instead, the direct appeal will materially advance the proceeding.  The Summary Judgment Order implicates questions of public importance as it impacts the rights of mass-tort litigants.

Accordingly, for good cause, it is hereby

**ORDERED** that Joint Certification is GRANTED; and it is further

**ORDERED** that, pursuant to 28 U.S.C.   158(d)(2)(A) and Rule 8006 of the Federal Rules of Bankruptcy Procedure, the Summary Judgment Order is certified for direct appeal to the United States Court of Appeals for the Third Circuit; and it is further

**ORDERED** that, following the issuance of this Order Certifying Direct Appeal, the next step is for the parties to file in the Third Circuit a petition for permission to appeal under Federal Rule of Appellate Procedure 5.  The circuit court will not open any Third Circuit case until that petition is filed.

Form order − ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  Whittaker, Clark & Daniels, Inc.
Debtor

Case No.: 23−13575−MBK
Chapter 11

Whittaker, Clark & Daniels, Inc.
Plaintiff

v.

Brenntag AG
Defendant

Adv. Proc. No. 23−01245−MBK                    Judge: Michael B. Kaplan

## NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

        Please be advised that on September 25, 2024, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 335 − 297, 329
ORDER CERTIFYING DIRECT APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT(related document:297 Notice of Appeal to District Court for Certification to Circuit Court, 329 Joint Certification (Form 24) to Court of Appeals by All Parties Filed by Official Committee of Talc Claimants. filed by Creditor Committee Official Committee of Talc Claimants). Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. See BNC Certificate of Notice. Signed on 9/25/2024. (bwj)

        Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: September 25, 2024
JAN: bwj

Jeanne Naughton
Clerk

**JA948**

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**SHERMAN, SILVERSTEIN,<br>KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email: aabramowitz@shermansilverstein.com<br>          rswitkes@shermansilverstein.com<br><br><br>*Local Counsel to the*<br>*Official Committee of Talc Claimants* | **COOLEY LLP**<br>Cullen D. Speckhart (admitted *pro hac vice*)<br>Michael Klein (admitted *pro hac vice*)<br>Evan M. Lazerowitz<br>Jeremiah P. Ledwidge (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Email: cspeckhart@cooley.com<br>          mklein@cooley.com<br>          elazerowitz@cooley.com<br>          jledwidge@cooley.com<br><br>*Lead Counsel to the*<br>*Official Committee of Talc Claimants* |
| **CAPLIN & DRYSDALE, CHARTERED**<br>Kevin C. Maclay (admitted *pro hac vice*)<br>Todd E. Phillips (admitted *pro hac vice*)<br>Kevin M. Davis (admitted *pro hac vice*)<br>Serafina A. Concannon (admitted *pro hac vice*)<br>Shahriar M. Raafi (admitted *pro hac vice*)<br>1200 New Hampshire Avenue NW, 8th Floor<br>Washington, DC 20036<br>Tel: (202) 862-5000<br>Email: kmaclay@capdale.com<br>          tphillips@capdale.com<br>          kdavis@capdale.com<br>          sconcannon@capdale.com<br>          sraafi@capdale.com<br><br>*Special Asbestos Counsel to the*<br>*Official Committee of Talc Claimants* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>           Debtors. | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered)<br><br>Honorable Michael B. Kaplan, U.S.B.J., Chief |

| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L. A. TERMINALS, INC., and SOCO WEST, INC., | Adv. Pro. No. 23-01245 (MBK) |
|---|---|
| Plaintiffs, | |
| v. | |
| BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000, | |
| Defendants. | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS TO DEBTORS' MOTION FOR AN ORDER EXTENDING THE AUTOMATIC STAY TO AND/OR PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS PENDING ENTRY OF A FINAL, NON-APPEALABLE ORDER <u>REGARDING THE DEBTORS' PROPOSED SETTLEMENT</u>**

# <u>TABLE OF CONTENTS</u>

Preliminary Statement......................................................................................................1

I.   The Court Does Not Have Subject Matter Jurisdiction to Enjoin the Direct Claims..........3

II.  Extension of the Automatic Stay Is Not Warranted Under the Circumstances..................9

A.   The Automatic Stay Should Not Be Extended to Protect Brenntag for Its Own
     Independent Liability...........................................................................................10

B.   There Is No Identity of Interest Between the Debtors and Brenntag...........................11

C.   The Debtors' Assertion of Adverse Impact to the Estates Is Illusory and
     Insufficient to Justify Extension of the Stay.............................................................14

III. The Debtors Have Failed to Meet the Standard for a Preliminary Injunction Enjoining
     the Direct Claims.................................................................................................18

A.   The Debtors Cannot Satisfy the Likelihood of Success Prong Because They Do
     Not Intend to Resolve the Direct Claims in These Cases and the Prospects of a
     Successful Reorganization Are Not Likely...............................................................19

B.   Denial of the Motion Does Not Present Risk of Any Harm to the Estates, Let
     Alone Irreparable Harm........................................................................................21

     1.   The Debtors have no indemnity obligations for the Direct Claims and such
          obligations would not create irreparable harm in any event.................................22

     2.   There is no risk of litigation prejudice that warrants enjoining the Direct
          Claims...........................................................................................................26

C.   The Balance of Harms Decisively Weighs in Favor of Denying the Motion...............28

D.   The Public Interest Decisively Weighs Against Granting the Motion.........................31

Conclusion ...................................................................................................................33

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ...............................................................9, 10, 11, 13

*ACME Fast Freight v. United States*,
135 F. Supp. 823 (D. Del. 1955)........................................................................23

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000)...............................................................................19

*ADP, Inc. v. Levin*,
No. 21-2187, 2022 WL 1184202 (3d Cir. Apr. 21, 2022) ................................22

*In re Aearo Technologies LLC*,
642 B.R. 891 (Bankr. S.D. Ind. 2022) ..............................................................25

*Algemene Bank Nederland, N.V. v. Hallwood Industries, Inc.*,
133 B.R. 176 (W.D. Pa. 1991)...........................................................................12

*In re All Seasons Resorts, Inc.*,
79 B.R. 901 (Bankr. C.D. Cal. 1987).................................................................13

*In re American Film Technologies, Inc.*,
175 B.R. 847 (Bankr. D. Del. 1994) ..................................................................17

*American Freedom Insurance Co. v. Garcia*,
192 N.E.3d 649 .................................................................................................27

*Austin v. Unarco Industries, Inc.*,
705 F.2d 1 (1st Cir. 1983)..................................................................................29

*In re Bankruptcy Appeal of Allegheny Health, Education and Research Foundation*,
252 B.R. 309 (W.D. Pa. 1999)............................................................................4

*BDO Seidman LLP v. Strategic Resources Corp.*,
896 N.Y.S.2d 15 (2010).....................................................................................26

*In re Bestwall LLC*,
606 B.R. 243 (Bankr. W.D.N.C. 2019), *aff'd*, No. 3:20-CV-103-RJC, 2022
WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168 (4th Cir. 2023)....... 17, 30

*Biogen International GmbH v. Amneal Pharmaceuticals LLC*,
487 F. Supp. 3d 254 (D. Del. 2020)...................................................................16

*Bondex International v. Ott*,
    774 N.E.2d 82 (Ind. Ct. App. 2002)...................................................................26

*Bostick v. Flex Equipment Co.*,
    54 Cal. Rptr. 3d 28 (2007) ................................................................................26

*Breen v. Breen*,
    370 So. 3d 1095 (La. Ct. App. 2023), *reh'g denied* (July 27, 2023), *and writ
    denied*, 373 So. 3d 979 (La. 2023)...................................................................26

*In re Broad Street Media LLC*,
    No. 17-1450 (JNP), 2017 WL 5624879 (Bankr. D.N.J. Nov. 20, 2017) ...........8, 9

*Bullock v. Carney*,
    463 F. Supp. 3d 519 (D. Del. 2020), *aff'd*, 806 F. App'x 157 (3d Cir. 2020),
    *and aff'd*, No. 20-2096, 2020 WL 7038527 (3d Cir. June 4, 2020) ..................23

*Bullock v. City of Antioch*,
    293 Cal. Rptr. 3d 668 (2022)............................................................................26

*CAE Industries Ltd. v. Aerospace Holdings Co.*,
    116 B.R. 31 (S.D.N.Y. 1990).............................................................................11

*In re Calpine Corp.*,
    365 B.R. 401 (S.D.N.Y. 2007)...........................................................................15

*Casco Indemnity Co. v. O'Connor*,
    755 A.2d 779 (R.I. 2000)..................................................................................26

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004)...........................................................5, 6, 11, 21

*In re Continental Air Lines, Inc.*,
    61 B.R. 758 (S.D. Tex. 1986) .............................................................................4

*Cook v. Blazer*,
    No. 7:15CV456, 2016 WL 3453663 (W.D. Va. June 20, 2016) .........................27

*Dent v. Cunningham*,
    786 F.2d 173 (3d Cir. 1986)..............................................................................32

*Dore & Associates Contracting, Inc. v. American Druggists' Insurance Co.*,
    54 B.R. 353 (Bankr. W.D. Wis. 1985)................................................................22

*In re Drexel Burnham Lambert Group, Inc.*,
    146 B.R. 92 (S.D.N.Y. 1992).............................................................................24

**JA953**

*In re Eagleston*,
    236 B.R. 183 (Bankr. D. Md. 1999) .......................................................... 28

*In re El Apple, Inc.*,
    362 S.W.3d 154 (Tex. App. 2012) ............................................................ 26

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ................................................................. 23

*In re Federal-Mogul Global, Inc.*,
    300 F.3d 368 (3d Cir. 2002) ...................................................................... 8

*Forcine Concrete & Construction Co. v. Manning Equipment Sales & Service*,
    426 B.R. 520 (E.D. Pa. 2010) ................................................................. 12

*In re G-I Holdings, Inc.*,
    420 B.R. 216 (D.N.J. 2009) .................................................................... 18

*In Re G-I Holdings, Inc.*,
    564 B.R. 217 (Bankr. D.N.J. 2016), *aff'd sub nom. In re G-I Holdings Inc.*,
    No. 01-30135 (RG), 2017 WL 1788656 (D.N.J. May 5, 2017) ............................ 7

*Gold v. Johns-Manville Sales Corp.*,
    723 F.2d 1068 (3d Cir. 1983) ........................................................... 10, 29

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ............................................................................... 32

*Greenway Center, Inc. v. Essex Insurance Co.*,
    475 F.3d 139 (3d Cir. 2007) .................................................................... 16

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ............................................................................. 32

*Harrington v. Purdue Pharma L.P.*,
    144 S. Ct. 2071 (2024) .......................................................................... 21

*In re Homaidan*,
    640 B.R. 810 (Bankr. E.D.N.Y. 2022), *appeal dismissed sub nom. Navient
    Sols., LLC v. Homaidan*, No. 17-AP-1085(ESS), 2022 WL 4079579
    (E.D.N.Y. Sept. 6, 2022) ....................................................................... 23

*Hulmes v. Honda Motor Co.*,
    924 F. Supp. 673 (D.N.J. 1996) .............................................................. 16

*In re Imerys Talc America, Inc.*,
    No. 19-MC-103 (MN), 2019 WL 3253366 (D. Del. July 19, 2019) ..................... 6

**JA954**

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989).................................................................18

*Jackson v. Trump Entertainment Resorts, Inc.*,
    No. CV 13-1605 (JHR/JS), 2015 WL 13637411 (D.N.J. Feb. 11, 2015).......................10, 11

*James v. Varano*,
    No. 1:14-CV-01951, 2017 WL 895569 (M.D. Pa. Mar. 7, 2017)..........................................20

*In re Johns-Manville Corp.*,
    26 B.R. 420 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y.), *and
    vacated on other grounds*, 41 B.R. 926 (S.D.N.Y. 1984)............................................5, 17, 31

*In re Johns-Manville Corp.*,
    801 F.2d 60 (2d Cir. 1986)...................................................................................................5

*Jones v. Schortman*,
    No. 22-CV-1512 (VDO), 2024 WL 449612 (D. Conn. Feb. 5, 2024)...................................20

*Jurista v. Amerinox Processing, Inc.*,
    492 B.R. 707 (D.N.J. 2013) ..................................................................................................23

*In re Kmart Corp.*,
    285 B.R. 679 (Bankr. N.D. Ill. 2002) ...................................................................................28

*In re Lomas Financial Corp.*,
    117 B.R. 64 (S.D.N.Y. 1990).................................................................................................15

*In re Lower Bucks Hospital*,
    488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) .................................6

*In re LTL Management, LLC*,
    638 B.R. 291 (Bankr. D.N.J. 2022) ..............................................................12, 13, 17, 24

*Maritime Electric Co. v. United Jersey Bank*,
    959 F.2d 1194 (3d Cir. 1991).................................................................................................9

*McCartney v. Integra National Bank North*,
    106 F.3d 506 (3d Cir. 1997)..............................................................................................9, 12

*McMillian v. Konecny*,
    No. 9:15-CV-0241, 2018 WL 813515 (N.D.N.Y. Feb. 9, 2018)...........................................19

*Millard v. Developmental Disabilities Institute, Inc.*,
    266 B.R. 42 (E.D.N.Y. 2001) ...............................................................................................13

*Mitchell v. Horn*,
    318 F.3d 523 (3d Cir. 2003).................................................................................................4

*In re Monroe Well Service, Inc.*,
    67 B.R. 746 (Bankr. E.D. Pa. 1986) ..................................... 4

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ......................................................... 18

*NutraSweet Co. v. Vit-Mar Enterprises, Inc.*,
    176 F.3d 151 (3d Cir. 1999) ............................................. 18

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984) ....................................... *passim*

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979) ................................................... 17, 28

*Patton v. Bearden*,
    8 F.3d 343 (6th Cir. 1993) ................................................. 4

*In re Phar-Mor, Inc. Securities Litigation*,
    164 B.R. 903 (W.D. Pa. 1994) ......................................... 18

*In re Phar-Mor, Inc. Securities Litigation*,
    166 B.R. 57 (W.D. Pa. 1994) ........................................... 22

*In re Philadelphia Newspapers, LLC*,
    407 B.R. 606 (E.D. Pa. 2009) ......................................... 12

*In re Philadelphia Newspapers LLC*,
    410 B.R. 404 (Bankr. E.D. Pa. 2009), *aff'd sub nom. In re Philadelphia
    Newspapers, LLC*, 423 B.R. 98 (E.D. Pa. 2010) ..................... 4

*Picard v Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014) ............................................. 11

*Queenie, Ltd. v. Nygard International*,
    321 F.3d 282 (2d Cir. 2003) ............................................. 27

*Roverano v. John Crane, Inc.*,
    226 A.3d 526 (2020) ....................................................... 26

*In re Saxby's Coffee Worldwide*,
    440 B.R. 369 (Bankr. E.D. Pa. 2009) ............................... 23

*Sea Quest International, Inc. v. Trident Shipworks, Inc.*,
    958 So. 2d 1115 (Fla. Dist. Ct. App. 2007) ..................... 26

*Shearin v. Doe 1 through 10*,
    No. CIV.A. 03-503-JJF, 2007 WL 4365621 (D. Del. Dec. 11, 2007) .................................. 30

*Smith v. Tiffany*,
    799 S.E.2d 479 (2017) ............................................................ 26

*Stanford v. Foamex L.P.*,
    No. CIV. A. 07-4225, 2009 WL 1033607 (E.D. Pa. Apr. 15, 2009) ..................................... 28

*In re Sudbury, Inc.*,
    140 B.R. 461 (Bankr. N.D. Ohio 1992) ......................................................... 17, 31

*Teachers Insurance & Annuity Ass'n of America v. Butler*,
    803 F.2d 61 (2d Cir. 1986) ............................................................. 4

*In re Uni-Marts, LLC*,
    399 B.R. 400 (Bankr. D. Del. 2009) ............................................................ 13

*In re United Health Care Organization*,
    210 B.R. 228 (S.D.N.Y. 1997) ............................................................. 30

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983) ............................................................. 31

*In re W.R. Grace & Co.*,
    115 F. App'x 565 (3d Cir. 2004) ............................................................. 12

*In re W.R. Grace & Co.*,
    591 F.3d 164 (3d Cir. 2009) ........................................................ 3, 5, 14, 24

*In re W.R. Grace & Co.*,
    No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ..................... 9

*W.R. Grace & Co. v. Chakarian* (*In re W.R. Grace & Co.*),
    386 B.R. 17 (Bankr. D. Del. 2008) ........................................................ 14, 24

*Wedgeworth v. Fibreboard Corp.*,
    706 F.2d 541 (5th Cir. 1983) ............................................................. 29

*Williford v. Armstrong World Industries, Inc.*,
    715 F.2d 124 (4th Cir. 1983) ............................................................. 31

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ....................................................... 18, 19, 21, 22

*In re World Trade Center Disaster Site Litigation*,
    503 F.3d 167 (2d Cir. 2007) ............................................................. 32

**Statutes**

11 U.S.C. § 105 ............................................................. *passim*

11 U.S.C. § 105(a) .......................................................................................... 4, 5, 11, 21

11 U.S.C. § 362 ............................................................................................................ 3, 4

11 U.S.C. § 362(a) ....................................................................................................... 4, 9

11 U.S.C. § 502(e)(1)(B) ............................................................................................... 24

11 U.S.C. § 524(g) ......................................................................................................... 21

11 U.S.C. § 1301 ............................................................................................................ 24

Ariz. Rev. Stat. Ann. § 14-3110 ................................................................................... 30

Fla. Stat. Ann. § 768.21 ................................................................................................ 30

Ga. Code Ann. § 51-12-33 ............................................................................................ 26

Idaho Code § 5-327(2) .................................................................................................. 30

Mich. Comp. Laws Ann. § 600.2957 ............................................................................ 26

N.J. Stat. Ann. § 2A:15-5.2 .......................................................................................... 26

viii

The Official Committee of Talc Claimants (the "**Committee**") of Whittaker, Clark &

Daniels, Inc. ("**WCD**") and its affiliated debtors and debtors-in-possession in the above-captioned

bankruptcy cases (collectively, the "**Debtors**") hereby submits this Objection (the "**Objection**")

to *Debtors' Motion for an Order Extending the Automatic Stay to and/or Preliminarily Enjoining*

*Certain Actions Against Non-Debtors Pending Entry of a Final, Non-Appealable Order*

*Regarding the Debtors' Proposed Settlement* (Adv. Docket No. 299)[1] (the "**Motion**").  In support

of the Objection, the Committee respectfully represents as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      The Debtors' Motion seeks unprecedented relief while, at the same time, failing

to present any evidence that such relief might nonetheless be warranted.  The Debtors seek to

preliminarily enjoin certain, scheduled *direct claims* against Brenntag that seek damages against

*only* Brenntag and *only* on account of Brenntag's conduct and products following Brenntag's

acquisition of the WCD business in 2004 (the "**Direct Claims**").[2]  To be clear, the Direct Claims

do not seek any findings of liability against the Debtors or any damages on account of the Debtors'

conduct or talc products.  Indeed, no evidence has been presented that the Direct Claims have any

legally significant relationship to the Debtors or their estates whatsoever.  The Debtors have even

admitted on multiple occasions—including in their Settlement Motion and the plan term sheet

attached thereto—that they have no intention of resolving or otherwise addressing these Direct

Claims in their chapter 11 cases.

2.      Nonetheless, the Debtors assert it is imperative that this Court enjoin these Direct

Claims to prevent triggering the Debtors' indemnification obligations and "litigation prejudice."

---

[1]      References to "Docket No." are to docket entries in Case No. 23-13575, and references to "Adv. Docket No."
are to docket entries in Adv. Proceeding No. 23-01245.

[2]      Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

However, not only is there a complete lack of evidence that the Debtors have any indemnification obligations for Direct Claims, the Debtors also affirmatively dispute that any such obligations exist. Moreover, not only have the Debtors failed to provide any evidence of the potential for litigation prejudice—i.e., the Debtors being bound by rulings to which they are not a party—the applicable law appears to make such litigation prejudice effectively impossible.

3.      Against this backdrop, the audacity of the Debtors' Motion becomes clear. The Debtors ask this Court to stop tort victims from seeking redress in other courts, against non-debtors, for injuries stemming only from non-debtor conduct and for which there is no evidence that the Debtors would be held responsible, whether through indemnity or otherwise. The Committee is not aware of a single instance, and the Debtors have identified none, in which any bankruptcy court has granted such relief or even suggested it has the authority to do so. To the contrary, binding Third Circuit law compels this Court to deny the Debtors' Motion at the outset for want of jurisdiction.

4.      And, even if this Court had jurisdiction to enjoin the Direct Claims, it should decline to do so as the Debtors fail to satisfy any of the requisite elements for a preliminary injunction. The Debtors have no likelihood of success on the merits because they are not even seeking to succeed in permanently enjoining or otherwise addressing the Direct Claims through a chapter 11 plan. The Debtors have provided no evidence that their claimed irreparable harms—potential, disputed indemnification claims and "litigation prejudice"—would come to pass or even constitute harms sufficient to warrant injunctive relief. The Debtors' lack of harm is undoubtedly outweighed by the potential for sick and dying victims being effectively robbed of their day in court on their Direct Claims. And the public has zero interest in bankruptcy courts enjoining litigation that has no legally cognizable relationship to a debtor or its estates.

5.      The Motion asks for relief that this Court cannot give and on bases that the evidence fails to support in any event.  The Motion should be denied.[3]

## I.    THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION TO ENJOIN THE DIRECT CLAIMS

6.      This Court does not have jurisdiction to "enjoin proceedings between third parties unless *those proceedings* arise in or under or are related to the underlying bankruptcy."  *In re W.R. Grace & Co.*, 591 F.3d 164, 175 (3d Cir. 2009) (emphasis added).  Thus, to grant the Debtors' Motion, this Court must have jurisdiction over the Direct Claims themselves.  It does not.

7.      The Debtors assert that the Court has core, "arising under" jurisdiction to enjoin the Direct Claims because their request for extension of the automatic stay "is rooted in sections 105 and 362 of the Bankruptcy Code."  Motion ¶ 48.  But the Debtors' conclusory assertion concerns only the Court's jurisdiction over the Motion.  Whether this Court has jurisdiction to entertain the Motion is a distinct question from whether it ultimately has jurisdiction to grant the relief sought therein—i.e., enjoining the Direct Claims.  *See W.R. Grace*, 591 F.3d at 175 ("If it were the case that a bankruptcy court's jurisdiction over an adversary proceeding was sufficient in and of itself to give it jurisdiction to enjoin third parties . . . the Supreme Court's entire analysis of related-to jurisdiction in *Celotex* would have been superfluous.  Clearly it was not.").  Put differently, a debtor's *mere invocation* of 11 U.S.C. § 362 or 11 U.S.C. § 105 is insufficient to

---

[3]    The Motion also seeks to enjoin all claims that "are expressly pled as Successor Liability Claims."  Motion ¶¶ 6-7.  That request is, however, moot given that such claims are already subject to the automatic stay pursuant to the Summary Judgment Order, and this Court has already ruled that such claims do not need to be doubly enjoined pursuant to interim injunctive relief.  *See* Hr'g Tr. at 75:16-22, Sept. 18, 2024 ("I do not see a need for a TRO with respect to successor liability claims.  And those claims . . . that . . . assert successor liability as the cause of action against Brenntag -- I do believe, based on my ruling, that they are property of the bankruptcy estate, protected by the automatic stay.").  Accordingly, this Objection incorporates the Committee's prior arguments against the Debtors' request for an injunction on Successor Liability Claims, which were made in the Committee's objection to the Debtors' request for a TRO in the Motion.  *See* Adv. Docket No. 310.

3

establish the Court's jurisdiction to enjoin non-debtor litigation in other courts. For example, if it were otherwise, the Third Circuit's ruling in *Pacor*—that a bankruptcy court lacks jurisdiction to stay actions between non-debtors unless those actions have some conceivable impact on the estate[4]—would be rendered completely meaningless, as any debtor could simply invoke § 362 to circumvent that jurisdictional requirement.[5]

8.  Moreover, the Debtors' invocation of § 362 is misplaced. Courts in this and other circuits agree that entering an injunction "extending" the automatic stay to actions against non-debtors (as the Debtors have requested here) is, despite the parlance, an act dependent on a bankruptcy court's equitable powers under § 105(a) rather than any authority under § 362.[6] That, of course, is not only logical—if § 362's provisions already applied to third-party actions, there would be no need for an injunction to extend the stay to those actions—but is also in line with the statutory text of § 362, which only concerns actions against a debtor or its property. *See generally* 11 U.S.C. § 362.

---

[4]  *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) ("The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*.").

[5]  *Cf. Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003) ("We do not look past the plain meaning unless it produces a result 'demonstrably at odds with the intentions of its drafters,' . . . or an outcome 'so bizarre that Congress could not have intended it . . . .'" (citations omitted)).

[6]  *See, e.g., In re Phila. Newspapers LLC*, 410 B.R. 404, 412 (Bankr. E.D. Pa. 2009) ("The law is clear that in some circumstances discretionary stays, beyond the scope of section 362, are appropriate and that a court's power to issue such injunctions stems from section 105 of the Code . . . ."), *aff'd sub nom. In re Phila. Newspapers, LLC*, 423 B.R. 98 (E.D. Pa. 2010); *see also In re Monroe Well Serv., Inc.*, 67 B.R. 746, 750 (Bankr. E.D. Pa. 1986) ("It is also clear that one of the purposes of section 105 is to give the bankruptcy court the power to issue stays or injunctions in situations not encompassed by section 362."); *In re Bankr. Appeal of Allegheny Health, Educ. & Rsch. Found.*, 252 B.R. 309, 331 (W.D. Pa. 1999) ("[T]he Bankruptcy Court has the authority to issue injunctions pursuant to section 105(a), 11 U.S.C. § 105, to enjoin proceedings that are not automatically stayed by section 362(a)."); *In re Cont'l Air Lines, Inc.*, 61 B.R. 758, 781 (S.D. Tex. 1986) ("[T]he sole statutory basis for issuance of a stay against a debtor's codefendants is section 105 of the Code."); *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) ("Even if we were to adopt the unusual circumstances test, the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105."); *Tchrs. Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65-66 (2d Cir. 1986) (construing stay extension as an exercise of § 105 authority, and stating that it "cannot extend to efforts made in bad faith by non-bankrupt co-defendants in order to escape from . . . liability").

4

9.      The Third Circuit has specifically held that "§ 105 does not provide an independent source of federal subject matter jurisdiction." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 227, 224-25 (3d Cir. 2004), *as amended* (Feb. 23, 2005).  Accordingly, "jurisdiction must . . . exist independently of any . . . [request to] enjoin claims against non-debtors." *Id.* at 225; *see also In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986) ("Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately . . . .").

10.     There is no argument that the Direct Claims arise under the Code or arise in these chapter 11 cases; none seeks relief under the Code, and none seeks relief from this Court against the Debtors or in these Cases.  Moreover, the Court also does not have "related to" jurisdiction to enjoin the Direct Claims under well settled Third Circuit law.  The Third Circuit has held that a bankruptcy court does not have "related to" jurisdiction over "third-party claims involving asbestos or asbestos-containing products supplied by the debtor when the third-party claim d[oes] not directly result in liability for the debtor." *Combustion Eng'g, Inc.*, 391 F.3d at 227, 231 (bankruptcy court did not have "related to" jurisdiction where "potential indemnification and contribution claims against . . . [the debtors] had not yet accrued and would require another lawsuit before they could affect . . . [the debtors'] bankruptcy estate"); *see also W.R. Grace*, 591 F.3d at 173 (confirming that the Third Circuit has "stated and restated that, in order for a bankruptcy court to have related-to jurisdiction to enjoin a lawsuit, that lawsuit must 'affect the bankruptcy without the intervention of yet another lawsuit'" (citation omitted)).  Those holdings control here.

11.     In addition, *Pacor* (related to the *Johns-Manville* bankruptcy), the seminal case on "related to" jurisdiction in this circuit, held that "an action is related to bankruptcy if the outcome

could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." 743 F.2d at 994. There, the court addressed whether the bankruptcy court had "related to" jurisdiction over a third-party personal injury suit against a non-debtor for damages allegedly caused by asbestos supplied by the non-debtor but manufactured by the debtor. *Id.* at 986. Even though debtor Johns-Manville manufactured the asbestos giving rise to the third-party claim, the Third Circuit found no "related to" jurisdiction because the "primary action"—i.e., the suit between the two non-debtors—would not, on its own, result in an indemnification claim against the debtor. *Id.* at 995 ("[T]he primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate . . . . At best, it is a mere precursor to the *potential third party claim for indemnification* . . . ." (emphasis added)).

12.     Under the *Pacor* test, "[t]o show indemnification sufficient for 'related-to' jurisdiction, a party must establish that the 'right to indemnification is *clearly established* and has accrued upon a filing of a civil action.'" *In re Imerys Talc Am., Inc.*, No. 19-MC-103 (MN), 2019 WL 3253366, at *3 (D. Del. July 19, 2019) (quoting *In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014)). A right is not clearly established or accrued in a situation where "the 'primary action' . . . would not, *itself*, result in an indemnification claim against the debtor." *Combustion Eng'g, Inc.*, 391 F.3d at 231 (emphasis added). In other words, "where the right to indemnification is contingent on a factual finding in an action not involving the bankruptcy debtor and requires the commencement of another lawsuit to establish that right, there is no effect on the bankruptcy estate and thus no 'related to' jurisdiction." *In re Lower Bucks Hosp.*, 488 B.R. at 314 (citing *In re Fed.-Mogul Glob., Inc.*, 300 F.3d 368, 382 (3d Cir. 2002)).

13.     The Debtors have failed to present any evidence that Brenntag holds any

indemnification rights against the Debtors in connection with the Direct Claims, much less the

requisite "clearly established" right that would accrue upon the filing of a Direct Claim.  Indeed,

the Debtors rely solely on the 2004 MSPA[7] to meet their evidentiary burden on this point.[8]  Hr'g

Tr. at 58:16-25, Sept. 18, 2024.  Consequently, they have not met that burden because the 2004

MSPA does not obligate the Debtors to indemnity Brenntag for any Direct Claims.

14.     The relevant indemnification provisions in the 2004 MSPA provide:

> WCD shall indemnify and hold harmless [Brenntag] . . . and each of their
> respective successors, assigns, officers, directors, managers, employees and agents
> . . . from and against any Indemnified Losses incurred in connection with any
> present or future *Retained Subsidiary Asbestos Claims relating to WCD* or any
> alleged corporate predecessor-in-interest thereof.

*See* 2004 MSPA § 12.1.2 (emphasis added).

15.     The 2004 MSPA defines "Retained Subsidiary Asbestos Claims" as:

> any *claim*, action, lawsuit, litigation, arbitration or legal proceeding in a court or
> tribunal of any kind, regardless of the legal or equitable theory alleged . . . *seeking
> to recover damages . . . allegedly caused by asbestos, asbestiform minerals and/or
> asbestos-containing products allegedly mined, manufactured, distributed, sold,
> used, installed, maintained, or possessed by any Retained Subsidiary [i.e., WCD]*
> or by any alleged predecessor entity of any Retained Subsidiary . . . .

*Id.* § 12.2 (emphasis added).  Accordingly, the plain language of the 2004 MSPA provides that

the Debtors' indemnity obligations only cover claims *seeking damages for injuries caused by*

*asbestos in WCD's talc products*.  The Direct Claims, of course, do not seek any damages for

exposure to WCD's talc products or for any conduct attributable to WCD—but rather only for

injuries based on Brenntag's own talc products and conduct.

---

[7]    The "**2004 MSPA**" refers to the Master Sale and Purchase Agreement dated December 8, 2003, and is available
at Adv. Docket Nos. 4-6, 4-7.

[8]    "The party asserting jurisdiction bears the burden of overcoming the assumption that subject matter jurisdiction
does not exist."  *In Re G-I Holdings, Inc.*, 564 B.R. 217, 230 (Bankr. D.N.J. 2016), *aff'd sub nom. In re G-I Holdings
Inc.*, No. 01-30135 (RG), 2017 WL 1788656 (D.N.J. May 5, 2017).

16.     Indeed, the Debtors' own representations to this Court show that there is no clearly established right to indemnification for the Direct Claims.  In response to the Court's question regarding whether "Brenntag . . . [assert]s indemnification rights against the debtor for post-closing exposure[,]" Debtors' counsel stated that it "becomes *complicated* when the trial goes forward" because "if evidence were still introduced at trial showing a potential link to a WCD product . . . that would give Brenntag the *potential* right to try to assert an allocable right of liability in a *potential* indemnification claim with respect to the dates of exposure."  Hr'g Tr. at 23:5-15, Sept. 18, 2024 (emphasis added).  Thus, the Debtors concede that a separate proceeding would have to occur for Brenntag to establish any right to indemnification on Direct Claims:  the exact circumstance that the Third Circuit has held is insufficient to create "related to" jurisdiction. *See Fed.-Mogul Glob., Inc.*, 300 F.3d at 382 ("The test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit.").  Further, the Debtors "dispute Brenntag's purported entitlement to indemnification with respect to claims that are not Successor Liability Claims[,]"[9] which further supports the point that Brenntag's right to indemnification does not accrue upon the filing or adjudication of a Direct Claim.

17.     In short, the present circumstances clearly fail to satisfy the Third Circuit's standard for related-to jurisdiction.[10]

---

[9]     *See* Motion ¶ 3 n.7.

[10]     The sole case the Debtors cite in support of their "related-to" argument, *Broad Street*, is inapposite.  Motion ¶ 49 (citing *In re Broad Street Media LLC*, No. 17-1450 (JNP), 2017 WL 5624879, at *4 (Bankr. D.N.J. Nov. 20, 2017)).  There, the claims over which the bankruptcy court exercised related-to jurisdiction were claims whose resolution would either rescind promissory notes secured *against the debtor's property*, or *offset the amount owed to secured creditors*.  *Broad Street Media LLC*, 2017 WL 5624879, at *5.  Due to the direct and clear impact on the debtor's property—something that is entirely lacking here—the court found that a resolution of those claims could "impact the estate without the intervention of an additional suit."  *Id.*  Further, the *Broad Street* court held that related-to jurisdiction did not exist as to claims filed by a non-debtor against another non-debtor because "in order to have any

---

8

18.     Furthermore, as discussed *infra* § III.B.1, the Debtors' responsibility for any indemnification owed to Brenntag has shifted to DBUS and/or NICO, who are required to backstop the Debtors if they are financially unable to satisfy Brenntag's indemnification claims. Consequently, even if there was some evidence (there is none) that the Debtors owe indemnification obligations to Brenntag for Brenntag's direct, post-2004 liability, the accrual of such obligations would not have any effect on the Debtors' estates; non-debtors NICO and/or DBUS would simply have to pay more funds to satisfy those obligations.  Under *Pacor* and its progeny, this falls far short of establishing "related to" jurisdiction over the Direct Claims.[11]

19.     In sum, the Court has neither core jurisdiction nor "related to" jurisdiction to enjoin the Direct Claims under controlling law.

## II.  EXTENSION OF THE AUTOMATIC STAY IS NOT WARRANTED UNDER THE CIRCUMSTANCES

20.     "Although the scope of the automatic stay is broad, the clear language of Section 362(a) indicates that it stays only proceedings against a 'debtor'—the term used by the statute itself."  *Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991).  While the Third Circuit has adopted the *Robins* "unusual circumstances" basis for nonetheless entering an injunction of claims against non-debtors,[12] courts in this circuit recognize that basis is narrow and reserved only for the "most extreme" circumstances.  *See, e.g.*, *In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004) ("Although the automatic stay can be extended to situations involving nondebtors, courts are careful to reserve such power to the most extreme and 'unusual circumstances.'").

---

impact on the estate, a separate action against . . . [the nondebtor defendant] will have to be resolved in . . . [nondebtor plaintiff's] favor." *Id.*

[11]     Moreover, as discussed *infra* § II.B, no "identity of interest" between the Debtors and Brenntag exists with respect to the Direct Claims that would provide any basis for exercising jurisdiction over such claims.

[12]     *See, e.g.*, *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 510-11 (3d Cir. 1997).

21.     The Debtors assert that the instant circumstances present "unusual circumstances" justifying extension of the stay to the Direct Claims because their phantom indemnification obligations on the Direct Claims create an "identity of interest" with Brenntag and the actions of Brenntag in defending the Direct Claims could create "litigation prejudice." *See* Motion ¶¶ 62-71. To the contrary, however, the instant circumstances do not approach the extreme circumstances warranting the extraordinary relief sought by the Debtors.

### A.     The Automatic Stay Should Not Be Extended to Protect Brenntag for Its Own Independent Liability

22.     It is well settled that the automatic stay "may not be invoked by solvent codefendants, even if they are in a similar legal or factual nexus with the debtor." *Jackson v. Trump Ent. Resorts, Inc.*, No. CV 13-1605 (JHR/JS), 2015 WL 13637411, at *2 (D.N.J. Feb. 11, 2015). As the Third Circuit has held, a chapter 11 filing by an asbestos debtor does not provide grounds to stay tort actions against the debtor's codefendants, even those who are being sued on account of the same asbestos products that led to the debtor's bankruptcy filing. *See Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1070-76 (3d Cir. 1983) (declining to stay claims against the debtor Johns-Manville's codefendants who are manufacturers, suppliers, and distributors of the asbestos products that led to Johns-Manville's bankruptcy filing despite the fact that "[p]articular defendants might be handicapped in particular cases because Johns-Manville assumed the lead in amassing the evidentiary material necessary to defend itself and its co-defendants in the upcoming litigation").

23.     Likewise, *Robins*, the seminal case on "extending the stay" under § 105, provides that an injunction of non-debtor litigation is inappropriate if the non-bankrupt defendant is "independently liable," as is the case here with the Direct Claims against Brenntag. *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (citing *In re Metal Center*, 31 B.R. 458, 462

(D. Conn. 1983)); *accord CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 33 (S.D.N.Y.

1990) (quoting *Robins*, 788 F.2d at 999); *Picard v Fairfield Greenwich Ltd.*, 762 F.3d 199, 208

(2d Cir. 2014) (Automatic stay is not extended to actions based on defendant's independent

misconduct that harmed plaintiff directly, nor to "actions taken against third parties that are only

factually likely, as opposed to legally certain, to impact estate property.").

24.      Likewise, in *Combustion Eng'g, Inc.*, the Third Circuit reversed a section 105(a)

injunction purporting to enjoin "independent, non-derivative third-party actions against non-

debtors," reasoning that it was inappropriate for "the practical effect of the § 105(a) injunction . . .

to extend bankruptcy relief to two non-debtor companies outside of bankruptcy."  391 F.3d at

233, 237.  In light of this controlling authority alone, the Debtors' request to enjoin the Direct

Claims as an "extension of the stay" should be denied.

**B.**      **There Is No Identity of Interest Between the Debtors and Brenntag**

25.      Contrary to the Debtors' assertions, no identity of interest between Brenntag and

the Debtors exists with respect to the Direct Claims, much less one that would support enjoining

the Direct Claims against Brenntag.  As the Fourth Circuit laid out in *Robins* (the progenitor of

the "identity of interest" test), such an identity of interest exists only where the claims against the

third party are "so intimately intertwined with . . . [claims against] the debtor that the . . . [debtor]

may be said to be the real party in interest," such as when the "third-party . . . is entitled to *absolute*

*indemnity by the debtor* on account of any judgment that might result against them in the case."

*A.H. Robins*, 788 F.2d at 999, 1001 (emphasis added).

26.      As the District of New Jersey has held, the existence of "an indemnity provision

is not in and of itself sufficient to satisfy the *A.H. Robins* standard" because "in the Third Circuit

there must be *sufficient evidence* that the indemnity agreement is '*absolute*' in order for the debtor

to be deemed the real party in interest."  *Trump Ent. Resorts, Inc.*, 2015 WL 13637411, at *3

(emphasis added); *see also Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.*, 133 B.R.

176, 180 (W.D. Pa. 1991) ("The debtor and the nonbankrupt defendant are not 'closely related'

in the sense contemplated by the circuits extending the stay provisions to nonbankrupt defendants,

merely by virtue of the indemnification agreement . . . ." (footnote omitted)); *Forcine Concrete

& Constr. Co. v. Manning Equip. Sales & Serv.*, 426 B.R. 520, 525 (E.D. Pa. 2010) ("Because

there is no indication that such obligations would be 'absolute' in this case, the prospect of

indemnification does not provide the 'unusual circumstances' required by *McCartney* to extend

the automatic stay to the non-debtor parties.").

  27. Accordingly, to satisfy the "identity of interest" test, the Debtors bear the burden

to provide *sufficient evidence* that there is an *absolute* indemnity right for Direct Claims.  The

Debtors have failed to meet that burden:  they have failed to provide evidence of any indemnity

right for Direct Claims, much less an absolute indemnity right.  Indeed, as demonstrated *supra*

¶¶ 13-16, the contractual indemnification language upon which the Debtors rely actually

undercuts any argument that such a right exists.

  28. Regardless, the mere existence of an indemnity obligation by the debtor to a third

party does not warrant an injunction of relevant claims against that third party.[13]  Rather, the

debtor must demonstrate that the purported indemnification obligation threatens its assets or

---

[13] Moreover, the Debtors' reliance on *LTL Management* for the proposition that "the mere possibility of indemnification obligations" by itself is sufficient to establish an "identity of interest" is misleading and contradicted by the factually distinguishable cases relied on by the *LTL* court.  *In re LTL Mgmt., LLC*, 638 B.R. 291, 312-13 (Bankr. D.N.J. 2022).  The *LTL* decision simply noted that "[o]ther courts which have addressed this issue likewise indicate that the mere possibility of indemnification obligations warrants extension of the automatic stay," *id.* at 312, but each of the cases cited by the *LTL* court for that proposition is readily distinguishable.  *See In re W.R. Grace & Co.*, 115 F. App'x 565, 568-69 (3d Cir. 2004) (extending stay where "possibility of indemnification" was based upon an existing indemnification right, set out in a contract "in which Grace agreed to release and indemnify MCC against any [derivative] asbestos-related claims filed against MCC that arose out of alleged liability on the part of Grace"); *In re Phila. Newspapers, LLC*, 407 B.R. 606, 614-15 (E.D. Pa. 2009) (employer had history of providing "indemnification and defense to its employees" as "a matter of general practice" even if there is no "common law duty or contractual obligation to indemnify its employees" and employer "identified several bases substantiating its obligation to defend and indemnify . . . [its employees] even in the absence of contractual indemnity" under "several common law theories" such as "respondeat superior, vicarious liability, and principal/agent theories").

reorganization in order to be granted such extraordinary relief. *See, e.g.*, *In re Uni-Marts, LLC*,

399 B.R. 400, 416 (Bankr. D. Del. 2009) (concluding that indemnification obligation did not

constitute "unusual circumstances" where it did not threaten reorganization); *see also Millard v.*

*Developmental Disabilities Inst., Inc.*, 266 B.R. 42, 45 (E.D.N.Y. 2001) ("Ultimately, the decisive

issue is consideration of the same policy underlying the Automatic Stay—whether extension of

the stay is necessary to foster the reorganization process."); *In re All Seasons Resorts, Inc.*, 79

B.R. 901, 904 (Bankr. C.D. Cal. 1987) ("Although there is a closeness between debtor and co-

defendants by reason of their officer and agent status and their right to indemnification . . . the

magnitude of the harm to debtor if no stay is in force does not approach the scope of the potential

injuries besetting the debtors in *Robins* . . . .").  As discussed further herein, *infra* § III.B.1, it is

incontrovertible that two solvent nondebtors are required to backstop any indemnification

obligations the Debtors have to Brenntag.  So even assuming that the Debtors had such obligations

with regard to Direct Claims (they do not), fulfilling those obligations would neither diminish a

single dollar from the estates nor threaten the Debtors' reorganization efforts.

      29.    Finally, the cases on which the Debtors rely to establish an "identity of interest"

are readily distinguishable.  In *LTL*, this Court found an "identity of interest" existed between the

debtor and its non-debtor affiliates where the debtor had assumed sole responsibility for its non-

debtor affiliates' talc liabilities pursuant to a prepetition divisional merger.  *LTL Mgmt.*, 638 B.R.

at 297.  That is, there was a one-to-one relationship between the LTL debtor's asserted liability

and the claims against the nondebtor affiliates, such that there was an identity of interest between

the LTL debtor and its non-debtor affiliates because the "talc claims against the . . . [non-debtor

affiliates] involve the same products, same time periods, same alleged injuries, and same evidence

as claims against Debtor."  *Id.* at 306.  Here, there is no similar one-to-one relationship between

Brenntag and the Debtors. The Direct Claims implicate only Brenntag's post-2004 conduct and products. *W.R. Grace* is similarly inapposite, as the court found an identity of interest between the debtors and third parties on claims asserting such third parties were *derivatively* liable for the debtors' conduct and products. *W.R. Grace & Co. v. Chakarian* (*In re W.R. Grace & Co.*), 386 B.R. 17, 23-24 (Bankr. D. Del. 2008). Again, the Direct Claims are definitionally not derivative; they are solely against Brenntag for Brenntag's conduct and products.

30.　　In sum, there is no "identity of interest" between the Debtors and Brenntag.

**C.　　The Debtors' Assertion of Adverse Impact to the Estates Is Illusory and Insufficient to Justify Extension of the Stay**

31.　　To support their argument that prosecution of the Direct Claims would adversely impact these estates to an extent justifying the extraordinary relief the Debtors seek, the Debtors rely on the following infirm arguments: (i) Direct Claims could trigger potential indemnification obligations to Brenntag; (ii) the Debtors and Brenntag would be distracted "from efforts to obtain this Court's approval of the Settlement Agreement"; and (iii) allowing the Direct Claims to proceed "could bind the Debtors under the doctrine of collateral estoppel and *res judicata*." Motion ¶¶ 63-65. These arguments lack merit and evidentiary support.

32.　　First, as demonstrated *supra* ¶¶ 13-16, there is no evidence that the Debtors have any indemnification obligations for Direct Claims at all, much less that they could adversely impact these estates. Indeed, as discussed above, the Third Circuit has held that claims against non-debtors like the Direct Claims here cannot conceivably have an effect on a bankruptcy estate (i.e., do not fall under related to jurisdiction) in the absence of a "clearly established" right to indemnity on a third-party claim. *See supra* ¶ 12. Consequently, an unsupported, disputed "potential" indemnification obligation like the one here cannot plausibly be held to so impact the Debtors' estates that it merits enjoining the Direct Claims.

33.     Second, the Debtors provide no legal basis for the concept that "distraction" provides a separate basis for enjoining third party claims.  Moreover, the Debtors provide nothing but a bare assertion that prosecution of the Direct Claims would actually distract them from seeking approval of the Settlement Motion.  *See* Motion ¶ 64.  The Debtors have a dedicated CRO and a cadre of bankruptcy professionals, who have been retained specifically to work on this bankruptcy.  Separately, the Debtors are also represented by a host of talc defense lawyers that have minimal involvement in this bankruptcy (if at all), and presumably those defense lawyers would be responsible for protecting the Debtors' interest in the underlying litigation of the Direct Claims (insofar as the Debtors imprudently decide to participate in such proceedings).[14]

34.     The Direct Claims have not been restrained until recently and yet the Debtors do not point to a single instance in which their officers or bankruptcy professionals have ever participated in the litigation of a Direct Claim.  Accordingly, not only is there no evidence that the Debtors have participated or would participate in any litigation of Direct Claims, there is also no evidence that doing so would require so much attention from the Debtors' key personnel or their professionals as to endanger the Debtors' prosecution of their Settlement Motion.

35.     Indeed, courts that have stayed litigation against individuals key to the debtor's reorganization efforts have required detailed evidence showing that failure to enjoin the subject actions would materially harm the Debtors' reorganization efforts.  *See In re Calpine Corp.*, 365 B.R. 401, 411-13 (S.D.N.Y. 2007) (affirming finding that transmission engineer was "integral and indispensable member of the restructuring team" after transmission engineer group had dwindled from 15 members to three); *see also In re Lomas Fin. Corp.*, 117 B.R. 64, 67 (S.D.N.Y.

---

[14]    The Debtors, of course, do not need to get involved in the underlying cases as the only way the Debtors could possibly be subject to collateral estoppel or res judicata is if they chose to participate in adjudication of the Direct Claims.  *See infra* ¶ 57.

1990) (affirming injunction of lawsuit against two officers of the debtor, who were "involved heavily in the reorganization effort"). No such evidence exists here.

36. Third, the Debtors have no meaningful risk of being bound by litigation of Direct Claims through res judicata or collateral estoppel because, among other things, they are neither parties to such claims nor in privity with Brenntag with respect to such claims. Indeed, the preclusive effects of collateral estoppel and res judicata can only apply when a party actually participates in the litigation or is in privity with one of the parties to the litigation.[15] The concept of privity, "[i]n its broadest sense . . . is defined as . . . an identification of interest of one person with another as to represent the same legal right." *Greenway Ctr., Inc. v. Essex Ins. Co.*, 475 F.3d 139, 149 (3d Cir. 2007) (citation omitted). Tellingly, the Debtors have never claimed that they are in privity with Brenntag with respect to adjudication of the Direct Claims. Such an argument would not pass muster on its face because when Brenntag seeks to apportion fault to the Debtors or introduce evidence of exposure to the Debtors' talc products in connection with the litigation of a Direct Claim, Brenntag is seeking to reduce its own liability by shifting blame to the Debtors, thereby rendering Brenntag's interests directly adverse to the Debtors—i.e., the opposite of "privity."

37. The cases relied on by the Debtors (*see* Motion ¶ 66) in which courts have found that a debtor (despite not participating in the underlying litigation) could suffer litigation prejudice have, unlike here, concerned litigation of claims relating to the debtor's derivative liability. *See*

---

[15]    *See Hulmes v. Honda Motor Co.*, 924 F. Supp. 673, 682 n.12 (D.N.J. 1996) ("In order for the doctrine of res judicata, or claim preclusion, to bar a subsequent action, the following requirements must be met: (1) the judgment in the prior action must be valid, final, and on the merits; (2) *the parties in the later action must be identical to or in privity with those in the prior action*; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one." (emphasis added)); *see also Biogen Int'l GmbH v. Amneal Pharms. LLC*, 487 F. Supp. 3d 254, 258 (D. Del. 2020) ("Under Third Circuit law, collateral estoppel applies when: (1) the identical issue was previously adjudicated, (2) that issue was actually litigated, (3) the previous determination was necessary to the decision and (4) *the party being precluded from relitigating the issue was fully represented in the prior action*." (emphasis added) (citation omitted)).

*LTL Mgmt.*, 638 B.R. at 314-15 (identifying collateral estoppel risk weighing in favor of stay where all claims at issue were derivative claims and indemnification rights were "clearly established"); *see also In re Bestwall LLC*, 606 B.R. 243, 248 (Bankr. W.D.N.C. 2019) (Texas Two-Step case where there was a one-to-one relationship between debtors' liability and non-debtors' liability), *aff'd*, No. 3:20-CV-103-RJC, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168 (4th Cir. 2023); *In re Sudbury, Inc.*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (identifying risk of collateral estoppel where the subject claims assert derivative liability and noting "it is not plausible that the defendants in these actions could be found liable to Plaintiffs except on facts that would impose liability on the Debtor"). The Direct Claims, of course, are not seeking redress for the Debtors' derivative liability.

38. Moreover, the other cases relied on by the Debtors in support of the argument that risks of collateral estoppel or res judicata warrant extension of the automatic stay (*see* Motion ¶¶ 65-66) are based on facts and considerations not present here. *See, e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332-33 (1979) (applying estoppel against party who "received a 'full and fair' opportunity to litigate their claims in the . . . [prior] action"); *In re Johns-Manville Corp.*, 26 B.R. 420, 435 (Bankr. S.D.N.Y. 1983) (identifying risk of collateral estoppel from suit brought against debtor's "insurance carriers" given potential impact on issues "respecting policy coverage and liability"), *aff'd*, 40 B.R. 219 (S.D.N.Y.), *and vacated on other grounds*, 41 B.R. 926 (S.D.N.Y. 1984); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850-55 (Bankr. D. Del. 1994) (identifying collateral estoppel risk where claims were asserted "against the individual [director] defendants *solely in their capacities as directors of AFT*" (i.e., solely for actions undertaken on behalf of the debtor (emphasis added)).

39.     In sum, extending the stay to the Direct Claims is inappropriate under the present circumstances.

## III.    THE DEBTORS HAVE FAILED TO MEET THE STANDARD FOR A PRELIMINARY INJUNCTION ENJOINING THE DIRECT CLAIMS

40.     As the Court has observed, "[a] preliminary injunction is an 'extraordinary remedy, which should be granted only in limited circumstances.'"  Adv. Docket No. 88 at 5 ("**TRO Opinion**"); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) ("[I]njunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) ("[An injunction] is an 'extraordinary remedy, which should be granted only in limited circumstances.'" (citation omitted)).

41.     Courts considering whether to grant interim injunctive relief apply the four traditional factors.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *In re G-I Holdings, Inc.*, 420 B.R. 216, 281 (D.N.J. 2009).  Those four factors, as tailored to a bankruptcy case, are: (i) the debtor's reasonable likelihood of a successful reorganization; (ii) the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; (iii) the balance of harms between the debtor and its creditors; and (iv) whether the public interest weighs in favor of an injunction.  *G-I Holdings*, 420 B.R. at 281.  To be successful, the movant must establish all four of these elements by clear and convincing circumstances.  *In re Phar-Mor, Inc. Sec. Litig.*, 164 B.R. 903, 907 (W.D. Pa. 1994); *see also NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) ("[F]ailure to establish any element in . . . [the plaintiff's] favor renders a preliminary injunction inappropriate.").  Here, the Debtors do not satisfy any of the elements.

A. **The Debtors Cannot Satisfy the Likelihood of Success Prong Because They Do Not Intend to Resolve the Direct Claims in These Cases and the Prospects of a Successful Reorganization Are Not Likely**

42.      In the bankruptcy context, the first factor refers to the likelihood of a successful reorganization.  Generally speaking, there must be some nexus between the claims sought to be enjoined and whether a successful reorganization would resolve such claims.  *See, e.g.*, *McMillian v. Konecny*, No. 9:15-CV-0241, 2018 WL 813515, at *2 (N.D.N.Y. Feb. 9, 2018) ("Because one of the issues presented by a motion for injunctive relief is whether the movant has shown a likelihood of success on the merits of a claim, the relief sought by a plaintiff in a motion for a temporary restraining order or preliminary injunction must relate to the claims of the plaintiff's complaint.").  A request for a preliminary injunction should be denied when, as here, it is inconsistent or unconnected with the ultimate relief the movant seeks.  *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 489-90 (3d Cir. 2000) (affirming denial of injunction where plaintiffs' harm was "insufficiently related to the complaint and d[id] not deserve the benefits of protective measures that a preliminary injunction affords").

43.      The Supreme Court's seminal opinion in *Winter* is instructive.  There, the Court denied plaintiffs' request for a preliminary injunction to enjoin the Navy from conducting sonar training exercises.  *Winter*, 555 U.S. at 12-19.  The Supreme Court rejected the request as inconsistent with any ultimate relief the plaintiffs were seeking:  i.e., the plaintiffs' "ultimate legal claim is that the Navy must prepare an . . . [environmental impact study], not that it must cease sonar training."  *See id.* at 32.  In other words, the requested preliminary injunction was inappropriate because it would have provided temporary relief inconsistent with the permanent relief the plaintiffs sought.  So too here.

19

**JA977**

44.    The Debtors admit that they neither seek to address nor resolve the Direct Claims in any way, including through the Settlement Agreement or any plan of reorganization.[16]  As such, the Debtors cannot show a likelihood of a successful reorganization that resolves the Direct Claims given that the Debtors intend to ultimately allow these same claims to pass through this bankruptcy and continue once this case concludes.  *See, e.g.*, *Jones v. Schortman*, No. 22-CV-1512 (VDO), 2024 WL 449612, at *1 (D. Conn. Feb. 5, 2024) (Because "one of the requirements for an award of preliminary injunctive relief is demonstration of a likelihood of success on the merits" of a claim, a movant's "request for preliminary injunctive relief must relate to the [underlying] claims proceeding in th[e] case."); *see also James v. Varano*, No. 1:14-CV-01951, 2017 WL 895569, at *3 (M.D. Pa. Mar. 7, 2017) ("[B]ecause the purpose of preliminary injunctive relief is to prevent irreparable injury pending the resolution of an underlying claims on the merits, the injury claimed in the motion for preliminary injunctive relief must relate to the conduct alleged and permanent relief sought in the plaintiff's complaint.").  This, alone, precludes satisfaction of the first prong.

45.    Even assuming the Debtors are not required to resolve the Direct Claims in their plan of reorganization to satisfy the first prong, the Debtors also cannot make a showing that a successful reorganization in this bankruptcy is likely.  The Settlement Agreement is a conflicted deal between and among the Debtors, their controlling affiliate NICO, DBUS, and Brenntag.[17]  It seeks to release the asbestos liabilities of numerous nondebtor entities on a nonconsensual basis

---

[16]    *See* Motion ¶ 102 ("[T]he Debtors are not seeking to permanently enjoin plaintiffs from prosecuting direct claims against Brenntag for Brenntag's independent post-2004 conduct."); *see also* Docket No. 1297 (("[T]he Settlement Agreement <u>does not</u> prohibit claimants from pursuing any *direct* claims they may have against the Contributing Parties, including any claims against Brenntag for liabilities arising from Brenntag's own post-February 2004 operations.").

[17]    Indeed, under the Settlement Agreement, NICO has the right to unilaterally terminate the agreement if the Court's Summary Judgment Order is overturned on appeal.  *See* Settlement Agreement ¶ 4, Docket No. 1297-3.

and outside the contours of § 524(g). The idea that co-defendant tortfeasors can "settle" among themselves to cut off claims against them by their asbestos victims is absurd and manifestly inequitable on its face.

46. Moreover, in asbestos-driven reorganizations like these, the only way to obtain releases for the asbestos liabilities of non-debtors while also safeguarding the constitutional due process rights of asbestos claimants is to comply with the requirements of 11 U.S.C. § 524(g). *See Combustion Eng'g, Inc.*, 391 F.3d at 236-37 ("Because § 524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction—and sets out the specific requirements that must be met in order to permit inclusion—the general powers of § 105(a) . . . cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g)." (footnotes omitted)). The Supreme Court's recent decision in *Purdue Pharma* further underscores that any plan which purports to provide nonconsensual releases to NICO and other nondebtors for asbestos liability would not pass muster under the Code. *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2074 (2024) ("The bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants."). In short, the Debtors' proposed path forward in these cases is unlikely to lead to a successful reorganization.

47. Thus, this factor weighs in favor of denying the Motion.

## B. Denial of the Motion Does Not Present Risk of Any Harm to the Estates, Let Alone Irreparable Harm

48. As the Supreme Court has emphasized, "plaintiffs seeking preliminary relief . . . [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may

21

only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* As this Court has stated, the "threatened harm cannot be speculative," and "the party seeking preliminary relief must produce affirmative evidence of the potential harm." TRO Opinion at 6 (citation omitted). The Debtors have failed to establish that the injunction they seek is necessary to prevent any harm to the estates, much less imminent irreparable harm.[18]

        1.      *The Debtors have no indemnity obligations for the Direct Claims and such obligations would not create irreparable harm in any event*

49.      To satisfy the irreparable harm prong, the Debtors rely mainly on the claim that Brenntag might assert that the Debtors owe them indemnity obligations that would be triggered if Direct Claims are allowed to proceed. *See, e.g.*, Motion ¶¶ 87-93. As discussed *supra* ¶¶ 13-16, no evidence that any such indemnification obligation exists has been introduced, and the evidence that has been introduced—i.e., the 2004 MSPA—undermines the existence of any such indemnification obligation.

50.      "[W]hen it is alleged that irreparable harm to the debtor's reorganization will result it is necessary to present strict proof of the facts and circumstances proving the likelihood of irreparable harm. Speculative and conclusory allegations are clearly insufficient." *Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.*, 54 B.R. 353, 358 (Bankr. W.D. Wis. 1985); *see also In re Phar-Mor, Inc. Sec. Litig.*, 166 B.R. 57, 62-63 (W.D. Pa. 1994) (in denying request for injunction, finding that allegation that pursuit of action against debtors' auditor would delay reorganization was "mere speculation . . . [that did] not constitute the type of proof required to entitle the Debtors to an injunction"). Here, the Debtors do not even have conclusory or

---

[18] Indeed, even the cases cited by the Debtors make clear that a "party seeking preliminary relief [must] produce *affirmative evidence* indicating that her or she *will* be irreparably harmed should that relief be denied." *ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *2 (3d Cir. Apr. 21, 2022) (emphasis added) (quoting *Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987)). The Debtors have produced no such affirmative evidence.

**JA980**

speculative allegations. Indeed, they make no allegation (because they cannot) that the indemnification obligations under the 2004 MSPA—the only indemnification between the Debtors and Brenntag—cover Direct Claims.[19] Instead, the Debtors themselves "dispute Brenntag's purported entitlement to indemnification with respect to claims that are not Successor Liability Claims and reserve all rights." Motion ¶ 3 n.7.

51. Of course, any party can assert a right to be indemnified, but that hardly establishes the merits of such an assertion or presents irreparable harm. *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) (reversing bankruptcy court's grant of a preliminary injunction enjoining action between two non-debtors where "bankruptcy court made no findings on whether [non-debtor] Hoffman has an indemnity agreement with [debtor] Excel, or whether that agreement actually covers Hoffman's potential liabilities from arbitration" but instead court "merely noted that Hoffman might state a 'defense' of indemnification"). The Debtors do not assert that they have historically indemnified Brenntag for Direct Claims, or that Brenntag has ever tendered an indemnification claim to the Debtors based on a Direct Claim. In short, the mere

---

[19] Courts in this Circuit and elsewhere require parties requesting a preliminary injunction or temporary restraining order to provide such specificity. *See Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 777 (D.N.J. 2013) (denying injunction and stating that "our Court of Appeals has previously recognized that 'an injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief'" (citation omitted)); *Bullock v. Carney*, 463 F. Supp. 3d 519, 523 (D. Del. 2020) (denying temporary restraining order and stating that "[l]ike a preliminary injunction, a temporary restraining order is 'an extraordinary and drastic remedy . . . that should not be granted unless the movant, by a clear showing, carries the burden of persuasion'" (alteration in original) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997))), *aff'd*, 806 F. App'x 157 (3d Cir. 2020), *and aff'd*, No. 20-2096, 2020 WL 7038527 (3d Cir. June 4, 2020); *In re Saxby's Coffee Worldwide*, 440 B.R. 369, 380 (Bankr. E.D. Pa. 2009) ("The determination whether to grant or deny a § 105 injunction is intensely fact driven."); *ACME Fast Freight v. United States*, 135 F. Supp. 823, 825 (D. Del. 1955) (vacating temporary restraining order and noting that "[t]he parties seeking a temporary restraining order or a preliminary injunction must not only allege facts as to which there is no serious dispute but also indicate such facts which show that the moving party has a reasonable probability of success upon final hearing"); *In re Homaidan*, 640 B.R. 810, 831 (Bankr. E.D.N.Y. 2022) ("To obtain an injunction or a temporary restraining order, the movant must identify specific, real-word facts" in support of its motion.), *appeal dismissed sub nom. Navient Sols., LLC v. Homaidan*, No. 17-AP-1085(ESS), 2022 WL 4079579 (E.D.N.Y. Sept. 6, 2022).

23

adjudication of a Direct Claim against Brenntag would not result in the accrual of an indemnity claim against the estates.

52.     But even assuming that direct claims against Brenntag could trigger any indemnity obligation of the Debtors (they cannot), they still would not pose a threat of irreparable harm to the Debtors' estates. Brenntag would simply have one contingent prepetition claim for indemnification under 11 U.S.C. § 502(e)(1)(B).[20] Moreover, Brenntag's claim would be subject to subordination or disallowance under § 502(e)(1)(B). Section 502(e) demonstrates that Congress contemplated that debtors like those here would face indemnification claims, and thus the mere prospect of such claims cannot supply the basis for finding a likelihood of irreparable harm. If Congress believed that indemnification claims against debtors were enough to require an injunction to prevent irreparable harm to the estate, Congress could have enacted a stay to protect nondebtors in chapter 11 cases, just as it enacted a stay shielding non-debtor individuals in chapter 13. *See* 11 U.S.C. § 1301. It did not and neither should this Court.[21]

---

[20]     *See In re Drexel Burnham Lambert Grp., Inc.*, 146 B.R. 92, 96 (S.D.N.Y. 1992) (stating that "it is well-established that contingent claims for indemnity are covered by § 502(e)(1)(B) where the claimant is co-liable with the debtor on the underlying claim").

[21]     The Debtors' reliance on *LTL* in support of the irreparable harm prong is misplaced. *See* Motion ¶ 86. *LTL* was a "Texas Two-Step" case in which the debtor had purportedly assumed and held sole responsibility for talc-related liabilities as a result of pre-petition divisional mergers. *LTL Mgmt.*, 638 B.R. at 297 ("As a result of the restructuring, LTL assumed responsibility for all of Old JJCI's talc-related liabilities."). The LTL debtor sought to enjoin or stay litigation that would hold non-debtor affiliates liable for tort liabilities which were *exclusively* held by the debtor. *Id.* at 297-98 (seeking stay or injunction of litigation against third parties on "talc-related claims," for which court found debtor had sole responsibility). *LTL* is not analogous to the present circumstances. In *LTL*, the debtor was seeking to enjoin clearly *derivative* claims against its affiliates, whereas the Debtors here seek to enjoin *direct* claims against a non-debtor who holds indemnity rights against the Debtors for derivative liability only. According to the Court, the potential for irreparable harm existed in *LTL* because an adverse ruling against the non-debtor affiliates would clearly result in an indemnity claim against LTL's estate. In contrast, Brenntag does not have indemnity rights against the Debtors with respect to direct claims against Brenntag. Likewise, *W.R. Grace* is easily distinguishable from the instant fact pattern. *See* Motion ¶¶ 73-74. There, the debtors moved to enjoin claims that sought to hold certain third parties derivatively liable for the debtors' conduct and products. *W.R. Grace*, 386 B.R. at 23-24. Here, the Debtors are attempting to enjoin claims against Brenntag that seek to hold Brenntag liable for its own independent conduct and products.

24

53.     What is more, the Debtors' estates would not be diminished even if Brenntag's indemnification claim could not be subordinated or disallowed. As this Court knows, the Debtors' indemnity obligations to Brenntag are backstopped by two solvent non-debtors (namely, NICO and DBUS) and those backstop obligations are triggered when the Debtors become "financially unable to satisfy" their indemnity obligations.[22] The Debtors have already asserted that they are financially unable to satisfy their own administrative expenses.[23] The Debtors thus cannot argue that they are financially able to satisfy their indemnity obligations.

54.     Accordingly, every new dollar of indemnity liability (if any) that the Debtors accrue will be borne by NICO and/or DBUS through the backstop. Indeed, it is telling that under the Debtors' proposed Settlement Agreement, the consideration to settle the Successor Liability Claims against Brenntag is being paid exclusively by NICO—an implicit acknowledgement that NICO is the party ultimately on the hook here.[24] Under these circumstances, allowing the Direct Claims to proceed would not lead to any depletion of estate assets and, consequently, would not lead to any likely irreparable harm. *See In re Aearo Techs. LLC*, 642 B.R. 891, 907 (Bankr. S.D. Ind. 2022) (declining to stay actions against non-debtor third parties because "there is no threat of inequitable distribution of insurance proceeds here as the Funding Agreement operates as a complete, uncapped backstop to the insurance policies," such that "tapping the insurance policies to cover any liability incurred in the Pending Actions does not affect the amount of money Aearo can pay its creditors because the Funding Agreement covers all claims arising from the Pending Actions in the absence or exhaustion of the applicable insurance").

---

[22]     *See* Adv. Docket No. 197 ¶¶ 16-17; *see also* Adv. Docket No. 90 ¶¶ 18-19.

[23]     *See* Docket No. 1302 ¶ 4 (Debtors stating that they "likely need to convert their chapter 11 cases to cases under chapter 7 of the Bankruptcy Code" absent approval of financing since they "have limited cash flows from interest on fixed assets, and finite assets that are only being depleted as these chapter 11 cases proceed.").

[24]     *See* Docket No. 1297-2 (showing that Settlement Payment is being "funded in Cash by NICO or its designee").

2. *There is no risk of litigation prejudice that warrants enjoining the Direct Claims*

55.     The primary litigation prejudice raised by the Debtors concerning the Direct Claims is that they allegedly could be bound by a factfinder's apportionment of fault against them after a trial on the merits. The Debtors, however, have failed to point to anything showing that such a risk is even plausible under the state laws applicable to the subject actions. As a general rule, a nonparty to an action cannot be bound by any rulings or findings from that action in any subsequent proceedings. *See supra* ¶ 36. That same principle applies to the doctrines of comparative fault and allocation of liability in the states where those doctrines are recognized— including every single state where the Direct Claims are venued.[25] Tellingly, the Debtors have

---

[25]     **California**: *See Bostick v. Flex Equip. Co.*, 54 Cal. Rptr. 3d 28, 43 (2007) (rejecting attempted collateral use of prior apportionment of liability to nonparty where nonparty did not participate and party had "no meaningful incentive to adjudicate" non-party's comparative fault); *see also Bullock v. City of Antioch*, 293 Cal. Rptr. 3d 668, 679 (2022) (noting that California courts follow general rule that a nonparty may not be bound by a finding in a prior proceeding unless there is "an identity of interest between the party to the prior proceeding and the party to be estopped, and adequate representation by the party to the prior proceeding"); **Texas**: *See In re El Apple, Inc.*, 362 S.W.3d 154, 158 (Tex. App. 2012) ("Neither granting of a motion for leave to designate a responsible third party, nor a finding of fault against the designated party imposes any liability upon that person. Similarly neither may be used in any other proceeding, on the basis of res judicata, collateral estoppel, or any other legal theory to impose liability upon that person." (citing TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(i)(*l*), (2)); **Pennsylvania**: *See Roverano v. John Crane, Inc.*, 226 A.3d 526, 545 (2020) (holding that allocation of fault to a nonparty "is not admissible or relied upon in any other action or proceeding for any purpose" (citing 42 PA. STAT. AND CONS. STAT. ANN. § 7102)); **Indiana**: *See Bondex Int'l v. Ott*, 774 N.E.2d 82, 87 (Ind. Ct. App. 2002) ("[A]ny allocation of fault to . . . bankrupt nonparties . . . [cannot] be used against them in a subsequent legal action through application of the collateral estoppel doctrine."); **Georgia**: *See* GA. CODE ANN. § 51-12-33 ("Where fault is assessed against nonparties . . . , findings of fault shall not subject any nonparty to liability in any action or be introduced as evidence of liability in any action."); **Michigan**: *See* MICH. COMP. LAWS ANN. § 600.2957 ("If fault is assessed against a nonparty, a finding of fault does not subject the nonparty to liability in that action and shall not be introduced as evidence of liability in another action."); **New York**: *See BDO Seidman LLP v. Strategic Res. Corp.*, 896 N.Y.S.2d 15, 20 (2010) (noting that in the allocation of fault context, a key "requirement for the application of collateral estoppel" is that the party against whom collateral estoppel is asserted had a "full and fair opportunity to litigate the matter" in the prior proceeding); **New Jersey**: *See* N.J. STAT. ANN. § 2A:15-5.2 (showing that allocation of fault can only be made against the parties to the action); **Rhode Island**: *Casco Indem. Co. v. O'Connor*, 755 A.2d 779, 782-83 (R.I. 2000) ("[C]ollateral estoppel cannot apply [to an allocation of fault against a nonparty] when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." (citation omitted)); **Louisiana**: *See Breen v. Breen*, 370 So. 3d 1095, 1101 (La. Ct. App. 2023) (noting that "Louisiana courts apply the federal law of *res judicata*" which "bars the relitigation of issues actually litigated and necessarily decided in an earlier case *between the same parties*"), *reh'g denied* (July 27, 2023), *and writ denied*, 373 So. 3d 979 (La. 2023); **South Carolina**: *See Smith v. Tiffany*, 799 S.E.2d 479, 485 (2017) ("A plain reading of the words 'defendant' and 'defendants' in [South Carolina's liability apportionment statute] . . . reveals the legislature's intent to allow 'only a "defendant" or "defendants"' to be listed on the jury form and included in the allocation of fault.'"); **Florida**: *See Sea Quest Int'l, Inc. v. Trident Shipworks, Inc.*, 958 So. 2d 1115, 1120-21 (Fla. Dist. Ct. App.

26

**JA984**

not pointed to a *single* state where the applicable law could allow the Debtors to be bound by an apportionment of liability or a finding of comparative fault against them in the underlying proceeding.

56.    In short, the Debtors have not presented any evidence or argument that a preliminary injunction is necessary to protect the Debtors from being bound by a finding of comparative fault or liability apportionment.  To the contrary, the Committee has affirmatively demonstrated that there is no risk of the Debtors being bound even if Brenntag succeeds in assigning fault to them in connection with the prosecution of a Direct Claim.  Accordingly, the Debtors' principal argument for litigation prejudice fails to demonstrate any real risk of harm, much less irreparable harm.

57.    Additionally, the Debtors contend that permitting the continued prosecution of the Direct Claims would "require the Debtors to expend scarce resources defending such actions or risk litigation prejudice through *res judicata*, collateral estoppel, and record taint."  Motion ¶ 96. Not so.  It is only if the Debtors become parties to such actions that any risk of such litigation prejudice could arise.  *See supra* ¶ 36, note 15.

58.    In addition, courts routinely refuse to stay actions against non-debtors regardless of the "apprehended later use [of] . . . collateral estoppel or the precedential effect of an adverse decision" as doing so would cause a "vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants."  *Cook v. Blazer*, No. 7:15CV456, 2016 WL 3453663, at *1 (W.D. Va. June 20, 2016) (citations omitted); *see also Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003) (refusing to "extend" automatic stay to two non-

---

2007) ("[I]ssue preclusion" may apply only where "the party against whom the doctrine is applied was *fully represented in the prior action*."); **Illinois**:  *See Am. Freedom Ins. Co. v. Garcia*, 192 N.E.3d 649, 660 (Ill. App. Ct. 2021) (Collateral estoppel or res judicata may apply to "[a] nonparty" only "if his or her interests were so closely aligned to those of a party that the party was the nonparty's virtual representative.").

debtor codefendants in copyright litigation, noting that it had "not located any decision applying the stay to a non-debtor solely because of an apprehended later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision"); *Stanford v. Foamex L.P.*, No. CIV. A. 07-4225, 2009 WL 1033607, at *1 (E.D. Pa. Apr. 15, 2009) (refusing to extend automatic stay to co-defendants of debtor even where debtor and other co-defendants had all been sued for violation of ERISA before the petition date and claims against the co-defendants were factually and legally related to claims against debtors).

59.     Moreover, even if res judicata or collateral estoppel were invoked against the Debtors in the future, this Court would retain discretion to reject the application of res judicata and collateral estoppel as inequitable to the Debtors. *See, e.g.*, *Parklane Hosiery Co.*, 439 U.S. at 331 (Courts have "broad discretion to determine" whether offensive collateral estoppel "should be applied."). Courts have rejected the application of those doctrines when invoked against a debtor who was in bankruptcy when the relevant adverse judgment was rendered. *In re Eagleston*, 236 B.R. 183 (Bankr. D. Md. 1999) (refusing to give collateral estoppel effect to a judgment that had been entered against the debtor's professional corporation in a non-bankruptcy action after the debtor had entered bankruptcy); *see also In re Kmart Corp.*, 285 B.R. 679, 689 (Bankr. N.D. Ill. 2002) (agreeing to lift the stay where a plaintiff "agreed to stipulate that it will not use any findings derived from the trial against [the debtor] Kmart, and this [c]ourt has authority under § 105 to prevent such use by either party").

60.     In sum, the Debtors have not established that a preliminary injunction is necessary to prevent irreparable harm to these estates.

## C.     The Balance of Harms Decisively Weighs in Favor of Denying the Motion

61.     As explained in § III.B *supra*, the purported harms to the Debtors' estates are speculative at best and illusory at worst. In contrast, granting the Motion would inflict manifest

Case 3:24-cv-00913-KZ-D   Doc 346   Filed 08/21/25   Page 39 of 44
Document 1352
Case 3:20-cv-12509-MBK-ZNQ   Doc 348-cumFiled 18/11/2   Filed 06/31/25   Page 994 of 1429   PageID
Document 1352   Page 39 of 44

injustice upon innocent tort victims.  Indeed, several circuits, including the Third Circuit, have

recognized that there is a high bar to enjoining tort claims given the significant harm visited upon

victims.  For example, in the *Johns-Manville* case, the Third Circuit stated:

> [T]he clear damage to the plaintiffs is the hardship of being forced to wait for an
> indefinite and, if recent experience is any guide, a lengthy time before their causes
> are heard. Moreover, we cannot ignore the fact that plaintiffs and crucial witnesses
> are dying, often from the very diseases that have led to these actions. We are not
> persuaded that the hardship imposed on defendants by proceeding to trial without
> Johns-Manville or our legitimate interest in judicial economy is sufficient to force
> these plaintiffs to forbear until the bankrupt defendants emerge from the
> reorganization proceedings. The defendants may be seriously inconvenienced by
> the resumption of the actions against them; under the standard announced in
> *Landis*, however, the balance of hardship weighs in favor of the injured plaintiffs.

*Johns-Manville Sales Corp.*, 723 F.2d at 1076 (footnote omitted); *see also Austin v. Unarco*

*Indus., Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) (denying discretionary stay where plaintiffs and crucial

witnesses were dying and "the damage to the plaintiff would be the financial hardship of being

forced to wait for an undefined but potentially lengthy period before receiving the money to which

she may be entitled"); *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983)

(concluding that discretionary stay was properly denied because "the requisite balancing of the

competing interests involved in these cases weighs in favor of allowing the remaining actions to

proceed.  The realities of the hardship of a stay on the plaintiffs, many of whom allege that they

are dying from asbestosis, is substantial and, in some instances, permanent.  The grim reaper has

called while judgment waits.").

62.     The case of Ms. Patricia Sneider is instructive.  She is a 61-year-old woman who

was diagnosed with mesothelioma, a terminal cancer, from exposure to Brenntag's talc.  Adv.

Docket No. 266 ¶ 1.  Due to her rapidly deteriorating health and a medical diagnosis that she

likely will not survive beyond six months, the California state court granted her "trial preference

status" in order provide her with a "chance to actively and meaningfully participate in the trial of

her case." *Id.* ¶ 3.  Granting the Motion would irreparably harm and prejudice Ms. Sneider and many other similarly situated talc victims dying from a terminal disease, depriving them of their day in court.

63.  Many of the claimants enjoined under the preliminary injunction would inevitably die during the delay.[26]  The death of a claimant will result in lost legal rights and compensation because some states limit the causes of action or damages a decedent's estate or personal representative may assert.[27]  For example, compensation for pain and suffering—often valued in the millions of dollars—may not be available to a decedent's estate.[28]  A lengthy delay also presents the risk of critical evidence being lost, as aging witnesses die or their memories fade while discovery and depositions are stayed.[29]

64.  The Court should also give significant weight to the fact that the Debtors ask the injunction to remain in effect until "a final, non-appealable Order granting the Settlement Motion" is entered.  Motion ¶ 43.  Given the likelihood of an appeal if the Court grants the Settlement Motion, the injunction sought by the Debtors could potentially remain in effect for *several years*. It would cause extreme hardship on asbestos victims and their families to wait several years for compensation for their injuries, especially when many of them only have months to live.

---

[26]  The cases the Debtors cite for the proposition that "mere delay is insufficient to prevent the issuance of an injunction" (Motion ¶ 101) are based on considerations that are absent here.  *See Bestwall LLC*, 606 B.R. at 255-57 (granting injunction as to debtor's *affiliates* where debtor's "indemnity obligations . . . would make judgments against the Protected Parties . . . tantamount to judgments against the Debtor"); *see also In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997) (upholding injunction as to claims against debtors' "principals and officers" who had agreed to fund estate settlement, because absent injunction, non-debtors would be "prevent[ed] . . . from obtaining the funds necessary to bring about the settlement").

[27]  *See, e.g.*, FLA. STAT. ANN. § 768.21 (specifying damages available to decedent's estate or personal representative).

[28]  *See, e.g.*, ARIZ. REV. STAT. ANN. § 14-3110 (providing that damages for pain and suffering do not survive death of tort victim); IDAHO CODE § 5-327(2) (specifying limited damages available in survival actions).

[29]  *See, e.g.*, *Shearin v. Doe 1 through 10*, No. CIV.A. 03-503-JJF, 2007 WL 4365621, at *2 (D. Del. Dec. 11, 2007) ("The lengthy passage of time involves the risk of loss of evidence or the fading of memory.").

30

65. In *Williford v. Armstrong World Industries, Inc.*, the Fourth Circuit affirmed the denial of a litigation stay in part because of the harm and manifest injustice that would be inflicted on an asbestos plaintiff. 715 F.2d 124 (4th Cir. 1983). In doing so, the Fourth Circuit gave greater weight to "the needs of a plaintiff in declining health as opposed to the practical problems imposed by the proceedings in bankruptcy, which very well could be pending for a long period of time." *Id.* at 128. Indeed, the Fourth Circuit recognized that a stay of litigation against non-debtors "under such circumstances would work manifest injustice to the claimant." *Id.* So too here.

66. Phantom indemnification rights and already-barred uses of issue preclusion simply will not harm the Debtors, and they certainly will not harm them more than the preliminary injunction would harm the sick and dying individuals forced to delay and possibly forego their claims and recoveries against Brenntag.

### D. The Public Interest Decisively Weighs Against Granting the Motion

67. To satisfy the public interest prong, the Debtors rely exclusively on the general proposition that there is a "public interest in a successful reorganization." Motion ¶¶ 105-107. But these are not your typical chapter 11 cases. As this Court has recognized, these Debtors "ha[ve] not operated since 2004[,]" there are no operating companies to salvage, and they do not have any employees, customers, or other stakeholders who would be adversely impacted absent a successful restructuring. *See* Hr'g Tr. at 23:24-25:1, Sept. 12, 2024. These Debtors thus stand in stark contrast to those in cases the Debtors cite in which courts found the public interest would be advanced by a successful reorganization. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983) ("By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners."); *Sudbury, Inc.*, 140 B.R. at 463 (discussing employees' continued, post-petition work in "manag[ing] financial, tax and other business-wide functions" of the debtor); *In re Johns-*

**JA989**

*Manville Corp.*, 26 B.R. at 422 ("Manville continues to operate its business and manage its property as a debtor-in-possession under Sections 1107 and 1108 of the Code."). No such public interest exists here.

68.     Instead, the public interest here favors the tort victims' due process rights under the Seventh Amendment and ability to obtain compensation for their direct claims against solvent, non-debtor tortfeasors. *See, e.g.*, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59-61 (1989) ("Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity."). Non-debtor Brenntag is a highly profitable corporate conglomerate that bought a talc business in 2004 and has continued to operate that same business. Its conduct and products have harmed countless innocent Americans nationwide. As such, there is a strong public interest in allowing claimants to continue pursuing Brenntag for its independent liability in the tort system without delay.[30] And unnecessary delay here would be particularly offensive and harmful to claimants such as Ms. Patricia Sneider who are terminally ill from exposure to Brenntag's post-2004 talc, and were given trial preference status under state law on account of being in an advanced state of a terminal disease.[31]

69.     On the other hand, there is zero public interest in allowing tortfeasors like Brenntag to escape litigation stemming from their own, direct liability simply by threatening to sue for indemnification (without evidence of any right to indemnification) or threatening to blame the Debtors for Brenntag's own conduct (again, without evidence that it could actually do so). Any

---

[30]     *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (discussing "public interest in deterrence of unlawful conduct and in compensation of victims"); *Dent v. Cunningham*, 786 F.2d 173, 176-77 (3d Cir. 1986) (noting that New Jersey courts have long recognized a significant public interest in compensating their injured domiciliaries).

[31]     *See* Adv. Docket No. 266 ¶ 2; *see also In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (recognizing public interest in having persons "who might be entitled to recovery receive compensation while still living and able to use it to cover medical costs and improve the quality of their lives").

defendant in any action could make these same baseless threats. Indeed, if Direct Claims against Brenntag could harm the Debtors (as explained above, they cannot), it would be because of the actions of Brenntag, not of the claimants.

70. As the Debtors fail to meet any of the elements for a preliminary injunction on the Direct Claims and those claims are outside of the Court's jurisdiction, the Motion should be denied as to those claims.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court deny the Motion, and grant such other relief as may be just and proper.

Dated: October 11, 2024

/s/ Arthur J. Abramowitz

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email:  aabramowitz@shermansilverstein.com
rswitkes@shermansilverstein.com

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
Michael Klein (admitted *pro hac vice*)
Evan M. Lazerowitz
Jeremiah P. Ledwidge (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Email:  cspeckhart@cooley.com
mklein@cooley.com
elazerowitz@cooley.com
jledwidge@cooley.com

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)

33

**JA991**

Kevin M. Davis (admitted *pro hac vice)*
Serafina A. Concannon (admitted *pro hac vice*)
Shahriar M. Raafi (admitted *pro hac vice*)
1200 New Hampshire Avenue NW, 8th Floor
Washington, DC 20036
Tel: (202) 862-5000
Email:  kmaclay@capdale.com
         tphillips@capdale.com
         kdavis@capdale.com
         sconcannon@capdale.com
         sraafi@capdale.com

*Co-Counsel to the*
*Official Committee of Talc Claimants*

34

**JA992**

**LATHAM & WATKINS LLP**
Adam S. Ravin
Madeleine C. Parish (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
adam.ravin@lw.com
madeleine.parish@lw.com

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (admitted *pro hac vice*)
Amy C. Quartarolo (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
jeff.bjork@lw.com
amy.quartarolo@lw.com

**LATHAM & WATKINS LLP**
Christina Craige (admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
chris.craige@lw.com

*Counsel for Brenntag*

**MONTGOMERY MCCRACKEN WALKER & RHOADES, LLP**
Lathrop B. Nelson, III
Richard G. Placey
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002
Telephone: (856) 488-7700
lnelson@mmwr.com
rplacey@mmwr.com

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

WHITTAKER, CLARK & DANIELS, INC.,
BRILLIANT NATIONAL SERVICES, INC., L.A.
TERMINALS, INC., and SOCO WEST, INC.,

         Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC.,
BRENNTAG GREAT LAKES, LLC, BRENNTAG
MID-SOUTH, INC., BRENNTAG NORTH
AMERICA, INC., BRENNTAG NORTHEAST,
INC., BRENNTAG PACIFIC, INC., BRENNTAG
SOUTHEAST, INC., BRENNTAG SOUTHWEST,
INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL
CHEMICAL CO., LLC, MINERAL AND
PIGMENT SOLUTIONS, INC., THOSE PARTIES
LISTED ON APPENDIX A TO THE
COMPLAINT, and JOHN AND JANE DOES 1-
1,000,

         Defendants.

Adv. Pro. No. 23-01245 (MBK)

## BRENNTAG'S (I) JOINDER IN DEBTORS'
## REPLY IN FURTHER SUPPORT OF MOTION FOR
## A PRELIMINARY INJUNCTION AND (II) RESERVATION OF RIGHTS

Brenntag North America, Inc. and certain of its North American affiliates

(collectively, "**Brenntag**"), by and through their undersigned counsel, hereby file this statement

(the "**Statement**") (i) joining in the *Debtors' Reply in Further Support of Motion for a Preliminary*

*Injunction*[2] [Adv. Proc. Docket No. 353] (the "**Debtors' Reply**"),[3] and (ii) reserving rights, and

respectfully state as follows:

---

[2]  Capitalized terms used but not otherwise defined in this Statement shall have the meanings ascribed to them in the Debtors' Response and Motion (as defined herein), as applicable.

[3]  The "**Motion**" refers to *Debtors' Motion for (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors Pending Entry of a Final, Non-Appealable Order Regarding the Debtors' Proposed Settlement and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision on the Debtors' Request for Such Injunctive Relief* [Adv. Proc. Docket No. 299].

### JOINDER IN DEBTORS' REPLY

1.      Brenntag joins in both the Debtors' requested relief as set forth in the Motion and the arguments made in further support thereof in the Debtors' Reply.  For the reasons articulated by the Debtors and for the additional reasons set forth herein, a preliminary injunction is necessary to protect the Debtors' estates pending entry of a final, non-appealable order with respect to the proposed settlement (the "**Proposed Settlement**").

2.      As an initial matter, Brenntag joins in the Debtors' arguments as to how continued prosecution of Straddle Claims[4] against Brenntag while the Proposed Settlement is pending approval by this Court would irreparably harm the estates, not only through mounting indemnification claims against the Debtors, but through risk of *res judicata*, collateral estoppel, and record taint.

3.      To be clear, Brenntag's consistent position has been that it is fully indemnified for Straddle Claims.  Nearly a year ago, in connection with the Debtors' initial request for a TRO, Brenntag explained to this Court that "[a]lthough an interpretation of or ruling on Brenntag's indemnification rights is not necessary with respect to issuance of the Temporary Restraining Order, ***it is not necessarily the case that the Debtors' indemnification obligations to Brenntag are limited to pre-2004 exposure***"[5] (emphasis added).  And, in granting injunctive relief, this Court recognized that "even direct claims against Brenntag can give rise to indemnification claims

---

[4]   A "**Straddle Claim**" refers to claim involving exposure to WCD talc, even where such claim also involves post-2004 exposure to a Brenntag product.

[5]   *Brenntag's Statement in Connection with Debtors' Motion for Entry of an Order: (I) Temporarily Enjoining Certain Actions Against Non-Debtors; and (II) Approving Procedures for Seeking Extensions of Temporary Restraining Order* [Adv. Proc. Docket No. 78], submitted to this Court on November 20, 2023 ("**Brenntag Initial TRO Statement**"), ¶ 5.  To be clear, Brenntag agrees that an interpretation of or ruling on Brenntag's indemnification rights is *not* before the Court at this time and that an affirmative ruling on the scope of the Debtors' indemnification obligations is not required in order to issue a preliminary injunction here.

depending on the conduct alleged, the timeframes implicated, and the products involved."[6]  Five months later, this Court again acknowledged the impact direct claims may have on the Debtors' estates vis-à-vis indemnification claims by explaining that the TRO was put in place that addressed a "broader array of claims" and "claims for which there could be possibl[e] indemnification claims asserted by Brenntag against the Debtors," which "*could arise both from the affirmative prosecution of claims or through the assertion of defenses by Brenntag*" (emphasis added).[7] Brenntag has continued to highlight this point on the record.  For example, at the hearing before this Court on August 15, 2024, Brenntag stressed that it "is being asked to pay either through settlement or through a judgment both shares, both a WCD share and a Brenntag share. [. . .] There's no question that Brenntag will be entitled to assert an indemnification claim against WCD under the MSPA."[8]

4.      Brenntag also joins in the Debtors' argument that there is no possible agreed form of preliminary injunction order that would allow plaintiffs to pursue direct claims against Brenntag while protecting the estates from irreparable harm.  In addition to the reasons articulated by the Debtors, Brenntag notes that the language previously proposed as "paragraph 15" in the TRO comments circulated by the Court creates undue (and presumably unintended) risk to Brenntag's indemnification rights.

5.      Specifically, under the MSPA,[9] Brenntag is entitled to broad indemnification from

---

[6]  Letter Opinion issued on November 22, 2023 in connection with Initial TRO [Adv. Proc. Docket No. 88] (the "**TRO Opinion**").

[7]  April 26, 2024 Hearing Tr., 40:18–41:1.  Relevant excerpts of the transcript from the hearing held before this Court on April 26, 2024 are attached hereto as Exhibit 1.

[8]  August 15, 2024 Hearing Tr., 61:9–11; 15–16.  Relevant excerpts of the transcript from the hearing held before this Court on August 15, 2024 is attached hereto as Exhibit 2.

[9]  The "**MSPA**" refers to that certain Master Sale and Purchase Agreement, dated December 8 and 9, 2003, by and between Sellers, Sellers' Guarantor, and Purchasers (as such terms are defined therein).  A copy of the MSPA was attached as Exhibit F to the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark &*

the Debtors, as well as DB US (and by extension, NICO) as to, among other things, claims that involve exposure to alleged asbestos in WCD talc.[10]  The Committee itself tries to argue in its Objection that Brenntag's indemnification rights do not extend to Straddle Claims (they do) because such claims are not "seeking damages" for exposure to WCD talc (they are). By prohibiting (i) plaintiffs from introducing evidence of WCD's products and conduct and (ii) Brenntag from using any findings or verdicts entered in litigation involving evidence of WCD's talc in any subsequent proceeding, the Court's proposed language may unintentionally create *additional* defenses to Brenntag's claims for indemnification Brenntag under the MSPA.

6. In the event this Court were to permit Straddle Claims to go forward against Brenntag while allowing only Brenntag to introduce evidence regarding the Debtors' potential liability, Brenntag understands that the Debtors and/or other responsible parties may take the position that they have a colorable defense to any indemnification obligations owed to Brenntag on the grounds that the Debtors' liability in a particular action was put at issue *by Brenntag*, notwithstanding the fact that a claimant's allegations and/or the specific facts and evidence of the case demonstrate exposure to WCD-related talc.  To be clear, Brenntag believes that any claim implicating pre-2004 exposure to asbestos allegedly contained in WCD's talc (regardless of whether such allegations are put at issue by a claimant at trial) triggers Brenntag's indemnification claims against the estates because the Debtors agreed to indemnify Brenntag for claims implicating exposure to allegedly asbestos-containing talc sold, or even possessed, by WCD.  However, any

---

*Daniels, Inc., in Support of Debtors' Summary Judgment and Preliminary Injunction Motions*, which was filed in this Adversary Proceeding at Docket No. 4.

[10]  *See* MSPA, § 12.2 (Brenntag is entitled to indemnification for, among other things, "Retained Subsidiary Asbestos Claims," which are defined as claims

> seeking to recover damages [. . .] allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any Retained Subsidiary . . . in the conduct of any business prior to the Effective Date.

order that results in Brenntag being forced to affirmatively put the Debtors' alleged liability at issue in order to defend itself and/or reduce its liability could impair Brenntag's ability to collect amounts that would otherwise be fully and contractually indemnified by the Debtors and DB US (and by extension, NICO). Brenntag has agreed to release its indemnification claims against the Debtors (and only the Debtors), but that release is not effective until the Settlement Agreement is approved by a final order, and Brenntag's rights and claims should not be permanently impaired (as they would through a similar construct to paragraph 15) in advance of that point.[11]

7. At a minimum, if the Court were inclined to include some version of a "paragraph 15" construct in an order granting preliminary injunctive relief, certain modifications would be required to appropriately balance the competing interests here. Any such construct would need to ensure Brenntag will have full and unfettered autonomy to control claims that are not stayed or otherwise enjoined and take all necessary actions, including, but not limited to, settling such claims.[12] As Brenntag explained to this Court when the Debtors initially sought the TRO, if claims continue to proceed against Brenntag, it must be free to settle such claims.[13] The same remains true now. Previously, in response to such concerns, the Court put in place a process pursuant to

[11] The Settlement Agreement provides for a fair, reasonable, and efficient resolution—not only of the Debtors' estate claims, including causes of action against Brenntag as an alleged successor-in-interest to Debtors Whittaker, Clark & Daniels, Inc. ("**WCD**") and Soco West, Inc. ("**Soco West**")—but also indemnity claims Brenntag holds against WCD and Soco West under the MSPA.

[12] In addition to settling claims, for example, Brenntag must also be able to remove cases to federal court at the time it is procedurally appropriate for Brenntag to take such action without any restrictions or prior requirements, such as seeking prior approval or notifying parties outside of what is required under the Federal Rules of Civil Procedure. This includes, for the avoidance of doubt, the removal of claims regardless of whether such claims have successor liability implications by virtue of a portion of such claims remaining stayed.

[13] *See* Brenntag Initial TRO Statement, ¶ 6 ("Brenntag must therefore reserve all rights with respect to those actions that presently fall outside the scope of any Temporary Restraining Order issued, including Successor Liability Claims. Brenntag specifically preserves its ability to defend, litigate, settle, and/or otherwise resolve such claims that are not presently within the scope of the Temporary Restraining Order."); *see also* transcript from hearing held on November 21, 2023 (the "**TRO Hearing Transcript**"), 53:12–18 ("[T]he practical effect of [the proposed scope of the TRO]" is that "Brenntag will continue to [. . .] actively litigate those [unstayed] claims and there may be settlements.").

which Brenntag was required to provide 28-days' notice to the Committee and Debtors of its intent
to settle claims not otherwise enjoined by this Court.[14]  However, that was during a period *before*
this Court had conclusively determined the scope of claims comprising estate property, and the
claims that Brenntag might settle would, under the framework at the time, be swept within the
TRO in advance of any trial on such claims.  The Court has now determined that those  portions
of Straddle Claims that do not constitute Successor Liability Claims are not property of the estates.
If such claims are removed from the scope of any preliminary injunction, trial could commence
against Brenntag almost immediately thereafter.[15]  Any future order entered by this Court thus
should not impair Brenntag's rights to immediately settle claims that are not otherwise enjoined
or stayed, including, for the avoidance of doubt, by placing any temporal restriction on Brenntag's
ability to settle such claims, regardless of whether some portion of the action remains stayed.
To do so would place Brenntag in the untenable position of being unable to make commercial
decisions in the face of unavoidable litigation expense and potentially immediate trial risk.  In
addition, in the event Brenntag entered into any such settlement of claims, it would explicitly
reserve the right to seek indemnity for such settlement amounts, both against the Debtors (unless
and until the Proposed Settlement is approved) and against DB US (and by extension, NICO).

       8.     Brenntag appreciates the Court's thought and consideration in attempting to weigh
competing interests, including those of the Debtors' estates, both in preserving what this Court has
conclusively determined to be estate claims and in ensuring the Debtors' estates are not harmed
by the continued litigation of Straddle Claims by claimants who wish to pursue such claims against

---

[14]  *Order Modifying Temporary Restraining Order* [Adv. Proc. Doc. No. 208], ¶ 2.

[15]  Indeed, the court in the Cooper Action has scheduled trial for October 21, 2024, *six* days after the current TRO is
set to expire, even though the action has been stayed for the past 61 days and typical pre-trial proceedings have not
taken place.

Brenntag even while the Chapter 11 Cases remain pending. However, Straddle Claims should not be permitted to proceed in a manner that either (i) risks mounting harm to the Debtors' estates (either through continuously increasing indemnification claims by Brenntag against the estates or factual findings and record taint in the underlying cases that could be used against the estates), or (ii) deprives Brenntag of its ability to seek indemnity for any liability allocated to the Debtors and/or creates additional defenses to indemnity if Brenntag were to put the Debtors' liability at issue at trial despite the fact that claimants' exposure may give rise to a finding of the Debtors' liability.

## <u>RESERVATION OF RIGHTS</u>

9.      Notwithstanding anything contained herein, Brenntag reserves all, and does not hereby release any, rights, claims, and defenses (whether contractual or otherwise) with respect to any actions that may in the future fall outside the scope of any order issued by this Court staying or enjoining claims, including claims for which portions have been determined to be Successor Liability Claims and are otherwise stayed. Brenntag specifically preserves its ability to defend, litigate, settle, and/or otherwise resolve such claims that are not enjoined or stayed by this Court, including to the extent such actions may result in indemnification claims against the Debtors' estates. Brenntag further reserves all, and does not hereby release any, rights, claims, and defenses (whether contractual or otherwise) with respect to all rights, claims, and defenses under the 2003 MSPA and 2007 SPA.

WHEREFORE, for the reasons set forth herein, Brenntag respectfully requests that this

Court (a) grant the Motion, (b) overrule any objections thereto, and (c) grant such other and further

relief as is just and proper.

Date:   October 14, 2024               */s/ Adam S. Ravin*

**LATHAM & WATKINS LLP**
Adam S. Ravin (No. 047591995)
Madeleine C. Parish (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
adam.ravin@lw.com
madeleine.parish@lw.com

-and-

Jeffrey E. Bjork (admitted *pro hac vice*)
Amy C. Quartarolo (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
jeff.bjork@lw.com
amy.quartarolo@lw.com

-and-

Christina Craige (admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
chris.craige@lw.com

-and-

**MONTGOMERY MCCRACKEN WALKER
& RHOADES, LLP**
Lathrop B. Nelson, III
Richard G. Placey
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002
Telephone: (856) 488-7700
lnelson@mmwr.com
rplacey@mmwr.com

*Counsel for Brenntag*

## CERTIFICATE OF SERVICE

I certify that on October 14, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the District of New Jersey on those parties registered to receive electronic notice.

*/s/ Adam S. Ravin*
Adam S. Ravin

**Exhibit 1**

**Relevant Excerpt of April 26 Hearing Transcript**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                      .    Case No. 23-13575(MBK)
                            .
WHITTAKER, CLARK &          .
DANIELS, INC.,              .    402 East State
                            .    Trenton, NJ 08608
          Debtor.          .
. . . . . . . . . . . . . ..
WHITTAKER, CLARK &          .    Adv. No. 23-01245(MBK)
DANIELS, INC., et al.,      .
                            .
          Plaintiffs,      .
      v.                    .
                            .
BRENNTAG SPECIALTIES,       .
LLC, et al,                 .
                            .    April 26, 2024
          Defendants.      .    11:31 a.m.
  . . . . . . . . . . . . .

        TRANSCRIPT OF DEBTOR'S MOTION TO ENFORCE TRO
            AND BRENNTAG'S MOTION FOR JOINDER
          BEFORE HONORABLE MICHAEL B. KAPLAN
        UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

VIRTUAL APPEARANCES:

For the Debtor:         Cole Schotz
                        By:  G. DAVID DEAN, ESQ.
                        500 Delaware Avenue, Suite 1410
                        Wilmington, DE 19801

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

VIRTUAL APPEARANCES (Cont'd):

For the Committee:          Caplin & Drysdale, Chartered
                            By:  KEVIN DAVIS, ESQ.
                            One Thomas Circle, NW, Suite 1100
                            Washington, DC 20005

For Brenntag
Specialties, LLC:           Latham & Watkins
                            By:  AMY QUARTAROLO, ESQ.
                            555 Eleventh Street NW, Suite 1000
                            Washington, D.C. 20004

For Kyung Lee:             Dean Omar Branham Shirley, LLP
                            By:  BRAD SMITH, ESQ.
                            302 N Market Street, Suite 300,
                            Dallas, TX 75202

Audio Operator:            Kiya Martin
                                - - -

**WWW.JJCOURT.COM**

**JA1005**

Case 23-01092-MBK Doc 54-1 Filed 10/24/23 Entered 10/24/23 17:19:29 PageID:
Exhibit 1 - Relevant Excerpt of April 26 Hearing Transcript    Page 4 of 6

40

1    claims.

2              And just briefly responding to Mr. Dean and his

3    comments, if they think, if the Debtors think that there is

4    harm here from continued litigation or settlements which they

5    appear to confirm today, we would posit that the solution is to

6    stay those cases and we need a clear path forward and that is

7    why, that we raised these issues with Your Honor.

8              So, thank you for your consideration.

9              THE COURT:  All right.  Thank you, all.

10             Is there anyone else who wishes to be heard before

11   the Court rules?

12             All right, thank you.

13             Let's address the Lee litigation first.  The TRO

14   entered by this Court attempted to clearly bar continued

15   litigation of claims, not just based on successor liability.

16             Yes, the summary judgment motion that's pending in

17   the adversary proceeding focuses on ownership of the summary

18   judgment -- I'm sorry, the successor liability claims.  But the

19   TRO that was put in place addressed a broader array of claims

20   and it included claims relevant, that spoke to the conduct of

21   the Debtors and claims for which there could be possibly

22   indemnification claims asserted by Brenntag against the

23   Debtors.

24             So, those could arise both from the affirmative

25   prosecution of claims or through the assertion of defenses by

1    Brenntag.  Now, the Court carved out a limited exception

2    applicable to two pending litigations:  the Haney litigation

3    and, I believe, the Sphinx litigation.

4          And there, the Court tried to make it clear that in

5    those situations where the Plaintiffs in those actions

6    dismissed with prejudice claims against Brenntag based on

7    successor interest, alter-ego, or other comparable types of

8    claims, premised on the relationship between Brenntag and the

9    Debtors, and stipulated that there would be no factual or legal

10   issues relevant to the Debtor's conduct adjudicated at trial,

11   the Court was willing to carve out those type of actions and

12   allow them to proceed.

13         When the Court reads the current -- well, when the

14   Court reads the third amended complaint, and I know it's a

15   moving target and there's no negative aspersions; this is what

16   happens in litigation.

17         When I read the complaint dated April 18th, I look at

18   paragraph 10; at all material times, the Defendants and their

19   predecessors for whose actions the Defendants are legally

20   responsible have been regularly engaged in the business of

21   manufacturing, designing, processing, marketing, distributing,

22   using, installing, applying, re-branding for sale, and-or

23   selling products containing asbestos fiber in Oregon, Plaintiff

24   Kyung Lee had substantial injurious asbestos exposure.

25         Paragraph 11; the exposures to each Defendants'

48

```
 1                          * * * * *

 2                  C E R T I F I C A T I O N

 3          I, TRACY E. VERGOLLO, court approved transcriber,

 4  certify that the foregoing is a correct transcript from the

 5  official electronic sound recording of the proceedings in the

 6  above-entitled matter, and to the best of my ability.

 7

 8  /s/ Tracy E. Vergollo

 9  TRACY E. VERGOLLO

10  J&J COURT TRANSCRIBERS, INC.    DATE: April 29, 2024

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit 2**

**Relevant Excerpt of August 15 Hearing Transcript**

```
                 UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEW JERSEY

IN RE:                     .   Case No. 23-13575(MBK)
                           .
WHITTAKER, CLARK &         .
DANIELS, INC.,             .   402 East State
                           .   Trenton, NJ 08608
          Debtor.          .
. . . . . . . . . . . . .  .
                           .
WHITTAKER, CLARK &         .   Adversary No. 23-01245(MBK)
DANIELS, INC., et al.,     .
                           .
          Plaintiffs,      .
     v.                    .
                           .
BRENNTAG SPECIALTIES,      .
LLC, et al,                .
                           .   August 15, 2024
          Defendants.      .   11:32 a.m.
. . . . . . . . . . . . .  .
```

```
    TRANSCRIPT OF STATUS CONFERENCE AND DEBTORS' NINTH REQUEST FOR
            EXTENSION OF TEMPORARY RESTRAINING ORDER
                 (ADV. PROC. DOCKET NO. 254]
           BEFORE THE HONORABLE MICHAEL B. KAPLAN
         UNITED STATES BANKRUPTCY COURT CHIEF JUDGE
```

APPEARANCES ON NEXT PAGE.

Audio Operator:        Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

                   **J&J COURT TRANSCRIBERS, INC.**
                     **268 Evergreen Avenue**
                   **Hamilton, New Jersey 08619**
                   **E-mail:  jjcourt@jjcourt.com**

          **(609) 586-2311    Fax No. (609) 587-3599**

                            **JA1010**

2

APPEARANCES VIA ZOOM VIDEOCONFERENCE:

For the Debtor:              Cole Schotz, P.C.
                             By: DAVID DEAN, ESQ.
                             500 Delaware Avenue, Suite 1410
                             Wilmington, DE 19801

For Various Talc             Simon Greenstone Panatier
Claimants:                   BY:  LEAH C. KAGAN, ESQ.
                             901 Main Street Suite 5900
                             Dallas, Texas 75202

For the Talc                 Cooley LLP
Claimants Committee:         BY:  JEREMIAH LEDWIDGE, ESQ.
                             55 Hudson Yards
                             New York, NY 10001

                             Cooley LLP
                             BY:  CULLEN SPECKHART, ESQ.
                             1299 Pennsylvania Avenue NW
                             Washington, DC 20004

For Brenntag                 Latham & Watkins
Specialties, LLC:            BY: CHRIS CRAIGE, ESQ.
                             555 Eleventh Street NW, Suite 1000
                             Washington, D.C. 20004

                                   - - -

61

1  to WCD talc or other potential defendants' talc.  So I think

2  this is just another indirect way of getting to the same

3  outcome.

4        And for that reason, it makes perfect sense why this

5  Court included an expansive definition of successor liability

6  claim in its summary judgment opinion.  These claims will

7  never -- will necessarily compete with the debtor's traditional

8  successor liability claims.  They're for the same damages.

9        Brenntag is being asked to pay either through

10  settlement or through a judgment both shares, both a WCD share

11  and a Brenntag share.  And so that will necessarily reduce the

12  value of any successor liability claim that the debtors may

13  hold against Brenntag.

14        It also implicates issues of record taint, res

15  judicata.  There's no question that Brenntag will be entitled

16  to assert an indemnification claim against WCD under the MSPA.

17  There's no requirement in the MSPA that there be evidence

18  adduced to trial or a particular a particular allocation in

19  trial in order to give rise to that indemnification right.

20        At the May 15th hearing, Your Honor articulated the

21  scope of the TRO as involving -- "involve actions against

22  certain non-debtor entities like Brenntag" -- pardon, Your

23  Honor.  That's from the summary judgment opinion.  The quote

24  is: "The TRO enjoins lawsuits and claims 'which would include

25  any acts that are pre-2004 or anything that could be traced or

90

1  something to address immediately, I wanted to give the parties

2  that opportunity.  So, well, this was certainly more than I

3  planned for this afternoon.  But we'll go from there.

4          We will reconvene on the 22nd.  And I'll ask the

5  parties to keep me apprised if there are any developments.

6  Again, the record is closed as far as the request on the

7  extension of the TRO.

8          All right.  Thank you.

9          IN UNISON:  Thank you, Your Honor.

10          THE COURT:  You're welcome.  Thank you.

11                    * * * * *

12           **C E R T I F I C A T I O N**

13          We, DIPTI PATEL and LIESL SPRINGER, court-approved

14  transcribers, hereby certify that the foregoing is a correct

15  transcript from the official electronic sound recording of the

16  proceedings in the above-entitled matter, and to the best of

17  our ability.

18

19  /s/ Dipti Patel_____

20  DIPTI PATEL, AAERT CET-997

21

22  /s/ Liesl Springer_____

23  LIESL SPRINGER, AAERT CET-685

24  J&J COURT TRANSCRIBERS, INC.        DATE:  August 16, 2024

25

NOT FOR PUBLICATION

<table>
<tr><td>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

---

---

Whittaker, Clark & Daniels, Inc. *et al.*,
        Debtors.

---

Whittaker, Clark & Daniels, Inc., *et al.*,

      Plaintiffs,

    v.

Brenntag, AG, *et al.*,

      Defendants.

</td><td>

Case No. 23-13575 (MBK)

Adv. Pro. No. 23-01245 (MBK)

Chapter 11

Hearing Date: October 15, 2024

</td></tr>
</table>

*All Counsel of Record*

## MEMORANDUM OPINION

This matter comes before the Court by way Debtor's bankruptcy case (Case No. 23-13575) and subsequent motion ("Motion", ECF No. 299) filed by Whittaker, Clark & Daniels, Inc., ("WCD") and its affiliates (collectively, "Debtors") in adversary proceeding Adv. Pro. No. 23-01245[1] seeking a preliminary injunction. The Court has fully considered the submissions of the parties and the arguments set forth on the record at a hearing held on October 15, 2024. The Court

---

[1] Unless otherwise specified, all ECF Nos. will refer to docket entries in the instant adversary proceeding (the "Second Talc Adversary Proceeding"), Adv. Pro. No. 23-01092.

also takes judicial notice of prior rulings and documents filed in this adversary proceeding, in the

underlying bankruptcy case (23-13575) and in the related state court tort actions.[2]  For the reasons

set forth below, the Court grants Debtor's Motion, in part, and enters a limited preliminary

injunction (the "Preliminary Injunction"), and denies the Motion, in part, for the specific purpose

of granting limited stay relief.[3]  As explained further, the limited Preliminary Injunction will

prohibit the continuation of the actions identified in the attached Schedule, subject to the

limitations described herein, until final resolution of the pending Settlement Motion (discussed

*infra*) or further of this Court.  The Court issues the following findings of fact and conclusions of

law as required by FED. R. BANKR. P. 7052.[4]

## I.      Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and

157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended

September 18, 2012, referring all bankruptcy cases to the Bankruptcy Court.  As explained in detail

below, this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (G).

Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] *See In re Davis*, 597 B.R. 770, 773 (Bankr. M.D. Pa. 2019) ("Federal Rule of Evidence 201 allows a federal court to take judicial notice of facts that are not subject to reasonable dispute. A bankruptcy court may take judicial notice of the docket entries in a case and the contents of the bankruptcy schedules to determine the timing and status of case events, as well as facts not reasonably in dispute."); *see also In re Washington Mut. Inc.*, 741 F. App'x 88, 89 n.1 (3d Cir. 2018) (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) and taking judicial notice of documents, "including matters of public record and judicial opinions").

[3] For the reasons set forth on the record during the October 15, 2024 hearing, the Court grants stay relief to plaintiff Sneider and directs Debtors to remove the Sneider action from the Schedule of restricted actions.

[4] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## II.    Background

The background and procedural history of this case is well known to the parties and will not be repeated in detail at this time.  For purposes this Opinion, it is enough to report that Debtors filed for chapter 11 bankruptcy to address and resolve existing and future claims alleging injuries from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest.

The claims against the Debtors fall into two general categories: (1) Asbestos Claims, which are claims alleging injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest; and (2) Environmental Claims, which are environmental litigation claims against the Debtors relating to the production or handling of hazardous materials which allegedly contaminated certain properties. *See Complaint* ¶ 1, ECF No. 1.   As a result of this litigation, Debtors are currently defendants in lawsuits across more than 30 different jurisdictions.  Much of the litigation also includes claims against Brenntag North America and its related entities ("Brenntag") which, in 2004, purchased substantially all the Debtors' operating assets, including indemnification rights against certain Debtors. *See First Day Decl. of Moshin Y. Meghji* ¶ 21, ECF No. 5 in Case No. 23-13575.[5]

---

[5] The parties have stipulated into evidence the Master Sale and Purchase Agreement ("MSPA", ECF Nos. 4-6 and 4-7), which include the following indemnification provisions:

> WCD shall indemnify and hold harmless [Brenntag] . . . and each of their respective successors, assigns, officers, directors, managers, employees and agents . . . from and against any Indemnified Losses incurred in connection with any present or future Retained Subsidiary Asbestos Claims relating to WCD or any alleged corporate predecessor-in-interest thereof.

JA1016

After filing their chapter 11 petition, Debtors commenced the instant adversary proceeding to address the Environmental and Asbestos Claims (collectively, the "Tort Claims"). Debtors then filed a Summary Judgment motion as to Counts I and IV. After oral argument and many months of stalled mediation efforts among the parties, this Court issued a decision and held that any Tort Claim that seeks to establish non-debtor entities' liability on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors—such as Brenntag— is property of the bankruptcy estate. Such claims are referred to by the parties and the Court as "Successor Liability Claims." The Court memorialized its ruling in a written Opinion dated August 13, 2024 (ECF No. 268) and directed the parties to meet and confer on a proposed form of order. This task proved to be easier said than done, and gave rise to further disputes regarding the scope of the existing Temporary Restraining Order ("TRO"). The Court continued the TRO on a limited basis and advised the Debtors that—in order to continue the TRO—Debtors must present to the Court a proposed end game, which would fully and finally address these claims. Ultimately, an Order granting summary judgment was entered on August 28, 2024.

Heeding the Court's instruction, the Debtors then filed the "Settlement Motion", seeking approval of an agreement between and among the Debtors, Brenntag, NICO, and DB US Holding

---

MSPA § 12.1.2.

Section 12.2 of the MSPA defines "Retained Subsidiary Asbestos Claims" as:

> any claim, action, lawsuit, litigation, arbitration or legal proceeding in a court or tribunal of any kind, regardless of the legal or equitable theory alleged . . . seeking to recover damages . . . allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any Retained Subsidiary [i.e., WCD] or by any alleged predecessor entity of any Retained Subsidiary . . . .

Corp. ("DBUS") that purports to resolve all Estate Causes of Action against the Contributing Parties and their Related Parties (including Successor Liability Claims) as of the Effective Date of the Settlement Agreement, in exchange for $535 million and mutual releases. Debtors then filed a Motion to Amend the Complaint—which the Court granted—and a Motion to Extend the Automatic Stay and/or Preliminarily Enjoin Certain Actions against Non-Debtors pending a final decision of the Debtors' Settlement Motion. The Court also granted the latter motion and entered an Order Enforcing the Automatic Stay and Temporarily Restraining Certain Actions Against Non-Debtors ("October TRO" ECF No. 344), which included Exhibits 1 & 2 (collectively, the "Schedule", ECF No. 344-2), identifying restrained actions. A final hearing on the October TRO was conducted on October 15, 2024, and this decision follows.

The parties debate appropriate treatment of claims and litigation involving a nondebtor, Brenntag. The Talc Claimants Committee ("TCC") concedes that Successor Liability Claims cannot proceed in light of this Court's Summary Judgment ruling, but asserts that direct claims against Brenntag should be allowed to continue. The Debtors assert that certain plaintiffs are attempting to circumvent the Summary Judgment Order and the October TRO by strategically dismissing the successor liability components of their claims against Brenntag. Notwithstanding these efforts, Debtors contend that the remaining direct claims against Brenntag continue to be premised on allegations of pre-2004 talc/asbestos exposure and, thus, implicate Debtors' conduct, operations, and potential indemnification obligations owing Brenntag. The record includes a detailed Schedule, listing such claims which Debtors seek to stay and/or enjoin, pending resolution of their Settlement Motion.

Debtors maintain that all of the six hundred eighty-three (683) lawsuits identified in the Schedule are either subject to the automatic stay or should be enjoined for one of three reasons: (1) because they include *express* Successor Liability Claims; (2) because they contain a bifurcation stipulation in which the plaintiff acknowledges Brenntag as successor to WCD; or (3) because the claims allege pre-2004 exposure, rendering them *effective* Successor Liability Claims and/or necessarily impacting Debtors' rights and defenses and creating the potential for litigation prejudice (by way of possible application of res judicata and collateral estoppel, as well as record taint).

The Court read an oral ruling into the record on October 21, 2024. This written Opinion is intended to clarify and supplement the oral opinion, the transcript of which is available on the docket at ECF No. 359 and is hereby incorporated by reference.

III. **Discussion**

A. **Authority and Standard for Extension of Stay to Nondebtors**

Prior to addressing the merits of Debtors' Motion, the Court first assures itself of its authority and jurisdiction to grant the requested relief. In doing so, the Court looks to its own well-documented jurisprudence on this issue; noting its view that § 362(a), §105(a), or a court's inherent powers can each serve as independent bases for extension of a stay to nondebtor third parties. *See In re LTL Mgmt., LLC*, 645 B.R. 59 (Bankr. D.N.J. 2022); *In Re LTL Mgmt., LLC*, 640 B.R. 322 (Bankr. D.N.J. 2022); *In re LTL Management, LLC*, 638 B.R. 291 (Bankr. D.N.J. 2022). The Court will not repeat the lengthy discussions therein and, instead, incorporates them by reference.

6

In sum, this Court relies on the Third Circuit's decision in *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506 (3d Cir. 1997) which, in turn, cites with approval the Fourth Circuit in *In re A.H. Robins Co*, 788 F.2d 994, 1001-1003 (4th Cir. 1986). Notably, the *McCartney* court determined that the automatic stay—and not a stay extension or an injunction under § 105—precluded a litigant from pursuing a state court action against a nondebtor. Thus, *McCartney* appears to be an endorsement of § 362 as an independent basis for applying the stay to nondebtor actions.

Nevertheless, this Court is mindful that other courts still view the question as unsettled. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 103 n.8 (E.D. Pa. 2010). While the practical effect of an extension of the stay under § 362 or an injunction under § 105 is the same, the distinction is significant because it impacts subject matter jurisdiction. Therefore, this Court will utilize the same three-step inquiry outlined in its *LTL Management* opinions to address the instant Motion. Namely, in determining whether to extend the automatic stay to nondebtor third parties, the Court considers: (1) whether it has jurisdiction to issue the injunction; (2) whether extension of the automatic stay under § 362(a) to the nondebtors is appropriate; and (3) whether the Court should, in its discretion, issue the injunction. *In re LTL Mgmt., LLC*, 638 B.R. at 301 (citing *In re Philadelphia Newspapers, LLC*, 423 B.R. at 102 (other citations omitted).

### 1. Subject Matter Jurisdiction

As the TCC points out, § 105 cannot serve as an independent source of federal subject matter jurisdiction. Thus, the TCC posits that this Court lacks subject matter jurisdiction to enjoin the direct claims against Brenntag. The Court disagrees.

"Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006), as amended (Mar. 17, 2006) (citing 28 U.S.C. § 1334(b) and *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004), as amended (Feb. 23, 2005) (citations omitted)). "The first three categories are considered 'core' proceedings, whereas the fourth category, 'related to' proceedings, are considered 'non-core' proceedings." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004)). A bankruptcy court has the power to hear, decide and enter final orders and judgments in the first three categories of proceedings. 28 U.S.C. § 157(b)(1); *In re Roggio*, 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020).

A proceeding "arise[s] under" the Bankruptcy Code when the Bankruptcy Code creates the cause of action or provides the substantive right being invoked. *Stoe v. Flaherty*, 436 F.3d at 217. A proceeding "arise[s] in" a case when it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. *Id.* at 216 (quoting *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999) and explaining that a proceeding arises in a bankruptcy case if it has "no existence outside of the bankruptcy"). Finally, "a claim falls within the bankruptcy court's 'related to' jurisdiction if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009) (internal quotations and citations omitted); *see also In re W.R. Grace & Co.*, 591 F.3d 164 (3d Cir. 2009). "What will or will not be sufficiently related to a

8

bankruptcy to warrant the exercise of subject matter jurisdiction is a matter that must be developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d at 174 n.9.

Here, Debtors' Motion unquestionably implicates § 362(a), which is a substantive right under the Code. This Court certainly has jurisdiction to determine § 362(a)'s applicability and scope in this bankruptcy case, and—more specifically—whether it is appropriate to apply or extend the substantive rights afforded under § 362(a) to nondebtors. *See, e.g.*, *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1100 (9th Cir. 2005) (holding that lower court had jurisdiction to determine whether the automatic stay of the Texas bankruptcy court applied to the Attorney General's suit). Therefore, the instant matter is decidedly a proceeding over which this Court has "core" jurisdiction. *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022) (collecting cases).

Having found "core" jurisdiction over the instant Adversary Proceeding, there is no need for a secondary source of jurisdiction. *See In re Essar Steel Minnesota, LLC*, 47 F.4th 193 (3d Cir. 2022) (discussing *In re Shenango Group, Inc.*, 501 F.3d 338, 342–44 (3d Cir. 2007), and holding that where a court finds one type of jurisdiction, it need not go further in its jurisdictional inquiry). Nevertheless, given the lack of clarity regarding the appropriate authority to enjoin third-party actions, the Court offers the following analysis and determines that, at a minimum, it has "related to" jurisdiction. As discussed in prior opinions, continued litigation of the actions identified in the Schedule—especially to the point of liquidation of a claim through trial—will have a "conceivable effect" on the bankruptcy estate. *In re Winstar Commc'ns, Inc.*, 554 F.3d at 405. Notably, the Third Circuit has also ruled that contractual indemnity claims can have an effect on a bankruptcy

estate and thus provide a basis for the exercise of "related to" jurisdiction. *See Belcufine v. Aloe*, 112 F.3d 633, 636 (3d Cir. 1997). As will be discussed, the Direct Claims against Brenntag necessarily implicate WCD's liability, which impacts Debtors' rights, results in liquidation of claims against the Debtors, and exposes Debtors to substantial indemnification obligations.

Having satisfied this Court's jurisdiction and the authority under which it makes the within ruling, the Court addresses the merits of the Motion and the second two factors: whether extension of the automatic stay under § 362(a) to the nondebtors is appropriate; and whether the Court should, in its discretion, issue the preliminary injunction.

### 2. The Automatic Stay Under § 362(a)—by Application or Extension—Precludes All Scheduled Actions

The Debtors seek a determination that all 683 of the lawsuits listed in the Schedule are subject to the stay because they each fall into one (or more) of three categories: (1) they include *express* Successor Liability Claims; (2) they contain a bifurcation stipulation in which the plaintiff acknowledges Brenntag as successor to WCD; or (3) they allege pre-2004 exposure, rendering them *effective* Successor Liability Claims and/or necessarily impacting Debtors' rights and defenses and creating the potential for application of res judicata and collateral estoppel, as well as record taint. The Court will address each category in turn.

### a. Express Successor Liability Claims

As for the six hundred fifty-five (655) scheduled actions that include express Successor Liability Claims, there is no question that the automatic stay applies. For the reasons expressed in this Court's Summary Judgment Opinion (ECF No. 268), Successor Liability Claims are property

10

Case 3:24-cv-45041-KNQ   Doc 360   Filed 08/21/24   Page 11 of 23   PageID:
Case 23-01243-ZNQ   Document 189-14   Filed 08/12/50/24   Page 1031 of 1429 PageID:
Document  1389 age 11 of 23

of the bankruptcy estate and, thus, subject to the automatic stay.  No additional injunctive relief is necessary.

### b.  Actions Including Bifurcation Stipulations

Debtors contend that seven (7) of the remaining actions involve an executed stipulation—referred to as a "Bifurcation Stipulation"—in which the plaintiff concedes that his or her claims against Brenntag constitute Successor Liability Claims.  This admission renders those claims *effective* Successor Liability Claims and, for the same reasons discussed in this Court's Summary Judgment Opinion, such claims are property of the estate and subject to the automatic stay.

### c.  Actions Involving Pre-2004 Exposure

The balance of the twenty-one (21) scheduled actions are among the five hundred seventy (570) actions which expressly allege pre-2004 talc and asbestos exposure or lack sufficient detail to discern the date of exposure.  The Court and the parties have employed the term "straddle claims" to identify these Direct Claims against Brenntag, but which also reference pre-2004 exposure. The TCC contends that these claims are not subject to the stay because they do not seek any damages for exposure to WCD's talc products or for any conduct attributable to WCD.  Rather, the TCC asserts that plaintiffs in these actions place the focus on their injuries stemming from Brenntag's own talc products and conduct.

As indicated during the oral ruling on this issue, the Court had hoped that a resolution could be reached that would insulate Debtors, while permitting Direct Claims against Brenntag to proceed.  Upon further reflection, however, the Court concludes such a situation is unworkable. In cases with factual allegations alleging pre-2004 exposure, Brenntag and WCD are in the same

11

boat. To the extent these Direct Claims against Brenntag make waves for Brenntag, Debtors inevitably will also feel the movement. In defending the direct claims that plaintiffs bring, Brenntag can—and has indicated to this Court that it will—highlight the evidence of pre-2004 exposure in an effort to defend against and reduce its own liability. This will necessarily implicate WCD's liability and/or give rise to a Successor Liability Claim. Additionally, Brenntag has stated expressly that it will seek indemnification from Debtors bottomed on the parties' MSPA. While the TCC maintains that Brenntag cannot seek indemnification for any Direct Claims, this position again ignores that these cases may well involve evidence of pre-2004 exposure—meaning there exists a direct link to WCD and its products and conduct. Pursuant to the terms of the MSPA, Brenntag is entitled to indemnity from WCD as to any "damages . . . allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any Retained Subsidiary" such as WCD.

In short, once pre-2004 exposure is established, WCD's liability is on the table and at issue. To the extent Brenntag is held liable in such a case, said liability may very well be tied to WCD's conduct. There is simply no way to discern with certainty the source of a party's injuries in a case involving pre-2004 exposure allegations. This Court comprehends the TCC's explanation that juries regularly do make such determinations and allocate damages caused by separate entities, and notes that Ms. Kagan provided a demonstrative illustration with a sample jury sheet. However, even if such determinations are made and a jury distinguishes between Brenntag's and WCD's liability, these determinations effectively liquidate claims against Debtors.

12

JA1025

As a result, the Direct Claims against Brenntag involving pre-2004 exposure amount to either effective Successor Liability Claims—that is, derivative claims against Brenntag based on WCD's conduct—or serve to liquidate claims against WCD.  In either instance, continuation of these claims is expressly prohibited by § 362 of the Code

In the alternative—and assuming, without finding, that the Direct Claims are not already subject to the automatic stay under § 362—this Court finds cause to extend the stay to preclude these actions.  As the parties recognize, Third Circuit jurisprudence permits extension of the automatic stay to nonbankrupt codefendants where "unusual circumstances" exist. *McCartney*, 106 F.3d at 510 (citing *A.H. Robins*, 788 F.2d at 999; *see also In re Philadelphia Newspapers, LLC*, 423 B.R. at 104.  The *McCartney* court explained that such unusual circumstances may be found "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Id.*  Unusual circumstances have also been found where a third-party action will have an adverse impact on the debtor's ability to reorganize effectively, or where a debtor faces potential indemnification obligations. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009).

Here, the pre-2004 exposure allegations trigger WCD's potential liability.  Evidence of Debtors' conduct and culpability will be introduced, and findings will be rendered that may have future implications for Debtors—either through findings of liability or through indemnification obligations.  Thus, Debtors will be faced with the Hobson's choice of either standing idly by while their rights and defenses are not protected, or—alternatively—expending what little estate

resources remain to prevent findings and/or judgments that may be employed against them in the future.  These distractions will impede reorganizational efforts.

Moreover, Debtors' indemnification obligations owing to Brenntag are not in dispute.  Although the TCC frames Debtors' indemnification obligations as speculative and conclusory, the MSPA clearly establishes that Debtors must indemnify Brenntag for any "damages . . . allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by [WCD]."  While the extent and scope of Debtors' indemnification obligation remain unknown at this juncture (judgments have not been rendered), it is conceivable that any action in which a finding of liability could be bottomed on pre-2004 exposure may trigger the referenced indemnification clause.  This Court will not require the bankruptcy estate to bear such risks.

It is likely that Debtors will dispute indemnification to reduce their exposure.  The TCC seizes on the fact that indemnity will be debated and offers it as further evidence that Debtors' indemnification obligations are not "absolute," as required under Third Circuit precedent.  As an initial matter, this Court is not convinced that indemnity must be "absolute" in the sense that it is "automatic" or "an inevitable certainty" to warrant extension of the automatic stay.  The Court's rationale can be found in its *LTL* opinion and the Court will not repeat the analysis here. *See In re LTL MANAGEMENT, LLC*, 638 B.R. at 312.  As an illustration, however, the Court highlights the fact that in *McCartney*, the Third Circuit cites a Delaware bankruptcy case for the proposition that extension of a stay is appropriate where indemnification obligations exist.  The case cited favorably by the Third Circuit is *In re Am. Film Techs., Inc.*, 175 B.R. 847 (Bankr. D. Del. 1994) and, in that

14

**JA1027**

case, the bankruptcy court extended the stay where the obligation to indemnify was far from established. The complaint at issue in *AFT* pleaded certain facts that—if proven—would "presumably" entitle third party nondebtors to indemnification from the debtor. *Id.* at 854. However, if other facts were accepted as true (for instance, establishing fraud), indemnification obligations would not be triggered. Thus, this Court does not share the TCC's view that the indemnifications obligations here are too tenuous to warrant extension of the stay. The indemnification clause in the MSPA exists and, in that sense, Debtors' indemnification obligation is "absolute." The complaints alleging pre-2004 exposure contain facts that—if proven—could trigger those indemnification obligations; therefore, extension of the stay is warranted, consistent with Third Circuit precedent.

Additionally, still other courts have found unusual circumstances where a debtor is an indispensable party to litigation between a creditor and a third party, as determined under either Federal Rule of Civil Procedure 19 or comparable state rules of procedure and substantive law. *See, e.g.*, *In re Lennington*, 286 B.R. 672, 674–75 (Bankr. C.D. Ill. 2001) (collecting cases); *555 M Mfg., Inc. v. Calvin Klein, Inc.*, 13 F. Supp. 2d 719, 723 (N.D. Ill. 1998). In point of fact, in *McCartney*—the seminal case in this circuit regarding application of the automatic stay to nondebtor actions—the Third Circuit affirmed the lower court's decision staying an action involving nondebtors under § 362 because the debtor was a necessary party to that litigation. *See In re McCartney*, 165 B.R. 18, 20 (Bankr. W.D. Pa. 1994), subsequently aff'd sub nom. *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506 (3d Cir. 1997).

15

To determine whether a party is an "indispensable" party as defined by Federal Rule of Civil Procedure 19, the court must make a two-part inquiry. *See Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312–13 (3d Cir. 2007).

> A court must first determine whether a party should be joined if "feasible" under Rule 19(a). If the party should be joined but joinder is not feasible . . . the court must then determine whether the absent party is "indispensable" under Rule 19(b). If the party is indispensable, the action therefore cannot go forward.

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993)

Determining whether a party is indispensable requires a fact-specific, flexible analysis. In assessing whether WCD is a "necessary" party, the Court must inquire whether—in WCD's absence—the disposition of the action would as a practical matter prejudice WCD's ability to protect its own interest. *See, e.g.*, FED. R. CIV. P. 19(a)(1)(B)(i). For reasons previously discussed, continuation of the actions in which pre-2004 allegations are raised would impede WCD's ability to protect its own interests. Thus, it is a necessary party. However, due to its involvement in bankruptcy, joinder is not feasible. Ordinarily, the court considering the issue would then determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. To be clear, this Court does not have the authority to dismiss the actions in question and is not suggesting dismissal is appropriate. This Court engages in the indispensable party analysis for the sole purpose of considering whether extraordinary circumstances exist so as to warrant extension of the stay.[6]

---

[6] Additionally, the Court believes extension of the stay is appropriate to avoid the risk of dismissal in the event courts overseeing the litigations in question likewise find Debtors to be an indispensable party.

16

Engaging in this analysis, the Court carefully considers the Third Circuit's ruling in *Janney Montgomery Scott, Inc* and balances the interests of the plaintiffs, defendants, absent parties, and the public. As explained, adjudication of the claims involving pre-2004 exposure will implicate WCD's conduct and/or expose it to indemnification risks. The Court clarifies that this is not merely a situation where the litigation will result in a "persuasive precedent" against an absent party, an argument that the Third Circuit has rejected as a basis to deem a party indispensable. *See, e.g.*, *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 317 (3d Cir. 2007). Rather, continuation of these actions, without Debtors' participation, will have very real consequences for Debtors and certainly will impair or prejudice Debtors' interests. Unlike the circumstances in *Janney*, a judgment that Brenntag is liable where evidence supports a finding of pre-2004 exposure suggests that WCD may also have liability. Further, the *Janney* court observed that if it is shown that preclusion or collateral estoppel could be invoked against an absent party in other litigation, then continuation of the federal action could "as a practical matter impair or impede" the absent parties' interests. *Janney Montgomery Scott, Inc.*, 11 F.3d at 409 (quoting Rule 19(a)(2)(i)).

For all of these reasons, the Court finds that—because the actions involving pre-2004 exposure implicate conduct, operations, and potential indemnification obligations owing to Brenntag—they present the type of unusual circumstances that warrant extension of the automatic stay. As in *McCartney*, continued litigation of actions listed in the Schedule would defeat the purpose of § 362.

### 3. § 105(a) Injunction

The Court next addresses the parties' competing positions as to whether an injunction

17

under § 105(a) is appropriate.  Pursuant to § 105(a) of the Bankruptcy Code, "[t]he court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title." 11 U.S.C. § 105(a).  "The issuance of an injunction under section 105(a) is governed

by the standards generally applicable to the issuance of injunctive relief in non-bankruptcy

contexts." *In re Philadelphia Newspapers, LLC*, 423 B.R. at 105.  In determining whether a

preliminary injunction is appropriate, the Court considers the following factors:

> (1) whether the movant has shown a reasonable probability of success on the merits;
> (2) whether the movant will be irreparably injured by denial of the relief; (3)
> whether granting preliminary relief will result in even greater harm to the
> nonmoving party; and (4) whether granting the preliminary relief will be in the
> public interest.

*McTernan v. City of York, Pa.,* 577 F.3d 521, 527 (3d Cir. 2009) (quoting *United States v. Bell*,

414 F.3d 474, 478 n.4 (3d Cir. 2005)); *see also ADP, Inc. v. Levin*, No. 21-2187, 2022 WL

1184202, at *1 (3d Cir. Apr. 21, 2022) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 176

(3d Cir. 2017), as amended (June 26, 2017)).  "A preliminary injunction is an 'extraordinary

remedy, which should be granted only in limited circumstances.' " *Kos Pharmaceuticals Inc. v.

Andrex Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Instant Air Freight Co. v. C.F. Air

Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)).  The burden rests on the party seeking the

injunction to establish the appropriateness of the injunction. *See In re Union Tr. Philadelphia,

LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011) (citations omitted).

### a.  Success on the Merits

"In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's

ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC*, 460 B.R. at 660 (quoting

*In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986) (explaining reasonable likelihood of success in terms of a successful reorganization)).  To demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty. *See Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 397 (3d Cir. 2013) (Jordan, J., dissenting) (reversed and remand on other grounds) (collecting cases).

The TCC contends that this factor is not met where the request for a preliminary injunction is unrelated to the ultimate relief the movant seeks.  Here, however, the temporary relief sought is consistent with Debtors' ultimate goal of reorganization, which includes its desire to maximize its estate, avoid defense costs, minimize its exposure to findings of liability, and preserve its assets.  And although the Debtors face challenges still—namely a successful Settlement—Debtors have taken steps in the right direction, thus, satisfying their burden of demonstrating the possibility that it will succeed.  Accordingly, this first factor is weighs in favor of an injunction.

### b.  Irreparable Injury

The Court next assesses whether Debtors are likely to suffer irreparable injury without the requested relief.  As it has done in prior cases, this Court "recognizes that the alleged irreparable harm cannot be too remote—in terms of time—or too speculative—in terms of likeliness to occur." *In Re LTL Mgmt., LLC*, 640 B.R. at 341.  Nevertheless, it remains this Court's view "that the test for whether irreparable harm has been demonstrated in the context of a bankruptcy case should encompass a broader view of the impact on the debtor and can take into account risks of negative consequences." *Id.*

19

As explained, here, continuation of the Direct Claims presents the potential consequences of adverse judgments and litigation prejudice in the form of res judicata, collateral estoppel, and record taint.  Moreover, continued litigation of actions involving pre-2004 exposure poses the very real possibility of laying a foundation for indemnification obligations and for liquidating Successor Liability Claims belonging to the estate.

The Court agrees with the TCC that the mere existence of an indemnification agreement does not *per se* translate to irreparable harm.  Rather, this Court looks to the specific claims at issue and the terms of the agreement and concludes that irreparable harm is likely in these circumstances.  Notably, the case cited by the TCC in support of its position is materially distinguishable from the situation the Court now faces. In *In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007), the bankruptcy court had not made any findings that an indemnity agreement existed or that said agreement even covered the liabilities in question.  In contrast, here, the contractual indemnification obligations unquestionably exist.  And to the extent Brenntag is deemed liable for pre-2004 exposure, Debtors' indemnification responsibilities are triggered. Further, the Court reiterates that even if Brenntag is found liable on account of post-2004 closing conduct, indemnification rights may be triggered if the evidence establishes the existence of pre-2004 exposure.

The Court is unpersuaded by the TCC's argument that any indemnification obligation would not cause irreparable harm because it would result in a contingent prepetition claim disallowable under 11 U.S.C. § 502(e)(1)(B).  This contention effectively concedes that continued litigation of the Direct Claims could result in liquidation of a claim against Debtors—which is a

20

violation of the automatic stay and certainly harmful to the Debtors' reorganizational efforts. Additionally, this Court will not speculate as to the ultimate treatment of such a claim and whether it could be allowed or subordinated.

Finally, the Court further rejects the TCC's reference to Debtors' "backstop"; namely, that NICO and DBUS will pay in the event Debtors are financially unable to satisfy their own obligations. That the Debtors have a backstop ignores the fact that Debtors first will be required to deplete their own assets. In making determinations, this Court must keep the larger picture in focus. As this Court previously noted, the plaintiffs in these actions are not Debtors' only creditors—Debtors have significant creditors with Environmental Claims. Compelling the Debtor to expend its limited resources and deplete it assets with the aim of reaching the "backstop" resources (which serve to benefit only a portion of the creditor body) is unjust and inequitable.

### c. Public Interest

The court next jumps to the fourth factor for issuing a preliminary injunction: whether granting the preliminary relief will be in the public interest. In weighing all competing factors, the Court concludes that granting the injunction would be in the public interest. Again, this Court mindful of the interests of future claimants, and Environmental Claimants, and considers the inequities that could result if certain litigation proceeded outside the present bankruptcy. An injunction balances all interests involved. With these considerations in mind, the Court now returns to the third factor.

21

### d.  Harm to Nonmoving Party

The Court struggles the most—as it repeatedly has in the past—with this third factor.  The Court has tried to express through its prior rulings and on-record discussions that it does not enter this relief lightly.  This Court wants to give plaintiffs—who are suffering and dying—their day in Court, and takes no pleasure in standing in the way.  Nevertheless, this Court must be mindful of its role in overseeing this bankruptcy case.  The Court must balance all stakeholder interests involved.  If there were a way to permit these plaintiffs to proceed, without negatively impacting the bankruptcy estate, the cases could go to trial tomorrow.  However, careful analysis reveals the inevitable fact that the actions involving pre-2004 exposure are inextricably tied to Debtors' interests.  They cannot be unwound.

The Court considers the public policy concerns that underlie all mass tort cases and balances the equities on all sides.  To the extent it is successful, the Debtors' Settlement Motion will resolve issues with Brenntag and eliminate the need for future litigation and conserve estate resources—a result that benefits *all* of Debtors' creditors: the TCC, future claimants, and Environmental Claimants.

## IV.  Conclusion

For the reasons set forth above, the Court concludes that the actions identified in the Schedule are subject to the automatic stay under § 362 or, in the alternative, that "unusual circumstances" exist warranting an extension of the automatic stay to Brenntag under § 362(a).  To the extent § 362(a) does not serve as an independent basis for extension of the stay to nondebtor parties, the Court determines that a preliminary injunction under § 105(a) extending the stay is

appropriate.  In reaching today's ruling, this Court believes it has appropriately balanced the competing interests at stake.  Significantly, these actions are not stayed indefinitely.  Debtors have filed a Settlement Motion that will be considered in the near term and, if approved, would resolve their obligations to Brenntag.  Debtors acknowledge that injunctive relief would extend only through the Court's issuance of a ruling on the Settlement Motion.

For the foregoing reasons, the actions in the Schedule are hereby stayed pending resolution of the Settlement Motion or further Order of this Court.  Counsel for Debtors are directed to settle a proposed form of Order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: October 24, 2024

Form order − ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  Whittaker, Clark & Daniels, Inc.
Debtor

Case No.: 23−13575−MBK
Chapter 11

Whittaker, Clark & Daniels, Inc.
Plaintiff

v.

Brenntag AG
Defendant

Adv. Proc. No. 23−01245−MBK                Judge: Michael B. Kaplan

---

## NOTICE OF JUDGMENT OR ORDER
## Pursuant to Fed. R. Bankr. P. 9022

Please be advised that on October 24, 2024, the court entered the following judgment or order on the court's docket in the above−captioned case:

Document Number: 360 − 299
Opinion Granting Motion to Extend Stay (related document:299 Motion re: Debtors' Motion for (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non−Debtors Pending Entry of a Final, Non−Appealable Order Regarding the Debtors' Proposed Settlement and (II) filed by Plaintiff Whittaker, Clark & Daniels, Inc.).. Service of notice of the entry of this order pursuant to Rule 9022 was made on the appropriate parties. Signed on 10/24/2024 (wiq)

Parties may review the order by accessing it through PACER or the court's electronic case filing system (CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: October 24, 2024
JAN: wiq

Jeanne Naughton
Clerk

(Page 2)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

---

WHITTAKER, CLARK & DANIELS, INC., BRILLIANT
NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and
SOCO WEST, INC.,

     Plaintiffs,

v.

BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG
GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC.,
BRENNTAG NORTH AMERICA, INC., BRENNTAG
NORTHEAST, INC., BRENNTAG PACIFIC, INC.,
BRENNTAG SOUTHEAST, INC., BRENNTAG
SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC.,
BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL
CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC.,
THOSE PARTIES LISTED ON APPENDIX A TO THE
COMPLAINT and JOHN AND JANE DOES 1-1,000,

     Defendants.

Adv. Proc. No. 23-01245 (MBK)

**FILED**
JEANNE A. NAUGHTON, CLERK

NOV 19 2024

U.S. BANKRUPTCY COURT
TRENTON, NJ
BY_____DEPUTY

### ORDER ENFORCING AUTOMATIC STAY AND PRELIMINARILY
### ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS

The relief set forth on the following pages, numbered three (3) through nine (9), is

ORDERED.

Michael B. Kaplan, USBJ

11/19/24

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| Caption in Compliance with D.N.J. LBR 9004-1(b) | |
| COLE SCHOTZ P.C.<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com<br><br>-and-<br><br>COLE SCHOTZ P.C.<br>Seth Van Aalten, Esq. (admitted *pro hac vice*)<br>Anthony De Leo, Esq.<br>1325 Avenue of the Americas, 19th Floor<br>New York, NY 10019<br>Telephone: (212) 752-8000<br>Facsimile: (212) 752-8393<br>svanaalten@coleschotz.com<br>adeleo@coleschotz.com<br><br>-and-<br><br>COLE SCHOTZ P.C.<br>G. David Dean, Esq. (admitted *pro hac vice*)<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801<br>Telephone: (302) 652-3131<br>Facsimile: (302) 652-3117<br>ddean@coleschotz.com<br><br>*Counsel for Debtors and*<br>*Debtors-in-Possession* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>                       Debtors.[1] | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

65977/0001-48613045

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

This matter coming before the Court on the *Debtors' Motion for (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors Pending Entry of a Final, Non-Appealable Order Regarding the Debtors' Proposed Settlement and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision on the Debtors' Request for Injunctive Relief* [Adv. Proc. Docket No. 299] (the "**Motion**"); and the Court having previously entered an opinion dated August 13, 2024 [Adv. Proc. Docket No. 268] (the "**Summary Judgment Opinion**") and Order dated August 28, 2024 [Adv. Proc. Docket No. 292] (the "**Summary Judgment Order**")[2] declaring that Successor Liability Claims are property of the Debtors' estates pursuant to section 541(a) of the Bankruptcy Code; and the Court having found and determined that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C. § 157(b), (iii) venue is proper in this district pursuant to 28 U.S.C. § 1409, and (iv) entry of this Order is (a) fair and reasonable, (b) consistent with the Bankruptcy Code, the Bankruptcy Rules, the applicable Federal Rules, and the Local Rules, (c) appropriate under the circumstances, and (d) in the best interests of the Debtors and their estates and creditors; and the Court having considered the Motion, the amended declaration filed in support of the Motion [Adv. Proc. Docket No. 305] (the "**Declaration**"), the amended schedule reflecting the Brenntag Enjoined Claims [Adv. Proc. Docket No. 317] (the "**Summary Schedule**"), the objection to the relief requested in the Motion filed by the Official Committee of Talc Claimants [Adv. Proc. Docket No. 310], the Debtors' reply

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the October 24 Opinion (defined below), as applicable.

(Page 4)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

in support of the Motion [Adv. Proc. Docket No. 353] and Brenntag's joinder in support thereof

[Adv. Proc. Docket No. 354]; and upon the record of the hearings to consider the relief requested

in the Motion conducted on October 15, 2024 and October 21, 2024 (collectively, the **"Hearing"**),

and the Court having issued an opinion dated October 24, 2024 setting forth its reasoning in

granting the Motion [Adv. Proc. Docket No. 360] (the **"October 24 Opinion"**), the Court hereby

finds and determines that:

     A.    The findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact

constitute conclusions of law, they are adopted as such. To the extent any of the following

conclusions of law constitute findings of fact, they are adopted as such.

     B.    The findings of fact and conclusions of law set forth in the October 24 Opinion, the

Summary Judgment Opinion, and the Summary Judgment Order are incorporated into this Order

by reference as if fully set forth herein.

     C.    Without immediate injunctive relief, it is expected that the Debtors will be

irreparably harmed.

     D.    The legal and factual bases set forth in the Motion, the Declaration, and the

Summary Schedule and at the Hearing, as well as the parties' representations on the record,

establish just cause for the relief granted herein.

     Based on the foregoing findings and conclusions, **IT IS HEREBY ORDERED** that:

     1.    The Motion is **GRANTED**, except as set forth in Paragraph 6 hereof.

65977/0001-48613045

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

   2.    The claims against Brenntag (and only Brenntag) scheduled on **Exhibit 1** are
automatically stayed pursuant to section 362 of the Bankruptcy Code or, alternatively,
preliminarily enjoined through and including the date on which the Court enters: (i) a final, non-
appealable Order granting the Settlement Motion; or (ii) an Order denying the Settlement Motion,
absent further order of this Court.    Accordingly, Defendants are prohibited from prosecuting,
amending, or settling any such claims, subject to the terms of this Order.    Any dispute regarding
applicability of the automatic stay or this Order to a particular claim or action, or any allegations
regarding violations of the automatic stay or this Order, shall be brought before this Court for
resolution. For the avoidance of doubt, nothing in this Order shall prejudice any rights to move in
this Court for relief from the automatic stay or this Order under any theory.

   3.    The prospective effect of this Order shall terminate immediately upon this Court's
entry of (i) a final, non-appealable Order granting the Settlement Motion or (ii) an Order denying
the Settlement Motion.

   4.    The Debtors are authorized to amend or supplement Exhibit 1 to stay/enjoin
additional actions asserting claims against Brenntag (and only Brenntag) consistent with the
October 24 Opinion pursuant to the following procedures, which are hereby approved:

   i.    So long as this Order remains in effect, the Debtors shall be permitted to file on the
docket in the Adversary Proceeding a request (a **"Request to Amend"**), which shall
attach (a) a proposed order approving the requested amendment(s) (an **"Order
Approving Amendment"**), (b) an amended or supplemented Exhibit 1 that
identifies the additional actions sought to be stayed/enjoined (such actions,
**"Additional Actions"**), (c) a blackline of such exhibit marked against the
previously filed exhibit, and (d) a copy of the operative complaint and any
bifurcation stipulation filed in each Additional Action.

   ii.    Any Request to Amend shall be served by regular mail and email (where known)
on counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel

(Page 6)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

for NICO, counsel for DB US, and counsel for any individual plaintiff in any Additional Action (each, a **"Amendment Notice Party"** and collectively with counsel for the Debtors, the **"Amendment Notice Parties"**) within one (1) business day of filing a Request to Amend.

iii.  Objections, if any, to a Request to Amend, which shall be limited to arguing that the plaintiff's claims against Brenntag in the relevant Additional Action constitute purely direct claims based solely on plaintiff's post-2004 talc/asbestos exposure, either because (i) plaintiff's initial exposure to talc/asbestos occurred after February 27, 2004 or (ii) prior to February 28, 2024, plaintiff was exposed to talc/asbestos that was in no way connected to the Debtors (each, an **"Amendment Objection"**), shall be filed and served by first class mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US within fourteen (14) days of service of the applicable Request to Amend.

iv.  Any Amendment Notice Party that fails to timely file an Amendment Objection shall be deemed to consent to entry of the Order Approving Amendment as to the Additional Action(s) identified in the applicable Request to Amend.

v.  In the event an Amendment Notice Party timely files an Amendment Objection, the parties shall meet and confer in an attempt to resolve the Amendment Objection, and, in the absence of such resolution, the Court shall resolve the Amendment Objection at a hearing to be scheduled. For the avoidance of doubt, the Amendment Notice Parties reserve all rights to file a reply in connection with any Amendment Objection.

5.  The following Schedule Removal Procedures are hereby approved:

i.  So long as this Order remains in effect, any plaintiff whose action is listed on Exhibit 1 and whose claims against Brenntag constitute purely direct claims based solely on such plaintiff's post-2004 talc/asbestos exposure, either because (i) plaintiff's initial exposure to talc/asbestos occurred after February 27, 2004 or (ii) prior to February 28, 2024, plaintiff was exposed to talc/asbestos that was in no way connected to the Debtors, shall be permitted to file on the docket in the Adversary Proceeding a request to remove his or her action from Exhibit 1 (as amended or supplemented) (a **"Removal Request"**), which shall (a) identify the specific action plaintiff seeks to remove and (b) provide evidence sufficient to establish that plaintiff satisfies (i) or (ii) of this Paragraph 5.i.

ii.  Any Removal Request shall be served by regular mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US (each, a **"Removal Notice Party"** and

(Page 7)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims Against Non-Debtors

collectively, the **"Removal Notice Parties"**) within one (1) business day after filing such Removal Request.

iii. Objections, if any, to a Removal Request (each, a **"Removal Objection"**), shall be filed and served by first class mail and email (where known) on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and, if not the filing party, counsel for the applicable plaintiff within fourteen (14) days of service of such Removal Request.

iv. Any Removal Notice Party that fails to timely file a Removal Objection shall be deemed to consent to the removal of the action identified in the applicable Removal Request from the Schedule.

v. In the event a Removal Notice Party timely files a Removal Objection, the parties shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Removal Objection at a hearing to be scheduled. For the avoidance of doubt, the Removal Notice Parties reserve all rights to file a reply in connection with any Removal Objection.

6. The plaintiff in the action styled *Sneider v. Avon Products Inc., et al.*, Case No. 23STCV25951 (Cal. Super. Ct.) (the **"Sneider Action"**) and Brenntag are hereby granted relief from this Order solely to litigate or settle plaintiff's claims against Brenntag in the Sneider Action, including but not limited to the introduction of evidence or argument with respect to Debtors' alleged liability for the sole and limited purpose of raising any defense to such claims or allocating or apportioning some or all liability, if any, for such claims as among the Debtors, Brenntag, and/or any other entity, and pursuant to this Court's oral ruling on November 6, 2024, this Court annuls *although this Court finds that removal of the Sneider Action was a technical but not wilful violation of the automatic stay* the automatic stay as to the Sneider Action *nunc pro tunc* to the commencement of the Sneider Action as to all actions taken *to date* (MBK) by either Sneider or Brenntag in the Sneider Action. Accordingly, ~~no party's actions in the Sneider Action are deemed to have been violative of the automatic~~ stay (MBK) or ~~void ab initio,~~ and further litigation or settlement of the Sneider Action shall not violate the automatic stay or this Order, subject to the following *Continuing* limitations: *to* the extent a verdict or findings

65977/0001-48613045

(Page 8)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims Against Non-Debtors

are rendered, or a settlement is executed, evidence introduced implicating Debtors' liability shall have no preclusive effect against the Debtors and may not be referenced or offered into evidence in any future litigation involving Debtors, the Debtors' liabilities, and the Debtors' claims against Brenntag in this or any other proceeding involving the Debtors; provided that all claims for or defenses to indemnification as among Brenntag, DB US, and NICO are preserved.

7.    The Debtors shall serve a copy of this Order, including Exhibit 1, on all parties to this Adversary Proceeding via regular mail within one (1) business day of entry of this Order.

8.    Any party in interest is authorized to file this Order on the docket of the actions listed on Exhibit 1 of this Order.

9.    Pursuant to Federal Bankruptcy Rule 7065, the Debtors are relieved from posting bond under Federal Rule 65(c).

10.    Notwithstanding anything to the contrary in this Order, any party to an action listed on Exhibit 1 of this Order may, without leave of this Court, take reasonable steps to perpetuate the testimony of any person subject to this Order who is not expected to survive the duration of this Order or who otherwise is expected to be unable to provide testimony if such testimony is not perpetuated during the duration of this Order. Notice shall be provided to the Debtors and Brenntag by notifying counsel for the Debtors and counsel for Brenntag appearing in the applicable action, respectively, of the perpetuation of such testimony. The Debtors shall have the right to object to the notice on any grounds it would have if it were a party to the underlying proceeding and not subject to the terms of this Order, and the Debtors may raise any such objection with this Court. The use of such testimony in any appropriate jurisdiction shall be subject to the applicable procedural and evidentiary rules of such jurisdiction, except that the Debtors waive objecting to

65977/0001-48613045

**JA1045**

(Page 9)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

the use of any such testimony based on lack of notice or lack of opportunity to cross-examine. All parties reserve and do not waive any and all objections with respect to such testimony. Defendants may not seek to perpetuate the testimony of any representatives - including, but not limited to, directors, officers, current and/or former employees, and agents—of the Debtors without the consent of the Debtors or an order of the Court.

11.     The requirement set forth in D.N.J. LBR 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

12.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

13.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

14.     This Order constitutes a final appealable order within the meaning of 28 U.S.C. § 158(a).

15.     The terms and conditions of this Order shall be effective immediately upon its entry.

16.     This Court shall have exclusive jurisdiction over this Order and any and all matters arising from or relating to the implementation, interpretation, or enforcement of this Order, including, without limitation, any determination regarding whether an action is subject to this Order, and any requests for relief from the stay/injunction set forth in this Order.

65977/0001-48613045

Case 3:23-cv-12491-MBK Document 18-1 Filed 11/20/24 03/21/25 Page 1054 of 1429 PageID:
Notice of Order/Entry    Page 1 of 1
1412

Form order − ntcorder

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

In Re:  Whittaker, Clark & Daniels, Inc.
Debtor

                                         Case No.: 23−13575−MBK
                                         Chapter 11

Whittaker, Clark & Daniels, Inc.
Plaintiff

v.

Brenntag AG
Defendant

Adv. Proc. No. 23−01245−MBK                        Judge: Michael B. Kaplan

### NOTICE OF JUDGMENT OR ORDER
### Pursuant to Fed. R. Bankr. P. 9022

       Please be advised that on November 20, 2024, the court entered the following judgment or order on the court's
docket in the above−captioned case:

Document Number: 366 − 1, 360
ORDER ENFORCING AUTOMATIC STAY AND PRELIMINARILY ENJOINING CERTAIN ACTIONS
AGAINST NON−DEBTORS (related document:1 Adversary case 23−01245. Complaint by Whittaker, Clark &
Daniels, Inc., Brilliant National Services, Inc., L.A. Terminals, Inc., Soco West, Inc. against Brenntag AG ; Brenntag
Canada Inc. ; Brenntag Great Lakes, LLC ; Brenntag Mid−South, Inc. ; Brenntag North America, Inc. ; Brenntag
Northeast, Inc. ; Brenntag Pacific, Inc. ; Brenntag Southeast, Inc. ; Brenntag Southwest, Inc. ; Brenntag Specialties,
Inc. ; Brenntag Specialties LLC ; Coastal Chemical Co., LLC ; Mineral and Pigment Solutions, Inc. ; Those Parties
Listed on Appendix A to the Complaint and John and Jane Does 1−1000. Fee Amount $ 350.. (91 (Declaratory
judgment)) (Attachments: # 1 Appendix A − List of Defendants and their Counsel # 2 Appendix B − List of Protected
Parties) filed by Plaintiff Whittaker, Clark & Daniels, Inc., Plaintiff Brilliant National Services, Inc., Plaintiff Soco
West, Inc., Plaintiff L.A. Terminals, Inc., 360 Opinion Granting Motion to Extend Stay (related document:299
Motion re: Debtors' Motion For (I) an Order Extending the Automatic Stay to and/or Preliminarily Enjoining Certain
Actions Against Non−Debtors Pending Entry of a Final, Non−Appealable Order Regarding the Debtors' Proposed
Settlement and (II) filed by Plaintiff Whittaker, Clark & Daniels, Inc.).. Service of notice of the entry of this order
pursuant to Rule 9022 was made on the appropriate parties. Signed on 11/20/2024. (wiq)

       Parties may review the order by accessing it through PACER or the court's electronic case filing system
(CM/ECF). Public terminals for viewing are also available at the courthouse in each vicinage.

Dated: November 20, 2024
JAN: wiq

                                                  Jeanne Naughton
                                                  Clerk

Case 3:23-cv-02491-MZK Document 16-1 Filed 11/24/25 Page 1055 of 1429 PageID:
EXHIBIT 1143
Case 2:24-cv-04513-JKS Document 3-2 Filed 04/03/25 Page 1 of 38 PageID:
EXHIBIT 114

EX    IBIT

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P A C Nm |
|---|---|---|---|---|---|---|---|
| Acevedo | Yolanda | Yolanda Acevedo and Noe Acevedo v Avon Products, Inc et al. | MID-L-003625-23 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Adams | Jennifer | Jennifer E. Adams and Jon S Adams v Brenntag North America, Inc et al. | MID-L-004655-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Adams | Jacqueline | Jacqueline Adams and David Adams v Sumitomo Corporation of America et al. | 190017/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Adams | Sheri | Sheri Adams v Alberto Culver USA Inc et al. | 190233/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |
| Aikens | Kimberly | Kimberly O. Aikens v. Publix Supermarkets, Inc., et al | 2023-017836-CA01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. |
| Akins | Shirley | Shirley Akins and Charles Akins vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2021-80721-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Akins | Theresa | Theresa Akins vs. Brenntag Specialties LLC, et al | 2022-57520-ASB | Texas | Harris | Nachawati Law Group | Steven S. Schulte |
| Al Saad | Newal | Dan Albasry, as Trustee of the Estate of Newal Al Saad, and Firas Mohammad v. Barretts Minerals, Inc., et al., | 190002/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |
| Alber | Zachary Michael | Alber, Rebecca, Estate of Zachary Michael Alber, Pltf. v. Johnson & Johnson, et al. | MID-L-000955-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Alegre | Jorge | Jorge M Alegre and Luz Alegre v Arkema, Inc et al. | MID-L-001861-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Alexander-Jones | Ruth | G. RUTH ALEXANDER-JONES and JAMES R. JONES v. AVON PRODUCTS, INC., et al. | 22-2-18669-1 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Brian F. Ladenburg |
| Alicea | Maria | Maria Alicea v. Avon Products, Inc., et al. | 23-1551 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell |
| Aloisio | Roman | Roman Aloisio v Avon Products, Inc et al. | 190239/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Alvarado | Alvaro | Maria Del Rosario Tobias, Ind. and as Personal Rep. of the Estate of Alvaro Alvarado, Deceased, and a/n/f of L.A., a Minor vs. Avon Products, Inc., Brenntag Specialties LLC, et al | 2021-73332-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Alvarez | Josefina | Josefina Alvarez v. Barretts Minerals Inc., et al | 23 L 5583 | Illinois | Cook | Maune Raichle Hartley French & Mudd, LLC | Bethany Gasperin |
| Alvarez | Maria | Alvarez, Miguel, Executor of Estate of Maria Alvarez, Pltf. v. Johnson & Johnson, et al. | MID-L-005353-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Amerosa | Elaine | Elaine M. Amerosa v Amerilure Inc., et al. | EFCA2023-002100 | New York | Oneida | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Anderson | Gina | GINA ANDERSON v. AVON PRODUCTS, INC., et al. | 21-2-14042-1 SEA | Washington | King | Simon Greenstone Panatier, PC | Robert Green |
| Anderson | Carolyn | Carolyn S. Anderson v. Avon Products, Inc., et al. | MID-L-02533-18 AS | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Anderton | William | William Anderton and Margie Anderton v. Brenntag North America and Brenntag Specialties, Inc. | MID-L-005866-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Arazosa | Richard | Joan Arazosa, as Executor of the Estate of Richard Arazosa v. 3M Co. et al. | 190069/2016 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |

639771D001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Armstrong | Terry | Terry Armstrong and Katherine Armstrong vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-38902-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Arvelo | Donna | Arvelo, Donna, M., Pltf. vs. Asbestos Corporation, Ltd., et al. | MID-L-000588-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Ashdown | Janet | Janet Ashdown v Sumitomo Corporation of America et al. | 190018/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Ashelford | John | Susan Ashelford, as Personal Representative of the Estate of John Ashelford, Deceased v. Barretts Minerals, Inc., et al | 23-002556 CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Ashoori | Shanaz | Shanaz Ashoori and Jehangir Ashoori v. AII, et al. | MID-L-001341-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Backofen | Brent | Brent W. Backofen v. 84 Lumber Company, et al. | 190172/2012 | New York | New York | The Early law Firm, LLC | Brian Francis Early |
| Bascin | Alicia | Alicia Bascin & Kenneth Bascin v Avon Products, Inc et al. | 190069/2023 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Bagley | Patricia | Patricia Bagley v. Chanel, Inc., et al. | 190122/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Balas | Sandra | Sandra Balas and Anthony Balas v. Wegmans Food Markets, Inc., et al. | 811759/2024 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Ballesteros | Irma | Irma Ballesteros v. ALBERTSONS COMPANIES, INC., et al. | 23STCV06710 | California | Los Angeles | Frost Law Firm, PC | Andrew Seitz |
| Barker | Maureen | Georgina Jane Barker, Individually and as administrator of the estate of Maureen Barker v Christian Dior, Inc et al. | 190299/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Barnhart | Melissa | Melissa Barnhart and Christopher Barnhart v Avon Products, Inc et al. | MID-L-002049-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Barone | Nicholas | Nicholas Barone and Kathryn Barone v. Blue M, et al. | FBT-CV-22-6116587-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Barratt | Madelin | Barratt, Madelin and Henry Barratt, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008016-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Bartlett | Deborah Lee | Deborah Bartlett and Shawn Bartlett v Avon Products, Inc. et al. | 24STCV04012 | California | Los Angeles | Simon Greenstone Panatier, PC | Robert Green |
| Barton | Harold | Harold Barton, et al. v. Avon Products, Inc., et al. | CV21955385 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeRuve |
| Basili | Gina | Gina F. Basili v. Avon Products, Inc. et al. | 23-0784 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell |
| Basser | Carol | Carol Basser v AII, et al. | MID-L-000432-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Bast | Donna J. | DONNA J. BAST and LARRY A. BAST v. AVON PRODUCTS, INC. et al. | 23-2-15056-2 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton |
| Batey | Mary | William Batey Jr., Individually and as Administrator and Administrator ad Prosequendum for the Estate of Mary Batey, et al vs Avon Products, Inc., et al | MID-L-001565-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |

639770001-4866996851

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P A Nm |
|---|---|---|---|---|---|---|---|
| Bathgate | Josephine | Josephine Bathgate v Avon Products, Inc et al. | 1901125/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Belanger | Stacy | PETER BELANGER, individually and as successor-in-interest to STACY BELANGER, Deceased, CHRISTOPHER BELANGER, LUKE BELANGER, and LILY BELANGER, Individually, vs. RALPHS GROCERY COMPANY et al. | 22STCV08775 | California | Los Angeles | Waters Kraus & Paul | Kevin M. Loew |
| Bell | Judy Kay | Scott Bell, as Personal Representative for the Estate of Judy Kay Bell v. Almay, Inc., et al. | 1900090/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Bennett-Turner | Alan | Alan Bennett-Turner v Avon Products, Inc et al. | 190118/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Berris | Susan W. | SUSAN W. BERRIS and BRUCE C. BERRIS, vs. BRENNTAG NORTH AMERICA, INC., et al. | 62-CV-23-257 | Minnesota | Ramsey | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann |
| Berry | Sara | Sara Berry and Sean Berry v Sumitomo Corporation of the Americas et al. | 1902742/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Besse | Jodi | Besse, Jodi & George Besse, Pltfs. v. Duval's Pharmacy et al. | 1900102/2021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Best | Edna | Edna Best v. Avon Products, Inc., et al. | MID-L-0075465-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Betts | Susan | Susan Betts v. Avon Products, Inc., et al. | 190119/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Bezanilla | Bernadette | Bernadette A. Bezanilla and Leopoldo G. Bezanilla v. Avon Products, Inc., et al | CACE-23-003072 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiBona |
| Biggers | Walter | Walter A. Biggers and Janet L Biggers vs. Arkema, Inc., F/K/A Pennwalt Corporation, et. al. | 2024-LA-000830 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Steven D. Rineberg |
| Bijjetina | Jolynne | Jolynne Bijjetina and Eric Bijjetina, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 1900242/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Bill | Lorraine | Bill, Lorraine & Thomas South, Pltfs. v. Avon Products, Inc., et al. | 190065/22 | New York | New York | Weitz & Luxenberg P.C. | James Pliastras |
| Biondo | Nancy | Peter Biondo, as Administrator of the Estate of Nancy Biondo, Deceased v. Avon Products, Inc., et al. | 190199/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier |
| Bisceglio | Janice | Bisceglio, Janice, Pltf. v. Johnson & Johnson, et al. | MID-L-003853-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Biswas | Roman | Rohan Biswas and Jaclyn Biswas v Aramis Distributors New York, Inc et al. | 190004/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Black | Edward | Tameron S. Gifts, Ind. and as Special Administrator for the heirs and Estate of Edward E. Black Sr. and Wanda Jo Black vs. Brenntag Specialties LLC, et al | 2018-59007-ASB | Texas | Harris | The Lanier Law Firm, PLLC | Mark A. Linder |
| Black | Mary | Mary Black, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 1900162/2017 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block |
| Blackwell | Mary Kathryn | Mary Kathryn Blackwell vs. Avon Products, Inc. et al. | CACE-24-010680 | Florida | Broward | Simmons Hanly Conroy LLP | Juan P. Bauta, II |

3

659770001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Blankschaen | Judith | Blinkinsop, Robert and Karen Blinkinsop, etc, Pltfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008377-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Bloomberg | Jac | Bloomburg, Ellen, for the Estate of Jac M. Bloomberg, Pltf. v. Barretts Minerals, Inc., et al. | MID-L-002608-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden |
| Blue | Vertis | Blue, Vertis, Pltf. v. Avon Products, Inc., et al. | MID-L-02677-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Boatright | Angela | Boatright, Angela, Pltf. v. Avon Products, Inc., et al. | 190154/2021 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Bogler | Enza | Wolfgang Bogler, as Administrator of the Estate of Enza Bogler, and Wolfgang Bogler, Individually v. Avon Products, Inc., et al. | 614805/2024 | New York | Suffolk | Weitz & Luxenberg P.C. | Sean Kerley |
| Boice | Denise K. | DEBBIE A. BOICE, as Personal Representative of the Estate of DENISE K. BOICE v. AVON PRODUCTS, INC, et al. | 23-2-22519-8 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton |
| Bolen | Barbara Ellen | Poland-Stemock, DeAnna and Estate of Barbara Ellen Bolen, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-000404-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Borthwick | Anne | Anne Borthwick and David Borthwick v. Sumitomo Corporation of Americas, et al. | 190031/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Bowers | Bernard | Bowers, Bernard P. and Jeanne Bowers, Pltfs., v. A.W. Chesterton Company, et al. | 21-09-02481 | Pennsylvania | Philadelphia | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Bradford | Claire | Sharon Englerth, as Personal Representative of the Estate of Claire Bradford v. Bayer Healthcare LLC, et al. | 24-05-00433 | Pennsylvania | Philadelphia | Brookman, Rosenberg, Brown and Sandler | Steven J. Cooperstein |
| Brand | Karen | Brand, Karen & Ronald Brand, Pltfs. vs. Avon Products, Inc., et al. | 190206/2021 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Brannon | Billy | Billy Brannon and Wilma Brannon vs. Atec, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2023-15536-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Brantley | William | Kelly Brantley and Sara Brantley v. 3M Company a/k/a Minnesota Mining & Manufacturing Company, et al | C-717978 32 | Louisiana | East Baton Rouge Parish 19th JDC | Gettys Law Group, APLC Simon Greenstone Panatier, PC | Lawrence G. Gettys Holly C. Peterson |
| Braun | James | Gayle Braun, as Executor for the Estate of James M. Braun Jr., deceased v. Air & Liquid Systems Corporation, successor-by-merger to Buffalo Pumps, Inc., et al | 2022LA001010 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Eric Poplonski |
| Brewer | Rebecca | Rebecca Brewer v. Avon Products, Inc., et al. | 190367/2016 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block |
| Brown | Leroy | Leroy Brown v 3M Company et al. | 23-11-03107 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Jason P. Yampolsky |
| Buehler | Roger | Buehler, Eva, Individually and as Executor of the Estate of Roger D. Buehler, deceased, Pltf. vs Air & Liquid Systems Corporation, et al. | MID-L-002905-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Cody Greenes |
| Buhlig | Marcella | Buhlig, Marcella and William Buhlig, etc., Pltfs. vs. American International Industries, Inc. , et al. | MID-L-007265-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Burchette | Kimberly | Kimberly Burchette & Jamie Burchette v Avon Products, Inc et al | MID-L-004582-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Bus | Laura | Laura Bus and Mark Bus v Barretts Minerals, Inc et al. | MID-L-003086-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |

4

639770001-4866996Sv1

| P L N m | P F N m | C C | C N m | s m | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Byrd | Richard | RICHARD L. BYRD and MARLIE G. BYRD v. ARKEMA, INC., et al | 23-LA-1670 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Celena F. Bevard |
| Cairo | Nancy | Frank J. Cairo, Jr., Individually and as Executor and Executor Ad Prosequendum of the Estate of Nancy Cairo v. AII, et al. | MID-L-900-14AS | New Jersey | Middlesex (NJ) | Szaferman, Lakind, Blumstein & Blader, P.C. | Moshe A. Maimon |
| Calabrese | Thomas | Thomas Calabrese v Arkema, inc et al. | 190328/2023 | New York | New York | Weitz & Luxenberg P.C. | Sean Kerley |
| Cali | Julie | Julie Cali v. Arkema, Inc. f/k/a Pennwalt Corp., et al | C-705579 25 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC Fears Nachawati PLLC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Darren McDowel |
| Cammalleri | Emilio | Cammalleri, Emilio and Claudette Cammalleri, H/W, Pltfs. vs. American International Industries, Inc., et al. | MID-L-007266-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Campbell-Wright | Lorna | Lorna Campbell-Wright & Rodrick Wright v Avon Products, Inc. et al. | 190238/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Cantu | Juan | Cantu, Juan & Laura, Pltfs. v. Barrett Minerals, Inc., et al. | MID-L-000572-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Carderara | Carolyn | Carolyn Carderara vs. C and D Pharmacy, LLC, et al. | 21-0738 | Louisiana | St Bernard Parish / 34th JDC | Landry & Swarr, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Holly C. Peterson |
| Carlson | Connie M. | CONNIE M. CARLSON v. BARRETTS MINERALS, INC. et al. | 22-2-03149-2 KNT | Washington | King | Bergman Oslund Udo Little, PLLC | Brendan Little |
| Carlson | Peggy | Peggy Carlson and John Carlson, Pltfs. vs Borghese, Inc., Dfts. | MID-L-003572-17 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Casaravilla | Walter | Casaravilla, Walter M. and Tammar Casaravilla, Pltfs. v. Avon Products, et al. | 190296/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tambini |
| Catt | Helen | Helen Catt and Donald Catt, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-001410-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Cavalluzzi | John | Cavalluzzi, John and Rene Cavalluzzi, Pltfs. v. Barretts Minerals, Inc. et al. | MID-L-002519-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | James Andrew Plasitras |
| Cayer | Robert | Robert Cayer and Elisabeth Cayer v. Ajax Tocco Magnethermic Corporation, et al. | PC-2023-00731 | Rhode Island | Bristol | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Cerrato | Vincent | Cerrato, Vincent, Pltf. v. Amchem Products, Inc., et al. | 190003-22 | New York | New York | Weitz & Luxenberg P.C. | Chris Romanelli |
| Chamberlain | Jennifer | Jennifer Chamberlain v Albion Pharmacy, Inc et al. | 23-013029 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Chapman | Rita Ann | RITA-ANN CHAPMAN and GARY CHAPMAN vs. AVON PRODUCTS, INC. et al. | 22STCV05968 | California | Los Angeles | Dean Omar Branham Shirley, LLP | Ben Adams |
| Chason Gregory | Amanda | Amanda Chason-Gregory v. Publix Super Markets, Inc., et al. | 24-002569 CA27 | Florida | Broward | Simmons Hanly Conroy LLP | Rebecca Vinocur |
| Cheifetz | Michael | Cheifetz, Michael, Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 1901110/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Falda |

6397710001-4866996551

Case 3:23-cv-04491-MAS-JKQ Document 116-1 Filed 11/21/25 Page 7 of 38 PageID: 11419
EXHIBIT 11
Case 3:24-cv-04491-MAS-JKQ Document 36 Filed 03/21/25 Page 1061 of 1429 PageID:

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Chelikowsky | Jeanne | Laura Mackey as executor of est of Jeanne Chelikowsky v Avon Products et al. | MID-L-000292-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Cody Greenes |
| Clark | Sharilyn | Sharilyn Clark v. Brenntag North America, et al. | 190162/2018 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin |
| Clawson | Linda | Linda Clawson and Billy Clawson v Avon Products, Inc et al. | 190157/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Cline | Susan | Susan Cline & Patrick Cline v Acme Markets, Inc et al. | 23-012897 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Clinton (Riggins) | Amanda | Amanda Clinton, Pltf. v. Avon Products, Inc., et al. | MID-L-002337-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Cody | Laura | Cody, Laura and William Cody, Plfs. v. Rite Aid of New York City, Inc. et al. | 603356/22 | New York | Nassau | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Cohen | Connie | Cohen, Connie, Plf. v. Johnson & Johnson, et al. | MID-L-004448-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Cole | Roberta | Roberta Cole and John Cole v. Johnson & Johnson, et al. | MID-L-007272-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Connell | Ann | Ann Connell and George Connell v. Barretts Minerals Inc., et al. | 21-1714 | Massachusetts | Middlesex (MA) | Cody Law Firm and Duffy Law LLC | Edward Paul Coady |
| Conti | Carmela | Joanne Conti as Executrix of the Estate of Carmela Conti v Avon Products, Inc. et al. | MID-L-003823-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Conway | Thomas | DORCAS G. CONWAY, individually and as Special Administrator of the Estate of THOMAS P. CONWAY, Deceased v. Air & Liquid Systems Corporation, et al | 2021L 001012 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | A. Gentry Smith |
| Cooney | Tina | Cooney, Tina v Avon Products, Inc. et al. | MID-L-002992-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Cooper | Lilo | LILO COOPER and LESLIE COOPER v. Arkema, Inc. F/K/A Pennwalt Corporation And Elf Atochem North America, Inc. et al. | 23STCV15823 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oganesyan |
| Cooper | Michelle | Michelle Cooper vs Johnson & Johnson, et al. | MID-L-001326-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Cooper | Frederick | Frederick Cooper and Jeaneen Cooper v Arkema, Inc et al. | 22-12-000021 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |
| Corin | Paula | Paula Corin v. Arkema, Inc. et al. | 23STCV26571 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc Willick |
| Coronado | Mario | Coronado, Mario & Melania Porras, Pltfs. v. Johnson & Johnson, et al. | MID-L-004460-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Corum | Scott | Corum, Scott and Greta Corum, Plfts. v. Arkema, Inc., et al. | MID-L-001294-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Coss | Roger | Coss, Roger and Susan Coss, Plfs., vs. 3M Company, etc., et al. | MID-L-005031-19 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Costigan | Irene | Irene Costigan and Andrew Costigan v. Chanel, Inc., et al. | 190120/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Cotham | Cynthia | Cynthia Cotham vs. Safeway, Inc., et al. | 24STCV15034 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc l Willick |
| Craft | Cherie | Cherie A. Craft v. Ahold Delhaize USA, Inc., et al | 24-X-24-000005 | Maryland | Baltimore City | Brown Kiely LLP | Matthew E. Kiely |

6

6397710001-4866996561

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Crawford Starr | Taloa | Taloa J. Crawford Starr v. Janssen Pharmaceuticals, Inc., et al | MID-L-001278-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Crosby | Mary | Crosby, David as Executor of the Estate of Mary Crosby, Plft. v. Altnay, Inc., et al. | E2022-0467CV | New York | Steuben | Levy Konigsberg LLP | John P. Guinan |
| Cross | Margaret | Margaret M Cross v Barretts Minerals, Inc et al. | 1901155/2023 | New York | New York | Weitz & Luxenberg P.C. | John P. Guinan |
| Crozier | Beverly | Beverly Crozier and Donald Crozier v. Avon Products, Inc., et al. | 190385/2016 | New York | New York | Weitz & Luxenberg P.C. | John P. Guinan |
| Cubberley | Gladys | Gladys Cubberley v. Publix Super Markets, Inc., et al | 23-020045 CA 27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Cupps | Catherine | Cupps, Catherine and Clifton Cupps, Pltfs. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002853-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Curtis | Erik | Curtis, Erik and Tari Curtis, Pltfs. v. Avon Products, Inc., et al. | MID-L-00622S-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Davies | Michael | Davies, Lynn, individually and as Executrix of the Estate of Michael Davies, Pltfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190348/2017 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Davis | Janel | JANEL DAVIS, VS. ALBERTSON'S LLC, individually and as successor-in-interest to A LPHA BETA et al. | RG21112811 | California | Alameda | Simmons Hanly Conroy LLP | Deborah Rosenthal |
| Deadman | Jane | Anthony Deadman, Individually and as Personal Representative of the Estate of Survivors of Decedent Jane Deadman, Deceased v. L'Oreal Travel Retail Americas, Inc., et al. | 23-022397CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Deal | Michael | Deal, Michael and Christine Deal, Pltfs. v. Arkema, Inc., et al. | MID-L-000551-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Dean | James | James Bryan Dean and Lisa Dean v. 3M Company, a/k/a Minnesota Mining and Manufacturing Company, et. al. | 2023-CP-40-03441 | South Carolina | Richland | Meirowitz & Wasserberg, LLP | Kush Shukla |
| Decembrino | Richard | Richard Decembrino and Diana Decembrino v 3M Company et al. | 23-10-03193 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Clark P. Rosengarten |
| Deems | Daniel | Deems, Daniel and Jennifer Deems, Pltfs., vs. Avon Products, Inc., et al. | 190304/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| DeGannett | Paul | DeGannett, Paul II and Mary Ann DeGennett, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-000179-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Deierhoi | Peggy | Peggy J. Hedrick Deierhoi v. Avon Products, Inc., et al | 2023-021157-CA-01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen |
| Delgado | Ana | ANA M. DELGADO v. AVON PRODUCTS, INC., et al | 24LA0282 | Illinois | St. Clair | Menges Law Firm | Menges Law: Carson Menges / Kurst & Von Oiste, LLP (Of Counsel): Jason Ministrelli |
| Deng | Jian Kang | Jian Kang Deng and Li Ying Deng v Barretts Minerals, Inc et al. | 1901114/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Denham | Ann | Ann Denham v. Sumitomo Corporation of Americas, et al. | 1900672024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |

7

659770001-4866996S-1

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P C A Nm |
|---|---|---|---|---|---|---|---|
| Denk | William | ROSEMARY DENK, Individually and as Successor-in-Interest to WILLIAM J. DENK, Deceased vs. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY, et al. | 23STCV01707 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder |
| DeSaussure | Vashti | Tewonia Tucker as administrator of the estate of Vashti DeSaussure v 3M Company et al. | MID-L-005713-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Diaz | Walter | TAMMY EVETT DIAZ, individually and as successor-in-interest to WALTER NESTOR DIAZ, and HOLLY DIAZ, v. AVON PRODUCTS, INC., et al. | 22CV022885 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| DiBello | Audra | Audra Dibello and James Gay v Barrett Minerals, Inc et al. | MID-L-001282-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Dietzman | Heather | HEATHER R. DIETZMAN v. AVON PRODUCTS, INC., et al | 23-LA-001587 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | A. Gentry Smith |
| Dobbs | Sheryl | Sheryl Dobbs v. Avon Products, Inc., et al. | MID-L-002426-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Dohse | Scott | Connors-Dohse, Jocelyn, Individually and as Personal Representative for the Estate of Scott M. Dohse, Pltf. vs. Avon Products, Inc., etc., et al. | 190305/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Dominguez | Gloria | Rubio, Nellie, for the Estate of Gloria Dominguez, Pltf. v. Avon Products, Inc., et al. | 190227/21 | New York | New York | Weitz & Luxenberg P.C. | Clark Rosengarten (Since left Weitz) |
| Donnatin | John | PAULA M. DONNATIN, individually and as Special Administrator of the Estate of JOHN C. DONNATIN, deceased, CHARLES DONNATIN, an individual, and HALEY HASTIE, an individual; as legal heirs of JOHN C. DONNATIN, deceased, v. ARKEMA INC. f/k/a PENNWALT CORPORATION; et al. | 24STCV09343 | California | Los Angeles | Dean Omar Branham Shirley, LLP | Leonard Sandoval |
| Doonan | Elizabeth | Elizabeth Doonan v Christian Dior, Inc et al. | 190190/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Dotson | Ronald | Dotson, Ronald & Rosita Dotson, Pltfs. v. Johnson & Johnson, et al. | MID-L-005906-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Dozier | Verna | Dozier, Verna L.P., Pltf. vs. Avon Products, Inc., et al. | MID-L-08467-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Drayner | Monica | Monica Drayner v Avon Products et al. | 190124/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Dubois | Timothy | Timothy E. Dubois & Linda Dubois v. 3M Company, et al. | 49D13-2404-CT-015028 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Dugan | Edward | Edward Dugan and Paula Dugan v. Johnson & Johnson et al. | 23-1762 | Massachusetts | Middlesex (MA) | Duffy Law LLC | Christopher P. Duffy |
| Durkan | Ashling | Ashling Durkan v. Avon Products, Inc., et al. | 64929/2024 | New York | Westchester | Maune Raichle Hartley French & Mudd, LLC | Jessica Bussanich |

8

659770001-4866996s1

JA1056

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P C A Nm |
|---|---|---|---|---|---|---|---|
| Dussia | Evan | Evan & Phyllis Dussia v. Whitaker, Clark, and Daniels, Inc. et al. | MID-L-003967-15 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Jacob Jordan |
| Dvir | Jessica | Jessica Dvir & Jehoshua Dvir v Avon Products Inc et al | 190247/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Eaves | Frances | Eaves, G. Tyles, Administrator for Francis Eaves, Pltf. v. Kolmar Laboratories, Inc., et al. | 190112/2021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Ebua | Regina | Jay Ebua, as Personal Representative of the Estate of Regina Ebua v. Avon Products, Inc.., et al. | 23-1980 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell |
| Egert | Ilene | Egert, Lewis, as Personal Representative of the Estate of Ilene G. Egert and Lewis Egert, Individually, Plffs. v. Barretts Minerals, Inc.., et al. | 190204/2021 | New York | New York | Weitz & Luxenberg P.C. | Erik Jacobs |
| Eichler | Jay | Jay Eichler and Helene Eichlers v Block Drug Company, inc et al. | MID-L-000394-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| El-Abbasi | Patricia | MOHAMMAD EL-ABBASI, On His Own Behalf and on the Behalf of All Other Statutory Beneficiaries of PATRICIA ANNE EL-ABBASI, deceased v. AVON PRODUCTS, INC. et al. | CV2023-013113 | Arizona | Maricopa | Maune Raichle Hartley French & Mudd, LLC | Meghan K. McGlynn |
| Elacqua | Ann Marie | Ann Marie Elacqua and Michael Kaminsky v Avon Products, Inc et al. | EF2023-275144 | New York | Rensselaer | Simmons Hanly Conroy LLP | James Kramer |
| Elmer | Denise | Denise Elmer v Avon Products, Inc et al. | MID-L-000656-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella |
| Elmer | Robert | Elmer, Robert, Pltf. v. Charles B. Chrystal Company, Inc., et al. | EFC-2022-0597 | New York | Oswego | Weitz & Luxenberg P.C. | Thomas M. Comerford |
| Emge | Alfons | TERRI EMGE, in her capacity as Personal Representative of the Estate of ALFONS EMGE v. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al. | 24-2-05155-0 | Washington | Pierce | The Lanier Law Firm, PLLC | Mark A. Linder |
| Enciso | Hortensia | Hortensia Enciso, Ind. and a/n/f of MVE, a minor vs. Naterra International, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-40593-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Engebos | Gregory | Lori R. Frank, As Personal Representative For The Estate Of Gregory J. Engebos, vs. Ajax Steel Company LLC, Et. al. | 2024-LA-854 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Brian Ukman |
| Engelhardt | Thomas | Engelhardt, Thomas and Catherine, Pltfs. v. Kolmar Laboratories, Inc. | 190260/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Engelman | Alice | Alice Engelman v American International Industries et al | MID-L-007011-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| England | Carolyn | Carolyn England and David England v Sumitomo Corporation of Americas, et al. | 190250/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| English | Linda | Linda English and Patricia Raso v. Avon Products, Inc. et al. | 190346/2018 | New York | New York | Simmons Hanly Conroy LLP | Valere L. Nassif |

9

JA1057

659770001-4866996541

Case 3:23-cv-04491-MTK Document 118-1 Filed 11/04/25 Page 11 of 38
Case 3:23-cv-04491-MTK Document 68 Filed 11/20/23 Page 2065 of 1429 PageID:
EXHIBIT 1 1423

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Epstein | Ira | IRA J. EPSTEIN v. ALBERTSONS COMPANIES, INC, Individually and as successor-in-interest to American Stores Company, f/k/a Skaggs Companies, Inc. as successor-in-interest to Jewel Companies, Inc., et al | 2023L010467 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | Jon R. Neumann |
| Escobar | Rosario | Rosario Escobar vs. Avon Products, et al. | MID-L-002313-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Esqueda | Guillerma | Esqueda, Guillerma C. and Roberto Esqueda, Plffs. v Barretts Minerals, Inc., et al. | MID-L-001887-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Eulau | Alan | Eulau, Alan and Barbara Eulau, Plts. vs Avon Products Inc., et al. | 190211/2020 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman |
| Evans | Dolores | CHRYSTAL EVANS-BOWMAN, individually and as successor-in-interest to DOLORES EVANS, vs. JOHNSON & JOHNSON et al. | 23CV043499 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| Everest | Martha | Everest, Martha, Pltf. v. AMP Bowling Centers, Inc., et al. | MID-L-007151-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Feldman | Geoffrey Robert | Pamela Friede-Feldman, individually and as representative of estate of Geoffrey Robert Feldman v Bayer Consumer Care Holdings et al. | MID-L-000091-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Feldman-Nagel | Sharon | Sharon Feldman-Nagel & Christopher Nagel V Acme Markets, Inc et al. | 190191/2022 | New York | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Feldt | Carolyn | KIMBERLY J. DRONEN, as Special Administrator for the Estate of CAROLYN K. FELDT, deceased v. AMADA AMERICA, INC., et al | 23-LA-1382 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Jon R. Neumann |
| Ferrara | Angela | Ferrara, Angela, Plft. v. Avon Products, Inc., et al. | 190219/2020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Ferris | Julie | Julie Ferris v. Avon Products, Inc., et al. | 1900008/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Fielder | Frazier | Frazier Fielder & Mary Fielder v. Block Drug Company, Inc., et al | MID-L-002315-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Fields | Michael | LORA M. HOWARD, as Administrator CTA for the Estate of MICHAEL S. FIELDS, deceased v. AMERICAN INTERNATIONAL INDUSTRIES, et al | 2020-L-000447 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | James Morrow & Jon R. Neumann |
| Filip | Sharon | Sharon Filip and John Filip v Barretts Minerals et al. | EFCA2022001356 | New York | Broome | Weitz & Luxenberg P.C. | Peter Tambini |
| Finch | Frank | Frank Finch & Ruth Finch v Barrett Minerals Inc. et al. | MID-L-005051-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Fisher | Cynthia | Cynthia Fisher and Bruce Fisher, her husband vs. American International Industries Individually and As successor-in-interest to Pinaud, Inc., Barbara Alice, Inc., Ed Pinaud, Inc. d/b/a Ed Pinaud, and Nestle-Le Mur Company, All for The Clubman Line of Products | 24-0005907 ca27 | Florida | Broward | Dean Omar Branham Shirley, LLP | Shawna Forbes-King |

10

JA1058

659770001-4866996651

| P L N m | P F N m | C | C N m | s | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Fitch | John | Deborah J Fitch individually and as personal representative of the Estate of John Fitch v Block Drug Co, Inc et al. | MID-L-005992-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Fitzpatrick | Patricia | Richard Fitzpatrick III individually and as executor of the estate of Patricia Fitzpatrick v Chanel, Inc et al. | 911055-23 | New York | Albany | Lipsitz Green Scime Cambria LLP | Brendan J. Tully |
| Flanagan | Richard | Marilyna Keuhn for the Estate of Richard Flanagan vs. Barretts Minerals, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-00174-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Flater | Rose | Rose Flater and Bobbie Joe Flater vs. Albi Enterprises, et al. | MID-L-003589-16 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon |
| Fleemin | Joanne | Joanne Fleemin and John Fleemin v. Arkema, Inc. f/k/a Pennwalt Corp., et al | 21-022203 CA27 | Florida | Broward | Flint Cooper, LLC | Rebecca Vinocur |
| Fogel | Leslie | Leslie Fogel and Catherine Fogel, Pltfs. v. American International Industries for Clubman, et al Whitaker, Clark, and Daniels, Inc. et al. | 190093/2016 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Forslund | Carla | Carla Forslund and Blake Forslund v. Beacon Cmp Corp., et al. | MID-L0002879-24 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah C. Kagan |
| Friedman | Ilana | Ilana Friedman and Arthur Fridman v. ABC Supply Co, Inc., et al | 190283/2015 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |
| Frissora | Annette | Frissora, Annette, Pltf. v. Avon Products, Inc., et al. | MID-L-004867-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Frith | Marjorie | TRACEI SHOBE, as representative of the estate of MARJORIE FRITH, and as surviving daughter and on behalf of decedent's other surviving statutory beneficiaries, and SHERI GRAY and CHRISTINA FRITH, v. BRENNTAG SPECIALTIES, INC., et al. | CV2020-094998 | Arizona | Maricopa | Simon Greenstone Panatier, PC | Erica Falkner |
| Frizzley | Vikki | Vikki Frizzley v 3M Company et al. | 1900072024 | New York | New York | Levy Konigsberg LLP | Denise S. Persampieri |
| Fulmore | Catherine | Fulmore O'Neal, Denise, for the Estate of Catherine Fulmore, Plt. vs Avon Products Inc., et al. | 190157/2020 | New York | New York | Weitz & Luxenberg P.C. | Jeffrey S. Kanca |
| Galan | Melvin | Galan, Melvin & Louise, Pltfs. v. Kolmer Laboratories, et al. | 190287/2020 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Gallehdar | Roya | Roya Owlad Gallehdar and Abdul Hassan Owlad Gallehdar vs. Avon Products, Inc. | 2024CP4004185 | South Carolina | Richland | Simon Greenstone Panatier, PC | Brendan Tully |
| Gallo | John | Diana Farris, ind and as fiduciary of the Estate of John Gallo v Avon Products, Inc., et al. | 190027/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Garces | Laura | LAURA GARCES vs. AVON PRODUCTS, INC. et al. | 23CV032898 | California | Alameda | Simon Greenstone Panatier, PC | Erica Falkner |

11

659770001-4866996541

**JA1059**

| P L N m | P F N m | C C | C N m | S | C | S m | P C | P A C N m |
|---|---|---|---|---|---|---|---|---|
| Gardener | John | John Gardener and Vivienne Gardener v. Brenntag North America, Inc., sued individually and as successor-in-interest to Mineral Pigment Solutions, Inc. and as successor-in-interest to Whittaker Clark & Daniels, Inc., et al | 22-012299 CA27 | Florida | Miami-Dade | | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Garnes | Rosa | Garnes, Rosa & David Rodney Garnes, Pltfs. v. 3M Company, et al. | EF2022-0000051 | New York | Jefferson (NY) | | Levy Konigsberg LLP | Amber R. Long |
| Garton | Barbara | Watkins, Dena, as Administrator and Administrator Ad Prosequendum of the Estate of Barbara Garton, Pltf. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002423-22 | New Jersey | Middlesex (NJ) | | Levy Konigsberg LLP | Amber R. Long |
| Gattone | Peggy | Peggy B. Gattone and Peter Gattone, etc., v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | MID-L-003039-18 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Gee | Margaret | Margaret Gee v Avon Products, Inc et al. | 1900676/2023 | New York | New York | | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Geittmann | Peter | PETER B. GEITTMANN, M.D. and MARGARET M. GEITTMANN v. ARKEMA, INC., f/k/a Pennwalt Corporation, et al | 24-L-1848 | Illinois | Cook | | Maune Raichel Hartley French & Mudd, LLC | Dawn Besserman |
| Gentle | Samantha Leigh | Rego, Candace, for the Estate of Samantha Leigh Gentle, Pltf. v. Avon Products, Inc., et al | MID-L-007729-20 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Gerken | Anna | Andrew T. Gerken, individually and as Personal Representative of the Estate of Anna Marie L. Gerken, deceased, v. Avon Products, Inc., et. al. | 2023-CP-40-06111 | South Carolina | Richland | | Dean Omar Branham Shirley, LLP | Mark Buha |
| Gesualdi | Shannon | Gary Marcotte, Individually and as Administrator for the Estate, Shannon Gesualdi v. Barretts Minerals, Inc., et al. | PC-2023-01861 | Rhode Island | Bristol | | Motley Rice LLC | Vincent L. Greene |
| Geter | Rebecca | Geter, Rebecca, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003870-21 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Geyer | Ellen | Ellen Geyer v. Brenntag North America, Inc. & Brenntag Specialties, Inc., et al. | MID-L-003463-18 | New Jersey | Middlesex (NJ) | | Levy Konigsberg LLP | Kimberly Russell |
| Gibbs | Elaine | Elaine Gibbs and John Gibbs v Avon Products, Inc et al | 190221/2023 | New York | New York | | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Gibbs | Danny | Michelle Gibbs, individually and as administratrix of estate of Danny Gibbs v Arkema, Inc et al | 23-12-02901 | Pennsylvania | Philadelphia | | Meirowitz & Wasserberg, LLP | Neidra Wilson |
| Gilbride | Ellyn | Gilbride, Ellyn, Pltf v. Johnson & Johnson, et al. | MID-L-002848-21 | New Jersey | Middlesex (NJ) | | Levy Konigsberg LLP | Amber R. Long |
| Giroir | Glenda | Glenda R. Giroir and Dale Giroir vs. Anco Insulations, Inc., et al. | C-745104 | Louisiana | East Baton Rouge Parish 19th JDC | | Landry & Swarr, LLC; Dean Omar Branham Shirley, LLP | Mickey P. Landry; Frank J. Swarr; Matthew C. Clark; Jordan Bollinger |
| Goffreda | Karen | Goffreda, Karen, Pltf. v. Avon Products, Inc., et al. | MID-L-000274-21 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Goldstein | Lita | Goldstein, Lita, Pltf. v. Chanel, Inc., et al. | 190108/2022 | New York | New York | | Simmons Hanly Conroy LLP | Daniel Blouin |

12

6597700001-4866996fv1

Case 3:23-cv-04491-MBK Document 18 11/26/24 Page 14 of 38 PageID:
EXHIBIT 1 1426 Page 14 of 38

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Gomez | Maria | Maria Gomez v. Arkema, Inc. f/k/a Pennwalt Corp., et al | CACE-21-002366 | Florida | Broward | Simon Greenstone Panatier, PC | Frank Wathen |
| Gomez | Dolores | Gomez Dolores, Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 1901182020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Gonzales | Susan | ALEXANDER GONZALES, Individually, and ALEXANDER GONZALES as Personal Representative of the Estate of SUSAN GONZALES, Deceased v. AUTOZONE, INC. et al. | 2021CV32313 | Colorado | Denver | Simon Greenstone Panatier, PC | Robert A. Green; Deirdre E. Ostrowski, Esq |
| Gonzalez | Linda | Linda Gonzalez v. Whitaker, Clark, and Daniels, Inc., et al. | 190074/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Goode-Evans | Dorothy | Dorothy Goode-Evans and Herbert Evans v. Avon Products, Inc., et al. | 23-2731 | Massachusetts | Middlesex (MA) | Thornton Law Firm LLP | Andrea Landry |
| Graham | Elsie Louise | ELAINE CHATFIELD, as Personal Representative of the ESTATE OF ELSIE LOUISE GRAHAM v. BRENNTAG NORTH AMERICA, INC. et al. | 23CV34505 (3:23-cv-01399-HZ) | Oregon | Multnomah | Dean Omar Branham Shirley, LLP | Jessica Dean Jordan Blhnenfeld James |
| Granchelli | Georgina | Georgina Granchelli and Gordon Granchelli v Axral Health & Beauty, Inc., et al. | MID-L-002784-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella |
| Gray | Kim | Gray, Kim, Pltf. vs. Johnson & Johnson, et al. | MID-L-005932-19 | New Jersey | Middlesex (NJ) | Meirowitz & Wasserberg, LLP | Amber R. Long |
| Greenage | William | William Greenage v Avon Products, Inc et al. | 190093/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Gref | Brian | Gref, Brian, Plt. vs American International Industries, et al. | 190178/2020 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Griffith | Richard | Richard Griffith & Dee Griffith v Barretts Minerals et al. | MID-L-000154-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Grigoli | Salvatore | Salvatore Grigoli and Vincenza Grigoli v 3M Compan et al. | 190200/2023 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Grimes – Love | Toni | Grimes-Love, Toni R., Pltf. v. Aloette Cosmetics, Inc., et al. | MID-L-001991-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden |
| Guffey | William | William P Guffey and Brenda L Guffey v Ameritum, Inc., et al. | MID-L-006146-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Guild | Gregory | Gregory Guild and Nancy Guild, Pltfs. vs. Brenntag North America, et al. | MID-L-03527-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Gumpert | Esther | Gumpert, Esther and Gary Gumpert, Pltfs. v. Avon Products, Inc., et al. | 190056/2022 | New York | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Guth Cook | Denise J. | Denise J. Guth Cook v. Advance Stores Company, Incorporated, et al | CACE-24-003818 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Haas | Beverly | Haas, Charles, Administrator for the Estate of Beverly Haas, Lauri Welch and Stephen Haas, Pltfs. v. Almay, Inc., et al. | MID-L-03339-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Habib | Nagwa | Habib, Nagwa N., Pltf. v. Barretts Minerals Inc., et al. | 2021-2381 | New York | Schenectady | Weitz & Luxenberg P.C. | Thomas M. Comerford |
| Haghani | Mahtab | Mahtab Haghani & Martin Haghani v Avon Products Inc et al. | 190263/2022 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Hagwood | Steven | Hagwood, Steven R., Pltf. v. Avon Products, Inc., et al. | MID-L-001267-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |

13

**JA1061**

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P C A Nm |
|---|---|---|---|---|---|---|---|
| Hammond | Jane | Jane Hammond and Colin HAmmond v Avon Products, Inc et al. | 190162/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Haney | Verda | Verda Haney v. Advance Stores Co., Inc., et al. | 49D13-2404-CT-019200 | Indiana | Marion | Dean Omar Branham Shirley, LLP | Sarah Broderick |
| Harper | Charlene | Meredith Harper, as Trustee for the next-of-kin of Charlene Harper, Deceased, v. Target Brands, Inc. et al. | 62 CV-23-2656 | Minnesota | Ramsey | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Harrell | Helen | Helen Harrell & David Odell v BNA, et al. | MID-L-002525-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Harrington | Virginia | Harrington, Virginia, Pltf. v. Johnson & Johnson, et al. | MID-L-006733-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Harris | Kimberly | Harris, Kimberly C. and Michael Harris, Pltfs. v. Avon Products, Inc., et al. | MID-L-004711-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Hart | Theresa | Theresa L. Hart & Thomas Hart v. Avon Products, Inc., et al. | MID-L-003309-24 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne Ratcliffe |
| Hartman | Robert | Hartman, Robert and Karen Hartman, Pltfs. v. Akiyama International, et al. | MID-L-000953-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Hatcher | Kimberly | KIMBERLY HATCHER vs. ALBERTSON S LLC et al | 22CV021209 | California | Alameda | Simmons Hanly Conroy LLP | Christine A. Renken |
| Hathaway | Todd | Todd Hathaway & Fayda Hathaway v Avon Products et al | 800575/2023 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Haus | Elizabeth | Elizabeth Haus and Emery Haus vs Avon Products, Inc., et al. | MID-L-000895-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Hawkins | Terrance | Terrance Hawkins and Ona Broach v Arkema, Inc et al. | 190028/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Heard | Marlane | Marlane Heard v. Charles B. Chrystal Company, Inc., et al. | 190123/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Helms | Patrick | Mary Helms individually and as Administrator of the estate of Patrick Helms v Brenntag Specialties, Inc et al | MID-L-006342-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Helmuth | Leland | Leland J. Helmuth v. 3M Company, et al. | 49D13-2402-CT-003670 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Hembd | Nancy | Pfister, Peggy/Estate of Nancy Ann Hempd, Pltf. v. Avon Products, Inc., et al. | 49D13-2108-MI-029127 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Henderson | Jeannine | Jeannine Henderson vs. Taylor-Seidenbach, Inc., et al. | 2022-10279 | Louisiana | Orleans Parish CDC | Philip C. Hoffman, LLC Dean Omar Branham Shirley, LLP | Philip C. Hoffman Jessica Dean Samuel T. Iola |
| Herman | Elaine & Jacob | Elaine Adella Hickey Herman and Jacob Russell Herman, Sr. v. American Honda Motor Co. Inc., et al. | FBT-CV-23-6124687-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Heston | Raymond | Heston, Raymond and Sandra, Pltfs. v. Avon Products, Inc., et al. | MID-L-007187-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Hicks | Teresa | Frank Hicks & Est of Teresa Hicks v Avon Products et al | 190014/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Hidvegi | Nubia | Nubia Hidvegi v. Publix Super Markets, Inc., et al | 24-000642-CA-01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Rebecca Vinocur |

14

69977.0001-48669965v1

Case 3:23-cv-04491-MAS-JBD  Document 161-1  Filed 11/04/25  Page 16 of 38
Case 3:23-cv-04491-MAS-JBD  Document 136  Filed 11/04/25  Page 16 of 38  PageID:
EXHIBIT 1 1428  Page 16 of 38

| P L N m | P F N m | C C | C N m | S | C | P C | P C | A N m |
|---|---|---|---|---|---|---|---|---|
| Higginbotham | Robert | Robert and Linda Higginbotham vs. 3M Company, B Brenntag Specialties LLC, et al | 2019-39841-ASB | Texas | Harris | | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Higgins | Wendi | Wendi Higgins vs. The Bargain Barn, Inc. et al | 2024-CP-40-03642 | South Carolina | Richland | | Maune Raichle Hartley French & Mudd, LLC | Joshua Cagle |
| Hildebrandt | Martin | SARAH HILDEBRANDT, as representative of the estate of MARTIN HILDEBRANDT, and as surviving Spouse and on behalf of decedent s other surviving statutory beneficiaries, and KARA HILDEBRANDT JORDON, v. 3M COMPANY a/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al. | CV2020-093091 | Arizona | Maricopa | | Simon Greenstone Panatier, PC | Erica Falkner |
| Hill | Duane | Duane Hill v. Sumitomo Corporation of Americas, et al. | 190094/2024 | New York | New York | | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Hinkle | Sandra | Sandra L Hinkle v Arkema, Inc et al. | 23-04-01956 | Pennsylvania | Philadelphia | | Maune Raichle Hartley French & Mudd, LLC | Brian M. Ukman |
| Hodge | Pauline | Gary Hodge, individually and as representative of the Estate of Pauline Hodge v. Avon Products, Inc et al. | LACL151100 | Iowa | Polk | | Simon Greenstone Panatier, PC | Frank J. Wathen; James H. Cook |
| Hoeppner | Gerald | GERALD R. HOEPPNER and THERESA HOEPPNER v. A.O. SMITH CORPORATION, et al | 23-LA-1697 | Illinois | Madison | | Maune Raichle Hartley French & Mudd, LLC | Michael V. Oltmann |
| Hoffman | Vanessa | Hoffman, Vanessa, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-003244-21 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Hofmaister | Sharon | SHARON HOFMAISTER v. JOHNSON & JOHNSON et al | 23CV033743 | California | Alameda | | Kazan McClain Satterley & Greenwood | Michael T. Stewart |
| Hogue | Tamie | Lacy Hogue, Ind. and as Personal Rep. of Tamie Hogue , Deceased, Jennifer Clyburn vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2021-53353-ASB | Texas | Harris | | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Hohing | Winnette | Winnette A. Hohing v. Avon Products, Inc., et al. | MID-L-002758-23 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Holleman | Karlene | Holleman, Karlene, Pltf., vs. Avon Products, Inc., et al. | 190077/2018 | New York | New York | | Levy Konigsberg LLP | Amber R. Long |
| Holley | Luther Roy | Holley, Gladys Elaine, Individually and as Executrix of the estate of Luther Roy Holley, Deceased, Pltf., vs. Brenntag North America, Inc. and Brenntag Specialities, Inc., et al. | MID-L-002858-19 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Hollifield | Pattie | Brenda Bost individually and as executor of the estate of Pattie Hollifield v Conopco, Inc et al | 190295/2023 | New York | New York | | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Holloway | James | JAMES L HOLLOWAY and GAIL M. HOLLOWAY v. ABB, INC., Individually and as successor-in- interest to I-T-E Imperial Company, f/k/a I-T-E Circuit Breaker Company, et al | 2024LA000200 | Illinois | Madison | | Maune Raichle Hartley French & Mudd, LLC | Thomas Gibbons |
| Holmes | Agnes | Agnes A. Holmes v. Avon Products, Inc. | MID-L-005412-18 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |

15

659770001-4866996551

| P L N m | P F N m | C C | C N m | s | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Holtermann | Patrice | Holtermann, Alisa, Administratrix for the Estate of Patrice Holtermann, Pltf. v. American International Industries, et al. | 190058/2021 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman |
| Holtschneider | Betty | Holtschneider, Betty and Stanley Holtschneider, Pltfs. vs. Brenntag North America, Inc. et al. | MID-L-003009-16 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Horsch-Nusbaum | Ruth | Horsch-Nusbaum, Ruth, Plt. vs Avon Products Inc., et al. | MID-L-006015-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Howard | Elizabeth | Christopher L. Lewis, individually and as Personal Representative of the Estate of Elizabeth A. Howard, Deceased v. Asbestos Corporation Limited, et al. | 2024-CP-40-00458 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Aaron Chapman |
| Hucknall | Victoria | Victoria Hucknall and Simon Hucknall vs. L'Oreal Travel Retail Americas Inc d/b/a Lancome, L'Oreal, L'Oreal Paris | 2024-014277-CA-01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Brendan Tully |
| Huff | Linda | James D. Huff, Individually and as Administrator and Administrator ad Prosequendum of the Estate of Linda Kay Huff, Deceased v. Arkema, Inc., et al. | MID-L-002818-17 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Hug | Monique | Hug, Monique G. and Jean Philipp Hug, Pltfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc. et al. | MID-L-004862-15 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Hunter | Jaqueline | Jacqueline Hunter v Brenntag North America et al. | MID-L-007131-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Hutchings | Catherine | Catherine Hutchings v Avon Products, Inc et al. | 190115/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Huxley | Aleksandra | Aleksandra Huxley and Howard Huxley v. Conopco, Inc., et al. | 190116/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Iacovangelo | Jean | Jean Iacovangelo and Frank Iacovangelo v Arkema, Inc et al. | E2023005779 | New York | Monroe | Levy Konigsberg LLP | Amber R. Long |
| Iezzi | Deborah Kaye | Nicole Gudenau, Individually and APR the estate of Deborah Kaye Iezzi v BNA et al. | MID-L-004147-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | James Andrew Plasitras |
| Infante | Irma | Irma M Infante v Barretts Minerals et al. | 190137/2022 | New York | New York | Lanier Law Firm PLLC | Darron Berquist |
| Islin | David | David Islin vs. L'Oreal Travel Retail Americas, Inc: sued individually and as successor-in-interest to Helena Rubinstein, Inc. and d/b/a Helena Rubenstein | 2024-014273-CA-01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Brendan Tully |
| Jack | Mary | Mary L. Jack and David L. Dayen v. Brenntag Specialties, Inc., et al. | 190035/2024 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Jackson | Johnnie | Jackson, Johnnie & Mattie, Pltfs. v. Barretts Minerals Inc., et al. | MID-L-006778-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Jacoby | Lisa | Jacoby, Lisa and William Jacoby, Pltfs. v. Barretts Minerals, et al. | 190174/2021 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Jaconia | Lamona | Joseph Anthony Jaconia, Individually and as executor and executor ad Prosequendum of the Estate of Lamona Jaconia, Pltfs. vs 3M Company, etc., et al. | MID-L-002995-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |

63977.0001-48669965v1

| P L N m | P F N m | C C | C N m | S | C | P C | P C | P C A N m |
|---|---|---|---|---|---|---|---|---|
| James | Suzanne | James, Suzanne, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002078-20 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Jarvis | Patricia | Patricia Jarvis v. L'Oreal Travel Retail Americas, Inc., d/b/a Lancome, et al. | 23-015081 | Florida | Broward | | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Jatras | Kathy | Kathy Jatras and James Jatras vs. Johnson & Johnson, et al. | MID-L-002260-18 | New York | Middlesex (NJ) | | Levy Konigsberg LLP | Jacob Jordan |
| Jauregui | Maria | Maria Jauregui v Avon Products, Inc et al. | 190189/2022 | New York | New York | | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Jimenez | Luis | Luis Jimenez and Maria Jimenez v. Johnson & Johnson, et al | 23-L-011613 | Illinois | Cook | | Beasley Allen Law Firm | Gianaris Trial Lawyers, LLC - Joshua A. Edelson  Edelson/Vogelzang - Christian Luciano |
| Johnson | Gregory S. | Gregory S. Johnson and Barbara J. Johnson v. American International Industries, et al. | 2023CP4006819 | South Carolina | Richland | | Dean Omar Branham Shirley, LLP | Rachel Gross |
| Johnson | Neil | Neil Johnson and Carol Johnson v General Electric Company et al. | 190266/2023 | New York | New York | | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Johnson | Elaine | ELAINE JOHNSON v. 3M COMPANY, et al. | 24 L 3829 | Illinois | Cook | | Vogelzang Law | Michelle T. Pawlowski |
| Johnson-Brett | Linda | Johnson-Brett, Linda and Bradford Brett, Plfts. v. A.O. Smith Corporation, et al. | E2022002698 | New York | Monroe | | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Jones | Walter | Walter and Billie Jones vs. 3M Company, Brenntag Specialties LLC, et al | 21-05238-E | Texas | Harris | | The Lanier Law Firm, PLLC | Mark A. Linder |
| Jones | Janet | Janet Jones v. Avon Products, Inc., et al. | MID-L-003693-24 | New Jersey | Middlesex (NJ) | | Simmons Hanly Conroy LLP | James Kramer |
| Jordan | Judith | Judith Jordan, Pltf. v. Brenntag Specialties, Inc., et al. | 190072/2017 | New York | New York | | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Jovanovich | Sam | Sam Jovanovich, Jr. v. BASF Catalysts LLC, et al. | 2024L A000509 | Illinois | Madison | | Maune Raichel Hartley French & Mudd, LLC | Michael V. Oltmann |
| Jurrist | Gail | Gail Jurrist and David Jurrist v. Colgate-Palmolive Co., et al. | 190202/2024 | New York | New York | | Weitz & Luxenberg P.C. | Sean Kerley |
| Kaatz | Kraig | KRAIG KAATZ and ARLENE KAATZ, his wife v. 84 LUMBER COMPANY, et al | 2023L008335 | Illinois | Cook | | Simmons Hanly Conroy LLP | Taylor L. Kerns |
| Kaenzig | Steven | Linda Kaenzig, Individually and as Executrix and Executrix Ad Prosequendum of the Estate of Steven Kaenzig v. Brenntag Specialties, LLC, et al. | MID-L-003928-24 | New Jersey | Middlesex (NJ) | | Levy Konigsberg LLP | Amber Long |
| Kantor | William | Debra A. Kantor and William L. Kantor v. A.O. Smith Corporation, et al. | 2024L003627 | Illinois | Cook | | Vogelzang | Michelle Pawlowski |
| Kelso | Constance | Constance Kelso v. Arkema, Inc., et al. | CV21949769 | Ohio | Cuyahoga | | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Kelz | Robin | Robin Kelz v Bobbi Brown Cosmetics et al. | MID-L-006353-22 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Kendrick | Wendy | Wendy Kendrick and Charkella Kendrick v. Avon Products, Inc., et al | CACE-21-014417 | Florida | Broward | | Flint Cooper, LLC | Rebecca Vinocur |

17

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Kerley | Beverly | Kerley, Beverly & John Kerley, Pltfs. v. Brenntag Specialties, Inc., et al. | MID-L-006612-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Kernahan | Louise | Louise Kernahan and Martin Kernahan v Sumitomo Corp of America et al. | 190283/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Kershner | Barbara | Christa Ruth Machado individually and representative of estate of Barbara Kershner v Avon Products, Inc et al. | MID-L-007200-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Kieboom | Carol | Carol Kieboom and Herman Kieboom v Avon Products Co et al. | 190157/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Kier | Edward | Johnny Mize, Ind. and as Personal Rep. of the Estate of Edward Kier, Deceased vs. Brookshire Grocery Co., Brenntag Specialties LLC and Brenntag North America, et al | 2022-55642-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| King | Elizabeth | Stanley R. King, as Personal Representative of the Estate of Elizabeth H. King, Deceased v. Avon Products, Inc., et al | 23-017495 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| King | Martha | Martha Mccracken King and Justin W. King v. Alticor, Inc., et al. | CACE-24-005989 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Kinler | Leonard | Leonard Kinler vs. Breaux Mart Supermarkets, Inc., et al. | 2021-07239 | Louisiana | Orleans Parish CDC | Landry & Swarr, LLC / Simon Greenstone Panatier, PC | Mickey P. Landry / Frank J. Swarr / Matthew C. Clark / Holly C. Peterson |
| Kirchberg | Frederick | Carol Kirchberg individually and as Administrator of estate Frederick Kirchberg v Aventis, Inc., et al. | MID-L-005204-23 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Kirkwood | Bernice | Chatman, Latoya, Estate of Bernie Annette Kirkwood, Pltf., v Avon Products, Inc., et al. | MID-L-008746-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Kittrel | Linnie | Mary Ann Kittrell, Individually and as Personal Representative of the Estate of Linnie P. Kittrell v. Bell & Gossett Company, et al | 19-035889 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. |
| Klar | Ilona | Ilona Klar and Ronald Gaiser v American Internationl Industries, et al. | MID-L-000176-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Klayman | Hope | Hope Klayman and Mark Steven Klayman v. American International Industries Inc., et al. | MID-L-004994-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Kleiman | Kenneth | Kenneth Kleinman and Marian Roppolo vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-08588-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Klinker | Leah | Leah C. Klinker v. Avon Products, Inc., et al | 23-021414 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen |
| Klitus | Nancy | Nancy Klitus v. Block Drug Co., Inc., et al. | MID-L-003530-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | John W. Stevenson |
| Knight | Julie | Julie Knight vs Avon Products, Inc., et al | 190173/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Knolmayer | Joel | Cheryl Knolmayer, Individually and as Proposed Administrator of the Estate of Joel Knolmayer, Deceased v. All, et al. | MID-L-009981-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |

18

659772001-4866986551

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P C A Nm |
|---|---|---|---|---|---|---|---|
| Knox | Margaret | Kimberly Milligan, as Independent Administrator of the Estate of Margaret Knox, Deceased v. Cosmetic Specialties, Inc., et al. | MID-L-000786-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Kobel | Audrey | JENNIFER BARRINGER, individually and as successor-in-interest to AUDRY KOBEL; and JODY CULVER v. BRENNTAG SPECIALTIES, LLC, sued individually, and as successor-in-interest, parent, alter ego, and equitable trustee to BRENNTAG SPECIALTIES, INC. (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC. and as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC., et al. | 24CV084604 | California | Alameda | Kazan McClain Satterley & Greenwood | Akinyemi Ajayi |
| Koebert | Renee | Renee Koebert and Donovan Koebert v Avon Products, Inc., et al. | MID-L-002945-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Kopel | Robert | Cynthia L. Kelley, Personal Representative of the Estate of Robert S. Kopel, Deceased v. Bayer Healthcare, LLC, et al | CACE-23-19145 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiBona |
| Kopp | John | Kopp, John R. and Christine Kopp, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 609596/2020 | New York | Suffolk | Weitz & Luxenberg P.C. | Andrew Gayoso |
| Kral | Janet | JANET E. KRAL and LINUS B. KRAL v. AVON PRODUCTS, INC., et al | 2023-LA-001419 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Terah Bielec |
| Kulcavage | Edward | Shirley Kulcavage, Individually and as Personal Representative of the Estate of Edward Kulcavage vs Burnett Process Inc., et al. | E2021009637 | New York | Monroe | The Lanier Law Firm, PLLC | Darron Berquist |
| Kursh | Gail | Gail Kursh and Zev Primov v Arkema, inc et al. | 190280/2022 | New York | New York | Weitz & Luxenberg P.C. | Sean Kerley |
| Lairson | Larry | Larry Lairson and Stephanie Lairson v. Advance Auto Parts, Inc., et al | MID-L-006673-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Lambert | Charles R. | Whitney Lambert, and as successor in interest to Charles R. Lambert, deceased; Nell Ann Barnhart; Brenda Corbello; Sheila Labarge; Greg Lambert; Vicki Lambert; Angel Todosijevic v. Albertson Companies, Inc. et al. | 23STCV27302 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder |
| Lane | Thurman D. | Thurman D. Lane and Deborah L. Lane v. Block Drug Company, Inc., et al | MID-L-005938-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Lanehart | Tanya | Tanya Lanehart vs. H.E.B. LP, Brenntag Specialties LLC and Brenntag North America, et al | 2022CI15485 | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Langston | Randall | David Hardaway, as executor of the estate of Randal Langston vs. H-E-B, L.P. Also d/b/a H.E. Butt Grocery Company, for Its Hill Country Essentials Line of Products, et al. | 2024CI08664 | Texas | Bexar | Simon Greenstone Panatier, PC | Greyson ackerman |
| LaPlant | Lynn | David LaPlant, Individually and as Personal Representative of the Estate of Lynn Ann LaPlant v. Avond Products, Inc., et al | 23-CA-012151 | Florida | Hillsborough | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. |

19

639770001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Larson | Lillian | Larson, Lillian, Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002729-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| LaSalle | Jack | JACK LaSALLE and DIANNE LaSALLE v. AMERICAN INTERNATIONAL INDUSTRIES et al. | 23-2-08165-0 SEA | Washington | King | Kazan McClain Satterley & Greenwood | Jospeh Satterley |
| Latterell-Rice | Rebecca | Rebecca Latterell-Rice and Clair Brian Rice, her husband, v. Alticor, Inc.; Avon Products, Inc. et al. | 62-CV-24-545 | Minnesota | Ramsey | Karst & von Oiste LLP | Erik P. Karst |
| Laudig | Kathleen | Elizabeth Laudig as representative of the estate of Kathleen Laudig v Avon Products, Inc., et al. | 49D13-2312-CT-059425 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Laughlin | Dennis | Dennis Laughlin vs Avon Products, Inc., et al. | MID-L-007803-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Lazette | Dianne | LaZette, Diane and Christopher LaZette, Pltfs. v. Barrett Minerals, Inc., et al. | MID-L-007561-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Lee | Michaeleen | Michelle F. Felton, Executrix of the Estate of Michaeleen Lee, deceased, v. Acme Markets, Inc. | GD-23-008055 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Lee | Kyung H. | KYUNG H. LEE and JOE J. LEE v. BI-MART CORPORATION et al. | 23CV40369 | Oregon | Multnomah | Dean Omar Branham Shirley, LLP | Jessica Dean Sarah E. Gilson |
| Lee | Cynthia | Cynthia June Lee v. Avon Products, Inc., et al. | E2024006160 | New York | Monroe | Maune Raichle Hartley French & Mudd, LLC | Andrew M. Grous |
| Letizia | Joseph | Letizia, Joseph and Donna Letizia, Plfts. v. Barretts Minerals, Inc., et al. | MID-L-002232-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Levine | Joanna | Levine, Joanne & Timothy Spahr, Phfts. v. Kolmer Laboratories, et al. | 190251/2020 | New York | New York | Levy Konigsberg LLP | Ambre Jae Brandis |
| Linde | Stuart | Eileen Linde, as Administratrix for the Estate of Stuart Linde, and Eileen Linde, Individually v. Charles B. Chrystal Co., Inc., et al. | 190127/23 | New York | New York | Levy Konigsberg LLP | Ambre Jae Brandis |
| Link | Michael | Michael David Link and Sandra Strickland Link v. 3M Company, et al. | 2022CP4005543 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Jonathan Holder |
| Little | Robert | Robert A. K. Little and Irene K. Little v. American Honda Motor Co., Inc., et al. | 23-020780 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Little | Christopher | Christopher Little v Barretts Minerals, Inc., et al. | MID-L-003868-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Lock | Judith | Lock, Judith, Pltf., v. Barrett Minerals, Inc., etc., et al. | 190223/2019 | New York | New York | Weitz & Luxenberg P.C. | Justin J. Weitz |
| Leconte | Barbaram | Leconte, Barbaram, Pltf. v. Amaco, LLC, et al. | 190289/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tambini |
| Lodovico | Cynthia | Cynthia Lodovico v Barretts Minerals, Inc., et al. | MID-L-001418-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| LoGiudice | Keri | Logiudice, Keri and Joseph Logiudice, Pltfs., vs. American Talc Co., etc., et al. | 190253/2014 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Lorenzo | Richard | Lorenzo, Elizabeth, Individually and as Executrix of the Estate of Richard Lorenzo, Deceased, Pltf. v. Barretts Minerals, Inc., et al. | MID-L-001187-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden |
| Lowe | Celia | Celia Lowe and Brian Lowe v. L'Oreal Travel Retail Americas, Inc., et al | 23-022591 CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Lowis | Barbara | Barbara Lowis & Trevor Lowis v Avon Products, Inc. et al. | 190234/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |

20

JA1068

699770001-4866996S+1

| P L Nm | P F Nm | C C | C Nm | S | C | | P C | P A Nm |
|---|---|---|---|---|---|---|---|---|
| Lupton | Johnnie | Phyllis Johnson, Margaret Rowell, Johnnie Lupton, Jr., Leslie Lupton, Gene Lupton, Joseph Lupton, Statutory Heirs of Johnnie Lupton, Sr., Deceased vs. Louisiana Steam Equipment, LLC, et al. | C-148470 | Louisiana | Lafourche Parish JDC | 17th | Landry & Swarr, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry, Frank J. Swarr, Matthew C. Clark, Holly C. Peterson |
| Macron | Marilyn | Marilyn Macron v Maybelline, LLC, et al. | 190214/2023 | New York | New York | | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Madlik | Marilyn | Madlik, Donald C., as Representative of the Estate of Marilyn M. Madlik Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190139/2020 | New York | New York | | Weitz & Luxenberg P.C. | Brandon H. Perlman |
| Mager | Jenifer | Jenifer Mager and John Mandracchia v. American International Industries et al. | 23STCV09956 | California | Los Angeles | | Frost Law Firm, PC | Andrew Seitz |
| Maloney-Najjar | Kelley | Kelley Maloney-Najjar and Talib Najjar v Arkema, Inc et al | MID-L-03900-22 | New Jersey | Middlesex (NJ) | | The Lanier Law Firm, PLLC | Darron Berquist |
| Manning | Patricia | Manning, Patricia v. Avon Products, Inc., et al, DHs., including Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190052/2020 | New York | New York | | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Marceau | Deborah | Deborah Marceau and Timothy Marceau v Avon Products, Inc., et al | MID-L-004127-23 | New Jersey | Middlesex (NJ) | | Simmons Hanly Conroy LLP | James Kramer |
| Marinelli | Nicole | Nicole Marinelli vs. Chatem, Inc., et al. | 2022-07702 | Louisiana | Orleans Parish CDC | | Boling Law Firm | Jeremiah Boling Caroline Boling Benjamin Rumph LaCrisha McAllister |
| Markuson | Janice | Markuson, Janice & Milton, Pltfs. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-005589-20 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Marsico | Raffaella | Emilia C. Brady, Administrator for the Estate of Raffaella Marsico, et al vs Fisher Scientific Company, et al. | 161103253 | Pennsylvania | Philadelphia | | Weitz & Luxenberg P.C. | Joseph J. Mandia |
| Martin | Gerald | Gerald K Martin and Beverly E Martin v Bayer Healthcare et al. | MID-L-003576-23 | New Jersey | Middlesex (NJ) | | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Martin | James | Linda B Martin, individually and as Proposed estate representative of James P Martin v Block Drug Company, et al. | MID-L-006575-23 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Martin | Sheila | Jeffrey Martin, as Administrator ad Prosequendum for the Estate of Sheila Martin and as Guardian of John Doe, et al vs Brenntag North America, Inc., et al. | MID-L-007808-19 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Martines | Ottavio | Antonella Bouchard individually and as executor of the Estate of Ottavio Martines and Maria Martines v Block Drug Company, Inc et al | MID-L-000371-24 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Joshua Kristal |
| Martinez | Mary | Mary Martinez and Michael Martinez, her husband v. American International Industries, et al | 22-018794 CA27 | Florida | Broward | | Dean Omar Branham Shirley, LLP | Rebecca Vinocur |

21

6597710001-4866996651

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P A Nm |
|---|---|---|---|---|---|---|---|
| Mask | Mary | Linda K. Trimble, Individually and as Executrix of the Estate of Mary Mask v. Brenntag North America, Inc. & Brenntag Specialties, Inc., et al. | MID-L-002589-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Masterson | Leo | Leo Masterson and Lori Masterson v. Avon Products, Inc., et al. | 1901172/2023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Matsch | Sandra A | SANDRA A. MATSCH v. BAYER HEALTHCARE, LLC, et al | 23 LA 1528 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann |
| Maute | Tucker | Tucker D. Maute, D.O. and Olivia N. Munizza, M.D. v. Barretts Minerals, Inc., et al | CACE-22-008500 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Mayville | Arlene | Clare Day as Special Administratrix for the Estate of Arlene Jane Mayville vs Avon Products, Inc., et al. | MID-L-005285-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Mazuroski | Chloe | Chloe Mazuroski, Individually and as Executrix and Executrix Ad Prosequendum of the Estate of Michael Mazuroski v. American Honda Motor Co., Inc., et al. | MID-L-004556-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Denise Pensampieri |
| Mazzei | Norbert | Norberto Ramon Mazzei et al v. Alco Industries, Inc. et al. | 1903172/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Falda |
| McAllister | James | JACKI MCALLISTER, Individually and as Special Administrator for the Estate of JAMES O. MCALLISTER, deceased v. A.O. SMITH CORPORATION, et al | 2021L000870 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | A. Gentry Smith |
| McAteer | Aoife | McAteer, Aoife v Avon Products, Inc., et al. | 782000/2017 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| McBride | Ronald | McBride, Ronald & Michelle, Pltfs. v. American International Industries, Inc., et al. | 49D13-2110-MI-034781 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| McCollum | Beverlee | Beverlee McCollum v Avon Products, Inc., et al. | MID-L-004678-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| McDonough | Colleen | Colleen McDonough vs Johnson & Johnson, et al. | MID-L-001512-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| McGowan | Carole Lee | CATHLEEN BELTZ, individually and as successor-in-interest to CAROLE LEE MCGOWAN; LESHA CLARK, STEVEN SPRAGUE; KELLY SPRAGUE; and DUANE SPRAGUE, v. LOREAL USA, INC., et al. | 24CV070599 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| McGuire | Kevin | Kevin McGuire and Mary Jane McGuire v Barrett Minerals, et al. | 1901154/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| McKnight-Foster | Carol | Foster, Edwin, as Executor of the Estate of Carol McKnight-Foster, Pltf. v. Johnson & Johnson, et al. | MID-L-000312-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| McLoughlin | Carmel | Carmel H McLoughlin v Brenntag North America, et al. | 190302/2023 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Jessica A. Bussanich |
| McMahon | Anne | Anne McMahon and Stephen McMahon v Sumitomo Corporation, et al. | 190304/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Meade | Jody Kay | Jody Kay Meade and Arthur Meade v. Barretts Minerals Inc. et al. | 23STCV23517 | California | Los Angeles | Simmons Hanly Conroy LLP | Deborah Rosenthal |
| Means | Elena F. | Elena F. Means v. 3M Company, et al. | 24-1988 | Massachusetts | Middlesex (MA) | Belluck & Fox, LLP | Joseph W. Belluck |

22

639770001-4866996b1

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P A Nm |
|---|---|---|---|---|---|---|---|
| Megariotis | Joanna | Megariotis, Joanna, Pltf. v. Bristol Myers Squibb, et al. | MID-L-001970-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha |
| Messenger | Ronald | Donna Calawa, Personal Representative of the Estate of Ronald Messenger v. Advance Stores Company, Inc. et al. | FBT-CV-22-6115647-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Meyer | Carol | Carol J Meyer and Tommy Meyer v Avon Products, Inc., et al. | MID-L-001860-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe. |
| Milan | Elizabeth | Elizabeth Milan v. Brentag North America and Brentag Specialties, Inc., et al. | 190354/2018 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Milford | Louise | Louise Milford and Christopher Milford v. Chanel, Inc., et al. | 190128/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Miller | Ann | Miller, Ann and Jeffrey, Pltfs. v. Barrett Minerals, Inc., et al. | MID-L-002710-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Miller | Dale | Guy Miller individually and as administrator of the estate of Dale Miller v Block Drug Company, et al. | MID-L-005953-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Miller | Veronica | Ronald Raymond Miller, Individually and as Personal Representative ad Prosequendum of the Estate of Veronica Miller, Deceased vs. Brenntag North America, et al. | MID-L-005972-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon |
| Miller | Stephanie | Miller, Janet, Executrix of the Estate of Stephanie Miller, Pltf., vs. Brenntag North America, Inc. and Brenntag Socialties, Inc., et al. | 190188/2017 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Mirochin | Helen | Helen Mirochin v Barretts Minerals, Inc., et al. | 190185/2023 | New York | New York | Weitz & Luxenberg P.C. | Michael P. Fanelli |
| Mizer | Barbara | Barbara J Mizer and George A Mizer v Aisin USA Manufacturer, et al. | MID-L-004279-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Keith Binder |
| Mohammed | Hamedah | Renwick Mohammed, Individually and as Executor of the Estate of Hamedah Mohammed, Deceased v. Avon Products, Inc., et al. | 190189/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier |
| Monroe | Joan | Leslea Davis and Est of Joan Monroe v Avon Products, Inc., et al | EC2023-35161 | New York | Washington | Levy Konigsberg LLP | Amber R. Long |
| Montesano | Laura J | Laura Montesano v Brenntag North America, Inc., | MID-L-005265-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Moore | Scott | Lori Lee Campbell, individually and as representative of estate of Scott Moore v Bayer Healthcare, LLC, et al. | 23-12-02561 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern |
| Moreno | Amelia | Amelia L Moreno v Avon Products, et al. | MID-L-003387-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Moreno | Sonia | Sonia Moreno v. Avon Products, Inc., et al. | MID-L-004040-24 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella |
| Morgan | Colin | Colin Morgan v. L'Oreal Travel Retail Americas, Inc., et al | 23-021465 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Rebecca Vinocur |
| Morgan | Sandra | Sandra Morgan v. Avon Products, Inc., et al | CACE-24-001329 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Morgan | June Rose | June Rose Morgan v Brenntag North America, et al. | MID-L-003282-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |

23

6597700014866996S51

| P L N m | P F N m | C C | C N m | S | C | P C | P C | P A C N m |
|---|---|---|---|---|---|---|---|---|
| Morrison | Carolyn | Carolyn Morrison v Avon Products, Inc, Inc, et al. | MID-L-006026-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Mota | Maritza | Mota, Maritza, Pltf. v. Johnson & Johnson, et al. | MID-L-005753-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Mounce | Gina | Gina Mounce and Raymond Mounce v 3M Co., et al | 23-11-02558 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | | Neidra Wilson |
| Mukomela | Kenneth | GWENDOLYN J. MUKOMELA, Individually and as Special Administrator for the Estate of KENNETH D. MUKOMELA, deceased v. AGCO CORPORATION, et al | 2022LA000962 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | | Michael T. Flachs Jr. |
| Mullan | Robert | Robert Mullan and Tracy Mullan v. Sumitomo Corporation of Americas, et al. | 190066/2024 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Mullet | Anne Marie | Anne Marie Mullet and Ronald Mullet v Arkema, Inc., et al. | MID-L-000929-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | | Amber R. Long |
| Munoz | Renate | PETE T. MUNOZ, Individually and as Successor-in-Interest of the Estate of RENATE MUNOZ, Deceased, and JOHN CANTY, Individually, vs. Avon Products, Inc., et al. | 24STCV15955 | California | Los Angeles | Simon Greenstone Panatier, PC | | Stuart J. Purdy |
| Murphy | Geraldine | Murphy, Geraldine, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-00429-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Muster | Sophia | Sophia Muster & John Muster v Avon Products, Inc., et al. | MID-L-05232-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Matthew Adam Grubman |
| Muzzipapa | Lucy | Lucy Muzzipapa v. American International Industries, et al. | 190213/2024 | New York | New York | Meirowitz & Wasserberg, LLP | | Daniel J. Wasserberg |
| Myers | Beverly | Myers, Beverly and Timothy Myers, Pltfs. vs. Aventis Inc., et al. | 21-12-01748 | Pennsylvania | Philadelphia | The Halpern Firm | | David Halpern |
| Nasr | Yehia | Yehia Nasr & Deborah Nasr v Barretts Minerals, Inc., et al. | 190066/2023 | New York | New York | Weitz & Luxenberg P.C. | | David M. Kaufman |
| Nathan | Fraida | Nathan, Fraida & Yochanan Nathan, Pltfs. v. Johnson & Johnson, et al. | MID-L-006101-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | | Amber R. Long |
| Navaretta | Josephine | Josephine Navaretta and John Navaretta v. Sumitomo Corporation of Americas, et al. | 190117/2024 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Nelson | Sarah Sue | Nelson, Sarahsue, Pltf. v. American International Industries, et al. | MID-L-001022-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Nicholson | Harold | Nicholson, Nathan, Estate of Harold Nicholason, Pltf. v. Barrett Minerals. Inc., et al. | MID-L-004402-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Nutt | Charles | Denise M. Nutt, Individually and as Executor for the Estate of Charles J. Nutt v. Avon Products, Inc., et al. | 22-2455 | Massachusetts | Middlesex (MA) | Duffy Law LLC | | Christopher Duffy |
| Oakenfold | Sheila | Sheila Oakenfold v Christian Dior, Inc., et al. | 190238/2023 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| O'Brien | Karen | Karen C. O'Brien v. Air & Liquid Systems Corporation, et al. | CV-23-234 | Maine | Cumberland | Hallett Whipple Weyrens | | David A. Weyrens |
| Odum | Charles | Odum, Charles, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-004851-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Michelle C. Martha |
| Olson-Rizzo | Deborah | Olson-Rizzo, Deborah and Thomas Rizzo, Pltfs. v. American Art Clay Company, Inc., et al | 190018/2022 | New York | New York | Meirowitz & Wasserberg, LLP | | Daniel Wasserberg |
| Orloff | John | James Maynard as executor of estate of John Orloff v Baxter Healthcare Corporation, et al. | MID-L-004578-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | F Alexander Eiden |

639770001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P C | P A N m |
|---|---|---|---|---|---|---|---|---|
| Paes | Verginio | Verginio Paes vs. American International Industries, et al. | 24CV060231 | California | Alameda | Meirowitz & Wasserberg, LLP | | Kush Shukla |
| Pagano-Michels | Cynthia | Cynthia Pagano-Michels and Thomas Michels vs Barretts Minerals, Inc., et al. | MID-L-006234-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Pallotta | Josephine | Josephine Pallotta and James Pallotta v Avon Products, Inc., et al. | MID-L-003512-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Michelle C. Murtha |
| Palomino | Maria | Maria F. Palomino vs. Avon Products, Inc. et. al. | 2024L003179 | Illinois | Cook | Meirowitz & Wasserberg, LLP | | Daniel Wasserberg |
| Palumbo | Frank | Frank Palumbo & Liz Palumbo v 3M Company, et al. | E2023003380 | New York | Monroe | Meirowitz & Wasserberg, LLP | | Daniel Wasserberg |
| Parker | Pauline | Pauline Parker and James Parker v Barretts Minerals, et al. | 190186/2022 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Parvin | Janice | Janice Parvin v AII, et al. | MID-L-003126-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Joseph J. Mandia |
| Passmore-Meyer | Kathryn | Kathryn A. Passmore-Meyer and spouse John G. Meyer, Jr. v. Avon Products Inc., et. al. | CJ-2022-6281 | Oklahoma | Oklahoma | Dean Omar Branham Shirley, LLP | | Jordan Bollinger |
| Paternostro | Marilyn | Melissa Shackelford, Melinda Boudreaux, and Marlene Lebouef, Individually and on Behalf of Marilyn T. Paternostro vs. Trapp Cadillac Chevrolet, Inc., et al. | C66833 25 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC / Damon J Baldone & Associates. APLC / Simon Greenstone Panatier, PC | | Mickey P. Landry / Frank J. Swarr / Matthew C. Clark / Damon J. Baldone / Holly C. Peterson / Christian E. Mancuso |
| Payne | Clark | Payne, Clark and Barbara A. Payne, Pltfs. vs. AM International, Inc., et al. | 190307/2019 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | | Nathaniel N. Falda |
| Peddle | Gregory | Gregory A Peddle and Dorothy Peddle v Janssen Pharmaceuticals, Inc., et al. | MID-L-006525-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Joshua Kristal |
| Pelley | Stephanie | Stephanie Pelley, Individually and as Parent, Guardian, and Next Friend of Minor Children, A.C.P. and A.T.P. v. American International Industries, et al. | 23-0473 | Massachusetts | Middlesex (MA) | Early, Lucarelli, Sweeney & Meisenkothen, LLC | | Brian P. Kenney |
| Peltz | Judith | Benjamin Peltz, Individually and as Co-Personal Representative of the Estate of Judith Peltz, and Dennis C. Brown, as Co-Personal Representative of the Estate of Judith Peltz v. Brenntag North America, Inc. et al. | 21-1612 | Massachusetts | Middlesex (MA) | Thornton Law Firm LLP | | Leslie-Anne Taylor |
| Pena | Jacklyn | Pena, Jacklyn, Pltf. v. Barretts Minerals, Inc., et al. | MID-L-002573-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | | Amber R. Long |
| Penny | Sherry | Penny, Sherry, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-000918-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | | Amber R. Long |
| Perez | Maria Elena | Johanna Ortiz, and as successor in interest to Maria Elena Perez, deceased; Alejandrina Leon, as legal heir to Maria Elena Perez, deceased v. Albertson's LLC et al. | 23STCV14552 | California | Los Angeles | Simmons Hanly Conroy LLP | | Crystal G. Foley |

25

| P / L N m | P / F N m | C C | C N m | S | C | P C | P / C | P / C / A N m |
|---|---|---|---|---|---|---|---|---|
| Perkins | Lorraine | Lorraine A. Perkins and Julia A. Knox v. Avon Products, Inc., et al. | 24-L-003861 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | | Christine Kim |
| Perkins | Barbara | BARBARA PERKINS v. BARRETTS MINERALS, INC. et al. | CGC-23-277164 | California | San Francisco | Frost Law Firm, PC | | Ronald J. Shingler |
| Perl | Rosemarie | Perl, Rosemarie, Pltf. v. Avon Products, Inc., et al. | 190087-21 | New York | New York | Weitz & Luxenberg P.C. | | Patti Lynn Bushlyn |
| Pettijohn | Eileen | Pettijohn, Eileen and Dr. David Pettijohn, Plts. vs Barretts Minerals, Inc., et al. | MID-L-005203-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Petty | Brenda | Petty, Barbara and Curtis Petty, Pltfs. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002217-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Phelan | Marlene Theresa | Marlene Theresa Phelan v. Arkema Inc., et al. | FBT-CV-23-6123450-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | | Brian P. Kenney |
| Phillips | Patricia | Patricia Phillips and David Phillips v Avon Products, Inc., et al. | 190111/2023 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Phipps | Maria | Maria Phipps v Avon Products, Inc., et al. | MID-L-003953-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | | James Kramer |
| Picard | Carol | Carol A. Picard and Gerard R. Picard v. Avon Products, Inc., et al. | 2481cv1674 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | | Erika O'Donnell |
| Pichierri | Mary | Mary Pichierri and John Pichierri v. Avon Products, Inc., et al. | 20-2681 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | | Erika A. O'Donnell |
| Pickard | James | JAMES PICKARD vs. 3M COMPANY f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY; AIR & LIQUID SYSTEMS CORPORATION et al. | 22STCV18682 | California | Los Angeles | Frost Law Firm, PC | | Andrew Seitz |
| Pickering | Michelle | Michelle Pickering v. Arkema, Inc. et al. | 23STCV19273 | California | Los Angeles | Simon Greenstone Panatier, PC | | Albert Oganesyan |
| Pidge | Pamela | Pidge, Raymond, Individually and as Administrator of the Estate of Pamela K. Pidge, Deceased, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-001407-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | F Alexander Eiden |
| Pitcher | John | John Pitcher and Carolyn Pitcher v Union Carbide Corp., et al. | 190159/2022 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Plotkin | Evan | Evan C. Plotkin and Martha Barry-Plotkin v. Johnson & Johnson, et al. | FBT-CV21-6109520-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | | Brian P. Kenney |
| Portnoi | Herbert | Portnoi, Marjorie, Individually and as Proposed Administrator for the Estate of Herbert Portnoi, Pltf. v Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004551-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Michelle C. Martha |
| Possley | Madelon | Marc Possley, Individually and as Personal Representative of the Estate of Madelon Possley, Deceased v. Avon Products, Inc., et al. | MID-L-004237-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Potter | Shirley | Heather Donaghy, as Personal Representative of the Estate of Shirley Smiley Potter, deceased v. 4520 Corp., Inc., et al. | 2023-CP-40-03108 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | | Aaron Chapman |

26

659770001-4866990654

| P L N m | P F N m | C C | C N m | s | C | P C | P C | P C A N m |
|---|---|---|---|---|---|---|---|---|
| Poulton | Catherine | Poulton, Catherine and David Poulton, Plffs. v. Barretts Minerals, Inc. et al. | 190094/2022 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | | Suzanne M. Ratcliffe |
| Pountain | Marjean | Marjean Pountain and Charles Pountain v. Avon Products, Inc., et al. | MID-L-003694-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | | James Kramer |
| Powell | Katherine | Katherine Powell, as Personal Representative of the Estate of Amy Janelle Sisk, Deceased v. Avon Products, Inc., et al | 23-021560 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | | Marc P. Kunen |
| Powell | Dena Vee (f/k/a Dena V. Burch) | Tesa A Burch & Est of Dena Powell v Avon, et al | 1901122/2022 | New York | New York | Meirowitz & Wasserberg, LLP | | Daniel Wasserberg |
| Pryor | Carolyn | Pryor, Carolyn, Plt. vs Johnson & Johnson, et al. | MID-L-002649-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | | Moshe Maimon |
| Pryor | Michael | Pryor, Michael and Karen, Plffs., v Avon Products, Inc., et al. | MID-L-000022-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Przekop | Charles | Przekop, Charles and Delphine Przekop, Plffs. v. Johnson & Johnson, et al. | MID-L-003328-21 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | | Suzanne M. Ratcliffe |
| Purvis | Evangeline | Purvis, Nichelle, for the Estate of Angeline Purvis, Plff. v. Bristol Myers Squibb, et al. | MID-L-001749-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Ramirez | Irma | Irma Ramirez vs. Advanced Auto Parts, Brenntag Specialties LLC, et al | 2019-67370-ASB | Texas | Harris | Simon Greenstone Panatier, PC | | Holly C. Peterson |
| Ramos | Jim | Jim Ramos & Lillian Ramos v. Bayer Healthcare, LLC, et al. | MID-L-003840-24 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Rand | Charlene | Charlene Rand and Jason Rand v Block Drug Company, Inc et al. | MID-L-007180-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Matthew Adam Grubman |
| Randolph | Bernice | Rhonda Concepcion individually and as administrator of the Estate of Bernice Randolph v Metropolitan Life insurance Company et al. | MID-L-000059-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | F Alexander Eiden |
| Reed | Wesley | Wesley Reed at al v. Sumitomo Corporation of Americas, et al | 0041/70/2024 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Rego | John | RAYMOND BROWN, Individually and as Special Administrator for the Estate of JOHN H. REGO, deceased v. BLOCK DRUG COMPANY, INC., Individually and as successor-in-interest to The Gold Bond Sterilizing Powder Company; a/k/a The Gold Bond Company, et al | 2024LA000030 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | | Dawn Besserman |
| Remko | Marilyn | Remko, Marilyn Ann and John, Plffs. v. ACME Markets, Inc., et al | 190267-20 | New York | New York | Weitz & Luxenberg P.C. | | Ambre Jae Brandis |
| Renwick | Joyce | Joyce Renwick and Samuel Sohn v. Avon Products, Inc., et al | 23-011345-CA-01 | Florida | Miami-Dade | Dean Omar Branham Shirley, LLP | | Rebecca Vinocur |
| Reshad | Ghulam | Mary Reshad, Individually and as executor of estate of Ghulam Reshad v Bayer Consumer Care Holdings, LLC Company et al. | 628415/2023 | New York | Suffolk | Weitz & Luxenberg P.C. | | Sean Kerley |
| Reyes | Ezequiel | MARCELA REYES, LESLEY REYES, HOMAR REYES, GISELLE REYES, ERICK REYES, ESEQUIEL REYES and CRYSTAL REYES, as the Surviving Heirs of EZEQUIEL REYES, Deceased v. 3M COMPANY et al | 2222-CC09327 | Missouri | St. Louis | Simmons Hanly Conroy LLP | | Randy S. Cohn |

27

659770001-4866996551

| P L N m | P F N m | C C | C N m | s | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Reyes | Lidia | Julio Mendoza, Ind. and as Rep. of the Estate of Lidia Reyes (Deceased), Antonio Reyes & Nidia Reyes, Ind. vs. Avon Products, Inc., Brenntag Specialties LLC, et al | 2019-55560-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Reyes | Joel | Joel Reyes and Jesse Vaschar v. Avon Products, Inc., et al. | GD-23-008144 | Pennsylvania | Allegheny | Meirowitz & Wasserburg, LLP / Dean Omar Branham Shirly, LLP | Neidra Wilson / Cori J. Kapusta |
| Reyes-Vasquez | Jose | Reyes-Vasquez, Jose and Ramona Vasquez, Plts. v. Amchem Products, Inc., et al. | 190216-2021 | New York | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Reynolds | Douglas | Douglas and Carolyn Reynolds vs. Alfa Laval, Inc., Brenntag Specialties LLC, et al | 2019-45514-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Rhoades | Bonnie | JAMES W. RHOADES, Individually and as Executor of the Estate of BONNIE S. RHOADES, deceased v. BARRETT'S MINERALS INC., et al | 231,8925 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | Jon R. Neumann |
| Rice | Jeffrey | Jeffrey T. Rice and Teree Rice v. Colgate Palmolive Company, et al. | MID-L-004720-22 | New Jersey | Middlesex (NJ) | Meirowitz & Wasserberg, LLP | Perry Leigh Shusterman |
| Richards | Verna | BETHANY J. RICHARDS, Individually and as Personal Representative of the Estate of VERNA J. RICHARDS v. JOHNSON & JOHNSON et al | 21-2-10988-4 KNT | Washington | King | Dean Omar Branham Shirley, LLP | Matthew P. Bergman |
| Richards | Judith | Judith Richards v Sumitomo Corporation of the Americas, et al. | 190284/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Richardson | Patricia | Patricia Richardson v. L'Oreal Travel Retail Americas, Inc., et al. | 24-004504 ca27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Richardson | Karen | Karen Richardson & Ian Richardson v Avon Products, Inc., et al. | 190071/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Richardson | Phillip | Phillip Richardson and Larry Eron v American International Industries, et al. | 23-03-03073 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Neidra Wilson |
| Rigby | Penelope | Michele Stuck, Jack Bannister and Estate of Penelope Rigby v Avon Products, et al. | 190096/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Rini | William | Rini, Bridget, Individually and as Personal Representative of the Estate of William Rini, Deceased, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190271/2019 | New York | New York | Simon Greenstone Panatier, PC | Kevin M. Berry |
| Robbins | Vicki | Robbins, Vicki, Pltf. v. Avond Products, Inc., et al. | MID-L-001231-22 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Roberts | Deron | Roberts, Deron, Pltf. vs. Abb, Inc., etc., et al. | MID-L-006782-16 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Robinson | Jeanne | JAMIE MCMAHON, Individually and as Successor-In-Interest of the Estate of JEANNE ROBINSON, Deceased, v. AVON PRODUCTS, INC., et al. | 23STCV15780 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc Willick |
| Robinson | Sonja S. | Sonja Robinson and Rodney Robinson v Avon Products, Inc., et al | MID-L-005394-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Rodriguez | Jose | Jose H. Rodriguez & Carmen Rodriguez v Bayer Consumer Care Holdings, LLC, et al. | MID-L-005536-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |

659770001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Rodriguez | Jesus | JESUS RODRIGUEZ and ANA MARIA PEREZ DE RODRIGUEZ vs. THE VONS COMPANIES INC., a subsidiary of ALBERTSONS COMPANIES, INC.; et al. | 24STCV11423 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oganesyan |
| Rodriguez | Carlos | CARLOS RODRIGUEZ and FABIOLA RODRIGUEZ, his wife v. BAYER HEALTHCARE, LLC, et al. | 24 LA 301 | Illinois | St. Clair | Menges & Karst | Carson Menges & Jason Ministrelli (Karst) |
| Rohe | Patricia | Rohe, Patricia and William, Plffs. vs. Avon Products, Inc. et al. | 190202/2019 | New York | New York | Weitz & Luxenberg P.C. | Erik Jacobs |
| Roland | Jacqueline | Jacqueline Roland vs. H.E.B., LP, Brenntag Specialties LLC and Brenntag North America, et al | 23-74356 | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Rollman | Gregory | Rollman, Greg, Plff. v. Dr. Scholls, Inc., et al. | MID-L-000207-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Romahn | Audrey | Romahn, Audrey, Plff. vs. Barretts Minerals Inc., et al. | 211201513 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern |
| Rosas | Otila R | Silvia R. Rosas, individually and as successor-in-interest to Otilia R. Rosas; Elsa Herrera; Carlos Rosas; Santos Rosas Jr.; Marta E. Ruvulcaba v. Avon Products, Inc. et al. | 23STCV21311 | California | Los Angeles | Frost Law Firm, PC | Andrew Seitz |
| Roufail | Nancy | Dr. Hayam Shaker, Individually and Peter Raouf, As Anticipated Administrator Ad Prosequendum for the Estate of Nancy Roufail, Deceased, Dr. Raouf Sidra and Sandra Raouf v. Johnson & Johnson, et al. | MID-L-002491-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Rountree | Kenneth | Kenneth Scott MacDonald Rountree and Pascale A Rountree v Bayer Healthcare, LLC, et al. | MID-L-003139-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan T. Alvarado |
| Roush | David | DAVID G. ROUSH and SUZANNE D. ROUSH v. AFC-HOLCROFT, LLC, et al | 24la316 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Terah Bielec |
| Rowan | Dorothy | Dorothy A. Rowan v. Block Drug Company, Inc. | 190102/2024 | New York | New York | Weitz & Luxenberg P.C. | Benjamin T. Clinton, Esq. |
| Roy | Lynne | Lynne Roy vs. Colgate-Palmolive Company, et al | 2020-02718 | Louisiana | Orleans Parish CDC | Landry & Swarr, LLC Dean Omar Branham Shirley, LLP | Mickey P. Landry Frank J. Swarr Matthew C. Clark Mark J. Buha |
| Rudden | Michael | Michael Ruddin and Mary Rudden v Arvinmeritor, Inc., et al. | 190257/2021 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Rudnicki | Antony | Antony Rudnicki v Avon Products, Inc., et al. | 190070/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Ruffner | Michael | Michael Ruffner and Elaine Ruffner v. Avon Products, Inc., et al. | CV-24998 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Rusinko | Michelle | Michelle Rusinko and Robert Weisenfeld v Ben Nye Makeup Company, et al. | MID-L-006742-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |

29

JA1077

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Russell | Carolyn | Russell, Carolyn, Pltfs. v. Brenntag North America, Inc., et al. | MID-L-004065-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Ryall | Nancy | Nancy Ryall, Ind. a/n/f of LR, a minor vs. H.E.B. LP, Brenntag Specialties LLC and Brenntag North America, et al | 2022-42911-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Ryan | Sheila | Ryan, Sheila and Shawn Jones, Pltfs. vs. Avon Products, Inc., et al. | MID-L-004589-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Saams | Lucinda | Lucinda K Saams v Barretts Minerals, Inc., et al. | MID-L-001562-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Salem | Jennifer | Jennifer Salem & Jamal Salem v Coty, Inc., et al. | 190224/2022 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Salmeron | Rosa Maria Hernandez | Rosa Maria Hernandez Salmeron and Cristian Bautista v Sumitomo Corporation of Americas, et al. | 190267/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Sanden | Anita | Sanden, Anita, Pltf. v. Barrett Minerals, et al. | MID-L-007932-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Sandoval | Berenice | BERENICE SANDOVAL vs. BLOCK DRUG COMPANY, INC. individually and as successor to The Gold Bond Sterilizing Powder Co. a/k/a The Gold Bond Co., et al. | 24STCV09972 | California | Los Angeles | DeBlase Brown Eyerly LLP | Eric Brown |
| Santana | Dianna | Santana, Dianna and Robert, Pltfs. v. Avon Products, Inc., et al. | MID-L-000881-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Santos | Brianna | Briana M Santos v Brenntag Specialties LLC, et al. | MID-L-005026-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Savoy | Clarence | Clarence Savoy vs. Honeywell International, Inc., et al. | C722284_23 | Louisiana | East Baton Rouge Parish 19th JDC | Boling Law Firm | Jeremiah Boling, Caroline Boling, Benjamin Rumph, LaCrisha McAllister |
| Schaefer | Nancy | Schaefer, Nancy, Pltf. v. Barretts Minerals, Inc., et al. including Brenntag North America, Inc., and Brenntag Specialties, Inc., et al. | MID-L-007018-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joseph J. Mandia |
| Schaefer | Linda | Linda Schaefer and Carl Schaefer v. Brenntag North America, et al. | 190187/2020 | New York | New York | Simmons Hanly Conroy LLP | James M. Kramer |
| Schmidt | Grace | Grace Schmidt; Anthony Schmidt v. Arkema, Inc. fka Pennwalt Corporation et al. | 23STCV18513 | California | Los Angeles | Simon Greenstone Panatier, PC | Robert Green |
| Schmidt | Gary | James Schmidt, as Trustee for the next-of-kin of Gary Schmidt, Deceased, v. Gorman Thompson Foods, Inc. d/b/a Midtown Foods et al. | 62-CV-22-4900 | Minnesota | Ramsey | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Schroepfer | Carolyn | Lisa Thomas, Jeffry Schroepfer and Est of Carolyn Schroepfer v Avon Products, Inc., et al. | 190281/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Schultz | Beth | Schultz, Beth, Pltf. v. Barretts Minerals Inc., et al. | 190179/21 | New York | New York | Weitz & Luxenberg P.C. | Justin T. Weitz |
| Scott | Shirley | Sharon Scott (Estate of Shirley Scott), et al v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008439-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Seal | Maureen | Maureen Seal v. Christian Dior, Inc., et al. | 190129/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |

30

639770001-4866996541

Case 3:23-cv-04491-MDR Document 116-1 Filed 11/03/25 Page 32 of 38
Case 3:23-cv-04491-ZNQ Document 116-1 Filed 11/03/25 Page 1086 of 1429 PageID:
EXHIBIT 1 1444

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Searle | Graeme | Graeme Searle v. Conopco, Inc., et al. | 1901042024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Segal | Ann | Ann Segal v. Arkema, Inc., et al. | MID-L-003692-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Segedie | Carole | CAROLE SEGEDIE and KENNETH SEGEDIE v. COLGATE-PALMOLIVE COMPANY et al. | 22CV019385 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| Seitz | Mitchell | MITCHELL SEITZ v. BAYER HEALTHCARE, LLC et al. | 23CV44833 | Oregon | Multnomah | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton |
| Sellman | Alison | Allison R Sellman v Bremning Specialities, Inc., et al. | MID-L-003809-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Shader | Patricia | Shader, Patricia and Robert. v. Johnson & Johnson, et al. | MID-L-007836-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Shaffer | Thomas | Shaffer, Thomas and Jessilyn Shaffer, Pltfs. v.ABB, Inc., et al. | GD223668 | Pennsylvania | Allegheny | Maune Raichle Hartley French & Mudd, LLC | Jason Yampolsky |
| Shaker | Hayam | Shaker, Dr. Hayam, Individually and Peter Raouf, as Anticipated Administrator Ad Prosequendum for the Estate of Nancy Roufail, Dr. Raouf Sidra and Sandra Raouf, Pltfs. v. Johnson & Johnson, et al. | MID-L-002491-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Shakour | Farghaly | Farghaly A Shakour & Emily Shakour v Avon Products Inc., et al. | 19009722 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Sherman | Michelle | Sherman, Michelle and Jeremy Sherman, Pltfs. v. CONOPCO, Inc., et al | EF2022-0112 | New York | Tompkins | Weitz & Luxenberg P.C. | Thomas M. Comerford |
| Sherman | Rebecca | Heather Colding, Personal Representative of the Estate of Rebecca L. Sherman, deceased v. Advanced Stores | 24-003940 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Shrock | Roger | Roger Shrock and Donna Shrock v. 3M Company, et al. | 49D13-2406-CT-028631 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Shuman | Francine | Shuman, Francine, Pltf. vs Pfizer, et al. | 19115/2020 | New York | New York | Weitz & Luxenberg P.C. | Alani Golanski |
| Sides | Yaniv | Agnes Sides, as Executrix for the Estate of Yaniv N. Sides, and Agnes Sides, Individually, v. Advance Auto Parts Inc., et al | 190150/2021 | New York | New York | Weitz & Luxenberg P.C. | Chris Romanelli |
| Sifuentes | Wilfredo | Sifuentes, Wilfredo and Carmen Sifuentes, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-002779-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Silverman | Harriet | Harriet Silverman and Kenneth Silverman v. Bremning North America, Inc. and Bremning Specialties, Inc., et al. | 190347/2018 | New York | United States District Court for the Southern District of New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Simmons | Manijeh | Tina Poe, Ind. as as Independent Administrator of the Estate of Manijeh A. Simmons, Deceased, and Mahin Kasham vs. H.E.B. LP, Bremning Specialties LLC and Bremning North America, et al | 2022-50521-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Sinn | Ruth | Sinn, Ruth & George, Pltfs. v. Barretts Minerals, Inc., et al. | MID-L-008750-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Sliz | Jeannie | Jeannie Sliz and John Sliz v Avon Products, Inc., et al. | MID-L-005334-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |

31

63977.0001-4866996S-1

**JA1079**

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Small | DeAnna | Deanna Small v Barrett Minerals, et al. | MID-L-002915-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Smee | Lesley | Lesley Smee and Graham Smee v. L'Oreal Travel Retail Americas, Inc., d/b/a/ L'Oreal and Lancome, et al. | 23-017696CA-27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Smith | Michael | Michael S. Smith and Kathy S. Smith, his wife v. Avon Products, Inc., et al | 2023-019237-CA-01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Andrew J. Farrano |
| Smith | David | Mcdovich, Patrick, Individually and Administrator for Estate of David Smith and William Smith, et al, Pltfs. v. Avon Products, Inc., et al. | MID-L-002887-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Smith | Sheila Ann | Gregory J Smith & Estate of Sheila Ann Smith v Avon Products, In.,et al. | MID-L-003507-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Smith | Audrey | Audrey L. Smith, et al. v. Avon Products, Inc., et al. | CV23985434 | Ohio | Cuyahoga | Dean Omar Branham Shirley, LLC | Ethan A. Horn |
| Smithers | Cynthia Lou | Cynthia Lou Smithers v. Johnson & Johnson, et al. | MID-L-005778-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Sniegocki | Joseph | Joseph T. Sniegocki and Robbin E. Watts v. Altman Stage Lighting Co., Inc. et al | CACE-23-010939 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Soares | Susan | Susan Soares and Brian Soares v. Avon Products, Inc., et al | PC-2024-01631 | Rhode Island | Bristol | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Soechting | Erica | ERICA L. SOECHTING and BLAKE SOECHTING v. APEX TOOL GROUP, LLC, as successor-by-merger to Cooper Tools and Danaher Corporation, successor to Equity Group, successor to Easco Corporation, et al | 2023LA001735 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Dawn Besserman |
| Sorum | Mark James | MARK JAMES SORUM and BARBARA SORUM v. ALBERTSONS COMPANIES, INC. et al. | 23CV031203 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| Sosa | Jorge | Jorge Sosa and Susie Sosa vs. Safeway, Inc., et al. | 24STCV14266 | California | Los Angeles | Simon Greenstone Panatier, PC | Stuart J. Purdy |
| Spaulding | Donna | DONNA A. SPAULDING vs. JOHNSON & JOHNSON, et al. | CJ 2024-3673 | Oklahoma | Oklahoma | Dean Omar Branham Shirley, LLP | Steven Horton |
| Spayd | Jr., George | George Spayd, Jr. v. 3M Company, et al. | GD-23-010209 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Spiegelman | Sheldon | Spiegelman, Sheldon and Sandra Spiegelman, Pltfs. v. Arkema, Inc., et al | 190149/2021 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |
| Spingarn | Michael | Spingarn, Michael and Sandra Spingarn, Pltfs. v. Chas. B. Chrystal Co., Inc. et al. | 56025/2022 | New York | Westchester | Weitz & Luxenberg P.C. | Peter Tambini |
| Stark | Patsy | PATSY STARK AND DAVID STARK vs. COLGATE-PALMOLIVE COMPANY et al. | 22CV018867 | California | Alameda | Kazan McClain Satterley & Greenwood | Laurel Halbany |
| Steck | Philip | CYNTHIA JABBAY, Individually and as Special Administrator of the Estate of PHILIP STECK, Deceased v. 3M COMPANY, et al | 2023 L 10343 | Illinois | Cook | Vogelzang | Michael A. Maienza |
| Steggles | Susan | Susan Steggles and Christopher Steggles vs Avon Products, Inc., et al. | 190174/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |

32

639770001-4866996Sv1

Case 3:23-cv-04491-MAS-JBD Document 161-1 Filed 11/21/24 Page 2 of 2 PageID: 1446
Case 3:23-cv-04491-MAS-JBD Document 36 Filed 03/21/25 Page 34 of 38 PageID: 1429
EXHIBIT 1

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Stelzer | Sheila | Mark O. Stelzer, as Proposed Personal Representative of the Estate of Sheila K. Stelzer v. Avon Products, Inc., et al. | MID-L-001821-24 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Stengel | Robert | Stengel, Robert, Pltf. v. Barretts Minerals Inc., et al. | 190212/21 | New York | New York | Weitz & Luxenberg P.C. | Benjamin Alan Darche |
| Stephen | Wilma | Wilma Stephan vs 188A North Canon Inc., et al. | MID-L-001373-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Stevens | Patricia | Stevens, Patricia, Pltf. v. Avon Products, Inc., et al. | MID-L-002979-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Sipe | Pamela | Pamela A. Stipe And Richard R. Stipe vs. A.O. Smith Corporation, et al. | 23-la-001579 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Julia Kerr |
| Stone | Nicole | Stone, Nicole and Joshua Stone, Plfts. v. Barretts Minerals, Inc., et al. | MID-L-001972-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Stratford | Eva | Stratford, Sylvia, Individually and as Personal Representative of the Estate of Eva Stratford, Deceased, Pltf. v. Avon Products, Inc., et al. | CV21957443 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeRuve |
| Stringfellow | Thomas | Stringfellow, Thomas and Karen Stringfellow, Pltfs. v. Johnson & Johnson, et al. | MID-L-002906-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Suzanne M. Ratcliffe |
| Suedekum | Almon Lynn | Suedekum, Jeri Lynn as Administratrix of the Estate of Almon Lynn Suedekum, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-001859-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Sullivan | Joan | Joan Sullivan & George Sullivan v Access Business Group, LLC, et al. | MID-L-001278-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Sutton | Robert H. | Sutton, Lisa, Individually and as Administrator and Administrator ad Prosequendum for the Estate of Robert H. Sutton, Jr., Deceased, Plft. v. Avon Products, Inc., et al. | MID-L-001903-22 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Sutton | William | William A. Sutton Jr. vs. Avon Products, Inc., et. al. | CACE-24-009090 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Swedlow | Sharon | Sharon Swedlow vs Revlon, Inc., et al. | MID-L-001760-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Sweeney | Donald | KATHERINE M. KOMER, as Special Administrator for the Estate of DONALD E. SWEENEY, deceased, and ROBERTA S. SWEENEY, Individually v. BELDEN WIRE & CABLE COMPANY LLC, et al | 2022LA000724 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Meghan K. McGlynn |
| Swenson | Lynn | Martha Wahlstrom, as Special Administrator for the Estate of Lynn Swenson, deceased v. Avon Products, Inc., et al. | 190204/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Syed | Sadia | Sadia Syed v Avon Products, Inc et al. | MID-L-000462-23 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Jacob Jordan |
| Synowicki | John | Jane Davis, Individually and as Executrix for the Estate of John Synowicki v Beacon CMP Corp., et al. | MID-L-005034-22 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Tantillo | Dianne | Dianne Tantillo vs. Avon Products, Inc., et al. | 2024-01705 | Louisiana | Orleans Parish CDC | Landry & Swarr, LLC; Dean Omar Branham Shirley, LLP | Mickey P. Landry; Frank J. Swarr; Matthew C. Clark; Jordan Bollinger |

639770001-4866996551

| P L N m | P F N m | C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Tarka | Stanley | Stanley W Tarka and Barbara A Tarka v Avon Products, Inc., et al. | MID-L-006850-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Fulda |
| Taylor | Debra | Latoya Taylor Administratrix of the Estate of Debra Taylor v American International Industries, et al. | 23-07-02624 | Pennsylvania | Philadelphia | Simmons Hanly Conroy LLP | Sealey, James Andrew |
| Teffeteller | Jerry | Jerry Teffeteller; Sharon Teffeteller v. Alfia Laval, Inc., et al. | 23STCV07392 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc Willick |
| Tellez | Maria | Mauricio Tellez, Individually and as Administrator and Administrator ad Prosequendum for the Estate of Maria Tellez, Deceased, Natalia Olvera Evangeleva Tellez Ruiz, Jose Tellez Ruiz, and Omar Tellez Ruiz v. Avon Products, Inc., et al. | MID-L-000054-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Thomas | Narcissus | Narcissus Thomas vs Brenntag North America, Inc., et al. | 190126/2018 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block |
| Thompson | David | Megan Farver; Estate of David Thompson v. 3M Co., et al. | CV2194894 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeRuve |
| Tippin | Corey Grant | Tippin, Corey, Pltf. v. 3M Company, et al. | 190062/2021 | New York | New York | The Early Law Firm | Brian Francis Early |
| Tishman | Carol | Tishman, Carol, Pltf. v. Avon Products, Inc., et al. | MID-L-005500-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Tollefson | Katherine | Tollefson, Katherine and Kevin Tollefson, Pltfs. v. Johnson & Johnson, et al. | MID-L-004370-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Torrence | Cora Dean | Cora Dean Torrence v Avon Products, Inc., et al. | 190170/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Torres | Plinio | Plinio Torres and Mariana Torres v. Avon Products, Inc., et al. | 190165/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Townsend | Michelle | Rachel M. Morlock, as Personal Representative of the Estate of Michelle D. Townsend | MID-L-002370-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Trippett | Frank | Linda Trippett Individually and as Executor of the Estate of Frank Trippett v Barretts Minerals, Inc., et al. | MID-L-004860-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Kimberly Russell |
| Tushaj | Elizabeth | Elizabeth Tushaj v Brenntag North America, et al. | 190327/2023 | New York | New York | Weitz & Luxenberg P.C. | Sean Kerley |
| Uribarri | Peter | Peter V Uribarri and Ana L Uribarri v Barretts Minerals, Inc., et al. | MID-L-003279-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |
| Utz | Tammi | Tammi L. Utz, v. Agco Corp, et al. | 24 LA 814 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Jaclyn Harres |
| Valega | Walter | WALTER E. V ALEGA and RITA M. VALEGA, vs. ALBERTISONS COMPANIES, INC. et al. | 21STCV46564 | California | Los Angeles | Maune Raichle Hartley French & Mudd, LLC | Marissa Langhoff |
| Valentin | Barbara | Barbara Valentin and Malcolm Valentin v. L'Oreal Travel Retail Americas, Inc. et al. | 2024-009035-CA-01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Brendan Tully |
| Valley | Jody | Jody Valley and Elaine Thomason v. Block Drug Co., Inc., et al. | MID-L-002212-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | |
| Vasconcellos | Pedro | Pedro Javier Vasconcellos and Juan C. Estrada v. 3M Company, et al. | 190186/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |

6597700001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Vasquez | Jesse | Yanet Patricia Vasquez, Individually and as the Personal Representative of the Estate of Jesse Vasquez, Deceased v. Barrett Minerals, Inc., et al. | MID-L-000595-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Vasquez | Patricia | Vasquez, Patricia and Santiago Vasquez, H/W, Pltfs. v. Barrett Minerals, Inc. et al. | MID-L-000296-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Vaughn | Shirley | TERRY VAUGHN, Individually and as Successor In-Interest to the Estate of SHIRLEY VAUGHN, Deceased, and MACKENZIE OGDEN, by and through her Guardian al Litem, TERRY VAUGHN, and JAMES SETTLE and KILEE FULLER, VS. COTY, INC. et al. | 19STCV35819 | California | Los Angeles | Simon Greenstone Panatier, PC | Stu Purdy |
| Vaughn | Bobbie Jo | Gordon Vaughn, as Administrator of the Estate of Bobbie Jo Vaughn, Deceased v. Barrett Minerals, Inc., et al. | MID-L-07699-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Ventura | Theresa | Theresa Ventura v. Johnson & Johnson, et al. | 190055/21 | New York | New York | Weitz & Luxenberg P.C. | Benjamin Alan Darche |
| Verdolotti | Irma | Verdolotti, Irma, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-005973-16 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Virbitsky | William | William Virbitsky and Leslie Virbitsky v 84 Lumber Company, et al. | 23-11-01456 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |
| Vyner | Myralynn | Myralynn Vyner v Avon Products, Inc., et al. | 190077/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Walsh | Lillian | Walsh, Barry Indv and Administrator of the Estate of Lillian Margaret Walsh, Deceased v Avon Products, Inc. et al. | 190123/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Walston | John | Teri L. Walston, Ind. and as Personal Rep. of the Estate of John Dale Walston, et al vs. Aramis, Inc... Brenntag Specialties LLC, et al | 2020-76187-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Walters | Helen | Israel, Evelyn, as Administrator and Administrator Ad Presoquendumfor the Estate of Helen Waters, Pltf v. Clinique, et al. | MID-L-004313-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Waters | Ramona | Forrest Waters, Ind. and as the Pesonal Rep. of the estate of Ramona Gina Waters (deceased), Gregory Waters and Preston Waters vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-06630-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Weber | Rhanda | Mark Weber, as Personal Representative of the Estate of Rhanda Weber, Deceased v. Publix Super Markets, Inc., et al | 23-016220 CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca S. Vinocur<br>Matthew LaSorsa |
| Webster | Barry | Webster, Barry, Pltf. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-001410-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | James Andrew Plastiras |
| Weeks | Cheryl | Cheryl R. Weeks and Gregory W. Weeks v. Rayer Healthcare, LLC, et al. | CACE-23-004434 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |

35

659770001-4866996bs1

| P L N m | P F N m | C C | C N m | S | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Welch | Gail | Mary Fletcher and Laura Miner, individually and as Co-Executors of the Estate of Gail Welch, deceased vs Brenntag North America, Inc., and Brenntag Specialties, Inc., et al. | MID-L-003376-17 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Welch | Linda | Welch, Linda Pltf. v. American International Industries, Inc., et al. | MID-L-000304-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Welch | Kathleen | Edward L Welch Jr & Estate of Kathleen M Welch v Avon Products, Inc. et al. | 23-013392 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Weldon | Lois | Weldon, Bruce, Individually and as Administrator ad Prosequendum for the Estate of Lois Weldon, Deceased, Pltf v. Brenntag Specialties, Inc., et al. | MID-L-001874-22 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Wentz | Sharon | Steven Wentz and Scott Wentz individually and co executors for estate of Sharon L Wentz and Samuel R Wentz Jr v Avon Products, Inc., et al. | MID-L-002540-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joshua Kristal |
| Westover | Barbara | Westover, Barbara and Darl Westover v American International Industries, et al. | MID-L-003011-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Westropp | Victoria | Victoria Westropp vs Avon Products, Inc., et al. | 1902287/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Wewers | Tammie | Tammy L. Wewers and Travis L. Wewers v Barretts Minerals Inc., et al | MID-L-002895-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| White | Carol | White, Carol and James White, Pltfs. v. Johnson & Johnson, et al. | MID-L-005771-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Whiteley | Charma | SHERRI PINSON, Individually and as Personal Representative for the Estate of CHARMA WHITELEY, Deceased, and CHARLES E. WHITELEY, Individually v. AUTOZONE, INC. et al | 21CV34994 | Oregon | Multnomah | Maune Raichle Hartley French & Mudd, LLC | Meredith Good |
| Whiting | Kaye | Kaye Whiting and Larry Whiting v Avon Products, Inc., et al. | MID-L-000153-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Wilks | Jason Lee | Cynthia Wilks, individually and as Personal Representative of estate of Jason Lee Wilks v Bayer Consumer Care Holdings, LLC, et al. | MID-L-006750-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Willems | Henricus | Henricus Willems v Arkema Inc., et al. | MID-L-005697-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Williams | Teras | Teras Williams vs. H.E.B., LP, Brenntag Specialties LLC and Brenntag North America, et al | 2023-50984-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Greyson R. Ackerman |
| Williams | Shirley | Williams, Shirley and George Williams, Pltfs. v. Avon Products, Inc., et al. | MID-L-003872-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Williams | Ralph | Linda D. Williams, as Proposed Administrator of the Estate of Ralph Williams, and Nellie Williams, Individually v. Cnoopco, Inc., et al. | 604951/2024 | New York | Suffolk | Weitz & Luxenberg P.C. | Jeffrey S. Kanca |
| Williams | Jay | Jay C. Williams and Linda Williams v. Block Drug Co., Inc., et al. | EFCA202400098 | New York | Broome | Weitz & Luxenberg P.C. | Sara J. Merrill |
| Williamson | Stephen | Stephen Williamson v 3M Company, et al. | MID-L-004277-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Wilner | Kristi | Kristi Wilner and Brian Wilner v. Avon Products, Inc., et al. | 190140/2024 | New York | New York | Weitz & Luxenberg P.C. | Andrew Gnyoso |
| Wilson | Sandra | Sandra Wilson and Virgil Wilson v Brenntag North America, Inc., et al. | MID-L-005552-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |

639770001-4866996651

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Windram | Jennifer | Windram, Jennifer, Pltf. v. Johnson & Johnson, et al. | MID-L-003103-21 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Wintersteen | Bonita | Wintersteen, Bonita and Robert Wintersteen, Pltfs. v. Alticor Inc., fka Amway, et al. | 190034/2022 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Wisener | Naomi | Naomi Wisener vs. Amway Corp, Brenntag Specialties LLC and Brenntag North America, et al | 2021-70594-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Wisniewski | Sonia | Wisniewski, Sonia, Pltf. v. Barrett Minerals, et al. | MID-L-002224-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Wong | Carmen | Carmen Wong and Marcial Wong v. Avon Products, Inc., et al | 2024-7889-CA-01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc Kunen |
| Wood | Susan | Susan Wood & Donald Wood v Ace Poperty & Casualty Ins Co., et al. | 2211000310 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |
| Yerkes | Shelly E. | SHELLY E. YERKES AND THOMAS F. YERKES, vs. AVON PRODUCTS, INC, et al. | 23CV032102 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| Ylitalo | Carol | Ylitalo, Carol and James Ylitalo, Pltfs. v. Almay, Inc., et al. | MID-L-006664-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Yoder | Daryl | Yoder, Daryl and Linda, Pltfs., v Almay, inc., et al. | MID-L-000018-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Younger | Paul | Paul Younger and Margaret Younger v Goulds Pumps (NY), Inc., et al. | 190190/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Yurchick | Chesley | Serenity Yurchick, Ind. and as Rep. of the Estate of Chesley Yurchick, Jr. (Deceased), and a/n/f of A. Y., a minor vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-14971-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Zachary | Julanda | Zachary, Julanda, Pltf. v. Avon Products, Inc., et al. | 190095/2022 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Zane | David | David Zane and Rachel Zane v. L'Oreal Travel Retail Americas, Inc., et al | 23-013057 CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Zemar | Rose | Zemar, Rose, Pltf. v. Amerilure Inc., et al. | MID-L-000784-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Ziegler | Lorraine | Lorraine D Ziegler & Jeffrey Ziegler v Brenntag North America, et al. | 190187/2022 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Zimmer | Dieter | Heidi Anne Rerecich, Individually and as Executrix of the Estate of Dieter Zimmer, Deceased v. Block Drug Company, Inc., et al. | MID-L-001470-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew A. Grubman |
| Zois | George | Zois, Mary, individually and Mary Zois, as Executrix of the Estate of George Zois, Deceased, Pltf. v. Barretts Minerals, Inc., et al | 603057/2022 | New York | Suffolk | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Zuniga | Fania | Fania Zuniga and Dennis Osorio v. Avon Products, Inc., et al. | 24-03-00655 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Neidra Wilson |

659770001-4866996Ss1

**JA1085**

<table>
<tr><td colspan="2">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
</td></tr>
</table>

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**SHERMAN, SILVERSTEIN,**<br>**KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email:  aabramowitz@shermansilverstein.com<br>       rswitkes@shermansilverstein.com<br><br>*Local Counsel to the*<br>*Official Committee of Talc Claimants* | **COOLEY LLP**<br>Cullen D. Speckhart (admitted *pro hac vice*)<br>Michael Klein (admitted *pro hac vice*)<br>Evan M. Lazerowitz<br>Jeremiah P. Ledwidge (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Email:  cspeckhart@cooley.com<br>       mklein@cooley.com<br>       elazerowitz@cooley.com<br>       jledwidge@cooley.com<br><br>*Lead Counsel to the*<br>*Official Committee of Talc Claimants* |
| **CAPLIN & DRYSDALE, CHARTERED**<br>Kevin C. Maclay (admitted *pro hac vice*)<br>Todd E. Phillips (admitted *pro hac vice*)<br>Kevin M. Davis (admitted *pro hac vice*)<br>Serafina A. Concannon (admitted *pro hac vice*)<br>Shahriar M. Raafi (admitted *pro hac vice*)<br>1200 New Hampshire Avenue, 8th Floor<br>Washington, DC 20036<br>Tel: (202) 862-5000<br>Email:  kmaclay@capdale.com<br>       tphillips@capdale.com<br>       kdavis@capdale.com<br>       sconcannon@capdale.com<br>       sraafi@capdale.com<br><br>*Special Asbestos Counsel to the*<br>*Official Committee of Talc Claimants* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>                              Debtors. | Case No. 23-13575 (MBK)<br><br>Chapter 11<br><br>Honorable Michael B. Kaplan, U.S.B.J., Chief |

DOC# 10266480

| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L. A. TERMINALS, INC., and SOCO WEST, INC.,<br><br>                   Plaintiffs,<br><br>v.<br><br>BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1-1,000,<br><br>                   Defendants. | Adv. Pro. No. 23-01245 (MBK) |
| --- | --- |

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that the Official Committee of Talc Claimants (the "Committee") hereby appeals to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 158 and Rules 8002 and 8003 of the Federal Rules of Bankruptcy Procedure from the *Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Actions Against Non-Debtors* (the "Order"), entered on November 20, 2024, by the United States Bankruptcy Court for the District of New Jersey (Adv. Pro. Docket No. 366).

**PLEASE TAKE FURTHER NOTICE** that a copy of the Order is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the names of all parties to the Order appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

| Party | Counsel |
|-------|---------|
| Official Committee of Talc Claimants | **COOLEY LLP**<br>Cullen D. Speckhart (admitted *pro hac vice*)<br>Michael Klein (admitted *pro hac vice*)<br>Evan M. Lazerowitz<br>Jeremiah P. Ledwidge (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Email: cspeckhart@cooley.com<br>mklein@cooley.com<br>elazerowitz@cooley.com<br>jledwidge@cooley.com<br><br>**SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email: aabramowitz@shermansilverstein.com<br>rswitkes@shermansilverstein.com<br><br>**CAPLIN & DRYSDALE, CHARTERED**<br>Kevin C. Maclay (admitted *pro hac vice*)<br>Todd E. Phillips (admitted *pro hac vice*)<br>Kevin M. Davis (admitted *pro hac vice*)<br>Serafina A. Concannon (admitted *pro hac vice*)<br>Shahriar M. Raafi (admitted *pro hac vice*)<br>1200 New Hampshire Avenue, 8th Floor<br>Washington, DC 20036<br>Tel: (202) 862-5000<br>Email: kmaclay@capdale.com<br>tphillips@capdale.com<br>kdavis@capdale.com<br>sconcannon@capdale.com<br>sraafi@capdale.com |
| Donna A. Spaulding | **DEAN OMAR BRANHAM SHIRLEY, LLP**<br>Charles W. Branham III (admitted *pro hac vice*) |

JA1088

| | J. Bradley Smith (admitted *pro hac vice*)<br>302 North Market Street, Suite 300<br>Dallas, TX 75202<br>Tel: (214) 722-5990<br>Email: tbranham@dobslegal.com<br>        bsmith@dobslegal.com |
|---|---|
| Shelly Yerkes | **KAZAN, McCLAIN, SATTERLEY &<br>GREENWOOD**<br>A Professional Law Corporation<br>Steven Kazan, Esq.<br>Joseph D. Satterley, Esq.<br>Jack London Market<br>55 Harrison Street, Suite 400<br>Oakland, CA 94607<br>Tel: (510) 302-1000<br>Email: skazan@kazanlaw.com<br>        jsatterley@kazanlaw.com |
| Lilo Cooper | **SIMON GREENSTONE PANATIER, P.C.**<br>Leah C. Kagan (NJ ID No. 013602009)<br>901 Main Street, Suite 5400<br>Dallas, TX 75202<br>Tel: (214) 276-7680<br>Email: lkagan@sgptrial.com |
| Katia Figueroa | **WEITZ & LUXENBERG, P.C.**<br>Perry Weitz, Esq.<br>Justine Delaney, Esq.<br>700 Broadway<br>New York, NY 10003<br>Tel: (212) 558-5500<br>Email: pweitz@weitzlux.com<br>        jdelaney@weitzlux.com |
| Juliet Gray | **MRHFM LAW**<br>Marcus E. Raichle, Esq.<br>Clay Thompson, Esq.<br>1015 Locust Street, Suite 1200<br>St. Louis, MO 63101<br>Tel: (314) 241-2003<br>Email: mraichle@mrhfmlaw.com<br>        cthompson@mrhfmlaw.com |
| Whittaker, Clark & Daniels, Inc., *et al.*,<br><br>Debtors | **KIRKLAND & ELLIS LLP<br>KIRKLAND & ELLIS<br>INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C. (admitted *pro hac* |

4

| | *vice*)<br>601 Lexington Avenue<br>New York, NY 10022<br>Tel: (212) 446-4800<br>Email: joshua.sussberg@kirkland.com<br><br>Chad J. Husnick, P.C. (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, IL 60654<br>Tel: (312) 862-2000<br>Email: chad.husnick@kirkland.com<br><br>**COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, NJ 07601<br>Tel: (201) 489-3000<br>Email: msirota@coleschotz.com<br>       wusatine@coleschotz.com<br>       fyudkin@coleschotz.com |
|---|---|
| Brenntag AG, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, and Mineral and Pigment Solutions, Inc. | **LATHAM & WATKINS LLP**<br>Adam S. Ravin<br>Madeleine C. Parish (admitted *pro hac vice*)<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Tel: (212) 906-1200<br>Email: adam.ravin@lw.com<br>       madeleine.parish@lw.com<br><br>Jeffrey E. Bjork (admitted *pro hac vice*)<br>Amy C. Quartarolo (admitted *pro hac vice*)<br>355 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071<br>Tel: (312) 485-1234<br>Email: jbjork@lw.com<br>       amy.quartarolo@lw.com<br><br>Christina Craige (admitted *pro hac vice*)<br>555 Eleventh Street, NW, Suite 1000<br>Washington, DC 20004<br>Tel: (202) 637-2200<br>Email: chris.craige@lw.com<br><br>**MONTGOMERY MCCRACKEN** |

5

|  | **WALKER & RHOADES, LLP** |
|  | Lathrop B. Nelson, III |
|  | Richard G. Placey |
|  | 457 Haddonfield Road, Suite 600 |
|  | Cherry Hill, NJ 08002 |
|  | Tel: (856) 488-7700 |
|  | Email: lnelson@mmwr.com |
|  | rplacey@mmwr.com |
| Andrew R. Vara, United States Trustee for Regions Three and Nine | **UNITED STATES DEPARTMENT OF JUSTICE OFFICE OF THE UNITED STATES TRUSTEE** |
|  | Lauren Bielskie, Trial Attorney |
|  | One Newark Center, Suite 2100 |
|  | Newark, NJ 07102 |
|  | Tel.: (973) 645-2939 |
|  | Email: lauren.bielskie@usdoj.gov |
|  |  |
|  | Linda Richenderfer, Trial Attorney |
|  | J. Caleb Boggs Federal Building |
|  | 844 King Street, Suite 2207, Lockbox 35 |
|  | Wilmington, DE 19801 |
|  | Tel.: (302) 573-6491 |
|  | Email: linda.richenderfer@usdoj.gov |

Dated:   December 3, 2024

/s/ Arthur Abramowitz
**SHERMAN, SILVERSTEIN,
KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email:  aabramowitz@shermansilverstein.com
rswitkes@shermansilverstein.com

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
Michael Klein (admitted *pro hac vice*)
Evan M. Lazerowitz
Jeremiah P. Ledwidge (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Email:  cspeckhart@cooley.com

6

**JA1091**

mklein@cooley.com
elazerowitz@cooley.com
jledwidge@cooley.com

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Kevin M. Davis (admitted *pro hac vice*)
Serafina A. Concannon (admitted *pro hac vice*)
Shahriar M. Raafi (admitted *pro hac vice*)
1200 New Hampshire Ave NW, 8th Floor
Washington, DC 20036
Tel: (202) 862-5000
Email:  kmaclay@capdale.com
            tphillips@capdale.com
            kdavis@capdale.com
            sconcannon@capdale.com
            sraafi@capdale.com

*Co-Counsel to the*
*Official Committee of Talc Claimants*

 */s/ J. Bradley Smith*
**DEAN OMAR BRANHAM SHIRLEY, LLP**
Charles W. Branham III (admitted *pro hac vice*)
J. Bradley Smith (admitted *pro hac vice*)
302 North Market Street, Suite 300
Dallas, TX 75202
Tel: (214) 722-5990
Email: tbranham@dobslegal.com
            bsmith@dobslegal.com

*Counsel to Donna A. Spaulding*

 */s/ Joseph D. Satterley*
**KAZAN, McCLAIN, SATTERLEY &
GREENWOOD**
A Professional Law Corporation
Steven Kazan, Esq.
Joseph D. Satterley, Esq.
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000
Email: skazan@kazanlaw.com
            jsatterley@kazanlaw.com

7

*Counsel to Shelly Yerkes*

 */s/ Leah C. Kagan*
**SIMON GREENSTONE PANATIER, P.C.**
Leah C. Kagan (NJ ID No. 013602009)
901 Main Street, Suite 5400
Dallas, TX 75202
Tel: (214) 276-7680
Email: lkagan@sgptrial.com

*Counsel to Lilo Cooper*

 */s/ Justine Delaney*
**WEITZ & LUXENBERG, P.C.**
Perry Weitz, Esq.
Justine Delaney, Esq.
700 Broadway
New York, NY 10003
Tel: (212) 558-5500
Email: pweitz@weitzlux.com
          jdelaney@weitzlux.com

*Counsel to Katia Figueroa*

 */s/ Clay Thompson*
**MRHFM LAW**
Marcus E. Raichle, Esq.
Clay Thompson, Esq.
1015 Locust Street, Suite 1200
St. Louis, MO 63101
Tel: (314) 241-2003
Email: mraichle@mrhfmlaw.com
          cthompson@mrhfmlaw.com

*Counsel to Juliet Gray*

8

**JA1093**

**EXHIBIT A**

9

(Page 2)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

---

| | |
|---|---|
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC., <br><br>     Plaintiffs, <br><br> v. <br><br> BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT and JOHN AND JANE DOES 1-1,000, <br><br>     Defendants. | Adv. Proc. No. 23-01245 (MBK) <br><br><br> **FILED** <br> JEANNE A. NAUGHTON, CLERK <br><br> NOV 19 2024 <br><br> U.S. BANKRUPTCY COURT <br> TRENTON, NJ <br> BY_____DEPUTY |

### ORDER ENFORCING AUTOMATIC STAY AND PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST NON-DEBTORS

The relief set forth on the following pages, numbered three (3) through nine (9), is

**ORDERED**.

_____
Michael B. Kaplan, USBJ

11/19/24

65977/0001-48613045

**JA1095**

---

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
adeleo@coleschotz.com

-and-

**COLE SCHOTZ P.C.**
G. David Dean, Esq. (admitted *pro hac vice*)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com

*Counsel for Debtors and*
*Debtors-in-Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 100 First Stamford Place, Stamford, Connecticut 06902.

65977/0001-48613045

**JA1096**

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

This matter coming before the Court on the *Debtors' Motion for (I) an Order Extending*

*the Automatic Stay to and/or Preliminarily Enjoining Certain Actions Against Non-Debtors*

*Pending Entry of a Final, Non-Appealable Order Regarding the Debtors' Proposed Settlement*

*and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision*

*on the Debtors' Request for Injunctive Relief* [Adv. Proc. Docket No. 299] (the "**Motion**"); and

the Court having previously entered an opinion dated August 13, 2024 [Adv. Proc. Docket No.

268] (the "**Summary Judgment Opinion**") and Order dated August 28, 2024 [Adv. Proc. Docket

No. 292] (the "**Summary Judgment Order**")[2] declaring that Successor Liability Claims are

property of the Debtors' estates pursuant to section 541(a) of the Bankruptcy Code; and the Court

having found and determined that (i) the Court has jurisdiction to consider the Motion pursuant to

28 U.S.C. §§ 157 and 1334(b), (ii) this matter is a core proceeding under 28 U.S.C. § 157(b), (iii)

venue is proper in this district pursuant to 28 U.S.C. § 1409, and (iv) entry of this Order is (a) fair

and reasonable, (b) consistent with the Bankruptcy Code, the Bankruptcy Rules, the applicable

Federal Rules, and the Local Rules, (c) appropriate under the circumstances, and (d) in the best

interests of the Debtors and their estates and creditors; and the Court having considered the Motion,

the amended declaration filed in support of the Motion [Adv. Proc. Docket No. 305] (the

"**Declaration**"), the amended schedule reflecting the Brenntag Enjoined Claims [Adv. Proc.

Docket No. 317] (the "**Summary Schedule**"), the objection to the relief requested in the Motion

filed by the Official Committee of Talc Claimants [Adv. Proc. Docket No. 310], the Debtors' reply

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the
October 24 Opinion (defined below), as applicable.

(Page 4)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

in support of the Motion [Adv. Proc. Docket No. 353] and Brenntag's joinder in support thereof
[Adv. Proc. Docket No. 354]; and upon the record of the hearings to consider the relief requested
in the Motion conducted on October 15, 2024 and October 21, 2024 (collectively, the **"Hearing"**),
and the Court having issued an opinion dated October 24, 2024 setting forth its reasoning in
granting the Motion [Adv. Proc. Docket No. 360] (the **"October 24 Opinion"**), the Court hereby
finds and determines that:

A.      The findings and conclusions set forth herein constitute the Court's findings of fact
and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding
pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact
constitute conclusions of law, they are adopted as such. To the extent any of the following
conclusions of law constitute findings of fact, they are adopted as such.

B.      The findings of fact and conclusions of law set forth in the October 24 Opinion, the
Summary Judgment Opinion, and the Summary Judgment Order are incorporated into this Order
by reference as if fully set forth herein.

C.      Without immediate injunctive relief, it is expected that the Debtors will be
irreparably harmed.

D.      The legal and factual bases set forth in the Motion, the Declaration, and the
Summary Schedule and at the Hearing, as well as the parties' representations on the record,
establish just cause for the relief granted herein.

Based on the foregoing findings and conclusions, **IT IS HEREBY ORDERED** that:

1.      The Motion is **GRANTED**, except as set forth in Paragraph 6 hereof.

65977/0001-48613045

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

2.      The claims against Brenntag (and only Brenntag) scheduled on **Exhibit 1** are automatically stayed pursuant to section 362 of the Bankruptcy Code or, alternatively, preliminarily enjoined through and including the date on which the Court enters: (i) a final, non-appealable Order granting the Settlement Motion; or (ii) an Order denying the Settlement Motion, absent further order of this Court.  Accordingly, Defendants are prohibited from prosecuting, amending, or settling any such claims, subject to the terms of this Order.  Any dispute regarding applicability of the automatic stay or this Order to a particular claim or action, or any allegations regarding violations of the automatic stay or this Order, shall be brought before this Court for resolution. For the avoidance of doubt, nothing in this Order shall prejudice any rights to move in this Court for relief from the automatic stay or this Order under any theory.

3.      The prospective effect of this Order shall terminate immediately upon this Court's entry of (i) a final, non-appealable Order granting the Settlement Motion or (ii) an Order denying the Settlement Motion.

4.      The Debtors are authorized to amend or supplement Exhibit 1 to stay/enjoin additional actions asserting claims against Brenntag (and only Brenntag) consistent with the October 24 Opinion pursuant to the following procedures, which are hereby approved:

   i.   So long as this Order remains in effect, the Debtors shall be permitted to file on the docket in the Adversary Proceeding a request (a **"Request to Amend"**), which shall attach (a) a proposed order approving the requested amendment(s) (an **"Order Approving Amendment"**), (b) an amended or supplemented Exhibit 1 that identifies the additional actions sought to be stayed/enjoined (such actions, **"Additional Actions"**), (c) a blackline of such exhibit marked against the previously filed exhibit, and (d) a copy of the operative complaint and any bifurcation stipulation filed in each Additional Action.

   ii.  Any Request to Amend shall be served by regular mail and email (where known) on counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel

(Page 6)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

for NICO, counsel for DB US, and counsel for any individual plaintiff in any Additional Action (each, a **"Amendment Notice Party"** and collectively with counsel for the Debtors, the **"Amendment Notice Parties"**) within one (1) business day of filing a Request to Amend.

iii.    Objections, if any, to a Request to Amend, which shall be limited to arguing that the plaintiff's claims against Brenntag in the relevant Additional Action constitute purely direct claims based solely on plaintiff's post-2004 talc/asbestos exposure, either because (i) plaintiff's initial exposure to talc/asbestos occurred after February 27, 2004 or (ii) prior to February 28, 2024, plaintiff was exposed to talc/asbestos that was in no way connected to the Debtors (each, an **"Amendment Objection"**), shall be filed and served by first class mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US within fourteen (14) days of service of the applicable Request to Amend.

iv.    Any Amendment Notice Party that fails to timely file an Amendment Objection shall be deemed to consent to entry of the Order Approving Amendment as to the Additional Action(s) identified in the applicable Request to Amend.

v.    In the event an Amendment Notice Party timely files an Amendment Objection, the parties shall meet and confer in an attempt to resolve the Amendment Objection, and, in the absence of such resolution, the Court shall resolve the Amendment Objection at a hearing to be scheduled. For the avoidance of doubt, the Amendment Notice Parties reserve all rights to file a reply in connection with any Amendment Objection.

5.    The following Schedule Removal Procedures are hereby approved:

i.    So long as this Order remains in effect, any plaintiff whose action is listed on Exhibit 1 and whose claims against Brenntag constitute purely direct claims based solely on such plaintiff's post-2004 talc/asbestos exposure, either because (i) plaintiff's initial exposure to talc/asbestos occurred after February 27, 2004 or (ii) prior to February 28, 2024, plaintiff was exposed to talc/asbestos that was in no way connected to the Debtors, shall be permitted to file on the docket in the Adversary Proceeding a request to remove his or her action from Exhibit 1 (as amended or supplemented) (a **"Removal Request"**), which shall (a) identify the specific action plaintiff seeks to remove and (b) provide evidence sufficient to establish that plaintiff satisfies (i) or (ii) of this Paragraph 5.i.

ii.    Any Removal Request shall be served by regular mail and email on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, and counsel for DB US (each, a **"Removal Notice Party"** and

65977/0001-48613045

(Page 7)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

<blockquote>
collectively, the "**Removal Notice Parties**") within one (1) business day after filing such Removal Request.

iii.   Objections, if any, to a Removal Request (each, a "**Removal Objection**"), shall be filed and served by first class mail and email (where known) on counsel for the Debtors, counsel for the Committee, counsel for the FCR, counsel for Brenntag, counsel for NICO, counsel for DB US, and, if not the filing party, counsel for the applicable plaintiff within fourteen (14) days of service of such Removal Request.

iv.   Any Removal Notice Party that fails to timely file a Removal Objection shall be deemed to consent to the removal of the action identified in the applicable Removal Request from the Schedule.

v.   In the event a Removal Notice Party timely files a Removal Objection, the parties shall meet and confer in an attempt to resolve the Objection, and, in the absence of such resolution, the Court shall resolve the Removal Objection at a hearing to be scheduled. For the avoidance of doubt, the Removal Notice Parties reserve all rights to file a reply in connection with any Removal Objection.
</blockquote>

6.   The plaintiff in the action styled *Sneider v. Avon Products Inc., et al.*, Case No. 23STCV25951 (Cal. Super. Ct.) (the "**Sneider Action**") and Brenntag are hereby granted relief from this Order solely to litigate or settle plaintiff's claims against Brenntag in the Sneider Action, including but not limited to the introduction of evidence or argument with respect to Debtors' alleged liability for the sole and limited purpose of raising any defense to such claims or allocating or apportioning some or all liability, if any, for such claims as among the Debtors, Brenntag, and/or any other entity, and pursuant to this Court's oral ruling on November 6, 2024, this Court annuls ~~although this Court finds that removal of the Sneider Action was a technical but not willful violation of the automatic stay~~ the automatic stay as to the Sneider Action *nunc pro tunc* to the commencement of the Sneider ~~to date (MBK)~~ Action as to all actions taken by either Sneider or Brenntag in the Sneider Action. Accordingly, ~~no party's actions in the Sneider Action are deemed to have been violative of the automatic~~ stay (MBK) or ~~void ab initio, and~~ further litigation or settlement of the Sneider Action shall not violate the ~~Continuing~~ automatic stay or this Order, subject to the following limitations: to the extent a verdict or findings

65977/0001-48613045

(Page 8)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

---

are rendered, or a settlement is executed, evidence introduced implicating Debtors' liability shall have no preclusive effect against the Debtors and may not be referenced or offered into evidence in any future litigation involving Debtors, the Debtors' liabilities, and the Debtors' claims against Brenntag in this or any other proceeding involving the Debtors; provided that all claims for or defenses to indemnification as among Brenntag, DB US, and NICO are preserved.

7.       The Debtors shall serve a copy of this Order, including Exhibit 1, on all parties to this Adversary Proceeding via regular mail within one (1) business day of entry of this Order.

8.       Any party in interest is authorized to file this Order on the docket of the actions listed on Exhibit 1 of this Order.

9.       Pursuant to Federal Bankruptcy Rule 7065, the Debtors are relieved from posting bond under Federal Rule 65(c).

10.      Notwithstanding anything to the contrary in this Order, any party to an action listed on Exhibit 1 of this Order may, without leave of this Court, take reasonable steps to perpetuate the testimony of any person subject to this Order who is not expected to survive the duration of this Order or who otherwise is expected to be unable to provide testimony if such testimony is not perpetuated during the duration of this Order. Notice shall be provided to the Debtors and Brenntag by notifying counsel for the Debtors and counsel for Brenntag appearing in the applicable action, respectively, of the perpetuation of such testimony. The Debtors shall have the right to object to the notice on any grounds it would have if it were a party to the underlying proceeding and not subject to the terms of this Order, and the Debtors may raise any such objection with this Court. The use of such testimony in any appropriate jurisdiction shall be subject to the applicable procedural and evidentiary rules of such jurisdiction, except that the Debtors waive objecting to

(Page 9)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-01245-MBK
Caption of Order: Order Enforcing Automatic Stay and Preliminarily Enjoining Certain Claims
Against Non-Debtors

the use of any such testimony based on lack of notice or lack of opportunity to cross-examine. All

parties reserve and do not waive any and all objections with respect to such testimony. Defendants

may not seek to perpetuate the testimony of any representatives - including, but not limited to,

directors, officers, current and/or former employees, and agents—of the Debtors without the

consent of the Debtors or an order of the Court.

11. The requirement set forth in D.N.J. LBR 9013-1(a)(3) that any motion be

accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion

or otherwise waived.

12. The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order.

13. Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by

such notice.

14. This Order constitutes a final appealable order within the meaning of 28 U.S.C. §

158(a).

15. The terms and conditions of this Order shall be effective immediately upon its

entry.

16. This Court shall have exclusive jurisdiction over this Order and any and all matters

arising from or relating to the implementation, interpretation, or enforcement of this Order,

including, without limitation, any determination regarding whether an action is subject to this

Order, and any requests for relief from the stay/injunction set forth in this Order.

65977/0001-48613045

**JA1103**

# EX IBIT

JA1104

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Acevedo | Yolanda | Yolanda Acevedo and Noe Acevedo v Avon Products, Inc et al. | MID-L-003625-23 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Adams | Jennifer | Jennifer E. Adams and Jon S Adams v Brenntag North America, Inc et al. | MID-L-004655-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Adams | Jacqueline | Jacqueline Adams and David Adams v Sumitomo Corporation of America et al. | 190017/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Adams | Sheri | Sheri Adams v Alberto Culver USA Inc et al. | 190233/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |
| Aikens | Kimberly | Kimberly O. Aikens vs. Publix Supermarkets, Inc., et al | 2023-017836-CA01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. |
| Akins | Shirley | Shirley Akins and Charles Akins vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2021-80721-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Akins | Theresa | Theresa Akins vs. Brenntag Specialties LLC, et al | 2022-57520-ASB | Texas | Harris | Nachawati Law Group | Steven S. Schulte |
| Al Saad | Newal | Dan Albasry, as Trustee of the Estate of Newal Al Saad, and Firas Mohammad v. Barretts Minerals, Inc., et al., | 190002/2023 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |
| Alber | Zachary Michael | Alber, Rebecca, Estate of Zachary Michael Alber, Pltf. v. Johnson & Johnson, et al. | MID-L-000955-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Alegre | Jorge | Jorge M Alegre and Luz Alegre v Arkema, Inc et al. | MID-L-001861-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Alexander-Jones | Ruth | G. RUTH ALEXANDER-JONES and JAMES R. JONES v. AVON PRODUCTS, INC., et al | 22-2-18669-1 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Brian F. Ladenburg |
| Alicea | Maria | Maria Alicea v. Avon Products, Inc., et al. | 23-1551 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell |
| Aloisio | Roman | Roman Aloisio v Avon Products, Inc et al. | 190239/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Alvarado | Alvaro | Maria Del Rosario Tobias, Ind. and as Personal Rep. of the Estate of Alvaro Alvarado, Deceased, and a/n/f of L.A., a Minor vs. Avon Products, Inc., Brenntag Specialties LLC, et al | 2021-73332-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Alvarez | Josefina | Josefina Alvarez v. Barretts Minerals Inc., et al | 23 L 5583 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | Bethany Gasperin |
| Alvarez | Maria | Alvarez, Miguel, Executor of Estate of Maria Alvarez, Pltf. v. Johnson & Johnson, et al. | MID-L-005353-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Amerosa | Elaine | Elaine M. Amerosa v Amerilure Inc., et al. | EFCA2023-002100 | New York | Oneida | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Anderson | Gina | GINA ANDERSON v. AVON PRODUCTS, INC., et al. | 21-2-14042-1 SEA | Washington | King | Simon Greenstone Panatier, PC | Robert Green |
| Anderson | Carolyn | Carolyn S. Anderson v. Avon Products, Inc., et al. | MID-L-02533-18 AS | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Anderton | William | William Anderton and Margie Anderton v. Brenntag North America and Brenntag Specialties, Inc. | MID-L-005866-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Arazosa | Richard | Joan Arazosa, as Executor of the Estate of Richard Arazosa v. 3M Co. et al. | 190069/2016 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |

1

639770001-4866996541

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P A C Nm |
|---|---|---|---|---|---|---|---|
| Armstrong | Terry | Terry Armstrong and Katherine Armstrong vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-38902-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Arvelo | Donna | Arvelo, Donna, M., Pltf. vs. Asbestos Corporation, Ltd., et al. | MID-L-000588-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Ashdown | Janet | Janet Ashdown v Sumitomo Corporation of America et al. | 190018/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Ashelford | John | Susan Ashelford, as Personal Representative of the Estate of John Ashelford, Deceased v. Barretts Minerals, Inc., et al | 23-002556 CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Ashoori | Shanaz | Shanaz Ashoori and Jehangir Ashoori v. AII, et al. | MID-L-001341-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Backofen | Brent | Brent W. Backofen v. 84 Lumber Company, et al. | 190172/2012 | New York | New York | The Early law Firm, LLC | Brian Francis Early |
| Bacsin | Alicia | Alicia Bacsin & Kenneth Bacsin v Avon Products, Inc et al. | 190069/2023 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Bagley | Patricia | Patricia Bagley v. Chanel, Inc., et al. | 190122/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Balas | Sandra | Sandra Balas and Anthony Balas v. Wegmans Food Markets, Inc., et al. | 811759/2024 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Ballesteros | Irma | Irma Ballesteros v. ALBERTSONS COMPANIES, INC., et al. | 23STCV06710 | California | Los Angeles | Frost Law Firm, PC | Andrew Seitz |
| Barker | Maureen | Georgina Jane Barker, Individually and as administrator of the estate of Maureen Barker v Christian Dior, Inc et al. | 190299/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Barnhart | Melissa | Melissa Barnhart and Christopher Barnhart v Avon Products, Inc et al. | MID-L-002049-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Barone | Nicholas | Nicholas Barone and Kathryn Barone v. Blue M, et al. | FBT-CV-22-6116587-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Barratt | Madelin | Barratt, Madelin and Henry Barratt, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008016-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Bartlett | Deborah Lee | Deborah Bartlett and Shawn Bartlett v Avon Products, Inc. et al. | 24STCV04012 | California | Los Angeles | Simon Greenstone Panatier, PC | Robert Green |
| Barton | Harold | Harold Barton, et al. v. Avon Products, Inc., et al. | CV21955385 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeRatre |
| Basili | Gina | Gina F. Basili v. Avon Products, Inc. et al. | 23-0784 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell |
| Basser | Carol | Carol Basser v AII, et al. | MID-L-000432-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Bast | Donna J. | DONNA J. BAST and LARRY A. BAST v. AVON PRODUCTS, INC. et al. | 23-2-15056-2 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton |
| Batey | Mary | William Batey Jr., Individually and as Administrator and Administrator ad Prosequendum for the Estate of Mary Batey, et al vs Avon Products, Inc. et al | MID-L-001565-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |

6397700001-486699655/1

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P A Nm |
|---|---|---|---|---|---|---|---|
| Bathgate | Josephine | Josephine Bathgate v Avon Products, Inc et al. | 1901125/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Belanger | Stacy | PETER BELANGER, individually and as successor-in-interest to STACY BELANGER, Deceased, CHRISTOPHER BELANGER, LUKE BELANGER, and LILY BELANGER, Individually, vs. RALPHS GROCERY COMPANY et al. | 22STCV08775 | California | Los Angeles | Waters Kraus & Paul | Kevin M. Loew |
| Bell | Judy Kay | Scott Bell, as Personal Representative for the Estate of Judy Kay Bell v. Abnay, Inc., et al. | 1900090/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Bennett-Turner | Alan | Alan Bennett-Turner v Avon Products, Inc et al. | 190118/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Berris | Susan W. | SUSAN W. BERRIS and BRUCE C. BERRIS, vs. BRENNTAG NORTH AMERICA, INC., et al. | 62-CV-23-257 | Minnesota | Ramsey | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann |
| Berry | Sara | Sara Berry and Sean Berry v Sumitomo Corporation of the Americas et al. | 1902742023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Besse | Jodi | Besse, Jodi & George Besse, Pltfs. v. Duval's Pharmacy, et al. | 1900102021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Best | Edna | Edna Best v. Avon Products, Inc., et al. | MID-L-007546-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Betts | Susan | Susan Betts v. Avon Products, Inc., et al. | 190119/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Bezanilla | Bernadette | Bernadette A. Bezanilla and Leopoldo G. Bezanilla v. Avon Products, Inc., et al | CACE-23-003072 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiBona |
| Biggers | Walter | Walter A. Biggers and Janet L. Biggers vs. Arkema, Inc., F/K/A Pennwalt Corporation, et. al. | 2024-LA-000830 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Steven D. Rineberg |
| Bijjetina | Jolynne | Jolynne Bijjetina and Eric Bijjetina, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 1900242017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Bill | Lorraine | Bill, Lorraine & Thomas South, Pltfs. v. Avon Products, Inc., et al. | 19006522 | New York | New York | Weitz & Luxenberg P.C. | James Plastiras |
| Biondo | Nancy | Peter Biondo, as Administrator of the Estate of Nancy Biondo, Deceased v. Avon Products, Inc., et al. | 1901199/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier |
| Bisceglio | Janice | Bisceglio, Janice, Pltf. v. Johnson & Johnson, et al. | MID-L-003853-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Biswas | Roman | Rohan Biswas and Jaclyn Biswas v Aramis Distributors New York, Inc et al. | 1900004/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Black | Edward | Tameron S. Gifts, Ind. and as Special Administrator for the heirs and Estate of Edward E. Black Sr. and Wanda Jo Black vs. Brenntag Specialties LLC, et al | 2018-59007-ASB | Texas | Harris | The Lanier Law Firm, PLLC | Mark A. Linder |
| Black | Mary | Mary Black, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 1901016/2017 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block |
| Blackwell | Mary Kathryn | Mary Kathryn Blackwell vs. Avon Products, Inc. et al. | CACE-24-010680 | Florida | Broward | Simmons Hanly Conroy LLP | Juan P. Bauta, II |

3

639770001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Blankschaen | Judith | Blinkinsop, Robert and Karen Blinkinsop, etc, Plfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008377-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Bloomberg | Jac | Bloomburg, Ellen, for the Estate of Jac M. Bloomberg, Plf. v. Barretts Minerals, Inc., et al. | MID-L-002608-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden |
| Blue | Vertis | Blue, Vertis, Plf. v. Avon Products, Inc., et al. | MID-L-02677-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Boatright | Angela | Boatright, Angela, Plif. v. Avon Products, Inc., et al. | 190154/2021 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Bogler | Eriza | Wolfgang Bogler, as Administrator of the Estate of Eriza Bogler, and Wolfgang Bogler, Individually v. Avon Products, Inc., et al. | 614805/2024 | New York | Suffolk | Weitz & Luxenberg P.C. | Sean Kerley |
| Boice | Denise K. | DEBBIE A. BOICE, as Personal Representative of the Estate of DENISE K. BOICE v. AVON PRODUCTS, INC., et al. | 23-2-22519-8 SEA | Washington | King | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton |
| Bolen | Barbara Ellen | Poland-Stemock, DeAnna and Estate of Barbara Ellen Bolen, Plf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-000404-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Borthwick | Anne | Anne Borthwick and David Borthwick v. Sumitomo Corporation of Americas, et al. | 190031/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Bowers | Bernard | Bowers, Bernard P. and Jeanne Bowers, Plffs., v. A.W. Chesterton Company, et al. | 21-09-02481 | Pennsylvania | Philadelphia | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Bradford | Claire | Sharon Englerth, as Personal Representative of the Estate of Claire Bradford v. Bayer Healthcare LLC, et al. | 24-05-00433 | Pennsylvania | Philadelphia | Brookman, Rosenberg, Brown and Sandler | Steven J. Cooperstein |
| Brand | Karen | Brand, Karen & Ronald Brand, Plfs. vs. Avon Products, Inc., et al. | 190206/2021 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Brannon | Billy | Billy Brannon and Wilma Brannon vs. Atec, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2023-15536-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Brantley | William | Kelly Brantley and Sara Brantley v. 3M Company a/k/a Minnesota Mining & Manufacturing Company, et al | C-717978 32 | Louisiana | East Baton Rouge Parish 19th JDC | Gettys Law Group, APLC Simon Greenstone Panatier, PC | Lawrence G. Gettys Holly C. Peterson |
| Braun | James | Gayle Braun, as Executor for the Estate of James M. Braun Jr., deceased v. Air & Liquid Systems Corporation, successor-by-merger to Buffalo Pumps, Inc., et al | 2022LA001010 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Eric Poplonski |
| Brewer | Rebecca | Rebecca Brewer v. Avon Products, Inc., et al. | 190367/2016 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block |
| Brown | Leroy | Leroy Brown v 3M Company et al. | 23-11-03107 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Jason P. Yampolsky |
| Buehler | Roger | Buehler, Eva, Individually and as Executor of the Estate of Roger D. Buehler, deceased, Plf. vs Air & Liquid Systems Corporation, et al. | MID-L-002905-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Cody Greenes |
| Buhlig | Marcella | Buhlig, Marcella and William Buhlig, etc., Plfs. vs. American International Industries, Inc., et al. | MID-L-007265-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Burchette | Kimberly | Kimberly Burchette & Jamie Burchette v Avon Products, Inc et al. | MID-L-004582-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Bus | Laura | Laura Bus and Mark Bus v Barretts Minerals, Inc et al. | MID-L-003086-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |

4

659770001-4866996s1

| P L N m | P F N m | C C | C N m | s | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Byrd | Richard | RICHARD L. BYRD and MARLIE G. BYRD v. ARKEMA, INC., et al | 23-LA-1670 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Celena F. Bevard |
| Cairo | Nancy | Frank J. Cairo, Jr., Individually and as Executor and Executor Ad Prosequendum of the Estate of Nancy Cairo v. AII, et al. | MID-L-900-14AS | New Jersey | Middlesex (NJ) | Szaferman, Lakind, Blumstein & Blader, P.C. | Moshe A. Maimon |
| Calabrese | Thomas | Thomas Calabrese v Arkema, inc et al. | 190328/2023 | New York | New York | Weitz & Luxenberg P.C. | Sean Kerley |
| Cali | Julie | Julie Cali v. Arkema, Inc. f/k/a Pennwalt Corp., et al | C-705579 25 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC Fears Nachawati PLLC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Darren McDowel |
| Cammalleri | Emilio | Cammalleri, Emilio and Claudette Cammalleri, H/W, Pltfs. vs. American International Industries, Inc., et al. | MID-L-007266-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Campbell-Wright | Lorna | Lorna Campbell-Wright & Rodrick Wright v Avon Products, Inc. et al. | 190228/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Cantu | Juan | Cantu, Juan & Laura, Pltfs. v. Barrett Minerals, Inc., et al. | MID-L-000572-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Carderara | Carolyn | Carolyn Carderara vs. C and D Pharmacy, LLC, et al. | 21-0738 | Louisiana | St Bernard Parish / 34th JDC | Landry & Swarr, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry Frank J. Swarr Matthew C. Clark Holly C. Peterson |
| Carlson | Connie M. | CONNIE M. CARLSON v. BARRETTS MINERALS, INC. et al. | 22-2-03149-2 KNT | Washington | King | Bergman Oslund Udo Little, PLLC | Brendan Little |
| Carlson | Peggy | Peggy Carlson and John Carlson, Pltfs. vs Borghese, Inc., Dfts. | MID-L-003572-17 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Casaravilla | Walter | Casaravilla, Walter M. and Tammar Casaravilla, Pltfs. v. Avon Products, et al. | 190296/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tambini |
| Catt | Helen | Helen Catt and Donald Catt, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-001410-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Cavalluzzi | John | Cavalluzzi, John and Rene Cavalluzzi, Pltfs. v. Barretts Minerals, Inc. et al. | MID-L-002519-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | James Andrew Plastiras |
| Cayer | Robert | Robert Cayer and Elisabeth Cayer v. Ajax Tocco Magnethermic Corporation, et al. | PC-2023-00731 | Rhode Island | Bristol | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Cerrato | Vincent | Cerrato, Vincent, Pltf. v. Amchem Products, Inc., et al. | 190003-22 | New York | New York | Weitz & Luxenberg P.C. | Chris Romanelli |
| Chamberlain | Jennifer | Jennifer Chamberlain v Albion Pharmacy, Inc et al. | 23-013029 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Chapman | Rita Ann | RITA-ANN CHAPMAN and GARY CHAPMAN vs. AVON PRODUCTS, INC. et al. | 22STCV05968 | California | Los Angeles | Dean Omar Branham Shirley, LLP | Ben Adams |
| Chason Gregory | Amanda | Amanda Chason-Gregory v. Publix Super Markets, Inc., et al. | 24-002569 CA27 | Florida | Broward | Simmons Hanly Conroy LLP | Rebecca Vinocur |
| Cheifetz | Michael | Cheifetz, Michael, Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 1901110/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Falda |

659770001-4866996551

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P A Nm |
|---|---|---|---|---|---|---|---|
| Chelikowsky | Jeanne | Laura Mackey as executor of est of Jeanne Chelikowsky v Avon Products et al. | MID-L-000292-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Cody Greenes |
| Clark | Sharilyn | Sharilyn Clark v. Brenntag North America, et al. | 190162/2018 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin |
| Clawson | Linda | Linda Clawson and Billy Clawson v Avon Products, Inc et al. | 190157/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Cline | Susan | Susan Cline & Patrick Cline v Acme Markets, Inc et al. | 23-012897 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Clinton (Riggins) | Amanda | Amanda Clinton, Pltf. v. Avon Products, Inc., et al. | MID-L-002337-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Cody | Laura | Cody, Laura and William Cody, Pltfs. v. Rite Aid of New York City, Inc. et al. | 603356/22 | New York | Nassau | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Cohen | Connie | Cohen, Connie, Pltf. v. Johnson & Johnson, et al. | MID-L-004448-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Cole | Roberta | Roberta Cole and John Cole v. Johnson & Johnson, et al. | MID-L-007272-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Connell | Ann | Ann Connell and George Connell v. Barretts Minerals Inc., et al. | 21-1714 | Massachusetts | Middlesex (MA) | Cody Law Firm and Duffy Law LLC | Edward Paul Coady |
| Conti | Carmela | Joanne Conti as Executrix of the Estate of Carmela Conti v Avon Products, Inc et al. | MID-L-003823-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Conway | Thomas | DORCAS G. CONWAY, individually and as Special Administrator of the Estate of THOMAS P. CONWAY, Deceased v. Air & Liquid Systems Corporation, et al | 2021L 001012 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | A. Gentry Smith |
| Cooney | Tina | Cooney, Tina v Avon Products, Inc. et al. | MID-L-002992-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Cooper | Lilo | LILO COOPER and LESLIE COOPER v. Arkema, Inc. F/K/A Pennwalt Corporation And Elf Atochem North America, Inc. et al. | 23STCV15823 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oganesyan |
| Cooper | Michelle | Michelle Cooper vs Johnson & Johnson, et al. | MID-L-001326-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Cooper | Frederick | Frederick Cooper and Jeaneen Cooper v Arkema, inc et al. | 22-12-000021 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |
| Corin | Paula | Paula Corin v. Arkema, Inc., et al. | 23STCV26571 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc Willick |
| Coronado | Mario | Coronado, Mario & Melania Porras, Pltfs. v. Johnson & Johnson, et al. | MID-L-004460-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Corum | Scott | Corum, Scott and Greta Corum, Pltfs. v. Arkema, Inc., et al. | MID-L-001294-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Coss | Roger | Coss, Roger and Susan Coss, Pltfs., vs. 3M Company, etc., et al. | MID-L-005031-19 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Costigan | Irene | Irene Costigan and Andrew Costigan v. Chanel, Inc., et al. | 190120/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Cotham | Cynthia | Cynthia Cotham vs. Safeway, Inc., et al. | 24STCV15034 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc l Willick |
| Craft | Cherie | Cherie A. Craft v. Ahold Delhaize USA, Inc., et al | 24-L-24-000005 | Maryland | Baltimore City | Brown Kiely LLP | Matthew E. Kiely |

6

| P L N m | P F N m | C C | C N m | S | C | P C | A C N m |
|---|---|---|---|---|---|---|---|
| Crawford Starr | Taloa | Taloa J. Crawford Starr v. Janssen Pharmaceuticals, Inc., et al. | MID-L-001278-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Crosby | Mary | Crosby, David as Executor of the Estate of Mary Crosby, Plft. v. Altnay, Inc., et al. | E2022-0467CV | New York | Steuben | Levy Konigsberg LLP | John P. Guinan |
| Cross | Margaret | Margaret M Cross v Barretts Minerals, Inc et al | 1901155/2023 | New York | New York | Weitz & Luxenberg P.C. | John P. Guinan |
| Crozier | Beverly | Beverly Crozier and Donald Crozier v. Avon Products, Inc., et al. | 190385/2016 | New York | New York | Weitz & Luxenberg P.C. | John P. Guinan |
| Cubberley | Gladys | Gladys Cubberley v. Publix Super Markets, Inc., et al | 23-020045 CA 27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Cupps | Catherine | Cupps, Catherine and Clifton Cupps, Plfs. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002853-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Curtis | Erik | Curtis, Erik and Tari Curtis, Plfs. v. Avon Products, Inc., et al. | MID-L-006225-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Davies | Michael | Davies, Lynn, individually and as Executrix of the Estate of Michael Davies, Plfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190348/2017 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Davis | Janel | JANEL DAVIS, VS. ALBERTSON'S LLC, individually and as successor-in-interest to A LPHA BETA et al. | RG21112811 | California | Alameda | Simmons Hanly Conroy LLP | Deborah Rosenthal |
| Deadman | Jane | Anthony Deadman, Individually and as Personal Representative of the Estate of Survivors of Decedent Jane Deadman, Deceased v. L'Oreal Travel Retail Americas, Inc., et al. | 23-022397CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Deal | Michael | Deal, Michael and Christine Deal, Plfs. v. Arkema, Inc., et al. | MID-L-000551-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Dean | James | James Bryan Dean and Lisa Dean v. 3M Company, a/k/a Minnesota Mining and Manufacturing Company, et. al. | 2023-CP-40-03441 | South Carolina | Richland | Meirowitz & Wasserberg, LLP | Kush Shukla |
| Decembrino | Richard | Richard Decembrino and Diana Decembrino v 3M Company et al. | 23-10-03193 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Clark P. Rosengarten |
| Deems | Daniel | Deems, Daniel and Jennifer Deems, Plfs., vs. Avon Products, Inc., et al. | 190304/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| DeGannett | Paul | DeGannett, Paul II and Mary Ann DeGennett, Plfs. v. Barretts Minerals, Inc., et al | MID-L-000179-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Deierhoi | Peggy | Peggy J. Hedrick Deierhoi v. Avon Products, Inc., et al | 2023-021157-CA-01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen |
| Delgado | Ana | ANA M. DELGADO v. AVON PRODUCTS, INC., et al | 24LA0282 | Illinois | St. Clair | Menges Law Firm | Menges Law: Carson Menges Kurst & Von Oiste, LLP (Of Counsel): Jason Ministrelli |
| Deng | Jian Kang | Jian Kang Deng and Li Ying Deng v Barretts Minerals, Inc et al | 1901114/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Denham | Ann | Ann Denham v. Sumitomo Corporation of Americas, et al. | 1900067/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |

7

659770001-4866996S1

| P L N m | P F N m | C C | C N m | s | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Denk | William | ROSEMARY DENK, Individually and as Successor-in-Interest to WILLIAM J. DENK, Deceased vs. 3M COMPANY, F/k/a MINNESOTA MINING & MANUFACTURING COMPANY, et al. | 23STCV01707 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder |
| DeSaussure | Vashti | Tewonia Tucker as administrator of the estate of Vashti DeSaussure v 3M Company et al | MID-L-005713-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grabman |
| Diaz | Walter | TAMMY EVETT DIAZ, individually and as successor-in-interest to WALTER NESTOR DIAZ, and HOLLY DIAZ, v. AVON PRODUCTS, INC, et al. | 22CV022885 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| DiBello | Audra | Audra Dibello and James Gay v Barrett Minerals, Inc et al. | MID-L-001282-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Dietzman | Heather | HEATHER R. DIETZMAN v. AVON PRODUCTS, INC., et al | 23-LA-001587 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | A. Gentry Smith |
| Dobbs | Sheryl | Sheryl Dobbs v. Avon Products, Inc., et al. | MID-L-002426-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Dohse | Scott | Connors-Dohse, Jocelyn, Individually and as Personal Representative for the Estate of Scott M. Dohse, Pltf. vs. Avon Products, Inc., etc., et al. | 190305/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Dominguez | Gloria | Rubio, Nellie, for the Estate of Gloria Dominguez, Pltf. v. Avon Products, Inc., et al. | 190227/21 | New York | New York | Weitz & Luxenberg P.C. | Clark Rosengarten (Since left Weitz) |
| Donnatin | John | PAULA M. DONNATIN, individually and as Special Administrator of the Estate of JOHN C. DONNATIN, deceased, CHARLES DONNATIN, an individual, and HALEY HASTIE, an individual; as legal heirs of JOHN C. DONNATIN, deceased, v. ARKEMA INC. f/k/a PENNWALT CORPORATION; et al. | 24STCV09343 | California | Los Angeles | Dean Omar Branham Shirley, LLP | Leonard Sandoval |
| Doonan | Elizabeth | Elizabeth Doonan v Christian Dior, Inc et al. | 190190/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Dotson | Ronald | Dotson, Ronald & Rosita Dotson, Pltfs. v. Johnson & Johnson, et al. | MID-L-005906-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Dozier | Verna | Dozier, Verna L.P., Pltf. vs. Avon Products, Inc., et al. | MID-L-08467-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Drayner | Monica | Monica Drayner v Avon Products et al | 190124/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Dubois | Timothy | Timothy E. Dubois & Linda Dubois v. 3M Company, et al. | 49D13-2404-CT-015028 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Dugan | Edward | Edward Dugan and Paula Dugan v. Johnson & Johnson, et al. | 23-1762 | Massachusetts | Middlesex (MA) | Duffy Law LLC | Christopher P. Duffy |
| Durkan | Ashling | Ashling Durkan v. Avon Products, Inc., et al. | 64929/2024 | New York | Westchester | Maune Raichle Hartley French & Mudd, LLC | Jessica Bussanich |

8

JA1112

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Dussia | Evan | Evan & Phyllis Dussia v. Whitaker, Clark, and Daniels, Inc. et al. | MID-L-003967-15 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Jacob Jordan |
| Dvir | Jessica | Jessica Dvir & Jehoshua Dvir v Avon Products Inc et al | 1902477/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Eaves | Frances | Eaves, G. Tyles, Administrator for Francis Eaves, Pltf. v. Kolmar Laboratories, Inc., et al. | 190112/2021 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Ebua | Regina | Jay Ebua, as Personal Representative of the Estate of Regina Ebua v. Avon Products, Inc., et al. | 23-1980 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | Erika A. O'Donnell |
| Egert | Ilene | Egert, Lewis, as Personal Representative of the Estate of Ilene G. Egert and Lewis Egert, Individually, Plfs. v. Barretts Minerals, Inc., et al. | 1902044/2021 | New York | New York | Weitz & Luxenberg P.C. | Erik Jacobs |
| Eichler | Jay | Jay Eichler and Helene Eichlers v Block Drug Company, inc et al. | MID-L-000394-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| El-Abbasi | Patricia | MOHAMMAD EL-ABBASI, On His Own Behalf and on the Behalf of All Other Statutory Beneficiaries of PATRICIA ANNE EL-ABBASI, deceased v. AVON PRODUCTS, INC., et al. | CV2023-013113 | Arizona | Maricopa | Maune Raichle Hartley French & Mudd, LLC | Meghan K. McGlynn |
| Elacqua | Ann Marie | Ann Marie Elacqua and Michael Kaminsky v Avon Products, Inc et al. | EF2023-275144 | New York | Rensselaer | Simmons Hanly Conroy LLP | James Kramer |
| Elmer | Denise | Denise Elmer v Avon Products, Inc et al. | MID-L-000656-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella |
| Elmer | Robert | Elmer, Robert, Pltf. v. Charles B. Chrystal Company, Inc., et al. | EFC-2022-0597 | New York | Oswego | Weitz & Luxenberg P.C. | Thomas M. Comerford |
| Emge | Alfons | TERRI EMGE, in her capacity as Personal Representative of the Estate of ALFONS EMGE v. 3M COMPANY, f/k/a MINNESOTA MINING & MANUFACTURING COMPANY, et al. | 24-2-05155-0 | Washington | Pierce | The Lanier Law Firm, PLLC | Mark A. Linder |
| Enciso | Hortensia | Hortensia Enciso, Ind. and a/n/f of MVE, a minor vs. Naterra International, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-40593-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Engebos | Gregory | Lori R. Frank, As Personal Representative For The Estate Of Gregory J. Engebos, vs. Ajax Steel Company LLC, Et. al. | 2024-LA-854 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Brian Ukman |
| Engelhardt | Thomas | Engelhardt, Thomas and Catherine, Pltfs. v. Kolmar Laboratories, Inc., et al. | 190260/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Engelman | Alice | Alice Engelman v American International Industries et al. | MID-L-007011-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| England | Carolyn | Carolyn England and David England v Sumitomo Corporation of Americas, et al. | 190250/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| English | Linda | Linda English and Patricia Raso v. Avon Products, Inc. et al. | 190346/2018 | New York | New York | Simmons Hanly Conroy LLP | Valere L. Nassif |

9

659770001-4866996651

| P L N m | P F N m | C N m | C N m | S | C | P C | P C / A N m |
|---|---|---|---|---|---|---|---|
| Epstein | Ira | IRA J. EPSTEIN v. ALBERTSONS COMPANIES, INC, Individually and as successor-in-interest to American Stores Company, f/k/a Skaggs Companies, Inc., as successor-in-interest to Jewel Companies, Inc., et al | 2023L010467 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | Jon R. Neumann |
| Escobar | Rosario | Rosario Escobar vs. Avon Products, et al. | MID-L-002313-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Esqueda | Guillerma | Esqueda, Guillerma C. and Roberto Esqueda, Plffs. v. Barretts Minerals, Inc., et al. | MID-L-001887-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Eulau | Alan | Eulau, Alan and Barbara Eulau, Plfs. vs Avon Products Inc., et al. | 190211/2020 | New York | New York | Weitz & Luxenberg P.C. | Brandon H. Perlman |
| Evans | Dolores | CHRYSTAL EVANS-BOWMAN, individually and as successor-in-interest to DOLORES EVANS, vs. JOHNSON & JOHNSON et al. | 23CV043499 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| Everest | Martha | Everest, Martha, Plff v. AMP Bowling Centers, Inc., et al. | MID-L-0071 51-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Feldman | Geoffrey Robert | Pamela Friede-Feldman, individually and as representative of estate of Geoffrey Robert Feldman v Bayer Consumer Care Holdings et al. | MID-L-000091-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Feldman-Nagel | Sharon | Sharon Feldman-Nagel & Christopher Nagel V Acme Markets, Inc et al | 190191/2022 | New York | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Feldt | Carolyn | KIMBERLY J. DRONEN, as Special Administrator for the Estate of CAROLYN K. FELDT, deceased v. AMADA AMERICA, INC., et al | 23-LA-1382 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Jon R. Neumann |
| Ferrara | Angela | Ferrera, Angela, Plff v. Avon Products, Inc., et al. | 190219/2020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Ferris | Julie | Julie Ferris v. Avon Products, Inc., et al. | 1900008/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Fielder | Frazier | Frazier Fielder & Mary Fielder v. Block Drug Company, Inc., et al | MID-L-002315-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Fields | Michael | LORA M. HOWARD, as Administrator CTA for the Estate of MICHAEL S. FIELDS, deceased v. AMERICAN INTERNATIONAL INDUSTRIES, et al | 2020-L-000447 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | James Morrow & Jon R. Neumann |
| Filip | Sharon | Sharon Filip and John Filip v Barretts Minerals et al. | EFCA2022001356 | New York | Broome | Weitz & Luxenberg P.C. | Peter Tambini |
| Finch | Frank | Frank Finch & Ruth Finch v Barrett Minerals Inc. et al. | MID-L-005051-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Fisher | Cynthia | Cynthia Fisher and Bruce Fisher, her husband vs. American International Industries Individually and As successor-in-interest to Pinaud, Inc., Barbara Alice, Inc., Ed Pinaud, Inc. d/b/a Ed Pinaud, and Nestle-Le Mur Company, All for The Clubman Line of Products | 24-0005907 ca27 | Florida | Broward | Dean Omar Branham Shirley, LLP | Shawna Forbes-King |

10

659770001-4866996551

| P L N m | P F N m | C | C N m | S | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Fitch | John | Deborah J Fitch individually and as personal representative of the Estate of John Fitch v Block Drug Co, Inc et al. | MID-L-005992-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Fitzpatrick | Patricia | Richard Fitzpatrick III individually and as executor of the estate of Patricia Fitzpatrick v Chanel, Inc et al. | 911055-23 | New York | Albany | Lipsitz Green Scime Cambria LLP | Brendan J. Tully |
| Flanagan | Richard | Marilyna Keuhn for the Estate of Richard Flanagan vs. Barretts Minerals, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-00174-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Flater | Rose | Rose Flater and Bobbie Joe Flater vs. Albi Enterprises, et al. | MID-L-003589-16 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon |
| Fleemin | Joanne | Joanne Fleemin and John Fleemin v. Arkema, Inc. f/k/a Pennwalt Corp., et al | 21-022203 CA27 | Florida | Broward | Flint Cooper, LLC | Rebecca Vinocur |
| Fogel | Leslie | Leslie Fogel and Catherine Fogel, Plfs. v. American International Industries for Clubman, et al Whitaker, Clark, and Daniels, Inc. et al. | 190093/2016 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Forslund | Carla | Carla Forslund and Blake Forslund v. Beacon Cmp Corp., et al. | MID-L-002879-24 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah C. Kagan |
| Friedman | Ilana | Ilana Friedman and Arthur Fridman v. ABC Supply Co, Inc., et al. | 190283/2015 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |
| Frissora | Annette | Frissora, Annette, Plff. v. Avon Products, Inc., et al. | MID-L-004867-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Frith | Marjorie | TRACEI SHOBE, as representative of the estate of MARJORIE FRITH, and as surviving daughter and on behalf of decedent's other surviving statutory beneficiaries, and SHERI GRAY and CHRISTINA FRITH, v. BRENNTAG SPECIALTIES, INC., et al. | CV2020-094998 | Arizona | Maricopa | Simon Greenstone Panatier, PC | Erica Falkner |
| Frizzley | Vikki | Vikki Frizzley v 3M Company et al. | 190007/2024 | New York | New York | Levy Konigsberg LLP | Denise S. Persampieri |
| Fulmore | Catherine | Fulmore O'Neal, Denise, for the Estate of Catherine Fulmore, Plt. vs Avon Products Inc., et al. | 190157/2020 | New York | New York | Weitz & Luxenberg P.C. | Jeffrey S. Kanca |
| Galan | Melvin | Galan, Melvin & Louise, Plfs. v. Kolmer Laboratories, et al. | 190287/2020 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Gallehdar | Roya | Roya Owlad Gallehdar and Abdul Hassan Owlad Gallehdar vs. Avon Products, Inc. | 2024CP4004185 | South Carolina | Richland | Simon Greenstone Panatier, PC | Brendan Tully |
| Gallo | John | Diana Farris, ind and as fiduciary of the Estate of John Gallo v Avon Products, Inc., et al. | 190027/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Garces | Laura | LAURA GARCES vs. AVON PRODUCTS, INC. et al. | 23CV032898 | California | Alameda | Simon Greenstone Panatier, PC | Erica Falkner |

11

639770001-4866996541

| P L N m | P F N m | C C | C N m | S m | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Gardener | John | John Gardener and Vivienne Gardener v. Brenntag North America, Inc., sued individually and as successor-in-interest to Mineral Pigment Solutions, Inc. and as successor-in-interest to Whittaker Clark & Daniels, Inc., et al | 22-012299 CA27 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Games | Rosa | Games, Rosa & David Rodney Games, Plfs. v. 3M Company, et al. | EF2022-00000051 | New York | Jefferson (NY) | Levy Konigsberg LLP | Amber R. Long |
| Garton | Barbara | Watkins, Dena, as Administrator and Administrator Ad Prosequendum of the Estate of Barbara Garton, Plfl. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002423-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Gattone | Peggy | Peggy B. Gattone and Peter Gattone, etc., v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al | MID-L-003039-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Gee | Margaret | Margaret Gee v Avon Products, Inc et al. | 190076/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Geittmann | Peter | PETER B. GEITTMANN, M.D. and MARGARET M. GEITTMANN v. ARKEMA, INC., f/k/a Pennwalt Corporation, et al | 24-L-1848 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | Dawn Besserman |
| Gentle | Samantha Leigh | Rego, Candace, for the Estate of Samantha Leigh Gentle, Plfl. v. Avon Products, Inc., et al | MID-L-007729-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Gerken | Anna | Andrew T. Gerken, individually and as Personal Representative of the Estate of Anna Marie L. Gerken, deceased, v. Avon Products, Inc., et. al. | 2023-CP-40-06111 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Mark Buha |
| Gesualdi | Shannon | Gary Marcotte, Individually and as Administrator for the Estate, Shannon Gesualdi v. Barretts Minerals, Inc., et al. | PC-2023-01861 | Rhode Island | Bristol | Motley Rice LLC | Vincent L. Greene |
| Geter | Rebecca | Geter, Rebecca, Plfl. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003870-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Geyer | Ellen | Ellen Geyer v. Brenntag North America, Inc. & Brenntag Specialties, Inc., et al. | MID-L-003463-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Kimberly Russell |
| Gibbs | Elaine | Elaine Gibbs and John Gibbs v Avon Products, Inc et al | 190221/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Gibbs | Danny | Michelle Gibbs, individually and as administratrix of estate of Danny Gibbs v Arkema, Inc et al | 23-12-02901 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Neidra Wilson |
| Gilbride | Ellyn | Gilbride, Ellyn, Plfl. v. Johnson & Johnson, et al. | MID-L-002848-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Giroir | Glenda | Glenda R. Giroir and Dale Giroir vs. Anco Insulations, Inc., et al. | C-745104 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC; Dean Omar Branham Shirley, LLP | Mickey P. Landry; Frank J. Swarr; Matthew C. Clark; Jordan Bollinger |
| Goffreda | Karen | Goffreda, Karen, Plfl. v. Avon Products, Inc., et al. | MID-L-000274-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Goldstein | Lita | Goldstein, Lita, Plfl. v. Chanel, Inc., et al. | 190108/2022 | New York | New York | Simmons Hanly Conroy LLP | Daniel Blouin |

12

6597700001-4866996541

| P L N m | P F N m | C C | C N m | s | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Gomez | Maria | Maria Gomez v. Arkema, Inc. f/k/a Pennwalt Corp., et al | CACE-21-002366 | Florida | Broward | Simon Greenstone Panatier, PC | Frank Wathen |
| Gomez | Dolores | Gomez Dolores, Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190118/2020 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Gonzales | Susan | ALEXANDER GONZALES, Individually, and ALEXANDER GONZALES as Personal Representative of the Estate of SUSAN GONZALES, Deceased v. AUTOZONE, INC. et al. | 2021CV32313 | Colorado | Denver | Simon Greenstone Panatier, PC | Robert A. Green; Deirdre E. Ostrowski, Esq |
| Gonzalez | Linda | Linda Gonzalez v. Whitaker, Clark, and Daniels, Inc., et al. | 190074/2017 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Goode-Evans | Dorothy | Dorothy Goode-Evans and Herbert Evans v. Avon Products, Inc., et al. | 23-2731 | Massachusetts | Middlesex (MA) | Thornton Law Firm LLP | Andrea Landry |
| Graham | Elsie Louise | ELAINE CHATFIELD, as Personal Representative of the ESTATE OF ELSIE LOUISE GRAHAM v. BRENNTAG NORTH AMERICA, INC. et al. | 23CV34505 (3.23-cv-01399-HZ) | Oregon | Multnomah | Dean Omar Branham Shirley, LLP | Jessica Dean Jordan Blhnenfeld James |
| Granchelli | Georgina | Georgina Granchelli and Gordon Granchelli v Asral Health & Beauty, Inc., et al. | MID-L-002784-23 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella |
| Gray | Kim | Gray, Kim, Pltf. vs. Johnson & Johnson, et al. | MID-L-005932-19 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Greenage | William | William Greenage v Avon Products, Inc et al. | 190093/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Gref | Brian | Gref, Brian, Plt. vs American International Industries, et al. | 190178/2020 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Griffith | Richard | Richard Griffith & Dee Griffith v Barretts Minerals et al. | MID-L-000154-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Grigoli | Salvatore | Salvatore Grigoli and Vincenza Grigoli v 3M Compan et al. | 190200/2023 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Grimes – Love | Toni | Grimes-Love, Toni R., Plf. v. Aloette Cosmetics, Inc., et al. | MID-L-001991-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden |
| Guffey | William | William P Guffey and Brenda L Guffey v Amerilure, Inc., et al. | MID-L-006146-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Guild | Gregory | Gregory Guild and Nancy Guild, Pltfs. vs. Brenntag North America, et al. | MID-L-03527-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Gumpert | Esther | Gumpert, Esther and Gary Gumpert, Pltfs. v. Avon Products, Inc., et al. | 190056/2022 | New York | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Guth Cook | Denise J. | Denise J. Guth Cook v. Advance Stores Company, Incorporated, et al | CACE-24-003818 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Haas | Beverly | Haas, Charles, Administrator for the Estate of Beverly Haas, Lauri Welch and Stephen Haas, Pltfs. v. Almay, Inc., et al. | MID-L-03339-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Habib | Nagwa | Habib, Nagwa N., Pltf. v. Barretts Minerals Inc., et al. | 2021-2381 | New York | Schenectady | Weitz & Luxenberg P.C. | Thomas M. Comerford |
| Haghani | Mahtab | Mahtab Haghani & Martin Haghani v Avon Products Inc et al. | 190263/2022 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Hagwood | Steven | Hagwood, Steven R., Pltf. v. Avon Products, Inc., et al. | MID-L-00126722 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |

13

JA1117

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Hammond | Jane | Jane Hammond and Colin HAmmond v Avon Products, Inc et al. | 190162/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Haney | Verda | Verda Haney v. Advance Stores Co., Inc., et al. | 49D13-2404-CT-019200 | Indiana | Marion | Dean Omar Branham Shirley, LLP | Sarah Broderick |
| Harper | Charlene | Meredith Harper, as Trustee for the next-of-kin of Charlene Harper, Deceased, v. Target Brands, Inc. et al. | 62-CV-23-2656 | Minnesota | Ramsey | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Harrell | Helen | Helen Harrell & David Odell v BNA, et al. | MID-L-002525-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Harrington | Virginia | Harrington, Virginia, Pltf. v. Johnson & Johnson, et al. | MID-L-006733-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Harris | Kimberly | Harris, Kimberly C. and Michael Harris, Pltfs. v. Avon Products, Inc., et al. | MID-L-004711-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Hart | Theresa | Theresa L. Hart & Thomas Hart v. Avon Products, Inc., et al. | MID-L-003309-24 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne Ratcliffe |
| Hartman | Robert | Hartman, Robert and Karen Hartman, Pltfs. v. Akiyama International, et al. | MID-L-000953-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Hatcher | Kimberly | KIMBERLY HATCHER vs. ALBERTSON S LLC et al. | 22CV021209 | California | Alameda | Simmons Hanly Conroy LLP | Christine A. Renken |
| Hathaway | Todd | Todd Hathaway & Fayda Hathaway v Avon Products et al. | 800575/2023 | New York | Erie | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Haus | Elizabeth | Elizabeth Haus and Emery Haus vs Avon Products, Inc., et al. | MID-L-000895-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Hawkins | Terrance | Terrance Hawkins and Ona Broach v Arkema, Inc et al. | 190028/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Heard | Marlane | Marlane Heard v. Charles B. Chrystal Company, Inc., et al. | 190123/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Helms | Patrick | Mary Helms individually and as Administrator of the estate of Patrick Helms v Brenntag Specialties, Inc et al. | MID-L-006342-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Helmuth | Leland | Leland J. Helmuth v. 3M Company, et al. | 49D13-2402-CT-003670 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Hembd | Nancy | Pfister, Peggy/Estate of Nancy Ann Hempd, Pltf. v Avon Products, Inc., et al. | 49D13-2108-MI-029127 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Henderson | Jeannine | Jeannine Henderson vs. Taylor-Seidenbach, Inc., et al. | 2022-10279 | Louisiana | Orleans Parish CDC | Philip C. Hoffman, LLC Dean Omar Branham Shirley, LLP | Philip C. Hoffman / Jessica Dean / Samuel T. Iola |
| Herman | Elaine & Jacob | Elaine Adella Hickey Herman and Jacob Russell Herman, Sr. v. American Honda Motor Co. Inc., et al. | FBT-CV-23-6124687-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Heston | Raymond | Heston, Raymond and Sandra, Pltfs. v. Avon Products, Inc., et al. | MID-L-007187-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Hicks | Teresa | Frank Hicks & Est of Teresa Hicks v Avon | 190014/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Hidvegi | Nubia | Nubia Hidvegi v. Publix Super Markets, Inc., et al | 24-000642-CA-01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Rebecca Vinocur |

14

659770001-4866986Sv1

| P L N m | P F N m | C C | C N m | s | C | P C | P C | P C A N m |
|---|---|---|---|---|---|---|---|---|
| Higginbotham | Robert | Robert and Linda Higginbotham vs. 3M Company, B Brenntag Specialties LLC, et al | 2019-39841-ASB | Texas | Harris | Simon Greenstone Panatier, PC | | Frank J. Wathen |
| Higgins | Wendi | Wendi Higgins vs. The Bargain Barn, Inc. et al | 2024-CP-40-03642 | South Carolina | Richland | Maune Raichle Hartley French & Mudd, LLC | | Joshua Cagle |
| Hildebrandt | Martin | SARAH HILDEBRANDT, as representative of the estate of MARTIN HILDEBRANDT, and as surviving Spouse and on behalf of decedent s other surviving statutory beneficiaries, and KARA HILDEBRANDT JORDON, v. 3M COMPANY a/k/a MINNESOTA MINING & MANUFACTURING COMPANY et al. | CV2020-093091 | Arizona | Maricopa | Simon Greenstone Panatier, PC | | Erica Falkner |
| Hill | Duane | Duane Hill v. Sumitomo Corporation of Americas, et al. | 190094/2024 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Hinkle | Sandra | Sandra L Hinkle v Arkema, Inc et al. | 23-04-01956 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | | Brian M. Ukman |
| Hodge | Pauline | Gary Hodge, individually and as representative of the Estate of Pauline Hodge v. Avon Products, Inc et al. | LACL151100 | Iowa | Polk | Simon Greenstone Panatier, PC | | Frank J. Wathen; James H. Cook |
| Hoeppner | Gerald | GERALD R. HOEPPNER and THERESA HOEPPNER v. A.O. SMITH CORPORATION, et al | 23-LA-1697 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | | Michael V. Oltmann |
| Hoffman | Vanessa | Hoffman, Vanessa, Pltf. v. Barrett Minerals, Inc., et al | MID-L-003244-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Hofmaister | Sharon | SHARON HOFMAISTER v. JOHNSON & JOHNSON et al. | 23CV033743 | California | Alameda | Kazan McClain Satterley & Greenwood | | Michael T. Stewart |
| Hogue | Tamie | Lacy Hogue, Ind. and as Personal Rep. of Tamie Hogue , Deceased, Jennifer Clyburn vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2021-53353-ASB | Texas | Harris | Simon Greenstone Panatier, PC | | Holly C. Peterson |
| Hohing | Winnette | Winnette A. Hohing v. Avon Products, Inc., et al. | MID-L-002758-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Holleman | Karlene | Holleman, Karlene, Pltf., vs. Avon Products, Inc., et al. | 190077/2018 | New York | New York | Levy Konigsberg LLP | | Amber R. Long |
| Holley | Luther Roy | Holley, Gladys Elaine, Individually and as Executrix of the estate of Luther Roy Holley, Deceased, Pltf., vs. Brenntag North America, Inc. and Brenntag Specialities, Inc., et al. | MID-L-002858-19 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Hollifield | Pattie | Brenda Bost individually and as executor of the estate of Pattie Hollifield v Conopco, Inc et al | 190295/2023 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Holloway | James | JAMES L HOLLOWAY and GAIL M. HOLLOWAY v. ABB, INC., Individually and as successor-in- interest to I-T-E Imperial Company, f/k/a I-T-E Circuit Breaker Company, et al | 2024LA000200 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | | Thomas Gibbons |
| Holmes | Agnes | Agnes A. Holmes v. Avon Products, Inc. | MID-L-005412-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |

15

639770001-4866996541

| P L Nm | P F Nm | C | C Nm | s | C | P C | P C | P A C Nm |
|---|---|---|---|---|---|---|---|---|
| Holtermann | Patrice | Holtermann, Alisa, Administratrix for the Estate of Patrice Holtermann, Pltf. v. American International Industries, et al. | 190058/2021 | New York | New York | Weitz & Luxenberg P.C. | Simmons Hanly Conroy LLP | Brandon H. Perlman |
| Holtschneider | Betty | Holtschneider, Betty and Stanley Holtschneider, Pltfs. vs. Brenntag North America, Inc. et al. | MID-L-003009-16 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Simon Greenstone Panatier, PC | Leah Kagan |
| Horsch-Nusbaum | Ruth | Horsch-Nusbaum, Ruth, Plt. vs Avon Products Inc., et al. | MID-L-006015-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Howard | Elizabeth | Christopher L. Lewis, individually and as Personal Representative of the Estate of Elizabeth A. Howard, Deceased v. Asbestos Corporation Limited, et al. | 2024-CP-40-00458 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | | Aaron Chapman |
| Hucknall | Victoria | Victoria Hucknall and Simon Hucknall vs. L'Oreal Travel Retail Americas Inc d/b/a Lancome, L'Oreal, L'Oreal Paris | 2024-014277-CA-01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | | Brendan Tully |
| Huff | Linda | James D. Huff, Individually and as Administrator and Administrator ad Prosequendum of the Estate of Linda Kay Huff, Deceased v. Arkema, Inc., et al. | MID-L-002818-17 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Hug | Monique | Hug, Monique G. and Jean Philipp Hug, Pltfs. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004862-15 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Hunter | Jaqueline | Jacqueline Hunter v Brenntag North America et al. | MID-L-007131-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | | James Kramer |
| Hutchings | Catherine | Catherine Hutchings v Avon Products, Inc et al. | 190115/2023 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Huxley | Aleksandra | Aleksandra Huxley and Howard Huxley v. Conopco, Inc., et al. | 190116/2024 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Iacovangelo | Jean | Jean Iacovangelo and Frank Iacovangelo v Arkema, Inc et al. | E2023005779 | New York | Monroe | Levy Konigsberg LLP | | Amber R. Long |
| Iezzi | Deborah Kaye | Nicole Gudenau, Individually and APR the estate of Deborah Kaye Iezzi v BNA et al. | MID-L-004147-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | James Andrew Plastiras |
| Infante | Irma | Irma M Infante v Barretts Minerals et al. | 190137/2022 | New York | New York | Lanier Law Firm PLLC | | Darron Berquist |
| Islin | David | David Islin vs. L'Oreal Travel Retail Americas, Inc: sued individually and as successor-in-interest to Helena Rubinstein, Inc. and d/b/a Helena Rubinstein | 2024-014273-CA-01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | | Brendan Tully |
| Jack | Mary | Mary L. Jack and David L. Dayen v. Brenntag Specialties, Inc., et al. | 190035/2024 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | | Suzanne M. Ratcliffe |
| Jackson | Johnnie | Jackson, Johnnie & Mattie, Pltfs. v. Barretts Minerals Inc., et al. | MID-L-006778-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Jacoby | Lisa | Jacoby, Lisa and William Jacoby, Pltfs. v. Barretts Minerals, et al. | 190174/2021 | New York | New York | Weitz & Luxenberg P.C. | | Patti Lynn Bunshtyn |
| Jaconia | Lamona | Joseph Anthony Jaconia, Individually and as executor and executor ad Prosequendum of the Estate of Lamona Jaconia, Pltfs. vs 3M Company, etc., et al. | MID-L-002995-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | | Amber R. Long |

16

659770001-4866996(s)1

JA1120

| P L N m | P F N m | C C | C N m | s | C | P C | P C | P C A N m |
|---|---|---|---|---|---|---|---|---|
| James | Suzanne | James, Suzanne, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002078-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Jarvis | Patricia | Patricia Jarvis v. L'Oreal Travel Retail Americas, Inc. d/b/a Lancome, et al. | 23-015081 | Florida | Broward | Simon Greenstone Panatier, PC | | Rebecca Vinocur |
| Jatras | Kathy | Kathy Jatras and James Jatras vs. Johnson & Johnson, et al. | MID-L-002260-18 | New York | Middlesex (NJ) | Levy Konigsberg LLP | | Jacob Jordan |
| Jauregui | Maria | Maria Jauregui v Avon Products, Inc et al. | 190189/2022 | New York | New York | Meirowitz & Wasserberg, LLP | | Daniel Wasserberg |
| Jimenez | Luis | Luis Jimenez and Maria Jimenez v. Johnson & Johnson, et al | 23-L-011613 | Illinois | Cook | Beasley Allen Law Firm | | Gianaris Trial Lawyers, LLC - Joshua A. Edelson / Edelson/Vogelzang - Christian Luciano |
| Johnson | Gregory S. | Gregory S. Johnson and Barbara J. Johnson v. American International Industries, et. al. | 2023CP4006819 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | | Rachel Gross |
| Johnson | Neil | Neil Johnson and Carol Johnson v General Electric Company et al. | 190266/2023 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Johnson | Elaine | ELAINE JOHNSON v. 3M COMPANY, et al. | 24 L 3829 | Illinois | Cook | Vogelzang Law | | Michelle T. Pawlowski |
| Johnson-Brett | Linda | Johnson-Brett, Linda and Bradford Brett, Plfts. v. A.O. Smith Corporation, et al. | E2022002698 | New York | Monroe | Meirowitz & Wasserberg, LLP | | Daniel Wasserberg |
| Jones | Walter | Walter and Billie Jones vs. 3M Company, Brenntag Specialties LLC, et al | 21-05238-E | Texas | Harris | The Lanier Firm, PLLC | | Mark A. Linder |
| Jones | Janet | Janet Jones v. Avon Products, Inc., et al. | MID-L-003693-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | | James Kramer |
| Jordan | Judith | Judith Jordan, Pltf. v. Brenntag Specialties, Inc., et al | 190072/2017 | New York | New York | Meirowitz & Wasserberg, LLP | | Daniel Wasserberg |
| Jovanovich | Sam | Sam Jovanovich, Jr. v. BASF Catalysts LLC, et al. | 2024LA000509 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | | Michael V. Oltmann |
| Jurrist | Gail | Gail Jurrist and David Jurrist v. Colgate-Palmolive Co., et al. | 190202/2024 | New York | New York | Weitz & Luxenberg P.C. | | Sean Kerley |
| Kaatz | Kraig | KRAIG KAATZ and ARLENE KAATZ, his wife v. 84 LUMBER COMPANY, et al | 2023L008335 | Illinois | Cook | Simmons Hanly Conroy LLP | | Taylor L. Kerns |
| Kaenzig | Steven | Linda Kaenzig, Individually and as Executrix and Executrix Ad Prosequendum of the Estate of Steven Kaenzig v. Brenntag Specialties, LLC, et al. | MID-L-003928-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | | Amber Long |
| Kantor | William | Debra A. Kantor and William L. Kantor v. A.O. Smith Corporation, et al. | 2024L003627 | Illinois | Cook | Vogelzang | | Michelle Pawlowski |
| Kelso | Constance | Constance Kelso v. Arkema, Inc., et al. | CV21949769 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | | Holly C. Peterson |
| Kelz | Robin | Robin Kelz v Bobbi Brown Cosmetics et al. | MID-L-006353-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Kendrick | Wendy | Wendy Kendrick and Charkella Kendrick v. Avon Products, Inc., et al | CACE-21-014417 | Florida | Broward | Flint Cooper, LLC | | Rebecca Vinocur |

17

659770001-4866996S-1

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Kerley | Beverly | Kerley, Beverly & John Kerley, Pltfs. v. Brenntag Specialties, Inc., et al. | MID-L-006612-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Kernahan | Louise | Louise Kernahan and Martin Kernahan v Sumitomo Corp of America et al. | 190283/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Kershner | Barbara | Christa Ruth Machado individually and representative of estate of Barbara Kershner v Avon Products, Inc et al. | MID-L-007200-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Kieboom | Carol | Carol Kieboom and Herman Kieboom v Avon Products Co et al. | 190157/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Kier | Edward | Johnny Mize, Ind. and as Personal Rep. of the Estate of Edward Kier, Deceased vs. Brookshire Grocery Co., Brenntag Specialties LLC and Brenntag North America, et al | 2022-55642-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| King | Elizabeth | Stanley R. King, as Personal Representative of the Estate of Elizabeth H. King, Deceased v. Avon Products, Inc., et al. | 23-017495 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| King | Martha | Martha Mccracken King and Justin W. King v. Alticor, Inc., et al. | CACE-24-005989 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Kinler | Leonard | Leonard Kinler vs. Breaux Mart Supermarkets, Inc., et al. | 2021-07239 | Louisiana | Orleans Parish CDC | Landry & Swarr, LLC<br>Simon Greenstone Panatier, PC | Mickey P. Landry<br>Frank J. Swarr<br>Matthew C. Clark<br>Holly C. Peterson |
| Kirchberg | Frederick | Carol Kirchberg individually and as Administrator of estate Frederick Kirchberg v Aventis, Inc., et al. | MID-L-005204-23 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Kirkwood | Bernice | Chatman, Latoya, Estate of Bernie Annette Kirkwood, Pltf., v Avon Products, Inc., et al. | MID-L-008746-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Kittrel | Linnie | Mary Ann Kittrell, Individually and as Personal Representative of the Estate of Linnie P. Kittrell v. Bell & Gossett Company, et al | 19-035889 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. |
| Klar | Ilona | Ilona Klar and Ronald Gaiser v American Internatoinal Industries, et al. | MID-L-000176-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Klayman | Hope | Hope Klayman and Mark Steven Klayman v. American International Industries Inc., et al. | MID-L-004994-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Kleinman | Kenneth | Kenneth Kleinman and Marian Roppolo vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-08588-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Klinker | Leah | Leah C. Klinker v. Avon Products, Inc., et al | 23-021414 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc P. Kunen |
| Klitus | Nancy | Nancy Klitus v. Block Drug Co., Inc., et al | MID-L-003530-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | John W. Stevenson |
| Knight | Julie | Julie Knight vs Avon Products, Inc., et al | 190173/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Knolmayer | Joel | Cheryl Knolmayer, Individually and as Proposed Administrator of the Estate of Joel Knolmayer, Deceased v. AII, et al. | MID-L-000981-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |

18

JA1122

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P C A Nm |
|---|---|---|---|---|---|---|---|
| Knox | Margaret | Kimberly Milligan, as Independent Administrator of the Estate of Margaret Knox, Deceased v. Cosmetic Specialties, Inc., et al. | MID-L-000786-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Kobel | Audrey | JENNIFER BARRINGER, individually and as successor-in-interest to AUDRY KOBEL; and JODY CULVER v. BRENNTAG SPECIALTIES, LLC, sued individually, and as successor-in-interest, parent, alter ego, and equitable trustee to BRENNTAG SPECIALTIES, INC. (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC. and as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC., et al. | 24CV084604 | California | Alameda | Kazan McClain Satterley & Greenwood | Akinyemi Ajayi |
| Koebert | Renee | Renee Koebert and Donovan Koebert v Avon Products, Inc., et al. | MID-L-002945-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Kopel | Robert | Cynthia L. Kelley, Personal Representative of the Estate of Robert S. Kopel, Deceased v. Bayer Healthcare, LLC, et al. | CACE-23-19145 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Whitney DiBona |
| Kopp | John | Kopp, John R. and Christine Kopp, Pltfs. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 609596/2020 | New York | Suffolk | Weitz & Luxenberg P.C. | Andrew Gayoso |
| Kral | Janet | JANET E. KRAL and LINUS B. KRAL v. AVON PRODUCTS, INC., et al. | 2023-LA-001419 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Terah Bielec |
| Kulcavage | Edward | Shirley Kulcavage, Individually and as Personal Representative of the Estate of Edward Kulcavage vs Burnett Process Inc., et al. | E2021009637 | New York | Monroe | The Lanier Law Firm, PLLC | Darron Berquist |
| Kursh | Gail | Gail Kursh and Zev Primor v Arkema, inc et al. | 190280/2022 | New York | New York | Weitz & Luxenberg P.C. | Sean Kerley |
| Lairson | Larry | Larry Lairson and Stephanie Lairson v. Advance Auto Parts, Inc., et al. | MID-L-006673-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Lambert | Charles R. | Whitney Lambert, and as successor in interest to Charles R. Lambert, deceased; Nell Ann Barnhart; Brenda Corbello; Sheila Labarge; Greg Lambert; Vicki Lambert; Angel Todosijevic v. Albertson Companies, Inc, et al. | 23STCV27302 | California | Los Angeles | The Lanier Law Firm, PLLC | Mark A. Linder |
| Lane | Thurman D. | Thurman D. Lane and Deborah L. Lane v. Block Drug Company, Inc., et al. | MID-L-005938-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Lanehart | Tanya | Tanya Lanehart vs. H.E.B. LP, Brenntag Specialties LLC and Brenntag North America, et al | 2022CI15485 | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Langston | Randall | David Hardaway, as executor of the estate of Randal Langston vs. H-E-B, L.P. Also d/b/a H.E. Butt Grocery Company, for Its Hill Country Essentials Line of Products, et al. | 2024CI08664 | Texas | Bexar | Simon Greenstone Panatier, PC | Greyson ackerman |
| LaPlant | Lynn | David LaPlant, Individually and as Personal Representative of the Estate of Lynn Ann LaPlant v. Avond Products, Inc., et al | 23-CA-012151 | Florida | Hillsborough | The Ferraro Law Firm, P.A. | Jose L. Becerra, Esq. |

19

639770001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P C (A N m) |
|---|---|---|---|---|---|---|---|
| Larson | Lillian | Larson, Lillian, Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-002729-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| LaSalle | Jack | JACK LaSALLE and DIANNE LaSALLE v. AMERICAN INTERNATIONAL INDUSTRIES et al. | 23-2-08165-0 SEA | Washington | King | Kazan McClain Satterley & Greenwood | Joseph Satterley |
| Latterell-Rice | Rebecca | Rebecca Latterell-Rice and Clair Brian Rice, her husband, v. Alticor, Inc.; Avon Products, Inc. et al. | 62-CV-24-545 | Minnesota | Ramsey | Karst & von Oiste LLP | Erik P. Karst |
| Laudig | Kathleen | Elizabeth Laudig as representative of the estate of Kathleen Laudig v Avon Products, Inc., et al. | 49D13-2312-CT-059425 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Laughlin | Dennis | Dennis Laughlin vs Avon Products, Inc., et al. | MID-L-007803-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Lazette | Dianne | LaZette, Diane and Christopher LaZette, Pltfs. v. Barrett Minerals, Inc., et al. | MID-L-007561-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Lee | Michaeleen | Michelle F. Felton, Executrix of the Estate of Michaeleen Lee, deceased, v. Acme Markets, Inc. | GD-23-008055 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Lee | Kyung H. | KYUNG H. LEE and JOE J. LEE v. BI-MART CORPORATION et al. | 23CV40369 | Oregon | Multnomah | Dean Omar Branham Shirley, LLP | Jessica Dean / Sarah E. Gilson |
| Lee | Cynthia | Cynthia June Lee v. Avon Products, Inc., et al. | E2024006160 | New York | Monroe | Maune Raichle Hartley French & Mudd, LLC | Andrew M. Grous |
| Letizia | Joseph | Letizia, Joseph and Donna Letizia, Plfts. v. Barretts Minerals, Inc., et al. | MID-L-002232-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Levine | Joanna | Levine, Joanne & Timothy Spahr, Phfs. v. Kolmer Laboratories, et al. | 190251/2020 | New York | New York | Levy Konigsberg LLP | Ambre Jae Brandis |
| Linde | Stuart | Eileen Linde, as Administratrix for the Estate of Stuart Linde, and Eileen Linde, Individually v. Charles B. Chrystal Co., Inc., et al. | 190127/23 | New York | New York | Levy Konigsberg LLP | Ambre Jae Brandis |
| Link | Michael | Michael David Link and Sandra Strickland Link v. 3M Company, et al. | 2022CP4005543 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | Jonathan Holder |
| Little | Robert | Robert A. K. Little and Irene K. Little v. American Honda Motor Co., Inc., et al. | 23-020780 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Little | Christopher | Christopher Little v Barretts Minerals, Inc., et al. | MID-L-003868-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Lock | Judith | Lock, Judith, Pltf., v. Barrett Minerals, Inc., etc., et al. | 190223/2019 | New York | New York | Weitz & Luxenberg P.C. | Justin J. Weitz |
| Leconte | Barbarann | Leconte, Barbarann, Pltf. v. Amsco, LLC, et al. | 190289/2020 | New York | New York | Weitz & Luxenberg P.C. | Peter Tambini |
| Lodovico | Cynthia | Cynthia Lodovico v Barretts Minerals, Inc., et al. | MID-L-001418-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| LoGiudice | Keri | Logiudice, Keri and Joseph Logiudice, Pltfs., vs. American Talc Co., etc., et al. | 190253/2014 | New York | New York | Weitz & Luxenberg P.C. | Brendan J. Tully |
| Lorenzo | Richard | Lorenzo, Elizabeth, Individually and as Executrix of the Estate of Richard Lorenzo, Deceased, Pltf. v. Barretts Minerals, Inc., et al. | MID-L-001187-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden |
| Lowe | Celia | Celia Lowe and Brian Lowe v. L'Oreal Travel Retail Americas, Inc., et al | 23-022591 CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Lowis | Barbara | Barbara Lowis & Trevor Lowis v Avon Products, Inc., et al. | 190234/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |

20

659770001-4866996S:1

| P L N m | P F N m | C C | C N m | S | C | | P C | P A N m |
|---|---|---|---|---|---|---|---|---|
| Lupton | Johnnie | Phyllis Johnson, Margaret Rowell, Johnnie Lupton, Jr., Leslie Lupton, Gene Lupton, Joseph Lupton, Statutory Heirs of Johnnie Lupton, Sr., Deceased vs. Louisiana Steam Equipment, LLC, et al. | C-148470 | Louisiana | Lafourche Parish JDC | 17th | Landry & Swarr, LLC; Simon Greenstone Panatier, PC | Mickey P. Landry; Frank J. Swarr; Matthew C. Clark; Holly C. Peterson |
| Macron | Marilyn | Marilyn Macron v Maybelline, LLC, et al. | 190214/2023 | New York | New York | | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Madlik | Marilyn | Madlik, Donald C., as Representative of the Estate of Marilyn M. Madlik Pltf. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190139/2020 | New York | New York | | Weitz & Luxenberg P.C. | Brandon H. Perlman |
| Mager | Jenifer | Jenifer Mager and John Mandraschia v. American International Industries et al. | 23STCV09956 | California | Los Angeles | | Frost Law Firm, PC | Andrew Seitz |
| Maloney-Najjar | Kelley | Kelley Maloney-Najjar and Talib Najjar v Arkema, Inc et al | MID-L-03900-22 | New Jersey | Middlesex (NJ) | | The Lanier Law Firm, PLLC | Darron Berquist |
| Manning | Patricia | Manning, Patricia v. Avon Products, Inc., et al, DHs., including Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190052/2020 | New York | New York | | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Marceau | Deborah | Deborah Marceau and Timothy Marceau v Avon Products, Inc., et al. | MID-L-004127-23 | New Jersey | Middlesex (NJ) | | Simmons Hanly Conroy LLP | James Kramer |
| Marinelli | Nicole | Nicole Marinelli vs. Chatem, Inc., et al. | 2022-07702 | Louisiana | Orleans Parish CDC | | Boling Law Firm | Jeremiah Boling; Caroline Boling; Benjamin Rumph; LaCrisha McAllister |
| Markuson | Janice | Markuson, Janice & Milton, Pltfs. vs Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-003589-20 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Marsico | Raffaella | Emilia C. Brady, Administrator for the Estate of Raffaella Marsico, et al vs Fisher Scientific Company, et al. | 161103253 | Pennsylvania | Philadelphia | | Weitz & Luxenberg P.C. | Joseph J. Mandia |
| Martin | Gerald | Gerald K Martin and Beverly E Martin v Bayer Healthcare et al. | MID-L-003576-23 | New Jersey | Middlesex (NJ) | | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Martin | James | Linda B Martin, individually and as Proposed estate representative of James P Martin v Block Drug Company, et al. | MID-L-006575-23 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Martin | Sheila | Jeffrey Martin, as Administrator ad Prosequendum for the Estate of Sheila Martin and as Guardian of John Doe, et al vs Brenntag North America, Inc., et al. | MID-L-007808-19 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Martines | Ottavio | Antonella Bouchard individually and as executor of the Estate of Ottavo Martines and Maria Martines v Block Drug Company, Inc et al | MID-L-000371-24 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Joshua Kristal |
| Martinez | Mary | Mary Martinez and Michael Martinez, her husband v. American International Industries, et al | 22-018794 CA27 | Florida | Broward | | Dean Omar Branham Shirley, LLP | Rebecca Vinocur |

639770001-4866996551

| P L N m | P F N m | C C | C N m | s | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Mask | Mary | Linda K. Trimble, Individually and as Executrix of the Estate of Mary Mask v. Brenntag North America, Inc. & Brenntag Specialties, Inc., et al. | MID-L-002589-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Masterson | Leo | Leo Masterson and Lori Masterson v. Avon Products, Inc., et al. | 1901172/2023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Matsch | Sandra A | SANDRA A. MATSCH v. BAYER HEALTHCARE, LLC, et al | 23 LA 1528 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Jon R. Neumann |
| Maute | Tucker | Tucker D. Maute, D.O. and Olivia N. Munizza, M.D. v. Barretts Minerals, Inc., et al | CACE-22-008500 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Mayville | Arlene | Clare Day as Special Administratrix for the Estate of Arlene Jane Mayville vs Avon Products, Inc., et al. | MID-L-005285-18 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Mazuroski | Chloe | Chloe Mazuroski, Individually and as Executrix and Executrix Ad Prosequendum of the Estate of Michael Mazuroski v. American Honda Motor Co., Inc., et al. | MID-L-004556-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Denise Penampieri |
| Mazzei | Norbert | Norberto Ramon Mazzei et al v. Alco Industries, Inc. et al. | 1903172/2020 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Falda |
| McAllister | James | JACKI MCALLISTER, Individually and as Special Administrator for the Estate of JAMES O. MCALLISTER, deceased v. A.O. SMITH CORPORATION, et al | 2021L000870 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | A. Gentry Smith |
| McAteer | Aoife | McAteer, Aoife v Avon Products, Inc., et al. | 782000/2017 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| McBride | Ronald | McBride, Ronald & Michelle, Pltfs. v. American International Industries, Inc., et al. | 49D13-2110-MI-034781 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| McCollum | Beverlee | Beverlee McCollum v Avon Products, Inc., et al. | MID-L-004678-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| McDonough | Colleen | Colleen McDonough vs Johnson & Johnson, et al. | MID-L-001512-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| McGowan | Carole Lee | CATHLEEN BELTZ, individually and as successor-in-interest to CAROLE LEE MCGOWAN; LESHA CLARK, STEVEN SPRAGUE; KELLY SPRAGUE; and DUANE SPRAGUE, v. LOREAL USA, INC., et al. | 24CV070599 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| McGuire | Kevin | Kevin McGuire and Mary Jane McGuire v Barrett Minerals, et al. | 190154/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| McKnight-Foster | Carol | Foster, Edwin, as Executor of the Estate of Carol McKnight-Foster, Pltf. v. Johnson & Johnson, et al. | MID-L-000312-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| McLoughlin | Carmel | Carmel H McLoughlin v Brenntag North America, et al. | 190302/2023 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Jessica A. Bussanich |
| McMahon | Anne | Anne McMahon and Stephen McMahon v Sumitomo Corporation, et al. | 190304/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Meade | Jody Kay | Jody Kay Meade and Arthur Meade v. Barretts Minerals Inc. et al. | 23STCV23517 | California | Los Angeles | Simmons Hanly Conroy LLP | Deborah Rosenthal |
| Means | Elena F. | Elena F. Means v. 3M Company, et al. | 24-1988 | Massachusetts | Middlesex (MA) | Belluck & Fox, LLP | Joseph W. Belluck |

22

6597T0001-4866996S1

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P C A Nm |
|---|---|---|---|---|---|---|---|
| Megariotis | Joanna | Megariotis, Joanna, Pltf. v. Bristol Myers Squibb, et al. | MID-L-001970-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha |
| Messenger | Ronald | Donna Calawa, Personal Representative of the Estate of Ronald Messenger v. Advance Stores Company, Inc. et al. | FBT-CV-22-6115647-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Meyer | Carol | Carol J Meyer and Tommy Meyer v Avon Products, Inc., et al. | MID-L-001860-23 | New York | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Milan | Elizabeth | Elizabeth Milan v. Brenntag North America and Brenntag Specialties, Inc., et al. | 190354/2018 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Milford | Louise | Louise Milford and Christopher Milford v. Chanel, Inc., et al. | 190128/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Miller | Ann | Miller, Ann and Jeffrey, Pltfs. v. Barrett Minerals, Inc., et al. | MID-L-002710-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Miller | Dale | Guy Miller individually and as administrator of the estate of Dale Miller v Block Drug Company, et al. | MID-L-005953-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Miller | Veronica | Ronald Raymond Miller, Individually and as Personal Representative and Personal Representative ad Prosequendum of the Estate of Veronica Miller, Deceased vs. Brenntag North America, et al. | MID-L-005972-17 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Moshe Maimon |
| Miller | Stephanie | Miller, Janet, Executrix of the Estate of Stephanie Miller, Pltf., vs. Brenntag North America, Inc. and Brenntag Socialties, Inc., et al. | 190188/2017 | New York | New York | Levy Konigsberg LLP | Amber R. Long |
| Mirochin | Helen | Helen Mirochin v Barretts Minerals, Inc., et al. | 190185/2023 | New York | New York | Weitz & Luxenberg P.C. | Michael P. Fanelli |
| Mizer | Barbara | Barbara J Mizer and George A Mizer v Aisin USA Manufacturer, et al. | MID-L-004279-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Keith Binder |
| Mohammed | Hamedah | Renwick Mohammed, Individually and as Executor of the Estate of Hamedah Mohammed, Deceased v. Avon Products, Inc., et al. | 190189/2024 | New York | New York | Simmons Hanly Conroy LLP | Dennis M. Geier |
| Monroe | Joan | Leslea Davis and Est of Joan Monroe v Avon Products, Inc., et al. | EC2023-35161 | New York | Washington | Levy Konigsberg LLP | Amber R. Long |
| Montesano | Laura J | Laura Montesano v Brenntag North America, Inc., et al. | MID-L-005265-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Moore | Scott | Lori Lee Campbell, individually and as representative of estate of Scott Moore v Bayer Healthcare, LLC, et al. | 23-12-02561 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern |
| Moreno | Amelia | Amelia L Moreno v Avon Products, et al. | MID-L-003387-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Moreno | Sonia | Sonia Moreno v. Avon Products, Inc., et al. | MID-L-004040-24 | New Jersey | Middlesex (NJ) | Cohen, Placitella & Roth, PC | Jared M. Placitella |
| Morgan | Colin | Colin Morgan v. L'Oreal Travel Retail Americas, Inc., et al | 23-021465 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Rebecca Vinocur |
| Morgan | Sandra | Sandra Morgan v. Avon Products, Inc., et al | CACE-24-001329 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Morgan | June Rose | June Rose Morgan v Brenntag North America, et al. | MID-L-003282-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |

23

6397710001-4866996551

| P L N m | P F N m | C C | C N m | S | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Morrison | Carolyn | Carolyn Morrison v Avon Products, Inc, Inc, et al. | MID-L-006026-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Mota | Maritza | Mota, Maritza, Pltf. v. Johnson & Johnson, et al. | MID-L-005753-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Mounce | Gina | Gina Mounce and Raymond Mounce v 3M Co., et al. | 23-11-02558 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Neidra Wilson |
| Mukomela | Kenneth | GWENDOLYN J. MUKOMELA, Individually and as Special Administrator for the Estate of KENNETH D. MUKOMELA, deceased v. AGCO CORPORATION, et al | 2022LA000962 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Michael T. Flachs Jr. |
| Mullan | Robert | Robert Mullan and Tracy Mullan v. Sumitomo Corporation of Americas, et al. | 1900066/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Mullet | Anne Marie | Anne Marie Mullet and Ronald Mullet v Arkema, Inc., et al. | MID-L-000929-24 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Munoz | Renate | PETE T. MUNOZ, Individually and as Successor-in-Interest of the Estate of RENATE MUNOZ, Deceased, and JOHN CANTY, Individually, vs. Avon Products, Inc., et al. | 24STCV15955 | California | Los Angeles | Simon Greenstone Panatier, PC | Stuart J. Purdy |
| Murphy | Geraldine | Murphy, Geraldine, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-00429-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Muster | Sophia | Sophia Muster & John Muster v Avon Products, Inc., et al. | MID-L-05232-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Muzzipapa | Lucy | Lucy Muzzipapa v. American International Industries, et al. | 190213/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel J. Wasserberg |
| Myers | Beverly | Myers, Beverly and Timothy Myers, Pltfs. vs. Aventis Inc., et al. | 21-12-01748 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern |
| Nasr | Yehia | Yehia Nasr & Deborah Nasr v Barretts Minerals, Inc., et al. | 1900066/2023 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Nathan | Fraida | Nathan, Fraida & Yochanan Nathan, Pltfs. v. Johnson & Johnson, et al. | MID-L-006101-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Navaretta | Josephine | Josephine Navaretta and John Navaretta v. Sumitomo Corporation of Americas, et al. | 1901177/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Nelson | Sarah Sue | Nelson, Sarahsue, Pltf. v. American International Industries, et al. | MID-L-001022-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Nicholson | Harold | Nicholson, Nathan, Estate of Harold Nicholson, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-004402-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Nutt | Charles | Denise M. Nutt, Individually and as Executor for the Estate of Charles J. Nutt v. Avon Products, Inc., et al. | 22-2455 | Massachusetts | Middlesex (MA) | Duffy Law LLC | Christopher Duffy |
| Oakenfold | Sheila | Sheila Oakenfold v Christian Dior, Inc., et al. | 190238/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| O'Brien | Karen | Karen C. O'Brien v. Air & Liquid Systems Corporation, et al. | CV-23-234 | Maine | Cumberland | Hallet Whipple Weyens | David A. Weyens |
| Odum | Charles | Odum, Charles, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-004851-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Martha |
| Olson-Rizzo | Deborah | Olson-Rizzo, Deborah and Thomas Rizzo, Pltfs. v. American Art Clay Company, Inc., et al. | 190018/2022 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Orloff | John | James Maynard as executor of estate of John Orloff v Baxter Healthcare Corporation, et al. | MID-L-004578-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | F Alexander Eiden |

697770001-4866996561

| P L N m | P F N m | C C | C N m | S | C | P C | P A C N m |
|---|---|---|---|---|---|---|---|
| Paes | Verginio | Verginio Paes vs. American International Industries, et al. | 24CV060231 | California | Alameda | Meirowitz & Wasserberg, LLP | Kush Shukla |
| Pagano-Michels | Cynthia | Cynthia Pagano-Michels and Thomas Michels vs Barretts Minerals, Inc., et al. | MID-L-006234-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Pallotta | Josephine | Josephine Pallotta and James Pallotta v Avon Products, Inc., et al. | MID-L-003512-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Michelle C. Murtha |
| Palomino | Maria | Maria F. Palomino vs. Avon Products, Inc. et. al. | 2024L003179 | Illinois | Cook | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Palumbo | Frank | Frank Palumbo & Liz Palumbo v 3M Company, et al. | E2023003380 | New York | Monroe | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Parker | Pauline | Pauline Parker and James Parker v Barretts Minerals, et al. | 190186/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Parvin | Janice | Janice Parvin v AII, et al. | MID-L-003126-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joseph J. Mandia |
| Passmore-Meyer | Kathryn | Kathryn A. Passmore-Meyer and spouse John G. Meyer, Jr. v. Avon Products Inc., et. al. | CJ-2022-6281 | Oklahoma | Oklahoma | Dean Omar Branham Shirley, LLP | Jordan Bollinger |
| Paternostro | Marilyn | Melissa Shackelford, Melinda Boudreaux, and Marlene Lebouef, Individually and on Behalf of Marilyn T. Paternostro vs. Trapp Cadillac Chevrolet, Inc., et al. | C666833 25 | Louisiana | East Baton Rouge Parish 19th JDC | Landry & Swarr, LLC / Damon J Baldone & Associates. APLC / Simon Greenstone Panatier, PC | Mickey P. Landry / Frank J. Swarr / Matthew C. Clark / Damon J. Baldone / Holly C. Peterson / Christian E. Mancuso |
| Payne | Clark | Payne, Clark and Barbara A. Payne, Pltfs. vs. AM International Inc., et al. | 190307/2019 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Falda |
| Peddle | Gregory | Gregory A Peddle and Dorothy Peddle v Janssen Pharmaceuticals, Inc., et al. | MID-L-006525-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joshua Kristal |
| Pelley | Stephanie | Stephanie Pelley, Individually and as Parent, Guardian, and Next Friend of Minor Children, A.C.P. and A.T.P. v. American International Industries, et al. | 23-0473 | Massachusetts | Middlesex (MA) | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Peltz | Judith | Benjamin Peltz, Individually and as Co-Personal Representative of the Estate of Judith Peltz, and Dennis C. Brown, as Co-Personal Representative of the Estate of Judith Peltz v. Brenntag North America, Inc., et al. | 21-1612 | Massachusetts | Middlesex (MA) | Thornton Law Firm LLP | Leslie-Anne Taylor |
| Pena | Jacklyn | Pena, Jacklyn, Pltf. v. Barretts Minerals, Inc., et al. | MID-L-002573-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Penny | Sherry | Penny, Sherry, Pltf. v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-000918-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Perez | Maria Elena | Johanna Ortiz, and as successor in interest to Maria Elena Perez, deceased; Alejandrina Leon, as legal heir to Maria Elena Perez, deceased v. Albertson's LLC et al. | 23STCV14552 | California | Los Angeles | Simmons Hanly Conroy LLP | Crystal G. Foley |

63977.0001-48669965v1

| P<br>F N m | P<br>L N m | C C | C N m | S | C | P C | P C | P C<br>A N m |
|---|---|---|---|---|---|---|---|---|
| Perkins | Lorraine | Lorraine A. Perkins and Julia A. Knox v. Avon Products, Inc., et al. | 24-L-003861 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | | Christine Kim |
| Perkins | Barbara | BARBARA PERKINS v. BARRETTS MINERALS, INC. et al. | CGC-23-277164 | California | San Francisco | Frost Law Firm, PC | | Ronald J. Shingler |
| Perl | Rosemarie | Perl, Rosemarie, Pltf. v. Avon Products, Inc., et al. | 190087-21 | New York | New York | Weitz & Luxenberg P.C. | | Patti Lynn Bushhyn |
| Pettijohn | Eileen | Pettijohn, Eileen and Dr. David Pettijohn, Plts. vs Barretts Minerals, Inc., et al. | MID-L-005203-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Petty | Brenda | Petty, Barbara and Curtis Petty, Pltfs. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-002217-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | | Leah Kagan |
| Phelan | Marlene Theresa | Marlene Theresa Phelan v. Arkema Inc., et al. | FBT-CV-23-6123450-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | | Brian P. Kenney |
| Phillips | Patricia | Patricia Phillips and David Phillips v Avon Products, Inc., et al. | 190111/2023 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Phipps | Maria | Maria Phipps v Avon Products, Inc., et al. | MID-L-003953-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | | James Kramer |
| Picard | Carol | Carol A. Picard and Gerard R. Picard v. Avon Products, Inc., et al. | 2481cv1674 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | | Erika O'Donnell |
| Pichierri | Mary | Mary Pichierri and John Pichierri v. Avon Products, Inc., et al. | 20-2681 | Massachusetts | Middlesex (MA) | Shepard O'Donnell, P.C. | | Erika A. O'Donnell |
| Pickard | James | JAMES PICKARD vs. 3M COMPANY f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY; AIR & LIQUID SYSTEMS CORPORATION et al. | 22STCV18682 | California | Los Angeles | Frost Law Firm, PC | | Andrew Seitz |
| Pickering | Michelle | Michelle Pickering v. Arkema, Inc. et al. | 23STCV19273 | California | Los Angeles | Simon Greenstone Panatier, PC | | Albert Oganesyan |
| Pidge | Pamela | Pidge, Raymond, Individually and as Administrator of the Estate of Pamela K. Pidge, Deceased, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-001407-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | F Alexander Eiden |
| Pitcher | John | John Pitcher and Carolyn Pitcher v Union Carbide Corp., et al. | 190159/2022 | New York | New York | Simon Greenstone Panatier, PC | | Brendan J. Tully |
| Plotkin | Evan | Evan C. Plotkin and Martha Barry-Plotkin v. Johnson & Johnson, et al. | FBT-CV21-6109520-S | Connecticut | Fairfield at Bridgeport | Early, Lucarelli, Sweeney & Meisenkothen, LLC | | Brian P. Kenney |
| Portnoi | Herbert | Portnoi, Marjorie, Individually and as Proposed Administrator for the Estate of Herbert Portnoi, Pltf. v Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-004551-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Michelle C. Murtha |
| Possley | Madelon | Marc Possley, Individually and as Personal Representative of the Estate of Madelon Possley, Deceased v. Avon Products, Inc., et al. | MID-L-004237-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | | Erin M. Boyle |
| Potter | Shirley | Heather Donaghy, as Personal Representative of the Estate of Shirley Smiley Potter, deceased v. 4520 Corp., Inc., et al. | 2023-CP-40-03108 | South Carolina | Richland | Dean Omar Branham Shirley, LLP | | Aaron Chapman |

26

639770001-4866996bs1

| P L N m | P F N m | C C | C N m | S | C | P C | P C | P C A N m |
|---|---|---|---|---|---|---|---|---|
| Poulton | Catherine | Poulton, Catherine and David Poulton, Plfs. v. Barretts Minerals, Inc. et al. | 190094/2022 | New York | New York | | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Pountain | Marjean | Marjean Pountain and Charles Pountain v. Avon Products, Inc., et al. | MID-L-003694-24 | New Jersey | Middlesex (NJ) | | Simmons Hanly Conroy LLP | James Kramer |
| Powell | Katherine | Katherine Powell, as Personal Representative of the Estate of Amy Janelle Sisk, Deceased v. Avon Products, Inc., et al. | 23-021560 | Florida | Miami-Dade | | The Ferraro Law Firm, P.A. | Marc P. Kunen |
| Powell | Dena Vee (f/k/a Dena V. Burch) | Tesa A Burch & Est of Dena Powell v Avon, et al. | 190122/2022 | New York | New York | | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Pryor | Carolyn | Pryor, Carolyn, Plt. vs Johnson & Johnson, et al. | MID-L-002649-20 | New Jersey | Middlesex (NJ) | | Levy Konigsberg LLP | Moshe Maimon |
| Pryor | Michael | Pryor, Michael and Karen, Pltfs., v Avon Products, Inc., et al. | MID-L-000022-21 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Przekop | Charles | Przekop, Charles and Delphine Przekop, Pltfs. v. Johnson & Johnson, et al. | MID-L-003328-21 | New Jersey | Middlesex (NJ) | | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Purvis | Evangeline | Purvis, Nichelle, for the Estate of Angeline Purvis, Pltf. v. Bristol Myers Squibb, et al. | MID-L-001749-21 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Ramirez | Irma | Irma Ramirez vs. Advanced Auto Parts, Brenntag Specialties LLC, et al | 2019-67370-ASB | Texas | Harris | | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Ramos | Jim | Jim Ramos & Lillian Ramos v. Bayer Healthcare, LLC, et al. | MID-L-003840-24 | New Jersey | Middlesex (NJ) | | Simon Greenstone Panatier, PC | Leah Kagan |
| Rand | Charlene | Charlene Rand and Jason Rand v Block Drug Company, Inc et al. | MID-L-007180-23 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Randolph | Bernice | Rhonda Concepcion individually and as administrator of the Estate of Bernice Randolph v Metropolitan Life insurance Company et al. | MID-L-000059-22 | New Jersey | Middlesex (NJ) | | Weitz & Luxenberg P.C. | F Alexander Eiden |
| Reed | Wesley | Wesley Reed at al v. Sumitomo Corporation of Americas, et al | 004170/2024 | New York | New York | | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Rego | John | RAYMOND BROWN, Individually and as Special Administrator for the Estate of JOHN H. REGO, deceased v. BLOCK DRUG COMPANY, INC., Individually and as successor-in-interest to The Gold Bond Sterilizing Powder Company; a/k/a The Gold Bond Company, et al | 2024LA000030 | Illinois | Madison | | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Remko | Marilyn | Remko, Marilyn Ann and John, Pltfs. v. ACME Markets, Inc., et al. | 190267-20 | New York | New York | | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Renwick | Joyce | Joyce Renwick and Samuel Sohn v. Avon Products, Inc., et al | 23-011345-CA-01 | Florida | Miami-Dade | | Dean Omar Branham Shirley, LLP | Rebecca Vinocur |
| Reshad | Ghulam | Mary Reshad, Individually and as executor of estate of Ghulam Reshad v Bayer Consumer Care Holdings, LLC Company et al. | 623415/2023 | New York | Suffolk | | Weitz & Luxenberg P.C. | Sean Kerley |
| Reyes | Ezequiel | MARCELA REYES, LESLEY REYES, HOMAR REYES, GISELLE REYES, ERICK REYES, ESEQUIEL REYES and CRYSTAL REYES, as the Surviving Heirs of EZEQUIEL REYES, Deceased v. 3M COMPANY et al | 2222-CC09327 | Missouri | St. Louis | | Simmons Hanly Conroy LLP | Randy S. Cohn |

6597T0001-4866996851

| P L Nm | P F Nm | C C | C Nm | s | C | P C | P A C Nm |
|---|---|---|---|---|---|---|---|
| Reyes | Lidia | Julio Mendoza, Ind. and as Rep. of the Estate of Lidia Reyes (Deceased), Antonio Reyes & Nidia Reyes, Ind. vs. Avon Products, Inc., Brenntag Specialties LLC, et al | 2019-55560-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Reyes | Joel | Joel Reyes and Jesse Vaseliar v. Avon Products, Inc., et al. | GD-23-008144 | Pennsylvania | Allegheny | Meirowitz & Wasserburg, LLP / Dean Omar Branham Shirly, LLP | Neidra Wilson / Cori J. Kapusta |
| Reyes-Vasquez | Jose | Reyes-Vasquez, Jose and Ramona Vasquez, Pltfs. v. Amchem Products, Inc., et al. | 190216-2021 | New York | New York | Weitz & Luxenberg P.C. | Ambre Jae Brandis |
| Reynolds | Douglas | Douglas and Carolyn Reynolds vs. Alfa Laval, Inc., Brenntag Specialties LLC, et al | 2019-45514-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Rhoades | Bonnie | JAMES W. RHOADES, Individually and as Executor of the Estate of BONNIE S. RHOADES, deceased v. BARRETT'S MINERALS INC., et al | 23L8925 | Illinois | Cook | Maune Raichel Hartley French & Mudd, LLC | Jon R. Neumann |
| Rice | Jeffrey | Jeffrey T. Rice and Terce Rice v. Colgate Palmolive Company, et al. | MID-L-004720-22 | New Jersey | Middlesex (NJ) | Meirowitz & Wasserberg, LLP | Perry Leigh Shusterman |
| Richards | Verna | BETHANY J. RICHARDS, Individually and as Personal Representative of the Estate of VERNA J. RICHARDS v. JOHNSON & JOHNSON et al. | 21-2-10988-4 KNT | Washington | King | Dean Omar Branham Shirley, LLP | Matthew P. Bergman |
| Richards | Judith | Judith Richards v Sumitomo Corporation of the Americas, et al. | 190284/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Richardson | Patricia | Patricia Richardson v. L'Oreal Travel Retail Americas, Inc., et al. | 24-004504 ca27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Richardson | Karen | Karen Richardson & Ian Richardson v Avon Products, Inc., et al. | 190071/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Richardson | Phillip | Phillip Richardson and Larry Eron v American International Industries, et al. | 23-03-03073 | Pennsylvania | Philadelphia | Meirowitz & Wasserberg, LLP | Neidra Wilson |
| Rigby | Penelope | Michele Stuack, Jack Bannister and Estate of Penelope Rigby v Avon Products, et al. | 190096/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Rini | William | Rini, Bridget, Individually and as Personal Representative of the Estate of William Rini, Deceased, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190271/2019 | New York | New York | Simon Greenstone Panatier, PC | Kevin M. Berry |
| Robbins | Vicki | Robbins, Vicki, Pltf. v. Avond Products, Inc., et al. | MID-L-001231-22 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Roberts | Deron | Roberts, Deron, Pltf. vs. Abb, Inc., etc., et al. | MID-L-006782-16 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Robinson | Jeanne | JAMIE MCMAHON, Individually and as Successor-In-Interest of the Estate of JEANNE ROBINSON, Deceased, v. AVON PRODUCTS, INC., et al. | 23STCV15780 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc Willick |
| Robinson | Sonja S. | Sonja Robinson and Rodney Robinson v Avon Products, Inc., et al | MID-L-005394-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Rodriguez | Jose | Jose H. Rodriguez & Carmen Rodriguez v Bayer Consumer Care Holdings, LLC, et al. | MID-L-005536-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |

28

639770001-4866990551

| P L N m | P F N m | C C | C N m | S | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Rodriguez | Jesus | JESUS RODRIGUEZ and ANA MARIA PEREZ DE RODRIGUEZ vs. THE VONS COMPANIES INC., a subsidiary of ALBERTSONS COMPANIES, INC.; et al | 24STCV11423 | California | Los Angeles | Simon Greenstone Panatier, PC | Albert Oganesyan |
| Rodriguez | Carlos | CARLOS RODRIGUEZ and FABIOLA RODRIGUEZ, his wife v. BAYER HEALTHCARE, LLC, et al. | 24 LA 301 | Illinois | St. Clair | Menges & Karst | Carson Menges & Jason Ministrelli (Karst) |
| Rohe | Patricia | Rohe, Patricia and William, Plffs. vs. Avon Products, Inc. et al. | 190202/2019 | New York | New York | Weitz & Luxenberg P.C. | Erik Jacobs |
| Roland | Jacqueline | Jacqueline Roland vs. H.E.B, LP, Brenntag Specialties LLC and Brenntag North America, et al | 23-74356 | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Rollman | Gregory | Rollman, Greg, Plhf. v. Dr. Scholls, Inc., et al. | MID-L-002407-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Romahn | Audrey | Romahn, Audrey, Plhf. vs. Barretts Minerals Inc., et al. | 211201513 | Pennsylvania | Philadelphia | The Halpern Firm | David Halpern |
| Rosas | Otila R | Silvia V. Rosas, individually and as successor-in-interest to Otilia R. Rosas; Elsa Herrera; Carlos Rosas; Santos Rosas Jr.; Marta E. Ruvulcaba v. Avon Products, Inc. et al. | 23STCV21311 | California | Los Angeles | Frost Law Firm, PC | Andrew Seitz |
| Roufail | Nancy | Dr. Hayam Shaker, Individually and Peter Raouf, As Anticipated Administrator Ad Prosequendum for the Estate of Nancy Roufail, Deceased, Dr. Raouf Sidra and Sandra Raouf v. Johnson & Johnson, et al. | MID-L-002491-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Rountree | Kenneth | Kenneth Scott MacDonald Rountree and Pascale A Rountree v Bayer Healthcare, LLC, et al. | MID-L-003139-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan T. Alvarado |
| Roush | David | DAVID G. ROUSH and SUZANNE D. ROUSH v. AFC-HOLCROFT, LLC, et al | 24la316 | Illinois | Madison | Maune Raichel Hartley French & Mudd. LLC | Terah Bielec |
| Rowan | Dorothy | Dorothy A. Rowan v. Block Drug Company, Inc. | 190102/2024 | New York | New York | Weitz & Luxenberg P.C. | Benjamin T. Clinton, Esq. |
| Roy | Lynne | Lynne Roy vs. Colgate-Palmolive Company, et al | 2020-02718 | Louisiana | Orleans Parish CDC | Landry & Swarr, LLC Dean Omar Branham Shirley, LLP | Mickey P. Landry Frank J. Swarr Matthew C. Clark Mark J. Buha |
| Rudden | Michael | Michael Ruddin and Mary Rudden v Arvinmeritor, Inc., et al. | 190257/2021 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Rudnicki | Antony | Antony Rudnicki v Avon Products, Inc., et al. | 190070/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Ruffner | Michael | Michael Ruffner and Elaine Ruffner v. Avon Products, Inc., et al. | CV-24998 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Rusinko | Michelle | Michelle Rusinko and Robert Weisenfeld v Ben Nye Makeup Company, et al. | MID-L-006742-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |

639770001-4866996Sv1

JA1133

| P L Nm | P F Nm | C C | C Nm | s | C | P C | P A / C Nm |
|---|---|---|---|---|---|---|---|
| Russell | Carolyn | Russell, Carolyn, Pltfs. v. Brenntag North America, Inc., et al. | MID-L-004065-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Ryall | Nancy | Nancy Ryall, Ind. and a/n/f of LR, a minor vs. H.E.B. LP, Brenntag Specialties LLC and Brenntag North America, et al | 2022-42911-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Ryan | Sheila | Ryan, Sheila and Shawn Jones, Pltfs. vs. Avon Products, Inc., et al. | MID-L-004589-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Saams | Lucinda | Lucinda K Saams v Barretts Minerals, Inc., et al. | MID-L-001562-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Salem | Jennifer | Jennifer Salem & Jamal Salem v Coty, Inc., et al. | 1902242022 | New York | New York | Weitz & Luxenberg P.C. | David M. Kaufman |
| Salmeron | Rosa Maria Hernandez | Rosa Maria Hernandez Salmeron and Cristian Bautista v Sumitomo Corporation of Americas, et al. | 190267/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Sanden | Anita | Sanden, Anita, Pltf. v. Barrett Minerals, et al. | MID-L-007932-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Sandoval | Berenice | BERENICE SANDOVAL vs. BLOCK DRUG COMPANY, INC. individually and as successor to The Gold Bond Sterilizing Powder Co. a/k/a The Gold Bond Co., et al. | 24STCV09972 | California | Los Angeles | DeBlase Brown Eyerly LLP | Eric Brown |
| Santana | Dianna | Santana, Dianna and Robert, Pltfs. v. Avon Products, Inc., et al. | MID-L-000881-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Santos | Brianna | Briana M Santos v Brenntag Specialties LLC, et al. | MID-L-005026-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Savoy | Clarence | Clarence Savoy vs. Honeywell International, Inc., et al. | C723284_23 | Louisiana | East Baton Rouge Parish 19th JDC | Boling Law Firm | Jeremiah Boling Caroline Boling Benjamin Rumph LaCrisha McAllister |
| Schaefer | Nancy | Schaefer, Nancy, Pltf. v. Barretts Minerals, Inc., et al. including Brenntag North America, Inc., and Brenntag Specialties, Inc., et al. | MID-L-007018-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joseph J. Mandia |
| Schaefer | Linda | Linda Schaefer and Carl Schaefer v. Brenntag North America, et al. | 19018/2020 | New York | New York | Simmons Hanly Conroy LLP | James M. Kramer |
| Schmidt | Grace | Grace Schmidt; Anthony Schmidt v. Arkema, Inc. fka Pennwalt Corporation et al. | 23STCV18513 | California | Los Angeles | Simon Greenstone Panatier, PC | Robert Green |
| Schmidt | Gary | James Schmidt, as Trustee for the next-of-kin of Gary Schmidt, Deceased, v. Gorman Thompson Foods, Inc. d/b/a Midtown Foods et al. | 62 CV-22-4900 | Minnesota | Ramsey | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Schroepfer | Carolyn | Lisa Thomas, Jeffry Schroepfer and Est of Carolyn Schroepfer v Avon Products, Inc., et al. | 190281/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Schulz | Beth | Schultz, Beth, Pltf. v. Barretts Minerals Inc., et al. | 190179/21 | New York | New York | Weitz & Luxenberg P.C. | Justin J. Weitz |
| Scott | Shirley | Sharon Scott (Estate of Shirley Scott), et al v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-008439-18 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Seal | Maureen | Maureen Seal v. Christian Dior, Inc., et al. | 190129/2024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |

30

659770001-4866996S-1

JA1134

| P L Nm | P F Nm | C C | C Nm | s | C | P C | P A Nm |
|---|---|---|---|---|---|---|---|
| Searle | Graeme | Graeme Searle v. Conopco, Inc., et al. | 1901042024 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Segal | Ann | Ann Segal v. Arkema, Inc., et al. | MID-L-003692-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Segedie | Carole | CAROLE SEGEDIE and KENNETH SEGEDIE v. COLGATE-PALMOLIVE COMPANY et al. | 22CV019385 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| Seitz | Mitchell | MITCHELL SEITZ v. BAYER HEALTHCARE, LLC et al. | 23CV44833 | Oregon | Multnomah | Maune Raichle Hartley French & Mudd, LLC | Katryn Newton |
| Sellman | Alison | Allison R Sellman v Brenntag Specialties, Inc., et al. | MID-L-003809-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Shader | Patricia | Shader, Patricia and Robert. v. Johnson & Johnson, et al. | MID-L-007836-20 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Shaffer | Thomas | Shaffer, Thomas and Jessilyn Shaffer, Plfts. v.ABB, Inc., et al. | GD223668 | Pennsylvania | Allegheny | Maune Raichle Hartley French & Mudd, LLC | Jason Yampolsky |
| Shaker | Hayam | Shaker, Dr. Hayam, Individually and Peter Raouf, as Anticipated Administrator Ad Prosequendum for the Estate of Nancy Roufail, Dr. Raouf Sidra and Sandra Raouf, Plfts. v. Johnson & Johnson, et al. | MID-L-002491-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Shakour | Farghaly | Farghaly A Shakour & Emily Shakour v Avon Products Inc., et al. | 190097/22 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Sherman | Michelle | Sherman, Michelle and Jeremy Sherman, Plfts. v. CONOPCO, Inc., et al. | EF2022-0112 | New York | Tompkins | Weitz & Luxenberg P.C. | Thomas M. Comerford |
| Sherman | Rebecca | Heather Colding, Personal Representative of the Estate of Rebecca L. Sherman, deceased v. Advanced Stores | 24-003940 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Shrock | Roger | Roger Shrock and Donna Shrock v. 3M Company, et al. | 49D13-2406-CT-028631 | Indiana | Marion | DOBS & Farinas, LLP | Kathleen A. Farinas |
| Shuman | Francine | Shuman, Francine, Pltf. vs Pfizer, et al. | 190115/2020 | New York | New York | Weitz & Luxenberg P.C. | Alani Golanski |
| Sides | Yaniv | Agnes Sides, as Executrix for the Estate of Yaniv N. Sides, and Agnes Sides, Individually, v. Advance Auto Parts Inc., et al | 190150/2021 | New York | New York | Weitz & Luxenberg P.C. | Chris Romanelli |
| Sifuentes | Wilfredo | Sifuentes, Wilfredo and Carmen Sifuentes, Plfts. v. Barretts Minerals, Inc., et al. | MID-L-002779-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Silverman | Harriet | Harriet Silverman and Kenneth Silverman v. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | 190347/2018 | New York | United States District Court for the Southern District of New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Simmons | Manijeh | Tina Poe, Ind. as as Independent Administrator of the Estate of Manijeh A. Simmons, Deceased, and Mahin Kasham vs. H.E.B. LP, Brenntag Specialties LLC and Brenntag North America, et al | 2022-50521-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Sinn | Ruth | Sinn, Ruth & George, Plfts. v. Barretts Minerals, Inc., et al. | MID-L-008750-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Sliz | Jeannie | Jeannie Sliz and John Sliz v Avon Products, Inc., et al. | MID-L-005334-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |

659770001-4866996Sv1

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Small | DeAnna | Deanna Small v Barrett Minerals, et al. | MID-L-002915-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |
| Smee | Lesley | Lesley Smee and Graham Smee v. L'Oreal Travel Retail Americas, Inc., d/b/a/ L'Oreal and Lancome, et al. | 23-017696CA-27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Smith | Michael | Michael S. Smith and Kathy S. Smith, his wife v. Avon Products, Inc., et al. | 2023-019237-CA-01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Andrew J. Farrano |
| Smith | David | Mcdovich, Patrick, Individually and Administrator for Estate of David Smith and William Smith, et al, Pltfs. v. Avon Products, Inc., et al. | MID-L-002887-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Smith | Sheila Ann | Gregory J Smith & Estate of Sheila Ann Smith v Avon Products, In.,et al. | MID-L-003507-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Smith | Audrey | Audrey L. Smith, et al. v. Avon Products, Inc., et al. | CV23985434 | Ohio | Cuyahoga | Dean Omar Branham Shirley, LLC | Ethan A. Horn |
| Smithers | Cynthia Lou | Cynthia Lou Smithers v. Johnson & Johnson, et al. | MID-L-005778-23 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Sniegocki | Joseph | Joseph T. Sniegocki and Robbin E. Watts v. Altman Stage Lighting Co., Inc. et al | CACE-23-010939 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Soares | Susan | Susan Soares and Brian Soares v. Avon Products, Inc. et al | PC-2024-01631 | Rhode Island | Bristol | Early, Lucarelli, Sweeney & Meisenkothen, LLC | Brian P. Kenney |
| Soechting | Erica | ERICA L. SOECHTING and BLAKE SOECHTING v. APEX TOOL GROUP, LLC, as successor-by-merger to Cooper Tools and Danaher Corporation, successor to Equity Group, successor to Easco Corporation, et al | 2023LA001735 | Illinois | Madison | Maune Raichel Hartley French & Mudd, LLC | Dawn Besserman |
| Sorum | Mark James | MARK JAMES SORUM and BARBARA SORUM v. ALBERTSONS COMPANIES, INC. et al. | 23CV031203 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| Sosa | Jorge | Jorge Sosa and Susie Sosa vs. Safeway, Inc., et al. | 24STCV14266 | California | Los Angeles | Simon Greenstone Panatier, PC | Stuart J. Purdy |
| Spaulding | Donna | DONNA A. SPAULDING vs. JOHNSON & JOHNSON, et al. | CJ 2024-3673 | Oklahoma | Oklahoma | Dean Omar Branham Shirley, LLP | Steven Horton |
| Spayd | Jr., George | George Spayd, Jr. v. 3M Company, et al. | GD-23-010209 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Spiegelman | Sheldon | Spiegelman, Sheldon and Sandra Spiegelman, Pltfs. v. Arkema, Inc., et al. | 190149/2021 | New York | New York | The Lanier Law Firm, PLLC | Darron Berquist |
| Spingarn | Michael | Spingarn, Michael and Sandra Spingarn, Pltfs. v. Chas. B. Chrystal Co., Inc. et al. | 56025/2022 | New York | Westchester | Weitz & Luxenberg P.C. | Peter Tambini |
| Stark | Patsy | PATSY STARK AND DAVID STARK vs. COLGATE-PALMOLIVE COMPANY et al. | 22CV018867 | California | Alameda | Kazan McClain Satterley & Greenwood | Laurel Halbany |
| Steck | Philip | CYNTHIA JABBAY, Individually and as Special Administrator of the Estate of PHILIP STECK, Deceased v. 3M COMPANY, et al | 2023 L 10343 | Illinois | Cook | Vogelzang | Michael A. Maienza |
| Steggles | Susan | Susan Steggles and Christopher Steggles vs Avon Products, Inc., et al. | 190174/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |

32

JA1136

| P L Nm | P F Nm | C Nm | C Nm | S | C | P C | P C A Nm |
|---|---|---|---|---|---|---|---|
| Stelzer | Sheila | Mark O. Stelzer, as Proposed Personal Representative of the Estate of Sheila K. Stelzer v. Avon Products, Inc., et al. | MID-L-001821-24 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Stengel | Robert | Stengel, Robert, Pltf. v. Barretts Minerals Inc., et al. | 190212/21 | New York | New York | Weitz & Luxenberg P.C. | Benjamin Alan Darche |
| Stephen | Wilma | Wilma Stephan vs 188A North Canon Inc., et al. | MID-L-001373-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Stevens | Patricia | Stevens, Patricia, Pltf. v. Avon Products, Inc., et al. | MID-L-002979-22 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Sipe | Pamela | Pamela A. Stipe And Richard R. Stipe vs. A.O. Smith Corporation, et al. | 23-la-001579 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Julia Kerr |
| Stone | Nicole | Stone, Nicole and Joshua Stone, Plfts. v. Barretts Minerals, Inc., et al. | MID-L-001972-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Stratford | Eva | Stratford, Sylvia, Individually and as Personal Representative of the Estate of Eva Stratford, Deceased, Pltf. v. Avon Products, Inc., et al. | CV21957443 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeRuve |
| Stringfellow | Thomas | Stringfellow, Thomas and Karen Stringfellow, Pltfs. v. Johnson & Johnson, et al. | MID-L-002906-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Suzanne M. Ratcliffe |
| Suedekum | Almon Lynn | Suedekum, Jeri Lynn as Administratrix of the Estate of Almon Lynn Suedekum, Pltf. v. Barrett Minerals, Inc., et al. | MID-L-001859-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Sullivan | Joan | Joan Sullivan & George Sullivan v Access Business Group, LLC, et al. | MID-L-001278-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Sutton | Robert H. | Sutton, Lisa, Individually and as Administrator and Administrator ad Prosequendum for the Estate of Robert H. Sutton, Jr., Deceased, Plft. v. Avon Products, Inc., et al. | MID-L-001903-22 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Sutton | William | William A. Sutton Jr. vs. Avon Products, Inc., et al. | CACE-24-009090 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |
| Swedlow | Sharon | Sharon Swedlow vs Revlon, Inc., et al. | MID-L-001760-18 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Sweeney | Donald | KATHERINE M. KOMER, as Special Administrator for the Estate of DONALD E. SWEENEY, deceased, and ROBERTA S. SWEENEY, Individually v. BELDEN WIRE & CABLE COMPANY LLC, et al | 2022LA000724 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Meghan K. McGlynn |
| Swenson | Lynn | Martha Wahlstrom, as Special Administrator for the Estate of Lynn Swenson, deceased v. Avon Products, Inc., et al. | 190204/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Syed | Sadia | Sadia Syed v Avon Products, Inc et al. | MID-L-000462-23 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Jacob Jordan |
| Synowicki | John | Jane Davis, Individually and as Executrix for the Estate of John Synowicki v Beacon CMP Corp., et al. | MID-L-005034-22 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Tantillo | Dianne | Dianne Tantillo vs. Avon Products, Inc., et al. | 2024-01705 | Louisiana | Orleans Parish CDC | Landry & Swarr, LLC; Dean Omar Branham Shirley, LLP | Mickey P. Landry; Frank J. Swarr; Matthew C. Clark; Jordan Bollinger |

33

| P L N m | P F N m | C C | C N m | S | C | P C | P A N m |
|---|---|---|---|---|---|---|---|
| Tarka | Stanley | Stanley W Tarka and Barbara A Tarka v Avon Products, Inc., et al. | MID-L-006850-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Nathaniel N. Fulda |
| Taylor | Debra | Latoya Taylor Administratrix of the Estate of Debra Taylor v American International Industries, et al. | 23-07-02624 | Pennsylvania | Philadelphia | Simmons Hanly Conroy LLP | Sealey, James Andrew |
| Teffeteller | Jerry | Jerry Teffeteller; Sharon Teffeteller v. Alfia Laval, Inc., et al. | 23STCV07392 | California | Los Angeles | Simon Greenstone Panatier, PC | Marc Willick |
| Tellez | Maria | Mauricio Tellez, Individually and as Administrator and Administrator ad Prosequendum for the Estate of Maria Tellez, Deceased, Natalia Olvera Evangeleva Tellez Ruiz, Jose Tellez Ruiz, and Omar Tellez Ruiz v. Avon Products, Inc., et al. | MID-L-000054-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Thomas | Narcissus | Narcissus Thomas vs Brenntag North America, Inc., et al. | 190126/2018 | New York | New York | Levy Konigsberg LLP | Jerome Howard Block |
| Thompson | David | Megan Farver; Estate of David Thompson v. 3M Co., et al. | CV21954894 | Ohio | Cuyahoga | Simon Greenstone Panatier, PC | Michael DeRuve |
| Tippin | Corey Grant | Tippin, Corey, Pltf. v. 3M Company, et al. | 190062/2021 | New York | New York | The Early Law Firm | Brian Francis Early |
| Tishman | Carol | Tishman, Carol, Pltf. v. Avon Products, Inc., et al. | MID-L-005500-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Tollefson | Katherine | Tollefson, Katherine and Kevin Tollefson, Pltfs. v. Johnson & Johnson, et al. | MID-L-004370-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Torrence | Cora Dean | Cora Dean Torrence v Avon Products, Inc., et al. | 190170/2023 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Torres | Plinio | Plinio Torres and Mariana Torres v. Avon Products, Inc., et al. | 190165/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |
| Townsend | Michelle | Rachel M. Morlock, as Personal Representative of the Estate of Michelle D. Townsend | MID-L-002370-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Phan Alvarado |
| Trippett | Frank | Linda Trippett Individually and as Executor of the Estate of Frank Trippett v Barretts Minerals, Inc., et al. | MID-L-004860-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Kimberly Russell |
| Tushaj | Elizabeth | Elizabeth Tushaj v Brenntag North America, et al. | 190327/2023 | New York | New York | Weitz & Luxenberg P.C. | Sean Kerley |
| Uribarri | Peter | Peter V Uribarri and Ana L Uribarri v Barretts Minerals, Inc., et al. | MID-L-003279-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |
| Utz | Tammi | Tammi L. Utz, v. Agco Corp, et al. | 24 LA 814 | Illinois | Madison | Maune Raichle Hartley French & Mudd, LLC | Jaclyn Harres |
| Valega | Walter | WALTER E. V ALEGA and RITA M. VALEGA, vs. ALBERTSONS COMPANIES, INC. et al. | 21STCV46564 | California | Los Angeles | Maune Raichle Hartley French & Mudd, LLC | Marissa Langhoff |
| Valentin | Barbara | Barbara Valentin and Malcolm Valentin v. L'Oreal Travel Retail Americas, Inc. et al. | 2024-009035-CA-01 | Florida | Miami-Dade | Simon Greenstone Panatier, PC | Brendan Tully |
| Valley | Jody | Jody Valley and Elaine Thomason v. Block Drug Co., Inc., et al. | MID-L-002212-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | |
| Vasconcellos | Pedro | Pedro Javier Vasconcellos and Juan C. Estrada v. 3M Company, et al. | 190186/2024 | New York | New York | Meirowitz & Wasserberg, LLP | Daniel Wasserberg |

659770001-4866996551

**JA1138**

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Vasquez | Jesse | Yanet Patricia Vasquez, Individually and as the Personal Representative of the Estate of Jesse Vasquez, Deceased v. Barrett Minerals, Inc., et al. | MID-L-000595-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Vasquez | Patricia | Vasquez, Patricia and Santiago Vasquez, H/W, Pltfs. v. Barrett Minerals, Inc. et al. | MID-L-000296-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Vaughn | Shirley | TERRY VAUGHN, Individually and as Successor-In-Interest to the Estate of SHIRLEY VAUGHN, Deceased, and MACKENZIE OGDEN, by and through her Guardian ad Litem, TERRY VAUGHN, and JAMES SETTLE and KILEE FULLER, VS. COTY, INC, et al. | 19STCV35819 | California | Los Angeles | Simon Greenstone Panatier, PC | Stu Purdy |
| Vaughn | Bobbie Jo | Gordon Vaughn, as Administrator of the Estate of Bobbie Jo Vaughn, Deceased v. Barrett Minerals, Inc., et al. | MID-L-07699-20 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Ventura | Theresa | Theresa Ventura v. Johnson & Johnson, et al. | 190055/21 | New York | New York | Weitz & Luxenberg P.C. | Benjamin Alan Darche |
| Verdolotti | Irma | Verdolotti, Irma, Pltf. vs. Brenntag North America, Inc. and Brenntag Specialties, Inc., et al. | MID-L-005973-16 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Virbitsky | William | William Virbitsky and Leslie Virbitsky v 84 Lumber Company, et al. | 23-11-01456 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |
| Vyner | Myralynn | Myralynn Vyner v Avon Products, Inc., et al. | 190077/2023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Walsh | Lillian | Walsh, Barry Indv and Administrator of the Estate of Lillian Margaret Walsh, Deceased v Avon Products, Inc. et al. | 190123/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Walston | John | Teri L. Walston, Ind. and as Personal Rep. of the Estate of John Dale Walston, et al vs. Aramis, Inc., Brenntag Specialties LLC, et al. | 2020-76187-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Walters | Helen | Israel, Evelyn, as Administrator and Administrator Ad Presoquendumfor the Estate of Helen Waters, Pltf v. Clinique, et al. | MID-L-004313-19 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Waters | Ramona | Forrest Waters, Ind. and as the Pesonal Rep. of the estate of Ramona Gina Waters (deceased), Gregory Waters and Preston Waters vs. Arkema, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-06630-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Frank J. Wathen |
| Weber | Rhanda | Mark Weber, as Personal Representative of the Estate of Rhanda Weber, Deceased v. Publix Super Markets, Inc., et al | 23-016220 CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca S. Vinocur; Matthew LaSorsa |
| Webster | Barry | Webster, Barry, Pltf. v. Brenntag North America and Brenntag Specialties, Inc., et al. | MID-L-001410-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | James Andrew Plastiras |
| Weeks | Cheryl | Cheryl R. Weeks and Gregory W. Weeks v. Rayer Healthcare, LLC, et al. | CACE-23-004434 | Florida | Broward | Maune Raichle Hartley French & Mudd, LLC | Dawn Besserman |

35

JA1139

659770001-4866996S>1

| P L Nm | P F Nm | C C | C Nm | S | C | P C | P A Nm |
|---|---|---|---|---|---|---|---|
| Welch | Gail | Mary Fletcher and Laura Miner, individually and as Co-Executors of the Estate of Gail Welch, deceased vs Brenntag North America, Inc., and Brenntag Specialties, Inc., et al. | MID-L-003376-17 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Welch | Linda | Welch, Linda Pltf. v. American International Industries, Inc., et al. | MID-L-000304-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Welch | Kathleen | Edward L Welch Jr & Estate of Kathleen M Welch v Avon Products, Inc., et al. | 23-013392 | Pennsylvania | Allegheny | Dean Omar Branham Shirley, LLP | Cori J Kapusta |
| Weldon | Lois | Weldon, Bruce, Individually and as Administrator ad Prosequendum for the Estate of Lois Weldon, Deceased, Pltf. v. Brenntag Specialties, Inc., et al. | MID-L-001874-22 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Wentz | Sharon | Steven Wentz and Scott Wentz individually and co executors for estate of Sharon L Wentz and Samuel R Wentz Jr v Avon Products, Inc., et al. | MID-L-002540-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Joshua Kristal |
| Westover | Barbara | Westover, Barbara and Darl Westover v American International Industries, et al. | MID-L-003011-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Westropp | Victoria | Victoria Westropp vs Avon Products, Inc., et al. | 1902282023 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Wewers | Tammie | Tammy L. Wewers and Travis L Wewers v Barretts Minerals Inc., et al | MID-L-002895-23 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| White | Carol | White, Carol and James White, Pltfs. v. Johnson & Johnson, et al. | MID-L-005771-21 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Whiteley | Charma | SHERRI PINSON, Individually and as Personal Representative for the Estate of CHARMA WHITELEY, Deceased, and CHARLES E. WHITELEY, Individually v. AUTOZONE, INC. et al | 21CV34994 | Oregon | Multnomah | Maune Raichle Hartley French & Mudd, LLC | Meredith Good |
| Whiting | Kaye | Kaye Whiting and Larry Whiting v Avon Products, Inc., et al. | MID-L-000153-24 | New Jersey | Middlesex (NJ) | Simmons Hanly Conroy LLP | James Kramer |
| Wilks | Jason Lee | Cynthia Wilks, individually and as Personal Representative of estate of Jason Lee Wilks v Bayer Consumer Care Holdings, LLC, et al. | MID-L-006750-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Williams | Henricus | Henricus Willems v Arkema Inc., et al. | MID-L-005697-22 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Williams | Teras | Teras Williams vs. H.E.B., LP, Brenntag Specialties LLC and Brenntag North America, et al | 2023-50984-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Greyson R. Ackerman |
| Williams | Shirley | Williams, Shirley and George Williams, Pltfs. v. Avon Products, Inc., et al. | MID-L-003872-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Williams | Ralph | Linda D. Williams, as Proposed Administrator of the Estate of Ralph Williams, and Nellie Williams, Individually v. Cnoopco, Inc., et al. | 604951/2024 | New York | Suffolk | Weitz & Luxenberg P.C. | Jeffrey S. Kanca |
| Williams | Jay | Jay C. Williams and Linda Williams v. Block Drug Co., Inc. et al. | EFCA202400098 | New York | Broome | Weitz & Luxenberg P.C. | Sara J. Merrill |
| Williamson | Stephen | Stephen Williamson v 3M Company, et al. | MID-L-004277-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Wilmer | Kristi | Kristi Wilmer and Brian Wilmer v. Avon Products, Inc., et al. | 1901140/2024 | New York | New York | Weitz & Luxenberg P.C. | Andrew Gayoso |
| Wilson | Sandra | Sandra Wilson and Virgil Wilson v Brenntag North America, Inc., et al. | MID-L-005552-23 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew Adam Grubman |

36

659770001-48669965v1

| P L N m | P F N m | C C | C N m | S | C | P C | P C A N m |
|---|---|---|---|---|---|---|---|
| Windram | Jennifer | Windram, Jennifer, Pltf. v. Johnson & Johnson, et al. | MID-L-003103-21 | New Jersey | Middlesex (NJ) | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Wintersteen | Bonita | Wintersteen, Bonita and Robert Wintersteen, Pltfs. v. Allicor Inc., fka Amway, et al. | 190034/2022 | New York | New York | Simmons Hanly Conroy LLP | James Kramer |
| Wisener | Naomi | Naomi Wisener vs. Amway Corp, Brenntag Specialties LLC and Brenntag North America, et al | 2021-70594-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Wisniewski | Sonia | Wisniewski, Sonia, Pltf. v. Barrett Minerals, et al. | MID-L-002224-21 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Erin M. Boyle |
| Wong | Carmen | Carmen Wong and Marcial Wong v. Avon Products, Inc., et al | 2024-7889-CA-01 | Florida | Miami-Dade | The Ferraro Law Firm, P.A. | Marc Kunen |
| Wood | Susan | Susan Wood & Donald Wood v Ace Poperty & Casualty Ins Co., et al. | 2211000310 | Pennsylvania | Philadelphia | Maune Raichle Hartley French & Mudd, LLC | Jenna Egner |
| Yerkes | Shelly E. | SHELLY E. YERKES AND THOMAS F. YERKES, vs. AVON PRODUCTS, INC. et al. | 23CV032102 | California | Alameda | Kazan McClain Satterley & Greenwood | Michael Reid |
| Ylitalo | Carol | Ylitalo, Carol and James Ylitalo, Pltfs. v. Almay, Inc., et al. | MID-L-006664-20 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Yoder | Daryl | Yoder, Daryl and Linda, Pltfs., v Almay, inc., et al. | MID-L-000018-21 | New Jersey | Middlesex (NJ) | Simon Greenstone Panatier, PC | Leah Kagan |
| Younger | Paul | Paul Younger and Margaret Younger v Goulds Pumps (NY), Inc., et al. | 190190/2022 | New York | New York | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Yurchick | Chesley | Serneity Yurchick, Ind. and as Rep. of the Estate of Chesley Yurchick, Jr. (Deceased), and a/n/f of A. Y., a minor vs. Avon Products, Inc., Brenntag Specialties LLC and Brenntag North America, et al | 2022-14971-ASB | Texas | Harris | Simon Greenstone Panatier, PC | Holly C. Peterson |
| Zachary | Julanda | Zachary, Jolanda, Pltf. v. Avon Products, Inc., et al. | 190095/2022 | New York | New York | Weitz & Luxenberg P.C. | Patti Lynn Burshtyn |
| Zane | David | David Zane and Rachel Zane v. L'Oreal Travel Retail Americas, Inc., et al | 23-013057 CA27 | Florida | Broward | Simon Greenstone Panatier, PC | Rebecca Vinocur |
| Zenar | Rose | Zenar, Rose, Plf. v. Amerilure Inc., et al. | MID-L-000784-22 | New Jersey | Middlesex (NJ) | Levy Konigsberg LLP | Amber R. Long |
| Ziegler | Lorraine | Lorraine D Ziegler & Jeffrey Ziegleri v Brenntag North America, et al. | 190187/2022 | New York | New York | Maune Raichle Hartley French & Mudd, LLC | Suzanne M. Ratcliffe |
| Zimmer | Dieter | Heidi Anne Rerecich, Individually and as Executrix of the Estate of Dieter Zimmer, Deceased v. Block Drug Company, Inc., et al. | MID-L-001470-24 | New Jersey | Middlesex (NJ) | Weitz & Luxenberg P.C. | Matthew A. Grubman |
| Zois | George | Zois, Mary, individually and Mary Zois, as Executrix of the Estate of George Zois, Deceased, Pltf. v. Barretts Minerals, Inc., et al | 603057/2022 | New York | Suffolk | Simon Greenstone Panatier, PC | Brendan J. Tully |
| Zuniga | Fama | Fama Zuniga and Dennis Osorio v. Avon Products, Inc., et al. | 24-03-00655 | Pennsylvania | Philadelphia | Merowitz & Wasserberg, LLP | Neidra Wilson |

659771D001-4866996S-1

| Fill in this information to identify the case: |
|---|

United States Bankruptcy Court for the:

**District of New Jersey**
(State)

Case number *(if known):* _____  Chapter __11__

☐ Check if this is an
amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form.  On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. | **Debtor's Name** | **Whittaker, Clark & Daniels, Inc.** |
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | **N/A** |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 1  3  -  5  4  8  4  7  6  0 |

4. **Debtor's address**

**Principal place of business**

**100 First Stamford Place**
Number        Street

**Stamford**                    **CT**        **06902**
City                        State        Zip Code

**Fairfield County**
County

**Mailing address, if different from principal place of business**

Number        Street

P.O. Box

City                        State        Zip Code

**Location of principal assets, if different from principal place of business**

Number        Street

City                        State        Zip Code

5. **Debtor's website** (URL)  _____

6. **Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

**JA1142**

| Debtor | **Whittaker, Clark & Daniels, Inc.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7.  Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C.  NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

**2123 (Nonmetallic Mineral Mining and Quarrying)**

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub- box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11.  *Check all that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, and it chooses to proceed under Subchapter V of Chapter 11. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.

| District | _____ | When | MM/DD/YYYY | Case number | _____ |
| District | _____ | When | MM/DD/YYYY | Case number | _____ |

---

Official Form 201           Voluntary Petition for Non-Individuals Filing for Bankruptcy           page 2

| Debtor | **Whittaker, Clark & Daniels, Inc.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

---

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No
☒ Yes.

| Debtor | **See Rider 1** | Relationship | **Affiliate** |
|---|---|---|---|
| District | **District of New Jersey** | When | **04/26/2023** |
| Case number, if known | _____ | | MM / DD / YYYY |

---

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

| _____ | |
|---|---|
| Number | Street |
| _____ | |
| City | State | Zip Code |

**Is the property insured?**

☐ No
☐ Yes. 

| Insurance agency | _____ |
|---|---|
| Contact name | _____ |
| Phone | _____ |

---

| **Statistical and administrative information** |
|---|

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors (on a consolidated basis)**

| | | | | | |
|---|---|---|---|---|---|
| ☐ | 1-49 | ☒ | 1,000-5,000 | ☐ | 25,001-50,000 |
| ☐ | 50-99 | ☐ | 5,001-10,000 | ☐ | 50,000-100,000 |
| ☐ | 100-199 | ☐ | 10,001-25,000 | ☐ | More than 100,000 |
| ☐ | 200-999 | | | | |

---

**JA1144**

| Debtor | **Whittaker, Clark & Daniels, Inc.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

| | | | | | |
|---|---|---|---|---|---|
| **15. Estimated assets (on a consolidated basis)** | ☐ $0–$50,000 | ☐ $1,000,001–$10 million | ☐ $500,000,001–$1 billion | | |
| | ☐ $50,001–$100,000 | ☐ $10,000,001–$50 million | ☐ $1,000,000,001–$10 billion | | |
| | ☐ $100,001–$500,000 | ☐ $50,000,001–$100 million | ☐ $10,000,000,001–$50 billion | | |
| | ☐ $500,001–$1 million | ☒ $100,000,001–$500 million | ☐ More than $50 billion | | |

| | | | | | |
|---|---|---|---|---|---|
| **16. Estimated liabilities (on a consolidated basis)** | ☐ $0–$50,000 | ☐ $1,000,001–$10 million | ☐ $500,000,001–$1 billion | | |
| | ☐ $50,001–$100,000 | ☐ $10,000,001–$50 million | ☒ $1,000,000,001–$10 billion | | |
| | ☐ $100,001–$500,000 | ☐ $50,000,001–$100 million | ☐ $10,000,000,001–$50 billion | | |
| | ☐ $500,001–$1 million | ☐ $100,000,001–$500 million | ☐ More than $50 billion | | |

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    __04/26//2023__
               MM/ DD / YYYY

✗   __/s/ Mohsin Meghji__                          __Mohsin Meghji__
    Signature of authorized representative of debtor    Printed name

Title   __Chief Restructuring Officer__

**18. Signature of attorney**

✗   __/s/ Michael D. Sirota__          Date   __04/26//2023__
    Signature of attorney for debtor          MM/DD/YYYY

__Michael D. Sirota__
Printed name

__Cole Schotz P.C.__
Firm name

__Court Plaza North, 25 Main Street__
Number          Street

__Hackensack__                    __New Jersey__        __07601__
City                             District of New Jersey

__(201) 489-3000__                __msirota@coleschotz.com__
Contact phone                    Email address

__014321986__                    __New Jersey__
Bar number                       State

**JA1145**

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
</table>

United States Bankruptcy Court for the:

**District of New Jersey**

(State)

Case number *(if known):* _____ Chapter ___11___

☐ Check if this is an
amended filing

**Rider 1**
**Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor**

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the District of New Jersey for relief under chapter 11 of title 11 of the United States Code. The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Whittaker, Clark & Daniels, Inc.

• Whittaker, Clark & Daniels, Inc.
• Brilliant National Services, Inc.
• L. A. Terminals, Inc.
• Soco West, Inc.

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WHITTAKER, CLARK & DANIELS, INC. | ) Case No. 23-_____(___) |
| | ) |
| Debtor. | ) |
| | ) |

## LIST OF EQUITY SECURITY HOLDERS[1]

| Equity Holder | Address of Equity Holder | Type of Interest | Percentage of Equity Held |
|---|---|---|---|
| Soco West, Inc. | 100 First Stamford Place, Stamford, CT 06902 | Common | 100% |

---

[1] This list serves as the disclosure required to be made by the debtor pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure. All equity positions listed indicate the record holder of such equity as of the date of commencement of the chapter 11 case.

**JA1147**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WHITTAKER, CLARK & DANIELS, INC. | ) | Case No. 23-_____(___) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

| Shareholder | Approximate Percentage of Shares Held |
|---|---|
| Soco West, Inc. | 100% |

**JA1148**

| Fill in this information to identify the case: |
|---|
| United States Bankruptcy Court for the: |
| District of New Jersey |
| (State) |
| Case number *(if known):* _____  Chapter  11 |

☐ Check if this is an
amended filing

## Chapter 11 Cases: List of Law Firms Representing the Tort Plaintiffs    12/15

Whittaker, Clark & Daniels, Inc., Brilliant National Services, Inc., Soco West, Inc., and L. A. Terminals, Inc. (the "Debtors") each filed a petition in this Court on the date hereof for relief under chapter 11 of title 11 of the United States Code. The following is a consolidated list of parties that represent or have represented the known parties that have alleged claims against the Debtors related to tort claims (the "Top Counsel List"). Substantially contemporaneously with this petition, the Debtors have filed a motion seeking authority to file this Top Counsel List in lieu of a list of the 20 largest unsecured creditors.[1] This list does not include any person or entity who is an "insider" under section 101(31) of title 11 of the United States Code. The Top Counsel List was prepared for with information existing as of the date hereof. The Debtors reserve the right to amend the Top Counsel List based on additional information it may identify. The information contained in the Top Counsel List shall not constitute an admission by, nor shall it be binding on, the Debtors.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, profession | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | **Simon Greenstone Panatier, PC** 1201 Elm St. Dallas, TX 75270 | David C. Greenstone (214) 276-7680 dgreenstone@sgpblaw.com | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |
| 2 | **Weitz & Luxenberg, P.C.** 700 Broadway New York, NY 10003 | Perry Weitz pweitz@weitzlux.com (856) 755-1115 Danny Kraft dkraftjr@weitzlux.com (212) 558-5500 | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |
| 3 | **SWMW Law, LLC** 701 Market St., Unit 1000 St. Louis, MO 63101 | Benjamin Schmickle ben@swmklaw.com (314) 862-2882 | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |
| 4 | **Maune Raichle Hartley French & Mudd, LLC** 1015 Locust St., Ste. 1200 St. Louis, MO, 63101 | T. Barton French (314) 244-1397 bfrench@mrhfmlaw.com Neil Maune nmaune@mrhfmlaw.com | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |

---

[1]   This list is in substantially the same form as Official Bankruptcy Form 204 for chapter 11 cases setting forth the list of creditors other than insiders, who have the 20 largest unsecured claims against a debtor.

Debtor Name: Whittaker, Clark & Daniels, Inc.　　　　　　Case Number (if known):_____

| 5 | **Napoli Shkolnik PLLC**<br>360 Lexington Ave., 11th floor<br>New York, NY 10017 | James Heisman<br>JHeisman@napliLaw.com<br>(844) 230-7676<br><br>Christopher LoPalo<br>clopalo@napolibern.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
|---|---|---|---|---|---|---|---|
| 6 | **Levy Konigsberg LLP**<br>800 3rd Ave., 33rd floor<br>New York, NY 10158 | Moshe Maimon<br>mmaimon@levylaw.com<br>(609) 720-0400 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 7 | **Dean Omar Branham Shirley, LLP**<br>302 N. Market St.<br>Dallas, TX 75202 | Jessica Dean<br>jdean@dobslegal.com<br>(214) 722-5990 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 8 | **Simmons Hanly Conroy LLC**<br>1 Court St.<br>Alton, Illinois 62002 | Laurence v. Nassif<br>lnassif@simmonsfirm.com<br>(212) 257-8482 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 9 | **Early, Lucarelli, Sweeney &<br>Meisenkothen, LLC**<br>360 Lexington Ave., 20th Floor<br>New York, NY 10017 | James F. Early<br>(203) 777-7799<br>jfe@elslaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 10 | **Cohen, Placitella & Roth, P.C.**<br>2001 Market St., Ste. 2900<br>Philadelphia, PA 19103 | Christopher Placitella<br>cplacitella@cprlaw.com<br>(888) 219-3599 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 11 | **The Gori Law Firm**<br>156 N. Main St.<br>Edwardsville, IL 62025 | Sara Salger<br>sara@gorilaw.com<br>(618) 247-4247<br><br>D. Todd Matthews<br>todd@gorijulianlaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 12 | **The Lanier Law Firm**<br>10940 W. Sam Houston Pkwy<br>Houston, TX 77064 | Mark Lanier<br>WML@LanierLawFirm.com<br>(212) 421-2800<br><br>Michael A. Akselrud<br>Michael.Akselrud@LanierLawFirm.com<br>(310) 277-5100 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 13 | **Meirowitz & Wasserberg, LLP**<br>1040 6th Ave., Ste. 12B<br>New York, NY 10018 | Daniel Wasserberg<br>dw@mwinjurylaw.com<br>(212) 897-1988 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 14 | **Waters Kraus & Paul**<br>3141 Hood St., Ste. 200<br>Dallas, Texas 75219 | Sam Iola<br>siola@waterskraus.com<br>(214) 357-6244 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 15 | **Belluck & Fox, LLP**<br>546 5th Ave., 5th Floor<br>New York, NY 10036 | Joseph W. Belluck<br>jbelluck@belluckfox.com<br>(212) 681-1575 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 16 | **Karst & Von Oiste LLP**<br>505 Main St.<br>Port Jefferson, NY 11777 | Erik Karst<br>epk@karstvonoiste.com<br>(281) 970-9988 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 17 | **Phillips & Paolicelli, LLP**<br>747 3rd Ave., 6th floor<br>New York, NY 10017 | Daniel J. Woodard<br>dwoodard@p2law.com<br>(212) 388-5100 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 18 | **Kazan, McClain, Satterley &<br>Greenwood, A Professional Law<br>Corporation**<br>55 Harrison St., Ste. 400<br>Oakland, CA 94607 | David McClain<br>Joseph Satterley<br>(510) 302-1000<br>jsatterley@kazanlaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |

**JA1150**

Debtor Name: Whittaker, Clark & Daniels, Inc.　　　　　　　　　　Case Number (if known):_____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 19 | **Nachawati Law Group (f/k/a Fears Nachawati)** 5489 Blair Rd. Dallas, TX 75231 | Majed Nachawati mn@ntrial.com (214) 890-0711 | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |
| 20 | **Kelley Ferraro, LLC** 950 Main Ave., Ste. 1300 Cleveland, OH 44113 | John Martin Murphy (216)-238-8657 jmurphy@kelley-ferraro.com | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |

**JA1151**

## CONSENT TO CORPORATE ACTION
## BY THE BOARDS OF DIRECTORS OF EACH
## OF THE COMPANIES SET FORTH ON EXHIBIT A ATTACHED HERETO

The undersigned, being all of the members of the Boards of Directors (each, a "Board" and collectively, the "Boards") of Brilliant National Services Inc., a Delaware corporation, and certain of its direct and indirect subsidiaries identified on **Exhibit A** (each, a "Company," and collectively, the "Companies"), having considered the filing of voluntary petitions for relief under the provisions of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**" and such petitions, "**Bankruptcy Petitions**") and exploring strategic and/or financial alternatives in light of the Companies' current circumstances, including possibilities of undertaking a restructuring, reorganization, or other transaction and related financing (each of the foregoing and any combination of the foregoing, a "**Restructuring Transaction**");

**WHEREAS,** the Boards have reviewed and considered the following:

1.  the presentations by the Companies' management and the legal and financial advisors of the Companies regarding the liabilities and liquidity of the Companies and the strategic alternatives available to them;

2.  the information and advice previously provided to and reviewed by the Boards; and

3.  the related matters reported on at meetings of the Boards on and before the date hereof;

**WHEREAS,** the Boards have had the opportunity to consult with the Companies' management and the legal and financial advisors of the Companies and to fully consider each of the strategic alternatives available to the Companies; and

**WHEREAS,** the Boards have determined, in their business judgment, that it is desirable and in the best interests of the Companies and their respective stakeholders for the Companies to file, or cause the filing of, voluntary petitions under chapter 11 of the Bankruptcy Code and that such action will benefit the Companies and their respective stakeholders.

***Authorizing the Filing of Bankruptcy Petitions***

**NOW, THEREFORE, IT IS RESOLVED,** that the Companies are authorized to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code and seek necessary relief;

**FURTHER RESOLVED,** that, in the judgment of the Boards, it is desirable and in

the best interests of the Companies, their interest holders, their creditors, and other parties in interest, that the Companies file, or cause to be filed, Bankruptcy Petitions under the provisions of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey or such other court of competent jurisdiction (the "**Court**").  In accordance with the requirements of the Companies' governing documents and applicable law, the Boards hereby consent to, authorize, and approve the filing of the Bankruptcy Petitions; and

FURTHER RESOLVED, that any director, officer, or other duly appointed officer of the Companies (each an "**Authorized Person**" and collectively, the "**Authorized Persons**") is hereby authorized and appointed to act as signatory and attorney on behalf of the Companies in respect of any Restructuring Transaction, and/or any person to whom such Authorized Persons and/or officers delegate certain responsibilities is hereby authorized to execute (under the common seal of the Companies, if appropriate) and file on behalf of the Companies all petitions, schedules, lists, and other motions, papers, or documents, and to take any and all actions they deem necessary or proper to obtain such relief.

### *Retention of Professionals*

FURTHER RESOLVED, that each of the Authorized Persons is hereby authorized, empowered, and directed to, on behalf of the Companies, employ: (i) the law firm of Kirkland & Ellis LLP as general bankruptcy counsel; (ii) the law firm of Cole Schotz P.C. as co-bankruptcy counsel; (iii) M3 Partners LLC as financial advisor; (iv) Stretto, Inc. as claims and noticing agent; and (v) any other legal counsel, accountant, financial advisor, restructuring advisor, estimation professional, or other professional the Authorized Persons deem necessary, appropriate, or advisable to retain; each to represent and assist the Companies in carrying out their duties and responsibilities and exercising their rights under the Bankruptcy Code and any applicable law (including, but not limited to, the law firms filing any pleadings or responses); and in connection therewith, the Authorized Persons are hereby authorized, empowered, and directed, in accordance with the terms and conditions hereof, to execute (under the common seal of the Companies, if appropriate) appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain such services; and

FURTHER RESOLVED, that each of the Authorized Persons is hereby authorized, empowered, and directed to execute (under the common seal of the Companies, if appropriate) and file all petitions, schedules, motions, lists, applications, pleadings, and other papers, and to perform such further actions and execute (under the common seal of the Companies, if appropriate) such further documentation that the Authorized Persons in their absolute discretion deem necessary, appropriate, or desirable in accordance with these resolutions.

*General*

**FURTHER RESOLVED,** that in addition to the specific authorizations heretofore conferred upon the Authorized Persons, the Authorized Persons, either individually or as otherwise required by the Companies' governing documents and applicable law, are hereby authorized to execute (under the common seal of the Companies, if appropriate), acknowledge, deliver, and file any and all agreements, certificates, instruments, powers of attorney, letters, forms, transfers, deeds, and other documents on behalf of the Companies relating to the Restructuring Transactions;

**FURTHER RESOLVED,** that each of the Authorized Persons (and their designees and delegates) is hereby authorized and empowered, in the name of and on behalf of the Companies, to take or cause to be taken any and all such other and further action, and to execute (under the common seal of the Companies, if appropriate), acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents, and to pay all expenses, including but not limited to filing fees, in each case as in such Authorized Person's or Authorized Persons' absolute discretion, as shall be necessary, appropriate, or desirable in order to fully carry out the intent and accomplish the purposes of the resolution adopted herein;

**FURTHER RESOLVED,** that the Boards have received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the governing documents of the Companies, or hereby waive any right to have received such notice;

**FURTHER RESOLVED,** that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Companies, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved, confirmed, and ratified as the true acts and deeds of the Companies with the same force and effect as if each such act, transaction, agreement, or certificate had been specifically authorized in advance by resolution of the Boards; and

**FURTHER RESOLVED,** that any Authorized Person is hereby authorized to perform all other acts, deeds, and other actions as the Companies themselves may perform, in accordance with their governing documents and applicable law, howsoever arising in connection with the matters above, or in furtherance of the intentions expressed in the foregoing resolutions, including, but not limited to, the negotiation, finalization, execution (under common seal, whether or not expressed to be a deed, as may be necessary or appropriate), and delivery of any other agreements, certificates, instruments, powers of attorney, letters, forms, transfers, deeds, and other documents whatsoever as the individual acting may in their absolute and unfettered discretion approve or deem or

determine necessary, appropriate, or advisable, such approval, deeming, or determination to be conclusively evidenced by said individual taking such action or the execution thereof.

* * * *

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the undersigned, being all the directors of the Companies, have executed this unanimous consent to be effective as of the date first written above. This unanimous consent may be signed by facsimile or other electronic means, with any such signature being of the same force and effect as an original signature, and in multiple counterparts, all of which will constitute one document.

DATED: April 25, 2023

_____
Raj R. Mehta

_____
Paul Aronzon

_____
Tim Pohl

**IN WITNESS WHEREOF**, the undersigned, being all the directors of the Companies, have executed this unanimous consent to be effective as of the date first written above. This unanimous consent may be signed by facsimile or other electronic means, with any such signature being of the same force and effect as an original signature, and in multiple counterparts, all of which will constitute one document.

DATED: April 25, 2023

_____          _____
Raj R. Mehta                              Paul Aronzon

_____
Tim Pohl

DocuSign Envelope ID: 924BRG1F-4AA7-4E87-A97E-975RBC7AEBD0

**IN WITNESS WHEREOF**, the undersigned, being all the directors of the Companies, have executed this unanimous consent to be effective as of the date first written above. This unanimous consent may be signed by facsimile or other electronic means, with any such signature being of the same force and effect as an original signature, and in multiple counterparts, all of which will constitute one document.

DATED: April 25, 2023

_____

Raj R. Mehta

_____

Paul Aronzon

_____

Tim Pohl

**Exhibit A**
**Subsidiaries**

| Name | Jurisdiction |
|---|---|
| Soco West, Inc. | Delaware |
| L.A. Terminals, Inc. | California |
| Whittaker, Clark & Daniels, Inc. | New Jersey |

Case 3:24-cv-05709-MAS-JBC   Document 14-26   Filed 08/21/24   Page 19 of 19 PageID:
Case 3:24-cv-05709-EKNQ   Document 152   Filed 04/26/23   Entered 08/21/24 16:53:23   Page 1573 of 1429   Main
Document   Page 19 of 19

Fill in this information to identify the case and this filing:

| | |
|---|---|
| Debtor Name | **Whittaker, Clark & Daniels, Inc.** |
| United States Bankruptcy Court for the: | **District of New Jersey** |
| | (State) |
| Case number (If known): | |

# Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐ *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐ *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐ *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐ *Schedule H: Codebtors (Official Form 206H)*

☐ *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐ Amended Schedule

☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒ Other document that requires a declaration **List of Equity Security Holders, Corporate Ownership Statement, and Certification of Creditor Matrix**

I declare under penalty of perjury that the foregoing is true and correct.

| Executed on | **4/26/2023** | ☒ **/s/  Mohsin Meghji** |
|---|---|---|
| | MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | | Mohsin Meghji |
| | | Printed name |
| | | **Chief Restructuring Officer** |
| | | Position or relationship to debtor |

Official Form 202            Declaration Under Penalty of Perjury for Non-Individual Debtors

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Joint Administration Requested) |

**DECLARATION OF MOHSIN Y. MEGHJI, CHIEF**
**RESTRUCTURING OFFICER OF WHITTAKER, CLARK & DANIELS, INC.,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mohsin Meghji, hereby declare under penalty of perjury:

**Introduction**

1.      Before 2004, Whittaker, Clark & Daniels, Inc. ("WCD"), Brilliant National

Services, Inc. ("Brilliant"), L. A. Terminals, Inc. ("LAT"), and Soco West, Inc. ("Soco")

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

(collectively, the "Debtors") or their predecessors in interest operated as processors, manufacturers, and distributors of industrial chemicals. The Debtors ceased all operations in 2004, but continued their corporate existence to manage alleged asbestos and environmental liabilities related to the historical processing and distribution of cosmetic and industrial compounds.

2.    At its zenith in the 1970s and 1980s, WCD operated one of the largest talc and industrial compound supply and distribution businesses in the United States. Substantially all of the Debtors' operational assets were sold to various entities under the umbrella of Brenntag North America ("Brenntag N.A.") in 2004, and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets. The consideration the Debtors received in exchange for these transfers remained on the Debtors' books for purposes of administering and satisfying any outstanding alleged asbestos or environmental liabilities (the "Liabilities").

3.    In December 2007, National Indemnity Company ("NICO") agreed to purchase— and assigned to an affiliated entity, Ringwalt & Liesche Co. ("Ringwalt")—the equity in the Debtors.[2] Since 2007, the Debtors' Liabilities have increased materially as a result of the evolution of the tort litigation landscape. Indeed, since the 2007 acquisition, the talc-asbestos theory of liability has risen to prominence and major talc suppliers have availed themselves of chapter 11 protection, leaving the Debtors as a main litigation target.

4.    Each Debtor has been in existence for at least 40 years and incurred the alleged Liabilities at issue in these cases through their operations before the sale of substantially all of their

---

[2]   NICO and Ringwalt are affiliates of Berkshire Hathaway, Inc. ("BHI"). None of Ringwalt, the Debtors' other indirect parent entities, NICO, or any other BHI affiliate were involved with the Debtors at the time the Debtors were conducting any of the historical business operations that gave rise to the Tort Claims (as defined herein). As a result, there are no allegations that any of these non-Debtor entities ever manufactured, distributed, or possessed any of the products that are the basis of the Asbestos Lawsuits.

operating assets in 2004. The Debtors are not the result of divisive merger nor any recent strategic corporate reorganization. Instead, they are the same corporate entities whose historical operations precipitated these chapter 11 cases. The Debtors have commenced these chapter 11 cases to address and fairly resolve their Liabilities in an effective, efficient, and centralized forum under title 11 of the United States Code (the "Bankruptcy Code").

5.  More specifically, the Debtors commence these chapter 11 cases to address:

- existing and future tort claims alleging various injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest (the "Asbestos Claims," and such claimants, the "Asbestos Claimants"); and

- certain environmental remediation costs and obligations of the Debtors or their predecessors in interest relating to production or handling of hazardous materials which subsequently contaminated certain properties (the "Environmental Claims," and such claimants, the "Environmental Claimants," and together with the Asbestos Claims and Asbestos Claimants, the "Tort Claims" and "Tort Claimants," respectively) in an equitable and efficient manner.

6.  Beginning in the late-2000s, the Debtors have been litigated claims stemming from talc-, asbestos-, and other chemical compound-related liabilities. In recent years, such claims have engulfed the Debtors in litigation. There are over 1,000 pending cases naming the Debtors as defendants or co-defendants that allege exposure to asbestos or talc (collectively, the "Asbestos Lawsuits"). The Asbestos Lawsuits are in addition to potentially tens of millions in costs related to Environmental Claims. The Debtors have been managing an active docket of cases across the United States for close to 40 years—a task that has recently become increasingly cumbersome to manage absent a centralized forum to achieve global resolution for the benefit of all Tort Claimants.

Case 3:24-cv-05710-BRM Document 14-27 Filed 08/20/25 Page 142 of 229 PageID: 9146
Case 3:24-cv-05710-BRM Document 14-27 Filed 08/21/25 Page 147 of 229 PageID: 9146
Document 1529  Page 4 of 23

7.      Dispositions of historical Asbestos Claims have varied significantly, from outright dismissal to judgments in excess of $76 million.[3]  Continued prosecution of the Asbestos Lawsuits will burden the Debtors with substantial defense and litigation costs, depleting resources and delaying or limiting recoveries to any legitimate claimants for years to come.  The Debtors are currently incurring up to $1,000,000 in defense costs monthly in connection with the Asbestos Lawsuits.  The Debtors anticipate that litigation of Asbestos Claims could consume an enormous amount of the Debtors' remaining resources with unpredictable and potentially unfairly preferential outcomes for the Asbestos Claimants.  The commencement of these chapter 11 cases is necessary and appropriate for these reasons.

8.      On March 10, 2023, following a recent jury verdict returned against WCD in excess of $29 million, a state court in South Carolina appointed a receiver over WCD.  But WCD possesses no assets in South Carolina.[4]  On April 18, 2023, in a bench ruling the state court denied WCD's motion to reconsider.  And on April 19—despite the absence of any written order—the receiver demanded privileged documents from attorneys representing WCD and filed a complaint in the South Carolina state court.  WCD disputes the validity and enforceability of the receivership order.

9.      In light of these recent developments, and the fact that the Debtors are currently defendants in lawsuits across more than 30 different jurisdictions, the benefits of chapter 11 and the Court as a centralized federal forum cannot be overstated.  In fact, counsel to the plaintiff in

---

[3]   *See, e.g.*, *Calif. Jury Awards Talc Plaintiff $76 Million; Case Settles Before Punitives Phase*, HarrisMartin (Dec. 16, 2021), https://www.harrismartin.com/publications/1/asbestos/articles/28555/calif-jury-awards-talc-plaintiff-76-million-case-settles-before-punitives-phase/#:~:text=OAKLAND%2C%20Calif.,plaintiff's%20risk%20of%20developing%20cancer.

[4]   *See* Order on Plaintiffs' Motion to Appoint a Receiver, *Plant v. Avon Prods., Inc.*, No. 2022-CP-40-01265 (S.C. March 10, 2023).

the South Carolina action gave a statement to Reuters after the verdict: "I just hope we can figure out a better way than having juries resolve (cases) every time."[5] The Debtors agree. The Debtors will seek to work with claimants' counsel by and through any tort claimants committee and future claims representative appointed in these chapter 11 cases and engage in rapid good faith negotiations. The Debtors' assets are truly a melting ice cube from which all claimants—both current and future—must recover fairly and equitably. There is simply no other Court that would have the jurisdictional power to administer the assets of the Debtors' estates and provide a global, equitable, and efficient resolution for all Tort Claimants.

10.     The Debtors intend to use the breathing spell and other tools afforded by chapter 11 of the Bankruptcy Code to establish a claims trust or trusts, as applicable, consistent with the requirements of sections 524(g) and 105(a) of the Bankruptcy Code, and ultimately seek approval of a settlement as part of a chapter 11 plan. The Debtors seek to most efficiently administer their remaining assets to maximize recoveries for claimants. Resolving the Debtors' Liabilities in a comprehensive manner through a claims trust or trusts will be the most efficient and equitable use of resources, expenses, and time and will inure to the benefit of all stakeholders—including both present and future Tort Claimants.

## Background

11.     I am the Chief Restructuring Officer of the Debtors and a Managing Partner of M3 Partners, LP ("M3 Partners"), the Debtors' proposed restructuring advisor.

12.     I submit this declaration to assist the Court and parties in interest in understanding the circumstances that resulted in the commencement of these chapter 11 cases, and in support of

---

[5]     Brendan Pierson, *Talc Supplier Hit With $29 mln Verdict in South Carolina Trial*, Reuters (Mar. 6, 2023), https://www.reuters.com/legal/talc-supplier-hit-with-29-mln-verdict-south-carolina-trial-2023-03-06.

the Debtors' petitions for relief under chapter 11 of the Bankruptcy Code filed on the date hereof (the "Petition Date") and related motions and pleadings seeking "first day" relief (collectively, the "First Day Motions").

13.    As Chief Restructuring Officer, I am generally familiar with the Debtors' historical businesses, financial condition, policies and procedures, claims management operations, and books and records.  The statements in this declaration are based upon my personal knowledge, information obtained from my colleagues at M3 Partners under my ultimate supervision or from the Debtors' other advisors, or my review of relevant documents and information concerning the Debtors' financial affairs.  The Debtors have authorized me to submit this declaration (this "Declaration") on their behalf.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

14.    Contemporaneously herewith, the Debtors are filing the First Day Motions to ensure a smooth transition into chapter 11.  I am familiar with the contents of each First Day Motion and believe that the relief sought therein (a) is necessary to enable the Debtors to manage the Tort Claims fairly and efficiently in these chapter 11 cases, (b) constitutes a critical element in achieving successful confirmation of a chapter 11 plan, and (c) best serves the Debtors' estates and the interests of the Debtors' stakeholders.  The facts set forth in each First Day Motion are incorporated herein by reference.  I submit this Declaration to assist the Court and parties in interest in understanding the background for these chapter 11 cases, and in support of the Debtors' chapter 11 petitions and First Day Motions.

15.    To familiarize the Court with the Debtors and the circumstances leading to these chapter 11 cases, I organized this Declaration as follows:

- **Part I** provides an overview of the Debtors' corporate history and structure;

- **Part II** describes the circumstances leading to the commencement of these chapter 11 cases and the Debtors' objectives for these chapter 11 cases; and

- **Part III** summarizes the relief requested in and the evidentiary support for the First Day Motions.

## I.  Overview of the Debtors' History and Governance.

16.    The Debtors and their predecessors in interest were formed as early as 1918 and continued their operations through the mid-2000s.  Debtors WCD, Soco, and LAT are direct or indirect subsidiaries of Brilliant.[6]  From the time of their formation until substantially all of the Debtors' operational assets were sold, the Debtors' businesses consisted of storage, and distribution of minerals and pigments, including talc, industrial chemicals, and solvents, as applicable.

17.    WCD was formed and began its operations as a supplier and distributor of minerals and pigments in New York in 1918.  In 1972, WCD reincorporated in New Jersey.  Brilliant (then named Brenntag Inc.), purchased the stock of WCD in 1988.  The operational assets of WCD were divested in 2004, as discussed further below, and the Debtors' current business activities largely relate to the management of alleged Tort Claims asserted against WCD.

18.    Soco's pre-2004 operations began as early as 1933, with the formation and incorporation of A.J. Lynch Co. ("A.J. Lynch"), which sold and distributed chemicals and raw materials to the paint industry.  Over multiple decades and through a series of strategic mergers and acquisitions and corporate name changes, Soco's historical operations expanded to include those of:

- Western Chemical & Manufacturing Co. ("Western Chemical"), which manufactured and distributed industrial chemicals and was incorporated in California in 1944;

---

[6]    An illustrative organizational chart is attached hereto as **Exhibit B**.

- Dyce Chemical Inc. ("Dyce Chemical"), which repackaged and distributed industrial chemicals and was incorporated as Dyce Sales & Engineering Service Co. in Montana in 1957;

- Crown Chemical Corp. ("Crown Chemical"), which sold and distributed industrial chemicals and was incorporated as Petrosolve Corp. Ltd. in California in 1969; and

- Holchem Inc. ("Holchem"), which distributed chemicals and handled and recycled solvents and was incorporated in California in 1981.

By 2001, after the culmination of various mergers, acquisitions, and name changes, A.J. Lynch, Western Chemical, Dyce Chemical, Crown Chemical, and Holchem became Brenntag West, Inc. ("Brenntag West"), an indirect subsidiary of Stinnes Corporation ("Stinnes").

19.    LAT was formed and began its operations importing and storing industrial chemicals in 1981.  Specifically, LAT operated a chemical storage and distribution terminal and bulk plant located within the Los Angeles Harbor.  LAT ceased its storage and distribution operations in 1994 and has largely resolved its Liabilities through ordinary course claims management.  By 2001, through a series of stock purchases, LAT became a direct subsidiary of Stinnes.

20.    Brilliant was formed and began its operations in 1977 as Stinnes Oil & Chemical Company, Inc. ("Stinnes Oil & Chemical").  Stinnes Oil & Chemical was a subsidiary of Stinnes, and by 1982, Stinnes Oil & Chemical withdrew from the oil business and concentrated its business on the marketing, distributing, and trading of chemicals.  Stinnes Oil & Chemical changed its name twice:  first to Soco Chemical Inc. in 1986, and then to Brenntag Inc., a direct subsidiary of Stinnes, in 1998.[7]

---

[7]    In 1995, Brenntag Inc. purchased the stock of Eastech Chemical Inc. ("Eastech"), which sold and distributed specialty chemicals.  Eastech was dissolved in 2008, the last lawsuit associated with Eastech was dismissed in 2012, and there are currently no known liabilities associated with Eastech.

21.     As of 2004, the Debtors were owned by Stinnes, an affiliate of Deutsche Bahn AG. In 2004, substantially all of WCD, Soco, and Brilliant's operating assets were sold to entities under the umbrella of Brenntag N.A., and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets (collectively, the "2004 Transactions"). LAT was not involved in the 2004 Transactions, as it had previously ceased all operations.

22.     More specifically, in 2004, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "2004 Soco APA"), Soco (then named Brenntag West, Inc.) divested substantially all of its assets in exchange for approximately $44 million and the assumption of certain ongoing liabilities by the purchaser, Brenntag Pacific, Inc. Pursuant to the 2004 Soco APA, Soco retained all liability for the Tort Claims and retained certain assets, including asbestos- and environmental-related insurance receivables and certain real estate. Following these transactions, on March 8, 2005, Soco changed its name from Brenntag West, Inc. to Soco West, Inc.

23.     Simultaneously, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "2004 WCD APA"), WCD divested substantially all of its assets in exchange for approximately $15.9 million and the assumption of certain ongoing liabilities by the purchaser, Mineral & Pigment Solutions Inc. Pursuant to the 2004 WCD APA, WCD retained all liabilities as to the Tort Claims and retained certain assets, including asbestos- and environmental-related insurance receivables and certain real property.

24.     Together with the execution of the 2004 Soco APA and the 2004 WCD APA, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "Brilliant APA," and together with the 2004 WCD APA and the 2004 Soco APA, the "2004 Transaction Documents"), Brilliant (then named Brenntag Inc.) engaged in an asset sale transaction with

Brenntag N.A.  In connection and concurrently with this transaction, Brilliant terminated certain management fee agreements, resigned from certain LLC agreements, and divested its intellectual property assets in exchange for assumption of certain non-asbestos-related and non-environmental ongoing liabilities by Brenntag N.A., in addition to certain other consideration and that consideration provided under the 2004 WCD APA and 2004 Soco APA.  Contemporaneously with the execution of the 2004 Brilliant APA, Brilliant changed its name from Brenntag Inc. to Brilliant National Services, Inc.

25.    The consideration the Debtors received under the 2004 Transaction Documents remained on the Debtors' books to satisfy the anticipated Liabilities.

26.    In 2007, NICO entered into an agreement to purchase the Debtors from Stinnes pursuant to that certain stock purchase agreement dated November 7, 2007 (the "2007 SPA"). Pursuant to the 2007 SPA, Stinnes agreed to certain post-closing purchase price adjustments payable to NICO up to $45 million, based on the amounts (a) paid and (b) "incurred but not reported" with respect to the asbestos and environmental liabilities retained by the Debtors (such provisions, the "Purchase Price Adjustment Provisions").[8]  Pursuant to an assignment agreement dated December 12, 2007, NICO assigned its right to receive the Debtors' equity interests to Ringwalt, which remains the direct parent of Brilliant (and the indirect parent of the other Debtors) today.

27.    Since 2008, certain administrative and shared services have been performed by NICO and National Liability & Fire Insurance Company ("NLF"), pursuant to those certain intercompany service agreements dated July 21, 2008, and May 9, 2008, respectively (collectively,

---

[8]    On March 1, 2023, pursuant to and in compliance with the Purchase Price Adjustment Provisions, NICO submitted a reimbursement request to Stinnes in the amount of $45 million.

the "Shared Services Agreements"). Pursuant to the Shared Services Agreements, NICO and NLF make available or otherwise provide, among other facilities and services reasonably necessary to the conduct of the Debtors' claims management operations, certain data processing equipment, business property, and claims services to the Debtors. The Debtors retain independent control and management of their businesses, and there is no commingling of funds among NICO, NLF, on one hand, and the Debtors on the other hand, under the Shared Services Agreements or otherwise.

28.     For nearly 20 years, the Debtors have had no chemical processing or distribution operations (outside of business operations related to management of the Liabilities), no employees, no funded third-party debt, and minimal assets aside from cash and certain insurance receivables. Since the 2007 SPA, the Debtors have not issued dividends or distributions to Ringwalt or any of its other indirect parent entities. The Debtors have carefully managed and invested their assets and have achieved significant realized and unrealized investment gains on their asset portfolio since 2007. These gains have allowed the Debtors to pay out significantly more in settlements and judgments on the Liabilities than the assets on their balance sheets at the time of the 2007 SPA.

29.     The only changes to the Debtors' corporate structure since the 2007 SPA occurred in 2008, when: (a) LAT, which was originally a direct subsidiary of Ringwalt and a corporate sibling to Brilliant, became a direct subsidiary of Brilliant; and (b) WCD, which was originally a direct subsidiary of Brilliant and a corporate sibling to Soco, became a direct subsidiary of Soco. In short, these chapter 11 cases, and the Debtors' Liabilities are not the result of a "two-step." The Debtors' status as entities with finite assets and no operations beyond those associated with the management of the Liabilities is the result of natural corporate evolution and a series of arm's-length transactions over the past 20 years.

## II.    Circumstances Leading to These Chapter 11 Cases and the Debtors' Objectives.

### A.    Historical Asbestos Litigation Arising from the Debtors' Talc and Chemical Compound Businesses.

30.    Plaintiffs first began alleging in 1979 that the Debtors' chemical processing and distribution operations were causally related to their asbestos-related injuries.  The Debtors have been sued by approximately 2,700 individual Asbestos Claimants, under numerous theories of tort liability, generally alleging exposure to asbestos- and talc- containing compounds and products arising from the Debtors' historical processing and distribution of cosmetic and industrial talc.  The Debtors have been subject to a deluge of cases and have seen increasingly large verdicts in the last 24 months.

31.    Each of these lawsuits have presented unique facts, circumstances, and allegations.  While these lawsuits have contained common allegations of asbestos or talc exposure and related injuries, they have involved plaintiffs who assert claims in different venues across the United States based on exposure to different products, sold by different companies, at different times.  Because of these litigation burdens, hurdles, and expenses, the Debtors have historically sought alternative ways to resolve asbestos and other litigation related to their historic chemical processing and distribution operations short of taking cases to trial, irrespective of the underlying merits of the claims.  As of the Petition Date, the Debtors have managed to settle approximately 1,696 Asbestos Claims.  During the five-year period ending December 31, 2022, approximately 1,700 asbestos- or talc- related lawsuits were asserted against the Debtors.  Since 2008, the Debtors have remitted approximately $213 million in payments related to Asbestos Claims.

32.    For the Debtors to defend against each of these cases, it must assess hundreds of different health profiles and medical situations.  Each case requires fact and expert analysis and discovery regarding events that occurred decades ago.  Moreover, approximately 100–200 new

Asbestos Claims are filed against the Debtors each year. Litigating each case is extremely costly and time-consuming. Moreover, the value of the Debtors' assets, including their applicable insurance policies, is expected to be dwarfed by the Debtors' outstanding Liabilities.

   **B.     Historical Environmental Litigation Arising from the Debtors' Talc and Chemical Compound Businesses.**

33.     Federal and state governmental entities and plaintiffs have pursued actions or brought claims against the Debtors alleging that the Debtors produced and handled hazardous materials that subsequently contaminated approximately 32 properties across at least 14 states. These properties historically housed the Debtors' or their predecessors' historical chemical processing and distribution operations, including legacy solvent recovery, reclamation, and recycling; chemical storage, treatment, and distribution; and waste transfer activities.

34.     The Debtors have actively engaged with both federal and state governmental entities with respect to responding to, investigating, monitoring, and remediating the alleged contamination on these properties. Of the approximately 32 properties, ten are in the remediation process, three are undergoing ongoing investigation, six are subject to continued monitoring, maintenance, or other operations, seven have been resolved, and six are engaged in other processes, including continued correspondence with U.S. Environmental Protection Agency. Two properties—one located in Longview, Texas, and another in Pacoima, California—previously operated by the Debtors' predecessors, are in the process of preparing for closure with expected site closures in 2023 and early 2024, respectively. As of December 31, 2022, the Debtors' accounting records reflect approximately $54.5 million of remediation, monitoring, investigation, and other environmental liabilities, on a GAAP basis, brought by federal and state government entities related to these properties. Since 2008, in the aggregate, the Debtors have remitted approximately $123 million in payments related to Environmental Claims.

## C.     Decision to Commence These Chapter 11 Cases.

35.     The Debtors' decision to commence these chapter 11 cases is a result of a lack of any alternative mechanism to efficiently and equitably address their alleged Liabilities.  The continuing influx of Asbestos Claims and recent judgments have made clear that it is nearly impossible for the Debtors to obtain finality with respect to the Asbestos Claims and Environmental Claims, absent these chapter 11 cases.

36.     Further, certain recent developments arising from the growing number of claimants pursuing talc manufacturers in the United States, including the significant increase in settlement demands with respect to cosmetic talc claims in the wake of recent verdicts such as those rendered against Johnson & Johnson, have threatened to swiftly exhaust the Debtors' remaining assets, leaving the universe of potential future claimants without any remaining assets from which to collect.[9]  The Debtors have become a main target for claimants asserting asbestos- and talc- based claims

37.     For example, a jury in South Carolina recently returned a verdict against WCD exceeding $29 million (the "Plant Verdict," and such action, the "Plant Action").[10]  Following the Plant Verdict, the plaintiffs filed a motion to appoint a receiver with the Richland County Court of Common Pleas on March 6, 2023 (such court, the "South Carolina State Court," and such motion, the "Plaintiffs' Receiver Motion").  The same day WCD received notice of the Plaintiffs' Receiver Motion, WCD informed the South Carolina State Court that it intended to file an opposition and

---

[9]     *See, e.g.*, Tim Povtak, *U.S. Supreme Court Rejects J&J Appeal of $2 Billion Talc Verdict*, Asbestos.com (June 2, 2021), https://www.asbestos.com/news/2021/06/02/johnson-johnson-supreme-court-talc/.

[10]    *See* Order on Plaintiffs' Motion to Appoint a Receiver, *Plant v. Avon Prods., Inc.*, No. 2022-CP-40-01265 (S.C. March 10, 2023) (the "Receivership Order").

requested a hearing.  Before WCD had an opportunity to respond and without holding a hearing, the South Carolina State Court entered the Receivership Order on March 10, 2023.

38.     The South Carolina State Court ordered the appointment of a receiver over WCD (the "Receiver"), notwithstanding that WCD has no assets in South Carolina.  In so doing, the South Carolina Court stated that the assets available to WCD have been precipitously reduced, WCD is currently set for numerous trials, and WCD is, "at bare minimum, in imminent danger of insolvency."[11]

39.     The Receivership Order provided that WCD could file a motion to reconsider, which WCD filed on March 16, 2023 (the "Reconsideration Motion").  A hearing for WCD's motion was set for April 18, 2023.  In its Reconsideration Motion, WCD disputes many of the assertions made by the plaintiff in the Plant Action and adopted by the South Carolina State Court in its Receivership Order, as well as the authority of the South Carolina State Court to appoint a South Carolina state receiver over a corporation that is incorporated in New Jersey and has no assets located in South Carolina.  In addition to the $29 million verdict, the litigation and defense costs associated with the Plant Action are significant.  This is just one action of the hundreds currently pending against the Debtors.

40.     Litigation costs continue to drain the Debtors of resources that could be more efficiently allocated to a trust designed to process claims in a single forum and get money into the hands of legitimate claimants on a far more expedited basis than can be accomplished through sequential, expensive trials.  All without the attendant risk of disparate judgments among Asbestos Claimants across the country.  Indeed, section 524(g) of the Bankruptcy Code provides such an

---

[11]     *See* Receivership Order, at 2.

effective, efficient, and equitable mechanism for the Debtors to address their Liabilities in a single forum.

### D. Corporate Governance Changes.

41. In connection with evaluating potential strategic alternatives to address the Liabilities, the Debtors appointed Paul Aronzon and Tim Pohl (together, the "<u>Disinterested Directors</u>") to their boards of directors (the "<u>Boards</u>"). Messrs. Aronzon and Pohl are experienced independent board members with no prior affiliations with the Debtors or their non-Debtor affiliates. The Disinterested Directors have been delegated broad decision-making authority with respect to matters that may constitute a conflict between the Debtors and their non-Debtor affiliates. The Debtors also engaged advisors—including Kirkland & Ellis LLP and Cole Schotz P.C. as legal counsel, M3 Partners as restructuring advisor, and appointed me as Chief Restructuring Officer—to advise the Boards with respect to the Tort Claims, including through a potential chapter 11 process.

### E. Objectives of the Debtors' Chapter 11 Cases.

42. The evolving litigation landscape (informed by the recent blockbuster verdicts), the defense and administrative costs associated with nationwide simultaneous litigation, and the South Carolina State Court's Receivership Order has placed the Debtors' assets at immediate risk of full and final depletion. This risk unfairly favors some plaintiffs at the expense of others—by either luck of the draw or their presence in a specific venue. There is no funding agreement nor any debtor-in-possession financing in these chapter 11 cases. The Debtors have limited cash-flow stemming from insurance proceeds in connection with its liability management operations, and the Debtors' resources are finite.

43.     The Debtors' goal in these chapter 11 cases is to negotiate and ultimately confirm a plan that would, among other things, establish and fund claims trusts to resolve current and future Liabilities pursuant to sections 524(g) and 105(a) of the Bankruptcy Code.  The Debtors believe they have sufficient assets (a) to fund claims trusts that will be governed by procedures that efficiently and fairly review claims and compensate current and future claimants, and (b) to otherwise satisfy the requirements necessary to qualify for section 524(g) and section 105(a) relief.

44.     The Debtors hope to reach a consensual resolution of these chapter 11 cases with representatives for current and future claimants as soon as their representatives are in position and willing to begin discussions.  The Debtors are prepared to promptly engage in good-faith negotiations with any tort claimants committee and future claimants' representative appointed in these cases.  The Debtors also plan to file a motion in the near term to schedule an estimation trial to determine the Debtors' Liabilities, utilizing key tools of the Bankruptcy Code in the event the parties are unable to reach a settlement.

## III.     Evidentiary Support for the First Day Motions.

45.     Contemporaneously with the filing of this Declaration, the Debtors have filed the First Day Motions, seeking relief intended to facilitate to minimize the adverse effects of the commencement and ensure the efficient administration of these chapter 11 cases.

46.     Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to preserve value for the Debtors' estates and their stakeholders.  I have reviewed each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11 and ultimately consummate a chapter 11 plan.  A list of the First Day Motions is set forth on **Exhibit A** attached hereto and is incorporated herein by reference.

## IV.    Conclusion.

47.    I am cautiously optimistic about the Debtors' ability to achieve a consensual resolution to address the Debtors' outstanding and future Liabilities efficiently and equitably.

48.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  April 27, 2023                        _/s/ Mohsin Meghji_
                                         Mohsin Meghji
                                         Chief Restructuring Officer
                                         Brilliant National Services, Inc.

[*Remainder of page intentionally left blank.*]

## Exhibit A

**First Day Motion Support**

## Evidentiary Support for First Day Motions

1.      Contemporaneously with the filing of this Declaration, the Debtors have filed the First Day Motions, seeking orders granting various forms of relief intended to facilitate to minimize the adverse effects of the commencement of these chapter 11 cases and ensure the efficient administration of these chapter 11 cases.  The First Day Motions include the following:

- **Joint Administration Motion.**  *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief*;

- **Notice and Claims Agent Motion.**  *Debtors' Application for Appointment of Stretto as Claims and Noticing Agent*;

- **Schedules/SOFAs Extension Motion.**  *Debtors' Motion for Entry of an Order (I) Extending Time to File Certain Schedules and Statements of Financial Affairs, and (II) Granting Related Relief*;

- **Case Management Motion.**  *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief*;

- **Creditor Matrix Motion.**  *Debtors' Motion For Entry of an Order (A) Authorizing the Debtors to (I) File a List of the Top Law Firms and Use the Addresses of Counsel in Lieu of Claimants' Addresses and (II) Redact Personally Identifiable Information, (B) Approving Certain Notice Procedures, and (C) Granting Related Relief*; and

- **Cash Management Motion.**  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to (A) Operate Their Cash Management System, (B) Use Their Bank Accounts, and (C) Perform Intercompany Transactions; (II) Authorizing the Debtors' Bank to Charge Certain Fees; and (III) Granting Related Relief*.

2.      These First Day Motions seek authority to, among other things, ensure the continuation of the Debtors' cash management system, which I believe is essential to fund the Debtors' expenses in these chapter 11 cases.  I believe that the relief requested in the First Day Motions is also necessary to allow the Debtors to achieve an immediate and orderly transition into chapter 11, successfully and efficiently negotiate a consensual plan, and successfully complete these chapter 11 cases.

3. I am familiar with the content and substance contained in each First Day Motion. The factual statements contained in each First Day Motion are true and correct to the best of my knowledge, information, and belief, and each such factual statement is incorporated herein by reference. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to efficiently navigate these chapter 11 cases, constitutes a critical element in successfully resolving the Debtors' Liabilities, and best serves the Debtors' estates.

## Exhibit B

### Organizational Chart



**JA1183**

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Martha R. Hildebrandt, Esq.
Jeffrey M. Sponder, Esq.
Lauren Bielskie, Esq.
One Newark Center, Suite 2100
Newark, NJ  07102
Telephone: (973) 645-3014
Fax: (973) 645-5993
Email: Jeffrey.M.Sponder@usdoj.gov
Email: Lauren.Bielskie@usdoj.gov

<div align="center">

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

</div>

|  | : |  |
|---|---|---|
| In Re: | : | Chapter 11 |
|  | : |  |
| Whittaker, Clark & Daniels, Inc., et al., | : | Case No. 23-13575 (MBK) |
|  | : |  |
| Debtors. | : | The Honorable Michael B. Kaplan, Chief Judge |

**NOTICE OF APPOINTMENT OF OFFICIAL COMMITTEE OF TALC CLAIMANTS**

Pursuant to Section 1102(a)(1) of the Bankruptcy Code, the United States Trustee hereby appoints effective May 23, 2023, the below listed creditors to the Official Committee of Talc Claimants in the above captioned case.

**Kathy Ripley Didawick, on behalf of Ann Ripley**
*Counsel:*
Leah C. Kagan, Esq.
Simon, Greenstone, Panatier, PC
1201 Elm Street, Suite 3400
Dallas, TX 75270
Tel: (214) 276-7680
Email: lkagan@sgptrial.com

**Blue Cross Blue Shield Association**
*Counsel:*
Alan D. Halperin, Esq.
Halperin Battaglia Benzija, LLP
40 Wall Street, 37 Floor
New York, NY 10005
Tel: (212) 765-9100
Email: ahalperin@halperinlaw.net

**Katia Figueroa**
*Counsel:*
Lisa Nathanson Busch, Esq.
Perry Weitz, Esq.
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Tel: (212) 558-5500
Email: lbusch@weitzlux.com

**Virginia Harrington**
*Counsel:*
Audrey Perlman Raphael, Esq.
Levy Konigsberg, LLP
605 Third Ave, 33rd Floor
New York, NY 10158
Tel: (917) 445-2755
Email: araphael@levylaw.com

Page 2
**Whittaker, Clark & Daniels, Inc., et al**
**Appointment of Official Committee of Talc Claimants**

**Juliet Gray**
*Counsel:*
Marcus Raichle, Esq.
MRHFM Law
1015 Locust St., suite 1200
St. Louis, MO 63101
Tel: (314) 241-2003
Email: mraichle@mrhfmlaw.com

**Sarah Plant**
*Counsel:*
Brad Smith, Esq.
Dean Omar Branham Shirley, LLP
302 N. Market St., Suite 300
Dallas, TX 75202
Tel: (214) 722-5990
Email: bsmith@dobslegal.com

**Shelly Yerkes**
*Counsel:*
Joseph Satterley, Esq.
Kazan McClain, Satterley & Greenwood
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000
Email: Jsatterley@kazanlaw.com

**Sandra Jankowski, individually and on behalf of Leo Jankowski**
*Counsel:*
Lauren Williams, Esq.
SWMW Law, LLC
701 Market Street, Ste 1000
St. Louis, MO 63101
Tel: (314) 480-5180
Email: lauren@swmwlaw.com

**Tara Valentine, on behalf of Patricia Krempecki**
*Counsel:*
Christopher Placitella, Esq.
Cohen, Placitella & Roth, P.C.
127 Maple Ave.
Red Bank, NJ 07701
Tel: (732) 747-9003
Email: cplacitella@cprlaw.com

ANDREW R. VARA
UNITED STATES TRUSTEE
Regions 3 & 9

By: */s/ Martha R. Hildebrandt*
    Martha R. Hildebrandt
    Assistant United States Trustee

    Jeffrey M. Sponder
    Trial Attorney

    Lauren Bielskie
    Trial Attorney

Date: May 24, 2023

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

<br>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# DEBTORS' MOTION FOR
## ENTRY OF AN ORDER (I) APPROVING THE SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND THE CONTRIBUTING PARTIES, (II) AUTHORIZING THE DEBTORS TO PERFORM ALL OF THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are: Whittaker, Clark & Daniels, Inc. ("WCD") (4760); Brilliant National Services, Inc. ("Brilliant") (2113); L. A. Terminals, Inc. ("LAT") (6800); and Soco West, Inc. ("Soco West") (3400). The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (the "Motion"):[2]

### Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit B** (the "Order"), (a) authorizing (i) entry into that certain settlement agreement attached

as Exhibit 1 to the Order (the "Settlement Agreement")[3] between and among the Debtors,

Brenntag,[4] NICO,[5] and DB US[6] (Brenntag, NICO, and DB US, collectively, the "Contributing

Parties"), and (ii) the Debtors (together with the Contributing Parties, the "Parties") to perform all

of their obligations thereunder; and (b) granting related relief.

---

[2]    The Debtors have filed or soon will file (a) the *Declaration of Tim Pohl in Support of the Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Pohl Declaration"); (b) the *Declaration of David L. McKnight in Support of the Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "McKnight Declaration"); and (c) the *Declaration of Brian J. Griffith in Support of the Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Griffith Declaration"). A detailed description of the facts and circumstances supporting the Settlement Agreement is set forth in greater detail in the Pohl Declaration, McKnight Declaration, and the Griffith Declaration, which are also incorporated by reference herein. The Debtors have also filed or will soon file the *Declaration of Gavin C.P. Campbell in Support of Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Campbell Declaration"), which attaches a number of exhibits concerning the historical facts described in this Motion. All references to "Ex." refer to exhibits to the Campbell Declaration.

[3]    A summary of the terms contained in the Settlement Agreement is attached to this Motion as **Exhibit A**.

[4]    "Brenntag" means, collectively, Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc. ("MPSI")) ("Brenntag Specialties"), and Coastal Chemical Co., LLC.

[5]    "NICO" means, collectively, Berkshire Hathaway Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company ("National Indemnity"), Resolute Management, Inc., Ringwalt & Liesche Co. ("Ringwalt"), and National Liability & Fire Insurance Company.

[6]    "DB US" means DB US Holding Corporation.

**Preliminary Statement**

2.      For more than a year, the Debtors have worked hard to reach a consensual, efficient, and value-maximizing outcome in these cases.  The Debtors have now successfully negotiated a $535 million contribution to their estates to resolve their estate causes of action against Brenntag, DB US, and NICO.  While the Debtors remain hopeful that they can achieve a fully consensual resolution to these cases, the Settlement Agreement will benefit all of the Debtors' stakeholders regardless of whether a global deal is ultimately reached.  The Settlement Agreement is a significant achievement, provides a material recovery that exceeds what tort claimants could have recovered against Brenntag, DB US, and NICO even if these bankruptcy proceedings had never been filed, and easily satisfies the factors courts consider in deciding whether to approve a settlement of estate claims.  It is not a close call.

3.      The challenges in these cases are well known.  The Debtors have finite assets—and limited cash flows from interest on such assets—that are rapidly depleting as these chapter 11 cases proceed without a resolution.  Indeed, besides cash and insurance assets, the Debtors' only material assets are the potential estate causes of action they hold.  Accordingly, the Debtors have sought to maximize the value of their assets by investigating and assessing these causes of action and engaging in extensive arm's-length negotiations with the Contributing Parties to achieve the value-maximizing outcome reflected in the Settlement Agreement.  This is similar to what other debtors have done with similar claims in other cases.[7]

---

[7]    *See, e.g.*, *In re Emoral, Inc.*, 740 F.3d 875, 882 (3d Cir. 2014) (affirming bankruptcy court's approval of settlement agreement of successor liability and other related claims); *see also In re Wilton Armetale, Inc.*, 968 F.3d 273, 283–84 (3d Cir. 2020) ("[T]he Bankruptcy Code makes a creditor's derivative causes of action property of the estate.  From there, the trustee decides how best to manage them for the benefit of all creditors.  One option is to prosecute those claims to judgment.  Another is to settle and extinguish them.") (internal citations omitted).

4.    As the Court has ruled, any causes of action for alter ego and successor liability against the Contributing Parties are property of the estate.[8] The Debtors view the settlement of these and any other potential estate causes of action as the most equitable, efficient, and value-maximizing means of resolving them, and one that avoids "an effective race to the courthouse."[9] Indeed, the Settlement Agreement ensures that *all* of the Debtors' stakeholders benefit from resolution of the Debtors' estate causes of action.  Importantly, the Settlement Agreement <u>does not</u> prohibit claimants from pursuing any *direct* claims they may have against the Contributing Parties, including any claims against Brenntag for liabilities arising from Brenntag's own post-February 2004 operations.

5.    The $535 million contribution that the Debtors were able to negotiate is sufficient to cover all or nearly all of the Debtors' total tort liabilities.  As the Court has observed, all estate causes of action asserting successor liability or alter ego theories attempt to hold non-Debtors liable for the Debtors' tort liabilities.[10]  As a result, the value of such causes of action can never exceed the amount of the Debtors' own liabilities.  The claims then must be discounted for the likelihood of success on the merits.  The Debtors' claims valuation expert estimates that the Debtors' asbestos and asbestos-related talc liabilities in the tort system but for these bankruptcies would be between $474 million and $571 million (in present value terms).  Thus, the settlement amount either exceeds or covers the vast majority of the Debtors' tort liabilities *before* necessary adjustments for litigation risks and uncertainties.  This remarkable outcome was only possible

---

[8]   *See* [Adv. Proc. Docket No. 268] (the "<u>MSJ Opinion</u>") at 36–37, 45; *see also* [Adv. Proc. Docket No. 292].

[9]   MSJ Opinion at 40.

[10]  *E.g., id.* at 30 ("Here, the Successor Liability Claims seek to establish a non-debtor's liability bottomed on Debtors' liability, through allegations of successor liability, alter ego, or some similar theory."); *id.* at 36 ("In sum, all Successor Liability Claims seek—in some fashion—to impute Debtors' liability to a non-debtor entity.").

because the Debtors were able to negotiate for millions of dollars in additional consideration based on what the Contributing Parties otherwise would spend to litigate absent a resolution here—value that, absent settlement, would go to *defense* lawyers and experts, and *not* to tort claimants.  Of course, the Debtors are not required to obtain such a significant recovery for the Court to approve the Settlement Agreement.  Once litigation risks and uncertainties are considered, the "lowest point" in the range of reasonable settlements is well below $300 million.  But the fact that the Debtors were able to achieve a settlement that either exceeds or covers nearly all of their tort liabilities demonstrates the inherent reasonableness of the compromise—and that "pursuit of Successor Liability Claims in good faith by the Debtors" has in fact "result[ed] in more efficient and equitable resolutions, thus, maximizing value to creditors."[11]

6.      Not surprisingly, the settlement easily satisfies the four factors courts in the Third Circuit consider in approving settlements of estate claims.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  ***First***, the probability of successfully litigating the claims resolved under the Settlement Agreement is inherently uncertain.  With respect to the Debtors' strongest claims, the Debtors believe they have no more than a 50%—and potentially materially lower— likelihood of success on their successor liability claims against Brenntag.  Even making the plaintiff-friendly assumption of continuity of operations and personnel between the relevant Debtors and the Brenntag entities that purchased their assets, the law of two of the three states most likely to apply also requires a continuity of ownership for successor liability claims to succeed, which indisputably does not exist here.  As to estate causes of action against DB US and NICO:  (a) claims against DB US based on historical dividends before it sold the Debtors in 2007 are likely either time-barred or otherwise lack merit, (b) NICO did not take dividends or otherwise

---

[11]  *Id.* at 27.

extract value from the Debtors during its ownership of the Debtors, (c) any alter ego claims against either DB US or NICO are likely curtailed because the Debtors' liabilities did not arise when they were owned by DB US or NICO, and (d) any alter ego claims against DB US and NICO would face substantial hurdles on the merits, including because the Debtors continued to generally pay their liabilities in the ordinary course until these bankruptcy proceedings.

7. **Second**, there would also be challenges to collecting any judgment on any estate causes of action against Brenntag, DB US, or NICO. Absent settlement, Brenntag likely would assert recoupment defenses against the Debtors that could materially diminish any recovery. Additionally, to obtain a significant recovery through litigation, the Debtors would need to obtain judgments against specific entities with sufficient assets to satisfy them or for which solvent entities remain part of an indemnification chain.

8. **Third**, any litigation over the Debtors' estate causes of action outside of a settlement would be complex, expensive, and time-consuming, requiring litigation over complicated factual and legal issues, often concerning events that took place over twenty years ago and for which memories have dramatically faded or for which witnesses may be unavailable.

9. **Fourth**, the paramount interest of all the Debtors' stakeholders is served by entering into the Settlement Agreement because it maximizes recoverable value for all of the Debtors' stakeholders, creates value for the Debtors' estates that would not be available in tort litigation outside of a settlement, does not release creditors' direct claims against non-Debtor parties (including based on Brenntag's post-2004 conduct), avoids any potential dilution of tort claimant recoveries by releasing any claims assertable against the estates by the Contributing Parties, and is the product of hard-fought, good-faith, arm's-length negotiations conducted and overseen by the Debtors' disinterested directors.

10.     For more than six months, the Debtors participated in the Court-ordered mediation process with the Contributing Parties, the Official Committee of Talc Claimants (the "Committee"), and the future claimants' representative (the "FCR") in good faith to try to reach a consensual, global, and workable resolution for the benefit of all the Debtors' stakeholders. That did not happen.  Nevertheless, if these cases are to have a value-maximizing, efficient, and equitable outcome for the benefit of *all* of the Debtors' stakeholders, the Settlement Agreement paves the best path forward and provides a source of substantial funding for a confirmable chapter 11 plan.  To be clear, the Debtors remain open to discussions with the Committee and the FCR and are still hopeful that a fully consensual deal can be reached.  But the Debtors must move these chapter 11 cases forward for the benefit of all their stakeholders.

11.     The Debtors require liquidity to facilitate and administer the Settlement Agreement and bring these chapter 11 cases to a conclusion in the near term.  Accordingly, the Debtors have negotiated for a portion of the settlement amount to be paid promptly to fund these chapter 11 cases in the form of a $50 million first priority secured debtor-in-possession delayed draw term loan facility (the "DIP Facility," and loans thereunder, the "DIP Loans"), as more fully explained in the motion to approve the DIP Facility filed substantially contemporaneously with this Motion (the "DIP Motion").

12.     For these and other reasons set forth in this Motion and the Pohl, McKnight, and Griffith Declarations, the Settlement Agreement falls within the range of reasonableness and should be approved as fair and equitable under the standard set forth by the Third Circuit in *Martin*.[12]

---

[12] On August 30, 2024, the Committee and the FCR filed the *Joint Motion of the Official Committee of Talc Claimants and the Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1293] (the "Standing Motion") seeking relief with respect to certain estate causes

## Jurisdiction and Venue

13.     The United States Bankruptcy Court for the District of New Jersey (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of*

*Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on

September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a

final order in connection with this Motion to the extent it is later determined that the Court, absent

consent of the parties, cannot enter final orders or judgments in connection herewith consistent

with Article III of the United States Constitution.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The bases for the relief requested herein are sections 105(a) and 363(b) of title 11

of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, and 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local

Bankruptcy Rules for the District of New Jersey (the "Local Rules").

## Background

16.     The Debtors highlight below some of their operational and corporate history

leading up to the Petition Date, as well as the indemnification relationships among the Debtors and

the Contributing Parties, to provide additional context for the claims resolved under the Settlement

Agreement and additional support for the reasonableness and fairness of the settlement.

**I.     The Debtors' Corporate History**

17.     The Debtors' corporate history collectively goes back more than 100 years.  Until

November 1998, however, the entities that now constitute the Debtors were part of two separate

of action that are property of the Debtors' estates.  Approval of the relief requested in this Motion would moot
the relief sought in the Standing Motion.  The Debtors reserve all rights to object to and all defenses regarding
the arguments raised in the Standing Motion, with which the Debtors strongly disagree.

revenue generating businesses that were *not* under the same corporate ownership: (a) the "SOCO Chemical" group and (b) WCD.

18.     Debtor Brilliant, the parent entity in these proceedings, has historically been a holding company, and was known for the majority of its pre-2004 history as first "Stinnes Oil & Chemical Company" (hence the abbreviation "SOCO") and then as SOCO Chemical.[13] During that time, Brilliant (f/k/a SOCO Chemical) served as a North American parent entity for chemical operations within the German industrial conglomerate Stinnes AG.[14] Brilliant was a direct, wholly owned subsidiary of Stinnes Corp., a US holding company.[15]

19.     Between Brilliant's founding in 1977 and 2004, Brilliant formed or acquired other operating companies. By 2004, Brilliant owned the equity of multiple separate chemical distribution businesses largely organized by region, which in turn were often the result of combining multiple different corporate entities.[16] For example, what is now Soco West was built by combining—over more than twenty years—multiple distributors with connections to California (Western Chemical & Manufacturing, A.J. Lynch, and Crown Chemical) with two entities (Dyce Chemical and Holchem) acquired from the Holland Chemical group (which was brought into the Stinnes corporate family around 2000).[17]

---

[13]     *See* Ex. 1 (original Dec. 1977 certificate of incorporation as Stinnes Oil & Chemical Company, Inc.); Ex. 2 at BNS-TCC-0978235 (1986 name change to SOCO Chemical, Inc.); *id.* at BNS-TCC-0978238 (1998 name change to Brenntag, Inc.); *id.* at BNS-TCC-0978240 (2004 name change to Brilliant National Services, Inc.).

[14]     *See* Ex. 7 at DBUS0036544 (Stinnes Corp.'s year-end financial statements for 2003 and 2002 describing Brilliant as Stinnes Corp.'s "chemical distribution subsidiary" in the United States and describing corporate chain from Stinnes Corp. to Stinnes AG).

[15]     *See id.*

[16]     *See* Ex. 29 (Dec. 2002 printout of various pages from Brilliant's website describing six "full-line distribution companies in the U.S." including Soco West, and three "specialty chemical distributors" including WCD, as well as listing various corporate acquisitions).

[17]     *See* Ex. 3 at BNS-TCC-0007542–43 (noting merger of Western Chemical); *id.* at BNS-TCC-0007556 (same for A.J. Lynch); at BNS-TCC-0007557 (same for Crown Chemical); *id.* at BNS-TCC-0007564–65 (same for

20.     During the multi-decade build-up of various chemical distribution businesses owned by Brilliant, Brilliant did *not* own WCD.  Instead, WCD was privately held for over 100 years after it first began business (and over twenty-five years after it was reorganized from a New York corporation to a New Jersey corporation),[18] operating as a distributor of minerals and pigments, including talc.  It was only in November 1998 that Brilliant acquired WCD from its then-individual stockholders and WCD became, indirectly, part of the Stinnes corporate family.[19]

**Figure 1:  Simplified 1998 Transaction Diagram**



21.     In 2002, Deutsche Bahn AG became the ultimate parent of the Stinnes group but it did not want to retain Stinnes' chemical businesses, including the U.S. operations conducted by Brilliant's subsidiaries.[20]  In a series of transactions between 2003 and 2004, Deutsche Bahn

---

Holchem); *id.* at BNS-TCC-0007567–68 (same for Dyce Chemical); *see also* Ex. 31 (letter and attachment describing ownership of various Holland Chemical entities eventually acquired by Stinnes Corp. or Brilliant, noting Holchem and Dyce Chemical were owned by HCI USA Distribution); Ex. 2 at BNS-TCC-0978242 (May 2001 certificate of merger between HCI USA Distribution and Brilliant).

[18]  *See* Ex. 5 (materials concerning 1972–73 reorganization of WCD from a New York corporation to a New Jersey corporation).

[19]  *See* Ex. 6 (Nov. 1998 share purchase agreement between Brenntag, Inc. and WCD's individual shareholders).

[20]  *See* Ex. 7 (Stinnes Corp. financial report noting that "On October 7, 2002, Deutsche Bahn AG ('DB') acquired 99.7% of the outstanding shares of Stinnes AG. . . . In 2003, DB acquired the remaining .3% of the outstanding shares of Stinnes AG."); Ex. 8 at 12 (Deutsche Bahn AG 2002 financial statements noting that "the [Stinnes] Chemicals division (Brenntag group) is an international leader in chemicals logistics . . . . Despite [its] high profitability and development potential, we plan to divest the Chemicals . . . division[] in the medium term, as [its] activities do not fit in with our core business.").

divested itself of these businesses by selling them to affiliates of Bain Capital. These transactions were effectuated with respect to Brilliant and its subsidiaries by two sets of agreements (collectively, the "2004 Transaction"): (a) a December 2003 master sale and purchase agreement (the "2003 MSPA") to which both Brilliant and its immediate parent Stinnes Corp. were parties, and (b) a series of February 2004 agreements between Brilliant or its subsidiaries on the one hand, and newly created Bain-affiliated "Brenntag" entities on the other.[21]  The result of these agreements was that Brilliant sold most of its operating subsidiaries to Brenntag North America, and Brilliant's remaining subsidiaries, including WCD and Soco West, sold their operating assets to other subsidiaries of Brenntag North America.[22]  In particular, WCD sold its assets to MPSI (n/k/a Brenntag Specialties), and Soco West sold its assets to Brenntag Pacific.[23]

22.    As a result of the February 2004 sales, Brilliant received approximately $140 million of cash from selling the equity in its other subsidiaries, WCD received approximately $16 million of cash from selling its operating assets, and Soco West received approximately $44 million of cash from selling its operating assets.[24]

---

[21]  *See* Ex. 9 (2003 MSPA); Exs. 10–12 (2004 asset purchase agreements for Brilliant, WCD, and Soco West). A further description of the 2004 Transaction is contained in the Debtors' filings in the adversary proceeding. *See, e.g.*, [Adv. Proc. Docket Nos. 1, 4].

[22]  *See* Ex. 7 at DBUS0036544 (Stinnes Corp. financial report noting that "[a]s part of the Sale, in the United States, five companies' shares were committed for sale and four companies committed to sell certain operating assets less certain assumed liabilities").

[23]  *See* Exs. 11–12 (Soco West and WCD asset purchase agreements).  Brilliant changed its name from SOCO Chemical to Brenntag, Inc. in July 1998.  Ex. 2 at BNS-TCC-0978238.  By 2004, the majority of Brilliant's subsidiaries also had "Brenntag"-prefix names (for example, Soco West was named "Brenntag West").  Ex. 3 at BNS-TCC-0007563 (Mar. 2001 name change to "Brenntag West").  WCD, however, never had a "Brenntag"-prefix name.

[24]  *See* Ex. 30 (cash flow statement showing "Funds Collected on Sale" for Brilliant, Soco West, and WCD).  WCD received an additional approximately $2.3 million because one of its subsidiaries (Crozier-Nelson Sales, Inc.) also sold its operating assets to a Brenntag entity in the 2004 Transaction, and Crozier-Nelson Sales then merged into WCD shortly after the 2004 Transaction, which is why just over $18 million is listed for WCD's sale proceeds.  *See* Ex. 13 (Crozier-Nelson Sales asset purchase agreement); Ex. 4 at BNS-TCC-0975135–38 (May 2004 certificate of merger and agreement of merger).

**Figure 2:  Simplified 2004 Transaction Diagram**



23.    Between February 2004 and December 2007, Brilliant, WCD, and Soco West

managed their liabilities under the direct ownership of Stinnes Corp. and the indirect ownership of

Deutsche Bahn.

24.    In December 2007, National Indemnity paid $1.00 to acquire the Debtors, with the

possibility of an up to $45 million purchase price adjustment payable by Stinnes Corp. (and

guaranteed by Deutsche Bahn) to National Indemnity if the Debtors actually paid (or incurred

before paying) more than specified thresholds for asbestos and environmental claims.[25]  At closing

in December 2007, National Indemnity assigned the right to acquire the Debtors' stock to

Ringwalt—a NICO affiliate under a different corporate chain—such that Ringwalt is Brilliant's

sole direct equityholder (together with National Indemnity's 2007 acquisition of the Debtors,

the "2007 Transaction").[26]

---

[25]  Ex. 14 (2007 share purchase agreement between National Indemnity and Stinnes Corp. (the "2007 SPA")).

[26]  Ex. 15 (2007 assignment agreement between National Indemnity and Ringwalt).

**Figure 3: Simplified 2007 Transaction Diagram**



25.      From 2007 through the Petition Date, Brilliant, WCD, and Soco West invested their

assets and managed their liabilities under the direct ownership of Ringwalt, and the indirect

ownership of NICO.[27]  In connection with their claims management and investment activities, the

Debtors also entered into intercompany services and tax sharing agreements with various

non-Debtor NICO affiliates.[28]

26.      The third Debtor that is a subsidiary of Brilliant is LAT.  LAT stands apart from

both WCD and Soco West because LAT (a former chemical business located at the Los Angeles

harbor) was *never* a revenue-generating entity while it was a subsidiary of Brilliant.  LAT had

already ceased operations by the mid-1990s before it was brought into the Stinnes corporate family

as part of the Holland Chemical transactions around 2000.[29]  As a result, LAT was not involved in

---

[27]  In 2008, WCD was moved underneath Soco West.  *See* Ex. 24 (Apr. 2008 reorganization agreement transferring
WCD from Brilliant to Soco West).

[28]  *See, e.g.*, Exs. 16–23 (intercompany services agreements and tax sharing agreements between NICO entities and
the Debtors).

[29]  *See* Ex. 31 (letter and attachment describing ownership of various Holland Chemical entities eventually acquired
by Stinnes Corp. or Brilliant, noting LAT was owned by HCI Americas, Inc.); Ex. 32 (Apr. 2001 certificate of
merger between Stinnes Corp. and HCI Americas, Inc.).

the 2004 Transaction. LAT was sold to Ringwalt as part of the 2007 Transaction between Stinnes

Corp. and National Indemnity and was moved underneath debtor Brilliant in 2008.[30]

### Figure 4: Simplified 2008 to Present Structure Diagram

## II. Indemnification Relationships Among the Debtors, Brenntag, DB US, and NICO[31]

27.     Under the 2003 MSPA, WCD and Soco West were responsible for indemnifying

the entities that purchased their assets and specified Brenntag-related entities and individuals from

claims seeking damages "allegedly caused by asbestos, asbestiform minerals and/or asbestos-

---

[30]  *See* Ex. 14 at BNS-TCC-0979379 (2007 SPA recitals noting LAT shares exclusively owned by Stinnes Corp. and included in "Shares" conveyed to National Indemnity); Ex. 15 (Ringwalt assignment of all "Shares" transferred under 2007 SPA); Ex. 25 (Apr. 2008 reorganization agreement transferring LAT from Ringwalt to Brilliant).

[31]  The summary descriptions of certain indemnification provisions in the 2003 MSPA and 2007 SPA are qualified in their entirety by reference to their terms, which contain additional provisions and specificity with respect to the scope of the relevant indemnification obligations and conditions and/or exclusions to such obligations. *See generally* Ex. 9 (2003 MSPA) § 10 ("Environmental Indemnity"); *id.* § 12 ("Asbestos Indemnity"); Ex. 14 (2007 SPA) art. VIII ("Indemnification").

containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by" WCD, Soco West, or their predecessors prior to the 2004 Transaction.[32]

28.     If WCD or Soco West could not fulfill their asbestos-related indemnification obligations to their Brenntag-related indemnitees, Brilliant guaranteed those obligations; if Brilliant could not fulfill its indemnification obligations, Stinnes Corp. (now DB US) guaranteed those indemnification obligations.[33]

29.     Additionally, although Brilliant itself was a holding company and had no legacy asbestos or environmental operations giving rise to liability, Brilliant and Stinnes Corp. agreed to indemnify the asset purchasers and other Brenntag-related entities and individuals from asbestos-related claims arising from the pre-transaction operations of the business entities that were sold outright to Brenntag (*i.e.*, even when unrelated to WCD or Soco West) as well as certain liabilities arising from existing environmental conditions at those sold businesses (in addition to any equivalent conditions at Soco West and WCD).[34]

30.     In connection with the 2007 Transaction, when National Indemnity and Ringwalt acquired the Debtors from Stinnes Corp., National Indemnity agreed to indemnify Stinnes Corp. and specified Stinnes-related entities and individuals for (a) asbestos-related claims seeking to hold Stinnes-related entities and individuals liable "under any theory that such party is liable for the acts or financial obligations of" WCD or Soco West and (b) any obligations owed by such

---

[32]  *See* Ex. 9 (2003 MSPA) § 12.1.1–12.1.2, 12.2.

[33]  *See id.*

[34]  *See* Ex. 9 (2003 MSPA) §§ 12.1.5, 12.3 (relating to "Non-Retained Subsidiary Asbestos Claims"); *id.* § 10 ("Environmental Indemnity").

Stinnes-related entities and individuals under the asbestos-related (and certain environmental-related) indemnification provisions of the 2003 MSPA.[35]

## III.     The Appointment of the Disinterested Directors, Their Investigation of Estate Causes of Action, and the Negotiation of the Settlement Agreement.

31.     Tim Pohl and Paul Aronzon were appointed as disinterested directors of the Debtors effective as of March 30, 2023.[36]  Other than their directorships, neither Mr. Pohl nor Mr. Aronzon have any relationships with the Debtors or any of their respective major debtholders or equityholders that would cause them to be unable to exercise independent judgment based on the best interests of the Debtors.

32.     The Debtors' disinterested directors have authority to both investigate and approve any transaction, settlement, or other action with respect to any "Conflict Matter," which is defined to include any matter pertaining to a strategic transaction or any chapter 11 proceeding in which a conflict of interest exists or is reasonably likely to exist between the Debtors, on the one hand, and any of the Debtors' equityholders, affiliates, subsidiaries, directors, managers, and officers, or other stakeholders (collectively, the "Related Parties"), on the other hand.[37]  Specifically, in connection with their appointment, the Debtors' disinterested directors were given the authority to (a) investigate and determine, in their business judgment, whether any matter constitutes a Conflict Matter, and (b) take any action with respect to the Conflict Matters, as determined in their sole judgment, including but not limited to:  (i) any release or settlement of potential claims or causes of action of the Debtors against Related Parties; (ii) any decision regarding all or part of a strategic

---

[35]   *See* Ex. 14 (2007 SPA) § 8.03.

[36]   *See* Ex. 28 (April 8, 2023 unanimous consent appointing Mr. Pohl and Mr. Aronzon as disinterested directors of the Debtors effective as of March 30, 2023).

[37]   *Id.*

transaction to the extent it constitutes a Conflict Matter; and (iii) any other transaction implicating the Debtors in which a Related Party has an interest.[38]

33.    At the direction of their disinterested directors, the Debtors investigated their potential causes of action against third parties.  The Debtors focused on potential successor liability theories against Brenntag entities, as well as any estate causes of action against DB US or NICO based on transactions and governance during their respective periods of ownership of the Debtors.

34.    During these cases, the Debtors have provided extensive discovery to all parties in interest, including the Committee, FCR, Brenntag, DB US, and NICO, and participated in good faith in a mediation with retired Judge Gerber.  This included producing more than 240,000 documents regarding the Debtors' corporate history, the litigation claims asserted against the Debtors, and other documents responsive to more than 100 formal document requests served by the Committee and FCR.  Following the breakdown in that mediation (as described by Judge Gerber in his report to the Court [Docket No. 1121]), the Debtors' disinterested directors and their advisors commenced discussions with the Contributing Parties and their advisors about the possibility of settling some or all of the estate causes of action held by the Debtors against those parties.

35.    Because NICO entities are affiliated with the Debtors, the process for negotiating and approving the Settlement Agreement on the Debtors' behalf was conducted entirely by and at the direction of the Debtors' disinterested directors and the Debtors' external advisors, without the participation of the Debtors' remaining NICO-affiliated director.  *See* Pohl Decl. ¶ 12.  As part of considering potential offers and the ultimate terms of the Settlement Agreement, the disinterested directors requested and received advice from their advisors, including from the Debtors' counsel

[38]    *Id.*

and claims estimation advisor, The Brattle Group Inc. ("Brattle").[39]  *See* Pohl Decl. ¶ 10.  The

disinterested directors have participated in multiple negotiation sessions, sometimes with advisors

and sometimes on a principals-only basis.  *Id.* ¶ 11.  The Debtors and the Contributing Parties have

exchanged multiple settlement offers and drafts of settlement documentation in the nearly two

months since they began negotiations.  *Id.* ¶ 11.

36.  The hard-fought, good faith, arm's-length negotiations between the Debtors and the

Contributing Parties have resulted in the Settlement Agreement.  The Settlement Agreement

provides for, among other things, a mutual release of claims and the Contributing Parties'

agreement to make an aggregate payment to the Debtors in the amount of $535 million.  The terms

of the Settlement Agreement were reviewed and approved by the Debtors' disinterested directors.

*See id.* ¶¶ 11–13.

## Basis for Relief

**I.  The Settlement Agreement Should be Approved Pursuant to Sections 105(a), 363(b), and Bankruptcy Rule 9019(a).**

37.  Bankruptcy Rule 9019(a) provides, in relevant part:

On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.

Fed. R. Bankr. Proc. 9019(a).  In addition, section 105(a) of the Bankruptcy Code provides that

"[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions of this title."  11 U.S.C. § 105(a).

38.  If a settlement is outside of a debtor's ordinary course of business, it requires

approval under section 363(b) of the Bankruptcy Code.  *Myers v. Martin (In re Martin)*, 91 F.3d

---

[39]  Brattle is an experienced economic consulting group that has over four decades of combined experience and has represented a variety of parties as a claims estimation expert in other mass tort chapter 11 cases.  *See* McKnight Decl. ¶¶ 4–5.

389, 394 n.2 (3d Cir. 1996) ("Section 363 of the Code is the substantive provision requiring a hearing and court approval; Bankruptcy Rule 9019 sets forth the procedure for approving an agreement to settle or compromise a controversy.").  Courts normally defer to a debtor's business judgment if there is a legitimate business justification for the use of estate property.  *See Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (holding that only a "sound business purpose" is needed to justify use of estate property pursuant to section 363(b)).

39.     "The federal courts have a well-established policy of encouraging settlement to promote judicial economy and limit the waste of judicial resources." *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 384 (S.D.N.Y. 2007). The force of this established federal policy is particularly acute in the bankruptcy context, where compromises and settlements are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Indeed, to "minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Martin*, 91 F.3d at 393 (cleaned up).

40.     Whether to approve a proposed settlement is committed to the discretion of the bankruptcy court, which must determine whether a proposed compromise is fair and equitable. *TMT Trailer*, 390 U.S at 424; *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644–45 (3d Cir. 2006).  In making this determination, the Third Circuit has stated that courts should consider:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393; *In re NovaPro Holdings, LLC*, 815 F. App'x 655, 658 (3d Cir. 2020).

41.     In determining whether to approve a proposed settlement, "[t]he Bankruptcy Court need not probe the merits of all claims or conduct a 'mini-trial' before approving the settlement; rather, avoiding litigating the issues is one of the main advantages of settlement."  *NovaPro Holdings*, 815 F. App'x at 658; *In re ID Liquidation One, LLC*, 555 F. App'x 202, 207 (3d Cir. 2014) (similar).   "Instead, the court need only canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness."  *In re Immune Pharms. Inc.*, 635 B.R. 118, 122 (Bankr. D.N.J. 2021) (cleaned up); *see also In re Annunziata*, 2018 WL 1091291, at *5 (D.N.J. Feb. 28, 2018) ("A settlement does not need to be the best possible compromise available, it only needs to be above the lowest point in the range of reasonableness.") (cleaned up).

42.     Here, the Settlement Agreement should be approved because it easily meets the *Martin* standard and is a reasonable exercise of the Debtors' business judgment.

**A.     Probability of Success in Litigation**

43.     Success on the merits of the Debtors' estate causes of action is inherently uncertain and there are significant hurdles to asserting colorable claims.   Given the significant risks in litigating the Debtors' estate causes of action to judgment, the recovery provided by the Settlement Agreement provides material benefits for the Debtors, their estates, and creditors and easily exceeds the lowest point in the range of reasonableness.  *See Immune Pharms.*, 635 B.R. at 122; *Annunziata*, 2018 WL 1091291, at *5.

**1.     Claims Against DB US and NICO**

44.     The Debtors have evaluated—and the Settlement Agreement would resolve—estate causes of action against NICO and DB US (the Debtors' existing and prior equityholders, respectively).   In evaluating those causes of action, the Debtors have focused on any (a) potential claims based on transfers of value from the Debtors to NICO or DB US during their respective

**JA1205**

ownership of the Debtors (*e.g.*, fraudulent transfer, unlawful dividend, and breach of fiduciary duty claims); and (b) potential alter ego or corporate veil-piercing claims. Because these face significant factual and legal hurdles, settling them is in the best interests of the Debtors' estates.

### (a)    Claims Based on Transfers of Value From the Debtors

45.    With respect to transfers of value to DB US, the Debtors historically paid dividends to DB US during its ownership of the Debtors, with the last dividend of $25 million paid in December 2004, after the sale of the Debtors' operating assets.[40] Any potential fraudulent transfer claims based on financial distress (*i.e.*, "constructive" fraudulent transfer claims), however, are likely completely time-barred for transactions during DB US's ownership of the Debtors (even assuming the applicability of a ten-year statute of limitations based on a potential governmental "golden creditor").[41] Other potential claims based on historical dividends or any other intercompany transactions during DB US's pre-December 2007 ownership of the Debtors, such as unlawful dividend, would likely also be entirely time-barred.[42] The most notable claims the Debtors could potentially assert without a time limitation against DB US are fraudulent transfer claims based on an "actual intent" to hinder, delay, or defraud creditors, based on the existence of any "golden creditor" tort claimant whose disease only manifested in the year leading up to the Petition Date.[43] Even assuming that theory could be used to extend the statute of limitations for

---

[40]    *See* Ex. 33 at BNS-TCC-0978255 (unanimous consent of the Brilliant board of directors approving $25 million dividend to Stinnes Corp. (n/k/a DB US) payable on December 31, 2004); *see also, e.g.*, *id.* at BNS-TCC-0978297, 310, 337 (unanimous board consents approving $10.34 million, $10.41 million, and $8.34 million dividends to Stinnes Corp. payable on January 1, 2000, January 1, 1999, and January 1, 1998, respectively).

[41]    *See In re Gilbert*, 642 B.R. 687, 704–05 & n.75 (Bankr. D.N.J. 2022) (discussing availability of and limitations on invoking IRS as a golden creditor triggering a 10-year lookback period under section 544(b)).

[42]    *See, e.g.*, 8 Del. C. § 174 (six-year limitations period for unlawful dividend claims for Delaware corporations).

[43]    *See, e.g.*, *Lippe v. Bairnco Corp.*, 225 B.R. 846, 855 (S.D.N.Y. 1998); *In re G-I Holdings, Inc.*, 313 B.R. 612, 639–40 (Bankr. D.N.J. 2004), *aff'd in relevant part*, 2006 WL 1751793, at *15–16 (D.N.J. June 21, 2006).

such claims, however, there is no indication that DB US's historical dividends were intended to hinder, delay, or defraud creditors. As a result, there are significant hurdles to any estate causes of action based on historical transfers of value to DB US. Accordingly, the Debtors believe that settling any such causes of action is a reasonable exercise of their business judgment and in the best interests of their estates.

46. With respect to transfers of value to NICO, the Debtors did not make any regular or extraordinary dividend payments to NICO during its ownership of the Debtors.[44] The only recurring transfers of value from the Debtors to NICO over the course of NICO's ownership of the Debtors were (a) payments for intercompany services provided by NICO to the Debtors and (b) payments under tax sharing agreements between Brilliant and NICO.[45] The payments for intercompany services totaled approximately $5.2 million paid to NICO entities over the more than 15 years of NICO's ownership—less than $350,000 a year.[46] In exchange for these payments, NICO provided the Debtors with the services of its officers and directors, and those of other NICO employees, who, together, provided the Debtors with their claims handling, finance, accounting, tax, and other functions.[47] With respect to tax sharing payments, while the Debtors did make certain payments to NICO entities, the Debtors also *received* substantial payments *from* NICO entities pursuant to their tax sharing agreements, resulting in net tax sharing payments *to* the Debtors of approximately $51 million over the course of NICO's prepetition ownership of the

---

[44] *See* Griffith Decl. ¶ 8.

[45] *See id.* ¶ 9.

[46] *See id.*

[47] In negotiating the Settlement, the Debtors also considered the outstanding net intercompany and tax sharing balances NICO entities owe to the Debtors of approximately $4.4 million as of July 31, 2024, and are otherwise resolving any claims under (and terminating) the intercompany agreements between the Debtors and NICO. *See id.* ¶ 10.

Debtors.[48]  As a result, there are significant hurdles to any estate causes of action based on the

intercompany payments and tax sharing payments to NICO, and the Debtors believe settling any

such causes of action is a reasonable exercise of their business judgment and in the best interests

of their estates.[49]

### (b)     Alter Ego and Veil-Piercing Claims

47.     With respect to alter ego or veil-piercing claims against both DB US and NICO, a

threshold defense that significantly reduces the likelihood of success on the merits is the timing of

when those entities owned the Debtors as compared to when the Debtors were engaged in the

underlying operations giving rise to potential liabilities.   Alter ego and veil-piercing claims

generally seek to impose the liabilities incurred by a debtor on another entity that is controlling the

debtor as an alter ego or sham front.[50]  Such theories are premised on the concept that a controlling

entity is using a debtor as an alter ego or sham front *at the time* it is transacting business and

creating the liabilities to be imposed on the controlling entity.   *See, e.g.*, *Fluorine On Call, Ltd. v.*

*Fluorogas Ltd.*, 380 F.3d 849, 861–62 (5th Cir. 2004) ("[Alter ego] theories, therefore, presume

that the corporations are unified *at the time of the wrongful act*.") (emphasis added).   As a result,

"[i]t is illogical, for example, to hold a parent liable for controlling another corporation's debts

when it had no control at the time the debts were incurred." *Id.*   Here, there is a significant

---

[48]   *See id.* ¶ 9.

[49]   In negotiating the Settlement, the Debtors also considered, among other transactions, any potential estate causes of action that might have been associated with (a) the 2008 commutation of an XL insurance policy assigned by Deutsche Bahn to National Indemnity as part of the 2007 Transaction and the commutation of the commutation proceeds plus interest to the Debtors in 2017, (b) the purchase price adjustment owed to National Indemnity under the 2007 SPA, and (c) the intercompany sales of Apple stock from the Debtors to other NICO affiliates at market prices prior to the Petition Date.

[50]   *See, e.g.*, *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 498 (N.J. App. Div. 2006) ("Veil piercing is an equitable remedy whereby . . . the parent corporation may be found liable for the actions of the subsidiary.").

disconnect between the time at which the Debtors' operations gave rise to liabilities and the timing of their ownership by DB US and NICO.

48.     Specifically, the only time at which WCD—the primary source of the talc liabilities that constitute the overwhelming majority of the Debtors' liabilities—was operating as a distributor of talc under the indirect ownership of either DB US or NICO was between November 1998 and February 2004, when WCD was indirectly owned by DB US (then known as Stinnes Corp.).  WCD never operated as a talc distributor under NICO's ownership of the Debtors.  Prior to November 1998, WCD was owned by individual shareholders, not by DB US.  And after February 2004, WCD's operating assets, including any related to talc distribution, were sold to Brenntag.  As a result, this timing mismatch is a potentially claim-dispositive hurdle to using any alter ego or veil-piercing theory to impose *any* WCD liabilities on NICO, or any WCD liabilities on DB US other than those incurred between November 1998 and February 2004.

49.     Similarly, any distribution of raw asbestos or asbestos-containing products by WCD that would result in "traditional" asbestos claims occurred far before either NICO's indirect ownership of WCD (beginning December 2007) or DB US's indirect ownership of WCD (beginning November 1998).  The only source of traditional asbestos liabilities based on *any* of the Debtors' operations during DB US's indirect ownership (and thus the only source of potential alter ego claims against DB US for such liabilities) would be if Western Chemical—which was acquired by and merged into Soco West in 1980—had distributed asbestos or asbestos-containing products after 1980, and even then, only for the portion of products (if any) sold after the acquisition.

50.     Even if any alter ego claims against NICO are not barred as a matter of law by the mismatch between its ownership of the Debtors and when they conducted operations giving rise

to alleged liabilities, such claims would still have to meet the two-pronged showing for any alter

ego or veil-piercing theory: (a) that there is significant interconnectedness, control, and a disregard

of corporate formalities between a debtor with liabilities and a specific non-debtor entity; and

(b) respecting corporate formalities would somehow effectuate a fraud or injustice (*e.g.*, where

entities are "shams" or created solely as vehicles for fraud).[51]  Additionally, any alter ego or

veil-piercing claim here would have to go up (and across) multiple steps in corporate chains—first

within the Debtors (from either Soco West to Brilliant or from WCD to Soco West to Brilliant),

and then outside the Debtors.  This gives rise to potential defenses based on whether each layer in

a corporate chain requires a separate veil-piercing analysis.[52]  Brilliant's direct parent is solely the

NICO entity Ringwalt, and National Indemnity (the original NICO signatory on the 2007 SPA and

a provider of intercompany services to the Debtors) is in a different corporate chain from—and is

not an indirect parent entity of—the Debtors.

     51.    On the merits of the two-prong test for imposing the Debtors' liabilities on NICO

under an alter ego theory, the factors that would most support alter ego or veil-piercing claims

against NICO would be: (a) the Debtors' officers and directors between December 2007 and

April 2023 were all employees of NICO; (b) NICO shared services employees provided back-

office, administrative, and investment services on behalf of the Debtors; and (c) NICO shared

services employees were involved in the litigation and settlement of tort and environmental claims

against the Debtors.  Such relationships, however, are typically held to be insufficient on their own

---

[51] *See, e.g.*, *Verdantus Advisors, LLC v. Parker Infrastructure Partners*, LLC, 2022 WL 611274, at *2 (Del. Ch. Mar. 2, 2022); *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 500 (N.J. App. Div. 2006).

[52] *Compare, e.g.*, *In re HH Liquidation, LLC*, 590 B.R. 211, 273 (Bankr. D. Del. 2018) ("[W]hen dealing with multiple layers of parents and subsidiaries, the corporate veil likely must be pierced at each level."), *with In re Moll Indus., Inc.*, 454 B.R. 574, 587 (Bankr. D. Del. 2011) ("The Court concludes that it is not necessary for the Committee to make allegations sufficient to pierce every layer of the corporate structure . . . .").

to establish alter ego liability.[53]  Moreover, against these factors showing interconnectedness, NICO could likely raise factors including that:  (a) the Debtors and NICO existed separately long before the 2007 Transaction, and the Debtors' post-2007 operations and assets were and are distinct from those of NICO; (b) the Debtors maintained separate and distinct boards of directors from NICO entities (despite some overlap) and enacted separate corporate resolutions;[54] (c) the Debtors did not intermingle funds with NICO or use bank accounts shared with NICO;[55] (d) the Debtors did not transfer funds to NICO without explanation, and only ever transferred limited amounts for intercompany services and tax sharing payments;[56] and (e) the Debtors have paid millions to tort claimants and other third parties in connection with defending and resolving claims since the 2007 Transaction.[57]  These factors likely go to both the interconnectedness and fraud or injustice prongs of the alter ego test.  In particular, NICO may argue that the intercompany services it provided to the Debtors led to the payment of far more tort and environmental claims against WCD and Soco West in the fifteen years leading up to the Petition Date than could have been accomplished using the less than $30 million in cash on their balance sheets at the time of the

---

[53]  *See, e.g.*, *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459–60 (2d Cir. 1995) (concluding that "[c]ourts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system," that domination could not be found based on evidence that a parent's "approval was required for [the subsidiary's] real estate leases" and "major capital expenditures" and was instead "conduct [that] is typical of a majority shareholder or parent corporation," and that "[p]arents and subsidiaries frequently have overlapping boards of directors while maintaining separate business operations"); *cf. In re Teleservs. Grp., Inc.*, 2009 WL 838157, at *14 (Bankr. D.N.J. Jan. 15, 2009) (citing *Fletcher* in analyzing breach of fiduciary duty claims under New Jersey law).

[54]  *Compare, e.g.*, Exs. 26–27 (Dec. 2007 consent appointing Raj Mehta, John Arendt, and Forrest Krutter as directors of Brilliant, May 2012 consent appointing Carmel O'Sullivan in place of Forrest Krutter on Brilliant board); *and* Ex. 28 (Apr. 8, 2023 consent replacing Carmel O'Sullivan and John Arendt with Paul Aronzon and Tim Pohl as directors of Brilliant), *with, e.g.*, Exs. 34–35 (lists of historical National Indemnity and Ringwalt directors and officers).

[55]  *See* Griffith Decl. ¶ 14.

[56]  *See supra* ¶ 47.

[57]  *See* Griffith Decl. ¶ 15.

2007 Transaction. As a result, there are significant hurdles to any estate causes of action seeking to impose the Debtors' liabilities on NICO under an alter ego or veil-piercing theory, and the Debtors believe settling any such causes of action is a reasonable exercise of their business judgment and in the best interests of their estates.

52. On the merits of the two-prong test for imposing the Debtors' liabilities on DB US under an alter ego theory (again putting aside the potentially dispositive timing mismatch described above), the Debtors have more limited records in their possession, custody, and control for the pre-2007 period under DB US's ownership. However, both WCD and Soco West had many different directors and officers from both their immediate parent Brilliant and indirect parent DB US.[58] Moreover, board materials make clear that WCD and Soco West had operations distinct from each other, their sibling corporations (other chemical distribution businesses), and from Brilliant and DB US (holding companies).[59] Indeed, WCD had decades of separate operations and existence prior to being acquired by DB US. And because DB US was the sole former direct parent of Brilliant, any attempt to impose liability on different or deeper-pocketed DB US-affiliated entities would require additional levels of veil-piercing. As a result, there appear to be significant hurdles to any estate causes of action seeking to impose the Debtors' liabilities on DB US under an alter ego or veil-piercing theory, and the Debtors believe settling any such causes of action is in the best interests of their estates.

---

[58] *Compare, e.g.*, Exs. 36–37 (historical Stinnes Corp. director and officer lists) *with* Exs. 38–39 (historical Brilliant director and officer lists), Exs. 40–41 (historical Soco West director and officer lists), Exs. 42–43 (1998–2002 WCD director and officer lists).

[59] *See, e.g.*, Ex. 44 (April 2000 Brilliant board minutes describing review of separate performance of different subsidiaries with and discussion with president of Brilliant); Ex. 45 (December 1999 WCD board minutes describing review of WCD's performance alone and discussion with WCD management); Ex. 46 (November 1999 Soco West board minutes describing review of Soco West's performance alone and discussion with Soco West management).

## 2. Claims Against Brenntag

53. Because Brenntag never owned the Debtors, the key estate cause of action against Brenntag entities are any claims for successor liability. Theories of successor liability are generally consistent across state lines (with the exception of the handful of states that have adopted a "product-line" theory of successor liability); however, application of these theories can vary significantly from state to state.[60] As the Debtors have previously explained in the Adversary Proceeding, they believe the most likely potential choice of law for successor liability claims against Brenntag would be Delaware, New Jersey, or New York.[61]

54. "The general rule of corporate-successor liability is that when a company sells its assets to another company, the acquiring company is not liable for the debts and liabilities of the selling company simply because it has succeeded to the ownership of the assets of the seller."[62] The four traditional exceptions to this rule are: "(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or *de facto* consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability."[63] In addition to these traditional exceptions, a minority of states (including New Jersey) have adopted a fifth "product-line" exception.[64]

---

[60] *See generally United States v. Gen. Battery Corp.*, 423 F.3d 294, 301 (3d Cir. 2005) ("Beneath a veneer of uniformity, the 'entire issue of successor liability . . . is dreadfully tangled, reflecting the difficulty of striking the right balance between the competing interests at stake.'").

[61] Choice of law issues were briefed extensively in the Debtors' motion for summary judgment and reply in support thereof. *See, e.g.*, [Adv. Proc. Docket Nos. 3, 99].

[62] *Lefever v. K.P. Hovnanian Enterprises, Inc.*, 160 N.J. 307, 310 (1999).

[63] *Id.*

[64] *See id.*

55.     The Debtors' strongest claims for successor liability against Brenntag entities would be grounded in a mere continuation or *de facto* merger theory.  An express or implied assumption theory would be unlikely to succeed on the merits because none of the Brenntag asset purchasers assumed WCD or Soco West's asbestos-related liabilities, and instead any such liabilities were expressly identified as "Excluded Liabilities."[65]  A fraud-based theory of successor liability would be unlikely to succeed on the merits because the 2004 Transaction where the Debtors sold their assets was between unrelated parties—a German industrial conglomerate and a sophisticated private equity firm—and occurred years before the present wave of talc litigation had appeared.  A product-line theory also would be unlikely to succeed.  Neither New York nor Delaware has recognized the product-line theory.[66]  New Jersey has recognized the exception.[67]  But courts applying New Jersey law have been reluctant to apply the "product-line" theory of successor liability to distributors like the Debtors and Brenntag.[68]

56.     With respect to the mere continuation or *de facto* merger theories, most courts consider four factors in determining whether a particular transaction amounts to a de facto consolidation or mere continuation:  "(i) continuity of management, personnel, physical location,

---

[65]  *See* Exs. 10–12 (2004 asset purchase agreements for Brilliant, WCD, and Soco West) at Schedule 1.2 ("Excluded Liabilities") ¶ 2 ("Any and all Liabilities relating to or arising from any Retained Subsidiary Asbestos Claims and Non-Retained Subsidiary Asbestos Claims (as defined in [the 2003 MSPA]).").

[66]  *See Semenetz v. Sherling & Walden, Inc.*, 7 N.Y.3d 194, 201 (2006) ("We [] join the majority of courts declining to adopt the 'product line' exception[.]"); *The O'Brien Corp. v. Hunt-Wesson, Inc.*, 1999 WL 126996, at *7 n.3 (Del. Ch. Feb. 25, 1999) (suggesting that product line theory is "not particularly well-thought out"); *see also Dickens v. A-1 Auto Parts & Repair Inc.*, 2020 WL 6265078, at *3 (S.D. Miss. Oct. 23, 2020) ("There is no indication that Delaware has adopted the product line exception to the general rule against successor liability.").

[67]  *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 358 (1981).

[68]  *See Falor v. G&S Billboard*, 2008 WL 539225, at *6 (D.N.J. Feb. 27, 2008) ("This Court has not located, and the parties have not identified, any case applying the product-line exception announced in *Ramirez* to a situation such as this where a third party plaintiff (or any plaintiff) argued, much less won the argument, that a defendant *distributor* was liable as a successor-in-interest to a predecessor *distributor* for strict products liability where the *manufacturer* is a viable defendant in the case at bar.").

assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the

predecessor as soon as practically and legally possible; (iii) assumption by the successor of the

liabilities ordinarily necessary for the uninterrupted continuation of the business of the

predecessor; and (iv) continuity of ownership/shareholders."[69]   There is a significant likelihood

that a court applying any relevant state law would deem the first and third factors satisfied based

on the evidence supporting (a) the continuity of assets, physical locations, management, and

business operations following the 2004 Transaction between WCD and Soco West on the one

hand, and Brenntag entities on the other, and (b) the Brenntag entities' assumption of the vast

majority of the Debtors' operational liabilities in connection with the 2004 Transaction.

The second and fourth factors, however, are far less certain.

57.   With respect to the second factor—the cessation of ordinary business and

dissolution of the predecessor—there is no dispute that the Debtors ceased all ordinary business

operations following the closing of the 2004 Transaction.  But it is equally undisputed that the

Debtors were not formally dissolved in connection with the 2004 Transaction and instead

continued their corporate existence for the purpose of administering their assets and managing

their liabilities for decades thereafter.[70]  Consequently, a court could well conclude that the Debtors

were not left a "barren continuation" or "corporate shell" given their decades-long existence in

this capacity following the 2004 Transaction.[71]

---

[69]   *Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, 678 F. Supp. 3d 611, 622 (D.N.J. 2023).

[70]   *See* Griffith Decl. ¶¶ 9–15.

[71]   *See In re New York City Asbestos Litig.*, 15 A.D.3d 254, 257 (N.Y. App. Div. 2005) (corporation was not a mere
"shell" following sale of most of its operating assets because corporation retained significant assets, including
cash, receivables, and causes of action, and retained obligations, including indemnification, insurance, and
environmental remediation obligations).

58.     The fourth factor—continuity of ownership—is likely the most critical factor for two reasons.  First, it has not been consistently applied by courts across the relevant states. And second, it weighs heavily against a finding that the 2004 Transaction amount to a *de facto* consolidation or mere continuation.  Indeed, the Debtors have not identified any evidence supporting continuity of ownership between the Debtors and Brenntag, as the 2004 Transaction constituted a cash purchase of assets by unrelated corporate entities.  New York and Delaware courts emphasize continuity of ownership in adjudicating the *de facto* merger/mere continuation theory and would likely dismiss any such claims that cannot satisfy this factor.[72]  On the other hand, a court applying New Jersey law is likely to omit the fourth factor from its analysis entirely.[73] Accordingly, whether the 2004 Transaction constitutes a *de facto* merger is highly dependent upon which state's law is applied such that the successor liability claims are subject to significant litigation risk.

59.     Based on the foregoing, the Debtors believe that the likelihood of success on the merits on their successor liability claims against Brenntag are no greater than 50%, and possibly materially lower.

### B.     Valuation of Claims

60.     In valuing any claim that seeks to hold another entity liable for the Debtors' liabilities—such as alter ego and successor liability claims—the Debtors have considered the likelihood of success on those claims as applied to the value attributable to the Debtors' liabilities.

---

[72]  *Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 401 (S.D.N.Y. 2012) ("The Second Circuit has explained that continuity of ownership is the essence of a merger, and therefore the [mere continuation/*de facto* merger] exception[s] cannot apply in its absence." (citations and internal quotations omitted)); *see also Simple Glob., Inc. v. Brathwait Watches, Inc.*, 2022 WL 100363, at *2 (Del. Super. Ct. Jan. 10, 2022).

[73]  *Pub. Serv. Elec. & Gas Co.*, 678 F. Supp. 3d at 622 ("[T]he more modern view of New Jersey law . . . no longer require[s] continuity of shareholder interest." (quoting *Woodrick v. Jack J. Burke Real Est., Inc.*, 306 N.J. Super. 61, 75, 703 A.2d 306, 313 (App. Div. 1997))).

61.     To assist the Debtors and the disinterested directors' assessment of the value of the Debtors' estate causes of action, the Debtors retained estimation experts at Brattle, who reviewed documents from the Debtors' productions (as well as documents produced by the Contributing Parties)—in particular, the Debtors' historical claims and sales data (where available)—and calculated reasonable estimates of what the Debtors' liabilities in the tort system would be but for the Debtors' bankruptcy. *Cf. In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 42 (Bankr. E.D.N.Y. 2014) (where trustee "retained a reputable valuation expert and utilized that valuation as a baseline in negotiating the Settlement," it was "neither necessary nor appropriate to engage in [valuation] litigation in the context of a Rule 9019 motion").

62.     With respect to successor liability theories against Brenntag, the Debtors have considered the value of (a) WCD cosmetic talc asbestos-related liabilities, (b) WCD industrial talc asbestos-related liabilities, (c) WCD and Soco West traditional asbestos-related liabilities, and (d) Soco West environmental liabilities. With respect to alter ego claims against DB US and NICO, the same liabilities were considered, as well as environmental liabilities at Brilliant and LAT, which would not be subject to a potential successor liability theory against Brenntag.[74] Brattle's estimates of these liabilities in present value terms are as follows:[75]

| | |
|---|---|
| WCD cosmetic talc liabilities | $428–$516 million |
| WCD industrial talc liabilities | $32–$41 million |
| WCD and Soco West traditional asbestos liabilities | $14 million |
| Soco West environmental liabilities | $24 million |
| **Total liabilities subject to potential successor liability theories** | **$498–$595 million** |

[74]   Successor liability is not even theoretically available to impose such liabilities on Brenntag because as noted above, Brilliant and LAT had no legacy operations or assets giving rise to environmental liabilities that were sold to Brenntag in the 2004 Transaction.

[75]   *See* McKnight Decl. ¶ 7.

| Brilliant and LAT environmental liabilities | $13 million |
|---|---|
| **Total liabilities subject to potential successor liability and alter ego theories** | **$511–$608 million** |

63.     Notably, with respect to claims that alleged the presence of asbestos in cosmetic and industrial talc distributed by WCD, the Debtors recognize there can be a wide range of disputes over the merits of such claims.  The Debtors vigorously disputed the tort claims prior to these chapter 11 proceedings and firmly believe in their defenses to the underlying liabilities on their merits.  However, for purposes of negotiating the Settlement Agreement, the Debtors took the approach that the value of estate causes of action that attempt to impose WCD and Soco West's liabilities on non-Debtors should be calculated off of a reasonable estimate of what WCD and Soco West would face in the tort system but for the Debtors' bankruptcy—not what the Debtors actually "should" be liable for under a legal liability approach.[76]  Brenntag, DB US, and NICO have emphasized to the Debtors what they believe to be fundamental weaknesses and flaws in many or most underlying talc-related claims against the Debtors, which would counsel in favor of basing a settlement off a much lower number than that calculated by Brattle, but the Debtors have diligently sought to maximize recoveries for their estates and all stakeholders by using the numbers calculated by their own advisors as a basis for negotiations.

64.     The estimated liability numbers calculated by Brattle must be discounted, as noted above, by a reasonable estimate of likelihood of success on the merits of any successor liability or alter ego claims.  For the reasons set forth above, the Debtors believe the likelihood of success on the merits of successor liability claims is much greater than the likelihood of success on alter ego

---

[76]  If actual legal liability were at issue (as would be the case in claims estimation under 11 U.S.C. § 502(c)), that figure should take into account not just causation evidence, but evidence of inefficiencies, settlement dynamics, and other confounding factors that can render figures derived from the tort system unreliable and overstated indicators of true liability.  *See In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 94–97 (Bankr. W.D.N.C. 2014).

claims. The Debtors do not assess the likelihood of success on the merits on those claims cumulatively above 50% (and indeed believe the likelihood of success on the merits could be materially lower). This places a reasonable potential settlement of estate causes of action—and at a minimum, the "the lowest point of reasonableness"—at a number below $300 million.

65. The Debtors, however, negotiated for a far higher recovery in the Settlement Agreement. In negotiating with NICO, DB US, and Brenntag, the Debtors advocated and obtained consideration that, in the Debtors' view, reflects two additional key factors.

66. *First*, the Debtors negotiated with Brenntag, DB US, and NICO over the inclusion of tort system defense costs. Brattle estimated that absent a bankruptcy, tort system defense costs associated with estimated claims alleging solely pre-2004 exposure would be approximately $158–$185 million in present value terms (using a percentage of indemnity methodology). *See* McKnight Decl. ¶¶ 7, 22–24.[77] Notably, the inclusion of *any* amount of defense costs during negotiations, and ultimately in the amount reflected in the Settlement Agreement, are a significant benefit to the Debtors' stakeholders. But for the settlement, tort system defense costs would never be paid to claimants—they would be paid to Brenntag's defense lawyers and experts. The inclusion of these costs—and the fact that the settlement amount is far greater than the value of the estate causes of action standing on their own—demonstrates not only the reasonableness of the settlement, but its superiority for the Debtors' stakeholders over the prepetition *status quo*.

67. *Second*, the Debtors negotiated with Brenntag, DB US, and NICO over an amount (or "premium") to reflect (a) the avoidance of uncertainty in the tort system provided by the settlement and the benefits to those entities from finally resolving all estate claims arising out of

---

[77] The Debtors focused on calculating tort system defense costs for claims alleging only pre-2004 exposures because Brenntag will not have to incur such costs if the successor liability claims are settled, whereas it will continue to have to defend claims asserting post-2004 exposures even if successor liability claims are settled.

the Debtors' operations, (b) any residual value of other estate causes of action, (c) the costs of

administering the chapter 11 cases, and (d) the costs of administering any future trust or trusts as

part of an eventual resolution of these proceedings.

68.     In sum, after considering all these component parts of value, the Debtors negotiated

a $535 million resolution of estate causes of action that provides for far more than the "the lowest

point of reasonableness" for settling those causes of action.

### C.     Difficulties in Collection

69.     As explained above, any estate causes of action face significant hurdles to

succeeding on their merits, regardless of any difficulties in collection.  The Settlement Agreement

further benefits the Debtors and their creditors by locking in payment from NICO and thus

eliminating any potential difficulties in collection.

70.     Absent settlement, Brenntag likely would raise equitable recoupment defenses

against any successor liability claims asserted by WCD or Soco West against Brenntag Specialties

and Brenntag Pacific, respectively.  *See, e.g.*, *In re Revel AC Inc.*, 909 F.3d 597, 603 (3d Cir. 2018)

("When a claim against a debtor qualifies for equitable recoupment, the claim avoids the usual

bankruptcy channels, in that it receives full value in the netting of obligations between a creditor

and the debtor without regard to the bankruptcy priority of the claim—thus, in essence, the claim

is given priority over other creditors' claims.") (cleaned up).  Following the 2004 Transaction,

WCD and Soco West owe indemnification obligations to Brenntag entities for asbestos and

environmental claims relating to the Debtors' pre-2004 operations, but the 2004 Transaction is

also what gives rise to the Debtors' potential successor liability claims against Brenntag entities.

As a result, Brenntag could argue that the transactional overlap and factual nexus between the

Debtors' successor liability claims and the Debtors' potential indemnification obligations meets

the standard for equitable recoupment. *See Revel AC*, 909 F.3d at 603 (explaining equitable recoupment requirements). While the Debtors could assert that any such indemnification claims do not meet the standard for equitable recoupment and should be disallowed as contingent indemnification claims under section 502(e)(1)(B), that issue would be disputed and at a minimum reduces the potential collectability of any successor liability claims asserted against Brenntag.

71. If any recoupment defenses are overcome, any successor liability claims that seek to impose the tort liabilities of WCD and Soco West onto Brenntag would likely be limited to the specific entities that purchased WCD and Soco West's assets: Brenntag Specialties and Brenntag Pacific, respectively. In particular, successor liability for WCD's asbestos-related talc liabilities— which constitute the overwhelming majority of the Debtors' total liabilities—would most likely be assertable only against Brenntag Specialties, which in turn would likely seek indemnification from DB US. Whatever the financial condition or strength of the overall Brenntag or Deutsche Bahn groups, it is the financial condition of these specific entities that would normally be directly relevant to assessing potential collectability challenges.

72. In *this* case, however, collectability on successor liability claims against Brenntag Specialties ultimately rests on a chain of indemnity relationships that relies on payment not from Brenntag Specialties or DB US, but from National Indemnity. Specifically, successor liability claims against a Brenntag entity will likely be tendered to DB US under the 2003 MSPA, and DB US will likely tender such claims to National Indemnity under the 2007 SPA. Any pressure on either of the steps on this indemnification chain further reduces the potential collectability of any successor liability claims. Since the Debtors' bankruptcy, DB US, Brenntag, and National Indemnity have exchanged correspondence contesting their respective obligations in this indemnification chain. Most notably, National Indemnity commenced an international arbitration

proceeding against DB US seeking, among other relief, to declare its indemnification obligations to DB US null and void. If the outcome of that pending proceeding is that National Indemnity is not obligated to indemnify DB US for claims relating to the Debtors' liabilities, the likelihood of collectability on any successor liability claim is undoubtedly less than if National Indemnity remains in the indemnification chain.

73. As to any potential estate causes of action directly against NICO and DB US, while there is no doubt that various NICO entities (including National Indemnity) have significant assets, any estate causes of action against NICO would have to succeed on a claim against a specific NICO entity with such assets—the assets of the entire NICO group are not available to satisfy any claim that the Debtors might have against any specific NICO entity. Similarly, while DB US may be part of a larger Deutsche Bahn group, the assets of that group are not readily available to satisfy any claim that the Debtors might have against DB US alone.

74. The Settlement Agreement avoids all of the uncertainties of collectability identified above by preserving National Indemnity's involvement and securing its backing of the payment obligations under the Settlement Agreement, and resolving any potential recoupment defenses that Brenntag might have been able to assert. As a result, the $535 million provided by the Settlement Agreement can be locked in now for the benefit of the Debtors' estates and all their stakeholders immediately, without the risks and costs associated with an uncertain litigation.

### D. Complexity of the Litigation Involved and the Attendant Expense, Inconvenience, and Delay

75. "The balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation." *Nutraquest*, 434 F.3d at 646. And it is "axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation." *Id.* (citing *TMT Trailer*, 390 U.S. at 434 ("Litigation and delay are always the

alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.")).  Where probability of success is low, a bankruptcy court is well within its discretion to find that escaping complex defenses via settlement is in the best interests of the debtor's estate.  *See id.*

76.    As noted above, the Debtors believe even the strongest of their estate causes of action have no greater than a 50% likelihood of success on the merits, and many of the claims released have a materially lower likelihood of success.  Absent settlement, all of the considerations that the Debtors set forth above would have to be litigated, requiring complex and expensive litigation over both factual and legal issues, likely concerning events that took place over twenty years ago and for which memories have dramatically faded or for which witnesses may be unavailable.  Among other issues, it is likely that absent the Settlement Agreement:  (a) Brenntag would aggressively litigate the merits of the successor liability claims, including the Debtors' working assumption (as discussed above) of a high degree of operational and personnel continuity between pre-2004 WCD and Soco West and post-2004 Brenntag Specialties and Brenntag Pacific, as well as the choice of law for successor liability, and the applicability of the equitable recoupment doctrine; (b) DB US and NICO would aggressively litigate the merits of any alter ego or other non-successor liability estate causes of action; and (c) each of Brenntag, DB US, and NICO would dispute the value of the Debtors' liabilities that the Debtors have used during negotiations.

77.    All of these disputes would be complex, time-consuming, and expensive, without any guarantee that the outcomes would be more favorable than those achieved through the Settlement Agreement.  The complexities, uncertainties, and risks surrounding these disputes are obviated by approval of the Settlement Agreement.  The Court should find that the complexity of

the litigation involved and the attendant expense, inconvenience, and delay weighs in favor of granting the Motion and approving the Settlement Agreement.

        **E.**    **Paramount Interest of the Creditors**

    78.    In considering whether a settlement is in the paramount interest of the creditors, courts will conduct an independent review of the fairness of the proposed settlement agreement. *See In re Scripsamerica, Inc.*, 634 B.R. 863, 874 (Bankr. D. Del. 2021). Courts have recognized that not all constituencies affected by a proposed settlement agreement may be involved in the negotiations, and the views of potential objectors "are not dispositive and cannot be permitted to predominate over the best interests of the estate as a whole." *Id.* (internal citations omitted).[78]

    79.    In this case, the Debtors' potential estate causes of action against Brenntag, DB US, and NICO are their most valuable asset for monetization and distribution under the Bankruptcy Code. Because this is a fixed asset case, monetizing and maximizing the value of those estate causes of action is in the best interests of all of the Debtors' creditors.[79] For the reasons discussed above, the Debtors *have* maximized the value of the estate causes of action released under the Settlement Agreement and achieved a settlement far exceeding the lowest point of reasonableness. As explained above, the Debtors negotiated for the inclusion of value reflecting tort defense system costs (and an additional premium) in the Settlement Agreement—value that would not be available

---

[78] *See also In re NovaPro Holdings, LLC*, 2018 WL 2102323, at *9 (Bankr. D. Del. May 4, 2018) ("[Objecting creditor] argues that the paramount interest of creditors does not favor settlement approval because 99% of the creditors object to the settlement. Indeed, if the decision was up to [two of the debtors' largest creditors], they may prefer to take a gamble by taking this case to trial. Even so, I am persuaded that the settlement serves the paramount interest of creditors."), *aff'd*, 2019 WL 1324950 (D. Del. Mar. 25, 2019), *aff'd*, 815 F. App'x 655 (3d Cir. 2020); *In re Summit Metals, Inc.*, 477 F. App'x 18, 22 (3d Cir. 2012) (affirming approval of settlement where "[c]oncerning . . . the paramount interest of the creditors, the Bankruptcy Court concluded that despite some creditors' objections to the settlement, and an indication some were willing to wait longer for the slightest chance of a more substantial recovery, 'the exercise is all about maximizing value for creditors'").

[79] *See Summit Metals*, 477 F. App'x at 22 (affirming approval of settlement where bankruptcy court, in discussing the paramount interest of creditors, emphasized "the exercise is all about maximizing value for creditors").

to the Debtors' creditors absent the Settlement Agreement. This allowed the Debtors to obtain a

settlement of more than half a billion dollars for the estates. Moreover, the avoidance of collection

risk, and the uncertainty, costs, and delay associated with otherwise litigating these causes of action

also directly benefit all creditors.

80. Another specific benefit that will improve the distributions to *all* creditors in these

cases is that the Settlement Agreement avoids any dilution of distributable value due to potential

allowance of, or the expense of litigating disputes regarding, potential unsecured indemnification

claims that might be asserted by Brenntag against the Debtors in the absence of any settlement.[80]

81. The limited scope of the releases in the Settlement Agreement also confirm that it

is in the best interests of creditors. The only claims released by the Debtors are estate causes of

action and any other claims assertable by the Debtors—not direct claims of individual tort creditors

against non-Debtors. And notably, nothing in the Settlement Agreement releases Brenntag from

independent, direct liability for its own conduct after the sale of the Debtors' assets to Brenntag in

February 2004. The principled and limited scope of the Settlement Agreement thus ensures that

Debtors' estates are maximized, while independent, direct claims for post-February 2004

non-Debtor conduct are not released.

82. The Debtors' hard-fought, arm's-length, and good faith negotiations also support

the conclusion that the Settlement Agreement is in the best interests of all stakeholders. *See ID*

*Liquidation One*, 555 F. App'x at 206 (affirming approval of settlement where the bankruptcy

court had "found that the Settlement was fair and equitable, given that the negotiations were

---

[80] *See, e.g.*, *NovaPro Holdings*, 2018 WL 2102323, at *9 & n.59 (noting benefits of a release "eliminat[ing] the need to litigate over the validity of [a] claim, and remov[ing] a sizable claim from the claims distribution pool" as supporting the paramount interest of creditors); *Immune Pharms.*, 635 B.R. at 126 (identifying a creditor's agreement to reduce the amount of its claim as favoring the paramount interest of creditors).

conducted in good faith and a special committee of the Debtors' board had approved and authorized the Settlement"). The Debtors' disinterested directors, unaffiliated with any of the other settling parties, were personally involved in negotiating the Settlement Agreement and received advice from their advisors and valuation experts, while Brenntag, DB US, and NICO were represented by separate principals and advisors. The nature of these negotiations therefore also supports approval of the Settlement Agreement.

83. For the reasons described in this Motion, the Debtors respectfully submit that the Settlement Agreement satisfies the standards for approval under applicable law and that the Court should therefore approve the Settlement Agreement pursuant to Bankruptcy Rule 9019.

## II. The Settlement Agreement Should Be Approved Under a Business Judgment Standard, and Regardless, Meets the Entire Fairness Standard.

84. The Debtors submit that the Settlement Agreement should be approved under the business judgment rule. *See Montgomery Ward*, 242 B.R. at 153 (explaining that the "sound business purpose" required to justify use of estate property pursuant to section 363(b) "essentially represent[s] a 'business judgment test'"). Such business judgments can only be set aside upon a showing that directors did not actually make a decision or were uninformed, grossly negligent, or lacking independence.[81] "A plaintiff faces 'an uphill battle' to carry this burden of proof."[82] Here, the Settlement Agreement is plainly a reasonable exercise of the Debtors' business judgment,

---

[81] *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[T]he business judgment rule governs unless the opposing party can show one of four elements: (1) the directors did not in fact make a decision, (2) the directors' decision was uninformed; (3) the directors were not disinterested or independent; or (4) the directors were grossly negligent."); *Immune Pharms.*, 635 B.R. at 123 ("Although the 'business judgment rule,' ordinarily would protect fully informed corporate decisions made in good faith, it does not apply to grossly negligent acts; acts tainted with fraud, self-dealing, or unconscionable conduct; or decisions which lack a business purpose or result from an obvious and prolonged failure to exercise oversight or supervision.").

[82] *HH Liquidation, LLC*, 590 B.R. at 272; *see also id.* ("The burden is on the plaintiff to show that the Business Judgment Rule is not applicable.").

because as described above, the Settlement Agreement was entered into for the valid purpose of monetizing and maximizing the value of the Debtors' estate causes of action and falls well within the range of reasonableness.  It should therefore be approved.

85.     The business judgment standard should apply to approval of the Settlement Agreement even though it settles causes of action against the Debtors' current direct and indirect equityholders (NICO) and related parties.  The Settlement Agreement was negotiated and approved on behalf of the Debtors exclusively by their disinterested directors (with the assistance of the Debtors' advisors), and without interference from NICO.  Bankruptcy courts have approved transactions with insiders without applying an "entire fairness" analysis akin to that applied in derivative suits for breach of fiduciary duty when, as here, the transaction is negotiated by a debtor without interference by any allegedly controlling insider.  *E.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (where settlement was "reviewed and approved by independent directors" who were "highly qualified individuals who had a regular practice during board meetings of convening separately from [an insider] and his designated directors to consider what was in [the debtor's] best interest," the court concluded that "[g]iven the role played by the independent directors and the evidence indicating that [the insider] did not exert any undue influence over [the debtor] in negotiating the CII Settlement, the CII Settlement should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and not under the 'entire fairness' standard of Delaware law applicable to transactions with controlling insiders"), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012); *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 642 (Bankr. S.D.N.Y. 2012) (finding that settlements with insiders that were negotiated on the debtor's behalf "without interference from" those insiders

were "not related party transactions that, in other contexts, make application of the entire fairness doctrine appropriate").

86.     For the same reasons, an entire fairness analysis should not apply to the approval of the Settlement Agreement.  Consistent with the delegation of authority to exclusively determine and handle any Conflict Matters, the disinterested directors led the settlement negotiations on behalf of the Debtors—and did not discuss these negotiations with the only NICO-affiliated director, who did not have input on the Debtors' positions on those negotiations.  Given the disinterested directors' independence from the other parties to the Settlement Agreement, and their extensive role (to the exclusion of any NICO-affiliated individuals) in negotiating, reviewing, and approving the Settlement Agreement on behalf of the Debtors, the "entire fairness" standard should not apply and the Settlement Agreement should be approved as a valid exercise of the Debtors' business judgment. *See* Pohl Decl. ¶¶ 5, 11–13.

87.     Even if the Court determined that an "entire fairness" standard applies to approval of the Settlement Agreement, the approval of the Settlement Agreement by the Debtors' disinterested directors shifts the burden of proving unfairness to any objecting party—it is not the Debtors' burden to prove fairness.  *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994) ("[A]n approval of the transaction by an independent committee of directors . . . *shifts the burden of proof on the issue of fairness* from the controlling or dominating shareholder *to the challenging shareholder-plaintiff*.") (emphasis added); *In re Match Grp., Inc. Deriv. Litig.*, 315 A.3d 446, 462 (Del. 2024) ("*Lynch* . . . clarified that if the defendants demonstrated that the transaction was . . . negotiated by a well-functioning special committee of independent directors . . . then the burden shifted to the plaintiffs to prove that the transaction was not entirely fair."); *see also Teleservs. Grp., Inc.*, 2009 WL 838157, at * 9 ("New Jersey courts have previously sought

guidance and instruction from Delaware case law when deciding matters involving corporate directors' decision-making. . . . In the absence of binding doctrinal authority from New Jersey, the Court here too reviews Delaware case law for guidance.").

88.    For the same reasons the Settlement Agreement should be approved, no potential objecting party could sustain its affirmative burden of proving that the terms of the Settlement Agreement are unfair—and the Debtors could readily demonstrate that the Settlement Agreement is entirely fair as a matter of both fair price and fair dealing. *See Match Grp.*, 315 A.3d at 459 ("The concept of fairness has two basic aspects:  fair dealing and fair price . . . entire fairness is a unitary test, under which a reviewing court will scrutinize both the price and the process elements of the transaction as a whole.").

89.    The Settlement Agreement is entirely fair as a matter of fair price because it resolves the settled causes of action well above the range of reasonableness, avoids collection risks, avoids the complexities and costs of litigating the issues resolved, and benefits all creditors by monetizing and maximizing estate assets.

90.    As described more fully above and in the Pohl Declaration, the Settlement Agreement was negotiated and approved on behalf of the Debtors by experienced and well-informed independent and disinterested directors. *See Match Grp.*, 315 A.3d at 461–62 ("[F]airness in this context can be equated to conduct by a theoretical, wholly independent, board of directors acting upon the matter before them . . . .  Particularly in a parent-subsidiary context, a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness.").

91.     The Settlement Agreement is therefore entirely fair both as a matter of price and process and should be approved under any standard.

### Request of Waiver of Stay

92.     To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to prosecute their chapter 11 cases and preserve the value of their estates.

### Waiver of Memorandum of Law

93.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

### Reservation of Rights

94.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds (other than as expressly provided for in the Settlement Agreement), (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the Motion are valid, and the rights of all parties are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all

such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### No Prior Request

95. No prior request for the relief sought in this Motion has been made to this Court or any other court.

### Notice

96. The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of New Jersey; (b) the Committee; (c) the Top Counsel List;[83] (d) NICO and counsel thereto; (e) the Office of the United States Attorney for the District of New Jersey; (f) the Internal Revenue Service; (g) the Securities Exchange Commission; (h) the Environmental Protection Agency; (i) the offices of the attorneys general in states where the Debtors conduct their business operations; (j) Brenntag and counsel thereto; (k) DB US and counsel thereto; (l) the FCR and counsel thereto; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice is required.

*[Remainder of page intentionally left blank.]*

---

[83] As defined in the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) File a List of the Top Law Firms and Use the Addresses of Counsel in Lieu of Claimants' Addresses and (II) Redact Personally Identifiable Information, (B) Approving Certain Notice Procedures, and (C) Granting Related Relief* [Docket No. 8].

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: September 3, 2024

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email:     joshua.sussberg@kirkland.com

-and-

Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email:     chad.husnick@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Co-Counsel for Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered)<br>**Hearing Date:  September 24, 2024, at 2:00 p.m. (ET)**<br>**Obj. Deadline:  September 17, 2024, at 4:00 p.m. (ET)**<br>**Oral Argument Waived Unless Objections Timely Filed** |

**NOTICE OF HEARING ON DEBTORS'**
**MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE**
**SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND THE**
**CONTRIBUTING PARTIES, (II) AUTHORIZING THE DEBTORS TO PERFORM ALL**
**OF THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:  Whittaker, Clark & Daniels, Inc. (4760); Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

**PLEASE TAKE NOTICE** that on <u>**September 24, 2024, at 2:00 p.m. (ET)**</u>, or as soon thereafter as counsel may be heard, the above-captioned debtors and debtors in possession (the "<u>Debtors</u>"), by and through their undersigned counsel, shall move (the "<u>Motion</u>") before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, New Jersey 08608 (the "<u>Court</u>"), for entry of an order (the "<u>Order</u>"), substantially in the form submitted herewith, authorizing and approving entry into the Settlement Agreement and granting related relief.

**PLEASE TAKE FURTHER NOTICE** that in support of the Motion, the Debtors shall rely on the accompanying Motion and Declarations of Tim Pohl, David L. McKnight, Brian J. Griffith, and Gavin Campbell, which set forth the relevant legal and factual bases upon which the relief requested should be granted.  A proposed Order granting the relief requested in the Motion is also submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion shall:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the Court electronically by attorneys who regularly practice before the Court in accordance with the (a) *Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 67]  (the "<u>Case Management Order</u>") and (b) *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "<u>General Order</u>") and the *Commentary Supplementing Administrative Procedures* dated as of March 2004 (the "<u>Supplemental Commentary</u>") (the General Order, the Supplemental Commentary, and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and

shall be served in accordance with the Case Management Order, the General Order and the

Supplemental Commentary, so as to be received no later than seven (7) days before the hearing

date set forth above.

   **PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these

chapter 11 cases may be obtained free of charge by visiting the website of Stretto, Inc. at

https://cases.stretto.com/whittaker.  You may also obtain copies of any pleadings by visiting the

Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set

forth therein.

   **PLEASE TAKE FURTHER NOTICE** that, unless responses are timely and properly

filed and served, the Motion shall be decided on the papers in accordance with D.N.J.

LBR 9013-3(d), and the relief requested may be granted without further notice or hearing.

**JA1235**

Dated:  September 3, 2024

/s/ Michael D. Sirota
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com

-and-

Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:      chad.husnick@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit A

## Settlement Agreement Summary of Proposed Terms

As set forth more fully in <u>Exhibit 1</u> to the Order, the key provisions of the Settlement

Agreement are summarized below:[1]

| Settlement Agreement Summary of Terms | |
|---|---|
| **Effective Date** | The first date by which both the following have occurred: (a) the Settlement Order has become a Final Order and (b) the Summary Judgment Order has become a Final Order. |
| **Settlement Payment** | The Settlement Payment is comprised of: (a) an initial contribution of a first priority secured debtor-in-possession delayed draw term loan facility of up to $50 million (the "<u>DIP Facility</u>," and loans thereunder, the "<u>DIP Loans</u>"), available upon the Court's entry of an order approving the DIP Motion (the "<u>Initial Settlement Contribution</u>"); and (b) an amount equal to $535 million *less* the aggregate principal amount of DIP Loans funded in Cash by NICO or its designee, within five business days of the Debtors giving NICO notice of the occurrence of the Effective Date and provided the Effective Date has occurred (the "<u>Settlement Contribution</u>, and together with the Initial Settlement Contribution, the "<u>Settlement Payment</u>"). |
| **Estate Causes of Action** | Any and all actions, Claims, rights, remedies, defenses, counterclaims, suits, and Causes of Action (a) owned or held, or assertable by or on behalf of any Debtor or its Estate (including, without limitation, claims assertable by the Tort Claimants' Committee or FCR, or by any other creditors, on behalf of any Debtor or its Estate), (b) that constitute property of the Estates under section 541 of the Bankruptcy Code, (c) that are or may be commenced or pursued by a representative of the Debtors or the Estates, including pursuant to sections 323 or 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (d) to avoid, invalidate or recover any transfer of any kind made by any Debtor, or any obligation of any Debtor, including under chapter 5 of the Bankruptcy Code or other applicable law, (e) that constitute Successor Liability Claims, or (f) otherwise assertable by any Debtor or its Estate under any federal, state, or other applicable law seeking to establish a non-Debtor's liability for existing or future Tort Claims, Environmental Claims, Indirect Environmental Claims, or other Claims against the Debtors; in all cases, however denominated and whether or not asserted, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction. |
| **Chapter 11 Plan** | The Contributing Parties shall support confirmation of a chapter 11 plan, including all exhibits, supplements, and amendments thereto (collectively, |

---

[1] To the extent there is any inconsistency between the terms set forth in the Settlement Agreement and the terms described herein, the Settlement Agreement shall control in all respects.

| Settlement Agreement Summary of Terms | |
|---|---|
| | as may be amended from time to time, the "Plan") that is consistent in all respects with the terms in the Plan Term Sheet attached as Exhibit B to the Settlement Agreement and is otherwise consistent with the Settlement Agreement and reasonably acceptable to NICO. |
| **Mutual Releases** | Without limitation, the Contributing Parties and the Debtors release each other, as well as their respective Related Parties, of and from any and all Causes of Action and Estate Causes of Action, as applicable, arising out of, in connection with, or relating to any matters occurring before the Effective Date, all as more fully set forth in the Settlement Agreement. |
| **Conditions Precedent** | The terms of the Settlement Agreement shall be dependent upon entry of the Settlement Order containing terms and provisions acceptable to the Parties, as well as certain other conditions set forth therein. |
| **Retention of Jurisdiction** | The Court shall retain exclusive jurisdiction to enforce the Order, including to determine, without limitation, whether (a) any claim brought against any Non-Debtor Released Party constitutes a Debtor Estate Cause of Action and is subject to the prohibition against prosecution of such claim and (b) any claims brought against any of the Debtor Releasees constitute Brenntag Released Claims, NICO Released Claims, and/or DB US Released Claims, as applicable, and are subject to the prohibition against prosecution of such claims. |
| **Termination Events** | NICO may terminate this Settlement Agreement, effective upon five business-days' notice to the Debtors, if any of the following occur: (1) entry of an order by any court denying the Settlement Motion; (2) entry of an order by any court reversing or vacating an order approving the Settlement Motion; (3) entry of an order by any court reversing, modifying, or vacating the Summary Judgment Order; (4) entry of an order by any court appointing a chapter 11 trustee in the Chapter 11 Cases; (5) entry of an order by any court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to chapter 7; (6) entry of an order by any court granting any person other than the Debtors standing to assert the Estate Causes of Action; or (7) an uncured default or Event of Default under the DIP Order and DIP Term Loan Facility pursuant to the terms of the DIP Order and the DIP Credit Agreement. NICO shall not be required to seek relief from the automatic stay in order to serve notice of termination, and to terminate, the Settlement Agreement pursuant to this paragraph. |

**Exhibit B**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## ORDER (I) APPROVING THE SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND THE

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:  Whittaker, Clark & Daniels, Inc. (4760); Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

**CONTRIBUTING PARTIES, (II) AUTHORIZING THE DEBTORS TO PERFORM ALL OF THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through eight (8),

is **ORDERED**

Upon the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "<u>Motion</u>"),[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), for entry of an order (this "<u>Order</u>"): (a) authorizing (i) entry into that certain settlement agreement attached as **Exhibit 1** to this Order (the "<u>Settlement Agreement</u>") between and among the Debtors, Brenntag,[1] NICO,[2] and DB US[3] (Brenntag, NICO, and DB US, collectively, the "<u>Contributing Parties</u>") and the Debtors (together with the Contributing Parties, the "<u>Parties</u>") and (ii) the Debtors to perform all of their obligations thereunder; and (b) granting related relief, all as more fully set forth in the Motion; and upon the Pohl Declaration, the McKnight Declaration, the Griffith Declaration, and the Campbell Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Settlement Agreement.

[1] "<u>Brenntag</u>" means, collectively, Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc.), and Coastal Chemical Co., LLC.

[2] "<u>NICO</u>" means, collectively, Berkshire Hathaway Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company, Resolute Management, Inc., Ringwalt & Liesche Co. ("<u>Ringwalt</u>"), and National Liability & Fire Insurance Company.

[3] "<u>DB US</u>" means DB US Holding Corporation (f/k/a Stinnes Corporation).

having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court

may enter a final order consistent with Article III of the United States Constitution; and this Court

having found that venue of this proceeding and the Motion in this district is proper pursuant to 28

U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in

the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court

having found that the Settlement is fair and equitable and that the probability of success in

litigation, the likely difficulties in collection, the complexity of the litigation involved and the

attendant expense, inconvenience, and delay, and the paramount interest of the creditors all weigh

in favor of approving the Settlement; and this Court having found that the Debtors' notice of the

Motion was appropriate under the circumstances and no other notice of the Motion need be

provided; and this Court having reviewed the Motion; and this Court having determined that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and

upon all of the proceedings had before the Court and after due deliberation and sufficient cause

appearing therefor **IT IS HEREBY FOUND, DETERMINED AND ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      Any objections to the Motion and to the relief requested therein and/or granted in

this Order that have not been withdrawn, waived, or settled, and all reservations of rights included

in such objections, are overruled on the merits.

3.      The Parties are authorized to enter into the Settlement Agreement, substantially in

the form attached hereto as **<u>Exhibit 1</u>** and the terms contemplated therein are hereby approved in

all respects.

4.      The claims to be released by the Debtors in the Settlement Agreement, defined as the Estate Causes of Action in the Settlement Agreement, are property of the Debtors' estates.

5.      The Settlement Agreement, including the releases contained therein, is fair and equitable and in the best interests of the Debtors and their estates, based upon the evidence and arguments made at the hearing on the Motion as to the probability of success in litigation; the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and the paramount interest of creditors.

6.      The probability of success on the claims the Debtors are releasing under the Settlement Agreement, and the value of any recovery in the event the Debtors were to prevail, are both uncertain.

7.      In the absence of a settlement, the resolution of the Debtors' claims against the Contributing Parties would require lengthy and costly litigation.  There is no assurance that such litigation would result in higher recoveries for the Debtors' creditors.  By entering into the Settlement Agreement, the Debtors avoid this delay, uncertainty, and risk.

8.      When considering the challenges the Debtors face on the merits of the Estate Causes of Action, the Settlement Payment is reasonable and exceeds the lowest point in the range of reasonableness.

9.      The Settlement Agreement was the product of good faith negotiations conducted at arm's-length between the Debtors and the Contributing Parties, each of which was separately represented by counsel.

10.    The terms and conditions of the Settlement Agreement, including the rationale

underlying the agreement, have been adequately disclosed to the Court.

11.    In accordance with the terms of the Settlement Agreement, the Debtor Releasing

Parties and creditors of the Debtors' estates, as applicable, are enjoined from commencing,

prosecuting, accepting payment on account of, or otherwise pursuing Debtor Released Estate

Causes of Action against the Non-Debtor Released Parties, and the Court will retain exclusive

jurisdiction to enforce this Order and to determine, without limitation, whether any claim brought

against any Non-Debtor Released Party constitutes a Debtor Estate Cause of Action and is thus

subject to the prohibition against prosecution of such claims.

12.    The Non-Debtor Released Parties are forever barred from asserting the Brenntag

Released Claims, the NICO Released Claims, and the DB US Released Claims, as applicable,

against the Debtor Releasees, and the Court will retain exclusive jurisdiction to enforce this Order

and to determine, without limitation, whether any claim brought against any of the Debtor

Releasees constitutes a Brenntag Released Claim, NICO Released Claim, and/or DB US Released

Claim and is thus subject to the prohibition against prosecution of such claims.

13.    Notwithstanding anything to the contrary contained herein (including, but not

limited to, this paragraph 13) or in the Settlement Agreement, each Contributing Party reserves all,

and does not release any, rights, claims, and defenses (whether contractual or otherwise) against

each other Contributing Party, including but not limited to all rights, claims, and defenses under

the 2003 MSPA and 2007 SPA (including in the arbitration proceeding pending under the 2021

Arbitration Rules of the International Chamber of Commerce, Case Ref. 27945/PDP), defined in

the Settlement Agreement as Preserved Rights.  For the avoidance of doubt, the Contributing

Parties agree that the releases of the Brenntag Released Claims, the DB US Released Claims, and

the NICO Released Claims by the respective Contributing Parties shall not be raised as a defense

and shall not constitute a defense to the assertion of Preserved Rights.

14.    For the avoidance of doubt, the effectiveness of the terms of the Settlement

Agreement are not contingent upon the confirmation of a chapter 11 plan, and this Order shall be

binding on all the Debtors, all holders of claims against the Debtors, the respective successors and

assigns referenced in this paragraph, and any chapter 11 trustee, liquidating or other trustee, or

other trust or other form of distribution vehicle established under a chapter 11 plan of the Debtors,

and on any chapter 7 trustee if any of the Debtors' cases is converted to a chapter 7 proceeding.

15.    Nothing in the Settlement Agreement or this Settlement Order bars any person from

asserting a Cause of Action against a Non-Debtor Released Party that is not an Estate Cause of

Action.

16.    The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

17.    Notwithstanding Bankruptcy Rule 6004(h), 7062, 9014, or otherwise, this Order

shall be effective and enforceable immediately upon entry hereof.

18.    Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied

by such notice.

19.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

20.     As set forth in the Settlement Agreement, any damages payable by the Debtors under the Settlement Agreement for breach of the Settlement Agreement shall be entitled to administrative expense priority under 11 U.S.C. § 503(b)(1) against each of the Debtors' estates.

21.     No party shall be required to seek relief from the automatic stay to enforce the Settlement Agreement or to exercise any rights thereunder, including to exercise rights of termination in accordance with the terms of the Settlement Agreement.

22.     This Court shall retain exclusive jurisdiction to interpret provisions of the Settlement Agreement and this Order in all respects and further to hear and determine any and all disputes relating to the Settlement Agreement; in the event the Debtors' cases are closed, there shall be cause to reopen the Debtors' cases upon motion or application for such purposes, absent which the parties may seek enforcement or interpretation of the Settlement Agreement or this Order in the District Court for this District.

**Exhibit 1**

**Settlement Agreement**

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (the "Settlement Agreement") is made and executed as of the third day of September, 2024 by and between: (a) BRENNTAG CANADA, INC.; BRENNTAG GREAT LAKES, LLC; BRENNTAG MID-SOUTH, INC.; BRENNTAG NORTH AMERICA, INC.; BRENNTAG NORTHEAST, LLC; BRENNTAG PACIFIC, INC.; BRENNTAG SOUTHWEST, INC.; BRENNTAG SPECIALTIES, LLC (F/K/A BRENNTAG SPECIALTIES, INC.; AND AS MINERAL AND PIGMENT SOLUTIONS, INC. ("MPSI")) ("Brenntag Specialties"), AND COASTAL CHEMICAL CO., LLC (collectively, "Brenntag"), a group of affiliated entities; (b) BERKSHIRE HATHAWAY INC.; BH COLUMBIA INC.; COLUMBIA INSURANCE COMPANY; NATIONAL INDEMNITY COMPANY; RESOLUTE MANAGEMENT, INC.; RINGWALT & LIESCHE CO.; and NATIONAL LIABILITY & FIRE INSURANCE COMPANY (collectively, "NICO"), a group of affiliated entities; (c) DB US HOLDING CORPORATION (f/k/a Stinnes Corporation) ("DB US," and together with Brenntag and NICO, collectively, the "Contributing Parties," and each individually, a "Contributing Party"), a corporation; and (d) WHITTAKER, CLARK & DANIELS, INC. ("WCD"); BRILLIANT NATIONAL SERVICES, INC. ("Brilliant"); L. A. TERMINALS, INC. ("LAT"); and SOCO WEST, INC. ("Soco," and together with WCD, Brilliant, and LAT, collectively, the "Debtors," together with Brenntag, NICO, and DB US, the "Parties," and each of the foregoing individually, a "Party").

WITNESSETH:

WHEREAS, Stinnes Corp. (n/k/a DB US), Stinnes AG, Stinnes UK Limited, Schenker-BTL, S.A., and Deutsche Bahn Aktiengesellschaft (collectively, the "DB Parties") and certain of its affiliates entered into a master sale and purchase agreement with certain affiliates of Bain Capital L.P. (the "2003 MSPA"), which contemplated, in part, sales of certain of the Debtors' assets to Brenntag North America, Inc., a then-affiliate of Bain Capital L.P., and certain of its affiliates in exchange for cash and the assumption of certain non-asbestos and non-environmental liabilities, while certain defined asbestos and environmental liabilities remained with the Debtors;

WHEREAS, the 2003 MSPA provided that WCD and Soco would indemnify Brenntag North America, Inc. and certain of its affiliates for certain defined asbestos-related liabilities, which indemnification obligations were guaranteed by Brilliant, which in turn were guaranteed by DB US if WCD, Soco, and Brilliant were unable to satisfy such claims, as applicable;

WHEREAS, Soco entered into that certain asset purchase agreement whereby Soco divested substantially all of its assets in exchange for, among other things, cash and the assumption of certain ongoing liabilities by the purchaser, Brenntag Pacific, Inc. (the "2004 Soco APA");

WHEREAS, WCD entered into an agreement divesting substantially all of its assets in exchange for, among other things, cash and the assumption of certain ongoing liabilities by the purchaser, MPSI (the "2004 WCD APA");

WHEREAS, Brilliant engaged in an asset sale transaction with Brenntag North America divesting its intellectual property assets, resigning from certain LLC agreements, and terminating certain management fee agreements in exchange for Brenntag North America assuming certain

non-asbestos-related and non-environmental related ongoing liabilities, in addition to the consideration paid under the Soco APA and WCD APA (the "2004 Brilliant APA," and together with the 2003 MSPA, the 2004 Soco APA, and the 2004 WCD APA, the "2004 Transaction Documents");

WHEREAS, Brenntag acquired substantially all of WCD's, Soco's, and Brilliant's operating assets pursuant to the 2004 Transaction Documents (collectively, the "2004 Transaction");

WHEREAS, pursuant to the 2004 Transaction Documents, the Debtors retained liabilities as to certain tort claims and retained certain assets, including certain asbestos- and environmental-related insurance receivables and certain real property;

WHEREAS, pursuant to the 2004 Transaction Documents, Brenntag asserts claims against the Debtors for indemnification of certain claims arising from the Debtors' historical business practices prior to the 2004 Transaction;

WHEREAS, in December 2007, National Indemnity Company purchased the equity in Brilliant (which owned all of the equity of WCD and Soco) and LAT from DB US (the "2007 Acquisition"), pursuant to a stock purchase agreement (the "2007 SPA");

WHEREAS, in the 2007 Acquisition, National Indemnity Company agreed to indemnify DB US for, among other things, certain indemnification obligations arising under the 2003 MSPA in connection with certain asbestos-related and environmental liabilities;

WHEREAS, after the consummation of the 2007 Acquisition, National Indemnity Company assigned the equity interests in Brilliant and LAT to its affiliate Ringwalt & Liesche Co.;

WHEREAS, on April 26, 2023, WCD, Soco, Brilliant, and LAT filed for chapter 11 bankruptcy relief under title 11 of the United States Code (the "Bankruptcy Code") and such bankruptcy cases are being jointly administered under the case captioned *Whittaker, Clark & Daniels, Inc. et al*, Case No. 23-13575 (MBK) in the United States Bankruptcy Court for the District of New Jersey (the "Court," and such cases, the "Chapter 11 Cases");

WHEREAS, on September 7, 2023, the Debtors initiated an adversary proceeding against Brenntag AG and other defendants under the caption *Whittaker, Clark & Daniels, Inc. v. Brenntag AG*, Adv. Proc. No. 23-01245 (MBK) (the "Adversary Proceeding");

WHEREAS, on September 8, 2023, the Debtors filed a motion for summary judgment in the Adversary Proceeding [Adv. Proc. Docket No. 3] (the "Summary Judgment Motion") seeking a declaration that Successor Liability Claims, as defined in the Summary Judgment Motion (the "Successor Liability Claims"), are property of the Debtors' Estates;

WHEREAS, on August 13, 2024, the Court issued a Memorandum Decision granting the Summary Judgment Motion [Adv. Proc. Docket No. 268] and entered an order to such effect on August 28, 2024 [Adv. Proc. Docket No. 292] (the "Summary Judgment Order");

WHEREAS, the Debtors own certain Estate Causes of Action (as defined below), including the Successor Liability Claims;

WHEREAS, the Contributing Parties deny liability on any potential Estate Causes of Action the Debtors may or could assert against the Contributing Parties and their Related Parties;

WHEREAS, the Debtors, Brenntag, NICO, and DB US wish to fully and finally resolve the disputes described in the above recitals;

WHEREAS, the Debtors believe that this Settlement Agreement is in the best interests of the Debtors' Estates and claimants;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Brenntag, NICO, DB US, and the Debtors agree as follows:

1.    Additional Defined Terms.  The following additional definitions apply to this Agreement.  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Bankruptcy Code.  The singular form of a word includes the plural and *vice versa*; the disjunctive "or" is not exclusive and thus includes the conjunctive "and"; all pronouns apply to the male, female, and neutral genders; the word "any" includes the word "all" and *vice versa*; the words "includes" and "including" are without limitation; and the past tense of a word includes the present tense and *vice versa*.

A.  "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other Claims and Causes of Action, actions, or remedies that may be brought by, or on behalf of, the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, actions, or remedies arising under sections 502, 510, 541, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws.

B.  "Brenntag Releasees" means Brenntag and Brenntag's Related Parties.

C.  "Causes of Action" means, collectively, any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, obligations, third-party claims, indemnity claims, damages (including claims for or award of costs and/or expenses, court costs and attorneys' fees), losses, remedies, causes of action, demands, rights, lawsuits, suits, litigation, arbitration, legal proceeding, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, franchises, guaranties, Avoidance Actions, agreements, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown or hereafter discovered, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, Law, equity, or otherwise pursuant to any theory of civil Law (whether local, state, or federal U.S. Law or non-U.S. Law).  Causes of Action

also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) any Claim (whether under local, state, federal U.S. Law or non-U.S. civil Law) based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction Law, violation of local, state, or federal non-U.S. Law or breach of any duty imposed by Law or in equity, including securities Laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

D.  "<u>Claim</u>" means any "claim," as defined in section 101(5) of the Bankruptcy Code.

E.  "<u>DB US Releasees</u>" means DB US and DB US's Related Parties, including the DB Parties.

F.  "<u>Debtor Releasees</u>" means the Debtors, the Estates, and their predecessors, and their past, present, and future officers, directors, employees, agents, servants, and representatives.

G.  "<u>Debtor Releasing Parties</u>" means the Debtors and the Estates, on behalf of themselves and (a) their respective predecessors and representatives, (b) any (i) trust, plan administrator, or trustee established under a chapter 11 plan, (ii) chapter 7 trustee, or (iii) chapter 11 trustee, and (c) any other persons claiming under or through each of the foregoing, including the Debtors and the Estates.

H.  "<u>Effective Date</u>" shall mean the first date by which both the following have occurred: (i) the Settlement Order has become a Final Order and (ii) the Summary Judgment Order has become a Final Order.

I.  "<u>Estate</u>" means as to each Debtor, the estate created in its Chapter 11 Case under section 541 of the Bankruptcy Code.

J.  "<u>Estate Causes of Action</u>" means any and all actions, Claims, rights, remedies, defenses, counterclaims, suits, and Causes of Action (a) owned or held, or assertable by or on behalf of any Debtor or its Estate (including, without limitation, claims assertable by the Tort Claimants' Committee or FCR, or by any other creditors, on behalf of any Debtor or its Estate), (b) that constitute property of the Estates under section 541 of the Bankruptcy Code, (c) that are or may be commenced or pursued by a representative of the Debtors or the Estates, including pursuant to sections 323 or 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (d) to avoid, invalidate or recover any transfer of any kind made by any Debtor, or any obligation of any Debtor, including under chapter 5 of the Bankruptcy Code or other applicable law, (e) that constitute Successor Liability Claims, or (f) otherwise assertable by any Debtor or its Estate under any federal, state, or other applicable law seeking to establish a non-Debtor's liability for existing or future Tort Claims, Environmental Claims, Indirect Environmental Claims, or other Claims against the Debtors; in all cases, however denominated and whether or not asserted, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction.

K. "<u>Environmental Claims</u>" means any Claim or Cause of Action against a Debtor asserted by any Government Environmental Unit, and other civil responsibilities, obligations or liabilities with respect to sites relating to or arising under the Comprehensive Environmental Response, Compensation, and Liability Act, Resource Conservation and Recovery Act, or any other environmental Laws, including Claims for restoration, corrective action, or remediation of environmental or natural resource conditions.

L. "<u>Final Order</u>" means, as applicable, an order or judgment of the Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken or any petition for certiorari that has been filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

M. "<u>Governmental Environmental Unit</u>" means federal, state, local, or tribal Governmental Units asserting claims or having regulatory authority or responsibilities with respect to environmental Laws.

N. "<u>Governmental Unit</u>" means governmental unit as defined in section 101(27) of the Bankruptcy Code.

O. "<u>Indirect Environmental Claims</u>" means a Claim held by a private party for breach of contract, indemnification, contribution, reimbursement, or cost recovery related to environmental monitoring or remediation, including Claims for contribution, personal injury, property damage, or direct costs under any environmental Law.

P. "<u>Law</u>" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Court).

Q. "<u>NICO Releasees</u>" means NICO and NICO's Related Parties.

R. "<u>Non-Debtor Intercompany Agreements</u>" means any agreement between a Debtor and NICO, including any delegation of authority by a Debtor to NICO or a Related Party of NICO.

S. "<u>Non-Debtor Released Parties</u>" means the Brenntag Releasees, the NICO Releasees, and the DB US Releasees.

T. "<u>Petition Date</u>" means April 26, 2023.

U. "<u>Related Party</u>" means, with respect to an entity, (a) such entity's current and former

affiliates and (b) such entity's and such entity's current and former affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

V. "Settlement Order" means an order approving this Settlement Agreement containing terms and provisions acceptable to the Debtors and each of the Contributing Parties.

W. "Tort Claims" means any Claim or Cause of Action against a Debtor whether known or unknown, manifested or unmanifested, for costs or damages, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or other personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to asbestos, talc, asbestiform minerals or any other chemical compound, or asbestos-, talc-, asbestiform- or any other chemical compound containing products caused or allegedly caused by, based on or allegedly based on, arising or allegedly arising from, attributable or allegedly attributable to, or in connection with, directly or indirectly, in whole or in part, the alleged acts, omissions, or conduct of the Debtors or any of the Debtors' predecessors-in-interest, including any such claims directly or indirectly, in whole or in part, arising out of or in any way relating to: (a) any products previously mined, manufactured, engineered, assembled, distributed, sold, used, consumed, installed, maintained, owned, occupied, stored, possessed, processed, designed, marketed, fabricated, constructed, supplied, produced, serviced, specified, selected, repaired, removed, replaced, released, and/or in any other way made available by the Debtors or any of the Debtors' predecessors-in-interest; (b) any materials present at any premises owned, leased, occupied, or operated by the Debtors or the Debtors' predecessors-in-interest; or (c) any talc in any way connected to the Debtors alleged to contain asbestos, asbestiform minerals, asbestos-containing products, or other constituent.

2. Subject to the terms and conditions of the debtor-in-possession financing order (such order, the "DIP Order") and the debtor-in-possession credit agreement approved by the DIP Order and that is consistent in all respects with the terms in the DIP Term Sheet attached as **Exhibit A** (the "DIP Credit Agreement"), and the entry of the DIP Order by the Court, NICO or its designee shall provide to the Debtors a first priority secured debtor-in-possession delayed draw term loan facility of up to $50 million (the "DIP Term Loan Facility," and loans thereunder, the "DIP Loans"). The aggregate principal amount of DIP Loans funded in Cash by NICO or its designee shall be deemed the "Initial Settlement Contribution."

3.      Within five business days of the Debtors giving NICO notice of the occurrence of the Effective Date, and provided that the Effective Date has occurred, (a) NICO or its designee shall pay the Debtors an amount equal to $535 million *less* the aggregate principal amount of DIP Loans funded in Cash by NICO or its designee (the "<u>Settlement Contribution</u>" and, together with the Initial Settlement Contribution, the "<u>Settlement Payment</u>") and (b) the DIP Loans and other obligations under the DIP Credit Agreement shall be deemed satisfied in full.  The Settlement Payment shall be made in full and final settlement and satisfaction of the Estate Causes of Action released in this Settlement Agreement against Brenntag, NICO, DB US, and their Related Parties. The Settlement Contribution shall be paid to the Debtors via wire transfer in lawful currency of the United States of America ("<u>Cash</u>").

4.      NICO may terminate this Settlement Agreement, effective upon five business-days' notice to the Debtors, if any of the following occur:  (1) entry of an order by any court denying the Settlement Motion; (2) entry of an order by any court reversing or vacating an order approving the Settlement Motion; (3) entry of an order by any court reversing, modifying, or vacating the Summary Judgment Order; (4) entry of an order by any court appointing a chapter 11 trustee in the Chapter 11 Cases; (5) entry of an order by any court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to chapter 7; (6) entry of an order by any court granting any person other than the Debtors standing to assert the Estate Causes of Action; or (7) an uncured default or Event of Default under the DIP Order and DIP Term Loan Facility pursuant to the terms of the DIP Order and the DIP Credit Agreement.  NICO shall not be required to seek relief from the automatic stay in order to serve notice of termination, and to terminate, the Settlement Agreement pursuant to this paragraph.

5.      Upon NICO's payment of the Settlement Payment, and without the need for the execution or delivery of any further documents or the taking of any other action by the Debtors, the Debtor Releasing Parties, waive, release, acquit, and forever discharge the Brenntag Releasees of and from the Estate Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date (the "<u>Debtor Released Brenntag Estate Causes of Action</u>"). The Brenntag Releasees other than Brenntag (which is a Party) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party.  The Debtor Releasing Parties agree not to file, commence, or assert any of the Estate Causes of Action against the Brenntag Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date).

6.      Upon NICO's payment of the Settlement Payment, and without the need for execution or delivery of any further documents or the taking of any other action by Brenntag, on behalf of itself and its respective successors and assigns, Brenntag waives, releases, acquits, and forever discharges the Debtor Releasees of and from any and all Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date (the "<u>Brenntag Released Claims</u>").  The Debtor Releasees other than the Debtors (which are Parties) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party. Brenntag agrees not to file, commence, or assert any of the Brenntag Released Claims against the Debtor Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the

Effective Date), including, for the avoidance of doubt, by filing a proof of claim in the Chapter 11 Cases.

7.    Upon NICO's payment of the Settlement Payment, and without the need for the execution or delivery of any further documents or the taking of any other action by the Debtors, the Debtor Releasing Parties waive, release, acquit, and forever discharge the NICO Releasees of and from the Estate Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date, including the Non-Debtor Intercompany Agreements (the "Debtor Released NICO Estate Causes of Action"). The NICO Releasees other than NICO (which is a Party) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party. The Debtor Releasing Parties agree not to file, commence, or assert any of the Estate Causes of Action against the NICO Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date).

8.    Upon NICO's payment of the Settlement Payment, and without the need for execution or delivery of any further documents or the taking of any other action by NICO, on behalf of itself and its respective successors and assigns, NICO waives, releases, acquits, and forever discharges the Debtor Releasees of and from any and all Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date, including the Non-Debtor Intercompany Agreements (the "NICO Released Claims"). The Debtor Releasees other than the Debtors (which are Parties) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party. NICO agrees not to file, commence, or assert any of the NICO Released Claims against the Debtor Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date), including, for the avoidance of doubt, by filing a proof of claim in the Chapter 11 Cases.

9.    Upon NICO's payment of the Settlement Payment, and without the need for the execution or delivery of any further documents or the taking of any other action by the Debtors, the Debtor Releasing Parties waive, release, acquit, and forever discharge the DB US Releasees of and from the Estate Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date (the "Debtor Released DB US Estate Causes of Action," and together with the Debtor Released Brenntag Estate Causes of Action and the Debtor Released NICO Causes of Action, the "Debtor Released Estate Causes of Action"). The DB US Releasees other than DB US (which is a Party) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party. The Debtor Releasing Parties agree not to file, commence, or assert any of the Estate Causes of Action against the DB US Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date).

10.    Upon NICO's payment of the Settlement Payment, and without the need for execution or delivery of any further documents or the taking of any other action by DB US, on behalf of itself and its respective successors and assigns, DB US waives, releases, acquits, and forever discharges the Debtor Releasees of and from any and all Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date (the "DB US Released Claims"). The Debtor Releasees other than the Debtors (which are Parties) are intended

third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party. DB US agrees not to file, commence, or assert any of the DB US Released Claims against the Debtor Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date), including, for the avoidance of doubt, by filing a proof of claim in the Chapter 11 Cases.

11.     Notwithstanding anything to the contrary contained herein (including, but not limited to, paragraph 16 herein) or in the Settlement Order, each Contributing Party reserves all, and does not release any, rights, claims, and defenses (whether contractual or otherwise) against each other Contributing Party, including but not limited to all rights, claims, and defenses under the 2003 MSPA and 2007 SPA (including in the arbitration proceeding pending under the 2021 Arbitration Rules of the International Chamber of Commerce, Case Ref. 27945/PDP) ("Preserved Rights"). For the avoidance of doubt, the Contributing Parties agree that the releases of the Brenntag Released Claims, the DB US Released Claims, and the NICO Released Claims by the respective Contributing Parties shall not be raised as a defense and shall not constitute a defense to the assertion of Preserved Rights.

12.     The Parties expressly acknowledge that there may be changes in the law or the Parties may hereafter discover facts different from, or in addition to, those that they now believe to be true with respect to any and all of the claims released in this Settlement Agreement. Nevertheless, the Parties hereby agree that the foregoing releases shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts. In addition, the Parties acknowledge that they have been advised by their respective legal counsel and are familiar with the provisions of Section 1542 of the California Civil Code, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

13.     As a material condition to the Effective Date of this Settlement Agreement, the Settlement Order must provide that holders of Claims against, and interest holders in, the Debtors, as applicable, are barred from asserting or recovering upon, directly or indirectly, the Estate Causes of Action against any Non-Debtor Released Party. The Court shall have exclusive jurisdiction to enforce the Settlement Order and to determine, without limitation, whether any such claims brought against any of the Non-Debtor Released Parties constitute Estate Causes of Action and are subject to the prohibition against prosecution of such claims.

14.     As a material condition to the Effective Date of this Settlement Agreement, the Settlement Order must provide that the Non-Debtor Released Parties are forever barred from asserting the Brenntag Released Claims, the NICO Released Claims, and the DB US Released Claims, respectively, against the Debtor Releasees, and the Court shall have exclusive jurisdiction to enforce the Settlement Order and to determine, without limitation, whether any such claims brought against any of the Debtor Releasees constitute Brenntag Released Claims, NICO Released

Claims, and/or DB US Released Claims, as applicable, and are subject to the prohibition against prosecution of such claims.

15.     As a material condition to the Effective Date of this Settlement Agreement, subject to the Debtors' compliance with the requirements of the Bankruptcy Code with respect to a plan and disclosure statement, each Contributing Party agrees they shall support confirmation of a chapter 11 plan, including all exhibits, supplements, and amendments thereto (collectively, as may be amended from time to time, the "Plan") that is consistent in all respects with the terms in the Plan Term Sheet attached as **Exhibit B** to this Settlement Agreement and is otherwise consistent with this Settlement Agreement and reasonably acceptable to NICO.  For the avoidance of doubt, confirmation of a Plan is not a condition precedent to the effectiveness of this Settlement Agreement.

16.     Nothing in this Settlement Agreement or Settlement Order bars any person from asserting a Cause of Action against a Non-Debtor Released Party that is not an Estate Cause of Action.

17.     Each Party shall use its reasonable efforts and take all such steps and execute all such documents as are reasonably necessary and proper to secure the purpose and intent of this Settlement Agreement, including entry of the Settlement Order.  In the event that any objection, action, proceeding, or appeal is commenced by any person to invalidate, hinder, or prevent approval, validation, enforcement, or carrying out of any provisions of this Settlement Agreement or entry of the Settlement Order, the Parties agree to cooperate in good faith and undertake reasonable efforts in opposing any such objection, action, proceeding, or appeal.  The Parties acknowledge that they share a common interest in effecting this Settlement Agreement, including that the Settlement Order becomes a Final Order.

18.     NICO shall be entitled to treat the Settlement Payment (and any portion thereof) in a manner that yields the most advantageous tax consequences to NICO; *provided* that, for the avoidance of doubt, NICO shall make each Settlement Payment within the time frame indicated in paragraph 3 of this Settlement Agreement.

19.     The Debtors' obligations under this Settlement Agreement shall be binding on their Estates and any representatives thereof, including any reorganized or wind-down Debtors, and any trust, plan administrator or trustee established under a chapter 11 plan, chapter 7 trustee, or chapter 11 trustee.  Following the Effective Date, the Debtors, and any successor or assignee of the Debtors, including any plan administrator or trustee appointed under a chapter 11 plan, shall indemnify and defend, and seek, at its sole cost and expense, the dismissal of any litigation asserting a Debtor Released Estate Cause of Action against Non-Debtor Released Parties in violation of this Settlement Agreement or the Settlement Order.

20.     The effectiveness of this Settlement Agreement is subject to entry of the Settlement Order.  Within five business days of execution of this Settlement Agreement, counsel for the Debtors shall file with the Court a motion to approve this Settlement Agreement acceptable in form and substance to the Parties (the "Settlement Motion").  Should any creditor or party in interest object to this Settlement Agreement, the Debtors shall oppose any such objection and each Contributing Party agrees to file a pleading opposing any such objection.

21.     Counsel for the Debtors shall seek relief from the Court establishing procedures and deadlines for filing proofs of claim for all claims arising before commencement of the Debtors' Chapter 11 Cases acceptable in form and substance to the Parties in conjunction with or prior to entry of an order confirming the Plan.

22.     The Parties agree that this Settlement Agreement constitutes settlement of disputed claims and that nothing stated herein shall constitute an admission of liability on the part of any Party, such liability being expressly denied by the same.

23.     Nothing contained in this Settlement Agreement, or in any negotiations, discussions, correspondence, other materials of any kind relating to this agreement or relating to the negotiation of this agreement waives or shall be deemed to waive any Party's work product protection or right to claim the protections of any privilege, including attorney-client privilege, common-interest privilege, or mediation privilege.

24.     This Settlement Agreement constitutes the entire agreement between and among the Parties hereto with respect to the matters contained herein and shall inure to the benefit of the predecessors, successors, and assigns of each.  The Parties hereto further state that they have carefully read the foregoing, understand the contents thereof, and each have been independently represented by counsel in entering this Settlement Agreement.

25.     The Parties warrant and represent that they each have the power and authority to sign, execute, and deliver this Settlement Agreement and to consummate the terms contemplated hereby.  The Parties further warrant and represent that they have not assigned to any person or entity any Claims or Causes of Action that are subject to this Settlement.

26.     In the event of a breach of this Agreement, the Parties shall have all remedies available in law and equity.  The Debtors acknowledge that the assertion of any claim or demand against any Non-Debtor Released Party in breach of this Settlement Agreement shall cause irreparable injury to the Non-Debtor Released Party for which there is no adequate remedy at law. Accordingly, the Debtors agree that a Non-Debtor Released Party shall have the right, in addition to any other remedies it may have under this Settlement Agreement or at law, to specific performance to enforce, or injunctive or other equitable relief to prevent a threatened breach of, this agreement.  No party shall assert that the automatic stay in the Debtors' bankruptcy case precludes an action for breach or enforcement of this agreement.  The Parties agree and the Settlement Order shall provide that damages, if any, payable by the Debtors hereunder for breach of this agreement shall be entitled to administrative expense priority under Section 503(b)(1) of the Bankruptcy Code against each of the Debtors' estates, and assertable against any reorganized or wind-down Debtors, and any trust established under a chapter 11 plan.

27.     This Settlement Agreement is entered into, and is to be construed in accordance with, and enforceable pursuant to, the laws of the State of New York without regard to the principles of conflicts of laws.  Any applications by any Party regarding the enforcement or non-enforcement of this Settlement will be limited to the exclusive jurisdiction of the United States Bankruptcy Court for the District of New Jersey or, if the Chapter 11 Cases have been closed and cannot be reopened, to the United States District Court for the District of New Jersey, to which jurisdiction the Parties consent.

28.    No persons or entities shall be considered third-party beneficiaries of this Settlement Agreement except the Debtor Releasees and Non-Debtor Released Parties (other than the Debtors, Brenntag, DB US, and NICO), each of which are not signatories hereto, but who shall be third-party beneficiaries under this Settlement Agreement and entitled to enforce it in accordance with its terms; *provided*, *however*, the consent of the Debtor Releasees and the Non-Debtor Released Parties (other than the Debtors, Brenntag, DB US, and NICO) shall not be required to amend, modify, or terminate this Settlement Agreement, or waive any of its provisions.

29.    This Settlement Agreement and the Plan Term Sheet attached hereto may be amended or modified only by a writing signed by or on behalf of each Party.

30.    This Settlement Agreement may be executed in one or more counterparts and by facsimile, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument.

[*Rest of Page Intentionally Left Blank*]

 

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**WHITTAKER, CLARK & DANIELS, INC.**
**BRILLIANT NATIONAL SERVICES, INC.**
**SOCO WEST, INC.**
**L. A. TERMINALS, INC.**

By: _____

Name:  Tim Pohl

Title:   Disinterested Director

By: _____

Name:  Paul Aronzon

Title:   Disinterested Director

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**WHITTAKER, CLARK & DANIELS, INC.**
**BRILLIANT NATIONAL SERVICES, INC.**
**SOCO WEST, INC.**
**L. A. TERMINALS, INC.**

By: _____
Name:  Tim Pohl
Title:   Disinterested Director

By: _____
Name:  Paul Aronzon
Title:   Disinterested Director

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**BRENNTAG CANADA, INC.**
**BRENNTAG GREAT LAKES, LLC**
**BRENNTAG MID-SOUTH, INC.**
**BRENNTAG NORTH AMERICA, INC.**
**BRENNTAG NORTHEAST, LLC**
**BRENNTAG PACIFIC, INC.**
**BRENNTAG SOUTHWEST, INC.**
**BRENNTAG SPECIALTIES, LLC (F/K/A BRENNTAG SPECIALTIES, INC., AND AS MINERAL AND PIGMENT SOLUTIONS, INC.)**
**COASTAL CHEMICAL CO., LLC**

By: _____
Name:  Jaime Skinner
Title:   General Counsel, Brenntag North America, Inc.

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**BERKSHIRE HATHAWAY INC.**

By: _____
Name: Marc Hamburg
Title: Authorized Signatory

**BH COLUMBIA INC.**
**COLUMBIA INSURANCE COMPANY**
**NATIONAL INDEMNITY COMPANY**
**RESOLUTE MANAGEMENT, INC.**
**RINGWALT & LIESCHE CO.**
**NATIONAL LIABILITY & FIRE INSURANCE COMPANY**

By: _____
Name: Brian Snover
Title: Authorized Signatory

*[NICO's Signature Page to Settlement Agreement]*

**JA1264**

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**DB US HOLDING CORPORATION**

By: _____

Name:  Richard Kaluzinski

Title:    Vice President & Head of Legal

# EXHIBIT A

**DIP Term Sheet**

**THIS TERM SHEET IS AN INDICATIVE SUMMARY OF SELECTED TERMS AND IS NOT COMPLETE OR A COMMITMENT, OFFER, OR AGREEMENT IN PRINCIPLE TO PROVIDE FINANCING. THIS TERM SHEET IS NOT BINDING ON ANY PARTY AND THE PARTIES DO NOT INTEND TO BE BOUND UNLESS AND UNTIL THEY ENTER INTO DEFINITIVE DOCUMENTATION REGARDING THE SUBJECT MATTER OF THIS TERM SHEET. NOTHING CONTAINED IN THIS TERM SHEET IS OR SHALL BE CONSTRUED AS AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES HERETO, BE ADMISSIBLE IN ANY ACTION RELATED TO THE MATTERS ADDRESSED HEREIN, OR CONSTITUTE A WAIVER OF ANY RIGHTS OF THE PARTIES HERETO, WITH RESPECT TO THE PLAN OR ANY OTHER DOCUMENTS CONTEMPLATED BY THE FOREGOING.**

**THIS TERM SHEET DOES NOT CREATE A DUTY TO NEGOTIATE IN GOOD FAITH TOWARD DEFINITIVE DOCUMENTATION AND SHALL NOT BE RELIED UPON BY ANY PERSON AS THE BASIS FOR ANY LIABILITY OR THE BASIS FOR A CONTRACT BY ESTOPPEL OR OTHERWISE.**

**THIS TERM SHEET IS SUBJECT TO MATERIAL CHANGES AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY.**

### INTRODUCTION

This Term Sheet describes potential structural terms for a financing transaction. This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in any definitive documents (the "DIP Financing Documents"), which remain subject to negotiation and completion, and none will become effective until agreed-to by the relevant parties.

| TERMS | |
|---|---|
| **Parties to the Proposed DIP Facility:** | Borrower: Brilliant National Services, Inc., a Delaware corporation.<br><br>Guarantors: Guaranteed, on a joint and several basis, by (a) Whittaker, Clark & Daniels, Inc., a New Jersey corporation; (b) L. A. Terminals, Inc., a California corporation; and (c) Soco West, Inc., a Delaware corporation (together with the Borrower, the "Debtors").<br><br>DIP Lenders: National Indemnity Company and/or certain of its affiliates or designees. |
| **DIP Facility:** | The DIP Lenders agree, severally and not jointly, to make senior secured superpriority debtor-in-possession loans to the Borrower consisting of new money delayed-draw term loans (the "DIP Loans") to be made from time to time pursuant to a term loan facility (the "DIP Facility") during the Availability Period (as defined below) in an aggregate principal amount (exclusive of interest) not to exceed at any time outstanding aggregate principal commitments of $50,000,000 (the "DIP Commitment"), which shall be made available to the Borrower subject to the terms of the DIP Credit Agreement.<br><br>The proceeds of the DIP Loans shall be funded into a deposit account of the Borrower. Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Lenders, which shall be perfected pursuant to the DIP Financing Order (as defined below) and shall be subject to an account control agreement reasonably satisfactory to the DIP Lenders and the Debtors.<br><br>"Availability Period" means the period from the Closing Date to the Maturity Date (each as defined below). |

| Interest Rate: | 5.35% per annum, payable in kind in arrears, on the last business day of the month. Interest shall be computed on the basis of a 365/366-day year for the actual number of days elapsed.<br><br>At all times following the earlier of (a) December 31, 2024 and (b) upon the written election of the DIP Lenders following the occurrence and during the continuance of an Event of Default (as defined below), the principal, interest and all other amounts due on the DIP Loans shall bear interest at a rate equal to 4.00% per annum in excess of the interest rate set forth above. |
|---|---|
| Security and Priority: | The DIP Lenders shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code (as defined below), continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first priority security interests and liens to secure the DIP Facility (the "DIP Liens") on all tangible and intangible real and personal property of the Debtors, and all other property of the Debtors of whatever kind, nature or description, whether acquired or created prepetition or post-petition, and the proceeds of each of the foregoing (the "DIP Collateral"). Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, (w) Avoidance Actions (as defined in the DIP Order), (x) Successor Liability Claims (as defined in the DIP Order), (y) other estate causes of action and estate claims, if any, against the DIP Lenders and their Affiliates (as defined in the DIP Financing Documents) (together with subclauses (w) and (x), the "Specified Estate Claims") and (z) Excluded Assets (as defined in the DIP Order); *provided*, that DIP Collateral shall include the proceeds of Specified Estate Claims and Excluded Assets; *provided*, *however*, that DIP Collateral shall not include the proceeds of the EPA Trust Account (as defined in the DIP Order). For the avoidance of doubt, all estate causes of actions and estate claims other than the Specified Estate Claims shall be DIP Collateral.<br><br>The DIP Facility shall constitute allowed superpriority administrative expense claims (the "DIP Claims") in the Chapter 11 Cases (as defined below) and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.<br><br>The DIP Liens and the DIP Claims shall be subject to the Carve Out (as defined below).<br><br>All of the liens described herein with respect to the assets of the Debtors shall be effective and perfected by the DIP Financing Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lenders may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the DIP Liens, or to enable the DIP Lenders to protect, exercise or enforce its rights under the DIP Financing Order and the DIP Documents. |
| Carve Out: | The DIP Financing Order shall include the professional fee carve out as set forth in **Annex A** attached hereto (the "Carve Out"). |
| Fees and Expenses: | None. |
| Closing Date: | Closing to occur upon satisfaction (or waiver by the DIP Lenders in their sole discretion) of the "Closing Conditions" (the date on which such conditions have been satisfied or waived, the "Closing Date"). |
| Closing Conditions; Conditions Precedent to | The DIP Facility and the making of each DIP Loan shall be conditioned upon the satisfaction of conditions precedent usual for facilities and transactions of this type and appropriate in these circumstances as set forth in the DIP Financing Documents, including, (a) no continuing default or Event of Default; (b) in the case of the initial DIP Loan, entry of an Approved Order |

| Extensions of Credit: | (as defined below) by the Bankruptcy Court approving the DIP Financing and DIP Financing Documents, on a final basis, which order shall not have been reversed, modified, amended, supplemented, stayed, vacated or subject to stay (the "DIP Financing Order") and delivery of the Initial Approved Budget; and (c) in the case of subsequent Approved DIP Loans, delivery of (i) a Notice of Borrowing and (ii) a Subsequent Approved Budget. |
|---|---|
| Budget: | The Debtors shall prepare and deliver to the DIP Lenders a budget beginning with the week which includes the Closing Date of the DIP Facility through January 31, 2025 (the "Budget Period"), showing anticipated cash receipts and cash disbursements in form and substance satisfactory to the DIP Lenders in their sole discretion (the "Initial Approved Budget"). <br><br> The Debtors shall prepare and deliver with a Notice of Borrowing an updated budget for the remainder of the Budget Period in form and substance reasonably satisfactory to the DIP Lenders and the Debtors (a "Subsequent Approved Budget"); *provided*, that any Subsequent Approved Budget that shows "Net Available Unrestricted Cash" of the Debtors at the end of the Budget Period of less than $5 million must be satisfactory to the DIP Lenders in their sole discretion |
| Milestones: | The Debtors shall comply with the following milestones (the "Milestones"), and the failure to timely comply shall constitute an immediate Event of Default: <br><br> (a) The hearing to approve the Proposed Settlement (which hearing may be the hearing to approve the Approved Plan) shall be scheduled to begin on or before December 1, 2024; <br><br> (b) Entry by the Bankruptcy Court of an Approved Order approving the Proposed Settlement (a "Settlement Order") on or before December 31, 2024; <br><br> (c) Filing an Approved Plan and Approved Disclosure Statement with the Bankruptcy Court on or before October 28, 2024; and <br><br> (d) Commencement of solicitation of acceptances of an Approved Plan on or before December 26, 2024. |
| Draw of Initial DIP Loan: | Subject to the satisfaction of certain conditions precedent, the Borrower may borrow DIP Loans in the amount of $20 million upon the Closing Date. |
| Subsequent Draws of DIP Loans: | At any time on or after October 12, 2024, subject to the satisfaction of certain conditions precedent, including the Borrower providing the DIP Lenders with (a) a Notice of Borrowing and (b) a Subsequent Approved Budget, the Borrower may borrow DIP Loans in amounts requested by the Borrower and the DIP Lenders shall promptly make available funds equal to the amount of the requested DIP Loan to the Borrower by wire transfer to the account specified in the Notice of Borrowing; *provided* that, notwithstanding anything to the contrary in this Term Sheet or Annex A, the DIP Lenders shall have no obligation to make DIP Loans to the extent that such DIP Loans would cause the aggregate amount of outstanding DIP Loans to exceed the DIP Commitment. |
| Maturity Date: | All obligations in respect of the DIP Facility and DIP Loans shall be due and payable in full and in cash, and the DIP Commitments (if any) shall terminate, on the earliest to occur (the "Maturity Date") of (i) the date the Debtors' receive the Settlement Contribution (as defined in the Proposed Settlement) (the "Settlement Contribution Date"), (ii) the date the DIP Loans are accelerated in accordance with the DIP Financing Documents and the DIP Financing Order, and (iii) the date of the dismissal of any of the chapter 11 cases or conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. |

| | No order confirming a plan of reorganization entered in the Chapter 11 Cases shall discharge or otherwise affect in any way the joint and several obligations of the Debtors to the DIP Lenders under the DIP Facility.

Notwithstanding the foregoing, upon the occurrence of the Settlement Contribution Date, the DIP Lenders hereby irrevocably agree that:  (a) the Debtors' obligations under the DIP Financing Documents to repay the principal of the DIP Loans and any interest thereon shall be automatically forgiven, released, and terminated, and (b) any DIP Liens or securities interests granted to the DIP Lenders by the Debtors on any DIP Collateral shall be automatically released and terminated. |
| **Use of Proceeds and Cash Collateral:** | Proceeds of the DIP Facility and other cash collateral will be used (i) for general corporate purposes of the Debtors, including to fund the costs of the administration of the Chapter 11 Cases and to pay such prepetition expenses, in each case in a manner consistent with the Approved Budget; (ii) to pay professional fees and expenses; (iii) to pay premiums, fees, expenses, penalties, and other amounts owed under the DIP Financing Documents, to the extent applicable; (iv) to fund a wind-down budget in form and substance acceptable to the DIP Lender; and (v) to fund the Carve Out; *provided*, that in no event shall any such proceeds be used to assert, support or prosecute (or to seek standing to assert, support or prosecute) any claims or causes of action against, or which are indemnified by, the DIP Lenders or any of their Affiliates; *provided*, however, that such proceeds may be used to seek approval of (or object to or otherwise respond to) the Proposed Settlement. |
| **Representations and Warranties:** | The DIP Facility (and the making of any DIP Loan) shall include representations and warranties of the Debtors usual for facilities and transactions of this type and appropriate in these circumstances. |
| **Covenants:** | The DIP Facility shall include covenants usual for facilities and transactions of this type and appropriate in these circumstances, including as set forth above. |
| **Events of Default:** | Each of following shall constitute an "Event of Default":

(i) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made and, to the extent capable of being cured, such representation or warranty is not corrected or clarified (in each case, in a manner which causes such representation or warranty to no longer be incorrect or misleading) within 5 days after it was initially made;

(ii) failure by any Debtor to be in compliance in all respects with the Milestones and any other provisions of the DIP Facility and/or the DIP Financing Order, unless, in the case of certain affirmative covenants, such failure is cured within 15 days after written notice thereof;

(iii) entry of an order of the Bankruptcy Court with respect to any Debtor, dismissal of its Chapter 11 Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), or, in each case, any Debtor shall seek approval therefor or support or fail to object to any motion seeking the foregoing;

(iv) the Bankruptcy Court declines to approve the Settlement Order or the Confirmation Order;

(v) entry of an order of the Bankruptcy Court or other court of competent jurisdiction reversing, amending, supplementing, staying, vacating or otherwise modifying the Estate |

Case 3:24-cv-05914-EKN Document 297-2 Filed 09/03/25 Page 32 of 42 PageID: 1636
Case 3:24-cv-05914-EKN Document 297-2 Filed 09/03/25 Page 33 of 48 PageID: 1636
Exhibit B - Proposed Order    Page 33 of 48

|  | Claims Decision, DIP Financing Order, the Settlement Order or the Confirmation Order or any Debtor shall seek approval therefor or support or fail to object to and motion seeking the foregoing, in each case; |
|---|---|
|  | (vi)  entry of an order in the Chapter 11 Cases confirming a plan that is not an Approved Plan or any Debtor shall seek approval therefor or support or fail to object to any motion seeking the foregoing; |
|  | (vii)  entry of an order of the Bankruptcy Court for any financing pursuant to Section 364 of the Bankruptcy Code (other than the DIP Financing), or any Debtor shall seek approval therefor or support or fail to object to and motion seeking the foregoing; |
|  | (viii)  entry of an order of the Bankruptcy Court granting (x) any Liens in any of the Chapter 11 Cases that (i) are senior to or pari passu with the DIP Liens or (ii) encumber any Specified Estate Claims, or (y) any claims that are senior to or pari passu with the DIP Claims or, in each case, any Debtor shall seek approval therefor or support or fail to object to and motion seeking the foregoing; |
|  | (ix)  any Debtor shall seek to, or shall support any motion to disallow in whole or in part the DIP Claims; |
|  | (x)  based on (a) the most recent Subsequent Approved Budget, (b) actual cash disbursements made by the Debtors as of such date and (c) fees incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code, as reflected on any fee statement or fee application filed with the Court as of such date, cash of the Debtors at the end of the Budget Period will be less than $5 million; and |
|  | (xi)  the DIP Financing Order or any DIP Financing Document shall cease, for any reason, to be in full force and effect or the Debtors shall so assert in writing. |
| **Remedies Upon Event of Default:** | Subject to the terms of the DIP Financing Order, the Carve Out, and the DIP Financing Documents, upon the occurrence and during the continuance of any Event of Default, subject to notice to the Debtors required under the DIP Financing Order, the DIP Lenders may take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay: |
|  | (a)  declare the DIP Loans (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable; and/or |
|  | (b)  exercise rights and remedies pursuant to the terms of the DIP Financing Order, the DIP Financing Documents or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of the DIP Financing Documents, and (ii) to sell or otherwise dispose of or otherwise monetize any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code; *provided* that, subject to the DIP Financing Order, the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Lenders' exercise of their rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Lenders. |

| CERTAIN DEFINITIONS | |
|---|---|
| **Approved Disclosure Statement** | A disclosure statement in form and substance mutually agreeable to the DIP Lenders and the Debtors. |
| **Approved Order** | An order of the Bankruptcy Court in form mutually agreeable to the DIP Lenders and the Debtors. |
| **Approved Plan** | A plan of reorganization in form and substance mutually agreeable to the DIP Lenders and the Debtors. |
| **Bankruptcy Code** | Title 11 of the United States Code, 11 U.S.C. §§ 101–1532. |
| **Bankruptcy Court** | The United States Bankruptcy Court for the District of New Jersey or such other court having jurisdiction over the Chapter 11 Cases. |
| **Chapter 11 Cases** | When used with reference (a) to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, and (b) to all Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 23-13575 (MBK) pursuant to the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 72]. |
| **Estate Claims Decision** | The order of the Bankruptcy Court entered on August 28, 2024 in Case No. 23-01245 (MBK) at Adv. Proc. Docket No. 292. |
| **Proposed Settlement** | That certain Settlement Agreement between the Debtors and various other parties settling estate claims and causes of action. |
| **Notice of Borrowing** | An irrevocable notice (which notice must be received by the Lender no later than 10:00 a.m., New York time, five (5) Business Days prior to the requested borrowing date). Such notice shall be signed by an authorized officer of the Borrower and state that, to the best of their knowledge, (a) the proceeds of the DIP Loans to be made in connection with such Notice of Borrowing shall be used in accordance with the terms of the DIP Credit Agreement, (b) no default or Event of Default has occurred and is continuing, and (c) the representations and warranties contained in the DIP Credit Agreement are true and correct in all material respects as at the applicable borrowing date. |

**Annex A**

**Carve Out**

Case 3:24-cv-00709-MBK Document 297 Filed 09/03/25 Page 1281 of 1429 PageID: 16390
Case 3:24-cv-00709-MBK Document 1297 Filed 09/03/25 Page 1281 of 1429 PageID: 16390
Exhibit B - Proposed Order    Page 36 of 48

1.    *Carve Out.*

    (a)    <u>Carve Out</u>.  As used in this Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>"), the FCR pursuant to section 105(a) or 1103 (the "<u>FCR Professionals</u>"), and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals and FCR Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the FCR, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

    (b)    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Lenders to the Debtors with a copy to counsel to the FCR and counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Commitments (each, as defined in the DIP Credit Agreement), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Commitments, in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  On the first business day after the DIP Lenders give such notice, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), the DIP Lenders shall make available to the Debtors such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Debtors.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments

have been terminated, in which case any such excess shall be paid to the Debtors.  Notwithstanding anything to the contrary in the DIP Facility Documents or this Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 7, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 7, prior to making any payments to the DIP Lenders.  Notwithstanding anything to the contrary in the DIP Facility Documents or this Order, following delivery of a Carve Out Trigger Notice, the DIP Lenders shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Lenders for application in accordance with the DIP Facility Documents.  Further, notwithstanding anything to the contrary in this Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Order or the DIP Facility, the Carve Out shall be senior to all liens and claims securing the DIP Facility and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

(c)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     No Direct Obligation To Pay Allowed Professional Fees.  The DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Order or otherwise shall be construed to obligate the DIP Lenders in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Order, the DIP Facility Documents, the Bankruptcy Code, and applicable law.

**<u>EXHIBIT B</u>**

**Plan Term Sheet**

**THIS IS AN ILLUSTRATIVE TERM SHEET AND IS NOT AND SHALL NOT BE CONSTRUED AS AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS ILLUSTRATIVE TERM SHEET IS OR SHALL BE CONSTRUED AS AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES HERETO, BE ADMISSIBLE IN ANY ACTION RELATED TO THE MATTERS ADDRESSED HEREIN, OR CONSTITUTE A WAIVER OF ANY RIGHTS OF THE PARTIES HERETO, WITH RESPECT TO THE PLAN OR ANY OTHER DOCUMENTS CONTEMPLATED BY THE FOREGOING.**

**THIS ILLUSTRATIVE TERM SHEET DOES NOT CREATE A DUTY TO NEGOTIATE IN GOOD FAITH TOWARD DEFINITIVE DOCUMENTATION AND SHALL NOT BE RELIED UPON BY ANY PERSON AS THE BASIS FOR ANY LIABILITY OR THE BASIS FOR A CONTRACT BY ESTOPPEL OR OTHERWISE.**

**THIS ILLUSTRATIVE TERM SHEET IS SUBJECT TO MATERIAL CHANGES AND IS BEING DISTRIBUTED FOR DISCUSSION AND ILLUSTRATIVE PURPOSES ONLY.**

*ILLUSTRATIVE TERM SHEET*[1]

## INTRODUCTION

This Illustrative Term Sheet describes potential structural terms of a chapter 11 plan, incorporating the implementation of a consensual resolution regarding estate causes of action against NICO, Brenntag, and DB US and related parties. This Illustrative Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in any definitive documents, which remain subject to negotiation and completion, and none will become effective until agreed-to by the relevant parties. This Illustrative Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

| CLAIMS TREATMENT | |
| --- | --- |
| **Treatment of Environmental Claims and Indirect Environmental Claims** | (i) <u>Treatment</u>:  On the Plan Effective Date, each Holder of an Allowed Environmental Claim and each Holder of an Allowed Indirect Environmental Claim shall receive, in full and final satisfaction of such Environmental Claim its Pro Rata share of the Environmental Remediation Trust Assets in accordance with the Environmental Remediation Trust Agreement after all DIP Claims, Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Priority Claims have been paid in full. |
| | (ii) <u>Impairment and Voting</u>:  Environmental Claims and Indirect Environmental Claims are impaired.  Holders of Environmental Claims and Holders of Indirect Environmental Claims are entitled to vote to accept or |

---

[1]  This Illustrative Term Sheet is presented for discussion purposes only and is subject in its entirety to (a) approval of the Debtors' boards of directors, and with respect to conflicts matters, the Disinterested Directors, and (b) confirmatory tax diligence.  Capitalized Terms not otherwise defined herein have the meaning ascribed to them in the Settlement Agreement.

Case 3:24-cv-05109-BKNQ Document 297-1 Filed 09/03/25 Page 1285 of 1429 PageID
Case 3:24-cv-05109-BKNQ Document Filed 09/03/25 Filed Page 1285 of 1429 PageID
Exhibit B - Proposed Order    Page 40 of 48

| | reject the Plan. |
|---|---|
| **Treatment of Tort Claims** | (i) <u>Treatment</u>:  On the Plan Effective Date, each Holder of an Allowed Tort Claim shall receive, in full and final satisfaction of such Tort Claim, its Pro Rata share of the Tort Claims Trust Assets in accordance with the Plan, Tort Claims Trust Agreement, and Tort Claims Trust Distribution Procedures after all Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Priority Claims have been paid in full. |
| | (ii) <u>Impairment and Voting</u>:  Tort Claims are impaired.  Holders of Tort Claims are entitled to vote to accept or reject the Plan. |
| **Treatment of General Unsecured Claims** | On the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, its Pro Rata share of the GUC Trust Assets in accordance with the Plan and GUC Claims Trust Agreement, after all Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Priority Claims have been paid in full. |
| **Treatment of Administrative, Priority and Priority Tax Claims** | On or as soon as practicable after the later to occur of (i) the Plan Effective Date and (ii) the date such claim becomes allowed (or as otherwise set forth in the Plan), each holder of an administrative, priority, or priority tax claim will either be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Treatment of DIP Claims** | On or as soon as practicable after the Plan Effective Date, each Holder of a DIP Claim shall receive, in full and final satisfaction of such DIP Claim, upon the earlier of: (i) the occurrence of the Settlement Effective Date, pursuant to the Estate Claims Settlement, a dollar-for-dollar reduction on account of the principal amount of the DIP Loans funded in cash otherwise required to be paid by such holder (or its designated affiliate); or (ii) the occurrence of a termination event pursuant to paragraph 4 of the Settlement Agreement, payment in full in cash of such DIP Claims. |
| **Treatment of Non-Debtor Intercompany Claims** | On the Plan Effective Date, each Holder of a Non-Debtor Intercompany Claim shall waive such Non-Debtor Intercompany Claim pursuant to the Estate Claims Settlement. |
| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING** | |
| **Wind-Down Transactions** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, the Wind-Down Debtors shall take all actions as may be necessary or appropriate to effectuate the Wind-Down Transactions, which shall be reasonably acceptable to NICO, including, without limitation:   (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, |

| | or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) such other transactions that are required to effectuate the Wind-Down Transactions; (5) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in, any of the Debtors which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (6) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. |
|---|---|
| **Distributable Proceeds and Waterfall Recovery** | On or after the Plan Effective Date, the Disbursing Agent shall make Distributions on account of Allowed Claims in accordance with the Plan, the Environmental Remediation Trust Agreement, Tort Claims Trust (and Tort Claims Trust Distribution Procedures), and GUC Trust Agreement, as applicable, using the Distributable Proceeds.<br><br>In accordance with this Plan, Distributable Proceeds shall be paid to Holders of Allowed Claims until satisfied in full from time to time in the following priority: (1) *first*, on account of DIP Claims (if any remain outstanding after giving effect to the Estate Claims Settlement), (2) *second*, on account of Allowed Administrative and Priority Tax Claims; (3) *third*, on account of Allowed Priority Claims; and (4) *fourth*, (A) Distributable Proceeds that constitute the Tort Claims Trust Assets shall be paid to Holders of Allowed Tort Claims in accordance with the Tort Claims Trust Distribution Procedures, (B) Distributable Proceeds that constitute the Environmental Remediation Trust Assets shall be paid to Holders of Allowed Environmental Claims and Holders of Allowed Indirect Environmental Claims, and (C) Distributable Proceeds that constitute the GUC Trust Assets shall be paid to Holders of Allowed General Unsecured Claims (collectively, the "**Waterfall Recovery**"); *provided*, for the avoidance of doubt, that the foregoing shall be subject in all respects to the funding of the Professional Fee Escrow Account prior to or on the Plan Effective Date. |
| **Environmental Remediation Trust**[2] | The trust to be established by the Debtors on the Plan Effective Date, to which the Debtors will contribute the Environmental Remediation Trust Assets and which will be governed by the Environmental Remediation Trust Agreement to be filed with the Plan Supplement. |
| **Environmental Remediation Trust Assets** | (a) the Cash proceeds obtained through the pursuit of Assigned Insurance Rights on account of Environmental Claims and Indirect Environmental Claims (the "Environmental Claim Insurance Proceeds" and (b) [●]% of the Settlement Proceeds. |

---

[2]    For the avoidance of doubt, trust structure is subject in all respects to confirmatory tax diligence.

| | |
|---|---|
| **GUC Claims Trust[3]** | The trust to be established by the Debtors on the Plan Effective Date, to which the Debtors will contribute the GUC Trust Assets and which will be governed by the GUC Trust Agreement to be filed with the Plan Supplement, which shall be reasonably acceptable to NICO. |
| **GUC Claims Trust Assets** | (a) the Cash proceeds obtained through the pursuit of Assigned Insurance Rights on account of General Unsecured Claims (the "General Unsecured Claim Insurance Proceeds") and (b) [●]% of the Settlement Proceeds. |
| **Tort Claims Trust[4]** | The trust to be established by the Debtors on the Plan Effective Date, to which the Debtors will contribute the Tort Claims Trust Assets and which will be governed by the Tort Claims Trust Agreement to be filed with the Plan Supplement. |
| **Tort Claims Trust Assets** | (a) the Cash proceeds obtained through the pursuit of Assigned Insurance Rights on account of Tort Claims (the "Tort Claim Insurance Proceeds") and (b) [●]% of the Settlement Proceeds. |
| **Tort Claims Trust Distribution Procedures** | The document to be included in the Plan Supplement governing the procedures for submission, resolution, and distribution in respect of all Tort Claims, which shall be reasonably satisfactory to NICO. |
| **Plan Administrator** | The Debtors, in consultation with NICO, shall appoint a Plan Administrator, who shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a president and chief executive officer (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order. |
| | The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distributable Proceeds to the Environmental Remediation Trust, Tort Claims Trust, and GUC Trust, as applicable, in accordance with the Plan, the Environmental Remediation Trust Agreement, Tort Claims Trust, and GUC Trust Agreement, and the Waterfall Recovery and wind down the affairs of the Debtors and Wind-Down Debtors, including (all without further order of the Bankruptcy Court): (1) receiving, holding, investing, liquidating, supervising, and protecting the assets of the Wind-Down Debtors (2) taking all steps to execute all instruments and documents necessary to effectuate the Distributions to be made under the Plan; (3) making Distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all |

---

[3]  For the avoidance of doubt, trust structure is subject in all respects to confirmatory tax diligence.

[4]  For the avoidance of doubt, trust structure is subject in all respects to confirmatory tax diligence.

| | reasonable and documented fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) investigating commencing, prosecuting, or settling the Retained Causes of Action; (10) pursuing Claims related to the Insurance Contracts subject to the terms and conditions of the Plan and applicable terms, conditions, and other provisions of the applicable Insurance Contracts and applicable Law; (11) taking all steps to enforce the Settlement Order and the Confirmation Order, including by acting for the Wind-Down Debtors with respect to actions to enforce the Settlement Order and the Confirmation Order and/or defend appeals of the Settlement Order and/or the Confirmation Order, and (12) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan. |
|---|---|
| **Estate Claims Settlement** | A settlement of all claims or causes of actions that are property of the Debtors' estates or that Debtors otherwise have standing to assert under the Bankruptcy Code, by and among the Debtors and the Contributing Parties, the proceeds of which (the "Settlement Proceeds") shall be used to fund the Professional Fee Amount and Distributions pursuant to the Waterfall Recovery, pursuant to terms agreeable to the parties and contingent upon Bankruptcy Court approval.<br><br>Following the Effective Date of the Settlement Agreement, the Debtors, and any successor or assignee of the Debtors, including any plan administrator or trustee appointed under a chapter 11 plan, shall indemnify and defend, and seek, at its sole cost and expense, the dismissal of any litigation asserting a Debtor Released Estate Cause of Action against the NICO Releasees, the DB US Releasees, or the Brenntag Releasees (each as defined in the Settlement Agreement) in violation of this Settlement Agreement or the Settlement Order. |
| **Gatekeeping Provisions** | The Settlement Order and the Confirmation Order shall, among other provisions, enjoin prosecution of any claims released pursuant to the Estate Claims Settlement and provide that the Bankruptcy Court shall retain jurisdiction to enforce the Settlement Order (as defined in the Settlement Agreement) and Confirmation Order, including to determine, without limitation, whether (a) any claim brought against any NICO Releasees, Brenntag Releasees, or DB US Releasees (each as defined in the Settlement Agreement) constitutes an Estate Cause of Action and is subject to the prohibition against prosecution of such claim and (b) any claims brought against any of the Non-Debtor Released Parties constitutes a Brenntag Released Claim, NICO Released Claim, and/or DB US Released Claim (each as defined in the Settlement Agreement) and are subject to the prohibition against prosecution of such claims. |
| **Releases** | In addition to the releases granted pursuant to the Estate Claims Settlement, which are subject to terms agreeable to the parties, the Plan shall provide for customary releases of Debtor Claims and Causes of Action. |

| Bar Date | A Bar Date for all claims arising before commencement of the Debtors' Chapter 11 Cases shall be established in accordance with the Estate Claims Settlement in advance of or pursuant to the Confirmation Order. |
|---|---|
| Related Parties | Collectively, with respect to an Entity, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity Holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of Law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other Representatives, and other Professionals, Representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants, and nominees of the foregoing. |
| Non-Debtor Released Parties | The parties benefitting from the releases of Debtor Released Estate Causes of Action granted pursuant to the Estate Claims Settlement. |
| Exculpation | The Plan shall provide for customary exculpation. |
| Procedures for Payment of Administrative Claims | The Debtors will be responsible for payment of all allowed administrative claims through the Plan Confirmation Date.  The TCC shall be dissolved on the Confirmation Date and the FCR shall be discharged from her duties on the Confirmation Date.  There shall be no further obligation of the Debtors to pay any of the FCR's or TCC's fees and expenses after the Confirmation Date; *provided*, *however*, that notwithstanding the foregoing, the TCC may, at its option and without taking any action or seeking or receiving any approval, continue to serve and function after the Confirmation Date for the purposes of participating in any hearing on a Committee Professional Fee Claim.  To the extent that the Committee determines to continue to serve and function after the Confirmation Date pursuant to the preceding sentence, the Committee shall dissolve upon entry of a final order approving such Committee Professional Fee Claim. |
| Conditions Precedent to the Plan Effective Date | The Plan shall provide for customary conditions precedent to the Effective Date, including funding of the remaining contribution of the Estate Claims Settlement, pursuant to terms agreeable to the Parties. |
| **DEFINITIONS** | |
| Debtors | Whittaker, Clark & Daniels, Inc., a New Jersey corporation, Brilliant National Services, Inc., a Delaware corporation; L. A. Terminals, Inc., a California corporation; and Soco West, Inc., a Delaware corporation. |
| NICO | Berkshire Hathaway Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company, Resolute Management, Inc., Ringwalt & Liesche Co., and National Liability & Fire Insurance Company. |

| Brenntag | Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc.), and Coastal Chemical Co., LLC. |
|---|---|
| DB US | DB US Holding Corporation (f/k/a Stinnes Corporation). |
| Bankruptcy Code | Title 11 of the United States Code, 11 U.S.C. §§ 101–1532. |
| Bankruptcy Court | The United States Bankruptcy Court for the District of New Jersey or such other court having jurisdiction over the Chapter 11 Cases. |
| Chapter 11 Cases | When used with reference (a) to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, and (b) to all Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 23-13575 (MBK) pursuant to the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 72]. |
| Plan | A plan under chapter 11 of the Bankruptcy Code in the Debtors' bankruptcy proceedings, proposed by the Debtors in form and substance consistent with this Term Sheet and in all respects otherwise reasonably acceptable to the Debtors and NICO, confirmed by the Confirmation Order of the Bankruptcy Court and, to the extent required, affirmed by order of the District Court. |
| Plan Effective Date | The date that is the first business day after all conditions precedent to the effectiveness of the Plan, including that the Plan has become final and non-appealable, have been satisfied or waived by the Parties. |
| Petition Date | April 26, 2023. |
| Avoidance Actions | Any and all actual or potential avoidance, recovery, subordination, or other Claims and Causes of Action, actions, or remedies that may be brought by, or on behalf of, the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, actions, or remedies arising under sections 502, 510, 541, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws. |
| Causes of Action | Collectively, any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, obligations, third-party claims, indemnity claims, damages (including claims for or award of costs and/or expenses, court costs and attorneys' fees), losses, remedies, causes of action, demands, rights, lawsuits, suits, litigation, arbitration, legal proceeding, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, franchises, guaranties, Avoidance Actions, agreements, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown or hereafter discovered, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly |

| | or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, Law, equity, or otherwise pursuant to any theory of civil Law (whether local, state, or federal U.S. Law or non-U.S. Law). Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) any Claim (whether under local, state, federal U.S. Law or non-U.S. civil Law) based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction Law, violation of local, state, or federal non-U.S. Law or breach of any duty imposed by Law or in equity, including securities Laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code. |
|---|---|
| **Law** | Any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Court). |
| **Claim** | Any claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor. |
| **Confirmation Order** | The order of the Bankruptcy Court approving the Plan under Section 1129 of the Bankruptcy Code, which order shall be reasonably acceptable to NICO. |
| **Debt** | Any "debt," as defined in section 101(12) of the Bankruptcy Code. |
| **Distributable Proceeds** | All (a) Cash, (b) Cash proceeds generated from the use, sale, lease, liquidation, or other disposition of Estate property, including, for the avoidance of doubt, proceeds generated from the Insurance Contracts, and (c) Cash proceeds generated by the use, sale, lease, liquidation, or other disposition of any property belonging to the Wind-Down Debtors, *less* (x) the Professional Fee Amount required to be funded into the Professional Fee Escrow Account on or prior to the Effective Date and (y) the Reserve Funds. |
| **Reserve Funds** | On the Effective Date, the Wind-Down Debtors shall (a) with respect to each unpaid Administrative Claim, Priority Tax Claim, and Priority Claim, either pay the Allowed amount of such Claim in full in Cash (collectively, the "**Effective Date Payment**") or reserve Cash sufficient for payment of the Allowed amount of such Claim in full and (b) reserve Cash sufficient for payment of all legal fees and expenses reasonably likely to be incurred by the Wind-Down Debtors through the closing of the Chapter 11 Cases, including all legal fees and expenses necessary to defend to final resolution any appeal of the Confirmation Order, the Motion to Dismiss Denial Order, or any other matter arising in or related to these Chapter 11 Cases, hearing on a Professional Fee Claim, and any adversary proceeding pending as of the Effective Date (the aggregate amount of such reserved Cash pursuant to clauses (a) and (b), the "**Reserve Funds**"). The Wind-Down Debtors will transfer, or cause to be transferred, to the to the Environmental Remediation |

| | Trust, Tort Claims Trust, and GUC Trust, on a *pro rata* basis, any Reserve Funds remaining following the Wind-Down Debtors' payment in full of all DIP Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims as well as all other post-Effective Date legal fees and expenses. |
|---|---|
| **DIP Order** | The order approving the first priority secured debtor-in-possession delayed draw term loan facility, entry into related documentation, including the debtor-in-possession credit agreement, and related relief. |
| **DIP Claim** | All Claims against any Debtor with respect to any DIP Obligations, as defined in the DIP Order, which shall be superpriority administrative expense claims against each of the Debtors' estate with priority over all other Administrative Claims, secured by perfected first priority liens on all assets of the Debtors. |
| **Environmental Claim** | Any Claim or Cause of Action against a Debtor asserted by any Government Environmental Unit, and other civil responsibilities, obligations or liabilities with respect to sites relating to or arising under the Comprehensive Environmental Response, Compensation, and Liability Act, Resource Conservation and Recovery Act, or any other environmental Laws, including Claims for restoration, corrective action, or remediation of environmental or natural resource conditions. |
| **Indirect Environmental Claim** | A Claim held by a private party for breach of contract, indemnification, contribution, reimbursement, or cost recovery related to environmental monitoring or remediation, including Claims for contribution, personal injury, property damage, or direct costs under any environmental Law. |
| **Tort Claims** | Any Claim or Cause of Action against a Debtor whether known or unknown, manifested or unmanifested, for costs or damages, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or other personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to asbestos, talc, asbestiform minerals or any other chemical compound, or asbestos-, talc-, asbestiform- or any other chemical compound containing products caused or allegedly caused by, based on or allegedly based on, arising or allegedly arising from, attributable or allegedly attributable to, or in connection with, directly or indirectly, in whole or in part, the alleged acts, omissions, or conduct of the Debtors or any of the Debtors' predecessors-in-interest, including any such claims directly or indirectly, in whole or in part, arising out of or in any way relating to: (a) any products previously mined, manufactured, engineered, assembled, distributed, sold, used, consumed, installed, maintained, owned, occupied, stored, possessed, processed, designed, marketed, fabricated, constructed, supplied, produced, serviced, specified, selected, repaired, removed, replaced, released, and/or in any other way made available by the Debtors or any of the Debtors' predecessors-in-interest; (b) any materials present at any premises owned, leased, occupied, or operated by the Debtors or the Debtors' predecessors-in-interest; or (c) any talc in any way connected to the Debtors alleged to contain asbestos, asbestiform minerals, asbestos-containing products, or other constituent. |

| Estate Causes of Action | Any and all actions, Claims, rights, remedies, defenses, counterclaims, suits, and Causes of Action (a) owned or held, or assertable by or on behalf of any Debtor or its Estate (including, without limitation, claims assertable by the TCC or FCR, or by any other creditors, on behalf of any Debtor or its Estate), (b) that constitute property of the Estates under section 541 of the Bankruptcy Code, (c) that are or may be commenced or pursued by a representative of the Debtors or the Estates, including pursuant to sections 323 or 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (d) to avoid, invalidate or recover any transfer of any kind made by any Debtor, or any obligation of any Debtor, including under chapter 5 of the Bankruptcy Code or other applicable law, (e) that constitute Successor Liability Claims, or (f) otherwise assertable by any Debtor or its Estate under any federal, state, or other applicable law seeking to establish a non-Debtor's liability for existing or future Tort Claims, Environmental Claims, Indirect Environmental Claims, or other Claims against the Debtors; in all cases, however denominated and whether or not asserted, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction. |
|---|---|
| General Unsecured Claims | Any unsecured Claim against any of the Debtors that is not: (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) a DIP Claim; (c) an Administrative Claim; (d) a Tort Claim; (e) an Environmental Claim; or (f) an Indirect Environmental Claim. |
| Non-Debtor Intercompany Claims | Any Claim (including Claims related to setoff rights) held against a Debtor by NICO or NICO's Related Parties. |
| TCC | The Official Committee of Talc Claimants appointed in the Chapter 11 Cases [Docket No. 121]. |
| FCR | Honorable Shelley C. Chapman, retired Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of New York, in the capacity as legal representative for future tort claimants in the Chapter 11 Cases [Docket No. 231]. |
| Other Sites | The sites not owned by any Debtor as of the Petition Date and to be identified in the Other Sites exhibit attached, as applicable, to any settlement agreement entered into with respect to Environmental Claims and Indirect Environmental Claims. |
| Owned Site | 1353 Taylor Place, Billings, MT 59101. |
| Governmental Unit | A governmental unit as defined in section 101(27) of the Bankruptcy Code. |
| Government Environmental Unit | Federal, state, local, or tribal Governmental Units asserting claims or having regulatory authority or responsibilities with respect to environmental Laws. |
| Settlement Agreement | The *Settlement Agreement* by and between the Debtors, Brenntag, NICO, and DB US. |
| Settlement Effective Date | "Settlement Effective Date" shall have the meaning ascribed to "Effective Date" in the Settlement Agreement. |

```
              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF NEW JERSEY

IN RE:                        .   Case No. 23-13575(MBK)
                              .
WHITTAKER, CLARK &            .
DANIELS, INC., et al.,        .   402 East State
                              .   Trenton, NJ 08608
         Debtors.             .
. . . . . . . . . . . . . .   .
                              .
WHITTAKER, CLARK &            .   Adversary No. 23-01245(MBK)
DANIELS, INC., et al.,        .
                              .
         Plaintiffs,          .
      v.                      .
                              .
BRENNTAG SPECIALTIES,         .
LLC, et al.,                  .
                              .   October 15, 2024
         Defendants.          .   10:03 a.m.
. . . . . . . . . . . . . .
```

        TRANSCRIPT OF STATUS CONFERENCE REGARDING PROCEDURES FOR
       EFFICIENTLY AND EFFECTIVELY RESOLVING DISCOVERY DISPUTES
     RELATED TO THE PENDING MOTIONS AND RELATED DOCUMENTS; DEBTORS'
       MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO
          OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND
       PROVIDING CLAIMS SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS;
        (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) MODIFYING
      THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF AND RELATED
                     DOCUMENTS [DOCKET 1302]
                        (Continued)

              BEFORE THE HONORABLE MICHAEL B. KAPLAN
            UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

Audio Operator:           Kiya Martin

      Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

                 **J&J COURT TRANSCRIBERS, INC.**
                      **268 Evergreen Avenue**
                    **Hamilton, New Jersey 08619**
                  **E-mail:  jjcourt@jjcourt.com**

          **(609) 586-2311    Fax No. (609) 587-3599**

```
                              (Continued)
  DEBTORS' MOTION FOR (I) AN ORDER EXTENDING THE AUTOMATIC STAY
    TO AND/OR PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST
    NON-DEBTORS PENDING ENTRY OF A FINAL, NON-APPEALABLE ORDER
REGARDING THE DEBTORS' PROPOSED SETTLEMENT AND (II) A TEMPORARY
   RESTRAINING ORDER ENJOINING SUCH CLAIMS PENDING THE COURT'S
DECISION ON THE DEBTORS' REQUEST FOR SUCH INJUNCTIVE RELIEF AND
 RELATED DOCUMENTS [ADV. PROC. DOCKET NO. 299]; TRIAL ON COUNTS
    II AND III OF THE AMENDED COMPLAINT AND RELATED DOCUMENTS
```

TELEPHONIC APPEARANCES:

```
For the Debtors:          Cole Schotz P.C.
                          By:  G. DAVID DEAN, ESQ.
                          500 Delaware Avenue, Suite 1410
                          Wilmington, DE 19801

                          Kirkland & Ellis LLP
                          By:  MARK McKANE, ESQ.
                               CHARLIE STERRETT, ESQ.
                          555 California Street, 27th Fl.
                          San Francisco, CA 94104

Counsel to Official       Caplin & Drysdale
Committee of Talc         By:  KEVIN M. DAVIS, ESQ.
Claimants:                1200 New Hampshire Avenue NW, 8th Fl.
                          Washington, DC 20036

For Lilo Cooper and       Simon Greenstone Panatier, PC
Patricia Sneider:         By:  LEAH C. KAGAN, ESQ.
                          Bank of America Plaza
                          901 Main Street, Suite 5900
                          Dallas, TX 75202

For the Talc Claimants    Cooley LLP
Committee:                By:  MICHAEL BERKOVITS, ESQ.
                          55 Hudson Yards
                          New York, NY 10001

For Brenntag              Latham & Watkins LLP
Specialties, Inc.:        By:  AMY C. QUARTAROLO, ESQ.
                          3555 South Grand Avenue, Suite 100
                          Los Angeles, CA 90071

For NICO:                 Munger Tolles & Olson LLP
                          By:  SETH GOLDMAN, ESQ.
                          350 South Grand Avenue, 50th Fl.
                          Los Angeles, CA 90071
```

3

TELEPHONIC APPEARANCES (Cont'd):

For DB US Holdings        Husch Blackwell
Corporation:              By:  JOHN J. CRUCIANI, ESQ.
                          4801 Main Street, Suite 1000
                          Kansas City, MO 64112

                          - - -

**JA1289**

4

INDEX

PAGE

<u>WITNESSES</u>
(None)

| <u>EXHIBITS</u> | <u>ID</u> | <u>EVD</u> |
|---|---|---|
| <u>FOR THE DEBTORS</u>: | | |
| 1 - Lathrop Nelson Declaration | 16 | 17 |
| 2 - Schedule of Claims | 16 | 17 |
| 3 - 12/8/03 Master Sale and Purchase Agreement | 17 | 17 |

 1              (Proceedings commenced at 10:03 a.m.)

 2              THE COURT:  Okay.  Good morning, everyone.  This is

 3    Judge Kaplan.  I will be addressing the Whittaker, Clark &

 4    Daniels matters this morning.

 5              I'll let everybody please adjust their videos, give

 6    them an opportunity.  All right.  Thank you.

 7              So we have -- there is a filed agenda this morning,

 8    and I'll look to debtors' counsel to see how they wish to

 9    proceed with the, I believe, three matters that are on.

10              As usual, for -- everyone is appearing remotely

11    today.  There's no one in the courtroom.  Those who wish to be

12    heard, please use the raise hand function.  I assume you all

13    can hear me.  I know we've had some technical issues.  If you

14    have trouble hearing me, just let me know.  Let us know, and

15    we'll try to adjust.

16              Let me then call upon debtors' counsel.  Who wishes

17    to come forward?

18              MR. STERRETT:  Good morning, Your Honor.  Charlie

19    Sterrett of Kirkland & Ellis for the debtors.

20              THE COURT:  Good morning.

21              MR. STERRETT:  Good morning.  I can hear you loud and

22    clear.

23              THE COURT:  Great.  Thank you.

24              MR. STERRETT:  We've got two agenda items in the main

25    case.  I'll hand things over to my colleague, Mr. McKane, for

6

1  the status conference regarding the scheduling order and the

2  pending motions.  We'll then turn to what is a consensual DIP

3  order that was -- with a CNO filed at Docket 1392, which I'll

4  take.  And then we'll hand things over to our co-counsel at

5  Cole Schotz for the adversary proceeding matters, unless Your

6  Honor would prefer we proceed in another order.

7          THE COURT:  No.  That works for me.  All right.

8  Let's move forward.  Thank you.

9          MR. STERRETT:  Thank you.  Then I'll hand the virtual

10  podium off to my colleague, Mr. McKane.

11          MR. McKANE:  Good morning, Your Honor.

12          THE COURT:  Good morning, Mr. McKane.  Nice to see

13  you.

14          MR. McKANE:  It's good to see you as well.  And for

15  the record, Mark McKane of Kirkland & Ellis on behalf of the

16  debtors.  Just a brief status update on where we stand since we

17  are approximately two months out from the start of the

18  settlement motion hearing and standing hearing.

19          First, the parties have substantially completed

20  document production other than in response to the government

21  entities and the Federal/Chubb request which will happen later

22  this month.

23          At present, I think we have at least 11 fact and

24  30(b)(6) depositions being scheduled.

25          And then on top of that, Your Honor, the parties have

7

1  identified nine experts so far.  Under the -- I -- and, yes,

2  nine.

3          Under the current schedule, there's a relatively

4  tight window between the conclusion of rebuttal reports.  To

5  get that done, the parties have started -- have been engaging

6  on how to address this issue, including as recently as last

7  night.  And there's at least one illness we are aware of as

8  well.  We're going to work through that.

9          Nothing for Your Honor at this point in time.  It

10  really is probably a preview of coming attractions.  And, you

11  know, just, not surprisingly, as much as the parties are

12  working through a number of discovery issues and resolving

13  them, we do anticipate there will be some discovery disputes.

14  There is one that is, I think, crystallized at this point and

15  maybe some others to come.

16          I think we're all familiar -- Your Honor has been

17  generous in allowing for some types of expedited discovery

18  resolution proceedings in the past in other cases, you know,

19  that I think a number of the parties here have been part of.

20  We have discussed this amongst the parties in terms of how to

21  proceed with regard -- if Your Honor's willing to do so here

22  with some form of like letter briefing process with some type

23  of page limitation.

24          I will just preview, I think the general thought, if

25  it is acceptable to the Court, would be letter briefings of

8

1   approximately five pages.  And once that comes in, Your Honor

2   sets the schedule in terms of having a hearing heard.  And then

3   a response comes in, you know, allowing, hopefully, parties two

4   business days to respond, in general.

5           I will preview there is one issue of more material

6   size.  That is the one that has already, I believe,

7   crystallized.  It relates to the debtors' privilege and whether

8   they have put certain issues -- privilege at issue through the

9   filing of the motion.  We have met and conferred with the TCC

10  on that, and I believe we've agreed as to a procedure, if it is

11  acceptable to the Court.  And I'll just preview it here.

12          If it is acceptable, it would be letter briefs.

13  Instead of five pages, I believe it would be more like seven

14  pages in size.  The TCC would file -- we're trying to keep it

15  short.  TCC would file theirs as early as today or tonight

16  under -- if they were to do that, the debtors would get their

17  response in on Friday.  And we'd -- and if the Court could hear

18  us at some point in the first half of next week, or as soon as

19  the Court is available, that would be great.

20          Obviously, a ruling on that issue, and if there were

21  additional materials that would have to be produced as a result

22  of that ruling, could impact some of the deposition scheduling.

23  And that's one of the reasons why we're trying to tee it up as

24  soon as we can.

25          THE COURT:  All right.  Before I weigh in, let me

9

1  hear, does counsel for the TCC or another party wish to be

2  heard?

3           MR. BERKOVITS:  I can speak on that, Your Honor.

4  Thank you.  This is Michael Berkovits at Cooley for the TCC.

5           I generally agree with Mr. McKane's recitation.  As

6  you might imagine, there's a lot to get done over a short

7  period of time.  And a number of parties, you know, not just

8  sort of the debtors, Berkshire and TCC, but, you know, other

9  parties that have been less active in the proceedings to date

10  have become more active, including government parties.  And

11  there's been quite a lot to get through, and the parties have

12  been working very cooperatively on all of that.

13           From the TCC's perspective, Mr. McKane's recitation

14  of the dispute resolution procedures is accurate.  We would be

15  okay with those procedures, if acceptable to the Court in terms

16  of timing and page length.

17           I will note that, from our perspective, we think that

18  this issue -- this privilege issue that Mr. McKane has

19  mentioned that has already sort of been crystallized over the

20  course of meeting and conferring might well affect a deposition

21  scheduled for Wednesday of next week, Wednesday the 23rd.

22  Which is not to say it wouldn't necessarily affect depositions

23  scheduled before then, but I think we would be most concerned,

24  if possible, in staging things so that, if it's possible, there

25  could be sort of a ruling in hand before that deposition on the

10

1  23rd, from our perspective.

2  And happy to talk through how that might work with

3  the Court's calendar or if we need, you know, different timing

4  on the briefing.  But that would be our -- as you might

5  imagine, it's been tricky to get pieces into place for

6  deposition scheduling with all of the parties and -- et cetera.

7  So that's what we're looking toward now on the 23rd.

8  THE COURT:  No, I can imagine.  All right.  Again,

9  before I comment, anybody else wish to weigh in?  All right.

10  You all have me pegged.  I'm fine and actually prefer

11  having -- not having motion practice and having an informal

12  resolution of discovery disputes.  I am very comfortable with

13  the five-page submissions.  My attention span -- that fits my

14  attention span.  It works, especially for discovery disputes.

15  We'll go two extra pages for the more critical one that's

16  coming up that is crystallized.

17  I can -- and I'm looking over at my law clerks.  It

18  looks like Tuesday the 22nd would be available at 11:30.  So

19  let's work backwards from that -- wait.

20  (Court and clerk confer)

21  THE COURT:  How about 2 p.m., rather, on Tuesday, if

22  that works for people?  We'll do 2 p.m.

23  MR. McKANE:  Your Honor, it's Mark McKane for the

24  debtors.  We can make that work.

25  THE COURT:  Okay.  Great.

11

1          MR. McKANE:  2 p.m. Eastern.  And with regard to the

2   witness on the 23rd, we will engage with that individual later

3   today to see if we can get an alternative date as well.  That's

4   someone who's under our control.

5          THE COURT:  All right.  And counsel with TCC, does

6   that work, Mr. Berkovits?

7          MR. BERKOVITS:  The 22nd does work.

8          And, Mr. McKane, we can connect offline on

9   depositions.  But the 22nd, next week, works.  Thank you.

10          THE COURT:  All right.  So that submissions would --

11   what are we suggesting as far as submissions?  There'll be a

12   TCC submission within the next day?

13          MR. BERKOVITS:  Yes, Your Honor.  That's what we're

14   planning toward.

15          THE COURT:  And then a response by the debtors?

16          MR. McKANE:  If they file -- we had agreed on three

17   business days, so if they file tonight, we'll get it in on

18   Friday night.  And if they file tomorrow, we'll target early

19   Monday morning, so Your Honor has something to read.

20          THE COURT:  All right.  I wouldn't want to waste the

21   weekend not having something to read.  That's fine.

22          MR. McKANE:  Well, we'll --

23          THE COURT:  Okay.

24          MR. McKANE:  We can do Monday morning either way.

25          THE COURT:  All right.

1          MR. McKANE:  We'll burn ours.

2          THE COURT:  So we'll go with that.  And that

3    addresses also just what I wanted to make sure that we don't

4    weigh ourselves down with motion practice on discovery issues.

5    Lay out the issues for me in succinct correspondence.  And if I

6    need to have a hearing, I will.  If I can call it based on the

7    correspondence, I will do so.

8          MR. BERKOVITS:  And, Your Honor, one follow-up there.

9    If Your Honor is likely inclined to review the back and forth

10   briefing on Monday morning in any respect, then we may shoot to

11   get it on file tomorrow for the debtors to file on Monday

12   morning.  But, you know, not looking to jam anyone.

13         THE COURT:  That's fine.

14         MR. BERKOVITS:  But just to clarify.

15         THE COURT:  If we're keeping it to seven pages each,

16   I can handle that on Monday.

17         MR. BERKOVITS:  Okay.

18         THE COURT:  All right?

19         MR. BERKOVITS:  Thank you.

20         THE COURT:  Thank you.

21         All right.  Now let's move to the financing motion.

22   My understanding is that this has go -- has gone by consent.

23   There was a certificate of no objection filed.

24         I did want to make a comment, because I think there

25   has been -- there was -- there has been in the past, and there

13

1  may have been with respect to this motion, a question as to

2  once the CNO has been filed, why hasn't the Court entered the

3  order.  And I just wanted to clarify that when we look at the

4  CNO, the notice states that there's a hearing on the motion for

5  October 15th at 10 a.m.  And then when I looked at the proposed

6  language of the order, it says based upon the record

7  established at the hearing, the Court hereby makes the

8  following findings of fact and conclusions of law.

9          So in general, if we're going to include that

10 language -- I find it a bit off-putting, to use a phrase, to

11 enter the order before the hearing.  I don't necessarily

12 have -- intend to have a hearing, and I appreciate the efforts

13 to have a consensual resolution.  It just seems that I -- and

14 in my chambers, we try to make sure that everybody's on board

15 with the language, especially this one had an amended language.

16 I want to make sure the U.S. Trustee's Office has had an

17 opportunity.  And so we tend to wait until the day of the

18 hearing, and then I'll enter it that day of the hearing.

19          If there's an issue by any party that -- whether or

20 not they need to be prepared to argue the motion or address

21 issues, call chambers, let us know, and we would make it clear

22 that we're comfortable entering the order.  We just think it

23 should wait for the noticed hearing date.

24          With that said, are there any other issues or

25 concerns with respect to the financing?

14

1          Well, then we'll get -- we'll move on to the main

2  show.  So let's move on to the adversary proceeding and the

3  injunctive relief that's sought.  Those that were just

4  interested in the finance motion, of course, can be excused.

5          Let me hear from debtor -- let me hear on behalf of

6  the debtor, please.

7          MR. DEAN:  Good morning, Your Honor.  David Dean of

8  Cole Schotz on behalf of the debtor.  Can you hear me okay?

9          THE COURT:  I can.  Good morning.

10          MR. DEAN:  Good morning.  Thank you.  As the Court

11  noted, we have one item on the agenda in the adversary

12  proceeding, which is the debtors' preliminary injunction motion

13  filed at Docket Number 299 on September the 12th.  And just to

14  be entirely precise, per the TRO order and our request, today

15  is actually the combined hearing on that motion and the

16  combined trial on Counts II and III of the complaints.  So in

17  other words, Your Honor, we don't have to come back after

18  today's hearing for a trial as it would be superfluous of

19  anything we'd be discussing today.

20          Your Honor, as the Court knows, the motion also

21  requests an entry of a TRO through the date of today's hearing,

22  which the Court granted by order on October 9th.  The TCC filed

23  the only objection to the PI motion last Friday.  And we filed

24  our reply yesterday per the Court's schedule at Docket Number

25  353 in the adversary proceeding.  I'll also note that, after

15

1  that, Brenntag filed a joinder to our reply yesterday as well

2  at Docket Number 354.

3        Through the PI motion, Your Honor, the debtors seek

4  to enjoin what Your Honor defined in the TRO order as the TRO

5  claims.  And we used that defined term in our reply to remain

6  consistent with that definition.  These are, of course, the 683

7  actions that are separately identified with a simple list of

8  the cases in Exhibits 1 and 2 of the TRO order.  So for

9  clarity, Your Honor, we referred to those claims as the

10 Brenntag enjoined claims in the opening motion.

11        THE COURT:  All right.

12        MR. DEAN:  Now, in the revised PI order that we filed

13 as Exhibit A to the reply, we've taken Your Honor's TRO order

14 and made some minor modifications to account for the extended

15 nature of the requested preliminary injunctive relief,

16 including the addition and removal procedures that were

17 included in the original proposed PI order.  Exhibit B to the

18 reply is a blackline that shows the changes to our proposed PI

19 order and the actual order entered by this Court on the TRO.

20        Now, Your Honor, before we begin argument on this

21 motion, I'll first address the evidence.  The Court will recall

22 at the TRO hearing that we moved into evidence the amended

23 declaration of Lathrop Nelson -- that's at Docket 305 -- along

24 with the revised schedule of claims filed the morning of the

25 TRO hearing at Docket 317.

16

1          As I'm sure the Court recalls, the documents were

2    admitted into evidence for the limited purposes of the TRO

3    hearing.  Mr. Nelson's declaration and the list that was filed

4    the morning of the hearing includes what was previously defined

5    as the schedule of Brenntag enjoined claims, which comprised

6    the same 683 actions that are now included in Exhibits 1 or 2

7    to Your Honor's TRO.  And these are, with one exception, Your

8    Honor, all actions against Brenntag that expressly assert

9    successor liability claims against them, that contain express

10   allegations of pre-2004 talc or asbestos exposure, or that

11   involve an executed bifurcation stipulation through which the

12   plaintiffs acknowledge that the claims against Brenntag

13   constitute successor claims.

14         Now, at this time, Your Honor, I'd like to move that

15   same declaration and schedule into evidence for the purposes of

16   today's hearing.  We understand through meet and confers with

17   the TCC that there is no intent to cross-examine Mr. Nelson on

18   the declaration, but he is here today for any questions that

19   the Court may have or -- and what I think is the unlikely event

20   that any party would seek to cross-examine him today, Your

21   Honor.  So at this time, I would move Docket 305 and 317 into

22   evidence.

23         THE COURT:  All right.  Are there any objections?

24         MR. BERKOVITS:  No objection from the committee, Your

25   Honor.

17

1          THE COURT:  All right.  Thank you.  Those documents

2    are admitted.  We will mark them as -- the Nelson Declaration

3    is D1, and the schedule of claims, as docketed at 317, as D-2.

4          (Debtors' Exhibits 1 and 2 admitted into evidence)

5          MR. DEAN:  Thank you, Your Honor.  Now, one

6    additional document just for the record that I'd like to move

7    into evidence is what's referred to in the papers as the 2004

8    MSPA, or the Master Sale and Purchase Agreement, dated

9    December 8, 2003, which, as the committee's objection noted, is

10   available at Docket Numbers 4-6 and 4-7, which are the filings

11   in connection with summary judgment.  This document was

12   previously moved into evidence by the TCC at the first TRO

13   hearing, which was almost a year ago today on November 21,

14   2023, and relied on in their papers.  So I don't anticipate

15   there will be any objection to that, but we would formally

16   moved that into evidence now, Your Honor.

17          MR. DEAN:  All right.  Mr. Davis, any objection?

18          MR. DAVIS:  No objection, Your Honor.

19          THE COURT:  Thank you.  And we'll accept that into

20   evidence as D-3.

21          (Debtors' Exhibit 3 admitted into evidence)

22          MR. DEAN:  Thank you, Your Honor.  That is all the

23   evidence that the debtors intend to submit in their case in

24   chief.  So before I get to argument, I'll ask Your Honor

25   whether you want to ask other parties if they have evidence to

18

 1  submit.

 2          THE COURT:  All right.  Thank you.

 3          Let me turn to the TCC.  Mr. Davis?  And I'm looking

 4  to you.  I assume you're leading the charge.  Are there any

 5  witnesses or other declarations or evidence on behalf of the

 6  TCC?

 7          MR. DAVIS:  Not on behalf of the TCC, Your Honor.

 8  No.

 9          THE COURT:  All right.  Thank you.

10          Any other party wish to offer up evidence, witnesses,

11  or declarations?

12          MS. KAGAN:  No, Your Honor.  I would just like to be

13  heard when it's appropriate.

14          THE COURT:  I will -- I assume as part of argument.

15  Is that fair enough?

16          MS. KAGAN:  Yes, Your Honor, with respect to only the

17  Cooper and Sneider matters.

18          THE COURT:  All right.  Thank you.

19          MS. KAGAN:  Thank you.

20          THE COURT:  All right.  Then we will close the record

21  as to evidence, and we'll proceed as to argument.

22          We'll first turn to the debtors' counsel.  Obviously,

23  I've read the submissions.  This isn't the first time we've

24  addressed these issues.  So please supplement as you deem

25  appropriate.

19

1          MR. DEAN:  Well, I think that's a great place to

2     start, Your Honor, because I was actually going to start with

3     something that I thought the Court would appreciate and note

4     that there are a number of arguments set forth in the papers

5     which Your Honor has had the great pleasure of hearing and

6     adjudicating on multiple occasions over the past year.  And we

7     do greatly appreciate the Court's patience on these issues.

8     And as a small showing of that appreciation, we're going to

9     spare the Court of having to feel like today is Groundhog's

10    Day.

11          Issues of the Court's subject matter jurisdiction;

12    the preliminary injunction factors of likelihood of success,

13    which is the first prong, and public interest, which is the

14    last prong; and the identity of interest with respect to the

15    stay extension request have all been extensively litigated and

16    ruled upon by the Court at prior hearings, including at the

17    most recent hearing on September the 18th.  So as the Court

18    noted -- we agree with you -- we will rest on our papers on

19    those issues and the prior arguments and hearings.

20          THE COURT:  Okay.

21          MR. DEAN:  Now, for today's purpose, Your Honor, I

22    would like to hone in on what is the most important issue in

23    deciding this motion, and that is the irreparable harm to the

24    estates if the tort claims are not enjoined pending approval

25    and consummation of the settlement.  Now, this harm not only

20

1 goes to the second of the four preliminary injunction prongs,

2 it also equally applies to the harm prong of our alternative

3 request to extend the stay.

4          When evaluating the harm to the estate, Your Honor,

5 we must start with the very telling and significantly

6 uncontroverted evidence.  The schedule of 683 claims provides

7 an undeniable and detailed picture of the true nature of the

8 claims at issue here and affirmatively demonstrates for Your

9 Honor that the requested injunction conforms with Your Honor's

10 prior rulings in this proceeding.

11          Now, as the Court may recall, I just want to go back

12 to last December when the TCC routinely criticized us in

13 connection with summary judgment for failing to provide a

14 schedule that would be applicable to that ruling.  And as we

15 noted then, we didn't need to list all the claims for purposes

16 of summary judgment.  But here, Your Honor, since we're here

17 seeking to enjoin those claims now, we did that homework

18 assignment.

19          The TCC did not like the results.  In fact, Your

20 Honor, when it came time to submit competing TRO orders, the

21 TCC fought vociferously to avoid the attachment of any schedule

22 at all.  And who could blame them?  They had done a good job to

23 date, prior to the details coming out, talking about the claims

24 in general abstract terms to posit vague theories of what

25 direct claims might be asserted against Brenntag.

1          The details of the schedule, however, Your Honor,

2  tell a very different story than the one the TCC has been

3  suggesting.  If you were to just extract some data points from

4  the schedule, the Court would see that 570 of the 683 actions

5  contain express allegations of pre-2004 exposure.  And none of

6  those claims distinguish between pre and post-2004 exposure.

7  662 of these actions expressly assert successor liability

8  claims against Brenntag or involve an executed bifurcation

9  stipulation where the plaintiffs admitted that the claims are

10 successor claims for the purposes of that bifurcation.  And 682

11 of these, all but one, either expressly assert successor

12 liability claims against Brenntag, contain express allegations

13 of pre-2004 exposure, or involve an executed bifurcation

14 stipulation.

15         In reviewing the schedule, Your Honor, the truth is

16 clear.  None of these actions, not one, Your Honor, is a purely

17 direct claim against Brenntag like the one we saw in the Haney

18 action.  Despite having the schedule for weeks, the TCC failed

19 to object to any of the claims being included on the schedule

20 on the basis of being purely direct, other than Sneider and

21 Cooper -- which I assume by the comments from Ms. Kagan we'll

22 get to later -- who violated the automatic stay in an attempt

23 to plead around the TRO.

24         And none of the so-called straddle claims, claims

25 where conduct is alleged to have straddled the 2003 transaction

1  date, not one was pled as a direct claim against Brenntag based

2  exclusively on post-2004 exposure.  And based on this

3  uncontroverted record, each and every one of these claims, Your

4  Honor, was pled as what?  A successor liability claim.  A

5  successor claim against Brenntag premised on allegations of

6  pre-2004 exposure.

7       That's the starting point, Your Honor.  That's how

8  these actions were brought before this bankruptcy case was

9  filed in this court.  And that's telling, because what the

10  committee seeks here today is not authority to allow the

11  plaintiffs to move forward on these pre-existing direct claims.

12  Those don't exist at the current moment, Your Honor.  That's

13  what the schedule definitively tells us.

14       Now, neither the TRO nor the proposed PI order

15  contains an express finding that all of the claims are

16  successor claims.  Nor is that needed to enter the requested

17  relief, which is to enjoin any claims that may exist in these

18  suits that are not successor claims, because they're -- all the

19  rest are subject to the automatic stay as the Court's TRO

20  provided.

21       But the Court could also find on this record that all

22  the claims actually are subject to the automatic stay, and we'd

23  be fine with that outcome too, Your Honor.  Either way the

24  Court decides to go on this issue, it's important to consider

25  what the claims as they exist today are and that the plaintiffs

23

1  are not asking to proceed on the claims as they exist today.

2  They are, in effect, asking this Court's permission to recast

3  their claims to work around the Court's summary judgment ruling

4  and the automatic stay.

5          But as we said in our reply, Your Honor, no manner of

6  artful pleading or relief from this Court can change the facts

7  or circumstances underlying these claims: the products, the

8  time periods, the injuries, the evidence of the plaintiffs'

9  exposure.  And therein lies the rub, Your Honor.  The facts and

10 circumstances are what the schedule tells us they are.

11         Each of these claims involve pre-2004 exposure or at

12 least cannot rule out pre-2004 exposure.  You simply can't

13 plead around that, Your Honor.  And because each and every one

14 of these TRO claims involves pre-2004 exposure, or with a small

15 handful can't be ruled out because they're not pled with

16 sufficient clarity, the adjudication of purported direct claims

17 in the tort system will necessarily involve evidence of the

18 debtors' conduct that has alleged to have caused the injury.

19         In other words, Your Honor, if this injunction isn't

20 granted or there isn't a finding that all of these claims are

21 subject to the stay and no injunction is needed, and plaintiffs

22 seek to do what Cooper and Sneider did, there's significant

23 risk to the estate that cannot be eliminated prior to the

24 settlement being consummated.  The adjudication of issues of

25 liability, causation, and damages on which the debtors and

24

1  Brenntag are aligned and in privity create the risk of res

2  judicata and collateral estoppel and, by extension,

3  indemnification claims against the estate.  They will impact

4  the merits of our defenses to the plaintiffs' talc claims

5  against us as well.

6         And that is why, Your Honor, in similar context as we

7  detail in our reply, courts have rejected attempts by

8  plaintiffs to plead around estate claims and the automatic

9  stay.  And that includes the <u>Revlon</u> decision Your Honor cited

10 with favor in the summary judgment opinion.  There's simply no

11 logical way to conclude that the claims on the schedule can

12 proceed without evidence being presented of pre-2004 exposure.

13 This means that every one of these claims would put the debtors

14 at risk of unfair prejudice of a significantly increased claims

15 pool in the form of indemnification obligations and claims by

16 the plaintiff.

17        And if that were not enough, Your Honor, there's

18 actually more.  There is another problem here.  This will

19 create significant risk that Brenntag may be forced to pay

20 plaintiffs on what in actuality are successor liability claims

21 if suits are permitted to proceed.  This would devalue our

22 claims by impairing our ability to pursue Brenntag for payment

23 on claims they have already paid.

24        This risk is illustrated in states that impose joint

25 and several liability.  And we cited three examples in the

25

 1  reply, Your Honor, states of New York, Ohio, and Illinois,

 2  which happened to be the venue for approximately a third of

 3  these actions.

 4           So let's assume that the purported direct claims go

 5  forward, Your Honor, by example, and a jury would apportion 55

 6  percent to Brenntag and 45 percent to the debtors, while we,

 7  the debtors, are still sitting here holding our successor

 8  liability claims waiting for the settlement to take effect.

 9  Well, what would happen?  What would happen is the plaintiff

10  would collect 100 percent of the jury award from Brenntag on a

11  joint and several basis.

12           Now, do we think Brenntag would be inclined to

13  thereafter pay anything to these estates on account of our

14  successor liability claim?  Can we actually compel them to pay

15  more than 100 cents?  We would submit that this is highly

16  questionable, Your Honor, and we shouldn't have to take that

17  risk, especially when a settlement on the table currently

18  proposes to pay the estates $565 million for these claims.

19           This hypothetical is just one of many countless ways

20  that a jury award could result in our forfeiture of the value

21  of our successor claims or otherwise prejudice us.  And to add

22  insult to injury, Your Honor, we'd still be sitting here left

23  having to deal with the indemnification claim that Brenntag

24  would assert against us after paying that jury award.

25           The committee, Your Honor, attempts to minimize these

26

1   risks.  And I'm not going to spend a lot of time on these
2   arguments, because they've all been briefed.  And that's
3   entirely fair today, because the committee didn't spend a lot
4   of time at all, even in their objection, considering their
5   arguments in the context of 683 actions that involve pre-2004
6   exposure or are too vague to rule it out, the indemnification
7   obligations triggered by those, or the fact that in each and
8   every one of these actions, Brenntag could absolutely put the
9   debtors' product and conduct on trial to minimize their own
10  liability.  And even if certain findings in these litigations
11  would not be technically binding on the debtors for lack of
12  privity with Brenntag, which is far from certain, Your Honor,
13  neither the plaintiffs nor Brenntag would be prevented from
14  introducing evidence supporting the findings of future
15  litigation.
16          In other words, Your Honor, record taint is a real
17  concern here that goes beyond the potential technical
18  application of preclusion doctrines.  Now, whether the debtors'
19  indemnification or successor relationship with Brenntag is
20  sufficient to trigger privity, particularly in view of the
21  debtors' alignment with Brenntag on many threshold issues of
22  liability, causation, and damages, are not questions that can
23  be definitively answered today.  They are creatures of state
24  law.  They vary by jurisdiction.  And their application is
25  highly dependent on particularized findings and rulings.

27

 1          And above all else, we would not know the answer
 2   until the train has left the station.  Because, as the case law
 3   makes clear, the application of res judicata and collateral
 4   estoppel are made only after a final judgment on the merits in
 5   the underlying action is entered.  These questions cannot be
 6   tested at the debtors' peril, Your Honor, as confirmed by the
 7   case law cited in our reply.  And from our perspective, Your
 8   Honor, the same applies to whether a preemptive order would
 9   protect the debtors from the preclusive effects of adverse
10   state court findings and judgment.
11          We appreciate the effort that Your Honor made.  We
12   explored this effort in depth internally.  We met and conferred
13   with the TCC and Brenntag.  But in the end, Your Honor, the
14   facts and circumstances of these claims are what they are.
15   Their adjudication fundamentally impairs the debtors' claims
16   and defenses, and there is no certainty that any preemptive
17   order would be binding and enforceable on state courts.
18          And like the application of preclusion doctrines, the
19   enforceability of such an order should not be tested at the
20   debtors' peril.  And that should be the case if the goal here
21   is to find a way to permit these claims to be prosecuted while
22   fully protecting the debtors.
23          Now, there is good news in all of this, Your Honor,
24   and that is that this is not a problem without a solution.  In
25   fact, the solution is before us, and it's the settlement

28

1  pending before the Court.  That's not that far away.

2          We have two problems here, as I've outlined today.

3  First, permitting the TRO claims to move forward jeopardizes

4  the value of our successor claims.  And second, permitting them

5  to move forward will expose the debtor to the possibility of

6  res judicata, collateral estoppel, and record taint.

7          The settlement, Your Honor, solves both of these

8  problems.  One, we have the certainty of a $535 million

9  recovery on the successor claims.  If those claims are

10 resolved, we don't have to worry about jury awards in the tort

11 system.  Second, we are released by Brenntag from any and all

12 claims, including indemnification claims.

13         Problems solved.  The settlement takes effect.  The

14 money comes in.  The claims disappear.  And this injunction

15 terminates, allowing the plaintiffs to pursue Brenntag in the

16 tort system on these purported direct claims without the risk

17 to the estates that exist today.

18         In other words, Your Honor, once the settlement is

19 approved and consummated, the plaintiffs in Brenntag can talk

20 about us and the state system all they want.  We don't care.

21         We, of course, are not blind to the fact that the

22 committee has, to date, expressed an unkind view of the

23 settlement.  I think the Court heard about the extensiveness of

24 the discovery that's about to take place and the hotly

25 contested nature of the settlement motion to date.  But the

29

1  committee will have their day in court, Your Honor.  If they

2  win, the injunction will terminate automatically.  If they lose

3  and don't appeal, this injunction would also terminate.  If

4  they lose and appeal, it doesn't automatically terminate,

5  because the settlement can't be consummated yet, but nothing in

6  our proposed order prohibits them or any other party from

7  seeking such relief in the future.

8          Now, admittedly, Your Honor, this is not -- we

9  recognize that this is not a perfect solution.  But we've done

10 the work, and I can confidently say to Your Honor that this is

11 the only solution that we have, the only one that does not

12 leave the estates vulnerable and unprotected while this

13 settlement is pending.

14         So in summary, Your Honor, we would ask the Court to

15 enter the preliminary injunction order.  We believe that it

16 appropriately balances the harms to the estate that I just

17 discussed and the plaintiffs by providing a solution and

18 certainty that they will ultimately get their day in court at a

19 time that will not put these estates in great peril.  And in

20 the meantime, the proposed order contains guardrails that have

21 been previously discussed that are contained in the TRO for the

22 preservation of evidence and, therefore, should be granted,

23 Your Honor.

24         I understand that -- unless the Court has any other

25 questions for me, I understand that Brenntag and NICO would

30

1    also like to briefly address the Court in support of the

2    motion.  So if the Court has no further questions for me at

3    this time, I'll turn the podium over to others, Your Honor.

4    Thank you very much.

5                THE COURT:  All right.  Thank you, Mr. Dean.

6                I will hear from Brenntag and others in support of

7    the injunctive relief.  Then I'll hear from Mr. Davis and

8    Ms. Kagan and others who wish to be heard.

9                Let me turn to counsel for Brenntag.

10               MS. QUARTAROLO:  Thank you, Your Honor.  Amy

11   Quartarolo of Latham & Watkins on behalf of the Brenntag

12   defendants.

13               As Mr. Dean noted, we submitted a joinder in

14   reservation of rights, and that can be found at adversary

15   proceeding Docket Number 354.  I recognize, Your Honor, that

16   much of the substance relevant to these issues has been

17   addressed previously.  And for that reason, I will endeavor to

18   be brief.  Just a few points that I wanted to add from

19   Brenntag's perspective.

20               First, it has been Brenntag's consistent position

21   over the course of these cases that it is fully indemnified for

22   what has been referred to as straddle claims.  That is those

23   claims that assert exposure to WCD talc, even if the overall

24   exposure that is alleged in the case includes both pre-2004

25   exposure and post-2004 exposure.  Those broad indemnification

31

1   rights run in the first instance to the debtors and then beyond

2   to other indemnifying parties.

3           But we openly acknowledge that there is a dispute as

4   to the scope of those indemnity obligations that are owed by

5   the debtors, DB US, and NICO.  But that dispute is not before

6   the Court today, and it -- the Court need not weigh the

7   parties' respective positions with respect to those indemnity

8   obligations.  The fact that there exists a live dispute today

9   as to the scope of those indemnity obligations on its own

10  justifies the relief that the debtors are seeking.

11          This Court has previously recognized the dispute in

12  the indemnity obligations and the fact that that dispute

13  justifies injunctive relief.  At least certain of those rights,

14  specifically the claims -- the indemnity claims that Brenntag

15  has against the debtors' estates, are among the claims that are

16  being compromised and proposed to be settled.  And, therefore,

17  we believe and support the debtors in seeking the limited

18  nature injunctive relief pending this Court's consideration and

19  ultimate adjudication of that settlement motion.

20          Second, despite substantial efforts, I think we have

21  determined, and I think the other interested parties as well,

22  that staying cases for a limited duration pending an order on

23  the settlement really is the only workable solution here that

24  balances the competing interests.  Again, we've met and

25  conferred.  We participated with the debtors, with Mr. Davis on

32

1  behalf of the committee in an attempt to work through whether

2  either something akin to the construct and the language that

3  you had proposed in connection with the TRO or some other

4  construct might present a viable path forward to allow claims

5  to be pursued in the interim while the settlement motion is

6  pending.

7          But we join in the comments made by Mr. Dean that

8  there really is no clear solution that would balance those

9  interests.  In particular, in addition to the issues that were

10 raised by Mr. Dean, I wanted to flag a few more from Brenntag's

11 perspective.  In particular, by prohibiting claimants from

12 introducing evidence of WCD's product and conduct, but also

13 prohibiting Brenntag from using findings or verdicts entered in

14 litigation involving evidence of WCD's talc in any subsequent

15 proceeding, the Court's proposed language may unintentionally

16 give rise to additional defenses to Brenntag's claims for

17 indemnification under the MSPA.

18         Specifically, Brenntag is aware that the debtors,

19 DB US, and NICO are expected to take the position that there is

20 no indemnity obligation unless a claimant or a plaintiff puts

21 exposure to WCD's talc at issue, and that allegation leads to a

22 finding of liability.  Again, the precise nature and scope of

23 the indemnity obligations remains in dispute.  Brenntag would

24 disagree with and would fight against that defense.  But given

25 the uncertainty and whether allowing Brenntag to put WCD's

1  conduct and products at issue in the underlying litigation

2  would actually serve to impair Brenntag's ultimate

3  indemnification rights, we believe that really is not a

4  workable solution.

5        In addition, for whatever claims do proceed, Brenntag

6  would need full, immediate, and unfettered ability to settle

7  those claims.  And while one could conceive of language that

8  makes clear that Brenntag could freely settle claims if they

9  were permitted to proceed, it still runs into the issue that

10 this Court has confronted previously that, unless and until a

11 settlement motion is addressed and adjudicated by this Court,

12 such settlements would necessarily include the settlement of

13 claims that allege pre-2004 exposure give rise to

14 indemnification rights.

15        We very much understand the Court's desire to balance

16 the competing interests.  We understand that the Court's

17 thinking on these issues has evolved over time.  And we put our

18 heads together with the other parties to see if there was some

19 language that would serve the interests and could present a

20 workable construct.

21        Unfortunately, we were not able to come up with

22 anything other than the relief that the debtors seek.  And,

23 therefore, we join in the debtors' request.  We believe that

24 that is the appropriate balance of the competing interests,

25 which would be a stay of the claims for a limited duration

34

1  pending the Court's consideration of the settlement motion.

2          Unless Your Honor has any questions, thank you for

3  your time and consideration.  I would turn the podium, I

4  believe, over to Mr. Goldman.

5          THE COURT:  All right.  Thank you, Ms. Quartarolo.

6          Mr. Goldman, good morning.

7          MR. GOLDMAN:  Good morning, Your Honor.  Seth Goldman

8  from Munger Tolles & Olson on behalf of National Indemnity

9  Company, or NICO.  I'll be very brief, Your Honor.

10          The National Indemnity Company does, in fact -- while

11  it's not before Your Honor today, does, in fact, dispute

12  Brenntag's alleged indemnity for the straddle claims from the

13  debtors and from DB US under the 2003 MSPA.  We just felt like

14  we needed to go on the record today to say that.

15          And we appreciate your Court's time -- Your Honor's

16  time.  And if you have any questions for National Indemnity,

17  we're happy to answer those.  But we do support the relief

18  requested by the debtors.

19          THE COURT:  All right.  Thank you, Mr. Goldman.

20          Mr. Cruciani?

21          MR. CRUCIANI:  May it, please the Court.  This is

22  John Cruciani with Husch Blackwell --

23          THE COURT:  I'm having a hard time hearing you.

24          MR. CRUCIANI:  Bear with me just a moment.  Is that

25  any better, Your Honor?

35

1           THE COURT:  It's a lot better.  Thank you.

2           MR. CRUCIANI:  I apologize for that.  May it please

3  the Court, Your Honor.

4           THE COURT:  Yes.

5           MR. CRUCIANI:  John Cruciani of Husch Blackwell for

6  DB US Holdings Corporation.  Don't want to repeat comments that

7  were made by other parties but just also wanted to go on the

8  record, Your Honor, to indicate that DB US disputes the

9  assertions made by Brenntag with respect to the scope of the

10 indemnities in the MSPA.  And won't repeat comments that others

11 made.  But thank you very much, Judge.

12          THE COURT:  All right.  Thank you, counsel.

13          All right.  Let me turn now to Mr. Davis.

14          MS. KAGAN:  Your Honor, if you don't mind, I will go

15 first just to address Ms. Cooper and Ms. Sneider, and then

16 Mr. Davis will handle the bigger issue, if that's all right

17 with Your Honor.

18          THE COURT:  That's absolutely fine.  Thank you.

19          MS. KAGAN:  Thank you, Your Honor.  Leah Kagan from

20 Simon Greenstone Panatier on behalf of Lilo Cooper and Patricia

21 Sneider.

22          Your Honor, Mr. Dean started out by saying he didn't

23 want this to be "Groundhog Day" and that you've heard all of

24 this many times before.  And then what I heard was both

25 "Groundhog Day" and then a recast of everything that has

36

1 happened, ignoring Your Honor's specific directives.

2          And I said this at the last hearing we had, I believe

3 last week now, that it feels like perhaps the parties in this

4 adversary are arguing for the sake of argument, as opposed to

5 actually listening to Your Honor and following through with

6 what Your Honor has directed.  And to be quite clear and

7 specific, Your Honor solved this problem at the September 18th

8 hearing.  Your Honor gave the debtors what they wanted, the TRO

9 to get us to today, with the explicit instruction that they

10 fashion a stipulation that would allow claims like Ms. Cooper's

11 and like Ms. Sneider's against Brenntag, non-debtor, to proceed

12 forward.  Your Honor, in fact, fashioned the language himself,

13 because it was clear the debtors and Brenntag were never going

14 to agree on any type of language.

15          And the language Your Honor fashioned, this was

16 paragraph 15 of Your Honor's proposed TRO from that hearing,

17 the September 18th hearing, made clear that the concerns that

18 Mr. Dean raised and that Ms. Quartarolo raised would be

19 protected, not affected.  And I want to read that language into

20 the record:

21          "The Court further grants Brenntag relief from the

22          automatic stay in order to litigate any TRO claim,

23          including, but not limited to, the introduction of

24          evidence with respect to debtors' alleged liability

25          for the sole and limited purpose of reducing its own

 1                allocated or apportioned liability.  Accordingly,

 2                continued litigation of actions that involve straddle

 3                claims and/or claims that include facts implicated by

 4                debtors' liability, whether directly, indirectly, or

 5                through assertion of indemnification obligations,

 6                shall not violate the automatic stay or this TRO

 7                subject to the following limitations.  To the extent

 8                verdicts or findings are rendered in cases in which

 9                evidence is introduced implicating debtors'

10                liability, whether directly, indirectly, or through

11                assertion of indemnification obligations, said

12                findings shall have no preclusive effect and may not

13                be referenced or offered into evidence in any future

14                litigation involving debtors in this or any other

15                proceeding."

16            We've certainly protected the debtors.  Now,

17    Ms. Quartarolo claims this language somehow now -- and this is

18    the first time I'm hearing of it -- now, somehow, this language

19    affects this indemnity that we've never seen.  And, Your Honor,

20    this is so incredibly, truly, actually just mind-numbing.

21    Ms. Quartarolo comes to your court and says there's an

22    indemnity obligation.  And then the debtors dispute it.  And

23    then two other gentlemen today disputed it.

24            And we've never seen it.  They've never produced an

25    indemnity agreement of any kind that would actually indicate

38

1  that the debtor owes an indemnity to Brenntag for any post-'04

2  conduct merely because there was pre-'04 exposure.  That

3  indemnity document does not exist, has never been shown to this

4  Court.

5          And so we're taking Ms. Quartarolo's word for it that

6  this indemnity right exists, that literally every other party

7  disputes exist.  And now, for the first time ever, she is

8  arguing to Your Honor that the language Your Honor fashioned to

9  protect the debtors' concerns raised in the debtors' papers

10 somehow now affect Ms. Quartarolo's client's ability to argue

11 about an indemnity that doesn't exist or that we've never seen.

12         And with that, my dying clients don't get their day

13 in court, my actual human beings who were supposed to start

14 trial on August 26th, who have been here every few weeks to

15 plead with Your Honor to allow them to try their case against

16 Brenntag for claims that exist that have been pled only for

17 post-'04 exposure.  No, no.  Those people should die while we

18 wait for Ms. Quartarolo to produce an indemnity agreement that

19 doesn't exist and a settlement that's hotly disputed to maybe

20 resolve so that maybe the estates of these women in 2025 or

21 perhaps 2026 could maybe go try a lawsuit against Brenntag,

22 maybe.

23         And, Your Honor, I think the part that's most

24 offensive to me is that Your Honor recognized this and said

25 this on the record.  This was at the September 18th hearing.

39

1  Your Honor said that -- and this is on page 71 at line --

2  beginning at line 13:

3          "I'm going to enter a TRO through October 15th.  I'm

4          going to allow the amendment of the complaint as

5          complying with Rule 15.  That having been said, I do

6          not anticipate that the injunction necessarily will

7          extend beyond the 15th.  I think there are some steps

8          that need to be taken, some language that has to be

9          crafted to ensure that all parties, from Brenntag

10         through the Court, claimants' rights are preserved."

11         The litigation with respect to the settlement is

12 going to go through December.  We know that.  And I'm sure it

13 will be aggressively litigated.  And who knows?  It may extend

14 beyond that.  I don't think it's appropriate to hold the tort

15 claimants hostage to the settlement.

16         Your Honor has repeatedly appreciated and understood

17 that these are human beings who have a cancer that gives them a

18 very finite time to live, to meaningfully participate in their

19 tort claim.  And I have come back here every few weeks at Your

20 Honor's extension of the TRO at the debtors' request, looking

21 for a solution for a way to protect the debtors' interest as

22 well as allowing these two women to have their day in court.

23         Your Honor has had to step into fashion language,

24 because the debtors and Brenntag will never agree to a

25 stipulated language on their own.  It does not serve Brenntag's

40

1  interest.  Brenntag has no interest in wanting to face a jury
2  in Ms. Sneider's case or Ms. Cooper's case.  And they will
3  continue to use this bankruptcy system and Your Honor as their
4  sword and their shield to delay the trial in these women's
5  mesothelioma claims.

6          And it's not appropriate.  And fairness has long gone
7  out the window.  And so I ask Your Honor to please adopt the
8  language that Your Honor has crafted in paragraph 15 to enter
9  this stipulation so that Ms. Sneider and Ms. Cooper can have
10 their day in court.

11         The last thing I will note -- and Mr. Dean continues
12 to say this.  He said this at the last hearing, and I find this
13 incredibly offensive.  No one violated a stay.  Your Honor did
14 not stay the Cooper and Sneider matters until after Ms. Cooper
15 and Ms. Sneider dismissed their pre-2004 claims.  At the time
16 this issue was brought to Your Honor, the only claims that
17 existed in those cases were direct claims against Brenntag.
18 There was no stay.

19         And so I appreciate that Mr. Dean doesn't like that
20 fact, but Your Honor has never ruled there was a stay
21 violation.  There was no stay violation.  And, in fact, Your
22 Honor ruled those are not successor liability claims.  I just
23 need that record to be clear.

24         And I will close out by saying that Mr. Dean said
25 that he thinks that the settlement is the solution.  Well, Your

1  Honor has already said that we are not going to wait for the

2  settlement to have these women die before they ever get a

3  chance to see their day in court.  Your Honor said that on

4  September 18th.

5          Mr. Dean also said the committee will have their day

6  in court.  And, frankly, Your Honor, as much as I appreciate

7  that the committee will have their day in court, the committee

8  doesn't have human beings dying on it that actually have a

9  trial date, that had one on August 26th.  I do.

10         And I -- all I ask is for Ms. Cooper and Ms. Sneider

11 to just have their day in court.  So please lift the stay on

12 these two cases to allow them to proceed to trial, either just

13 lifting the stay or fashioning the settlement -- the

14 stipulation language that you proposed in paragraph 15 of the

15 draft TRO.  Thank you.

16         THE COURT:  All right.  I assume when you request

17 lifting of the stay that you don't take issue with Brenntag's

18 counsel's further requirement that it, of course, have stay

19 relief to settle the action.  Correct?

20         MS. KAGAN:  Your Honor, I take no position on that.

21 I don't have an objection to them having stay relief to settle

22 claimants.  What I don't want is for then there to be some

23 other stay triggered if a case is actually settled.

24         I have no interest in settling these cases.  There

25 have been no settlement discussions happening since, gosh,

42

1  whenever it was that we made our initial settlement demands.

2  If there was a real opportunity to settle these cases, I would

3  be happy to engage in that conversation.  I just don't think

4  it's a likelihood, so I'm not concerned about that relief.

5          THE COURT:  And I also assume that stay relief for

6  all sides would allow the continued procedural rights of

7  Brenntag.  They recently removed the action to the district

8  court in California.  And whether or --

9          MS. KAGAN:  So, yes, Your Honor.  Yeah.

10          THE COURT:  And I'm aware of your stay motion.  And

11  whether or not it was a stay violation, the reality would seem

12  to be that, even if I were to rule that it was void ab initio,

13  they would just turn around and, within their rights, seek to

14  remove it again, subject to another court ruling on that.  You

15  would agree?

16          MS. KAGAN:  So, Your Honor, I think it is a very

17  curious position, isn't it?  And the reason that we filed the

18  sanctions motion before, Your Honor, is I was actually just

19  offended that they came into this court and told Your Honor

20  that no litigation can happen in the Sneider matter, and then

21  removed the case to a federal court days after requesting the

22  relief from Your Honor, and then got a scheduling order that

23  sets deadlines and discovery and expert litigation and so

24  forth.

25          I feel like we have been playing a game before this

43

1   court, and I don't think it's appropriate.  I don't think it's
2   fair to Your Honor.  I think it undermines Your Honor's
3   authority.  And letting these cases go to trial, whether they
4   are removed or remanded by the federal court, is, at this
5   point, irrelevant, because we're playing a game to avoid
6   Brenntag having to face their own liability in the court.  And
7   I don't think that's appropriate.
8           THE COURT:  Let me further make inquiry.  You
9   referenced that there is no indemnification agreement with
10  respect to the direct claims where there was pre-2004 exposure.
11  My understanding, of course, is that Brenntag and the debtor
12  are asserting that the language of the current indemnification
13  agreement covers that.  I don't think anybody's suggesting that
14  there's a separate -- apart from -- there's a separate
15  indemnification agreement apart from the MSPA.  But given that
16  there certainly is a contention by Brenntag that they have
17  rights for such straddle claims, why do I need a separate
18  indemnification agreement?
19          MS. KAGAN:  Well, Your Honor, because Third Circuit
20  law is clear that the mere contention of an indemnity agreement
21  is not sufficient.  And Mr. Davis certainly can speak to that.
22  And the TCC's briefing will speak to that.  But the mere
23  possibility is insufficient.
24          And the fact that it is actually disputed, I think,
25  weighs in favor of not staying these claims, because the clear

44

1    language of that indemnity agreement does not speak to post-'04
2    direct claims.  And so anybody can argue anything.  Anybody can
3    claim that something means something.  But unless it actually
4    does, it doesn't matter.

5          And so, again, my -- I -- Ms. Quartarolo can change
6    her argument every time we appear before Your Honor to do
7    whatever it takes to prevent these claims from going forward
8    against her client.  That's her job.  But I feel like, at this
9    point, we have strained credibility and need to just let these
10   cases go forward while the settlement is worked out.

11         And we heard this morning the settlement is not going
12   to be worked out by December.  They're trying.  But Your Honor
13   certainly understands this is something that is a big issue, a
14   big issue that is disputed and whether the amount is
15   sufficient, the terms are sufficient.  And real people will die
16   while these things work out, while the committee gets its day
17   in court.  Human beings won't.  And that's just the problem.

18         THE COURT:  All right.  Thank you, Ms. Kagan.

19         Let me turn to Mr. Davis.

20         MR. DAVIS:  Good morning, Your Honor.  For the
21   record, Kevin Davis of Caplin & Drysdale on behalf of the
22   Official Committee of Talc Claimants.  The committee agrees
23   that, you know, to the extent that this court were to enter
24   some sort of preliminary injunction for these claims, there
25   would need to be some sort of carve out and could be a carve

45

1  out that would allow many of the claims, the direct claims, to

2  move forward in any event.  And that should happen if the Court

3  enters a preliminary injunction.  But I will say that the real

4  solution here is not to enter any preliminary injunction

5  whatsoever.

6         The term "solution" was thrown around a lot by

7  Mr. Dean and by Ms. Quartaralo, but they've never actually

8  identified a problem that the Third Circuit says this Court can

9  grant a solution for.  And I think that that's really what

10  we're getting at here.

11         I first think that it's important to level-set

12  because I think that the debtors, in their reply, and a little

13  bit today, in going over the -- their schedule, have, one, gone

14  sort of way beyond what the schedule actually shows in terms of

15  their argument.  And I think also are muddling what is at issue

16  here in a way that sort of is advantageous to their argument,

17  but is -- should not be taken seriously.

18         So the first thing is to say that the schedule is a

19  is a summary, okay.  So it is a summary piece of evidence that

20  provides language -- or sorry -- provides details about the

21  numerous complaints that are out there now -- hundreds of

22  complaints.  And they say, Look at all these complaints.  They

23  have, all these successor liability claims.

24         Well, the successor liability claims are stayed

25  pursuant to the summary judgment.  Again, the committee

46

1  disagrees that the successor liability claims are property of

2  the estate, but we don't disagree as to the practical effect of

3  this Court's ruling on the summary judgment order, as to those

4  claims.

5         So the successor liability claims, in their

6  existence, provides absolutely no basis for a preliminary

7  injunction of claims that are not successor liability claims.

8  Successor liability claims are stayed.  And it seems as though

9  what Mr. Dean's arguing, for example, with regard to joint and

10 several liability, IS that by allowing direct claims against

11 Brenntag to move forward, it somehow impacts these successor

12 liability claims.  And that just doesn't make any sense.

13        The -- if a direct claim goes against Brenntag --

14 let's say that -- you know, I don't know how there would be

15 joint and several liability when the -- or when the claim is

16 against Brenntag for Brenntag's conduct at a time when the

17 debtor had no operations.  But even assuming that that were the

18 case -- for example, with Ms. Sneider's claim, this Court found

19 that it does not -- it is not a successor liability claim.  So

20 if joint and several liability is entered on that claim, it

21 doesn't impact the successor liability claims whatsoever.

22        And so the backup of Mr. Dean is:  Well, this might

23 create a problem with indemnification.  But as Ms. Kagan just

24 spoke about, there is no indemnification for post-2004 conduct

25 of Brenntag.  None.  There is zero evidence in front of Your

47

1  Honor that there is any indemnification obligation post-2004.

2  And as Ms. Kagan pointed out, the only party who says that

3  there is, is Brenntag.  Has Brenntag provided any language to

4  suggest why that is the case?  No.  Has Brenntag provided any

5  evidence that indemnification has ever been extended for

6  post-2004, that there's any practice of indemnification?  No.

7  They haven't provided any evidence whatsoever.  The only

8  evidence of indemnification in front of you, Your Honor, is the

9  2004 MSPA.  And on its face -- on its face -- it states that it

10 is only an indemnification for claims that are seeking damages

11 based on exposure to WCD products.

12         Now, I want to go to something else that Mr. Dean

13 spoke about, which was this idea that there's, you know, a

14 number of courts to talk about when you're considering this,

15 you need to move beyond the surface of the pleadings and look

16 at the actual nature of the claims at issue.  And I agree,

17 because the vast majority of these claims either did or do

18 contain successor liability claims against Brenntag.  So it

19 only makes sense that they would include allegations that they

20 were exposed to WCD products.  However, insofar as there is

21 also a claim in the complaint that is against Brenntag solely

22 for its post-2004 conduct, and solely for post-2004 exposure,

23 that allegation has nothing to do with that claim.

24         If I have a complaint against 15 different

25 co-defendants, and I say I was exposed to each one of their

48

1  products, that doesn't mean that I have to prove exposure to

2  all 15 products to get my claim against each one of those

3  defendants.  The allegations about 14 of those products are

4  irrelevant to each claim against the single producer.  The same

5  is true here.  The fact that there are allegations of pre-2004

6  exposure doesn't change the fact that the claim is not seeking

7  damages on account of that exposure.  The 2004 MSPA

8  specifically does not cover that.  There is no indemnification

9  for that whatsoever.  Debtors agree.  The debtors agree.

10         So -- and I think that one of the things that's

11  hobbled the thinking about this is this term "straddle claim."

12  I don't think that there really are straddle claims.  There are

13  claims against Whittaker; there are claims against Brenntag;

14  and then there are claims against Brenntag based on the conduct

15  of Whittaker.  The last of that list are the successor

16  liability claims.  They're stayed.  It's that -- claims against

17  Whittaker based on exposure to Whittaker products and

18  Whittaker's conduct -- those are stayed.

19         So now we only have claims against Brenntag for

20  Brenntag's conduct.  There's no straddle.  There's no one who's

21  indicating that they were exposed to talc at the moment that

22  the pen hit the paper to execute the 2004 MSPA, and

23  therefore -- you can't figure out whether or not it's Brenntag

24  or Whittaker.  These are two separate things.  If I get hit by

25  a car on Monday, on Wednesday, that person sells the car, and

49

1 the person who bought it hits me with that same car on

2 Thursday, I don't have a straddle claim. I was hit by two -- a

3 car twice. That's two separate claims. I have a claim against

4 the first person and a claim against the second person.

5 There's no straddle. These are distinct things.

6         THE COURT: Mr. Davis --

7         MR. DAVIS: And I think that they --

8         THE COURT: Mr. Davis, let me ask you a question just

9 on that. And I hate to interrupt, but it just -- let's say --

10 I guess I'm trying to understand how a jury can make a finding

11 that a product distributed -- or sold by Brenntag after 2004

12 didn't include asbestos or asbestos products that were

13 previously manufactured or inventoried or used or maintained by

14 WCD. And also, how can -- in other words, Brenntag took over

15 the operations. I assume they also took over inventories,

16 products, machinery, the systems. How would a jury be able to

17 identify where the asbestos lay? And also, how could they --

18 unlike your illustration with the car -- you know, what damage

19 you can tie to the vehicle hitting on Monday and the vehicle

20 hitting on Thursday. Can you really identify what -- the

21 causation of the exposure between WCD and Brenntag as easily as

22 car damage?

23         MR. DAVIS: I would say, Your Honor -- and I'm sure

24 that Ms. Kagan can talk about this with much more intelligence

25 than I can -- but juries do that all the time. That is not

50

1  uncommon whatsoever.  In asbestos litigation, for the past 40

2  years, there's been bankrupt defendants with overlapping

3  systems of distribution, with the same products, with the same

4  manufacturing, from the same minds.  And the Third Circuit has

5  held time and time again that the automatic stay doesn't extend

6  to protect those co-defendants.  And the Third Circuit has

7  found time and time again that it will not extend injunctions

8  to stop litigation against those defendants simply on the basis

9  that there may be some overlap in product or time period or

10 even injury.

11         So it -- juries make these segregations all the time.

12 If I were to -- you know, if -- for example, I think, you know,

13 if I were to file a complaint today that said I was only

14 exposed -- I was exposed to Brenntag's products post-2004, the

15 jury would be able to make that distinction.  They'd say, Okay.

16 Well, let's look at what happened after 2004, what your

17 exposures were.  You'd have expert testimony talking about X,

18 Y, and Z, about causation and timing, et cetera.  And then it

19 would be done.  I don't know how the fact that I alleged in

20 part of a claim that's been severed or stayed or otherwise

21 dispensed with -- that I was exposed to something else at some

22 other time -- becomes such a roadblock.  This sort of

23 complicated issue comes in front of juries in virtually every

24 single products liability.

25         THE COURT:  Do you want to allow Ms. Kagan to -- I

51

1 know she's probably jumping up and down --

2         MR. DAVIS:  Ah, yes, please --

3         THE COURT:  -- to come in.

4         MR. DAVIS:  Please.

5         THE COURT:  And then I'll come back to you.

6         Ms. Kagan.  Thank you, Your Honor.  I wanted to

7 actually, if I could, show an example.  This is not evidence.

8 This is just an example of what the proposed verdict form was

9 in Sneider, as submitted, before the stay, if I can, just so

10 that Your Honor could see what the verdict form looks like and

11 the types of questions the jury has to answer, how they're able

12 to parse this out, if that's all right with Your Honor.

13         THE COURT:  All right.

14         MS. KAGAN:  Okay.  Let's --

15         THE COURT:  We'll view it as a demonstrative.

16         MS. KAGAN:  Absolutely.  Just a demonstrative.  Okay.

17         THE COURT:  Does Ms. Kagan need to screen sharing --

18 ah, she's got it.

19         MS. KAGAN:  Okay.  And so this was the special --

20 proposed special verdict form.  And so, as a threshold matter,

21 in these mesothelioma cases, every jury has to answer the

22 question of whether or not the disease that the plaintiff has

23 was caused by asbestos exposure.  It is exceptionally rare that

24 there is only one exposure source.  Right?  And I think

25 everybody understands that asbestos is a ubiquitous -- or was

1   used ubiquitously in a certain time period.  There are all

2   these individuals -- whether it's a talc case or a traditional

3   occupational case, there are numerous sources of exposure that

4   contribute to the ultimate disease.  It's like that glass of

5   water that's filling up, right?  Each drop fills up your glass

6   of water.  What drop sets it over or where your water spills

7   over isn't really relevant.  You need all the water in there

8   for the glass to be full.  And so all of these exposures

9   contribute to the disease.

10          So the jury gets past the threshold question; we move

11  on to the actual liability concepts, right?  And so at this

12  moment in time -- this was before Avon had filed for

13  bankruptcy -- at this moment in time, during our pretrial on --

14  this was the 11th of August -- we had Avon, Brenntag, and

15  Vaughn's in the case.  And so the jury, through this trial,

16  will have heard evidence about Ms. Sneider's exposures to the

17  Avon products.  They will have heard about her exposures to the

18  Chanel products.  And they will have heard about Brenntag's

19  supply of talc to the Chanel piece.  And they will have heard

20  about Whittaker's supply to Avon and to other companies as

21  well.

22          And the jury, for these purposes, because these are

23  the remaining defendants, will answer these questions about

24  these defendants.  But at the end, if they get there, if they

25  go through -- as they parse out manufacturing defect, and they

53

1  have to answer these substantial factor questions for each of

2  these defendants -- and really, it's did each of these

3  defendants' conduct, each of these defendants products do or

4  not do certain things that caused or contributed to the

5  disease.  Right?  It's very specific.  And there are lots of --

6  you know, the predicate questions that get you to it.  We have

7  economic and non-economic damages that they have to parse out.

8  And then we get to allocation.

9         So, of course, the plaintiff's proposed verdict

10  sheet, you only get to allocate between these three.  But in

11  California, because of a proposition that exists, that was

12  voted on, the defendants get to put everyone, basically, on the

13  verdict sheet.  And so Ms. Sneider's jury would -- even though

14  this is my ideal at that time -- would have a line item for

15  other parties.  Every other defendant in the case most likely

16  would go on this list, including bankrupt defendants.

17         And so they would get to decide, between Brenntag's

18  independent claim for post-'04 conduct, how much of

19  Ms. Sneider's total damage was caused by their conduct as

20  compared to Avon, as compared to Vaughn's, as compared to,

21  also, Whittaker.  And I appreciate Whittaker's concern:  Well,

22  hey, we don't want that allocation to then be used against us

23  in this bankruptcy proceeding.  That affects our estate.  Well,

24  Your Honor's stipulation proposed language protects them from

25  that.  And I don't see how, on God's green earth, Your Honor,

54

1    stipulated language affects indemnity rights that we don't know

2    actually exist for Brenntag.

3            And again, I'm certain we can craft some language --

4    well, really, I think the Court would have to order that

5    language at this point, because I don't think anyone's agreeing

6    to anything -- that would obviate those concerns.  Let me stop

7    sharing here.

8            But it's a very -- you know, it's a very clean

9    process that jurors have to go through.  And they do hear all

10   of that evidence.  There will be evidence about Whittaker's

11   conduct, because they're part of the story; we would've never

12   hide from that.  The difference is, because there are no

13   successor liability claims, the only thing the jury could

14   apportion to Brenntag would be the direct liability claims.  So

15   whatever percentages assigned to Brenntag and Sneider and

16   Cooper are only for Brenntag's independent conduct.

17           THE COURT:  All right.  Thank you, Ms. Kagan.  I

18   appreciate it.

19           Mr. Davis, you may continue.

20           MR. DAVIS:  Yeah, thank you very much to Ms. Kagan

21   for that.

22           So I think that, you know, the situation that

23   Ms. Kagan showed there is common in products liability cases.

24   It's been common in asbestos cases for decades, and it's common

25   now in talc cases.  And I think this comes back to is this --

1    so let's say, you know, that this is a situation that exists.

2    Legally, is this a basis to then enjoin these claims from going

3    forward against Brenntag?  And the answer is no, under the

4    Third Circuit law.

5         The Third Circuit has held time and time again, as I

6    noted, that the bankruptcy Court should not and cannot enjoin

7    third-party litigation simply because it is related to the

8    debtor's product or something like that.  In fact, the --

9    neither Brenntag nor the debtors, in their motion, nor in their

10   reply, have provided a single example of a case in which a

11   Court has entered a third-party -- or excuse me -- an

12   injunction of third-party litigation where it is between

13   non-debtors, and it is on the direct independent liability of a

14   non-debtor.  Not a single one.

15        They rely heavily on cases like LTL, on the -- I know

16   there's many Grace cases here -- but on the unreported -- on

17   the Federal Appendix Grace case -- which, by the way, was

18   decided in the context of a Rule 60(b) motion -- they cite

19   those as a basis for there being this ability to go out and --

20   jurisdiction over these types of claims.  But in those claims,

21   they were derivative; this was all derivative liability.  It

22   was literally someone was saying, This third party is

23   responsible for this conduct that the debtor made.

24        That's not what's happening here.  These claims

25   that -- the actual claims that we're talking about enjoining

56

1  here -- because, again, the successor liability claims are

2  already subject to the stay -- the actual claims we're talking

3  about enjoining here are against Brenntag for Brenntag's

4  conduct.  They've not provided a single example of a case in

5  the Third Circuit, or elsewhere as far as I know, that provides

6  for that result.

7          And I think that the reason for that's clear, and

8  that is that the Third Circuit has a very clear jurisdictional

9  cabin on bankruptcy courts when it comes to enjoining

10 third-party litigation.  The third party -- excuse me -- the

11 Third Circuit, in Grace in 2009, 591 F.3d, 164 at 175,

12 specifically held that when a bankruptcy court is being asked

13 to enjoin third-party litigation, enjoining proceedings between

14 those third parties requires the court to have jurisdiction

15 over those proceedings that are sought to be enjoined.

16         I know that in the TRO, and as well as in LTL, this

17 Court said, "Well, the request before me is under 362 to extend

18 stay and under 105, and so, therefore, this is core."  And I

19 know that also there was a District Court opinion of the

20 District Court of New Jersey denying a motion to withdraw the

21 reference that also said that the adversary proceeding

22 regarding the PI was core for the purposes of determining

23 whether or not to withdraw the reference, and noted that it was

24 a request under 362 and 105.

25         However, the Third Circuit has specifically

1  distinguished -- this is also in the <u>Grace</u> case -- it

2  specifically distinguished between this Court's jurisdiction

3  over an adversary proceeding and the Court's jurisdiction over

4  the ability to deliver the relief requested in that adversary

5  proceeding.  It's just like a court always has jurisdiction to

6  determine its own jurisdiction.  That a motion comes before

7  this Court and it has the power to decide that motion is very

8  different of whether you have the jurisdiction to actually go

9  out and enjoin these claims.

10          And you know, we have a lot in our brief, and I won't

11  repeat it here, about how extension of the stay is not a

12  function of 362; it's a function of 105, because, obviously,

13  the automatic stay does what the automatic stay does.  362 does

14  not provide for any kind of effect or impact on cases -- or

15  lawsuits against non-debtors that don't concern state property,

16  and so it has to be extended by 105.  105 does not itself

17  create subject matter jurisdiction.  There has to be subject

18  jurisdiction -- subject matter jurisdiction over the matters

19  that this -- that the debtors are seeking to enjoin.  They do

20  not.

21          And you know, I just want to point out -- I mean,

22  under the framing that the debtors have put forward, that

23  simply because they've requested this relief under 362 and 105,

24  the Court therefore has jurisdiction to enjoin these matters --

25  again, contrary to the Third Circuit law -- it's contrary to

58

1  sort of the logical extensions of the Bankruptcy Court's

2  jurisdiction.  If the debtor said, "Well, the upcoming

3  presidential election might affect my estate.  I'm going to ask

4  you to enjoin it under 362 and 105" -- this Court certainly

5  wouldn't have jurisdiction to do that simply because the

6  request was made under the Bankruptcy Code.

7          The same is true here.  There has to be jurisdiction

8  over the thing that this Court is -- or over the thing that the

9  debtors are trying to affect, not merely the motion that

10  they're putting in.  And here, there is no jurisdiction.

11  There's no jurisdiction because there is no connection to this

12  estate.  And there's no connection to this estate -- the only

13  basis that has been raised as a connection to this estate is

14  this purported potential indemnification.

15          The Third Circuit has repeatedly held that in order

16  for there to be this type of related-to jurisdiction to enjoin

17  third-party litigation, the indemnification has to be clearly

18  established and absolute.  There is nothing clear about this.

19  Indeed, Mr. Dean said at our last hearing that it's

20  complicated.  It's the opposite of clearly established.  We had

21  75 percent of the parties speaking in favor of this relief,

22  disputing the existence of this indemnity.  Brenntag, who has

23  the most interest for it to exist, is the only one suggesting

24  that it does.

25          And I know that there is some case law out there that

JA1344

1  would appear, at first glance, to indicate that potential

2  indemnification claims can give rise to related-to

3  jurisdiction.  But if you look at what was actually going on in

4  those cases, including LTL before this Court, there was no

5  dispute over whether or not indemnification of the claims at

6  issue existed.  The potential for indemnification was the

7  potential that someone would attempt to pursue their

8  indemnification right, not the potential that an

9  indemnification right might exist.

10         And in fact, I think a case that we cite in our

11  brief, which is Jackson v. Trump Entertainment, which was a

12  District of New Jersey case from 2015, goes into this.  There,

13  there was someone who said:  Hey, the stay should be extended

14  to me.  I should get an injunction because the debtor has to

15  indemnify me for this liability.  And the debtor disputed that.

16  And everyone agreed that there was an indemnification agreement

17  between the parties.  But there was an open dispute about

18  whether or not that indemnification agreement actually covered

19  the claim at issue.  And because of that, the Court said:

20  Sorry.  Not sufficient.

21         This is not absolute indemnity.  This is not clearly

22  established.  There is no evidence.  What we need to be dealing

23  with here is a legal certainty that the debtor will be held

24  responsible, not merely a factual possibility that it might.

25  As Ms. Kagan put it, if we're limiting it to just -- or not

60

1  limiting it -- if we're expanding it to include even the
2  factual possibility of indemnification, well, then, anyone who
3  comes to this Court and says "Well, I might be able to sue them
4  for indemnity" would get the benefit of an extension of the
5  automatic stay.  That simply can't be the result.  So we do not
6  believe that the Court has jurisdiction to enter the
7  preliminary injunction as to the direct claims at issue here
8  for that reason.

9         And I think -- you know, I won't belabor this
10  point -- for the same reason, there's no identity of interest
11  between the parties here that would provide the basis for
12  extending the automatic stay.  The -- again, the automatic stay
13  being extended is based on a legal certainty, an absolute
14  indemnity that a -- that the debtors will be held responsible.
15  It is not just the mere allegation that is -- that there's an
16  indemnity, which is all that we're looking at here.

17         I would also note that the cases relied upon by the
18  debtors regarding identity of interest also are all derivative
19  liability cases -- LTL, Grace -- all dealing with derivative
20  liability, none of them dealing with direct and independent
21  liability against a third party.  Whereas there was -- you
22  know, there -- again, in derivative liability, it's the same
23  conduct:  Two parties are responsible.  Here, distinct conduct.

24         And for extension of the automatic stay, I would say
25  that the debtors concede in their reply that there does not

61

1  appear to be a single case in which record taint or risk of

2  res judicata has alone provided a basis for extending the

3  automatic stay under the <u>Robins</u> test.  It is always coupled

4  with an actual identity of interest or some other risk to the

5  estate.  Here, again, there is no evidence to support that

6  there's a risk to the estate here.  There is no evidence that

7  the debtors have ever gotten involved in a direct claim against

8  Brenntag, that they've ever sought to defend themselves.  These

9  are claims that have not been subject to the automatic stay or

10  any stay by order of this Court since the inception of this

11  bankruptcy, and not once have the debtors sought to be involved

12  in the -- in any litigation of any of these claims.  There's no

13  indication that they would do so now, especially at a time when

14  they purport to have settled all of these issues.  And again,

15  what they're settling isn't even concerning the direct claims.

16  It's the successor liability claims that they're purporting to

17  be settling, and it's resolving the indemnification

18  obligations -- which, again, there is no evidence that there's

19  indemnification for these direct claims.  Zero.  Zero evidence.

20          I would note that the debtors, in providing a basis

21  to say that collateral estoppel, res judicata provides a risk,

22  again, cite only to cases in which the courts were concerned

23  with derivative liability.  They completely ignore the Third

24  Circuit's consistent denial of stay relief or injunctive relief

25  simply for co-defendants with related facts or legal issues.

62

1  The times where courts have focused on res judicata or
2  collateral estoppel are where it is derivative liability, where
3  it is the exact same conduct -- the exact same conduct is -- or
4  rather, more specifically, the debtor's conduct is the alleged
5  wrong that is giving rise to liability for the third party.
6  Here, it is the third party's wrong.

7          Moving on to the preliminary injunction.  I apologize
8  for not being as brief as Mr. Davis and repeating some of my
9  arguments from before, but I just wanted to make sure -- set
10 the record here.

11         Again, I think that it's very, very important to
12 really think about what is the purpose of this injunction.
13 They want to enjoin direct claims against Brenntag that they
14 have -- they have conceded that they have absolutely no desire
15 to settle, they have absolutely no desire to resolve.  I don't
16 even think that they believe that they can settle or resolve
17 them.  There's nothing in the settlement agreement that -- and
18 they concede this -- that would impact these claims.  There is
19 absolutely nothing in their planned term sheet that would
20 affect these claims.  And in fact, Mr. Dean said today they're
21 more than happy to -- for everyone to litigate against
22 Brenntag, including bringing up things about Whittaker, once
23 the settlement is over.

24         So, again, we have a preliminary injunction being
25 requested that is completely unrelated to any ultimate relief

63

1  being sought here.  And again, this comes back to the Supreme

2  Court's decision in <u>Winter</u> as well as a number of other cases

3  that were cited in our objection, where if you're trying to

4  preliminary -- you know, if your ultimate relief is about A,

5  but your preliminary injunction is about B, then your

6  preliminary injunction is inappropriate.  And even when B is

7  related to A, the fact that they don't align means the

8  preliminary injunction is inappropriate.  And that's what's

9  happening here.  They're asking you to enjoin claims that will

10  not be dealt with in these cases.  That's inappropriate, and

11  that defeats them -- full stop -- on likelihood of success.

12  They have no likelihood of success on permanently enjoining or

13  resolving these direct claims.  They have no interest or

14  ability to do so.  They fail on that prong.

15         Irreparable harm.  Mr. Dean spoke for a long time

16  about the possibility of indemnification.  I won't belabor that

17  again.  They dispute the indemnification.  They've conceded it

18  would take an additional lawsuit in order to figure out the

19  indemnification -- the specific situation in which the <u>Pacor</u>

20  court determined it didn't have jurisdiction to enter the

21  injunction.  But I would also just note that even if there were

22  an indemnity obligation here -- and there's not -- but even if

23  there were, courts have found that the mere existence of an

24  indemnity isn't necessarily enough to provide irreparable harm,

25  especially when all it's doing is creating an unsecured claim

64

1  against the estate.

2          Moreover, again, here, the debtors have admitted in

3  their DIP financing motion that they would be administratively

4  insolvent absent the DIP.  So for them to claim that something

5  would have to happen before the NICO, DB US backstop is

6  triggered on their indemnification obligations is specious at

7  best.  It's certainly belied by the record they put before this

8  Court in the main case.  And so, just as a tertiary fallback

9  position here, even if there's an indemnification obligation,

10 even if it could potentially harm the estate, it won't because

11 all of this is backstop.  Every single dollar that would come

12 in as an indemnification obligation now is just a dollar out of

13 NICO or DB US's pocket, but not out of the estate.

14         THE COURT:  But, Mr. Davis, let me make inquiry on

15 that, because the backstop -- or just that -- backstops require

16 the debtors to exhaust their assets.  And there are creditors

17 who are not talc claimants.  There are environmental creditors.

18 How -- aren't other creditors prejudiced by watching the debtor

19 exhaust their asset base?  That -- to just depend on NICO or

20 DB US to backstop only the talc claims?  They're not

21 necessarily talc -- are they necessarily backstopping the

22 environmental claims?  I'm not aware of that.

23         MR. DAVIS:  Well, I think that the issue here is that

24 we've already watched them go through their estate.  So it's --

25 everyone is where they are, currently.  The fact that the top

1  claimants might have access to additional funds based on the

2  fact that -- well, and it's not even the top claimants, right?

3  It's the indemnity is backstop.  So it's really Brenntag.

4  Brenntag's rights are what's being preserved here, because the

5  indemnity is what is -- is what is backstop, but the talc

6  claimants having access to the backstop as well.  I mean,

7  that's just a -- that's just a matter of fact of where things

8  sit.  The fact that the debtor is exhausted and there are

9  certain assets that can only be tapped by certain creditors,

10  and maybe those are talc claimants, you know, is the way it

11  exists.  The fact that Brenntag makes an indemnification claim

12  isn't going to change that relationship among creditors, if

13  that makes sense.

14          THE COURT:  All right.  Continue, please.

15          MR. DAVIS:  But again, it's not something that we

16  need to worry about.  There's no indemnity here for these

17  post-2004 claims; so there's nothing from NICO, necessarily, to

18  backstop with regard to those direct claims.

19          I would then note, Your Honor, you know, the debtors

20  have not pointed to -- or rather, the -- for res judicata and

21  collateral estoppel -- we've talked about this a bit -- but I

22  would note that, you know, Mr. Dean's refrain is that these

23  ideas of preclusion shouldn't be tested at the debtor's peril.

24  But I think that that's really taken out of context.  In the

25  Grace case where that statement was made, it was a very

1  peculiar argument about how an agent-principal relationship

2  wouldn't give rise to privity.  Here, there's nothing so

3  complicated about these arguments.  The debtor's a non-party.

4  The debtor has no interest or privity with regard to Brenntag's

5  conduct.  And despite their claims of alignment or privity,

6  Ms. Quartaralo -- basically, she said that to the extent that

7  WCD exposure is brought up, it's going to be because Brenntag

8  will be blaming the debtors.  So there's to -- to its benefit.

9  So there will be -- you know, there's no privity there.

10 There's no ability to then use that in a later proceeding.  And

11 the debtors have not pointed to a single instance where a

12 similar situation has occurred.

13        I would also note that even this Court, in talking

14 about -- distinguishing from the Queenie decision in the Second

15 Circuit, which holds that res judicata isn't relevant to a

16 decision to extend a stay or to extend an injunction -- this

17 Court, in LTL, noted -- or distinguished it by saying that,

18 "Well, in that case it was solely res judicata and collateral

19 estoppel grounds."  That's a different situation from what we

20 have in LTL, where this is among many different factors.

21        And like I said, the debtors concede that they have

22 not found any instance in which -- and in fact, have found

23 several instances where a court has said res judicata by

24 itself -- the risk of res judicata by itself is not enough to

25 give them the relief that they want on these direct claims.

67

1  They have not pointed to anything to the contrary, where

2  res judicata's standing alone.

3          And given the lack of any indemnification obligation,

4  that's the situation that they find themselves in.  They're

5  relying solely on this concept of the potential for res

6  judicata, collateral estoppel, record taint.  There's been no

7  legal argument or evidence presented that that is an issue that

8  by itself would present the necessary connection or harm to

9  allow this Court to enjoin these cases.

10         I think that Ms. Kagan spoke about the balance of

11 harms here.  But just to note, I mean, the idea that this

12 non-operating entity -- with no money -- you know, we are sort

13 of preserving their ability to be free from someone arguing

14 they have indemnification obligations that they dispute at the

15 expense of actual human beings who are dying, moving forward on

16 their trials, against a third party, based solely on that third

17 party's conduct -- I think that that balance is a pretty simple

18 one to see -- that the debtor has no interest in these claims

19 whatsoever.  It's conceded that this case has nothing to do

20 with them, and it doesn't seek, and will not seek, to resolve

21 them or deal with them in the context of this case.  So the

22 balance of harms here clearly favors not entering the

23 injunction.

24         And the same is true with the public interest, I

25 think, for the same reasons.  There's no public interest in

1   having a non-operating company with no money not have someone

2   raise a specious and unsupported indemnity obligation about --

3   up against it, and that is somehow in the public's interest

4   above and beyond allowing tort victims to have their day in

5   court against non-debtors for the non-debtor's conduct.

6        So with that, Your Honor -- and again, I apologize

7   for going on a little more and being maybe repetitive of some

8   previous arguments.  But just to restate, there is -- the

9   claims that are really at issue here, that they're really

10  seeking to enjoin are not successor liability claims.  They are

11  direct claims against Brenntag for Brenntag's conduct.  There

12  is zero evidence -- zero evidence that those claims will have

13  any effect on the estate with regard to any kind of

14  indemnification whatsoever.  There's clearly not a clearly

15  established absolute indemnity.  Again, all of the

16  debtor-aligned entities who are asking for this relief dispute

17  that any such indemnification exists.  That is the basis for --

18  that's sort of the alpha and omega of this argument.  The

19  indemnification obligation doesn't exist.  That means this

20  Court doesn't have jurisdiction.  That means that there is not

21  irreparable harm that provides a basis for the preliminary

22  injunction.  That means that there is no possible way for the

23  debtors to balance out the harms to the claimants from the

24  injunction -- which, by the way, could last years if the

25  settlement is approved and appeals are taken.  And there is no

69

1  public interest in that either.  And again, there is no

2  likelihood of success here because there is not even an attempt

3  to be successor in enjoining or resolving on a permanent basis

4  any of these direct claims by the debtors in these cases.

5          So with that, Your Honor, there's no basis to enter

6  this preliminary injunction as requested or to extend the stay,

7  if we want to use that parlance, whatsoever.  And unless the

8  Court has questions, I'll cede the rest of my time.

9          THE COURT:  All right.  Well, thank you --

10         MR. DAVIS:  Thank you for your patience.

11         THE COURT:  Thank you, Mr. Davis.

12         Let me go back to Mr. Dean.  Mr. Dean --

13         MR. DEAN:  Thank you, Your Honor.

14         THE COURT:  -- before --

15         MR. DEAN:  I'll start out by addressing --

16         THE COURT:  Well, before you start, let me just ask a

17  question.

18         MR. DEAN:  Sure.

19         THE COURT:  Because you had started your argument --

20  and I didn't get a chance to address it, but I was curious

21  about it -- saying that, I guess, an alternative approach is to

22  view all of the claims subject to the automatic stay --

23         MR. DEAN:  That is correct.

24         THE COURT:  -- if I understood you correctly.  And I

25  just -- are, you're speaking of all 683 claims that are on the

70

1   schedule?

2           MR. DEAN:  That is correct, Your Honor.  With --

3           THE COURT:  And that would include Sneider and

4   Cooper?

5           MR. DEAN:  Well, our view is that the Cooper and

6   Sneider claims were in that category before the stay was

7   violated.  And just to be clear on that point that Ms. Kagan

8   raised, we're not accusing them of any willful violation of the

9   stay.  The stay is automatic, though, and that -- those changes

10  were made after the case was filed, while this Court's summary

11  judgment ruling was pending.  So the answer to your question is

12  yes, Your Honor --

13          THE COURT:  So --

14          MR. DEAN:  -- for that reason.

15          THE COURT:  So they were all subject -- and what's

16  the basis for that?

17          MR. DEAN:  Yeah, as I identified in the argument, I

18  started to walk the Court through some of the statistics.  If

19  you look at the data that was in the schedule, Your Honor -- so

20  just to walk you through it again, we did the math.  So 570 of

21  these 683 actions -- so if you look at the column that says --

22  that -- it alleges successor liability -- 570 of those 683 have

23  allegations of successor -- I'm sorry -- allegations of

24  pre-2004 exposure.  So there's a column says, "Allegations of

25  pre-2004 talc/asbestos exposure," and it either says "yes" or

71

1    "unclear" on the basis of the face of the complaint.  And 570

2    of the actions -- 662 of those expressly assert successor

3    liability claims directly, and all but one expressly assert

4    successor liability claims, which would give a basis to find

5    that their stay -- contain express allegations of pre-2004

6    exposure, with the exceptions of Cooper and Sneider, who

7    removed those allegations in violation of the stay, or involved

8    in executed bifurcation stipulation.  So that -- where the

9    plaintiff acknowledged the existence of success or liability

10   claims in order to bifurcate the claims against WCD prior to

11   bankruptcy.

12           So when you put all that together, Your Honor, we do

13   think there's a basis to hold that these claims are stayed.

14           THE COURT:  How do you get from 662 to 683, though?

15   I'm not -- you said six -- 570 contained pre-2004 exposure

16   allegations; 662 are expressly successor liability.

17           MR. DEAN:  There's overlap.

18           THE COURT:  So on top of the 662, some of the 570 get

19   added on to that to cover the 683?

20           MR. DEAN:  No, no.  They're all independent and

21   overlapping.  So the 570 of the 683 contain express allegations

22   of pre-2004 exposure.

23           THE COURT:  Right?

24           MR. DEAN:  Of that 683, 662, which also contained

25   many of the 570 I just mentioned, also, assert expressly

72

1  successor liability claims, or involve this executed

2  bifurcation stipulation where it was amended.  And then, when

3  you add all those up, you get the 682.  When you take out the

4  overlap, 682 of these all have one of the three features that

5  would make these subject to the automatic stay.

6          THE COURT:  All right.  Thank you.  Now, continue

7  with your argument -- or your response, rather.

8          MR. DEAN:  Thank you, Your Honor.  I want to just --

9  I'll just take it party by party.  So I'll start out addressing

10 the -- some of the comments that Ms. Kagan made.  On the

11 stipulation, Your Honor, I think I made it very clear that we

12 tried very hard to do this, and we were uncomfortable, without

13 getting agreement of all the parties, that these would be

14 enforceable.  So I'm not going to belabor that point, but I

15 just want to make it very clear that we tried very hard to

16 reach a stipulation and were not able to do so, and this is the

17 only solution that we've come up with that we think can protect

18 us.

19          On the indemnity issue -- this was raised by both

20 counsel -- I just want to point the Court to the actual

21 document that's in evidence at -- and I'll direct the Court to

22 the docket.  It's at Docket 4-7.  It's part -- this is a long

23 document; so this is part two of two of the MSPA.

24 Paragraph 12, starting on page 22 of 72 of Docket Number 4-7,

25 and the pages that follow, contain the indemnification

73

1  provision that we're all dealing with.

2          And there's been a lot of sleight of hand about this,

3  comments from both counsel that there is no indemnification,

4  that we haven't produced a document that shows indemnification

5  for post-2004 exposure.  But that -- I think Your Honor is on

6  to the issue Brenntag has taken the position that it does,

7  especially when there are allegations of pre-2004 exposure with

8  respect to products that Whittaker -- or supplied talc to prior

9  to the transaction date.  So it's a red herring to say there's

10 no indemnification for post-2004 exposure without putting it

11 into context and appreciating the position, albeit disputed,

12 that Brenntag is making under that document, Your Honor.  So

13 there is a documented evidence, there is an indemnification

14 provision, and there's a dispute between the parties as to what

15 that provision means.

16          Now, I want to just talk for a minute about the

17 Cooper and Sneider case, because it's important to understand

18 that those claims were not pled the way that has -- the way

19 that this is proposed to be taken to the jury, that -- as the

20 Court sat through that a very detailed hearing on Sneider, we

21 put Cooper on hold, but with -- we would've made the same

22 arguments in the case with respect to Cooper if we had gone

23 forward with it.  But Sneider did contain allegations of

24 pre-2004 exposure.  We had an entire evidentiary hearing on

25 this, and we were able to show, through redirect examination

74

1  and the declaration submitted for counsel for Brenntag, that

2  there was actually evidence of pre-2004 exposure.  The Court

3  may remember the Chanel No. 5 product and other products that

4  we were discussing during that evidentiary hearing.

5       So it's not that there wasn't pre-2004 exposure.

6  What they're saying is we want an opportunity just to focus on

7  the post-2004 piece of it, and seeking damages against

8  Brenntag.  That doesn't stop Brenntag from pointing the finger

9  at us at trial.  And I found Ms. Kagan's comment to be very

10 telling, where she acknowledged that WCD's conduct and its

11 manufacturing would certainly be at issue in the context of the

12 jury's award, which is why she's suggesting this language,

13 because she knows it's a problem for us, Your Honor.  So I just

14 want to make that very clear.

15      Now, as I mentioned, I -- on the violation of the

16 stay, we are not accusing Ms. Sneider and Ms. Cooper or

17 Ms. Kagan of doing anything nefarious or willful.  But it was a

18 technical violation of the automatic stay because the case had

19 been filed, and everyone know -- knew our -- what our position

20 was in the adversary proceeding while the summary judgment was

21 under consideration.  They also knew that the TROs on cases

22 that were approaching trial were -- they -- that they were

23 ultimately going to be added to that as trial approached.  And

24 so before they got added to the schedule, they made the change.

25      So not only was that done in the face of our request

75

1  for declaratory judgment, it was all -- these changes were also

2  made in the face of a TRO protocol where they knew they were

3  about to get added to the schedule, and they were setting it up

4  so they didn't get added to the schedule.

5         So we're -- our position today, Your Honor, is that

6  in finding that those cases should be put on hold, you should

7  consider them to have alleged pre-2004 conduct, like all the

8  others have that have not taken that action yet, in violation

9  of the automatic stay, which, from our perspective, is void

10 ab initio.

11        Now, just turning to some of Mr. Davis's comments,

12 Your Honor -- he started out by talking about the schedule and

13 his view of the fact that there's a dispute about the

14 application of the ruling with respect to the schedule and the

15 particular cases that should be on the sheet with respect to

16 summary judgment.  And that is exactly why we filed this

17 schedule and we sought the relief that we did, because we

18 wanted to be very precise as to which claims were put on hold

19 so we didn't have fights about this down the road.

20        Now, I just want to say one thing about joint and

21 several liability, Your Honor.  There could be joint and

22 several liability even if there were post-2004 allegations,

23 because there are allegations in these lawsuits of pre-2004

24 exposure if -- as we just went over by reviewing the columns.

25 I already addressed the issue of the no indemnification.

1 Ms. Kagan addressed it; Mr. Davis also addressed it.  But I

2 just have to say, this is an absolute red herring.  We've

3 raised a bona fide dispute with the Court as to the application

4 of the documented evidence, and we think that is sufficient to

5 award injunctive relief Your Honor.

6        Now, with respect to the so-called allegations in the

7 complaint solely for post-2004 exposure, Brenntag, as we've

8 noted -- and we went through this in detail at the Sneider

9 hearing, and Brenntag made it very clear that they would still

10 point the finger at us to show that there was pre-2004

11 exposure.  And that case really illustrates the point:  The

12 plaintiff would stipulate to moving forward solely with respect

13 to post-2004 exposure, but Brenntag would still not agree not

14 to point the finger at us and establish a record at the -- at

15 trial with respect to WCD's involvement, which Ms. Kagan

16 admitted would be a relevant issue for that particular trial.

17 And that is exactly why we are seeking the relief that we're

18 seeking.

19        Moreover, Your Honor on the issue of Mr. Davis's

20 point that there are no real straddle claims here, I honestly

21 don't have any idea what he's talking about.  But this, again,

22 is one of these -- one of the reasons why we're very happy that

23 we did the work to put the schedule together, because these

24 generalities should no longer be accepted.  The straddle --

25 there -- almost all of these claims are straddle claims, and

77

1  that they allege pre-2004 and post-2004 conduct.  And all you

2  have to do is look at the column that says "Allegation of

3  pre-2004 talc/asbestos exposure" in this uncontroverted,

4  admitted exhibit to see that.

5         Now, I thought the Court asked a very good question.

6  And again -- on the product issue -- and again we sat through a

7  multi-hour hearing on Sneider, and it was found that there was

8  evidence of exposure when WCD owned the business.  And

9  ironically, Your Honor, this is the claim -- this is the very

10 claim that -- example that we're discussing where the plaintiff

11 is saying, We're just seeking post-2004 exposure.

12        And as we discussed, Brenntag would certainly point

13 the finger at us and show that that product -- that there were

14 products that WCD supplied.  Even if the plaintiff is saying,

15 I'm not seeking damages on it, it doesn't necessarily eliminate

16 our indemnification obligations based on Brenntag's

17 interpretation of Paragraph 12 of the document that -- excuse

18 me -- is in evidence.

19        Just a couple more points, Your Honor.  On the

20 settlement being unrelated to the PI -- I don't even know where

21 to start with this, Your Honor.  It's, of course, wholly

22 related to the PI.  We are proposing to allow these claims to

23 go back to the State Court as part of this resolution.  The

24 Court already ruled on this issue at the last hearing and found

25 that there was a -- there was sufficient connectivity between

78

 1  the injunctive relief and the ultimate resolution.  So I'm not

 2  going to get into the details about that right now, other than

 3  the mention that we cited the transcript in our reply of the

 4  Court's commentary on that.  But just to say that this is a far

 5  cry from having no relation to the requested relief in the

 6  TCC's attempt to argue that the preliminary injunction is

 7  somehow improper because it's not titled and it doesn't resolve

 8  directly these claims that Brenntag -- against Brenntag in the

 9  State Court.  What is being resolved is the debtor's potential

10  liability with -- in connection with those claims.  And that is

11  more than enough Your Honor to create an appropriate

12  preliminary injunction request.

13          And the jurisdiction of this Court, which I'm not

14  going to address again, other than to say Mr. Davis ignores

15  what we cited in our TRO reply, where we cited the District

16  Court's decision in LTL, where the court's -- expressly said

17  that the mere possibility of indemnification obligations

18  warrants an extension of the stay.

19          Now, I -- all of this other stuff about the risk to

20  the estate, record taint, all the arguments you heard today

21  about collateral estoppel all rest on one huge fundamental

22  flaw, and that there's -- and that is that they base everything

23  on this theory that there's no indemnification claim, as if we

24  have to prove up Brenntag's indemnification claim in order to

25  succeed.

1              I think the Court got it right on the backstop; we

2    agree with what the Court said.  There are other creditors

3    involved who should not be permitted -- or not be required to

4    sit around while the debtors exhaust all of their resources to

5    trigger the backstop.  But as we said in our TRO reply, there

6    is no backstop trigger until our assets are exhausted, and our

7    creditors should not be prejudiced while that happens.

8              One last point, Your Honor.  Mr. Davis discussed the

9    W.R. Grace case that we cited in our PI reply, and tried to

10   distinguish it, and that was a distinction without consequence,

11   Your Honor.  In arguing that the case doesn't apply, Mr. Davis

12   said that it was complicated there, and it's not that

13   complicated here.  But in another argument on the lack of

14   indemnification, he used my words at a prior hearing against me

15   to argue that the indemnification issues are complicated and

16   needed to be simple and well-established in order to trigger

17   jurisdiction of this Court.  Your Honor, you cannot square

18   these two arguments.  And the case law is clear that this is a

19   complex situation and triggers not only the jurisdiction of

20   this Court and the ability to seek the PI that we're seeking,

21   but the application of W.R. Grace's principle and the other

22   case law that we cited in our reply brief.

23             And for all of those reasons, Your Honor, unless you

24   have further questions for me, we respectfully request that the

25   Court issue the preliminary injunction, or alternatively, find

80

1 that these cases are subject to the automatic stay, Your Honor.

2 Thank you very much.

3          THE COURT:  All right.  Thank you, Mr. Davis.

4          I don't see any other hands.

5          THE CLERK:  Ms. Quartaralo.

6          THE COURT:  Ms. Quartaralo?  All right.  Did you want

7 to be heard?

8          MS. QUARTARALO:  Yes.  Just very briefly, Your Honor.

9 I guess just a few quick points.  I know it came up in your

10 colloquy with Ms. Kagan, but the notice of removal that was

11 filed -- we'll obviously be prepared to address that later this

12 month, when it comes before the Court.  But that was in no way

13 intended to circumvent an order of this Court.  And, indeed,

14 the notice of removal, on its face, made reference to this

15 Court's order and the fact that the case and the prosecution of

16 the case was stayed.

17          Again, just briefly -- because I think Mr. Dean

18 covered much of what I was prepared to say -- but Mr. Davis

19 attempted to draw a distinction between pre-2004 and post-2004

20 exposure.  And I just don't think that it's as clear-cut as he

21 was positing.  The -- Brenntag took over the inventory and the

22 talc on hand in connection with the transaction.  And that, in

23 fact, is why there is an indemnity.  That indemnity is in

24 place, and it is -- it's not a hypothetical indemnity, it's not

25 an imaginary indemnity.  It's a documented contractual

81

1  indemnity, and it's an evidence before this Court.  Yes, there

2  is a dispute as to the scope of that indemnity and the extent

3  of the claims that may be covered, but that's not surprising

4  here, given that there's a lack of corporate affiliation among

5  the parties to that indemnity.  And so, in some ways, it's

6  different than some of the other cases where there's -- there

7  is a clear corporate affiliation between the parties that have

8  those indemnity obligations and rights, and may concede that on

9  the front end.

10        Here, we have a dispute, but it doesn't make the

11  decisions of this Court and other courts as to the impact of

12  those indemnity rights and obligations, whether or not they're

13  in dispute, any more applicable.  They are, in fact, relevant

14  to this Court's determination, and support the relief that the

15  debtors are seeking.

16        And last point, Your Honor.  Ms. Kagan showed Your

17  Honor a verdict form.  We appreciate that was taken as a

18  demonstrative.  To be clear, that is not an agreed-upon verdict

19  form.  That is not a verdict form that has been adopted by the

20  Court.  And I think, as you heard from Ms. Kagan, Brenntag and

21  any other parties would have the ability to name and include

22  additional parties and WCD on the verdict form.  As for Cooper

23  and Sneider, those claims are not claims that were pled only

24  for post-2004 exposure.  Those claims were originally pled as

25  successor liability claims.  That means it's a claim that, at

82

1    least in part, is premised on WCD's talc.

2           We think it's plaintiffs who originally put WCD's

3    conduct and product at issue in those cases, and now they're

4    trying to minimize the emphasis on those allegations here.  But

5    they can't proceed to trial without harming the debtor's

6    estates, because Brenntag and/or plaintiffs will put WCD's

7    products and conduct at issue in those cases.  And so we think

8    unless and until the settlement agreement is taken up by this

9    Court, the appropriate balance of the harms is to grant the

10   reliefs that the debtors are seeking.

11          THE COURT:  All right.  Thank you, Ms. Quartaralo.

12          Thank all counsel.

13          I certainly have much to ponder, and I understand the

14   time frames involved.  What I'd like to do is adjourn for a few

15   hours, and come back at -- could we do 3:00 p.m.

16          THE CLERK:  We can do that.

17          THE COURT:  I have a 1 o'clock calendar,

18   unfortunately.  We've --

19          THE CLERK:  We could probably do 2:30 if you want to

20   do -- give more buffer between our 4:00 p.m. thing.

21          THE COURT:  I think 3 o'clock.

22          THE CLERK:  Okay.

23          THE COURT:  We'll come back at 3 o'clock.  We're --

24   I'm not going to take any further arguments.  I might have

25   questions, although I intend to give at least a summary ruling,

83

1  so we know where we're going.

2          THE CLERK:  Can you please use the same link.

3          THE COURT:  Please use the same link.

4          Ms. Kagan, I see your hand raised.

5          MS. KAGAN:  Yes, Your Honor.  I have a flight at

6  3:36.  Is there any way that we could come back at 2 o'clock,

7  or even 2:30?

8          THE COURT:  All right.  Sold, 2:30.

9          MS. KAGAN:  Thank you, Your Honor.

10          THE COURT:  All right.  And we should be able to

11  accommodate.

12          All right.  2:30.  Please use the same link, and I'll

13  see you then.  Thank you.

14          MS. QUARTARALO:  Thank you, Your Honor.

15          MR. DAVIS:  Thank you, Your Honor.

16                      *  *  *  *  *

17

18

19

20

21

22

23

24

25

84

1             **C E R T I F I C A T I O N**

2             We, LIESL SPRINGER and KAREN SCHOUEST, court-approved

3    transcribers, hereby certify that the foregoing is a correct

4    transcript from the official electronic sound recording of the

5    proceedings in the above-entitled matter, and to the best of

6    our ability.

7

8    /s/ Liesl Springer

9    LIESL SPRINGER, AAERT CET-685

10

11   /s/ Karen Schouest

12   KAREN SCHOUEST, AAERT CET-1176

13   J&J COURT TRANSCRIBERS, INC.       DATE:  October 17, 2024

14

15

16

17

18

19

20

21

22

23

24

25

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION FOR**
**ENTRY OF AN ORDER (I) AUTHORIZING THE**
**DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING**
**LIENS AND PROVIDING CLAIMS SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE STATUS; (III) AUTHORIZING THE USE OF CASH COLLATERAL;**
**(IV) MODIFYING THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

TO THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES

BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (the "Motion"):[2]

## Introduction

1.     The Debtors' ultimate goal in these chapter 11 cases is to confirm a plan that efficiently and equitably resolves all valid claims asserted against the Debtors.  After more than a year in bankruptcy, the Debtors have reached a settlement that provides a source of substantial funding for a confirmable chapter 11 plan that maximizes the value of the Debtors' estates for the benefit of all stakeholders.  However, the Debtors are faced with the stark reality of diminishing assets and strained liquidity.  This has come to a head after the Debtors spent many months in settlement negotiations in an attempt to reach a consensual plan in these chapter 11 cases—including a mediation process with the Contributing Parties (as defined below), the Official Committee of Talc Claimants (the "Committee"), and the Future Claimants' Representative (the "FCR") that lasted over six months—all while concurrently responding to and litigating motions to dismiss (and related appeals), an adversary proceeding, and discovery requests that resulted in the Debtors producing over 240,000 documents regarding the Debtors' corporate history, the litigation claims asserted against the Debtors, and other documents responsive to the

---

[2]     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, is set forth in greater detail in the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 5].  In support of this Motion, the Debtors respectfully submit the (a) *Declaration of Paul Aronzon in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Claims Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (the "Aronzon Declaration"), and (b) *Declaration of Mohsin Y. Meghji in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Claims Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (the "Meghji Declaration").  For the avoidance of doubt, the First Day Declaration, Aronzon Declaration, and Meghji Declaration are incorporated by reference herein.  Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Term Sheet or the Order (each as defined below), as applicable.

2

**JA1372**

more than 100 formal document requests served by the Committee and FCR. The Debtors require additional liquidity to implement and consummate the Settlement (as defined herein) and propose and confirm a chapter 11 plan for the benefit of all their stakeholders.

2.      Cognizant of the dwindling cash on hand to fund these chapter 11 cases through the confirmation and consummation of a plan,[3] the Debtors leveraged ongoing settlement negotiations to obtain critical liquidity by monetizing otherwise illiquid estate causes of action. To that end, as part of the Settlement, the Debtors negotiated for an up to $50 million senior secured multiple draw term loan credit facility (the "DIP Facility," and the amount of the facility, the "Initial Contribution").

3.      The DIP Facility is one component of an aggregate $535 million settlement (the "Settlement," and such proceeds, the "Settlement Funds")[4] of estate causes of action against the Contributing Parties, including, but not limited to the Successor Liability Claims,[5] by and between the Debtors and Brenntag,[6] NICO,[7] and DB US Holding Corporation ("DB US," and

---

[3]    The Debtors began these chapter 11 cases with approximately $77 million of cash on hand [Docket No. 122], and as of August 23, 2024, the Debtors only have approximately $9.4 million of unrestricted cash.

[4]    As detailed in the Settlement Motion (as defined herein), following the Initial Settlement Contribution, NICO or its designee will provide a subsequent payment to the Debtors in the amount of $535 million *less* the aggregate principal amount of DIP Loans funded in Cash by NICO or its designee (the "Settlement Contribution," and together with the Initial Settlement Contribution, the "Settlement Payment) within five business days of the date the Debtors notify NICO of the occurrence of the Effective Date, pursuant to the Settlement Agreement. Upon the Debtors' receipt of the Settlement Contribution, the principal amount of the DIP Loans will be forgiven, and the liens and security interests granted to the DIP Lenders will be automatically released and terminated.

[5]    "Successor Liability Claims" has the meaning ascribed to such term in the Debtors' motion for summary judgment in the adversary proceeding attendant to these chapter 11 cases, Case No. 23-01245 [Adv. Proc. Docket No. 3].

[6]    "Brenntag" means, collectively, Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc. ("MPSI")) ("Brenntag Specialties"), and Coastal Chemical Co., LLC.

[7]    "NICO" means, collectively, Berkshire Hathaway Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company ("National Indemnity"), Resolute Management, Inc., Ringwalt & Liesche Co. ("Ringwalt"), and National Liability & Fire Insurance Company.

3

together with Brenntag and NICO, the "Contributing Parties").[8]  The Settlement, including the

DIP Facility, will bring critical liquidity into the estates and allow the Debtors to maximize the

value of their estate causes of action for the benefit of *all* of their stakeholders.

4.        Absent the DIP Financing (as defined herein), the Debtors would likely need to

convert their chapter 11 cases to cases under chapter 7 of the Bankruptcy Code (as defined below)

in the near term, to the serious detriment of their stakeholders.  *See* Aronzon Decl. ¶ 20.  Given

that the Debtors have limited cash flows from interest on fixed assets, and finite assets that are

only being depleted as these chapter 11 cases proceed without resolution, it is highly unlikely that

a third-party would provide postpetition financing on any terms, much less on better terms than

the DIP Lenders.  *See* Meghji Decl. ¶¶ 11, 14.  Moreover, the terms of the DIP Facility are

reasonable, and were the product of good faith, arm's-length negotiations led by the Debtors'

disinterested directors.  *See* Aronzon Decl. ¶¶ 11, 18, 22.  Thus, the DIP Financing represents the

Debtors' rational and reasonable decision in an exercise of their business judgment and discharge

of their fiduciary obligations.

5.        At bottom, the Debtors require liquidity if these chapter 11 cases are to have a

value-maximizing, efficient, and equitable outcome for the benefit of *all* of the Debtors'

stakeholders, and the DIP Financing provides essential liquidity on terms that cannot be matched

by any third-party lender to fund the administration of these chapter 11 cases.  For these reasons,

and for the reasons set forth below and in the Aronzon Declaration and Meghji Declaration, the

Debtors firmly believe that the DIP Financing will maximize value for all of the Debtors'

---

[8]    The terms of the Settlement are described more fully in the *Debtors' Motion for Entry of An Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Settlement Motion"), filed substantially contemporaneously herewith, seeking approval of the agreement governing the Settlement (the "Settlement Agreement").

4

stakeholders, constitutes an exercise of the Debtors' sound business judgment, and is entirely fair. Accordingly, the Debtors request that the Court approve the DIP Facility, the consensual use of Cash Collateral (as defined in the Bankruptcy Code, and together with the DIP Facility, the "DIP Financing"), and the other relief requested herein, and enter an order substantially in the form attached hereto as **Exhibit A** (the "Order").

## Jurisdiction and Venue

6. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The bases for the relief requested herein are sections 105(a), 361, 362, 363, 364 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-3 of the local bankruptcy rules for the District of New Jersey (the "D.N.J. LBR" or "Local Rules").

## Background

9. On April 26, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 8, 2023, the Court entered an order [Docket No. 72] authorizing procedural consolidation and joint

administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). On May 24, 2023, the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed the Committee [Docket No. 121].

10.    On June 26, 2023, the Court entered an *Order (I) Appointing the Honorable Shelley C. Chapman (Ret.) as Future Claimants' Representative, Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 231], pursuant to which the Honorable Shelley C. Chapman (Ret.) was appointed to serve as FCR in these chapter 11 cases. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

## Relief Requested

11.    By this Motion, the Debtors seek entry of the Order granting the following relief:

- ***DIP Facility***:  Authorization for the Debtors to incur senior secured superpriority debtor-in-possession loans consisting of new money delayed-draw term loans to be made from time to time pursuant to the DIP Facility during the Availability Period (as defined in the DIP Term Sheet attached to the Order as Exhibit 1 (the DIP Term Sheet")), in an aggregate principal amount (exclusive of interest) not to exceed at any time outstanding aggregate principal commitments of $50,000,000 (such loans, the "DIP Loans"), as set forth in that certain Secured Debtor-in-Possession Credit Agreement that shall be consistent in all respects with the terms of the DIP Term Sheet (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among Brilliant National Services, Inc., as borrower (in such capacity, the "Borrower"), each of the other Debtors party thereto as guarantors (each, a "Guarantor" and, collectively, the "Guarantors," and the Guarantors, together with the Borrower, the "DIP Loan Parties"), and National Indemnity and/or certain of its affiliates or designees, as lender (the "DIP Lenders");

- ***DIP Facility Documents***:  Approval of the terms of the DIP Term Sheet and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including the DIP Credit Agreement and any security agreements, intellectual property security agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, collectively with the DIP Credit Agreement, the "DIP Facility Documents"), and authorization for the Debtors to execute and deliver the DIP Facility Documents and perform such other acts as may be necessary or desirable in connection with the DIP Facility Documents;

**JA1376**

- *Cash Collateral*: Authorization for the Debtors to use the Cash Collateral of the DIP Lenders under the DIP Facility Documents;

- *DIP Financing*: Authorization for the Debtors to use proceeds of the DIP Financing, to the extent provided in, and in accordance with, the DIP Facility Documents and the Order: (a) for general corporate purposes of the Debtors, including to fund the costs of the administration of the chapter 11 cases and to pay such prepetition expenses, in each case in a manner consistent with the DIP Budget, attached to the Order as <u>Exhibit 2</u>; (b) to pay professional fees and expenses; (c) to pay interest, premiums, fees, expenses, penalties, and other amounts owed under the DIP Facility Documents, to the extent applicable; (d) to fund a wind-down budget in form and substance acceptable to the DIP Lenders; and (e) to fund the Carve Out; *provided*, that in no event shall any such proceeds be used to assert, support, or prosecute (or to seek standing to assert, support or prosecute) any claims or causes of action against, or which are indemnified by, the DIP Lenders or any of their Affiliates; *provided*, however, that such proceeds may be used to seek approval of (or object to or otherwise respond to) the Settlement;

- *DIP Liens and Superpriority Claims*: Subject in all respects to the Carve Out, granting to the DIP Lenders: (a) continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first priority security interests and liens on the DIP Collateral (collectively, the "<u>DIP Liens</u>") to secure the DIP Obligations with the priority set forth below and (b) allowed superpriority administrative expense claim status in each of the chapter 11 cases, with priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (collectively, the "<u>DIP Claims</u>");

- *Automatic Stay*: Modification of the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility Documents and the Order; and

- *Related relief*.

**<u>Concise Statement Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-3</u>**

12.     The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-3.

| Bankruptcy Rule | Relief Requested |
|---|---|
| **Parties to the DIP Facility** <br> Bankruptcy Rule 4001(c)(1)(B) | **Borrower**: Brilliant National Services, Inc., a Delaware corporation, as the Borrower. *See* DIP Term Sheet; *see also* Order at 3. <br><br> **DIP Guarantors**: Guaranteed, on a joint and several basis, by each other Debtor. *See* DIP Term Sheet; *see also* Order at 3. |

7

**JA1377**

| Bankruptcy Rule | Relief Requested |
|---|---|
| | **DIP Lenders**: National Indemnity and/or certain of its affiliates or designees. *See* DIP Term Sheet; *see also* Order at 3. |
| **Purpose** | The Debtors have a critical need to obtain the DIP Financing for, among other things, general corporate purposes and the administration of these chapter 11 cases. Absent the DIP Facility and use of Cash Collateral, the Debtors will be harmed by a value-destructive interruption to their administration of these chapter 11 cases as a result of their limited liquidity. Such harm would be detrimental to all of the Debtors' stakeholders. The DIP Facility is vital to the preservation and maintenance of the value of the Debtors and their estates and to confirmation and consummation of a chapter 11 plan. *See* Order ¶ F. |
| **Term** Bankruptcy Rule 4001(c)(1)(B) | The maturity date with respect to the DIP Facility (the "Maturity Date") shall be the earliest of: (a) the date the Debtors' receive the Settlement Contribution (as defined in the Settlement Agreement); (ii) the date the DIP Loans are accelerated in accordance with the DIP Facility Documents and the DIP Financing Order; and (c) the date of the dismissal of any of the chapter 11 cases or conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. *See* DIP Term Sheet. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility commitment total of up to $50 million (the commitment thereunder, the "DIP Commitment"). *See* DIP Term Sheet; *see also* Order at 3. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The Order and DIP Facility Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type. *See* DIP Term Sheet. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will bear and accrue interest at 5.35% per annum, payable in kind in arrears, on the last business day of the month. Interest shall be computed on the basis of a 365/366-day year for the actual number of days elapsed. At all times following the earlier of (a) December 31, 2024 and (b) upon the written election of the DIP Lenders following the occurrence and during the continuance of an Event of Default (as defined below), the principal, interest and all other amounts due on the DIP Loans shall bear interest at a rate equal to 4.00% per annum in excess of the interest rate set forth above. *See* DIP Term Sheet. |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(c)(l)(B)(ii) | Substantially in accordance with the DIP Budget attached to the Order as Exhibit 2 (except in respect of professional fees), the proceeds of the DIP Facility and/or Cash Collateral shall be available: (a) for general corporate purposes of the Debtors, including to fund the costs of the administration of the chapter 11 cases and to pay such prepetition expenses, in each case in a manner consistent with the DIP Budget; (b) to pay professional fees and expenses; (c) to pay interest, premiums, fees, expenses, penalties, and other amounts owed under the DIP Facility Documents, to the extent applicable; (d) to fund a wind down budget in form and substance acceptable to the DIP Lenders; and (e) to fund the Carve Out; *provided*, that in no event shall any such proceeds be used to assert, support or prosecute (or to seek standing to assert, support or prosecute) any claims or causes of action against, or which are indemnified by, the DIP Lenders or any of their Affiliates; |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | provided, however, that such proceeds may be used to seek approval of (or object to or otherwise respond to) the Proposed Settlement.<br><br>*See* DIP Term Sheet; *see also* Order at 4. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The DIP Lenders.<br><br>*See* Order ¶ F(v). |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | None. |
| **DIP Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | The proceeds from the DIP Facility are subject to the DIP Budget, attached to the Order as Exhibit 2.<br><br>*See* DIP Term Sheet; *see also* Order ¶ 3. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall comply with the following milestones (the "Milestones"), and the failure to timely comply shall constitute an immediate Event of Default:<br><br>(a)  The hearing to approve the Proposed Settlement (which hearing may be the hearing to approve the Approved Plan) shall be scheduled to begin on or before December 1, 2024;<br><br>(b)  Entry by the Bankruptcy Court of an Approved Order approving the Proposed Settlement (a "Settlement Order") on or before December 31, 2024;<br><br>(c)  Filing an Approved Plan and Approved Disclosure Statement with the Bankruptcy Court on or before October 28, 2024; and<br><br>(d)  Commencement of solicitation of acceptances of an Approved Plan on or before December 26, 2024.<br><br>  *See* DIP Term Sheet; *see also* Order ¶ 12. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | DIP Liens.  The DIP Lenders shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code (as defined below), continuing, valid, binding, enforceable, non avoidable, and automatically perfected, post-petition first priority security interests and liens to secure the DIP Facility (the "DIP Liens") on all tangible and intangible real and personal property of the Debtors, and all other property of the Debtors of whatever kind, nature or description, whether acquired or created prepetition or post-petition, and the proceeds of each of the foregoing (the "DIP Collateral"). Notwithstanding anything to the contrary contained in the Order, to the extent an asset is an Excluded Asset (as defined in the Order) or a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to the Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.<br><br>Superpriority Claims.  Subject to, and subordinated in all respects to, the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of |

JA1379

| Bankruptcy Rule | Relief Requested |
|---|---|
| | claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, their estates or their property, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, any proceeds or property recovered in connection with the pursuit of claims or causes of action (x) brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents, if any (the "<u>Avoidance Actions</u>") or (y) that were held to be property of the estates in the Memorandum Decision issued by the Court in Adv. Pro. No. 23-01245 (MBK) on August 13, 2024 (the "<u>Successor Liability Claims</u>"), subject only to the payment of the Carve Out. Except as set forth in the Order, no other superpriority claims shall be granted or allowed in these chapter 11 cases. <br><br> *See* DIP Term Sheet; *see also* Order ¶¶ 5–6. |
| **Liens on Avoidance Actions** <br> Local Rule 4001-3 | Proceeds from Avoidance Actions shall be subject to liens upon entry of the Order. <br> *See* Order ¶ 6. |
| **Marshaling and 506(c) Waivers** <br> Bankruptcy Rules 4001(c)(1)(B)(vii), 4001(c)(1)(B)(x) <br> Local Rule 4001-3 | Subject to and effective upon the entry of the Order, the DIP Lenders are subject to a waiver of (a) any equitable doctrine of marshaling with respect to the DIP Lenders and (b) 506(c) of the Bankruptcy Code. <br> *See* Order ¶¶ 14, 27. |
| **Carve-Out** <br> Bankruptcy Rule 4001(c)(1)(B) | The Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code. <br> *See* Order ¶ 7. |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | None. |
| **Reporting Obligations** <br><br> Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall provide the DIP Lenders and their advisors with all reporting and other information required to be provided to the DIP Lenders under the DIP Facility Documents. <br> *See* Order ¶ 4. |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(l)(B) | The DIP Facility contains events of default that are usual and customary for debtor-in-possession financings. Each of the following shall constitute an Event of Default: <br><br> (i)   failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made and, to the extent capable of being cured, such representation or warranty is not |

| Bankruptcy Rule | Relief Requested |
|---|---|
| | corrected or clarified (in each case, in a manner which causes such representation or warranty to no longer be incorrect or misleading) within 5 days after it was initially made; |
| | (ii)   failure by any Debtor to be in compliance in all respects with the Milestones and any other provisions of the DIP Facility and/or the DIP Financing Order, unless, in the case of certain affirmative covenants, such failure is cured within 15 days after written notice thereof; |
| | (iii)   entry of an order of the Bankruptcy Court with respect to any Debtor, dismissal of its Chapter 11 Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), or, in each case, any Debtor shall seek approval therefor or support or fail to object to any motion seeking the foregoing; |
| | (iv)   the Bankruptcy Court declines to approve the Settlement Order or the Confirmation Order; |
| | (v)   entry of an order of the Bankruptcy Court or other court of competent jurisdiction reversing, amending, supplementing, staying, vacating or otherwise modifying the Estate Claims Decision, DIP Financing Order, the Settlement Order or the Confirmation Order or any Debtor shall seek approval therefor or support or fail to object to and motion seeking the foregoing, in each case; |
| | (vi)   entry of an order in the Chapter 11 Cases confirming a plan that is not an Approved Plan or any Debtor shall seek approval therefor or support or fail to object to any motion seeking the foregoing; |
| | (vii)   entry of an order of the Bankruptcy Court for any financing pursuant to Section 364 of the Bankruptcy Code (other than the DIP Financing), or any Debtor shall seek approval therefor or support or fail to object to and motion seeking the foregoing; |
| | (viii)   entry of an order of the Bankruptcy Court granting (x) any Liens in any of the Chapter 11 Cases that (i) are senior to or pari passu with the DIP Liens or (ii) encumber any Specified Estate Claims, or (y) any claims that are senior to or pari passu with the DIP Claims or, in each case, any Debtor shall seek approval therefor or support or fail to object to any motion seeking the foregoing; |
| | (ix)   any Debtor shall seek to, or shall support any motion to disallow in whole or in part the DIP Claims; |
| | (x)   based on (a) the most recent Subsequent DIP Budget, (b) actual cash disbursements made by the Debtors as of such date and (c) fees incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code, as reflected on any fee statement or fee application filed with the Court as of such date, cash of the Debtors at the end of the Budget Period will be less than $5 million; and |

JA1381

| Bankruptcy Rule | Relief Requested |
|---|---|
| | (xi)  the DIP Financing Order or any DIP Financing Document shall cease, for any reason, to be in full force and effect or the Debtors shall so assert in writing.<br><br>*See* DIP Term Sheet; *see also* ¶ 11. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Order.<br><br>*See* Order ¶¶ 3, 13, 19. |
| **Releases**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective upon entry of the Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of the Order, the DIP Lender and its affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest (collectively, "<u>Representatives</u>"), each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof (collectively, "<u>Claims</u>") with respect to or relating to the DIP Obligations, the DIP Liens, or the DIP Facility Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses with respect to or relating to the DIP Obligations, the DIP Liens, or the DIP Facility Documents and (ii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender; *provided* that nothing in this paragraph shall (x) in any way limit or release the obligations of the DIP Lender under the DIP Facility Documents, (y) release any Claims of a Debtor against another Debtor or any Debtors' officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each solely in their capacity as such or (z) release any Avoidance Actions or Successor Liability Claims against the DIP Lender or its Affiliates.<br><br>*See* Order ¶ 20. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | None. |

## **The Debtors Require Postpetition Financing and Continued Access to Cash Collateral**

13.     It would not be prudent, or even possible, to administer these chapter 11 with the

Debtors' current liquid assets, rendering postpetition financing a necessity.  The Debtors require

access to up to $50 million under the DIP Facility and use of Cash Collateral to continue to fund general and corporate business needs and the administration of these chapter 11 cases. The Debtors have no funded third-party debt, have ceased all historical operations, and began these chapter 11 cases with approximately $77 million of cash on hand. The Debtors' cash has been constantly depleted by professional fees.[9] Additionally, the Debtors' need to respond to discovery requests, litigate a motion to dismiss (and related appeals), litigate an adversary proceeding, and negotiate the terms of the Settlement further depleted the Debtors' cash. As of August 23, 2024, the Debtors have only approximately $9.4 million of unrestricted cash on hand. The Debtors expect their liquidity to be exhausted before an equitable conclusion of these chapter 11 cases can be reached. In summary, the Debtors' current cash position is sufficient to continue for only a short period of time.

14.     Absent the DIP Facility and use of Cash Collateral, the Debtors will be harmed by a value-destructive interruption to their administration of these chapter 11 cases as a result of their limited liquidity. Such harm would be detrimental to all of the Debtors' stakeholders. The DIP Facility provides the liquidity necessary for the Debtors' pursuit of the most viable path for consummating a chapter 11 plan.

15.     As described above, the DIP Facility is the product of good faith, extensive arm's-length negotiations led by the Debtors' disinterested directors and is necessary for the Debtors to pursue confirmation and consummation of a chapter 11 plan that would maximize value for all of their stakeholders in these chapter 11 cases. *See* Aronzon Decl. ¶¶ 8–9, 18, 23. Approval

---

[9]     The Debtors' records—including a review of all of the professionals' fee statements and interim fee applications filed on the docket of these chapter 11 cases—indicate that Debtor professionals requested fees totaling approximately $27.5 million for services rendered for the period between April 26, 2023 and July 31, 2024, while Committee and FCR professionals requested fees totaling approximately $33.3 million for services rendered over the same period. Notably, the Committees' and FCR's professionals' combined requested fees nearly doubled those of the Debtors' professionals during the period of May 1, 2024 through July 31, 2024.

of the DIP Facility is thus in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasoned business judgment.

### Alternative Sources of Financing Are Not Available on Better Terms

16.     In light of the Debtors' fixed assets, limited cash flows from interest on such fixed assets, absence of prepetition lenders, and alleged liabilities, the Debtors, in consultation with their advisors, concluded that it was highly unlikely that any third party would be willing to provide postpetition financing on any terms, let alone on terms more favorable than the DIP Lenders. Accordingly, the Debtors' disinterested directors and advisors commenced discussions with the DIP Lenders to provide necessary postpetition financing in conjunction with the Settlement Agreement.  Because the Debtors and the DIP Lenders were already in discussions and the DIP Lenders are familiar with the Debtors, the Debtors and the DIP Lenders arrived at an agreement to pull forward a subset of the consideration provided for under the Settlement Agreement that ultimately culminated in the DIP Facility, as memorialized in the DIP Facility Documents.

17.     The terms of the DIP Facility were subject to extensive negotiations between the Debtors' disinterested directors and the DIP Lenders.  Moreover, the Debtors, in consultation with their advisors, conducted a marketing process to obtain postpetition financing from third parties on an expedited timeline in a reasonable manner in light of the Debtors' constrained cash position to market test the terms of the DIP Facility.  Specifically, the Debtors solicited interest from twenty potential third-party financing sources.  The potential third-party lenders the Debtors' contacted included various institutions that routinely provide postpetition financing, including both well-known commercial banks and specialty lenders.  As of the date of this Motion, none of these third parties provided DIP financing proposals as an alternative to the DIP Lenders' proposal. *See* Meghji Decl. ¶ 12; Aronzon Decl. ¶¶ 14–18.

**JA1384**

18.     For these reasons, the Debtors' disinterested directors, in consultation with the Debtors' advisors, determined that the DIP Lenders' financing proposal represents the best, and only, postpetition financing alternative available to the Debtors. The DIP Facility provides the Debtors and their creditor constituencies with postpetition financing on the best, and only, available terms, and is reasonable under the circumstances. Accordingly, approval of the DIP Facility is in the best interests of the Debtors' estates and the Debtors request entry of the Order approving the DIP Facility.

## Basis for Relief

**I.      The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Facility Documents.**

### A.      Entering into the DIP Facility Documents Is an Exercise of the Debtors' Sound Business Judgment.

19.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Facility Documents, obtain access to the DIP Facility, and use Cash Collateral. Considerable deference should be given to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the

**JA1385**

bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

20.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

21.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" in the context of postpetition financing).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a

confirmable reorganization plan. That which helps foster consensus
may be preferable to a notionally better transaction that carries the
risk of promoting unwanted conflict.

2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

22.      The Debtors' decision to move forward with the DIP Facility is a sound exercise of
their business judgment following a thorough process and evaluation of the availability and
viability of potential alternatives. *See* Aronzon Decl. ¶¶ 14–18. The DIP Facility, which bears an
initial below-market interest rate of 5.35% per annum, payable in kind in arrears (that is forgiven
upon the Debtors' receipt of the Settlement Contribution), will allow the Debtors to access liquidity
sufficient to pursue confirmation of a plan that will maximize value for all stakeholders while
fairly and equitably addressing all Claims, including tort and environmental Claims. *See* Meghji
Decl. ¶¶ 13–14, 17–18. The DIP Facility is tailored to the Debtors' unique go-forward funding
needs, and appropriately balances the interests of all stakeholders. *See* Meghji Decl. ¶¶ 14, 16–
18. The Debtors negotiated the DIP Facility and other DIP Facility Documents with the DIP
Lenders in good faith, at arm's length, and at the direction of the Debtors' disinterested directors,
and the Debtors believe that they have obtained the best financing available under the
circumstances. *See* Meghji Decl. ¶ 15. Accordingly, the Debtors' determination to move forward
with the DIP Facility is reasonable and appropriate and is a sound exercise of the Debtors' business
judgment and should be approved. *See* Aronzon Decl. ¶ 22.

### B.      Entering into the DIP Facility Documents Should Be Approved Under a Business Judgment Standard, and Regardless, Meets the Entire Fairness Standard.

23.      As discussed above, the Debtors submit that the DIP Financing should be approved
under the business judgment rule. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del.
2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of
the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases

consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). Such business judgments can only be set aside upon a showing that directors did not actually make a decision or were uninformed, grossly negligent, or lacking independence.[10] "A plaintiff faces 'an uphill battle' to carry this burden of proof."[11] Here, the DIP Financing is plainly a reasonable exercise of the Debtors' business judgment for the reasons discussed above, and it should therefore be approved.

24. The business judgment standard should apply to approval of the DIP Financing even though it may constitute a related-party transaction. The DIP Facility Documents were negotiated and approved on behalf of the Debtors exclusively by their disinterested directors (with the assistance of the Debtors' advisors), and without interference from NICO. Bankruptcy courts have approved transactions with insiders without applying an "entire fairness" analysis akin to that applied in derivative suits for breach of fiduciary duty when, as here, the transaction is negotiated by a debtor without interference by any allegedly controlling insider. *See, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012); *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 642 (Bankr. S.D.N.Y. 2012).

---

[10] *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[T]he business judgment rule governs unless the opposing party can show one of four elements: (1) the directors did not in fact make a decision, (2) the directors' decision was uninformed; (3) the directors were not disinterested or independent; or (4) the directors were grossly negligent."); *In re Immune Pharms. Inc.*, 635 B.R. 118, 123 (Bankr. D.N.J. 2021) ("Although the 'business judgment rule,' ordinarily would protect fully informed corporate decisions made in good faith, it does not apply to grossly negligent acts; acts tainted with fraud, self-dealing, or unconscionable conduct; or decisions which lack a business purpose or result from an obvious and prolonged failure to exercise oversight or supervision.").

[11] *In re HH Liquidation, LLC*, 590 B.R. 211, 272 (Bankr. D. Del. 2018); *see also id.* ("The burden is on the plaintiff to show that the Business Judgment Rule is not applicable.").

JA1388

25.     For the same reasons, an entire fairness analysis should not apply to the approval

of the DIP Facility Documents.  Consistent with the delegation of authority to exclusively

determine and handle any Conflict Matters (as defined in the Settlement Motion), the disinterested

directors led the negotiations of the DIP Financing on behalf of the Debtors—and did not discuss

these negotiations with the only NICO-affiliated director, who did not have input on the Debtors'

positions on those negotiations.  Given the disinterested directors' independence from the other

parties to the DIP Facility Documents, and their extensive role in negotiating, reviewing, and

approving the DIP Facility Documents on behalf of the Debtors, the "entire fairness" standard

should not apply and the DIP Financing should be approved as a valid exercise of the Debtors'

business judgment.  *See* Aronzon Decl. ¶¶ 8, 15–18, 22.

26.     Even if the Court determined that an "entire fairness" standard applies to approval

of the DIP Financing, the approval of the DIP Financing by the Debtors' disinterested directors

shifts the burden of proving unfairness to any objecting party—it is not the Debtors' burden to

prove fairness.  *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994) ("[A]n

approval of the transaction by an independent committee of directors . . . *shifts the burden of proof*

*on the issue of fairness* from the controlling or dominating shareholder *to the challenging*

*shareholder-plaintiff*.") (emphasis added); *In re Match Grp., Inc. Deriv. Litig.*, 315 A.3d 446, 462

(Del. 2024) ("*Lynch* . . . clarified that if the defendants demonstrated that the transaction was . . .

negotiated by a well-functioning special committee of independent directors . . . then the burden

shifted to the plaintiffs to prove that the transaction was not entirely fair."); *see also In re Teleservs.*

*Grp., Inc.*, 2009 WL 838157, at * 9 (Bankr. D.N.J. Jan. 15, 2009) ("New Jersey courts have

previously sought guidance and instruction from Delaware case law when deciding matters

JA1389

involving corporate directors' decision-making. . . . In the absence of binding doctrinal authority from New Jersey, the Court here too reviews Delaware case law for guidance.").

27.     For the same reasons the DIP Financing should be approved, no potential objecting party could sustain its affirmative burden of proving that the terms of the DIP Facility Documents are unfair—and the Debtors could readily demonstrate that the DIP Financing is entirely fair as a matter of both fair price and fair dealing.  *See Match Grp.*, 315 A.3d at 459 ("The concept of fairness has two basic aspects: fair dealing and fair price . . . entire fairness is a unitary test, under which a reviewing court will scrutinize both the price and the process elements of the transaction as a whole.").

28.     For example, although National Indemnity is the Debtors' affiliate, the negotiation of the DIP Facility Documents on the Debtors' behalf was led and conducted by the Debtors' disinterested directors, in consultation with the Debtors' advisors, before ultimately being approved by the Debtors' disinterested directors.  *See* Aronzon Decl. ¶¶ 8, 15–18; *see also Match Grp.*, 315 A.3d at 461 ("[F]airness in this context can be equated to conduct by a theoretical, wholly independent, board of directors acting upon the matter before them . . . . Particularly in a parent-subsidiary context, a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness.").  The terms of the DIP Facility, including the below-market 5.35% per annum interest rate (and interest rate increases upon the occurrence of certain conditions), are likewise fair and reasonable, and the Debtors' entry into the DIP Facility is in the best interests of the Debtors' and their estates.  Accordingly, the Debtors' entry into the DIP Facility satisfies the entire fairness standard to the extent such standard applies.

**C.    The Debtors Should Be Authorized to Grant Liens and DIP Superpriority Claims to the DIP Lenders.**

29.    The Debtors propose to obtain necessary financing under the DIP Facility, in part, by providing superpriority administrative claims and liens pursuant to section 364(c) of the Bankruptcy Code.  The Debtors propose to provide superpriority liens on the DIP Collateral.

30.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a)    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

31.    As described above, the Debtors ceased all historical operations except with respect to management of alleged liabilities and fixed assets, so it is highly unlikely that a third-party lender would be willing to provide postpetition DIP financing on an unsecured basis to the Debtors. Absent approval of the DIP Facility, the Debtors will have no clear path to pursue confirmation of

JA1391

a chapter 11 plan and the value of the Debtors' estates will be significantly impaired to the detriment of all stakeholders. The DIP Facility is the product of good-faith, arm's-length negotiations among the Debtors' disinterested directors and the DIP Lenders. Given these circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Facility Documents and the Order, are fair, reasonable, and adequate. For these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

32.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (i) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim and liens in favor of the DIP Lenders is reasonable and appropriate.

**D.    No Comparable Alternative to the DIP Facility Is Reasonably Available.**

33.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating

that credit was unavailable absent the senior lien by establishing unsuccessful contact with other

financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo.

1981) (bankruptcy court's finding that the refusal of two national banks to grant unsecured loans

was sufficient to support conclusion that section 364 requirement was met).

34.     As noted above, the Debtors do not believe that a more favorable alternative DIP

Financing bearing an initial below-market 5.35% per annum, payable in kind in arrears interest

rate is available given the Debtors' limited cash-flow, finite assets, and alleged liabilities.  Thus,

the Debtors have determined that the DIP Facility is the only viable postpetition financing option

available to the Debtors.  Therefore, the Debtors submit that the requirement of section 364 of the

Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is

satisfied.

## II.     Continued Access to Cash Collateral Is Warranted and Should Be Approved.

35.     The Debtors' use of property of their estates, including the Cash Collateral, is

governed by section 363 of the Bankruptcy Code.[12]  It provides in relevant part:

> If the business of the debtor is authorized to be operated under
> section . . . 1108 . . . of this title and unless the court orders
> otherwise, the [debtor] may enter into transactions, including the
> sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of the
> estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

---

[12]    Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash
> equivalents whenever acquired in which the estate and an entity other than the estate have an interest
> and includes the proceeds, products, offspring rents, or profits of property and the fees, charges,
> accounts or other payments for the use or occupancy of rooms and other public facilities in hotels,
> motels, or other lodging properties subject to a security interest as provided in section 552(b) of this
> title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

23

36.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lenders would be the only party with an interest in Cash Collateral, and the DIP Lenders consent to the use of Cash Collateral. Accordingly, the Debtors' use of Cash Collateral should be approved.

### III.    The Debtors Should Be Authorized to Pay the Interest and Incidental Fees Required by the DIP Lenders under the DIP Facility Documents.

37.     Under the DIP Facility Documents, the Debtors have agreed, subject to Court approval, to accrue interest to the DIP Lenders, which will be credited against the Settlement Funds upon the occurrence of the Effective Date (as defined in the Settlement Agreement). In particular, as noted above, the Debtors have agreed to accrue and credit interest at the initial rate of 5.35% per annum, payable in kind in arrears and pay certain incidental fees such as required filing fees, bank account fees, and other administrative fees or costs associated with incurring and maintaining the DIP Facility.

38.     Courts in this district and others have similarly approved payment of interest and incidental fees in chapter 11 cases. *See, e.g.*, *In re Rite Aid Corp.*, No. 23-18992 (MBK) (Bankr. D.N.J. June 19, 2024) (approving the payment of fees and interest allowed under the DIP documents); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 4, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23-14854 (JKS) (Bankr. D.N.J. July 19, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (same).

39.     The Debtors believe that the interest and fees to be paid under the DIP Facility are reasonable and appropriate, particularly in light of the circumstances of these chapter 11 cases and

represent the most favorable terms available to the Debtors. The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility constituted the best, and only, actionable terms on which the Debtors could obtain necessary postpetition financing. It is understood and agreed by all parties, that the interest and fees are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Facility Documents in connection with the DIP Facility.

## IV.    The Scope of Carve Out Is Appropriate.

40.     The DIP Liens are subject to the Carve Out. Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve Out ensures that assets will be available for the payment of fees of the Clerk of the Bankruptcy Court or the U.S. Trustee and professional fees of the Debtors, the Committee, and the FCR. Accordingly, the Carve Out is necessary and appropriate, and should be approved.

41.     Furthermore, courts in this district and others routinely approve carve outs agreed to by the debtors and their DIP lenders, similar to the Carve Out. *See, e.g.*, *In re Rite Aid Corp.*, No. 23-18992 (MBK) (Bankr. D.N.J. June 19, 2024); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J.

**JA1395**

Apr. 4, 2024); *In re Cyxtera Techs., Inc.*, No. 23-14854 (JKS) (Bankr. D.N.J. July 19, 2023);

*In re Bed Bath & Beyond Inc.,* No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023).

**V.     The DIP Lenders Should Be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code.**

42.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

43.     The DIP Facility is the result of (a) the Debtors' reasonable and informed

determination that the DIP Lenders offered the only terms on which to obtain critical postpetition

financing given the circumstances and (b) extensive good faith, arm's-length negotiations between

the Debtors' disinterested directors and the DIP Lenders.  The terms and conditions of the DIP

Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP

Facility will be used only for purposes that are permissible under the Bankruptcy Code.  The

obligations arising under the DIP Facility and other financial accommodations made to the Debtors

have been extended by the DIP Lenders in "good faith" within the meaning of section 364(e) of

the Bankruptcy Code and, therefore, the DIP Lenders are entitled to all of the protections afforded

thereby.

## VI. The Automatic Stay Should Be Modified on a Limited Basis.

44.     The Order provides that the automatic stay provisions of section 362 of the
Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements,
security agreements, notices of liens, and other similar instruments and documents in order to
validate and perfect the liens and security interests granted to them under the Order.  The proposed
Order further provides that the automatic stay shall be modified to the extent necessary to
implement and effectuate the terms of the Order.  Finally, the proposed Order provides for relief
from the automatic stay to allow the DIP Lenders to take certain actions upon the occurrence of
certain termination events (although the Order provides that a hearing would take place prior to
the exercise of remedies against collateral to allow the Debtors to seek authority to use Cash
Collateral on a non-consensual basis and/or ask the Court to fashion an appropriate remedy).

45.     Stay modifications of this kind are ordinary and standard features of
debtor-in-possession financing arrangements.   In the Debtors' business judgment, they are
reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re WeWork
Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. Dec. 11, 2023) (modifying automatic stay as necessary
to effectuate the terms of the order); *In re Rite Aid Corp.,* No. 23-18992 (MBK) (Bankr. D.N.J.
Oct. 17, 2023) (same); *In re Cyxtera Techs., Inc.*, No. 23-14854 (JKS) (Bankr. D.N.J. Jun. 7, 2023)
(same); *In re David's Bridal, LLC* No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (same);
*In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (same);
*In re Blackhawk Mining LLC,* No. 19-11595 (LSS) (Bankr. D. Del. July 23, 2019) (same);
*In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (modifying automatic
stay as necessary to effectuate the terms of the order); *ATD Corp.*, No. 18-12221 (KJC) (Bankr.
D. Del. Oct. 26, 2018) (same); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del.

Dec. 12, 2017) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015).

### Request of Waiver of Stay

46.    To the extent that the relief sought in this Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  Further, to the extent applicable, the Debtors request that the Court find that the provisions of Bankruptcy Rule 6003 are satisfied.  As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.

### Waiver of Memorandum of Law

47.    The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

### Reservation of Rights

48.    Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that

**JA1398**

may be satisfied pursuant to the Motion are valid, and the rights of all parties are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## No Prior Request

49.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Notice

50.     The Debtors have provided notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the Committee; (c) the Top Counsel List;[13] (d) NICO and counsel thereto; (e) the Office of the United States Attorney for the District of New Jersey; (f) the Internal Revenue Service; (g) the Securities Exchange Commission; (h) the Environmental Protection Agency; (i) the office of the attorneys general in states where the Debtors conduct their business operations; (j) counsel to the FCR; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

---

[13]    As defined in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing the Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel for Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases, and (VII) Granting Related Relief* [Docket No. 8].

**WHEREFORE**, the Debtors respectfully request that the Court enter the Order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: September 3, 2024

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email: msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com

-and-

Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: chad.husnick@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

KIRKLAND & ELLIS LLP
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

KIRKLAND & ELLIS LLP
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Co-Counsel for Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and
Debtors in Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al*., | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered)<br>**Hearing Date: March 27, 2025, at 11:00 a.m. (ET)**<br>**Obj. Deadline: March 20, 2025, at 4:00 p.m. (ET)**<br>**Oral Argument Waived Unless Objections Timely Filed** |

### NOTICE OF HEARING ON
### DEBTORS' MOTION FOR ENTRY OF AN
### ORDER (I) AUTHORIZING THE DEBTORS TO AMEND
### THE DIP CREDIT AGREEMENT AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on **March 27, 2025, at 11:00 a.m. (ET)**, or as soon

thereafter as counsel may be heard, the above-captioned debtors and debtors in possession

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113), L. A. Terminals, Inc. (6800), and Soco West, Inc. (3400).  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

(the "Debtors"), by and through their undersigned proposed counsel, shall move (the "Motion")[2]

before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States

Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, New Jersey 08608

(the "Bankruptcy Court"), for entry of an order (the "Order"), substantially in the form submitted

herewith, authorizing the Debtors to amend the DIP Credit Agreement to: (a) increase the size of

the DIP Commitment under the DIP Facility by up to $30 million in new money DIP Loans

pursuant to the Amendment, a copy of which is attached as Exhibit 1 to the Order; (b) make certain

technical modifications to provisions of the DIP Credit Agreement in connection therewith; and

(c) granting related relief.

 **PLEASE TAKE FURTHER NOTICE** that in support of the Motion, the Debtors shall

rely on the accompanying Motion and the Declaration of Brian J. Griffith, which set forth the

relevant legal and factual bases upon which the relief requested should be granted. A proposed

Order granting the relief requested in the Motion is also submitted herewith.

 **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in

the Motion shall: (a) be in writing; (b) state with particularity the basis of the objection; and (c) be

filed with the Clerk of the Bankruptcy Court electronically by attorneys who regularly practice

before the Bankruptcy Court in accordance with the (a) *Order (I) Establishing Certain Notice,*

*Case Management, and Administrative Procedures and (II) Granting Related Relief*

[Docket No. 67] (the "Case Management Order") and (b) *General Order Regarding Electronic*

*Means for Filing, Signing, and Verification of Documents dated March 27, 2002*

(the "General Order") and the *Commentary Supplementing Administrative Procedures* dated as of

March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Commentary, and the User's Manual for the Electronic Case Filing System can be found at
www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other
parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in
accordance with the Case Management Order, the General Order and the Supplemental
Commentary, so as to be received no later than seven (7) days before the hearing date set forth
above.

      **PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these
chapter 11 cases may be obtained free of charge by visiting the website of Stretto, Inc. at
https://cases.stretto.com/whittaker.  You may also obtain copies of any pleadings by visiting the
Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set
forth therein.

      **PLEASE TAKE FURTHER NOTICE** that, unless responses are timely and properly
filed and served, the Motion shall be decided on the papers in accordance with D.N.J. LBR
9013-3(d), and the relief requested may be granted without further notice or hearing.

Dated:  March 5, 2025

_/s/ Michael D. Sirota_

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted _pro hac vice_)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com

-and-

Chad J. Husnick, P.C. (admitted _pro hac vice_)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:      chad.husnick@kirkland.com

_Co-Counsel to the Debtors_
_and Debtors in Possession_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

<div align="center">

**DEBTORS' MOTION FOR ENTRY**
**OF AN ORDER (I) AUTHORIZING THE DEBTORS TO AMEND**
**THE DIP CREDIT AGREEMENT AND (II) GRANTING RELATED RELIEF**

</div>

TO: THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES

BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113), L. A. Terminals, Inc. (6800), and Soco West, Inc. (3400).  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (the "Motion"):[2]

## Relief Requested[3]

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), authorizing, but not directing, the Debtors to amend the DIP Credit

Agreement to:  (a) increase the size of the DIP Commitment under the DIP Facility by up to

$30 million in new money DIP Loans pursuant to the Amendment (as defined herein), a copy of

which is attached as Exhibit 1 to the Order; (b) make certain technical modifications to provisions

of the DIP Credit Agreement in connection therewith; and (c) granting related relief.

## Preliminary Statement

2.      The Debtors' ultimate goal in these chapter 11 cases remains the same:  to confirm

a chapter 11 plan that efficiently and equitably resolves all valid claims asserted against the

Debtors.  After more than a year in bankruptcy, the Debtors reached a settlement that provides a

source of substantial funding for a chapter 11 plan that maximizes the value of the Debtors' estates

for the benefit of all stakeholders.  In connection with the settlement, the Debtors entered into the

---

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the *Order (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 1410] (the "DIP Order") and the *Senior Secured Debtor-in-Possession Credit Agreement*, attached as Exhibit 1 to the DIP Order (the "DIP Credit Agreement"), as applicable.

[3]    In support of this Motion, the Debtors respectfully submit the *Declaration of Brian J. Griffith in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement and (II) Granting Related Relief* (the "Griffith Declaration").  Further, a detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Mohsin Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "First Day Declaration"), and a description of the DIP Facility and the facts and circumstances supporting it is set forth in greater detail in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Claims Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 1302] (the "DIP Motion").  For the avoidance of doubt, the Griffith Declaration, the First Day Declaration, and the factual discussion set forth in the DIP Motion are incorporated herein by reference.

DIP Facility, which provided the Debtors with advance access to up to $50 million of the aggregate settlement value.  On October 15, 2024, the Court entered the DIP Order, on an uncontested basis, approving entry into the DIP Facility.

3.      The DIP Facility was sized based on a shorter chapter 11 case timeline that aimed to maximize the distributable proceeds for the Debtors' general unsecured creditors, evidenced, in part, by the milestones contemplated by the DIP Credit Agreement.  *See* DIP Credit Agreement § 6.7.  Following the entry of the DIP Order, the case timeline changed, in part, to allow the parties additional time to attempt to reach a mediated global resolution of various contested matters, including the Settlement Motion[4] and Standing Motion[5]—gating items for the Debtors' advancement of their chapter 11 plan.  Because consideration of the Debtors' disclosure statement and solicitation procedures is currently set for April 15, 2025, it is likely the confirmation hearing will trail into the summer.  Moreover, the extended case timeline brought with it higher case administration costs, including professional fees and litigation and discovery expenses.[6]  Based on these developments in the case timeline and expense profile, the Debtors and the DIP Lender

---

[4]     *Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1297] (the "Settlement Motion," and the settlement agreement attached as Exhibit 1 to the accompanying proposed order, the "Settlement Agreement").

[5]     *The Joint Motion of the Official Committee of Talc Claimants and the Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1293] (the "Standing Motion") filed by the Committee and the FCR.

[6]     Based on filed monthly fee statements as of the date of this Motion, in the five months following the filing of the DIP Motion, approximately $41.5 million in global professional fees and expenses were requested compared to the approximately $69.2 million in global professional fees and expenses requested in the more than sixteen months before the DIP Motion was filed.  Thus, the average monthly global fee and expense burn in these chapter 11 cases for the five months following the filing of the DIP Motion was approximately $4.0 million higher than the monthly average for the preceding sixteen months.

realized that additional liquidity would be required to fund the administration of these chapter 11 cases through Plan confirmation and consummation as originally intended.

4.  To that end, the Debtors negotiated for the *First Amendment to Senior Secured Debtor-in-Possession Credit Agreement* (the "Amendment"), which increases the DIP Commitment under the DIP Facility by up to $30 million. The Amendment will bring critical liquidity into the estates to pursue confirmation of the Plan and fund the continued litigation of the Settlement Motion. Absent the Amendment, the Debtors would only be able to administer these chapter 11 cases for a short period of time. *See* Griffith Decl. ¶ 10. Given that the Debtors have limited cash flows from interest on fixed assets, and finite assets that are only being depleted as these chapter 11 cases proceed without resolution, it is highly unlikely that a third-party would provide additional postpetition financing on terms more favorable than those under the DIP Credit Agreement. *See id.* ¶¶ 12, 14–15. In fact, similar to the marketing efforts conducted in connection with the DIP Facility initially, no third party was willing to provide a DIP financing proposal on terms reasonably comparable to those of the Amendment and the DIP Credit Agreement as an alternative to the DIP Lender's proposal—even when considering the contingent value attributable to the pending Settlement. *See id.* ¶13. Moreover, the terms of the Amendment are reasonable and appropriate, and were the product of good faith, arm's-length negotiations. Thus, the Amendment represents a rational and reasonable business decision.

5.  At bottom, the Debtors require liquidity if these chapter 11 cases are to have a value-maximizing, efficient, and equitable outcome for the benefit of *all* of the Debtors' stakeholders, and the Amendment provides essential liquidity on terms that cannot be matched by any third-party lender to fund the administration of these chapter 11 cases. *See id.* ¶ 15. For these reasons, and for the reasons set forth below, the Debtors firmly believe that the Amendment is

necessary to maximize value for all of the Debtors' stakeholders and constitutes a sound business judgment. Accordingly, the Debtors request that the Court authorize the Amendment and the other relief requested herein, and enter the Order.

## Jurisdiction and Venue

6.     The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The bases for the relief requested herein are sections 105, 362, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-3 of the local bankruptcy rules for the District of New Jersey (the "D.N.J. LBR" or "Local Rules")

## Background[7]

9.     On April 26, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 8, 2023, the Court entered an order [Docket No. 72] authorizing procedural consolidation and

---

[7]    The terms and conditions set forth in this Motion, along with the descriptions of the terms of the Amendment, the DIP Credit Agreement, the DIP Order, and the Settlement Agreement, are provided solely for the convenience of the Court and parties-in-interest and are qualified in their entirety by the actual terms of the Amendment, the DIP Credit Agreement, the DIP Order, or the Settlement Agreement, as applicable.

joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  On May 24, 2023, the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed Official Committee of Talc Claimants (the "Committee") [Docket No. 121].

10.     On June 26, 2023, the Court entered an *Order (I) Appointing the Honorable Shelley C. Chapman (Ret.) as Future Claimants' Representative, Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 231], pursuant to which the Honorable Shelley C. Chapman (Ret.) was appointed to serve as the future claimants' representative (the "FCR") in these chapter 11 cases.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

11.     On September 3, 2024, the Debtors filed the DIP Motion seeking, in part, authorization to incur a senior secured multiple draw term loan credit facility consisting of new money delayed-draw term loans in an aggregate principal amount up to $50 million.

12.     In addition, on September 3, 2024, the Debtors filed the Settlement Motion seeking approval of the Debtors' entry into the Settlement Agreement and the settlement set forth therein (the "Settlement").  As detailed in the Settlement Motion and set forth in the Settlement Agreement, the Settlement Payment (as defined in the Settlement Agreement) is comprised of:  (a) an initial contribution of the DIP Facility; and (b) an amount equal to $535 million *less* the aggregate principal amount of DIP Loans funded by the DIP Lender in cash.  *See* Settlement Agreement §§ 2–3.  Upon the Debtors' receipt of the Settlement Contribution (as defined in the Settlement Agreement), the principal amount of the DIP Loans will be forgiven, and the liens and security interests granted to the DIP Lender will be automatically released and terminated.

13.    On October 5, 2024, the Debtors filed the *Notice of Filing of DIP Credit Agreement in Connection with Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Claims Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 1382].

14.    On October 15, 2024, the Court entered the DIP Order, pursuant to which the Debtors gained access to up $50 million of postpetition financing.  Pursuant to the DIP Order, the DIP Loans are senior secured and are entitled to superpriority administrative expense status pursuant to section 364(c) of the Bankruptcy Code.  Pursuant to the DIP Credit Agreement, upon occurrence of the Settlement Contribution Date:   (i) the obligations under the DIP Facility Documents shall be automatically forgiven, released, and terminated in exchange for a reduction in the amount to be paid by the DIP Lender as set forth in section 3 of the Settlement Agreement, and (ii) any Liens or security interests granted to the DIP Lender by any Loan Party on any Collateral shall be automatically released and terminated.

15.    Since the entry of the DIP Order, among other things, the Debtors and their professionals have:

- negotiated, prepared, and filed the *Chapter 11 Plan of Whittaker, Clark & Daniels, Inc. and Its Debtor Affiliates* [Docket No. 1468] (the "Plan");

- prepared and filed the *Disclosure Statement Relating to the Chapter 11 Plan of Whittaker, Clark & Daniels, Inc. and Its Debtor Affiliates* [Docket No. 1469] (the "Disclosure Statement");

- prepared and filed the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (IV) Granting Related Relief* [Docket No. 1470] (the "Disclosure Statement Motion");

- prepared and filed the *Debtors' Motion for Entry of an Order Setting Bar Dates (I) For Filing Proofs of Claim, (II) Approving (A) Claim Forms and Procedures for Filing Proofs of Claim, (B) The Form and Manner of Notice of Bar Dates, and (C) Confidentiality Procedures, and (III) Granting Related Relief* [Docket No. 1479];

- participated in more than twenty depositions in connection with the litigation of the Settlement Motion and Standing Motion;

- participated in good faith in the mediation in accordance with the *Agreed Order Regarding Mediation Stipulation* [Docket No. 1586];

- sought and obtained the *Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving (A) Claim Forms and Procedures for Filing Proofs of Claim, and (B) The Form and Manner of Notice of Bar Dates, and (III) Granting Related Relief* [Docket No. 1588];

- prepared and filed the *Debtors' Objection to the Joint Motion of the Official Committee of Talc Claimants and the Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1595];

- prepared and filed the *Debtors' Motion for Entry of an Order (I) Further Extending the Time Within Which the Debtors May Remove Civil Actions and (II) Granting Related Relief* [Docket No. 1598];

- prepared and filed the *Debtors' Motion in Limine to Exclude the Testimony of Committee Experts Robert J. Jackson, Jr. and Alexandra D. Lahav* [Docket No. 1647];

- prepared and filed the *Debtors' Reply in Support of Their Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1665] and the *Debtors' Reply to the Environmental Parties' Objections to Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1692];

- prepared and filed the *Brief for Debtors-Appellees* [App. Case No. 25-01044 Docket No. 30];

- prepared and filed the *Debtors' Objection to Official Committee of Talc Claimants' Emergency Motion for Stay Pending Appeal* [Docket No. 1751]; and

- prepared and filed the *Supplemental Brief of Debtor-Appellee* [App. Case Nos. 24-02210–11 Docket No. 46].

16.   On February 20, 2025, the Court entered a notice rescheduling the hearing on the
Disclosure Statement Motion to April 15, 2025 [Docket No. 1764].

17.   To date, the Debtors have completely drawn down the full availability under the
DIP Facility—receiving the final draw on December 27, 2024—and exhausted a substantial
portion of the Initial Settlement Contribution (as defined in the Settlement Agreement).

**Concise Statement Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-3**

18.   The following chart summarizes the material terms of the Amendment that differ
from the original DIP Credit Agreement, as required by Bankruptcy Rule 4001(b)(1)(B) and
(c)(1)(B) and Local Rule 4001-3.

| Material Term(s): | Proposed Modification: |
|---|---|
| **DIP Loan(s) and Borrowing Limits:**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The "DIP Commitment" will be increased by up to $30 million.<br>Amendment, § 2.2. |
| **Conditions of Borrowing**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The Amendment includes an additional condition under section 5.2 of the DIP Credit Agreement for any draw requests made after $20,000,000 has been borrowed in accordance with the Amendment.<br>*See* Amendment, § 2.3. |

**The Amendment**

19.   Pursuant to section 9.1 of the DIP Credit Agreement, the "DIP Lender and each
Loan Party party thereto may, from time to time, enter into written amendments, supplements, or
modifications" to amend or modify the DIP Credit Agreement.  DIP Credit Agreement § 9.1.

20.   Paragraph 3(d) of the DIP Order addresses amendments to the DIP Facility
Documents, and provides as follows:

> [E]ach Debtor is authorized, and the automatic stay imposed by section 362 of the
> Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts
> and to make, execute, and deliver all instruments and documents . . . that may be

reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, *including, without limitation . . . the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Facility Documents* (in each case in accordance with the terms of the applicable DIP Facility Documents, in such form as the Debtors and the DIP Lenders may reasonably agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Facility Documents or the DIP Obligations that are not material.

DIP Order ¶ 3(d) (emphasis added).

21.     The Debtors and the DIP Lender have negotiated the terms of the Amendment that will (a) increase the DIP Commitment under the DIP Facility by $30 million of new money DIP Loans and (b) make certain technical modifications to provisions of the DIP Credit Agreement in connection therewith.

22.     The Amendment is necessary to provide incremental liquidity needed for the Debtors to administer these chapter 11 cases as they continue to litigate the Pending Appeals[8] and pursue confirmation and consummation of the Plan, including approval of the Disclosure Statement Motion at the April 15th hearing.  The Amendment was the subject of arms'-length negotiations among the Debtors and the DIP Lender, and no third party was willing to offer alternative financing on terms reasonably comparable to those of the Amendment and the DIP Credit Agreement.  Accordingly, the Debtors submit that they should be authorized to effectuate the Amendment.

### The Debtors' Liquidity Needs

23.     When negotiating the DIP Facility, the Debtors sized their liquidity and financing needs based on a number of factors, including a prospective timeline for these chapter 11 cases

---

[8]  "Pending Appeals" means, collectively, the appeals in connection with the order denying the motion to dismiss Debtor Whittaker, Clark & Daniels, Inc.'s chapter 11 case [Docket No. 211] and the orders granting summary judgment and enforcing the automatic stay and enjoining certain actions against non-debtors in the adversary proceeding [Adv. Proc. Docket Nos. 292, 366].

and projected case administration and litigation expenses. Since the DIP Motion was filed, the anticipated timeline of these chapter 11 cases has been extended and professional fee and litigation expenses have exceeded initial projections in connection with litigation of the Settlement Motion and Standing Motion.

24.     The Debtors have expended substantial resources in litigating the Settlement Motion and Standing Motion, are preparing to seek approval of the Disclosure Statement Motion and further bar date relief at the April 15th hearing, and are continuing to defend the Pending Appeals. The Debtors have determined that additional financing is required to further administer these chapter 11 cases through confirmation and consummation of the Plan.

25.     In recent weeks, the Debtors' advisors engaged with the DIP Lender regarding the Debtors' additional financing and liquidity needs. In parallel, the Debtors' advisor, M3, conducted a marketing process to obtain postpetition financing from third parties on an expedited timeline in a reasonable manner in light of the Debtors' constrained cash position to market test the terms of the Amendment. *See* Griffith Decl. ¶ 13. Of the five third-parties contacted (which included specialty lenders and litigation financing firms), none were willing to provide a DIP financing proposal on terms reasonably comparable to those of the Amendment and the DIP Credit Agreement as an alternative to the DIP Lender's proposal—even when considering the contingent value attributable to the pending Settlement. *See id.* Following these negotiations, the Debtors and the DIP Lender agreed to enter into the Amendment, with the increase of the DIP Commitment under the DIP Facility being subject to Court approval.

26.     The Amendment increases the maximum aggregate amount of DIP Loans the Debtors are permitted to borrow, and the DIP Lender is obligated to advance, by up to $30 million. The Amendment, however, does not change the nature or treatment of the DIP Loans. The DIP

Loans will remain senior secured and entitled to superpriority administrative expense status under section 364(c) of the Bankruptcy Code. Consistent with the DIP Credit Agreement, upon occurrence of the Settlement Contribution Date: (a) the obligations under the DIP Facility Documents shall be automatically forgiven, released, and terminated in exchange for a reduction in the amount to be paid by the DIP Lender as set forth in section 3 of the Settlement Agreement, and (b) any Liens or security interests granted to the DIP Lender by any Loan Party on any Collateral shall be automatically released and terminated. Further, consistent with the DIP Credit Agreement, the Amendment has none of the fees typically associated with third-party lender debtor-in-possession financing transactions and maintains the interest rate payable in kind in arrears applicable to the DIP Facility (that is forgiven upon the Debtors' receipt of the Settlement Contribution). *See id.* ¶ 14.

27. The Debtors believe the additional funding requested through the Amendment is necessary and in the best interests of their estates. The Amendment will enable the Debtors to continue paying the administrative expenses of these chapter 11 cases as the parties proceed to oral argument on the Pending Appeals and the Debtors continue their steadfast pursuit of Plan confirmation and consummation.

28. For these reasons, the Debtors respectfully request that the Court authorize the Debtors to increase the DIP Commitment under the DIP Facility by up to an additional $30 million in new money DIP Loans under the Amendment.

## Basis for Relief

**I.** **Borrowing up to an Additional $30 Million in New Money DIP Loans Under the Amendment is a Sound Business Judgment.**

29. The Court should authorize the Debtors to increase the maximum aggregate amount of new money DIP Loans the Debtors are permitted to borrow, and the DIP Lender is obligated to

advance, by up to $30 million in order to fund the reasonable administrative expenses of these chapter 11 cases.  Section 364 of the Bankruptcy Code governs a debtor's ability to secure postpetition financing.  *See* 11 U.S.C. § 364.  The Court previously approved the DIP Credit Agreement and, in doing so, determined that such agreement satisfied the requirements of section 364(c) of the Bankruptcy Code.  The Amendment, which increases the amount of DIP Loans available to the Debtors under the DIP Credit Agreement by up to $30 million, likewise meets the requirements of section 364(c) of the Bankruptcy Code.

30.      *First*, no lender other than the DIP Lender has been willing to provide a loan to the Debtors on as favorable or better terms, including because of the Debtors' fixed assets, limited cash flows from interest on such fixed assets, absence of prepetition lenders, and alleged liabilities.  *See* Griffith Decl. ¶ 12.  The Debtors, through their advisors, solicited interest from five potential third-party financing sources, including well-known specialty lenders and litigation financing firms.  *See id.* ¶ 13.  None of these third parties were willing to provide a debtor-in-possession financing proposal on terms reasonably comparable to those of the Amendment and the DIP Credit Agreement as an alternative to the DIP Lender's proposal, even in light of the pending Settlement.  *See id.*

31.      *Second*, the Debtors have determined that they need additional financing to administer these chapter 11 cases successfully.  Without access to additional funds, the Debtors will not have sufficient liquidity to seek confirmation of the Plan or continue with the administration of these chapter 11 cases.  Consequently, approval of the Amendment is necessary to facilitate the Debtors' chapter 11 goals.  *See id.* ¶¶ 10, 19.  This represents a reasonable business justification for the additional DIP Loans contemplated by the Amendment.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 883, 885 (Bankr. W.D. Mo. 2003) (finding that the amendment of a postpetition financing agreement was a "sound and reasonable business judgment" as the amendment allowed the debtors to "file their disclosure statement and plan," "gain[] valuable time in which to reorganize their business," and "garner the support of [] remaining creditors"); *In re Cyprus Mines Corp.*, No. 21-10398 (LSS) (Bankr. D. Del. Dec. 30, 2024) [Docket No. 2776] ¶ 3 (finding that the amendment of a postpetition credit agreement was an "exercise of prudent business judgment" and the amendment allowed the debtor to "among other things, pay the administrative costs of the Case" and "preserv[e] and maint[ain] [] the Debtor's estate").[9]

32.    Importantly, there are no fees associated with the Amendment, and the Amendment maintains the interest rate payable in kind in arrears applicable to the DIP Facility. *See* Griffith Decl. ¶ 14. Moreover, consistent with the DIP Credit Agreement, upon occurrence of the Settlement Contribution Date:  (a) the obligations under the DIP Facility Documents shall be automatically forgiven, released, and terminated in exchange for a reduction in the amount to be paid by the DIP Lender as set forth in section 3 of the Settlement Agreement, and (b) any Liens or security interests granted to the DIP Lender by any Loan Party on any Collateral shall be automatically released and terminated.

---

[9]    The Debtors do not believe any heightened scrutiny is applicable here. *See* DIP Motion ¶¶ 23–28; *see also* [Docket No. 1665] ¶¶ 11–13.

33.     The Debtors submit that the Amendment reflects fair and reasonable terms and presents the best available option under the circumstances.  *See id.* ¶ 16.  Overall, the Amendment represents a necessary step to preserve and maintain the value of the Debtors' estate.  *See id.* ¶¶ 19–20.  Approval of the Amendment will provide greater certainty to the Debtors and their stakeholders, while continuing to facilitate the Debtors' Plan confirmation and consummation processes.  *See id.* ¶ 20.

34.     Accordingly, the Amendment satisfies the requirements of section 364 of the Bankruptcy Code, and the Debtors respectfully request that the Court approve the Amendment.

## Request of Waiver of Stay

35.     To the extent that the relief sought in this Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  Further, to the extent applicable, the Debtors request that the Court find that the provisions of Bankruptcy Rule 6003 are satisfied.  As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to administer these chapter 11 cases and preserve the value of their estates.

## Waiver of Memorandum of Law

36.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## Reservation of Rights

37.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a

promise or requirement to pay any particular claim, (d) an implication or admission that any

particular claim is of a type specified or defined in this Motion or any order granting the relief

requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease

pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors', or any

other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (g) a

concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that

may be satisfied pursuant to the Motion are valid, and the rights of all parties are expressly reserved

to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants

the relief sought herein, any payment made pursuant to the Court's order is not intended and should

not be construed as an admission as to the validity of any particular claim or a waiver of the

Debtors' rights to subsequently dispute such claim.

## No Prior Request

38.      No prior request for the relief sought in this Motion has been made to this Court or

any other court.

## Notice

39.      The Debtors have provided notice of this Motion to the following parties or their

respective counsel:  (a) the U.S. Trustee; (b) the Committee; (c) the Top Counsel List;[10] (d) NICO

and counsel thereto; (e) the Office of the United States Attorney for the District of New Jersey;

(f) the Internal Revenue Service; (g) the Securities Exchange Commission; (h) the Environmental

Protection Agency; (i) the offices of the attorneys general in states where the Debtors conduct their

business operations; (j) counsel to the FCR; and (k) any party that has requested notice pursuant

---

[10]   As defined in the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) File a List of the Top Law Firms and Use the Addresses of Counsel in Lieu of Claimants' Addresses and (II) Redact Personally Identifiable Information, (B) Approving Certain Notice Procedures, and (C) Granting Related Relief* [Docket No. 8].

to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no

other or further notice is required.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, in substantially the forms submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated:  March 5, 2025

/s/ Michael D. Sirota
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:        msirota@coleschotz.com
                 wusatine@coleschotz.com
                 fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:        joshua.sussberg@kirkland.com

-and-

Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:        chad.husnick@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*