**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **OFFICIAL COMMITTEE OF TALC CLAIMANTS,** *et al.*, <br><br>            Appellants, <br><br>            v. <br><br> **WHITTAKER, CLARK & DANIELS, INC.,** *et al.*, <br><br>            Appellees. | Civil Action No. 24-10914 (ZNQ) <br><br> **OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon Appellant Official Committee of Talc Claimants' (the "TCC") appeal of the Bankruptcy Court's November 20, 2024 Order (the "Order") that extended the automatic stay and preliminary enjoined certain state-law actions against a non-debtor (the "Appeal"). (ECF No. 1.) The TCC filed an appellate brief, ("TCC Br.," ECF No. 18); Appellees Whittaker, Clark & Daniels ("WCD"), Brilliant National Services, Inc. ("Brilliant"), L.A. Terminals, Inc. ("LAT"), and Soco West, Inc. ("Soco") filed a brief in opposition, ("Debtors Br.," ECF No. 19); and the TCC filed a reply brief, ("TCC Reply Br.," ECF No. 20). The Court has carefully considered the parties' submissions and decides the Appeal without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will **AFFIRM IN PART** and **REMAND IN PART**.

## I.   BACKGROUND AND PROCEDURAL HISTORY

On April 26, 2023, WCD filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). (JA1142.)[1] That same day, Brilliant, LAT, and Soco (collectively with WCD, the "Debtors") also filed a petition for relief in Bankruptcy Court. (JA1146.) The Debtors were processors, manufacturers, and distributors of industrial chemicals, and WCD operated as one of the largest talc and industrial compound supply and distribution businesses in the United States. (JA1162.)

The Debtors sold substantially all their operational assets to Brenntag North America, Inc. ("Brenntag") in 2004 (the "2004 Transactions").[2] (JA1162.) The 2004 Transactions are governed by a Master Sale and Purchase Agreement (the "MSPA") dated December 9, 2003. (JA353.) Under the MSPA, WCD agreed to indemnify Brenntag "from and against any Indemnified Losses incurred in connection with any present or future Retained Subsidiary Asbestos Claims relating to WCD or any alleged corporate predecessor-in-interest thereof." (JA448–49.) The "Retained Subsidiary Asbestos Claims" are defined as:

> any claim, action, law suit, litigation, arbitration or other legal proceeding in a court or tribunal of any kind, regardless of the legal or equitable theory alleged, including without limitation, any of the foregoing which are pending or threatened as of the date hereof . . . seeking to recover damages (including without limitation damages for personal injuries or property damage) allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any Retained Subsidiary or by any other entity . . . in the conduct of any business prior to the Effective Date

---

[1] References to "JA" refer to Appellants' Joint Appendix to Appellants' Opening Brief. (ECF No. 18-1.) References to "DA" refer to the Debtors' Appendix filed with Debtors' Brief at ECF No. 19-1.
[2] Debtor LAT was not involved in the 2004 Transactions because it had previously ceased all operations. (JA1169.)

(JA450–51.) Stines Corporation, the Debtors parent company at the time of the 2004 Transactions, agreed to be the guarantor with respect to any claims that WCD was unable to financially satisfy. (JA448–49.) Following the 2004 Transactions, Debtors WCD, Brilliant, and Soco ceased all operations but continued their corporate existence to manage alleged asbestos and environmental liabilities related to their historical processing and distribution of cosmetic and industrial compounds. (JA1162.)

In 2007, National Indemnity Company ("NICO") purchased the equity in the Debtors (the "2007 NICO Equity Sale") from Stines for $1. (JA545.) In exchange, NICO agreed to indemnify Stines for its indemnity obligations to Brenntag under the terms of the MSPA.

Following the Debtors' commencement of bankruptcy proceedings in April 2023, they filed a Complaint on September 7, 2023 (JA1), along with a motion for summary judgment on Counts I, II, and IV of the Complaint (the "Summary Judgment Motion"). (JA32.) In Count I, the Debtors sought a declaration by the Bankruptcy Court that the commencement of, continued prosecution, or settlement of Successor Liability Claims[3] violates the automatic stay imposed by section 362(a) of the Code. (JA22.) Count II sought an extension of the automatic stay to the Successor Liability Claims to the extent those claims were not automatically stayed pursuant to section 362(a)(3). (JA23.) In Count IV, the Debtors sought a declaration by the Bankruptcy Court that the Successor Liability Claims are the property of the Debtors pursuant to section 11 U.S.C. § 541(a). (JA29.) The Bankruptcy Court granted the Summary Judgment Motion as to Counts I

---

[3] The Complaint defines Successor Liability Claims as "claims against certain non-Debtor entities seeking to establish such entities' liability for Tort Claims on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors." (JA3 ¶1). "Tort Claims" include all "existing and future tort claims against the Debtors alleging injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest" and "environmental litigation against the Debtors relating to the production or handling of hazardous materials which allegedly contaminated certain properties." (*Id.*)

and IV, holding that the Successor Liability Claims are property of the Debtors' estates subject to the automatic stay provisions set forth in section 362(a) of the Code.

On September 3, 2024, the Debtors filed a motion seeking approval of a proposed settlement ("Settlement Agreement") they entered into with Brenntag, NICO, and DB US Holding Corp ("DB US", formerly Stines, together with Brenntag and NICO, the "Contributing Parties"). (JA1186.)  Pursuant to the Settlement Agreement, NICO would pay the Debtors $535 million to settle all estate causes of action (including Successor Liability Claims).  (JA1188.)  The Settlement Agreement would also release Brenntag's indemnification rights against the Debtors under the MSPA.  Importantly, the Settlement Agreement does not prohibit claimants from pursuing direct claims they may have against the Contributing Parties, including any claims against Brenntag for liabilities arising from Brenntag's own post-February 2004 operations.  (JA1189.)

On September 12, 2024, the Debtors filed a motion seeking to extend the automatic stay to, or alternatively, to preliminary enjoin 684 scheduled talc claims against Brenntag (the "Motion")[4].  (JA693.)  Those claims fall into two categories.  The first category of claims comprises 657 of the 684 scheduled claims, which are "expressly pled as Successor Liability Claims."  (JA703 ¶ 7).  The TCC does not dispute that those claims are stayed under section 362(a).  (TCC Br. at 11.)

The second category of claims (i.e., the remaining 28) are the subject of this appeal (the "Appealed Claims").[5]  The TCC argues that the Appealed Claims "are talc personal injury claims which expressly seek damages against Brenntag only on account of Brenntag's conduct and products following Brenntag's acquisition of the WCD business in 2004."  (TCC Br. at 11–12.)

---

[4] One of the claims was dismissed after the Motion was filed, bringing the total number of claims to 683.
[5] There appears to be some uncertainty about the exact number of remaining claims.  (Debtors Br. at 2 n.3.)  Because the TCC did not address this in its Reply, the Court assumes there are 28 Appealed Claims.

The Debtors, by contrast, argue that the Appealed Claims include express allegations of pre-2004 exposure or, in two instances, do not allege sufficient facts to determine the year of the alleged initial exposure, rendering them effective Successor Liability Claims and/or impacting Debtors' rights and defenses.  (Debtors Br. at 19; *see also* JA703.)

On October 15, 2024, the Bankruptcy Court issued an Opinion (the "Opinion") granting the Debtor's Motion in part and entering a preliminary injunction prohibiting the continuation of all 684 claims.  (JA1014.)  The Bankruptcy Court found that the Appealed Claims were automatically stayed under section 362 of the Code, or in the alternative, that they should be enjoined under section 105(a).  (JA1035.)  The TCC filed a timely notice of appeal on December 4, 2024.  (ECF No. 1.)

## II.    <u>SUBJECT MATTER JURISDICTION</u>

The Court has appellate jurisdiction over a bankruptcy court's final judgments, orders, and decrees pursuant to 28 U.S.C. § 158(a).

## III.    <u>LEGAL STANDARD</u>

A district court reviews a "Bankruptcy Court's legal determinations *de novo* and review its factual determinations for clear error."  *In re Bocchino*, 794 F.3d 376, 380 (3d Cir. 2015).  When addressing mixed questions of law and fact, district courts divide the questions into their respective components, applying the clearly erroneous test to factual findings and a plenary review to questions of law.  *See In re Brown*, 951 F.2d 564, 567 (3d Cir. 1991).

## IV.    <u>DISCUSSION</u>

### A.    THE BANKRUPTCY COURT'S SUBJECT MATTER JURISDICTION

To start, the Court must determine whether the Bankruptcy Court had jurisdiction to enjoin the Appealed Claims.  It is well-established that bankruptcy courts have jurisdiction over: "(1)

cases under the Bankruptcy Code; (2) proceedings "arising under" the Code, meaning rights or remedies expressly provided by the statute; (3) proceedings "arising in" a bankruptcy case, meaning those that would not exist outside of bankruptcy; and (4) proceedings "related to" a bankruptcy case, often causes of action under non-bankruptcy law." *In re Boy Scouts of America*, 137 F.4th 126, 147 (3d Cir. 2025) (citations omitted).  The first three types of jurisdictions are referred to as "core" jurisdiction, whereas the fourth is referred to as "non-core" or "related-to" jurisdiction.  *See In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 198 (3d Cir. 2022).

The Bankruptcy Court found that it had core jurisdiction because section 362(a) is a substantive right under the Code and that it "certainly has jurisdiction to determine § 362(a)'s applicability and scope" and "whether it is appropriate to apply or extend the substantive rights afforded under § 362(a) to nondebtors." (JA 1022).  Because the Third Circuit has not addressed the precise issue of whether section 362(a) provides bankruptcy courts with "core" jurisdiction over state law claims against non-debtors, the Bankruptcy Court also determined that it had "related to" jurisdiction.  (JA1022.)  Specifically, the Bankruptcy Court held that the continued litigation of the Appealed Claims would have a "conceivable effect" on the bankruptcy estate because the claims against Brenntag would implicate WCD's liability and contractual indemnity obligations.  (JA1022–23.)

On appeal, the TCC argues that the Bankruptcy Court lacked jurisdiction altogether. Regarding the Bankruptcy Court's "core" jurisdiction, the TCC argues that the Bankruptcy Court only addressed whether it had jurisdiction to address the Debtors' Motion and not whether it had jurisdiction to enjoin the Appealed Claims.  (TCC Br. at 28–29.)  As to that latter question, the TCC argues that the Bankruptcy Court does not have "arising under" or "arising in" jurisdiction over the Appealed Claims, which are state-law tort claims against a non-debtor.  (TCC Br. at 29.)

The Debtors, in response, argue that the TCC's position would render bankruptcy courts powerless to determine the applicability of the stay to non-bankruptcy proceedings. (Debtors Br. at 25.)

With respect to the Bankruptcy Court's "related to" jurisdiction, the TCC argues that WCD's indemnification obligations to Brenntag under the MSPA are not "clearly established" and is therefore insufficient under Third Circuit precedent to establish "related to" jurisdiction. (TCC Br. at 32.) According to the Debtors, Brenntag will seek to introduce evidence of pre-2004 exposure to asbestos in the Appealed Claims to reduce Brenntag's own liability and will also assert indemnification claims against the Debtors. (Debtors Br. at 28.) Moreover, the Debtors argue that WCD's indemnification obligations are "clearly established" because if the Appealed Claims are within the scope of the MSPA, then they would automatically be triggered upon the filing of the Appealed Claims. (Debtors Br. at 30.)

       1.    <u>Core Jurisdiction</u>

The Court notes at the outset that there does not appear to be any Third Circuit precedent about the extent of a bankruptcy court's "arising under" or "arising in" jurisdiction to extend the automatic stay of section 362(a) to state-law claims over non-debtors. The precise question that the Court must answer, and which the parties dispute, is whether the Court should look to the nature of the underlying state-law claims against Brenntag when evaluating whether a bankruptcy court has core jurisdiction, or whether a party's invocation of section 362(a) *ipso facto* grants a bankruptcy court with core jurisdiction to enjoin such disputes. Because this is a question of law, the Court reviews the Bankruptcy Court's decision *de novo*.

The TCC principally relies on *In re W.R. Grace & Co.* for the proposition that "a bankruptcy court does not have jurisdiction to 'enjoin proceedings between third parties unless *those proceedings* arise in or under or are related to the underlying bankruptcy.'" (TCC Br. at 28.) (emphasis in original). In *W.R. Grace*, a bankruptcy court entered an automatic stay for all

litigation against a debtor after it filed for relief under Chapter 11 because of costs associated with asbestos litigation.  591 F.3d 164, 167 (3d Cir. 2009).  A group of claimants then sued the state of Montana, alleging that Montana was liable to them because it had a duty to warn them of the risks associated with asbestos from the debtor's mining operations.  *Id.* at 168.  In response, Montana asked the bankruptcy court for relief from the automatic stay so that it could implead the debtor as a third-party defendant in the Montana actions.  *Id.*  The debtor opposed that motion but also filed its own motion asking the bankruptcy court to expand the preliminary injunction to include the claims brought against Montana.  *Id.*  On appeal, the Third Circuit, without discussing "core" jurisdiction, affirmed the lower court's conclusions that the bankruptcy court did not have "related to" jurisdiction to hear the case.  *Id.* at 173.  The Third Circuit found that the debtor would not be bound by any judgment against Montana, and that even if Montana was liable, it would still need to bring an indemnification or contribution claim against the debtor.  *Id.* at 172–73.  Because there would not be any liability "without the intervention of yet another lawsuit," the Third Circuit held that the bankruptcy court did not have "related to" jurisdiction to enjoin the lawsuit against Montana.  *Id.* at 173.

Other Third Circuit cases have reached similar conclusions.  In *In re Exide Technologies*, the Third Circuit discussed whether a bankruptcy court had "core" jurisdiction to enjoin state law claims against non-debtor defendants.  544 F.3d 196, 206 (3d Cir. 2008).  In its analysis, the Third Circuit discussed a "two-step test, according to which a claim will be deemed core 'if (1) it invokes a substantive right provided by title 11 or (2) if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case.'"  *Id.* at 206.  Notably, the Third Circuit then conducted an inquiry into the underlying state law claims, finding that each of those state law claims (breach of contract, conversion, and unjust enrichment) were asserted against non-debtor defendants and

8

did not fall into the list of core proceedings under 28 U.S.C. § 157(b)(2). *Id.* The Third Circuit then went on to discuss how the state law claims did not invoke a substantive right under the Code because "[e]ach claim is a state law cause of action, sounding in contract and tort." *Id.* at 207. However, the Third Circuit remanded the case to the bankruptcy court to determine whether the state law claims against the non-parties were actually claims against the debtor, which would provide the bankruptcy court with "core" jurisdiction to enjoin the state law claims. *Id.* at 212.

The Debtors, in response to TCC's motion, argue that the Bankruptcy Court had core jurisdiction to extend the stay to the Appealed Claims. (Debtors Br. at 24.) They cite to *In re LTL Management, LLC*, in which a bankruptcy court addressed the precise issue of whether an extension of a stay under section 362(a) to non-debtors grants core jurisdiction to the bankruptcy court. 645 B.R. 59, 69 (Bankr. D.N.J. 2022). There, the bankruptcy court found that the focus of the jurisdictional inquiry is on the adversary proceeding, and that because the debtor's motion implicated section 362(a), a substantive right under the Code, the bankruptcy court had core jurisdiction to determine section 362(a)'s applicability and scope over the state law claims against non-debtors. *See LTL Management*, 645 B.R. at 70. In distinguishing this case from *W.R. Grace*, the bankruptcy court noted that *W.R. Grace* did not involve section 362(a) and only addressed a bankruptcy court's jurisdiction to issue an injunction under section 105(a). *Id.*

Based on this Circuit's precedent, it appears that the jurisdictional focus is on the underlying state law claims when a motion before the bankruptcy court involves enjoining third-party claims. *See In re Exide Technologies*, 544 F.3d at 207 (holding that a bankruptcy court should "analyze the nature of the underlying [state-law] claim to determine whether" it has core jurisdiction); *see also W.R. Grace & Co.*, 591 F.3d at 174 ("The existence of a bankruptcy proceeding itself has never been and cannot be an all-purpose grant of jurisdiction."). Indeed, the

Third Circuit in *Exide* specifically focused on *what* the underlying state law claims were when determining whether the bankruptcy court had jurisdiction. *See In re Exide Technologies*, 544 F.3d at 207 ("Here, the claims brought by the [plaintiffs] are state law claims, respectively, breach of contract, conversion, and unjust enrichment, asserted against non-debtor defendants. None of the claims fall neatly into the list of core proceedings under 28 U.S.C. § 157(b)(2)."). But the inquiry does not stop there. *Who* the state law claims are brought against is just as relevant. That is because section 362(a) provides a debtor with substantive rights under the Code and it necessarily follows that a bankruptcy court would have "core" jurisdiction over the state law claims against the debtor, even if those state-law claims are insufficient in and of themselves to confer the bankruptcy court with "core" jurisdiction. Given that the Third Circuit has extended the provisions of section 362(a) to non-debtors in unusual circumstances, it also necessarily follows that a bankruptcy court would have "core" jurisdiction over the state law claims against the non-debtors if the provisions of section 362(a) are applicable. *Id.* at 218 (holding that state law claims against a non-debtor would be "core proceedings" if an indemnification agreement would make the debtor solely liable for the state law claims).

Here, the Appealed Claims are based on state law causes of action and do not fall neatly into the list of core proceedings under 28 U.S.C. § 157(b)(2). Moreover, none of the Appealed Claims invoke a substantive right under the Code. They were all "filed in state court and, consequently, do not appear to be proceedings that could arise only in the context of a bankruptcy case." *Exide*, 544 F.3d at 207. But as the Third Circuit made clear in *Exide*, the inquiry does not end there. As will be discussed, because the Appealed Claims, with two possible exceptions, trigger the Debtors' indemnification provisions under the MSPA, the Bankruptcy Court properly determined that it had "core" jurisdiction.

2.    The Automatic Stay Under § 362(a)

Section 362(a) of the Code operates as an automatic stay at the:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title. . . .

11 U.S.C. § 362(a)(1). As the Third Circuit has found, the automatic stay serves several purposes. It may give a debtor breathing room from creditors by stopping collection efforts, or it could protect creditors by preventing particular creditors from acting unilaterally to obtain payment from a debtor to the detriment of other creditors. *See McCartney v. Integra Nat. Bank North*, 106 F.3d 506, 509 (3d Cir. 1997). Although the language of section 362(a) applies to "debtors", courts have extended the automatic stay protection to non-debtor third parties in "unusual circumstances."[6] *Id.* at 510; *see also In re LTL Management, LLC*, 638 B.R. 291, 312 (Bankr. D.N.J. 2022) (discussing unusual circumstances test that warrant extension of automatic stay). As the *McCartney* court explained, "unusual circumstances" exist when "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." 106 F.3d at 510 (quoting *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)). Unusual

---

[6] According to the Bankruptcy Court, the Third Circuit in *McCartney* "determined that the automatic stay—and not a stay extension or an injunction under § 105—precluded a litigant from pursuing a state court action against a nondebtor." (JA1020.) The TCC refutes this interpretation of *McCartney*, arguing instead that the automatic stay must be extended pursuant to section 105(a) to enjoin an action against a non-debtor. (TCC Br. at 26.) This Court agrees that *McCartney* does not stand for the proposition that an automatic stay, without an extension or injunction under section 105(a), can preclude a litigant from pursuing a state court action against a non-debtor. In *McCartney*, the Pennsylvania Deficiency Judgment Act required a creditor to file a claim against any person directly or indirectly liable to the creditor. 106 F.3d at 509. Because the creditor could not a file a deficiency judgment without also including the debtor, McCartney, the Third Circuit held that the "automatic stay *extended* to enjoin [the creditor] from complying with the requirements of the DJA." *Id.* at 511 (emphasis added). Thus, it appears that the automatic stay must be extended or enjoined under section 105.

circumstances may also exist "where stay protection is essential to the debtor's efforts of reorganization." *Id.*

In *In re Philadelphia Newspapers, LLC*, the debtors filed a motion seeking an extension of the automatic stay under section 362(a) and for injunctive relief under section 105(a). 407 B.R. 606, 610 (E.D. Pa. 2009). That court found that "unusual circumstances" were present because the debtors owed potential contractual and common law duties to indemnify the non-debtors, and the state law actions against the non-debtors would impact the debtors' ability to effectively reorganize. *Id.* at 616.

The TCC argues that the indemnification obligations must be "absolute" before a court can find unusual circumstances, and that in this case, no such absolute right exists. (TCC Br. at 40.) But WCD's indemnification obligation undoubtedly exists. Under the MSPA, WCD must indemnify Brenntag for any "damages . . . allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by [WCD]." The Bankruptcy Court thus found that because the Appealed Claims involve allegations of exposure to asbestos prior to 2004, WCD's indemnification obligations to Brenntag are automatically triggered. (JA1026.) Moreover, the Bankruptcy Court concluded that the Debtors would be faced with the Hobson's choice of either standing by while their rights and defenses are not protected or alternatively would need to expend estate resources to prevent findings or judgments that could be used against them in the future, impeding the Debtors' reorganizational efforts. (*Id.*)

This Court readily agrees with the Bankruptcy Court for 26 out of 28 of the Appealed Claims. Those 26 Appealed Claims involve allegations of exposure to asbestos prior to 2004, which, for the reasons explained by the Bankruptcy Court, both trigger WCD's indemnification

obligations and would impact the Debtors' reorganizational efforts if they were allowed to proceed. The TCC's arguments to the contrary are not persuasive. These 26 Appealed Claims involve allegations of pre-2004 asbestos exposure, and are therefore not, as the TCC suggests, claims only involving Brenntag's "independent conduct." (TCC Br. at 36). While the extent of WCD's indemnification obligations may be disputed, the existence of those obligations is not. Simply put, the MSPA requires WCD to indemnify Brenntag for any claims involving pre-2004 asbestos exposure, and those indemnification obligations necessarily impact the Debtors' estate. As such, those 26 Appealed Claims involve "unusual circumstances" that warrant extending the automatic stay of section 362(a). *See McCartney*, 106 F.3d at 511 (holding that any judgment against non-debtor would have impacted the debtor's estate because the debtor was the guarantor of the non-debtor). Moreover, because section 362(a) provides the Debtors with a substantive right under the Code, the Bankruptcy Court properly determined that it had subject matter jurisdiction over those claims.

However, two of the Appealed Claims do not contain enough facts to determine if there are allegations of asbestos exposure prior to 2004.[7] Indeed, the Debtors themselves concede this point. (Debtors Br. at 19.) Because it is unclear if WCD's indemnification obligations would be triggered by those two claims, there is not enough to establish "such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant." *McCartney*, 106 F.3d at 510 (quoting *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)). Those two counts must be remanded (the "Remanded Claims") to the Bankruptcy Court to determine if they contain allegations of asbestos exposure prior to 2004 and whether

---

[7] While neither party directed the Court to the Appealed Claims in the Schedule of Enjoined Claims, it appears those claims are Nos. 230 and 440 of the Amended Schedule of Brenntag Enjoined Claims. (DA45 and DA54.). Neither of those claims identify Brenntag as a successor or have allegations of pre-2004 talc and asbestos exposure.

13

"unusual circumstances" exist that warrant extending the automatic stay to those claims.[8]  If so, then it necessarily follows that the Bankruptcy Court would have "core" jurisdiction to extend the automatic stay to those claims.[9]

### B.    PRELIMINARY INJUNCTION

Because it is not clear if section 302(a) can be an independent basis for extending the automatic stay, the Bankruptcy Court also conducted an analysis under section 105(a) of the Code. Pursuant to section 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  To issue an injunction under that section, a court uses the following four-part test: (1) a reasonable likelihood of a successful plan of reorganization; (2) irreparable harm to the Debtors' ability to reorganize without the requested relief; (3) the relative balance of the harms to the adverse parties in determining whether or not to issue an injunction; and (4) whether granting relief would serve the public interest.  *See In re G-I Holdings Inc.*, 420 B.R. 216, 281 (D.N.J. 2009).  "A preliminary injunction is reviewed for abuse of discretion."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000).  Abuse of discretion occurs only when the bankruptcy court's "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Bartok v. DeAngelis*, Civ. No. 11-3710, 2012 WL 664928, at *4 (D.N.J. Feb. 29, 2012).  For the reasons explained below, the Bankruptcy Court did not abuse its discretion by granting the preliminary injunction.

---

[8] Given that the initial date of asbestos exposure is apparently not clear in the Remanded Claims, there is also no basis to conclude that the Debtors would be an indispensable party that would warrant a finding of "unusual circumstances."
[9] Without more, the Bankruptcy Court's "related to" jurisdiction also cannot be established for the Remanded Claims. To the extent the two Remanded Claims do not involve pre-2004 asbestos exposure, they would not have "any conceivable effect" on the Debtors' estate. *Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984), *overruled in part by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 116 (1995).

1.      Likelihood of Success

"In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." *In re Union Trust Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011). Here, the Debtors' proposed settlement, if approved, would resolve the Debtors' claims against the Contributing Parties in exchange for a payment of $535 million and a release of all claims against the Debtors (including Brenntag's indemnification claims). The Bankruptcy Court properly found that the Debtors have taken the appropriate steps towards a successful settlement and the TCC has not demonstrated otherwise. Moreover, contrary to the TCC's argument, the temporary relief sought in the injunction is sufficiently related to the Debtors' successful reorganization. The Debtors' interests (i.e., Brenntag's indemnification rights against the Debtors) in the remaining 26 Appealed Claims ("Remaining Appealed Claims") would be resolved by the Settlement Agreement. Accordingly, the Bankruptcy Court did not abuse its discretion in finding that the first factor favored the Debtors.

2.      Irreparable Harm

Second, the Bankruptcy Court did not abuse its discretion in finding that the Remaining Appealed Claims would irreparably harm the Debtors if they were allowed to proceed. The Remaining Appealed Claims could expose the Debtors to potential adverse judgments and litigation prejudice in the form of res judicata, collateral estoppel, and record taint. Contrary to the TCC's arguments, Brenntag's indemnification rights are clearly established in the MSPA and allow Brenntag to seek indemnification from the Debtors. Allowing that to happen would certainly impact the Debtors' reorganizational efforts. Moreover, the TCC's argument that irreparable harm does not exist because NICO and DB US are "on the hook for the Debtors' indemnity obligations" is also unpersuasive. (TCC Br. at 51.) The Bankruptcy Court properly determined that the "backstop" is only triggered if the Debtors first deplete all their own assets, and that allowing that

to happen would be unjust and inequitable.  *See In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 106 (E.D. Pa. 2010) (affirming preliminary injunction where bankruptcy court determined that continued litigation would divert resources away from the bankruptcy estate); *see also In re W.R. Grace & Co.*, 115 Fed. Appx 565, 570 (3d Cir. Oct. 28, 2004) (finding injunction appropriate where it "would interfere with, deplete or adversely affect" the debtors' estate).

The TCC's other argument that irreparable harm cannot be shown because third-party indemnification claims would be subject to subordination or disallowance under 11 U.S.C. § 502(e)(1)(B) is also unpersuasive.  As the Bankruptcy Court noted, how the indemnification claims would be treated under section 502(e)(1)(B) is entirely speculative.  Indeed, section 502(e)(1)(B) only applies to "contingent" claims, and any adverse judgment or settlement of the Appealed Claims would trigger the Debtors' indemnification obligations.  In that sense, they would no longer be "contingent."  Accordingly, the Bankruptcy Court did not abuse its discretion in finding that the Debtors are likely to suffer irreparable injury without the injunction.

        3.     <u>Balance of Harms</u>

Although not explicit, the Bankruptcy Court did not abuse its discretion by finding that this factor weighed in favor of the Debtors.  Contrary to the TCC's assertion, the Bankruptcy Court discussed the competing interests and took into consideration the harm that plaintiffs would face by preventing them from proceeding with their lawsuits.  And the Bankruptcy Court did not abuse its discretion by concluding that if the Debtors' settlement is successful, it would resolve litigation and conserve estate resources, something that benefits all the Debtors' creditors, including any successful state-claim plaintiffs.  *See In re United Health Care Organization*, 210 B.R. 228, 234 (S.D.N.Y. 1997) (finding that balance of harm was in favor of debtor where the plaintiffs would eventually be allowed to bring their claims and staying litigation would conserve estate resources).

        4.    <u>Public Interest</u>

Finally, the Bankruptcy Court did not abuse its discretion in finding that the preliminary relief would be in the public interest. Specifically, enjoining the Appealed Claims would conserve estate resources for all claimants. The Appealed Claims involve allegations of pre-2004 asbestos exposure, so the TCC's argument that Brenntag would have independent liability is simply not plausible. As has been discussed, WCD's indemnification obligations are triggered when claims involve allegations of asbestos exposure prior to 2004. Because the Debtors would be obligated to indemnify Brenntag is those situations, the Bankruptcy Court did not abuse its discretion by finding that the public interest favored the Debtors.

## V.    **CONCLUSION**

For the reasons stated above, the Court will Affirm the Bankruptcy Court's order with respect to the Remaining Appealed Claims. The Remanded Claims are remanded to the Bankruptcy Court to determine whether they contain allegations of pre-2004 asbestos exposure and whether "unusual circumstances" exist that warrant extending the automatic stay to those claims. An appropriate Order will follow.


Date: October 31, 2025

                    <u>s/ Zahid N. Quraishi</u>
                    **ZAHID N. QURAISHI**
                    **UNITED STATES DISTRICT JUDGE**